# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PRAKAZREL MICHEL (1),<br>Defendant. | Criminal No. 19-148-1 (CKK) |

## MEMORANDUM OPINION
(November 6, 2019)

In this criminal action, Defendant Prakazrel Michel has brought three pending motions. First, he has moved under Federal Rule of Criminal Procedure 12 to dismiss Counts Two and Three of the Indictment on the basis that they are barred by the statute of limitations. Second, he has moved to sever Count Four of the Indictment. Lastly, he has moved for a bill of particulars listing unindicted co-conspirators known or unknown to the grand jury under Count One of the Indictment. Upon consideration of the Indictment, briefing, relevant legal authorities, and record as a whole, the Court **DENIES** Mr. Michel's Motion to Dismiss Counts Two and Three,[1] **DENIES WITHOUT PREJUDICE** his Motion to Sever Count Four,[2] and **GRANTS IN PART** his Motion

---

[1] For this Motion, the Court's consideration has focused on the following documents:
- Defendant's Motion to Dismiss Counts Two and Three ("Def.'s Mot. to Dismiss"), ECF No. 17;
- United States' Opposition to Defendant Prakazrel Michel's Motion to Dismiss ("Gov't Opp'n to Mot. to Dismiss"), ECF No. 23; and
- Mr. Michel's Reply to the Government's Opposition to the Motion to Dismiss Counts Two and Three ("Def.'s Reply in Supp. of Mot. to Dismiss"), ECF No. 26.

[2] For this Motion, the Court's consideration has focused on the following documents:
- Defendant's Motion to Sever Count Four ("Def.'s Mot. to Sever"), ECF No. 18;
- United States' Opposition to Defendant's Motion to Sever Count Four ("Gov't Opp'n to Mot. to Sever"), ECF No. 25; and
- Mr. Michel's Reply to the Government's Opposition to the Motion to Sever Count Four ("Def.'s Reply in Supp. of Mot. to Sever"), ECF No. 27.

for a Bill of Particulars.[3]

# I. BACKGROUND

## A. Indictment

A grand jury returned an Indictment charging Mr. Michel and his co-Defendant, Malaysian national Low Taek Jho, on May 2, 2019. Indictment ("Indict."), ECF No. 1. The Indictment contained four charges against Mr. Michel arising from an alleged scheme to funnel money from a foreign donor, Mr. Low, into the 2012 Presidential Election and to conceal the true source of those contributions from the Federal Election Commission ("FEC"). *Id.* ¶¶ 1–2. Mr. Michel and Mr. Low "concealed the scheme from the candidate, the candidate's campaign and administration, federal regulators, and the public." *Id.* ¶ 2.

Count One of the Indictment charges Mr. Michel with conspiracy to defraud an agency of the United States in violation of 18 U.S.C. § 371. *Id.* ¶¶ 23–70. It alleges that from about June 2012 to June 2015, Mr. Michel and Mr. Low conspired with each other and with others "known and unknown to the grand jury" to do three things: (1) "[k]nowingly defraud the United States by impairing, obstructing, and defeating the lawful functions of a department or agency of the United States," which was "the FEC's ability to administer federal regulations concerning source and dollar restrictions in federal elections"; (2) "[k]nowingly and willfully make foreign contributions

---

[3] For this Motion, the Court's consideration has focused on the following documents:
- Defendant's Motion for a Bill of Particulars ("Def.'s Mot. for Bill of Particulars"), ECF No. 19;
- United States' Opposition to Defendant's Motion for a Bill of Particulars ("Gov't Opp'n to Mot. for Bill of Particulars"), ECF No. 24; and
- Mr. Michel's Reply to the Government's Opposition to the Motion for a Bill of Particulars ("Def.'s Reply in Supp. of Mot. for Bill of Particulars"), ECF No. 28.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCrR 47(f).

and independent expenditures" that aggregated to more than $25,000 in a calendar year in violation of 52 U.S.C. § 30121 and 52 U.S.C. § 30109(a)(1)(A); and (3) "[k]nowingly and willfully make contributions to a candidate for federal office in the names of other persons" that aggregated to more than $25,000 in a calendar year in violation of 52 U.S.C. § 30121 and 52 U.S.C. § 30109(a)(1)(A). *Id.* ¶ 24. The Indictment provided a similarly broad object of the conspiracy, which in full reads:

> The object of the conspiracy was for MICHEL and JHO LOW to gain access to, and potential influence with, Candidate A and his administration, by secretly funneling foreign money from JHO LOW through MICHEL and other straw donors to Political Committees A and B, all while concealing from the committees, the FEC, the public, and law enforcement the true source of the money.

*Id.* ¶ 25.

According to the Indictment, the manner and means by which Mr. Michel and Mr. Low carried out the conspiracy were numerous and included using shell entities and bank accounts, using conduits or straw donors, attending certain fundraising events and White House events, providing false statements to the FEC, and using false tax records. *Id.* ¶¶ 26–35. The Indictment further alleges that Mr. Michel and Mr. Low committed numerous overt acts in furtherance of the conspiracy. *Id.* ¶¶ 36–70. These acts spanned from 2012 through 2015. *Id.*

One set of overt acts concerns alleged use of straw donors to Political Committee A at various fundraisers beginning in June 2012.[4] *Id.* ¶¶ 37–60. Mr. Michel allegedly received a large sum of at least $1,000,000 from Mr. Low and funneled that money through straw donors to make contributions to Political Candidate A in June through September 2012. *Id.* ¶¶ 37–43. He also,

---

[4] Pursuant to the Court's contemporaneous Order and Memorandum Opinion allowing the briefing for Mr. Michel's pretrial motions to be filed on the public docket with the Government's proposed redactions, the Court does not include here the names of certain individuals and entities. Rather than redacting these names, however, the Court uses the names and terms used by the Government—such as Political Committee A or Associate B—in the Indictment and pretrial briefing for ease of reading and clarity purposes.

according to the Indictment, made efforts to secure permissions for Mr. Low and Mr. Low's father to attend a fundraising event in Washington, D.C. in September 2012 and then attended the event with Mr. Low's father. *Id.* ¶¶ 55–56. Another set of overt acts concerns Mr. Michel contributing money obtained from Mr. Low directly to Political Committee B in his own name and in the name of a certain company, Company E. *Id.* ¶¶ 61–63.

The last set of acts deal with false reports and statements to the FEC. *Id.* ¶¶ 64–70. This includes the following reports and statements, which Mr. Michel allegedly caused or made:

- On or about July 20, 2012: Political Committee A submitted an FEC form that attributed contributions to straw donors when they were allegedly not the true source of those contributions. *Id.* ¶ 64.

- On or about September 20, 2012: Political Committee A submitted an FEC form that attributed contributions to straw donors who were allegedly not the true source of the contributions. *Id.* ¶ 65.

- On or about October 15, 2012: Political Committee B submitted an FEC form that claimed Mr. Michel was the true source of a contribution when Mr. Low was allegedly the true source. *Id.* ¶ 66.

- On or about October 25, 2012: Political Committee B submitted an FEC form that claimed that Company E was the true source of contributions when Mr. Low was allegedly the true source. *Id.* ¶ 67.

- On or about December 6, 2012: Political Committee B submitted an FEC form that claimed that Mr. Michel's company was the true source of a contribution when Mr. Low was allegedly the true source. *Id.* ¶ 68.

- On or about January 30, 2013: Political Committee B submitted an amended report containing the same false statements as in the report submitted on December 6, 2012. *Id.*

- On or about February 6, 2013: Political Committee A submitted an amended report containing the same false statements as they made on September 20, 2012. *Id.* ¶ 65.

- On or about June 3, 2013: Political Committee A submitted an amended report containing the same false statements submitted in the report on July 20, 2012. *Id.* ¶ 64.

- On or about June 15, 2015: In response to a complaint filed with the SEC alleging that Mr. Michel had illegally made contributions to Political Committee B, Mr. Michel caused to be submitted to the FEC an allegedly "false declaration" stating that he had made four contributions to Political Committee B and that he had no reason to hide the true source of his donations to Political Committee B. *Id.* ¶¶ 69–70.

Second, the Indictment charges Mr. Michel with concealment of material facts under 18 U.S.C. § 1001(a)(1)–(2). *Id.* ¶¶ 71–72. In particular, the Indictment framed Mr. Michel as having "knowingly and willfully falsified, concealed, and covered up, by a trick, scheme, and device," a material fact and "made or caused to be made false, fictitious, and fraudulent statements or representations in a matter within the jurisdiction of the executive branch." *Id.* ¶ 72. He allegedly did this through many of the same acts underlying the conspiracy in Count One, which fall into three categories: (1) he caused Political Committee A to make false statements regarding the source of certain contributions on or about July 20, 2012, September 20, 2012, February 6, 2013, and June 3, 2013; (2) he caused Political Committee B to submit false statements regarding the source of certain contributions on or about October 15, 2012, October 25, 2012, December 6, 2012, and January 30, 2013; and (3) he submitted a declaration to FEC with the false statement that Mr. Michel was the source of the contributions made to Political Committee B. *Id.*

Count Three of the Indictment charges Mr. Michel with making a false entry in a record in violation of 18 U.S.C. § 1519 on the basis that Mr. Michel allegedly caused Political Committee A to make false statements in an FEC form on or about June 3, 2013 that listed the straw donors as the true sources of certain contributions. *Id.* ¶¶ 73–74. Similarly, Count Four of the Indictment charges Mr. Michel with making a false entry in a record under the same statute based on his allegedly false declaration submitted to the FEC on June 15, 2015. *Id.* ¶¶ 75–76.

