**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA |
| v. |
| PRAKAZREL MICHEL (1),<br> Defendant. |

Criminal No. 19-148-1 (CKK)

**MEMORANDUM OPINION AND ORDER**
(September 9, 2022)

Defendant Prakazrel Michel ("Defendant" or "Michel"), with co-Defendant Low Taek Jho ("Low"), is charged by indictment with a variety of criminal offenses arising from a conspiracy to unlawfully launder foreign money to influence American elections and foreign policy.  Now for the second time, Defendant has moved for a bill of particulars.  Defendant argues that the operative [84] Superseding Indictment, totaling 46 pages and 186 paragraphs, is insufficiently specific to put him on notice of the factual bases for each count applicable to him.  Because the Superseding Indictment is sufficiently detailed and much of the requested information is available through already-produced discovery, a bill of particulars is unwarranted.  Accordingly, and upon consideration of the Indictment, briefing, relevant legal authorities, and record as a whole, the Court **DENIES** Defendant's [115] Motion for a Bill of Particulars.[1]

---

[1] For this Motion, the Court's consideration has focused on the following documents:
- Defendant's Notice of Motion and Motion for Bill of Particulars; Memorandum of Points and Authorities, ECF No. 115 ("Mot.");
- United States' Response in Opposition Defendant's Motion for a Bill of Particulars, ECF No. 129 ("Opp."); and
- Defendant's Reply Paper Relative to his Request the Honorable Court Order the Government to Issue a Bill of Particulars, ECF No. 134 ("Repl.").

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCrR 47(f).

## I.       BACKGROUND

Michel is charged by indictment with:  (1) Conspiracy to Defraud the United States and to

Make Illegal Foreign and Conduit Contributions, in violation of 18 U.S.C. § 371; (2) Concealment

of Material Facts, in violation of 18 U.S.C. §§ 1001(a)(1) and 2; (3) two counts of Making a False

Entry in a Record, in violation of 18 U.S.C. §§ 1519 and 2; (4) two counts of Witness Tampering,

in violation of 18 U.S.C. §§ 1512(b)(1) and 2; (5) Conspiracy to Serve as an Unregistered Agent

of a Foreign Principal and Foreign Government and to Commit Money Laundering, in violation

of 18 U.S.C. § 371; (6) Unregistered Agent of a Foreign Principal and Aiding and Abetting in

violation of 22 U.S.C. §§ 612 and 618 ("FARA"); (7) acting as an Agent of a Foreign Government,

in violation of 18 U.S.C. § 951; and (8) Conspiracy to Make False Statements to Banks, in violation

of 18 U.S.C. § 371.  Only some of these counts are relevant for present purposes, which the Court

discusses only in detail sufficient to resolve the Motion.

### A.  Allegations in the Indictment

#### 1.   Conspiracy to Defraud the United States and to Make Illegal Foreign and Conduit Contributions

The Government first alleges that from June 2012 to June 2015, Michel and Low "secretly

funnel[ed] foreign money . . . [from] other straw donors" to two political action committees that

supported a candidate for President of the United States ("Candidate") "while concealing from the

candidate, the committees, the FEC, the public, and law enforcement the true source of the money."

Indictment at 4-5.  The Indictment quotes from particular alleged emails detailing the first effort,

beginning in May 2012, to funnel money from Low to Michel with the assistance of an unindicted

co-conspirator.  *Id.* at 8.  Michel and co-conspirators allegedly intended to funnel approximately

$1,000,000, to be contributed via a June 2012 fundraiser that the Candidate would attend.  *Id.*  The

emails, specifically identified by date and contents, suggest that Michel knowingly solicited

2

contributions from foreign individuals via wires from offshore companies. *See id.* at 10. The Indictment then identifies specific wire transfers, by date, showing Michel transferring portions of a $1,000,000 foreign contribution to various accounts and then paying straw donors to make contributions with those funds. *Id.* at 11-12. The Indictment also describes how these contributions gained Michel, Low, and unindicted coconspirators access to the Candidate at various fundraisers. *Id.* at 11-14.

