**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. No. 1:19-cr-148** |
| | ) | |
| | ) | |
| **PRAKAZREL MICHEL,** | ) | |
| **LOW TAEK JHO** | ) | |
| | ) | |

## UNITED STATES' TRIAL BRIEF

The United States, by and through its attorneys, respectfully submits this brief summarizing the government's evidence at trial and setting forth its motions *in limine* and various legal issues likely to arise at trial.

### I.      INTRODUCTION

Between approximately June 2012 and approximately January 2018, the defendants, Prakazrel Michel and Low Taek Jho ("Low"), pursued foreign access to and influence with high-ranking U.S. government officials for their own financial benefit.  The defendants' efforts to unlawfully inject foreign money and influence into U.S. politics and policy manifested in multiple criminal schemes and actions.  The first criminal scheme involved Michel and his use of conduit contributors (or, "straw donors") to funnel more than a million dollars of Low's money into the U.S. presidential election in 2012, all while concealing Low as the true source of the money— even years after the illegal contributions.  Then, after he had been indicted for that conduct, Michel attempted to obstruct the case by trying to intimidate and corruptly persuade witnesses to withhold or alter their potential testimony.  The second criminal scheme involved Michel and his co-conspirators waging an illicit, for-profit, undisclosed foreign lobbying campaign to help (1) Low

resolve forfeiture proceedings and related federal investigations into his embezzlement and laundering of 1MDB funds, and (2) the government of the People's Republic of China ("PRC") in securing the return of a notable PRC dissident living in the United States.  To further that scheme, Michel and a co-conspirator made false statements to banks to enable the transfer and receipt of Low's money into the United States.

## II.      THE DEFENDANT'S FOREIGN CONDUIT CONTRIBUTION SCHEME

### a.  Summary

Beginning in or about June 2012, Michel and Low commenced their scheme to funnel Low's foreign money into the U.S. presidential election, specifically in support of one of the presidential candidate's ("Candidate A") campaigns.  Between June and August 2012, Low directed approximately $11 million in foreign money to domestic bank accounts controlled by Michel and his financial advisor at that time, Barry Bekkedam.  During the next couple months, Michel recruited approximately 20 straw donors to each of whom he provided Low's money— usually in the amount of $40,000 per person—so they could make a political contribution to Candidate A's campaign, typically in the same approximate $40,000 amount that Michel gave them.  In exchange for those contributions, the straw donors had the opportunity to attend one of two campaign fundraising dinners featuring Candidate A.  Michel also attended both of those dinners.  In total, between June and August 2012, the straw donors contributed more than $750,000 to Candidate A's campaign in monies traceable to Low via Michel.  In addition to using conduits to facilitate and conceal Low's money, Michel also served as a straw donor for Low's money.  Specifically, in September and October 2012, Michel contributed approximately $1 million to an independent-expenditure-only committee, Black Men Vote ("BMV"), with funds traceable to Low.  On or about election day in 2012, Low directed approximately another $11 million in foreign

money to a domestic bank account controlled by Michel.  In total, Michel received about $21 million from foreign accounts controlled by Low between June and November 2012.

As a result of the foreign conduit contributions that he made and facilitated, Michel caused Candidate A's political campaign and BMV to unwittingly file several false reports with the Federal Election Commission (FEC).  Instead of identifying Low as the true source of the contributions, several of the reports filed by Candidate A's campaign and BMV identified Michel and/or the straw donors as the contributors.  Moreover, in or about April 2015, the FEC commenced an investigation into whether Michel violated the prohibition against conduit contributions when he contributed money to BMV through a limited liability corporation that Michel operated.  During the course of that FEC proceeding, Michel submitted a signed declaration to the FEC on or about June 15, 2015.  In the declaration, signed by Michel under penalty of perjury, Michel falsely attested, *inter alia*, that he "had no reason to hide the true source of my donations to Black Men Vote nor did I wish to diminish the disclosure of source or amounts of my contributions to Black Men Vote as being attributable to myself."  The declaration was false, much like the FEC reports filed by Candidate A's committee and BMV, because Michel was not the true source of the funds he contributed—Low was the true source, and Michel merely served as Low's conduit.

### b.  The Government's Proof

The government will present the testimony of FBI Forensic Accountant Eric Van Dorn, who, relying on extensive financial records, will detail the movement of monies from foreign accounts controlled by Low to accounts controlled by Michel.  The financial analyst also will address the movement of Low's money from Michel's accounts to the straw donors, and from the straw donors to Candidate A's campaign.  Furthermore, the financial analyst will testify about

Michel's use of Low's money to contribute approximately $1 million to BMV in September and October 2012.

In addition to this extensive financial analysis, the government will present the testimony of several straw donors. While each donor's account will vary in detail, the overarching substance of their testimony is expected to be that (1) Michel asked if they wanted to attend a campaign fundraising dinner with Candidate A; (2) the straw donors did not have, or were not interested in spending, the money necessary to attend the dinner; (3) Michel offered to and did pay for the straw donors to attend the dinner by giving them the requisite money, usually $40,000 per person; (4) Michel instructed the straw donors to provide the money he gave them to Candidate A's campaign in order to attend; and (5) for some straw donors, Michel later sent them a letter falsely characterizing the payments as loans and demanding repayment. Financial records, photographs from the two campaign fundraising dinners, and email communications, among other evidence, will corroborate the straw donors' accounts that they received money from Michel, contributed to Candidate A's campaign, and attended the dinners, with Michel also present.

