EXHIBIT J

1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
2

3    - - - - - - - - - - - - - - - - )

4    IN RE:                            *

5    ELLIOTT BROIDY, et al.            *

6                                      *

7    - - - - - - - - - - - - - - - - )

8

9                         Grand Jury 19-5

10                        United States District Courthouse
                          333 Constitution Avenue, NW
11                        Washington, DC 20001

12                        Thursday, August 27, 2020

13

14          The testimony of GEORGE HIGGINBOTHAM was taken in

15   the presence of a full quorum of the Grand Jury, commencing

16   at 1:25 p.m., before:

17              JOHN KELLER
                Attorney, Department of Justice
18

19

20

21

22

23

24       Reported by:

25       Roxanne Parsons

                         FREE STATE REPORTING, INC.
                        Court Reporting  Transcription
                           D.C. Area 301-261-1902
                         Balt. & Annap. 410-974-0947

1                       E X H I B I T S

2      Exhibit No.          Description                Marked

3          1     Email from Higginbotham to Pras 3/23/17      13

4          2     Email and draft retainer dated 4/6/17        14

5          3     Email and retainer agreement dated 4/28/17   18

6          4     Email and news article dated 5/31/17         30

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2    (Whereupon

 3                    GEORGE HIGGINBOTHAM

 4    was called as a witness and, after first being duly sworn

 5    by the Foreperson of the Grand Jury, was examined and

 6    testified as follows:)

 7                    EXAMINATION

 8         BY MR. KELLER:

 9         Q.   Good afternoon, Mr. Higginbotham.

10         A.   Good afternoon.

11         Q.   Could you state your name and spell your last name

12    for the court reporter?

