# EXHIBIT K

My name is Harry Litsky . I am a special agent with the U.S. Department of Justice , office of the Inspector General of Cyber Investigations Office . This interview is being conducted as part of an official investigation . Today's date is July 20 , 2017 . The time is 10 51 . This interview is being conducted at the RPK Justice Building in Washington , D.C. . Also present with me are Alicia Vasquez , also of the OIG Cyber Investigations Office , and George Higginbotham , senior congressional affairs specialist at the Department of Justice . So , Mr. Higginbotham , we may call you George , please . Thank you . You're here today as a subject to answer questions in official OIG investigation regarding allegations of insider threat . This is a security review furtherance of those allegations at this point . I'll read you the warnings for . Familiarize yourself with . You are being asked to provide information as part of an investigation being conducted by the Office of the inspector general . This investigation is being conducted pursuant to the inspector general act of 1978 as amended . This investigation pertains to insider threat security review . This is a voluntary interview . Accordingly , you do not have to answer questions . No disciplinary action will be taken against you if you choose not to answer questions . Any statement you furnish may be used as evidence in any future criminal proceedings where agency discipline or disciplinary proceeding or both . And the waiver portion of this score , if you so choose , as I understand the warnings and assurances stated above , and I am willing to make a statement and answer questions , no promises or threats have been made to me and no pressure or coercion of any kind has been used against me . If you would , sir , please just read over that form , ask any questions you may have and if you'd like to proceed . Well , go ahead . Sign our designated . OK , the form has been executed , thank you , before beginning in the statement on the recording . I will now place you under oath . So if you would , please raise your right hand by George Higginbotham , George Higginbotham hereby solemnly affirm , hereby , solemnly affirm that the statement which I'm about to make , that the signal that we ought to make shall be the truth and nothing but the truth shall be the truth and nothing but the truth . Thank you . For the record , I'm going to just ask you some personal and professional questions about your background , your name , please . George Alexander Higginbotham in your home address , city and state . My official address is one three zero eight Gallatin Street , Northwest Washington , D.C. , two zero zero one one . Thank you . Your title here at the department , senior congressional specialist who is going to be great . I became a 14 eight as of the last pay period and components . Are you currently assigned ? I work for the Office of Justice Programs , Office of Communications . I'm currently on the detail as an attorney advisor to the Office of Legislative Affairs . Your length of employment with the department ? I think I just made a year , but maybe a couple of days ago or coming . I can't remember exactly . So now your office telephone calls . I do not remember . Honestly , do you know your work cell phone ? I do not have it written down on my desk because I was only at OJP for about six months . And then down here I have it written down . Gachet I'm sure that your employer , Department of Justice , Justice and your office , 16 23 , the main justice building . Thank you . The others present when the statement is given . Harry Litsky Cyber Investigations Office Leesha of Assamese Cyber Investigations Office , both senior special . If at any time you need a recess , bathroom break water protocol for whatever it is , just let me know . We can pause recording and . OK , with that , we'll get started . Thank you very much again for your time this morning . Appreciate your . This can be an unexpected . To help us resolve this issue as best we can . I previously explained to you , I'll reiterate again for the recording , obviously , there was an event that took place that was . Potential concern in the department from a security standpoint and a potential insider threat standpoint , we were notified about that and asked to verify that there was there was no . Nefarious activity in conjunction with that in the event . Of course , I'm talking about his visit to the Chinese embassy . We cannot believe it was Sunday , July 16th , Sunday

afternoon , three o'clock . OK , so along those lines , I have a number of questions . Feel free to elaborate as is please . This is please do a much more productive , not just yes , no . And OK , if we have to , you know , extract information . So I'll ask questions . Just kind of start on the topic and feel free to elaborate with as much information as you can that you think will help us clear this up . Sure . OK . So with that said , why don't we just start ? I'll start out with just a couple of . Clear cut questions that I need to get answers to and then we can . We can delve into things , but please . OK . On Sunday , did you pass any DOJ material to the Chinese ? Absolutely not . Was any DOJ material involved in meeting with the Chinese ? Absolutely not . OK , good . Thank you . You brought your personal phone in with you . You did not have your department justice . I neither had my Department of Justice phone with me , nor did I have nor did I have my Department of Justice credentials , nor did I have my Department of Justice , even business card . Got a few questions ahead of you . That's great . Fantastic . You did have your personal phone with you . I did have my personal phone with me and I turned the phone off upon entering the facility . Do you now or did you then have any DOJ material and personal phone other than what might be ? Absolutely not . I do not have anything DOJ related on my personal phone in any kind of way whatsoever . The only with the caveat that with the birth of my child , I asked the Office of Human Resources to send me documentation to fill out that I have a new dependent on my insurance . Of course , that's the that you will find that on my my personal email account . Now , that's to be expected . And it was just because I was out of the office and I wanted to be in the process of that paperwork . Judge . It makes perfect sense . So would that would that be the case that this wasn't a DOJ driven meeting , that you were there to pass the department or U.S. government secrets to the Chinese , can you ? Run us through from start to finish . What this was , give us some context , some idea of what it was . Sure . We've established now what it was and we're all relieved to hear that . But can you elaborate on that comment ? Oh , most definitely . Just going back for for for a second . I'm an attorney advisor that's responsible for doing grants and liaising with Congress on grants . I have . So just to further answer that first question , I don't have anything that I possibly could pass on . I am not privy to any classified information . Even when I was working at USAID , the highest level of information that I ever was a party to was Espoo , which is sensitive but unclassified . And that only mostly had to do with internal agency , USAID agency , things that we just didn't want in the press or anything like that . So not only did I not pass on anything DOJ related that could compromise or anything US related that could compromise anything , I don't have any of that information to pass on . Just haven't been I don't have access to it . I have no reason to have access to it . With regard to the the the conversation , if you'd give me a little bit of latitude , I can explain . Sure . From the beginning . And actually I , I think probably most helpful if you could start with . You know , the genesis behind no problem to even . No problem as far back as you'd like . No problem to . Paint a clear picture . So before working for what you call before working for USAID , I worked in the music business . I was an attorney in the music business from where I graduated from law school in 2000 through 2009 when I started working for USAID in 2001 , 2002 timeframe , maybe 2003 . And then I met a gentleman by the name of Michel . He's a member of who ? He's formerly a member of the Fuji's . And I met him in a transactional matter , transactional framework , doing some legal work for him and that kind of thing over the course of the last , I guess that's what , 15 some years or whatever . We have continued to do business together . We've continued to maintain a friendship together . And we have , you know , work pretty closely on a number of issues . I have come to be somewhat of a confidant of his and a confidant of other people , because I've kind of developed the reputation of just being able to help solve problems when people are in the thick of things and notwithstanding the fact that I've begun working for the government , there are still people that call on

me , him being one of them . That's George . Listen , I need your help on this . The vast majority of the time it's not really in the capacity . It's more just how do I work through this particular issue or work through to this particular matter . He did approach me on some entertainment stuff going back . I mean , we've worked together off and on for years . And he did impress me on some entertainment stuff in November of last year . And then he called me and he said , I've got an issue with my business manager who I think is embezzling money from me . Can you just take a look at what's going on with this particular situation ? I got the information on the businessman or manager . I did some research on the business manager . I suggested him to him , a forensic accountant that I knew from the music business . And I suggested to him another individual that might be able to help him negotiate through some of the issues that were going on with his with his finances through that relationship and being very effective in trying to help him with that . He was like , well , I've got some other business stuff that's going on . Can you help me out with that stuff as well ? And I was like , all right , no problem . One of the things that I stress to him , though , from the very , very beginning was , listen , I cannot in any kind of way have what I do for the Department of Justice and what I do for you or anybody else that is similarly situated to you . Have there be any conflict of interest , period ? This is by 9:00 to 5:00 . I have a wife at that particular point in time . I knew I had a child on the way . I was like , listen , I can't I can't jeopardize what's going on at DOJ with any of the stuff that you're doing , period . Not not with it . I was like , OK , fine , no problem . There was another business . There was another business venture that he was looking at in terms of some exchange of commodities and that kind of thing overseas with some other partners that he has . He's approached all the time for various and sundry things . And so I oftentimes try to vet some of these things to make sure that they make it make appropriate sense . So that has been you know , that's been our relationship . We have a good relationship . We have a good working relationship in the matter with his in the matter with his business manager because of the services that I provided to him . You know , I do get paid . I'm not you know , I received funds for that and start . started moving , started moving forward . He asked me then more recently , he said that he was doing some business with some people in Asia . I was like , OK , no problem . I was under the impression , to be quite honest with you , that this was a real estate transaction , something having to do with that . That's what he did . That's the way that he had always suggested it . Then on Saturday , literally Saturday during the day , he gave me a call and he said , listen , can you take a meeting for me ? And I said , yeah , sure . You know , what's this ? What's this all about ? He's like , this is Saturday . Yeah , this is this past Saturday . So this whole transaction or event that we are now describing it as I knew nothing about it before Saturday , literally before Saturday , he calls me on Saturday and he says , listen , can you take a meeting for me ? And I was like , yeah , sure , no big deal . I mean , I've done stuff for him before . I represented him in various capacities and taking meetings for him because notwithstanding , he's a performer , he's an artist . He is a little bit reluctant to take on this newfound role . So he has gotten involved in more , I would say , political kinds of activities and that kind of thing . And , you know , I have no problem with that . I actually prefer doing that kind of stuff as opposed to the music industry stuff , because I'm quite tired of it . But because of his celebrity status and that kind of thing , he has access to people and I guess people , I don't know , trust him to figure out certain issues for him . It's always been a very productive relationship . As recently as last last couple of months , he invited me to a fund and a fundraiser , a awards ceremony where I had an opportunity to meet a few representatives and senators that were being what do called that were being interviewed . I mean , that they were being awarded prizes there in that capacity , handed out my DOJ business card representatives and such and such . I work for a while . I mean , yeah , I work for L.A. I have grant money . I know that you guys , what you call it , I know

that your constituents need it . Please feel free to reach out to me and that kind of thing . So it's never been any kind of nefarious , bad , negative kind of relationship at all . So you called me on Saturday and he said , listen , can you take a meeting for me ? And I was like , Yeah , sure . And I was like , what's this all about ? He's like , Well , I need you to meet with the ambassador of China . And I said . OK , what do you need me to be for with the ambassador , China is like , well , I'm working on this project and a message needs to be relayed to this person and , you know , I'd appreciate it if you could relay that message to . And I said , you know , that's really , really , really dicey . I'm not 100 percent comfortable with doing that . But if I do it , there has to be absolutely in no way am I representing am I representing the Department of Justice , that there can't be anything having to do with that whatsoever , as stated in any kind of way or whatever . I am doing a favor for you . I'm going in there on your behalf to relay a message to to to the to the to the to the ambassador . At first I didn't even really believe it because I was like , you know , how do you even set up a meeting with the ambassador at that point in time ? I didn't really think anything of it . He goes , you know , I'll call you back then . I was like , fine in talking with him . Since this has transpired . I asked him point blank . I said , did you say anything about DOJ in setting up this meeting ? And from what I understand , he said something like , yeah , you know , that's my boy , whatever he works for , DOJ Power Blog , etcetera , etcetera , etcetera . He gave my full name . I work for DOJ . I have a LinkedIn account that says I work for DOJ choosing to go , OK , I have a LinkedIn account that says I work for DOJ . It's my understanding that that information must have been communicated , obviously , to some representative at the Chinese embassy . From the conversation that I have with I can't remember her name , but the lady from the Office of Internal Bank gets paid . Well , what she told me is on Saturday evening she received a number of phone calls or from the Chinese embassy saying that who is this George Higgenbotham person that I did not know . One thing that I do want to show you on my phone , it's not going to come up on this thing . It looks as though she tried to get in contact with me on this phone , which I said was off because I was on paternity leave . It looks like she tried to get in contact with me on Saturday evening , which is the first phone call on the top there . It completely unbeknownst to me , I did not know so . At that point in time , I didn't know anything about this , I didn't know that they had communicated any information having to do with me being at DOJ or anything like that whatsoever . I spoke with him on Sunday morning . He told me what he what he told me on Sunday morning , oh , by the way , the meeting that we were talking about is at three o'clock this afternoon . And I'm like , dude , like we didn't even get . Passed , you know , yes , I would do it for anything like that , he just continued to move forward and clearly move forward on Sunday evening . I mean , sorry , clearly continue to move forward on Saturday evening completely . Unbeknownst to me , I did not know that this was being set up . I did not know about the meeting being confirmed until three o'clock until Sunday morning . At that point in time , I was like , dude , you put me in kind of a tough spot here . But as long as this doesn't have anything to do , OJ and I stress that because I do understand the sensitivities , particularly with the country that we're dealing with . I do understand the sensitivities . I was like , OK , so I was like , what do you want ? OK , what is so important that you need to tell me ? What he told me was , is that there is an immigration matter , that he's working with some people to try to resolve that there was what he wanted me to communicate was that there is progress on this immigration matter and that in the short course there's going to be a phone call between , I guess , representatives of the Chinese government and representatives of this government to work out the logistics on how that immigration matter is going to be resolved . I said , OK , that sounds simple enough , no problem , I can go and take the meeting , I went and called a number which I have . And if you would give me a moment , not a break for my own personal break , but I can give you the two business

cards that I received from the the people that I met with at the at the embassy . Yes , there are . In my office . Yeah , we do that . OK , no problem . I appreciate that . So and as it turns out , I think that one of the people is one of the people that made the phone call just by what Penghu said to me . I called the number that I was given to confirm the meeting on one occasion and then I got over in . That was that Saturday or Sunday there . This is Sunday . This Sunday during the day , actually Sunday , early afternoon . I called one person to confirm the meeting . I said specifically to them , is there any way that the meeting could be moved from the embassy because it at the embassy makes it seem like it's more official . And I wanted it to be less official . The person said , no , no , I think it's best that we have it at the embassy . I said , fine , no problem . I call that person again when I got in that area over in the Venice area because I didn't know exactly where it was . And you have to kind of walk up a hill and that kind of thing . So I had I went over there , I was greeted by a drive there , too . I dropped Pedro . Yeah . What time did you get there ? Early before you said the meeting was at ? The meeting was at 3:00 . So I would say maybe to 40 ish , something like that . I mean , at the end of the day , I'm still meeting with an ambassador . I don't want to be late . Sure . But just out of professional courtesy , I got there , called him . I said , can you just kind of guide me ? He said this next to the Singapore Embassy , found the Singapore embassy . Whatever walked up the hill went in . I was greeted by the gentleman and I have his business card that I guess set up the meeting or whatever the deal may be . There was another gentleman that I met as well who I don't remember his title , but it has to do with police something or another that I have his I have his business card . And then I was walked through the embassy to a conference room , not unlike this one . There was some small talk that ensued because they had pictures in the in the conference room of various meetings of Chinese leaders with presidents . And we talked about that . The person who set up the meeting with asked me , oh , so you're an attorney advisor ? And I said , I am an attorney advisor . Not here for that at all whatsoever . So that conversation was completely cut off . When they hand me my business , when they handed me their business cards , they asked me if I had a business card . The only business card that I have is the Department of Justice business card . I did not have them on my person whatsoever and I was like , no , I do not have any business cards . We sat down at the table . I communicated him that on this issue that supposedly is of great importance to them on this immigration issue , that things are moving forward , that the people that sent me here , basically the people that asked me to come here , wanted me to communicate that on this immigration issue it is moving forward and that there will be some phone call in the near future that will discuss the logistics of this particular phone call . At that point in time , they said , do you have any more information in terms of time frame ? Do you have any information , more information on whether or not it'll be you getting in contact ? And I said absolutely not . It will not be me . I do not have any more information on time frame . I don't have any more information on , you know , who or what . That is what I was you know , that's what I was asked to communicate to you . I communicated that . I said with that I really don't have anything else . I walked out the totality of the time that I was in the embassy was maybe 15 , 20 minutes , the totality of that conversation was a fraction of that . That was it . I walked out . It was it directly with the ambassador that was with the police person and the ambassador at . I was sure it was very short , and that's why that was the only reason that I had some what's the word I'm looking for ? That's the only reason why I had some level of comfort with having the conversation , because I was like and I even asked because I said . That's . Is he going to be mad at me that I wasted his time to bring that , to bring that information to him ? And the weird thing , though , was the ambassador seemed to be very receptive to it and was like , OK , thank you for your time . And that was it . Thank you for coming out on a Sunday afternoon . It was one of the questions I had . Why did that have to be

done in this case ? Your friend explained why he was choosing this way to go about it and why he did not explain why he was going about and why it could not have been communicated in a phone call . Obviously , they had what he called they had the ability to get in contact with the ambassador . So I don't know what the deal is with that . The the the when I asked him about that , his explanation was , quote unquote , press . Yes . When I asked him about that , his explanation was quote unquote , optics . That , you know , the the and I am in no way trying to cast aspersions on any body or culture or anything like that , but the way that it was explained to me is that the Chinese are very much oriented to appreciate optics . And so if an attorney , not a DOJ attorney , but an attorney walks in and says , you know , certain things and it's much better received , that's what I was told , I think capacity as an attorney . And no , I wouldn't say I did not . I mean , they asked me if I was an attorney I am licensed to practice with , you know , like I did your passport . They did not ask me for . I did they did not ask me for my date of birth . Biographical passport , no I.D. I did not go through any kind of security . They did not answer my phone . They did not do anything like that whatsoever in any kind of way . They expected you by name when you showed up afterwards . Yes , they were , yeah . Please just be thorough for the reasons we're here , so you pass it on . You didn't pass it . I don't mean I do not mean to . I don't mean to laugh . I'm I'm I'm being I'm being 100 percent I mean , I've had sleepless nights because I you know , I don't find myself in these situations ever . This I take very seriously , absolutely zero from DOJ , absolutely no thumb drives , no information , no nothing . I did not give as much as a piece of paper that is a business card to them . Nothing . Absolutely nothing . Ultimately , it ended up being a single sentence . Listen , this particular thing that you guys are concerned about , there are there's progress that's moving forward with it and that there should be there should be some conversation that's going to take place between appropriate people in the administration , your administration and whatever , and this one to to try to work through this particular issue . And the ambassador was interested to think he was receptive to what the investor the investor was receptive to it . He was like , OK , that is that is very good news . I said , OK , fine . Was he surprised in that context ? I mean , was was that kind of the first he was hearing about it ? Clearly not because . No , I mean , what do you mean by the first time you hear about it ? Was that , you know , expecta was like , you know , oh , that's great news that , you know , was that . Was he kind of waiting on no news or hoping ? I mean , I don't really realize I'm asking you about judges . Yeah , his demeanor , but his body language was very professional . It was not unlike yours . It was OK . That's good information . Thank you for that . Thank you for taking time away on a Sunday afternoon to come talk to me . Clearly , there are some other context that is involved with this that is completely unfamiliar to me . But he got definitely any idea where transcoding got the information . I mean , how he was it primitive ? That's really a question you should ask him . I really don't know . He didn't he didn't acknowledge it . You know , I mean , I know that he I know that that he has a number of contacts around the world , basically , and that he , you know , talks to various and sundry people . And the best that I know is that . He's probably the best person to answer that question . Yeah , I mean , I yeah , I don't know , I'm just leaving that alone . So it's OK , literally about . The status of the immigration issue . People from our government . People from our government , the U.S. government , the U.S. says , yes , people from our government would be . Contacting the Chinese government soon to discuss yes , today . That is what I guess . I'm say , if you're going to go through this weekend , everything I was , did you receive anything from them to this price ? Absolutely not . Absolutely not . I received nothing . I gave nothing in any kind of way , you know , sir . Is there another meeting scheduled ? Absolutely not . And I told him I told that to the to the ambassador that there is you know , you will probably never see me again . He asked me whether or not I would be the one , you know , facilitating this in some kind of way .

And I said absolutely not . And there was no expectation of that from from from Prouse or anything like that . This was , as far as I knew , a one off kind of conversation . And that was it done . Do you realize we're we're straying here did . If you indulge me . It sounds like Krause's had . Conversations with the ambassador before , do they know each other based on limited context ? I do not know that . I do not know . I really don't know . I I really don't think that he has any specific contacts with the ambassador . I think that maybe some of the people that he's working with have contacts with the ambassador or have had had contacts with the ambassador does . This is the president's proposal , does he travel ? Is there I mean , is he travels all the time everywhere . I don't know that he's traveled . Trying to think , I mean , because we're in pretty constant contact . I know that he has traveled to Asia recently . I don't know whether he's actually traveled to China recently , Gatch . So before we we were talking just kind of generally before we get to the Q&A . Yourself based ? Yeah , fairly unhappy would be an understatement . OK , yeah , fair enough . Have you discussed that with bras ? Oh yeah , OK . Oh yeah . I understand your concerns now . Oh , yeah , he will be putting you in a similar situation . The the and it's hard to explain outside of your individual knowledge of the music business , music business , to a certain extent , there's a lot about bravado , right ? I'm the best rapper in the world . I'm the best singer in the world . I can drive whatever car I want . I can have as many women as I want . I want whatever , blah , blah . It's about bravado . A lot of the music industry is based on perception versus reality . Right . And so it would not strike me as unusual if in this conversation or in this context , he would say something to the effect of , oh , yeah , yeah , that's my boy , blah , blah . He works for DOJ , you know , making the what's the word I'm looking for making the association larger than what it is . I am not a political appointee . I am not . I'm a civil servant . I don't hold some super high position in the Department of Justice where I have access to the attorney general on a regular basis or anything in any kind of way that has any kind of gravitas . And I don't mean to belittle the work that I do , but I in the grand scheme of things , what I do is not I work on grants and make sure that constituents from various representatives and senators , you know , get the grants that they need . I don't I don't do anything that is . Oh , DOJ , you know what I mean ? And I I'm believing and what he is telling me is that in that context he mentioned me , but I think that it was partly to provide gravitas . That is not supported by the position that I hold dear . Does that does that make sense for the Chinese ? No . Excuse me , the Chinese would not have known that . Right . Exactly . But even when I was in the informal conversation with and I like I said , I have the business cards , I can show them to you with the person who was kind of the facilitator of the meeting , who I spoke to on three occasions . When he asked me about being an attorney advisor , I said , dude , why didn't I do ? I said , this is not what I'm here for . I'm not I'm here to pass on a message and not to see you shut that down . Quickly , immediately , like I said , and I reiterate , I didn't take my phone , I did not take my DOJ credentials , neither my DOJ badge nor my my Senate , you know , up on the hill past , I did not take my business card when business cards were exchanged . I did not give my business card because I wanted there to be a very , very clear distinction between what I was doing , basically as a favor to a friend and the work that I do . I did not . And even as the conversation started , I said , I am not here on behalf of the administration . I am not here on behalf of the Department of Justice . I am not here on behalf of anything other than to communicate this information to you . And that's it absolutely did not have anything to do with the Department of Justice , did not have anything to do with the U.S. government . There was nothing . And I reiterate , because you have brought it up on more than one occasion , nothing was given from me to them . Nothing I received . There was no anticipated meeting afterwards . There has been no follow up afterwards . No one has called me . No one has gotten back in contact with me . I have not gotten back in contact with them . I expressed my

displeasure to prize to saying , you know , basically Whiskey Tango Foxtrot , like , seriously , dude , are you I mean , I'm getting phone calls from my job and I'm having some very , very uncomfortable conversations about this particular situation . What is going on ? He's a. he's that wasn't supposed to happen , I don't know why that happened . I'll get in contact with my people . I'll try to figure out what's going on . This at the other . And I was like , dude , seriously , at this particular point in time , I don't want you to do anything until I find out more from DOJ about what's going on . When I had the meeting at one o'clock with Penghu , I thought that I would have more information at that point in time . Mr Raemer , Sam Raemer came in about ten minutes before that meeting and said that that meeting was going to happen . The and then I haven't gotten any other information from anybody before today . I mean , looking into it , though , you didn't know how . I do , yes . And so even knowing that , why did you still proceed with meeting the ambassador to deliver ? Because I really there was nothing in the message that was in any way compromising of me or my position . There was no illegal information that was passed on . There was no nothing like that that was done . So I really thought to a certain extent that it was pretty innocuous . I did not think that it was that dangerous or that much of of of an issue . I mean , that's really it . Do you . know , it sounds like you're your . Your business association with the prize is just kind of one offs , arms , they just kind of ad hoc . I can you characterize it they go where I'm going with this . Sure . You know , I would hope , you know , we don't expect , you know , future . Incidents where he sets up other meetings with the same or other countries and puts you in the same position , I mean , are you guys you know , if you do your friends . But I got a friend . You know , I've been playing friends returnee's . When I have a question or two , I get , you know . Context that you described , I don't I'm not I'm not in any way trying to take a break . Right . But what I would like to do is go get something from my office as well as the cards and just bring them right back . And I will I want to give that to you , not give it to you , but let you guys see that so that you can see the kinds of things that I have done for him previously . I actually have it in the office . So , yeah , no , that's fine . If you just if you just give me a few moments , you can walk with me back to the office or whatever . I mean , so I'm just going to have to just announce the time . And you say we're positive . OK , it's now eleven , thirty five and we're going to pause recording . So Mr. Higgenbotham . Can can just go down to his office and retrieve some documents that will put context to my relationship with process . All right

.

**U.S. Department of Justice**
Office of the Inspector General

**MEMORANDUM OF INVESTIGATION**

| Case Number: | Reporting Office: |
|---|---|
| 2017-009920 | Cyber Investigations Office |

Interview of George Higginbotham

## Introduction

On January 3, 2018, Senior Special Agent Harry A. Lidsky and Assistant Special Agent in Charge Kenneth R. Dieffenbach, Department of Justice (DOJ), Office of the Inspector General (OIG), Cyber Investigations Office and Fraud Detection Office (FDO), respectively, interviewed DOJ employee George Higginbotham in OIG space located at 1401 S. Clark Street, Arlington, Virginia.

FDO Senior Forensic Auditor Elizabeth Gontarek and Federal Bureau of Investigation (FBI) Special Agents Rob Heuchling and Justin McNair monitored the interview in real-time through a remote audio/video system.

