UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PRAKAZREL MICHEL,<br>        Defendant. | Criminal No. 19-148-1 (CKK) |

**MEMORANDUM OPINION AND ORDER**
(March 1, 2023)

Defendant Prakazrel Michel ("Defendant" or "Michel"), with co-Defendant Low Taek Jho ("Low"), is charged by indictment with a variety of criminal offenses arising from three alleged conspiracies to unlawfully launder foreign money to influence American elections and foreign policy. The Government has moved to disqualify Defendant's proffered expert and exclude that expert's testimony. Because Defendant actually proffers lay, not expert, testimony, and Defendant's proposed expert is not qualified to offer expert testimony in this matter, the Court **GRANTS** the Government's [190] Motion to Exclude Defense Expert.

I.   BACKGROUND

For purposes of resolving the pending motion, the Court sets out pertinent allegations in the operative indictment and the Government's informal proffer at the *Daubert* hearing. For a more detailed explanation of the material facts alleged in the operative indictment, the Court refers the reader to its prior opinions in this case.[1]

---

[1] *United States v. Michel*, 2022 WL 4182342 (D.D.C. Sept. 13, 2022); *United States v. Michel*, 2022 WL 4119774 (D.D.C. Sept. 9, 2022); *United States v. Michel*, 2019 WL 5790115 (D.D.C. Nov. 6, 2019).

### A. Charged Conspiracies

In summary terms, this criminal case centers on three alleged conspiracies. First, the Government alleges that Michel and Low allegedly "secretly funnel[ed] foreign money . . . [from] other straw donors" to two political action committees that supported a candidate for President of the United States ("Candidate") during the 2012 Presidential Election, "while concealing from the candidate, the committees, the FEC, the public, and law enforcement the true source of the money." Indictment at 4-5. Michel purportedly organized several straw donors, providing them funds to themselves make individual contributions to political action committees supporting the Candidate. This scheme was so successful that it earned Michel and Low personal access to the Candidate on two separate occasions. *See id.* Throughout the conspiracy, Michel and his straw donors concealed the true, foreign source of the contributions in violation of 52 U.S.C. §§ 30109 and 20122, 18 U.S.C. §§ 1001(a)(1) and 2, and 18 U.S.C. §§ 1519 and 2.

Second, the Indictment alleges a broad conspiracy beginning in March 2017 to assist Low in surreptitiously lobbying the Administration of then-President Donald J. Trump to drop an investigation into Low's alleged graft of a Malaysian sovereign wealth fund, 1MDB. *See id.* at 24, 30-33. Michel and Low purportedly worked with George Higginbotham, at that time an attorney at the United States Department of Justice, Elliott Broidy, a businessman and former Deputy Finance Chair of the Republican National Committee, and Nickie Lum Davis, a California businesswoman and a foreign agent operating at the behest of the People's Republic of China. Both Higginbotham and Broidy have pleaded guilty before this Court for their roles in this conspiracy, Broidy to "Conspiracy to Serve as an Unregistered Agent of a Foreign Principal, in violation of 18 U.S.C. § 371" and Higginbotham to "Conspiracy to Make False Statements to a Bank in violation of 18 U.S.C. § 371." Plea Agreement at 1, ECF No. 8, *United States v. Broidy*,

Crim A. No. 20-0210 (CKK) (Oct. 20, 2020); Plea Agreement at 1, ECF No. 14, *United States v. Higginbotham*, Crim. A. No. 18-343 (CKK) (Nov. 30, 2018). Lum Davis has also pleaded guilty, to failure to register under FARA and aiding and abetting, in violation of 18 U.S.C. § 2 and 22 U.S.C. §§ 612 and 618(a), for her role in the conspiracy. Mem. of Plea Agreement at 2, ECF No. 15, *United States v. Lum Davis*, CR. No. 20-00068 LEK (Aug. 31, 2020).

Third and finally, the Government alleges that Michel conspired with Lum Davis, Higginbotham, Broidy, Low, and a government official of the People's Republic of China to lobby the President of the United States and his administration to extradite a Chinese national and dissident back to the People's Republic of China. *Id.* at 34. The conspiracy with the Chinese government began on May 18, 2017, when Michel traveled to Hong Kong to meet with his co-conspirators and, upon his arrival, was shuttled from Hong Kong to Shenzhen, China. *See id.* There, the Chinese minister allegedly told the co-conspirators that he "was having trouble scheduling meetings with certain high-ranking United States government officials." *Id.* at 34.

