**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 19-148-1 (CKK) |
| PRAKAZREL MICHEL, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**
(March 6, 2023)

Defendant Prakazrel Michel ("Defendant" or "Michel"), with co-Defendant Low Taek

Jho ("Low"), is charged by indictment with a variety of criminal offenses arising from three

alleged conspiracies to unlawfully launder foreign money to influence American elections and

foreign policy.  Before the Court is the Government's [193] Motion to Exclude Witnesses

("Motion" or "Mot.").  The Government moves *in limine* to preclude Defendant from calling or

otherwise eliciting testimony from:  (1) former President Barack Obama, (2) former President

Donald Trump, (3) former Secretary of Homeland Security Jeh Johnson ("Johnson"), and (4)

former Secretary of Housing and Urban Development Benjamin Carson ("Carson").  Separately,

Carson has moved to quash Defendant's subpoena for his testimony.  Because testimony from

the first three witnesses would either be irrelevant or otherwise run afoul of Federal Rule of

Evidence 403, the Court shall **GRANT** the [193] Motion to Exclude Witnesses as to former

President Obama, former President Trump, and Johnson.  The remainder of the [193] Motion

shall be **HELD IN ABEYANCE** and addressed concomitantly with Carson's [200] Motion to

Quash.[1]

---

[1] The Court relies on the following in resolving this pending [193] Motion:
- The Government's Motion to Exclude Witnesses, ECF No. 193 ("Mot.");

I.      **BACKGROUND**

A.  **Superseding Indictment**

In summary terms, this criminal case centers on three alleged conspiracies.  First, according to the Government, Michel and Low allegedly "secretly funnel[ed] foreign money . . . [from] straw donors" to two political action committees that supported then-President Barack Obama's reelection campaign in 2012, "while concealing from the candidate, the committees, the FEC, the public, and law enforcement the true source of the money."  Indictment at 4-5.  Michel and Low purportedly intended to funnel approximately $1,000,000, to be contributed via a June 2012 fundraiser that then-President Obama would attend.  *Id.*  The emails suggest that Michel knowingly solicited contributions from foreign individuals via wires from offshore companies.  *See id.* at 10. Michel allegedly organized several straw donors, providing them funds to themselves make individual contributions to political action committees supporting the then-President Obama.  This scheme was so successful that it earned Michel and Low personal access to then-President Obama on two separate occasions.  *See id.*  Throughout the conspiracy, Michel and his straw donors concealed the true, foreign source of the contributions in violation of 52 U.S.C. §§ 30109 and 20122, 18 U.S.C. §§ 1001(a)(1) and 2, and 18 U.S.C. §§ 1519 and 2.

Second, the Indictment alleges a broad conspiracy beginning in March 2017 to assist the Malaysian Prime Minister in convincing then-President Donald Trump to order the Department of Justice to drop investigations into Low for graft related to a Malaysian sovereign wealth fund.  *See*

----

- Defendant's Response in Opposition to Government's Motion to Exclude Witnesses, ECF No. 195 ("Opp.");
- The Government's Reply to Defendant's Opposition to Motion to Exclude Witnesses, ECF No. 203 ("Repl.');
- The Superseding Indictment, ECF No. 84.

In an exercise of its discretion, the Court has concluded that oral argument would not be of assistance in the resolution of the Motion.

*id.* at 24, 30-33.  Michel and Low worked with George Higginbotham, at that time an attorney at the United States Department of Justice, Elliott Broidy, a businessman and former Deputy Finance Chair of the Republican National Committee, and Nickie Lum Davis, a California businesswoman and a foreign agent operating at the behest of the People's Republic of China.  Both Higginbotham and Broidy have pleaded guilty before this Court for their roles in this conspiracy, Broidy to "Conspiracy to Serve as an Unregistered Agent of a Foreign Principal, in violation of 18 U.S.C. § 371" and Higginbotham to "Conspiracy to Make False Statements to a Bank in violation of 18 U.S.C. § 371."   Plea Agreement at 1, ECF No. 8, *United States v. Broidy*, Crim A. No. 20-0210 (CKK) (Oct. 20, 2020);  Plea Agreement at 1, ECF No. 14, *United States v. Higginbotham*, Crim. A. No. 18-343 (CKK) (Nov. 30, 2018). Lum Davis has also pleaded guilty, to failure to register under FARA and aiding and abetting, in violation of 18 U.S.C. § 2 and 22 U.S.C. §§ 612 and 618(a), for her role in the conspiracy.  Mem. of Plea Agreement at 2, ECF No. 15, *United States v. Lum Davis*, CR. No. 20-00068 LEK (Aug. 31, 2020).

