# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    )
                               )
                               )
      v.                     )     Case No. 19-148-1 (CKK)
                               )
PRAKAZREL MICHEL (1),       )
                               )     **ORAL ARGUMENT REQUESTED**
                               )
       Defendant.      )

---

# DEFENDANT PRAKAZREL MICHEL'S
## MOTION FOR JUDGMENT OF ACQUITTAL

M. Scott Peeler (*pro hac vice*)
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas, 42nd Fl
New York, NY 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
scott.peeler@afslaw.com

Peter Zeidenberg (Bar No. 440803)
Michael F. Dearington (Bar No. 5223987)
David M. Tafuri (*pro hac vice*)
Sarah "Cissy" Jackson (*pro hac vice*)
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20006-5344
Telephone: (202) 857-6000
Facsimile:  (202) 857-6395
peter.zeidenberg@afslaw.com
michael.dearington@afslaw.com
david.tafuri@afslaw.com
cissy.jackson@afslaw.com

*Counsel for Defendant Prakazrel Michel*

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 1

STANDARD OF REVIEW ............................................................................................... 2

ARGUMENT ..................................................................................................................... 3

    I.      The evidence was insufficient to convict Michel on Count 1 for conspiring with Low to violate campaign finance laws. ........................................................ 3

    II.    The evidence was insufficient to convict Michel on Count 3 because there was no evidence that Michel knowingly caused others to file false reports with the FEC. ......................................................................................................... 9

    III.   The evidence was insufficient on Count 4 because Michel's statement in his declaration to the FEC was not false and was not intended to obstruct the FEC's narrow investigation. ............................................................................... 11

    IV.   The evidence was insufficient to convict Michel on Count 2 because there was no evidence that Michel knowingly caused others to file false reports with the FEC or that he personally filed a false report. ...................................... 13

    V.    The evidence was insufficient to convict Michel on Count 12 for conspiring to make false statements to banks because the bank false statement statute, 18 U.S.C. § 1014, does not proscribe false statements to induce a bank to accept a deposit. ................................................................................................. 14

    VI.   The evidence was insufficient to convict Michel on Count 10, which charged him with acting as an agent of the Chinese government, because there was no evidence he had agreed to act at the Chinese government's "direction or control." .................................................................................... 18

    VII.  The evidence was insufficient to convict Michel on the substantive FARA charge in Count 8 because he did not lobby the United States government on behalf of Low, and he did not aid and abet Broidy's FARA violation. .......... 22

    VIII. The evidence was insufficient to convict Michel on Count 7 because he did not conspire with anyone to effect any of the charged objects of the conspiracy. ................................................................................................... 25

          A.    There was no evidence of an agreement between Michel and a co-conspirator for anyone to violate FARA. .................................................. 25

          B.    There was no evidence of an agreement between Michel and an alleged co-conspirator for anyone to agree to lobby the Trump administration under the "direction or control" of the Chinese government. ............................................................................................ 28

          C.    The evidence was insufficient to prove a conspiracy to conceal the proceeds of a FARA violation, or a conspiracy to transfer funds into the United States to promote a FARA violation, in contravention of the money laundering statute. ................................................................ 29

IX.    The Court should also vacate the conviction on Count 7 because one of the objects was legally invalid, and the Court can have no certainty that the jury did not rest its conviction on the legally invalid object. ...................................... 32

X.    At a minimum, the Court should grant a new trial on the above counts under Rule 33 because the verdict was against the weight of the evidence................... 36

CONCLUSION ....................................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. United States,*
  417 U.S. 211 (1974)...................................................................................................4

*Direct Sales Co. v. United States,*
  319 U.S. 703 (1943)...................................................................................................4

*Gebardi v. United States,*
  287 U.S. 112 (1932)........................................................................................... *passim*

*Ingram v. United States,*
  360 U.S. 672 (1959)...................................................................................................4

*Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n,*
  38 F.4th 1126 (D.C. Cir. 2022).................................................................................15

*Rosemond v. United States,*
  572 U.S. 65 (2014).....................................................................................................23

*Skilling v. United States,*
  561 U.S. 358 (2010)...................................................................................................36

*United States v. $37,564,565.25 in Acct. No. XXXXXXXXXXX at Morgan*
  *Stanley, in Name of Anicorn, LLC,*
  No. 18-CV-02795 (CKK), 2019 WL 5269073 (D.D.C. Oct. 17, 2019) ...................15

*United States v. Amen,*
  831 F.2d 373 (2d Cir. 1987)......................................................................................34

*United States v. Castle,*
  925 F.2d 831 (5th Cir. 1991) ........................................................................33, 35, 36

*United States v. Castro-Aguirre,*
  983 F.3d 927 (7th Cir. 2020) ....................................................................................30

*United States v. Dellosantos,*
  649 F.3d 109 (1st Cir. 2011)..................................................................................4, 28

*United States v. Enmons,*
  410 U.S. 396 (1973)...................................................................................................17

*United States v. Gaskins,*
  690 F.3d 569 (D.C. Cir. 2012) .............................................................................27, 28

*United States v. Hall*,
  613 F.3d 249 (D.C. Cir. 2010), *amended*, No. 07-3036, 2019 WL 6794225
  (D.C. Cir. Dec. 12, 2019) ........................................................................................................30

*United States v. Hoskins*,
  902 F.3d 69 (2d Cir. 2018) ...........................................................................................34, 35, 36

*United States v. Kapelioujnyj*,
  547 F.3d 149 (2d Cir. 2008) ........................................................................................................3

*United States v. Kinard*,
  788 F. Supp. 36 (D.D.C. 1992) ...................................................................................................3

*United States v. Klein*,
  515 F.2d 751 (3d Cir. 1975) .......................................................................................................27

*United States v. Loveland*,
  825 F.3d 555 (9th Cir. 2016) ......................................................................................................4

*United States v. Melchor-Lopez*,
  627 F.2d 886 (9th Cir. 1980) ......................................................................................................4

*United States v. Naegele*,
  537 F. Supp. 2d 36 (D.D.C. 2008) ..............................................................................................2

*United States v. Pino-Perez*,
  870 F.2d 1230 (7th Cir. 1989) ...................................................................................................35

*United States v. Rafiekian*,
  68 F.4th 177 (4th Cir. 2023) ..........................................................................................19, 20, 21

*United States v. Rafiekian*,
  991 F.3d 529 (4th Cir. 2021) ............................................................................................18, 19, 20, 21

*United States v. Recognition Equip. Inc.*,
  725 F. Supp. 587 (D.D.C. 1989) .................................................................................................3

*United States v. Robinson*,
  71 F. Supp. 9 (D.D.C. 1947) ......................................................................................................36

*United States v. Rogers*,
  918 F.2d 207 (D.C. Cir. 1990) ...................................................................................................36

*United States v. Southard*,
  700 F.2d 1 (1st Cir. 1983) ..........................................................................................................35

*United States v. Townsend*,
  924 F.2d 1385 (7th Cir. 1991) .....................................................................................................4

*United States v. Trie*,
   21 F. Supp. 2d 7 (D.D.C. 1998) ...........................................................................11

*United States v. Vanoosterhout*,
   898 F. Supp. 25 (D.D.C. 1995), *aff'd sub nom.*, *United States v. Van*
   *Oosterhout*, 96 F.3d 1491 (D.C. Cir. 1996) ........................................................17

*United States v. Viola*,
   35 F.3d 37 (2d Cir. 1994), *abrogated on other grounds as recognized in*
   *United States v. Boyland*, 862 F.3d 279 (2d Cir. 2017) ................................27, 28

*United States v. White*,
   882 F.2d 250 (7th Cir. 1989) ...............................................................................17

*United States v. Wilson*,
   160 F.3d 732 (D.C. Cir. 1998) .............................................................................27

*United States v. Zeigler*,
   994 F.2d 845 (D.C. Cir. 1993) ...............................................................................3

*Williams v. United States*,
   458 U.S. 279 (1982) .......................................................................................16, 17

*Yates v. United States*,
   354 U.S. 298 (1957) .............................................................................................36

*Yates v. United States*,
   574 U.S. 528 (2015) .............................................................................................16

**Statutes**

18 U.S.C. § 2 ...............................................................................................1, 9, 22

18 U.S.C. § 371 .........................................................................................1, 14, 25

18 U.S.C. § 924(c) ................................................................................................23

18 U.S.C. § 951 .......................................................................................... *passim*

18 U.S.C. § 1001(a) ...............................................................................................1

18 U.S.C. § 1014 ........................................................................................ *passim*

18 U.S.C. § 1512(b) ...............................................................................................1

18 U.S.C. § 1519 .........................................................................................1, 9, 11

18 U.S.C. § 1956(a)(1)(B) ..............................................................................25, 29

18 U.S.C. § 1956(a)(2)(A) ............................................................................25, 29

18 U.S.C. § 1956(c)(9) ........................................................................................29

22 U.S.C. § 611(b)(c) ..........................................................................................35

22 U.S.C. § 612 ........................................................................................22, 23, 25

22 U.S.C. § 618 ............................................................................................22, 25

22 U.S.C. § 619 ..................................................................................................35

52 U.S.C. § 30109 ................................................................................................3

52 U.S.C. § 30121 ................................................................................................3

Foreign Corrupt Practices Act (FCPA), 15 U.S.C. §§ 78dd-1, 78dd-2 ............33, 34, 35

**Other Authorities**

Fed. R. Crim. P. 29 .......................................................................................1, 2, 3

Fed. R. Crim. P. 33 ..............................................................................................36

H.R. Rep. 91-1457 (1970) ....................................................................................17

H.R. Rep. 91-1556 (1970) ....................................................................................17

S. Rep. 88-1078 (1964) ........................................................................................16

S. Rep. No. 89-143 (1965) ....................................................................................35

Prakazrel "Pras" Michel moves under Federal Rule of Criminal Procedure 29 for a judgment of acquittal on Counts 1–4, 7, 8, 10, and 12 because the evidence at trial was insufficient as a matter of law to sustain his convictions on those counts. The Government overreached in this case by bringing a ten-count Superseding Indictment (SI) involving twelve different statutes, alleging three different schemes, even though several of the Government's charging theories misapprehended the charged statutes, and the evidence as to other counts fell woefully short of proving Michel's guilt beyond a reasonable doubt. For the reasons stated below, Michel respectfully requests that the Court acquit him on Counts 1–4, 7, 8, 10, and 12, or at a minimum grant a new trial on these counts because the verdict was against the weight of evidence.

