# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 19-148-1 (CKK) |
| | ) | |
| PRAKAZREL MICHEL (1), | ) | **Evidentiary Hearing and Oral** |
| | ) | **Argument Requested** |
| | ) | |
| Defendant. | ) | |

---

## DEFENDANT PRAKAZREL MICHEL'S
## MOTION FOR NEW TRIAL
## [REDACTED]

M. Scott Peeler (*pro hac vice*)
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas, 42nd Fl
New York, NY 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
scott.peeler@afslaw.com

Peter Zeidenberg (Bar No. 440803)
Michael F. Dearington (Bar No. 5223987)
David M. Tafuri (*pro hac vice*)
Sarah "Cissy" Jackson (*pro hac vice*)
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20006-5344
Telephone: (202) 857-6000
Facsimile:  (202) 857-6395
peter.zeidenberg@afslaw.com
michael.dearington@afslaw.com
david.tafuri@afslaw.com
cissy.jackson@afslaw.com

*Counsel for Defendant Prakazrel Michel*

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 2

I.  A June 2021 Superseding Indictment charged Michel with a 2012 foreign conduit scheme and two 2017 unregistered lobbying schemes. ........................... 2

II.  On April 26, 2023, the jury convicted Michel on all ten counts. ......................... 4

LEGAL STANDARD ....................................................................................................... 4

ARGUMENT ..................................................................................................................... 5

I.  The Court should grant a new trial on all counts because the jury was told that two federal judges had already ruled that Michel conspired to commit the charged crimes, influencing the jury and tainting the verdict. ......................... 5

    A.  The Court erred by making the jury aware, over the defense's objection, that the grand jury judge issued a crime-fraud ruling finding that Michel had conspired with Higginbotham and others to commit the charged crimes. ................................................................... 5

    B.  The Court also erred by informing the jury of its own belief that Michel had conspired with others by repeatedly ruling in front of the jury that the co-conspirator exception to the rule against hearsay applied. .............................................................................................. 7

    C.  The jury's awareness of two federal judges' rulings that Michel conspired to commit the charged crimes plainly prejudiced Michel, overrode the presumption of innocence, and tainted the verdict. .............. 9

II.  The Court should grant a new trial on all counts because the Government improperly used Agent Heuchling as an overview witness, and Agent Heuchling improperly offered lay opinion testimony that Michel was guilty of the charged schemes. .................................................................................... 12

    A.  The D.C. Circuit has "condemn[ed]" the use of overview witnesses, as well as lay opinion testimony that a defendant is guilty ..................... 13

    B.  The Government ignored the D.C. Circuit's prohibition on using an overview witness and on offering lay opinion testimony of guilt when Agent Heuchling acted as an overview witness and repeatedly opined about Michel's guilt. ................................................................. 15

III.  A new trial is warranted under *Strickland* because Michel's defense counsel, David Kenner, was ineffective and severely prejudiced the defense. .................................................................................................................. 20

    A.  Kenner used an experimental AI program to write his closing argument, which made frivolous arguments, conflated the schemes, and failed to highlight key weaknesses in the Government's case. ......... 22

i

B.      Kenner failed to familiarize himself with the charged statutes, causing him to overlook critical weaknesses in the Government's case.................................................................................... 24

C.      Kenner did not understand the facts or allegations, and he outsourced trial preparations and strategy to contract attorneys at a friend's e-discovery company, leading to ineffectual examinations and further prejudice. ........................................................... 25

D.      Kenner failed to move for severance, likely because he had conflated the alleged schemes, and because of his flat fee arrangement with Michel, causing severe spillover prejudice................. 29

E.      Kenner failed to object to the Government's clearly erroneous use of its case agent as an overview witness and the case agent's improper opinion about Michel's guilt based on unspecified evidence and hearsay. ............................................................ 32

F.      Kenner failed to object to other obvious hearsay that was extremely prejudicial to the defense. ........................................................ 33

G.      Kenner failed to object to the introduction of attorney-client privileged conversations between Michel and Higginbotham that formed the basis of the Government's proof of willfulness under FARA. ....................................................................................... 36

H.      Kenner failed to object to prejudicial evidence that lacked foundation. .............................................................................. 38

I.      Kenner failed to properly prepare for trial or prepare Michel for his testimony and cross-examination............................................... 41

IV.     Even if there were no prejudice under *Strickland*, Michel would still be entitled to a new trial under *Cuyler* because his counsel had two conflicts of interest that adversely affected his counsel's performance................................. 41

A.      Kenner and Israely had a conflict of interest when they decided to use an experimental AI program in which they had a financial stake to write the closing argument, resulting in a frivolous and ineffectual closing argument. ................................................................... 42

B.      Kenner also had a conflict of interest due to the contempt charges prosecutors filed one month before trial, which adversely affected his trial performance. ............................................................... 43

1.      Kenner developed a conflict of interest when the prosecutors filed contempt charges against him one month before trial for willfully leaking grand jury materials to the media and seeking to influence the jury pool. ................................................ 43

2.      Kenner's conflict of interest due to the contempt charges adversely affected his performance at trial. ................................. 47

V.  At a minimum, when viewed in the aggregate, the errors during the trial and the ineffective assistance of counsel require a new trial.................................... 48

VI.  The Court should at least hold an evidentiary hearing on Michel's ineffective assistance of counsel and conflict-of-interest claims........................ 49

CONCLUSION .................................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Campbell v. United State*s,
364 F.3d 727 (6th Cir. 2004) ...................................................................49

*Cortez v. Griffin*,
No. 18CV766, 2023 WL 3266926 (S.D.N.Y. May 5, 2023) ...................................................47

*Curry v. Haynes*,
No. 3:22-cv-5493, 2023 WL 3902314 (W.D. Wash. May 11, 2023) ......................................21

*Cuyler v. Sullivan*,
446 U.S. 335 (1980) ...................................................................... *passim*

*Faigin v. Kelly*,
184 F.3d 67 (1st Cir. 1999) ...................................................................10

*Hairston v. Wash. Metro. Area Transit Auth.*,
No. Civ. 93–2127, 1997 WL 411946 (D.D.C. Apr. 10, 1997) ......................................9, 10, 11

*Herrera v. Russi*,
No. CV-95-0187(CPS), 1996 WL 651017 (E.D.N.Y. Nov. 6, 1996)..............................42, 47

*Mickens v. Taylor*,
535 U.S. 162 (2002)...........................................................................41, 42

*Moore v. Hartman*,
102 F. Supp. 3d 35 (D.D.C. 2015) ...................................................................9, 11

*Nipper v. Snipes*,
7 F.3d 415 (4th Cir. 1993) ...................................................................10

*Osborne v. Shillinger*,
861 F.2d 612 (10th Cir. 1988) ...................................................................21, 36, 42

*Pavulak v. United States*,
248 F. Supp. 3d 546 (D. Del. 2017)...................................................................49

*Pegg v. United States*,
253 F.3d 1274 (11th Cir. 2001) ...................................................................42

*People v. Hudson*,
333 N.W.2d 12 (Mich. Ct. App. 1982) ...................................................................10, 11

*Harris ex. rel. Ramseyer v. Wood,*
    64 F.3d 1432 (9th Cir. 1995) ............................................49

*Rodriguez v. Hoke,*
    928 F.2d 534 (2d Cir. 1991)...............................................49

*Strickland v. Washington,*
    466 U.S. 668 (1984)............................................... *passim*

*U.S. Steel, LLC v. Tieco, Inc.,*
    261 F.3d 1275 (11th Cir. 2001) .......................................9, 10

*United States v. Baptiste,*
    8 F.4th 30 (1st Cir. 2021).................................................49

*United States v. Browne,*
    619 F. Supp. 3d 100 (D.D.C. 2022) ....................................49

*United States v. Bruce,*
    89 F.3d 886 (D.C. Cir. 1996) ............................................42

*United States v. Cronic,*
    466 U.S. 648 (1984)...................................................36, 42

*United States v. Debango,*
    780 F.2d 81 (D.C. Cir. 1986) ............................................21

*United States v. Diaz–Munoz,*
    632 F.2d 1330 (5th Cir. 1980) ..........................................30

*United States v. Eiland,*
    738 F.3d 338 (D.C. Cir. 2013) ..........................................15

*United States v. Fennell,*
    53 F.3d 1296 (D.C. Cir. 1995) ..........................................50

*United States v. Finotti,*
    No. 88-0286, 1988 WL 129723 (D.C.C. Nov. 17, 1988) .......................38

*United States v. Gooch,*
    665 F.3d 1318 (D.C. Cir. 2012) .........................................30

*United States v. Hampton,*
    718 F.3d 978 (D.C. Cir. 2013) ...........................13, 14, 15, 20

*United States v. Hansen,*
    No. CR18-092RAJ, 2021 WL 2434561 (W.D. Wash. June 15, 2021)...................10

*United States v. Howard*,
  245 F. Supp. 2d 24 (D.D.C. 2003) ........................................................................4

*United States v. Hurt*,
  543 F.2d 162 (D.C. Cir. 1976) ...........................................................................48

*United States v. Kladouris*,
  739 F. Supp. 1221 (N.D. Ill. 1990) ....................................................................49

*United States v. Lewisbey*,
  843 F.3d 653 (7th Cir. 2016) ..............................................................................42

*United States v. Meili Lin*,
  326 F.R.D. 214 (N.D. Cal. 2018) .......................................................................30

*United States v. Miller*,
  738 F.3d 361 (D.C. Cir. 2013) ......................................................................13, 15

*United States v. Moore*,
  651 F.3d 30 (D.C. Cir. 2011) ...................................................................... *passim*

*United States v. Njock Eyong*,
  No. 06–305(JDB), 2007 WL 1576309 (D.D.C. May 30, 2007) ...........................10

*United States v. Otero*,
  848 F.2d 835 (7th Cir. 1988) ..............................................................................21

*United States v. Patel*,
  No. 20-613, 2022 WL 2713890 (D.N.J. July 13, 2022) ........................................9

*United States v. Proctor*,
  12 F.R.D. 359 (D.D.C 1951)................................................................................4

*United States v. Richardson*,
  161 F.3d 728 (D.C. Cir. 1998) ...........................................................................30

*United States v. Robinson*,
  71 F. Supp. 9 (D.D.C. 1947) ...............................................................................4

*United States v. Sevilla-Acosta*,
  746 F. 3d 900 (8th Cir. 2014) .............................................................................12

*United States v. Sine*,
  493 F.3d 1021 (9th Cir. 2007) ........................................................................... 10

*United States v. Sitzmann*,
  893 F.3d 811 (D.C. Cir. 2018) ...........................................................................20

*United States v. Stiner*,
765 F. Supp. 663 (D. Kan. 1991), *aff'd*, 952 F.2d 1401 (10th Cir. 1992) .................................4

*United States v. Treadwell*,
566 F. Supp. 80 (D.D.C. 1983) ......................................................................................29

*United States v. Tucker*,
12 F.4th 804 (D.C. Cir. 2021) ........................................................................................42

*United States v. Wheeler*,
753 F.3d 200 (D.C. Cir. 2014) ..........................................................................................4

*United States v. White*,
887 F.2d 267 (D.C. Cir. 1989) ........................................................................................37

*United States v. Williams*,
827 F.3d 1134 (D.C. Cir. 2016) .................................................................................14, 19

**Statutes**

18 U.S.C. § 2 ...........................................................................................................3, 32

18 U.S.C. § 371 .........................................................................................................2, 3

18 U.S.C. § 951 ..................................................................................................... *passim*

18 U.S.C. § 1001(a)(1) ....................................................................................................2

18 U.S.C. § 1014 ............................................................................................................3

18 U.S.C. § 1512(b)(1) ...................................................................................................3

18 U.S.C. § 1519 ............................................................................................................2

18 U.S.C. § 1956(a) ........................................................................................................3

22 U.S.C. § 612 ..............................................................................................................3

22 U.S.C. § 618 ..............................................................................................................3

**Other Authorities**

Fed. R. Crim. P. 8 .............................................................................................29, 30, 31

Fed. R. Crim. P. 14 ...........................................................................................29, 30, 31

Fed. R. Crim. P. 33 ......................................................................................................1, 4

Fed. R. Crim. P. 52(b) ...................................................................................................15

Fed. R. Evid. 403 ........................................................................................................9, 39

Fed. R. Evid. 801(c)........................................................................................................10

Defendant Prakazrel "Pras" Michel moves for a new trial under Rule 33(a) in the interest of justice because numerous errors—many of them precipitated by his ineffective trial counsel—undermine confidence in the verdict. The jury was exposed to evidence and information that *two federal* judges and the lead case agent all believed Michel was guilty, reducing the jury to a rubber stamp, while Michel's own counsel utterly failed to test the Government's case.

Before finding Michel guilty on all 10 counts, the jury heard improper evidence (over defense counsel's objection) that another federal judge, as part of a crime-fraud order, had already ruled that Michel conspired with an alleged co-conspirator. And, rather than directing the jury to disregard this evidence, the Court provided an instruction that elaborated on the crime-fraud order. Compounding this unfair prejudice, when it ruled on the applicability of the co-conspirator exception to the rule against hearsay, the Court stated in front of the jury on multiple occasions that Michel and others had conspired to commit crimes, rather than doing so outside the presence of the jury as required. Making matters worse, the Government erroneously used its case agent to provide overview testimony, in clear violation of *United States v. Moore*, 651 F.3d 30, 60 (D.C. Cir. 2011), and the case agent proceeded to provide improper lay opinion testimony that Michel was guilty on roughly 25 occasions, usurping the role of the jury to make that determination. The result was that the jury began deliberations with the presumption that Michel was guilty, as two federal judges and a case agent had already informed them.