## B. Requests for Foreign Evidence

In 2018, the Government submitted two *ex parte* applications to suspend the statute of limitations under 18 U.S.C. § 3292. It submitted its first application on February 16, 2018, based on a February 2, 2018 official request from the Office of International Affairs of the Department of Justice to the British Virgin Islands ("BVI") for evidence, specifically seeking "records confirming that the source of the contribution money was a foreign entity in the British Virgin Islands, and banking and communications records concerning the relevant fund transfers." Def.'s Mot. to Dismiss Ex. 1 at 1, 3; *see id.* at Ex. 1, Attach. B (official request to BVI). The application explained that a grand jury was investigating Mr. Michel, Mr. Low, and others for "the following offenses: 18 U.S.C. §§ 371 (conspiracy) and 1001 (false statements), and 52 U.S.C. §§ 30116 (contributions in excess of legal limits) and 30121 (contributions and donations by foreign nationals)." *Id.* Ex. 1 at 1; *see id.* Ex. 1 Attach. A at 1 (declaration in support of application explaining same).

Chief Judge Beryl A. Howell granted the Government's *ex parte* application on March 7, 2018, suspending the statute of limitations as of February 2, 2018, when the request was sent to the BVI. *Id.* Ex. 2 at 1–2. She reiterated the offenses that the grand jury was considering and found that it "reasonably appear[ed], based on a preponderance of evidence presented to the Court,

that evidence of the offenses under investigation [wa]s located in the British Virgin Islands." *Id.* Ex. 2 at 1. The BVI responded to the official request on June 11, 2018. *Id.* Ex. 3; Gov't Opp'n to Mot. to Dismiss at 5.

Then, on September 28, 2018, the Government submitted an *ex parte* application based on a September 27, 2018 official request from the Office of International Affairs of the Department of Justice to the United Arab Emirates ("UAE"). Def.'s Mot. to Dismiss Ex. 5 at 1; *see id.* Ex. 4 (redacted request to UAE). In its application, the Government explained that a grand jury was conducting an investigation of Mr. Michel, Mr. Low, and others "for the following offenses: 18 U.S.C. §§ 371 (conspiracy), 1001 (scheme to conceal and false statements), and 1519 (falsification of records); and 52 U.S.C. §§ 30116 (contributions in excess of legal limits) and 30121 (contributions and donations by foreign nationals)." *Id.* Ex. 5 at 1.

In its second application, the Government specifically requested information pertaining to Associate B, who purportedly owned a company suspected to be involved in funneling the alleged funds as part of the conduit scheme. *Id.* Ex. 5 at 4. Associate B was a United States citizen who was believed to be residing in the UAE. *Id.* It further described the evidence requested as including "evidence showing the source of the funds transferred to Michel by Low [and various corporate entities potentially connected with Associate B]; [Associate B]'s knowledge of the control, if any, that Low exercised over the funds paid to Michel and subsequently donated to the United States Presidential election in 2012; [Associate B]'s knowledge of Low's intentions regarding the United States Presidential election in 2012, and what, if any, influence Low intended to exercise during the campaigns; and [Associate B]'s knowledge of the relationship and dealings between Michel and Low." *Id.* Ex. 5 at 4.

Chief Judge Howell granted the Government's second *ex parte* application on September 28, 2018. *Id.* Ex. 6 at 1. The Order granting the application suspended the statute of limitations commencing on September 27, 2018. *Id.* Ex. 6 at 2. Like with the first Order, this one repeated the offenses under investigation according to the *ex parte* application and found that, under the preponderance of evidence standard, it appeared that "evidence of the offenses under investigation [wa]s located in the United Arab Emirates." *Id.* Ex. 6 at 1. According to the Government, the UAE has not yet responded to its request. Gov't Opp'n to Mot. to Dismiss at 6.

## II. DISCUSSION

Mr. Michel has made three pretrial Motions: a Motion to Dismiss Counts Two and Three, a Motion to Sever Count Four, and a Motion for a Bill of Particulars. The Court considers each Motion in turn.

### A. Motion to Dismiss Counts Two and Three

Mr. Michel first moves to dismiss Counts Two and Three of the Indictment on the grounds that they are barred by the applicable five-year statutes of limitations. *See* 18 U.S.C. § 3282(a) (providing five-year statute of limitations for non-capital criminal offenses, unless otherwise specified). He also challenges Count Two on duplicity grounds. Federal Rule of Criminal Procedure 12 provides that a "party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(2). When considering a motion to dismiss an indictment, a court must assume the truth of the factual allegations in the indictment. *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015). The Court first addresses Mr. Michel's arguments regarding Count Two before turning to his arguments related to Count Three.

*1. Count Two is not barred by the statute of limitations or duplicitous.*

Count Two charges Mr. Michel with concealment of material facts in violation of 18 U.S.C. § 1001(a), a statute that can be violated in three ways. The Indictment alleges that Mr. Michel violated it in the ways outlined by subsections 1001(a)(1) and 1001(a)(2). Subsection 1001(a)(1) proscribes "knowingly and willfully" falsifying, concealing, or covering up "by any trick, scheme or device a material fact" in "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." 18 U.S.C. § 1001(a)(1). Subsection 1001(a)(2) proscribes "knowingly and willfully" making "any materially false, fictitious, or fraudulent statement or representation" in the jurisdiction of the same. *Id.* § 1001(a)(2). The penalties for violating this provision include a fine and imprisonment of up to five to eight years. *Id.* § 1001(a). In particular, the Indictment alleges that Mr. Michel violated subsection 1001(a)(2) through a scheme, trick, and device, and that the acts constituting that scheme ranged from July 20, 2012, when Political Committee A made its first false report, to June 15, 2015, when Mr. Michel submitted his own declaration the FEC. Indict. ¶¶ 71–72.

Mr. Michel argues that this count is barred by the statute of limitations for two reasons. First, he claims that Section 1001 is not a continuing offense for statute of limitations purposes. And because it is not a continuing offense, each of the allegedly false statements must be its own charge, and he therefore challenges it on duplicity grounds. Second, he contends that the Government's application to suspend the statute of limitations under Section 3292 did not suspend the statute specifically for Count Two. Neither of his arguments prevail here.

9

### a. Scheme offenses under Section 1001 are continuing offenses for statute of limitations purposes.

Statutes of limitations "normally begin to run when the crime is complete." *Toussie v. United States*, 397 U.S. 112, 115 (1970) (quoting *Pendergast v. United States*, 317 U.S. 412, 418 (1943)). This means that "a criminal offense is typically completed," and the statute of limitations begins to run, "as soon as each element of the crime has occurred." *United States v. McGoff*, 831 F.2d 1071, 1078 (D.C. Cir. 1987). A five-year statute of limitations applies to Section 1001 offenses. *See* 18 U.S.C. § 3282(a). The Indictment was returned on May 2, 2019, and thus any criminal offenses committed before May 2, 2014 would generally be time-barred. The Government contends that Count Two alleges a scheme offense, and as the last act was completed in 2015, the charge is timely.

Mr. Michel, however, argues that "Section 1001 does not criminalize schemes to commit false statements" and that it only prohibits discrete false statements, not falsifications by scheme. Def.'s Mot. to Dismiss at 15. According to him, Count Two consequently improperly alleges eight individual violations and engages in duplicity. *Id.* at 15–16. Furthermore, he contends that an offense under Section 1001 is not a "continuing offense," and thus the statute of limitations began to run as soon as each of the allegedly false statements was made; as a result, eight individual statements in Count Two are time-barred. *Id.* The crux of this last argument is his contention that the holding in Supreme Court case *Toussie v. United States*, 397 U.S. 112, is inconsistent with and called into question the earlier D.C. Circuit case *Bramblett v. United States*, 231 F.2d 489 (D.C. Cir. 1956), which found that the date of the last act in a scheme under Section 1001 is when the crime is complete. But *Toussie* did not disturb *Bramblett*'s holding.