### 2. Witness Tampering

The Indictment identifies two texts by date that it alleges "intimate[d], threaten[ed], and persuade[d]" potential witnesses after the inception of this case. First, the Indictment alleges that Michel "caused a text message to be sent" on July 14, 2019, "threatening [a] [s]traw [d]onor [] with potential legal and reputational harm, including threatening to refer [them] to the United States Department of Justice for criminal investigation" allegedly "in an effort to cause [them] to falsely characterize" a conduit payment from Michel "as a loan" and to stop them "from providing testimony." *Id.* at 22. Second, the Indictment claims Michel "caused a text message to be sent threatening to refer" a witness "to federal law enforcement . . . "in an effort to cause him to withhold his testimony." *Id.* at 23.

### 3. FARA

The Indictment alleges that Michel, and others, entered into two separate conspiracies on behalf of foreign powers. First, the Indictment claims that Michel and Low worked with two others to assist the Malaysian Prime Minister in convincing the President of the United States to order the Department of Justice to drop investigations into Low for graft related to a Malaysian sovereign wealth fund. *See id.* at 24, 30-33. Second, the Indictment charges Michel with engaging in a scheme to lobby the President of the United States and the United States Department of Justice to

"arrange for the removal and return of . . . a dissident of the [People's Republic of China] living in the United States[] back to the [People's Republic of China] at the direction of [a Chinese] Minister and the [Chinese] Government." *Id.* at 24.  The Indictment delineates specific meetings, communications, and actions taken in furtherance of the conspiracy by date, location, and content.

As to the sovereign wealth fund, Michel allegedly assisted Low in executing a retainer agreement with a third co-conspirator.  The Indictment identifies specific emails and wire transfers in March 2017 formalizing the agreement between Low and the third co-conspirator.  *Id.* at 30.  It also details a purported meeting on May 2, 2017, between four co-conspirators in which the parties strategized how to achieve the end of their conspiracy through exerting influence on the President of the United States and his administration.  *Id.* at 31.  It further describes Michel's role in drafting talking points for the Malaysian Prime Minister on the issue for an upcoming meeting between the Malaysian Prime Minister and the President of the United States.  *See id.* at 33.

As to extradition, the Indictment claims that Michel traveled to Hong Kong with Low for a meeting with an official of the Chinese government to discuss the matter.  *Id.* at 34.  The meeting allegedly took place on May 18, 2017, after the co-conspirators were shuttled from Hong Kong to Shenzhen, China.  *Id.*  There, the Chinese minister allegedly told the co-conspirators that he "was having trouble scheduling meetings with certain high-ranking United States government officials." *Id.* at 34.  The Indictment describes subsequent meetings and wire transfers in August and September 2017, including in Macau, China, in which the co-conspirators allegedly discussed the structure of additional payments from Low to further the backchannel lobbying campaign.  *Id.* at 36-37.  It also claims Low told the co-conspirators that he was "concerned that United States banks would not allow him to transfer large sums of money in or through the United States financial

system." *Id.* at 36.  Michel allegedly suggested that the money be mischaracterized as "funds for entertainment purposes" to conceal their true source.  *Id.*

### 4.   Conspiracy to Make False Statements to Banks

Next, the Indictment claims that Michel and his co-conspirators acting together "to funnel millions of dollars from foreign bank accounts into the United States bank accounts controlled by Michel by misrepresenting to financial institutions the source and purpose of the funds." *Id.* at 40 (capitalization altered).  The Indictment lists no fewer than seven allegedly criminal transfers by date, company alias, citizenship of the source bank account, and amount of the transfer.  *Id.* at 42. The Indictment claims that Michel falsely stated that the transfers were for "civil litigation" or "entertainment matters" when they were, in fact, to further conspiracies to launder foreign money to affect American governmental policy and elections.  *See id.* at 43-44.

### 5.   George Higginbotham and Steve Wynn

Finally, the instant Motion makes a number of requests regarding George Higginbotham, an attorney and alleged co-conspirator, and Steve Wynn, a businessman.  *Infra* at 8-9. There is no mention in the Indictment of Steve Wynn.  As to Higginbotham, the Indictment characterizes him as a "co-conspirator and an attorney employed by" the Department of Justice.  *Id.* at 4.  The Indictment alleges that Higginbotham "prepared a purported consulting agreement" between Michel's company and Low "as part of an effort to falsely characterize" Michel's work with Low to influence American policy on Low's alleged graft from the Malaysian wealth fund.  *See id.* at 31.  According to the Indictment, "[a]t Michel's direction, Higginbotham did not include Low's name in the agreement and referred to Low as 'WuTang' in emails in order to conceal" Low's identity.  *Id.* (capitalization altered).  Michel, on the Chinese government's behalf, also allegedly directed Higginbotham to meet with the Chinese Ambassador to the United States to assist the