For the false reports and the false declaration submitted to the FEC, the government plans to call at least one FEC witness who will attest to the significance and materiality of the reports and the declaration for purposes of the FEC's enforcement of federal campaign finance law. Evidence at trial will also demonstrate that Eric Tan, a foreign national and an associate of Low, served as a proxy or intermediary on behalf of Low, particularly for purposes of financial transactions. Tan is the signatory of two foreign entities through which Low transferred money to Michel during the relevant period in 2012. The government will present witnesses, including an actor and an auction house executive, who will testify about their interactions with Low and Tan and their understanding as to the relationship between those two individuals. Specifically, the

government anticipates both witnesses to explain that Tan often handled or helped facilitate financial transactions for Low at Low's direction.

Moreover, the government intends to call Bekkedam, Michel's former financial advisor, to testify about his communications with Michel regarding the source of the millions of dollars that Michel received from abroad in 2012. Based on Michel's representations, the government expects Bekkedam to testify that he understood the relevant financial transfers to come from Low. His testimony will be corroborated by email communications between Bekkedam and Michel.

Bekkedam also will testify about a "gift" letter that he prepared for Michel to account for the approximately $20 million that Michel received from Low and to help relieve Michel's tax burden in relation to those monies. The letter claims that the $20 million received during the relevant period in 2012 was a gift from foreign entities with taxes already paid on it. Tan is included in the signature line at the bottom of the letter. Bekkedam will explain that he received Tan's name from Michel, was told that Tan was Low's financial assistant, and understood the $20 million referenced in the letter to have been provided by Low. The government also will introduce electronic communications, including emails and text messages, between Michel, unindicted co-conspirators who assisted in funneling Low's money to Michel and into the election, and others involved, directly or indirectly, in efforts to fundraise for Candidate A's campaign and/or to arrange the relevant campaign fundraising events. The government may rely on an FBI case agent in part to introduce many of these communications admissible as statements by an opposing party, *see* Fed. R. Evid. 801(d)(2), including as co-conspirators statements, *see* Fed. R. Evid. 801(d)(2)(E).[1]

---

[1] The government anticipates multiple non-hearsay justifications and hearsay exceptions applying throughout trial to permit the admission of various statements and communications by Michel, co-conspirators, witnesses, and others. Those likely applicable categories will include but not be

### c. **Michel's Witness Tampering**

On or about July 14, 2019—after Michel had been indicted and received initial discovery in this case—Straw Donor N, one of Michel's straw donors in 2012, and Individual A, a political fundraiser for Candidate A, received text messages ostensibly referencing Michel and this case. The messages constituted attempts to corruptly persuade Straw Donor N and Individual A to not fully cooperate or testify truthfully in the government's criminal case against Michel.

At trial, the government will introduce those text messages and witness and agent testimony concerning the messages and the context surrounding them. In addition, the government will present FBI Special Agent Justin Gray, who is a certified member of FBI's Cellular Analysis Survey Team (CAST).[2] The agent, relying on cell site and location data, will explain how the cellular phone that sent the text messages to Straw Donor N and Individual A was in close proximity throughout a portion of New York City with the cellular phones known to belong to Michel at various times on July 14, 2019, the day the texts were sent. Based on this and other information, the evidence will prove that Michel sent or directed the sending of the threatening text messages.

---

limited to: present sense impression, Fed. R. Evid. 803(1); records of regularly conducted activity, Fed. R. Evid. 803(6); public records, Fed R. Evid. 803(8); and then-existing mental, emotional, or physical condition, Fed. R. Evid. 803(3); *United States v. Brown*, 490 F.2d 758, 762 (D.C. Cir. 1973) ("[T]he state of mind exception to the hearsay rule allows the admission of extrajudicial statements to show the state of mind of the declarant at that time if that is at issue in the case. It also allows such statements to show a future intent of the declarant to perform an act if the occurrence of that act is at issue." (internal citations omitted)); *Rink v. United States*, 388 A.2d 52, 57 (D.C. 1978); *Clark v. United States*, 412 A.2d 21, 25 (D.C. 1980). To ensure the jury does not consider the statements for the truth of the matter asserted when otherwise prohibited, and to limit the prejudicial potential of the statements, a limiting instruction should be given to the jury that the statements are only offered as evidence of the declarant's intentions at the time. *See Brown*, 490 F.2d at 762-63; *see also United States v. Safavian*, 435 F. Supp. 2d 36, 43 (D.D.C. 2006).

[2] The government previously provided expert notice for Special Agent Gray's testimony as a CAST analyst. *See* Gov. Expert Notice, ECF Nos. 122 & 123.

### III.   THE DEFENDANT'S UNDISCLOSED FOREIGN LOBBYING SCHEME

#### a.  Summary

For nearly a year beginning in approximately March 2017, Michel, Low, and others conspired to conduct an illegal, undisclosed foreign lobbying campaign to influence high-ranking U.S. government officials and policy. The purposes of this illicit influence operation were twofold. First, Michel, Low, and their co-conspirators sought to convince U.S. governmental decision makers to resolve the forfeiture proceedings and related federal investigations into Low for the embezzlement of billions of dollars from 1MDB, a strategic investment and development company owned by the Government of Malaysia. Second, Michel, Low, and their co-conspirators—after meeting with, and while colloborating with, a PRC government official—sought to convince U.S. governmental decision makers to extradite a high-profile PRC dissident back to the PRC. To carry out these efforts, Michel and others enlisted the services of Elliott Broidy, a prolific businessperson and political fundraiser who served as Deputy Finance Chair of the President's political party and maintained close ties to the President's Administration during the relevant period. Michel and his co-conspirators intended and attempted to leverage Broidy's connections and influence with the Administration to address Low's 1MDB matter and the extradition of the PRC dissident sought by the PRC government. In return for their efforts, Michel, Broidy, and others received millions of dollars from Low via foreign bank accounts that he controlled. To conceal their relationship and financial arrangement with Low, and to coat it with a sheen of legitimacy, Michel and others funneled Low's payments through the domestic bank accounts of various shell entities and a law firm, and drafted sham contracts.