13         A.   George Higginbotham.  Last name is spelled

14    H-i-g-g-i-n-b-o-t-h-a-m.

15         Q.   And, Mr. Higginbotham, you currently live in the

16    District of Columbia; is that right?

17         A.   Yes, sir.  I do.

18         Q.   And you currently moved here from Seattle,

19    Washington?

20         A.   Yes, sir.  I did.

21         Q.   How long did you live in Seattle?

22         A.   Roughly a year and a half.

23         Q.   And before that time, so a year and a half ago

24    would put us maybe back into 2018.  So before 2018, did you

25    live in D.C. as well?
```

4

1    A.    Yes, sir.  I did.

2    Q.    And how long did you live in D.C. leading up to

3  the move to Seattle in 2018?

4    A.    I moved to D.C. from New York City in 2009.

5    Q.    And you lived in D.C. continuously from 2009 to

6  2018?

7    A.    Yes, sir.

8    Q.    Mr. Higginbotham, you're here providing testimony

9  before a federal grand jury related to potential charges

10  involving the Foreign Agents Registration Act and conspiracy

11  and money laundering.  It's my understanding that you have a

12  lawyer here with you today?

13    A.    Yes, sir.  I do.

14    Q.    And, Mr. Higginbotham, in fact, you've already

15  pled guilty in connection with this matter; is that right?

16    A.    Yes, sir.  I did.

17    Q.    And specifically you pled guilty to a one count

18  charge and conspiracy to make false statements to a bank in

19  violation of 18 U.S.C. Section 371?

20    A.    Yes, sir.  I did.

21    Q.    And generally that conduct related to false

22  statements that you along with Pras Michel made to financial

23  institutions in the United States to try and provide false

24  justifications for millions of dollars that were coming in

25  from accounts, to your understanding, that were controlled

1    by Jho Low or Low Taek Jho; is that a fair summary?

2         A.   That is very fair and accurate, yes.

3         Q.   And as part of your plea agreement,

4    Mr. Higginbotham, you agreed to cooperate in this

5    investigation; is that correct?

6         A.   Yes, sir.  I did.

7         Q.   And your cooperation agreement requires you to

8    first and foremost tell the truth; is that correct?

9         A.   Yes, sir.

10        Q.   And to cooperate as needed, to testify as needed

11   as you're doing today, related to the information you know

12   about this investigation, about the facts underlying this

13   investigation; is that right?

14        A.   That is correct.  Yes, sir.

15        Q.   And on the government's side, what you can expect

16   to receive based on your plea agreement and cooperation

17   agreement is that at your sentencing the government will

18   make a recommendation to the judge, if the government deems

19   you have provided substantial assistance and that you have

20   been truthful in your cooperation.  What you could expect to

21   receive would be that the government would make a motion to

22   the judge that the judge consider your cooperation and

23   reduce your ultimate sentence based on that cooperation; is

24   that your understanding?

25        A.   Yes, sir.  That is my understanding.

1          Q.   All right, Mr. Higginbotham.  You should feel free

2     to let me know if you need to step outside and consult with

3     counsel at any point today.  If you need a break for the

4     restroom or water, let me know.  We will accommodate that.

5          The Fifth Amendment does not apply strictly in the

6     grand jury, but you do have a right not to answer a question

7     that would tend to incriminate you.  So I guess I -- to more

8     precisely, the Fifth Amendment doesn't apply as a blanket in

9     the grand jury.  In other words, you can't invoke the Fifth

10    Amendment as to all questions that are asked of you.  You

11    can only refuse to ask [sic] a question that if the answer

12    to that question might tend to incriminate you.  Do you

13    understand that?

14         A.   Yes, sir.

15         Q.   And here based on your cooperation agreement, it's

16    my understanding that you don't intend to invoke your Fifth

17    Amendment as to any questions that are asked of you today.

18         A.   No, sir.

19         Q.   All right.  So getting into the substance,

20    Mr. Higginbotham, I want to start in late 2016, early 2017.

21    At or around that time, did you have contact with an

22    individual named Pras Michel?

23         A.   Yes, sir.  I did.

24         Q.   And what was the reason for that contact?  Had

25    you -- was this someone -- was Pras Michel someone that you

1    had known previously?

2        A.    I believe I met Pras sometime in the early 2000s,

3    so somewhere in the 2000, 2002, 2003 time frame.  And

4    throughout that time I had worked with him on and off on

5    various matters related to the entertainment industry.

6        Q.    And so were there some new matters that he reached

7    out to you about specifically in the late 2016, early 2017

8    time frame?

9        A.    Yes.  One of those matters had to do with his

10   personal finances with the business manager at the time.  I

11   was able to help him provide some sort of resolution to

12   that, at least a -- in the interim resolution for that.  And

13   then I began to think -- I think he began to see me as

14   someone who could be trusted with some other matters that --

15   where he was being presented with.

16       Q.    And at that time, late 2016-2017, where did you

17   work?

18       A.    I worked at the Department of Justice in the

19   Office of Justice Programs.

20       Q.    And what was your job there?

21       A.    I was a congressional affairs -- senior

22   congressional affairs analyst.  And I had some

23   responsibilities in my capacity as an attorney as well.

24       Q.    So after you and Mr. Michel resumed contact and

25   you had these dealings related to his financial advisor

1   where it was your understanding that you had gained some of

2   his trust, some of his confidence, did Mr. Michel reach out

3   to you with another project specifically relating to a

4   potential foreign client and some forfeiture proceedings

5   that were happening in the U.S. and internationally?

6       A.   Yes.  Pras had asked me through my contacts here

7   in D.C. if I was aware of any high-powered, well-connected

8   attorney that might be able to take on the matter with the

9   individual Jho Low, who it came to be known to me that it

10  was Jho Low that he was asking for that assistance.

11      Q.   And when was this roughly, if you can estimate the

12  month?

13      A.   This is early 2017, so I would say February time

14  frame.

15      Q.   What, if any, detail did Mr. Michel give you in

16  that very initial stage?  I heard you say that you later

17  came to learn that the individual was Jho Low or Low Taek

18  Jho.  If Mr. Michel didn't give you that name up front, what

19  information did he give you, if any, about the client or

20  about the matter that the client needed help with?

21      A.   He identified the person relatively quickly

22  because I told him it was important for me to understand who

23  that person was in order to align them with an attorney that

24  may be able to help out in that position.  Once I found out

25  who that person was, I did some of my own personal research

1    to find out -- to get a better understanding of what the

2    case involved.

3        Q.   And from your discussions with Mr. Michel, what

4    did you understand the case to involve?

5        A.   Jho Low had a very significant forfeiture action

6    against him on the civil side.  And the way that it was

7    explained to me by Pras, or Mr. Michel, was that he was

8    looking to come to some kind of a resolution of that so that

9    he felt comfortable interacting and doing business in the

10   country, in the U.S. again.  And he wanted to find some

11   favorable resolution to that, to the forfeiture action.

12       Q.   And did Mr. Michel explain to you at some point or

13   did the two of you discuss what the basis of the forfeiture

14   actions were?  What the underlying conduct was that Mr. Low

15   was alleged to have engaged in that resulted in the

16   forfeiture actions?

17       A.   As I said previously, through my own personal

18   research, I realized that it was associated with the 1MDB

19   matter.  I approached Pras on that.  He was very dismissive

20   and said, oh, you know he's already -- they've already

21   determined in his own country that he hasn't done anything

22   wrong, and portrayed it in a way that significantly

23   diminished its importance other than Jho Low wanting to

24   clear his name, so he could continue to conduct business in

25   the U.S.

1     Q.   And did you understand generally that the 1MDB

2   matter allegedly involved Jho Low and others including the

3   Prime Minister of Malaysia's theft of money, sovereign tax

4   money essentially, money from a sovereign wealth fund?  Was

5   that your understanding?

6     A.   Yes, sir.  I did understand that.

7     Q.   And did you have understanding of what the amounts

8   were that were alleged to have been stolen by Jho Low and

9   others?

10    A.   From the open source documents that I looked at,

11  it was a significant and very sizable amount of money

12  including the sizable amount in the forfeiture itself.

13    Q.   Millions, billions, do you remember?

14    A.   Billions.

15    Q.   Sorry, I spoke over you.  Billions with a B?

16    A.   Yeah.  I believe that the -- most of the

17  allegations that I read in open source were somewhere in the

18  range I think of 5 to 6 billion dollars.

19    Q.   Was it your understanding when Mr. Michel

20  approached you with this project, that there was a

21  significant opportunity to profit because of the large sums

22  of money involved?

23    A.   Yes, definitely.

24    Q.   And did Mr. Michel relate to you that Jho Low had

25  already paid a significant amount of money to someone else

1  in the U.S. who he saw or who he thought would be able to

2  use his connections for Jho Low's benefit?

3      A.   Not exactly at that time.  But after I presented

4  Pras with a person that I knew, a very high-powered, for

5  lack of a better word, headhunter who worked with very