## Background

The interview commenced at approximately 1:25 p.m. and was conducted in the OIG interview room. The door to interview room was not locked, and is located off the main lobby to the office space, which was also unlocked.  Higginbotham sat closest to the door and there were no OIG personnel between him and the exit.  Previous portions of this interview were detailed and reported separately.  A portion of the previous interview was recorded.  Higginbotham was provided Garrity warnings and assurances prior to commencement of the initial interview, and was reminded that the conditions of the warnings and assurances remained in force during the second part of the interview, which he acknowledged (Attachment 1).

Parties took several breaks throughout the day and Dieffenbach permanently departed at approximately 7:30 p.m.  Heuchling and McNair joined the interview at approximately 6:00 p.m.  The interview concluded when Higginbotham left at approximately 7:45 p.m.

Higginbotham took several bathroom breaks throughout the afternoon, was offered water, protein bars and pizza, and at one point left OIG space unattended for approximately 30 minutes to get coffee or food as desired and then returned to the interview room.  Higginbotham was reminded of the voluntary nature of the interview upon his return, and that he was free to leave the space or terminate the interview at any time.

## Vehicle Search

At approximately 1:45 p.m., FDO Assistant Special Agent in Charge Andrew Hartwell came to the interview room after conducting a consent vehicle search of Higginbotham's BMW.  Higginbotham previously provided the OIG permission to search his vehicle via written consent on an OIG Consent to Search form (Attachment 2).  Hartwell seized an 8 ½ by 11 inch brown enveloped mailed on November 27, 2017 from Wealth Management Associated to the Higginbotham law firm.  The envelope was unopened and Higginbotham identified it as being from Mark Moscowitz and that he had not yet

| Special Agent Name and Signature: | Date: | Reviewer: |
|---|---|---|
| Kenneth R. Dieffenbach | January 31, 2018 | Keith A. Bonanno, SAC |

OIG Form III-207/2 (04/23/07)   This document contains neither recommendations nor conclusions of the IG. It is the property of the IG and is loaned to your agency; it and its contents are not to be distributed outside of your agency.

reviewed the material.

Hartwell also seized a black leather bag and Higginbotham and Dieffenbach reviewed its contents. Higginbotham identified and took possession of utility bills, a piece of mail related to Flatbridge Consulting, and other personal items and the OIG retained the remaining items.   Higginbotham explained that Flatbridge is a company that he established.  Two phones were also found in the bag and were retained for forensic examination.

## Anicorn

Higginbotham stated that a professional financial manager named Marc Moscowitz was engaged to create a company named Anicorn at Pras Michel's direction.  Higginbotham recommended Michel use Moscowitz as opposed to his former financial manager due to a falling out.  Barry Bekkedam was identified as having previously worked for Michel, but due to the deterioration in their relationship, Michel wanted to keep the Anicorn funds separate from Bekkedam.

## Pras Michel

Higginbotham stated that during 2017, Michel paid him $20,000, $50,000, and $100,000 for work related to both the entertainment platform they were developing and funds transfers related to Jho Taek Low.  He added that he never established a billing rate with Michel and does not submit invoices to him. According to Higginbotham, Michel pays him whatever and whenever Michel chooses.

Higginbotham began his involvement in the funds transfers in April or May of 2017.

## Anicorn Contract

When discussing a photo of a single page of a contract located on his phone in July 2017 (details reported separately), Higginbotham advised that it was a photo (Attachment 3) he took of a page from the first version of a contract that was provided from Low to Michel.  Higginbotham received the contract from Michel and believed it was an original because it was typed on a paper size that was common to Malaysia, but is not common in the U.S.  The size was described as being larger than letter sized but smaller than legal size.  Michel provided the document to Higginbotham and told him, "this is how we'll do it" and asked him to reformat the document into proper English style writing.

Higginbotham acknowledged having a copy of the document at his house, which was recovered during the consent search and is included as (Attachment 4).  Page two of the recovered document appeared to be identical to the photo on Higginbotham's phone, and also consistent with his statements.

## May 1, 2017 Anicorn Consulting Contract

Higginbotham was presented with a copy of a May 1, 2017 consulting contract (Attachment 5) and stated that Michel directed him to draft this document based on the aforementioned original that had been provided by Low (Attachment 4).

## Discussions with Michel

Higginbotham stated that he and Michel discussed that these funds transfers pursuant to the Anicorn contract were a "business opportunity" and that the bank compliance issue associated with it was a "side headache," because "we couldn't tell the banks what it was for."  Higginbotham later clarified that by business opportunity he meant a way to make money.

Michel told Higginbotham that the funds were Low's money and they discussed the need to move the money to the U.S. for influencing the "case."

Michel and Higginbotham also had several discussions about Higginbotham leaving DOJ to work fulltime for their new "platform" and they discussed salaries of $250,000 and $500,000 a year.

## Moscowitz E-Mail to City National

Higginbotham was asked about an e-mail sent by Marc Moscowitz to City National Bank in August 2017 and was presented with a copy for review (Attachment 6).  Higginbotham stated that he did not know the basis for the facts in this e-mail and that he did not read it at the time it was sent to him.  He stated that he never discussed this e-mail with Moscowitz or Michel.

Higginbotham added that if he read it he would have challenged it as being inconsistent with his understanding of the facts.  Higginbotham advised that he and Michel, together with Low, had come up multiple explanations and multiple documents to use to explain the money transfers to the banks, and that Moscowitz's explanation in the e-mail was not one of them.

## Anicorn Loan Agreement

When asked about an investor loan agreement between Lucky Mark and Anicorn that had been recovered during the investigation, Higginbotham reported that it was Michel's idea.  Higginbotham acknowledged signing the document and stated that it was another way to move Low's funds to the U.S. and "fool the bank" regarding the true source of the funds.  The loan agreement is included with this report as Attachment 7.

## Macau Trip

Higginbotham explained that in early September 2017 he traveled to Macau with Michel.  The trip was arranged by Michel who told Higginbotham that they needed to go to Macau to meet with Jho Low and discuss how to move money to the U.S.

Michel paid for the trip and he flew first class.  Higginbotham traveled in business class.  Upon their arrival in Malaysia they were met by an Asian woman in her 30's who served as Jho Low's assistant.  Higginbotham described the woman as unattractive and heavyset.  The party traveled to Macau by ferry and arrived at a hotel, possibly the Four Seasons, which was connected to a shopping mall.

The Macau trip was the only time Higginbotham has met with Low.  Higginbotham described Low as very worried about everything and added that he does not want to talk on the phone, get arrested, or do business with "bad people."

## Macau Discussions

Higginbotham explained that while in Macau, he, Low, Michel, and Joel Rousseau discussed transferring funds to the U.S. for two purposes.  First, to influence U.S. policy related to Guo Wengui, a Chinese national living in New York, NY.  Low was petitioning to have Guo returned to China.  Second, to influence a DOJ/FBI case against Low in order to have it dismissed or moved to a settlement.  Higginbotham described Rousseau as Low's "lackey" and stated that he remained silent during the entire meeting.

Higginbotham understood that the funds being transferred by Low were potentially to be paid to Eric Trump, Steve Wynn and Elliott Broidy, whom he referred to as the "influencers".  Higginbotham believes that a woman named Nikki is involved as she has connections to these individuals.  The $41 million Higginbotham previously admitted to receiving and holding was money set aside for the "influencers" if Guo was actually sent back to China.

Higginbotham recalled that he, Michel, and Low discussed that they needed to get funds into the U.S. and understood they would need to be able to explain to the banks what the source of the funds was and the reason for the transfers.  Michel and Low decided that they would use "consulting" and "entertainment" as the reasons for the transfer of funds.  Higginbotham stated that he told Michel "consulting" was too "wishy-washy".   Michel never told Higginbotham directly that Low directed the use of these categories, but Higginbotham believes that this was done to satisfy the bank's questions.

Higginbotham stated that he did not think this activity was money laundering because the source of the Guo money was likely the Chinese government.  Higginbotham believes that Low is under pressure from the Chinese government to get Guo extradited back to China and that he believes the original

source of the $41 million was the Chinese government.  He believes this because China, not Low, is most concerned about Guo's whereabouts and because Low expressed concern about having the $41 million returned if Guo was not returned to China.

Higginbotham stated that he thought money laundering was only if you knew the source of the funds was prohibited, such as a prostitution ring or a drug cartel.

During the September 2017 trip to see Low in Macau, Michel provided Higginbotham details about certain actions the Malaysian government would take with regard to the U.S. before they occurred. These actions would be made public following a meeting between President Trump and Malaysian Prime Minister Najib, which took place about a week after the meeting with Low.  Higginbotham presumed that Low provided the details to Michel.

Higginbotham added that on this trip to Macau he spent several days at his hotel, the attached shopping mall and restaurant and that he and Michel discussed several issues related to their entertainment platform and other entertainment business ventures.

## Fiduciary Discussion

At one point during the Macau trip, Low asked Higginbotham to be a "fiduciary" for him related to one of his companies, Red Rock IX.  Michel was present for this discussion.  Higginbotham agreed and signed a power of attorney form.  Higginbotham later contacted the International and Commercial Bank of China (ICBC) to try and obtain Low's account numbers and other information, but the bank refused to provide the information.  According to Higginbotham, no funds were actually moved related to this issue under his banking authority.  Higginbotham advised that he maintained documents from this meeting including a power of attorney to the Red Rock IX company and account documents he completed at ICBC.

Higginbotham indicated that both documents were executed by Low's proxy "PL", which he described as a person with a hard to pronounce ethnic name.  Higginbotham met with "PL" while in Macau at Low's direction.  Lidsky showed an electronic spelling of the name Phengphian Laogumnerd to Higginbotham and he confirmed this is the name of the person he met with and referred to as "PL." Higginbotham was provided a photo of Laogumnerd and further confirmed him as the person he had met and who had signed the documents.  Copies of the power of attorney and ICBC documents are included with this report as Attachment 8.

## September 27, 2017 Letter to City National

Higginbotham reviewed his September 27, 2017 letter to City National (Attachment 9) and explained that Michel did not likely read a draft of the letter before it went to the bank, but that he was courtesy

copied on the correspondence itself.

When asked about Lucky Mark, Higginbotham stated that he first heard/saw the name when he reviewed bank statements provided to him by Michel. He took it upon himself to lookup what he thought was the same company on the internet. Higginbotham found a souvenir company named Lucky Mark, and assumed it was the same as the one referenced. He was not aware of the slight misnomer between the two company names until being informed of it during the interview. A copy of Higginbotham's correspondence with City National is included with this report as Attachment 9.

## $41 Million Transfer

Higginbotham recounted that approximately two to three months ago Michel called him and stated that we are expecting funds to come in from Lucky Mark or Red Rock. Michel did not discuss what was to be done with the money. Higginbotham was surprised as he thought this issue (Guo) was dead because the Chinese election had passed and he believed that was some type of deadline.

Higginbotham stated that he received $41 million from Red Rock in October 2017. When he tried to deposit the funds into his Citibank attorney business account, the bank asked numerous questions about the source and purpose of the money. Higginbotham reported that he told them that the funds were related to "entertainment," which was not entirely true. Higginbotham acknowledged during the interview that some of these funds were earmarked for the Guo removal issue and were to be held in escrow per a contract he signed while in Macau. Higginbotham stated that he had a copy of the escrow contract as part of the document collection that would be located in his residence. The document was located during the search of his residence and is included with this report as Attachment 10.

Higginbotham added that in his personal e-mail account there is a message from an unknown individual with instructions about the $41 million. Higginbotham had never heard of this person before.

Since receiving the funds from Red Rock, Higginbotham sent $4.75 million to McKinney for a Super Bowl advertisement at Michel's direction. Higginbotham stated that he cautioned Michel about spending the money that he agreed would be held in escrow for resolution of the Guo issue, but that Michel instructed him to use the money anyway.

## Transfer of Funds to Morgan Stanley

In late September 2017, City National terminated its relationship with Michel and provided him with checks for the closing balance of funds in the account. Higginbotham and Michel engaged Ron Vinder at Morgan Stanley to setup a new account. In response to Vinder's questions about the source and purpose of funds, Higginbotham stated that Michel lied to Vinder in his responses, and acknowledged that he echoed Michel's lies during his own conversations with Vinder and failed to correct the record.

Shortly after beginning their relationship with Morgan Stanley, Higginbotham advised that Vinder told them he was uncomfortable with the answers provided in response to his questions about the origin and purpose of the money and advised them he was terminating their relationship. Higginbotham advised that Michel took the proceeds of the Anicorn account in the form of a check, and believed that he still had the check in his possession.

Higginbotham told Michel that they should expect similar problems if they attempted to engage with another bank. He said that this had all become a "crock of shit." He told Michel that the bank's questions were legitimate and that their answers were not "good enough." Higginbotham then told Michel that he would become Michel's "compliance chief" and that "this is making me very uncomfortable."

Michel and Higginbotham most recently engaged a banking representative from the Royal Bank of Canada branch in the Cayman Islands. In order to deposit the funds, Anicorn needed to be established as a business there first, and they were in the process of doing that.

## Summary of Actions

Higginbotham agreed with the OIG that his letter and statements to the banks were designed to try and hide the fact that this was Low's money and that he understood Low could not bank in the U.S. He added that he did not know of all the various transactions as they were occurring.

## Review of False Statements

Lidsky and Dieffenbach summarized the substantive false statements made to the various banks during the course of the money transfers between May 2017 and October 2017. Higginbotham concurred with the list and acknowledged they included the following events:

1. A call between Higginbotham and Michel and Vinder from Morgan Stanley. Higginbotham could not recall the date of the call but indicated he was in New York, NY with Michel when it took place. He believed it was on a Wednesday and believed it was the same day he purchased an Amtrak ticket. In the call Michel omitted that the funds were related to Low and indicated they were for entertainment and media consulting.
2. Higginbotham's September 2017 letter (via e-mail) to City National Bank claiming that Anicorn was helping represent Lucky Mark.
3. Moscowitz's e-mail to City National Bank claiming that Lucky Mark was a former investment company embroiled in a trademark infringement lawsuit.
4. Higginbotham's claims to Citibank that the $41 million was for consulting and entertainment.

## Previous Meetings

In reference to prior meetings with the OIG and FBI, Higginbotham stated that he had asked both agencies months ago "what do you want me to do about this" when he originally explained portions of the activity that was transpiring.  He claimed that since he received no reply with regard to guidance for action that he did not think there were any issues.  He said that he was left with the impression that the government did not care what he was doing.

## Attachments

1. Garrity warning form signed by Higginbotham
2. Consent to search vehicle/residence form signed by Higginbotham
3. Photo of page 2 of Anicorn contract
4. Original Anicorn contract provided by Low
5. Edited version of the Anicorn contract drafted by Higginbotham at Michel's direction
6. Moscowitz e-mail to City National Bank
7. Investor Loan Agreement signed by Higginbotham
8. Red Rock IX Power of Attorney and ICBC documents
9. Higginbotham e-mail to City National Bank
10. Escrow Agreement signed by Higginbotham

# ATTACHMENT 1

# UNITED STATES DEPARTMENT OF JUSTICE
## Office of the Inspector General

### WARNINGS AND ASSURANCES TO EMPLOYEE REQUESTED
### TO PROVIDE INFORMATION ON A VOLUNTARY BASIS

You are being asked to provide information as part of an investigation being conducted by the Office of the Inspector General.  This investigation is being conducted pursuant to the Inspector General Act of 1978, as amended.

This investigation pertains to:   Fraud

This is a voluntary interview.  Accordingly, you do not have to answer questions.  No disciplinary action will be taken against you if you choose not to answer questions.

Any statement you furnish may be used as evidence in any future criminal proceedings or agency disciplinary proceeding, or both.

### WAIVER

I understand the warnings and assurances stated above and I am willing to make a statement and answer questions.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

_____
Office of the Inspector General
Special Agent

_____
Witness        Dieffenbach

_____
Time        0927

_____
Employee's Signature        9.27.2018   9:22 Am

_____
Date

_____
Place        0927        Crystal City, VA

OIG Form III-226/2 (04/23/07) *Non-Custodial/Employee*

# ATTACHMENT 2

# United States Department of Justice
## Office of the Inspector General

**Consent to Search Premises/Vehicle**

I have been informed of my constitutional right not to have a search made of the premises/vehicle hereinafter specified without a search warrant.

I have also been informed of my right to refuse to consent to the premises/vehicle being searched without a search warrant.

I have been warned that anything discovered during such a search may be used against me in a criminal or administrative proceeding.

I hereby authorize Special Agent(s) Harry Lidsky and any other officer of the United States Department of Justice Office of the Inspector General (OIG) to conduct a complete search of my:

☑ Premises located at 1308 Gallatin Street, Washington, DC 20011
   *Address of premises to be searched*

☑ Vehicle  Silver BMW M5
   *Make, model, and license plate number of vehicle to be searched*

I have given this authorization to the above-named OIG agent(s) voluntarily and without threats, promises, or coercion of any kind.

_____
*Signature*

Date and hour:  1/3/17   12:07

Place:  1401 S. Clark St.  Arlington, VA

Witnesses:  _____ Dieffenbach
            _____ Lidsky



# United States Department of Justice
# Office of the Inspector General

## Consent to Search Computer/Electronic Equipment

I, George Higginbotham                    , have been asked to give my consent to the search of my computer/electronic equipment. I have also been informed of my right to refuse to consent to such a search. I have been informed that I have a right not to have my computer/electronic equipment searched without a search warrant.

I, hereby authorize Harry Lidsky                              and any other person(s) designated by the Department of Justice Office of the Inspector General to conduct at any time a complete search of:

☒   All computer/electronic equipment located at 1308 Gallatin Street, NW, Washington, DC 20011

These persons are authorized by me to take from the above location: any computer hardware and storage media, including internal hard disk drive(s), floppy diskettes, compact disks, scanners, printers, other computer/electronic hardware or software and related manuals; any other electronic storage devices, including but not limited to, personal digital assistants, cellular telephones, and electronic pagers; and any other media or materials necessary to assist in accessing the stored electronic data.

☒   The following electronic devices:

Description of computer, data storage device, cellular telephone, or other device (make, model, and serial number, if available)

> All computers, drives, electronic storage devices including my MacBook
> located at OJP Rm 8111 @ 810 7th Street, Washington, DC.
>
> My personal cell phones (616-272-0027 (old & new)
>              code 0863
>
> ↓DOJ Phone & Laptop

I certify that I own, possess, control, and/or have a right of access to use these devices and all information found in them. I understand that any contraband or evidence on these devices may be used against me in a criminal, civil, or administrative proceeding.

I relinquish any constitutional right to privacy in these electronic devices and any information stored on them. I authorize the Department of Justice Office of the Inspector General to make and keep a copy of any information stored on these devices.

I understand that any copy made by the Department of Justice Office of the Inspector General will become the property of the Department of Justice Office of the Inspector General and that I will have no privacy or possessory interest in the copy.

This written permission is given by me voluntarily. I have not been threatened, placed under duress, or promised anything in exchange for my consent. I have read this form; it has been read by me; and I understand it. I understand the English language and have been able to communicate with agents/officers.

I understand that I may withdraw my consent at any time. I may also ask for a receipt for all things turned over.

Signed: George Higginbotham          Signature of Witnesses: _____

Date and Time: 1/13/18      1308          _____ Dieffenbach

OIG FORM 233/4 (03/23/2012)

# ATTACHMENT 3

- **Client's Representative:** Anicorn shall take all direction from the Client's nominated representative(s) unless and until notified that the representative has been duly and properly relieved of such authority. All bills shall be sent to the Client representative's advised mailing or e-mail address.

- **Fixed Fees:**

  - **Retainer Fee:** To commence our representation, Anicorn requires the deposit of a non-refundable retainer fee of Nineteen Million (EUR 19,000,000.00) Euros as per the schedule below into the Anicorn's Euro bank account pursuant to the wire instructions to be provided.

    | By 9 May 2017 | : | EUR 2,000,000.00 |
    |---|---|---|
    | By 19 May 2017 | : | EUR 2,000,000.00 |
    | By 26 May 2017 | : | EUR 2,500,000.00 |
    | By 2 June 2017 | : | EUR 2,500,000.00 |
    | By 9 June 2017 | : | EUR 2,500,000.00 |
    | By 16 June 2017 | : | EUR 2,500,000.00 |
    | By 23 June 2017 | : | EUR 2,500,000.00 |
    | By 30 June 2017 | : | EUR 2,500,000.00 |

  - **Success Fee:** Client shall pay Anicorn a Success Fee of Two Hundred and Eighty Million (EUR 280,000,000.00) Euros into the Anicorn's bank account as per the schedule below, when the Matters below are achieved on the Matter no later than 31 September 2017 as a result of Anicorn's work done and/or efforts taken:

    The US Department of Justice ("USDOJ"), US Federal Bureau of Investigations ("FBI") and any other relevant US Government agencies, and Swiss, Singapore, Luxembourg authorities by way of an official notification and/or agreement to drop all civil and/or criminal cases and/or cease investigations and/or removal of any INTERPOL Red Notice (or other forms of international notices and/or actions) by 31 September 2017 within the USA, Switzerland, Singapore, Luxembourg or internationally against Mr. Low Taek Jho ("LTJ") and related family, Mr. Tan Kim Loong ("TKL") and related family, and Mr. Riza Aziz ("RA") and related family, Loo Ai Swan / Jasmine ("LAS") and any assets or companies related to LTJ, TKL, RA and their related families, and LAS with: (a) no wrongdoing whatsoever; (b) no admission of guilt; (c) no forfeiture of any further assets other than previous artworks directly owned by LTJ (and not Trusts in which LTJ and/or his family is a beneficiary of) that have already been seized in Switzerland. Known as the "Matter")

    | By 3 October 2017 | : | EUR 2,000,000.00 |
    |---|---|---|
    | By 6 October 2017 | : | EUR 139,000,000.00 |
    | By 11 October 2017 | : | EUR 139,000,000.00 |

2

# ATTACHMENT 4



ANICORN, LLC
[Insert Address]

May 1, 2017

TYCOON TALENT LIMITED
Sertus Chambers, Suite F24,
First Floor, Eden Plaza, Eden Island,
PO Box 334, Mahe, Seychelles

Re:         **Fee Agreement**
Dear Sirs,

This letter constitutes a formal Agreement between you, Tycoon Talent Limited (hereinafter referred to as "You" or "Client") and Anicorn, Inc., a corporation incorporated in NY or CA, and doing business in, the State of California (hereinafter referred to as "Anicorn"), regarding the global brand development, global public relations, global strategic consulting and global all-encompassing risk management and resolution services that Anicorn will provide to your nominated third party persons and/or companies and/or assets and, when executed by You, constitutes our understanding and agreement with respect to the determination and payment of fees incurred by You in connection with Anicorn's representation of You.

This letter sets forth our understanding of the terms, conditions and limitations of our engagement and representation for all work that the Anicorn undertakes on your behalf. Please review this letter carefully so that we will have a common understanding with regard to our respective obligations.

- <u>Services to be Provided by Anicorn:</u>   Anicorn is engaged in the business of providing, global brand development, global public relations, global strategic consulting and global all-encompassing risk management and resolution services to private and corporate clientele who are require effective and efficient solutions to highly complex and highly confidential matters. Anicorn will shall execute, implement, identify, retain, and coordinate all services reasonably required to represent Client in connection with the matters (the "Matter") described below. Anicorn has no obligation to give advice to or represent Client with respect to additional matters not related to the Matter.

- <u>Personnel:</u> The Client acknowledges that the services the Anicorn or its professionals perform on the Matter may not be performed by any one person. Anicorn reserves the right to designate any of its professionals to perform or handle any and all tasks or aspects of the Matter. Finally, Anicorn reserves the right to engage one or more consultants on the Matter. All fees payable to such consultants shall come from the Retainer Fee and/or if applicable, the Success Fee described below. There shall be no other fees payable by the Client other than the Retainer Fee and/or if applicable, the Success Fee described below. Anicorn will be primarily responsible for supervising the Matter and shall in consultation with the Client determine which professionals shall perform any particular services which are not part of Anicorn.

1

- <u>Client's Representative:</u> Anicorn shall take all direction from the Client's nominated representative(s) unless and until notified that the representative has been duly and properly relieved of such authority. All bills shall be sent to the Client representative's advised mailing or e-mail address.

- <u>Fixed Fees:</u>

  - <u>Retainer Fee:</u> To commence our representation, Anicorn requires the deposit of a non-refundable retainer fee of Nineteen Million (EUR 19,000,000.00) Euros as per the schedule below into the Anicorn's Euro bank account pursuant to the wire instructions to be provided.

    | By 9 May 2017 | : | EUR 2,000,000.00 |
    |---|---|---|
    | By 19 May 2017 | : | EUR 2,000,000.00 |
    | By 26 May 2017 | : | EUR 2,500,000.00 |
    | By 2 June 2017 | : | EUR 2,500,000.00 |
    | By 9 June 2017 | : | EUR 2,500,000.00 |
    | By 16 June 2017 | : | EUR 2,500,000.00 |
    | By 23 June 2017 | : | EUR 2,500,000.00 |
    | By 30 June 2017 | : | EUR 2,500,000.00 |

  - <u>Success Fee:</u> Client shall pay Anicorn a Success Fee of Two Hundred and Eighty Million (EUR 280,000,000.00) Euros into the Anicorn's bank account as per the schedule below, when the Matters below are achieved on the Matter <u>no later than 31 September 2017</u> as a result of Anicorn's work done and/or efforts taken:

    **The US Department of Justice ("USDOJ"), US Federal Bureau of Investigations ("FBI") and any other relevant US Government agencies, and Swiss, Singapore, Luxembourg authorities by way of an official notification and/or agreement <u>to drop all civil and/or criminal cases and/or cease investigations and/or removal of any INTERPOL Red Notice (or other forms of international notices and/or actions)</u> by 31 September 2017 within the USA, Switzerland, Singapore, Luxembourg or internationally against Mr. Low Taek Jho ("LTJ") and related family, Mr. Tan Kim Loong ("TKL") and related family, and Mr. Riza Aziz ("RA") and related family, Loo Ai Swan / Jasmine ("LAS") and any assets or companies related to LTJ, TKL, RA and their related families, and LAS with: (a) no wrongdoing whatsoever; (b) no admission of guilt; (c) no forfeiture of any further assets other than previous artworks directly owned by LTJ (and not Trusts in which LTJ and/or his family is a beneficiary of) that have already been seized in Switzerland. (known as the "Matter")**

    | By 3 October 2017 | : | EUR 2,000,000.00 |
    |---|---|---|
    | By 6 October 2017 | : | EUR 139,000,000.00 |
    | By 11 October 2017 | : | EUR 139,000,000.00 |

2

- _Type of Funds:_ All funds used to pay the Retainer Fee and the Success Fee must be lawfully received funds of Client and shall in no event be any funds that are in dispute relating to the Matter.