The Indictment describes subsequent meetings and wire transfers in August and September 2017, including in Macau, China, in which the co-conspirators allegedly discussed the structure of additional payments from Low to further the backchannel lobbying campaign. *Id.* at 36-37. It also claims Low told the co-conspirators that he was "concerned that United States banks would not allow him to transfer large sums of money in or through the United States financial system." *Id.* at 36. Michel allegedly suggested that the money be mischaracterized as "funds for entertainment purposes" to conceal their true source. *Id.*

The Indictment identifies specific emails and wire transfers that allegedly furthered the latter two conspiracies. *Id.* at 30. Michel allegedly facilitated foreign payments from entities controlled by Low, "Lucky Mark Company" ("Lucky Mark") and "Red Rock Nine, Limited"

("Red Rock"), to shell companies owned by Michel, "Anicorn" and "Artemis." *See id.* at 29-30; Transcript of Daubert Hearing, ECF No. 190-1 (Jan. 20, 2023) ("Trans.") at 14:5-10. The Government charges Michel with then routing the funds initially deposited into Anicorn and Artemis to "other third parties before the funds were ultimately transferred" to his co-conspirators. *Id.* at 7:17. The Government claims that the "true purpose" of routing these transactions through third parties "was to fund the [unlawful] activity" in lobbying the Trump administration in violation of FARA "and to conceal the true source of the funds," Low. *Id.* at 14:20.

These factual allegations underly Count Seven, charging Defendant with Conspiracy to Serve as an Unregistered Agent of a Foreign Principal and a Foreign Government and to Commit Money Laundering, in violation of 18 U.S.C. § 371. More specifically, the Government identifies two predicate offenses: (1) "promotional" money laundering in transferring Low's funds to Michel's accounts to be used for the FARA scheme, in violation of 18 U.S.C. § 1956(a)(2)(A), and (2) "concealment" money laundering in transferring funds between Anicorn, Artemis, and other domestic accounts, respectively, in violation of 18 U.S.C. § 1956(a)(1)(B).

B. **Proposed Expert Testimony**

On June 3, 2022, Defendant identified Mr. Richard Malone ("Malone") as a proposed expert in this matter. Defendant characterized Malone as having "conducted and supervised hundreds of investigations including corporate and individual tax evasion, public corruption, money laundering, white-collar fraud[,] and bank deposit analysis" in work for the Internal Revenue Service. Def.'s Notice of Expert Witness, ECF No. 113 at 1. Defendant stated that he would "examine the financial records and transactions provided by the [G]overnment related to the charges brought against Defendant[.]" *Id.* Broadly, Defendant represented that Malone would emphasize what he views as a lack of evidence tying (1) Low to Lucky Mark and Red Rock and,

4

(2) funds transferred to and from Anicorn and Artemis being using for unlawful purposes. *See* Def.'s Notice of Expert Report, ECF No. 124 at 2-4. The Government moved to disqualify Malone, ECF No. 155, so the Court held a *Daubert* hearing on January 20, 2023.

There, Malone clarified the precise opinions he expected to deliver at trial. First, he expected to testify that there was insufficient evidence from the documents he reviewed to conclude that Lucky Mark and Red Rock were owned by, or linked to, Low. Trans. 21:14-22:9. Second, he expected to testify that the source of the funds were "the product of [an] embezzlement scheme or any other illegal conduct." *Id.* 23:1-4. Third, he expected to testify that the bank records he reviewed did not indicate that Defendant conspired with others to violate FARA. *Id.* 26:17-22.

Malone also clarified his professional background. Although he worked on domestic money laundering investigations for the Drug Enforcement Agency, he never worked on a FARA case, *id.* at 29:11-15, and he rarely, if ever, investigated international money laundering, *see id.* at 33:8-14. He stated that he had only read FARA's relevant provisions once, after arriving at his conclusions and approximately one month before the *Daubert* hearing. *Id.* at 29:21-22. He also explained in more detail the records on which he based his conclusions. Despite admitting on cross-examination that he would not "expect to find evidence of the intent and purpose behind in the transactions in the bank records themselves," *id.* at 34:20-35:1, he nevertheless conceded that he reviewed nothing but bank records to arrive at his conclusions, *id.* at 39:24-40:7. He further admitted that he only relied on *some* germane bank records, not all. *See id.* at 37:12-15. He also stated that he had no knowledge of any of the co-conspirator's financial dealings, or general dealings with Defendant, beyond those limited bank records that he reviewed. *See id.* at 30:23-31:25.