In this conspiracy, beginning in or around March 2017, Michel allegedly assisted Low in executing a retainer agreement with Higginbotham and funneling illicit wire transfers from Low to Higginbotham, Lum Davis, and Broidy.  Indictment at 29.  The Indictment identifies specific emails and wire transfers in March 2017 formalizing the agreement between Low and his co-conspirators.  *Id.* at 30.  Michel played a crucial role in facilitating and fraudulently concealing these wire transfers that funded the scheme.  *Id.* at 29-30.  It also details a purported meeting on May 2, 2017, in which the parties strategized how to best exert influence on then-President Trump. *Id.* at 31.  It further describes Michel's role in drafting talking points for the Malaysian Prime Minister on the issue for an upcoming meeting between the Malaysian Prime Minister and the President.  *See id.* at 33.

3

Third and finally, Michel allegedly conspired with Lum Davis, Higginbotham, Broidy, Low, and a government official of the People's Republic of China to lobby the President of the United States and his administration to extradite a Chinese national and dissident, Guo Wengui ("Guo"), back to the People's Republic of China.  *Id.* at 34.  The conspiracy with the Chinese government began on May 18, 2017, when Michel traveled to Hong Kong to meet with his co-conspirators and, upon his arrival, was shuttled from Hong Kong to Shenzhen, China.  *See id.* There, the Chinese minister allegedly told the co-conspirators that he "was having trouble scheduling meetings with certain high-ranking United States government officials." *Id.* at 34.  The Indictment describes subsequent meetings and wire transfers in August and September 2017, including in Macau, China, in which the co-conspirators allegedly discussed the structure of additional payments from Low to further the backchannel lobbying campaign. *Id.* at 36-37.  It also claims Low told the co-conspirators that he was "concerned that United States banks would not allow him to transfer large sums of money in or through the United States financial system." *Id.* at 36.  Michel allegedly suggested that the money be mischaracterized as "funds for entertainment purposes" to conceal their true source.  *Id.*

Finally, the Indictment adds two counts for criminal conduct allegedly completed after the end of the three conspiracies. After the filing of the first indictment in this case, ECF No. 1, Michel purportedly threatened two witnesses to change their testimony before the Government.  The Indictment identifies two texts by date that it alleges "intimidate[d], threaten[ed], and persuade[d]" potential witnesses after the inception of this case.  First, the Indictment alleges that Michel "caused a text message to be sent" on July 14, 2019, "threatening [a] [s]traw [d]onor [] with potential legal and reputational harm, including threatening to refer [them] to the United States Department of Justice for criminal investigation" allegedly "in an effort to cause [them] to falsely

characterize" a conduit payment from Michel "as a loan" and to stop them "from providing testimony." *Id.* at 22.  Second, the Indictment claims Michel "caused a text message to be sent threatening to refer" a witness "to federal law enforcement . . . in an effort to cause him to withhold his testimony." *Id.* at 23.[2]

## II.    DISCUSSION

### A.  Legal Standard

As a general matter, the Sixth Amendment mandates that a defendant receive "compulsory process for obtaining witnesses in his favor."  "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1972) (citations omitted).  That said, a defendant must nevertheless demonstrate that a subpoenaed witness's testimony will be both "material" and "favorable" to his defense.  *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).  To that end, in determining whether to exclude a witness's testimony *in limine*, a court necessarily looks to the probative value of the proffered testimony.  *United States v. North*, 910 F.2d 843, 948-49 (D.C. Cir. 1990) (Silberman, J., concurring) *withdrawn and superseded in irrelevant part on reh'g* 920 F.2d 940 (D.C. Cir. 1990).