## BACKGROUND

Michel and Jho Low were indicted in a Superseding Indictment (SI), ECF No. 84, that alleged Michel's involvement in three schemes. The first scheme (Counts 1–4) alleged a conduit contribution scheme whereby Michel used money from Low to make conduit contributions to the 2012 re-election campaign of President Obama, in violation of 18 U.S.C. § 371, and caused false reports to be made to the Federal Election Commission (FEC), in violation of 18 U.S.C. §§ 1001(a)(1) and 2 and 18 U.S.C. §§ 1519 and 2. In addition, the Government alleged that, after an investigation into the conduit scheme began in 2019, Michel engaged in witness tampering by attempting to dissuade two potential witnesses from cooperating with investigators, in violation of 18 U.S.C. §§ 1512(b)(1) and 2 (Counts 5 & 6).

The second and third schemes both alleged unregistered foreign lobbying financed by Low. The first lobbying scheme (Counts 7 & 8) alleged that Michel conspired with Low to lobby the Department of Justice to end an investigation into a forfeiture case proceeding against Low. The SI alleged that Michel engaged other co-conspirators to effectuate this goal yet failed to register

1

under the Foreign Agent Registration Act (FARA). The second lobbying scheme (Counts 7 & 10) alleged that Michel acted as an agent of the Chinese government, and failed to register with the Attorney General, when he conspired with Low to persuade the United States government to extradite a Chinese national, Guo Wengui, to China. In addition, the Government alleged that Michel conspired to launder the money he received from Low in connection with both of these lobbying schemes (Count 7). The SI also alleged (Count 12) that Michel conspired to make false statements to banks in connection with his efforts to deposit the funds sent to him by Low.

Michel's trial began on March 30, 2023, and the jury returned guilty verdicts on all counts on April 26, 2023. ECF No. 273. After the Government rested, the defense moved for judgment of acquittal, and the Court held the motion in abeyance "pending further order of the Court, and at least until the return of a verdict in this case." Minute Order (Apr. 17, 2023). By Minute Order on April 26, 2023, the Court ordered that Michel "file his supplemental Rule 29 motion and any other post-trial motion on or before June 9, 2023." After a series of extensions, the Court ordered Michel to file his post-trial briefs by October 16. Michel timely filed this brief, as well as a separate motion for a new trial.

## STANDARD OF REVIEW

Under Rule 29, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In ruling on a motion under Rule 29, the Court must consider "the evidence in the light most favorable to the government and determin[e] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt." *United States v. Naegele*, 537 F. Supp. 2d 36, 38, 43 (D.D.C. 2008) (granting a judgment of acquittal because "the evidence presented to the jury was insufficient to support a guilty verdict").

To avoid acquittal, the verdict must "rest on an adequate foundation." *United States v. Kinard*, 788 F. Supp. 36, 39 (D.D.C. 1992). A verdict that is based on speculation cannot stand. *See United States v. Zeigler*, 994 F.2d 845, 850 (D.C. Cir. 1993) (reversing conviction because "[o]nly speculation supports [defendant's] conviction"); *see also United States v. Recognition Equip. Inc.*, 725 F. Supp. 587, 588 (D.D.C. 1989) (noting that the "Court is obligated to take a hard look at the evidence and accord the government the benefit of only legitimate inferences" (internal quotations omitted)); *Kinard*, 788 F. Supp. at 39 ("A defendant may not be convicted because the facts presented are merely susceptible to an interpretation of guilt. There must be sufficient evidence, direct or circumstantial, to support the interpretation beyond a reasonable doubt in the eyes of reasonable jurors"); *United States v. Kapelioujnyj*, 547 F.3d 149, 153 (2d Cir. 2008) ("[S]pecious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty."). "[I]f a reasonable mind must be in balance as between guilt and innocence, a verdict of guilt cannot be sustained." *Recognition Equip.*, 725 F. Supp. at 588–89 (granting a Rule 29 motion due to insufficient evidence of conspiracy). These principles warrant a judgment of acquittal on Counts 1–4, 7, 8, 10, and 12.

## ARGUMENT

### I.   The evidence was insufficient to convict Michel on Count 1 for conspiring with Low to violate campaign finance laws.

Count 1 alleged that Michel conspired with Low to: (i) "defraud the United States by impairing, obstructing, and defeating" the "FEC's [Federal Election Commission's] ability to administer federal regulations concerning source and dollar restrictions in federal elections, including the prohibitions applicable to foreign nationals and straw donors"; (ii) "knowingly and willfully make foreign contributions" of more than $25,000 in a calendar year in violation of 52 U.S.C. §§ 30121 and 30109; (iii) "knowingly and willfully make contributions to a candidate for

federal office in the names of other persons." ECF No. 84 ¶ 21. As Michel and Low were the only alleged conspirators, the Government had to prove beyond a reasonable doubt that Michel *and* Low agreed with each other to violate campaign finance laws. The evidence was insufficient to satisfy this requirement, as there was *no evidence* that Low had knowledge and intent to violate campaign finance laws. The lack of evidence that Low was aware that his conduct was illegal, and had agreed to violate campaign finance laws, is fatal to Count 1.

"The agreement is the *sine qua non* of a conspiracy," *United States v. Dellosantos*, 649 F.3d 109, 115 (1st Cir. 2011), and "[w]ithout an agreement, there is no conspiracy," *United States v. Loveland*, 825 F.3d 555, 557 (9th Cir. 2016). "[T]his element is not supplied by mere knowledge of an illegal activity," *Dellosantos*, 649 F.3d at 115, by "approval of, or acquiescence in the object or purpose of the conspiracy," *United States v. Melchor-Lopez*, 627 F.2d 886, 891 (9th Cir. 1980), by "suspicion," or by "carelessness, indifference [or] lack of concern" in whether a crime will be committed, *United States v. Townsend*, 924 F.2d 1385, 1392–93 (7th Cir. 1991).[1]

In reviewing a conspiracy conviction, courts must "scrutinize the record" and exercise "special care" to ensure that the conviction was not the result of "piling inference upon inference," since the government must prove specific intent. *Anderson v. United States*, 417 U.S. 211, 223–24 (1974); *accord Ingram v. United States*, 360 U.S. 672, 680 (1959); *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943). To prove specific intent based on "evidence of knowledge," the knowledge must "be clear, not equivocal." *Ingram*, 360 U.S. at 680.

---

[1] The decision to charge a conspiracy "affects much about trial and sentencing, all to the advantage of the prosecution," but it "imposes one substantial disadvantage to the prosecution: the prosecution must prove the existence of the agreement beyond a reasonable doubt." *Loveland*, 825 F.3d at 557.

Here, although the evidence at trial showed that Low wired millions of dollars to Michel and that Michel used a portion of that money to make campaign contributions, there was no evidence of an agreement between Low and Michel to make illegal campaign contributions. Nor was there any evidence of an agreement between Michel and Low that Michel would use straw donors to make these contributions. The Government recognized that evidence that Low acted "knowingly and willfully"[2] was absent, and the Government attempted to cover-up this fatal gap in its proof with a two-step sleight of hand—which likely fooled the jury into thinking that Low had the requisite *mens rea*, when there was no such evidence.

In the first step, the Government introduced Exhibit 301, which was an email to Michel from the Obama re-election campaign, referencing "the official invitation to the Obama Fundraiser in Miami on June 26." Tr. 3/30 AM at 102; Trial Ex. 301. The Government then introduced the email's attachment, Exhibit 302, a formal invitation to the Miami fundraiser. Tr. 3/30 AM at 102; Trial Ex. 302. The invitation consisted of two pages: the first page announced the event, and the second page contained a form for a prospective donor to fill out, and included a notice that foreign contributions were prohibited. Trial Ex. 302. The Government asked Agent Robert Heuchling to read from the second page of the invitation, which stated that "Federal law prohibits foreign nationals, except lawfully admitted permanent residents of the U.S., from contributing to the Obama Victory Fund 2012. By signing below, I certify that I am a U.S. citizen or lawfully admitted permanent resident of the U.S." Tr. 3/30 AM at 106. Agent Heuchling then testified that this

---

[2] The jury was instructed that: "The elements of the crime of making foreign contributions are that: one, a foreign national, directly or indirectly, made a contribution of money or other thing of value, or made an express or implied promise to make a contribution or donation; two, the contribution was made in connection with a federal, state or local election or to a committee of a political party; three, **the Defendant acted knowingly and willfully**; and, four, the aggregate amount of the foreign contribution equaled $25,000 or more during the calendar year of 2012." Tr. 4/24 AM at 50 (emphasis added).

attachment, with the legal warning, had been emailed to Michel. *Id.* 106–07. With the jury conditioned to understand that the invitation in Exhibit 302 included the legal warning, the Government took a second, deceptive step.