These errors alone warrant a new trial, but the ineffective representation by Michel's trial counsel, David Kenner, leaves no doubt that a new trial is required. Kenner outsourced trial preparations—including drafting briefs, critical cross-examinations, and the opening statement—to inexperienced contract attorneys who worked for an e-discovery vendor. He failed to familiarize himself with the charged statutes or required elements, including highly technical statutes like

FARA and the money laundering statute, and he overlooked nearly every colorable defense. He failed to object to damaging and inadmissible testimony, betraying a failure to understand the rules of evidence. And he used an experimental artificial intelligence (AI) program to draft the closing argument, ignoring the best arguments and conflating the charged schemes, and he then publicly boasted that the AI program "turned hours or days of legal work into seconds." It is now apparent that Kenner and his co-counsel appear to have had an undisclosed financial stake in the AI program, and they experimented with it during Michel's trial so they could issue a press release afterward promoting the program—a clear conflict of interest. Kenner also labored under a second conflict of interest, having allegedly leaked grand jury and other materials to reporters, giving rise to contempt charges one month before trial by Michel's prosecutors, which caused Kenner to elevate his personal interest over Michel's in the critical pretrial and trial phases. All of this denied Michel his constitutional right to effective, conflict-free counsel and due process under the law.

With an impartial jury and effective counsel, Michel may (and should) have been acquitted. Absent these constitutional safeguards, the verdict is unreliable. Michel respectfully requests that the Court grant him a new trial, resulting in a verdict in which Michel and the public can have confidence.

## BACKGROUND

### I.     A June 2021 Superseding Indictment charged Michel with a 2012 foreign conduit scheme and two 2017 unregistered lobbying schemes.

On May 2, 2019, the Government indicted Michel and Jho Low in a four-count indictment alleging that Michel conspired with Low to make conduit contributions to the 2012 re-election campaign of President Obama and then lied to the Federal Election Commission (FEC) about the contributions, in violation of 18 U.S.C. §§ 371, 1001(a)(1), and 1519 (Counts 1–4). ECF No. 1.

On June 10, 2021, the Government issued a 12-count, 46-page Superseding Indictment

(SI), alleging 10 counts against Michel. ECF No. 84. The SI added two counts of witness tampering against Michel relating to two of the alleged straw donors, in violation of 18 U.S.C. § 1512(b)(1) (Counts 5 and 6); and four counts against Michel related to alleged foreign lobbying schemes on behalf of a foreign principal (Low) and a foreign government (China), in violation of 18 U.S.C. §§ 371 and 951, and 22 U.S.C. §§ 612 and 618, respectively (Counts 7, 8, 10, and 12).

Specifically, Counts 7, 8, and 10 allege that Michel conspired with Low and others in 2017 to retain Elliott Broidy, a former Deputy Finance Chair for the Republican National Party, to engage in "back-channel, unregistered" lobbying of Trump administration officials on two issues. ECF No. 84 ¶¶ 15, 99–100, 106–07. Count 7 charges a conspiracy under 18 U.S.C. § 371 with four objects: (1) conspiring with Low, Broidy, Nicky Lum Davis, and George Higginbotham to violate the Foreign Agent Registration Act (FARA), 22 U.S.C. §§ 612 and 618, through Broidy's unregistered lobbying of the Trump administration to end an investigation into Low's embezzlement of assets from 1MDB, a Malaysian sovereign wealth fund; (2) conspiring with the same individuals to violate 18 U.S.C. § 951 through Broidy's lobbying of the Trump administration to extradite Chinese national Guo Wengui, while acting as agents of China; (3) conspiring with Low and others to engage in financial transactions to conceal the proceeds of the FARA violation, in violation of 18 U.S.C. § 1956(a)(1)(B); and (4) conspiring with Low and others to transfer funds into the United States to promote the FARA violations in violation of 18 U.S.C. § 1956(a)(2)(A). ECF No. 84 ¶¶ 105–49.

Counts 8 and 10 charged Michel with violating FARA (22 U.S.C. §§ 612 and 618) and acting as an agent of China (18 U.S.C. § 951). ECF No. 84 ¶¶ 150–51, 154–55. Count 12 charged Michel under 18 U.S.C. § 371 with conspiring to make false statements to FDIC-insured banks in

connection with lending activities, in violation of 18 U.S.C. § 1014. ECF No. 84 ¶¶ 158–59.[1]

## II.     On April 26, 2023, the jury convicted Michel on all ten counts.

Michel's trial began on March 30, 2023, and the jury returned guilty verdicts on all counts on April 26, 2023. ECF No. 273. After the Government rested, the defense moved for judgment of acquittal, and the Court held the motion in abeyance "pending further order of the Court, and at least until the return of a verdict in this case." Minute Order (Apr. 17, 2023). By Minute Order on April 26, 2023, the Court ordered that Michel "file his supplemental Rule 29 motion and any other post-trial motion on or before June 9, 2023." After a series of extensions, the Court ordered Michel to file his post-trial briefs by October 16.

## LEGAL STANDARD

"[T]he court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a); *see also United States v. Proctor*, 12 F.R.D. 359, 361 (D.D.C 1951) (holding that the movant "was deprived of the fair trial which is his constitutional guarantee, and that a new trial must therefore be granted him 'in the interest of justice'"). This includes where "a serious miscarriage of justice may have occurred." *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014). The trial court's decision to grant a new trial is afforded "broad discretion which will not be disturbed on appeal absent plain abuse of that discretion." *United States v. Stiner*, 765 F. Supp. 663, 664 (D. Kan. 1991), *aff'd*, 952 F.2d 1401 (10th Cir. 1992). "The standards for granting a new trial are not as strict as the standards for granting judgment of acquittal," because Rule 33 "provides that a court may grant a new trial 'if required in the interest of justice.'" *Id.* (quoting Fed. R. Crim. P. 33).[2]

---

[1] The SI also alleged aiding and abetting in violation of 18 U.S.C. § 2 for Counts 8 and 10.

[2] Unlike the standard for a motion for judgment of acquittal, the standard on a motion for a new trial does not require that the court accept the evidence in the light most favorable to the government. *United States v. Howard*, 245 F. Supp. 2d 24, 30 (D.D.C. 2003). Rather, the court sits

# ARGUMENT

**I.    The Court should grant a new trial on all counts because the jury was told that two federal judges had already ruled that Michel conspired to commit the charged crimes, influencing the jury and tainting the verdict.**

The Court should grant a new trial in the interest of justice because the jury was improperly influenced when it heard that *two federal judges*—the grand jury judge and the judge presiding over the trial—had ruled that Michel conspired with Higginbotham and others to commit the charged crimes. This evidence undoubtedly influenced the jury, violated Michel's due process rights, and undermined confidence in the verdict.

**A.    The Court erred by making the jury aware, over the defense's objection, that the grand jury judge issued a crime-fraud ruling finding that Michel had conspired with Higginbotham and others to commit the charged crimes.**

During the trial, the Court and the prosecution repeatedly informed the jury that another federal judge had already ruled that Michel conspired with Higginbotham—an alleged co-conspirator or principal in Counts 7, 8, 10, and 12—in a crime-fraud ruling issued before trial.

Without warning, and by using a leading question, the Government exposed the jury to this inadmissible and extraordinarily prejudicial evidence, over a defense objection:

> Q. Mr. Kenner also asked you about attorney-client privilege and about whether some notes of Mr. Higginbotham's were privileged and what steps you took to either review or not review privileged documents. Do you remember those questions?
> A. I do.
> Q. *The filter team, the Government filter team in this case, obtained a crime fraud order from a judge ruling that because there was probable cause to believe that Mr. Michel involved Mr. Higginbotham in criminal activity*, there was no valid attorney-client privilege –
> MR. KENNER: Objection.
> BY MR. KELLER:
> Q. -- right?
> MR. KENNER: Move to strike. Inappropriate question, your Honor. Assumes facts not in evidence.
> THE COURT: Well --

---

as a "thirteenth juror," and thus "may weigh the evidence and consider the credibility of witnesses." *United States v. Robinson*, 71 F. Supp. 9, 10–12 (D.D.C. 1947).

> MR. KELLER: He has opened the door to this.
>
> THE COURT: So I think he can certainly point out that there was a court order -- which is correct; there's nothing wrong with that -- and discuss what the filter team did or didn't do. You asked about it.

Tr. 4/17 PM at 43–44 (emphasis added). By referencing the crime-fraud order in a leading question, the prosecutor ensured that the jury would hear this evidence even in the event of a successful objection.[3]

Rather than sustain the objection, the Court allowed the Government to continue, and the Government took full advantage by repeating the prejudicial information twice more:

> BY MR. KELLER:
>
> Q. ***So again, Special Agent Lidsky, the filter team in this case obtained a crime fraud order from a judge ruling that because there was probable cause to believe that Mr. Michel involved Mr. Higginbotham in criminal activity, there was no valid attorney-client privilege between them. Right?***
>
> A. *That is correct.*
>
> Q. ***In other words, because Mr. Michel used an attorney to help commit his crimes, there was no valid privilege?***
>
> A. Yes.

*Id.* at 44–45 (emphasis added).

The next day, the Court exacerbated the prejudice when, after denying a defense motion for a mistrial, the Court provided a *sua sponte* instruction that served to emphasize the ruling:

> THE COURT: All right. Members of the jury, we are going to move in a moment to the next witness, but I wanted to give you this jury instruction. ***Yesterday you heard testimony during Agent Lidsky's testimony that a different judge, not me, issued what is termed a crime-fraud order during the grand jury's investigation of this case.*** So during the early stage of a criminal case, the government can apply to the court for permission to access materials that may be subject to an attorney-client privilege. The government can do this in order to continue on its investigation. ***The government may and did argue to a different judge, among other things, that the Court should find that the attorney, which would be Mr. Higginbotham, in this case assisted his client in the commission of a criminal offense. It is sometimes termed what we call the crime-fraud exception to the attorney-***

---

[3] The Government's contention that Kenner had opened the door to this evidence by inquiring about the prosecution's handling of privileged information was meritless. At most, Kenner opened the door to testimony that a court had deemed the materials non-privileged—not the extraordinarily prejudicial reason for that order.

*client privilege.*

So the standard for the court -- for that court, to find that no attorney-client privilege existed because of the crime fraud exception to the attorney-client privilege, in other words, which allows the information to be seen and considered is much lower than the standard for you to find a defendant guilty. ***That Court need only find there is probable cause to believe the attorney assisted in the commission of a crime, so that would be Mr. Higginbotham.*** Probable cause means there are circumstances that would lead a reasonable person to believe that the attorney assisted in the commission of a crime. ***So here, another judge found that there was probable cause to believe that Mr. Higginbotham assisted Mr. Michel in the commission of a crime based on the information that the government provided to that particular judge.*** You, however, must find Mr. Michel guilty beyond a reasonable doubt, not probable cause. Anything less will not do. Proof beyond a reasonable doubt is a much higher standard and burden than probable cause. And I will be instructing you later. Proof beyond a reasonable doubt means evidence that leaves you firmly convinced of something. As a result, you may not find that Mr. Michel committed any element of any offense, simply because ***another judge found that probable cause existed to believe that a particular fact was true at that time based on evidence that the government had provided to that particular judge***. All right.

Tr. 4/18 AM at 48–49 (emphasis added). Rather than direct the jury to disregard inadmissible evidence of the crime-fraud ruling, the Court allowed the jury to consider it, just not exclusively.

> **B.      The Court also erred by informing the jury of its own belief that Michel had conspired with others by repeatedly ruling in front of the jury that the co-conspirator exception to the rule against hearsay applied.**

The Court also made known to the jury its own conclusion that Michel had conspired as alleged in the SI. For example, during the Government's direct examination of Higginbotham, rather than simply overrule an objection, the Court ruled, in the jury's presence, that certain statements were admissible because they were "co-conspirator statements":

> Q. In those meetings, did Mr. Michel – was Mr. Michel more focused on the money that you could potentially earn from Jho Low or what China could do for the United States?
> MR. KENNER: Same objection, Your Honor. He can testify to what Mr. Michel said or did.
> THE COURT: ***He can certainly testify as to what Mr. Michel did as a co-conspirator statement. And at this point there's sufficient evidence that the government has put on for the Court to consider them as co-conspirator statements and enough for a conspiracy in order to be able to do so***.

Tr. 4/6 AM at 76 (emphasis added).

That was not an isolated incident:

7

Q. Was it your understanding based on these conversations with Mr. Michel that he was already familiar with FARA before you ever raised it with him?

MR. KENNER: Objection; calls for a conclusion, no foundation as to what Mr. Michel thought or didn't think.

THE COURT: *I think these are conversations with Mr. Michel. I think they fit in the coconspirator aspect of it.*

Tr. 4/11 PM at 53 (emphasis added).

During the Government's direct and re-direct of Higginbotham, the Court *twice more* indicated in front of the jury that Michel and Higginbotham were co-conspirators:

Q. Again, oppositely, Mr. Higginbotham, was Mr. Michel dismissive of your concerns about FARA every time you raised them?

A. Yes, he was.

MR. KENNER: Objection. He can testify to what his -- objection.

THE COURT: As to what his -- as to what? What is your objection again?

MR. KENNER: As to his testimony as to Mr. Michel's state of mind.

THE COURT: In terms of his actions, presumably, what he is talking about is conversations and his actions. ***These are co-conspirators.*** They can certainly discuss – this is not a state of mind. This is based on conclusions based on conversations dealing with him. He has not put it in the context of what Mr. Michel was thinking. He is discussing it in the context of conversations or actions, so I will allow it. …

MR. KENNER: I'm sorry. I object to his understanding of Mr. Michel's state of mind.

THE COURT: I don't think that is – *in the context of not state of mind, but based on conversations or interactions that they would have had as co-conspirators,* I will allow it. That is not commenting on his state of mind.

*Id.* at 57, 72–73 (emphasis added).

And during the direct examination of Agent Heuchling, the Court stated in front of the jury:

THE COURT: Is there something that indicates that it includes Mr. Michel?

MS. LOCKHART: Yes, Your Honor. Ms. Orozco, if we could drop to the messages that lists Pras NY. I think if you go down two messages, you'll see that. Yep. So the bottom message.

THE COURT: All right. So there it includes Mr. Michel. ***So these are the co-conspirators, that includes your client.*** Are you still objecting or not?

MR. KENNER: No, Your Honor.

Tr. 4/13 PM at 22 (emphasis added).

### C. The jury's awareness of two federal judges' rulings that Michel conspired to commit the charged crimes plainly prejudiced Michel, overrode the presumption of innocence, and tainted the verdict.