The D.C. Circuit considered in *Bramblett* when a falsification by scheme under Section 1001 is complete. The defendant in *Bramblett* was charged with "knowingly and wilfully

falsify[ing] by a scheme a material fact" in violation of Section 1001. 231 F.2d at 490. The indictment had alleged that in 1949, he submitted a form designating an individual as his clerk, but that he in fact intended to divert the compensation authorized by the form to himself. *Id.* This was framed as a scheme, as the clerk designation remained on file and the defendant had continued to receive money based on this designation until at least December1950. *Id.* The defendant argued that because more than three years had passed since he submitted the form on August 27, 1949, and the indictment, which was returned on June 17, 1953, the case was barred by the then-applicable three-year statute of limitations. *Id.* at 490–91. The D.C. Circuit found that the indictment alleged a scheme offense; that the statute allowed the charging of scheme offenses, which it likened to conspiracy offenses in that both "continued over a period of time"; and explained that the statute "revealed a Congressional intent to reach a pattern of conduct." *Id.* at 491. Because he left the designation on file, represented that the designated individual was his clerk every subsequent month, and continued to benefit from the false designation through December 1950, the scheme continued through that December. *Id.* Consequently, because "the period of limitations did not begin to run until the scheme ended" in December 1950, the Section 1001 charge was timely. *Id.*

Decided fourteen years later, *Toussie* concerned a conviction under the Universal Military Training and Service Act, which required male citizens to register for the draft within a certain number of days after turning eighteen. 397 U.S. at 113. Toussie was required to register in June 1959 and was not indicted for violating the statute until eight years later in 1967. *Id.* at 113–14. He argued that the charge was barred by the applicable five-year statute of limitations, while the Government contended that failing to register for the draft was a continuing offense that "continued to be committed each day that Toussie did not register." *Id.* at 114. The Supreme

Court disagreed with the Government. *Id.* at 116. In doing so, the Court established a two-part test for determining whether offenses are continuing ones: either (1) "the explicit language of the substantive criminal statute compels such a conclusion" or (2) "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Id.* at 115.

Mr. Michel argues that *Toussie* is "squarely in conflict" with *Bramblett.* Def.'s Mot. to Dismiss at 20. *Toussie*, according to Mr. Michel, held that the nature of the offense in the abstract determines whether an offense is a continuing one, whereas *Bramblett* found that it was a continuing offense solely on the specific facts alleged. *Id.* at 20, 22. Not so. This is a misreading of *Bramblett.* The D.C. Circuit in *Bramblett* focused on the intent behind Section 1001 itself, and on the statute's explicit inclusion of the word "scheme," which is in accordance with the second prong of the *Toussie* test. As a result, the *Bramblett* court concluded that the statute "support[ed] an indictment of defendant for a single offense which continued until the scheme ended in December, 1950." 231 F.2d at 491; *see Hubbell v. United States*, 177 F.3d 11, 13 (D.C. Cir. 1999) (discussing how *Bramblett* court interpreted statute to allow charging of falsifications by scheme). While the *Bramblett* court discussed the specific indictment at issue, it did so to determine whether a scheme had been alleged, as the statute proscribes multiple means of violating it. *See Bramblett*, 231 F.2d at 491–92. And though the court also focused on the specific facts of the case, it did so to consider at what point the scheme ended. *See id.* at 490–91. In any event, it is not as clear as Mr. Michel claims that if *Toussie*'s framework had been applied, the D.C. Circuit would have decided *Bramblett* differently. *Toussie* itself did not even touch on Section 1001, or conspiracy or scheme offenses more generally, and the D.C. Circuit's focus on the language of Section 1001 in *Bramblett* is consistent with the second prong of *Toussie.* It is true that because *Bramblett* predated *Toussie*, the opinion did not frame its analysis in exactly the terms expressed by the Supreme

Court in *Toussie*. But that does not necessarily invalidate *Bramblett*'s analysis or ultimate conclusion.

Indeed, the D.C. Circuit has more recently reaffirmed the principles underlying *Bramblett* and demonstrated its viability. In *Hubbell v. United States*, 177 F.3d at 13, Hubbell argued, similar to Mr. Michel here, that "§ 1001 does not define a separate offense of committing a scheme; it merely limits the type of concealments that violate the statute." *Id.* But the D.C. Circuit rejected that argument on the basis that *Bramblett* found that Section 1001 encompassed falsifications by scheme, stating in relevant part that "[b]y falsifying a material fact, and in leaving it on file, thereby continuing the falsification in order repeatedly to partake of the fruits of the scheme, the defendant [in *Bramblett*] committed **a continuing crime of falsification by scheme** that fairly falls within the terms of section 1001." *Id.* (emphasis added) (internal quotation marks omitted) (quoting *Bramblett*, 231 F.2d at 491). So, to the extent that Mr. Michel argues that Section 1001 prohibits individual false statements and not falsifications by scheme, he is incorrect. *See, e.g.*, Def.'s Mot. to Dismiss at 22 ("Section 1001(a)(1) does not criminalize *the* scheme; it criminalizes the discrete act of lying to the Government 'by scheme.'").

What is more, *Hubbell* squarely demonstrates that *Bramblett* was not overturned by *Toussie* and that its reasoning survived. While *Hubbell* did not directly deal with the statute of limitations, it clarified that the D.C. Circuit continues to interpret Section 1001 as encompassing "continuing crime[s] of falsification by scheme," as alleged here. *Hubbell*, 177 F.3d at 13. While a scheme offense is not the same as a continuing offense, *see United States v. Jaynes*, 75 F.3d 1493, 1506 (10th Cir. 1996), *Hubbell*'s discussion and affirmation of *Bramblett* demonstrates that the case is still binding on this Court even after *Toussie*. In fact, Judge Amy Berman Jackson recently recognized this under similar circumstances. *See United States v. Craig*, No. 19-cr-0215 (ABJ),

2019 WL 3604630, at *22 (D.D.C. Aug. 6, 2019) (similarly finding that Section 1001 is continuing

offense for statute of limitations purposes under *Bramblett* and *Hubbell*). At bottom, *Hubbell* cited

approvingly to *Bramblett* with no mention of its supposed abrogation or implicit overturning and,

in doing so, reaffirmed that it is binding on this Court.

In addition to overlooking the importance of *Hubbell*, Mr. Michel cites to non-binding

cases from other circuits that have found that Section 1001 is not a continuing offense under

*Toussie*. These cases are not persuasive here. Not only do these cases come from circuits that do

not follow *Bramblett*, but not all of them even address the specific use of the word "scheme" in

Section 1001 at issue here and in *Bramblett*. In *United States v. Dunne*, 324 F.3d 1158, 1164 (10th

Cir. 2003), for instance, the Tenth Circuit rejected the argument that Section 1001 was a continuing

offense under *Toussie*. It quoted the relevant statutory language and found that the nature of the

crime did not "indicate that Congress intended that it be a continuing offense," as the acts in the

statute did not "'clearly contemplate[] a prolonged course of conduct.'" *Id.* at 1164–65 (quoting

*Toussie*, 397 U.S. at 120). The parties apparently did not raise, and the court did not address, the

language in Section 1001 relating to schemes, which the D.C. Circuit recognized in *Bramblett* and

in *Hubbell* as allowing for "a continuing crime of falsification by scheme." *Hubbell*, 177 F.3d at

13. This Court accordingly does not find this reasoning persuasive.[5]

---

[5] Two of the cases cited by Mr. Michel do address the scheme argument. In *United States v. Mubayyid*, 567 F. Supp. 2d 223, 239–42 (D. Mass. 2008), *aff'd in part, rev'd in part*, 658 F.3d 35 (1st Cir. 2011), the district court considered whether Section 1001 was a continuing offense in light of the word "scheme" in the statute. It decided that it was not. *Id.* at 240–41. It offered several rationales for its decision. First, it noted that "there is nothing about the nature of the crime itself to indicate that Congress 'assuredly intended' to make the 'scheme' component of § 1001 a continuing offense." *Id.* at 241 (quoting *Dunne*, 324 F.3d at 1164–65). But the D.C. Circuit did, in fact, recognize that intent in both *Bramblett* and *Hubbell*, as discussed above, and thus this reasoning is not persuasive here. Second, the district court explained that at least two other courts had found that Section 1001 was not a continuing offense. *Id.* But so too have other courts found that it *is* a continuing offense. *See, e.g., United States v. Heacock*, 31 F.3d 249, 256 (5th Cir.

For the same reasons as discussed above, Mr. Michel's duplicity challenge as to Count Two cannot succeed. "Duplicity is the joining in a single count of two or more distinct and separate offenses." *Hubbell*, 177 F.3d at 14. Mr. Michel argues that because Section 1001 criminalizes discrete false statements, Count Two in fact charges at least eight separate offenses. *See* Def.'s Mot. to Dismiss at 15–16. "But this construction of the indictment makes sense only if § 1001 does not state an offense for a scheme crime—which it clearly does." *Hubbell*, 177 F.3d at 14; *see also Menendez*, 137 F. Supp. 3d at 700 (rejecting duplicity argument because it found that scheme offense under Section 1001 was continuing offense for statute of limitations purposes). Count Two is therefore not duplicitous.