scheme directed by Michel and Low to influence the American government to extradite the Chinese dissident living in the United States back to the People's Republic of China. *Id.* at 35-36. Higginbotham was purportedly present at the September 3, 2017 meeting in Macau, China "to meet with Low to discuss ways to funnel Low's money into the United States to pay those involved in the lobbying campaigns." *Id.* at 36 (capitalization altered). Higginbotham allegedly agreed to conceal and mischaracterize the wire transfers from Low to Michel in furtherance of the conspiracy. *Id.*

**B. Defendant's Requests**

Defendant makes the following requests for more specific allegations.[2]

**FARA**

1. Good faith factual averments in support of the notion that Mr. Michel was, pursuant to FARA at 22 USC 611, et seq., an "agent."

2. Good faith factual averments in support of Mr. Michel's alleged sciente r / "criminal knowledge" (relative to those respective four charges and specifically in relation to the assertion that Mr. Michel either was aware of any alleged requirement that he register.)

3. Good faith factual averments in support of the notion that Mr. Michel engaged in "lobbying" or acted as a "lobbyist," either as a matter of law or as those terms are commonly defined.

4. Good faith factual averments in support of the notion that Mr. Michel was seeking updates or pressuring any one on behalf of Mr. Low (see FSI 131.)

---

[2] In this subsection, the Court quotes from the Motion in its entirety with minor formatting changes. The Court preserves typos and similar errors.

**Foreign Meetings**

5. Relative to the alleged Macau meeting in early September 2017, please provide good faith factual averments in support of: (a) who was present; (b) what specifically was said; and (c) from whom, and in what manner, the DOJ gathered such information.

6. Relative to the alleged Hong Kong meeting in mid May 2017, please provide good faith factual averments in support of: (a) who was present; (b) what specifically was said; and (c) from whom, and in what manner, did the DOJ gathered such information.

**Transfers and Tracing**

7. To the extent the DOJ proffers that Mr. Low sent Mr. Michel sent / transferred / wired money during the timeframe set forth in the FSI, please provide good faith factual averments in support of:

   a. whether Mr. Low actually caused the money to be sent and / or sent the money himself;

   b. and in terms of tracing, any and all factual bases in support of the notion that the funds allegedly sent by Mr. Low to Mr. Michel were the proceeds of criminal activity, of any type (e.g., state or federal crimes; violations of international law, etc.); and,

   c. relative to alleged criminal proceeds which Mr. Low either personally sent or caused to be sent to Mr. Michel, please provide good faith factual averments in terms of who provided to the DOJ such information, when and in what format.

8. Relative to the alleged misrepresentation to financial institutions about the source and purpose of funds transferred to Mr. Michel, please provide good faith factual averments in support of: (a) the original source of funds transferred from foreign bank

7

accounts; and (b) ownership information related to any such original source bank accounts.

**Banking**

9. Please provide good faith factual averments in support of the notion that: a. the DOJ knows that the statements made to any bank were false, and in what respect, who said as much, what specifically was said, who was present for said alleged disclosure and so forth; and, b. U.S. banks considered Mr. Lo "toxic" (here, too: who, what, when where, how, why and so forth.)

**Steve Wynn**

10. Relative to alleged target and Las Vegas business magnate, Stephen Wynn— given that Mr. Wynn did meet with President Trump relative to the allegations in the instant case, please provide good faith factual averments in support of the notion that he (Mr. Wynn) was not aware of said registration requirement.

**George Higginbotham, Esq.**

11. Relative to Mr. Higginbotham's "moonlighting" in the instant case, please provide good faith factual averments regarding:

    a. the extent to which the DOJ knew / or didn't know that a full-time, salaried employee was running a full-blown, freestanding law practice on the side;

    b. the extent to which the DOJ knew / or didn't know that Mr. Higginbotham was doing so to such an extent that he saw fit to advise Mr. Michel, directly and in person, that Mr. Low's money, which allegedly totaled on the order of millions of dollars, could be—and ultimately did—run through, Mr. Higginbotham's personally maintained attorney-client trust account; and,