In furtherance of their scheme, Broidy and other co-conspirators drafted documents and contacted U.S. government officials personally and through others to (1) suggest that the United

States should not be involved in the 1MDB matters; (2) attempt to arrange a golf outing between the President and the Malaysian Prime Minister so they could address the 1MDB matter; and (3) advocate for the extradition of the PRC dissident.  Broidy enlisted Rick Gates, a political campaign official and consultant, and Stephen Wynn, a businessperson and casino magnate, to utilize their connections and influence with the Administration to assist in the influence operation.  Among the U.S. government officials whom Broidy contacted or attempted to contact or influence, directly or indirectly, were the Attorney General, the Secretary of State, and the President's Chief of Staff and National Security Advisor.

### b.  The Government's Proof

The government will present the testimony of FBI Forensic Accountant Eric Van Dorn, who, relying on extensive financial records, will trace the monies from foreign accounts controlled by Low to domestic accounts controlled by Michel, Broidy, and Lum Davis.  Many of the relevant financial transactions passed through a bank account associated with Colfax Law Office, which the evidence will show served as a means to obfuscate the true source and purpose of the funds— that is, to facilitate the undisclosed foreign lobbying scheme.  An FBI case agent will introduce communications between co-conspirators, including Michel, and toll record analysis for calls between the co-conspirators.  In addition, the government plans to present several former government officials, including the former National Security Advisor and his colleagues, who will testify about their knowledge concerning efforts urging the extradition of the PRC dissident, among other things.

In October 2020, Broidy pleaded guilty to one count of conspiracy to serve as an unregistered foreign agent, in violation of 18 U.S.C. § 371, for his role in this undisclosed foreign lobbying scheme.  *See United States v. Elliott Broidy*, Case No. 1:20-cr-210-CKK (D.D.C.).  In

January 2021, he received a full presidential pardon for his offense.  At trial, the government anticipates Broidy testifying about the origins of this scheme in early 2017, including his initial, in-person meeting with Michel and Lum Davis in Los Angeles, and their meeting in Bangkok, Thailand with Low where the parties agreed on the lobbying campaign and Low's financial compensation to the co-conspirators.  Broidy will describe generally the financial transactions surrounding Low's payments including transfers to Michel's entities, and the efforts to conceal Low as a client.  Broidy also will recall the meeting that he, Michel, Lum Davis, and Low had with a PRC government official in Shenzhen, China, at which the PRC official sought help in facilitating the extradition of a PRC dissident from the United States back to PRC.  Broidy will testify about the efforts he undertook, and represented to others that he undertook, to (1) arrange a golf outing/meeting between the President and the Malaysian Prime Minister, (2) arrange meetings for the PRC government official to meet with high-ranking U.S. government officials during a trip to Washington, D.C., and (3) persuade high-ranking U.S. government officials to extradite the PRC dissident.  The government expects Broidy to detail his frequent communications with Lum Davis regarding the status and progress of his influence efforts and his understanding that Lum Davis was reporting those updates to Michel, who in turn was updating Low.  The government will introduce electronic communications between Broidy, Lum Davis, and others to contextualize and corroborate Broidy's testimony about the undisclosed lobbying campaign.  To the extent these communications are hearsay, most will be admissible at trial pursuant to the co-conspirators hearsay exception, among other possible exceptions.

In November 2018, Higginbotham pleaded guilty to conspiracy to make false statements to a bank, in violation of 18 U.S.C. § 371.  *See United States v. George Higginbotham*, Case No. 1:18-cr-343-CKK (D.D.C.).  At trial, Higginbotham will testify about his relationship with Michel,

Michel's and his own involvement in the undisclosed lobbying campaign, the receipt and transfer of Low's monies, and the aim to conceal Low's identity, especially from banks. Higginbotham also will specifically recount (1) his meeting at the Chinese Embassy in Washington, D.C., at Michel's direction, to provide an update on efforts to extradite the PRC dissident, and (2) the trip he and Michel took to Macau, China to meet with Low to obtain more money in furtherance of the scheme. Lastly, Higginbotham will testify about his and Michel's conspiracy to make false statements to banks in furtherance of the undisclosed lobbying scheme, as detailed below. Higginbotham will introduce relevant communications between himself, Michel, and the banks that they used to receive and manage Low's payments.

### c.  Michel's False Statements to Banks

During the same period of their undisclosed foreign lobbying scheme, between approximately March 2017 and approximately January 2018, Michel and Higginbotham conspired to make false statements to banks to facilitate the transfer and receipt of Low's millions of dollars—the money intended to fund the undisclosed lobbying campaign—from foreign accounts associated with Low to domestic accounts controlled by Michel. Michel and Higginbotham took substantial steps to conceal the source and purpose of the wire transfers, including by drafting various false written agreements and contracts to disguise the transfers as legitimate business transactions. In September 2017, Michel, through Higginbotham, misrepresented to City National Bank the source and purpose of the funds. In November 2017, Michel, personally and through Higginbotham, made similar misrepresentations to Morgan Stanley. And in December 2017, Higginbotham and Michel misrepresented to Citibank, in response to the bank's inquiry about $41 million of Low's money deposited into Higginbotham's account, that the money was an investment in one of his client's music and entertainment projects, concealing the fact that the

money came from Low and was actually intended for the undisclosed political lobbying campaign.