6  high-powered attorneys in the city and in the country.  A

7  couple names were -- a couple firms were presented and a

8  couple names were presented.  One of the names was

9  conflicted out because of work that they had done

10 previously, and the other name was Rudy Giuliani.

11     Q.   And when you mentioned Rudy Giuliani to Mr. Michel

12 as an option, what was his response?

13     A.   He was very excited about that.  If you remember

14 the time frame, it is now early 2017, Mr. Giuliani was very

15 much in the press and was being considered for very high

16 positions in the administration.  And the appearance of

17 someone that had close connections to the incoming

18 administration was very important to Jho Low.  And Pras was

19 very excited that that could be a possibility and that he

20 thought that that would be someone that Jho low would want

21 to represent him in trying to resolve this matter.

22     Q.   And did Mr. Michel then later convey any response

23 from Jho Low to the proposal to have Rudy Giuliani help?

24     A.   Right.  It's my understanding that Pras met with

25 not Giuliani directly but one of his senior associates.  Had

1  a meeting, either over the phone or in New York, went back

2  and told Jho Low about Mr. Giuliani.  And Jho Low

3  immediately dismissed Giuliani as a candidate to represent

4  him, saying that he had already paid him 8 million dollars

5  and absolutely nothing had been done by him on the same

6  matter.

7      Q.   Mr. Higginbotham, I wanted to show you a few

8  documents here from this time frame to provide context and

9  evidence for the grand jury.  So on this topic of money, and

10  the fact that there were substantial amounts of money

11  involved with 1MDB, and the fact that you understood that

12  Mr. Giuliani had already been paid, I believe your testimony

13  was 8 million dollars was what you understood?

14      A.   That's what was told to me.

15      Q.   And that there had been no satisfactory results.

16  Again, I asked you this previously, but especially as you

17  learned these additional facts, was it your understanding,

18  and based on your discussions with Pras, that perhaps as

19  intermediaries, you and more directly Pras Michel would be

20  able to make a significant commission off of whatever was

21  paid to the eventual individual with connections who would

22  be helping Jho Low with the matter?

23      A.   At that particular time, no.  But it became very

24  quickly -- I came to understand that that was what the

25  arrangement was going to be, yes.

1      Q.   Was Mr. Michel -- did he make an effort in written

2   communications and sometimes in conversations to refer to

3   Jho Low by some other name or to anonymize Jho Low in his

4   conversations with you to avoid using his real name?

5      A.   Yes.  Both of those came from the hip-hop

6   community and we gave him the moniker Wu Tang.

7      Q.   I'm showing you what I've marked as Grand Jury

8   Exhibit 1.  See that sticker here at the bottom.

9           (Grand Jury Exhibit 1 marked for identification.)

10          MR. KELLER.   Are all the grand jurors, are you

11   guys all close enough to a monitor that you can read -- can

12   read documents?  Okay.

13          BY MR. KELLER:

14      Q.   So, Mr. Higginbotham, do you recognize this

15   document?

16      A.   Yes, sir.  I do.

17      Q.   It appears to be an email from G. Higginbotham;

18   ghesquire@gmail.com, was that at the time or is that still

19   currently your email address?

20      A.   Yes, it is.

21      Q.   And it appears that this was an email you sent on

22   or about March 23rd, 2017, to Pras Michel at a Gmail address

23   as well?

24      A.   Yes, sir.

25      Q.   And that's the -- is that an email address that

1    you understood to be Pras Michel's actual email address?

2        A.   Yes, sir.

3        Q.   The email walks through some issues about expenses

4    and trying to settle on some kind of a financial agreement

5    for various projects that you were working on with Pras; is

6    that a fair summary?

7        A.   Yes, sir.

8        Q.   And then in the third full paragraph, there's a

9    reference to Wu Tang, and based on your previous testimony,

10   was that a reference to the Jho Low matter?

11       A.   Yes, it is.

12       Q.   Then towards the end of that paragraph it says, "I

13   will contribute my time, and energy to make them happen, as

14   an investment to getting that BAG," all caps, "and a bunch

15   more bags down the road."  Was that a reference to bags of

16   cash or reference to, you know, the potential to earn

17   significant amounts of money on this project?

18       A.   Yes, sir.

19       Q.   So that was late March 2017.  I'm going to

20   fast-forward a week to early April 2017, and this is what I

21   marked as Grand Jury Exhibit 2.

22            (Grand Jury Exhibit 2 marked for identification.)

23            BY MR. KELLER:

24       Q.   Do you recognize this document?

25       A.   Yes, sir.  I do.

1      Q.   And it appears to be an email sent from Pras

2   Michel to you on April 6th, 2017; is that accurate?

3      A.   Yes, sir.

4      Q.   And it looks like there's an attachment listed:

5   Colfax Low Taek Jho Retainer Agreement for Legal Services.

6      A.   Yes, sir.

7      Q.   Do you remember that retainer agreement?  Do you

8   remember this email, this document?

9      A.   Yes, sir, I do.

10     Q.   What was Colfax?

11     A.   Colfax was a law firm that at that particular time

12  I didn't understand the meaning of the law firm, but it was

13  a law firm that was going to handle the resolution of the

14  1MDB forfeiture matter for Jho Low.  In the interim, after

15  Giuliani was no longer a consideration, I had, for lack of a

16  better word, exhausted my best suggestion to him.  And he

17  was able to identify another person who could potentially

18  have an impact on resolving the 1MDB matter for Jho Low.

19  And it was my understanding that Colfax was going to be the

20  means by which that was going to happen.

21     Q.   And did you know who that other person was?

22     A.   He was identified as Elliott Broidy, yes.

23     Q.   And what did Pras tell you about Elliott Broidy?

24     A.   So Pras had some political gravitas in the

25  Democratic community.  I don't think that that extended to

1    the new Republican administration that had come in.  And so

2    he was looking for someone that had that in the Republican

3    sphere, so to speak, Republican political community.  He was

4    very excited to find Elliott and presented me -- showed me a

5    picture of Mr. Broidy standing next to or shaking hands with

6    actually the President at the time and was very excited by

7    the prospect that this would really look good for Jho Low,

8    because Jho Low wanted someone who had some clear political

9    pull and power to be working on the case for him.

10        Q.   And did you know or understand whether or not

11   Mr. Broidy was a lawyer?

12        A.   At that time I did not know whether or not he was

13   a lawyer or not.

14        Q.   Did you come to learn later whether he was lawyer?

15        A.   I came to learn later that he was not a lawyer,

16   yeah, so --

17        Q.   Based on Pras's emphasis on Mr. Broidy's close

18   connections to the administration and later learning

19   Mr. Broidy was not a lawyer, did you come to understand that

20   the true purpose of hiring Mr. Broidy was to leverage his

21   political connections as opposed to actually doing any legal

22   work or performing any legal services?

23        A.   That was exactly what I came to understand, yes.

24        Q.   So flipping to the second page of this email, the

25   attachment rather, the second page of the exhibit, there is

1  a stamp at the top that reads Colfax Law Office and then a

2  reference to Mr. Low Taek Jho, and below that in the

3  re line, it says, "Retainer and Fee Agreement - Litigation

4  Services."  Do you recognize this as a draft contract

5  between Colfax Law Office and Jho Low?

6         A.   Yes, sir.

7         Q.   And then flipping to the second page, third page

8  of the exhibit, but second page of the contract, there is a

9  section that is numbered four and is titled, "Fixed Fees."

10 And then there's a subsection that says, "Retainer Fee," and

11 sets forth that "the Firm requires the deposit of a non-

12 refundable retainer fee of $8,000,000."  Was that your

13 understanding that, in order for Mr. Broidy to undertake

14 this work on behalf of Jho Low, that he was demanding an 8

15 million dollar retainer fee?

16        A.   Yes, sir.

17        Q.   And then below that there's a success fee that

18 states if the principals of Mr. Broidy and Colfax are

19 successful, they would receive an additional fee of 75

20 million dollars.

21        A.   Yes, sir.

22        Q.   Sorry.  I took that off.  And do you remember

23 discussing those figures with Mr. Michel at around the time

24 these draft contracts were being circulated?

25        A.   Yes.  I mean, in principle, yes.

1      Q.   Did Mr. Michel talk to you at this time, that you

2   remember, about what portion of this money he would be able

3   to obtain or he would be able to obtain to share with you,

4   if any, or whether he would have a separate arrangement with

5   Jho Low?

6      A.   The way that I understood it was that there was

7   going to be a total fee presented to Jho Low to pay.  A

8   portion of that fee was going to go to Elliott Broidy, and a

9   portion of the fee was going to go to Pras and potentially

10  other intermediaries that had worked for facilitating this.

11  At that time, there was no explicit understanding between

12  Pras and I as to what my compensation was going to be.

13     Q.   So that last email and contract that we looked at

14  was April 6th.  Fast-forwarding a few weeks to April 28th,

15  I'm showing you what I've previously marked as Grand Jury

16  Exhibit 3.

17          (Grand Jury Exhibit 3 marked for identification.)

18          BY MR. KELLER:

19     Q.   Do you recognize this document as another email

20  sent from you to Pras Michel on April 28th, 2017?

21     A.   Yes, sir.  I do.

22     Q.   And there appears to be an attachment listed as

23  "Anicorn with Wu Tang."  Do you see that?

24     A.   Yes, sir.

25     Q.   What was Anicorn?