- _Wire Transfer Instructions:_ Anicorn is to provide Euro wire accounts details to the Client.

- _Billings:_ Anicorn will send the Client an invoice for the Retainer Fees and if applicable, the Success Fees. The amount set forth on the invoice will be due on receipt, but in no event later than 30 days from receipt. Interest at the rate of 10% per annum will be payable by Client on any balance that remains unpaid 30 days after the date the Client receives the invoice.

- _Disclaimer:_ Anicorn has made no promises or guarantees to Client concerning the outcome of the Matter, and nothing in this Agreement shall be construed as such a promise or guarantee.

- _Taxes:_ Anicorn will bear its own taxes for all Retainer Fees and if applicable, the Success Fees received. Except as expressly set forth herein, Anicorn has not been engaged to provide any tax advice to Client with respect to this or any other matter, and Anicorn specifically disclaims any responsibility therefore.

- _Termination of Services:_

  - Client shall have the right at any time to terminate Anicorn's services upon written notice sent by registered mail to Anicorn's address provided above, and Anicorn shall immediately after receiving such notice cease to render additional services. Such termination shall not, however, relieve Client of the obligation to pay the fees due for services that have been rendered if such fees have been earned in accordance with this Agreement.

  - If Client fails to meet any of Client's obligations under this Agreement and/or if Anicorn and Client are unable to resolve their differences with respect to any disputed invoices, then Anicorn shall have the right to terminate this Agreement.

  - If Anicorn fails to meet any of Anicorn's obligations under this Agreement, then Client shall have the right to terminate this Agreement with no fees due.

- _Enforcement of Terms:_  The parties agree that this Agreement was accepted and performed by all parties in the City and County of Los Angeles, State of California, and will in all respects be interpreted, enforced and governed under and pursuant to the laws of the State of California, without regard to the laws pertaining to conflicts or choice of law principles. Client further agrees that any and all disputes between the parties, which pertain in any way to the services hereunder, must be resolved through binding arbitration, before a single, neutral arbitrator in Los Angeles County, selected from a panel of arbitrators among either Judicial Arbitration and Mediation Services ("JAMS") or ADR Services, Inc., aka ADR Services, at the option of the party initiating a request for arbitration, the selection to

3

be made by the non-initiating party among five (5) arbitrators proposed by the party initiating arbitration. Such panel must be proposed by the party initiating arbitration within five (5) days of initiating arbitration and the non-initiating party shall make his/her/its selection no later than fifteen (15) days following initiation of the arbitration; should the non-initiating party fail to make his/her/its selection within the time set forth herein, the initiating party shall be entitled to choose the arbitrator from the five proposed arbitrators. There shall be no right to pre-arbitration discovery. All arbitration costs shall be initially borne equally by the parties. Nothing herein shall limit or waive any right to seek a provisional remedy, including a writ of attachment, in a court of competent jurisdiction located within the County of Los Angeles, State of California.

- Retention of Records: Anicorn hereby discloses that it is the policy of Anicorn to retain files relating to the Matter for no more than one (1) year after conclusion of the Matter. Anicorn shall provide Client with an opportunity to obtain said files, but if Client declines then Anicorn shall have the right to destroy same.

[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Sincerely,
ANICORN, INC.

By: _____
    Authorized Signatory
    ("Anicorn")


AGREED and ACCEPTED for and on behalf of TYCOON TALENT LIMITED

By: _____
    Authorized Signatory
    ("Client")

ANICORN, LLC
[Insert Address]

May 1, 2017

TYCOON TALENT LIMITED
Sertus Chambers, Suite F24,
First Floor, Eden Plaza, Eden Island,
PO Box 334, Mahe, Seychelles

Re:          **Fee Agreement**
Dear Sirs,

This letter constitutes a formal Agreement between you, Tycoon Talent Limited (hereinafter referred to as "You" or "Client") and Anicorn, Inc., a corporation incorporated in NY or CA, and doing business in, the State of California (hereinafter referred to as "Anicorn"), regarding the global brand development, global public relations, global strategic consulting and global all-encompassing risk management and resolution services that Anicorn will provide to your nominated third party persons and/or companies and/or assets and, when executed by You, constitutes our understanding and agreement with respect to the determination and payment of fees incurred by You in connection with Anicorn's representation of You.

This letter sets forth our understanding of the terms, conditions and limitations of our engagement and representation for all work that the Anicorn undertakes on your behalf. Please review this letter carefully so that we will have a common understanding with regard to our respective obligations.

*   <u>Services to be Provided by Anicorn:</u>   Anicorn is engaged in the business of providing, global brand development, global public relations, global strategic consulting and global all-encompassing risk management and resolution services to private and corporate clientele who are require effective and efficient solutions to highly complex and highly confidential matters. Anicorn will shall execute, implement, identify, retain, and coordinate all services reasonably required to represent Client in connection with the matters (the "Matter") described below. Anicorn has no obligation to give advice to or represent Client with respect to additional matters not related to the Matter.

*   <u>Personnel:</u> The Client acknowledges that the services the Anicorn or its professionals perform on the Matter may not be performed by any one person. Anicorn reserves the right to designate any of its professionals to perform or handle any and all tasks or aspects of the Matter. Finally, Anicorn reserves the right to engage one or more consultants on the Matter. All fees payable to such consultants shall come from the Retainer Fee and/or if applicable, the Success Fee described below. There shall be no other fees payable by the Client other than the Retainer Fee and/or if applicable, the Success Fee described below. Anicorn will be primarily responsible for supervising the Matter and shall in consultation with the Client determine which professionals shall perform any particular services which are not part of Anicorn.

1

- **Client's Representative:** Anicorn shall take all direction from the Client's nominated representative(s) unless and until notified that the representative has been duly and properly relieved of such authority. All bills shall be sent to the Client representative's advised mailing or e-mail address.

- Fixed Fees:

  - **Retainer Fee:** To commence our representation, Anicorn requires the deposit of a non-refundable retainer fee of Nineteen Million (EUR 19,000,000.00) Euros as per the schedule below into the Anicorn's Euro bank account pursuant to the wire instructions to be provided.

    | By 9 May 2017   | : | EUR 2,000,000.00 |
    |-----------------|---|------------------|
    | By 19 May 2017  | : | EUR 2,000,000.00 |
    | By 26 May 2017  | : | EUR 2,500,000.00 |
    | By 2 June 2017  | : | EUR 2,500,000.00 |
    | By 9 June 2017  | : | EUR 2,500,000.00 |
    | By 16 June 2017 | : | EUR 2,500,000.00 |
    | By 23 June 2017 | : | EUR 2,500,000.00 |
    | By 30 June 2017 | : | EUR 2,500,000.00 |

  - **Success Fee:** Client shall pay Anicorn a Success Fee of Two Hundred and Eighty Million (EUR 280,000,000.00) Euros into the Anicorn's bank account as per the schedule below, when the Matters below are achieved on the Matter <u>no later than 31 September 2017</u> as a result of Anicorn's work done and/or efforts taken:

    **The US Department of Justice ("USDOJ"), US Federal Bureau of Investigations ("FBI") and any other relevant US Government agencies, and Swiss, Singapore, Luxembourg authorities by way of an official notification and/or agreement <u>to drop all civil and/or criminal cases and/or cease investigations and/or removal of any INTERPOL Red Notice (or other forms of international notices and/or actions)</u> by 31 September 2017 within the USA, Switzerland, Singapore, Luxembourg or internationally against Mr. Low Taek Jho ("LTJ") and related family, Mr. Tan Kim Loong ("TKL") and related family, and Mr. Riza Aziz ("RA") and related family, Loo Ai Swan / Jasmine ("LAS") and any assets or companies related to LTJ, TKL, RA and their related families, and LAS with: (a) no wrongdoing whatsoever; (b) no admission of guilt; (c) no forfeiture of any further assets other than previous artworks directly owned by LTJ (and not Trusts in which LTJ and/or his family is a beneficiary of) that have already been seized in Switzerland. (known as the "Matter")**

    | By 3 October 2017  | : | EUR 2,000,000.00   |
    |--------------------|---|--------------------|
    | By 6 October 2017  | : | EUR 139,000,000.00 |
    | By 11 October 2017 | : | EUR 139,000,000.00 |

2

- Type of Funds: All funds used to pay the Retainer Fee and the Success Fee must be lawfully received funds of Client and shall in no event be any funds that are in dispute relating to the Matter.

- Wire Transfer Instructions: Anicorn is to provide Euro wire accounts details to the Client.

- Billings: Anicorn will send the Client an invoice for the Retainer Fees and if applicable, the Success Fees. The amount set forth on the invoice will be due on receipt, but in no event later than 30 days from receipt. Interest at the rate of 10% per annum will be payable by Client on any balance that remains unpaid 30 days after the date the Client receives the invoice.

- Disclaimer: Anicorn has made no promises or guarantees to Client concerning the outcome of the Matter, and nothing in this Agreement shall be construed as such a promise or guarantee.

- Taxes: Anicorn will bear its own taxes for all Retainer Fees and if applicable, the Success Fees received. Except as expressly set forth herein, Anicorn has not been engaged to provide any tax advice to Client with respect to this or any other matter, and Anicorn specifically disclaims any responsibility therefore.

- Termination of Services:

  - Client shall have the right at any time to terminate Anicorn's services upon written notice sent by registered mail to Anicorn's address provided above, and Anicorn shall immediately after receiving such notice cease to render additional services. Such termination shall not, however, relieve Client of the obligation to pay the fees due for services that have been rendered if such fees have been earned in accordance with this Agreement.

  - If Client fails to meet any of Client's obligations under this Agreement and/or if Anicorn and Client are unable to resolve their differences with respect to any disputed invoices, then Anicorn shall have the right to terminate this Agreement.

  - If Anicorn fails to meet any of Anicorn's obligations under this Agreement, then Client shall have the right to terminate this Agreement with no fees due.

- Enforcement of Terms:  The parties agree that this Agreement was accepted and performed by all parties in the City and County of Los Angeles, State of California, and will in all respects be interpreted, enforced and governed under and pursuant to the laws of the State of California, without regard to the laws pertaining to conflicts or choice of law principles. Client further agrees that any and all disputes between the parties, which pertain in any way to the services hereunder, must be resolved through binding arbitration, before a single, neutral arbitrator in Los Angeles County, selected from a panel of arbitrators among either Judicial Arbitration and Mediation Services ("JAMS") or ADR Services, Inc., aka ADR Services, at the option of the party initiating a request for arbitration, the selection to

3

be made by the non-initiating party among five (5) arbitrators proposed by the party initiating arbitration. Such panel must be proposed by the party initiating arbitration within five (5) days of initiating arbitration and the non-initiating party shall make his/her/its selection no later than fifteen (15) days following initiation of the arbitration; should the non-initiating party fail to make his/her/its selection within the time set forth herein, the initiating party shall be entitled to choose the arbitrator from the five proposed arbitrators. There shall be no right to pre-arbitration discovery. All arbitration costs shall be initially borne equally by the parties. Nothing herein shall limit or waive any right to seek a provisional remedy, including a writ of attachment, in a court of competent jurisdiction located within the County of Los Angeles, State of California.

- Retention of Records: Anicorn hereby discloses that it is the policy of Anicorn to retain files relating to the Matter for no more than one (1) year after conclusion of the Matter. Anicorn shall provide Client with an opportunity to obtain said files, but if Client declines then Anicorn shall have the right to destroy same.

[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

4

ANICORN, LLC
[Insert Address]

May 1, 2017

TYCOON TALENT LIMITED
Sertus Chambers, Suite F24,
First Floor, Eden Plaza, Eden Island,
PO Box 334, Mahe, Seychelles

Re:          **Fee Agreement**
Dear Sirs,

This letter constitutes a formal Agreement between you, Tycoon Talent Limited (hereinafter referred to as "You" or "Client") and Anicorn, Inc., a corporation incorporated in NY or CA, and doing business in, the State of California (hereinafter referred to as "Anicorn"), regarding the global brand development, global public relations, global strategic consulting and global all-encompassing risk management and resolution services that Anicorn will provide to your nominated third party persons and/or companies and/or assets and, when executed by You, constitutes our understanding and agreement with respect to the determination and payment of fees incurred by You in connection with Anicorn's representation of You.

This letter sets forth our understanding of the terms, conditions and limitations of our engagement and representation for all work that the Anicorn undertakes on your behalf. Please review this letter carefully so that we will have a common understanding with regard to our respective obligations.

- <u>Services to be Provided by Anicorn:</u>   Anicorn is engaged in the business of providing, global brand development, global public relations, global strategic consulting and global all-encompassing risk management and resolution services to private and corporate clientele who are require effective and efficient solutions to highly complex and highly confidential matters. Anicorn will shall execute, implement, identify, retain, and coordinate all services reasonably required to represent Client in connection with the matters (the "Matter") described below. Anicorn has no obligation to give advice to or represent Client with respect to additional matters not related to the Matter.

- <u>Personnel:</u> The Client acknowledges that the services the Anicorn or its professionals perform on the Matter may not be performed by any one person. Anicorn reserves the right to designate any of its professionals to perform or handle any and all tasks or aspects of the Matter. Finally, Anicorn reserves the right to engage one or more consultants on the Matter. All fees payable to such consultants shall come from the Retainer Fee and/or if applicable, the Success Fee described below. There shall be no other fees payable by the Client other than the Retainer Fee and/or if applicable, the Success Fee described below. Anicorn will be primarily responsible for supervising the Matter and shall in consultation with the Client determine which professionals shall perform any particular services which are not part of Anicorn.

1

- Client's Representative: Anicorn shall take all direction from the Client's nominated representative(s) unless and until notified that the representative has been duly and properly relieved of such authority. All bills shall be sent to the Client representative's advised mailing or e-mail address.

- Fixed Fees:

  - Retainer Fee: To commence our representation, Anicorn requires the deposit of a non-refundable retainer fee of Nineteen Million (EUR 19,000,000.00) Euros as per the schedule below into the Anicorn's Euro bank account pursuant to the wire instructions to be provided.

    | By 9 May 2017 | : | EUR 2,000,000.00 |
    |---|---|---|
    | By 19 May 2017 | : | EUR 2,000,000.00 |
    | By 26 May 2017 | : | EUR 2,500,000.00 |
    | By 2 June 2017 | : | EUR 2,500,000.00 |
    | By 9 June 2017 | : | EUR 2,500,000.00 |
    | By 16 June 2017 | : | EUR 2,500,000.00 |
    | By 23 June 2017 | : | EUR 2,500,000.00 |
    | By 30 June 2017 | : | EUR 2,500,000.00 |

  - Success Fee: Client shall pay Anicorn a Success Fee of Two Hundred and Eighty Million (EUR 280,000,000.00) Euros into the Anicorn's bank account as per the schedule below, when the Matters below are achieved on the Matter no later than 31 September 2017 as a result of Anicorn's work done and/or efforts taken:

    **The US Department of Justice ("USDOJ"), US Federal Bureau of Investigations ("FBI") and any other relevant US Government agencies, and Swiss, Singapore, Luxembourg authorities by way of an official notification and/or agreement to drop all civil and/or criminal cases and/or cease investigations and/or removal of any INTERPOL Red Notice (or other forms of international notices and/or actions) by 31 September 2017 within the USA, Switzerland, Singapore, Luxembourg or internationally against Mr. Low Taek Jho ("LTJ") and related family, Mr. Tan Kim Loong ("TKL") and related family, and Mr. Riza Aziz ("RA") and related family, Loo Ai Swan / Jasmine ("LAS") and any assets or companies related to LTJ, TKL, RA and their related families, and LAS with: (a) no wrongdoing whatsoever; (b) no admission of guilt; (c) no forfeiture of any further assets other than previous artworks directly owned by LTJ (and not Trusts in which LTJ and/or his family is a beneficiary of) that have already been seized in Switzerland. (known as the "Matter")**

    | By 3 October 2017 | : | EUR 2,000,000.00 |
    |---|---|---|
    | By 6 October 2017 | : | EUR 139,000,000.00 |
    | By 11 October 2017 | : | EUR 139,000,000.00 |

2

- **Type of Funds:** All funds used to pay the Retainer Fee and the Success Fee must be lawfully received funds of Client and shall in no event be any funds that are in dispute relating to the Matter.

- **Wire Transfer Instructions:** Anicorn is to provide Euro wire accounts details to the Client.

- **Billings:** Anicorn will send the Client an invoice for the Retainer Fees and if applicable, the Success Fees. The amount set forth on the invoice will be due on receipt, but in no event later than 30 days from receipt. Interest at the rate of 10% per annum will be payable by Client on any balance that remains unpaid 30 days after the date the Client receives the invoice.

- **Disclaimer:** Anicorn has made no promises or guarantees to Client concerning the outcome of the Matter, and nothing in this Agreement shall be construed as such a promise or guarantee.

- **Taxes:** Anicorn will bear its own taxes for all Retainer Fees and if applicable, the Success Fees received. Except as expressly set forth herein, Anicorn has not been engaged to provide any tax advice to Client with respect to this or any other matter, and Anicorn specifically disclaims any responsibility therefore.

- **Termination of Services:**

  - Client shall have the right at any time to terminate Anicorn's services upon written notice sent by registered mail to Anicorn's address provided above, and Anicorn shall immediately after receiving such notice cease to render additional services. Such termination shall not, however, relieve Client of the obligation to pay the fees due for services that have been rendered if such fees have been earned in accordance with this Agreement.

  - If Client fails to meet any of Client's obligations under this Agreement and/or if Anicorn and Client are unable to resolve their differences with respect to any disputed invoices, then Anicorn shall have the right to terminate this Agreement.

  - If Anicorn fails to meet any of Anicorn's obligations under this Agreement, then Client shall have the right to terminate this Agreement with no fees due.

- **Enforcement of Terms:** The parties agree that this Agreement was accepted and performed by all parties in the City and County of Los Angeles, State of California, and will in all respects be interpreted, enforced and governed under and pursuant to the laws of the State of California, without regard to the laws pertaining to conflicts or choice of law principles. Client further agrees that any and all disputes between the parties, which pertain in any way to the services hereunder, must be resolved through binding arbitration, before a single, neutral arbitrator in Los Angeles County, selected from a panel of arbitrators among either Judicial Arbitration and Mediation Services ("JAMS") or ADR Services, Inc., aka ADR Services, at the option of the party initiating a request for arbitration, the selection to

3

be made by the non-initiating party among five (5) arbitrators proposed by the party initiating arbitration. Such panel must be proposed by the party initiating arbitration within five (5) days of initiating arbitration and the non-initiating party shall make his/her/its selection no later than fifteen (15) days following initiation of the arbitration; should the non-initiating party fail to make his/her/its selection within the time set forth herein, the initiating party shall be entitled to choose the arbitrator from the five proposed arbitrators. There shall be no right to pre-arbitration discovery. All arbitration costs shall be initially borne equally by the parties. Nothing herein shall limit or waive any right to seek a provisional remedy, including a writ of attachment, in a court of competent jurisdiction located within the County of Los Angeles, State of California.

- <u>Retention of Records:</u> Anicorn hereby discloses that it is the policy of Anicorn to retain files relating to the Matter for no more than one (1) year after conclusion of the Matter. Anicorn shall provide Client with an opportunity to obtain said files, but if Client declines then Anicorn shall have the right to destroy same.

[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

4

Sincerely,
ANICORN, INC.

By: _____

    Authorized Signatory
    ("Anicorn")

AGREED and ACCEPTED for and on behalf of TYCOON TALENT LIMITED

By: _____

    Authorized Signatory
    ("Client")

Sincerely,
ANICORN, INC.

By: _____
    Authorized Signatory
    ("Anicorn")

AGREED and ACCEPTED for and on behalf of TYCOON TALENT LIMITED

By: _____
    Authorized Signatory
    ("Client")

Sincerely,
ANICORN, INC.

By: _____
     Authorized Signatory
     ("Anicorn")


AGREED and ACCEPTED for and on behalf of TYCOON TALENT LIMITED


By: _____
     Authorized Signatory
     ("Client")

ANICORN, LLC
Address        :   _____
                   _____

May 1, 2017

TYCOON TALENT LIMITED
Sertus Chambers, Suite F24,
First Floor, Eden Plaza, Eden Island,
PO Box 334, Mahe, Seychelles

Re:        **Fee Agreement**

Dear Sirs,

This letter constitutes a formal Agreement between you, Tycoon Talent Limited (hereinafter
referred to as "You" or "Client") and Anicorn, Inc., a corporation incorporated in NY or CA, and
doing business in, the State of California (hereinafter referred to as "Anicorn"), regarding the global
brand development, global public relations, global strategic consulting and global all-encompassing
risk management and resolution services that Anicorn will provide to your nominated third party
persons and/or companies and/or assets and, when executed by You, constitutes our understanding
and agreement with respect to the determination and payment of fees incurred by You in
connection with Anicorn's representation of You.

This letter sets forth our understanding of the terms, conditions and limitations of our engagement
and representation for all work that the Anicorn undertakes on your behalf. Please review this
letter carefully so that we will have a common understanding with regard to our respective
obligations.

1.    Services to be Provided by Anicorn:  Anicorn is engaged in the business of providing,
global brand development, global public relations, global strategic consulting and global all-
encompassing risk management and resolution services to private and corporate clientele who are
require effective and efficient solutions to highly complex and highly confidential matters. Anicorn will
shall execute, implement, identify, retain, and coordinate all services reasonably required to represent
Client in connection with the matters (the "Matter") described below. Anicorn has no obligation to
give advice to or represent Client with respect to additional matters not related to the Matter.

2.    Personnel: The Client acknowledges that the services the Anicorn or its professionals
perform on the Matter may not be performed by any one person. Anicorn reserves the right to
designate any of its professionals to perform or handle any and all tasks or aspects of the Matter.
Finally, Anicorn reserves the right to engage one or more consultants on the Matter. All fees payable to
such consultants shall come from the Retainer Fee and/or if applicable, the Success Fee described below.
There shall be no other fees payable by the Client other than the Retainer Fee and/or if applicable, the
Success Fee described below. Anicorn will be primarily responsible for supervising the Matter and
shall in consultation with the Client determine which professionals shall perform any particular
services which are not part of Anicorn.

3.    Client's Representative: Anicorn shall take all direction from the Client's nominated

representative(s) unless and until notified that the representative has been duly and properly relieved of such authority. All bills shall be sent to the Client representative's advised mailing or e-mail address.

4.   Fixed Fees:

(a) Retainer Fee:  To commence our representation, Anicorn requires the deposit of a non-refundable retainer fee of Nineteen Million (EUR 19,000,000.00) Euros as per the schedule below into the Anicorn's Euro bank account pursuant to the wire instructions to be provided.

| By 9 May 2017 | : | EUR 2,000,000.00 |
| By 19 May 2017 | : | EUR 2,000,000.00 |
| By 26 May 2017 | : | EUR 2,500,000.00 |
| By 2 June 2017 | : | EUR 2,500,000.00 |
| By 9 June 2017 | : | EUR 2,500,000.00 |
| By 16 June 2017 | : | EUR 2,500,000.00 |
| By 23 June 2017 | : | EUR 2,500,000.00 |
| By 30 June 2017 | : | EUR 2,500,000.00 |

(b) Success Fee: Client shall pay Anicorn a Success Fee of Two Hundred and Eighty Million (EUR 280,000,000.00) Euros into the Anicorn's bank account as per the schedule below, when the Matters below are achieved on the Matter no later than 31 September 2017 as a result of Anicorn's work done and/or efforts taken:

**The US Department of Justice ("USDOJ"), US Federal Bureau of Investigations ("FBI") and any other relevant US Government agencies, and Swiss, Singapore, Luxembourg authorities by way of an official notification and/or agreement to drop all civil and/or criminal cases and/or cease investigations and/or removal of any INTERPOL Red Notice (or other forms of international notices and/or actions) by 31 September 2017 within the USA, Switzerland, Singapore, Luxembourg or internationally against Mr. Low Taek Jho ("LTJ") and related family, Mr. Tan Kim Loong ("TKL") and related family, and Mr. Riza Aziz ("RA") and related family, Loo Ai Swan / Jasmine ("LAS") and any assets or companies related to LTJ, TKL, RA and their related families, and LAS with: (a) no wrongdoing whatsoever; (b) no admission of guilt; (c) no forfeiture of any further assets other than previous artworks directly owned by LTJ (and not Trusts in which LTJ and/or his family is a beneficiary of) that have already been seized in Switzerland. (known as the "Matter")**

| By 3 October 2017 | : | EUR 2,000,000.00 |
| By 6 October 2017 | : | EUR 139,000,000.00 |
| By 11 October 2017 | : | EUR 139,000,000.00 |

(c) Type of Funds: All funds used to pay the Retainer Fee and the Success Fee must be lawfully received funds of Client and shall in no event be any funds that are in dispute relating to the Matter.

(d) <u>Wire Transfer Instructions:</u> Anicorn is to provide Euro wire accounts details to the Client.

5.    <u>Billings:</u> Anicorn will send the Client an invoice for the Retainer Fees and if applicable, the Success Fees. The amount set forth on the invoice will be due on receipt, but in no event later than 30 days from receipt. Interest at the rate of 10% per annum will be payable by Client on any balance that remains unpaid 30 days after the date the Client receives the invoice.

6.    <u>Disclaimer:</u> Anicorn has made no promises or guarantees to Client concerning the outcome of the Matter, and nothing in this Agreement shall be construed as such a promise or guarantee.