5

## II. LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admission of expert testimony. The rule states that: "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *Id.* The trial judge has "considerable leeway in deciding in a particular case how to go about determine whether particular" testimony is expert testimony and, if so, reliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

This inquiry is governed by the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Under *Daubert*, if the Court concludes that the proposed testimony is that appropriately delivered by an expert, "the district court is required to address two [further] questions, first whether the expert's testimony is based on 'scientific knowledge,' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1126 (D.C. Cir. 2001) (quoting *Daubert*, 509 U.S. at 590). "[I]n order to qualify as 'scientific knowledge, an inference or assertion must be derived by the scientific method." *Id.*

"[T]he proponents of [expert] evidence . . . bear the burden to prove the expert testimony is reliable" and admissible. *See Arias v. DynCorp.*, 928 F. Supp. 2d 10, 17 (D.D.C. 2013).

### III. DISCUSSION

Malone's proffered testimony is not expert testimony. As a threshold matter, to the extent that Malone means to claim that Defendant lacked the requisite mental state to conspire to violate FARA or launder funds to assist in a conspiracy to violate FARA, "an expert witness [may] not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime." Fed. R. Evid. 704(b). The locus of the proffered testimony, however, seems merely to highlight the lack of certain information on certain documents. The jury, however, is more than capable of noting that the names of the alleged conspirators do not appear on the records that Malone examined. "[T]his kind of argument may be made, based on the evidence, by lawyers in closing argument." *See Green v. Kinney Shoe Corp.*, 715 F. Supp. 1122, 1124 (D.D.C. 1989) (excluding proffered expert testimony that would do no more than identify factual inference that lay jurors had capacity to identify themselves); *see also, e.g.*, *SEC v. Lipson*, 46 F. Supp. 2d 758, 764 (N.D. Ill. 1998) ("Defendant has not established that the financial evidence he will testify about is so complicated that the jury will be unable to understand it without repetition" by a witness with a more illustrious curriculum vitae.).

Moreover, it is unlikely that Malone, who was not familiar with FARA and has rarely, if ever, encountered international money laundering in his professional career, is qualified to offer any expert testimony in this case. *See United States v. Beavers*, 756 F.3d 1044, 1055-56 (7th Cir. 2014) (in public corruption case, excluding proposed expert testimony where expert, among other things, "may have lacked expertise about certain germane subjects (including relevant portions of the tax code)"); *United States v. Cooks*, 589 F.3d 173, 180-81 (5th Cir. 2009) (in mortgage fraud case, error to permit federal agent to testify where they had no experience in mortgage fraud and was unaware of basic statutes and literature in field of mortgage fraud). If his knowledge as to

money laundering *generally* did qualify him as an expert in this matter, then his admission that bank records do not generally bear on motive, plan, or intent raises the substantial problem that these records on which he relied are not those that "experts [in the field of money laundering] would reasonably rely on . . . in forming an opinion" on the subject of whether the accounts were, in fact, used to launder money aimed at furthering FARA violations. *See* Fed. R. Evid. 703; *United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987) (in tax evasion prosecution, affirming trial court's exclusion of proffered expert testimony based on defendant's statement concerning his possessions of large amounts of money where there was no showing that expert accountants reasonably rely on such statements to establish tax evasion).

Lastly, to the extent that Malone expects to testify that there is insufficient evidence for a jury to convict Defendant on 18 U.S.C. § 371, *see* Trans. 43:8-9, it is eminently clear that "'[a]n expert witness may not deliver legal conclusions on domestic law, for legal principles are outside the witness' area of expertise[,]'" *United States v. Robinson*, 255 F. Supp. 3d 199, 206 (D.D.C. 2017) (quoting *Weston v. Wash. Metro. Area Transit Auth.*, 78 F.3d 682, 684 n.4 (D.C. Cir. 1996) *amended on reh'g in irrelevant part* 86 F.3d 216 (D.C. Cir. 1996)). Just as a medical doctor is not qualified to give legal testimony as to whether a defendant complied with the strictures of the Controlled Substances Act, *see id.* at 206-07, an accountant cannot give legal testimony as to the ultimate question in a criminal case of whether Defendant did not launder money to further a conspiracy to forgo FARA's registration requirements. *See also Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("expert testimony couch in terms of a 'legal conclusion' is not 'helpful to the jury'" (quoting *Torres v. Cty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985)).

* * *

For the foregoing reasons, it is hereby

**ORDERED**, Government's [190] Motion to Exclude Defense Expert is **GRANTED**.

**SO ORDERED.**

Dated:  March 1, 2023

/s/<br>
COLLEEN KOLLAR-KOTELLY<br>
United States District Judge