The parties spend the vast majority of their briefing contesting whether a higher standard should apply to trial subpoenas issued to former Presidents and Cabinet secretaries.  Relying on *United States v. Poindexter*, 732 F. Supp. 142 (D.D.C. 1990), the Government argues that a court's review of the appropriateness of compulsory process on a former President should be "particularly meticulous" and "scrutinized with a sharper eye and held to a higher standard than one to an ordinary citizen."  *Id.* at 147; *see also United States v North*, 713 F. Supp. 1448, 1449 (D.D.C.

---

[2]  This list of charges is not exhaustive.  For a fuller summary of the operative indictment's allegations, the Court refers the reader to *United States v. Michel*, 2022 WL 4182342 (D.D.C. Sept. 13, 2022) and *United States v. Michel*, 2022 WL 4119774 (D.D.C. Sept. 9, 2022).

1989) (requiring a "sufficient showing" that a "former President's testimony is essential to assure the defendant a fair trial") *aff'd* 910 F.2d 843 (D.C. Cir. 1990) (assuming, without deciding, that any legal error in such a rule was harmless).

For his part, Defendant argues that the Supreme Court implicitly abrogated such an approach in *Trump v. Vance*, 140 S. Ct. 2412 (2020). There, the Court held that a state, grand-jury subpoena *duces tucem* for a sitting President's private papers is not subject to a standard higher than that normally applied to subpoenas issued to private citizens. *Id.* at 2430. The Court need not decide whether *Vance* abrogates *Poindexter* or *North*, however, because Defendant has not shown that the proffered testimony would be sufficiently "relevant and material" to be admissible under Federal Rules of Evidence 401 or 403, as applied to any deponent.[3]

### B. Former President Obama

Defendant intends to call former President Obama to provide testimony regarding Count One of the Superseding Indictment, which charges Michel with conspiring to defraud the United States and make illegal foreign and conduit contributions, all in violation of 18 U.S.C. § 371. Opp. at 6. Specifically, the Government names two main predicate offenses for the charged conspiracy: (1) knowingly and willfully making conduit, foreign contributions to a campaign for federal office in violation of 52 U.S.C. §§ 30121 and 30109(d)(1)(A); and (2) knowingly and willfully making

---

[3] *Vance* appears to draw a distinction between official and private documents. *See id.* at 2429 (citing *United States v. Burr*, 25 F. Cas. 187, 191 (C.C.D. Va. 1807) (Marshall, C.J.)). Whatever the distinction, the concurrence in *Vance* suggests that lower courts must nevertheless begin by "delving into why [a litigant] wants the information [held by a current or former President]; why and how much [a litigant needs it]; . . . and whether compliance with the subpoena would unduly burden or interfere with a President's official duties." *Id.* at 2433 (Kavanaugh, J., concurring). The Court stresses that it does not reach in any way whether communications between then-President Trump or then-President Obama and certain advisers are official or unofficial or otherwise apply the concurrence's approach because former President Obama's and Trump's testimony would not be warranted even if they were private citizens at the time of the charged conduct.

contributions to a campaign for federal office in the name of another, in violation of 52 U.S.C. §§ 30122 and 30109(d)(1)(A), (D).  The Government does not charge, and does not appear to proceed on a theory of, violations of the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 612 and 618, or 18 U.S.C. § 951, as predicate offenses of this charged conspiracy.  The Government does, however, characterize "gain[ing] access to, and influence with," then President Obama as an "[o]bject" of the charged conspiracy to violate federal campaign-finance laws.  Superseding Indictment at 4.

Defendant intends to call former President Obama with the expectation that he would testify that neither Low nor any individual connected to Low attempted to influence him either at the time he met then President Obama at the White House or during a 2012 fundraiser.  *See* Opp. at 8.  In other words, Defendant aims to challenge the Government's characterization of his motive in the charged conspiracy.  Defendant intends to explain that his motive was not to mount an influence campaign on behalf of himself, Low, or anyone else, but rather was "to help the Obama campaign raise money[.]"  *Id.* at 10.