In the second step, the Government gave the jury the false impression that Low *also* received the same invitation *with* the second page—which second page included the legal warning about foreign contributions—when that was false:

> Q. Okay. And that email that we saw, Government Exhibit 301, was dated June 10th. Did someone else receive . . . a copy of the invitation on June 10, 2012?
> A. *Yes, this invitation was forwarded to Mr. Low as well.*
> MR. MULRYNE: Can we pull up Government Exhibit 291. And if we can zoom in, please, on that.
> Q. I*s this an email from Mr. Rousseau to Mr. Low regarding the campaign --*
> A. It is.
> Q. *-- the fundraising event?*
> A. *Yes, it is.*
> MR. MULRYNE: Your Honor, move to admit Government Exhibit 291.
> MR. KENNER: No objection.
> THE COURT: All right. Then I'll admit without objection 291.
> Q. *Agent Heuchling, we see that it's Mr. Rousseau to Mr. Low, June 10, 2012; the attachment "Obama Event June 26th"; is that right?*
> A. *Yes.* …
> Q. *And, Agent Heuchling, if we scroll down to Page 2 of 291, what do we see there?*
> A. *This is the invitation to the June 26th fundraiser that we just discussed.*
> Q. All right.
> MR. MULRYNE: You can take that down, Ms. Orozco.

Tr. 3/30 AM at 107–08 (emphasis added); Trial Ex. 291.

What Agent Heuchling misrepresented was that the "invitation" was the same as the one that he had "just discussed." It was different in that the email to Low did *not* include the invitation's second page, which had the legal warning. It included only the cover page of the invitation, as the below comparison demonstrates.

**Trial Ex. 301 & 302: E-mailed to Michel; legal warning on second page of invitation**



**Trial Ex. 291: E-mailed to Low; described by Agent Heuchling**
**as "the invitation . . . we just discussed" in Ex. 302; missing second page with legal warning**



Any juror hearing this presentation, in this sequence, would have understood from it that Low received a full copy of the invitation to the campaign event in Exhibit 302 that contained the warning about foreign contributions. But the brevity of the Government's discussion of Exhibit 291 with Agent Heuchling was a tell—here was the only evidence that purportedly established the *mens rea* for Low, yet the Government asked the agent only to identify the exhibit; it never asked

7

him to read from it, as it did with the other key exhibits. The reason for this abbreviated approach is clear if one actually examines Exhibit 291: it does not contain the second page of the invitation which had the warning about federal contributions. *See* Trial Ex. 291.

Although Exhibit 291, like Exhibit 302, is a two-page exhibit; the first page is an email from Joel Rousseau to Low that simply says, "This is the invitation for the event I BB u about, would u like to be a host along with Carlos Slim senior on June 26th in Miami . . ." Trial Ex. 302. The second page of Exhibit 291 consists of *only* the first page of the Obama campaign event invitation—even though the full invitation was two pages, and it was the second page which contained the crucial warnings about the prohibition of foreign donations. By the Government's clever and careful questioning of its lead case agent—which was at best misleading—the jury was led to believe that Low received the two-page invitation with the legal warning when that was not the case.

The Government may have felt compelled to resort to this chicanery because it had no other evidence to demonstrate that Low had knowledge of the prohibition on foreign donations. Indeed, shorn of the misleading testimony, Exhibit 291 is affirmative evidence that Low lacked such knowledge and intent. It demonstrates that Rousseau removed the second page of the invitation, likely to keep Low in the dark about the legal prohibitions on foreign contributions. That is the only plausible—and certainly the most logical—explanation of why he included only the first page of the invitation when he sent it to Low, rather than include the second page with the warnings.

Indeed, the evidence indicated that Low was being deliberately misled so that he would feel comfortable making campaign donations, even though prohibited by law. Exhibit 290 was another email from Rousseau to Low that referenced the Obama campaign event that Michel planned to attend and included this piece of misleading advice: "being a foreigner is not a problem

as long u owned corporation in US just like George Sorros etc ….All donation can be made to the Super Pack and it can be unlimited." Trial Ex. 290. But this was untrue; as Agent Heuchling testified, although U.S. corporations can make campaign contributions, they "cannot be used as a pass-through for a foreign person to donate money." Tr. 3/30 AM at 98. Thus, the evidence not only failed to support a finding that Low knew his conduct was illegal, it established that Low was lulled into believing his conduct was lawful.

The Government's failure to introduce any evidence that Low knew that the donations would violate campaign finance laws means that Low did not conspire to violate those laws, and thus the evidence was insufficient to prove that Michel and Low conspired together. Accordingly, the Court should acquit on Count 1.

## II.    The evidence was insufficient to convict Michel on Count 3 because there was no evidence that Michel knowingly caused others to file false reports with the FEC.

Count 3 alleged that Michel caused the Obama Victory Fund to make a false report to the FEC that "falsely listed the names of straw donors as the true source of the contributions" in violation of 18 U.S.C. §§ 1519 and 2. ECF No. 84 ¶ 78.

At trial, the Government introduced evidence that Michel gave $40,000 to multiple straw donors who then attended one of two campaign fundraising events and made a contribution in the same amount. At the fundraising events, the campaign sought to obtain donor information by use of a donor card (Trial Ex. 509) in which the donor would have to indicate, among other things, that the money being contributed was their own when, in fact, it was given to them by Michel for the purpose of contributing to the fundraiser. Tr. 3/31 PM at 10–12; Trial Ex. 509.

Eric Feigenbaum, the Obama campaign fundraiser, testified that the campaign sought to collect accurate donor information at each campaign event, and did this by using donor cards that each donor was supposed to fill out. Tr. 3/31 PM at 10–12. The donor card contained a warning

that stated: "Federal law prohibits foreign nationals, except lawfully admitted permanent residents of the U.S., from contributing to OVF 2012. By signing below, I certify that I am a U.S. citizen or lawfully admitted permanent resident of the U.S.; the funds I am donating are not being provided to me by another person or entity for the purpose of making this contribution; and that my contribution shall be allocated as stated below." *Id.* at 13. Feigenbaum testified that the donor card was the "primary way" the campaign would gather donor information, and it was filled out "either in advance or at the time of the event." *Id.* at 12.

Count 3 fails for a simple reason: the Government never introduced the donor cards showing any false information, and there was no evidence that Michel ever saw or was aware of the donor cards that the straw donors were required to complete. Nor was there any evidence that Michel told any of the straw donors how to report their donations to the campaign. Nor was there evidence that Michel told the donors not to be truthful about the source of their funds. Nor was there testimony from the straw donors themselves as to how they filled out the forms and if their answers were, in fact, false.

In all, the Government called seven straw donors as witnesses at trial.[3] The Government never asked any of these witnesses if they filled out a donor card at their fundraising event or, if they did, what they reported. Nor did the Government ask any of these witnesses what, if anything, Michel told them to say if they were asked about the source of their donation. The Government did not prove that any of the straw donors made false statements to the campaign, much less that Michel aided and abetted any such false statements.

---

[3] The witnesses were Neville Richardson, Jean Randall Toussaint, Tysa Wright, Rudolph Moise, Richard Kromka, David Sugarman, and Jack Brewer.

The hurdle the Government faces here is particularly high because "when a contributor is charged as an aider and abettor in the federal election law context for causing an innocent intermediary to make a false statement to the FEC, the prosecution must prove that 'defendant knew of the [political party] treasurers' reporting obligations, that he attempted to frustrate those obligations, and that he knew his conduct was unlawful.'" *United States v. Trie*, 21 F. Supp. 2d 7, 14–15 (D.D.C. 1998). The Government came nowhere close to satisfying these requirements.

Accordingly, the Court should acquit Michel on Count 3.

**III. The evidence was insufficient on Count 4 because Michel's statement in his declaration to the FEC was not false and was not intended to obstruct the FEC's narrow investigation.**

Count 4 charged Michel with making a false declaration to the FEC in order to obstruct its investigation into a private complaint alleging that Michel used his company to make a contribution to a super PAC when he should have used his own name. ECF No. 84 ¶¶ 74, 79–80; *see* 18 U.S.C. § 1519 (making it a crime to, *inter alia*, "make[] a false entry in any record [or] document . . . with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States"). The Court should acquit Michel on Count 4 because his declaration was not false and was not meant to obstruct the FEC's narrow investigation into whether he should have used his own name to make contributions and not that of his company.