The Court should grant a new trial in the interest of justice because the jury's awareness that the Court, and the grand jury judge before that, had determined that Michel was guilty plainly prejudiced Michel and influenced the jury's verdict—violating Michel's presumption of innocence. Each of these errors independently requires a new trial, but together they leave no doubt that a new trial is warranted.

*First,* the Court erred by admitting evidence that the grand jury judge found that Michel had conspired with Higginbotham, and then elaborated upon the ruling in a jury instruction. It is extremely prejudicial for a jury to learn of fact finding by a court or judge, particularly judicial fact finding of prior wrongdoing by the defendant. *See, e.g.*, *Hairston v. Wash. Metro. Area Transit Auth.*, No. Civ. 93–2127, 1997 WL 411946, at *2 (D.D.C. Apr. 10, 1997) ("[J]udicial findings of fact . . . must be excluded under Fed. R. Evid. 403, because its probative value is substantially outweighed by the danger of unfair prejudice."); *see also Moore v. Hartman*, 102 F. Supp. 3d 35, 143 (D.D.C. 2015) ("Within this district, '[c]ourts have consistently avoided potential jury confusion and unfair prejudice in related actions by excluding judicial findings, convictions, and similar evidence on Rule 403 grounds.'"); *U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1287–88 (11th Cir. 2001) (holding that the lower court "abused its discretion" and committed "reversible error" by admitting factual findings by another judge).

Courts have recognized that the danger of a jury's exposure to a judge's findings is due to the likelihood that the jury will give undue weight to a judge's findings. *See, e.g.*, *Hairston*, 1997 WL 411946, at *2 ("[I]t is likely that judicial findings of fact would be given undue weight by a jury which would result in a serious danger of unfair prejudice to the defendant."); *see also United States v. Patel*, Crim. No. 20-613 (RMB), 2022 WL 2713890, at *3 (D.N.J. July 13, 2022) ("[A]

jury is likely to give undue weight to findings made by a judge, and thus, the evidence would be inadmissible under Federal Rule of Evidence 403(b).”); *United States v. Sine*, 493 F.3d 1021, 1033 (9th Cir. 2007) (“jurors are likely to defer to findings and determinations relevant to credibility made by an authoritative, professional factfinder rather than determine those issues for themselves”); *Nipper v. Snipes*, 7 F.3d 415, 418 (4th Cir. 1993) (reversible error to admit a judicial finding “because judicial findings of fact ‘present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice’” and noting that “a jury . . . is apt to give exaggerated weight to a judgment.”); *Faigin v. Kelly*, 184 F.3d 67, 80 (1st Cir. 1999) (“A lay jury is quite likely to give special weight to judicial findings merely because they are judicial findings.”).[4]

Based on these principles, in *People v. Hudson*, 333 N.W.2d 12 (Mich. Ct. App. 1982), the Michigan Court of Appeals reversed a defendant’s conviction where, as here, “the trial court informed the jury that a preliminary examination had been conducted . . . and [had determined] that there was probable cause to believe that the defendant had committed the offense.” 333 N.W.2d at 13. Just like here, the trial judge in *Hudson* instructed the jury about the difference

---

[4] Courts have also consistently held that a prior judicial finding is inadmissible because it constitutes hearsay. *See, e.g.*, *United States v. Njock Eyong*, No. 06–305(JDB), 2007 WL 1576309, at *2 (D.D.C. May 30, 2007) (“[D]efendant correctly points out that various courts of appeals have held that judicial findings of fact constitute hearsay and are inadmissible to prove the truth of those findings unless an exception to the hearsay bar applies.”); *see also Hairston*, 1997 WL 411946, at *2 (“[T]he Court finds that judicial findings of fact are hearsay, and not covered by the Rule 803(8)(C) public records or reports exception to the hearsay rule.”); *Sine*, 493 F.3d at 1036 (“[a] court judgment is hearsay ‘to the extent that it is offered to prove the truth of the matters asserted in the judgment’”); *United States v. Hansen*, No. CR18-092RAJ, 2021 WL 2434561, at *3 (W.D. Wash. June 15, 2021) (“Judicial findings of fact are inadmissible hearsay unless a specific hearsay exception exists.”); *Tieco*, 261 F.3d at 1286–87 (admission of state court order was unduly prejudicial and inadmissible hearsay; court opinions are inadmissible hearsay pursuant to Fed. R. Evid. 801(c), and no exception applies).

between probable cause and proof beyond a reasonable doubt. In reversing the conviction, however, the court concluded that the instruction was deficient because it was "likely to place the burden of proof on the defendant to prove his innocence," whereas "[t]he burden of proof in a criminal case may not be placed on the defendant and instructions of the trial judge susceptible of any such interpretation are erroneous." *Id.* Thus, even without a timely objection, the court reversed the conviction and remanded for a new trial.

So too here. The jury's awareness that the grand jury judge had already ruled that Michel conspired with Higginbotham and others plainly prejudiced Michel and tainted the jury's verdict, and the jury likely gave the grand jury judge's ruling "undue weight … which would result in a serious danger of unfair prejudice" to Michel. *Hairston*, 1997 WL 411946, at *2.

The Court's instruction to the jury about the crime-fraud ruling amplified the error and prejudice. As an initial matter, the danger of prejudice in permitting a jury to hear a court's fact-finding—as here—is so extreme that a jury instruction is insufficient to cure the prejudice. *See, e.g.*, *Moore*, 102 F. Supp. 3d at 145 ("[A] cautionary instruction would not overcome the unfair prejudice of admitting the prior judicial opinion because of both the nature of the evidence and its judicial source."). But even if a curative instruction could have reduced the prejudice, the Court's instruction exacerbated it. The Court repeated multiple times that the prior judge ruled that Michel had conspired, stating: "So here, another judge found that there was probable cause to believe that Mr. Higginbotham assisted Mr. Michel in the commission of a crime based on the information that the government provided to that particular judge. … [A]nother judge found that probable cause existed to believe that a particular fact was true at that time based on evidence that the government had provided to that particular judge." Tr. 4/18 PM at 49–50. Instead of instructing the jury to disregard this evidence, the Court told the jury it could not find guilt "simply because" of the

evidence, and effectively permitted the jury to consider the crime-fraud ruling provided it did not rely solely on the crime-fraud ruling in reaching its verdict.[5]

***Second***, the Court erred when it evaluated hearsay objections by ruling in front of the jury that Michel conspired with others. "District courts 'should rule on the admissibility of a coconspirator's statement on the record but out of the hearing of the jury.'" *United States v. Sevilla-Acosta,* 746 F. 3d 900, 904–05 (8th Cir. 2014). "[T]he court's ruling in the jury's presence [is an] error." *Id.* (declining to reverse only because of the strength of the curative instruction the Court gave to directly address its erroneous rulings in front of the jury). Here, no curative instruction was provided, so the Court's repeated findings that Michel had conspired caused great prejudice.

These two errors together leave no doubt that a new trial is warranted. Admission of a single judge's findings that a defendant committed a charged crime, even with a curative instruction, is extraordinarily rare and prejudicial. Two judges' findings to that effect, with no appropriate curative instruction, is unprecedented. It is inconceivable that a jury would ignore these judicial findings of guilt in these circumstances. The magnitude of these errors requires a new trial on all counts.

## II.    The Court should grant a new trial on all counts because the Government improperly used Agent Heuchling as an overview witness, and Agent Heuchling improperly offered lay opinion testimony that Michel was guilty of the charged schemes.

A new trial is also warranted in the interest of justice because the Government improperly used the case agent, Agent Heuchling, as an "overview witness," contrary to D.C. Circuit precedent, and Agent Heuchling then offered improper lay opinion testimony that Michel was

---

[5] Nor did the Court inform the jury that the crime-fraud ruling was made on the basis of an *ex parte* request by the Government with no input from the defense, and that none of the offenses discussed in the order were even charged in this case. Thus, the Government and the Court gave the *false* impression that the prior ruling had found that Michel and Higginbotham conspired as alleged in the indictment.

guilty of the charged schemes, usurping the role of the jury and influencing the jury's verdict. Although Kenner was ineffective in failing to object, *see infra* § III.E, admission of this evidence constituted plain error that affected Michel's substantial rights, warranting a new trial.

### A. The D.C. Circuit has "condemn[ed]" the use of overview witnesses, as well as lay opinion testimony that a defendant is guilty.

In *United States v. Moore*, the D.C. Circuit joined its sister circuits in "condemning the practice" where the Government uses a witness to "present[] an overview of the government's case-in-chief" because it "runs the serious risk of permitting the government to impermissibly 'paint a picture of guilt before the evidence has been introduced.'" 651 F.3d 30, 60 (D.C. Cir. 2011). The court pointed to "three 'obvious dangers posed by summarization of evidence'" by a witness, especially at the outset of the Government's case: "First, the jury might treat the summary evidence as additional or corroborative evidence that unfairly strengthens the government's case. . . . Second, summary witness testimony posed the risk that otherwise inadmissible evidence might be introduced. . . . Third, a summary witness might permit the government to have an extra closing argument." *Id.* at 56. For these reasons, the court observed that other circuits have also "reached uniformly negative conclusions" about the use of overview witnesses "in view of the serious dangers of prejudice to a fair trial." *Id.*

Overview witnesses "impermissibly invite[] the jury to rely upon the alleged facts in the overview as if those facts had already been proved." *Id.* at 59 (cleaned up). This is because, when a "government agent's testimony [i]s broadly based on his knowledge of the entire investigation . . . the jury ha[s] no way of verifying [the agent's] inferences or of independently reaching its own interpretations" of the evidence. *United States v. Miller*, 738 F.3d 361, 373 (D.C. Cir. 2013) (internal quotation marks omitted). An agent's interpretations of evidence is also improper "under Rule 701 because, rather than being helpful to the jury, it usurp[s] the jury's function." *United*

*States v. Hampton*, 718 F.3d 978, 983 (D.C. Cir. 2013). "Overview testimony by government agents is especially problematic because juries may place greater weight on evidence perceived to have the imprimatur of the government." *Moore*, 651 F.3d at 57.

Critically, an overview witness's opinion testimony that the defendant is guilty is especially improper because "[w]eighing trial evidence and making determinations of credibility are for the jury, as is drawing the ultimate conclusion of guilt or innocence." *Id.* at 59 (cleaned up). For example, in *Moore*, the court ruled that an agent "crossed the line" when he testified that cooperating witnesses were co-conspirators. *Id.* Such testimony "went far beyond constructing the sequences of events in the investigation … to provide background information and to explain how and why the agents even came to be involved with [a] particular defendant." *Id.* "Instead, these statements suggested both directly and indirectly to the jury that an experienced and highly trained FBI agent had determined that the cooperating co-conspirators who would testify at trial were to be treated as credible witnesses and that appellants were guilty of the charged crimes." *Id.*

Similarly, in *United States v. Williams*, 827 F.3d 1134, 1162 (D.C. Cir. 2016), the D.C. Circuit reversed a conviction and concluded that the error of admitting an agent's opinion testimony interpreting wire tap evidence was not harmless in part because "there was a strong likelihood that the jurors afforded [Agent] Bevington substantial authority because of his expertise and access to information unavailable to them, allowing his lay opinion testimony to influence their decision." *Id.* (internal quotation marks omitted)); *see also Hampton*, 718 F.3d at 981–82 ("Judicial scrutiny of a law-enforcement witness's purported basis for lay opinion is especially important because of the risk that the jury will defer to the officer's superior knowledge of the case and past experiences with similar crimes.").

The D.C. Circuit has further held that the Government's use of an overview witness

constitutes plain error and thus can be grounds for a new trial even if defense counsel did not object. *See United States v. Eiland*, 738 F.3d 338, 352–53 (D.C. Cir. 2013) (finding plain error where government used an overview witness who vouched for the testimony of the cooperating witnesses because the "testimony infringes on the jury's role as the sole judge of a witness's credibility"); *Miller*, 738 F.3d at 373 ("Admission of the government agents' interpretative lay opinion testimony was plain error under *Hampton*."); *see* Fed. R. Crim. P. 52(b). Indeed, the D.C. Circuit warned in *Moore*: "This court now having made clear the exacerbated 'obvious dangers' of the overview witness testifying about evidence yet to be admitted before the jury affords all parties clear direction to avoid unnecessary risks—for the prosecutor of an overturned conviction, for the defense of an unfair trial, and for the district court of having to retry a case." 651 F.3d at 61. The Government failed to heed this warning here.

### B.    The Government ignored the D.C. Circuit's prohibition on using an overview witness and on offering lay opinion testimony of guilt when Agent Heuchling acted as an overview witness and repeatedly opined about Michel's guilt.

The Court should grant a new trial because the Government improperly used Agent Heuchling, at the outset and at the mid-point of its case-in-chief, as both an improper overview witness and to offer his improper lay opinion that Michel was guilty of the charged schemes, based almost entirely on hearsay, including his observations from witness interviews and his review of financial records. The Court provided no limiting instruction to the jury that it should disregard his opinions about Michel's guilt. This constituted plain error and affected Michel's substantial rights.

Beginning with the foreign conduit scheme charged in Counts 1–4, Agent Heuchling repeatedly testified that Michel was guilty of conspiracy to use straw donors in violation of federal law, tainting the jury on the very first day of trial:

A. In 2012 the *defendant conspired with Mr. Low* to bring more than $20 million into the United States, and then the defendant subsequently used those funds from a foreign source to donate a portion to a campaign committee associated with the president -- sorry, then-

President Obama, who was running for re-election, as well as to *make illegal contributions to a Super PAC. The defendant also used a series of straw donors*, more than 20 straw donors, *to give those funds to the campaign in violation of federal law*.

Tr. 3/30 AM at 86 (emphasis added). But whether Michel "conspired with Mr. Low," made "illegal contributions to a Super PAC," used "a series of straw donors," or "violat[ed] federal law" were all questions for the jury—not proper testimony from the case agent.