Mr. Michel further contends that the June 15, 2015 declaration that he allegedly made to the FEC cannot constitute part of the scheme because it is after-the-fact concealment.[6] Def.'s Mot. to Dismiss at 15. The Court addresses a similar argument regarding the June 15, 2015 declaration

---

1994); *United States v. Menendez*, 137 F. Supp. 3d 688, 699 (D.N.J. 2015), *aff'd*, 831 F.3d 155 (3d Cir. 2016). And one of the cases cited as support in *Mubayyid* explicitly distinguished the facts of that case from cases in which "scheme" offenses are charged, as is the case here. *See United States v. Gremillion-Stovall*, 397 F. Supp. 2d 798, 801–02 (M.D. La. 2005) ("The case before this court does not involve the type of 'scheme crime' that was at issue in *Heacock*."). Lastly, the *Mubayyid* court rejected the Government's argument that the scheme continued to run "as long as the defendant continued to reap the benefits of his crime" in part because it suggested that the limitations period would never start to run. *Mubayyid*, 567 F. Supp. 2d at 241. That is not at issue here, as the Government has alleged distinct acts within the limitations period rather than claiming just that there were continuing benefits. For these reasons, the Court does not find the reasoning in *Mubayyid* or the cases it cites to be persuasive. The same is true of *United States v. Tracy*, No. 5:13-cr-00018, 2014 WL 12698499, at \*2–\*3 (W.D. Va. Jan. 28, 2014), in which the court relied on *Mubayyid* and employed similar reasoning.

[6] He also argues that it is not part of the charge in Count Two at all because the Indictment does not provide the exact date and the same act is separately alleged in Count Four. Def.'s Mot. to Dismiss at 15 n.10. This overlooks, however, that Count Two specifically included this act along with the other alleged acts as part of the alleged scheme and that the Indictment elsewhere provides a specific date for the alleged declaration. Indict. ¶¶ 71–72. Accordingly, there is little basis to read Count Two in the way that Mr. Michel proposes.

in the context of the conspiracy charge in Count One when discussing Defendant's Motion to Sever. *See infra* Section II.B. He relies on the same authorities here, all of which deal with conspiracy charges and not scheme offenses under Section 1001. *See, e.g., Grunewald v. United States*, 353 U.S. 391, 394 (1957). Although conspiracy and scheme offenses are similar, these cases hinged on circumstances specific to conspiracies and it is far from clear that these cases apply to scheme offenses. Even assuming that the same principles apply, though, Mr. Michel is incorrect that the June 15, 2015 declaration is a distinct act of concealment not properly alleged within the scheme for the same reasons as discussed below with respect to Count One's conspiracy charge. *See infra* Section II.B.

Because binding precedent establishes that Section 1001 is a continuing offense for statute of limitations purposes, the offense was complete when the last act was allegedly committed. That was June 15, 2015. Indict. ¶¶ 72, 76. The Indictment was returned on May 2, 2019, which was within the five-year limitations period. Accordingly, Count Two was timely.

### b. The Government's official requests to the BVI and UAE, and the two subsequent court orders, suspended the statutes of limitations for Count Two.

Alternatively, and in addition to his first argument, Mr. Michel argues that the Government's two *ex parte* applications to suspend the statute of limitations, and the court's subsequent orders suspending the statute of limitations, did not extend to the offenses in Count Two. Def.'s Mot. to Dismiss at 28–35; Def.'s Reply in Supp. of Mot. to Dismiss at 20–23. Even if it did, he claims, the only statement with a limitation period that had not lapsed was the June 3, 2013 report, and therefore that can be the only offense for which the statute of limitations was suspended. *Id.* at Def.'s Mot. to Dismiss at 31–32. This latter argument overlooks the June 15, 2015 declaration, which was included as part of the falsification by scheme in Count Two, and only makes sense if Count Two is read as duplicitous, an argument which this Court rejected above.

Regardless, even if Count Two's falsification by scheme did not include the June 15, 2015 declaration and ended on June 13, 2013, the statute of limitations was still suspended. The Court agrees with the Government that Mr. Michel construes Section 3292 too narrowly.

Section 3292 allows the United States to suspend the statute of limitations in certain circumstances:

> Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

18 U.S.C. § 3292(a)(1). The plain language of the statute establishes that Section 3292 is offense-specific—it repeatedly refers to "an offense" or "the offense." *Id.*; *see United States v. Trainor*, 277 F. Supp. 2d 1278, 1283 (S.D. Fla. 2003), *aff'd*, 376 F.3d 1325 (11th Cir. 2004); *United States v. Neill*, 952 F. Supp. 831, 833 (D.D.C. 1996). When suspended, the period of suspension generally begins "on the date on which the official request is made and ends on the date on which the foreign court or authority takes final action on the request." 18 U.S.C. § 3292(b).

A case illustrating the specificity required under Section 3292, and "the central authority on point," *United States v. Ratti*, 365 F. Supp. 2d 649, 656 (D. Md. 2005), is *United States v. Neill*. Neill argued that the official request in his case to the foreign government was insufficiently specific. 952 F. Supp. at 832–33. On reconsideration of its prior order dismissing certain counts, however, the *Neill* court agreed with the Government that Section 3292 does not "impose any specific requirements regarding the precise content of foreign evidence requests." 952 F. Supp. at 832. While the statute is "offense-specific," the court explained, "such specificity does not require that a foreign evidence request expressly list by citation the alleged statutory violations in order for a foreign evidence request to pass muster." *Id.* Instead, the requirements are that an "an offense

17

be under investigation by a grand jury" and that "the request for evidence must nevertheless be reasonably specific in order to elicit evidence of the alleged violations under investigation by the grand jury." *Id.* at 832–33. In *Neill*, the evidence sought included "foreign evidence related to money laundering, conflicts of interest, bribery or gratuity and foreign financial transactions," including "bank records." *Id.* at 833. That evidence was "reasonably specific to elicit evidence probative of the tax violations then under investigation by the grand jury, and it was, therefore, effective to toll the statutes of limitations for those offenses." *Id.*; *see also United States v. Wilson*, 249 F.3d 366, 374 (5th Cir. 2001) (agreeing with and quoting *Neill*), *abrogated on other grounds by Whitfield v. United States*, 543 U.S. 209 (2005).

Here, though, Mr. Michel does not contest the validity of the official requests or the *ex parte* applications that the Government submitted to the Court. He instead questions whether both applications extended to Count Two. First, as for the application to the BVI, he appears to argue that it did not encompass Count Two because "the evidence sought from the BVI did not pertain to the Section 1001 offense charged in Count Two." Def.'s Mot. to Dismiss at 32. The Government, he claims, already had evidence that the funds did not originate from the straw donors and that Mr. Michel had submitted a false declaration. *Id.* at 32–33. The evidence requested about the identities of who owned the BVI entities involved were therefore irrelevant to Count Two. *Id.* at 33.

He imposes on the statute a rigidity that it does not require. Mr. Michel's argument hinges on his mistaken reading of Count Two as alleging eight individual charges rather than one charge of falsification by scheme and his belief that Count Two only includes the June 3, 2013 statement. Moreover, he cites no authority for the proposition that whether the statute of limitations can be suspended depends on what evidence the Government already has or whether it has sufficient

evidence to bring a charge. The statute's language presents no such requirement: it only refers to "evidence of an offense." 18 U.S.C. § 3292. Other courts have persuasively rejected this argument. *See, e.g., United States v. Broughton*, 689 F.3d 1260, 1275 (11th Cir. 2012) ("It is neither here nor there that the Government knew of the conspiracy before sending its official requests to Costa Rica and Panama; that the conspiracy had terminated before the Government requested the statute of limitations be tolled; or that 'none of the evidence requested or obtained by the Government' was needed at trial."). *Neill* does not counsel differently: it referred to the evidence as "evidence of the alleged violations under investigation by the grand jury" and "evidence probative of the tax violations" at issue. *Neill*, 952 F. Supp. at 833. Mr. Michel appears to concede that the statute includes evidence probative of an offense. Def.'s Mot. to Dismiss at 32 (using term "pertinent to"); Def.'s Reply in Supp. of Mot. to Dismiss at 22 (using term "probative").

This is exactly the type of evidence that the request to the BVI sought with respect to the falsification by scheme charge in Count Two. The request included business and official records from several companies involved in transferring the funds at issue, including the identity of their shareholders and owners as well as their banking activities. Def.'s Mot. to Dismiss Ex. 1, Attach. B at 9–10. Evidence concerning the actual source of the funds—and whether the funds originated from someone other than Mr. Michel, such as a foreign national—was still relevant to and evidence of the Section 1001 offense alleging a large-scale falsification by scheme, regardless of what evidence the Government already had. Whether the funds did in fact come from a foreign national, for instance, would be probative not only of whether the statements were false but also of Mr. Michel's mental state for Section 1001—whether he "knowingly and willfully" carried out the scheme to conceal the true source of the contributions. *Cf. Neill*, 952 F. Supp. at 833 (finding that

financial evidence sought, including bank records, was probative of tax violations). Accordingly, the March 7, 2018 order suspended the statute of limitations for the offense in Count Two.