8

c. the extent to which the DOJ knew / or didn't know that Mr. Higginbotham, while working full-time for the self-same federal agency prosecuting Mr. Michel, wrote a letter, on self-styled letterhead ("Higginbotham Law, P.C."), to City Bank attempting to assuage their concerns about the Anicorn / Lucky Mark transactions;

d. the position of the DOJ, in light of relevant statutory authority, interpretive case law, ethical rules and, among other things, the USAM, on Mr. Higginbotham's private practice.

e. please provide good faith factual averments to support the any claim to the contrary – to wit, that Messers Higginbotham and Michel did not have an attorney-client relationship in any respect (this despite Mr. Higginbotham flying to, and negotiating, Mr. Michel's business interests, in the nation-state of Sudan, during which trip he openly introduced himself to individuals as Mr. Michel's attorney.)

f. the DOJ's understanding of Mr. Higginbotham's role (attorney, friend, consultant, etc.?) either on behalf of Mr. Michel and / or any other individual, given that, while being a full-time, salaried employee of the DOJ, he physically visited the PRC Embassy during the timeframe set forth in the First Superseding Indictment;

g. Mr. Higginbotham's advising Mr. Michel on, among other things, FARA's legal requirements; and

h. Relative to the alleged meeting at the Chinese Embassy in mid- July 2017, please provide good faith factual averments in support of: (a) who was present;

(b) what was specifically said; and (c) from whom, and in what manner, the DOJ
gathered such information

**Obstruction**

12. Please provide good faith factual averments in support of: (a) what, if any,
evidence does the DOJ have with respect to the witness tampering/obstruction
charges insofar as the FSI reads "… with the express purpose of making a straw
donation."

13. Relative to the text messages alleged to be sent from Mr. Michel to Straw Donor
N and Individual A, please provide good faith factual averments in support of: (a)
from which device, and using what network, were those text messages sent; (b) how
(in what manner) were those text messages captured such that evidentiary integrity
has been maintained; (c) any scientific or mobile forensics theories or methods used
to make determinations based on cellular or geo-location information (i.e., what proof
that those text messages were "cause[d] to be sent from MICHEL"?).

14. Please provide good faith factual averments in support of the notion that Mr.
Michel acted an "intent to intimidate, threaten and persuade…"? (See FSI para. 94) .

## II.   DISCUSSION

A criminal indictment must provide "a plain, concise, and definite written statement of the
essential facts constituting the offense charged."  Fed. R. Crim. P. 7.  As a method to remedy
deficient pleading, a bill of particulars is only warranted when the offenses are not "stated with
enough precision" to allow the defendant to understand the charges against him and prepare a
defense in advance of trial.  *See United States v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987); *see
also United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) ("A bill of particulars should be

required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." (cleaned up)) *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010).   In determining whether to grant a motion for a bill of particulars, the "Court must strike a 'prudent balance' between the legitimate interests of the government and the defendant." *United States v. Manafort*, Crim. A. No. 17-0201-01 (ABJ), 2018 WL 10394893, at *1 (D.D.C. June 12, 2018) (quoting *United States v. MacFarlane*, 759 F. Supp. 1163, 1169 (W.D. Pa. 1991)).

Broadly, Michel has filed a discovery request disguised as a motion for a bill of particulars. That will not do.   "A bill of particulars properly includes clarification of the indictment," but it is not "a discovery tool or a device for allowing the defense the government's evidence." *United States v. Concord Mgmt. & Consulting LLC*, 385 F. Supp. 3d 69, 74 (D.D.C. 2019).   Nor may it "be used as a weapon to force the government into divulging its prosecution strategy." *United States v. Maurya*, 25 F.4th 829, 837 (11th Cir. 2022).   Similarly, a bill of particulars is not a tool to forgo reviewing discovery provided by the government.   *See United States v. Bazezew*, 783 F. Supp. 2d 160, 162 (D.D.C. 2011) ("the general rule is that the defendant is not entitled to obtain detailed information about the conspiracy in a bill of particulars").

As to Defendant's requests regarding the *mens rea* for the alleged FARA and obstruction violations, that the indictment adequately alleges the requisite *mens rea* of each offense and pleads facts permitting an inference that the defendant acted with the requisite intent is more than sufficient.   *See United States v. Mejia*, 448 F.3d 436, 445 (D.C. Cir. 2006) (in drug conspiracy prosecution, bill of particulars unnecessary where indictment merely pleads requisite *mens rea*); *United States v. Sutton*, Crim. A. No. 21-0598 (PLF), 2022 WL 1183797, at *4-5 (D.D.C. Apr. 21, 2022) (request for bill of particulars detailing "all evidence" of defendant's "mens rea for [the]

second degree murder" charge inappropriate).  Similarly, requests for information regarding how the Government understands the terms "agent" and "lobbying" within the meaning of FARA is nothing more than an attempt to preview "the government's theories" in advance of trial.  *See Bazezew*, 783 F. Supp 2d at 168.