In addition to Higginbotham, Marc Moscowitz, Michel's money manager during this relevant period, will testify about his knowledge and understanding of the events and circumstances surrounding these transactions and Michel's correspondence with the banks. And the government expects to present several witnesses from the relevant financial institutions who will attest to their banks' respective inquiries and the significance and materiality of the representations made to their institutions by Michel and Higginbotham.

## IV.    LEGAL ISSUES & MOTIONS *IN LIMINE*

### a.  Michel Should Not be Permitted to Make Impermissible Arguments to the Jury

The government respectfully requests that the Court preclude Michel from making any impermissible statements or arguments before the jury. As in any criminal case, the jury's verdict should be based solely on an application of the law to admissible evidence and nothing else. Nevertheless, Michel has made pretrial arguments suggesting an intent to contest the charges against him with irrelevant and improper references to selective prosecution, outrageous government misconduct, his prior good acts, inequitable application of the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611, *et seq.*, and other general arguments seeking jury nullification. The government seeks a pretrial order to preclude argument and evidence based on the above and any other irrelevant and prejudicial topics at trial. *See Sparf v. United States*, 156 U.S. 51, 72 (1895) (noting that when a jury disregards a court's instructions, "there may be no remedy"); *United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975) (affirming a trial court order precluding defense evidence that might encourage a "conscience verdict" of acquittal); *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993) ("A trial judge, therefore, may block defense attorneys' attempts to serenade a jury with the siren song of nullification.").

11

### i. Claims of Outrageous Government Conduct and Selective or Vindictive Prosecution are for the Court, not the Jury, to Decide

Michel filed multiple Motions to Dismiss the Superseding Indictment attacking the investigation and prosecution. *See* Mot. to Dismiss Sel. Pros., ECF No. 131; Mot. to Dismiss Out. Conduct, ECF No. 133.  The Court has addressed Michel's selective prosecution motion and rejected his arguments, and holds in abeyance decision on Michel's arguments regarding vindictive prosecution.  *See* Omnibus Mem. Op. and Order, ECF No. 154 at 12-18.  These arguments are legal arguments that are improper for a jury's consideration.

Strewn throughout Michel's filings are the incorrect assertions that Michel was improperly targeted because of either his race or his decision not to plead guilty.  *See* Mot. To Dismiss Sel. Pros., ECF No. 131, at 3-4; Mot. to Dismiss Out. Conduct, ECF No. 133 at 3-12.  But these arguments are issues of law to be decided by the Court and ultimately irrelevant to the charges Michel faces. *See* ECF No. 154 at 12-18; *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983) ("The issue of selective prosecution is one to be determined by the court, as it relates to an issue of law entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which she was charged." (citations omitted)); Fed. R. Crim. P. 12(b)(3)(A)(iv) ("The following defenses, objections, and requests must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits: . . . selective or vindictive prosecution[.]"); *United States v. Dufresne*, 58 F. App'x 890, 895 (3d Cir. 2003) ("[A] claim of vindictive prosecution is not permissible argument to a jury.").  The defendant should not be permitted to make improper arguments of selective or vindictive prosecution to the jury.

So too should Michel's outrageous government conduct claims be excluded from being presented to the jury.  ECF No. 133.  It is well established that claims of outrageous government

conduct are issues of law to be decided by the court, and this Court has already denied his claims. *See* ECF No. 154 at 16-18; *United States v. Brock*, No. CR 21-140 (JDB), 2022 WL 3910549, at *9 (D.D.C. Aug. 31, 2022) ("'Whether particular government conduct was sufficiently outrageous to meet this standard is a question of law,' and if the standard were met, the proper remedy would be dismissal of the indictment[.]" (quoting *United States v. Boone*, 437 F.3d 829, 841 (8th Cir. 2006))); *United States v. Mosley*, 965 F.2d 906, 909 n.3 (10th Cir. 1992) (claim of outrageous government conduct, which focuses on government's behavior rather than that of the defendant, may be presented to the court as a motion to dismiss, but it is not an affirmative defense to be presented to the jury). Any attempt, by argument or the introduction of evidence, to further an outrageous government conduct claim is a veiled attempt to seek jury nullification. Courts have made clear that jury nullification is improper—"Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power." *Washington*, 705 F.2d at 495.

### ii. Mention of Other Civil or Criminal FARA Enforcement Actions are Irrelevant and Inadmissible

Michel has repeatedly attacked FARA's statutory scheme and what he perceives as inequitable application of FARA's criminal provisions. Mots. to Dismiss FARA Counts, ECF Nos. 116, 117, 130. The Court has denied Michel's arguments regarding FARA's constitutionality wholesale. *See* Omnibus Mem. Op. and Order, ECF No. 154 at 8-12. Michel's legal arguments regarding FARA's constitutionality should be reserved to pretrial motions, and he should not be permitted to raise these arguments to the jury. The introduction of such evidence could be considered impermissible solicitation of jury nullification. *See United States v. Walsh*, 654 F. App'x 689, 697 (6th Cir. 2016) (affirming trial court's refusal to allow the defense to argue the legitimacy of federal marijuana laws).