1    A.    Anicorn was one of the companies that Pras had

2    recently incorporated that was designed, in part, to handle

3    these kinds of matters outside of his entertainment related

4    activities.

5    Q.    Were you involved in the setting up of the

6    formation of or opening accounts for Anicorn for Mr. Michel,

7    or no?

8    A.    No, I wasn't.  That was handled by his business

9    manager.

10    Q.    And this specific attachment, "Anicorn with Wu

11    Tang," again, did you understand the reference to Wu Tang to

12    be a reference to Jho Low?

13    A.    Yes, sir.

14    Q.    Just turning to the second page of the exhibit,

15    the first page of the attachment, Anicorn, LLC is listed at

16    the top of the document.  It's dated May 1st, 2017, and then

17    the re line is "Retainer and Fee Agreement, Consulting

18    Agreement."  And on the second page of the attachment, again

19    similar to the document we looked at before, there's a

20    section for fixed fees, and there's a retainer fee listed

21    for 25 million dollars; is that accurate?

22    A.    Yes, sir.

23    Q.    To be paid to Anicorn, right?

24    A.    Yes, sir.

25    Q.    And then there's a success fee contemplated of 300

1   million dollars; is that right?

2       A.   Yes, sir.

3       Q.   And at the bottom of the document there are wire

4   transfer instructions set forth for a bank, City National

5   Bank in California; is that right?

6       A.   Yes, sir.

7       Q.   And then on the second to last page of the

8   attachment, there's a signature line listing Anicorn and

9   then Pras Michel as the CEO?

10      A.   Yes, sir.

11      Q.   And there's a signature line for the client, but

12  the client is not identified; is that correct?

13      A.   Yes, sir.

14      Q.   And then on the last page, there's a reference to

15  exhibit -- it's titled "Exhibit A," and as a heading,

16  there's a listing for "Description of the Matter" and it

17  references United States of America v. The Wolf of Wall

18  Street Motion Picture and a civil case number.  And then in

19  number two, it references all other forfeiture actions that

20  are referred to in the complaint in the case described

21  above.  Was it your understanding that this all referred to

22  forfeiture actions related to Jho Low's assets?

23      A.   Yes, sir.

24      Q.   And was it your understanding that one of Jho

25  Low's assets was some interest, equity interest, or

1    ownership of *The Wolf of Wall Street,* which was a motion

2    picture?

3         A.   Yes, sir.

4         Q.   So, Mr. Higginbotham, I wanted to compare,

5    quickly, that contract that we just looked at in which no

6    client is listed by name and the matter is generally

7    referenced as the Wolf of Wall Street or the civil matter

8    versus the contract that we looked at just a moment ago that

9    was from April 6th.  So I'm going to go back to Grand Jury

10   Exhibit 2 for a moment.  And this is the Colfax Jho Low

11   retainer agreement.  Do you remember looking at this?

12        A.   Yes, sir.

13        Q.   So in this agreement, as we noted in the first

14   paragraph, Jho Low is identified by name, correct?

15        A.   Yes, sir.

16        Q.   And there are wire transfer instructions for

17   Colfax Law Office for a bank account in Los Angeles,

18   California?

19        A.   Yes, sir.

20        Q.   And then on the second to last page of the

21   attachment, there's a signature block for Robin Rosenzweig

22   of Colfax Law Office, Attorney.  Who was Robin Rosenzweig?

23        A.   At that time I did not know.  I came to later find

24   out that that is Elliott Broidy's wife.

25        Q.   And to your knowledge throughout the course of

1   this entire time period, from early 2017 through the end of

2   the year, did Robin Rosenzweig ever provide any legal

3   services or perform any legal work for Jho Low?

4        A.   Not that I know of.

5        Q.   Did Mr. Michel ever discuss with you, especially

6   in the context of these agreements, where the money would

7   come from that would be paying these significant retainers

8   and potential success fees?

9        A.   The money would be coming from Jho Low.

10       Q.   Did he discuss with you whether there would be

11  accounts in Malaysia, in China, where the money would be

12  coming from?

13       A.   No.  I mean, I saw those -- I saw the bank

14  records, and there were a number of what I've come to know

15  as shell companies that were providing the funds.  But it is

16  my understanding they were all being directed -- those funds

17  were all being directed by Jho Low.

18       Q.   And were you able to determine from those

19  financial records and from your involvement in this matter

20  whether those shell companies were inside or outside of the

21  United States?

22       A.   I believe all of them were outside of the United

23  States.

24       Q.   Did you or Mr. Michel ever have any

25  conversations -- or did you have an understanding based on

1   your conversations with Mr. Michel why, for example, there

2   was a progression from the early draft of the contracts with

3   Colfax, where Jho Low is named, to later contracts, like the

4   contract with Anicorn several weeks later, where Jho Low was

5   not named?  Did you and Mr. Michel have any discussions

6   about whether Jho Low should actually be named in the

7   records or whether he should remain anonymous?

8       A.   From very early, on Mr. Michel made it very

9   obvious to me that Jho Low should be anonymized and that

10  specific reference to him should not be made if it can be

11  avoided.

12      Q.   In the -- as part of the search process to

13  identify a suitable individual for this project, for Jho Low

14  and Mr. Michel's eventual discovery of Mr. Broidy for that

15  role, did he ever mention an individual named Nickie Lum

16  Davis?

17      A.   I didn't come to know about Nickie Lum Davis until

18  after Broidy was identified.

19      Q.   And so when Broidy was identified, what did you

20  understand Nickie Lum Davis's role to have been?

21      A.   That through Pras's contact with Nickie Lum Davis,

22  she was a key, or conduit so to speak, to the Republican

23  Party.

24      Q.   And specifically that she had a relationship with

25  Mr. Broidy in this instance?

1       A.   I didn't know what the nature of their

2   relationship was, but she was able to get in contact with

3   him, being Mr. Broidy obviously, and present this

4   opportunity to him.   And so Pras was excited to find someone

5   that would be able to, you know, have an impact on this

6   matter and someone who had appropriate connections within

7   the current administration.

8       Q.   During this time period, so we've looked at some

9   emails from March/April into late April 2017, did you have

10  an understanding of whether Pras Michel was actually

11  traveling to Asia to meet with Jho Low to go over some of

12  these proposals?

13      A.   Yes.   It was my understanding that he traveled to

14  Asia on more than one occasion, yes.

15      Q.   And specifically around the time of some of these

16  contracts, late April 2017, do you recall sending Mr. Michel

17  an email with some related financial documents where you

18  referenced reading for the plane or reading for the flight,

19  something to that nature?

20      A.   Yes, sir.   I do.

21      Q.   And was that because you understood that

22  Mr. Michel was on his way to meet with Jho Low in Asia?

23      A.   Yes.   Pras lamented quite frequently that he did

24  not like the flight because of its length and duration and

25  that he didn't really like being there for that long, so it

1   was a common thing for him to say that he didn't like taking

2   those flights.  He did feel it was necessary to do it,

3   though.

4        Q.   And for that specific trip, in that time frame of

5   late April, around the time of the email that we just looked

6   at, the Anicorn with Wu Tang contract, Grand Jury Exhibit 3,

7   sent on April 28th, 2017, do you recall whether Mr. Michel

8   mentioned that anyone else would be traveling with him to

9   meet with Jho Low?  Mr. Broidy, Ms. Lum Davis, anyone else?

10       A.   I was not sure of that.  There was an associate of

11  Mr. Michel, a Joel Rousseau that often times facilitated

12  this, but I think Joel had a longer standing relationship

13  with Jho Low.  But as to the other specific people who

14  traveled with him, I am not sure.  I know that there was

15  some talk of other people traveling with him though.

16       Q.   Just as a brief aside, did you know who Joel

17  Rousseau was?  Did you know anything about his background,

18  what he did for a living?

19       A.   Very little.  As a matter of fact, I didn't come

20  to know his real name -- he was nicknamed the Promoter -- I

21  didn't come to know who he really was and his real name

22  until we met in Los Angeles on a layover to Hong Kong, I

23  believe, in September of 2017.

24       Q.   Did you have -- did you ever learn what his

25  connection was to Jho Low?

1      A.    Through conversations with him, it was my

2  understanding, and through conversations -- so Mr. Rousseau

3  was, I believe, a party promoter in New York City.  And we

4  had -- we did the name game and exchanged that we knew some

5  people -- this is actually in Hong Kong, that we knew some

6  people in common.  And the way that Mr. Rousseau explained

7  it to me is that Jho Low had contacted him to throw parties

8  and other social events.  And through that, they had struck

9  up a friendship.  And I believe that it is through Rousseau

10  that Pras came to be known by Jho Low and vice versa.

11      Q.    I should have asked you this before when we were

12  looking at the two contracts comparing them.  But one thing

13  that is obviously different in the two contracts is the

14  amount of the retainer and the success fee.

15           So in the Colfax agreement, I believe the retainer

16  was 8 million dollars, and then the success fee was maybe 50

17  million dollars.  Sorry I stand corrected -- from this

18  version -- so this again is Grand Jury Exhibit 2, third page

19  of the exhibit.  It looks like the retainer is 8 million

20  dollars and the success fee is 75 million dollars.  On the