7.    <u>Taxes:</u> Anicorn will bear its own taxes for all Retainer Fees and if applicable, the Success Fees received. Except as expressly set forth herein, Anicorn has not been engaged to provide any tax advice to Client with respect to this or any other matter, and Anicorn specifically disclaims any responsibility therefore.

8.    <u>Termination of Services:</u>

   A.  Client shall have the right at any time to terminate Anicorn's services upon written notice sent by registered mail to Anicorn's address provided above, and Anicorn shall immediately after receiving such notice cease to render additional services. Such termination shall not, however, relieve Client of the obligation to pay the fees due for services that have been rendered if such fees have been earned in accordance with this Agreement.

   B.  If Client fails to meet any of Client's obligations under this Agreement and/or if Anicorn and Client are unable to resolve their differences with respect to any disputed invoices, then Anicorn shall have the right to terminate this Agreement.

   C.  If Anicorn fails to meet any of Anicorn's obligations under this Agreement, then Client shall have the right to terminate this Agreement with no fees due.

9.    <u>Enforcement of Terms:</u>   The parties agree that this Agreement was accepted and performed by all parties in the City and County of Los Angeles, State of California, and will in all respects be interpreted, enforced and governed under and pursuant to the laws of the State of California, without regard to the laws pertaining to conflicts or choice of law principles. Client further agrees that any and all disputes between the parties, which pertain in any way to the services hereunder, must be resolved through binding arbitration, before a single, neutral arbitrator in Los Angeles County, selected from a panel of arbitrators among either Judicial Arbitration and Mediation Services ("JAMS") or ADR Services, Inc., aka ADR Services, at the option of the party initiating a request for arbitration, the selection to be made by the non-initiating party among five (5) arbitrators proposed by the party initiating arbitration. Such panel must be proposed by the party initiating arbitration within five (5) days of initiating arbitration and the non-initiating party shall make his/her/its selection no later than fifteen (15) days following initiation of the arbitration; should the non-initiating party fail to make his/her/its selection within the time set forth herein, the initiating

party shall be entitled to choose the arbitrator from the five proposed arbitrators. There shall be no right to pre-arbitration discovery. All arbitration costs shall be initially borne equally by the parties. Nothing herein shall limit or waive any right to seek a provisional remedy, including a writ of attachment, in a court of competent jurisdiction located within the County of Los Angeles, State of California.

10.     Retention of Records: Anicorn hereby discloses that it is the policy of Anicorn to retain files relating to the Matter for no more than one (1) year after conclusion of the Matter. Anicorn shall provide Client with an opportunity to obtain said files, but if Client declines then Anicorn shall have the right to destroy same.

[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Sincerely,
ANICORN, INC.

By: _____
    Authorized Signatory
    ("Anicorn")


AGREED and ACCEPTED for and on behalf of TYCOON TALENT LIMITED

By: _____
    Authorized Signatory
    ("Client")

By: _____
   Pras Michel
   ("Anicorn")


AGREED and ACCEPTED:

_____, an individual on behalf of himself and on behalf of all
corporations relevant to this Matter
("Client")


By: _____

1

By: _____
    Pras Michel
    ("Anicorn")

AGREED and ACCEPTED:

_____, an individual on behalf of himself and on behalf of all
corporations relevant to this Matter
("Client")

By: _____

1

Sincerely,
ANICORN, INC.

By: _____
     Authorized Signatory
     ("Anicorn")

AGREED and ACCEPTED for and on behalf of TYCOON TALENT LIMITED

By: _____
     Authorized Signatory
     ("Client")

EXHIBIT "A"
Description of the "Matter"

1. 

2. All other Forfeiture *In Rem* actions filed by the United States of America that are referred to in the Complaint filed in the case described in Item 1 above which apply to Client or any corporation in which Client has or is alleged to have an interest.

2

# ATTACHMENT 5

| | |
|---|---|
| **From:** | G Higginbotham |
| **To:** | Pras Michel |
| **Subject:** | Anicorn w/ WuTang |
| **Attachments:** | (Alternate Body) |
| | ANICORN with WuTang 02.docx |

Text me when you get this.


I will need names and account numbers to finish this.


Best

ANICORN, LLC

May 1, 2017

_____,

address

Re:          Retainer and Fee Agreement – Consulting Agreement

Dear  _____:

This letter constitutes a formal Agreement between you, _____, an individual, on behalf of yourself and on behalf of all other corporations in which you have a controlling interest or with respect to which you have the authority to bind, that are related to the Matter (defined below), (hereinafter referred to collectively as "You" or "Client") and Anicorn, Inc., a corporation incorporated in NY or CA, and doing business in, the State of California (hereinafter referred to as "Anicorn"), regarding the brand development,  global strategic consulting and risk management general services that Anicorn will provide to You and, when executed by You, constitutes our understanding and agreement with respect to the determination and payment of fees incurred by You in connection with Anicorn's representation of You.

This letter sets forth our understanding of the terms, conditions and limitations of our engagement and representation for all work that the Anicorn undertakes on your behalf. Please review this letter carefully so that we will have a common understanding with regard to our respective obligations.

         1.   Services to be Provided by Anicorn:  Anicorn is engaged in the business of providing, brand development,  global strategic consulting and risk management services to private and corporate clientele who are require effective and efficient solutions to highly complex and highly confidential matters. Anicorn will shall identify, retain, and coordinate all services legal and otherwise reasonably required to represent Client in connection with the litigation matters (the "Matter") described on Exhibit "A". Anicorn has no obligation to give advice to or represent Client with respect to additional matters not related to the Matter. In the event Client requests Anicorn's services with respect to additional matters and Anicorn agrees to render such services, this Agreement (other than respect to additional fees that shall be due for such additional matters) shall apply to such additional matters (and at that time the term "Matter" as defined herein shall be deemed to include the original Matter and such additional matters), unless and until the parties execute a new and separate agreement specifically regarding such additional matters.

         2.   Personnel: The Client acknowledges that the services the Anicorn or its professionals perform on the Matter may not be performed by any one person. Anicorn reserves the right to designate any of its professionals to perform or handle any and all tasks or aspects of the Matter, including the

lawyer who may appear at trial. Finally, Anicorn reserves the right to engage one or more consultants on the Matter. All fees payable to such consultants shall come from the Retainer Fee and/or if applicable, the Success Fee described below. At the present time, Anicorn will be primarily responsible for supervising the Matter and shall have complete discretion in determining which professionals shall perform any particular services.

      3.   <u>Client's Representative</u>: Client hereby designates _____ as their representative for purposes of communicating with Anicorn. Anicorn shall take all direction from said person unless and until notified that the representative has been duly and properly relieved of such authority. All bills shall be sent to the above-address in care of Client's representatives.

      4.   <u>Fixed Fees</u>:

      (a)   <u>Retainer Fee:</u> To commence our representation, Anicorn requires the deposit of a non-refundable retainer fee of Twenty Five Million ($25,000,000.00) Dollars into the Anicorn's bank account pursuant to the wire instructions set forth below. This Agreement shall not become effective until the Anicorn receives such retainer.

      (b)   <u>Success Fee</u>:

         (i)   Client shall pay Anicorn a Success Fee of Three Hundred Million ($300,000,000.00) Dollars into the Anicorn's bank account, immediately (within 36 hours) following the successful resolution of the Matter.

         (ii)   While Anicorn anticipates resolution of the Matter within 180 from payment of the Success Fee is not contingent upon successful resolution of the matter within 180 days.

      (c) <u>Type of Funds</u>: All funds used to pay the Retainer Fee and the Success Fee must be lawfully received funds of Client and shall in no event be any funds that are in dispute pursuant to the Matter set forth on Exhibit "A".

      (d) <u>Wire Transfer Instructions</u>: Unless otherwise notified in writing, both the Retainer Fee and, the Success Fee, shall be paid via wire transfer in accordance with the following instructions:

| | |
|---|---|
| Bank Name: | City National Bank |
| Bank Address: | 400 Roxbury Drive<br>Beverly Hills, CA 90210 |
| SWIFT Code: | CINAUS6L |
| Account Name: | Anicorn, LLC |
| Account Number:<br>Routing Number: | 665595870<br>122016066 |

5.  Billings:  Anicorn will send Client an invoice for the Retainer Fee and if applicable, the Success Fee. The amount set forth on the invoice will be due on receipt, but in no event later than 15 days from receipt. Interest at the rate of 10% per annum or the maximum allowed by law (whichever is greater) will be payable by Client on any balance that remains unpaid 30 days after the date of the invoice.

6.  Grant of Lien/Power of Attorney: Client hereby grants to Anicorn a lien on all assets pursuant to the Matter (the "Assets") as security for the payment of fees due and owing to the Firm under this Agreement. Client hereby agrees to sign such documents as may be necessary to properly record such lien or effectuate the grant of rights and other purposes of this Agreement. Client irrevocably appoints Anicorn as attorney-in-fact with full power to execute and deliver such documents in the event Client fails to submit such documents to Anicorn signed within three (3) business days of submission to Client or Client's representative. Anicorn reserves the right to commence sale of Assets if Client's failure to make payments of the fee(s) exceeds sixty (60) days, in order to be made whole for fees in arrears as well as reasonable attorney's fees and administrative expenses. This appointment shall be deemed a power coupled with an interest and irrevocable.

7.  Disclaimer: Anicorn has made no promises or guarantees to Client concerning the outcome of the Matter, and nothing in this Agreement shall be construed as such a promise or guarantee.

8.  No Tax Advice: Except as expressly set forth herein, Anicorn has not been engaged to provide any tax advice to client with respect to this or any other matter, and Anicorn specifically disclaims any responsibility therefore.

9.  Professional Responsibility:    As long as, in our judgment, it will not substantively harm your position in this matter, we must respectfully retain control over decisions affecting the outcome of this matter.

10.  Termination of Services:

A.  Client shall have the right at any time to terminate Anicorn's services upon written notice to Anicorn, and Anicorn shall immediately after receiving such notice cease to render additional services. Such termination shall not, however, relieve Client of the obligation to pay the fees due for services rendered if such fees have been earned in accordance with this Agreement.

B.  If Client fails to meet any of Client's obligations under this Agreement including prompt payment of invoices and/or if Anicorn and Client are unable to resolve their differences with respect to disputed invoices, then Anicorn shall have the right to terminate this Agreement, and Client shall take all steps necessary to free Anicorn of any obligation to perform further.

11.    Enforcement of Terms:  The parties agree that this Agreement was accepted and performed by all parties in the City and County of Los Angeles, State of California, and will in all respects be interpreted, enforced and governed under and pursuant to the laws of the State of California, without regard to the laws pertaining to conflicts or choice of law principles. Client further agrees that any and all disputes between the parties, which pertain in any way to the services hereunder, must be

resolved through binding arbitration, before a single, neutral arbitrator in Los Angeles County, selected from a panel of arbitrators among either Judicial Arbitration and Mediation Services ("JAMS") or ADR Services, Inc., aka ADR Services, at the option of the party initiating a request for arbitration, the selection to be made by the non- initiating party among five (5) arbitrators proposed by the party initiating arbitration. Such panel must be proposed by the party initiating arbitration within five (5) days of initiating arbitration and the non-initiating party shall make his/her/its selection no later than fifteen (15) days following initiation of the arbitration; should the non-initiating party fail to make his/her/its selection within the time set forth herein, the initiating party shall be entitled to choose the arbitrator from the five proposed arbitrators. There shall be no right to pre-arbitration discovery. All arbitration costs shall be initially borne equally by the parties. In the event of any litigation or other proceeding for the collection of Anicorns' fees and costs incurred on Client's behalf, the prevailing party shall recover from the other party or parties all Anicorns' fees and all other costs and expenses as may have been incurred by the prevailing party or parties in such collection proceedings. Nothing herein shall limit or waive any right to seek a provisional remedy, including a writ of attachment, in a court of competent jurisdiction located within the County of Los Angeles, State of California.

12.     Retention of Records: Anicorn hereby discloses that it is the policy of Anicorn to retain files relating to the Matter for no more than two (2) years after conclusion of the Matter. Anicorn shall provide Client with an opportunity to obtain said files, but if Client declines then Anicorn shall have the right to destroy same.

Sincerely,
ANICORN, INC.

By: _____

    Pras Michel, CEO
    ("Anicorn")

AGREED and ACCEPTED:

_____, an individual on behalf of himself and on behalf of all corporations relevant to this Matter
("Client")

By: _____

EXHIBIT "A"
Description of the "Matter"

1.  UNITED STATES OF AMERICA V. "THE WOLF OF WALL STREET" MOTION PICTURE, INCLUDING ANY RIGHTS TO PROFITS, ROYALTIES AND DISTRIBUTION PROCEEDS OWED TO RED GRANITE PICTURES, INC. OR ITS AFFILIATES AND/OR ASSIGNS

Case No.  CV 16-16-5362

Filed in the United States District Court for the Central District of California on 7/20/16.

2.  All other Forfeiture *In Rem* actions filed by the United States of America that are referred to in the Complaint filed in the case described in Item 1 above which apply to Client or any corporation in which Client has or is alleged to have an interest.

## Properties ⁻

| | |
|---|---|
| Size | 31.1KB |
| Pages | 5 |
| Words | 1719 |
| Total Editing Time | 0 Minutes |
| Title | Add a title |
| Tags | Add a tag |
| Comments | Add comments |
| Template | Normal |
| Status | Add text |
| Categories | Add a category |
| Subject | Specify the subject |
| Hyperlink Base | Add text |
| Company | DOJ |

## Related Dates

| | |
|---|---|
| Last Modified | 4/28/2017 10:01 PM |
| Created | 4/28/2017 10:01 PM |
| Last Printed | |

## Related People

| | |
|---|---|
| Manager | Specify the manager |
| Author |  GAH |
| | Add an author |
| Last Modified By | GAH |

## Related Documents

 Open File Location

**Show Fewer Properties**

# ATTACHMENT 6

**Webb, Jayme**

| | |
|---|---|
| **From:** | Marc Moscowitz <marc@wealthmgmt.org> |
| **Sent:** | Friday, July 21, 2017 2:41 PM |
| **To:** | Maragh, Allan |
| **Cc:** | Gluzberg, Boris |
| **Subject:** | Pras Michel |

Hi Allan,

In response from your compliance department's request for information as to Artemus, I've referred it to Mr. Michel's attorney for advice – there are non-disclosure issues, and the sensitivity of the facts in the case involved. As to Artemus, it's his production and operating company, and I wouldn't presume to ask him about a $3,000 cash withdrawal. I'd say it was likely pocket money. I frequently withdraw cash from my business (in smaller amounts like $1500) which I use for pocket money. I pay my cab in Cutchogue $20 each way ($40) to take me between my home and the Jitney stop. They don't accept credit cards. I tip waiters, my condo concierge, office maintenance workers in cash in town. I also tip the kids at the golf course who handle my clubs, the landscaper, the plumber, the A/C mechanic, my refuse collection man and others. I'm just a schlep who hardly goes out – Pras Michel, on the other hand, is a public figure of some stature. As a former member of the Fugees, and now a national and international consultant, it's a pretty fair guess that the $3k was pocket money. As to the $30k, he told me he asked a friend to loan him $30k in cash as he found himself short, and repaid him in like kind – cash. Anicorn is a consulting and personal investment company that is owned by Pras, and Artemus is a production company involved in music, TV and film.

When I get a response from Pras' counsel, we'll provide what details within our rights to do. I can say that this is a legitimate consulting business, and it's conduct is not out of the ordinary. The bulk of the outbound wires went to a law firm for legal services. Again, we'll have a fuller explanation as advised by his personal counsel.

Best,


Marc Moscowitz
CEO | Founder
marc@wealthmgmt.org


Wealth Management Associates LLC
Executive Office:
POB 778 | Cutchogue, NY 11976-0778
646-736-2394 Ext. 4

45 Broadway, Suite 2230 | New York, NY 10006
646.736.2394 Ext. 4 | 646.225.5233 fax

191 Peachtree St., Suite 330| Atlanta, GA 30303
404.736.3589 | 646.225.5233 fax

www.wealthmgmt.org

***Disclaimer***:
This email and any or all attachments may contain confidential, copyright or privileged information. If you are not the intended recipient or if you have received this e-mail in error, please notify the sender immediately and destroy this e-mail and/or shred the materials and any attachments. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly forbidden. Wealth Management Associates LLC cannot guarantee the integrity of this communication, or that it is free from errors, viruses or interference.  As the Internet is not a guaranteed secure environment, Wealth Management Associates LLC cannot ensure that an email is not interfered with during transmission.

*** IRS Circular 230 Disclosure ***
To ensure compliance with requirements imposed by the IRS, we inform you that, unless specifically indicated otherwise, any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

## Webb, Jayme

| | |
|---|---|
| **From:** | Marc Moscowitz <marc@wealthmgmt.org> |
| **Sent:** | Tuesday, August 01, 2017 3:55 PM |
| **To:** | Maragh, Allan |
| **Cc:** | Gluzberg, Boris |
| **Subject:** | International Compliance |

Hi Allan,

I now have firm answers on your compliance department's recent query. First, please be advised that Anicorn undertakes International consulting projects. Pras, in addition to being a world-famous artist (and possibly because he is) was able to develop and international reputation and presence among business large businesses and some governments. He consults for several large companies (including but not limited to ) Lucky Mark Trading in Hong Kong.

As to Lucky Mark Trading, it began as a venture capital company predominantly engaged in second-round and succeeding capital raises and funding placements. In recent years, it took a deeper interest in one of its client companies ( a tech R & D company) in which it acquired a majority equity interest. The company now does more tech R&D business than VC. In any event, some of the software it developed, raised trademark infringement issues resulting in a civil lawsuit here in the U.S. The loss of the suit could result in a financial loss for Lucky Mark well in excess of $1 Billion USD.

Anicorn's services were engaged to spear-head and co-ordinate the legal efforts to prevail in the suit. Pras has relationships with some very influential law firms, skilled in such matters. All inbound funds from Lucky Mark are its own, coming through established banks in Hong Kong. Once the funds are transferred to Anicorn, Anicorn makes payments to a law firm in the U.S. The undertaking of this case may cost as much as $25 Million USD. Should Lucky Mark prevail, the success bonus could be very high, depending on the final settlement of the matter.

As to the $100,000 in cash withdrawn by Anicorn, it was used to fund a business trip for Pras and others to investigate an investment opportunity. The country that was visited does not accept credit cards or checks – hence the need for USD. The group consisted of approximately a dozen people, and the funds were used for airfare, ground transportation, lodging, food, security, entertainment, etc.

We've provided more information than needed, with the understanding that all of it is sensitive and confidential. Pass along to the compliance department only as much information is necessary to satisfy their needs – these are not people who want their business in the street. I trust you judgment in this matter.

Best Regards,

Marc Moscowitz
CEO | Founder
marc@wealthmgmt.org

## Wealth Management Associates LLC

45 Broadway, Suite 2230 | New York, NY 10006
646.736.2394 | 646.225.5233 fax

3330 Cumberland Blvd, Suite 500, Atlanta, GA 30339
404.736.3589 | 646.225.5233 fax

1999 Avenue of The Stars, Suite 1000 | Los Angeles, CA 90067
845.401.7805 | 646.225.5233

Executive Office:
POB 778 | Cutchogue, NY 11935-0778
646.736.2394 | 646.225.5233

www.wealthmgmt.org

***Disclaimer***:
This email and any or all attachments may contain confidential, copyright or privileged information. If you are not the intended recipient or if you have received this e-mail in error, please notify the sender immediately and destroy this e-mail and/or shred the materials and any attachments. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly forbidden. Wealth Management Associates LLC cannot guarantee the integrity of this communication, or that it is free from errors, viruses or interference.  As the Internet is not a guaranteed secure environment, Wealth Management Associates LLC cannot ensure that an email is not interfered with during transmission.

*** IRS Circular 230 Disclosure ***
To ensure compliance with requirements imposed by the IRS, we inform you that, unless specifically indicated otherwise, any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# ATTACHMENT 7

## INVESTOR LOAN AGREEMENT II

This **Investor Loan Agreement** ("**this Agreement**") is made this <u>13th</u> day of <u>September</u> 2017 by and between:

**Lucky Mark (HK) Trading Limited**, a limited company incorporated and existing under the laws of Hong Kong Special Administrative Region ("**Hong Kong SAR**") and having its address at 7/F, Hong Kong Trade Centre, 161-167 Des Voeux Road, Central, Hong Kong (hereinafter referred to as the "**Lender**"), and

**Anicorn LLC**, a limited company incorporated and existing under the laws of Delaware, United States of America and having its address at 45 Broadway, Suite 2230 New York, NY 10006, United States of America (hereinafter referred to as the "**Company**" or the "**Borrower**") of the other part.

(The Lender and the Borrower shall hereinafter collectively be referred to as the "**Parties**" and shall individually be referred to as the "**Party**").

**WHEREAS:**

A.   The Borrower engages in the business of International and Domestic Political Advocacy, Crisis Management, Press and Media Consulting globally.

B.   The Borrower is seeking interest parties to invest in the Company and/or to provide financial assistance to the Company.

C.   The Lender is interested in considering an investment in the Company, and subject to the terms and conditions of this Agreement, has agreed to provide a loan to the Borrower for its working capital.

**NOW, THEREFORE**, the Parties agree as follows:

**1.       The Loan**

1.1     In consideration of the Lender being permitted to conduct a due diligence review on the Company and its business and to subscribe for shares in the Company in accordance with Clause 8 and the mutual covenants set out in this Agreement, the Lender agrees to provide to the Borrower a loan in the sum of Twenty Five Million Euros (EUR 25,000,000) or equivalent in other currencies (hereinafter referred to as the "**Loan Sum**") upon the terms and conditions set out in this Agreement ("hereinafter referred to as the "**Loan**").

1.2     The Borrower hereby authorises the Lender to pay and remit the Loan Sum within five (5) Business Days of the date of this Agreement directly to a designated bank account of the Company as follows:



| | |
|---|---|
| Bank | : CITIBANK N.A., |
| Bank Address | : London, England, U.K. |
| SWIFT Code | : CITIGB2L |
| Account No. | : 94002579 |
| Account Holder | : Anicorn LLC |
| Address of Account Holder | : c/o Wealth Management Associates 45 Broadway, Suite 2230 New York, NY 10006 United States of America |

The receipt by the Company of the Loan Sum therein shall be deemed to be good receipt by the Borrower of such Loan Sum. The date on which the Loan Sum is received or deemed received by the Company shall hereinafter be referred to as the "**Disbursement Date**".

1.3     The proceeds of the Loan shall be applied by the Borrower for the purposes of working capital and/or general corporate purposes of the Borrower and/or its subsidiaries or associated companies.

**2.      Interest**

2.1     Interest on the Loan shall accrue on a daily basis at the fixed rate of four point seven-five percent (4.75%) per annum (hereinafter referred to as the "**Interest Rate**") on the balance outstanding from time to time under the Facility, and shall be calculated on the basis of a three hundred sixty five (365) day year.

2.2     The Borrower shall pay all accrued interest on the last day of each interest period, which shall be every twelve (12) months period (hereinafter referred to as the "**Interest Period**").

2.3     In the event the Borrower fails to pay any sum payable under this Agreement (including without limitation the principal of the Loan and the interest accrued thereon) on the due date, the Borrower shall pay to the Lender interest on such overdue amount at a rate of two per cent (2%) per annum over the Interest Rate specified in Clause 2.1 (hereinafter referred to as the "**Default Rate**"). Such default interest shall accrue from day to day, shall be calculated on the basis of the actual number of days elapsed and a three hundred sixty five (365) day year and shall be payable from time to time on demand. Default interest (if unpaid) arising on any overdue amount under this Agreement will be compounded with that overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.



**3.      Repayment**

3.1      Subject as otherwise provided in this Agreement, the Loan Sum including all accrued interest and all other amounts due under this Agreement shall be repaid by the Borrower on the date falling twenty-four (24) months from the Disbursement Date (hereinafter referred to as the "**Maturity Date**") unless extended in accordance with the terms of this Agreement (in which event "Maturity Date" shall in this Agreement refer to such extended Maturity Date).

3.2      The Borrower may request that the Maturity Date be extended, on the same terms, for successive period(s) of twelve (12) months (hereinafter referred to as the "**Rollover Option**") by giving notice to the Lender not less than thirty (30) Business Days before the Maturity Date or extended Maturity Date, as the case may be.

3.3      The Lender shall notify the Borrower of its decision (which shall be in its sole discretion) whether or not to agree to the request for Rollover Option not later than fifteen (15) days before the Maturity Date (and, if any Lender has not notified the Borrower of its acceptance of the request on or before such date, it shall be deemed to have refused such request). In the event the Lender agrees to the request for Rollover Option, the Maturity Date shall be extended by a period of twelve (12) months, in which event the Loan Sum including all accrued interest and all other amounts due under this Agreement shall be repaid by the Borrower on that extended Maturity Date.

3.4      Subject only to a request for a Rollover Option being agreed to by the Lender, the Borrower may not re-borrow any amount repaid or prepaid under the terms of this Agreement.

3.5      Any amounts not paid when they are required to be paid pursuant to this Agreement shall bear interest at the Default Rate.

**4.      Prepayment**

4.1      The Borrower may at any time prior to Maturity Date prepay all or part of the Loan without premium or penalty provided that:

(a)      the Borrower shall have given to the Lender not less than thirty (30) Business Days prior written notice of its intention to make the prepayment, specifying the amount thereof and the date on which it is to be made; and

(b)      any such prepayment must be accompanied by all accrued interest.

4.2      Any notice of intended prepayment of the Loan or any part thereof given by the Borrower under this Agreement shall be irrevocable and



the Borrower shall be bound to make a prepayment in accordance therewith. The Borrower may only prepay the Loan or any part thereof in accordance with the express terms of this Agreement and no amount prepaid may be redrawn.

**5.    No Deductions**

5.1    All sums payable by the Borrower under the Agreement (whether of principal or interest) shall be paid in full without any set-off or counterclaim whatsoever and without any deductions for any taxes, deductions or withholdings of any nature unless the Borrower is required by law to make such a deduction.