It has long been Hornbook law that, to violate 18 U.S.C. § 371, the object of the defendant's conspiracy must be a criminal act.  *E.g.*, *United States v. Aloi*, 511 F.2d 585, 592 (2d Cir. 1975) *cert. denied* 423 U.S. 1015 (1975).  Here, the criminal object of the conspiracy turns on whether Michel knew that it was unlawful to funnel foreign money into American elections and make contributions to a campaign in another's name and conspired to do so anyway.  *See, e.g.*, *United States v. Trie*, 23 F. Supp. 2d 55, 59 (D.D.C. 1998) (discussing conspiracy to, among other things, solicit foreign sources for campaign contributions); *United States v. Whittemore*, 944 F. Supp. 2d 1003, 1008-12 (D. Nev. 2013) (discussing straw-donor scheme) *aff'd* 776 F.3d 1074 (9th Cir.

2015).  The conspiracy therefore does not depend on whether Michel further intended to influence anyone, including former President Obama, through such a scheme.

In this regard, consider *United States v. Verrusio*, 762 F.3d 1 (D.C. Cir. 2014).  In that case, the former policy director of the House Transportation Committee was convicted of bribery, in which the indictment factually charged that the policy director accepted a pecuniary benefit because of assistance he would provide to the person who provided the benefit.  *Id.* at 13.  The policy director subpoenaed another Congressional staffer who, he proffered, would testify that the policy director never attempted to assist the person who provided the benefit.  *Id.* at 23.  Yet the Court of Appeals held that the former policy director had no right to such subpoenaed testimony, because whether he actually attempted to influence other Congressional staff or members was not a dispositive factor in establishing criminal liability.  *See id.* at 24.  Therefore, the policy director could not establish the proffered testimony's materiality under *Valenzuela-Bernal.*

Here, Defendant seeks to contest motive, i.e., *why* Michel conspired with Low to funnel foreign money into the 2012 Presidential Election through straw donors.  Similar to *Verrusio*, ultimately, the "why" of the predicate offense here does not matter.  As several cases have noted, evidence of motive often bears little probative value when compared to evidence of intent. *E.g.*, *United States v. Ali*, 870 F. Supp. 2d 10, 20 & n.14 (D.D.C. 2012) (collecting cases).  Evidence of motive is generally highly probative only where is speaks to the mental state in a specific-intent crime.  *See Poindexter*, 727 F. Supp. at 1475.  The material question in this case is whether Michel knew the fraudulent-contribution scheme was unlawful and nevertheless engaged in it.  Even if Michel did not want to influence former President Obama and his administration, and instead funneled Low's funds because he simply wanted to assist former President Obama win a second

term, he would nevertheless be guilty of the predicate offense.  Moreover, Michel's proffered motive is *still* motive to commit the predicate offense.

As such, the proffered testimony has little, if any, relevance to Count One.  *See* Fed. R. Evid. 401(a) ("Evidence is relevant if [] it has any tendency to make a factor more or less probable than it would be without evidence[] and [] the fact is of consequence in determining the action."). Were such testimony to be relevant, the Court must balance excluding the exhibits if their "probative value is substantially outweighed by a danger of . . . confusing the issues[ or] misleading the jury."  *See* Fed. R. Evid. 403; *United States v. Bigesby*, 685 F.3d 1060, 1065 (D.C. Cir. 2012) (noting that a trial court should consider excluding evidence if it risks "'creating a sideshow and sending the trial off track'" (quoting *Duran v. Town of Cicero*, 653 F.3d 632, 635 (7th Cir. 2011)). By focusing on motive, when motive does not impact an element of the charged offense, Defendant would impermissibly risk confusing the jury regarding the key facts at issue.  *Cf. United States v. Hite*, 769 F.3d 1154, 1171 (D.C. Cir. 2014) (in sex solicitation case involving minor, affirming exclusion of impeachment evidence that risked confusing jury as to elements of the offense). Therefore, in an exercise of its discretion pursuant to Federal Rule of Evidence 403, the Court excludes testimony from former President Obama and *sua sponte* quashes that subpoena.  *See United States v. Binh Tang Vo*, 78 F. Supp. 3d 171, 176 (D.D.C. 2015) (noting that a court may *sua sponte* quash an invalid subpoena).