The private complaint alleged that Michel had violated campaign finance laws by making contributions to a super PAC called Black Men Vote (BMV) in the name of his company, SPM Holdings LLC (SPM), when he should have made the contributions only in his own name. *See* Trial Ex. 243. After receiving the private complaint, the FEC sent a letter to Michel on April 22, 2015, attaching the private complaint and offering Michel the opportunity to respond to the allegation. Trial Ex. 584. Critically, the private complaint did not allege that Michel or SPM used

foreign money to make contributions, nor was such an allegation investigated by the FEC. *Id.* Michel's attorneys responded by letter dated June 15, 2015, asserting that Michel and SPM are different entities, and each can make a contribution, and "Michel had no reason or intent to conceal that his company was the source of the contributions, but rather, the contributions were drawn from which funds were available at what time," as "Michel's declaration confirms." Trial Ex. 246 at 4. Michel's declaration confirmed that he "had no reason to hide the true source of my donations to [BMV]" or "diminish the disclosure of source or amounts of my contributions to [BMV] as being attributable to myself. To the contrary, I had every reason and desire to take full credit for the full amount of the contributions that I made to [BMV]." Trial Ex. 245. Thus, Michel truthfully stated that he had no reason to conceal his personal name by having his corporation make the donations.

The Government failed to prove Count 4's allegation that Michel concealed from his FEC declaration that he allegedly received funds from Low with intent to obstruct the FEC's investigation. ECF No. 84 ¶ 80. The FEC was not investigating the source of Michel's funds. Trial Ex. 584. The private complaint that triggered the FEC's investigation made no allegation about the source of Michel's funds. *See* Trial Ex. 243. And neither Michel nor his attorneys made reference to the source of his funds, let alone whether they were from a foreign source. Trial Exs. 245, 246. Nor would it have made sense for the FEC to have investigated Michel for using foreign funds, or for Michel to deny using foreign funds, when no one had accused him of that until years later. Agent Heuchling testified that the FEC was investigating "allegations that were different and distinct from those in this case." Tr. 3/30 PM at 62. The Government did not even call the FEC investigators as witnesses, and there was no evidence that the FEC's investigation related in any

way to use of foreign funds to make contributions, or that the FEC could have read Michel's statement as a denial that he had received foreign funds.

In these circumstances, no reasonable juror could have found beyond a reasonable doubt that Michel's indifference as to whether he or SPM, the corporation that he owned, was reported as the donor is tantamount to a false statement that he received no foreign funds from Low to make contributions. And no reasonable juror could have found beyond a reasonable doubt that his declaration was meant to obstruct the FEC's investigation, which had nothing to do with whether Michel received foreign funds to make contributions. The jury would have had to erroneously believe that the FEC was investigating whether Michel received foreign funds in order to rationally convict him on Count 4. The Court should therefore acquit on Count 4.

## IV. The evidence was insufficient to convict Michel on Count 2 because there was no evidence that Michel knowingly caused others to file false reports with the FEC or that he personally filed a false report.

Count 2 alleged that Michel caused the Obama Victory Fund to make reports to the FEC that "falsely listed the names of straw donors as the true source of the contributions," caused BMV to similarly make false reports to the FEC about the true source of contributions, and submitted a false declaration to the FEC (as detailed above in § III).  ECF No. 84 ¶ 76. The Government failed to introduce sufficient evidence to prove any of these allegations beyond a reasonable doubt.

Count 2 suffers from the same infirmities as do Counts 3 and 4: First, the Government neglected to introduce any donor cards submitted by the straw donors to the Obama Victory Fund. As a result, there is no evidence indicating what the donors stated to the campaign or if they said anything at all. Indeed, it may have been the case that the campaign neglected to collect the donor cards as required and simply assumed it knew the correct information to report. Tellingly, the Government called the alleged straw donors to testify, yet it did not ask any of them whether Michel told them what to say on their donor cards or asked if they filled out the donor cards at all.

And the Government never asked Eric Feigenbaum, the witness from the Obama campaign, what the campaign reported to the FEC and why. Nor did the Government introduce evidence that Michel falsely stated that contributions to BMV came only from him. And, finally, the Government never asked the FEC witness to identify the source of the information that was the basis of the final financial reports made to the FEC. Rather, Agent Heuchling testified at length about the donor cards that the donors must complete. Tr. 3/30 AM at 102–06, 144–46; 3/30 PM at 26–29. Agent Heuchling then testified about the amount of monies that Michel contributed to BMV. *Id.* at 26–29. The Government then introduced the FEC Reports (Trial Exs. 235–38) that reflected Michel's donation. What the Government did *not* introduce were the signed donor cards that—had they existed—might have had a declaration from Michel that the donated funds were his own.

Without this critical link in the chain—demonstrating that Michel provided false information to donors who passed that information on to the Obama campaign, and that Michel provided false information to BMV, which passed that information on to the FEC—the Government failed to prove the necessary causation for any false statement to the FEC. The false statements to the FEC cannot be attributed to Michel on this record. Because Michel's statements in the June 2015 FEC declaration also were not knowingly false or material, *see supra* § III, the Court should acquit Michel on Count 2.

**V.     The evidence was insufficient to convict Michel on Count 12 for conspiring to make false statements to banks because the bank false statement statute, 18 U.S.C. § 1014, does not proscribe false statements to induce a bank to accept a deposit.**

Count 12 alleged that, in violation of 18 U.S.C. § 371, Michel conspired with Higginbotham to make false statements to FDIC-insured banks by giving explanations for the source of funds that they sought to deposit, concealing that the funds had originated with Low, in violation of 18 U.S.C. § 1014. Section 1014 proscribes only the making of false statements to banks "for the purpose of influencing in any way the action of" an FDIC-insured bank "upon any

application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee," a list that does *not* include the decision to accept deposits. 18 U.S.C. § 1014. Under the plain language of the statute, and case law construing it, a false statement to convince an FDIC-insured bank to accept a deposit does not violate § 1014. The Court should therefore acquit Michel on Count 12.[4]

The plain language of § 1014, the alleged object of the conspiracy charged in Count 12, provides that it applies only to false statements "for the purpose of influencing in any way the action of" an FDIC-insured bank "upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor." 18 U.S.C. § 1014. Section 1014 does not apply to false statements to induce a bank to accept a deposit, as the word "deposit" appears nowhere in the statute. *See id.*

Multiple canons of statutory construction confirm that § 1014 does not apply to false statements that induce a bank to accept a deposit. First, the *expressio unius est exclusio alterius* canon of construction provides that "mention of one thing . . . implies exclusion of another thing." *Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n*, 38 F.4th 1126, 1137 (D.C. Cir. 2022) (cleaned up). By listing 18 items to which the statute does apply—but *not* referencing "deposits"—Congress plainly meant to exclude deposits from Section 1014's reach. *See id.* This principle applies *a fortiori* because deposits are a far more common banking transaction than other items in the list,

---

[4] The Court declined to rule on this issue in a related forfeiture proceeding after concluding that it did not need to reach the issue. *See United States v. $37,564,565.25 in Acct. No. XXXXXXXXXXXX at Morgan Stanley, in Name of Anicorn, LLC*, No. 18-CV-02795 (CKK), 2019 WL 5269073, at *6 (D.D.C. Oct. 17, 2019).

such as a "renewal" or "deferment," which is evidence that Congress included every type of transaction it intended to cover and would not have simply overlooked deposits in crafting this list. If Congress wanted to include "deposit" in the list, it would have done so, but it did not. Second, to the extent the Government tries to shoehorn deposits into one of the 18 types of transactions listed in § 1014, that argument is contrary to the *noscitur a sociis* canon of construction. That canon provides that "a word is known by the company it keeps," and is meant to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015). All 18 items in the list of transactions in § 1014 involve a false statement to induce the bank to put its own funds in jeopardy, and none involve inducing a bank to *accept* funds. Thus, construction of any of the 18 items in § 1014 in a way that embraces deposits is erroneous. *See id.*

Although § 1014's plain language is dispositive, the legislative history of § 1014 reinforces that it does not encompass false statements to induce a bank to accept a deposit. Indeed, in *Williams v. United States*, 458 U.S. 279, 288–89 (1982), in holding that check-kiting was outside the scope of § 1014 because it was not a false statement, the Supreme Court observed: "[A]t no point was it suggested that the statute should be applicable to anything other than representations made in connection with conventional loan or related transactions." *Id.* The Court highlighted that when Congress amended § 1014 in 1964, it described the statute "as barring 'false statements or willful overvaluations in connection with applications, loans, and the like.'" *Id.* (quoting S. Rep. 88-1078 (1964)). The Court also pointed to the Senate Committee on Banking and Currency's statement that § 1014 "is designed primarily to apply to borrowers from Federal agencies or federally chartered organizations." *Id.* The Court also noted that, when Congress amended the statute in 1970, it "characterized [§ 1014] simply as 'relating to false statements in loan and credit

applications.'" *Id.* (quoting H.R. Rep. 91-1457, at 21 (1970)). Critically, the Court further observed that, when Congress added FDIC-insured banks to the list of institutions covered by the statute, "the Reports accompanying the amendment stated simply that the addition 'would describe more explicitly the institutions which are covered by 18 U.S.C. § 1014, which provides penalties for making false statements or reports in connection with loans or other similar transactions." *Id.* at 289–90 (quoting H.R. Rep. 91-1556, at 35 (1970)). The legislative history and "a narrow interpretation of § 1014" endorsed by the Court, *id.* at 290, confirms that § 1014 does not apply to false statements to induce a bank to take a customer's deposits.