When the Government asked Heuchling "what else does [defendant] do soon after receiving the million dollars from Blackstone?," he again summarized that Michel was guilty of making illegal contributions through "straw donors":

> A. He gives $100,000 to three different *straw donors* who then subsequently donate to the Obama Victory Fund.
> Q. So we see several individuals here: Dr. Rudolph Moise, we see Claudine Oriol, and Gilbert Hippolyte. Who are those individuals?
> A. *Dr. Moise, Ms. Oriol, and Mr. Hippolyte are all straw donors*.
> Q. Meaning what?
> A. *Meaning that they were used as cutouts -- and by that I mean that the defendant gave them funds that they then subsequently donated to the Obama Victory Fund*.

*Id.* at 122–23 (emphasis added).

Agent Heuchling again testified that Michel's activities were "illegal," again usurping the role of the jury:

> Q. Agent Heuchling, just to pause here for a minute before we go on. We've had many references to President Obama. During your investigation, any allegations that President Obama or his administration knew of or was involved in any criminal activities?
> A. No. In the course of the investigation, we uncovered nothing to indicate that either the former president or his administration was aware *of the defendant's illegal activities*.

*Id.* at 126 (emphasis added).

During the rest of his testimony on the first morning of trial, both Agent Heuchling and the Government continued to refer to campaign contributors as "straw donors," repeatedly usurping the jury's role of making that determination:

> Q. So, Agent Heuchling, here $600,000 from Alsen Chance to the defendant. What does the defendant do with a portion of this money soon after receipt?

A. *So the defendant transfers those funds to straw donors, and those straw donors subsequently donate to the Obama Victory Fund.*

Q. And so we see a few individuals here named: Randall Toussaint, Richard Kromka, and Joseph Ronquillo. *What, if anything, would the individuals, the straw donors, the conduits whom you identified*; how did the monies that they received from the defendant compare to the monies that they then provided to the Obama Victory Fund?

A. *So in almost every instance when the defendant provided money to the straw donors, the straw donors provided the exact same amount of money to the Obama Victory Fund.* So if they received $40,000, they gave $40,000 to the victory fund.

Q. So we see a few individuals listed on their chart. *Were there other individuals, other straw donors or conduits, who also received money from the defendant around this time*?

A. *Yes, around this time the defendant gave approximately $375,000 to straw donors.* …

Q. All right. And soon after the defendant received the $9 million from Alsen Chance, what did he do with a portion of that money?

A. He takes almost $100,000 of that money and first transfers it to some of his own personal accounts, *but then gives hundreds of thousands of dollars of those funds to straw donors, who then subsequently donate to the Obama Victory Fund.*

Q. All right. And same question as I asked you before. Other than the individuals we see listed on this chart --Marc Richard Hilaire, David Sugarman, Tysa Wright – *were there other conduits or straw donors around this time who received money from the defendant and then contributed it to OVF?*

A. Yes, there were. *This chart and the one we saw previously are not inclusive of all the straw donors who received funds from the defendant at this time.* …

Q. All right. And Mr. Mejia and Mr. Toussaint, do you recognize those names?

A. Yes. *Those are names of straw donors.* …

Q. Agent Heuchling, can you tell us, what's reflected in this summary chart?

A. *So this is a chart showing some of the straw donors that Mr. Michel used to donate funds to the Obama Victory Fund*, noting that *Mr. Michel donated approximately $865,000 to the Obama Victory Fund from June to September 2012 using straw donors.*

Q. And of that $21 million that the Defendant had received from those [Blackstone and Alsen Chance] *how much of that money was provided to straw donors?*

A. *Approximately $865,000 to approximately 21 straw donors.* …

Q. All right. *And you mentioned that Dr. Moise and Ms. Oriol are straw donors. Is that correct?*

A. That is correct.

Q. So the monies reflected here, based on your examination, review and understanding of the financial records, from where did these monies come?

A. *Those funds came from Jho Low and then from Jho Low to the Defendant and then from the Defendant to the straw donors.* …

Q. Agent Heuchling, I won't ask you to have to go through all the information in all four of these [Exhibits 689, 686, 692 and 691], but can you just tell us, who are these individuals? What's reflected in these exhibits?

A. *These are four individuals who are all straw donors. Each one of them received funds from the Defendant and subsequently donated those funds to the Obama Victory Fund.*

Tr. 3/30 AM at 138, 139–40 (emphasis added); Tr. 3/30 PM at 17, 26, 51–53 (emphasis added).

This testimony invaded the jury's province.[6]

In all, Agent Heuchling testified that Michel was guilty of the alleged conduit scheme on at least 17 occasions, including the above testimony that Michel "conspired with Low," made "illegal contributions to a Super PAC," gave "funds to the campaign in violation of federal law," and engaged in "illegal activities," as well as testimony on 14 occasions that Michel received money from Low and then transferred it to "straw donors" or "cutouts" who donated it to the Obama Victory Fund. Tr. 3/30 AM at 122–23, 126, 138–40; Tr. 3/30 PM at 17, 26, 51–53, 75. Making matters worse, Agent Heuchling frequently stated that his summary conclusions were based on his "investigation," including "witness interviews," and without identifying the specific evidence he relied on. *See, e.g.*, Tr. 3/30 AM at 87, 91, 110; Tr. 3/30 PM at 5.

The Government also used Agent Heuchling to introduce inadmissible overview and opinion testimony that Michel was guilty of the unregistered lobbying schemes:

> Agent Heuchling: . . . As well as we uncovered that the same individuals [*Michel, Broidy, Lum Davis, and Higginbotham*] were working on behalf and with Mr. Low and on behalf of the Chinese government to influence the White House and the administration of then President Trump to deport a Chinese national who was in the United States back to China.*

Tr. 4/13 AM at 33 (emphasis added). Rather than testify about the *subject matter* of the FBI's investigation, Agent Heuchling testified about his *conclusion* after reviewing all of the evidence. And again, this was a decision for the jury to make, not Agent Heuchling.

Agent Heuchling exacerbated the prejudice by repeatedly and improperly referring to Michel, Broidy, Lum Davis, and Higginbotham as "co-conspirators" in relation to the alleged unregistered lobbying schemes. For example, Agent Heuchling testified:

A. Yes. Mr. Michel took numerous trips in 2017 to China, to Hong Kong, to Thailand. . . .

---

[6] Agent Heuchling even opined on the quality of the evidence, and others' hearsay about the quality of the evidence, testifying that he traced funds to entities associated with Michel, and "others confirmed that tracing as well," which was "straightforward" and "is solid." Tr. 3/30 PM at 28–29.

Some trips as far as I know were by himself *but others were with **the co-conspirators, Mr. Broidy, Ms. Davis, Mr. Higginbotham***.

Q. And what is Anicorn?

A. Anicorn is a shell company that Mr. Michel had set up, primarily it is used to receive these funds from – for Mr. Michel then to distribute those funds out to both Mr. Michel's other accounts *and also to **the other co-conspirators***.

A. So Mr. Michel almost immediately sent himself in two transactions $1.3 million. And he sends that to another account that he had called Artemus, LLC. *In addition, he almost immediately paid out the other **co-conspirators in his scheme**, Ms. Davis, Mr. Higginbotham and Mr. Broidy*. Mr. Broidy's payments went through Colfax Law Office and through Mr. Rousseau. But the other payments were direct from Mr. Michel. *So, in effect, Mr. Michel gets $2.8 million and almost immediately almost the same day or the day after is paying out **his co-conspirators***. . . .

Q. *Looking at the financial transactions you mentioned to the **co-conspirators** here, looking from Lucky Mark down to Mr. Broidy,* about how many financial transactions does it take to get from Mr. Low to Mr. Broidy? . . .

What happened after Mr. Michel received the $3 million on May 17th?

A. So Mr. Michel takes those $3 million. And on the same day he received it, he sends that $3 million to Colfax Law Office account. *Colfax Law Office then distributes those funds to the **other co-conspirators, Mr. Broidy and Ms. Davis**.* . . . So, again, *Mr. Michel distributes the funds keeping some for himself, but then distributes the funds to the **other co-conspirators***. We see he sends $3 million to the Colfax Law Office. Colfax then distributes about half a million dollars to Mr. Elliott Broidy over three transactions.

Tr. 4/13 AM at 38, 41–43, 46, 50 (emphasis added).

The Government's use of Agent Heuchling as an overview or summary witness—based on his awareness of unspecified evidence—including inadmissible hearsay—who then opined that Michel was guilty constituted plain error that affected Michel's substantial rights. Agent Heuchling's roughly 25 references to Michel's guilt were far more prejudicial than the agent's testimony that the court found "crossed the line" in *Moore*, where the agent testified that certain *witnesses* were co-conspirators, 651 F.3d at 59, or in *Williams*, where the court reversed because the agent testified about his interpretations of wire-tap evidence, 827 F.3d at 1162. Agent Heuchling's testimony conveyed to the jury that, based on his expertise and knowledge of the case, he had already concluded that Michel was guilty, and thus the jury should, too. The jury naturally "place[d] greater weight on evidence perceived to have the imprimatur of the government," given that Agent Heuchling was a "highly trained FBI agent." *Moore*, 651 F.3d at 57, 59.

"Rather than being helpful to the jury," Agent Heuchling's testimony "usurped the jury's function." *Hampton*, 718 F.3d at 983. The erroneous admission of this evidence related to the alleged conduit scheme and the unregistered lobbying scheme and infected all counts. This was particularly prejudicial when coupled with the improper admission of the crime-fraud ruling and the Court's statements in front of the jury that Michel and others were conspirators for purposes of the co-conspirator hearsay exception. *See supra* § I. All told, before deliberating, the jury was aware that two federal judges and the lead FBI case agent believed Michel was guilty, undermining confidence in the verdict, and requiring a new trial.

**III.    A new trial is warranted under *Strickland* because Michel's defense counsel, David Kenner, was ineffective and severely prejudiced the defense.**

A new trial is also warranted because Michel's counsel was ineffective in violation of Michel's Sixth Amendment and due process rights, causing severe prejudice. The "right to counsel is the right to the effective assistance of counsel" under the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*

To establish ineffective assistance of counsel, a defendant must show both that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *United States v. Sitzmann*, 893 F.3d 811, 831 (D.C. Cir. 2018). Prejudice means "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*; *see Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

reasonable probability is a probability sufficient to undermine confidence in the outcome.").[7] "The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Curry v. Haynes*, No. 3:22-cv-5493, 2023 WL 3902314, at *19 (W.D. Wash. May 11, 2023).

Michel's lead trial counsel, David Kenner, lacked experience handling a complex white collar case, having gained prominence over his five-decade career for successfully representing Calvin Broadus ("Snoop Dogg") in his 1993 murder trial, but lacking any relevant experience for a complex case of this nature. Declaration of Peter Zeidenberg ("Zeidenberg Decl.") Ex. A. His general criminal practice, which involved defending charges of assault, robbery, homicide, false imprisonment, burglary, drug offenses, DUIs, and reckless driving, did not qualify him for this case. *Id.*[8] also failed to take the necessary steps to competently represent Michel.

As demonstrated below, Kenner was unqualified, unprepared, and ineffectual throughout the trial, and his myriad errors severely prejudiced the defense and undermined the reliability of the verdict, easily satisfying both prongs of the *Strickland* test.[9]

---

[7] "[T]he defendant is entitled to more than just a warm body standing next to him during the criminal process; he or she is entitled to reasonably effective legal assistance." *United States v. Otero*, 848 F.2d 835, 837 (7th Cir. 1988); *see Osborne v. Shillinger*, 861 F.2d 612, 626 (10th Cir. 1988) (ineffectiveness can be shown by demonstrating that "his attorney was so inadequate that he was effectively denied the benefit of full adversarial testing of his guilt").

[8] More recently, Kenner reportedly represented rapper Daystar Peterson, known as "Tory Lanez," who was convicted of shooting rapper Megan Pete, known as "Megan Thee Stallion," in the foot. Zeidenberg Decl. ¶ 3 & n.2. Kenner also advertised that he won acquittals of two Hells Angels gang members in South Dakota on attempted murder charges in 2008. *Id.*, Ex. A.

[9] "[W]hen counsel changes prior to appeal and when there is still a reasonable opportunity to challenge a conviction in the District Court, a criminal defendant bears the usual obligation to raise issues and introduce evidence in the trial court in order to preserve his claims on appeal." *United States v. Debango*, 780 F.2d 81, 86 (D.C. Cir. 1986).

**A. Kenner used an experimental AI program to write his closing argument, which made frivolous arguments, conflated the schemes, and failed to highlight key weaknesses in the Government's case.**

Kenner generated his closing argument—perhaps the single most important portion of any jury trial—using a proprietary prototype AI program in which he and Alon Israely appear to have had an undisclosed financial stake. Zeidenberg Decl. ¶ 5–7 & Exs. C–G.[10] Far from hiding this fact, Kenner boasted about it after Michel was convicted, stating; "The system turned hours or days of legal work into seconds." *Id.*, Ex. C.[11] The AI company touted it as the first use of "generative AI in a federal trial." *Id.* It showed. Kenner's closing argument made frivolous arguments, misapprehended the required elements, conflated the schemes, and ignored critical weaknesses in the Government's case. The closing was *damaging* to the defense.

For example, Kenner's first substantive statement to the jury appeared to be an admission of guilt: "Ladies and gentleman, this case started back in 2012 when there was, as the government characterizes it, an effort to funnel money to President Obama's reelection campaign." Tr. 4/20 PM at 10. Having admitted to the scheme, Kenner launched into his sole, frivolous defense—that Michel had made the contributions in order to help Low get a photograph with President Obama, and not because he wanted to influence policy:

> In 2012, Mr. Michel was trying to arrange to get a photograph for someone named Jho Low. *This was not about an attempt to influence the United States Government or its position on anything.* I don't really think that it mattered what happened in the election insofar as Jho Low was concerned. *Jho Low in 2012 wanted a photograph. That is what this entire case at that time was about. . . . Jho Low is willing again to spend any amount*

---

[10] *See* EyeLevel, *First Use of AI in Federal Trial: EyeLevel's Litigation Assist Aids Defense in Pras Michel Fraud Case*, https://www.eyelevel.ai/post/first-use-of-ai-in-federal-trial; Olivier Katz, LinkedIn post, https://www.linkedin.com/posts/olivier-katz_legaltech-ai-ailaw-activity-7063539584009207808-9PNU/.