The statute of limitations was therefore suspended between February 2, 2018, when the official request was made, to June 11, 2018, when the BVI took final action on the request, which totaled 129 days. *See* 18 U.S.C. § 3292(b). If Mr. Michel were correct that the falsification scheme did not include the June 5, 2015 statement, and instead ended with the June 3, 2013 statement, this suspension would push back the end of the limitation period from June 3, 2018 to October 10, 2018.[7] Before that date, on September 26, 2018, the Government submitted an official request to the UAE.

Mr. Michel challenges the September 28, 2018 order suspending the statute of limitations based on the Government's September 26, 2018 request to the UAE.[8] *See* Def.'s Reply in Supp. of Mot. to Dismiss at 22. He argues that the information requested is not probative of the specific false statement that he believes constitutes the entirety of Count Two, which is the June 3, 2013 false statement listing straw donors as the true sources of certain donations. *See id.* ("The request for an interview with and documents pertaining to [Associate B] is not probative of whether Mr. Michel caused [Political Committee A] to file a report with the FEC on June 3, 2013 that falsely listed straw donors as the true sources of certain donations, as charged in Count Two."). But as

---

[7] Mr. Michel agreed in his Reply that this would have been the end of the limitation period for the June 3, 2013 statement if the official request to BVI suspended the statute of limitations in the context of Count Three. *See* Def.'s Reply in Supp. of Mot. to Dismiss at 2.

[8] He notes in his Reply, which principally advances this argument, that the Government did not argue that the official request to the UAE *did* suspend the statute of limitations. Def.'s Reply in Supp. of Mot. to Dismiss at 22. This ignores that the Government was responding to Mr. Michel's arguments and his opening brief did not make this extended argument as to Count Two. *See* Def.'s Mot. to Dismiss at 34–35.

the Court has found, Count Two encompassed an entire falsification by scheme, and not just the June 3, 2013 statement. The evidence requested was relevant to that falsification by scheme.

The official request to the UAE sought to interview Associate B, who purportedly owned one of the companies involved in transferring the funds ultimately donated to one of the political committees about which Mr. Michel made allegedly false statements. Def.'s Mot. to Dismiss Ex. 4 at 2, 4, 7. It also requested that Associate B produce records to determine the source of the funds transferred, his knowledge of the control that Mr. Low exercised over the funds paid, his knowledge or Mr. Low's intentions regarding the 2012 Presidential election, and his knowledge regarding the dealings and relationship between Mr. Michel and Mr. Low. *Id.* Ex. 4 at 10. Those records included records revealing the identity of one of the company's shareholders, directors and officers, owners as well as its banking activities and communications related to specific transactions. *Id.* Ex. 4 at 10–11. Like with the evidence requested from the BVI, the evidence sought from the UAE is relevant to the falsification by scheme. The original source of the funds would likely be probative of whether Mr. Michel knew of the original source, which would speak to his mental state in making the statements alleged. And, for instance, evidence of the dealings and relationship between Mr. Michel and Mr. Low would speak to the same.

Accordingly, as the UAE had not yet responded to the Government's official request as of May 2, 2019 when the indictment was returned, Gov't Opp'n to Mot. to Dismiss at 6, Count Two was timely.[9]

---

[9] The parties also present the possibility that even if the evidence sought was not relevant to Count Two, it was evidence of an intimately related offense, which some courts have found is encompassed by Section 3292. *See, e.g., Ratti*, 365 F. Supp. 2d at 656. As the Court decides that the evidence sought is relevant to Count Two for both official requests, and that the request and order encompassed Count Two, it does not examine this issue.

*2. Count Three is not barred by the statute of limitations.*

Mr. Michel contends that Count Three is barred by the statute of limitations on similar grounds. Count Three charges Mr. Michel with making a single false entry under 18 U.S.C. § 1519 by causing Political Committee A to make false statements in an FEC form on June 3, 2013. Indict. ¶¶ 73–74. The statement was allegedly false because it listed the straw donors as the true source of the contributions. *See id.* Like Section 1001, Section 1519 has a five-year statute of limitations, and the limitations period ordinarily would have ended on June 3, 2018 for this false statement. *See* 18 U.S.C. 3282(a). The Government contends, however, that the official requests for foreign evidence and subsequent orders had the effect of suspending the statute of limitations for Count Three as well.

Mr. Michel argues that both sets of requests and orders failed to suspend the statute of limitations. First, as to the official request to the BVI, Mr. Michel contends that the statute of limitations was not tolled because the request, application, and order did not list Section 1519 as one of the offenses. He cites no authority for this provision. While it is true that Section 3292 is offense-specific, there is no requirement that the Government list each and every offense that is being investigated. The statute simply explains that the statute of limitations shall be suspended "for the offense." 18 U.S.C. § 3292.

In fact, numerous courts have recognized that "it would be unreasonably formalistic as well as unnecessary to impose a requirement that the Government list by citation the statutes that may have been violated" in the official request. *Neill*, 952 F. Supp. at 833 ("Listing those offenses by statutory citation would do nothing to facilitate the foreign evidence request, and, most importantly, it is not required by 18 U.S.C. § 3292."); *see Wilson*, 249 F.3d at 374 (finding that reference to "money laundering" in request was sufficient to toll limitations for statute that had

been described in opinions as money laundering); *United States v. Arrington*, No. 8:13CR146, 2013 WL 5963140, at *5 (D. Neb. Nov. 7, 2013) ("To require the United States to be omniscient of every possible crime before records are requested and the investigation is complete would be an overly formalistic reading of the statute."); *United States v. Swartzendruber*, No. 3:06-CR-136, 2009 WL 485144, at *5 (D.N.D. Feb. 25, 2009) ("Section 3292, of Title 18, does not require that the offenses sought to be tolled be listed by statutory citation."); *Ratti*, 365 F. Supp. 2d at 656 (finding that wire fraud counts were "reasonably specific" under *Neill* because they were tied to, and intertwined with, general scheme to defraud that was specifically referenced in suspension application). The request need only be "reasonably specific in order to elicit evidence of the alleged violations." *Neill*, 952 F. Supp. at 833.

That standard was met here. While the request and application did not explicitly list Section 1519, they comprehensively explained that the Government was investigating a conduit contribution scheme involving contributions to Political Committee A and whether Mr. Michel caused Political Committee A to consequently make false statements regarding the true source of those contributions. *See* Def.'s Mot. to Dismiss Ex. 2, Attach. B at 1–8. In other words, it described the offenses under investigation with reasonable specificity. And, as previously noted above, the evidence sought included financial records of companies allegedly involved in transferring the funds that ultimately became contributions to Political Committee A. *Id.* Ex. 4, Attach. B at 2, 9–11. The origination of the funds ultimately contributed to Political Committee A is relevant to whether they originated from the straw donors or Mr. Michel, and therefore whether Mr. Michel caused Political Committee A to make a false statement in the June 3, 2013 report at issue in Count Three. The ensuing order therefore had the effect of suspending the statute of limitations and extended the end of the limitation period to October 10, 2018. *See* Def.'s Reply

in Supp. of Mot. to Dismiss at 2 (conceding this date would be end of limitation period if BVI - related application suspended statute).

Second, Mr. Michel contends that the request to the UAE and subsequent order also did not suspend the statute of limitations because the evidence requested was not related to Count Three.[10]  Def.'s Mot. to Dismiss at 37–38.  But it was.  The requested evidence included an interview with Associate B about the source of the funds, his knowledge of the control that Mr. Low exercised over the funds, his knowledge of Mr. Low's intentions regarding the election, and his knowledge of the relationship between Mr. Michel and Mr. Low.  Def.'s Mot. to Dismiss Ex. 4 at 10–11.  As with Count Two, this evidence would be probative of Mr. Michel's state of mind and whether he "knowingly" caused Political Committee A to make the allegedly false statement in its report.  *See* 18 U.S.C. § 1519 (imposing "knowingly" mental state requirement).  Moreover, the request also encompassed financial records that could shed light on the original source of the funds, which would be probative of whether the statement was actually false.  *See* Def.'s Mot. to Dismiss Ex. 4 at 10–11.  The Government's application and the court's subsequent order therefore suspended the statute of limitations as of September 26, 2018 for Count Three, rendering the charge timely when the Indictment was returned on May 2, 2019.

Mr. Michel suggests at one point that this case is like the example given in *Neill*, where the court explained that the Government "could not reasonably request foreign evidence related to tax violations to toll the statute of limitations regarding conspiracy to import a controlled substance" because the two were insufficiently connected.  *Neill*, 952 F. Supp. at 833 n.2; *see* Def.'s Mot. to Dismiss at 30.  However, this case is not like the example given.  Each of the charges in the

_____

[10] He does not contend that the request or order did not encompass the Section 1519 charge on their face, as both list it as one of the offenses under investigation.  *See* Def.'s Mot. to Dismiss Ex. 4 at 8; *id.* Ex. 6 at 1.