Defendant is also not entitled to learn—through a bill of particulars—all attendees at each alleged meeting, all statements *verbatim*, and all sources and/or methods to gather such information.  This set of requests is undoubtedly the sort of "description[s] of the nature of all acts or statements . . . engaged in or uttered in support of or in furtherance of the conspiracy" that are not the province of a bill of particulars.  *See id.*; *see also United States v. Brodie*, 326 F. Supp. 2d 83, 91 (D.D.C. 2004) (the indictment is not required to list "when the conspiracy was formed[ or] the details of any meeting or when the defendant joined the conspiracy").  Even were the indictment required to list the details of each meeting with specificity, it already identifies most, if not all, attendees across all the alleged meetings, in addition to the contents of a number of statements.  As such, Defendant already has sufficient factual allegations as to the alleged meetings in Macau, Hong Kong, Shenzhen, and Washington, DC.

As to the fraudulent and/or criminal wire transfers, the indictment identifies in detail the date of the transfers, the sender, the recipient, the amounts, and, if applicable, how each transfer was mischaracterized.  Because Defendant can readily identify the transfers and false statements at issue, no further detail is necessary.  *See United States v. Trie*, 21 F. Supp. 2d 7, 21-22 (D.D.C. 1998) (requiring bill of particulars where the offending transfers and false statements were not readily identifiable); *Sutton*, 2022 WL 1183797, at *7 (on conspiracy charge, no bill of particulars required where the indictment "contain[ed] four specific 'manner and means' and twenty overt acts that [the defendants] allegedly took in furtherance of the conspiracy").  It is not the

indictment's duty to "connect every dot in [the] case" nor to "state [all] approximate times and places [a] defendant participated in an alleged conspiracy." *United States v. Han*, 280 F. Supp. 3d 144, 149 (D.D.C. 2017) (citing *Butler*, 822 F.2d at 1193-94).

Defendant's requests for further information as the obstruction counts fail for similar reasons. Each message is identified by date, time, and content. They are easily discoverable from Defendant's own phone records. *See Saffarinia*, 422 F. Supp. 3d at 276 ("a bill of particulars is unwarranted where . . . 'the requested information is available in some other form'" (quoting *Butler*, 822 F.2d at 1193)).[3] Although Defendant may later be entitled to move to exclude these messages on authenticity grounds, he is not entitled to know all "scientific or mobile forensics theories or methods used to make determinations that . . . th[e] text messages" were sent by him.

Finally, Defendant's invocation of Steve Wynn and Higginbotham is a *non sequitur*. The indictment makes no mention of Steve Wynn, and not until the instant Motion has his name been mentioned in any pleading in this case. The entirety of Defendant's requests regarding Higginbotham are either an effort to develop a potential advice-of-counsel defense (assuming *arguendo* that one is viable) or impeachment evidence. Defendant identifies no authority supporting the proposition that a bill of particulars may be used to develop a defendant's own affirmative defenses. After all, the bill of particulars is a device only "intended to give the defendant [] that minimum amount of information necessary to permit the defendant to conduct his *own* investigation." *United States v. Sanford Ltd.*, 841 F. Supp. 2d 309, 316 (D.D.C. 2012) (emphasis original).

---

[3] Although the Government correctly notes that it has produced a substantial amount of discovery, much of it answering Defendant's requests for additional specificity, discovery alone does not remedy an insufficiently specific indictment. *See Concord Mgmt.*, 385 F. Supp. 3d at 77. Although an additional basis for denial of the pending Motion, the greater part of the Court's analysis rests on the adequacy of the indictment itself.

### III. CONCLUSION AND ORDER

For the foregoing reasons, it is hereby

**ORDERED**, that Defendant's [115] Motion for a Bill of Particulars is **DENIED**.

**SO ORDERED.**

Dated:  September 9, 2022

_____
                                        /s/
COLLEEN KOLLAR-KOTELLY
United States District Judge