Michel points to Stephen Wynn as an example of how Michel has been singled out for

criminal prosecution while others have faced lesser consequences under FARA's statutory scheme. As discussed above, this selective prosecution argument is reserved for the Court and should not be presented to the jury. *Washington*, 705 F.2d at 495.  And the Court noted that Michel failed to make out a selective prosecution claim with respect to Wynn because "the Government may have been concerned that it could not show that Wynn 'willfully' violated FARA."  ECF No. 154 at 14 (citing *United States v. Navarro*, Crim A. No. 22-200 (APM) (Sept. 12, 2022) (slip op.), at 5 (delineating circumstances defeating "similarly situated" inference)).

Michel's arguments and presentation of evidence at trial should be limited only to that relevant to the crime charged or to an affirmative defense, and he should not be permitted to make impermissible sideshows of irrelevant evidence.  Under the Federal Rules of Evidence, evidence "is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401; *see* Fed. R. Evid. 402 ("Relevant evidence is admissible," while "[i]rrelevant evidence is not admissible").[3]  Trial courts have broad discretion to determine the relevance and admissibility of any given piece of evidence.  *See United States v. Carter*, 522 F.2d 666, 685 (D.C. Cir. 1975); *United States v. Catalano*, 491 F.2d 268, 273 (2d Cir. 1974); *United States v. Linetsky*, 533 F.2d 192, 204 (5th Cir. 1976).  Michel argued in his Motions to Dismiss that he lacked willfulness—an element of the FARA offense he faces.  Michel is free to present evidence and argue to the jury that this element has not been met.  He is not, however, permitted to argue the legitimacy of the FARA scheme or its constitutionality.  That argument has been presented and rejected by the Court as a matter of law.

---

[3]  To the same extent, cumulative evidence regarding Michel's profession as an entertainer should be excluded unless relevant to the offenses charged.

### iii.   Prior Good Acts of Defendant Should be Limited

In an effort to distract the jury from the charges for which Michel is standing trial, Michel may seek to elicit testimony regarding his "charitable, political and humanitarian activity" or other "good acts" evidence wholly unrelated to the charges at hand that is previewed throughout many of his filings. *See, e.g.,* ECF No. 130 at 3; ECF No. 117 at 3-4. The government moves to exclude all evidence of Michel's general good character and evidence of specific instances of good conduct.

As a general matter, "good acts" evidence is irrelevant and therefore inadmissible. Fed. R. Evid. 404(a) ("Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion."). Rule 405(a) permits "testimony about [a] person's reputation or . . . testimony in the form of an opinion" where "evidence of a person's character or character trait is admissible." Such testimony is limited to a description of the subject's reputation or to a brief statement of opinion, without support from specific instances of conduct. *See* Advisory Committee Notes to Rule 405 ("[The rule] contemplates that testimony of specific instances is not generally permissible on direct examination of an ordinary opinion witness to character . . . . [O]pinion testimony on direct in these situations ought in general to correspond to reputation testimony as now given *i.e.* be confined to the nature and extent of observation and acquaintance upon which the opinion is based."). Michel should be prevented from eliciting testimony regarding his other specific good acts in violation of Federal Rules of Evidence 404(a) and 405(a).

### iv.  Improper Reference to the Consequences of Conviction Should be Excluded

Michel should be precluded from introducing evidence or argument about the potential

penalties or collateral consequences associated with a conviction for the charged offenses.  It is well-settled law that arguments or evidence regarding punishment are improper because the potential penalties faced by a defendant are irrelevant to the jury's determination of guilt or innocence.  *See Shannon v. United States*, 512 U.S. 573, 579 (1994) ("[A] jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" (quoting *United States v. Rogers*, 422 U.S. 35, 40 (1975))); 1 Criminal Jury Instructions for DC Instruction 2.505 (2021) ("The question of possible punishment of the defendant in the event a conviction is not a concern of yours and should not enter into or influence your deliberations in any way.  The duty of imposing sentence in the event of a conviction rests exclusively with me.  Your verdict should be based solely on the evidence in this case, and you should not consider the matter of punishment at all.").

This analysis applies equally to the collateral penalties associated with a felony conviction—such as being prohibited from certain types of employment, losing the rights to possess firearms and vote, and any family or business-related hardships caused by a federal conviction.  *See, e.g.*, *United States v. Patrick*, 494 F.2d 1150, 1153-55 (D.C. Cir. 1974) (reversible error for court to inform jury that it could recommend psychiatric treatment along with a verdict of second degree murder); *United States v. Del Rosario*, No. 12-CR-81, 2012 WL 2354245, at *1 (S.D.N.Y. June 14, 2012) (excluding evidence related to immigration consequences); *United States v. Johnson*, No. 08-CR-466, 2011 WL 809194, at *4 (N.D. Ill. Mar. 2, 2011) (precluding argument or evidence about the "hardship" defendants' families would face if the defendants were convicted).

Evidence relating to the punishment and the collateral consequences of a conviction serve only to compromise the verdict, confuse the jury, or invoke sympathy for the defendant and serve

to compromise the verdict, and therefore should be excluded from trial.