21  next page there's another success fee if the matters settled

22  in a longer period of time; there's a success fee of 50

23  million dollars.

24           So 8 million, 75 million, 50 million versus in the

25  Anicorn contract, again Grand Jury Exhibit 3, the retainer

1    is 25 million dollars and the success fee is 300 million

2    dollars.  Did you have an understanding of why there was

3    such a large discrepancy in the Colfax retainer agreement

4    versus the Anicorn agreement?

5         A.   Not exactly.  The figures, although enormous and

6    astronomical, were always explained by saying if the client

7    has the resources in which to pay for it, then he will.  It

8    was at that time that I did learn though, that there was an

9    agreement between Pras and Broidy that, you know, Broidy

10   would get his share.  There would be a number given to Jho

11   Low, and whatever beyond Broidy's share would be shared

12   between Pras and other individuals, one of whom came to be

13   Nickie Lum Davis.

14        Q.   And so did you understand that that excess was

15   anything above and beyond the 8 million dollars that was

16   listed as a retainer fee or were the figures not specified,

17   at least to your knowledge?

18        A.   Not specified to my knowledge.

19        Q.   All right.  So after this trip in late April,

20   early May, do you remember there being a tense time period

21   where there was an expectation and everyone was awaiting the

22   first wire transfer from Jho Low?

23        A.   Yes, definitely.

24        Q.   Did Pras tell you anything about what had happened

25   on the trip that was leading to this first payment that was

1   being expected?

2        A.   That -- all that he told me was that the trip was

3   successful and they had been able to work something out and

4   that he was now waiting on confirmation of -- or

5   confirmation of what they had discussed would be the deposit

6   of this, you know, this first payment.

7        Q.   And do you recall a payment actually coming in, a

8   wire transfer coming in to Pras's Anicorn account around

9   this time frame early May 2017?

10       A.   Yes, I do.

11       Q.   And do you remember roughly how much it was?

12       A.   I don't remember exactly how much it was, but it

13   was sizable, and it was important because it showed that Jho

14   Low was serious about retaining Broidy, and that this was

15   likely the first of many payments to be coming in.

16       Q.   And when you say sizable, was it in excess of a

17   million dollars?

18       A.   Yes, sir.

19       Q.   Did Mr. Michel tell you especially as the money

20   started to come in and after returning from the trip where

21   he met with Jho Low, did he explain what Mr. Broidy was

22   going to do for all of this money?

23       A.   Well, Pras explained to me that Mr. Broidy was

24   telling him that he was extraordinarily well connected in

25   Washington, he was well connected on the West Coast as well,

1    that his connections went as high as congressmen and the

2    Attorney General, and that it would be very easy for him to

3    have this matter resolved.  The only delay was the turning

4    over the government, so to speak, and important positions to

5    the incoming administration.

6         Q.   Did Mr. Michel relate to you any statements by

7    Mr. Broidy about not wanting to be tied directly to Jho Low

8    either financially or contractually?

9         A.   I don't know if there was any explicit statements,

10   but it was very clear in that no payments were ever made to

11   him, payments were made to the Colfax Law Firm, payments

12   were made to Anicorn and not directly to Mr. Broidy.  So if

13   you look at the actual way that the transactions took place,

14   he was anonymized also.

15        Q.   You mentioned seeing photographs of Mr. Broidy

16   with the President.  Did Pras at that time, or in this time

17   frame kind of April, May, or later, ever specifically

18   describe for you the officials that Mr. Broidy would be

19   lobbying or would be talking to?

20        A.   Not necessarily that I recall by name but by

21   position.  So the AUSA that was going to be coming into the

22   District where the Wolf of Wall Street was one person,

23   various congressmen, senators, and, I believe, reference to

24   people at the White House and a relationship with the

25   Attorney General at the time, I think, was Sessions.

1    Q.   You said an AUSA in California.  Do you remember

2    whether that position in California in the office was

3    actually a presidentially appointed position to be the U.S.

4    Attorney, the head of the Federal Prosecutors Office in Los

5    Angeles in the Central District of California?

6    A.   I can't -- I don't recall whether or not it was

7    specifically that position, but there was a bravado that was

8    communicated to Pras, and then from Pras to me that

9    Mr. Broidy had the ability to resolve this matter, resolve

10   it quickly.  That is why there was a time frame in terms of

11   the success fee.  That he would be able to do this once, for

12   lack of a better word, his people were, you know, in

13   positions of power.

14   Q.   Due to the turnover in the administration?

15   A.   Due to the -- yeah, exactly.

16   Q.   All right.  Fast-forwarding a few weeks now into

17   late May of 2017, I'm going to show you what I've marked as

18   Grand Jury Exhibit 4.

19        (Grand Jury Exhibit 4 marked for identification.)

20        BY MR. KELLER:

21   Q.   Do you recognize this as an email sent from you to

22   Pras Michel on May 31st, 2017?

23   A.   Yes, sir.  I do.

24   Q.   And the subject is "2nd Room"?

25   A.   Yes, sir.

1      Q.   And there's a link to a *New York Times* article.

2   The headline appears to be related to China and Guo Wengui;

3   is that correct?

4      A.   Yes, sir.

5      Q.   What was your understanding of who Guo Wengui was

6   and why were you sending Mr. Michel an article about Guo

7   Wengui in late May of 2017?

8      A.   So I guess a few days previous to this I had

9   visited Pras in Manhattan in New York at his loft there.

10   The subject line "2nd Room" refers to just kind of the way

11   that the loft is configured.  And he gave me a very long and

12   elaborate -- or we had a very long and elaborate

13   conversation about his experiences with Jho Low asking him

14   to participate with another matter, which was the

15   extradition of Guo Wengui, a Chinese national who, I guess,

16   was in self-exile in Manhattan himself, and that there was a

17   possibility for even more money to be coming from Jho Low if

18   Mr. -- if there was some way that the U.S. Government could

19   be petitioned, requested, and then actually fulfills an

20   extradition of Mr. Guo Wengui to China.

21      Q.   Had you ever heard of Guo Wengui before this

22   meeting with Pras --

23      A.   No.

24      Q.   -- in his loft?

25           Did you understand from Mr. Michel's comments,

1   either in that initial meeting or in later meetings, that in

2   addition to this being important to Jho Low, that it was

3   also something important to the Chinese Government?

4       A.   Yes.  Over a course it became very clear that it

5   was important to the Chinese Government as well.

6       Q.   And did you reach an understanding as to why it

7   was important to the Chinese Government?  What the

8   significance was of Guo Wengui?

9       A.   I tend to do a lot of my own personal research on

10  things.  And through finding out the relationship that Guo

11  Wengui had with the current administration, the current

12  Chinese administration I should say, it became pretty clear

13  why they would not -- why they would want him extradited.

14  And there was also, Pras made mention to the fact that the

15  Chinese elections were coming up and that Mr. Guo Wengui was

16  quite -- very much against the current administration in

17  China.

18      Q.   Was it your understanding that Mr. Wengui had been

19  vocally critical of the Chinese administration and was known

20  publically as a critic or a dissident of the Chinese

21  Government?

22      A.   Yeah, I learned that through my own open source

23  research.

24      Q.   And we're not going to go through the whole thing,

25  but the attachment here, that the link references in the

1   email, is this the article that's referenced in the email?

2   This is page two of Grand Jury Exhibit 4, it's -- the

3   headline is "The Billionaire Gadfly in Exile Who Stared Down

4   Beijing"?

5        A.   Yes.

6        Q.   And this just briefly, that's the second paragraph

7   describes, "That's where Guo Wengui, a billionaire in self-

8   imposed exile, has hurled political grenades at the Chinese

9   Communist Party for months, accusing senior leaders of graft

10  using Twitter as his loudspeaker."  And it goes on from

11  there.

12        But was it your understanding this article

13  generally kind of lays out the tense relationship of, for

14  lack of a better characterization, between Guo Wengui and

15  the Chinese government?

16        A.   Yes.  A lot of the stuff that Pras was saying when

17  I was -- when I met with him, I found incredibly fantastic.

18  And so I went back and did some of my own research and

19  realized that it may not have been as fantastic as I

20  originally thought.

21        Q.   Did you have an understanding after that first

22  conversation with Pras in late May and then your own

23  personal research and further discussions with Pras, or

24  Mr. Michel, did you come to have an understanding whether

25  Mr. Broidy and Ms. Lum Davis would also be involved in this

1    project related to Guo?

2         A.   Yes, I did.

3         Q.   What was that understanding?

4         A.   That in their, for lack of a better word, lobbying

5    efforts to solve the 1MDB matter, that this would be added

6    on to their lobbying efforts, because in all likelihood they

7    would be talking to similar people.

8         Q.   And was it your understanding again, based on your

9    conversations with Pras, that everyone understood that there

10   was a potential significant financial payday that would come

11   if they were able to actually successfully get the

12   government to remove Guo?

13        A.   Yes.  Pras was very excited about the prospect and