5.2    The Lender acknowledges that the Borrower may be required by law to withhold or deduct withholding tax from any interest payment due or payable to the Lender under this Agreement, and agrees that the Borrower shall where required be permitted to withhold or deduct any such amount from the sums due or payable to the Lender.

**6.    Ranking**

6.1    The Loan shall rank junior only to and shall be subordinated to all secured indebtedness of the Borrower, whether existing as of the date of this Agreement or hereafter incurred.

6.2    The Loan shall rank senior in right of payment and security to all loans and indebtedness due to any shareholder of the Borrower or any related company of the Borrower (being a company which controls or is controlled by or is under the common control of the Borrower).

6.3    The Borrower covenants and agrees that anything in this Agreement to the contrary notwithstanding, the indebtedness evidenced by this Agreement is subordinate and junior only in right of payment and security to all senior secured indebtedness of the Borrower only, but shall at all times constitute unconditional and unsubordinated general obligations thereof ranking at least pari passu with all of its other present and future unsubordinated indebtedness thereof.

**7.    Representations and Warranties**

7.1    The Borrower makes the following representations and warranties to the Lender:

(a)    it is a limited liability company, duly incorporated and validly existing under the law of its jurisdiction of incorporation; and has the power to own its assets and carry on its business as it is being conducted or is contemplated to be conducted;

(b)    it has the power to enter into and perform, and has taken all necessary action to authorise its entry into, and performance



of, this Loan Agreement to which it is party and the transactions contemplated by this Loan Agreement;

(c) the obligations expressed to be assumed by it in this Loan Agreement are, subject to any general principles of law as at the date of this Agreement limiting its obligations, legal, valid, binding and enforceable obligations;

(d) all written information supplied by it to the Lender in connection with this Agreement was true and accurate in all material respects as at the date it was given and was not misleading in any material respect at such date; and it has not knowingly withheld any information which, if disclosed, could reasonably be expected materially and adversely to affect the decision of the Lender in considering whether or not to provide the Loan to the Borrower;

(e) no litigation, arbitration or administrative proceedings of or before any court, arbitral body or government agency which, if adversely determined, might reasonably be expected to have a material adverse effect (to the best of its knowledge and belief) have been started or threatened against it; and

(f) it has neither taken any corporate action, nor have any other steps been taken or legal proceedings started or (to the best of its knowledge and belief, after due enquiry) threatened against it, for its winding-up, dissolution, administration or reorganisation or for the enforcement of any encumbrance over all or any of its revenues or assets or for the appointment of a receiver, administrator, administrative receiver, conservator, custodian, trustee or similar officer of it or of all or any of its assets which could reasonably be expected to have a material adverse effect.

7.2 All the representations and warranties in this Clause 7 are made by the Borrower on the date of this Agreement; and shall be deemed repeated (by reference to the facts and circumstances then existing) on the Disbursement Date.

## 8. Conversion Right and Information Undertakings

8.1 The undertakings in this Clause 8 are given in favour of the Lender and shall remain in force from the date of this Agreement for so long as any amount is outstanding under the Loan.

8.2 The Borrower shall supply to the Lender as soon as the same become available, but in any event within one hundred and twenty (120) days after the end of each of its financial year, its audited consolidated financial statements for that financial year.



8.3     As soon as reasonably practicable after the execution of this Agreement and until the Loan Sum is repaid in full or Maturity Date (as defined below) whichever the earlier and unless extended by mutual agreement of the Parties, and subject to Lender's agreement to maintain confidentiality of all data and information provided or made available by the Borrower pursuant to the provisions set forth below, the Borrower shall allow the Lender or its representatives to conduct inspection and perform continuing due diligence review of the Borrower (including, without limitation, its assets, books and records and financial condition) at reasonable times and upon reasonable notice during regular business hours.

8.4     The Lender shall provide the Borrower with a schedule and due diligence programme prior to the commencement of any due diligence review or inspection under this Clause 8. Upon receipt of such schedule or programme, the Borrower will cooperate in a timely manner with any reasonable due diligence review to be conducted by the Lender or its representative from time to time and as may be reasonably requested.

8.5     At any time prior to the Maturity Date, the Lender shall have the right to convert the Loan Sum into ordinary shares of the Company at a mutually agreed valuation basis per ordinary share or if a mutually agreed valuation cannot be achieved, then a valuation to be determined by a big four auditing firm to be determined by the Borrower (hereinafter referred to as the "**Conversion Right**") subject always to the mechanism of conversion of debt-to-equity being mutually agreed to by the Parties. The Lender may at any time prior to its exercise assign the Conversion Right to any party nominated by it by written notification to the Company.

8.6     The Parties agree that the Lender may utilize the funds received from the Company in repayment of the Loan Sum to subscribe for ordinary shares of the Company for the purposes of exercising the Conversion Right.

**9.      Other Undertakings and Covenants**

9.1     Debt to Equity Ratio

The Borrower shall have sole responsibility for financing the business of the Company and shall maintain sufficient capital to carry out its obligations under this Agreement. The Borrower shall ensure that for so long as any amount is outstanding under this Loan Agreement, it maintains a ratio of shareholders' equity to total indebtedness which is sufficient to reasonably assure its solvency for the benefit of the Company's creditors and shareholders.

9.2     Notification of Default



The Borrower shall notify the Lender of any Event of Default occurring (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence

### 10. Events of Default

10.1 The occurrence of any of the following events shall constitute an "**Event of Default**", upon which the Lender may, without prejudice to the Lender's rights contained in this Agreement or under the laws, at its discretion notify and request the Borrower to repay the principal amount of the Loan Sum under this Agreement within thirty (30) days of such notice. Additionally, in the event that the Borrower fails to effect the aforesaid repayment within the time specified above, the Lender shall be entitled to terminate this Agreement and execute its right of litigation towards the settlement of the outstanding Loan Sum without prejudice to the Lender's any other rights to recover the outstanding Loan Sum.

(a) the Borrower fails to pay any amount of Loan Sum under this Agreement on the Maturity Date therefor;

(b) the Borrower fails to observe or perform any of its obligations under this Agreement (unless where such failure is capable of being remedied and before the Lender terminates this Agreement, the Borrower has remedied such failure within fifteen (15) Business Days after the Borrower has become aware of the failure to the Lender's satisfaction);

(c) an encumbrance takes possession of, or a planner, plan administrator, receive or similar official is appointed in respect of all or any part of the business or assets of the Borrower;

(d) the Borrower is deemed by law to be unable to pay its debts or becomes unable to pay its debts as they fall due or suspends or threatens to suspend making payments with respect to all or any class of its debts;

(e) the Borrower fails to pay on the due date therefore any monies payable by it under any agreement or arrangement with any other lender or credit provider;

(f) the Borrower ceases or threatens to cease to carry on the whole or a substantial part of its business

(g) the Borrower convenes a meeting of its creditors, or a petition is presented or other steps are taken for the bankruptcy or reorganization/rehabilitation of the Borrower;

(h) there is a material adverse change in the financial condition of the Borrower which materially impairs the ability of the



Borrower to perform or comply with any one or more of its obligations under this Agreement; and

(i)     any representation or warranty made by the Borrower under this Agreement is found to be false or misleading.

10.2   Any amounts not paid following a demand under this Clause shall bear interest at the Default Rate.

## 11.     Notice

11.1   Any notice or communication under or in connection with this Agreement shall be in writing and shall be delivered personally, by registered post to the addresses given in this Agreement or at such other address as the recipient may have notified to the other Parties in writing. Proof of posting or dispatch of any notice or communication shall be deemed to be proof of receipt:

(a)    in the case of a letter, on the third business day after posting.

## 12.     Governing Law

12.1   This Agreement shall be governed by and construed in accordance with the laws of Hong Kong SAR.

## 13.     Dispute Resolution

13.1   In the event of any dispute between the Parties, controversy or claim arising out of or relating to this Agreement, on the breach, termination or invalidity thereof, the Parties shall seek to resolve such dispute, controversy or claim by arbitration in accordance with the Hong Kong International Arbitration Centre ("**HKIAC**") Rules, applicable at the time of submission of the dispute to arbitration and the conduct of the arbitration thereof shall be under the auspices of the HKIAC. The award of the arbitrator is final.

## 14.     Miscellaneous

14.1   Assignment

(a)    The Lender may assign any of its rights under this Agreement to any one or more persons and the assignee(s) shall thereafter be deemed to be the Lender.

(b)    Unless otherwise a prior written consent is given by the Lender, no right or obligation of the Borrower shall be assigned or transferred to any other person, firm, corporation or other entity.

14.2   Entire Agreement

This Agreement shall serve to reiterate all understanding and obligations pertaining to the Loan given by the Lender to the Borrower whether or not expressly provided herein and shall retroactively be enforceable against the Borrower from the date of the Lender being shareholder of the Company if any.

14.3    Taxes

Except as otherwise agreed in this Agreement, the Lender shall be responsible for all taxes incurred in connection with this Agreement.

14.4    Severability

If at any time any provision of this Agreement becomes invalid, illegal or unenforceable in any respect under any law, such invalidity, illegality or unenforceability shall not in any way affect or impair any other provisions (or any hereof).

14.5    Waiver

A provision of or right created under this Agreement may not be waived or varied except in writing signed by the Party or Parties to be bound. No failure on the part of the Lender to exercise, and no delay on its part in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

14.6    Modification

This Agreement shall be amended, supplemented or varied only by a document signed in writing by all of the Parties.

14.7    Business Day

In this Agrement, "**Business Day**" refers to a day (other than a Saturday, Sunday or public holiday) when banks in the United States of America, United Kingdom and Hong Kong SAR are open for general commercial business.



**IN WITNESS WHEREOF**, the Parties hereto have cause this Agreement to be executed in counterparts as of the day and year first above written, each Party having retained one original copy.

**LENDER:**
For and on behalf of **Lucky Mark (HK) Trading Limited**

For and on behalf of
LUCKY MARK (HK) TRADING LIMITED
裕標（香港）貿易有限公司

Authorised Director       Authorized Signature(s)

**BORROWER:**
For and on behalf of **Anicorn LLC**

Authorised Director

Anicorn LLC

45 Broadway, Suite 2230
New York, New York 10006

# ATTACHMENT 8

IRREVOCABLE POWER OF ATTORNEY
TO OPERATE RED ROCK IX LIMITED

NOTICE: THE POWERS GRANTED BY THIS DOCUMENT ARE BROAD AND
SWEEPING.

THIS DOCUMENT IS APPLICABLE AND ENFORCEABLE FOR RED ROCK IX
LIMITED, AN ENTITY INCOPORATED IN THE SPECIAL ADMINISTRIVE
REGION OF HONG KONG IN ACCORDANCE WITH COMPANY ORDINANCE
CHAPTER 622 OF THE LAWS OF HONG KONG AS A LIMTED COMPANY,
INCORPORTAION NUMBER 2474363 ON 10 JANUARY 2017 (RED ROCK IX).
INCORPORATION DOCUMENTS ARE ATTACHED HERETO AS EXHIBIT A AND
ARE INCORPORATED INTO THIS AGREEMENT BY THIS REFERENCE.

THAT I, Mr. Phengphian Laogumnerd, whose passport number is, AA3888819 and
date of birth is July 6, 1979 with a residence address at 11/1 Vipavadee 16/21, Vipavadee-
rangsit Rd., Dindang, Bangkok, 10400, Thailand, is the current principal owner and holder
of one hundred (100%) percent of Red Rock IX shares, do hereby make, constitute and
appoint Higginbotham Law, P.C. c/o George Higginbotham, partner, whose United States
passport number is 546134426 and date of birth is September 18, 1972 ("Attorney in
Fact"), my true and the lawful Attorney-in-Fact for me and in my name, place and stead,
to do any and all things necessary in connection with the totality of operations related to
Red Rock IX as defined above.

The specific powers conferred hereby shall include, by way of illustration and not
by way of limitation, the following:

1.      To exercise, do or perform any act, right, power, duty or obligation that I now have
or may acquire the legal right, power or capacity to exercise, do or perform in connection
with, arising out of or relating to Red Rock IX including the sale of Red Rock IX. This
Irrevocable Power of Attorney delivers complete and total control of all aspects of Red
Rock IX operations to Attorney In Fact / Higginbotham.

2.      To execute execute all Red Rock IX related documents including those with any
banking entity associated with Red Rock IX, contractors, business personnel i.e. attorneys
and accountants and such other instruments as may be required in the course of conducting
the business of Red Rock IX.

3.      To pay, set over and deliver all sums of money which have or may become due and
owing by Red Rock IX, arising out of any of the services rendered including but not limited
to those referenced in the immediately preceding paragraph as well as such
sale/purchase/refinance transactions, and to settle any dispute and compromise any and all
claims in connection therewith as the Attorney-In-Fact may deem proper.

4.      I specifically authorize the Attorney-In-Fact to perform all banking functions
associated with Red Rock IX, including but not limited day-to-day banking matters, receipt



and disbursement of funds, creation and dissolution of current and future bank accounts. This power extends specifically to the bank account currently associated with Red Rock IX held at the Industrial and Commercial Bank of China ("ICBC") a copy of the account established by Ms. Ma Hoi Yan Karen of ICBC is attached as Exhibit B hereto and incorporated by this reference:

> Industrial and Commercial Bank of China (Asia) Limited
>
> Account Numbers:
> 701-530-032889: Multi-currency & RMB and USD
> 701-502-041484: HKD
> 701-560-008511: RMB

5.      To take any and all other action in connection with Red Rock IX as the Attorney-In-Fact may deem to be necessary or desirable.

I hereby revoke any and all powers of attorney heretofore (if any) made by me authorizing any person or entity to do any act relative to the above-described property or any part thereof.

I hereby give and grant to the said Attorney-In-Fact full power and authority to do and perform all and every act and thing whatsoever requisite, necessary and proper to be done in the exercise of any of the rights and powers herein granted, as fully to all intents and purposes as I might or could do if personally present, hereby ratifying and confirming all that my said Attorney-In-Fact shall lawfully do or cause to be done by virtue of this Irrevocable Power of Attorney and the rights and powers herein granted.

I further give to the said Attorney-In-Fact full power and authority to appoint a substitute to perform any of the acts that the said Attorney-In-Fact is by this instrument empowered to perform, with the right to revoke such appointment of such substitute at the pleasure of the Attorney-In-Fact.

I hereby agree to indemnify any third party and further give to the said Attorney-In-Fact full power and authority to indemnify and hold harmless and third party who accepts and acts under this Irrevocable Power of Attorney for and claims that arise against the third party because of reliance on this Irrevocable Power of Attorney.

The Attorney-In-Fact named herein shall not be obligated to furnish bond or other security.

INTENTIONALLY LEFT BLANK

This Irrevocable Power of Attorney shall not be affected by and shall not terminate on the disability or incapacity of the principal. THIS IS A DURABLE POWER OF ATTORNEY.

This Irrevocable Power of Attorney shall be effective from the date hereof indefinitely, until such time as complete and total ownership of Red Rock IX is assumed by new shareholder(s) and or owner(s). A copy of the sale of shares of Red Rock IX is attached as Exhibit C hereto and incorporated by this reference.

EXECUTED this 5th day of September, 2017.

_____
Phengphian Laogumnerd
Principal

ACKNOWLEDGED BY

GESMUS HIGGINBOTHAM

The undersigned witness certifies that Mr.Phengphian Laogumnerd, know to me to be the same person whose name is subscribed as principal to the foregoing power of attorney, appeared before me and acknowledged signing and delivered this Irrevocable Power of Attorney as the free and voluntary act of the principal, for the uses and purposes therein set forth. I believe him/her to be of sound mind and memory.

Dated: 5 September 2017

Witness: _____
Joel Rousseau

# Purchase Agreement
## for
## Red Rock IX Limited

AN ENTITY INCOPORATED IN THE SPECIAL ADMINISTRIVE REGION OF HONG KONG IN ACCORDANCE WITH COMPANY ORDINANCE CHAPTER 622 OF THE LAWS OF HONG KONG AS A LIMTED COMPANY, INCORPORTAION NUMBER 2474363 ON 10 JANUARY 2017

This Purchase Agreement ("Agreement"), is made as of _____, by and among _____, (collectively referred to as "the Members" or individually as a "Member"), Mr.Phengphian Laogumnerd ("Principal") and Higginbotham Law, P.C. c/o George Higginbotham with reference to the following facts:

A.     The Members according to the terms of this document will acquire all shares as well as complete and total ownership of the company Red Rock IX, Ltd. an entity incorporated in the Special Administrative Region of Hong Kong in accordance with company ordinance chapter 622 of the laws of Honk Kong as a limited company, incorporation number 2474363 on 10 January, 2017 ("Red Rock IX" and/or "Company").

B.     On or about 5 September 2017, Red Rock IX Principal of record Mr.Phengphian Laogumnerd assigned all control of Red Rock IX to Higginbotham Law, P.C. c/o George Higginbotham ("Attorney in Fact") via an Irrevocable Power of Attorney until such time as this Purchase Agreement could be executed and enforced by the parties hereto.

C.     The information provided in this preamble is material to the terms of this agreement.

NOW, THEREFORE, the Members, the Principal with the concurrence of the Attorney in Fact, by the terms of this Purchase Agreement set forth the purchase of Red Rock IX.

## ARTICLE I
## ORGANIZATIONAL MATTERS

<u>Name</u>.  The name of the Company shall be "Red Rock IX". The Company may conduct business under that name or any other name approved by the Members.

<u>Term</u>.
A.     The term of this Purchase Agreement shall commence on the date hereof and continue in perpetuity.

B.      The term of the Company commenced as of 10 January 2017, and unless sooner terminated, shall continue in perpetuity.

Purchase of Company.  For good and valuable consideration the receipt of which is hereby acknowledged, Mr.Phengphian Laogumnerd, Principal agrees to transfer all ownership, rights, shares and any other ownership interest to members according to the terms of this Purchase Agreement.

Office and Agent.  The Company shall continuously maintain an office and registered in the Special Administrative Region of Hong Kong with an address at Level 54 Hopewell Centre, 183 Queen's Road East, Hong Kong.  The principal office of the Company shall be located at _____or such location as the Members may determine.  The registered agent shall be as stated in the Articles or as otherwise determined by the Members.

Business of the Company.  Notwithstanding the purpose of the Company which is described in the Articles, the Company shall not engage in any business other than the following without the consent of all of the Members:

(a)      the business development consulting, crisis management and resolution, asset acquisition and management, media consulting, identification of business opportunities in emerging market and market analysis.

(b)      such other activities directly related to the foregoing business as may be necessary or advisable in the reasonable opinion of the Members to further such business.

Counsel to the Company.  Counsel to the company may also be counsel to any Member or any Affiliate of a Member.  The Members may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the Georgia Rules of Professional Conduct or similar rules in any other jurisdiction ("Rules").  The Company has selected Higginbotham Law, P.C. c/o George Higginbotham, Esq., ("Company Counsel") currently Attorney in Fact, as legal counsel to the Company.  Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit agreement to such effect between the Member and Company Counsel, and that in the absence of any such written agreement Company Counsel shall owe no duties directly to a Member. Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, then each Member agrees that Company Counsel may represent either the Company or such Member in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

Complete Agreement.  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements



among the Members.  To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

Binding Effect.  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

Severability.  If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

Notices.  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.

Amendments.  All amendments to this Agreement will be in writing and signed by all of the Members.

Multiple Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

Remedies Cumulative.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

Section Intentionally Left Blank



Signature Page

If the foregoing is an accurate representation of your understanding of this agreement, regarding Red Rock IX Limited, A Hong Kong Limited Company, please execute by singing below; effective as of the date written above.

MEMBERS:

_____

Pras Michel
Member _____ %

_____

Nicki Lum-Davis
Member _____ %

_____

Phengphian Laogumnerd
Principal

_____

George Higginbotham
Attorney In Fact

RED ROCK IX                                  4



| (2) | ☐ 合夥人 Partner | ☐ 股東 Shareholder | ☐ 主席 Chairman | ☐ 董事 Director | ☐ 委員 Committee Member | ☐ 授權人 Authorized Signatory | ☐ 其他 (請註明) Others (Please specify) _____ |
|---|---|---|---|---|---|---|---|

| 英文姓名<br>Name in English | | (先生／太太／小姐／女士)*<br>( Mr./Mrs./Miss/Ms )* | 中文姓名<br>Name in Chinese | |
|---|---|---|---|---|
| 香港身份證／內地居民身份證／護照／其他證件號碼*<br>HKID Card/PRC identity card/<br>Passport/Other ID Number* | 簽發國家／地區<br>Issue Country/Place | | 簽發日期<br>Issue Date | 屆滿日期<br>Expiry Date |
| 其他證件號碼 (如適用)<br>Second ID Number (if applicable) | 簽發國家／地區<br>Issue Country/Place | | 簽發日期<br>Issue Date | 屆滿日期<br>Expiry Date |
| 出生日期 (日／月／年)<br>Date of Birth (DD/MM/YYYY) | @ 出生國家／地區<br>Country/Place of Birth | | 國籍<br>Nationality | |
| 住宅電話國家代碼<br>Country Code of<br>Residential Phone | 住宅電話號碼<br>Residential Phone Number | 手機國家代碼<br>Country Code of<br>Mobile | 手提電話號碼<br>Mobile Phone Number | |

| 住宅地址<br>Residential Address | ☐ 香港 HK   ☐ 九龍 KLN   ☐ 新界 NT<br>☐ 國家(請註明) Country (Please specify) _____ |
|---|---|
| 永久地址 (如與住宅地址不同)<br>Permanent Address (if different from Residential Address) | ☐ 香港 HK   ☐ 九龍 KLN   ☐ 新界 NT<br>☐ 國家(請註明) Country (Please specify) _____ |

| 僱主／公司名稱<br>Name of Employer/Company | | |
|---|---|---|
| 僱主／公司職務<br>Employer/Company Business | 職銜<br>Occupation | # 辦公室電話號碼<br>Office Phone Number |

| # 電郵地址<br>Email Address |
|---|

| (3) | ☐ 合夥人 Partner | ☐ 股東 Shareholder | ☐ 主席 Chairman | ☐ 董事 Director | ☐ 委員 Committee Member | ☐ 授權人 Authorized Signatory | ☐ 其他 (請註明) Others (Please specify) _____ |
|---|---|---|---|---|---|---|---|

| 英文姓名<br>Name in English | | (先生／太太／小姐／女士)*<br>( Mr./Mrs./Miss/Ms )* | 中文姓名<br>Name in Chinese | |
|---|---|---|---|---|
| 香港身份證／內地居民身份證／護照／其他證件號碼*<br>HKID Card/PRC identity card/<br>Passport/Other ID Number* | 簽發國家／地區<br>Issue Country/Place | | 簽發日期<br>Issue Date | 屆滿日期<br>Expiry Date |
| 其他證件號碼 (如適用)<br>Second ID Number (if applicable) | 簽發國家／地區<br>Issue Country/Place | | 簽發日期<br>Issue Date | 屆滿日期<br>Expiry Date |
| 出生日期 (日／月／年)<br>Date of Birth (DD/MM/YYYY) | @ 出生國家／地區<br>Country/Place of Birth | | 國籍<br>Nationality | |
| 住宅電話國家代碼<br>Country Code of<br>Residential Phone | 住宅電話號碼<br>Residential Phone Number | 手機國家代碼<br>Country Code of<br>Mobile | 手提電話號碼<br>Mobile Phone Number | |

| 住宅地址<br>Residential Address | ☐ 香港 HK   ☐ 九龍 KLN   ☐ 新界 NT<br>☐ 國家(請註明) Country (Please specify) _____ |
|---|---|
| 永久地址 (如與住宅地址不同)<br>Permanent Address (if different from Residential Address) | ☐ 香港 HK   ☐ 九龍 KLN   ☐ 新界 NT<br>☐ 國家(請註明) Country (Please specify) _____ |

| 僱主／公司名稱<br>Name of Employer/Company | | |
|---|---|---|
| 僱主／公司職務<br>Employer/Company Business | 職銜<br>Occupation | # 辦公室電話號碼<br>Office Phone Number |

| # 電郵地址<br>Email Address |
|---|

\* 請刪去不適用者。‧ Please delete where inapplicable.

# 註: 如屬「F」者，該部分為非必須填寫的資料。如申請人為美國公民或居民或美國稅法目的的相關的美國人士，「@」的部分為非必須填寫的資料。Completion of the sections marked with "#" is optional for account opening.
If you are a citizen or resident of the United States (U.S.) or other U.S. person for the purposes of U.S. tax law, completion of the sections marked with "@" is optional.