### C.  Former President Trump

Defendant appears to argue that testimony by former President Trump would bear on the second two charged conspiracies:  (1) the conspiracy to convince his administration to drop investigations into 1MDB and Low and (2) the conspiracy to convince his administration to extradite Guo back to the People's Republic of China ("PRC").  The Government charges 22

U.S.C. §§ 612, 618, and 951 ("FARA Charges") as the predicate offenses for both conspiracies. Superseding Indictment at 26 (Count Seven), 37 (Count Eight), 38 (Count Ten).

Defendant expects that former President Trump would testify to conversations between Broidy and Steve Wynn, purportedly an unindicted co-conspirator.   Opp. at 14-15.  In these conversations, former President Trump purportedly discussed extraditing Guo back to the PRC. *Id.*  Defendant also proffers that former President Trump was somehow privy to an allegedly recorded conversation between Johnson and Guo.  *Id.* at 15.

Unlike the first conspiracy, the second two conspiracies require the Government to demonstrate that Michel conspired with others to influence the federal government without first registering with the Department of Justice and did so knowing that lobbying the Government without registration is unlawful.  *See United States v. Manafort*, 318 F. Supp. 3d 1, 3-4 (D.D.C. 2018) (discussing elements of FARA offense); *United States v. Dumeisi*, 424 F.3d 556, 579 (7th Cir. 2005) (discussing elements of 18 U.S.C. § 951).  Section 371 conspiracy, of course, does not require the Government to show a completed offense; rather, the Government need only show that the defendant entered into an agreement to commit that "specific offense," "knowingly partcipat[ed] in the conspiracy with the intent to commit the offense," and committed "at least one overt act in furtherance of the conspiracy."  *See United States v. Smith*, 950 F.3d 893, 895 (D.C. Cir. 2020) (cleaned up) (noting that the Government was not required to establish that the defendants committed every element of bank robbery for charge of conspiracy to commit bank robbery in violation of 18 U.S.C. § 371).

In this regard, whether Broidy or Wynn ever actually lobbied then-President Trump pursuant to their alleged scheme with Michel is not legally dispositive.  Indeed, as a hypothetical, even if it were impossible for any member of the conspiracy to ultimately lobby any member of

then-President Trump's administration, impossibility nevertheless cannot terminate legal liability for a conspiracy to achieve a predicate offense. *See United States v. Recio*, 537 U.S. 270, 275 (2003); *United States v. Mendina-Garcia*, 918 F.2d 4, 8 (1st Cir. 1990) ("The crime of conspiracy is complete upon the agreement to do an unlawful act as implemented by one or more overt acts. Factual impossibility is no defense." (cleaned up)).  As such, whether Broidy ever discussed the matter with former President Trump may well bear on whether Broidy completed the conspiracy on behalf of his co-conspirators, but it does not bear in any salient part on whether *Michel* took the actions with which *Michel* is charged in the operative indictment.  So long as Michel and one other conspirator agreed to violate FARA, facts to which Broidy has already admitted under oath, the precise details of any meetings former President Trump may or may not have attended have little, if any, bearing on Michel's state of mind or any other dispositive fact. *See Ali*, 870 F. Supp. 2d at 19 (evidence of *defendant's* actions before and after actions charged in conspiracy probative of whether the defendant specifically intended unlawful goals of the conspiracy).

To be sure, in some rare circumstances, a factual argument that the end goal of a conspiracy was never achieved may make the conspiracy's existence more or less probable.  Where the Government intends to call almost every other member of the conspiracy as a witness at trial, however, the probative value of former President Trump's proffered testimony is substantially outweighed by the risk that such testimony would confuse the issues or mislead the jury.  Put differently, lengthy focus on facts that are not legally dispositive—whether one or more of Michel's conspirators ever actually violated 18 U.S.C. § 951—may lead the jury to erroneously believe that the Government must show that Michel ultimately completed a charged, predicate offense.