If the Court has any doubt whether § 1014 should extend to deposits—although none is warranted—the rule of lenity requires the Court to acquit Michel on Count 12. *See United States v. Enmons*, 410 U.S. 396, 411 (1973) ("[T]his being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity."). The Supreme Court already recognized in *Williams* that the rule of lenity warrants a narrow interpretation of § 1014: "[W]hen a choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." 458 U.S. at 290. This Court has held that § 1014 is a "very specific statute" and cannot be interpreted to apply to non-enumerated items. *United States v. Vanoosterhout*, 898 F. Supp. 25, 30 (D.D.C. 1995) (finding that since the "[Small Business Administration (SBA)] is not mentioned by name and is not among the listed generic types of agencies," § 1014 does not apply to false statements made to obtain SBA-guaranteed financing), *aff'd sub nom.*, *United States v. Van Oosterhout*, 96 F.3d 1491 (D.C. Cir. 1996); *see also United States v. White*, 882 F.2d 250, 253 (7th Cir. 1989) (reversing § 1014 conviction for making a false

statement to a bank's leasing subsidiary because the language of § 1014 and its legislative history did not indicate that the statute covered subsidiaries of federally insured banks).

Accordingly, because Count 12 charged as an object of the conspiracy conduct that does not violate § 1014, the Court should acquit Michel on Count 12.

## VI. The evidence was insufficient to convict Michel on Count 10, which charged him with acting as an agent of the Chinese government, because there was no evidence he had agreed to act at the Chinese government's "direction or control."

The Government alleged in Count 10 that Michel violated 18 U.S.C. § 951 by agreeing to operate as an agent of China and at the "direction or control" of the Chinese government in connection with a scheme by Low to convince the Trump administration to extradite Guo to China. ECF No. 84 ¶ 155. The evidence on Count 10 is plainly deficient because Michel never agreed to act at the direction or control of the Chinese government. Nor did he aid and abet Elliott Broidy, George Higginbotham, or Nickie Lum Davis in agreeing to act at the direction or control of the Chinese government. At best, they acted at the request of Low—not the Chinese government, and certainly not after agreeing to be subject to the "direction or control" of the Chinese government.

Section 951 makes it a crime to "act[] in the United States as an agent of a foreign government without prior notification to the Attorney General." 18 U.S.C. § 951(a). The statute defines "agent of a foreign government" to mean "an individual who *agrees* to operate within the United States subject to the *direction or control* of a foreign government or official." *Id.* § 951(d) (emphasis added). As the Fourth Circuit recently observed, "One thing is clear right off the bat: To fall within § 951's ambit, a person must do more than act in parallel with a foreign government's interest or pursue a mutual goal. An 'agent' further 'agrees to operate … subject to the *direction or* control of that government." *United States v. Rafiekian*, 991 F.3d 529, 538 (4th Cir. 2021) ("*Rafiekian I*"). A defendant does not operate subject to the "direction or control" of a foreign government merely because he "is willing to do something the foreign principal requests."

*Id.* at 539. The person must also "agree[]" to act at the direction or control of the foreign government, such that the person "does not become an 'agent' for purposes of § 951 simply by acting in accordance with foreign interests." *Id.* at 540–41; *accord United States v. Rafiekian*, 68 F.4th 177, 184 (4th Cir. 2023) ("*Rafiekian II*").[5]

Here, the evidence at trial fell well short of proving beyond a reasonable doubt that Michel agreed to act as an agent of the Chinese government subject to its "direction or control," or aided and abetted Broidy, Higginbotham, or Lum Davis. To the contrary, the evidence at trial established that Low, a Malaysian citizen living in China, sought to have Guo extradited to China. There is no dispute that it was Low, not the Chinese government, that financed the effort to extradite Guo. And Low—and only Low—gave directions about what he expected to be done. Only Low pulled the strings.

As Broidy testified, his meeting in Shenzhen, China, in May 2017 did not involve an agreement to act at the direction or control of the Chinese government, and was instead part of the engagement with Low. Specifically, Broidy testified that, during the trip, he met with who he "assumed" was a member of the Chinese government, Sun Lijun. Broidy testified that the discussion related to Sun's concerns about being able to obtain the meetings he wanted when he visited Washington, D.C. Tr. 4/4 AM at 90. Broidy further testified that Sun "asked if I could be helpful in trying to ensure that he receives those meetings." *Id.* at 91. According to Broidy, Sun spoke "generally" about Guo's extradition, why it was warranted, and how doing so would benefit the U.S. *Id.*

---

[5] Section 951 "has its roots in the Espionage Act of 1917." *Rafiekian I*, 991 F.3d at 538.

The reason *why* Broidy met with Sun and helped him to secure meetings, however, was because Low—not the Chinese government—requested that of him. Indeed, Broidy testified on direct examination by the Government:

> Q. With regard to those meetings that [Sun] was seeking, and with regard to this Guo extradition matter, did you agree to help?
> A. I did. **I felt that it was part of my engagement with Jho Low**; that I was there, and I thought I would try to help him assist with getting the meetings.
> Q. So you said that you felt this was sort of also related to your arrangement with Mr. Low. How did you understand Mr. Low to be connected at all to this request?
> A. **Well, he told us to come there.** It was his meeting. He set up the meeting, and he was present. Although he didn't say much, he was present during the meeting.

*Id.* at 91–92 (emphasis added).

This testimony is also consistent with Broidy's Statement of Offense, introduced into evidence by the Government, which made clear that the effort to return Guo to China was at the behest and direction of Low, not the Chinese government: "BROIDY Davis, and [Michel] also agreed to lobby the Administration and the DOJ to arrange for the removal and return of [ ] PRC National [Guo] . . . *on behalf of Foreign National [Low]*." Trial Ex. 532 at 1 (emphasis added).

There was no evidence that Michel, Broidy, Higginbotham, or Lum Davis "agree[d]" to act under the "direction or control" of Sun or the Chinese government, let alone actually acted under the "direction or control" of the Chinese government. 18 U.S.C. § 951; *Rafiekian I*, 991 F.3d at 540–41. Rather, Broidy assisted in securing the meetings because of his engagement with Low—who is Malaysian and not part of the Chinese government. That the Chinese government was interested in securing Guo's extradition is insufficient as a matter of law to transform Michel, Broidy, Higginbotham, or Lum Davis into foreign agents of China acting subject to the direction or control of the Chinese government, and a person "does not become an 'agent' for purposes of § 951 simply by acting in accordance with foreign interests." *Rafiekian I*, 991 F.3d at 540–41; *accord Rafiekian II*, 68 F.4th at 184.

20

This case involves even less evidence of an agreement and "direction or control" than in *Rafiekian II*, where the Fourth Circuit upheld the district court's ruling that the evidence Rafiekian acted at the direction or control of the Turkish government was against the weight of evidence. 68 F.4th at 192. Rafiekian, an executive at a consulting/lobbying firm, was engaged to work on the extradition of an individual from the U.S. to Turkey. Rafkiekian's point of contact was a Turkish businessman who held himself out to Rafiekian as having contact with Turkish officials and had, in fact, shared his proposals with Turkey's Foreign Affairs Minister and other Turkish government officials. The businessman hosted a meeting between Rafiekian, his colleague, and Turkey's Energy and Foreign Affairs Ministers concerning Turkey's desire to extradite the individual. *Id.* at 181. In upholding the district court's ruling, the Fourth Circuit explained: "We recur to the standard we outlined in *Rafiekian I* for determining when an individual operates subject to the 'direction or control' of a foreign government: there must be 'a foreign government or official on one end of the line,' and the alleged agent must do more than 'simply ... act[ ] in accordance with foreign interests' or 'privately pledg[e] allegiance.' Instead, he must agree *with that foreign government* to act in furtherance of its interests. For all of the reasons just outlined, the district court reasonably concluded that 'any inference that Turkey was, in fact, the undisclosed client, giving directions to [the defendant] through [the Turkish businessman],' was heavily outweighed by competing inferences." *Id.* at 192 (emphasis added) (citation omitted). So too here. Low alone set up and caused the meeting between Broidy and Sun, and Broidy acted only when Low requested that he do so.

Accordingly, because there is no evidence that Michel acted "as an agent of" China, and agreed to act "subject to the direction or control" of China, or aided and abetted Broidy, Higginbotham, or Lum Davis in doing so, the Court should acquit on Count 10.

**VII.  The evidence was insufficient to convict Michel on the substantive FARA charge in Count 8 because he did not lobby the United States government on behalf of Low, and he did not aid and abet Broidy's FARA violation.**

The Government charged Michel with being an unregistered agent of a foreign principal by "executing an unregistered, back-channel lobbying campaign to resolve the 1MDB investigation favorably for Low," in violation of FARA (22 U.S.C. §§ 612, 618). ECF No. 84 ¶ 151. The Government further alleged that Michel aided and abetted Broidy's, Higginbotham's, and Lum Davis's FARA violations in violation of 18 U.S.C. § 2. *Id.* The Court should acquit on Count 8, however, because only Broidy had a registration obligation under FARA—not Michel— and Michel did not aid and abet Broidy in failing to register, a point the Government did not even argue at trial.

FARA provides that "[n]o person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement." 22 U.S.C. § 612(a). Relevant here, the statute defines "agent of a foreign principal" to mean an agent of a foreign principal who "within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States." *Id.* § 611(c)(1)(iv).[6] A FARA violation thus has two components: a lobbying component and a lack-of-registration component. *See id.*[7] Section 618 of FARA makes it a crime for a person to "willfully violate[] any provision" of FARA. *Id.* § 618(a)(1).