[11] Kenner's reliance on an experimental AI program may also explain why the closing argument misattributed a Puff Daddy song to Michel's group, the Fugees. Kenner asserted that the Fugees had a song with the lyrics, "Every single day, every time I pray, I will be missing you." In fact, those lyrics are by Puff Daddy. He also misattributed Michel's worldwide hit "Ghetto Supastar (That is What You Are)" to the Fugees, when it was actually a single by Michel.

*of money to get this photograph.* Jho Low had whatever reasons he had for wanting that photo. You could call it a trophy photo. You could call it whatever it is you want. This is a man who had the money, the wherewithal to spend anything he wanted to do or spend – you heard about this man spending a million dollars a day to rent a yacht for 40 days to party in Europe. This $20 million to him was nothing. To Pras, $20 million transitioning into a new life and a new career was incredible for him. He wanted to make that money. He did get that money. And he did try his very, very best to get Jho Low that photo.

*Id.* at 10, 13, 15, 16 (emphasis added).[12]

Of course, the reason *why* Low allegedly wanted to funnel money to the Obama re-election campaign was immaterial. But Kenner appears to have confused the conduit scheme with the lobbying scheme, which did allege Low's policy aims.[13] Kenner conflated these schemes again when he argued: "What he did was use what he believed to be his money to further the effort to get Jho Low this $20 million photograph. The question of whether or not Mr. Michel was involved in a conspiracy, willfully and knowingly to funnel foreign money into President Obama's election campaign and another conspiracy to not register under FARA, willfully and knowingly, is simply not true… For the 2012 accounts, as I told you, this was all about a photograph." Tr. 4/20 PM at 18. But the alleged FARA scheme was completely independent of the 2012 conduit scheme, as anyone who read the indictment would know. By focusing only on a meritless defense about Low's reasons for the alleged conduit scheme, Kenner failed to provide a cogent theory of defense.

Similarly, when Kenner attempted to argue why the jury should acquit on the § 951 charge and conspiracy, he failed to make the strongest and most obvious argument: that there was no evidence that Michel or anyone else acted at the "direction or control" of the Chinese government. Indeed, Kenner made no reference to the "direction or control" element central to the charge. *See*

---

[12] Kenner also included this as the primary defense to the conduit charges in the jury instructions. Tr. 4/24 AM at 106.

[13] An alternative explanation for this gaffe is that Kenner—or the AI program—had conflated the alleged conduit scheme with the alleged unregistered lobbying scheme, as Kenner had done in the leadup to trial. Michel Decl. ¶ 4.

*also* Mot. for Judgment of Acquittal, § VI. Instead, he appeared to believe—incorrectly—that the success of the alleged scheme was an element of the offense, and he also appeared to agree with the Government that Steve Wynn had lobbied the Trump administration:

> And then what did Mr. Pottinger do? He called and asked for a representative from White House counsel's office to come and to join the meeting, because he was concerned that the President might be treading in unlawful territory. *And he was there when Mr. Wynn again said to the President that it would be helpful to extradite Mr. Guo from the United States.* Now, there are several things that are important about Mr. Pottinger and his testimony. *What is important is that the President was not being influenced by Mr. Michel. The President was not being influenced by the People's Republic of China. The President was not being influenced by Jho Low. The President was not being influenced by Guo Wengui. The President was being influenced by Mr. Steve Wynn, the casino magnate, as you heard.* And you know what I think what is also very, very significant here is … [t]he government says that all of this stuff was done to help the Chinese's People's Republic to influence the government of the United States. *Mr. Pottinger says, I didn't allow that to happen with the President.*

Tr. 4/20 PM at 40–41 (emphasis added).

Kenner appeared to believe it was a defense if the alleged lobbying was unsuccessful. Kenner also appeared to believe it was a defense if it was Wynn who influenced the Government to extradite Guo, ignoring the Government's contention that Broidy used Wynn for this purpose. Kenner did not understand either point and, as a result, his closing offered no coherent rationale for acquittal.

Kenner also failed to address other critical weaknesses in the Government's case, detailed in Michel's Motion for Judgment of Acquittal, filed the same day as this brief, which Michel hereby incorporates herein by reference.

At bottom, the AI program failed Kenner, and Kenner failed Michel. The closing argument was deficient, unhelpful, and a missed opportunity that prejudiced the defense.

### B.    Kenner failed to familiarize himself with the charged statutes, causing him to overlook critical weaknesses in the Government's case.

Kenner's unfamiliarity with the charged statutes was clear. Two weeks before the trial, a

member of Kenner's trial team was so alarmed by the state of Kenner's preparations and understanding of the case that he asked a law school classmate, a trial attorney in Miami, if he would fly to Los Angeles to help. *See* Zeidenberg Decl. ¶¶ 8–9. The Miami attorney immediately recognized that the defense was unprepared for trial and was particularly alarmed when Kenner asked him to explain the money laundering statute to him. *Id.* ¶ 10–12.

Kenner and the other trial team members also did not understand the unregistered lobbying statutes, FARA and 18 U.S.C. § 951. Despite being lead counsel for nearly two years prior to trial, Kenner waited until the trial's final days to try to understand FARA. Decl. of Jasmine Zaki ¶¶ 2–4. A member of Kenner's trial team contacted an attorney with FARA experience and asked if she would testify as a FARA expert. *Id.* ¶¶ 2, 5. The attorney met with the defense team on April 13, 2023, and was shocked when they asked her the most rudimentary questions about how FARA works. *Id.* ¶ 4. The defense team was unfamiliar with FARA, despite that the trial was largely over. *See id.* The defense never retained or called her as an expert witness, however, because the expert designation deadline had passed nearly a year earlier. *See* 4/13/23 Minute Order; ECF No. 106.

Kenner's unfamiliarity with the statutes help explain why he failed to make critical arguments during his closing argument or during the examination of witnesses, further prejudicing the defense. *See supra* § III.A.

### C.   Kenner did not understand the facts or allegations, and he outsourced trial preparations and strategy to contract attorneys at a friend's e-discovery company, leading to ineffectual examinations and further prejudice.

Kenner was also unfamiliar with the facts and allegations. Decl. of Prakazrel Michel ("Michel Decl.") ¶ 4. When Michel expressed concern about Kenner's level of preparedness, Kenner assured Michel that he had been a lawyer for nearly 50 years and knew what he was doing, and would often remark that the Government's case was weak. *Id.* ¶ 5. And, despite that Michel spent hours trying to educate Kenner about the facts, Kenner rarely took notes, and he frequently

conflated the alleged conduit scheme from 2012 with the alleged unregistered lobbying schemes from 2017, which may explain why Kenner dismissed the idea of moving to sever these schemes. *Id.* ¶ 4.

Kenner also outsourced trial preparations to inexperienced contract attorneys who worked for an e-discovery vendor, Business Intelligence Associates, Inc. (BIA), and performed critical tasks like researching and drafting motions, cross-examination outlines, and even joining the trial team in court. Alon Israely, Kenner's family friend who co-founded BIA, joined the trial team as second-chair, even though he was a non-practicing attorney with no white collar or even litigation experience. Zeidenberg Decl. Ex. B.[14] A second contract attorney, who was barred in 2019 and also lacked white collar or litigation experience, also served as trial counsel. ECF Nos. 146, 262.[15]

According to billing records, among other tasks, Kenner outsourced the following critical tasks to contract attorneys with no relevant white collar or litigation experience: (1) draft and work on opening statement; (2) research and draft motions; (3) prepare direct examination of Michel; (4) prepare cross-examination for numerous key witnesses, including Broidy, Higginbotham, Agent Heuchling, Agent Lidsky; and (5) work on jury instructions. *See* Zeidenberg Decl. ¶ 15.

The prejudice of delegating these critical trial tasks to attorneys who lacked white collar and litigation experience was obvious. For instance, Kenner failed to cross-examine Higginbotham about his meeting at the Chinese Embassy. Had he reviewed the discovery, Mr. Kenner would have been aware that Higginbotham told the FBI that Michel's instructions were to "tell the

---

[14] That Kenner and the contract attorneys lacked white collar experience is evident from their strategy and work product. For instance, the defense filed a motion to dismiss on the basis of an advice-of-counsel defense, ECF No. 132, even though any competent white-collar practitioner would know that the advice-of-counsel defense can only be raised at trial.

[15] The trial team consisted of Kenner, Israely (from BIA), Kris Anne Carlstrom (from BIA), and local counsel Charles Haskell. Haskell's role was limited to attending trial and executing filings.

ambassador that McMaster was aware of and/or working on the Guo matter, and that the administration was aware that China wanted Guo back." Ex. A (FBI 302, DOJ #-0000103695). At no point was Higginbotham given any directions from anyone from the Embassy. He also failed to cross-examine Higginbotham about the fact that Low indicated that Wynn was lobbying the Trump administration regarding Guo because Wynn wanted Low to help him secure casino permits in Macau[16]—demonstrating that Wynn was lobbying to curry favor with Low for his own benefit and not as part of the alleged conspiracy with Michel or Broidy, and not at the direction or control of the Chinese government. Ex. B (FBI 302, DOJ # - 0000105622). Mr. Kenner failed to cross-examine Higginbotham about his Factual Basis For Plea, made under oath, in which he stated it was Low—as opposed to the Chinese government—who "wanted [Guo] . . . to be removed from the United States and sent back to [China]." Ex. C (Gov't Ex. 534) at 3.

The cross-examination of Broidy was equally ineffective. Kenner failed to elicit testimony during the cross-examination of Broidy about his Statement of Offense. Like Higginbotham's, this proffer, made under oath, stated that "Broidy, Davis, and [Michel] also agreed to lobby the Administration and the DOJ to arrange for the removal and return of [ ] PRC National [Guo] . . . *on behalf of Foreign National [Low]*." Trial Ex. 532 at 1. This admission directly contradicted the Government's claim that the efforts to extradite Guo were done at the behest of the Chinese government. Kenner never bothered to ask Broidy if he or anyone else in the alleged conspiracy was acting at the "direction or control" of the Chinese government. The answer likely would have been no, eviscerating the substantive and conspiracy count related to § 951. Kenner also failed to cross-examine Broidy about the fact that Wynn had never asked to be paid for his alleged role in

---

[16] Higginbotham should also have been asked about the fact that Wynn had personal reasons to curry favor with Guo and/or the PRC since 70% of Wynn's business was in China. Ex. B (FBI 302, DOJ # 0000105617).

the lobbying scheme, which buttressed the argument that Wynn acted to curry favor with Low so that he could secure casino permits in Macau—not as part of a conspiracy with Michel or Broidy.[17]

A cross-examination by someone steeped in the facts and the law would have elicited these points, and the failure to do so prejudiced the defense.

One reason Kenner may have outsourced trial preparation and strategy because he was unable to personally work on the case due to health issues, which were—and remain—largely hidden from Michel. On October 10, 2022, Kenner moved to continue the November 4, 2022 trial date because he had recently suffered significant injuries after falling, was admitted to the emergency room, and was advised by doctors to refrain from work. ECF No. 176.[18] ███████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████. ECF No.

177, Declaration of Kenner. ████████████████████████████████████

████████████████████████████████. *Id.*[19] Kenner stated that he recognized "his inability to provide effective assistance of counsel," ECF No. 176 at 1, but nevertheless remained lead counsel during the critical pretrial period leading up to the new March 30, 2023 trial date. Kenner did not advise Michel of the information he disclosed to the Court related to the

---

[17] Kenner's cross-examinations of Agent Heuchling and Lidsky were also deficient. For instance, even though the Government seized all of Michel's electronic devices, email, and physical records, and that of his alleged co-conspirators, Kenner failed to ask them if they had found *any* communications demonstrating that Michel or the other alleged conspirators were working under the "direction or control" of the Chinese government or were aware of FARA or thought that it applied, let alone an express or tacit agreement not to register.

[18] Kenner provided a declaration and medical records to the Court and the Government, but did not disclose them to Michel, keeping him in the dark on the severity of Kenner's medical issues.

[19] To this day, when the undersigned defense counsel requested a copy of the Kenner's medical records—previously filed with the Court *on behalf of Michel*—Kenner declined through counsel to provide the records. Zeidenberg Decl. ¶ 16. Because of Mr. Kenner's secrecy, Michel is unaware of Kenner's significant health issues and their impact on his abilities.

nature and severity of his injuries.[20] Kenner's health issues appeared to affect his concentration during trial, such as when he asked the Court to adjourn early one day because his "knee is hurting very badly and so is my lower back. It's difficult for me to concentrate." Tr. 4/3 PM at 93.

>   **D.     Kenner failed to move for severance, likely because he had conflated the alleged schemes, and because of his flat fee arrangement with Michel, causing severe spillover prejudice.**

Kenner also failed at the outset of the case to move to sever the alleged conduit scheme from the alleged unregistered lobbying schemes, under Rules 8(a) and 14. As a result, the jury needlessly heard highly prejudicial evidence that Michel sought to corruptly tamper with alleged straw donors to dissuade them from testifying against him.

Joinder of offenses is permissible only where the offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). "The term 'similar character' found in Rule 8(a) has been construed to mean nearly corresponding, resembling in many respects, somewhat alike, or having a general likeness. The term 'transaction' has been interpreted to comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship. Offenses have been held to be 'connected together' when there is commonality of proof." *United States v. Treadwell*, 566 F. Supp. 80, 86 (D.D.C. 1983) (citations omitted).