Indictment are part of a conduit contribution scheme and all the charges are closely related to each other. For instance, the substantive offense in Count Three is included as part of the conspiracy in Count One and the scheme in Count Two. Mr. Michel appears to argue that making false statements to the Government is not in any way related to the allegations regarding the actual contributions. But when the statements are about the contributions, and about the true source of the contributions, that is not the case. Accordingly, neither Count Two nor Count Three are barred by the statute of limitations and the Court denies Mr. Michel's Motion to Dismiss Counts Two and Three.

## B. Motion to Sever Count Four

Mr. Michel further moves to sever Count Four of the Indictment. Count Four charges him with violating 18 U.S.C. § 1519 for submitting the allegedly false June 2015 declaration to the FEC claiming that he was the true source of the funds contributed to Political Committee B. Indict. ¶¶ 75–76. Mr. Michel himself made contributions to Political Committee B; the Indictment does not allege that he used straw donors to donate to Political Committee B as it does for Political Committee A. *Id.* at ¶¶ 61–63. Mr. Michel argues that he will be prejudiced without severance because he has important testimony to offer for Count Four and convincing reasons not to testify on Counts One, Two, and Three. In response, the Government argues that severance is not warranted because Count Four is "fundamentally intertwined" with the other counts and because Mr. Michel has not met his burden to show prejudice. Gov't Opp'n to Mot. to Sever at 4. On the present record, the Court agrees with the Government.

Under Federal Rule of Criminal Procedure 14, the Court "may order separate trials of counts" or "provide any other relief that justice requires" if joining offenses "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). "The defendant carries the burden of

demonstrating prejudice resulting from a failure to sever, but such a showing does not result in an automatic grant of the motion." *United States v. Gooch*, 665 F.3d 1318, 1326 (D.C. Cir. 2012) (citations omitted). "[T]he Supreme Court has cautioned that 'a district court should grant a severance motion under Rule 14 only if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence.'" *United States v. Bikundi*, 926 F.3d 761, 780 (D.C. Cir. 2019) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). The D.C. Circuit has recognized that "[t]hree kinds of prejudice warrant relief under Rule 14": first, "the jury may cumulate evidence of the separate crimes"; second, "the jury may improperly infer a criminal disposition and treat the inference as evidence of guilt"; or, third, "the defendant may become 'embarrassed or confounded' in presenting different defenses to the different charges." *Blunt v. United States*, 404 F.2d 1283, 1288 (D.C. Cir. 1968) (quoting *Drew v. United States*, 331 F.2d 85, 88 (D.C. Cir. 1964)). The third variety of prejudice is at issue here.

This type of "[p]rejudice may develop when an accused wishes to testify on one but not the other of two joined offenses which are **clearly distinct in time, place and evidence**." *Baker v. United States*, 401 F.2d 958, 976 (D.C. Cir. 1968) (emphasis added). In general, a defendant must balance numerous factors to determine whether to testify, and when counts are jointed together for trial, "it is not possible for him to weigh these factors separately as to each count" because if he testifies on one, "he runs the risk that any adverse effects" from either speaking or staying silent on one count "will influence the jury's consideration of the other count." *Id.* To meet his burden, the defendant must "make[] a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other." *Id.* at 977. The defendant must present sufficient information "regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other"

to "satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of 'economy and expedition in judicial administration' against the defendant's interest in having a free choice with respect to testifying." *Id.* But "the accused's election to testify on some but not all of the charges on trial does not automatically require a severance"—that would "divest the court of all control over the matter of severance and entrust it to the defendant." *Bradley v. United States*, 433 F.2d 1113, 1122 (D.C. Cir. 1969) (internal quotation marks omitted) (quoting *Baker*, 401 F.2d at 976).

Mr. Michel argues that he meets this standard. To begin with, Mr. Michel proposes that Count Four is completely distinct from the other Counts. Def.'s Mot. to Sever at 3–4, 5–6. In general, he claims that Count Four alleges "a single false declaration" while the other counts feature "allegations concerning a complex international conduit contribution scheme" involving numerous other persons and conduit mechanisms. *Id.* at 5–6. So, he claims, none of the information underlying Counts One through Three is relevant to his statements two years later in 2015. *Id.* But *Baker* recognized that this type of prejudice is present specifically when offenses are joined that are "clearly distinct in time, place and evidence." *Baker*, 401 F.2d at 976. While Mr. Michel argues that Count Four is distinct in time, place, and evidence, he has failed to show that Count Four is sufficiently distinct to prompt severance under *Baker*. *See Bradley*, 433 F.2d at 1122–23 (finding that joined offenses were not clearly distinct and "bore such a relationship that evidence as to each was mutually admissible upon trial of the other," which weighed against need for severance).

Indeed, Count Four is intertwined with the first three counts. Count Four charges Mr. Michel with submitting a false declaration in June 2015 about contributions to Political Committee B claiming that the funds were his and that he had no reason to hide their true source. Indict.

¶¶ 69–70, 75–76; *see also id.* ¶¶ 61–63 (allegations regarding contributions to Political Committee B). Mr. Michel frames this as a distinct charge—"a single false declaration"—unconnected with the other three counts. Def.'s Mot. to Sever at 5–6. But this count is related to, and builds upon, the earlier counts. The June 2015 declaration involves contributions to Political Committee B, events that also underlie Counts One and Two. Indict. ¶¶ 61–63, 71–72. Mr. Michel submits that the evidence does not substantially overlap because no straw donors were allegedly used to contribute to Political Committee B, but that overlooks the other existing evidentiary overlap. On the present record, to show both that Mr. Michel's had the requisite mental state and that the declaration was false for Count Four, the Government will have to present much of the same evidence underlying Counts One and Two. For instance, to show that Mr. Michel "knowingly" made the false declaration in June 2015, the Government must demonstrate that he was not the original source of the funds contributed to Political Committee B in 2012 and that he was aware of that fact in June 2015 when he made his declaration. *See* 18 U.S.C. § 1519 (requiring mental state of "knowingly"). In fact, if Mr. Michel were to testify as to Count Four and not to the other counts, he would likely open himself up to cross-examination about the original contributions in 2013 alleged in Counts One and Two. In light of these considerations, it is unclear how Count Four is "clearly distinct" from the other three counts. *See Bradley*, 433 F.2d at 1122–23; *see also Holmes v. Gray*, 526 F.2d 622, 626 (7th Cir. 1975) (finding that causally connected crimes with significantly "overlapping evidence" were not "clearly distinct" for severance purposes).

Moreover, he contends that although Count One includes the June 2015 declaration, that act is not properly pled as part of that count because the June 2015 declaration is after-the-fact concealment and not in furtherance of the conspiracy. Def.'s Mot. to Sever at 3 n.2. But *Grunewald v. United States*, upon which Mr. Michel relies, does not mandate that result. The

Supreme Court in *Grunewald* found that "an agreement to conceal a conspiracy" could not, on the facts of that case, "be deemed part of the conspiracy" to "extend its duration for the purposes of the statute of limitations." 353 U.S. at 399. There the indictment charged not only conspiracy to defraud the United States, but also "charged that a part of the conspiracy was an agreement to conceal the acts of the conspirators." *Id.* at 394. To support its decision, the *Grunewald* Court quoted *Krulewitch v. United States, id.* at 399–400, in which it had rejected the argument that "even after the central criminal objectives of a conspiracy have succeeded or failed, an implicit subsidiary phase of the conspiracy" with concealment "as its sole objective" survives. 336 U.S. 440, 443 (1949).

The concurrence in *Grunewald* clarified that "a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." 353 U.S. at 405 (Jackson, J., concurring). The D.C. Circuit has referred to this as "an exception to the *Grunewald* rule." *United States v. Andrews*, 532 F.3d 900, 909 (D.C. Cir. 2008); *accord United States v. Stinson*, 647 F.3d 1196, 1215–16 (9th Cir. 2011) (explaining, based on same language in *Grunewald*, that concealment may be in furtherance of conspiracy depending on scope of alleged conspiracy and finding that it was when conspiracy charged attempting to conceal certain information from government). In sum, "[w]hen '[t]he successful accomplishment of the crime necessitates concealment, acts of concealment are properly considered to be within the scope of the original conspiracy.'" *Andrews*, 532 F.3d at 909–10 (quoting *United States v. Gleason*, 766 F.2d 1239, 1242 (8th Cir. 1985)); *see United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001) (explaining that court must determine "the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy,

and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy").