> **b. Michel's Proposed Expert Testimony Comments on Facts Not in Issue, Provides No Technical Analysis, Strays Beyond the Proffered Area of Expertise, and Includes Inadmissible Legal Conclusions; the Testimony Should be Excluded**

The proffered testimony of Michel's proposed accounting and financial investigations expert consists of irrelevant commentary on immaterial facts; defense-oriented characterizations of financial transactions unsupported by any methodology or principles of accountancy; and inadmissible legal opinions. The testimony should largely be excluded as unreliable and irrelevant. To the extent that Michel offers witness testimony summarizing bank documents to present certain categories of relevant financial transactions in summary fashion or to highlight certain transactions without improper additional characterizations, the testimony may be admissible subject to relevance and foundational objections, but not in the form of expert testimony.[4]

"[D]istrict courts have broad discretion in determining whether to admit or exclude expert testimony." *United States ex. rel. Miller v. Bill Harbert Inter. Cont., Inc.*, 608 F.3d 871, 895 (D.C. Cir. 2010) (internal quotation marks and citation omitted). Federal Rule of Evidence 702 provides the framework for the Court's determination and provides that expert testimony is only admissible where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of

---

[4] Out of an abundance of caution, the government previously provided notice for its own financial expert, FBI Forensic Accountant Eric Van Dorn. *See* Gov. Expert Notice, ECF Nos. 122 & 123. The government does not presently anticipate offering Van Dorn's testimony as expert testimony given that the testimony will consist largely of outlining various relevant financial transactions reflected in bank records, summarizing the records in summary exhibits and/or demonstratives, and potentially providing some limited lay opinion testimony based on Van Dorn's personal involvement in this investigation and related matters. Should defense argument or cross-examination of government witnesses put facts in issue for which expert testimony would be required, the government reserves the right to qualify Van Dorn as an expert.

reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "[U]nder the Rules, the trial judge must ensure that any and all scientific testimony is not only relevant but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "[C]ourts are obligated to 'determine whether [expert] testimony has a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Heller v. District of Columbia*, 801 F.3d 264, 271 (D.C. Cir. 2015) (alteration in original) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)).

The proffered testimony of Michel's expert is irrelevant in some instances and beyond his expertise and lacking any discernible methodology in others. The defendant's expert notice focuses primarily on the money laundering objects of the conspiracy charged in Count 7 and provides that the expert will opine that the funds transferred to Michel's companies were not "sourced from 1MDB." Def. Notice of Expert Report, ECF No. 125 at 2-3. The government has not charged Michel with laundering proceeds from Low's 1MDB embezzlement scheme. Rather, Michel is charged with conspiring to (1) commit international promotional money laundering by causing the transfer of funds from foreign accounts to U.S. accounts to promote the specified unlawful activity that constitutes the charged FARA scheme; and (2) to commit concealment money laundering by routing the proceeds of the FARA scheme through shell accounts to conceal the true control, source, and purpose of the funds. Superseding Indictment, ECF No. 84 at 26. Because the government did not charge Michel with laundering proceeds of the 1MDB embezzlement scheme and because the government does not intend to present evidence or argument that the funds used in furtherance of the charged FARA scheme were 1MDB proceeds, Michel's expert's opinion that the bank records do not prove that the funds were 1MDB proceeds does not "help the trier of fact . . . determine a fact in issue." Fed. R. Evid. 702.

18

Michel's expert notice also provides that the expert will testify that no "documents or records . . . conclusively tie Mr. Low to the funds transferred from Lucky Mark and Red Rock IX." ECF No. 125 at 4. Witness testimony and circumstantial evidence will establish that Low directed the relevant wire transfers to Michel and Higginbotham and that Low's associates were listed on some of the involved accounts. The bank documents themselves will be introduced into evidence. No specialized knowledge is necessary to explain that Low's name does not appear on the documents—that fact can be clearly established through cross-examination of the government witness who will introduce the exhibits or by reference to the exhibits themselves. Such basic factual assertions do not require expert testimony. *See Sec. & Exch. Comm'n v. Lipson*, 46 F. Supp. 2d 758, 764 (N.D. Ill. 1998) ("Defendant has not established that the financial evidence he will testify about is so complicated that the jury will be unable to understand it without repetition by [Expert].").

Michel's expert report also includes opinions that Michel's transactions are consistent with his defense that the funds were all related to entertainment ventures rather than the FARA scheme: "a sizeable portion of the funds wired into Anicorn's accounts were further transferred to a law firm;" "[a]fter performing web-searches, the principal of the firm lists on her LinkedIn page that she is, among other things, an entertainment lawyer with experience in developing entertainment projects;" "Michel had projects that were of an entertainment nature;" "Mr. Michel has been in the entertainment business since the 1990's and has projects in development;" "[t]he disbursements here certainly would be consistent with the development of entertainment projects;" and "Michel . . . . has significant funds . . . tied up in project development." ECF No. 125 at 5, 9, 11. The bank records themselves identify the recipients of Michel's transfers. No expert testimony is necessary to explain the identity of the recipients or the nature of the goods or services that they purportedly

provided. No methodology is offered to support the proffered characterizations of certain transactions as "consistent with the development of entertainment projects." And this witness has no proffered personal knowledge of Colfax Law Office or Michel's expenditures or entertainment ventures that would provide sufficient foundation to allow him to testify beyond the information on the face of the records as to the nature of the relevant transactions. The opinions are defense-oriented lay characterizations from a witness without any personal knowledge, disguised as expert opinion and devoid of any analysis. *See Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997) ("[Expert]'s affidavit exemplifies everything that is bad about expert witnesses in litigation. It is full of vigorous assertion (much of it legal analysis in the guise of banking expertise), carefully tailored to support plaintiffs' position but devoid of analysis.").