14   that he felt that this represented an even more lucrative

15   opportunity.

16        Q.   And from this point forward, so May/June 2017, was

17   it your understanding that all of the money that came in

18   from Jho Low from these foreign accounts controlled by Jho

19   Low and the shell companies, that the money was kind of

20   commingled as to both 1MDB and Guo?

21        A.   Yes.  I -- it would be very difficult for me to

22   make a distinction as to which dollar amounts were for each

23   one of the different matters.

24        Q.   With that said, did you ever see a contract that

25   ever specifically separately addressed the Guo matter?  Like

1    the contract -- the contracts that were drafted to

2    specifically address the 1MDB matter?

3         A.   No.

4         Q.   In July related to Guo, did Mr. Michel come to

5    D.C. and make a request of you to try and help in this

6    endeavor to get Guo removed back to China?

7         A.   Yes.  Pras had asked me to take a meeting with the

8    Chinese ambassador and express to him that things were being

9    done and there was a -- things were in motion in order to

10   get the extradition to take place.

11        Q.   So -- sorry, that was the message that Mr. Michel

12   asked you to relay to the Chinese ambassador, that steps

13   were being taken, official action was being taken,

14   initiated, to actually deport or extradite Guo?

15        A.   Yes.  The team that Pras and Jho Low and Broidy

16   and whomever else, they were actually doing something and

17   that there would be some progress in that shortly.

18        Q.   And what was your initial reaction to this

19   request?

20        A.   I was very reluctant to do it.

21        Q.   Why?

22        A.   I was an employee of the Department of Justice.  I

23   did not really believe that he could get someone like myself

24   a audience with the ambassador of China to the United

25   States.  I did not like it at all.  I was very reluctant to

1     do it.

2          Q.    Did you ever have any understanding of why Pras

3     was asking you to do it as opposed to just delivering the

4     message or setting up the meeting for himself?

5          A.    I asked him that question directly.  And he said,

6     you know, George, you're an attorney; you're more well

7     spoken than I am.  He'll have more respect for you.  You're

8     familiar with working in the international community.  You

9     know, any number of reasons having to do with me being a

10    more official person to convey that message.

11         Q.    Along those lines, at some point did Mr. Michel

12    ask you to send him a photo of your business card, your DOJ

13    official business card?

14         A.    Yes, he did.

15         Q.    And did you ever learn what he did with that photo

16    of that credential?

17         A.    I believe that he probably gave it to Jho Low.

18    One of the things that Pras had said from almost the very

19    beginning is that Jho Low was the kind of person that was

20    impressed by status and wealth and connections and that kind

21    of thing.  And it's important to understand that Pras was

22    trying to get his business, and in trying to get his

23    business, I think that Pras wanted to show Jho Low that he

24    was associated with people that had some power, had some

25    influence and that kind of thing.  And I would only imagine

1  that he used the card for that purpose.

2      Q.   Do you -- did he ever say to you in the -- as part

3  of this request to meet with the Chinese ambassador, whether

4  he was representing others, that you were going in your

5  official capacity as some sort of representative from DOJ?

6      A.   I told him under no circumstances would I go as a

7  representative of DOJ.  I did not have that authority, I did

8  not have that position, I did not have any reason whatsoever

9  to go in official capacity.  And actually, when I sat down

10 with the ambassador, I told him point blank, I'm here on

11 behalf of my private client.  This has nothing to do with

12 the Department of Justice, and I am here in absolutely no

13 official capacity.

14     Q.   And your private client that you were referencing

15 was Pras?

16     A.   Was Pras, yes.

17     Q.   Did you mention Pras Michel specifically during

18 that meeting with the Chinese ambassador?  Do you remember?

19     A.   I do not remember whether I mentioned him

20 specifically.

21     Q.   And where did the meeting take place?

22     A.   At the Chinese Embassy.

23     Q.   And how did you gain access to the embassy?  Did

24 anyone contact you to set up the meeting or to tell you

25 where to go or what time to be there?

1       A.   Pras provided me with a number of an individual

2  who's an assistant to the Ambassador.  I actually asked for

3  the meeting to be moved somewhere else so it would look or

4  it would appear to be less official.  So I suggested, you

5  know, a restaurant or coffee or something other than that.

6  It also took place on a Sunday, which usually official

7  meetings don't take place on Sundays.  Yeah, no, I was very

8  reluctant to go.

9       Q.   But Pras gave you the details.  You did go to the

10  embassy on Sunday?  This is in early July time frame?

11      A.   Yes, it was.

12      Q.   And once you arrived at the embassy, did someone

13  meet you at the gate or --

14      A.   Yeah -- oh, I'm sorry.  Yes, there was an

15  assistant to the ambassador.  I had his phone number; he had

16  mine.  He called me and we established a time to meet.  I

17  went to the front gate of the embassy.  I was ushered in.

18  There was a large meeting room that we were -- that I was

19  ushered to through the embassy.  The assistant left me, tea

20  was served, and the -- shortly thereafter the ambassador

21  came in.

22      Q.   And did the ambassador speak with you in English,

23  or was there a translator present?

24      A.   No, the ambassador spoke to me in English.

25      Q.   And what did he say?

1      A.   He looked at me and basically was why are you

2   here?  What do you have to tell me?

3           And I told him the message that I was told to

4   relay, which was that the Guo matter was, you know, people

5   were actively working on the Guo matter.  There was a

6   specific reference to, I think, General McMaster and that he

7   was working on it.  I think that he had, if I remember

8   correctly, he was one of the -- in the National Security

9   Office at the White House.  And I conveyed to him that he

10  should expect over the course of the next few days a call

11  from him setting up how and in what ways the extradition

12  would take place, or the deportation.

13      Q.   And what was the ambassador's response?

14      A.   The ambassador continued to ask more questions.

15  And I did not -- I literally did not have answers to those

16  questions.  So I told him, I do not know.  He said, is there

17  anything else?  I said, the only other thing that I said is,

18  you know, I would appreciate if this meeting never happened

19  in no official capacity and reiterated the fact that I was

20  not there on behalf of the government.

21      Q.   You asked the ambassador not to disclose the fact

22  that the meeting had occurred?

23      A.   Yes.

24      Q.   Did Mr. Michel actually come to D.C. to meet with

25  you in preparation for this meeting?

1      A.   We met that morning, yes.

2      Q.   Where did you meet?

3      A.   The Four Seasons in Georgetown.

4      Q.   After the meeting with the ambassador, not with

5  Mr. Michel, did you then return and have another meeting and

6  discuss with Mr. Michel?  Or had he already left D.C. by

7  that point?

8      A.   I believe he had left D.C. by that point.  I

9  called him and told him the meeting -- I remember calling to

10  tell him the meeting had taken place and that the message

11  that he asked me to be delivered was delivered.

12      Q.   And did he give you any feedback in the days

13  following about what the -- how the meeting had been

14  received by Jho Low or the Chinese or the ambassador?

15      A.   It was from -- Pras told me that Jho Low was happy

16  with the results of the meeting.

17      Q.   So after that point, after that meeting in early

18  July 2017, did you do anything else related to the Guo

19  matter in an effort to, again, facilitate the removal,

20  extradition, deportation of Guo back to China?

21      A.   No, not at all.

22      Q.   Did Michel continue to discuss the Guo matter with

23  you?  Did you understand that Mr. Broidy and possibly others

24  efforts were continuing to try and bring about the removal

25  of Mr. Guo back to China?

1      A.   Yes.  Pras continued to discuss it.  It was my

2   understanding, kind of generally, that yes things were still

3   progressing in order to extradite him.  It was a somewhat of

4   an uptick of that activity in terms of Pras talking about it

5   closer to the Chinese elections that were taking place, I

6   believe, in the early fall of 2017.

7      Q.   At some point along this time line, do you

8   remember Mr. Michel giving you an anecdote or explaining

9   just how connected Mr. Broidy was to the administration and

10   to the President?  And how he might be among a privileged

11   group that could obtain special access to the President?

12      A.   Right.  The way that Pras explained it to me,

13   which I assume he got that information from Mr. Broidy, is

14   that around the President was an inner sanctum of

15   individuals that all had a card or multiple cards to play,

16   and that at the right time they could cash in that card, so

17   to speak, for, you know, a political favor or whatever it

18   may be and that Elliott Broidy was one of those individuals,

19   that this was one of the cards he was playing in order to

20   get these two things handled.

21      Q.   And do you remember over this time frame

22   Mr. Michel ever talking to you or discussing meetings that

23   Mr. Broidy was able to set up for Chinese or Malaysian

24   officials with the President or DOJ officials?  Or meetings

25   that Mr. Broidy himself was having with officials or with

1    the President?  Any reference to those type of meetings that

2    you remember over this time frame?