---

### Customer Declarations 客戶聲明

I/We confirm that the information given above is true, correct and complete.  I/We further undertake to notify the Bank promptly in writing whenever there is any change to any of such information.
本人／吾等確實上述資料全屬真實、正確及完備。本人／吾等承諾，如任何該等資料有所變改，本人／吾等當即時以書面通知 貴銀行。

Customer Signature(s)
客戶簽署

| Account Owner/Chairman/Sole Proprietor/Partner/Others<br>帳戶持有人／主席／獨資公司持有人／合夥人／其他 | Joint Account Owner/Partner/Authorized Signatory/Director (If Applicable)<br>聯名賬戶持有人／合夥人／授權人／董事 (如適用) |
|---|---|
| *Phengwen Loujumard* (S.V.) | *[signature]* (S.V.) |
| Name 姓名： | Name 姓名： |
| ID Document Number 證件號碼： *In Phen.p* | ID Document Number 證件號碼： *P.A* |
| Date 日期： | Date 日期： |

| For Bank Use Only 銀行專用 | | | | | |
|---|---|---|---|---|---|
| Branch | | | | | TPC (For Company Account Use Only) |
| CIF Number | Date | Prepared by | Input by | Checked by | Checked by |
| | | | | | |



**Customer Information Supplementary Sheet**
客戶資料補充記錄表

| Branch 分行/ Center 中心 |
| --- |

帳戶號碼
Account Number _____

## 客戶資料(適用於個人賬戶) Customer Information (For Personal Account)

**賬戶授權人 (如適用) Account Authorized Signatory (If applicable)**

| 英文姓名<br>Name in English | | 中文姓名<br>Name in Chinese | |
| --- | --- | --- | --- |
| ( Mr./Mrs./Miss/ Ms ) * | | (先生/太太/小姐/女士)* | |
| 香港身份證／內地居民身份證／護照／其他證件號碼*<br>HKID Card/PRC identity card/<br>Passport/Other ID Number* | 簽發國家／地區<br>Issue Country/Place | 簽發日期<br>Issue Date | 屆滿日期<br>Expiry Date |
| 其他證件號碼 (如適用)<br>Second ID Number (if applicable) | 簽發國家／地區<br>Issue Country/Place | 簽發日期<br>Issue Date | 屆滿日期<br>Expiry Date |
| 出生日期 (日／月／年)<br>Date of Birth (DD/MM/YYYY) | @ 出生國家／地區<br>Country/Place of Birth | 國籍<br>Nationality | |
| 住宅電話國家代碼<br>Country Code of<br>Residential Phone | 住宅電話號碼<br>Residential<br>Phone Number | 手機國家代碼<br>Country Code of<br>Mobile | 手提電話號碼<br>Mobile<br>Phone Number |
| #電郵地址<br>Email Address | | | |
| 住宅地址<br>Residential Address | | | ☐ 香港 HK  ☐ 九龍 KLN  ☐ 新界 NT<br>☐ 國家(請註明) Country (Please specify) _____ |
| 永久地址 (如與住宅地址不同)<br>Permanent Address (if different from Residential Address) | | | ☐ 香港 HK  ☐ 九龍 KLN  ☐ 新界 NT<br>☐ 國家(請註明) Country (Please specify) _____ |
| 受僱情況<br>Employment Status | ☐ 受僱 Employed  ☐ 自僱 Self-Employed<br>☐ 退休 Retired  ☐ 其他 (請註明) Others (please specify)_____ | 職業<br>Occupation | |
| 僱主／公司名稱<br>Name of Employer/Company | | 僱主／公司業務<br>Employer/Company Business | |

\*　　請刪去不適用者。Please delete where inapplicable.

#@　如閣下同意，便記錄『#』的部分為非必須要填寫的資料。如中國人為美國公民或居民或其他美國稅法上目的的美國人士，便記錄『@』的部分為非必須填寫的資料。Completion of the sections marked with "#" is optional for account opening.
　　If you are a citizen or resident of the United States (U.S.) or other U.S. person for the purposes of U.S. tax law, completion of the sections marked with "@" is optional.

## 公司賬戶之獨資經營商號持有人／合夥人／股東／主席／董事／委員／授權人的資料
Information of Sole Proprietor/ Partners/ Shareholders/ Chairman/ Directors/ Committee Members/Authorized Signatories of the Company Accounts

| (1) ☐ 獨資經營商號持有人<br>Sole Proprietor | ☐ 合夥人<br>Partner | ☐ 股東<br>Shareholder | ☐ 主席<br>Chairman | ☐ 董事<br>Director | ☐ 委員<br>Committee Member | ☐ 授權人<br>Authorized Signatory | ☐ 其他 (請註明)<br>Others (Please specify) _____ |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 英文姓名<br>Name in English | | | | | (先生/太太/小姐/女士)*<br>( Mr./Mrs./Miss/Ms )* | 中文姓名<br>Name in Chinese | |
| 香港身份證／內地培民身份證／護照／其他證件號碼*<br>HKID Card/PRC identity card/<br>Passport/Other ID Number* | | 簽發國家／地區<br>Issue Country/Place | | 簽發日期<br>Issue Date | | 屆滿日期<br>Expiry Date | |
| 其他證件號碼 (如適用)<br>Second ID Number (if applicable) | | 簽發國家／地區<br>Issue Country/Place | | 簽發日期<br>Issue Date | | 屆滿日期<br>Expiry Date | |
| 出生日期 (日／月／年)<br>Date of Birth (DD/MM/YYYY) | | @ 出生國家／地區<br>Country/Place of Birth | | | 國籍<br>Nationality | | |
| 住宅電話國家代碼<br>Country Code of<br>Residential Phone | | 住宅電話號碼<br>Residential Phone Number | | 手機國家代碼<br>Country Code of<br>Mobile | | 手提電話號碼<br>Mobile Phone Number | |
| 住宅地址<br>Residential Address | | | | | | ☐ 香港 HK  ☐ 九龍 KLN  ☐ 新界 NT<br>☐ 國家(請註明) Country (Please specify) _____ | |
| 永久地址 (如與住宅地址不同)<br>Permanent Address (if different from Residential Address) | | | | | | ☐ 香港 HK  ☐ 九龍 KLN  ☐ 新界 NT<br>☐ 國家(請註明) Country (Please specify) _____ | |
| 僱主／公司名稱<br>Name of Employer/Company | | | | | | | |
| 僱主／公司業務<br>Employer/Company Business | | 職業<br>Occupation | | | #辦公室電話號碼<br>Office Phone Number | | |
| # 電郵地址<br>Email Address | | | | | | | |

\*　　請刪去不適用者。Please delete where inapplicable.

#@　如閣下同意，便記錄『#』的部分為非必須要填寫的資料。如中國人為美國公民或居民或其他美國稅法上目的的美國人士，便記錄『@』的部分為非必須填寫的資料。Completion of the sections marked with "#" is optional for account opening.
　　If you are a citizen or resident of the United States (U.S.) or other U.S. person for the purposes of U.S. tax law, completion of the sections marked with "@" is optional.

**Notification of Change of Signing Instruction** *(for Company/other Organization)*

To:  **Industrial and Commercial Bank of China (Asia) Limited (the "Bank")**

Date: _____

Company Name: _____

Account No(s): _____

We hereby inform you that with effect from _____ or receipt of the Bank and due processing of this notification, whichever is the later (the "Effective Date"), the authorized signatory(ies) mentioned at the end of this notification be appointed the authorized signatory(ies) of the Company to operate and give instructions and to execute and deliver any and all documents which he/they consider(s) necessary or desirable in relation to the account(s) listed above (collectively the "Account") and all transactions connected therewith or contemplated thereby and be served as a record of our current specimen signature(s) for the Account with the Bank. We hereby agree that the Bank shall not be liable for our losses and damages as a result of any transaction conducted in respect of any of the Account as per the instruction(s) given or upon reliance of any documents executed before the Effective Date by any of our previous authorized signatory(ies), the authorization of which has/have been revoked herein.

The authorization and instructions hereby given shall remain in full force until any written notice from the Board of the Directors of the Company to the contrary and/or such other documents required by the Bank in this regard, shall have been received and duly processed by the Bank.

The undersigned certify that resolutions in the above terms have been duly passed by the Company's board of directors / governing body in accordance with the Company's articles of association / constitution (and any rules or by-laws) on _____ and continue in full force and effect without amendment.

X _____
Director / Member of governing body
Name in English: _____ Mr Pheng

_____
Director / Secretary / Member of governing body
Name in English:

Authorized Signatory(ies):

| Specimen Signature | Specimen Signature | Specimen Signature |
|---|---|---|
| _S.V._ | _S.V._ | _S.V._ |
| Name in English: | Name in English: | Name in English: |
| ID No: _____ Mr Pheng | ID No: _____ P A. | ID No: |
| Class (if applicable): | Class (if applicable): | Class (if applicable): |
| Specimen Signature | Specimen Signature | Specimen Signature |
| _S.V._ | _S.V._ | _S.V._ |
| Name in English: | Name in English: | Name in English: |
| ID No: | ID No: | ID No: |
| Class (if applicable): | Class (if applicable): | Class (if applicable): |

*(By their signature, each authorized signatory confirms that his/her information provided to the Bank is correct and agrees to notify the bank of any material changes.)*

**Signing Instruction:**

☐ Any ___1___ of ___2___

☐ All of us

☐ Others (please specify): _____

| For Bank Use Only | | |
|---|---|---|
| CI No: | | |
| Branch / Business Units | | TPC |
| Approved by | "更改印鑑" status set on FOVA | Checked by |
| | | |

125-1045C/1509/GH

## 改變簽署指示的通知書 *(適用於公司/其他組織)*

致：中國工商銀行(亞洲)有限公司（「貴行」）　　　　　　　　　日期：＿＿＿＿＿＿＿＿＿＿

公司名稱：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

戶口號碼：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

吾等謹此通知　貴行，自 ＿＿＿＿＿＿＿＿＿ 或　貴行收到及正式處理本通知書起（以較後者為準）（「生效日期」），本通知書之末所提及的授權簽署人獲委任為公司的授權簽署人，以操作及給予指示以及釘立及交付任何及所有其認為必需或合適有關上述帳戶（統稱「帳戶」）的文件及所有有關或擬進行的交易，並用作為吾等現時與　貴行帳戶的簽名樣本記錄。吾等謹此同意，　貴行不會就吾等任何帳戶因給予的指示或因依賴吾等任何前授權簽署人於生效日期前釘立的任何文件而進行的交易所產生的損失及損害承擔負責，而有關授權現已作廢。

鑑此作出的授權及指示將持續全面生效，直至　貴行已收到及正式處理任何本公司董事會所作出相反的書面通知及/或　貴行就此要求的該等其他文件。

下列簽署人證實，按照以上內容的決議案已由本公司的董事會／管治團體按其組織章程細則／組織章程(及任何規則或章程)於　年　　　　月　　　　日正式通過，並且繼續維持十足效力及作用，並無任何修訂。

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
董事／管治團體成員　　　　　　　　　　　　董事／秘書／管治團體成員
英文姓名：　　　　　　　　　　　　　　　　英文姓名：

授權簽署人：

| 簽名樣本 | 簽名樣本 | 簽名樣本 |
|---|---|---|
| S.V. | S.V. | S.V. |
| 英文姓名：<br>身份證號碼：<br>類別（如適用）： | 英文姓名：<br>身份證號碼：<br>類別（如適用）： | 英文姓名：<br>身份證號碼：<br>類別（如適用）： |
| 簽名樣本 | 簽名樣本 | 簽名樣本 |
| S.V. | S.V. | S.V. |
| 英文姓名：<br>身份證號碼：<br>類別（如適用）： | 英文姓名：<br>身份證號碼：<br>類別（如適用）： | 英文姓名：<br>身份證號碼：<br>類別（如適用）： |

*(各授權簽署人透過簽署，確認其提供予　貴行的資料乃正確無誤，並同意如有任何重大變動將會通知　貴行。)*

簽署指示：

☐ ＿＿＿＿中任何＿＿＿＿＿＿

☐ 吾等全體

☐ 其他（請註明）：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

| For Bank Use Only | | |
|---|---|---|
| CI No: | | |
| Branch / Business Units | | TPC |
| Approved by | "更改印鑑" status set on FOVA | Checked by |
| | | |

**ICBC 工银亚洲**

Personal/Joint/Sole Proprietorship/    A/C No. _____
Partnership/Limited Company/Society    A/C No. _____

| Name | | (In Chinese) | BR/CI No. |
| --- | --- | --- | --- |
| | | (In English) | Tel No. |

| Name & ID/PP No. | | Specimen Signature(s) | SIGNING INSTRUCTIONS |
| --- | --- | --- | --- |
| | | | ☐ Any ___ of the ___ specimen signature(s) |
| | | | ☐ Others (Please Specify) |
| N. Phe... | (Class ) | X Phongphet Louyanmah | |
| P.A | (Class ) | X | SPECIMEN CHOP |
| | (Class ) | | |
| | (Class ) | | |

| For Bank Use Only | Opened By | Approved By | For BDS Use Only | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | A/C Open Date | Mandate Date | Checked By | | Certified By |
| Page ___ of ___ | | | | | | | |

**For Bank Use Only**

| Account No. | Account Open Date | Effective Date | Remarks |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

125-0208C/1008/GH

(3)　簽署或接收與上文第 1(a)條所述條款及細則中載述、提及或預期的任何事項有關或為之而起的所有通知、確認書、賬目報表、收據、承諾書、證書、保證、協議、文書或文件，但在行使上述簽署權時，授權人士的簽署須根據第二部份符合當時有效的議定簽署安排。

To sign or receive all notices, confirmations, statements of account, receipts, acknowledgements, certificates, undertakings, agreements, instruments or documents for or relating to any of the matters mentioned in, referred to or contemplated the Terms and Conditions referred to in paragraph 1(a) above, provided that, in exercising such signing authority, the Authorized Person(s) shall sign in accordance with the signing arrangement as set out in Part II for the time being in effect.

本人／吾等同意，授權人士基於或根據上文第 1(a)條所述條款及細則授予共同或各別所辦理、履行、訂立或實施的所有行為、事情、事項和交易在所有方面對本人／吾等有約束力。授權人士應具備為本人／吾等及代表本人／吾等與貴行持續往來的權限，而其簽字可作為充足權限依據並在所有方面對本人／吾等有約束力。貴行有權信賴授權人士的此權限並據此行動，除非：

I/We hereby agree that all acts, things, matters and transactions done, performed, entered into or effected by the Authorized Person(s) jointly or singly on or pursuant to the authority conferred upon them under the Terms and Conditions referred to in paragraph 1(a) above shall in all respects be binding upon me/us. The Authorized Person(s) shall have such continuous authority to deal with the Bank, for and on behalf of me/us and the signatures of the Authorized Persons shall be a sufficient authority and shall bind me/us in all respects, and the Bank is entitled to act and rely on such authority of the Authorized Person(s) unless:

(1)　貴行已經實際收到本人／吾等發出的一份書面指示，聲明撤銷、修訂或變更授予授權人士的權限或授權人士的組成或第二部份所述的簽署安排；及

the Bank has actually received an instruction in writing from me/us revoking, amending or varying the authority conferred upon or the composition of the Authorized Person(s) or the signing arrangement as set out in Part II; and

(2)　此項指示應按貴行規定的形式作成或令貴行滿意，且本人／吾等已向貴行提供其授權妥當的證據。

such instruction is completed in a form prescribed by the Bank or is otherwise found by the Bank to be satisfactory and evidence of due authorization thereto by me/us have been furnished to the Bank.

本人／吾等同意此後任何時候經任何或所有授權人士作出的所有行為、契據或指示，並承認此等行為、契據或指示無論何時均對本人／吾等有約束力。

I/We agree to ratify at any time hereafter all acts, deeds or instructions given by any or all of the Authorized Person(s) and acknowledge that the same shall at all times be binding on me/us.


賬戶持有人簽署 Signature of account holder(s)
賬戶名稱 Name of Account：
賬戶號碼 Account No：
日期 Date：

授權書
## Letter of Authorization

致： 中國工商銀行（亞洲）有限公司（「貴行」）
To:   Industrial and Commercial Bank of China (Asia) Limited (the "Bank")

本人／吾等謹授權載述於下文第一部份的人士（各自稱為「授權人士」）根據下文第二部份所載述的簽署安排，代表本人／吾等作出或執行下述全部或任何事項：
I/We, the undersigned hereby authorize and empower the person(s) whose particular are set out in Part I below (each a "Authorized Person") for and on my/our behalf to do or execute all or any of the acts and things hereinafter mentioned in accordance with the signing arrangements set out in Part II below:

第一部份 - 授權人士詳情
Part I - Particulars of Authorized Person(s)

| 姓名 Name | 身份證明文件號碼 Identification Document No. | 簽字式樣 Specimen Signature |
|---|---|---|
|  | P9   大 |  |
|  |  |  |
|  |  |  |

第二部份 - 簽署安排
Part II - Signing Arrangements

(1)   就涉及以下有關事項，以書面或口頭向貴行發出任何性質的所有通知、指令、命令或指示：
       To give the Bank all notices, directions, orders or instructions of whatever nature, written or verbal, for or in relation to or in respect of:

    (a)   遵照或根據（包括但不限於）貴行所提供產品的條款及細則擬進行的交易（包括但不限於基金投資服務、債券投資、證券、股票掛鈎定期存款或貨幣掛鈎定期存款）；
       the transactions under or pursuant to, including, without limitation, the Terms and Conditions with respect to various products offered by the Bank (including but not limited to Unit Trusts Investment Service, Bond Investment, Securities, Equity-Linked Deposit or Currency-Linked Deposit);

    (b)   對本人／吾等投資賬戶操作（包括但不限於基金投資戶口、每月儲蓄計劃、債券投資賬戶、證券賬戶、股票掛鈎定期存款賬戶、貨幣掛鈎定期存款賬戶）；
       the operation of my/our investment account(s), including, without limitation, accounts for Unit Trusts Investment, Monthly Savings Plan, Bond Investment, Securities, Equity-Linked Deposit, Currency-Linked Deposit;

    (c)   將證券、基金單位、股份或存款或其相關的收入、產生於債券投資賬戶／貨幣掛鈎定期存款賬戶／股票掛鈎定期存款賬戶／基金投資戶口／每月儲蓄計劃的其他收入、款項、資產、財產、權利、股息或利息提取、轉讓或處置（並出具有效的收據後即解除因此的責任）；及
       the withdrawal, transfer or disposal of securities, units, share or deposit or the proceeds thereof, other income, moneys, assets, properties, rights, dividends or interests derived therefrom to or from the Bond Investment Account/Currency-Linked Deposit Account/Equity-Linked Deposit Account/Unit Trusts Investment Account/Monthly Savings Plan (and to give valid receipt and discharge therefor); and

    (d)   關於涉及或因上文第 1(a)條所述條款及細則而產生的任何其他事項；及
       any other matter whatsoever with respect to, concerning or arising from the Terms and Conditions referred to in paragraph 1(a) above; and

(2)   在貴行與本人／吾等根據上文第 1(a)條所述條款及細則進行的所有事項、經營及交易中，全權及有效地為本人／吾等的所有意圖和目的行事，就如本人／吾等親自出席並在上述事項、經營和交易中行事一樣；及
       With respect to all matters, dealings or transactions between the Bank and me/us under or pursuant to the Terms and Conditions referred to in paragraph 1(a) above, to act as fully and effectually for all intents and purposes as if I/we were personally present and were acting in the matters, dealings and transactions aforesaid; and

# ATTACHMENT 9

**HIGGINBOTHAM LAW, P.C.**

GEORGE HIGGINBOTHAM, PARTNER
1308 GALLATIN STREET, NW
WASHINGTON, DC 20011
GHESQUIRE@GMAIL.COM
646-232-0027

September 27, 2017

Via Email: allan.maragh@cnb.com

Allan Maragh
Vice President
City National Bank
Sports & Entertainment Banking
1140 Avenue of the Americas, 2nd Floor
New York, NY 10036

Re: Anicorn, LLC & Artemus, LLC - Banking Relationship

Gentlemen,

In an email dated September 19, 2017, you requested various documents and further information related to the business transactions of Anicorn, LLC ("Anicorn") and Artemus, LLC ("Artemus") as they relate to City National Bank ("CNB"). I represent Mr. Pras Michel who owns both of these entities and as such assist with the business and legal aspects of these companies. Upon receipt of your email, I requested documentation from Wealth Associates, Management Inc. regarding the incorporation of these entities and Mr. Michel regarding the origin of the funds that have been received by both entities. Consistent with our conversation on September 19, the following is an attempt to address your requests and inquiries.

Inquiries follow numbering in email:

1.      Anicorn is the corporate entity which Mr. Michel has created to provide services to those clients who wish to retain professionals in conflict resolution, crisis management and media strategies. Mr. Michel has created a way to commoditize his celebrity status vis-a-vis his personal and political relationships in a way that provide problem solving services to his clients, and developing solutions for complex issues. With some matters Mr. Michel is actively involved in the process, in others Mr. Michel/Anicorn is the conduit to those who are best positioned to provide the desired outcome.

There are individuals and corporations in the global community like Lucky Mark Trading, LTD ("Lucky Mark") who not withstanding their individual or corporate wealth find themselves in circumstances where there is a need for a strategic partner to identify, vet and bring to bear other highly qualified professionals who are able to provide extremely competent and confidential services to resolve their issues. Anicorn provides those services, whether it is coordinating political introductions, identifying legal counsel, or determining an effective crisis management strategy, Anicorn has the ability to implement a plan of action to achieve the best results. Due to the highly sensitive nature of the matters Anicorn handle for Lucky Mark, as well as confidentiality provisions in the retainer agreement, I am not at liberty to discuss the specific nature of the matters that Anicorn are handling beyond the services listed above.

Anicorn has experienced successes in achieving the interim goals of its current client and expects to continue and expand this business model, staying true to core principles of providing outstanding services and exercising the highest degree of discretion and respect for the clients' needs.

1

  a.  Please see attached
  b.  Please see attached
  c.  Please see attached

  d.  To date Mr. Michel is the only advertising/promotion that Anicorn has needed (there is only one client to date).  In addition to his musical successes, his international efforts in Haiti, Sudan, Malaysia, the Dominican Republic, Ethiopia, Senegal, and Canada have confirmed his bona-fides in in consulting.  In addition, Anicorn clientele is strictly by reference only and to date has only worked with Lucky Mark.

    The 'model' contracts are not dissimilar to standard retainer agreements or agreements for services.  A copy of such a form has been provided for reference.

2.  Lucky Mark has retained Anicorn to identify appropriate counsel, as well as other professionals to resolve a highly complex civil litigation matter.  Of the monies received by Anicorn, most has been paid to these professionals in resolution of this matter.  A review of CNB records will show who has received these transfers.

  Mr. Michel determined that there was a significant business model associated with the services he had performed previously for other friends/clients.  Mr. Michel decided to incorporate Anicorn on March 20, 2017 to formalize these relationships through this Anicorn, LLC.  Lucky Mark is the Anicorn's only paying client to date.  The volume of work, the need for personal hands-on engagement, and the lucrative nature of this project has made it difficult to seek out new business opportunities for Anicorn.

  The source of funds is Lucky Mark, according to the documents provided it was incorporated in 2016.  Lucky Mark is a souvenirs, gifts and novelty manufacturer and exporter based in HK.  Lucky Mark creates new designs, source variety of souvenirs, gifts and novelty merchandise including high-quality Porcelain, Ceramic, Stoneware Mugs, Glassware a range of other souvenir and novelty products.

3.  Please refer to the first answer regarding the services that Anicorn provides.
  a.  Please see attached
  b.  The figures were provided to CNB by Wealth Management as a best estimate based on information at that time.  As parties came to understand the complexity of the matter, the scope of work increased, and the fees increased accordingly.

4.  Lucky Mark requested that Anicorn identify suitable counsel to assist with its legal matters.  As a Hong Kong entity with few connections to the U.S. legal community, Lucky Mark relied on Anicorn to identify, vet and introduce potential law firms to Lucky Mark which Anicorn did.
  a.  In order to avoid paying numerous third party 'vendors', Anicorn collected fees for the law firm among other consultants and paid out their fees.  CNB records of the Anicorn account should reflect payments to the chosen Los Angeles firm of approximately $9 million dollars USD.

5.  Artemus LLC is another entity owned by Mr. Michel more specifically related to his work in the entertainment business.  Lucky Mark requested work on a project that was separate from work being done by Anicorn so Mr. Michel directed those funds through Artemus as the fee being charged was to be applied to the entertainment matters as opposed to Anicorn business.

  CNB should have a record of the recipient, CHR Group, LLC owned by Nikki Lum.  CHR Group invests in media and entertainment products for packaging, show running and other forms of distribution.

6.  Anicorn is unable to provide particulars related to the litigation matter as it is confidential to the client.
  a.  Colfax Law Firm – CNB wires to the firm should contain all relevant information regarding names and address.

2

7. There may be additional funds wired into the Anicorn account from Lucky Mark. As of the date of this communication the amount and when those wires may take place is unknown. Anicorn will make every effort to inform you of those wires as that information becomes available.

In the future, Anicorn aspires to provide the above referenced services to a number of domestic and international clients. Once again who they may be and where the funds originate is unknown at this time.

In the event you have any additional questions, please feel free to contact me.

Kind regards,

George Higginbotham

CC: P. Michel, B. Gluzberg

3

# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "ANICORN, LLC", FILED IN THIS OFFICE ON THE TWENTIETH DAY OF MARCH, A.D. 2017, AT 6:12 O`CLOCK P.M.



Jeffrey W. Bullock, Secretary of State

6354096  8100
SR# 20171880257

Authentication: 202231786
Date: 03-20-17

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 06:12 PM 03/20/2017
FILED 06:12 PM 03/20/2017
SR 20171880257 - File Number 6354096

# STATE OF DELAWARE
## CERTIFICATE OF FORMATION
## OF LIMITED LIABILITY COMPANY

The undersigned authorized person, desiring to form a limited liability company pursuant to the Limited Liability Company Act of the State of Delaware, hereby certifies as follows:

1.     The name of the limited liability company is ANICORN, LLC

2.     The Registered Office of the limited liability company in the State of Delaware is located at 42 READ'S WAY (street), in the City of NEW CASTLE , Zip Code 19720 . The name of the Registered Agent at such address upon whom process against this limited liability company may be served is THE INCORPORATING COMPANY, LLC

By: _____
Authorized Person

Name: MARC MOSCOWITZ
Print or Type

# ARTICLES OF ASSOCIATION

## OF

## LUCKY MARK (HK) TRADING LIMITED
## 裕標(香港)貿易有限公司

---

Incorporated the 22nd day of July 2016

---

No. 2406594
編號

[ C O P Y ]

公 司 註 冊 處
COMPANIES REGISTRY

公 司 註 冊 證 明 書
### CERTIFICATE OF INCORPORATION

---

本 人 謹 此 證 明
I hereby certify that

## LUCKY MARK (HK) TRADING LIMITED
## 裕標(香港)貿易有限公司

於 本 日 根 據 香 港 法 例 第 622 章 《 公 司 條 例 》
is this day incorporated in Hong Kong under the Companies Ordinance

在 香 港 成 立 為 法 團 ， 此 公 司 是 一 間
( Chapter 622 of the Laws of Hong Kong ), and that this company is

有 限 公 司 。
a limited company.

本 證 明 書 於 二 〇 一 六 年 七 月 二 十 二 日 發 出 。
Issued on 22 July 2016.