Indeed, compared to the proffered testimony of then-President Ronald Reagan in *North*, the proffered testimony here has far less probative value.   There, former National Security Council staffer Oliver North was convicted of destroying records in order to corruptly obstruct Congress. *See* 910 F.2d at 891.   North subpoenaed President Reagan, expecting him to testify that he impliedly ordered North to destroy documents.   *See id.*   This testimony, North argued, would bear on whether he corruptly (i.e., with consciousness of wrongdoing) obstructed Congress.   *Id.*   The panel concluded that such testimony was insufficiently probative to warrant denying former President Reagan's motion to quash the subpoena.   *See id.*[4]   Here, none of former President Trump's testimony bears at all on Michel's criminal intent or any other legally dispositive fact.[5]

Materiality for Counts Eight and Ten, charging Michel with willfully aiding and abetting Broidy and others in unlawfully lobbying the federal government, presents a closer question.   Here, the Government must ultimately show a completed offense or an attempt; inchoate conspiracy will not suffice.   *See supra* at 10.   The indictment alleges that Michel "aided and abetted Broidy's, Higginbotham's, and Lum Davis's knowing and willful unregistered actions as agents of a foreign principal."   Superseding Indictment at 37.   Broidy's conversations with then-President Trump may well go directly to whether Michel aided and abetted Broidy in unlawfully lobbying then-President Trump.

---

[4]   The court in *North* also rejected any argument that a President's unlawful order *ipso facto* insulates a defendant from criminal liability.  This Court recently applied this principle to reject a January 6 defendant's argument that any purported direction by then-President Trump to his supporters to engage in insurrection could insulate those supporters from any criminal liability for their unlawful actions at the United States Capitol on January 6, 2021.  *See United States v. Grider*, Crim. A. No. 21-022, 2022 WL 3030974, at *4 (D.D.C. Aug. 1, 2022).

[5]   There is also some risk that at least some of the testimony Defendant seeks to elicit could be subject to the executive privilege.  *See United States v. Nixon*, 418 U.S. 683, 708 (1974) ("Presidential communications are presumptively privileged" (internal quotation marks omitted)).

However, Defendant's subpoena for former President Trump's testimony fails in Defendant's proffer.  Defendant focuses predominantly on then-President Trump's subjective understanding as to whether Broidy or Wynn were lobbying him on behalf of the Chinese government.  *E.g.*, ECF No. 190-1, Trans. 58:17-20 (then-President "Trump had no sense that Mr. Wynn or Mr. Broidy were acting as secret agents for the Chinese . . .").  Neither the foreign agent statute nor FARA have any element bearing on whether the government official subjectively believes that the lobbyist is acting on behalf of the foreign government.  Nor would it, given both statutes are aimed at furtive and illicit attempts to shape American policy in furtherance of foreign interests.  Insofar as the proffer does not contest that Broidy was in fact furthering foreign interests during his conversations with then-President Trump, the proffered testimony does not bear on any material fact at issue.

To the extent that Defendant means to proffer that former President Trump would testify that (1) he never met with Broidy or (2) that Broidy insisted to Trump in their conversations that Broidy was furthering solely his own interests, the Court would be unable to accept it.  As an initial matter, testimony regarding Broidy's statements would be hearsay if offered for the truth of the matter asserted, *see* Fed. R. Evid. 801(c), and a party generally may not obtain inadmissible evidence through a Rule 17 subpoena, *cf. Nixon*, 418 U.S. at 699-700 (subpoena *duces tucem*).  More importantly, a court cannot accept a proffer based upon "only speculation."  *See, e.g.*, *United States v. Barnes*, 560 F. App'x 36, 40 (2d Cir. 2014) (affirming trial court's quashing trial subpoena where proffer based on mere speculation).  Neither Defendant nor his counsel represents that they have ever spoken to former President Trump, much less spoken to former President Trump regarding this case.  Defendant's proffer is all the more speculative when balanced against Broidy's sworn testimony before this Court in his change-of-plea hearing.  As Defendant puts it

in his briefing, "[d]id the Prime Minister ask President Trump to stand down on the DOJ's investigation of [Low]?  Whether the answer is 'yes,' 'nor,' or 'I don't recall,' the answer will be relevant."  Opp. at 16.  Before issuing a subpoena, a defendant must have a good faith basis to already know the answer to such a question.  Anything less is speculation, and speculation will not do.