---

[6] Although the Court provided the full definition of "agent of a foreign principal," which includes four types of activities, the Government charged Count 8 as an "unregistered, back-channel lobbying campaign," implicating only § 611(c)(iv). It did not allege any facts in Count 8 of the SI that could violate any other prong of § 611(c)(iv) in Count 8, and its reliance on any such theory would therefore be an improper variance and constructive amendment of the indictment.

[7] There is nothing inherently illegal about lobbying the government to seek a particular action, even on behalf of a foreign principal, so long as the lobbyist registers.

The Government failed to prove its allegation in Count 8 that Michel himself lobbied the U.S. government to "resolve the 1MDB investigation favorably for Low," ECF No. 84 ¶ 151, and thus Michel himself was under no obligation to register with the Attorney General. *See* 22 U.S.C. § 612(a). Thus, while Michel was not registered, the Government failed to prove the required element that he lobbied the U.S. Government on behalf of Low.

Nor did the Government prove that Michel "aided and abetted Broidy's, Higginbotham's, and Lum Davis's knowing and willful . . . unregistered, back-channel lobbying campaign to resolve the 1MDB investigation favorably for Low." ECF No. 84 ¶ 151. The Supreme Court has held that a person aids and abets only when he "intends to facilitate that offense's commission," which require that he have intent that goes "to the specific and entire crime charged." *Rosemond v. United States*, 572 U.S. 65, 76 (2014). Thus, where the defendant was charged with aiding and abetting a principal's use of a firearm in relation to a drug trafficking crime under 18 U.S.C. § 924(c), the Court held that the Government had to prove that the defendant must intend for both elements to occur—that the principal commit a drug trafficking crime *and* that the principal use a firearm. *See Rosemond*, 572 U.S. at 77. In other words, the Government must prove that "the accomplice has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope—that the plan calls not just for a drug sale, but for an armed one. In so doing, he has chosen … to align himself with the illegal scheme in its entirety—including its use of a firearm." *Id.* at 77–78.

Here, the Government introduced evidence only that Broidy lobbied the U.S. Government to end the investigation into the 1MDB—not that Higginbotham or Lum Davis did—and it failed to prove beyond a reasonable doubt that Michel aided and abetted Broidy's lobbying with *intent that he not register*, a required element of the aiding-and-abetting charge. *See id.* Indeed, the

Government failed to introduce any evidence that Michel intended for Broidy not to register. To the contrary, Broidy was unequivocal that there had been no agreement or even discussion between himself and Michel (or Low, Lum Davis, or Higginbotham, for that matter) about whether to register under FARA, let alone agreeing that he should *not* register:

> Q. Sir, when you went to, I believe it was, Bangkok initially and you met with Jho Low, was there any conversation about FARA, the Foreign Agent Registration Act?
> A. No.
> Q. Was there any conversation about whether or not you had to evaluate whether you needed to file under FARA?
> A. No.
> Q. Did Mr. Jho Low ever tell you don't register under FARA?
> A. I don't believe it came up at all.
> Q. Okay. At any time, did Mr. Jho Low tell you don't register under FARA? He didn't, did he?
> A. I don't believe so.
> Q. At any time, did Nickie Lum Davis tell you don't register under FARA?
> A. No.
> Q. And at no time did you tell Nickie Lum Davis to register under FARA; isn't that true?
> A. That's true.
> Q. And at no time did you tell Mr. Michel not to register under FARA; correct?
> A. Correct. …
> Q. (BY MR. KENNER) Did you, to your knowledge, or do you feel like you ever entered into an agreement to not register under FARA with Mr. Michel, Ms. Davis, Jho Low, or anybody else?
> A. No.

Tr. 4/4 PM at 54–56. The Government's failure to introduce *any* evidence that Michel encouraged Broidy to lobby while *intending* that Broidy not register under FARA is fatal to its aiding-and-abetting claim in Count 8.

Accordingly, because the Government failed to prove that Michel himself engaged in lobbying of the U.S. government without registering, and failed to prove that Michel aided and abetted Broidy, Higginbotham, or Lum Davis in lobbying the U.S. Government without registering, the Court should acquit Michel on Count 8.

**VIII.  The evidence was insufficient to convict Michel on Count 7 because he did not conspire with anyone to effect any of the charged objects of the conspiracy.**

Count 7 alleges a conspiracy under the general federal conspiracy statute, 18 U.S.C. § 371, with four alleged objects: (1) to lobby the U.S. government to end an investigation into Low's embezzlement of assets from 1MDB, a Malaysian sovereign wealth fund, in violation of FARA (22 U.S.C. §§ 612 and 618); (2) to lobby the U.S. government to extradite Chinese national Guo Wengui, while acting as agents of China and without registering, in violation of 18 U.S.C. § 951; (3) to engage in financial transactions to conceal the proceeds of the FARA violation, in violation of 18 U.S.C. § 1956(a)(1)(B); and (4) to transfer funds into the United States to promote the FARA violation in violation of 18 U.S.C. § 1956(a)(2)(A). ECF No. 84 ¶¶ 105–49. The Court should acquit Michel on Count 7 because the evidence fails to prove beyond a reasonable doubt a conspiracy to effect *any* of these objects.

**A.  There was no evidence of an agreement between Michel and a co-conspirator for anyone to violate FARA.**

The evidence was insufficient to prove that Michel and another alleged co-conspirator *agreed* to violate FARA, in violation of 22 U.S.C. §§ 612 and 618; *see* ECF No. 84 ¶ 105(a). Although Broidy and Higginbotham were both Government witnesses who testified under the conditions of cooperation agreements, neither one of them testified that there was any kind of agreement not to register under FARA. Broidy testified that he was "generally" familiar with the requirements of FARA, Tr. 4/4 AM at 85–86, as noted above, *supra* pp. 23–24, he was unequivocal that there had been no agreement or even discussion between himself and Michel, Low, Lum Davis, or Higginbotham about FARA and, critically, no agreement—either explicit or tacit—that they should not register under FARA. Tr. 4/4 PM at 54–56. Broidy, the one alleged co-conspirator who actually lobbied the U.S. government, confirmed that there was no agreement that he or anyone else should not register under FARA.

Higginbotham testified that while he did not believe he personally needed to register, he suggested to Michel that he *might* need to register. Specifically, Higginbotham testified that he "ha[d] concerns about FARA" and indicated to Michel that registration *might* be necessary, but Michel did not share those concerns. Tr. 4/6 AM at 20–21. Higginbotham further testified: "I didn't say, You must register. I suggested to him that it looked like FARA becomes very, very important as we were doing activities with regards to 1MDB and Guo Wengui." Tr. 4/11 AM at 22. Higginbotham further testified that he did not believe that he (Higginbotham) was required to register under FARA because he "didn't believe that [he] was the one that was actually performing the services that would fall under – that would fall under FARA." *Id*. Critically, despite being a cooperating Government witness, Higginbotham never testified that there was any agreement— express or tacit—between himself and Michel, or any of the other alleged co-conspirators, that Broidy or anyone else should not register under FARA.[8]

To the contrary, the evidence at trial was that the alleged co-conspirators, with the exception of Broidy, were unsophisticated, political neophytes. No one, except for Broidy, had experience or background in lobbying. And although Broidy testified he had familiarity with FARA, he also testified that he did not discuss any concerns he might have had about FARA with anyone else.

Aside from the lack of *any* evidence of an agreement between Michel and a co-conspirator that Broidy or anyone else should violate FARA, the testimony of cooperating witnesses who are alleged co-conspirators indicating that there was no agreement is dispositive. Indeed, Courts have reversed conspiracy convictions where none of the Government's cooperating co-conspirator

---

[8] There can be no reasonable inference that Low, a Malaysian citizen residing in China, would have understood when a FARA registration was required. Such a conclusion could only be based on rank, unreasonable speculation.

witnesses testify that the defendant joined in an agreement to commit a crime. *See, e.g.*, *United States v. Gaskins*, 690 F.3d 569, 572 (D.C. Cir. 2012) (reversing because "[n]one of the cooperating witnesses, many of whom pled guilty to participating in the conspiracy, described [the defendant] as having any knowledge of the conspirators' drug trafficking activities"); *United States v. Wilson*, 160 F.3d 732, 737, 750 (D.C. Cir. 1998) (reversing because none of "several witnesses" who would have had knowledge of the defendant's involvement testified that he was part of the murder plot).[9] Reversal is warranted in these cases because, "when witnesses with inside knowledge of a conspiracy 'are in a position to offer testimony about the nature of a defendant's involvement, the absence of such evidence is telling.'" *Gaskins*, 690 F.3d at 577 (quoting *Wilson*, 160 F.3d at 737) (brackets and ellipsis omitted). There is "reason to doubt [a defendant's] involvement in the charged conspiracy" if cooperating witnesses who were "motivated to provide the government with whatever evidence [they] had on" the defendant were "unable to point to" conclusive evidence of the defendant's guilt. *Id.* at 578.