"[J]oinder under Rule 8 is not infinitely malleable: it cannot be stretched to cover offenses,

---

[20] Defense counsel have also asked Kenner for basic discovery, such as the FD-302 FBI witness interview memos, but Kenner indicated that he does not have these and referred new counsel to the e-discovery vendor. The e-discovery vendor declined to make the discovery available to current defense counsel because its bills for work performed at Kenner's request remain unpaid. As a result, current defense counsel are unable to fully assess the extent of Kenner's ineffectiveness—including what exculpatory discovery or impeachment evidence he may have overlooked when outsourcing the defense to contract attorneys. Michel reserves the right to present any new evidence or arguments his counsel may discover as they work to obtain discovery.

like those here, which are discrete and dissimilar and which do not constitute parts of a common scheme or plan. . . . Where there is no substantial overlap in evidence and particularly where the evidence necessary to prove each of the offenses would be inadmissible in a trial of the other, judicial economy does not favor joinder." *United States v. Richardson*, 161 F.3d 728, 734 (D.C. Cir. 1998). "In assessing whether counts are of the same or similar character, the Court is 'to consider factors such as the elements of the statutory offenses, the temporal proximity of the acts, the likelihood and extent of evidentiary overlap, the physical location of the acts, the modus operandi of the crimes, and the identity of the victims.'" *United States v. Meili Lin*, 326 F.R.D. 214, 218 (N.D. Cal. 2018). In addition, "there must be a logical relationship between the acts alleged and a large area of overlapping proof." *Id.* at 219 (internal quotation marks omitted). Schemes are improperly joined if "commission of one of the offenses neither depended upon nor necessarily led to the commission of the other, and proof of the one act neither constituted nor depended upon proof of the other." *Id.* at 220 (internal quotation marks omitted).

Even if joinder is appropriate, severance may be required "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a); *see United States v. Gooch*, 665 F.3d 1318, 1335–36 (D.C. Cir. 2012) ("Whereas misjoinder under Rule 8 is determined according to the propriety of joining offenses before trial, severance may be warranted under Rule 14 at all stages of trial because the district court has a continuing duty to sever counts if it finds a risk of prejudice."); *see United States v. Diaz–Munoz*, 632 F.2d 1330, 1335–36 (5th Cir. 1980) (misjoinder of tax counts with insurance fraud and embezzlement counts because the government failed to prove the illegally obtained proceeds were unreported on tax returns).

Kenner was deficient in failing to move to sever the alleged unregistered lobbying schemes

from the alleged conduit scheme. The alleged conduit contribution scheme began and ended in 2012,[21] five years prior to the lobbying schemes. The conduit scheme involved the Obama reelection campaign, whereas the lobbying campaign was with the Trump administration. The conduit scheme had no specific policy goal in mind; there was no legislative "ask" that was being sought. The lobbying scheme allegedly had two specific aims—the cessation of the forfeiture case against Low, and the extradition of Guo to China. Different individuals were involved in the two schemes, and vastly different statutes were involved—the conduit scheme involved the violation of campaign finance laws and the lobbying scheme involved FARA and being an unregistered foreign agent. In sum, these two sets of cases should not have been indicted together and, once they had, the Court should have granted severance had the appropriate motion been made.

Kenner should have moved for sever the two alleged lobbying schemes and associated money laundering and false statements to banks (Counts 7, 8, 10, and 12), on one hand, from the alleged conduit scheme and witness tampering counts (Counts 1–6), on the other hand, which occurred five years earlier than the alleged lobbying schemes and was wholly unrelated to them, and involved different actors, transactions, and presidential administrations. The Court would have been compelled to grant severance under Rules 8(a) and 14.

Kenner's failure to seek severance caused tremendous spill-over prejudice from the conduit scheme. Severance would have avoided having the jury that heard the unregistered lobbying case also hear about the conduit scheme and, most damaging, the witness tampering. And it would have enabled Michel to advance a defense on the lobbying counts (discussed herein), while remaining

---

[21] The false statement to the FEC, made in 2015, was the result of a complaint brought years after the conduit scheme had been completed. Even if one were to accept the Government's argument that this was one continuous scheme—albeit one that took a three year time-out—there was still a more than two year gap before the lobbying scheme began.

silent on the conduit scheme. Apart from evincing prejudicial ineffective assistance of counsel, the lack of severance also constituted plain error that affected Michel's substantial rights, further warranting a new trial.[22]

> **E.   Kenner failed to object to the Government's clearly erroneous use of its case agent as an overview witness and the case agent's improper opinion about Michel's guilt based on unspecified evidence and hearsay.**

Throughout trial, Kenner failed to object to obviously inadmissible evidence, betraying a lack of familiarity with the rules of evidence. One of the most damaging examples of this was when Kenner failed to object to the Government's use of the case agent, Agent Heuchling, as an overview witness who repeatedly testified as to his opinion that Michel was guilty of the various schemes, usurping the role of the jury and causing severe prejudice to Michel. *See supra* § II.

Remarkably, at times Kenner himself used Agent Heuchling as an overview witness who opined about Michel's guilt, such as this exchange during his cross of George Higginbotham:

> Q: So you were continuing to work with him and at some point you ran into him in DC or in NY?
> A. What is the timeframe, sir?
> Q. The timeline, sir, is when you again started to represent Mr. Michel.
> A. Yes.
> Q. *During the time period of this conspiracy*. Do you have that in mind?

Tr. 4/11 AM at 64–65 (emphasis added).

Some of Kenner's questions of Agent Heuchling could easily have been mistaken for those of the prosecutor:

> Q. (BY MR. KENNER) *Mr. Heuchling, when did you first determine that Mr. Michel was violating the FARA laws? What year, what month?*
> A. *I – I couldn't point to any – any specific year or month, but we got turned on to Mr. Michel's scheme as it relates to FARA in July of 2017 after Mr. Higginbotham entered the Chinese embassy.*
> Q. *So would it be a fair statement, then, as of July of 2017, Mr. Michel was in violation of*

---

[22] Kenner may have also been financially motivated to avoid severance. Michel paid him a flat fee for the representations, so having to represent Michel in two trials would have hurt Kenner's bottom line. Michel Decl. ¶ 2.

> *FARA?*
>
> A. *I – I couldn't tell you exactly when – when Mr. Michel would have been in violation of FARA, so that – you asked me when I became aware of it. My understanding of the statute, though, is that it applies as soon as any individual starts acting on behalf of a foreign principal. So, therefore, I assume that he would have been in violation of the law prior to that.*

Tr. 4/13 PM at 48 (emphasis added). Rather than vigorously cross-examine Agent Heuchling, Kenner encouraged his plainly erroneous opinion testimony that Michel was guilty of violating FARA. More than simply ineffective, this testimony was directly adverse to Michel.

> ### F. Kenner failed to object to other obvious hearsay that was extremely prejudicial to the defense.

Aware of Kenner's lack of facility with the hearsay rules, the Government took full advantage, such as when Matthew Pottinger of the National Security Council testified almost entirely to prejudicial hearsay without any objection from Kenner.

The prejudice here was manifest in that Pottinger was the sole witness who provided evidence that the alleged lobbying scheme had reached inside the Trump administration, yet Pottinger had virtually no first-hand knowledge of the information about which he testified. Instead, without objection or limiting instruction, Pottinger testified about: (i) what he had heard President Trump say that he learned from a third party—which constituted double-hearsay; (ii) what the FBI had told him they had done about Guo; (iii) what the State Department had told him they had done about Guo; (iv) how the "U.S. government" in general was responding to the extradition requests; and (v) what Steve Wynn had told him about his desire to see Guo extradited.

The Government used Pottinger to introduce hearsay and double-hearsay, without any objection from Kenner, as the following excerpts make clear:

> Q. Directing your attention to the May, June 2017 timeframe, do you recall there being a request with regard to China regarding a Chinese national who was in the United States named Guo Wengui or Mr. Guo? … How did that matter come to your attention?
> A. … It came to my attention in a meeting in the Oval Office. There were a handful of staff who were meeting with the President. *And the President mentioned during this meeting,*

*that he had received some information about Guo Wengui at dinner the previous night.*[23]
*So he had some things he wanted to tell us about that.*

Q. Had you been aware of Mr. Guo before this meeting in the Oval Office?

A. I didn't know that Mr. Guo would come up in this meeting, but I had heard of him probably primarily from press reporting, but I did know who he was.

Q. And what, if anything, did the President ask you to do with respect to Mr. Guo?

A. Yeah. Well, the President had asked that –

MR. KENNER: Objection; hearsay, Your Honor.

THE COURT: What did you do in response to what the President asked without telling us what the President said?[24]

THE WITNESS: Right. *The topic in the Oval Office was about Guo Wengui and international police allegedly wanted him and that a friend of the President had told him that it would be helpful to have him extradited from the United States back to China.*

BY MR. KELLER:

Q. Did you know who that friend was at that point, the friend of the President?

A. *Yeah. It came up in the conversation. It was casino magnate Steve Wynn, who was a friend of President Trump. ...*

Q. After that Oval Office meeting, did you have any additional contact with government officials or anyone from China regarding Guo?

A. *At a later point, the Chinese government approached the US government about Guo's case and also asking for him to be extradited.*[25]

Q. *Do you recall whether a delegation from China actually traveled to the United States to meet with Mr. Guo and discuss this issue?*

A. *Yes.*

Q. What, if anything, did you learn about that trip or that delegation and their actions?

A. *I learned from the Department of Justice that a group of Chinese security officials had been operating illegally in the United States trying to coax Mr. Guo to return to China.*[26]

Q. What was your understanding of what was improper about that?

A. The US government was not informed and had not issued a visa for that activity. And, in fact, the visa that was issued to these officials was inconsistent with allowing them to do Chinese law enforcement on US soil.

---

[23] Not only is this double hearsay, but the Government also moved *in limine* to preclude the defense from calling former President Trump as a witness, ECF No. 193, and the Court granted that motion, ECF No. 207. So after precluding testimony from the witness, the Government instead introduced it as hearsay, so that there could be no cross-examination.

[24] The Court's instruction to the witness to simply testify about what he did as a result of what he learned was proper. The witness ignored this instruction, however, and Kenner failed to object. The Court also did not intercede when Pottinger testified about what he had *heard*, not about what he *did*.

[25] Notably, Pottinger never suggested that anyone from the Chinese government approached him, personally, about Guo; Pottinger simply testified about what others in the government had told him about the Chinese government and what the Chinese government wanted.

[26] Here, Pottinger is testifying about what other officials in another branch of the government, the Department of Justice, saw and concluded.

Q. What did the US government do in response, if anything?[27]

A. *The Department of Justice, the FBI, had been following this delegation and told these Chinese security officials they had to leave New York and go back to China. My understanding was they escorted the Chinese officials from New York back down to Washington, DC.*[28]

Q. And what happened next, if you know?

A. *The Chinese officials ignored the warning from the FBI and went straight back to New York to try to coerce Guo to return again.*[29]

Q. Were they successful in convincing Mr. Guo to leave with them and return to China?

A. *They were not. And FBI then escorted those men to a flight in New York and sent them back to China. . . .*

Q. In addition to the meetings that you have already testified about, did you also have a later meeting at the end of summer or fall of 2017 at the White House with Steve Wynn?

A. I did.

Q. What precipitated that meeting?

A. For me, it was an unexpected meeting. I received a cell phone call from the Chief of Staff of the White House or from his office asking me to come down to the West Wing for a meeting. I arrived and Mr. Wynn was there waiting and we had a brief conversation.

Q. What was the general topic of the meeting?[30]

A. *The topic was how to extradite Guo Wengui from the United States, **which Mr. Wynn had said the Chinese government had asked him to do.** . . .*

Q. *During this time period, was it your understanding that part of the reason that China wanted Guo back was that he had been a vocal political critic of Chinese government officials?*[31]

A. Yeah. It was clear that Mr. Guo had been vocal in the months leading up to the events that we have been talking about. He had been talking to US and other press outlets, criticizing certain members of the Chinese leadership and divulging embarrassing information.

Tr. 4/11 PM at 80–87 (emphasis added).

All of this inadmissible hearsay was extraordinarily damaging, and none of it was

---

[27] Neither Kenner nor the Court asked the Government to explain why it believed Pottinger should be permitted to describe the activities of the United States government, writ large, or how he would know what the "U.S. government" was doing, in general.

[28] Here, Pottinger is permitted, without objection, to testify about his "understanding" about what the FBI—an agency unrelated to the National Security Council where Pottinger worked—may have done in regards to Guo; this testimony is pure hearsay.

[29] Pottinger was not present for any of this; this was all information he learned second-hand; it is hearsay.

[30] The Government's efforts to introduce hearsay without drawing notice from defense counsel or the Court were, at times, artful. A question like this—"what was the general topic of the meeting" —did not necessarily call for hearsay and perhaps lulled the Court into thinking that what was coming next would be appropriate.

[31] This question was far less "artful" and clearly called for hearsay.

cumulative. Pottinger was the only witness who testified about what went on inside the White House, with President Trump, and with Steve Wynn, and the actions that the State Department, FBI, and the "U.S. government" did in connection with Guo.[32]

### G. Kenner failed to object to the introduction of attorney-client privileged conversations between Michel and Higginbotham that formed the basis of the Government's proof of willfulness under FARA.

Kenner also failed to object to attorney-client privileged communications between Michel and Higginbotham that formed the basis of the Government's argument that Michel knowingly and willfully failed to register and conspired in violation of FARA.

The grand jury judge correctly concluded that the facts "tend to indicate that Higginbotham and Michel had an attorney-client relationship," and "Michel sought advice and legal assistance from Higginbotham," who "repeatedly took actions on behalf of Michel" and "held himself out as Michel's attorney." Order at 16 n.4, No. 1:21-sc-03805-BAH, ECF No. 2-9. Indeed, at trial, Higginbotham testified that he and Michel had an attorney–client relationship, Tr. 4/6 AM at 14, 134.[33] Accordingly, discussions between Higginbotham and Michel concerning legal advice are presumed protected by the attorney-client privilege.

Without any objection, Kenner allowed the Government to introduce the following privileged communications between Higginbotham, as an attorney, and Michel, as his client:

Q. Based on the work for Low, the 1MDB work and the work of trying to get the Chinese national extradited, did you have concerns about FARA?

---

[32] "When the trial or sentencing process is rendered unreliable because it has clearly lost its adversary character, the Sixth Amendment violation is clear." *Schillinger*, 861 F.2d. at 625; *see also United States v. Cronic*, 466 U.S. 648, 659 (1984) (whether the attorney is influenced by loyalties to other defendants, parties, or the government, "if [he] entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights").

[33] Email evidence confirmed this. For instance, on March 24, 2017—prior to any of the overt acts alleged for Counts 7, 8, 10 and 12—Higginbotham emailed Mr. Michel telling him that he was "excited to be working with you again" and said, "I assure you that I will continue to protect your interests and think strategically to make sure that your situation is 100% correct." Trial Ex. 274.