This case falls into the *Grunewald* exception. Count One of the Indictment frames the object of the conspiracy as for Mr. Michel and Mr. Low "to gain access to and potential influence with Candidate A and his administration by secretly funneling foreign money" from Mr. Low through Mr. Michel "and other straw donors to Political Committees A and B, all while concealing from the committees, the FEC, the public, and law enforcement the true source of the money." Indict. ¶ 25. As framed in the Indictment, it was an object of the conspiracy to conceal from the FEC and others the true source of the contributions. The concealment was not just to cover up the prior alleged crimes, but in furtherance of the main objectives of the conspiracy: to keep the FEC and others from knowing that anyone but Mr. Michel was the source of the contributions. Count One can therefore include the June 2015 declaration, in which Mr. Michel allegedly continued to conceal the true source of the contributions, as an act in furtherance of the conspiracy. *See Forman v. United States*, 361 U.S. 416, 424 (1960) (applying *Grunewald* exception and finding that tax evasion conspiracy extended to concealment because "concealment of the 'holdout' income must continue if the evasion is to succeed"), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978); *Gleason*, 766 F.2d at 1242 (finding that concealment evidence in fraud case was properly admitted because concealment of fraud alleged was in furtherance of main aims of conspiracy and collecting other cases finding same). Consequently, Count Four is closely connected to and intertwined with the other three counts and not "clearly distinct" under *Baker*.

Furthermore, Mr. Michel has not met his burden under *Baker* to provide a convincing showing and compelling reasons for why he wants to testify on Count Four but not the other three counts. He explains that he "has important testimony to give concerning Count Four that could

not come from any other source"—his personal knowledge and mental state in 2015 when submitting the declaration. Def.'s Mot. to Sever at 6. Mr. Michel also "has a strong interest in refraining from testifying" on the other Counts because he "will have to weigh his ability to recall and describe events from six or seven years ago" and potentially rebut testimony from numerous witnesses, including "individuals with whom Mr. Michel has a close relationship." *Id.* at 7.

But Mr. Michel's knowledge and mental state is at issue not in just Count Four, but in each count, all of which have some knowledge or mental state requirement. *See* 18 U.S.C. §§ 371 (conspiracy for Count One), 1001(a)(1)-(2) (concealment of material facts for Count Two), 1519 (making false entry in record for Counts Three and Four). That his mental state is also at issue in the other three counts makes his argument that he has a compelling need to testify on only Count Four less convincing. This is especially the case because, as discussed above, Count Four builds on the facts underlying Counts One and Two.

The same is true of his reasons for not wanting to testify on the other three counts. To the extent that Mr. Michel would potentially have to remember past events, it is not as if there is a ten-year gap between the first three counts and Count Four—they are about events two to three years apart, and the June 2015 declaration directly builds on and harkens back to the past events. For instance, if Mr. Michel were to testify that he did not knowingly make a false statement in 2015, he would necessarily be drawing on not only his recollections from 2015, but also what he remembered in 2015 about the acts that occurred years before in 2012 and 2013, and would open himself up to cross-examination on those facts that also underlie Counts One and Two. And because the Government will likely have to present a substantial amount of evidence relating to the other counts to show that the declaration at issue in Count Four was false, it is unclear that Mr. Michel will have any different decision to make with respect to the witnesses called. On this

record, his reasons are therefore not sufficiently convincing to demonstrate that his claim of prejudice is genuine under *Baker*.

Regardless, the Court recognizes that a criminal defendant's testimony in his own trial is "unique and inherently significant," *United States v. Best*, 235 F. Supp. 2d 923, 929 (N.D. Ind. 2002) (internal quotation marks omitted) (quoting *Rodriguez v. United States*, 286 F.3d 972, 985 (7th Cir. 2002)), and that Mr. Michel has presented some reasons for why he wants to testify on Count Four and not on the other three counts. Even if those reasons were convincing, they must be weighed against "economy and expedition in judicial administration." *Baker*, 401 F.2d at 977. There are important considerations of judicial economy here. As previously noted, to show that the June 2015 declaration was false and to show Mr. Michel's mental state, the Government will likely present much of the same evidence as it did for Counts One and Two, especially because both of those counts include the June 2015 declaration as an act in furtherance of the alleged conspiracy and scheme. Indict. ¶¶ 69–72. Because severance would result in presenting a significant amount of overlapping evidence in a second trial, judicial economy strongly weighs against granting Mr. Michel's motion for severance.

To demonstrate why severance is warranted, Mr. Michel likens his case to *United States v. Oaks*, 285 F. Supp. 3d 876, 881–83 (D. Md. 2018), in which the district court granted a motion for severance due to potential prejudice. There, the grand jury originally returned a nine-count indictment charging the defendant with various bribery-related charges, including wire fraud and Travel Act violations. *Id.* at 877. Then, almost six months later and after the case had been scheduled for trial, the grand jury returned a superseding indictment adding a tenth count charging the defendant with obstruction of justice. *Id.* Apparently, the defendant had been confronted with evidence of his original crimes and agreed to cooperate with the FBI, but he subsequently warned

another individual that he was under investigation. *Id.* The government alleged that he confessed to tipping off that other individual, but the confession was not recorded. *Id.* at 882. The court granted the defendant's motion to sever the count in the superseding indictment because the defendant had a compelling reason to testify on that count "to refute, explain, or qualify either the alleged obstructive comments or his own alleged confession, neither of which was recorded on tape." *Id.* In doing so, it distinguished a Fourth Circuit case on the basis of "[t]he disparity in recorded conversations between the bribery counts and the obstruction count." *Id.*

*Oaks* is inapposite here. First, the two sets of counts at issue were not as intertwined as those in this case. While the *Oaks* court did not address this issue at length, the second charge came six months later and was based on conduct separate from that in the other counts. *Id.* at 877. Nor would the Government have needed to show much of the same evidence to show the obstruction of justice charge, unlike here where there is substantial evidentiary overlap. Second, Oaks presented more compelling reasons than given here: there was no recording of the statements or his alleged confession, and the court there emphasized this in finding that he "made a strong and genuine showing" of potential prejudice. *Id.* at 882. Lastly, the superseding indictment came after trial had already been scheduled for the first nine counts, which would present separate concerns about judicial economy. The Court therefore does not find the decision in *Oaks* on point or persuasive.[11]

---

[11] Mr. Michel's reliance on *United States v. Best* is similarly misplaced. The charges in *Best* differed in substance and the reasons the defendant provided were more compelling as a result. Best wanted to testify as to his alibi for a murder charge and remain silent on drug and firearm possession charges. 235 F. Supp. 2d at 929. The court emphasized that the defendant faced the death penalty if convicted on the murder charge and that the defendant's acquittal on one charge would "likely eliminate the need for a second trial," considerations that weighed heavily in favor of severance. *Id.* at 929–30. The same considerations are not present here.

Mr. Michel also relies on *United States v. Sampson*, 385 F.3d 183, 193–94 (2d. Cir. 2004), in which the Second Circuit partially reversed the district court's denial of severance. *Sampson* is also distinguishable from this case. In *Sampson*, there was little overlap between the two sets of charges, one of which involved acts in 1998 and the other unrelated acts in 2000. *Id.* at 185. The Second Circuit emphasized that evidence of one set of counts would not have been admissible at a trial for the other counts due to the distinct nature of the charges. *See id.* at 192–93. That is not the case here. Even if the charges involve acts a couple of years apart, Count Four is intertwined with the other counts, and a significant amount of the evidence underlying Counts One and Two will also likely be admissible as to Count Four. Reliance on *Sampson* is therefore unpersuasive.

While the Court finds that Mr. Michel's provided reasons are not convincing in light of the highly connected nature of Count Four with the other counts, it recognizes that circumstances may change and that severance may, at some point, be warranted. Accordingly, the Court denies Mr. Michel's Motion to Sever Count Four without prejudice.

C. Motion for Bill of Particulars

Lastly, Mr. Michel has moved for a bill of particulars "identifying all individuals or corporations that the Government contends are unindicted co-conspirators, whether they were known or unknown to the grand jury, so that he may adequately investigate the case, prepare his defense, and avoid unfair surprise at trial." Def.'s Mot. for Bill of Particulars at 4. A court may "direct the government to file a bill of particulars" under Federal Rule of Criminal Procedure Rule 7, and "[t]he government may amend a bill of particulars subject to such conditions as justice requires." Fed. R. Crim. P. 7(f). A bill of particulars helps to "ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges" and "to prepare a defense." *United States v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir.

1987). Moreover, a bill of particulars clarifies an indictment rather than requiring the government to hand over proof of its case, *United States v. Savoy*, 889 F. Supp. 2d 78, 114 (D.D.C. 2012), and "is not a discovery tool or a device for allowing the defense to preview the government's evidence," *United States v. Brodie*, 326 F. Supp. 2d 83, 91 (D.D.C. 2004). Consequently, if an "indictment is sufficiently specific, or if the requested information is available in some other form, then a bill of particulars is not required." *Butler*, 822 F.2d at 1193.