Finally, Michel's expert notice provides irrelevant factual observations coupled with impermissible legal conclusions, including: "I witnessed extensive lobbying by defense attorneys of DOJ to get the department to either close an ongoing investigation or to refuse to indict the subject of an investigation;" "the government, in the Indictment, alleges that the FARA violation in essence 'back taints' the funds transferred from Lucky Mark and Red Rock IX. . . . [t]his is a novel theory of the definition of 'proceeds' and a matter for counsel, but I can say that, both as a special agent and as a supervisor reviewing the cases of a group of 10-15 special agents solely involved in the investigations of financial crimes in the Central District in California, I never recall seeing this theory used in a prosecution;" "[i]n the Indictment it is the alleged FARA violation that makes the transferred funds 'proceeds' but in the Forfeiture Complaint those same funds are not alleged to be proceeds of a FARA violation but instead are alleged to be proceeds from a bank fraud." ECF No. 125 at 6-8. The witness's personal observations in investigations unrelated to this case are not relevant or the proper subject of expert testimony; references to alternative legal

theories cited in a separate civil forfeiture complaint filed by a distinct team of prosecutors in a related civil proceeding are similarly irrelevant and are likely to confuse the jury as to the issues properly before it; and the expert's opinions about what constitutes proceeds or bank fraud (which is not charged in this case) are inadmissible encroachments on the Court's authority on the law. *See, e.g., Weston v. Wash. Metro. Area Transit Auth.*, 78 F.3d 682, 684 n.4 (D.C. Cir. 1996) ("An expert witness may not deliver legal conclusions on domestic law, for legal principles are outside the witness' area of expertise under Federal Rule of Evidence 702."); *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (same) (collecting cases).

The defendant's proposed expert testimony is inadmissible. The various assertions in the proffered testimony either fail to address a fact in issue, do not rely on any methodology, data, or testing, are inadmissible lay opinions lacking foundation, or constitute impermissible legal conclusions. The defense-tailored opinions and conclusions in Michel's expert report do not satisfy Federal Rule of Evidence 702 or *Daubert* and should be excluded.

### c.   Michel Should Not be Permitted to Introduce Extrinsic Evidence of Witnesses' Prior Acts

The government intends to call several witnesses at trial who have pleaded guilty to federal criminal offenses (e.g., Bekkedam, Broidy, Higginbotham) and/or who have been subjects of or otherwise implicated in other federal investigations.[5] Under certain circumstances, a trial witness's criminal conviction may be used to impeach the witness. *See* Fed. R. Crim. P. 609. And a witness at trial may be cross-examined, subject to certain limitations and restrictions, regarding issues or matters bearing on the witness's credibility and character for truthfulness. *See, e.g.*, Fed.

---

[5] The government, as part of its discovery, has disclosed to Michel its knowledge of existing or previous investigations concerning its potential trial witnesses.

R. Crim. P. 608(b).   However, notwithstanding those potentially proper areas of cross-examination, defense counsel should be barred from presenting at trial any extrinsic evidence to prove specific instances of a witness's prior acts unrelated to this case.

The Federal Rules of Evidence limit and preclude certain areas and types of evidence at trial.   For example, evidence must be relevant to be admissible.   Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").   Even relevant evidence is subject to the balancing test of Rule 403, which "exclude[s] relevant evidence if its probative value is substantially outweighed by . . . unfair prejudice," confusion, waste of time, or other reasons.   Fed. R. Evid. 403.   Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."   Fed. R. Evid. 404(b)(1).[6]   And Rule 608(b) provides that "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."   Fed. R. Evid. 608(b).

Based on these principles, the government seeks a pretrial order limiting Michel from introducing extrinsic evidence at trial pertaining to the underlying facts of trial witnesses' unrelated criminal convictions,[7] and to the prior acts or allegations underlying any federal investigations of

---

[6] Pursuant to Rule 404(b)(2), evidence of other crimes, wrongs, or acts may be admissible at trial for other, non-propensity purposes.   While Rule 404(b) is typically used by prosecutors to introduce evidence of a defendant's uncharged conduct, defendants also may rely on the rule, under appropriate circumstances, to support their defense.   *United States v. Edwards*, 901 F. Supp. 2d 12, 16 (D.D.C. 2012) (quoting *United States v. Alayeto*, 628 F.3d 917, 921 (7th Cir. 2010)) (brackets omitted).   However, "reverse 404(b)" evidence, as it is sometimes known, is only admissible "'if it tends, along or with other evidence, to negate the defendant's guilt of the crime charged against the defendant.'"   *Id.* (quoting *Alayeto*, 628 F.3d at 921).   Here, the prior acts of and investigations involving potential trial witnesses are unrelated to the present case and do not have any bearing on Michel's guilt of the crimes charged in this case, let alone any exculpatory effect.

[7] Michel, of course, would not be prohibited from cross-examining Broidy or Higginbotham about

those witnesses.   A district court "has considerable discretion to place reasonable limits on a criminal defendant's presentation of evidence and cross-examination of government witnesses." *United States v. Watson*, 409 F.3d 458, 462-63 (D.C. Cir. 2005) (citation and internal quotation marks omitted).   Specifically with respect to cross-examination, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).   Rule 608(b) generally prohibits the use of extrinsic evidence to prove specific instances of conduct associated with a witness.   Moreover, to permit Michel to present extrinsic evidence related to any of those prior acts or allegations invites a mini-trial within the trial, the probative value of which is substantially outweighed by the likelihood of unfair prejudice, confusion of the jury, and the wasting of time and resources.   *See* Fed. R. Evid. 403.   And for federal investigations of witnesses that were unknown to the witnesses themselves, Michel has no basis to question the witnesses about possible bias or motive to curry favor on those grounds.   *See United States v. Landes*, 704 F.2d 152 (5th Cir. 1983) (affirming district court decision to restrict defendant's attempt to impeach a prosecution witness for proof of bias when the proffered evidence did not lend logical support for the point defendant wished to make).