3        A.   Towards the end of the summer, those conversations

4    picked up pretty significantly.  When I went to Hong Kong, I

5    was privy to some conversations about setting up a meeting

6    with the Malaysian Prime Minister in exchange for any number

7    of different business transactions and dealings that were

8    potentially contemplated.  In addition with regard to China,

9    if Guo was to be extradited, there were a number of things

10   that the Chinese government was willing to do and the

11   Malaysian -- well, with regard to Guo, the Chinese

12   government was willing to do in the event that he was

13   extradited.

14       Q.   You mentioned a trip to Macau, and I think Hong

15   Kong you mentioned at one point too.  So what trips or trip

16   did you take to Asia over this time frame related to Jho Low

17   and Guo?

18       A.   Only one trip.  We flew into Hong Kong and

19   immediately went to Macau from there.

20       Q.   And what happened once you got -- sorry, when was

21   this again roughly?  I think you said September?

22       A.   Yes.

23       Q.   2017?

24       A.   Yes, sir.

25       Q.   And what happened once you got to Macau?

1     A.   So, once again, I was very reluctant to go.  My

2    daughter was born earlier in the summer so I really didn't

3    want to leave my wife and, literally, my newborn daughter.

4    I was very concerned because after the meeting with -- after

5    the meeting at the Chinese Embassy, I was conducted by -- I

6    contacted by DOJ Internal Affairs.  I had a meeting at the

7    FBI Field Office where I explained everything that was going

8    on.  So I felt that it was just a very volatile kind of

9    situation, and it wasn't in my best interests to go.

10          Once again, Pras tends to be very convincing.  He

11    asked me to go.  He said, George, now I really need you on

12    this one.  So I ended up going.  I didn't fully understand

13    the purpose or need for me to be in Hong Kong to meet with

14    Jho Low until I got there.  And then it was more fully

15    explained what my role was to be.

16     Q.   Who else traveled with you or who else was present

17    for the meeting with Jho Low in Macau?

18     A.   Pras traveled with a lady friend, Joel Rousseau

19    was on the flight with us, and that was it.

20     Q.   And you said once you got there, you kind of had a

21    better understanding for what your role was.  What was your

22    understanding of your role once you got there?

23     A.   Well, Pras basically said to me, George, you and I

24    have known each other for a very long time, but that is not

25    the role I need you to play.  We know each other, but you

1    are one of Broidy's people; you are an emissary for Broidy.

2    And this is showing that Broidy is still very much

3    interested in this.  He's still very much working on the

4    issues that are taking place.

5              Clearly, Pras was having some conversations that I

6    wasn't privy to and setting me up in a way that I was on

7    Broidy's team, so to speak.  And because Broidy couldn't

8    travel, I was traveling on his behalf to try and work

9    something out.  The problem was a significant amount of

10   money had been transferred from the main time frame to now,

11   and not a lot in terms of the Guo matter nor in terms of the

12   Wolf of Wall Street matter had actually taken place.

13        Q.   There weren't a lot of results to show for -- to

14   show for Jho Low; is that right?

15        A.   On those -- yeah, on those two fronts.

16        Q.   So how did the meeting go?  Was Jho Low -- was he

17   dissatisfied, was he critical of the efforts?  What was the

18   meeting like?

19        A.   He was not outwardly dissatisfied with anything.

20   He didn't -- I didn't see any sense of that from him.  I

21   think that there was a reluctance on his part to continue

22   sending money.  And I think that there was an impasse

23   because on the Broidy, Pras side, obviously they wanted the

24   money to continue to come in.  He wanted results, and that

25   was creating an impasse.

1            So what I think what was trying to be resolved

2   with the meeting in Hong Kong and in Macau was is there a

3   way that additional money could be sent in a contingency

4   kind of situation, so that if results started to happen,

5   then more money would continue to flow.

6       Q.   And did you reach some kind of resolution as a

7   group during that meeting about the financial arrangements?

8       A.   Yes.  The resolution was that there was a company

9   that had a certain amount of assets, a Hong Kong based

10  company that had a certain amount of assets that would cover

11  any payments that needed to be made to Broidy and Pras and

12  that I was to be made executor, power of attorney over that

13  company.  And in the event that certain things started

14  happening on the two matters, then I would have power over

15  the bank account and power over the assets of the company

16  and that that would provide somewhat of a middle ground

17  comfort both to Jho Low that money was not immediately

18  dispersed, and to Pras and Broidy that in the event that

19  they were able to get done what they wanted, the money could

20  be moved quickly.

21      Q.   Prior to that meeting in Macau in September, do

22  you remember roughly how much money had come in to Anicorn,

23  Pras's company he had set up for this that we talked about

24  earlier?  How much money came into Anicorn from Jho Low

25  accounts during that summer before this trip to Macau?

1    A.   Not exactly.  I remember asking for an accounting

2    from Pras's money manager at the time.  I would say north of

3    50 million dollars.  Yeah, I would say north of 50 million

4    dollars.

5    Q.   And did any money continue to flow after this

6    meeting?

7    A.   Yes.

8    Q.   How much money came in after the meeting?

9    A.   I don't know how much money was sent to -- I can't

10   speak to specifically how much money was sent to Pras's

11   account.  But in my escrow account, I received the

12   equivalent of 35 million euro, which converted to roughly

13   about 41 million dollars U.S.

14   Q.   And it was your understanding that all of the

15   money from that summer and then the additional money that

16   flowed after this meeting in Macau was related to the

17   efforts for 1MDB and Guo; is that right?

18   A.   Yes.  And you can probably add in the meeting

19   with -- the facilitated meeting with the Malaysian Prime

20   Minister with the President which took place late summer,

21   early fall time frame.

22   Q.   Was it your understanding that one of the purposes

23   of that meeting between -- or setting up that meeting

24   between the Malaysian Prime Minister and the President was

25   to allow the Malaysian Prime Minister to raise the 1MDB

1   matter?

2       A.   Yes, definitely.  And because he was going to

3   be -- the Malaysian Prime Minister was up for election.  And

4   he felt that -- or the way that was conveyed to me is that

5   if he was having a meeting with the U.S. President, then it

6   would play well in front of his own electorate in Malaysia

7   to downplay the 1MDB scandal.

8       Q.   And you said during this meeting in Macau with

9   Pras and Jho Low, there was some reference, some discussion

10  to the meeting between the Malaysian Prime Minister and

11  President Trump?

12      A.   Yes.  So when I -- I had mentioned earlier that

13  after the trip to the Chinese Embassy, I was approached by

14  DOJ Internal Affairs, and I also met with a few FBI agents.

15  At that point in time, it was my understanding that this was

16  a national security kind of issue.  Obviously, meeting with

17  the Chinese ambassador, I can understand that.

18          When I heard about the proposed meeting that was

19  being set up with the Malaysian Prime Minister and the

20  President, immediately when I got back from Macau and Hong

21  Kong, I got in contact with the DOJ investigator and told

22  him that at a specific time and a specific date certain

23  things were going to happen.  And almost verbatim, those

24  things did, in fact, happen after I told him.

25      Q.   To be clear, you weren't acting at the

1    government's direction when you traveled to Macau.  You

2    weren't like an undercover, like a source working for the

3    government at that point?

4        A.   No, I was not.

5        Q.   You weren't making recordings of Pras.  You

6    weren't wearing a wire.  You weren't recording Jho Low.

7        A.   No, not in any capacity.

8        Q.   And to your knowledge, in all of Mr. Broidy's

9    efforts related to Guo and related to 1MDB, did you ever

10   learn of Mr. Broidy disclosing that he was actually acting

11   on behalf of Jho Low and was being paid millions of dollars

12   by Jho Low to lobby for these issues?

13       A.   I don't know whether or not he said specifically

14   he was working on behalf of Jho Low.  I do know that he was,

15   you know, anonymized from very early on in the process.

16       Q.   Did you -- were you aware of FARA during this time

17   period?

18       A.   I was.

19       Q.   And did you ever raise FARA with Pras Michel?

20       A.   On more than one occasion.

21       Q.   And what was the nature of those discussions?

22   What did you say, what did he say?

23       A.   Pras tends to be very cavalier about things and

24   dismissed it as, oh, no, we don't need to do that; that's

25   not necessary.  And I advised him, I'm reading the statute,

1    it seems like we're getting pretty close to this.

2         Q.   You were suggesting that the group should register

3    under FARA given the conduct that was happening?

4         A.   I was speaking specifically to Pras; Pras should

5    register.

6         Q.   Based on the activity that you understood Pras and

7    Broidy and others to be engaged in?

8         A.   Absolutely.

9         Q.   And Pras's response was dismissive.  We don't want

10   to do that; we don't need to do that?

11        A.   That is true, yes.

12        Q.   Mr. Higginbotham, we've covered a fair amount of

13   ground today, but is it fair to say that there were a lot of

14   conversations, a lot of communications, a lot of

15   interactions between you and Mr. Michel over this time