(Sd.) Ms Ada L L CHUNG

••••••••••••••••••••••••••••••••••••••••••••••••••••••••
香港特別行政區公司註冊處處長鍾麗玲
Ms Ada L L CHUNG
*Registrar of Companies*
*Hong Kong Special Administrative Region*

註 Note :
公司名稱獲公司註冊處註冊，並不表示獲授予該公司名稱或其他任何部分的商標權或任何
其他知識產權。
Registration of a company name with the Companies Registry does not confer any trade mark rights
or any other intellectual property rights in respect of the company name or any part thereof.

**THE COMPANIES ORDINANCE (Chapter 622)**

**Private Company Limited by Shares**

ARTICLES OF ASSOCIATION

**OF**

# LUCKY MARK (HK) TRADING LIMITED
# 裕標(香港)貿易有限公司

**PRELIMINARY**

1.  The name of the Company is

    "LUCKY MARK (HK) TRADING LIMITED
    裕標(香港)貿易有限公司"

2.  The liability of the members is limited.

3.  The liability of the members is limited to any amount unpaid on the shares held by the members.

4.  Capital and initial shareholdings (on the company's formation)

| | | |
|---|---|---|
| (a) | The total number of ordinary shares that the Company proposes to issue | 1 |
| (b) | The total amount of share capital to be subscribed by the Company's founder member(s) | HKD1.00 |
| (c) | The amount to be paid up or to be regarded as paid up | HKD1.00 |
| (d) | The amount to remain unpaid or to be regarded as remaining unpaid | NIL |

5. The regulations in Schedule 2 to the Companies (Model Articles) Notice (Cap.622H) shall apply to the Company save in so far as they are hereby specifically excluded or are inconsistent with the Articles herein contained. In particular, but without in any way limiting the generality of the foregoing, Articles 11, 12, 16, 21, 22, 23, 26, 28, 33, 39, 41, 53, 56, 63, 64 and 81 shall not apply or are modified as hereinafter appearing.

## GENERAL MANAGEMENT

6. The board of director(s) shall be entrusted with the general management of the business and the affairs of the Company, and shall have full power to do all such acts and things and enter into such contracts and engagements on behalf of the company as the director(s) may consider necessary or desirable and may also appoint and remove or suspend any officers, accountants, agents, servants and employees.

## TRANSFER OF SHARES

7. The directors may in their absolute discretion refuse to register a transfer of any share. If the directors refuse to register a transfer they shall within two months after the date on which the transfer was lodged with the Company, send to the transferee notice of the refusal.

## GENERAL MEETINGS

8. (a) The quorum for the transaction of business at any General Meeting shall be two members present in person or by proxy. Notwithstanding any provision herein, if the Company has only one member, the decision of that member shall be taken by way of written resolution(s).

(b) Meetings may be held in Hong Kong or at such other place or places in the world as the majority of the members in value shall from time to time by resolution determine.

(c) A resolution in writing signed by all of the members of the Company and annexed or attached to the General Meetings Minute Book shall be as valid and effective as a resolution passed at a meeting duly convened. The signature of any member may be given by his Attorney or Proxy. Any such resolution may be contained in one document or separate copies prepared and/or circulated for the purpose and signed by one or more members.

(d) Where the Company has only one member and that member takes any decision that may be taken by the Company in General Meeting and that has effect as if agreed by the Company in General Meeting, he shall (unless that decision is taken by way of a resolution in writing duly signed by him) provide the Company with a written record of that decision within 7 days after the decision is made.

## DIRECTORS

9. Unless and until otherwise determined by an ordinary resolution of the Company, the minimum number of director(s) shall be one and there shall be no maximum number of directors.

10. The first director(s) of the company is/are the person(s) named as the director(s) in the Incorporation Form delivered to the Registrar of Companies.

11. A director need not hold any shares in the Company and is not subject to rotation or retirement at the annual general meetings. A director who is not a member of the Company shall nevertheless be entitled to attend and speak at general meetings.

12. (a)  No director or intended director shall be disqualified from his office by contracting with the Company either as vendor, purchaser or otherwise, nor shall any such contract or any contract or arrangement entered into by or on behalf of the Company with any company or partnership of or in which any director shall be a member or otherwise interested be capable on that account of being avoided, nor shall any director so contracting or being such a member or so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason only of such director holding that office or of the fiduciary relationship thereby established. Provided always that each Director shall forthwith disclose the nature of his interest in any contract or arrangement in which he is interested as required by and subject to the provisions of the Ordinance.

(b)  Provided such disclosure is made as aforesaid, a Director shall be entitled to vote in respect of any contract or arrangement in which he is interested and to be counted in the quorum present at the meeting at which such contract or arrangement is considered.

### POWERS OF DIRECTORS

13. The directors, in addition to the powers and authorities expressly conferred upon them by these Articles, may exercise all such powers and do all such acts as may be exercised or done by the Company in General Meeting subject nevertheless to the provisions of the Companies Ordinance, (Chapter 622), to these Articles, and to any regulations from time to time made by the Company in General Meeting, provided that no regulation so made shall invalidate any prior act of the directors which would have been valid if such regulation had not been made.

14. Without prejudice to the general powers conferred by the last preceding Article and the other powers conferred by these Articles, it is hereby expressly declared that the directors shall have the following powers, that is to say, power :-

(a)  To pay the costs, charges and expenses preliminary and incidental to the promotion, formation, establishment and registration of the Company.

(b)  To purchase or otherwise acquire for the Company or sell or otherwise dispose of any property, rights and privileges which the Company is authorised to acquire at such price and generally on such terms and conditions as they shall think fit.

(c)  To engage, dismiss, and fix the salaries or emoluments of the employees of the Company.

(d)  To institute, conduct, defend, compromise or abandon any legal proceedings by or against the Company or its officers, or otherwise concerning the affairs of the Company, and also to compound and allow time for payment or satisfaction of any debts due to, and of any claims or demands by or against the Company.

(e)  To refer any claims or demands by or against the Company to arbitration and observe and perform the awards.

(f)  To make and give receipts, releases, and other discharges for money payable to the Company, and for claims and demands of the Company.

(g)  To invest, lend or otherwise deal with any of the moneys or property of the Company in such manner as they think fit and to vary or realise any such investment from time to time.

(h)  To arrange for banking facilities, on behalf of the Company, and to pledge, mortgage or hypothecate any of the property of the Company, if required.

(i)  To open a current account with themselves for the Company and to advance any money to the Company with or without interest upon such terms and conditions as they shall think fit.

(j)  To enter into all such negotiations and contracts, and rescind and vary all such contracts, and execute and do all such acts, deeds and things in the name and on behalf of the Company as they may consider expedient for, or in relation to, any of the matters aforesaid, or otherwise for the purpose of the Company.

(k)  To give to any director, officer or other person employed by the Company a commission on the profits of any particular business or transaction, and such commission shall be treated as part of the working expenses of the Company, and to pay commissions and make allowance (either by way of a share in the general profits of the Company or otherwise) to any persons introducing business to the Company or otherwise promoting or serving the interest thereof.

(l)  To sell, improve, manage, exchange, lease, let, mortgage or turn to account all or any part of the land, property, rights and privileges of the Company.

(m) To employ, invest or otherwise deal with any Reserve Fund or Reserve Funds in such manner and for such purposes as the directors may think fit.

(n)  To execute, in the name and on behalf of the Company, in favour of any director or other person who may incur or be about to incur any personal liability for the benefit of the Company, such mortgages of the Company's property (present or future) as they think fit, and any mortgages may contain a power of sale and such other powers covenants and provisions as shall be agreed upon.

(o)  From time to time to provide for the management of the affairs of the Company abroad in such manner as they think fit, and in particular to appoint any persons to be the Attorneys or agents of the Company with such powers (including power to sub-delegate) and upon such terms as they think fit.

(p)  From time to time to make, vary or repeal rules and by-laws for the regulation of the business of the Company, its officers and servants.

(q)  To delegate any or all of the powers herein to any director or other person or persons as the directors may at any time think fit.

## DIRECTORS' REMUNERATION

15. (a) The directors shall be paid out of the funds of the Company fees for their services, such sum (if any) as the Company may by ordinary resolution from time to time determine.

(b) The directors shall also be entitled to be paid their reasonable expenses incurred in consequence of their attendance at meetings of directors, committee meetings or general meetings or otherwise in or about the business of the Company.

16. The directors may award extra remuneration out of the funds of the Company (by way of salary, commission or otherwise as the directors may determine) to any director who performs services which in the opinion of the directors are outside the scope of the ordinary duties of a director.

4

## BORROWING POWERS

17. (a) The directors may exercise all the powers of the Company without restriction or limitation to borrow money and to mortgage or charge all or any part of the undertaking, property and assets (present and future) and uncalled capital of the Company and to issue debentures, debenture stocks, bonds and other securities, whether outright or as collateral security for any debt, liability or obligation of the Company or of any third party. Debentures, debenture stocks, bonds and other securities of the Company may be made assignable free from any equities between the Company and the person to whom the same may be issued, and may be issued at a discount, premium or otherwise and with any special privileges as to redemption, surrender, drawings, allotment of shares, attending and voting at general meetings of the Company, appointment of directors and otherwise.

(b) The directors shall cause a proper register to be kept, in accordance with the provisions of the Ordinance, of all mortgages and charges affecting the property of the Company and shall duly comply with the requirements of the Ordinance in regard to the registration of mortgages and charges therein specified and otherwise. Where any uncalled capital of the Company is charged, all persons taking any subsequent charge thereon shall take the same subject to such prior charge, and shall not be entitled, by notice to the members or otherwise, to obtain priority over such prior charge.

## APPOINTMENT AND REMOVAL OF DIRECTORS

18. The Company may, from time to time, by ordinary resolution appoint new Directors.

19. The Company may also by ordinary resolution remove any director notwithstanding anything in these Articles or in any agreement between him and the Company and may, appoint another person in his stead.

20. The directors shall have power, exercisable at any time and from time to time, to appoint any other person as a director, either to fill a casual vacancy or as an addition to the Board.

21. In the event that the quorum and minimum number of directors are fixed at two or more directors, the continuing directors may act notwithstanding any vacancy in their body, but if and so long as the number of directors is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of directors, the continuing directors may act for the purpose of increasing the number of directors to that number, or of summoning a general meeting of the Company, but for no other purpose. If there shall be no directors able or willing to act, then any two members may summon a general meeting (and if the Company has only one member, by way of a written resolution passed by that only member) for the purpose of appointing directors.

## RESERVE DIRECTOR

22. If the Company has only one member and that member is also the sole director, the Company may in General Meeting, notwithstanding anything in these Articles, nominate a person (other than a body corporate) who has attained the age of 18 years as a reserve director of the Company to act in the place of the sole director in the event of his death. Any duly authorised officer of the Company is empowered to send the particulars of the nomination of the reserve director to the Registrar of Companies, pursuant to section 455 of the Ordinance.

## ALTERNATE DIRECTORS

23. Any Director may at any time and from time to time appoint any person to be his alternate director and may at any time remove from office the alternate director so appointed by him and appoint another in his place. An alternate director shall not be entitled to receive any remuneration from the

5

Company but shall otherwise be subject to the provisions of these Articles with regard to directors. An alternate director shall subject to his giving to the·Company an address within Hong Kong at which notice may be served upon him be entitled to receive notices of all meetings of the directors and to attend and vote as a director at any meeting at which the director by whom he was appointed is not personally present and generally in the absence of such appointor to perform all the functions of his appointor as director. An alternate director shall ipso facto cease to be an alternate director if his appointor ceases for any reason to be a director. All appointments and removals of alternate directors shall be effected by notice in writing sent to or left with the Company and signed by the director making or revoking such appointment.

## DIRECTORS' MEETINGS

24. (a) Meetings of the directors may be held in Hong Kong or in any other part of the world as may be convenient for the majority.

(b) Unless otherwise determined by the Company by Ordinary Resolution, the quorum for meeting of the directors shall be two. Notwithstanding any provision herein, if the Company has only one director, the decision of that director shall be taken by way of written resolution(s).

(c) The directors may participate in any Board Meeting by means of conference telephone or other communications equipment through which all other directors present at the Meeting can hear each other and such participation shall constitute attendance at Board Meeting as if those participating were present in person, provided always that the quorum was already present at the meeting. The directors may also, in urgent cases, pass a resolution by way of telephonic conference, provided always that a written resolution is subsequently signed by all the directors in accordance with (d) below.

(d) A resolution in writing, signed by majority of the directors for the time being entitled to receive notice of a meeting of the directors, shall be as valid and effectual as if it had been passed at a meeting of the directors duly convened and held, without the need for any agenda or notice. The signature of any director may be given by his alternate. Any such resolution may be contained in one document or separate copies prepared and/or circulated for the purpose and signed by one or more of the directors. A cable, telex, fax or e-mail message or other written electronic communication sent by a director or his alternate shall be deemed to be a document signed by him for the purposes of this Article.

## THE SEAL AND CHEQUES

25. The Company may or may not have a common seal. However, if the directors shall decide to have one made for the Company, the common seal must be a metallic seal having the Company's name engraved on it in legible form and the director(s) shall provide for the safe custody thereof. The seal shall not be affixed to any instrument except by the authority of the directors or a committee authorised by the Board in that behalf, and every instrument to which the seal shall be affixed shall be signed by one director or some other person nominated by the directors for the purpose.

26. The Company may exercise all the powers of having official seals conferred by the Ordinance and such powers shall be vested in the directors.

27. All cheques, bills of exchange, promissory notes and other negotiable instruments issued or required to be signed, endorsed or accepted or otherwise negotiated by the Company shall be signed by the director(s) or such person or persons as the board of director(s) shall from time to time appoint.

## COMPANY SECRETARY

28. (a) The directors shall appoint a secretary of the Company for such period, at such remuneration and upon such conditions as they may think fit, and any secretary so appointed may be removed by them. In the event that the secretary appointed is a corporation or other body, it may act and sign by the hand of any one or more of its directors or officers duly authorised. The First Secretary of the Company is the person named as the Company Secretary in the Incorporation Form delivered to the Registrar of Companies and is **GRL16 SECRETARY LIMITED**.

(b) Where the Company has only one director, that director shall not also be the Secretary of the Company.

(c) Where the Company has only one director, the Company shall not have as Secretary of the Company a body corporate the sole director of which is the sole director of the Company.

## WINDING UP

29. If the Company shall be wound up and the assets available for distribution among the members as such shall be insufficient to repay the whole of the paid up Capital, such assets shall be distributed so that as near as may be the losses shall be borne by the members in proportion to the capital paid up or which ought to have been paid up at the commencement of the winding up on the shares held by them respectively and if in a winding up the assets available for distribution among the members shall be more than sufficient to repay the whole of the capital paid up at the commencement of the winding up the excess shall be distributed among the members in proportion to the capital at the commencement of the winding up paid up or which ought to have been paid up on the shares held by them respectively. But this Article is to be without prejudice to the rights of the holders of any shares issued upon special terms and conditions.

30. (a) If the Company shall be wound up whether voluntarily or otherwise the liquidators may with the sanction of a special resolution divide among the contributories in specie or kind any part of the assets of the Company and may with the like sanction vest any part of the assets of the Company in trustees upon such trusts for the benefit of the contributories or any of them as the liquidators with the like sanction think fit.

(b) If thought expedient any such division may be otherwise than in accordance with the legal rights of the contributories and in particular any class may be given preferential or special rights or may be excluded altogether or in part; but in case any division otherwise than in accordance with the legal rights of the contributories shall be determined on any contributory who would be prejudiced thereby shall have a right to dissent and  ancillary rights as if such determination were a Special Resolution passed pursuant to the Ordinance.

(c) In case any of the shares to be divided as aforesaid consist of shares which involve a liability to calls or otherwise, any person entitled under such division to any of the said shares may, within ten days after the passing of the Special Resolution by notice in writing, direct the liquidator to sell his proportion and pay him the net proceeds, and the liquidator shall, if practicable, act accordingly.

**********************************************

I/We, the undersigned, wish to form a company in pursuance of these articles of association and I/we respectively agree to subscribe for the amount of share capital of the Company and to take the number of share(s) in the Company set opposite to my/our respective name(s):-

| Name(s) and Address(es) of Founder Member(s) | Number of Share(s) Taken | Total Amount of Share Capital |
|---|---|---|
| GRL16 NOMINEE LIMITED<br>14/F., Chun Wo Commercial Centre,<br>25 Wing Wo Street, Central, Hong Kong<br>Corporation | 1 | HKD1.00 |
| Total: | 1 | HKD1.00 |

Dated the 4th day of July, 2016.

請沿虛線剪下並將有效的商業／分行登記證展示在營業地點。
Please cut along the dotted line and display the valid business/branch registration certificate at business address.

✄

| 正　本<br>*ORIGINAL* | 表格　2　　FORM 2<br>《商業登記條例》（第 310 章）<br>**BUSINESS REGISTRATION ORDINANCE (Chapter 310)**<br>《商業登記規例》<br>**BUSINESS REGISTRATION REGULATIONS** | ［第 5 條］<br>[regulation 5] |
|---|---|---|

XXXXXXX
XXXXXXXX

商業 XXX 登記證　*Business XXXXX Registration Certificate*

業務／法團所用名稱<br>Name of Business/<br>Corporation
裕標（香港）貿易有限公司
**LUCKY MARK (HK) TRADING LIMITED**

業務／分行名稱<br>Business/<br>Branch Name
＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊
＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊

地　址<br>Address
**7/F
HONG KONG TRADE CENTRE
161-167 DES VOEUX ROAD
CENTRAL                         HK**

業務性質<br>Nature of Business
**TRADING**

法律地位<br>Status
**BODY CORPORATE**

| 生效日期<br>Date of Commencement | 屆滿日期<br>Date of Expiry | 登記證號碼<br>Certificate No. | 登記費及徵費<br>Fee and Levy |
|---|---|---|---|
| **22/07/2017** | **21/07/2018** | **66459475-000-07-17-1** | **$2,250** |
| | | | （登記費 FEE = $2,000）<br>（徵費　LEVY = $　250） |

請注意下列《商業登記條例》的規定：

1. 第 6(6) 條規定任何業務獲發商業登記證或分行登記證，並不表示該業務或經營該業務的人或受僱於該業務的僱員已遵從有關的任何法律規定。

2. 第 12 條規定各業務須將其有效的商業登記證或有效的分行登記證於每一營業地點展示。

**Please note the following requirements of the Business Registration Ordinance:**

1. Section 6(6) provides that the issue of a business registration certificate or a branch registration certificate shall not be deemed to imply that the requirements of any law in relation to such business or to the persons carrying on the same or employed therein have been complied with.

2. Section 12 provides that valid business registration certificate or valid branch registration certificate shall be displayed at every address where business is carried on.

機印所示登記費及徵費收訖。 RECEIVED FEE AND LEVY HERE STATED IN PRINTED FIGURES.

IRDB101A (12/2010)　　**12/07/2017**　**326001378**　**$2,250.00**

**CR**

公 司 註 冊 處
**COMPANIES REGISTRY**

編號 2406594
**No.**

公 司 註 冊 證 明 書
# CERTIFICATE OF INCORPORATION

\* \* \*

本 人 謹 此 證 明
**I hereby certify that**

LUCKY MARK (HK) TRADING LIMITED
裕標(香港)貿易有限公司

於 本 日 根 據 香 港 法 例 第 6 2 2 章 《 公 司 條 例 》
**is this day incorporated in Hong Kong under the Companies Ordinance**

在 香 港 成 立 為 法 團 ， 此 公 司 是 一 間
**(Chapter 622 of the Laws of Hong Kong), and that this company is**

有 限 公 司 。
**a limited company.**

本 證 明 書 於 二 〇 一 六 年 七 月 二 十 二 日 發 出 。
**Issued on** 22 July 2016 .

香港特別行政區公司註冊處處長鍾麗玲
Ms Ada L L CHUNG
***Registrar of Companies***
***Hong Kong Special Administrative Region***

註 Note：
公司名稱獲公司註冊處註冊，並不表示獲授予該公司名稱或其任何部分的商標權或任何
其他知識產權。
Registration of a company name with the Companies Registry does not confer any trade mark rights
or any other intellectual property rights in respect of the company name or any part thereof.



# Delaware

### The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "ARTEMUS GROUP, LLC", FILED IN THIS OFFICE ON THE TWENTIETH DAY OF MARCH, A.D. 2017, AT 6:12 O`CLOCK P.M.



Jeffrey W. Bullock, Secretary of State

6354095  8100
SR# 20171880258

Authentication: 202231774
Date: 03-20-17

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 06:12 PM 03/20/2017
FILED 06:12 PM 03/20/2017
SR 20171880258 - File Number 6354095

# STATE OF DELAWARE
## CERTIFICATE OF FORMATION
## OF LIMITED LIABILITY COMPANY

The undersigned authorized person, desiring to form a limited liability company pursuant to the Limited Liability Company Act of the State of Delaware, hereby certifies as follows:

1.    The name of the limited liability company is ARTEMUS GROUP, LLC

2.    The Registered Office of the limited liability company in the State of Delaware is located at 42 READ'S WAY _____ (street), in the City of NEW CASTLE _____, Zip Code 19720 _____. The name of the Registered Agent at such address upon whom process against this limited liability company may be served is THE INCORPORATING COMPANY, LLC

By: _____

Authorized Person

Name: MARC MOSCOWITZ _____

Print or Type

## STRATEGIC COMMUNICATIONS & CRISIS MANAGEMENT

**Dated:  7 August 2017**

### 1    PARTIES

1.1    This Agreement is made between

**Lucky Mark (HK) Trading Limited** with its registered office address at 7/F, Hong Kong Trade Centre, 161-167 Des Voeux Road, Central, Hong Kong (the "**Company**"),

and

**Artemus Group LLC** with its registered office address at 8800 Sunset Boulevard, Suite 600, West Hollywood, CA 90069, United States of America (the "**Consultant**").

### 2    APPOINTMENT AND TERM

2.1    The Company appoints the Consultant as the Company's independent external consultant to provide advice and consultancy services based on the Consultant's business experience in strategic communications planning, advisory and consultancy, and the Consultant has agreed to accept such appointment under the terms and the conditions set forth in this Agreement.

2.2    This Agreement shall commence on 31 July 2017 (the "**Commencement Date**") and continue for a term of five (5) months from the Commencement Date (the "**Term**") unless terminated in accordance with the terms of this Agreement.

### 3    SERVICES PROVIDED

3.1    During the subsistence of this Agreement, the Consultant shall provide strategic communications, crisis management, consultancy and other related services as agreed from time to time with the Company (the "**Services**") in relation to the scope of work set out in Appendix A for the Company.

3.2    Where the Company requires further services from the Consultant, the Parties shall discuss what further Services are required, and upon agreement in writing, and the further services shall be governed by the provisions of this Agreement.

1



3.3 The Consultant shall not, without the prior consent of the Company, accept any consultancy, employment, directorship or other position or engagement which would compromise or create a conflict of interest to the Company with its obligations under this Agreement.

3.4 The Consultant shall perform the services in a completely independent manner and under its sole responsibility. The Consultant shall at all times retain a sufficient number of competent and qualified professional and other personnel adequate for the prompt and satisfactory performance of this Agreement.

3.5 The Consultant shall perform the Services conscientiously and shall devote his best efforts and abilities thereto in such manner as the Company and the Consultant shall mutually agree.

3.6 The Consultant warrants that it will use reasonable care and skill in performing the Services and to the standard generally accepted within the industry, sector or profession in which the Consultant operates for the same kind of services provided by the Consultant.

3.7 The Consultant agrees to keep the Company advised as to the Services performed and progress of any project, issue or crisis management matter handled by it in performing the Services hereunder, and shall, as requested by the Company, provide progress reports via meetings with the Company. The Consultant shall meet the Company at least once per month to provide such progress reports.

## 4    NON-COMPETITION

4.1 During the subsistence of this Agreement, the Consultant shall not engage in any business or other activities which are, directly or indirectly, competitive with the business activities of the Company without obtaining the prior written consent of the Company.

4.2 The Consultant agrees that for a period of one (1) year after termination of this Agreement, Consultant shall not:

4.2.1 Divert or attempt to divert from the Company any business of any kind in which it is engaged, including, without limitation, the solicitation of or interference with any of its suppliers or customers, or

4.2.2 Employ, solicit for employment, or recommend for employment any person employed by the Company during the Term and for a period of one (1) year thereafter.

2



## 5    FEES, EXPENSES AND PAYMENT TERMS

5.1    For and in consideration of the Services performed or to be performed by the Consultant under this Agreement, the Company shall pay the Consultant a total fee of EUR 8,482,200.00 (the "**Fees**") as follows:

| Payment date | Amount (EUR) |
|---|---|
| On or before 9 August 2017 | EUR 4,241,100.00 |
| On or before 16 August 2017 | EUR 4,241,100.00 |
| **Total:** | **EUR 8,482,200.00** |

Notwithstanding anything to the contrary under this Agreement, the Consultant has commenced the Services since the Commencement Date and shall continue to do so as long as the payment instalments are paid according to the schedule above.

5.2    The Fees shall be capped and inclusive of all expenses incurred or to be incurred by the Consultant in performing the Services under this Agreement (including, without limitation, hotel charges and airfares for all international travel incurred by the Consultant and/or its personnel or third party consultants in connection with this Agreement, fees of subject matter experts, research specialists, and other consultants engaged by the Consultant in connection with this Agreement and all costs and overhead charges incurred by the Consultant in performing the Services).

5.3    If at any time during the Term a change is required by the Company and agreed to by the Consultant which necessitates the incurrence of additional costs to the Consultant not otherwise agreed between the Parties, the Consultant shall so notify the Company and the Parties shall consult with each other as to any additional fees to be paid.