As such, because the non-speculative aspects of Defendant's proffer as to former President Trump's proposed testimony are insufficiently material to Defendant's case, the Court grants the Government's request to preclude former President Trump's testimony and *sua sponte* quashes Defendant's subpoena for his testimony.

**D.  Jeh Johnson**

The Court need not pause long on Defendant's subpoena to Johnson.  Defendant argues that Johnson would testify that he intended to advance Guo's interests before the federal government and that Johnson had not (and presumably did not plan) to register pursuant to FARA. *See* Opp. at 19 (According to Defendant, "Mr. Michel learned of Secretary Johnson's efforts to assist Guo by leveraging contacts in the Trump administration when Johnson ha[d not] register[ed] under FARA[.]").  In other words, Defendant argues that Johnson's testimony would be relevant to whether Defendant acted "willfully," the applicable mental state.[6] Even taking as true the factual

---

[6]  Relying on *Ratzlaf v. United States*, 510 U.S. 135 (1994) and *United States v. Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d 38 (D.D.C. 2018), Defendant argues that the Government must demonstrate that Defendant "had actual knowledge of the [specific] criminal statute" to show willfulness.  Neither case stands for that proposition.  Rather, a person acts "willfully" when they "'act[] with knowledge that [their] conduct was unlawful.'"  *Bryan v. United States*, 524 U.S. 184, 191-92 (1998) (quoting *Ratzlaf*, 510 U.S. at 137 (1994)); *see also United States v. Moore*, 612 F.3d 698, 703 (D.C. Cir. 2010) (Kavanaugh, J., concurring).  To be sure, the Court in *Ratzlaf* suggested that knowledge of a specific tax provision is necessary when the provision itself is fairly abstruse and a reporting omission is not inherently malign. *See* 510 U.S. at 144.  Not so for FARA.  FARA and similar statutes are "not just about paperwork; their object is to ensure that no person acts to advance the interests of a foreign government or principal within the United States unless

allegation that Johnson had not complied with FARA's registration requirements, an issue decidedly not before the Court, Defendant does not proffer that he knew at the time of the charged conduct that Johnson did not comply with FARA's registration requirements.  Given Defendant was (and is) a private citizen and is not otherwise acquainted with Johnson, the Court cannot further assume that Defendant would somehow have been privy to *Johnson*'s intent to register or actual registration.  Because the proffered testimony cannot speak to Michel's intent in the alleged conspiracy,[7] the Court shall *sua sponte* quash the subpoena to Johnson.

### III.    CONCLUSION AND ORDER

For the foregoing reasons, it is hereby

**ORDERED**, the Government's [193] Motion to Exclude Witnesses is **GRANTED IN PART AND HELD IN ABEYANCE IN PART**.  It is further

**ORDERED**, that Defendant's subpoenas to Barack Obama, Donald Trump, and Jeh Johnson are **QUASHED**.

**SO ORDERED**.

Dated:  March 6, 2023

                                    /s/

                                 COLLEEN KOLLAR-KOTELLY

                                 United States District Judge

---

the public has been properly notified of his or her allegiance."  *United States v. Manafort*, 318 F. Supp. 3d 1, 4 (D.D.C. 2018).

[7]  Defendant also argues that Johnson "must authenticate [a] tape" of a purported conversation between Johnson and Guo.  Opp. at 18.  Such a tape and its contents have no relevance to this case. To the extent that Defendant intends to present evidence that there is some connection between this tape and purported instances of Defendant's assistance to the federal government, the Court has already precluded such evidence as "good acts" evidence violative of Federal Rule of Evidence 405.  Order, ECF No. 182 at 1 & n.1 (Oct. 14, 2022).