This principle applies *a fortiori* where, as here, the Government collected a wealth of communications between the defendant and other alleged co-conspirators, and the alleged co-conspirators testify as Government cooperators at trial, and yet the Government still fails to introduce evidence that there was an agreement not to register for FARA. *See id.* at 577 (reversing drug-trafficking conspiracy conviction because the government "had the cooperation of . . . coconspirators" and "intercepted thousands of telephone calls between members of the conspiracy,

---

[9] *See also United States v. Viola*, 35 F.3d 37, 44 (2d Cir. 1994) (reversing RICO conspiracy conviction where "testimony from participants in the conspiracy" did not implicate the defendant in the charged enterprise), *abrogated on other grounds as recognized in United States v. Boyland*, 862 F.3d 279, 289 (2d Cir. 2017); *United States v. Klein*, 515 F.2d 751, 757 (3d Cir. 1975) (reversing conviction for conspiracy to commit mail fraud where the "chief government witness," an unindicted co-conspirator, provided "no testimony implicating" the defendant).

conducted weeks of surveillance, and searched numerous apartments," and "[i]n all of this, there was no evidence" that the defendant ever discussed drug trafficking). "[A]ny reasonable jury should have wondered why the government could not find such evidence," in these circumstances, given the "scope of the government's investigation and the role its witnesses played in the conspiracy." *Id.*[10]

The foregoing applies with particular weight here where Michel's personal attorney and alleged co-conspirator was a cooperating witness for the Government. As in *Gaskins*, neither Broidy nor Higginbotham testified that there was any agreement with Michel to not register under FARA. Broidy testified there were no discussions regarding FARA, and Higginbotham testified that he suggested that FARA registration might be necessary but Michel appeared to disagree.

Thus, the evidence was insufficient to prove that Michel conspired to violate FARA.

**B.    There was no evidence of an agreement between Michel and an alleged co-conspirator for anyone to agree to lobby the Trump administration under the "direction or control" of the Chinese government.**

For substantially the same reasons cited above in § VI, the evidence was also insufficient to prove that Michel and another alleged co-conspirator agreed that Broidy (or anyone else) should lobby the U.S. government at the "direction or control" of the Chinese government, in violation of 18 U.S.C. § 951; *see* ECF No. 84 ¶ 105(b). Nor was there evidence that even Broidy himself—or anyone else—agreed on their own to lobby the U.S. government at the "direction or control" of the Chinese government. *See also supra* § VI. Thus, this alleged object of the conspiracy also fails.

---

[10] *See also Viola*, 35 F.3d at 44 (concluding that it was "telling" that the government's "wealth of evidence," which included a "year-long electronic surveillance," turned up no evidence implicating the defendant in the charged conspiracy); *Dellosantos*, 649 F.3d at 124 (finding it "quite significant that none of the[] recordings" among "hundreds of telephone conversations (from a pool of thousands of calls intercepted by the government) involving hours of intercepted communications" implicated the defendants in the charged conspiracy).

**C.** **The evidence was insufficient to prove a conspiracy to conceal the proceeds of a FARA violation, or a conspiracy to transfer funds into the United States to promote a FARA violation, in contravention of the money laundering statute.**

The Government further alleged in Count 7 that Michel conspired to violate the money laundering statute in two ways: (1) by conspiring to conduct a financial transaction that involved "the proceeds" of a FARA violation and that was designed to "conceal or disguise the nature, location, source, ownership, and control of the proceeds of" the alleged FARA violation, in violation of 18 U.S.C. § 1956(a)(1)(B) (*i.e.*, concealment money laundering); and (2) by conspiring to transfer funds into the United States "with the intent to promote the carrying on of" a FARA violation, in violation of 18 U.S.C. § 1956(a)(2)(A) (*i.e.*, promotional money laundering). *See* ECF No. 84 ¶ 105(c), (d).

In support of the money laundering conspiracy, the Government alleged a series of financial transactions: four transactions in May 2017, where Low wired funds to Michel and Michel then transferred the funds to the Colfax Law operated by Broidy's wife, who then transferred the money to Broidy and Davis; two similar transactions in August 2017 where, once again, Low wired funds to Michel, who then wired a portion of those funds to Colfax Law, which subsequently transferred the funds to Broidy and Davis; a transaction in September 2017, where Low wired funds to Michel according to a purported loan agreement; and an October 2017 transaction where Low wired funds to a bank account controlled by Higginbotham.

The evidence was insufficient to prove beyond a reasonable doubt that Michel conspired to violate either of these objects. First, the evidence was insufficient to prove that Michel conspired to commit concealment money laundering because none of the funds were designed to conceal "proceeds" of a FARA violation. Section 1956 defines "proceeds" to mean "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity." 18 U.S.C. § 1956(c)(9). "The offense of money laundering must be separate and distinct from the

underlying offense that generated the money to be laundered." *United States v. Hall*, 613 F.3d 249, 254 (D.C. Cir. 2010), *amended*, No. 07-3036, 2019 WL 6794225 (D.C. Cir. Dec. 12, 2019). Thus, "[t]here must be evidence of activity that is separate from the underlying predicate offense that generates the proceeds to be laundered, in order successfully to charge a defendant with involvement in a conspiracy to commit money laundering." *United States v. Castro-Aguirre*, 983 F.3d 927, 941 (7th Cir. 2020). "The evidence against a defendant will not support a conviction for conspiracy to commit money laundering when it demonstrates involvement only in a conspiracy that generated proceeds but does not demonstrate involvement in any subsequent conspiracy to launder those proceeds." *Id.* Under these principles, transfers of funds in order to pay the alleged conspirators for their roles in the lobbying scheme are not "proceeds" of a FARA violation. Thus, the alleged concealment object fails.

Second, the alleged concealment money laundering object fails because the evidence showed that transactions meant to conceal the source of funds was not meant to conceal that they related to a FARA violation, but rather to reduce the risk that those funds would be identified as coming from Low and therefore *seized* as fruits of the 1MDB scandal (which was not alleged as a specified unlawful activity). The evidence demonstrated that this was the only reason that the Colfax Law office was used to send funds to Broidy and Lum Davis. It was well known that the Government was seizing Low's assets all over the United States and recipients had to forfeit them. Indeed, that was the reason why Low wanted help with his forfeiture matter. As a result, any funds coming from Low were subject to seizure, and Michel, Broidy, and Davis were concerned that money received could be traced back to Low. This is why the funds were wired to shell companies and to Colfax Law—not to conceal the proceeds of a FARA violation.

Broidy's testimony was clear on this point, and that he wanted to be paid for his lobbying efforts using untainted funds. He testified on direct examination by the Government:

> Q. And just to be specific, what were the terms of that –
> A. That was the $8 million retainer together with a success fee of $50 to $75 million, dependent upon the duration of the length of time to settlement.
> Q. Did the issue that you discussed with Mr. Michel previously, before your trip to Bangkok, about funds that were clean or untainted, did that come up during this meeting as well?
> A. Yes.
> Q. And can you tell the jury what was discussed about the money in that regard?
> A. *Yes. I expressed that concern, and I was assured by Jho Low that the funds would be untainted. He had a source of the funds, a guy called Fang -- I don't remember the second part of his name -- who was going to be putting up the money for this purpose.*
> Q. *And Mr. Michel and Ms. Lum Davis, did they share your concern about the cleanness, the untaintedness, of the money?*
> A. *Yes.*

Tr. 4/4 AM at 80 (emphasis added). This was the only testimony elicited by the Government concerning *why* money was sent in the fashion that it was. And this uncontradicted testimony was that the intention was not to hide the purpose of the payments but, rather, the source of the funds so that the money would not be seized.

Third, both the alleged concealment and promotional money laundering objects fail because the Government failed to prove that Michel and at least one co-conspirator engaged in the transactions with intent that they promote or conceal a FARA violation, as opposed to promoting or concealing payments for lobbying alone.[11] The evidence was insufficient to prove that Michel had specific intent that anyone violate FARA. *See supra* § VII. While Michel may have engaged in transactions meant to facilitate lobbying by Broidy, that alone is insufficient to prove Michel's specific intent to engage in transactions with the aim of promoting or concealing a FARA violation. Indeed, none of the transfers that the Government contends were to promote a FARA violation

---

[11] Relatedly, the money laundering counts fail because a FARA violation is a crime of omission— the failure to register. There were no funds that promoted this failure to register, and there were no proceeds generated as a result of the alleged failure to register.

were conditioned on the recipient of the funds not registering under FARA. And Michel never

discussed whether Broidy should register under FARA, let alone directed or agreed with Broidy

that he should not register.

Accordingly, the evidence was insufficient as a matter of law to prove the two money

laundering objects in Count 7.

* * * * *

In sum, the Government failed to prove beyond a reasonable doubt that Michel conspired

with anyone to effect any of the four charged objects, and the Court should therefore acquit Michel

on Count 7.

**IX.    The Court should also vacate the conviction on Count 7 because one of the objects was legally invalid, and the Court can have no certainty that the jury did not rest its conviction on the legally invalid object.**

In Count 7, the Government made the unprecedented and aggressive decision to charge

Michel with conspiring *with* a foreign principal (Low) to violate FARA. *See* ECF No. 84 ¶ 105(a)

(alleging that Michel and Low "conspired with one another" to "willfully act as agents of a foreign

principal, specifically, Low, without registering"). This theory is legally invalid under *Gebardi v.*

*United States*, 287 U.S. 112 (1932), however, because FARA reflects an affirmatively legislative

policy to leave the foreign principal unpunished. The Government therefore cannot charge a

conspiracy between Michel and Low to violate FARA, and the Court should vacate the guilty

verdict in Count 7 because the jury may have rested its guilty verdict on this legally invalid object

of the charged conspiracy.