A. I did have concerns about FARA, yes.
Q. Did you share those with the defendant?
A. I did, on more than one occasion.
Q. And what was Michel's response when you raised FARA?
A. Also very dismissive. You know, I remember one time he said something to the effect of, "I don't want to register for FARA because, you know, I travel a lot, and I get stopped coming in and out of airports, and it just all seemed like a very much inconvenience."
Q. Did Mr. Michel ever ask you, when you raised it, 'What is FARA? I don't know what FARA is'?
A. Oh, no, no. There was – he was aware of what FARA was. And I think that – . . . It was something he was aware of . . . .

Tr. 4/6 AM at 20–21. Higginbotham later clarified: "I don't think I ever said, You must register for FARA. I recommended to him on more than one occasion during the, I would say, late spring, early summer when I was aware of the – not only the Jhho Low matter, but also the Guo Wengui matter, that it was necessary to register." Tr. 4/11 AM at 32–33.

Kenner's failure to object to this evidence—and the Government's improper introduction of this evidence without any prior waiver of the privilege by Michel—were extraordinarily prejudicial. Without Higginbotham's testimony, there is no evidence that Michel was familiar with FARA or any other registration requirement or had reason to believe it applied to him or to Broidy. The Government used this evidence to prove its FARA allegations, arguing during its closing:

> Mr. Michel has told you in his testimony that he knew nothing about FARA. But you know that's not true. George Higginbotham testified that he spoke with Mr. Michel on multiple occasions during this timeframe in 2017 specifically about FARA because George Higginbotham was worried that they might need to be registering in light of all this work that they're doing on behalf of Jho Low and the 1MDB matter. But as you heard from Mr. Higginbotham, Mr. Michel seems familiar with FARA. It wasn't like this seemed new to him at all. But he didn't care. He wasn't interested in registering. He thought it would be an inconvenience.

Tr. 4/20 AM at 60. Absent evidence of that purported conversation, the jury would have been far more likely to credit Michel's testimony that he was unaware of the registration requirements.[34]

---

[34] The crime-fraud exception also did not apply to this conversation, as Michel's alleged dismissal of Higginbotham's concerns did not further a crime. As the court held in *United States v. White*, 887 F.2d 267, 272 (D.C. Cir. 1989): "Far from showing that [an attorney's] advice was intended

### H.      Kenner failed to object to prejudicial evidence that lacked foundation.

Kenner's failure to prepare for the case also meant that he appeared to be unfamiliar with—

and failed to object to—introduction of perhaps the single most prejudicial piece of evidence

introduced by the Government at trial: Exhibit 474, a 33-page mishmash of text, phone, and

screenshots found on Lum Davis's Google Drive. The exhibit included a constellation of

disconnected screen shots of messages from unknown individuals to other unknown individuals.

Although the Government failed to lay a proper foundation for the exhibit, Kenner offered no

objection, as he appeared unfamiliar with the exhibit or its significance:

> Q. And I am going to show what has not yet been admitted, Government Exhibit 464 and
> Government Exhibit 474.
> MR. KENNER: May I have a moment, Your Honor?
> MS. LOCKHART: 464 and 474.
> THE COURT: 46 or 45?
> MR. KENNER: I'm sorry. This 474 is quite a lengthy document. May I have time to review
> it, please? . . .
> MR. KENNER: Your Honor, I have no objection to Exhibit 474.

Tr. 4/13 AM at 91–92.

Agent Heuchling then read page after page of Exhibit 474, notwithstanding that he was

unable to testify as to the identity of the sender or recipient of the vast majority of the messages:

> Q. So looking at this photo again now that the jury has the benefit of seeing the document,
> where was this photo obtained?
> A. This was obtained from Ms. Davis' Google Drive.
> Q. And are you able to tell, because it is a photo who the message was from or to?
> A. No. You can't tell exactly who sent or received this message, but it is a photo recovered
> from Ms. Davis' account. …
> Q. (BY MS. LOCKHART) From this image, are we able to tell any information about the
> sender or recipient of this message?
> A. No, we can't tell who sent or received this message. But, again, it was recovered from

---

to further a crime or fraud, the evidence suggests . . . that [the attorney's] advice was intended to
prevent unlawful conduct. [The defendant's] failure to heed his lawyer's counsel does not alter
this critical facet of the case." *Id.* at 271; *see also United States v. Finotti*, No. 88-0286, 1988 WL
129723 (D.C.C. Nov. 17, 1988) (noting that, "even if arguendo, the attorney did become a co-
conspirator, the privilege is not necessarily gone if the discussions themselves are lawful").

> Ms. Davis's cloud – Google Drive. …
> Q. The name at the top here, T1 Freedom, do you know who that person is?
> A. I can't say with certainty who that individual is.

Tr. 4/13 AM at 92; Tr. 4/13 PM at 8–9.

Despite the Government's inability to identify the senders and recipients, Kenner failed to object on foundation, Rule 403, or other grounds, and sought no limiting instruction. Nor did he force the Government to introduce each document or message individually, such that a proper foundation and objection could be laid for each. Instead, he failed to object, and the entire 33-page exhibit, including several dozen conversations, were all admitted.

The prejudice is clear, as the Government spent hours having Agent Heuchling read each message in this 33-page exhibit and then permitting Agent Heuchling to speculate who or what he believed was being referenced, and Kenner only objected at the end of this presentation after it "was already admitted," Tr. 4/13 PM at 20:

> Q. (BY MS. LOCKHART) Agent Heuchling, is this another message from *T1 Freedom*?[35]
> A. Yes, it is.
> Q. Agent Heuchling, I'm going to have you read this. If you could read the first paragraph on the left-hand side.
> A. "I just need a straight answer if it can or can't be done. No point dragging people out. That's not how it works in C. We are dealing with serious guys and making promises since Monday, and now is Wednesday is terrible. We are seen as complete joke to them."
> Q. And if you could read the next paragraph.
> A. Yes. *Someone responds*, "I totally with you, copy this and sending to the guy and will send to E," or Mr. Broidy.[36]
> Q. And to the next one?
> A. "I should never vouched" – again, the writer is writing. "I should never vouched for these guys. Now I am in hot soup, and he has walked away with the dough doing nothing while my relations will definitely suffer now in C," meaning China.[37]
> Q. Are you aware, through the course of your investigation, where Mr. Low was living in 2017?
> A. Yeah. At this time period, Mr. Low was known to be residing or in some cases hiding out in China.

---

[35] Agent Heuchling had previously testified that he did not know the identity of T1 Freedom. Tr. 4/13 PM at 9.

[36] There was no objection to this speculation.

[37] There was no objection to this speculation.

MS. LOCKHART: If we could go to the next message at the -- on the right-hand side of the screen. And, Your Honor, permission for Agent Heuchling to read the message with the expletives included. He also can skip over them.

THE COURT: Yes. No, you can go ahead.

A. Okay. "Bro, I don't give a fuck. This is fucking" –

MR. KENNER: *Your Honor, I'm going to object. We don't know who this is from or to.*

MS. LOCKHART: *Your Honor, it's already in evidence. These were all seized* –

THE COURT: *It is in evidence, and it's obviously a conversation back and forth* –

MR. KENNER: *Between?*

THE COURT: *We know where it was taken from, which I believe is from Ms. Davis; is that correct?*

MS. LOCKHART: *That's correct.*

THE COURT: S*o this is on something that she possessed, and this is the material – information that she has on her – I believe it was her phone.*

MS. LOCKHART: *It's her Google Drive account.*

THE COURT: *Google -- Google -- so, and it's already been admitted. So I see no reason why – we've read the other portions, why you can't read this portion of it.*

A. "This is fucking irresponsible. You guys don't fucking understand whom you are dealing with. They will fucking put a bullet through our heads any part of the globe for jerking them around. And now we have taken part of their money and not delivered what was promised since money," or Monday. "I don't think you understand how serious this shit is. Try taking money from Putin, promising him and not delivering. Same story."

*Id.* at 18–20 (emphasis added).

Kenner's failure to object caused severe prejudice to the defense, as the Government read from the exhibit during its closing argument, and the exhibit formed the fulcrum of its case under § 951. Tr. 4/20 AM at 56–57. Citing Exhibit 474, and Agent Heuchling's speculation and interpretations of the messages, the Government stated that "[t]hese are messages being communicated between the co-conspirators. . . . And then the request from – the direction from the Chinese government . . . . In addition to these directions coming from the Chinese government, you also saw messages from this user T1. And as Agent Heuchling testified, based on his investigation, he understood T1 to be Jho Low. And what we see in these messages are concerns, concerns that monies coming from the Chinese government, that Mr. Michel and his folks have agreed to do its bidding, to try to deliver on the Guo extradition." *Id.*

I.     **Kenner failed to properly prepare for trial or prepare Michel for his testimony and cross-examination.**

During trial preparation, Kenner never went through the key documents produced by the Government in discovery with Michel so that he could explain their significance and understand their context. Michel Decl. ¶ 4. Nor did Kenner explain the elements of each offense to Michel, so that they could determine potential defenses to charges. *Id*. There was no discussion of overall defense strategy or theory of the case. *Id.* Kenner therefore prevented Michel from effectively assisting in the preparation of his case.

Kenner also failed to prepare Michel for his direct examination or explain to him the risks of testifying. *Id.* ¶ 11. The resulting prejudice was devastating. Kenner failed to ask Michel about the most critical and damaging facts of the case in order to permit Michel to explain his actions and why he took them, instead leaving it to the Government to bring them up during a damaging cross-examination. And Kenner failed to ask Michel the most basic and fundamental questions about his intent and state of mind which, if believed, would have provided the jury with a reason, if they believed him, to acquit.

IV.   **Even if there were no prejudice under *Strickland*, Michel would still be entitled to a new trial under *Cuyler* because his counsel had two conflicts of interest that adversely affected his counsel's performance.**

The Court should also grant a new trial because Michel's counsel had two conflicts of interest that adversely affected his performance. *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980) (a defendant can "establish a violation of the Sixth Amendment" if his defense counsel had a conflict of interest that "adversely affected his lawyers performance"); *accord Mickens v. Taylor*, 535 U.S. 162, 172–73 (2002). A defendant "who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief," *Cuyler*, 446 U.S. at 349–50, because *Cuyler* "presumes prejudice" if the conflict had an

"effect upon representation," *Mickens*, 535 U.S. at 173. This includes "when a client's interest conflicts with that of his attorney." *United States v. Lewisbey*, 843 F.3d 653, 657 (7th Cir. 2016).

To succeed under the *Cuyler* standard, the defendant must identify a "nexus between the alleged conflict and these examples of claimed ineffectiveness." *United States v. Bruce*, 89 F.3d 886, 896 (D.C. Cir. 1996); *see also United States v. Tucker*, 12 F.4th 804, 819 (D.C. Cir. 2021) ("To satisfy this standard, [movant] must articulate a strategy that a reasonable, nonconflicted defense counsel would have pursued. The conflict must have caused the failure to pursue this strategy, and must have 'significantly affected counsel's performance ... rendering the verdict unreliable, even though *Strickland* prejudice cannot be shown[.]'" (internal citations omitted)). The defendant "need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative." *Herrera v. Russi*, No. CV-95-0187(CPS), 1996 WL 651017, at *7 (E.D.N.Y. Nov. 6, 1996). The "alternative defense strategy or tactic" must have been "plausible" and "reasonable under the facts." *Pegg v. United States*, 253 F.3d 1274, 1278 (11th Cir. 2001). A defendant also satisfies *Cuyler* if the conflicted attorney "entirely fails to subject the prosecution's case to meaningful adversarial testing." *Osborne v. Shillinger*, 861 F. 2d 612, 625 (10th Cir. 1988) (quoting *Cronic*, 466 U.S. at 659).

As demonstrated below, Kenner's two conflicts of interest adversely affected his performance at trial, violating Michel's Sixth Amendment and due process rights.

### A. Kenner and Israely had a conflict of interest when they decided to use an experimental AI program in which they had a financial stake to write the closing argument, resulting in a frivolous and ineffectual closing argument.

It is now apparent that the reason Kenner decided to experiment at Michel's trial with a never-before-used AI program to write the closing argument is because he and Israely appear to have had an undisclosed financial interest in the program, and they wanted to use Michel's trial as a test case to promote the program and their financial interests. Indeed, the press release the AI

company issued after the trial that quotes Kenner praising the AI program states that the company launched the program "with technology partner CaseFile Connect." Zeidenberg Decl. ¶ 7 & Ex. C. The CaseFile Connect website does not identify its owners, but it lists its principal office address as 16633 Ventura Blvd., Suite 735, which the California Bar website indicates is the office address for Kenner's law firm. *Id.*, Ex. F. Open sources further indicate that the third office address CaseFile Connect's website provides is associated with Kenner's co-counsel and friend, Israely. *Id.*, Ex. G. The reason they used the experimental program during Michel's trial and then boasted about it in a press release is now clear: They wanted to promote the AI program because they appear to have had a financial interest in it. They did this even though this experiment adversely affect Michel's defense at trial, creating an extraordinary conflict of interest.

As demonstrated above, Kenner and Israely's decision to elevate their financial interest in the AI program over Michel's interest in a competent and vigorous defense adversely affected Kenner's trial performance, as the closing argument was frivolous, missed nearly every colorable argument, and damaged the defense. *See supra* § III.A. *Cuyler* therefore warrants a new trial.