The D.C. Circuit has not yet resolved when a defendant is entitled to a bill of particulars listing the identities of unindicted co-conspirators, and other courts are divided in how they approach this issue. *See United States v. Concord Mgmt. & Consulting LLC*, 385 F. Supp. 3d 69, 74–75 (D.D.C. 2019) (explaining same and collecting cases from other circuits and courts). But courts in this circuit have granted such motions based on the circumstances of particular cases. *See, e.g., id.* at 74–76 (granting motion for bill of particulars due to scope of case, international nature, number of potential co-conspirators, amount of discovery produced, and restrictions on discovery); *United States v. Bazezew*, 783 F. Supp. 2d 160, 168–69 (D.D.C. 2011) (granting motion for bill of particulars listing, among other things, unindicted co-conspirators due to lack of helpful detail in indictment as to co-conspirator's alleged actions); *United States v. Trie*, 21 F. Supp. 2d 7, 22 (D.D.C. 1998) (granting motion for bill of particulars listing unindicted co-conspirators because some co-conspirators may have dealt only with co-conspirator other than defendant, conspiracy lasted three and a half years, and there was large number of potential co-conspirators). The trial court has broad discretion in this regard. *See United States v. Mejia*, 448 F.3d 436, 445 (D.C. Cir. 2006) ("The determination of whether a bill of particulars is necessary 'rests within the sound discretion of the trial court' and will not be disturbed absent an abuse of that discretion." (quoting *Butler*, 822 F.2d at 1194)).

Ultimately, in determining whether a bill of particulars is warranted, "[t]he Court must strike a 'prudent balance' between the legitimate interests of the government and those of the defendants." *United States v. Ramirez*, 54 F. Supp. 2d 25, 29 (D.D.C. 1999) (quoting *United States v. MacFarlane*, 759 F. Supp. 1163, 1169 (W.D. Pa. 1991)). Those legitimate interests include "the defendant's need to know evidentiary-type facts in order to adequately prepare a defense" and "the government's need to avoid prematurely disclosing evidentiary matters to the extent that it will be unduly confined in presenting its evidence at trial." *United States v. Sanford Ltd.*, 841 F. Supp. 2d 309, 316 (D.D.C. 2012) (internal quotation marks omitted) (quoting *United States v. Baker*, No. 08-CR-00075, 2010 WL 936537, at *2 (M.D. Pa. Mar. 15, 2010)).

Balancing those interests here leads to the conclusion that a bill of particulars listing persons or entities that the Government plans to identify as co-conspirators at trial is appropriate. First, the scope of the conspiracy charged in the Indictment demonstrates the difficulty that Mr. Michel will encounter in investigating the charges, building his defense, and avoiding unfair surprise at trial without this information. Count One of the Indictment alleges a vast conduit contribution scheme involving numerous persons and corporate entities. Indict. ¶¶ 23–70. The conspiracy allegedly lasted from early 2012 to mid-2015, a three-year period in which numerous persons could have become co-conspirators. *Id.* Yet the detailed conspiracy allegations in the Indictment as to the actions of Mr. Michel do not necessarily reveal which of numerous other persons the Government will claim are co-conspirators at trial. The Indictment specifies that Mr. Michel and Mr. Low "knowingly conspired with each other and others known and unknown to the Grand Jury" to do these acts and also mentions some other persons such as corporate entities and straw donors; however, while this sheds light on a small number of potential co-conspirators, it does not allow Mr. Michel to easily determine the universe of possible co-conspirators. *See, e.g.,*

*id.* ¶¶ 24 ("others known and unknown to the Grand Jury"), 37 (Mr. Michel's financial advisor), 43–44 (straw donors), 46 (Associate A and Associate B).

This case therefore differs from other cases relied upon by the Government in which the scope of the conspiracy and the persons involved were more easily identifiable. *See, e.g., Sanford,* 841 F. Supp. 2d at 316–18 (denying motion for bill of particulars in part because conspiracy involved crew members of defendant's vessel when it was out at sea because there were "a finite number of people on board and a finite list of crew members"). Considering the long three-year timeframe of the alleged conspiracy, the significant gaps between overt acts (such as between June 2013 and June 2015), the vast scope of the conspiracy, and the large number of possible co-conspirators, Mr. Michel cannot easily discern exactly who the Government might contend are co-conspirators at trial, rendering it difficult for him to investigate the charges or build a defense. *See Trie,* 21 F. Supp. 2d at 22 (granting motion for bill of particulars in case involving false statements to FEC due in part to length of conspiracy and large number of potential co-conspirators); *Bazezew,* 783 F. Supp. 2d at 168–69 (emphasizing gaps between overt acts of co-conspirators, and how defendants would consequently "not be able to adequately prepare for trial or avoid surprise at trial," in granting motion for bill of particulars).

The Government also suggests that it has provided sufficient information regarding potential co-conspirators in the discovery that it has produced. But "it is not sufficient for the government to respond to a motion for a bill of particulars by pointing to the voluminous discovery already provided or by relying on a governmental open file policy." *Bazezew,* 783 F. Supp. 2d at 168. Regardless, while the Government has produced significant discovery, the amount and contents of that discovery weigh against denying Mr. Michel's motion. The Government has produced over 35,000 documents, more than 26,000 of which are emails with at least 4,700 unique

email addresses. Def.'s Reply in Supp. of Mot. for Bill of Particulars at 11. While this is not necessarily a prohibitive amount of discovery on its own, it demonstrates the large number of people who could potentially be considered unindicted co-conspirators by the government. *See Concord Mgmt.*, 385 F. Supp. 3d at 75 (noting that similar discovery concerns in case with voluminous discovery weighed in favor of granting motion for bill of particulars).

Moreover, the Government has provided less information identifying likely co-conspirators than in the cases upon which it relies. In *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 150–51 (D.D.C. 2015), for example, the government had provided extensive discovery of phone records, which was accompanied by a detailed index identifying a limited universe of participants who could be co-conspirators, plus "judicial and investigative documents" that identified some of the same co-conspirators. The court concluded that the government had disclosed "the identities of alleged co-conspirators who participated in or were discussed on intercepted communications," and as a result denied the defendant's motion. *Id.* at 151. Here, however, the Government has provided more limited information to Mr. Michel: the names of the alleged straw donors, grand jury transcripts and FBI-302s, and a list of three potential unindicted co-conspirators. Gov't Opp'n to Mot. for Bill of Particulars at 6–8. But the Government appears to concede that this information is not exhaustive and that it may claim at trial that other persons were co-conspirators at trial. *See id.* at 8 (describing list as "non-exhaustive"). That fact, plus the sheer scope of the conspiracy, distinguishes this case from cases like *Mosquera-Murillo*.

What is more, Mr. Michel's concerns are tied to concrete risks: Mr. Michel might be potentially held liable for the actions of any co-conspirators under *Pinkerton v. United States*, 328 U.S. 640 (1946), and the identity of co-conspirators may impact what evidence can be admitted at trial as statements of co-conspirators under Federal Rule of Evidence 801(d)(2)(E).

Mr. Michel may even be potentially held liable for acts of co-conspirators who dealt only with Mr. Low, his alleged co-conspirator. *See Trie*, 21 F. Supp. 2d at 22 (finding that one factor in favor of granting motion was that "some of the alleged co-conspirators may have dealt only with Mr. Pan," another co-conspirator). In fact, because of such risks, courts in this district have frequently granted motions for bills of particulars listing unindicted co-conspirators. *See United States v. Palfrey*, 499 F. Supp. 2d 34, 52 (D.D.C. 2007) ("As Defendant correctly points out, however, disclosure of the names of alleged co-conspirators is not uncommon in conspiracy cases, and particularly in cases alleging nonviolent offenses, brought in this jurisdiction.").

Accordingly, for all the above reasons, the Court agrees with Mr. Michel that a bill of particulars is warranted here. However, in recognition of the Government's legitimate interests to not produce its evidence or be unduly limited in its positions at trial, the Court shall require the Government to produce a bill of particulars listing only the unindicted persons or entities who the Government plans to identify as co-conspirators at trial, rather than a list of all possible unindicted co-conspirators. *See Concord Mgmt.*, 385 F. Supp. 3d at 76; *United States v. Ramirez*, 54 F. Supp. 2d 25, 30 (D.D.C. 1999).

### III. CONCLUSION

For the foregoing reasons, the Court shall **DENY** Mr. Michel's Motion to Dismiss Counts One and Two, **DENY WITHOUT PREJUDICE** Mr. Michel's Motion to Sever Count Four, and **GRANT IN PART** Mr. Michel's Motion for a Bill of Particulars. In particular, the Court shall require the Government to produce a bill of particulars listing the unindicted persons or entities that the Government plans to identify as co-conspirators at trial. An appropriate Order accompanies this Memorandum Opinion.

Dated: November 6, 2019

                                         /s/
                                    COLLEEN KOLLAR-KOTELLY
                                    United States District Judge