### d.   Admissions of Business Records Without a Custodian

In proving Michel's wide-reaching foreign influence and conduit contribution schemes, the government intends to introduce business records from multiple entities, including, but not limited

the facts underlying their criminal convictions related to this case.   Indeed, the government expects to elicit testimony about those facts during the direct examinations of those witnesses.

to, banks, phone service providers, and airlines. These records are accompanied by a certification satisfying the requirements of Federal Rule of Evidence 803(6) (business records exception to the rule against hearsay). Although the government may introduce testimony from some of the related custodians, for many of the records, testimony from a custodian is unnecessary as the certifications establish that the records comply with Federal Rules of Evidence 803(6) and 902(11).[8]

The government seeks to introduce records with such a certification without a custodian at trial. Each of these sets of records is accompanied by a certification establishing that the related records are authentic duplicates of the originals, and that the records (1) "[were] made at or near the time by—or from information transmitted by—someone with knowledge;" (2) "[were] kept in the course of a regularly conducted activity of a business, organization, occupation, or calling;" and (3) were made "as a regular practice of that activity." Fed. R. Evid. 803(6)(A)-(C).

Federal Rule of Evidence 902(11) provides that "[t]he original or copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian" is self-authenticating and "require[s] no extrinsic evidence of authenticity in order to be admitted." Fed. R. Evid. 902(11). Pursuant to Rule 902, a records custodian or other qualified person from the business or organization may provide a certification attesting to the record's compliance with Rule 803(6) in lieu of appearing at trial.

To avoid wasting the jury and this Court's time, as well as to avoid the cost of travel and

---

[8]   Where applicable, certain materials also contain certifications under Federal Rule of Evidence 902(13) showing that the records were generated by "an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11)," and Federal Rule of Evidence 902(14) showing that the "data [was] copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)."

lodging for custodians, the government respectfully requests the Court rule pretrial that records accompanied by such a certification are admissible without testimony from a custodian. Accordingly, the government requests that this Court rule that documents accompanied by the appropriate certification be admissible under Rules 803(6) and 902(11). The government recognizes that the defendant has a right to object on other grounds when these documents are offered at trial.

The government will seek to admit records from the following custodians:[9]

1. Verizon Wireless

2. City National Bank

3. Citibank

4. Morgan Stanley

5. Wells Fargo

6. HSBC

7. AT&T

8. Metro PCS T-Mobile

9. Bank of America

10. American Airlines

---

[9] Because the Exhibit List will not be finalized until its filing on September 30, the government has provided the Court with the custodians of records that it will seek to admit using a certification. If the Court wishes, the government can supplement this filing after the Exhibit List is filed on September 30 to identify all of the exhibits it seeks to admit using certifications.

The government expects to receive outstanding custodian declarations in the next few weeks, at which time these will be made available to the defense. The government reserves the right to amend this list. This list represents records the government might use at trial, but the listing here does not mean that the government will introduce all of these records.

11. Bank of Hawaii

12. Industrial Bank

13. Standard Chartered Bank

The Confrontation Clause does not bar the use of these certifications. Courts have consistently held that a business records certification is nontestimonial and that admitting business records on the basis of a certification without testimony is entirely proper under the Confrontation Clause. *See, e.g.*, *United States v. Edwards*, No. Crim. 11-129-1 CKK, 2012 WL 5522157, at *1 (D.D.C. Nov. 15, 2012); *United States v. Johnson*, 688 F.3d 494, 504-05 (8th Cir. 2012); *United States v. Yeley-Davis*, 632 F.3d 673, 680 (10th Cir. 2011); *United States v. Schwartz*, 315 F. App'x 412, 417 (3d Cir. 2009); *United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006); *United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005). As this Court explained in *Edwards*, "[t]he business records—not the certifications—are used to establish facts against the defendant at trial," and "the Supreme Court has specifically distinguished affidavits or certificates authenticating records from other types of affidavits." 2012 WL 5522157 at *2 (citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 322-23 (2009)).

The government has attempted on two occasions to obtain stipulations from defense counsel as to the admissibility of these records but has not yet received an answer. Michel has not yet raised any objection to the government introducing the noticed records without the testimony of a custodian but has also not indicated whether he plans to object in the future. Having established the requirements of Rule 806(3) or another hearsay exception and the authentication requirements of Rule 902(11), (13), or (14) by certification, documents accompanied by such certifications are properly admissible at trial, and the government moves this Court to allow their admission without further foundation when the government sufficiently demonstrates their

relevance.

Respectfully submitted,

COREY R. AMUNDSON
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice


By: */s/ Sean F. Mulryne*
      John D. Keller
      Principal Deputy Chief

      Sean F. Mulryne
      Director of Enforcement & Litigation
      Election Crimes Branch

      Nicole Lockhart
      Trial Attorney
      1301 New York Ave., NW
      Washington, DC 20530
      Telephone:  202-514-1412
      Facsimile:   202-514-3003
      john.keller2@usdoj.gov
      sean.mulryne@usdoj.gov
      nicole.lockhart@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will serve counsel for the Defendant via electronic notification.


Dated:  September 16, 2022                                      <u>*/s/ Sean F. Mulryne*</u>
                                                                                     Sean F. Mulryne