16   period between, say, February/March 2017 through

17   September/October 2017?

18        A.   We spoke all the time.

19        Q.   And so we haven't covered all of those

20   communications, all of the topics, all of the facts that

21   were occurring over this time period today, right?

22        A.   No, we haven't.  No.

23             MR. KELLER.  Do any of the grand jurors have any

24   questions for Mr. Higginbotham?

25             GRAND JUROR.  So you said that -- I'm confused,

1   when you got back from these trips, you talked with the FBI.

2   I mean, what did you say to them?  Did you not know -- was

3   it one of those casual, you went to this country, what did

4   you do?  Kind of going through this regular travel order, or

5   was this something specific?

6          And then the second time you had gotten the 35

7   million dollar transfer, did you say that to DOJ or --

8          WITNESS.   So from a timing perspective, when I

9   got back, just out of my understanding of what I thought the

10  investigation was about, I thought that it was important

11  that there were outside people that were having an influence

12  financially -- through financial means on being able to set

13  up this meeting with the Malaysian Prime Minister.  The

14  transfer of the 35 million didn't happen for a few days or

15  months after -- or not months, didn't happen until after

16  that meeting had taken place.

17          BY MR. KELLER:

18     Q.   If I could clarify, I think, with a couple of

19  questions.  After you went and met with the Chinese

20  ambassador, did you get a call from DOJ OIG to set up a

21  meeting to talk to you about why you had met with the

22  ambassador?

23     A.   Yes, I did.

24     Q.   And during the course of that meeting, did you get

25  the impression that DOJ OIG was at least investigating the

1    conduct or interested in the conduct?  In your meeting with

2    the ambassador and what was going on and why you would have

3    been meeting with the ambassador and trying to figure out

4    more information?

5         A.   Yes, definitely.

6         Q.   And then so was that the reason that when you got

7    back from Macau, you contacted DOJ OIG and/or FBI about what

8    you had learned in the meeting in Macau?

9         A.   The DOJ OIG person seemed seriously, significantly

10   interested in anything that may compromise the U.S.  And

11   I -- when I got back, I was concerned about some of the

12   things I had heard there, and I had an amicable relationship

13   with this particular OIG investigator.  I called him and I

14   said, listen, I'd like to sit down and tell you some things

15   that I heard while I was away.  We sat down very casually

16   and informally, and I told him that a certain number of

17   things were going to happen and the reasons why I thought

18   that those things were going to happen.  And, you know, he

19   said thank you for the information.

20        Q.   But you didn't get into all the details about the

21   money that had flowed in and who all was being paid and what

22   the financial relationships were and who Jho Low was and

23   things of that nature; is that right?

24        A.   No, not at all.

25        Q.   And then after that money came in, the 35 million

1    euro, shortly after that money came in, was it seized?

2         A.   That money was seized in January, I believe.

3         Q.   Of 2018?

4         A.   Of 2018, yes.

5         Q.   As part of the -- what you understood or what you

6    know now to have been the ongoing investigation into the

7    conduct?

8         A.   Exactly, yes.

9              GRAND JUROR.   Did you -- it sounded like you were

10   doing outside business activities.  Is that from -- justice

11   or was this -- is that something you had to report or --

12             WITNESS.   No, that was in violation of DOJ

13   policy.  So DOJ has a policy that if you are -- or anything

14   other than a practicing attorney, pretty much within the law

15   you can do.  You just cannot practice law outside of DOJ.

16             MR. KELLER.   Any other questions for

17   Mr. Higginbotham?  Yes?

18             GRAND JUROR.   So was there any -- sorry, was

19   there any concern or -- discussion -- sorry, concern or

20   discussion on your part with Pras Michel about private

21   citizens trying to get this man deported back to China on

22   behalf of the Chinese government?  I mean, like, was Pras

23   Michel concerned about that or --

24             WITNESS.   He didn't seem to be.  You know, he saw

25   an opportunity to -- he saw an opportunity to make a few

1   more dollars and significantly more money.  He seemed to

2   have the team already in place for the 1MDB matter that

3   might be able to do it.  And Jho Low seemed to be

4   comfortable in giving him that additional responsibility in

5   order for that to happen.

6           GRAND JUROR.  Another question.  So I think you

7   had said this -- say this.  When that money came into your

8   bank from a foreign entity, was that -- that was

9   immediately, that triggered immediately, a red flag for the

10  banks.  I mean, was the money seized immediately, or was it

11  explained away?  Or, what -- and if you're getting that

12  money, Pras is probably getting the money in an American

13  bank account --

14          WITNESS.  Well, the money was deposited into my

15  firms IOLTA account, which is designed to hold large sums of

16  money or hold money in escrow basically for clients.  I

17  wasn't asked about the purpose of the money in any real

18  official capacity for a number of weeks later.  When I

19  represented -- when I was asked about the nature of the

20  money and why all that money had come in, Pras is a

21  international, you know, widely recognized musician and that

22  kind of thing.  I worked in the music industry for a long

23  time, and I explained it as investment dollars for

24  entertainment ventures.

25          MR. KELLER.  Just to put a fine point on it, you

1    and Pras essentially came up with a cover story, with a lie,

2    to try and satisfy the banks that the money was legitimate?

3              WITNESS.   Yes.

4              GRAND JUROR.   Yeah, so in your testimony today

5    you talked about your -- with Pras --

6              COURT REPORTER.   I'm sorry, can you use the mic

7    please?

8              GRAND JUROR.   So, okay.   In your testimony --

9              COURT REPORTER.   You have to turn it on.

10             GRAND JUROR.   Oh, is it not on?   How's that?

11             How's that?   Is that better?   No.

12             All right, first time talking into these things.

13   So you talked about your interaction with Pras, right?   So

14   did you ever meet with or interact directly with Broidy?

15             WITNESS.   Never met with or interacted directly

16   with Broidy.

17             GRAND JUROR.   But they considered you his

18   surrogate in Hong Kong?

19             WITNESS.   Yes.   I found that out when I got to

20   Hong Kong.

21             GRAND JUROR.   So that was Pras setting you up as

22   the surrogate in Hong Kong?

23             WITNESS.   That was part of the subterfuge that

24   was going on, yes.

25             MR. KELLER.   All right.   Any additional

 1    questions?

 2              Okay.   Thank you, Mr. Higginbotham.   You can step

 3    down.

 4              WITNESS.    Thank you.

 5              (Whereupon, at 2:53 p.m., the witness was excused

 6    and was subsequently recalled at 2:55 p.m.)

 7              BY MR. KELLER:

 8        Q.   I will remind you that you are still under oath,

 9    Mr. Higginbotham.  And, I believe -- well, I can state the

10    questions as I understand it, and then if we need to

11    clarify, we can.

12              So was it your understanding that you were in

13    violation of DOJ policy by engaging in outside business as

14    part of this conduct?

15        A.   The way that I understood DOJ's code of ethics as

16    it applies to employees of DOJ is that employees of DOJ may

17    have outside businesses.  You may not, if you are an

18    attorney, one of those businesses cannot be representing

19    clients.  So if you, for example, if you have an outside

20    real estate business, my understanding is that's fine as

21    long as it doesn't have any interaction with DOJ.  If you

22    have an outside floral business, that's fine.  But if you

23    are an attorney, then even if you're not working as an

24    attorney in, you know, at DOJ, you still cannot practice law

25    outside of DOJ.

1    Q.   And whether it was, you know, without getting into

2    the technicalities of the policies that might apply or not,

3    I mean, do you understand and did you understand at least at

4    some point during the course of this activity, that given

5    that you and Pras and Mr. Broidy and Ms. Lum Davis were

6    engaged in this endeavor to help Jho Low with civil

7    forfeiture proceedings that were a DOJ action, that were a

8    DOJ -- part of a DOJ investigation, that it was probably not

9    appropriate for you to be working on behalf of Jho Low on

10   this matter?

11   A.   I knew that I was in some very, very precarious

12   waters.  And I tried to convince myself that, you know, I

13   was far enough distanced away from the actual activities of

14   lobbying to try to resolve the matters that, you know, you

15   convince yourself in your head, so to speak, that you're

16   within the guidelines, but I knew that I was, you know,

17   beyond where I should be, definitely.

18        MR. KELLER.   Any follow-up on that?  Okay.  Thank

19   you, Mr. Higginbotham.  You may step down.

20        (Whereupon, the witness was excused at 2:58 p.m.

21   on August 27, 2020.)

22

23

24

25

1                    *C E R T I F I C A T E*

2

3          We hereby certify that the foregoing is a true and

4    accurate transcript, to the best of our skill and ability,

5    from my notes of this proceeding.

6

7    September 24, 2020                    _Debbie Serio_
     Date                                 Debbie Serio

8                                         Transcriber

9

10

11   COURT REPORTER:                      _Roxanne Parsons_

12                                        Roxanne Parsons
                                          Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947