5.4    Unless and until otherwise instructed in writing by an authorized representative of the Consultant, payments of the Fees (or additional fees, if any) shall be made by remittance to the below account using the following routing details:

Beneficiary Name:    Artemus Group LLC

Account Number:    931962901

Beneficiary Bank:    Chase Bank

Bank Address:    8500 Wilshire Boulevard, Beverly Hills, CA, 90210, USA

SWIFT Code:    CHASUS33

3

Routing Number:     021000021

5.5     All payments made by the Company under this Agreement shall be all-inclusive lump sum fee which shall be deemed to have included but not limited to all costs, expenses, charges, levies and taxes whatsoever incurred or to be incurred by the Consultant in connection with fulfilment and completion of all the Consultant's obligations, responsibilities and works under this Agreement.

## 6     TERMINATION

6.1     Without prejudice to the other remedies or rights, either Party may terminate this Agreement, at any time by written notice to the other Party (the "**Other Party**") upon the occurrence of any of the following events:

6.1.1     If the Other Party is in material breach of its obligations under this Agreement, which if the breach is capable of remedy, that breach is not remedied within the thirty (30) days of the Other Party receiving written notice which specifies the breach and requiring the breach to be remedied; or

6.1.2     If the Consultant has acted in a manner prejudicial to the efficient conduct of the Company's business; or

6.1.3     If the Consultant becomes insolvent or if an order is made or a resolution is passed for the winding up of the Consultant or if an administrator, administrative receiver or receiver is appointed in respect of the whole or any part of the Consultant's assets or business, or if the Consultant makes any composition with its creditors or takes or suffers any similar or analogous action in consequence of debt, the Consultant to notify the Company of any such circumstances forthwith.

6.2     On termination of this Agreement, the Company shall pay for all Services provided up to the date of termination, and all such Fees outstanding and due for payment to the Consultant up to the date of termination shall be paid immediately and without need for demand be satisfied by the Company.

6.3     On termination of this Agreement, the Consultant shall be liable to and pay for any loss of Company caused by the fraud or misconduct of Consultant, its authorised representatives, directors, officers, employees or agents.

## 7.     WORK PRODUCT AND MATERIALS

7.1     In this Agreement, the term "Work Product" shall mean all work products generated by Consultant solely or jointly with others in the performance of the Services, including, but not limited to, any and all information, notes, reports, analyses, methodologies, materials, records, diagrams, formulae, processes,

technology, firmware, software, know-how, designs, ideas, discoveries, inventions, improvements, copyrights, trademarks and trade secrets.

7.2   The Consultant agrees to assign and does hereby assign to Company all the Consultant's right, title and interest in and to the Work Product. All such right, title and interest shall be the sole and exclusive property of the Company and Consultant will not have any rights of any kind whatsoever in them.

7.3   The Consultant agrees, at the request of Company, to promptly sign, execute, make and do all such deeds, documents, acts and things as Company may reasonably require or desire to perfect Company's entire right, title, and interest in and to any Work Product.

7.4   The Consultant will not make any use of any of the Work Product in any manner whatsoever other than for providing the Services without the Company's prior written consent. All Work Product shall be promptly communicated to Company.

7.5   In the event that Consultant integrates any work that was previously created by the Consultant into any Work Product, the Consultant shall grant to, and Company is hereby granted, a worldwide, royalty-free, perpetual, irrevocable license to exploit the incorporated items, including, but not limited to, any and all copyrights, patents, designs, trade secrets, trademarks or other intellectual property rights, in connection with the Work Product in any manner that Company deems appropriate. Consultant warrants that it shall not incorporate into any Work Product any material that would infringe any intellectual property rights of any third party.

## 8   FORCE MAJEURE

8.1   If a Party is prevented from performing this Agreement or performing it on the agreed conditions hereunder as a result of force majeure, including earthquake, typhoon, flood, fire, war, hacker attack on the internet, changes in policies and laws and other events, causes or circumstances that are unforeseeable or whose happenings are unpreventable or unavoidable, such prevented Party shall forthwith notify the other Party immediately of the occurrence thereof and within thirty (30) days thereafter, provide the documentary evidence thereof, explaining the details of the event and the reasons for its failure to perform this Agreement or its need to delay the performance of this Agreement. The Parties may negotiate whether or not to exempt part of the obligations hereunder or delay the performance of this Agreement depending on the effect of such event of force majeure upon the performance of this Agreement. Neither Party shall be liable to the other Party in respect of the economic losses incurred as a result of force majeure.

## 9    CONFIDENTIALITY

9.1    In this Agreement, the term "**Confidential Information**" shall mean any Reports and all information relating to the Company's business, including, but not limited to, reports, analyses, research, developments, product plans, products, services, diagrams, formulae, processes, techniques, technology, firmware, software, know-how, designs, ideas, discoveries, inventions, improvements, copyrights, trademarks, trade secrets, customers, suppliers, markets, marketing, finances disclosed by Company either directly or indirectly in writing, orally or visually, to Consultant. Confidential Information does not include information which:

9.1.1    is in or comes into the public domain without breach of this Agreement by the Consultant,

9.1.2    was in the possession of the Consultant prior to receipt from the Company and was not acquired by the Consultant from the Company under an obligation of confidentiality or non-use,

9.1.3    is acquired by the Consultant from a third party not under an obligation of confidentiality or non-use to the Company, or

9.1.4    is independently developed by the Consultant without use of any Confidential Information of the Company.

9.2    Unless otherwise agreed to in advance and in writing by the Company, the Consultant will not, except as required by law or court order, use the Confidential Information for any purpose whatsoever other than the performance of the Services or disclose the Confidential Information to any third party.

9.3    The Consultant may disclose the Confidential Information only to those of its employees who need to know such information. In addition, prior to any disclosure of such Confidential Information to any such employee, such employee shall be made aware of the confidential nature of the Confidential Information and shall execute, or shall already be bound by, a non-disclosure agreement containing terms and conditions consistent with the terms and conditions of this Agreement. In any event, Consultant shall be responsible for any breach of the terms and conditions of this Agreement by any of its employees. Consultant shall use the same degree of care to avoid disclosure of the Confidential Information as it employs with respect to its own Confidential Information of like importance, but not less than a reasonable degree of care.

9.4    All documentation, software and other property made available to the Consultant by the Company shall remain the property of the Company and the Consultant shall return forthwith, upon the request of the Company, and in any event upon the termination of this Agreement howsoever caused, all such documentation, software and property, to the Company, together with all

6

copies of any such materials in the possession custody or power of the Consultant.

## 10   ASSIGNMENT

10.1   Neither Party may assign this Agreement and/or any or all of its rights and/or obligations hereunder to any of its affiliates and/or any other party without the prior written approval of the other Party.

10.2   Notwithstanding Clause 10.1, the Consultant shall have the right to hire subcontractors and consultants to provide and supplement professional and non-professional services on behalf of the Consultant in accordance with this Agreement.   The Consultant shall hold and keep the Company harmless against any loss through the failure of such subcontractors or consultants to execute properly their scope of services for the purposes of this Agreement.

## 11   GENERAL

11.1   Governing Law

This Agreement shall be governed by the laws of Hong Kong, and the Parties shall submit to the exclusive jurisdiction of the Hong Kong courts in respect of any dispute relating to this Agreement.

11.2   Independent Consultant

11.2.1   This Agreement shall not constitute or imply any partnership, joint venture, agency, fiduciary relationship or other relationship between the Parties other than the contractual relationship expressly provided for in this Agreement.

11.2.2   The Consultant agrees that, in the performance of this Agreement, it is and will, at all times, remain an independent contractor. The Consultant further agrees that it will not bind the Company or any of the officers or employees of the Company except as authorized in writing by the Company.

11.2.3   Neither the Consultant nor any person in its employ, shall be deemed, construed or become an employee of the Company and that all instructions and directions given to the Consultant or to any of its employees by the Company or its officers shall be for general guidance of the Consultant only.

11.3   Amendments

This Agreement may only be amended in writing signed by duly authorised representatives of the Parties.

7

### 11.4   Entire agreement

This Agreement contains the whole agreement between the Parties and supersedes and replaces any prior written or oral agreements, representations or understandings between them. The Parties confirm that they have not entered into this Agreement on the basis of any representation that is not expressly incorporated into this Agreement. Nothing in this Agreement excludes liability for fraud.

### 11.5.   Waiver

No failure or delay by the Consultant in exercising any right, power or privilege under this Agreement shall impair the same or operate as a waiver of the same nor shall any single or partial exercise of any right, power or privilege preclude any further exercise of the same or the exercise of any other right, power or privilege. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights and remedies provided by law.

### 11.6   Severance

If any provision of this Agreement is prohibited by law or judged by a court to be unlawful, void or unenforceable, the provision shall, to the extent required, be severed from this Agreement and rendered ineffective as far as possible without modifying the remaining provisions of this Agreement, and shall not in any way affect any other circumstances of or the validity or enforcement of this Agreement.

### 11.7   Announcements

No Party shall issue or make any public announcement or disclose any information regarding this Agreement unless prior to such public announcement or disclosure it furnishes all the Parties with a copy of such announcement or information and obtains the approval of such persons to its terms. However, no Party shall be prohibited from issuing or making any such public announcement or disclosing such information if it is necessary to do so to comply with any applicable law or the regulations of a recognised stock exchange subject to the reasonable prior consent of the other Party in writing.

### 11.8   Notices

11.8.1   Any notice, request, demand or other communications required to be given or made under or pursuant to this Agreement shall be in writing and delivered to the receiving Party at the addresses designated by each of the Parties.

11.8.2   The notices or other communications shall be duly given: if delivered by hand delivery, when delivered; if delivered by mail, after five (5) days of posting.

8

### 11.9   Binding on Successors

This Agreement shall be binding on the respective legal successors of the Parties.

### 11.10   Taxes

The Parties undertake that they shall respectively make tax declaration and payment pursuant to law in connection with the Agreement hereunder.

### 11.11   Supplementary Agreements.

The Parties may sign supplementary agreements (**"Supplementary Agreements"**) to amend the provisions of this Agreement after its execution date. If there's any inconsistency or difference between this Agreement and any Supplementary Agreement, the latter shall prevail.



IN WITNESS WHEROF the Parties have executed this Agreement the day and year first above written.

SIGNED:

For and on behalf of **Lucky Mark (HK) Trading Limited**

For and on behalf of
LUCKY MARK (HK) TRADING LIMITED
裕 標（香 港）貿 易 有 限 公 司

......................................................
Dated: 7 August 2017

SIGNED:

For and on behalf of **Artemus Group LLC**

**ARTEMUS GROUP LLC**
**8000 Sunset Boulevard, Suite 600**
**West Hollywood, CA 90069**

......................................................
Dated: 7 August 2017

10

**APPENDIX A**

**SERVICES: SCOPE OF WORK**

**STRATEGIC COMMUNICATIONS & CRISIS MANAGEMENT**

**Services to be Performed:**

1. Strategic Advisory, Analysis and Research - Provide advisory, analysis and high-level research in relation to key strategy and communications functions of the Company.

2. Stakeholder Mapping - Conduct a comprehensive mapping exercise to identify all stakeholders of importance across target markets.

3. Perception Research - Conduct a systematic benchmarking of sentiment amongst key stakeholders.

4. Key Message Development - Develop consistent and compelling key messages that address risks and challenges while harnessing positive aspects.

5. Collaterals - Review all existing communications materials; provide revised collaterals; talking points; messaging; factsheets etc.

6. Crisis and Issue Management – Manage the communications affairs of the Company, including issue and crisis management, including but not limited to:

   (a) Develop and maintain up-to-date media intelligence, including Internet-based and social media outlets/sites;

   (b) Provide counsel and advice on news and media matters;

   (c) Develop talking points for the Company, including for stakeholder meetings and/or media interviews related to Company's business;

   (d) Attend and provide counsel at meetings when required;

   (e) Assist with drafting and updating content when required, for example on the official website;

   (f) Track traditional media and social media outlets for Company-related news coverage or social media posts;

   (g) Compile and distribute news coverage;

   (h) Research and prepare for issues that may arise; and;

11

(i) After the campaign, conduct a benchmarking exercise to determine success. Manage the entire communications programme, including the work of external consultants, and regularly review all aspects of the campaign, report results and provide progress evaluations.

7. Campaign Implementation – Implement a stakeholder and media engagement campaign. To involve in-person briefings to key stakeholders, media outreach, content development, and online engagement.

8. Media Training - Identify the most appropriate spokespeople and design and implement holistic training programmes. These will range from the basics of media relations, to detailed interview preparation, advanced interview techniques and interview simulations – from mock press conferences to one-to-one interviews for newspapers, radio and television.

9. Online Strategy - Create a comprehensive online strategy covering all social media channels, online monitoring, identification of online leaders, engaging in the online conversation and auditing, revamping and creating web platforms.

10. Stakeholder Engagement – Managing all public affairs campaigns of the Company and cultivating third party endorsers.

11. Risk Analysis – Assess demands and risks of potential projects in relation to existing capabilities and gaps.

12. Oversight Role – Oversee the implementation of the agreed strategic communications plan in target markets together with the management and personnel of the Company. Review and conduct follow-up studies of the plan and its results.



# ATTACHMENT 10

## ESCROW AGREEMENT

**THIS ESCROW AGREEMENT** ("Escrow Agreement") is made as of the __ day of November, 2017, by and among Nickie Davis, a U.S. citizen residing in Hawaii ("Owner"); Prasperity Group, LLC, a limited liability company with an address at 10000 Santa Monica Blvd, Los Angeles, CA 90067 ("Prasperity"), and George Higginbotham, Esq., an attorney admitted to practice law in the State of _____ ("Escrow Agent"). Each of Owner and Prasperity may hereinafter be referred to individually as a "Party" and, collectively, as the "Parties."

RECITALS:

A.     Prasperity has agreed that in 2018 it will engage an entity (the "Consultant") to be designated by Owner in 2018 as a consultant pursuant to an agreement the form of which is attached (the "Consulting Agreement").

B.     Pursuant to Section 4 of the Consulting Agreement, the Consultant shall receive 100% of the consideration due under the Consulting Agreement of Twenty-Five Million U.S. Dollars (US$ 25,000,000, the "Consideration") upon execution of the Consulting Agreement.

C.     To allow Owner time to determine the appropriate entity to act as the consultant under the Consulting Agreement for services to be performed in 2018, while assuring Owner that upon designating the Consultant that Prasperity will promptly pay the consideration due to the Consultant upon its execution (whether or not it fails to execute the Consulting Agreement after such designation), the Parties have agreed to place Consideration to be received by the Consultant in escrow as herein provided.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     <u>Recitals</u>.  The foregoing recitals are true and are hereby affirmed, agreed to and made a part of this Escrow Agreement.

2.     <u>Escrowed Funds</u>.  Prasperity shall deliver the Consideration to the Escrow Agent by wire transfer within five (5) business days of the execution of this Escrow Agreement by each of the Parties and the Escrow Agent.  The Consideration delivered by Prasperity to the Escrow Agent, are also sometimes herein referred to as the "Escrowed Funds."  Escrow Agent shall have no obligation to maintain the funds other than in a form of a Certificate of Deposit over which he has the power to negotiate to a company designated by Owner in January, 2018.  At all times Escrow Agent is holding the Consideration it is understood that the owner of such funds shall be Prasperity, and Prasperity shall provide to Escrow Agent simultaneously with the execution hereof a Form W-9, "Request of Taxpayer Identification Number and Certification", certifying as to its correct taxpayer identification number and status as a U.S. person. As used herein, the term "Escrowed Funds" shall include any interest earned thereon. Escrow Agent shall hold and disburse the Escrowed Funds only in accordance with the provisions of this Escrow Agreement.

3.     <u>Consulting Agreement</u>.  Prasperity hereby agrees that in order to provide Owner with time to consider whether or not Owner should cause an existing entity to perform the

services in 2018 under the Consulting Agreement, or form a new entity in a jurisdiction to be determined, Owner will have until January 31, 2018 to have the Consultant determined by Owner execute the Consulting Agreement, unmodified except for the inclusion of the date of the agreement and identifying information of the Consultant, and shall forward the executed agreement to Prasperity for counter signature at the address indicated in the Consulting Agreement.

4.    Disbursement of Escrowed Funds.

(a)    Owner may cause the release of any or all of the Escrowed Funds to Prasperity at any time while such funds are being held by the Escrow Agent by delivery to Escrow Agent of a written notice, in accordance with Section 8 below, directing Escrow Agent to release and deliver such funds to Prasperity.

(b)    Owner may cause the release to the Consultant of the Escrowed Funds to the extent of the Consideration, at any time between January 1, 2018 and January 31, 2018, while such funds are being held by the Escrow Agent, by delivery to Escrow Agent of either (1) a fully executed copy of Consulting Agreement or (2) a copy of Consulting Agreement executed by Consultant and a certified copy of a bill of lading or similar document evidencing that the version of such Consulting Agreement executed by Consultant was forwarded to Prasperity prior to January 31, 2017, together with written notice in accordance with Section 8 below directing Escrow Agent to release and deliver such funds to Consultant. Upon releasing the Consideration to the Consultant, any additional Escrow Funds above the Consideration will be released to Prasperity.

5.    Interpleader Action Authorized.  If: (i) all Escrow Funds have not been disbursed by Escrow Agent in accordance with the provisions of Section 4 above prior to February 28, 2018; (ii) in Escrow Agent's sole opinion, any dispute has arisen among any of the Parties and/or any third parties (whether concerning this Escrow Agreement, Escrow Agent's duties hereunder, the disposition of the Escrowed Funds, or any other matters pertaining to the escrow), (iii) Escrow Agent, in its sole opinion, is uncertain as to its duties or rights under this Escrow Agreement or shall receive conflicting instructions, claims, or demands from any Party and/or any third parties with respect to the Escrowed Funds, or (iv) Escrow Agent is joined as a party to a lawsuit by virtue of the fact that it is holding the Escrowed Funds, then Escrow Agent may interplead the Escrowed Funds by filing an interpleader action in the Supreme Court, New York County, New York (the jurisdiction to which all parties do hereby consent) and depositing the Escrowed Funds into the registry of the court, whereupon Escrow Agent shall be relieved and released from any further liability as Escrow Agent under this Escrow Agreement.  Escrow Agent, at the expense of Owner, may undertake such interpleader action and shall not be liable to either party for actions taken in good faith pursuant to this Section 5.

6.    Escrow Agent.

(a)    The duties of Escrow Agent are purely ministerial in nature and shall be expressly limited to the safekeeping of the Escrowed Funds, and the disposition of the Escrowed Funds in accordance with this Escrow Agreement. Each of the Parties shall and do jointly and severally indemnify Escrow Agent and hold Escrow Agent harmless from and against any and all claims, liabilities, damages, costs, penalties, losses, actions, suits, or proceedings at law or in equity, or any other expenses, fees, or charges of any character or nature, which Escrow Agent may incur or with which Escrow Agent may be threatened directly or indirectly arising from or in any way connected with this Escrow Agreement or which may result from Escrow Agent's following of instructions from the Parties, whether or not litigation is instituted, unless caused by the gross negligence or willful misconduct of Escrow Agent.

(b)    Escrow Agent shall not be liable, with respect to its role as Escrow Agent, (i) to any of the Parties for any act or omission to act except for Escrow Agent's own gross negligence or willful misconduct, (ii) for any legal effect, insufficiency, or undesirability of any instrument deposited with or delivered by Escrow Agent or exchanged by the Parties, (iii) for any loss or impairment of funds that have been deposited in escrow while those funds are in the course of collection, or while those funds are on deposit in a financial institution, if such loss or impairment results from the failure, insolvency, or suspension of a financial institution, (v) for the expiration of any time limit or other consequence of delay, unless a properly executed written instruction, accepted by Escrow Agent, has instructed Escrow Agent to comply with such time limit, (vi) for the default, error, action, or omission of any Party, other than Escrow Agent, or (vii) for Escrow Agent's compliance with any legal process, subpoena, writs, orders, judgments, and decrees of any court, whether issued with or without jurisdiction, and whether or not subsequently vacated, modified, set aside, or reversed. Escrow Agent may, at the expense of Prasperity, consult with independent counsel of its own choice in respect to any questions relating to its duties or responsibilities under this Escrow Agreement, and shall not be liable for any action taken in good faith on advice of such counsel.

(c)    Escrow Agent may (i) act in reliance upon any writing or instrument or signature which it, in good faith, believes to be bona fide and genuine, (ii) assume the validity and accuracy of any statement contained in such a writing or instrument, and (iii) assume, unless it has actual knowledge to the contrary, that any person purporting to give any writing, notice, advice, or instructions in connection with the provisions of this Escrow Agreement has been duly authorized to do so.  Escrow Agent shall not be liable in any manner for the sufficiency or correctness as to form, manner, and execution, or validity, of any instrument deposited in escrow, or as to the identity, authority, or right of any person executing same.  Escrow Agent's duties under this Escrow Agreement shall be limited solely to those provided in this Escrow Agreement. Each Party acknowledges and agrees that nothing in this Escrow Agreement shall prohibit Escrow Agent from serving in a similar capacity on behalf of others.

(d)    The parties hereby acknowledge and agree that (i) Owner is a client of Escrow Agent, and has an on-going attorney/client relationship with Escrow Agent, and (ii) Escrow Agent's performance of its duties under this Escrow Agreement may require Escrow Agent to take actions or positions which might otherwise be in conflict with its role and duties in connection with such ongoing attorney/client relationship.  Accordingly, except for acts of gross

negligence or willful misconduct by Escrow Agent, and except for matters involving the attorney/client privilege between Escrow Agent and Owner, the Parties hereby voluntarily and knowingly, fully, finally, completely and irrevocably (x) waive any such actual, apparent or alleged conflict between Escrow Agent's duties under this Escrow Agreement and any other duties which Escrow Agent may have to Owner, and (y) remise, release, discharge and forever free Escrow Agent and each of its partners, employees and agents, of and from any and all liability, claims, debts, obligations, demands, judgments, actions, causes of action, suits, sums of money, accounts, covenants, agreements, promises, damages, liabilities and charges of every kind and nature, at law or in equity, and whether in tort, contract, or otherwise, that the parties now or in the future have, may have or may claim to have against Escrow Agent or any of its partners, employees or agents based on, arising out of, in connection with, or in any way pertaining to, any such actual, apparent or alleged conflict, unless the same is caused by the gross negligence or willful misconduct of Escrow Agent, and agree that Escrow Agent may continue to act as attorney for Owner throughout the transactions contemplated hereby or in connection with any disputes under the Consulting Agreement.

7.      Termination and/or Expiration of this Escrow Agreement

(a)      This Escrow Agreement shall remain in effect unless and until it is canceled in any of the following manners:

(i)      Upon written notice given by all Parties of the termination of the Escrow Agreement, which notice shall be effective no earlier than twenty (20) days after delivery thereof to the Escrow Agent; or

(ii)      Escrow Agent may resign as escrow agent at any time, for any or no reason, upon giving notice to all Parties of its desire to so resign; provided, however, that resignation of Escrow Agent shall take effect no earlier than ten (10) days after the giving of notice of resignation; or

(iii)      Upon the distribution of all Escrowed Funds in the manner set forth in this Escrow Agreement.

(b)      In the event of a termination of this Escrow Agreement as provided in Section 7(a)(i) and Section 7(a)(ii) above, the Parties shall jointly provide Escrow Agent with written instructions as to the transfer of the Escrowed Funds prior to the date in which this Escrow Agreement terminates. The Escrow Agent will transfer the Escrowed Funds to a newly appointed escrow agent, if instructed to do so by written notice from all Parties. In the event the Parties fail to provide the Escrow Agent with the written instructions with respect to the transfer of the Escrowed Funds as required by this Section 7(b), Escrow Agent shall have the right to interplead the Escrowed Funds in accordance with Section 5 above.

(c)      Escrow Agent shall not be bound by any modification, cancellation or rescission of this Escrow Agreement unless in writing and signed by all the Parties and Escrow Agent. In no event shall any modification of this Escrow Agreement, which shall affect the rights or duties of Escrow Agent, be binding on Escrow Agent unless it shall have given its prior written consent.

4

8.     Notices. Any and all notices to the Parties required or permitted to be served pursuant to the terms of this Escrow Agreement shall be sent to the following address:

George Higginbotham, Esq.

_____

_____

9.     Choice of Law and Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without application of conflict of law principles. In the event any action, suit, or proceeding is instituted as a result of any matter or thing affecting this Agreement, the parties hereby designate New York, New York, as the proper jurisdiction and the venue in which same is to be instituted.

10.     Binding; Assignment. This Agreement shall be binding upon the Parties and their respective successors and permitted assigns. Neither of Prasperity or Owner may assign this Escrow Agreement.

11.     Waiver; Modification. The waiver of any term, provision or condition of this Escrow Agreement shall be effective only if in writing and signed by all the Parties, and then only in the specific instance and for the particular purpose for which it was given. No failure to exercise and no delay in exercising any right or power under this Escrow Agreement shall operate as a waiver thereof. No modification, amendment, cancellation or rescission hereof shall be valid and binding, unless it is in writing and signed by all Parties to this Escrow Agreement.

12.     Counterparts. This Escrow Agreement may be executed in any number of counterparts. Each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one Escrow Agreement. This Escrow Agreement may be executed via facsimile transmission, and facsimile counterparts shall have the same force and effect as original signatures.

13.     Enforcement Costs. If any civil action, arbitration or other legal proceeding is brought for the enforcement of this Escrow Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provision of this Escrow Agreement, the successful or prevailing Party or Parties shall be entitled to recover reasonable attorneys' fees, court costs and all expenses (including, without limitation, all such fees, costs and expenses incident to arbitration, appellate, bankruptcy and post-judgment proceedings), incurred in that civil action, arbitration or legal proceeding, in addition to any other relief to which such Party or Parties may be entitled. Attorneys' fees shall include, without limitation, paralegal fees, investigative fees, administrative costs and all other charges billed by the attorney to the prevailing party.

[SIGNATURES ON PAGE FOLLOWING.]

IN WITNESS WHEREOF, the parties have caused this Escrow Agreement to be executed as of the date first above written.

**PRASPERITY GROUP, LLC**

By: Pras Michel
Title: Manager
Date: Nov 2, 2017

**OWNER:**

By:  Nickie Davis
Nov 2, 2017

**ESCROW AGENT**

BY: _____ 11/7/2017
George Higginbotham, Esq

HIGGINBOTHAM LAW, P.C.