In *Gebardi*, the Supreme Court held that a man and woman could not conspire to violate

the Mann Act by agreeing to transport her across state lines to engage in adultery, because it would

be contrary to Congress's "affirmative legislative policy" of punishing only the man's role when

enacting the Mann Act. *Id.* at 123. The Court noted that the Mann Act "is drawn to include those

32

cases in which the woman consents to her own transportation," as it was meant "to deal with cases which frequently, if not normally, involve consent and agreement on the part of the woman to the forbidden transportation." *Id.* at 119, 121. "Yet it does not specifically impose any penalty upon her," the Court observed, "although it deals in detail with the person by whom she is transported," and the woman's acquiescence "was not made a crime under the Mann Act." *Id.* at 119, 121. The Court thus "perceive[d] in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her mere consent, evidence of an affirmatively legislative policy to leave her acquiescence unpunished." *Id.* at 123. The Court held that "[i]t would contravene that policy to hold that the very passage of the Mann Act effected a withdrawal by the conspiracy statute of that immunity which the Mann Act itself confers." *Id.* The Court therefore reversed the man and woman's convictions. *Id.*

Courts have invalidated conspiracy convictions in other contexts under the *Gebardi* principle where the substantive statute contemplates two necessary actors but punishes only one. For example, in *United States v. Castle*, the Fifth Circuit held that the Government could not charge foreign officials with conspiracy to violate the Foreign Corrupt Practices Act (FCPA), 15 U.S.C. §§ 78dd-1, 78dd-2, a statute that criminalized payments of bribes to foreign officials but not the receipt of such bribes by the officials. 925 F.2d 831, 831–32 (5th Cir. 1991) (per curiam). The court explained that:

> The principle enunciated by the Supreme Court in *Gebardi* squarely applies to the case before this Court. Congress intended in both the FCPA and the Mann Act to deter and punish certain activities which necessarily involved the agreement of at least two people, but Congress chose in both statutes to punish only one party to the agreement. . . . [T]he Court explicitly built its analysis on Congress' clear intention, evinced by the plain language of the statute, to exempt the transported women from *all* prosecutions for their involvement in the prohibited activities. A similar intent is apparent from the language of the FCPA, especially when compared to other bribery statutes which criminalize both the payment and receipt of bribes. . . . The question is . . . whether Congress intended the general conspiracy statute, passed many years before the FCPA, to reach foreign officials.

> . . . Based upon the language of the statute and the legislative history, this Court finds in the FCPA what the Supreme Court in *Gebardi* found in the Mann Act: an affirmative legislative policy to leave unpunished a well-defined group of persons who were necessary parties to the acts constituting a violation of the substantive law. . . . As in *Gebardi*, it would be absurd to take away with the earlier and more general conspiracy statute the exemption from prosecution granted to foreign officials by the later and more specific FCPA.

*Id.* at 833–36. Thus, the Fifth Circuit held that "the Court declines to extend the reach of the FCPA through the application of the conspiracy statute." *Id.* Since *Castle*, the Government has not charged anyone with conspiring with a foreign official to violate the FCPA.

Similarly, in *United States v. Hoskins*, 902 F.3d 69, 83–84 (2d Cir. 2018), the Second Circuit relied on *Gebardi* in holding that a foreign national who acts outside the United States and not on behalf of a domestic person cannot be charged with conspiracy to violate the FCPA. The court examined the text, structure, and legislative history of the statute, concluding: "[I]t is clear that the FCPA's enumeration of the particular individuals who may be held liable under the Act demonstrated a conscious choice by Congress to avoid creating individual liability through use of the conspiracy and complicity statutes. . . . [T]he legislative history of the FCPA further demonstrates Congress's affirmative decision to exclude from liability the class of persons considered in this case and we thus hold that the government may not override that policy using the conspiracy and complicity rules." *Id.* at 94–95.[12]

---

[12] In the analogous aiding-and-abetting context, in *United States v. Amen*, 831 F.2d 373 (2d Cir. 1987), the Second Circuit relied on *Gebardi* in holding that a defendant could not conspire or aid and abet a drug enterprise's "kingpin" in violation of the "continuing criminal enterprise statute," even though he himself was not a "kingpin." *Id.* at 382. The court explained: "When Congress assigns guilt to only one type of participant in a transaction, it intends to leave the others unpunished for the offense." *Id.* at 381 (citing *Gebardi*, 287 U.S. at 112). The court reasoned that "Congress defined the offense as leadership of the enterprise, necessarily excluding those who do not lead." *Id.* As the First Circuit has explained, an "exception to accomplice liability" is "when the crime is so defined that participation by another is necessary to its commission," and "the legislature, by specifying the kind of individual who is to be found guilty when participating in a transaction necessarily involving one or more other persons, must not have intended to include the participation by others in the offense as a crime," which is why "one having intercourse with a

The *Gebardi* principle renders legally invalid the Government's theory that Michel, as an agent of Low, conspired with Low, as a foreign principal to Michel, in violation of FARA. Indeed, just like the FCPA and the Mann Act, FARA evinces an "affirmative legislative policy" by Congress to leave one of two necessary actors "unpunished." *Gebardi*, 287 U.S. at 123; *Castle*, 925 F.2d at 833–36; *Hoskins*, 902 F.3d at 94–95. Like the FCPA and the Mann Act, a FARA violation requires two necessary actors: the agent and the foreign principal. *See* 22 U.S.C. §§ 611(b)(c), 612(a). In enacting FARA, Congress was aware that every FARA violation would necessarily involve a foreign principal, on whose behalf the agent operated within the United States. *See id.* Yet Congress chose only to force the agent to register, and it imposed criminal penalties only on a violation of the registration requirements by the agent—not the foreign principal, who remains "unpunished." *Gebardi*, 287 U.S. at 123.

Other aspects of the text, structure, and legislative history of FARA confirm that it targets only the agents and leaves foreign principals unpunished. For instance, FARA is expressly applicable only within United States jurisdictions, reinforcing that its focus is on the agent, not the principal. *See* 22 U.S.C. § 619. And the legislative history to the 1966 amendments that overhauled FARA reveal the same. For instance, the Senate Report indicated that FARA was "intended to protect the interests of the United States by requiring complete public disclosure by persons acting for or in the interests of foreign principals where their activities are political in nature or border on the political. Such public disclosures as required by the act will permit the Government and the people of the United States to be informed as to the identifies and activities of such persons and to be better able to appraise them and the purposes for which they act." S. Rep. No. 89-143 (1965).

---

prostitute is not liable for aiding and abetting prostitution, and a purchaser is not an accomplice to an illegal sale." *United States v. Southard*, 700 F.2d 1, 20 (1st Cir. 1983); *accord United States v. Pino-Perez*, 870 F.2d 1230, 1231 (7th Cir. 1989).

FARA's text, structure, and legislative history make clear that Congress had an affirmative legislative policy of leaving the foreign principal (*i.e.*, Low) unpunished, and the Government therefore cannot charge a conspiracy between Michel and Low whose object was for Michel not to register. *Gebardi*, 287 U.S. at 123; *Castle*, 925 F.2d at 833–36; *Hoskins*, 902 F.3d at 94–95.

Because Count 7 charged four objects, one of which is legally flawed as demonstrated above, the verdict on Count 7 "is flawed." *Skilling v. United States*, 561 U.S. 358, 414 (2010) (citing *Yates v. United States*, 354 U.S. 298 (1957)).

## X. At a minimum, the Court should grant a new trial on the above counts under Rule 33 because the verdict was against the weight of the evidence.

Even if the Court finds that the evidence was sufficient as to any count above, for the reasons stated above, the Court should grant a new trial on such count under Rule 33 because the evidence was at least against the weight of evidence. "In considering a motion for a new trial, a district judge weighs the evidence and evaluates the witnesses' credibility and decides whether a serious miscarriage of justice may have occurred." *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990) (internal quotation marks omitted). The court sits as a "thirteenth juror," and thus "may weigh the evidence and consider the credibility of witnesses." *United States v. Robinson*, 71 F. Supp. 9, 10, 12 (D.D.C. 1947). For the reasons stated above, the weight of the evidence is against the verdict for Counts 1–4, 7, 8, 10, and 12, warranting a new trial on such counts.

## CONCLUSION

For the reasons stated above, Michel respectfully requests that the Court acquit him on Counts 1–4, 7, 8, 10, and 12.

Dated: October 16, 2023

Respectfully submitted,

 /s/ Peter Zeidenberg
Peter Zeidenberg (Bar No. 440803)
Michael F. Dearington (Bar No. 5223987)
David M. Tafuri (*pro hac vice*)
Sarah "Cissy" Jackson (*pro hac* vice)
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20006-5344
Telephone:  (202) 857-6000
Facsimile:  (202) 857-6395
peter.zeidenberg@afslaw.com
michael.dearington@afslaw.com
david.tafuri@afslaw.com
cissy.jackson@afslaw.com

M. Scott Peeler (*pro hac vice*)
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas, 42nd Fl
New York, NY 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
scott.peeler@afslaw.com

*Counsel for Defendant Prakazrel Michel*