**B.     Kenner also had a conflict of interest due to the contempt charges prosecutors filed one month before trial, which adversely affected his trial performance.**

1.     <u>Kenner developed a conflict of interest when the prosecutors filed contempt charges against him one month before trial for willfully leaking grand jury materials to the media and seeking to influence the jury pool.</u>

On March 2, 2023, one month before the trial, Bloomberg published two stories about the case,[38] including an in-depth cover story in *Bloomberg Businessweek* that cited Kenner eight times

---

[38] The stories were entitled, "*The Fugee, the Fugitive and the FBI: How rapper Pras Michel got entangled in one of the century's great financial scandals, mediated a high-stakes negotiation between global superpowers and was accused of major crimes*," and "*FBI Documents Show Leonardo DiCaprio, Kim Kardashian Grilled for 1MDB Secrets*." Jason Leopold et al., Bloomberg Businessweek, Mar. 6, 2023, https://www.bloomberg.com/features/2023-us-china-tensions-scandal-fugees-1mdb/; Anthony Cormier et al., Bloomberg Businessweek, Mar. 2, 2023,

and included what the reporters called "a cache of previously undisclosed FBI and Justice Department documents," including a photograph that included a grand jury sticker on it. ECF No. 204 at 4. According to the Government, the articles also quoted from grand jury transcripts, cited "internal government documents" and FBI FD-302s provided to the defense in discovery, and internal FBI communications provided to the defense as *Jencks* material. *Id.* at 4–5.

On March 3, 2023, the Government filed a Motion for Order to Show Cause against defense counsel, charging them with criminal contempt for "willful[ly]" leaking grand jury and other materials to the media to intimidate witnesses and taint the jury pool in violation of the protective order. *Id.* at 7. The motion requested "an Order to Show Cause notifying defense counsel of the contempt charge and setting a bench trial to resolve the matter." *Id.* at 8. Kenner's alleged aim was for Bloomberg to "publish stories amplifying defense theories and criticizing prosecution and government witnesses," and an "attempt to influence the jury pool shortly before trial by selectively disclosing discovery and narrating an extrajudicial defense to the media." *Id.* at 1, 8.

Kenner essentially admitted to the charges in a filing later that day. In a bizarre confession, he conceded that the defense shared materials with the Bloomberg reporters after the reporters "signed or acknowledged" the protective order, and stated that the reporters "access[ed]" defense information "as agents of the Defense as set forth in the Protective Order." ECF No. 205. The Court then held the charges in abeyance, ECF No. 211, but neither the prosecutors nor the Court recused themselves until April 3, 2023, three days into trial.

On March 31, 2023, the Government raised the issue of the contempt motion and a concern that Kenner may "want[] to appease the government to try to avoid negative consequences

---

https://www.bloomberg.com/news/features/2023-03-02/leonardo-dicaprio-kim-kardashian-grilled-for-1mdb-secrets-fbi-documents-show.

associated with that motion." Tr. 3/31 AM at 6. Kenner responded, "I very much appreciate Mr. Keller raising that. It is very uncomfortable for me to vigorously defend my client in front of a judge who may rule on whether or not my conduct has been contemptuous." *Id.* But the Court opined that there was no conflict, stating that the contempt motion "had nothing to do with" the defense itself, and "I don't see a – you know, a conflict." *Id.* at 8. The Court did not address the prosecutor's concern that Kenner could seek to curry favor with the prosecutors. *Id.* at 9.

On the afternoon of March 31, 2023, the Court again raised the conflict issue, and indicated that it would assign the contempt proceeding to another judge. Tr. 3/31 PM at 4. Kenner resisted the reassignment and proposed that he meet and confer with the prosecutors. *Id.* Kenner and the prosecutors apparently discussed his contempt charges thereafter—a conversation to which Michel was not privy. Tr. 4/3 AM at 5. Then, on April 3, 2023, the Government raised the issue again, and Kenner insisted—in front of Michel—that he lacked a conflict: "[T]here is no conflict. . . . There's nothing to waive right now. . . . It still doesn't given rise to the need for Mr. Michel to have to waive something that doesn't yet exist." *Id.* at 5, 7. At the same time, Kenner acknowledged the impact of the contempt charges: "I believed the purpose for this being done was to put the sword of Damocles over me and trying to control the cross-examination that I do and having to be extra careful because of what the government has done." *Id.* at 11. The Government recognized the conflict, and indicated that it would assign the contempt motion to another office. *Id.* at 10.

The Court recognized that the contempt motion created "at least an appearance of a potential conflict," and decided to inquire with Michel "to make sure he understands" and is "comfortable" with the situation. *Id.* at 8–9. The Court suggested that Michel can speak to independent counsel about the conflict issue "if he wishes . . . he can decide whether he wants to talk to somebody else, not talk to somebody else or whatever; or if he's sufficiently comfortable,

we'll go forward." *Id*. What the Court did not know at the time—and what would only have been revealed had Michel been appointed independent counsel—is that Kenner had coached Michel to respond to the Court's inquiry by saying that he "loved his attorney." Michel Decl. ¶ 8.

During the colloquy, the Court signaled to Michel that there was no real conflict, and Michel responded as Kenner had instructed him, while also making clear that he did not understand the conflict issue or situation:

> [THE COURT:] . . . [T]here's an appearance that your attorney could want to please the government in an effort to get the government to abandon the motion. And I want to make sure that you want to continue to be represented by your attorney notwithstanding that this motion is out there which could present a conflict. Do you understand? Do you have any questions you want to ask me?
> THE DEFENDANT: *Not really. I don't really understand. All I know is that I'm totally pleased with my attorney. . . . Other than that, I don't know what the conflict is,* but I'll leave the politics up to him and the government. I don't involve myself in politics anymore.
> THE COURT: Okay. This is hopefully not a political issue. What I want you to do is to just make sure you know this motion is pending. It won't be decided, you know, until sometime after the trial, and the government – somebody else in the government will be deciding it. Another judge will be deciding it. So none of my rulings will have anything to do with the motion. It wouldn't have anyway, but just to make sure that there's no problem with it.
> So part of it – the conflict is whether there appears to be a conflict, that he would have this motion pending that the government's pursuing in terms of representing you. *But if you're satisfied with the representation and you're not concerned at all about this pending motion and how your attorney is handling the case, then that's the end of it.* I can also appoint somebody to talk to you more specifically, if that's what you want to do. But if you've decided it, then just let me know. This is your decision.
> THE DEFENDANT: I'm very satisfied with my attorney. Thank you, Your Honor.

Tr. 4/3 AM at 14–15 (emphasis added). With no understanding of the conflict issue, Michel did not knowingly and intelligently waive the conflict.[39] With that, the trial proceeded.

Although the Court transferred the show-cause motion to another judge and other prosecutors on April 3, 2023, Kenner had labored under a conflict up until that point because he

---

[39] Kenner's advice to Michel on how to respond to the Court's inquiry itself suffered from a conflict of interest, because Kenner had a personal interest in concealing the nature and risks of the conflict from Michel, so that Kenner could stay on as trial counsel, and avoid having to withdraw, which would mean he would immediately face contempt proceedings.

believed the same prosecutors that were handling the Michel case would decide whether to pursue the charges against him. Even after the transfer, Kenner had a conflict because he knew that the same prosecutors would be witnesses against him at his contempt proceeding. And he knew that, if Michel were found not guilty, the Government would claim that it was due to Kenner's misconduct before trial in seeking to intimidate witnesses and taint the jury pool. Thus, Kenner was incentivized to curry favor with the prosecutors, and pursue an unaggressive defense, adversely affecting his performance before and during trial.

> 2.   Kenner's conflict of interest due to the contempt charges adversely affected his performance at trial.

Kenner's conflict of interest—owing to his significant stress and distraction from the contempt charges, and his incentive to curry favor with the prosecution and pursue an unaggressive defense—adversely affected his performance at trial and satisfies the *Cuyler* standard.

Kenner's conflict of interest arising from the contempt charges placed incredible stress and distraction on him, which impeded his performance at trial. *See, e.g.*, *Herrera*, 1996 WL 651017, at *9 (noting that "a conflict could arise simply because it is plausible that [the defense attorney] was unable to zealously represent the petitioner because of [the attorney's] preoccupation with the investigation into his competence and his possible suspension and disbarment"). Kenner must have been preoccupied before and during trial with the possibility that he may lose his law license and even his liberty as a result of the contempt charges. This explains his failure to defend the case. *See supra* § III.

Kenner's performance was also adversely affected because, from March 3 to April 3, 2023, he believed that the same prosecutors who he was opposing in Michel's case would decide his fate after the trial, incentivizing him to pursue a less vigorous defense. *See, e.g.*, *Cortez v. Griffin*, No. 18CV766, 2023 WL 3266926, at *18 (S.D.N.Y. May 5, 2023) (ruling that "there is a clear record

of a conflict for" an attorney who was subject to "prosecution by the same office that was concurrently prosecuting her client" because "it was entirely plausible that [the attorney's] natural concern over how she would be dealt with in her own case would inhibit the vigor of her opposition to her prosecutor's case against her client").

Even after the prosecutors transferred the contempt motion to another office on April 3, 2023, Kenner likely concluded that a guilty verdict for Michel would reduce the Government's appetite to prosecute him for contempt. *See, e.g.*, *United States v. Hurt*, 543 F.2d 162, 166 (D.C. Cir. 1976) (appellate counsel had a conflict with client when he was sued for defamation by trial counsel and sought to withdraw after arguing that trial counsel was ineffective, because while "his client's interest plainly lay in hammering away toward that objective [of demonstrating ineffective assistance], self-interest in not worsening his own position tugged strongly in the opposite direction"). Indeed, if Michel were convicted, Kenner could seek to rebut the allegations that he attempted to intimidate witnesses and taint the jury pool by pointing to the lack of harm arising from his conduct, since Michel would have been convicted anyway. On the other hand, a not-guilty verdict for Michel would have the opposite effect. Kenner's demonstrably defective performance at trial—while laboring under this conflict—satisfies *Cuyler* and requires a new trial.

**V.    At a minimum, when viewed in the aggregate, the errors during the trial and the ineffective assistance of counsel require a new trial.**

Even if individual errors viewed in isolation do not warrant a new trial, a new trial is warranted here because the errors and ineffective assistance of counsel plainly prejudiced Michel when viewed in the aggregate. As the First Circuit recently explained:

> The cumulative-error doctrine holds that errors not individually reversible can become so cumulatively. That is because '[i]ndividual errors, ***insufficient in themselves to necessitate a new trial,*** may *in the aggregate* have a more debilitating effect' and thus add up to prejudice. [ ] And we have long held that the prejudice inquiry under *Strickland* can be a cumulative one as to the effect of all of counsel's slipups that satisfy the deficient-performance prong – meaning that a defendant

> need show it more likely than not that the several blunders, even if not prejudicial on their own, prejudiced him when taken together. . . . So what matters is the cumulative effect of counsel's errors (even if no error in isolation suffices to establish qualifying prejudice) – *i.e.*, the focus must be on the collective impact of counsel's deficiencies. . . . [T]he "interest of justice" empowers a judge to grant a new trial based on perceived unfairness of something not amounting to reversible error.

*United States v. Baptiste*, 8 F.4th 30, 39–41 (1st Cir. 2021).[40] So too here. The myriad errors during Michel's trial, even if this Court deems them insufficient in isolation to warrant a new trial, cumulatively leave no doubt that the Court should grant a new trial in the interest of justice. *Id.*

## VI. The Court should at least hold an evidentiary hearing on Michel's ineffective assistance of counsel and conflict-of-interest claims.

Although the current record is sufficient to mandate a new trial in the interest of justice, if the Court has any reservation, it should hold an evidentiary hearing so that Michel can further develop the record of his ineffective assistance of counsel arguments—both before and during trial—through targeted subpoenas for documents and testimony. *See, e.g.*, *United States v. Browne*, 619 F. Supp. 3d 100, 105 (D.D.C. 2022) (noting that "the typical practice" where a litigant raises ineffective assistance of counsel is to "'remand the claim for an evidentiary hearing'" (quoting

---

[40] *See also Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991) ("Since Rodriguez's claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all his allegations of ineffective assistance should be reviewed together."); *Pavulak v. United States*, 248 F. Supp. 3d 546, 564 (D. Del. 2017) ("the cumulative error doctrine allows a petitioner to present a standalone [constitutional] claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process. . . . In order to prevail on his cumulative error claim, movant must demonstrate that counsel's errors combined would be sufficient to show *Strickland* prejudice." (internal quotation marks omitted)); *Campbell v. United State*s, 364 F.3d 727, 736 (6th Cir. 2004) ("We acknowledge that trial-level errors that would be considered harmless when viewed in isolation of each other might, when considered cumulatively, require reversal of a conviction"); *United States v. Kladouris*, 739 F. Supp. 1221, 1230 (N.D. Ill. 1990) ("Sometimes, no single specific error counsel is sufficiently bad to justify a new trial. But, when considered cumulatively, enough 'not-too-bad' errors can amount to a one very bad trial. . . . That is what happened here."); *Harris ex. rel. Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (granting habeas relief based on cumulative effect of counsel's deficiencies: "We have previously recognized that 'prejudice may result from the cumulative impact of multiple deficiencies.'").

*United States v. Fennell*, 53 F.3d 1296, 1304 (D.C. Cir. 1995)).[41]

## CONCLUSION

Michel never had a chance. Two federal judges and the lead case agent all informed the jury of their views that he was guilty before the jury began deliberating. Michel's counsel was deficient throughout, likely more focused on promoting his AI program and saving himself from the contempt proceeding than zealously defending Michel. The net effect was an unreliable verdict. Michel respectfully requests that the Court grant a new trial on all counts in the interest of justice, so that the Court, Michel, and the public can have confidence in the verdict.

Dated: October 16, 2023

Respectfully submitted,

 */s/ Peter Zeidenberg*
Peter Zeidenberg (Bar No. 440803)
Michael F. Dearington (Bar No. 5223987)
David M. Tafuri (*pro hac vice*)
Sarah "Cissy" Jackson (*pro hac* vice)
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20006-5344
Telephone: (202) 857-6000
Facsimile:  (202) 857-6395
peter.zeidenberg@afslaw.com
michael.dearington@afslaw.com
david.tafuri@afslaw.com
cissy.jackson@afslaw.com

M. Scott Peeler (*pro hac vice*)
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas, 42nd Fl
New York, NY 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
scott.peeler@afslaw.com

*Counsel for Defendant Prakazrel Michel*

---

[41] Michel's trial counsel, Kenner and Israely, declined through their own counsel to speak with Michel's current counsel about the representation, further requiring an evidentiary hearing on the ineffectiveness and conflict issues. *See* Zeidenberg Decl. ¶ 17.