```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2      - - - - - - - - - - - - - - - x
        THE UNITED STATES OF AMERICA,
 3                                        Criminal Action No.
                    Plaintiff,           1:19-cr-00148-CKK-1
 4                                        Wednesday, March 29, 2023
        vs.                               8:54 a.m.
 5
        PRAKAZREL MICHEL,
 6
                    Defendant.
 7      - - - - - - - - - - - - - - - x
        _____
 8
                        TRANSCRIPT OF JURY TRIAL
 9         HELD BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
                     UNITED STATES DISTRICT JUDGE
10      _____

11      APPEARANCES:

12      For the United States:      JOHN DIXON KELLER, ESQ.
                                    U.S. DEPARTMENT OF JUSTICE
13                                  1301 New York Avenue NW
                                    Suite 1016
14                                  Washington, DC 20530
                                    (202) 598-2231
15                                  john.keller2@usdoj.gov

16                                  SEAN F. MULRYNE, ESQ.
                                    NICOLE RAE LOCKHART, ESQ.
17                                  U.S. DEPARTMENT OF JUSTICE
                                    Public Integrity Section
18                                  1400 New York Avenue, NW
                                    Washington, DC 20005
19                                  (202) 598-2816
                                    sean.mulryne@usdoj.gov
20                                  nicole.lockhart@usdoj.gov

21      For the Defendant:          DAVID ELLIOTT KENNER, ESQ.
                                    ALON ISRAELY, ESQ.
22                                  KENNER LAW FIRM
                                    16633 Ventura Boulevard
23                                  Encino, CA 91436
                                    (818) 995-1195
24                                  david@kennerlaw.com
                                    aicb@biaprotect.com
25      (Continued on Next Page)
```

```
 1     APPEARANCES (CONTINUED):

 2     For the Defendant:          CHARLES R. HASKELL, ESQ.
                                   LAW OFFICES OF CHARLES R.
 3                                 HASKELL, P.A.
                                   641 Indiana Avenue, NW
 4                                 Washington, DC 20004
                                   (202) 888-2728
 5                                 charles@charleshaskell.com

 6
       Court Reporter:            Lisa A. Moreira, RDR, CRR
 7                                Official Court Reporter
                                  U.S. Courthouse, Room 6718
 8                                333 Constitution Avenue, NW
                                  Washington, DC  20001
 9                                (202) 354-3187

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2         THE COURT:  All right.  Ms. Patterson is off at the
 3    ceremonial courtroom getting together the jurors.  We don't
 4     have everybody, and they're not all in exactly the same
 5      order, so I don't want to wait any longer so we'll go
 6                    forward.  So let me call the case.
 7       This is United States of America vs. Prakazrel Michel,
 8                         19-cr-148-1.
 9     If the counsel would identify themselves, starting with the
10                         government.
11         MR. KELLER:  Good morning, Your Honor; John Keller
12    along with Nicole Lockhart and Sean Mulryne.
13         THE COURT:  Good morning.
14         And defense counsel.
15         MR. KENNER:  Good morning, Your Honor; David
16    Kenner along with Charles Haskell for the defendant.
17         THE COURT:  All right.  Good morning.
18         MR. HASKELL:  Good morning.
19         MR. KENNER:  Good morning.
20         THE COURT:  Okay.  So I did issue the order on Mr.
21    Giuliani.  I understand that you're not going to be calling
22    Mr. Guo.
23         MR. KENNER:  That's correct, Your Honor.  I did
24    meet and confer with his counsel at your suggestion, and he
25    has advised that he would advise his client to take the
```

1     Fifth Amendment.  As such, I will not be calling him.

2                THE COURT:  All right.

3                So what I'm going to do, then, is I'll indicate

4     which juror we'll note is not exactly in the order.  We'll

5     go back and make sure that they are, but it doesn't seem

6     useful to wait.  So we're going to get, it will be juror

7     0758, which is No. 57 on the list.  We don't have 56 at this

8     point, unless they've shown up in between.

9                All right.  If you would step up over here,

10    please, to my left.

11               All right.  If you would step up, and go ahead and

12    sit down.  Take your mask off so we can hear what you're

13    saying, and if you'd speak into the microphone.

14               And this is Juror No. 0758, and the questions are

15    13, 14, 16, 22, 28, 33.  Let me just make sure I've got

16    those right.

17               All right.  So let me move to the questions.  13

18    relates to government witnesses that were introduced, some

19    of which may testify, some of which may -- their names may

20    simply come up.

21               Were any of the witnesses that were identified

22    known to you personally as opposed to by reputation?

23               PROSPECTIVE JUROR 0758:  I recognized several.

24    I'm a little bit confused about that.  There's one I did

25    meet several times just given my previous job.

```
1              THE COURT:  Okay.  And who was that?
2              PROSPECTIVE JUROR 0758:  Dr. Ben Carson.
3              THE COURT:  Okay.  And how did you meet him?  I
4      mean, in what capacity?  Can you explain?
5              PROSPECTIVE JUROR 0758:  Sure.  So I previously
6      worked on the Hill for a member of Congress from South
7      Florida, and he was a chairman of the Housing Appropriations
8      Subcommittee; and Dr. Carson and him would meet a few times
9      in the office, and I would kind of staff that meeting.
10             And we also did an event with him in Miami to talk
11     about housing.
12             THE COURT:  So was it all business related and --
13             PROSPECTIVE JUROR 0758:  Yes.
14             THE COURT:  Did you ever socialize with him?
15             PROSPECTIVE JUROR 0758:  Just like exchanging
16     pleasantries in the beginning.  No, it's kind of a...
17             THE COURT:  Okay.  When would be the last time
18     that you would have had any contact with him?
19     Approximately.
20             PROSPECTIVE JUROR 0758:  2017 or '16.  2017.
21     2017.
22             THE COURT:  Okay.  Obviously we're asking this
23     question to see whether or not, if this person is called or
24     if their name comes up, you know, in an email or some
25     document, whether or not you have views about the person
```

1     such that you would already have decided about their

2     credibility as opposed to waiting until they come to the

3     courtroom and you hear what their testimony is and make a

4     decision at that point.

5              So do you think you can separate out whatever

6     contact you had with him and make an independent decision,

7     assuming that this person gets called?

8              PROSPECTIVE JUROR 0758:  Yes.

9              THE COURT:  All right.  And is there anybody else

10    personally that you know, or are the rest by reputation or

11    news or something?

12             PROSPECTIVE JUROR 0758:  No, just by news.

13             THE COURT:  And of the ones that were not personal

14    but by reputation and news or some other way of finding out,

15    which ones do you recall?

16             PROSPECTIVE JUROR 0758:  Do I recall?

17             THE COURT:  Yes.

18             PROSPECTIVE JUROR 0758:  I'm going off memory, but

19    H.R. McMaster was on there, Steve Wynn, the Trump family.

20             THE COURT:  Do you need your card?

21             PROSPECTIVE JUROR 0758:  Sure, if you don't mind.

22             THE COURT:  Let me have my law clerk -- it's sort

23    of awkward with the Plexiglas.  Let me give it to you so

24    that you can refresh your memory as to who you put down.

25             PROSPECTIVE JUROR 0758:  Steven Bannon was on

 1     there, Rudy Giuliani, Matt Pottinger, Jeff Sessions.  I

 2     think Chris Christie was on there, Patrick Gaspard, Senator

 3     Grassley, and I think a few celebrities that are probably

 4     more well known.

 5              THE COURT:  Okay.  But this is still 13, right?

 6     Not 14.

 7              PROSPECTIVE JUROR 0758:  Oh, sorry.  13 would just

 8     be McMaster and Mr. Wynn.

 9              THE COURT:  Okay.  So we'll combine 13 and 14.

10     These are individuals that you don't know personally but

11     you've heard about them and have -- know something about

12     them from the news or from other things.

13              Do you have particular views about them one way or

14     the other?  And I'm talking about -- we're getting at the

15     issue, again -- Mr. Giuliani will not be testifying.  There

16     may be some material that would come in that would have, you

17     know, his name in there.  But in terms of the others, and we

18     don't know whether they'll all be called, but let's assume

19     that they would be, again, the question is:  Can you put

20     aside whatever your opinions are about them and make a

21     decision based on, you know, what they have to say when they

22     actually come in, depending on what they're asked?

23              PROSPECTIVE JUROR 0758:  Yes, I think so.

24              THE COURT:  All right.  So you don't have any

25     concerns about your opinions in any way influencing your

1    decision about what they would have to say in this

2    particular case?

3              PROSPECTIVE JUROR 0758:  No.

4              THE COURT:  All right.  I think that takes care of

5    13 and 14.

6              16 is whether you or somebody close to you is

7    involved with law enforcement.  Is that you or somebody

8    else?

9              PROSPECTIVE JUROR 0758:  Somebody else.

10             THE COURT:  What's the relation?

11             PROSPECTIVE JUROR 0758:  My brother and my

12   brother-in-law.

13             THE COURT:  Okay.  And what's the law enforcement

14   agency or connection?

15             PROSPECTIVE JUROR 0758:  My brother is the City of

16   Hollywood Florida Police Department.  And then my

17   brother-in-law just retired, NYPD.

18             THE COURT:  Okay.  In terms of your brother, do

19   you know what -- if he's got a particular assignment within

20   the police department?

21             PROSPECTIVE JUROR 0758:  He was a -- I guess like

22   a street cop for years, and then became a detective, and now

23   just this month he's back on the streets.

24             THE COURT:  Okay.  When he was a detective, were

25   there particular crimes that he was investigating?

```
 1              PROSPECTIVE JUROR 0758:  Homicides.

 2              THE COURT:  All right.  And in terms of your

 3    brother-in-law, does he have particular assignments that you

 4    know of?

 5              PROSPECTIVE JUROR 0758:  He was on the street for

 6    years.  He was in some sort of accident, and then he

 7    basically joined the medical unit, I believe, at NYPD, and

 8    did that for all the time I've known him.

 9              THE COURT:  Okay.  So we will be having FBI agents

10    and law enforcement people testifying.  So, again, we want

11    to make sure that they are treated like everybody else, that

12    you make no decisions about their credibility, more

13    credible, less credible, before they actually testify.  So

14    sometimes with the law enforcement connection in the family,

15    that might influence you.

16              So can you separate out, you know, the work that

17    your brother and brother-in-law did and treat anybody from

18    law enforcement who comes to testify as you would anybody

19    else, making an independent decision as to their

20    credibility?

21              PROSPECTIVE JUROR 0758:  Yes, I think so.

22              THE COURT:  All right.  Any discussions you've had

23    with your brother or brother-in-law about trials or the law,

24    criminal justice or something?

25              PROSPECTIVE JUROR 0758:  I think my brother's just
```

1    mentioned cases he's worked on; I mean, just in general like

2    what he sees at a crime scene, stuff like that.

3            THE COURT:  Okay.  Anything about those

4    discussions that you think would influence you in this case?

5            PROSPECTIVE JUROR 0758:  I don't think so.

6            THE COURT:  Okay.

7            All right.  22 is whether you or members of your

8    close family or friends have worked in campaign fundraising

9    or in campaign finance.  So part of it is if you've worked

10   in campaigns, but have you actually been involved in

11   campaign finance or actual fundraising?  Is it you or

12   somebody else?

13           PROSPECTIVE JUROR 0758:  Me.

14           THE COURT:  Okay.  And so have you -- which one,

15   in terms of campaign finance, which is slightly different

16   than actually doing the fundraising?

17           PROSPECTIVE JUROR 0758:  So I served as a kind of

18   campaign manager for my own boss when he was running for

19   re-election probably in '08 or 2010.  And then I've kind of

20   taken leave to work on his campaigns when I was on the Hill.

21   You know, attended fundraisers with him, picked up checks

22   from folks.  I personally donated.

23           I think that covers it.

24           THE COURT:  Okay.  So in terms of your fundraising

25   activities on behalf of your candidate, what did you

1  actually do?  I mean, did you contact donors?  What was sort

2  of your job as it relates to the fundraising?

3  　　　　　PROSPECTIVE JUROR 0758:  Sometimes it was reaching

4  out to donors, kind of requesting support.  Other times it

5  was going to events, kind of interacting, engaging with

6  donors.  Discussing, I guess, campaign strategy with the

7  candidate as well.

8  　　　　　THE COURT:  Okay.  And that was in 2008 to 2010,

9  somewhere in there?

10  　　　　　PROSPECTIVE JUROR 0758:  Yes.  So I left the Hill

11  in 2017, and so between '04 to '17 I was kind of involved in

12  I think various aspects of that.

13  　　　　　THE COURT:  Okay.  How much did you know about

14  sort of the legal issues around campaign fundraising and

15  campaign finance?

16  　　　　　PROSPECTIVE JUROR 0758:  I mean, I know there's

17  limits that individuals can donate to or limits placed on

18  individuals, placed on PACs.  I think it depends, too, if

19  you're giving to a -- you know, hard or soft money, I guess,

20  too, is part of it as well.  I don't know the exact details,

21  but I know that's a piece of that.

22  　　　　　THE COURT:  All right.  Again, since you did some

23  campaign financing and I guess fundraising, can you put

24  aside, you know, what you know about, you know, how you go

25  about appropriately to raise funds?  And, you know, what we

1    don't want is to have sort of an expert in the jury room

2    saying, "Well, it should be this way or that way."  We want

3    you to make a decision about what gets presented here in the

4    courtroom as to what's appropriate and what may not be

5    appropriate.

6              Can you do that?  In other words, put aside what

7    your own experiences are and make a decision based on the

8    evidence in the courtroom?

9              PROSPECTIVE JUROR 0758:  I think so, yes.

10             THE COURT:  Okay.  28 is that one of the offenses

11   charged is a conspiracy to violate and actually violations

12   of the law call the Foreign Agents Registration Act.

13             Have you or any person or entity with which you've

14   come in contact with been the subject to this law or

15   considered this law at length?  In other words, getting your

16   familiar -- if you're familiar with it and in what context.

17             PROSPECTIVE JUROR 0758:  So, again, when I was on

18   the Hill, my Congressman then was on the committee that

19   funds kind of State Department, foreign aids.  We met with a

20   lot of embassy folks or just kind of lobbyists representing

21   a foreign company or foreign governments or foreign

22   entities.  And I know I've engaged with a few folks that are

23   kind of registered under FARA as foreign agents.

24             THE COURT:  How familiar did you become with the

25   law?  Was it sort of a passing thing, or did you -- would

1     you view yourself as really fairly knowledgeable about it?

2            PROSPECTIVE JUROR 0758:  I mean, I think I

3     understand that you have to -- if you represent a foreign

4     government or agency, you have to kind of register.  That's

5     kind of the basic that I know at least.

6            THE COURT:  All right.

7            PROSPECTIVE JUROR 0758:  I know they have to

8     disclose, too, whenever they would meet with me as part of

9     their registration.

10           THE COURT:  Okay.  And, again, the same question:

11    You'll be given instructions as to, you know, what the

12    requirements are under FARA.  You'll be listening to

13    evidence and you'll be, you know, required to apply the law

14    to whatever the evidence is.

15           Again, can you put aside what you may have had

16    experience with when you were working and make a decision

17    based on what gets presented in the courtroom, not what you

18    may know separately?

19           PROSPECTIVE JUROR 0758:  I think so, yes.

20           THE COURT:  All right.  And the last question is:

21    You've served as a juror in the past; is that correct?

22           PROSPECTIVE JUROR 0758:  Yes.

23           THE COURT:  And so to some degree you have some

24    sense of how you make decisions based on what's presented in

25    the courtroom and not what you may know separately.

```
 1                  Were you able to do that when you were a juror?
 2                  PROSPECTIVE JUROR 0758:  Yes.
 3                  THE COURT:  Okay.  And how many times have you
 4      been a juror in a criminal case?
 5                  PROSPECTIVE JUROR 0758:  I think just one.
 6                  THE COURT:  Okay.  And how long ago was that,
 7      approximately?
 8                  PROSPECTIVE JUROR 0758:  I was 18, so 23 or -4
 9      years ago.
10                  THE COURT:  Okay.  And where was that?
11                  PROSPECTIVE JUROR 0758:  In Florida, in Miami.
12                  THE COURT:  Do you remember what the nature of the
13      charge was?
14                  PROSPECTIVE JUROR 0758:  I think it was a domestic
15      violence case.
16                  THE COURT:  All right.  Without telling us what
17      the verdict was, do you recall whether the jury actually
18      reached a verdict?
19                  PROSPECTIVE JUROR 0758:  Yes.
20                  THE COURT:  Okay.  And were you the foreperson of
21      the jury?
22                  PROSPECTIVE JUROR 0758:  No.
23                  THE COURT:  Was there anything about your
24      participation as a juror, either at the trial proceedings
25      themselves or your -- you know, working with the other
```

1    jurors and your deliberations that you think would affect

2    your consideration of the evidence in this case?

3              PROSPECTIVE JUROR 0758:  No.

4              THE COURT:  All right.  Mr. Keller.

5              MR. KELLER:  Thank you, Your Honor.

6              Good morning, sir.

7              PROSPECTIVE JUROR 0758:  Good morning.

8              MR. KELLER:  Going in kind of reverse

9    chronological order there, starting with the jury trial in

10   Florida.  If you remember, roughly how long were

11   deliberations in that case?

12             PROSPECTIVE JUROR 0758:  The same day.  A few

13   hours maybe, but it was the same day.

14             MR. KELLER:  And then in terms of your work on the

15   Hill, did you do any work or have any engagement with

16   anybody at the Department of Justice or any issues related

17   to legislation targeting enforcement, law enforcement, DOJ

18   work, anything like that?

19             PROSPECTIVE JUROR 0758:  One of the subcommittees

20   has oversight over DOJ, and we'd get requests, like the COPS

21   program, which I believe is a kind of state or nationwide

22   program to fund police officers at jurisdictions.  I think

23   we would support something like that.  But that's like the

24   extent, I think, of DOJ engagement.

25             MR. KELLER:  I just want to make sure I

1  understand.  You were working directly for a member in their

2  congressional office back in '08, 2010, sometime around

3  then?

4          PROSPECTIVE JUROR 0758:  '04 to '17.

5          MR. KELLER:  Okay.  So you stayed in the same

6  member's office the whole time, you just did different

7  committee work --

8          PROSPECTIVE JUROR 0758:  Correct.

9          MR. KELLER:  -- as part of that member's office?

10          PROSPECTIVE JUROR 0758:  Correct.

11          MR. KELLER:  Who is the member?

12          PROSPECTIVE JUROR 0758:  Mario Diaz-Balart.

13          MR. KELLER:  And then you since left the Hill and

14  now you're working in public policy with Amazon; is that

15  right?

16          PROSPECTIVE JUROR 0758:  Correct.

17          MR. KELLER:  In terms of Amazon, do you have

18  contact with government agencies, DOJ, or others?

19          PROSPECTIVE JUROR 0758:  DOT, FAA, MARAD.

20          MR. KELLER:  And what specific issues are you in

21  contact with the federal government on?

22          PROSPECTIVE JUROR 0758:  Aviation and kind of

23  supply chain ports and maritime issues.

24          MR. KELLER:  In terms of -- I know the judge

25  talked to you about a number of different topics, but in

1    terms of things that you're aware of, whether it's -- well,

2    let's start with witnesses -- whether you're aware of

3    certain individuals' names or reputation.  I think you heard

4    in the beginning of the case when we were reading names out,

5    there are a lot of very visible people who are going to be

6    mentioned in this trial, including former presidents.

7         So if the judge is to instruct you during trial,

8    again, that you would need to separate any of your prior

9    opinions or any biases or any views, positive or negative,

10   about these people and not hold those against the defendant

11   and make your decision in this case solely based on evidence

12   that is presented in the courtroom, would you be able to do

13   that?

14        PROSPECTIVE JUROR 0758:  I think so, yes.

15        MR. KELLER:  And same question with respect to any

16   knowledge of FARA or campaign finance.  Again, if you're

17   instructed by the judge as to what the law is that governs

18   the outcome in this case, can you put aside your prior

19   knowledge and experience and rely only on the legal

20   instructions that the judge gives you and the evidence

21   that's presented in the courtroom?

22        PROSPECTIVE JUROR 0758:  I think so, yes.

23        MR. KELLER:  Nothing further, Your Honor.

24        THE COURT:  Mr. Kenner.

25        MR. KENNER:  Thank you, Your Honor.

1       Good morning.

2       PROSPECTIVE JUROR 0758:  Good morning.

3       MR. KENNER:  Have you ever been to any meetings

4  with a president?

5       PROSPECTIVE JUROR 0758:  No, not like a one-on-one

6  meeting.  You know, whenever the sports teams win a

7  championship, there will be some sort of like White House

8  event, and I've attended a few of those under President Bush

9  and Obama.  Like when the Miami Heat won a championship in

10  the 2000s, I was at the White House for a big event.  But

11  that's it.

12       MR. KENNER:  Okay.  Did you have a relationship

13  with President Obama more than just having seen him at these

14  kinds of events?

15       PROSPECTIVE JUROR 0758:  No.

16       THE COURT:  Mr. Kenner, again, keep your voice up

17  a little bit.

18       MR. KENNER:  I'm sorry, Your Honor.

19       THE COURT:  Thank you.

20       MR. KENNER:  Let me ask you this:  Do you recall

21  when the first time was that you met with somebody who had

22  to register under FARA as a result of meeting with you?

23       PROSPECTIVE JUROR 0758:  So if I can back up and

24  explain.

25       THE COURT:  Sure.

1              PROSPECTIVE JUROR 0758:  So my boss and his

2       brother both served in Congress.  The person that I'm

3       thinking who registered, his name is Jordan.  Jordan used to

4       work for the Congressman's brother, so I knew him as a

5       staffer when I started on the Hill back in '04.

6              And then he left the Hill, and then went to work

7       for the embassy of Morocco or something Morocco related.

8       And that's when you have to register for FARA.  And he was

9       more involved in kind of lobbying my office when my boss

10      served on that subcommittee that has jurisdiction over the

11      State Department and USAID, which would probably be around

12      2010.

13             MR. KENNER:  Okay.  Is that the only person that

14      you can recall that you met with that had to register under

15      FARA?

16             PROSPECTIVE JUROR 0758:  No.

17             MR. KENNER:  Can you tell me something about the

18      others?

19             PROSPECTIVE JUROR 0758:  Sure.  So I only can

20      recall one other person, Congresswoman Ros-Lehtinen, she is

21      from South Florida.  I interned for her when I first came to

22      D.C., and I think she has since retired.  But I think she

23      recently, from what I remember on the press report or

24      something, had to register under FARA for -- I forget what

25      government she was representing.

```
 1                MR. KENNER:  Okay.  Anybody else?

 2                PROSPECTIVE JUROR 0758:  No.

 3                MR. KENNER:  Did you do any investigation of your

 4      own with regard to what FARA required?

 5                PROSPECTIVE JUROR 0758:  No.  I think just what I

 6      read or have seen in news reports that have just come across

 7      my desk, but nothing proactive.

 8                MR. KENNER:  All right.  Have you ever read the

 9      FARA law?

10                PROSPECTIVE JUROR 0758:  No.

11                MR. KENNER:  Would you be willing to listen to Her

12      Honor's jury instructions when she explains those laws?

13                PROSPECTIVE JUROR 0758:  Yes.

14                MR. KENNER:  And you would follow her instruction

15      on dealing with that and not rely in any way on your own

16      personal background?

17                PROSPECTIVE JUROR 0758:  Yes.

18                MR. KENNER:  Has your brother or brother-in-law

19      ever testified in cases?

20                PROSPECTIVE JUROR 0758:  I don't know for sure, to

21      be honest.

22                MR. KENNER:  Okay.  Then would it be fair to say

23      you have not had any discussions about testifying in court

24      with them?

25                PROSPECTIVE JUROR 0758:  No.  About this case, no.
```

```
1              MR. KENNER:  Not about this case --
2              PROSPECTIVE JUROR 0758:  No.
3              MR. KENNER:  -- about any case.
4              PROSPECTIVE JUROR 0758:  No.  That I can recall,
5    no.
6              I'm assuming he has, but I don't remember a story.
7              MR. KENNER:  Okay.  I want to explore with you, on
8    a number of questions that you've been asked by the judge
9    about whether you think you can set something aside and
10   whether you think you can do a variety of things, I often
11   heard you answering, "I think so."  Like when the judge
12   asked you, could you put aside your experience, personal
13   experience with regard to the issues in this case and base
14   your verdict only on what comes into evidence in this court,
15   and your response, as I recall it, was "I think so."
16             What do you mean when you say you think so?  Does
17   that mean you'll try but you're not sure you can?
18             PROSPECTIVE JUROR 0758:  I think I said "I think
19   so, yes," or "yeah."  So, I mean, yes, I will try.  I don't
20   know the evidence or exactly the -- what's going to be
21   presented, but I think my inclination is yes.
22             MR. KENNER:  Thank you.
23             THE COURT:  Did you have to do that when you were
24   a juror?  I know it was many years ago.  So you've been a
25   juror, so you know generally in terms of what the role of a
```

1    juror is, although a totally different case.  But were you

2    able to separate out what your own views about it might have

3    been from what was presented in the courtroom?

4              PROSPECTIVE JUROR 0758:  Yes, then I was, yes.

5              MR. KENNER:  Thank you.

6              Do you have any views of your own regarding the

7    campaign financing and regulatory scheme?

8              PROSPECTIVE JUROR 0758:  Just that it's pretty

9    complicated.

10             MR. KENNER:  Does that apply to both FARA and

11   Federal Election Commission rules?

12             PROSPECTIVE JUROR 0758:  I'm sure FARA's

13   complicated.  I just don't know enough about that.

14             I probably know a little bit more about the

15   campaign side.

16             MR. KENNER:  I'm sorry?  I didn't hear you.

17             PROSPECTIVE JUROR 0758:  I'm sure FARA's

18   complicated, but I know a little bit more about the campaign

19   side, which I think is also complicated --

20             MR. KENNER:  All right.

21             PROSPECTIVE JUROR 0758:  -- or complex.

22             MR. KENNER:  Are you -- do you have any knowledge

23   of -- or recollection of anybody that you've come into

24   contact with that was accused of violations of the campaign

25   finance law?

1          PROSPECTIVE JUROR 0758:  No.

2          MR. KENNER:  In your work for the Congressman, can

3     you tell me generally what kinds of assignments or what

4     subject matters you worked on?

5          PROSPECTIVE JUROR 0758:  So the last few years,

6     which was probably the most substantive, I was his deputy

7     chief of staff and legislative director primarily focused on

8     kind of overseeing appropriations issues, so government

9     funding issues, with a focus on kind of defense, housing,

10    and transportation.

11         MR. KENNER:  Is there anything about those

12    experiences that would cause you to feel bias or prejudice

13    about any of the subject matters that you worked on?

14         PROSPECTIVE JUROR 0758:  No.

15         MR. KENNER:  Given the fact that you have both a

16    brother and a brother-in-law involved in law enforcement,

17    has that left you with a positive or a negative or neither

18    view about law enforcement?

19         PROSPECTIVE JUROR 0758:  I would say positive.

20         MR. KENNER:  Positive view?

21         Do you have an opinion with regard to law

22    enforcement officers being more truthful than other people?

23         PROSPECTIVE JUROR 0758:  I think like all

24    professions, there's good and bad.  I think I know my

25    brother and brother-in-law, so I would -- I see them as good

24

1    people, so I would maybe extrapolate that to others, but I

2    think like all professions, there's good and bad.

3              THE COURT:  So I guess the question -- getting

4    back to the question of since we have law enforcement

5    testifying, can you treat them as you would anybody else?

6    In other words, don't decide before they get up on the stand

7    as to whether they're truthful or not truthful.  You're

8    going to give them greater weight or lesser weight -- in

9    this case I guess maybe greater weight, or wait until you

10   hear what they have to say like you would with any other

11   witness?  Can you do that?

12             PROSPECTIVE JUROR 0758:  Yes, I think so.

13             MR. KENNER:  Let me ask you with regard to your

14   current position with Amazon, can you describe generally

15   what kinds of issues you work with?

16             PROSPECTIVE JUROR 0758:  Sure.  So I'm a lobbyist

17   for their transportation team supporting our aviation

18   business, so air cargo, big airplanes that fly packages, and

19   also the business that's responsible for moving cargo on

20   ocean carriers -- on ocean vessels, through ports into our

21   fulfillment centers or warehouses.

22             MR. KENNER:  Okay.  Are you registered in any

23   capacity as a lobbyist?

24             PROSPECTIVE JUROR 0758:  I am, yes.

25             MR. KENNER:  And in what capacity are you

1    registered?

2            PROSPECTIVE JUROR 0758:  Through the House and the

3    Senate database that I need to register, through the

4    lobbyist disclosure database.

5            MR. KENNER:  Have you filed anything in connection

6    with FARA --

7            PROSPECTIVE JUROR 0758:  No.

8            MR. KENNER:  -- with respect to your job?

9            PROSPECTIVE JUROR 0758:  No.

10           MR. KENNER:  Does your job, what you've described

11    that you do, does that apply to countries outside of the

12    United States, or just domestic companies?

13           PROSPECTIVE JUROR 0758:  No, my focus is the U.S.

14    only.

15           MR. KENNER:  I have nothing further, Your Honor.

16           THE COURT:  All right.

17           MR. KELLER:  Your Honor, just one area of

18    follow-up.

19           Sir, with respect to your work on the Hill, it

20    sounds like you mentioned a few different members from

21    Florida that you've had interactions with.  I think you

22    mentioned Ms. Ros-Lehtinen.

23           Have you had any -- or a number, but have you had

24    any interactions with Representative Matthew Gaetz?

25           PROSPECTIVE JUROR 0758:  I mean, he's been in

1   meetings that I've been in.  I've seen him around the halls,

2   but not like a one-on-one conversation.

3            MR. KELLER:  Okay.  Nothing further, Your Honor.

4            THE COURT:  All right.  You can step down and

5   we'll give you further instructions.  All right?

6            PROSPECTIVE JUROR 0758:  Okay.

7            Can I just say I have travel plans on April 28th

8   for two weeks in Hilton Head, South Carolina.  I was going

9   to work remote, but I just wanted to flag that.

10           THE COURT:  I'm sorry, what was the 28th?

11           PROSPECTIVE JUROR 0758:  April 28th for two weeks

12   in Hilton Head, South Carolina.

13           THE COURT:  I hope we're done by then.

14           PROSPECTIVE JUROR 0758:  So am I.

15           THE COURT:  I will say to you obviously it's hard

16   to tell about deliberations, but let me just ask, is this a

17   vacation or --

18           PROSPECTIVE JUROR 0758:  It is, yes.

19           THE COURT:  So if you were -- I want to make sure,

20   if, for some reason, we're still in the trial in the sense

21   that you're at that point say deliberating, I would want to

22   make sure that your plans to go to Hilton Head would not

23   affect your participation as a juror in terms of rushing

24   things along as a judgment as opposed to taking the time

25   that's necessary.

 1            Can I count on you to take the time that's

 2    necessary should that come up?

 3            PROSPECTIVE JUROR 0758:  Yes.  I prefer to finish

 4    sooner, if possible, but yes.

 5            THE COURT:  Okay.  As long as you're not rushing

 6    things.

 7            PROSPECTIVE JUROR 0758:  Right.

 8            THE COURT:  I don't know that that's going to be a

 9    problem.  It's hard to foretell.

10            All right.  If you can step down.

11            PROSPECTIVE JUROR:  Thank you.

12            THE COURT:  Any issue with him?

13            MR. KELLER:  Not from the government, Your Honor.

14            MR. KENNER:  Not from the defense, Your Honor.

15            THE COURT:  All right.

16            I think we're going to now get the one in between,

17    0220.

18            The last juror needs to leave by 4:00 to catch a

19    flight, so we'll see where we are.  But he has -- well, let

20    me just ask a question.

21            If you would step up over here.  And I do need to

22    speak to my law clerk again for a quick second.

23            If you would come on over here to the left.  If

24    you can go ahead and step up and make yourself comfortable.

25    Put your things down, et cetera.  Take your time.  No rush.

```
 1              Take your mask off just so we can hear what you're

 2     saying.

 3              PROSPECTIVE JUROR 0220:  Okay.

 4              THE COURT:  So this is Juror 0220, and the numbers

 5     are 5, 13, 14, 16, 20, 21, 22, and 39.

 6              All right.  Let me start with 39, which is whether

 7     you have any religious, moral beliefs, social, political,

 8     philosophical or other beliefs that would interfere with you

 9     being a member of the jury in returning a fair and impartial

10     verdict solely on the evidence.  So could you -- what is

11     your concern?

12              PROSPECTIVE JUROR 0220:  That in general I believe

13     that juries should be able to also rule on constitutionality

14     and fact --

15              MR. KENNER:  Your Honor, I can't hear.

16              THE COURT:  You need to speak up into the

17     microphone.

18              PROSPECTIVE JUROR 0220:  Oh, I'm sorry.

19              Like I put in the note, I don't think it would be

20     an issue in this case, but as a normative belief, I believe

21     that juries should be able to rule on constitutionality of

22     law and law itself, not merely the facts of a case.

23              THE COURT:  Well, your role as a juror is to make

24     a decision based on the facts.  The Court tells you what the

25     law is, and then you're required -- and there may be issues
```

1    that have been discussed outside of the presence of the jury

2    about the law.  You're expected to accept it and to apply it

3    to the facts that the jury finds.

4             So can you do that, or are you indicating you

5    can't?

6             PROSPECTIVE JUROR 0220:  I'm saying that in this

7    particular case I don't see any issue with it.

8             THE COURT:  What kind of a case would you see it

9    as an issue?

10            PROSPECTIVE JUROR 0220:  What I'm saying -- this

11   is almost purely a theoretical idea that I have.  I can't

12   actually give you a case that I would have.

13            THE COURT:  Okay.

14            PROSPECTIVE JUROR 0220:  I'm not a lawyer, and I

15   have not read the law, and so I don't know the full scope of

16   the law.

17            THE COURT:  Okay.  Well, what I want to make sure

18   is that, one, you would be willing to reach a judgment.  You

19   don't have beliefs that you're not allowed to judge other

20   people, so I take it you don't have that belief?

21            PROSPECTIVE JUROR 0220:  No.

22            THE COURT:  All right.  So the question is, I need

23   to have you --

24            PROSPECTIVE JUROR 0220:  In -- what I'll say, I

25   will retract that particular number insofar as in this

1    particular case I would have absolutely no social,

2    political, religious belief that would not allow me to

3    follow your directions and the Court's directions in

4    providing a fair --

5              THE COURT:  Okay.  So just to make sure so we

6    don't have to go through this.

7              I just want to make sure that you -- even if you

8    didn't agree with the law as I give it to you, that you

9    would apply it as I give it to you.  Your role is not to

10   question the law.  Your role is to decide the facts, and

11   then apply the law as it's stated to you.

12             So do you think you can do that?

13             PROSPECTIVE JUROR 0220:  Yes.

14             THE COURT:  All right.  Then let me move back to

15   some of the earlier questions, which would be 5, which is,

16   are you familiar with the facts of this case?  It doesn't

17   matter what the source is.

18             So are you familiar with it?

19             PROSPECTIVE JUROR 0220:  I am familiar with the --

20   so the specifics of this particular case?  No.  Insofar as

21   having read about multiple cases of people trying to use the

22   previous administration and people -- corruption issues, I

23   have read enormous numbers of articles referring to that.

24             I have not looked up this case.  I haven't tried

25   to dig into it while I've been on the jury.  And so I don't

1    know whether there would be facts of this case that would

2    sort of like ping off of other things that I've read.  But I

3    am an obsessive political junky, and so...

4              THE COURT:  So, again, part of the question would

5    be you don't remember reading anything specifically about

6    this case, I take it?

7              PROSPECTIVE JUROR 0220:  No, but there are lots

8    of -- like -- there are names that popped up that I've read.

9              THE COURT:  Right.  Which we'll get to in a

10   minute.

11             PROSPECTIVE JUROR 0220:  Yeah.

12             THE COURT:  But in terms of -- have you -- do you

13   remember reading anything about the defendant --

14             PROSPECTIVE JUROR 0220:  No.

15             THE COURT:  -- specifically in terms of his --

16             PROSPECTIVE JUROR:  No.

17             THE COURT:  No?  Okay.  So let's assume that

18   you're chosen to be a part of the jury, and then there's

19   something that comes up in the evidence that, you know,

20   prompts your memory of something that you might have read

21   about the case or from your perspective you connect the two.

22   Can you tell me that you can separate these things out and

23   not be influenced by what it is you read?

24             We don't want you bringing in, you know,

25   third-party views that it may have provided or your personal

1    views.  I mean, this is not an issue where you personally

2    decide whether this is a good idea or not.  This has to do

3    with does the government prove beyond a reasonable doubt

4    each of the elements, and you have to make the decision

5    based on what's presented in the courtroom.

6            So we want to make sure that there aren't outside

7    views -- everybody has opinions, so that's not -- I'm not

8    expecting -- we're not expecting people to come with no

9    opinions.  But what we want to make sure is that your

10   opinions don't inform as opposed to the evidence and the law

11   as you apply it don't inform, you know, what you're

12   deciding.

13           PROSPECTIVE JUROR 0220:  I mean, I don't think

14   that in reference to the defendant I have any particular

15   information, biases, or anything of that nature associated

16   with the defendant.

17           THE COURT:  Okay.  Then let me move on to -- 13

18   and 14 are related to indicating particular witnesses that

19   may or may not be called, but we wanted to make sure if

20   people either knew them personally or by reputation that we

21   would have this information.  So they may be called; they

22   may not be called.  Or it may be only that they show up in

23   documents or anything and not actually testify.

24           So let me ask you, between the government's

25   witnesses as they've introduced it, or the defense

1    witnesses, do you know any of these people personally?

2              PROSPECTIVE JUROR 0220:  I don't know any of these

3    people personally.

4              MR. KENNER:  Your Honor, I'm having trouble

5    hearing.

6              PROSPECTIVE JUROR 0220:  I'm sorry.  I don't know

7    any of these people personally.

8              MR. KENNER:  Thank you.

9              THE COURT:  Okay.  So it would be more by

10   reputation or what you've read; is that correct?

11             PROSPECTIVE JUROR 0220:  Yes.

12             THE COURT:  So, again, what we want to have happen

13   here is -- and this would be true of all witnesses -- is for

14   you to not decide it before they get up on the stand,

15   whether you know the name by reputation or whatever their

16   status is or something, that you either are more inclined to

17   believe them or not believe them before they open their

18   mouth and say anything.

19             What we want you to do is to basically, you know,

20   wait -- listen to the testimony, what they have to say, and

21   make a decision based on their credibility about what they

22   say, not what you may have read or heard in some other --

23   you know, some other venue.  So that's the purpose of, you

24   know, asking you these questions.

25             So you've -- obviously you've indicated --

```
 1    which -- is there somebody in particular or a couple of
 2    people in particular that you recognize?
 3              PROSPECTIVE JUROR 0220:  When the name James
 4    Broidy was named, I actually had trouble figuring out who
 5    exactly that was, but I had an almost complete sense of oh,
 6    that's an awful human being.  And it took me a while.  So
 7    that's why I wrote down his name, because if I just had that
 8    association in my head just hearing his name --
 9              THE COURT:  Okay.  So you've heard of him before?
10              PROSPECTIVE JUROR 0220:  Well, if we're referring
11    to the person that I think we're referring to, which is the
12    former finance head of the RNC -- is that who we're
13    referring to?
14              THE COURT:  Yes.
15              PROSPECTIVE JUROR 0220:  Okay.  Then I would
16    probably be able to put that aside if I was sitting with
17    testimony, but I put that down literally because I --
18              THE COURT:  And we want you to.  I mean, we wanted
19    to explore.  That's why we brought this up.
20              I mean, the idea is that you may, you know, have
21    views -- negative or positive -- about particular people.
22    So whether they're trustworthy based on this third-party
23    information that you're getting, we would want you to wait
24    to consider whether, you know, a particular thing that
25    they're testifying to, whether it's accurate, and whether
```

1    you would credit it or not credit it based on your own

2    decision, listening to them in court, and not based on what

3    you may have read by third parties.

4          So do you think you could do that?  Do you

5    understand what I'm asking?

6          PROSPECTIVE JUROR 0220:  No, no, no, I understand

7    what you're saying.

8          Yes, I believe I could do that.

9          THE COURT:  I'm sorry, yes?

10         PROSPECTIVE JUROR 0220:  Yes.

11         THE COURT:  Okay.  Do you have any -- I mean,

12   nobody ever does things 100 percent guaranteed, but is your

13   view that you would be able to do that?

14         What we want you to do is to make your own

15   decision based on your observations and listening to it and

16   not based on what some other people have said.  I mean,

17   that's really what it boils down to.

18         PROSPECTIVE JUROR 0220:  No, I understand.

19         Like I said, I've been involved in politics for a

20   long time, so it's a little more difficult in my head,

21   sometimes, to separate out the politics from other things.

22         THE COURT:  Okay.

23         PROSPECTIVE JUROR 0220:  But I am answering your

24   question to say that yes, I could do it, but that's why I

25   had to pause where I had to --

```
 1                    THE COURT:  And that's fine.  Lots of people have
 2        opinions.  I don't expect people not to.
 3                    The question is, you know, whether you can -- and
 4        it doesn't matter what the source is, but I want to make
 5        sure that those opinions -- and at this point since you
 6        don't know him personally, it's based on third-party
 7        information -- that those opinions do not inform, you know,
 8        how you decide once the witness comes or you listen to -- if
 9        there's some information that has their name, that you
10        decide in that context here in court, not based on what, you
11        know, somebody else has said at some earlier point.
12                    PROSPECTIVE JUROR 0220:  Yes, I can do that.
13                    THE COURT:  All right.  16 is whether you or
14        somebody close to you is involved with law enforcement.  Is
15        that you or somebody else?
16                    PROSPECTIVE JUROR 0220:  I am a consultant with
17        the federal government and have previously worked with the
18        FBI.
19                    THE COURT:  Okay.  What's your area of expertise
20        or subject matter?
21                    PROSPECTIVE JUROR 0220:  Intelligence.
22                    MR. KENNER:  Your Honor, I'm having trouble
23        hearing.  I am sorry.
24                    PROSPECTIVE JUROR 0220:  I apologize.
25        Intelligence.
```

1          THE COURT:  Okay.  Is this intelligence that would

2     be --

3          PROSPECTIVE JUROR 0220:  It would have nothing to

4     do with --

5          THE COURT:  -- in the United States or foreign?

6          PROSPECTIVE JUROR 0220:  Foreign.

7          THE COURT:  Sir --

8          PROSPECTIVE JUROR 0220:  I'm sorry, I'm sorry.

9          THE COURT:  Is it intelligence that would be

10    involved in, you know, U.S. nationals or United States or

11    foreign?

12         PROSPECTIVE JUROR:  Foreign.

13         THE COURT:  Okay.  And can you tell us what -- you

14    know, what you're looking at that you're providing

15    information in?  It doesn't have to be the -- in other

16    words, what's your role in terms of providing it?

17         PROSPECTIVE JUROR 0220:  So in my past, I've

18    worked with the FBI, but primarily the DOD.

19         THE COURT:  Okay.  And so have you been -- have

20    you provided particular information to the FBI?

21         PROSPECTIVE JUROR 0220:  It was reviewing

22    information for FISA applications.

23         THE COURT:  Oh, okay.  And was this part of your

24    job to do this, or was this something you had information

25    separate from that?

```
1              PROSPECTIVE JUROR 0220:  No, this was part of a

2     job.

3              THE COURT:  And so who did you work for at that

4     point when you were doing it?  Were you working for DOD?

5     Some private entity?

6              PROSPECTIVE JUROR 0220:  I was working for a

7     private entity that was contracted with the FBI, for the

8     FBI.  For DOD, for DIA, it was another private entity that

9     was contracted with.

10             THE COURT:  Okay.  In terms of the FBI, we're

11    going to have agents who, in all likelihood, will testify.

12    Did you have daily contact with the FBI or, you know --

13             PROSPECTIVE JUROR 0220:  I mean, I was in the

14    Hoover building.

15             THE COURT:  Just let me finish.  One at a time so

16    that we can get a record.  It's okay.  Go ahead.

17             PROSPECTIVE JUROR 0220:  I was in the Hoover

18    building, so...

19             THE COURT:  Okay.  So was your office there?

20             PROSPECTIVE JUROR 0220:  Yes.

21             THE COURT:  Okay.  So your office was in the FBI.

22    So you were a contractor with the FBI; would that be

23    accurate?

24             PROSPECTIVE JUROR 0220:  Yes, ma'am.

25             THE COURT:  Okay.  And so we're going to have FBI
```

1    agents testify in this case.  Would your relationship with

2    them in the past and the work that you've done with them be

3    such that that might influence you in terms of deciding

4    about their credibility in terms of testifying?

5            Again, we want you to make a decision based on the

6    individual who testifies, not on -- based on, you know, your

7    views based on your outside contact.

8            PROSPECTIVE JUROR 0220:  No, I would have no

9    issue.

10           THE COURT:  Okay.  So even though you've worked --

11   you were in the building as a contractor providing

12   information that the FBI used for FISA applications, it's

13   your view that you would treat the FBI agents that would

14   testify like everybody else?

15           PROSPECTIVE JUROR 0220:  It's amazing when you

16   meet people how much they are people and not some...

17           THE COURT:  Okay.  All right.

18           Okay.  And how long did you do this?

19           PROSPECTIVE JUROR 0220:  Oh, that was like three

20   or four months.  I mean, it wasn't -- I just --

21           THE COURT:  How long ago?

22           PROSPECTIVE JUROR 0220:  2017.

23           THE COURT:  Okay.  And what are you doing now?

24   Are you continuing to do the same kind of work or a

25   different context?

1          PROSPECTIVE JUROR 0220:  I am going through a

2    program with Booz Allen Hamilton to be their data scientist.

3          MR. KENNER:  I can't hear, Your Honor, I'm sorry.

4          PROSPECTIVE JUROR 0220:  I'm a consultant with

5    Booz Allen Hamilton, not with any particular government

6    entity at the moment, doing data science.

7          THE COURT:  So what kind of work are you doing

8    with Booz Hamilton, can you tell us?

9          PROSPECTIVE JUROR 0220:  I am what is called "on

10   the bench."  So not --

11         THE COURT:  What does that mean?

12         PROSPECTIVE JUROR 0220:  It basically means that I

13   am ready and able to work, but no role has been found at the

14   moment for me.

15         THE COURT:  Okay.  Is there a subject matter

16   expertise that you have that sort of runs through all of

17   these jobs?

18         PROSPECTIVE JUROR 0220:  No.  They're relatively

19   eclectic.

20         THE COURT:  Okay.  Is there anything else in terms

21   -- besides your job, is there anybody else that's connected

22   to law enforcement in answer to that question?

23         PROSPECTIVE JUROR 0220:  Oh, no.

24         THE COURT:  If I could ask, in the position that

25   you had at the FBI, did you deal with any intelligence

```
 1    agencies that would have been outside of the United States,

 2    you directly?

 3              PROSPECTIVE JUROR 0220:  No.

 4              THE COURT:  20 is whether you or somebody close to

 5    you was a lawyer, worked for a lawyer or studies the law.

 6    Is that you or somebody else?

 7              PROSPECTIVE JUROR 0220:  Long, long ago, back in

 8    2007, I spent a year working for the ACLU of South Carolina

 9    underneath the -- the executive director was a lawyer, so

10    just to be complete.

11              Also, my mother was a lawyer.

12              THE COURT:  Okay.  So in terms of the first, what

13    did you do -- what kind of a firm was -- was the lawyer

14    involved?  What was the subject matter?

15              PROSPECTIVE JUROR 0220:  She was a criminal

16    defense lawyer, but in her role as the executive director of

17    the ACLU.

18              THE COURT:  You need to talk into the mic.

19              PROSPECTIVE JUROR 0220:  Sorry.  In her role as

20    the executive director of the ACLU, she was doing

21    constitutional law.

22              THE COURT:  Okay.  What did you do exactly?

23              PROSPECTIVE JUROR 0220:  I was an organizer.

24              THE COURT:  So you organized the office, or you

25    organized their --
```

```
 1                    PROSPECTIVE JUROR 0220:  People for demonstrations

 2       and for other...

 3                    THE COURT:  Okay.  You need to let me finish --

 4                    PROSPECTIVE JUROR 0220:  I'm sorry.

 5                    THE COURT:  -- before you start.

 6                    So let me ask you again.  You said you were an

 7       organizer.  Is that sort of organizing just the office or

 8       the actual work with others from -- that the office did, if

 9       that makes sense?

10                    PROSPECTIVE JUROR 0220:  So it was a very small

11       office, so sort of a multirole.  I organized the office,

12       organized intake of cases, and also organized people for

13       demonstrations.

14                    THE COURT:  Okay.  And in terms of -- did you work

15       on specific cases, specific legal cases yourself?

16                    PROSPECTIVE JUROR 0220:  No.  I was more periphery

17       to anything the executive director organized.

18                    THE COURT:  So I think you also said a relative

19       was a lawyer as well?

20                    PROSPECTIVE JUROR 0220:  Yes, my mother was a

21       lawyer, did criminal defense and family law.

22                    THE COURT:  Okay.  And is she in this area or

23       someplace else?

24                    PROSPECTIVE JUROR 0220:  No, she's in South

25       Carolina.
```

1          THE COURT:  And does she do litigation as part of

2     that, or did she at some point?

3          In other words, did she bring cases -- did she do

4     criminal defense work in the sense of their going to court

5     and trying cases?

6          PROSPECTIVE JUROR 0220:  She was primarily a --

7     yes.  I think she told me she picked family law at the end

8     because it was more in court than anything else.

9          THE COURT:  Okay.  So family law was separate from

10    what she did in terms of her criminal cases, or the criminal

11    cases involved family law?

12         PROSPECTIVE JUROR 0220:  The criminal cases

13    involved family law.

14         THE COURT:  Okay.  Did you ever go watch her in

15    terms of trials and to see what -- you know, what a trial

16    was like?

17         PROSPECTIVE JUROR 0220:  At least once or twice.

18         THE COURT:  Okay.  And were they jury trials, if

19    you can recall?

20         PROSPECTIVE JUROR 0220:  Honestly I was about 7 or

21    8, so I don't recall.

22         THE COURT:  Okay.  Is your mother still

23    practicing?

24         PROSPECTIVE JUROR 0220:  No, she is not.

25         THE COURT:  When would she have stopped

1    practicing, roughly?

2             PROSPECTIVE JUROR 0220:  Ten years ago.

3             THE COURT:  Okay.  Is there anything about

4    discussions that you might have had with her about criminal

5    cases, criminal justice, trials or whatever, that you think

6    would influence you in this case?

7             PROSPECTIVE JUROR 0220:  No.

8             THE COURT:  21 is whether you or somebody close to

9    you worked in accounting, forensic accounting, banking or

10   banking regulations.  Is that you or somebody else?

11            PROSPECTIVE JUROR 0220:  My father was a banker

12   for Bank of America.

13            THE COURT:  Okay.  Was a banker where?

14            PROSPECTIVE JUROR 0220:  In South Carolina.

15            THE COURT:  And do you know what role he had?  Was

16   he with a particular bank or division?

17            PROSPECTIVE JUROR 0220:  He was the vice

18   president/director of North and South Carolina for Bank of

19   America was I think his final role.

20            THE COURT:  Okay.  Do you know what he did in that

21   capacity with the bank?

22            PROSPECTIVE JUROR 0220:  So he did lobbying.  He

23   did -- mostly he talked about problem-solving and, you know,

24   putting out brush fires.  But he had lots of stories about

25   lobbying.

1          THE COURT:  Okay.  And what was your impression in

2      terms of what the nature of his lobbying was?  What was he

3      lobbying for?  Let me put it that way.

4          PROSPECTIVE JUROR 0220:  Well, basically he was

5      the only Democrat in the bank, so he was in charge of

6      lobbying the Democrats in the State House for the bank.  And

7      he more -- I mean, he didn't tell the day-to-day stuff, but

8      he would tell the more obnoxious, you know -- a state

9      representative's kid would go out to dinner and say the bank

10     was going to pay for it, and he would get a call saying,

11     "You all are paying for this, right?"  And him having to

12     call the state representative and be like, "I'm not

13     appreciative of this."

14         THE COURT:  Okay.  So in terms of the lobbying,

15     obviously with the state representatives, but was he

16     lobbying for better local banking regulations or what?

17         PROSPECTIVE JUROR 0220:  I assume so.

18         THE COURT:  Were you old enough to know?

19         PROSPECTIVE JUROR 0220:  By the time I was old

20     enough, he was actually -- he had moved on to be in the

21     Department of Commerce for South Carolina.  So honestly I

22     couldn't say in high school I was particularly interested in

23     the niceties of banking regulation.

24         THE COURT:  Okay.  Anything about your father's

25     work or discussions you might have had with him that you

1       think might influence you in this case?

2                   PROSPECTIVE JUROR 0220:  Not in this case.

3                   THE COURT:  All right.  22 is whether you or

4       somebody close to you worked in a campaign fundraising or

5       campaign finance.  Is that you or somebody else?

6                   PROSPECTIVE JUROR 0220:  No, one of my good

7       friends who I met on the Obama campaign moved on to campaign

8       finance for a while and now works as a fundraiser for

9       nonprofits.

10                  THE COURT:  All right.  Did you have discussions

11      with this person about, you know, what was involved in the

12      campaign finance or laws that were related to it or anything

13      else, or did you just know that he was out campaigning

14      trying to raise money?

15                  PROSPECTIVE JUROR 0220:  No, I mean, I've been

16      around -- I've worked for multiple campaigns so I've been

17      around the finance departments on a regular basis and had

18      discussions with various people at times on campaign

19      finance, and with him about little bits of it.  But nothing

20      -- I wouldn't say I've ever gone into an in-depth

21      conversation about the totality of campaign finance law or

22      something -- or any in-depth conversation about campaign

23      finance law because it was periphery to the work that I was

24      doing.

25                  THE COURT:  So in terms of yourself, though, in

1    terms of your own campaigning that you've done -- and was it

2    for presidential elections or other elections?

3            PROSPECTIVE JUROR 0220:  So two congressional

4    elections, one presidential election, and one state delegate

5    race in Virginia.

6            THE COURT:  Okay.  And in terms of what was the

7    nature of your campaign fundraising, was it just getting

8    donors to donate money, or was it a more elaborate effort on

9    your part?

10           PROSPECTIVE JUROR 0220:  No, my role was as a

11   political organizer, and so, like I said, the finance stuff

12   was periphery.  People would hand me checks every once in a

13   while, and I would hand them over to the finance office, but

14   I was not directly involved with the finance of the

15   campaigns.

16           THE COURT:  So you would not -- you would not have

17   been involved in knowing how you're supposed to legally go

18   about collecting money for campaigns?

19           PROSPECTIVE JUROR 0220:  I have surface level

20   knowledge, but not anything that would go in-depth.

21           THE COURT:  Okay.  Again, you're going to get

22   instructions in terms of how you consider all of this.  Will

23   you follow my instructions and not what you may think was

24   the way that you're supposed to go about legally donating

25   money or anything of that nature?

```
1              PROSPECTIVE JUROR 0220:  I wouldn't say my

2    expertise in donations would compare to somebody who had

3    actually looked at it.

4              THE COURT:  Okay.  So but I'm asking --

5              MR. KENNER:  Sorry, Your Honor, I didn't hear the

6    last response.  I'm sorry, Your Honor, I didn't hear the

7    last part of that.

8              PROSPECTIVE JUROR 0220:  I'm saying, no, no, I

9    don't believe I have enough expertise to adjudicate finance

10   law different from what the -- what you would say --

11             THE COURT:  My instructions.

12             PROSPECTIVE JUROR 0220:  Yes.

13             THE COURT:  All right.  Overall, do you think that

14   you could be fair and impartial to both sides?  We've gone

15   through a number of questions where we need to make sure

16   that you don't bring in your personal views or experiences

17   and then make decisions based on what really gets presented

18   and said by witnesses.

19             So do you think you overall can be fair and

20   impartial in this case?

21             PROSPECTIVE JUROR 0220:  Insofar as I have no

22   knowledge of the defendant -- insofar as the defendant, yes,

23   I can be impartial.

24             THE COURT:  Okay.  I'm not sure I understand quite

25   that.  I mean, obviously this is the case where the
```

1     defendant has been charged, so I want to make sure that all

2     of the different things we've talked about -- the campaign,

3     campaign financing, your work with the FBI, et cetera --

4     that all of those things are such that you can -- and

5     putting them together, okay, putting all the puzzle pieces

6     together, that you ultimately can be fair and impartial to

7     both sides.

8                    PROSPECTIVE JUROR 0220:  Yes.

9                    THE COURT:  All right.  Mr. Keller.

10                   MR. KELLER:  Good morning, sir.

11                   PROSPECTIVE JUROR 0220:  Good morning.

12                   MR. KELLER:  On the constitutional issues that you

13    started off with talking with the Court, I just want to make

14    sure I understand.  It sounded like you were saying if the

15    Supreme Court decided that some certain conduct was illegal,

16    and that you felt personally that under the Constitution it

17    should actually be legal, it should not be illegal, that you

18    would have difficulty following the judge's instructions or

19    following the law in a given case if you personally believed

20    that what the state of the law was was not right.  Is that

21    fair?

22                   PROSPECTIVE JUROR 0220:  I can't see any practical

23    circumstance in which that comes into play, but as a

24    theoretical exercise, yes.

25                   THE COURT:  Is there a particular law that you're

1    thinking of?

2                    PROSPECTIVE JUROR 0220:  No.

3                    THE COURT:  Okay.

4                    MR. KELLER:  The flip side of that, is there a

5    particular kind of area of the Constitution that you're

6    thinking of?  First Amendment?

7                    PROSPECTIVE JUROR 0220:  No.

8                    MR. KELLER:  With respect to what you've heard

9    about some of the witnesses in the case -- I think you

10   described a viewpoint about specifically Elliott Broidy.  So

11   if you were to find out during the course of the case that

12   the government had entered into a plea agreement with Mr.

13   Broidy and a cooperation agreement with Mr. Broidy, and that

14   he was coming in under that plea agreement and that

15   cooperation agreement to testify as a government witness,

16   would you view that negatively with respect to the

17   government?

18                    PROSPECTIVE JUROR 0220:  No.

19                    MR. KELLER:  Would you view his testimony

20   negatively or skeptically?

21                    PROSPECTIVE JUROR 0220:  That wouldn't come into

22   the --

23                    THE COURT:  There is an instruction that would be

24   given in terms of how you consider all of this, so that's

25   part of it.

```
 1                    PROSPECTIVE JUROR 0220:  No, I don't see plea
 2       agreements as something suspect.
 3                    MR. KELLER:  No, no.  I guess I just meant the
 4       fact that the mere association with an individual -- it
 5       sounded like you had fairly strong opinions about Mr.
 6       Broidy.  The association between him as a government
 7       witness, would that cause you to view the government
 8       negatively?
 9                    PROSPECTIVE JUROR 0220:  No.
10                    MR. KELLER:  In terms of your discussions with
11       your mother about her work as a lawyer and some of her work
12       as a criminal defense attorney or your work for the ACLU, do
13       you feel like you have kind of an overall view or opinion
14       about the justice system or about criminal prosecution in
15       general?
16                    PROSPECTIVE JUROR 0220:  It has given me a sense
17       that everybody can make mistakes and everybody will make
18       mistakes, and that there should be no presumption given to
19       any individual depending on their role as to whether they
20       are more knowledgeable, able, or more perfect or more
21       truthful than anybody else.
22                    MR. KELLER:  And so when you say everybody makes
23       mistakes, are you specifically talking about people that are
24       charged with crimes?
25                    PROSPECTIVE JUROR 0220:  People that are charged
```

1    with crimes, people that charge people with crimes,

2    everybody involved with the justice system; that there's no

3    perfection there.

4           MR. KELLER:  Are you aware of any examples that

5    you discussed at the ACLU or with your mother in particular

6    where you're thinking about instances in which the

7    government or the prosecutors did something wrong or made

8    mistakes?

9           PROSPECTIVE JUROR 0220:  I've read numerous

10   stories about prosecutorial misconduct.  I've read numerous

11   stories about defendants who -- I mean, what I'm saying is I

12   don't have a presumption that the prosecution is more or

13   less credible than the defense.

14          MR. KELLER:  And so you would -- you would come

15   in, everybody in this case would be on even ground,

16   everybody would start with a clean slate, and you would draw

17   your conclusions based purely on whatever is presented in

18   court.

19          PROSPECTIVE JUROR 0220:  Yes.

20          MR. KELLER:  I didn't fully understand when you

21   said you're on the bench for Booz Allen.  You're available

22   for a role, but there's not a current role for you to be

23   plugged into.

24          If you were plugged into a role, what exactly

25   would you do?

1          PROSPECTIVE JUROR 0220:  I would be presumably

2     doing some type of data science or data analysis for a

3     government entity probably in a classified space.

4          MR. KELLER:  I know you mentioned at one point

5     that you were reviewing foreign intelligence.  Would this

6     also likely involve review of foreign intelligence?

7          PROSPECTIVE JUROR 0220:  Yes.

8          MR. KELLER:  And previously, when you reviewed

9     foreign intelligence, was it specific to any region or

10    country?

11         PROSPECTIVE JUROR 0220:  I have had positions that

12    have been specific to particular regions and countries, but

13    with the FBI it was not particular to any specific region or

14    country.

15         MR. KELLER:  Have you had any positions where your

16    specific focus related to Asia?

17         PROSPECTIVE JUROR 0220:  Yes, but it was primarily

18    terrorism focused.

19         MR. KELLER:  National security focused?

20         PROSPECTIVE JUROR 0220:  Yes.

21         MR. KELLER:  And so, getting more specific then,

22    which countries within Asia were you specifically reviewing

23    intelligence information on?

24         PROSPECTIVE JUROR 0220:  So I was on a watch floor

25    that covered Asia and Europe for terrorism, and so primarily

1    focused on the Philippines actually in the Asian space

2    because that was the area that had the most issues with

3    terroristic violence, and then Europe.

4            And then for the past three years, if you want to

5    include Russia in Asia, then lots and lots of stuff on

6    Russia.

7            MR. KELLER:  Did any of that work include

8    investigations involving individuals who might be in the

9    United States acting as agents of the foreign countries?

10           PROSPECTIVE JUROR 0220:  No.

11           MR. KELLER:  Are you familiar with 18 United

12   States Code Section 951 at all?

13           PROSPECTIVE JUROR 0220:  Not by that number.

14           MR. KELLER:  And then I guess that was with

15   respect to your historical work.  In terms of going forward,

16   do you have a sense of what -- regionally where you would

17   specialize?

18           PROSPECTIVE JUROR 0220:  No.

19           MR. KELLER:  It could be anywhere in the world?

20           PROSPECTIVE JUROR 0220:  Yeah.  No, generally you

21   don't get told until you have a role.

22           MR. KELLER:  Nothing further, Your Honor.

23           THE COURT:  Mr. Kenner.

24           MR. KENNER:  Thank you.

25           Do you have any awareness of what's referred to as

```
1    1MDB?

2              PROSPECTIVE JUROR 0220:  No.

3              MR. KENNER:  All right.  You have a very

4    interesting background, sir.

5              Do you agree that a trial is conducted kind of

6    like in a box, which means the only thing that you can

7    consider factually and what the law is comes from the

8    evidence from the witness stand and the judge's instruction

9    as to what law to apply?

10             PROSPECTIVE JUROR 0220:  Insofar as that's

11   possible, yes.

12             MR. KENNER:  All right.  Do you think that's

13   possible?

14             PROSPECTIVE JUROR 0220:  I don't think it's

15   perfectly possible, but...

16             MR. KENNER:  I'm sorry?

17             PROSPECTIVE JUROR 0220:  I don't think it's

18   perfectly possible, but...

19             MR. KENNER:  But you would do that to the best --

20             PROSPECTIVE JUROR 0220:  I would try to to the

21   best of my ability.

22             MR. KENNER:  And you don't have any bias or

23   prejudice for or against the government.  Is that true?

24             PROSPECTIVE JUROR 0220:  No.

25             MR. KENNER:  You don't have any bias or prejudice
```

 1    for or against the defendant?

 2              PROSPECTIVE JUROR 0220:  No.

 3              MR. KENNER:  You would start this trial with a

 4    blank slate -- "blank" meaning you would listen to the

 5    evidence, evaluate that, no matter what it said in anything

 6    you may have read, because we don't know what you read is

 7    true or not true.

 8              Can you set all of that aside, anything that you

 9    have talked about, and just make your judgment based on the

10    evidence in this case and the instructions about the law to

11    apply from the judge?

12              PROSPECTIVE JUROR 0220:  To the best of my

13    ability, I will do so, or try.

14              MR. KENNER:  Do you have any reason to think that

15    you would not be successful when you try to do that in doing

16    it?

17              PROSPECTIVE JUROR 0220:  Only that I spent the

18    previous administration in what I can describe as an almost

19    incandescent rage at the very fact of that administration,

20    which is what basically makes it harder than in other

21    circumstances.

22              MR. KENNER:  I'm sorry, can you repeat that,

23    please?

24              THE COURT:  Maybe you can explain it.  I mean,

25    this is not a -- well, there's some issues relating to

1    obviously campaign finance, et cetera, and some contacts

2    with government, both Obama and the Trump administration.

3    It's not a political case as such.

4              PROSPECTIVE JUROR 0220:  No, no, no, I'm not

5    saying that.  It's just -- the reason that I had those

6    people put down --

7              THE COURT:  Right.

8              PROSPECTIVE JUROR 0220:  -- was because I do have

9    some level of a visceral reaction to those people.  I'm not

10   saying that I can't put that aside, but I wanted to, in all

11   honesty, say that I am -- in most of my life, I exist as a

12   highly partisan individual.  And so when I say that I will

13   try to the best of my ability, I'm just admitting that my

14   habit of thought is to be incredibly partisan in terms of

15   how I view political actors in this world.

16             THE COURT:  Well, let me ask:  In your work, have

17   you had to make distinctions between what you may think

18   personally about different things, but you have been able to

19   separate out what you need to do for your work as opposed to

20   what your personal views might be about countries,

21   terrorism, or whatever else, and make distinctions between

22   what we're asking you to do, which is to make decisions

23   based on certain facts that are presented, and not have an

24   influence by whatever your own thoughts are?

25             So you have had to do that at work?

1          PROSPECTIVE JUROR 0220:  No, it's actually why I

2     stay out of -- why I try and stay away from contracting with

3     the FBI, because I don't want to do domestic work.

4          I mean, I don't have any particular opinions about

5     terrorism prior to taking a job dealing with terrorism.  I

6     didn't have any particular views as to the specific work I

7     was doing on Russia.  So really at no point have I

8     particularly had to review some bias of mine while doing

9     work.

10          THE COURT:  Okay.  I was trying to see whether

11     you've had experience making these distinctions.  That's why

12     I looked at it in terms of work.

13          Mr. Kenner, go ahead.

14          MR. KENNER:  Thank you.

15          Sir, with respect to the witnesses that come in,

16     can you set your bias aside?  Do they have a fair chance?

17     Are you going to listen to what they have to say no matter

18     who they are or what political party they're attached to;

19     and after you hear what they have to say, base your judgment

20     about their credibility about what they said based on what

21     comes out in this courtroom?

22          PROSPECTIVE JUROR 0220:  I will take into account,

23     I mean, all testimony, and will try my best to not allow my

24     biases to influence my thinking as to what any particular

25     person says outside of what the defense or prosecution says

1   in reference to their credibility.

2          MR. KENNER:  Okay.  I have no further questions.

3          THE COURT:  All right.  Then -- did you have

4   anything else?

5          MR. KELLER:  No, Your Honor.

6          THE COURT:  All right.  You can step down, sir.

7   We'll give you further direction.

8          Any issues?

9          MR. KELLER:  Your Honor, he seemed to express some

10  doubt about whether he would be able to set aside his biases

11  given how strong they are, more so than prior jurors that

12  we've had voir dired on this point.  I think the government

13  would move to strike him for cause.

14         THE COURT:  Mr. Kenner.

15         MR. KENNER:  Defendant accepts this juror.

16         Your Honor, my position is that you pointed out to

17  me in other jurors, a person is going to do -- if they can

18  set aside bias and prejudice and base their judgment on the

19  evidence and the law that they learn about in this case,

20  he's clearly said he could do that.  I credit him with

21  extreme honesty.  I think he's trying to let the Court know

22  what we all know:  We don't come in here and lose our

23  memory.  Every juror, you know, brings their own private

24  experiences into the case.

25         The question is, you always properly point out is,

1    can they set that aside and be fair and impartial?  I think

2    clearly this juror has indicated that he could.

3            THE COURT:  I think it's a close case, but I have

4    to say that he has not been a juror before so he hasn't had

5    that experience, and evidently he hasn't had to do that in

6    his work.  Sometimes people have.

7            But, you know, he doesn't speak in guarantees, and

8    most people don't, so a lot of people say, "Oh, yes, I

9    definitely can."  He's obviously thoughtful, and he will

10   make the effort.  I don't get the sense in his various

11   answers that he will not do it, you know, that he will not

12   make the effort to do it.  Whether it's 100 percent

13   successful, none of us are going to know from any of the

14   people that have said the things.

15           So I don't think there's enough here to excuse

16   him, so I'll leave him.  But we do need to go back to,

17   unfortunately, Mr. 0758.  It appears that he's the one who

18   -- who evidently had asked about flying out tonight.  He's

19   going to be gone until Saturday.  I don't know why he didn't

20   tell us that.  I don't know how he thinks he's going to be

21   in the trial, or maybe he's thinking it's going to take us

22   that long.

23           But anyway, it obviously doesn't sound like he's

24   going to be around.  We can bring him back, or we can excuse

25   him.

1              Mr. Keller?

2              MR. KELLER:  If he's not available the rest of the

3     week, Your Honor, the government wouldn't object to excusing

4     him.

5              THE COURT:  I mean, we can ask what it is to see,

6     but it sounded as if, you know -- he told my law clerk that

7     he needed to get out by 4:00 to take the flight.  He didn't

8     bring it up, so I don't know what it's about or whether it

9     can be changed.

10             MR. KENNER:  I have no objection.

11             THE COURT:  Do you want to ask him anything or do

12    you want to just let him go?

13             MR. KENNER:  I don't have any objection to letting

14    him go, Your Honor.

15             MR. KELLER:  Your Honor, can we at least ask him,

16    since he didn't bring it up in court?

17             THE COURT:  We can bring him back.  Wait.  Wait.

18    Wait.

19             THE LAW CLERK:  Sorry, are you ready, Your Honor?

20             THE COURT:  We need to have 0758 again.

21             THE LAW CLERK:  Exactly.

22             THE COURT:  Okay.  So if he'd come on back.

23             THE COURTROOM DEPUTY:  Judge, so we're keeping

24    this one?

25             THE COURT:  Yes.

```
 1              Okay.  We just had a couple of follow-up
 2     questions.  And you're 0758, am I correct?
 3              PROSPECTIVE JUROR 0758:  Yes.
 4              THE COURT:  You didn't indicate that you would not
 5     be available the rest of the week.  So we were a little
 6     surprised since obviously, as soon as we choose a jury,
 7     we're going to move to the case.  So is this something that
 8     you have to go to, or is this something that you could
 9     remain and be a juror in the case?
10              PROSPECTIVE JUROR 0758:  It's a work event, so I
11     can probably get out of it if I need to.
12              THE COURT:  Okay.  So you would be willing, then,
13     to not go on this trip and be available as a juror, assuming
14     that you get chosen?
15              PROSPECTIVE JUROR 0758:  Yes.
16              THE COURT:  Anybody have any questions?
17              MR. KELLER:  No, Your Honor.
18              THE COURT:  Mr. Kenner?
19              MR. KENNER:  Yes.
20              Do you have any other travel plans that might
21     interfere with the length of this trial plus deliberation?
22              PROSPECTIVE JUROR 0758:  April 28th and 29th as I
23     mentioned earlier for two weeks.
24              THE COURT:  He brought that up.
25              MR. KENNER:  Okay.  Thank you.
```

1          THE COURT:  All right.  Let me have you step down

2     again.

3          Obviously, if you're chosen for the jury, you will

4     need to cancel your flights.

5          PROSPECTIVE JUROR 0758:  Something I'll know

6     today?

7          THE COURT:  I hope so.  We're counting on it.

8          Okay.  So based on that, you know, I would leave

9     him.  So we have -- of the ones we did today, 0220 we're

10    keeping and 0758 we're keeping.  So presumably we're moving

11    to the next one, which is 0228.

12         If you would come over here to my left.  If you

13    would just step up here, and you can put your things down so

14    you can be comfortable.  Go ahead, put your backpack down.

15         Okay.  And you can take your mask down while we

16    talk to you to make sure that we can hear you, and if you

17    would talk into the microphone.  All right?

18         So this is Juror 0228, and she has listed

19    Questions 12, 16, 17, and 36.

20         So let me start with 36, which is the length of

21    the trial.  Is there an issue with that?

22         PROSPECTIVE JUROR 0228:  Yes.  I don't have child

23    care or no one to take my five year old to school.  He goes

24    to the school where I work.

25         THE COURT:  So you have a five year old, and you

```
1    take him to school and pick him up?

2              PROSPECTIVE JUROR 0228:  Yes.

3              THE COURT:  And there's nobody else that could

4    assist you with this?

5              PROSPECTIVE JUROR 0228:  No.

6              THE COURT:  Do you work?

7              PROSPECTIVE JUROR 0228:  Yes.

8              THE COURT:  How do you manage the working and the

9    child?

10             PROSPECTIVE JUROR 0228:  He goes to the school I

11   work at.

12             THE COURT:  Oh, okay.  So you work at the school

13   that he goes to?

14             PROSPECTIVE JUROR 0228:  Yes.

15             THE COURT:  Okay.  Anybody have any -- should I go

16   on or not?

17             MR. KELLER:  No, Your Honor.

18             MR. KENNER:  No, Your Honor.

19             THE COURT:  All right.  Let me ask you to step

20   down, and we'll give you further instructions.

21             MR. KELLER:  No objection, Your Honor.

22             MR. KENNER:  No objection, Your Honor.

23             THE COURT:  All right.  Then I'll excuse 0228 for

24   cause.  We'll move to the next one.

25             All right.  If you would step up over here,
```

1    please.  If you'd come to my left side here.  Come on up and

2    sit down.  Make yourself comfortable.  Put your things down.

3    I think you need to move it the other way.  There you go.

4            Okay.  You can take your mask off while we speak

5    so that we make sure that we can get a record of what you're

6    saying.

7            PROSPECTIVE JUROR 0725:  Okay.

8            THE COURT:  This is Juror No. 0725.  14, 16, 33,

9    and 36.

10           So let me start with 36.  Is there a problem with

11   the length of the trial?

12           PROSPECTIVE JUROR 0725:  Yes.

13           THE COURT:  Okay.  What's the problem?

14           PROSPECTIVE JUROR 0725:  I'm self-employed,

15   freelance editor, and I've already taken on several

16   different projects for the month of April, books, extended

17   textbooks, and they're all due by the end of April as well.

18   And additionally, I have a couple of doctors' appointments

19   all on Thursdays, physical therapy.

20           THE COURT:  Okay.  In terms of your

21   self-employment, so you don't work for anybody?  You

22   basically get clients, and you work with your clients?  Is

23   that what you're saying?

24           PROSPECTIVE JUROR 0725:  Yes, I do -- I edit books

25   and journal articles for publishers.

```
 1                    THE COURT:  So you have particular clients that
 2        give you work that you work on?
 3                    PROSPECTIVE JUROR 0725:  Yes.
 4                    THE COURT:  And you've indicated that you have
 5        some of these projects in April?
 6                    PROSPECTIVE JUROR 0725:  Yes.
 7                    THE COURT:  So they would have to be finished in
 8        April?
 9                    PROSPECTIVE JUROR 0725:  Yes.
10                    THE COURT:  Is that what you're saying?
11                    PROSPECTIVE JUROR 0725:  Yes.
12                    THE COURT:  Any questions?
13                    MR. KELLER:  No, Your Honor.
14                    MR. KENNER:  No, Your Honor.
15                    THE COURT:  All right.  You can step down.  We'll
16        give you further instructions.
17                    MR. KELLER:  No objection, Your Honor.
18                    MR. KENNER:  No objection, Your Honor.
19                    THE COURT:  All right.  Then I'll excuse 0725.
20                    If you would step up over here to my left, please.
21                    Please step up and make yourself comfortable.  Put
22        things down.
23                    Okay.  And you can take your mask down so that we
24        can hear what you actually say.
25                    PROSPECTIVE JUROR 0287:  Okay.
```

```
1               THE COURT:  And I'd ask if you would speak into
2      the microphone.
3               PROSPECTIVE JUROR 0287:  Okay.
4               THE COURT:  All right.  This is Juror No. 0287,
5      and it's -- oh, you just wrote down the days you wouldn't be
6      sitting.  Okay.
7               It's 21.
8               So 21 is whether you or somebody close to you ever
9      worked in accounting, forensic accounting, banking, or
10     banking regulations.  So is that you or somebody else?
11              PROSPECTIVE JUROR 0287:  My brother.
12              THE COURT:  You need to speak into the microphone.
13              PROSPECTIVE JUROR 0287:  My brother is a World
14     Bank retiree, and my niece had worked for Merrill Lynch for
15     maybe one to two years.
16              MR. KENNER:  I'm sorry, Your Honor, I'm having
17     difficulty hearing.
18              THE COURT:  She's indicated her brother is a world
19     -- he worked at the World Bank, although he's retired, and
20     her niece worked at Merrill Lynch for maybe one or two
21     years.
22              So let's start with your brother.  What did he --
23     do you know what he did at the World Bank?
24              PROSPECTIVE JUROR 0287:  I think at one time he
25     was a manager for the African division.  I don't exactly
```

1     know the details, what all of that involved.

2               THE COURT:  So you indicated he was the manager

3     for the African region?

4               PROSPECTIVE JUROR 0287:  Yes.

5               THE COURT:  Okay.  Did you have much discussions

6     with your brother about his work?  Do you know much about

7     what he did?

8               PROSPECTIVE JUROR 0287:  I wasn't really

9     interested.

10              THE COURT:  Okay.  So could you describe what he

11    actually did, or you just know that he worked for the bank,

12    World Bank, and at one point was the manager for the African

13    division?

14              PROSPECTIVE JUROR 0287:  Yes.  And I think when he

15    retired he was the senior advisor to the president, but I

16    don't know the details.  I know he traveled a lot, and my

17    main interest was that he comes home safely.  But I never

18    sat with him to discuss his day-to-day activities.

19              THE COURT:  You indicated that he was a senior

20    advisor to the president.  President of the country?

21    President of World Bank?

22              PROSPECTIVE JUROR 0287:  World Bank.

23              THE COURT:  I'm sorry?

24              PROSPECTIVE JUROR 0287:  President of the World

25    Bank.

```
 1                    THE COURT:  President of the World Bank, okay.

 2                    And then your niece, you said, works for Merrill

 3       Lynch?

 4                    PROSPECTIVE JUROR 0287:  She has worked there for

 5       Merrill Lynch, I think, for maybe one or two years.

 6                    THE COURT:  Do you know what she did there?

 7                    PROSPECTIVE JUROR 0287:  I don't know what she

 8       did.

 9                    THE COURT:  Okay.  All right.  Thank you.

10                    Mr. Keller.

11                    MR. KELLER:  Thank you, Your Honor.

12                    Good morning, ma'am.

13                    Have you worked outside the home at all?

14                    PROSPECTIVE JUROR 0287:  Yes.

15                    MR. KELLER:  And what do you do or what did you

16       do?

17                    PROSPECTIVE JUROR 0287:  Most recently I was a

18       teacher with DCPS.

19                    MR. KELLER:  What grades?

20                    PROSPECTIVE JUROR 0287:  I did special education,

21       7 to 9.

22                    MR. KELLER:  How long did you do that work?

23                    PROSPECTIVE JUROR 0287:  Seven school years.

24                    MR. KELLER:  And what about prior to that?

25                    PROSPECTIVE JUROR 0287:  I taught in the Bahamas
```

1     for five years and Bermuda for ten years.

2               MR. KELLER:  No further questions, Your Honor.

3     Thank you.

4               THE COURT:  Mr. Kenner.

5               MR. KENNER:  I'm sorry, what was the last place

6     where you said you taught?

7               PROSPECTIVE JUROR 0287:  D.C. public school for

8     seven school years, special education.

9               MR. KENNER:  How long have you lived in D.C.?

10              PROSPECTIVE JUROR 0287:  On a continuous basis,

11    from 2002 to present.

12              MR. KENNER:  May I ask, where did you live prior

13    to that?

14              PROSPECTIVE JUROR 0287:  I lived in Jamaica for

15    four years; in the Bahamas for five years; in Bermuda for

16    ten years; and I was born in Guyana, South America.

17              MR. KENNER:  And were these countries that you

18    lived in countries that you taught in also?

19              PROSPECTIVE JUROR 0287:  Yes.  I went to school in

20    Jamaica for four years.

21              MR. KENNER:  Okay.  May I ask, were you born in

22    the United States?

23              PROSPECTIVE JUROR 0287:  No, I wasn't.  I was born

24    in Guyana, South America.

25              THE COURT:  I'm sorry, I missed the country in

1    South America.

2                PROSPECTIVE JUROR 0287:  Pardon me?

3                THE COURT:  I missed what country.

4                PROSPECTIVE JUROR 0287:  Guyana.

5                THE COURT:  Oh, Guyana.  Okay.

6                MR. KENNER:  Her Honor is going to instruct you

7    about what burden the government has in order for you to be

8    able to render a verdict.  Can you follow the judge's

9    instructions on what the government has to do before you can

10   vote guilty in this case?

11               PROSPECTIVE JUROR 0287:  Yes.

12               MR. KENNER:  Do you agree with the proposition

13   that my client, Mr. Michel, as he sits here right now is

14   presumed to be innocent?

15               PROSPECTIVE JUROR 0287:  Yes.

16               MR. KENNER:  Do you have any disagreement with

17   that notion?

18               PROSPECTIVE JUROR 0287:  No.

19               MR. KENNER:  Did you ever have conversations with

20   your brother or anyone else about financial crimes?

21               PROSPECTIVE JUROR 0287:  No.

22               MR. KENNER:  And I just want to make sure.  Do you

23   have any knowledge about what -- other than being the senior

24   advisor to the president of the World Bank, do you know what

25   his responsibilities were; what areas, if any of them are

1    specific?

2              PROSPECTIVE JUROR 0287:  No.  We didn't discuss

3    that.

4              MR. KENNER:  I'm sorry?

5              PROSPECTIVE JUROR 0287:  No, that was not the

6    discussion.  I wasn't particularly interested.  I had my

7    job, he had his, and that was the end of it.

8              MR. KENNER:  I have no further questions.

9              THE COURT:  All right.  You can step down, and

10   we'll give you further instructions.  Thank you.

11             MR. KENNER:  Pass for cause, Your Honor.

12             THE COURT:  I'm sorry?

13             MR. KENNER:  Pass for cause.

14             THE COURT:  Okay.

15             MR. KELLER:  Agreed.

16             THE COURT:  All right.

17             Mr. Kenner, she didn't write any of the questions

18   down that you asked about.  It would be nice if we could get

19   this done today, you know, in terms of the presumption of

20   innocence and the rest.

21             Let's go.  We're keeping her.

22             After this one, I'll take a break, the morning

23   break.

24             All right.  If you would step up over here to my

25   left.

```
1              All right.  If you'd come on up, and go ahead and

2        sit down.  Make yourself comfortable.

3              All right.  And you can take the mask down so that

4        we can actually hear what you have to say.

5              PROSPECTIVE JUROR 0566:  Thank you.

6              THE COURT:  All right.  This is Juror 0566.  20,

7        22, 24, 30, and then you have 35, 36.

8              I believe you indicated that you recognized one of

9        the names of one of the witnesses, which was Steven Bannon;

10       is that correct?

11             PROSPECTIVE JUROR 0566:  I recognize the name,

12       that's correct, but I don't know him personally.

13             THE COURT:  All right.  Let me start, did --

14       Steven Bannon was indicated as a potential witness.  Do you

15       know him personally?

16             PROSPECTIVE JUROR 0566:  I do not know him

17       personally.

18             THE COURT:  Okay.  So I take it that you have some

19       views based on news reports or whatever in terms of his

20       reputation.  Is that correct?

21             PROSPECTIVE JUROR 0566:  That's correct.

22             THE COURT:  All right.  So one of the reasons we

23       ask this -- and I don't know whether he will or will not

24       testify, frankly, and whether or not there will be

25       documents, whatever, that might have his name in it.  But
```

1      let's assume for purposes of the discussion that it could be

2      one or the other.

3              What we want you to do is to put aside what you've

4      heard from third parties.  Everybody's got opinions, and if

5      you read the news, you develop opinions about people and

6      what other people say about them.

7              But what I want to find out is whether, you know,

8      if you have a view about him, about his trustworthiness,

9      whatever, generally, by his reputation, but would you wait

10     to consider whether something particularly that he was

11     testifying about or a piece of evidence that came in, to

12     decide whether it's accurate until it's actually been

13     testified to or presented?

14              In other words, we don't want you to make a

15     decision before you actually hear from the witness, should

16     he be called, or you actually look at the piece of evidence.

17     In other words, we want you to make a decision about

18     credibility based on what gets presented in the courtroom,

19     not based on whatever you may have heard on the outside.

20              So do you think you can make that distinction?

21              PROSPECTIVE JUROR 0566:  I believe I can.

22              THE COURT:  All right.  So what you would need to

23     do is put aside your opinions, leave them out.  Don't inform

24     your decision about credibility based on that, but based on

25     your own observations, demeanor, what the person says, and

1     come to your own conclusions about credibility.  So do you

2     think you can do that?

3          PROSPECTIVE JUROR 0566:  Yes, I believe I can do

4     that.

5          THE COURT:  All right.  Then let's move to -- you

6     have 35 and 36, which is -- 35 relates to every -- to reach

7     a verdict, every juror must agree on the verdict; you know,

8     it has to be unanimous.  So in deliberations, you have to

9     consider other people's views.  You have to be willing to

10    express your own, and then come to a conclusion, but you

11    have to come to your own conclusion.

12          So is there a problem with that?

13          PROSPECTIVE JUROR 0566:  No, I wasn't sure if the

14    trial date duration was 35 or 36, so I wrote 35 and 36.

15          THE COURT:  Oh, okay.  You did have 35/36, okay.

16    So let's move to 36.

17          PROSPECTIVE JUROR 0566:  I believe it's 36.

18          THE COURT:  Okay.  So in terms of the length of

19    the trial, is there an issue?

20          PROSPECTIVE JUROR 0566:  Yes, I do have a

21    conflict.

22          THE COURT:  And what's the conflict?

23          PROSPECTIVE JUROR 0566:  I have international

24    travel booked for April 18th to the 25th, so I would be

25    leaving on April 17th.  The last day I'd be available for

```
 1    trial is the 14th.
 2             THE COURT:  Is this business or is this a
 3    vacation?
 4             PROSPECTIVE JUROR 0566:  This is a personal trip.
 5    I have the documents for the flight and the hotel.
 6             THE COURT:  Did you know about this when you got
 7    the notice, or did you make arrangements after the notice?
 8             PROSPECTIVE JUROR 0566:  My wife booked the
 9    flight.  I may be able to tell you what date.
10             THE COURT:  Because obviously we hope once you get
11    the notice that you don't book trips so you can't be
12    available.
13             PROSPECTIVE JUROR 0566:  Yes, I'd be happy to
14    serve as a juror if the duration of the case was not to
15    exceed --
16             THE COURT:  I can't guarantee that by April 17th,
17    at the rate we're going, that the case would be done.
18             Any questions?
19             MR. KELLER:  No, Your Honor.
20             THE COURT:  Mr. Kenner.
21             MR. KENNER:  No, Your Honor.
22             THE COURT:  All right.  If you would step down.
23             I would just simply say when you get these
24    notices, and I know you get them in both courts, look at the
25    dates, and if you've made arrangements, you know, you should
```

 1    indicate on it because you may be able to be excused before

 2    having to come.  You're expected, once you're told --

 3    especially like a special panel like this -- that you would

 4    not make arrangements so that you would be precluded from

 5    being a juror; you would make it outside of the time period.

 6              But anyway, if you could step down.  Thank you.

 7              PROSPECTIVE JUROR 0566:  Okay.

 8              THE COURT:  Anybody going to say anything?

 9              MR. KELLER:  No objection to excusing the juror,

10    Your Honor.

11              MR. KENNER:  No objection to the excusal.

12              THE COURT:  All right.  I'll excuse 0566.

13              Did you want to take a break at this point before

14    we go on to the next one?  If we could do a ten-minute

15    break, that would be great.

16              Let me just indicate, we're going to take a

17    ten-minute break here for a quick second, okay, our morning

18    break.  So we'll be back in ten minutes, and we'll talk to

19    you at that point, but you can give me the card.

20              So it's 11:00.  Ten after.

21              (Recess taken)

22              THE COURT:  All right.  Let's get the next person

23    in.

24              If you'd step over here to my left.

25              Yes, please come up and sit down, make yourself

1      comfortable.  And you can actually take your mask off so we

2      can actually hear what you're saying.

3              All right.  This is Juror No. 0623.  Questions 5,

4      13, 14, 16, 20, 21, 24, 29, 33, and 36.

5              So let me start with 36, which is related to the

6      length of the trial.  What's the issue?

7              PROSPECTIVE JUROR 0623:  Just my job, Your Honor.

8              THE COURT:  You need to speak up so everybody can

9      hear you.

10             PROSPECTIVE JUROR 0623:  My job.  I'm just in the

11     midst of a regulatory writing process for banking

12     regulation, and we have a pretty tight deadline, so just --

13     it would be a lot of burden on my co-workers.

14             THE COURT:  Where do you work?

15             PROSPECTIVE JUROR 0623:  The Federal Reserve

16     Board.

17             THE COURT:  Is there no one else that would be in

18     a position to be able to do this if you were selected?

19             PROSPECTIVE JUROR 0623:  We have a small team, but

20     we have a very tight deadline right now, and we're trying to

21     get regulation finalized by early this summer.

22             THE COURT:  So when do you have to get these

23     banking regulations in?

24             PROSPECTIVE JUROR 0623:  We're trying to get it

25     out by late spring or early summer.

```
 1              THE COURT:  And what are the regulations?  How
 2      many regulations are we talking about?
 3              PROSPECTIVE JUROR 0623:  It's just a single
 4      regulation.
 5              THE COURT:  I'm sorry?
 6              PROSPECTIVE JUROR 0623:  It's just one single
 7      regulation that we're updating and rewriting.
 8              THE COURT:  What would happen if you were
 9      selected?  I mean, what would the -- what would the team do?
10      Do they have somebody else that would pick up?
11              PROSPECTIVE JUROR 0623:  Yes, they have other
12      people who are also working on it.  It's just we've been
13      working nights and weekends right now, and they just have to
14      do more work.
15              THE COURT:  All right.  But is there somebody that
16      could take over your role, I guess, is my question, if
17      necessary?
18              PROSPECTIVE JUROR 0623:  I believe the answer is
19      yes to that.
20              THE COURT:  I didn't hear the last --
21              PROSPECTIVE JUROR 0623:  Yes.
22              THE COURT:  Let me go through a couple of other
23      questions with you.
24              Question 5 is whether you know something about the
25      case.  So have you heard something?  Read something?  What's
```

1   the source of your thinking that you know something about

2   it?

3               PROSPECTIVE JUROR 0623:  Yes.  I've read about --

4   not this particular case, but I've read about -- I've read

5   the Mueller investigation, the Mueller report.  I've read

6   Seth Abramson's book about --

7               THE COURT:  Okay.  You need to talk into the

8   microphone so everybody can hear you.

9               PROSPECTIVE JUROR 0623:  Oh, I'm sorry.

10              -- about foreign money in our electoral politics,

11  and I've read some news accounts about this subject.

12              THE COURT:  So have you read about Mr. Michel

13  specifically or about something else?  What I'm trying to do

14  is what do you, in your mind, connect this case with that

15  you've read about?

16              PROSPECTIVE JUROR 0623:  You mentioned the

17  Malaysian Sovereign Fund.  I've read about the Malaysian

18  Sovereign Fund and the situation with that, and Jho Low.

19              THE COURT:  Okay.

20              PROSPECTIVE JUROR 0623:  And other aspects of the

21  people that you mentioned in the -- on Monday.

22              THE COURT:  In terms of -- because you did write

23  down 13 and 14, which would have been the particular

24  witnesses.  So from what you have read, what have you --

25  have you come to any particular conclusions, or it just

1    sounds familiar?

2          PROSPECTIVE JUROR 0623:  No, I have fairly formed

3    opinions about the situation with the inaugural --

4    presidential inaugural fund and the situation with the

5    Malaysian Sovereign Fund and the idea that there has been

6    money that was taken from that fund.

7          And I also am aware that Jho Low is currently not

8    in the U.S.

9          THE COURT:  Okay.  So let me pull 5 into 13 and

10   14.  Obviously what we -- we ask these questions because if

11   you've already formed opinions or have information based on

12   other reports, thirdhand reports, we want to make sure that

13   you're not going to look at the evidence, make decisions

14   about it, look through the lens of whatever it is that

15   you've read.

16          So what we want you to do is to put those aside

17   and listen to the evidence and come to your own conclusions

18   as to what actually happened, what is presented, and whether

19   witnesses are credible.

20          So do you understand -- the purpose of some of my

21   questions are to find out whether you can do that.  Do you

22   understand?

23          PROSPECTIVE JUROR 0623:  Yes, I do.

24          THE COURT:  So in terms of your general knowledge

25   about the Malaysian and MDB, et cetera, is this from reading

1    news reports, books, and those kinds of things?

2              PROSPECTIVE JUROR 0623:  Yes, it's from reading

3    both books and news reports.

4              THE COURT:  Okay.  So they're third-party sources

5    basically?

6              PROSPECTIVE JUROR 0623:  Correct.

7              THE COURT:  So you, if you were a juror, are going

8    to have, for whatever decisions you need to make, you'll be

9    getting firsthand information, and you'll be assessing that

10   information and the credibility of the witnesses directly,

11   not based on somebody else telling you something.  Do you

12   understand?

13             PROSPECTIVE JUROR 0623:  Yes.

14             THE COURT:  So my question is:  Can you, at least

15   in terms of the trial itself, put aside whatever you've read

16   about it and listen to what gets presented in the courtroom

17   and make a decision based on what's presented in the

18   courtroom, not based on whatever you may have read about

19   these things.  Can you do that?

20             PROSPECTIVE JUROR 0623:  Your Honor, I have fairly

21   formed opinions about foreign money in our political system,

22   but I would try to look at the facts of the case.

23             THE COURT:  Well, let me ask it in the context of

24   the witnesses then.  You evidently recognize some witnesses

25   for both the government that have been identified and the

1    defense.

2              Do you know any of these people personally, or is

3    this more by reputation?

4              PROSPECTIVE JUROR 0623:  Reputation.

5              THE COURT:  Okay.  So in terms of the witnesses

6    that you've recognized by reputation, again from third-party

7    news or books or whatever, I have the same question in terms

8    of you've formed opinions about, you know, whether they're

9    trustworthy or not trustworthy based on whatever it is that

10   you've read, and more generally in terms of their

11   reputation, but what I would want is whether you're able to

12   consider whether a particular aspect that they testify about

13   in their testimony, something that they bring up as

14   evidence, whether that's accurate, whether you would wait to

15   hear that to make a decision as to whether it's accurate and

16   you can credit it.  Because basically if you're doing it

17   based on third parties, it's other people's opinions that

18   are forming yours as opposed to you listening firsthand to

19   the testimony or reviewing the evidence and making your own

20   determination without being influenced by others.

21             So in terms of the witnesses that you evidently

22   know by or recognize by reputation, can you make a decision

23   based on what they say in court and not based on whatever it

24   is that you've read?

25             PROSPECTIVE JUROR 0623:  Your Honor, I hear what

1    you're saying.  I have reservations to whether I would be

2    impartial knowing the reputations of the people that you

3    mentioned.

4         THE COURT:  All right.  Any questions?

5         MR. KELLER:  No, Your Honor.

6         THE COURT:  Mr. Kenner?

7         MR. KENNER:  No, Your Honor.

8         THE COURT:  All right.  You can step down, sir,

9    and we'll give you further instructions.

10        MR. KENNER:  Move to excuse for cause.

11        MR. KELLER:  No objection, Your Honor.

12        THE COURT:  I have my own views about -- I will

13   excuse him for cause, but he's been a juror before.  He

14   knows how to do this.

15        If you would step over here to my left.  Yes, if

16   you just come around.  And if you could step up and go ahead

17   and sit down here, okay, and make yourself comfortable.  And

18   you can take your mask down so we can actually hear you, and

19   if you'll speak into the microphone.

20        This is Juror No. 0266.  13, 14, 22, and 36.

21        So let me start with 36, which is if there's a

22   problem with your sitting for the duration of the trial.  Is

23   there a particular day or a problem that you have?

24        PROSPECTIVE JUROR 0266:  Yes.  It would be April

25   4th and 5th.  I keep the New Covenant Passover and

1    unleavened bread.

2             THE COURT:  Okay.  April 5th we are taking half a

3    day.  April 4th, we're not taking it off.  So is that a

4    religious observance on your part?

5             PROSPECTIVE JUROR 0266:  Yes.

6             I have a letter from my church.  We keep service

7    at 9:00 a.m. and 3:00 p.m. on the 5th, and we keep the New

8    Covenant Passover at 10 p.m. on the 4th.  But I'll be

9    keeping it in Tyson's, so I would have to leave to get there

10   by 5:00 p.m.

11            THE COURT:  All right.  Any further questions?

12            MR. KELLER:  No, Your Honor.

13            MR. KENNER:  No, Your Honor.

14            THE COURT:  All right.  You can step down.  We'll

15   give you further instructions.

16            MR. KENNER:  Challenge for cause, Your Honor.

17            MR. KELLER:  No objection, Your Honor.

18            THE COURT:  All right.  I'll excuse 0266.

19            If you would step up over here to my left.  You

20   can come up and sit down and make yourself comfortable.  And

21   you can take your mask down so that we can actually hear

22   what you say.

23            PROSPECTIVE JUROR 0649:  Sure.

24            THE COURT:  Okay?  You need to speak into the

25   microphone.

1          PROSPECTIVE JUROR 0659:  Okay.

2          THE COURT:  This is 0649.  And No. 16 is the only

3    number.

4          And so 16 is whether you or somebody close to you

5    is associated with law enforcement.  Is that you or somebody

6    else?

7          PROSPECTIVE JUROR 0649:  No, my father worked for

8    the U.S. Attorney's Office I think 30 years ago, so I felt

9    like I had to answer that one.

10         THE COURT:  All right.  No, that's correct.

11   That's included.

12         PROSPECTIVE JUROR 0649:  All right.

13         THE COURT:  Is this the U.S. Attorney's Office

14   here in D.C. or someplace else?

15         PROSPECTIVE JUROR 0649:  In D.C., yes.

16         THE COURT:  Do you know how many years he worked

17   for them approximately?

18         PROSPECTIVE JUROR 0649:  Geez.  I was very young,

19   but -- I think I was probably around six, maybe, before I

20   went to --

21         THE COURT:  Do you remember what years it would

22   have been?

23         PROSPECTIVE JUROR 0649:  Early '90s, around 1990,

24   I believe.

25         THE COURT:  Okay.  And do you know if he did

1    criminal work or civil work?  He was an assistant U.S.

2    Attorney?

3              PROSPECTIVE JUROR 0649:  That's correct.  I

4    believe it was -- I don't want to answer because I don't

5    know for sure, but I think it was -- I think it was

6    criminal.

7              THE COURT:  Okay.  Did he go to -- did he handle

8    trials, and was he a trial attorney?

9              PROSPECTIVE JUROR 0649:  Yes.  Yes, he was

10   involved in trials, as far as I know.

11             THE COURT:  Did you ever go watch him in terms of

12   his trials?

13             PROSPECTIVE JUROR 0649:  No.  I was very young.

14             THE COURT:  Okay.  Did you listen to any

15   discussions with him about, you know, what his work was like

16   or what trials were like or the criminal justice system or

17   anything?

18             PROSPECTIVE JUROR 0649:  No.  He just said he

19   enjoyed being a trial attorney, and he really didn't

20   influence me much on that front.

21             THE COURT:  How old would you have been when he

22   moved on or, you know, was no longer in the U.S. Attorney's

23   Office, roughly?

24             PROSPECTIVE JUROR 0649:  Four or five years old, I

25   believe.

1          THE COURT:  Okay.  Limited discussions, then?

2          PROSPECTIVE JUROR 0649:  Yes, for sure.

3          THE COURT:  All right.  The U.S. Attorney's Office

4    obviously is part of the Department of Justice, and the

5    prosecutors are from the Department of Justice, and so I

6    want to make sure that the fact that your father worked for

7    the prosecutor's office many years ago, that that would not

8    influence you in any way in terms of being fair and

9    impartial to both sides, including making sure that the

10   government would not get more preferential, less

11   preferential treatment based on your father's work, but that

12   you would treat them evenly, both the government and the

13   defense, and not make any decisions based on the lawyers but

14   based on the evidence.

15          So do you have any issues with that?

16          PROSPECTIVE JUROR 0649:  I don't have any issues

17   with that.

18          THE COURT:  All right.

19          Mr. Keller.

20          MR. KELLER:  Good morning, sir.

21          PROSPECTIVE JUROR 0649:  Good morning.

22          MR. KELLER:  Do you know what your father did

23   after leaving the U.S. Attorney's Office?

24          PROSPECTIVE JUROR 0649:  Yes.  He worked for a law

25   firm for a few years, he made partner; and then he moved on

1    for a 25-year career in an in-house corporate law position.

2         MR. KELLER:  Do you remember whether, as a partner

3    at the law firm, or before he made partner at the law firm,

4    whether he did criminal defense cases?

5         PROSPECTIVE JUROR 0649:  I don't know because I

6    was more -- I was more familiar with his private career in

7    the corporate environment, and then -- yeah, I don't know

8    much about -- I mean, it wasn't until I was older that I

9    really put the dots together on what he did when I was very

10    young.

11         MR. KELLER:  What industry was the company in that

12    he was in-house counsel at?

13         PROSPECTIVE JUROR 0649:  Hospitality.

14         MR. KELLER:  No further questions, Your Honor.

15         THE COURT:  Mr. Kenner.

16         MR. KENNER:  Thank you, Your Honor.

17         Sir, I understand you're a financial analyst?

18         THE COURT:  You have to say something orally or we

19    don't get it on the record.

20         PROSPECTIVE JUROR 0649:  Yes, yes.

21         MR. KENNER:  And you work at the Urban Institute?

22         PROSPECTIVE JUROR 0649:  Yes, sir.

23         MR. KENNER:  Can you just briefly describe what

24    the Urban Institute is and does?

25         PROSPECTIVE JUROR 0649:  Of course.  The Urban

1    Institute is a nonpartisan think tank focusing on urban

2    planning.  It was founded in the mid-1900s in an effort to

3    create fair urban planning, I suppose.  But we're data-based

4    research.  We don't really affiliate with any side of the

5    aisle really.

6              I personally work on the systems, so I'm a

7    financial systems analyst, and I maintain kind of a lot of

8    accounting software for the company.

9              MR. KENNER:  Do I understand correctly you're

10   dealing more with the software than using it?

11             PROSPECTIVE JUROR 0649:  Yes.  I manage a lot of

12   interaction for the employees on the software, and it's a

13   lot of reporting and finance data, salary information.

14             But, yeah, we use it probably more for the

15   financial reporting and the accounting software.  It's an

16   ERP system.  So that's my main duty there.

17             MR. KENNER:  Okay.  And do you deal with urban

18   issues just --

19             THE COURT:  Can you speak up into the microphone?

20             MR. KENNER:  Do you deal with the urban issues

21   just in the United States, or also internationally?

22             PROSPECTIVE JUROR 0649:  It is mostly in the

23   United States.

24             MR. KENNER:  Do you recall any other countries

25   that you deal with?

```
 1              PROSPECTIVE JUROR 0649:  I remember one time I

 2    think I saw a contract come in, this was years ago, but I

 3    think it was in collaboration with a university in -- around

 4    India.  I think it might have been Bangladesh.  I don't

 5    remember because I don't work directly with the research.

 6    I'm more of a back-office role.

 7              MR. KENNER:  Okay.  Do you have any training in

 8    accounting?

 9              PROSPECTIVE JUROR 0649:  Somewhat.  I'm not an

10    accountant, but I work directly with accountants, and we use

11    accounting software.

12              But I'm going to say no, I don't have accounting

13    training.

14              MR. KENNER:  Okay.  Have you had any other finance

15    or accounting-type jobs besides the one for Urban Institute?

16              PROSPECTIVE JUROR 0649:  No.

17              MR. KENNER:  Is that the only place that you've

18    worked for?

19              PROSPECTIVE JUROR 0649:  I've worked there for

20    seven years, and then I was a student before that.

21              MR. KENNER:  You were a what before that?

22              PROSPECTIVE JUROR 0649:  A student.

23              MR. KENNER:  Ah.  Is your work deadline-driven?

24    Do you have to get things done quickly in a short amount of

25    time?
```

 1          PROSPECTIVE JUROR 0649:  A lot of ad hoc work.  I

 2    work at a help desk, so a lot of problems arise if people

 3    need stuff done quickly.

 4          So yes, I would say I need to do things quickly,

 5    in a timely manner.  There's a lot of monthly deadlines as

 6    far as reporting and things like that.

 7          MR. KENNER:  I have nothing further.

 8          THE COURT:  All right.  Thank you.  You can step

 9    down, and we'll give you further instructions.

10          MR. KENNER:  Defense passes for cause, Your Honor.

11          MR. KELLER:  Agreed, Your Honor.

12          THE COURT:  All right.  So we're keeping him.

13          All right.  If you would step up over here to my

14    left, and please come up and sit down.  Make yourself

15    comfortable.

16          And you can take your mask down so we can actually

17    hear what you're going to say, and if you'd speak into the

18    microphone.

19          This is Juror No. 0032, and it's 33 and 42.

20          So let me start with 33, which I believe is that

21    you've been a juror before; is that correct?

22          PROSPECTIVE JUROR 0032:  Yes.

23          THE COURT:  And was that in this courthouse, the

24    local D.C. Superior Court, or someplace else?

25          PROSPECTIVE JUROR 0032:  The D.C. superior next

```
 1     door.  Well, I don't know next door, but...

 2               THE COURT:  Have you been a juror more than once?

 3               PROSPECTIVE JUROR 0032:  No, just that one time.

 4               THE COURT:  And how long ago was that,

 5     approximately?

 6               PROSPECTIVE JUROR 0032:  2017.  It was a couple of

 7     years before the pandemic, 2017, 2018 maybe.

 8               THE COURT:  Okay.  And do you remember what -- it

 9     was a criminal case?

10               PROSPECTIVE JUROR 0032:  Yes.

11               THE COURT:  Do you remember -- without telling us

12     the verdict, do you remember if they reached a -- if the

13     jury reached a verdict?

14               PROSPECTIVE JUROR 0032:  No, we did not get the

15     chance to give a verdict.

16               THE COURT:  So was the -- did the jury actually

17     deliberate, or was the case basically resolved in another

18     way?

19               PROSPECTIVE JUROR 0032:  We had started to

20     deliberate, and then the judge came in and said I guess the

21     case had been resolved or something like that.

22               THE COURT:  Okay.  So you never actually had to

23     reach a verdict?

24               PROSPECTIVE JUROR 0032:  Correct.

25               THE COURT:  Okay.  Do you remember what the
```

1    charges were?

2           PROSPECTIVE JUROR 0032:  It was a type of -- it

3    was like a robbery of some sort, and it was involving an

4    elderly woman, so I think that added additional charges or,

5    you know, increased the significance of it, but it was

6    something along those lines.

7           THE COURT:  Okay.  Were you the foreperson?

8           PROSPECTIVE JUROR 0032:  No, I was not.

9           THE COURT:  Okay.  Is there anything about that

10   experience, either participating and listening to the trial

11   itself or the beginning of your deliberations dealing with

12   your other jurors that you think would affect your

13   consideration of the evidence in this case?

14          PROSPECTIVE JUROR 0032:  I guess could you sort of

15   reask that question?  Because I guess the thing that always

16   sticks to me -- out about that trial was I guess the defense

17   was talking to one of the witnesses, and it was a young --

18   it was like -- she was probably 14, a young girl, and it was

19   of course a very intense cross-examination, whatever you

20   guys call it, and I remember she like ran out of the

21   courtroom, and it was, you know, a little bit of a show.

22   But that was -- that's what stuck out to me.

23          THE COURT:  Okay.  But obviously this made an

24   impression to you in terms of how a witness particularly

25   handled themselves as well as how the counsel handled --

1    defense counsel, you indicated; is that correct?

2              PROSPECTIVE JUROR 0032:  Yes.

3              THE COURT:  Would that experience in any way

4    affect you in this case?  In other words, can you come to

5    this case, listen to the evidence in this case, and come to

6    your own conclusions and not be affected by whatever

7    happened in that other case?

8              PROSPECTIVE JUROR 0032:  Yes, I think that's -- I

9    would not come -- yes, I think I could do that, yes.

10             THE COURT:  Okay.  It sounded as if you felt that

11   the defense counsel, perhaps, should not have cross-examined

12   the witness in the manner in which the counsel did.  Am I

13   correct about my impression?

14             PROSPECTIVE JUROR 0032:  Yeah.  You know, again,

15   but I know these are the cases, so --

16             MR. KENNER:  Excuse me, I can't hear, sir.

17             PROSPECTIVE JUROR 0032:  Oh, I'm sorry.  Could you

18   repeat the question again?  I'm sorry.

19             THE COURT:  Okay, sure.  I just wanted to -- my

20   sense was that your view is that the defense counsel in

21   cross-examining the 14-year-old witness, that you had some

22   discomfort with the way it was handled or, you know, didn't

23   particularly care for the way it was done.  Am I correct in

24   this?

25             PROSPECTIVE JUROR 0032:  Yes.

```
 1              THE COURT:  Okay.  So I want to make sure --
 2   obviously we have both the prosecutor and we have defense
 3   counsel in this case, so I want to make sure that your views
 4   about how that defense counsel handled that case would not
 5   in any way affect how you consider the evidence that this
 6   defense counsel will present on behalf of his client should
 7   the -- you know, should he present a case, or he certainly
 8   will be cross-examining witnesses.
 9              Can you separate the two things out?
10              PROSPECTIVE JUROR 0032:  Yes, I believe I can
11   separate the two.
12              THE COURT:  All right.  And 42 was sort of my
13   catch-all question.  So there was something you thought of
14   afterwards?
15              PROSPECTIVE JUROR 0032:  Yes.  It was regarding, I
16   guess, family members.  My grandfather was a police officer
17   way back when, and then I have a friend and I was on the
18   border of, you know, friend, family, as you sort of asked
19   about, you know, how you consider close people, and she's
20   really close, and she's a lawyer herself, so that's why I
21   just put those two things down.
22              THE COURT:  Okay.  So one is your grandfather's a
23   police officer, and the other is you have a friend who is an
24   attorney?
25              PROSPECTIVE JUROR 0032:  Yes.
```

1          THE COURT:  Okay.  I do that catch-all because

2    people begin to really think about it afterwards.

3          So let me start with your grandfather.  Was he a

4    police officer here in D.C. or someplace else?

5          PROSPECTIVE JUROR 0032:  No, in Chicago.

6          THE COURT:  And do you know much about his work as

7    a police officer?  Do you know where he would have been

8    stationed, what he would have been doing, or just know that

9    he was a police officer?

10         PROSPECTIVE JUROR 0032:  No, I know he did some --

11   he became a detective.  You know, he made his way through --

12   ascended, made his way through.  I think he finished as a

13   detective.  I know he was a patrolman for a while, then I

14   guess you get promoted to that next stage, and I think

15   detective and probably -- I don't know, I guess a

16   superintendent.  I don't know the correct terminology for

17   maybe that particular office, that particular location.

18         THE COURT:  So do you know -- if he became a

19   detective, did he have particular assignments that you were

20   aware of?  You know, robbery, homicide, something like that,

21   do you know?

22         PROSPECTIVE JUROR 0032:  Not fully.  I mean, in

23   terms of stories he may have mentioned -- you know, I think

24   he's mentioned some robbery or a murder or two, but nothing

25   -- we didn't go into great detail.

1          THE COURT:  And then he moved above the detective

2     stage?  He moved up into another promotion?

3          PROSPECTIVE JUROR 0032:  I believe so, yes.  He

4     was just matriculating through the job.

5          THE COURT:  Okay.  Is there anything about the

6     fact that he was a policeman and that -- did you have

7     discussions with him about criminal justice or testimony or

8     defendants or anything, you know, when he was working as a

9     police officer or since then?  Have you had discussions with

10    him about his work?

11         PROSPECTIVE JUROR 0032:  Not particularly.  No, we

12    really didn't have a whole lot of discussion about that.

13    Again, we talked about in passing, you know, back when he

14    was younger and was doing some beat around some

15    neighborhood, he would, you know, point out or, you know,

16    this is -- he saw this and saw that, but it wasn't really

17    into detail.

18         THE COURT:  Okay.  Is there anything about the

19    fact that he was a police officer and these discussions --

20    we are going to have law enforcement officers who will be

21    testifying, and so we want to make sure that your connection

22    with your grandfather doesn't affect your, you know,

23    decisions about credibility, either finding them more

24    credible or less credible based on the fact that your

25    grandfather was a police officer.  We want you to treat the

1    law enforcement officers who testify as you would any

2    witness.  You wait for them to begin their testimony and

3    come to your own conclusions about whether they're credible

4    or not.

5              Can you do that?

6              PROSPECTIVE JUROR 0032:  Yeah, I think I can do

7    that, yes.

8              THE COURT:  Okay.  Because, as I said, we don't

9    want you to be influenced by, you know, the fact that your

10   grandfather was in law enforcement and therefore some

11   connection to those that are coming to testify.  We really

12   need you to consider each of the witnesses, even if they're

13   law enforcement officers, individually, and you come to your

14   own conclusions based on what they say, their demeanor, et

15   cetera.

16             So do you think you could do that?

17             PROSPECTIVE JUROR 0032:  Yeah, I think I can do

18   that.

19             THE COURT:  All right.  And then you have a friend

20   who is a lawyer.  And is that person working for the

21   government or a law firm, or where does that person work, do

22   you know?

23             PROSPECTIVE JUROR 0032:  Great question of where

24   she works.  I do know she does work with the government.

25   She has multiple jobs, a very busy woman.

1          THE COURT:  Is she in D.C. or someplace else?

2          PROSPECTIVE JUROR 0032:  Yes, she's in D.C.

3          THE COURT:  Okay.  So do you know who her employer

4     is?

5          PROSPECTIVE JUROR 0032:  She just switched jobs

6     like two weeks ago.

7          THE COURT:  Well, what jobs has she had?  Why

8     don't you tell us where she was working before she switched.

9          PROSPECTIVE JUROR 0032:  I know she did apply or

10    attempt to become -- I don't know if it was the FBI, but she

11    -- I know she did.  She was practicing for that, I know,

12    physical test.  So I don't know if that was FBI.  It was

13    some federal department, I'm assuming.  But I know she does

14    a mix of that, some PR work with a department of the

15    government.

16         So yes, she -- I know she works multiple hats, and

17    then -- yes, that's as far as with the --

18         THE COURT:  Do you know which department of the

19    government she works for?

20         PROSPECTIVE JUROR 0032:  I'm really, really trying

21    to think.

22         THE COURT:  Do you know if she does any criminal

23    work?

24         PROSPECTIVE JUROR 0032:  No, not any criminal

25    work, no.

1          THE COURT:  Do you know if she goes to court?

2          PROSPECTIVE JUROR 0032:  She has gone to court,

3     yes.

4          THE COURT:  And so has she gone to court to -- in

5     a trial or for some other reason?

6          PROSPECTIVE JUROR 0032:  I mean, I guess is -- I

7     guess is any type of court activity considered a trial, or

8     is that --

9          THE COURT:  Well, it could be a trial.  It could

10    be, you know, appellate where you go and you argue in front

11    of three judges, you know, what your case is about in terms

12    of that.  So that's why I said a trial versus something

13    else.

14         PROSPECTIVE JUROR 0032:  A trial, I'm less leaning

15    towards.  I'm leaning towards maybe -- what did you call it,

16    appellate or the --

17         THE COURT:  Okay.

18         PROSPECTIVE JUROR 0032:  Yes.

19         THE COURT:  All right.  Have you had any

20    discussions with her about the law and trials and what

21    happens and the things?

22         PROSPECTIVE JUROR 0032:  We've had our fair share

23    of discussions about that.

24         THE COURT:  Is there anything about those

25    discussions that you think would influence you in this case?

```
1            PROSPECTIVE JUROR 0032:  Nothing in particular.  I
2       mean, it's -- influence?
3            THE COURT:  Well, what you want to do is if you've
4       had discussions with her about the law and how trials should
5       take place or something, we want to make sure that you put
6       that aside and you listen to the evidence, you pay
7       attention, and you also decide the case based on the
8       evidence that's presented.  I'll give you legal
9       instructions, which you then apply, and then you, you know,
10      deliberate with the jurors in terms of finding whether or
11      not the government has proven the case beyond a reasonable
12      doubt.
13           So what we want you to do is to make a decision
14      based on what gets presented in the courtroom, what
15      instructions I give you, and not what somebody else may have
16      -- some other third party may have told you about the law or
17      something else.  We don't want you to have that be how
18      you're making your decisions.
19           PROSPECTIVE JUROR 0032:  Understood.
20           THE COURT:  We want you to make your decisions
21      based on what happens in the courtroom.
22           So do you think you could do that?
23           PROSPECTIVE JUROR 0032:  Yeah, I think -- I think
24      I can do that.
25           THE COURT:  All right.  I think that's it.
```

```
1                    Mr. Keller.

2                    MR. KELLER:  No questions, Your Honor.

3                    THE COURT:  Mr. Kenner.

4                    MR. KENNER:  Thank you, Your Honor.

5                    Understanding that it's my responsibility to

6      represent my client as effectively as I can, is there -- I'm

7      trying to understand.  Is there anything other than the fact

8      that the defense attorney in your previous case was talking

9      to a 14-year-old girl?  Was it the way he asked questions,

10     or did you feel the lawyer was attacking this 14-year-old

11     girl?

12                   PROSPECTIVE JUROR 0032:  At times I did feel like

13     it was an attack on her, you know.

14                   I would like to think, as you all are lawyers,

15     that there's -- I know there's a dynamic that, you know,

16     you're trying to, you know, get the information or have the

17     witness tell their information as you would want it, but I

18     just felt that it was a little aggressive at times, and that

19     it was unnecessary for a 14-year-old girl.

20                   MR. KENNER:  So you felt sorry for the witness?

21                   PROSPECTIVE JUROR 0032:  Yes, I felt sorry for her

22     at times, yes.  I don't think that she should have had to

23     have that type of, I guess -- I don't think she should have

24     had that type of aggression/intensity for her questions.

25                   MR. KENNER:  I'm really trying hard to understand.
```

1    What do you mean when you say "aggression"?  How did that

2    manifest itself?

3             PROSPECTIVE JUROR 0032:  I mean, the lawyer was

4    raising his voice a lot.  You know, the case, for the most

5    part, it was, you know, decent speaking levels, and, you

6    know, I guess when he was trying to drive home his point,

7    you know, he raised his voice and was very assertive, very

8    direct to her.  And, you know, at that time you could see

9    that she was not -- she was not receiving it well.  And it

10   was just -- it was -- it was -- it appeared to be an attack

11   on her, and, you know, I didn't feel comfortable with that.

12            MR. KENNER:  All right.  In this case, witnesses

13   will be examined and cross-examined and they -- some of the

14   witnesses might feel uncomfortable about the kinds of

15   questions they're being asked.  They might express that

16   displeasure by their demeanor.

17            If that happened in this case, would you feel that

18   the defense lawyer is to blame for -- we're not talking

19   about raising the voice or pounding on the table.  Her Honor

20   doesn't allow that.

21            THE COURT:  I'm definitely not going to be letting

22   you raise your voice or pound on the table, so we don't need

23   to worry about that.

24            I guess one question would be is you understand

25   that you're going to be making decisions based on what the

1    witnesses say and the evidence in the case and not based on

2    the attorneys.  In other words, the attorneys present the

3    case, but you should not be making a decision if you don't

4    like the way a particular attorney is presenting it, you

5    shouldn't hold it against whomever they're representing.

6    You should be looking at what the evidence is.

7              PROSPECTIVE JUROR 0032:  Understood, yes.

8              MR. KENNER:  Sir, your work is in architectural

9    design; is that correct?

10             PROSPECTIVE JUROR 0032:  Yes.

11             MR. KENNER:  Do you work for a company?

12             PROSPECTIVE JUROR 0032:  Yes, I do.

13             MR. KENNER:  And what is that company?

14             PROSPECTIVE JUROR 0032:  Gensler.

15             MR. KENNER:  Okay.  And can you describe the

16    nature of the work that you do?

17             PROSPECTIVE JUROR 0032:  Well, we're involved in

18    the design process of new construction, renovation, where,

19    you know, we come in, and where -- the firm is architects

20    and interior designers.  So, you know, you work with clients

21    from the start of their idea, what they want for a project,

22    and we walk them down a path from design all the way through

23    construction.

24             MR. KENNER:  Okay.  You have direct client contact

25    in that work?

```
1                    PROSPECTIVE JUROR 0032:  Yes.

2              MR. KENNER:  Have you ever done any work for

3    anybody in the political world?

4                    PROSPECTIVE JUROR 0032:  Political world?  We've

5    done work with law firms.  I don't think that's political.

6              I can't say that they -- I've -- at previous

7    firms, I've done houses and, you know, residential work, so

8    I cannot say that each person was a political figure or if

9    -- how much they were involved in politics.  You know, that

10   was just sort of talked about in passing, if it was talked

11   about at all.

12             MR. KENNER:  Anybody that you can recall that was

13   a client and elected -- held an elected office?

14                   PROSPECTIVE JUROR 0032:  Not that I can recall.

15             MR. KENNER:  Have you ever lived in Chicago?

16                   PROSPECTIVE JUROR 0032:  Yes, I have.

17             MR. KENNER:  Did you follow Chicago politics?

18                   PROSPECTIVE JUROR 0032:  Yes.  I was very -- I was

19   well aware of the politics throughout the city, yes.

20             MR. KENNER:  I have no further questions.

21             THE COURT:  All right.  You can step down, sir,

22   and we'll give you further instructions.

23             MR. KENNER:  Defense passes for cause, Your Honor.

24             MR. KELLER:  Agreed, Your Honor.

25             THE COURT:  All right.
```

1          If you could step up over here to my left.  Yes,
2     please.
3          Come up and sit down.  Make yourself comfortable.
4     Take your purse and backpack off.  And you can take your
5     mask off.  And we need to have you speak in a nice loud
6     clear voice into the microphone.
7          So this is Juror No. 0574, and it's 16, 18, and
8     42.
9          So 16 is whether you or somebody close to you has
10    been involved in law enforcement.  Is that you or somebody
11    else?
12          PROSPECTIVE JUROR 0574:  Somebody else.
13          THE COURT:  And can you just tell us what relation
14    it is -- that person is to you?
15          PROSPECTIVE JUROR 0574:  My boyfriend.
16          THE COURT:  Okay.  And what law enforcement agency
17    is he connected to?
18          PROSPECTIVE JUROR 0574:  MPD.
19          THE COURT:  MPD.
20          Can you speak up just a little bit?  Everybody
21    else has to hear you.
22          MR. KENNER:  Yes.
23          PROSPECTIVE JUROR 0574:  MPD.
24          THE COURT:  And is he -- is he assigned to a
25    particular ward, or what level is he -- do you know what he

1    does in terms of his work?

2              PROSPECTIVE JUROR 0574:  He works in district No.

3    2 as a police officer in Washington, D.C.

4              THE COURT:  I'm sorry?

5              PROSPECTIVE JUROR 0574:  He's a police officer in

6    district No. 2.

7              THE COURT:  Okay.  Is he patrol?  A detective?

8    What level, do you know?

9              PROSPECTIVE JUROR 0574:  Patrol, I guess.

10             THE COURT:  Okay.  Do you know how long he's been

11   a police officer?

12             PROSPECTIVE JUROR 0574:  25 years.

13             THE COURT:  Have you had much discussion about his

14   work or, you know, in terms of what he does or his view

15   maybe of courts or the criminal justice system or anything?

16             PROSPECTIVE JUROR 0574:  I just know that he works

17   on the bike force sometimes when they have special details.

18             MR. KENNER:  Sorry, I'm having trouble hearing,

19   Your Honor.

20             PROSPECTIVE JUROR 0574:  He works on the bike

21   force sometimes when they have special details, like when

22   they have riots and stuff, they're on their bicycles, and he

23   has special details.  That's all I know.

24             THE COURT:  Okay.  What I'm trying to get at is

25   whether there's anything about his being a police officer or

1    any discussions you might have had with him about his work

2    that might influence you in this case.  Do you think there's

3    anything about his work or any discussions you've had that

4    would influence you?

5              PROSPECTIVE JUROR 0574:  Yes.  We've talked about

6    different things that go on within the city.  He may say his

7    opinion or ask me what I think or I might ask him what --

8              MR. KENNER:  Excuse me, Your Honor, I'm having

9    difficulty --

10             PROSPECTIVE JUROR 0574:  He may ask me my opinions

11   or I will ask him his opinion on what he thinks is going on

12   with different things that's going on in the world.

13             THE COURT:  Okay.  So obviously there's no problem

14   with that.

15             My question to you is whether having had these

16   conversations, would that affect how you consider the

17   evidence in this case?

18             What we want you to do is to put those

19   conversations set aside and consider the evidence that gets

20   presented in the courtroom and make a decision based on what

21   you hear in the courtroom, not what conversations and what

22   conclusions you may have reached talking to him.  Can you do

23   that?

24             PROSPECTIVE JUROR 0574:  No, because my -- first

25   of all, I don't believe in the justice system, and I have my

 1   own personal reasons why.  That would be number -- I think

 2   that's 18, the question that you asked, that something that

 3   happened to me personally.

 4            THE COURT:  Okay.

 5            PROSPECTIVE JUROR 0574:  So yes, it would affect

 6   my decision.

 7            THE COURT:  We can move to that one.  That's 18,

 8   which is whether you or somebody close to you, either in law

 9   enforcement or the U.S. Attorney's Office or the Court, that

10   experience would make it difficult for you to be fair and

11   impartial.  I take it it's you?

12            PROSPECTIVE JUROR 0574:  Yes.

13            THE COURT:  And if you could explain to us who --

14   what the experience was or which entity you would have

15   trouble with.

16            PROSPECTIVE JUROR 0574:  It was a domestic dispute

17   with the officer.  She came to my house fully uniformed, gun

18   and all.  I went to them to file a complaint against this

19   young lady.  Nothing was done.  There's a paper trail.  But

20   my issue is if you didn't have a problem disciplining this

21   officer for her behavior, because if I would have did the

22   behavior that she presented to me, I would have been locked

23   up.

24            THE COURT:  Okay.

25            PROSPECTIVE JUROR 0574:  So even with filing a

1    complaint, you know, nothing was done.  And I'm still being

2    harassed by this officer, so -- yeah, I just don't believe

3    in our justice system.

4              THE COURT:  Okay.  So I'm trying to figure out,

5    was there a domestic dispute and the police were called, or

6    you had a domestic dispute with the officer?

7              PROSPECTIVE JUROR 0574:  With the officer.

8              What happened was my boyfriend cheated on me with

9    her.  She came to my house while he was there.

10             THE COURT:  Okay.  And so she came to your house

11   and --

12             PROSPECTIVE JUROR 0574:  In uniform, fully -- gun

13   and all, I guess to intimidate me or whatever the

14   circumstances may be.

15             THE COURT:  Okay.  I see.  In terms of -- so the

16   domestic dispute was basically with her and your boyfriend

17   or with her in terms of her actions?

18             PROSPECTIVE JUROR 0574:  But both of them are

19   police officers.

20             THE COURT:  And police.

21             PROSPECTIVE JUROR 0574:  Both of them are police

22   officers.  And she had no business coming to my home, for

23   one.

24             THE COURT:  Okay.  And you made a complaint about

25   her coming to your house?

1        PROSPECTIVE JUROR 0574:  And the harassment went

2   on -- this went on for about a year, and it's still going

3   on.

4        THE COURT:  And so from your perspective, is this

5   the whole criminal system, or is this just --

6        PROSPECTIVE JUROR 0574:  It's the whole system,

7   because if you allow her to do that to me, that's not her

8   first time doing that.  You've done it before and you're

9   comfortable doing that.  You don't use your badge to harass

10  people or terrify people.  I don't care who you are.

11       THE COURT:  All right.  And you've complained to

12  the police department.  Have you complained to other places?

13       PROSPECTIVE JUROR 0574:  I went to the police

14  department.  You go online, and it's a form that you fill

15  out.

16       THE COURT:  Okay.  Any questions?

17       MR. KELLER:  Was that the last question that --

18       THE COURT:  Yes.  Other than there was one that

19  had -- you put 42, which was either a catch-all question or

20  something else you wanted to bring to my attention.

21       PROSPECTIVE JUROR 0574:  That's fine.  It's okay.

22       THE COURT:  No?

23       PROSPECTIVE JUROR 0574:  It's okay.

24       MR. KELLER:  Good morning, ma'am.  Just to

25  understand, based on your experience and your views as you

1    just expressed them, would you have concerns about the

2    credibility of law enforcement or representatives of the

3    justice system in this case?

4              PROSPECTIVE JUROR 0574:  Yes.

5              MR. KELLER:  Nothing further, Your Honor.

6              THE COURT:  Mr. Kenner.

7              MR. KENNER:  Nothing further, Your Honor.

8              THE COURT:  All right.  You can step down.  We'll

9    give you further instructions, okay?

10             MR. KELLER:  The government would move to strike

11   for cause, Your Honor.

12             MR. KENNER:  Agreed.

13             THE COURT:  Okay.  Then 0574 is struck for cause.

14   We're not keeping her.

15             All right.  Sir, if you'd step up over here to my

16   left.

17             All right.  Sir, if you could go ahead and sit

18   down, please.  And you've taken your mask off already.

19   Okay.

20             PROSPECTIVE JUROR 0204:  I don't have a mask.

21             THE COURT:  Okay.  We can give you one once you

22   leave here.

23             PROSPECTIVE JUROR 0204:  All right, cool.

24             THE COURT:  Okay.  Let me -- can I give you your

25   card back and ask you to tell me the numbers?  I'm having a

1    little trouble figuring them out.

2              This is Juror No. 0204.

3              You obviously have written numbers, and then

4    you've got information, and it's not clear to me which

5    questions are at issue.  So just tell me the numbers.

6              PROSPECTIVE JUROR 0204:  All right.  So, I mean, I

7    don't remember what the numbers are but --

8              THE COURT:  Well, tell me what the subject matter

9    is.  You obviously wrote some numbers down, but I wasn't

10   sure whether they're the numbers or they're numbers of -- it

11   looks like dates and stuff for some of it.

12             PROSPECTIVE JUROR 0204:  I started with No. 3.

13             THE COURT:  Okay.  No. 3, okay.  So No. 3 is if it

14   should come to pass after you've heard the evidence, the

15   arguments of the lawyers, and my instructions, that you're

16   then persuaded by the trial itself that the defendant is

17   guilty of the charge beyond a reasonable doubt, then it

18   would be your duty to vote guilty.  And the question:  Is

19   there anyone who believes that they would be unable to carry

20   out that duty?

21             So are you indicating that you would be unable to

22   do that?

23             PROSPECTIVE JUROR 0204:  Yes, ma'am.  Based off of

24   ideology, I don't really -- I don't believe in sending

25   people to jail, so I don't see how I can impartially state

1     that someone is guilty.

2          THE COURT:  So what you're indicating is that you

3     do not want to make judgments about other people, and that

4     would be required to reach a judgment as to whether the

5     government had proved the case beyond a reasonable doubt?

6          PROSPECTIVE JUROR 0204:  Yes, ma'am.  I'm sorry,

7     go ahead.

8          THE COURT:  No, go ahead.  What I meant -- I

9     assumed -- you said your ideology.  So you would not -- if

10    you -- you would not participate in the trial in terms of

11    deciding whether the government had proved the case, is that

12    what you're -- I'm trying to figure out what --

13         PROSPECTIVE JUROR 0204:  So yes, my ideological

14    perspective, period, I'm not a judge of anyone despite of

15    what they've done in life, so it's impossible for me to find

16    someone guilty.  So that's all I'm saying.

17         THE COURT:  Okay.  Any other questions?  Mr.

18    Keller?

19         MR. KELLER:  No, Your Honor.

20         THE COURT:  Mr. Kenner?

21         MR. KENNER:  No, Your Honor.

22         THE COURT:  All right.  You can step down.  We'll

23    give you further instructions.

24         PROSPECTIVE JUROR 0204:  All right.

25         THE COURT:  And you do need to take the mask with

```
 1    you, at least.  Thanks.

 2              MR. KELLER:  The government would challenge for

 3    cause, Your Honor.

 4              THE COURT:  Any objections?

 5              MR. KENNER:  Agree.

 6              THE COURT:  All right.  Then 0204 is excused for

 7    cause.

 8              We've got 30 or 31.  We're getting there.  Slowly.

 9              I'm reviewing the final instructions on the

10    charges now, and I'm hopeful after lunch to give them to you

11    so you can take a look at them.

12              MR. KENNER:  Thank you, Your Honor.

13              THE COURT:  All right.  If you would step up over

14    here to my left.  You can come through here.  And come up

15    and sit down.  Make yourself comfortable.

16              You can take your mask off in terms of answering

17    questions so we can hear what you say.

18              PROSPECTIVE JUROR 0262:  Okay.

19              THE COURT:  This is Juror No. 0262.

20              PROSPECTIVE JUROR 0262:  Yes.

21              THE COURT:  And it looks like question 25 and 36.

22              PROSPECTIVE JUROR 0262:  Correct.

23              THE COURT:  And 36 is why you would not be able to

24    sit for the duration of the trial.

25              PROSPECTIVE JUROR 0262:  4/4/23 I have a court
```

```
 1   date.
 2               THE COURT:  Oh, on April 4th?
 3               PROSPECTIVE JUROR 0262:  Yes.
 4               THE COURT:  What time is your court date?
 5               PROSPECTIVE JUROR 0262:  9:00, protective order,
 6   something like that.
 7               THE COURT:  So have you been summoned to Superior
 8   Court or some other court?
 9               PROSPECTIVE JUROR 0262:  Can I look in my bag?
10               THE COURT:  Certainly.
11               PROSPECTIVE JUROR 0262:  Superior Court, District
12   of Columbia, civil protection order.
13               THE COURT:  Okay.  And so you've been summoned to
14   a particular courtroom to go to?
15               PROSPECTIVE JUROR 0262:  It should be on here.
16               THE COURT:  They usually tell you where to go.
17               PROSPECTIVE JUROR 0262:  I've got a case number, I
18   know.  I've got them all separated.
19               THE COURT:  Let me ask it this way.  Do you know
20   what it's about?
21               PROSPECTIVE JUROR 0262:  Yes.
22               THE COURT:  Did you ask for a civil protective
23   order yourself?
24               PROSPECTIVE JUROR 0262:  Yes.
25               THE COURT:  Okay.  So they've set a court date on
```

1    your request that a civil protective order be issued against

2    somebody?

3              PROSPECTIVE JUROR 0262:  Correct.

4              THE COURT:  Okay.  Obviously she would not be

5    available April 4th, and they're not necessarily quick

6    because they do them in -- they have a calendar of people.

7              PROSPECTIVE JUROR 0262:  I don't see no time.

8              THE COURT:  Any other questions?

9              MR. KELLER:  Not for the government, Your Honor.

10             MR. KENNER:  No, Your Honor.

11             PROSPECTIVE JUROR 0262:  8:30 a.m.

12             THE COURT:  All right.  Let me ask you to step

13   down.  We'll give you further instructions, okay, in terms

14   of this case.

15             PROSPECTIVE JUROR 0262:  Okay.

16             THE COURT:  She's asking for the civil protection

17   order.  I would not move it.

18             MR. KELLER:  No objection to excusal, Your Honor.

19             MR. KENNER:  No objection.

20             THE COURT:  All right.  We'll excuse 0262.

21             THE COURTROOM DEPUTY:  Excused?

22             THE COURT:  She's excused.

23             If you would step up over here to my left.  Take

24   your time.

25             If you'd come on over here.  If you want to hang

1    or put your coat on the back there, that might be easier in

2    terms of your doing it.  There we go.  Be careful.

3              All right.  So this is Juror 0809, and it's 5, 33,

4    36, and 37.

5              So let me start with 36, which is whether there's

6    a problem with your sitting for the duration of the trial.

7              PROSPECTIVE JUROR 0809:  Yes, ma'am.

8              THE COURT:  Can you tell me what the issue is?

9              PROSPECTIVE JUROR 0809:  Well, I'm in review right

10   now for knee surgery that is supposed to take place next

11   month.  I cannot sit long periods of time.  My knee locks up

12   on me.  Sometimes it makes me fall.  I am on medication for

13   that also.

14             My doctor recommends that I move every hour while

15   I'm at work.  I have to get up from my desk and walk around

16   a little so that my knee will not lock up on me.

17             THE COURT:  Okay.  And your surgery is going to be

18   scheduled -- your knee surgery is supposed to take place in

19   April?

20             PROSPECTIVE JUROR 0809:  Yes, ma'am.  They haven't

21   given me a date yet because I have to be cleared by a

22   dentist, a cardiologist, and a neurologist.

23             THE COURT:  Okay.  And so -- but they've told you

24   that it is going to be next month, you just don't know when?

25             PROSPECTIVE JUROR 0809:  I don't know the exact

1    date, yes, ma'am.

2          THE COURT:  All right.  Any further questions?

3          MR. KELLER:  No, Your Honor.

4          MR. KENNER:  No, Your Honor.

5          THE COURT:  All right.  Let me ask you to step

6    down, and we'll give you further instructions.

7          PROSPECTIVE JUROR 0809:  Okay.  All right.  Thank

8    you.

9          THE COURT:  Just be careful getting down.

10          MR. KELLER:  No objection to excusing the juror,

11    Your Honor.

12          MR. KENNER:  No objection.

13          THE COURT:  All right.  She's excused; 0809 is

14    excused for cause.

15          All right.  Sir, if you would step up over here to

16    my left, and if you would step up and you can sit.  You can

17    put your things down.

18          Okay.  This is Juror 0022, and it's Questions 9,

19    13 and 14, 15, 17, 19, 20, 21, 24, 28, and 42.  So let me

20    just start with 42.

21          What did you want to bring to my attention that

22    you didn't remember?  If you could speak into the

23    microphone, we have to make sure we get a record.

24          PROSPECTIVE JUROR 0022:  Thank you.  I realized as

25    we were going through the case and the witness list, I

1    recognized the defendant as a celebrity.  I also recognized

2    I saw a headline -- I don't think I read an article -- that

3    this case was being heard.

4              THE COURT:  Okay.  So you recognized Mr. Michel --

5              PROSPECTIVE JUROR 0022:  Correct.

6              THE COURT:  -- as a celebrity in terms of what his

7    profession is; is that correct?

8              PROSPECTIVE JUROR 0022:  Correct.

9              THE COURT:  Have you ever seen him in person or in

10   shows or something else?

11             PROSPECTIVE JUROR 0022:  I don't believe I've been

12   to his show before.  I have purchased his music 25 years

13   ago.

14             THE COURT:  Okay.  So is that how you know the

15   connection?

16             PROSPECTIVE JUROR 0022:  Correct.

17             THE COURT:  All right.  Would -- obviously he's

18   the defendant in this particular case.  Would the fact that

19   you recognize him, you know who he is, what he does, and you

20   obviously like his music, would that influence you in this

21   particular case?

22             PROSPECTIVE JUROR 0022:  No.  I don't believe so,

23   Your Honor.

24             THE COURT:  Have you come to any conclusions about

25   him based on his music or whatever you might know about him?

```
1                PROSPECTIVE JUROR 0022:  No.

2                THE COURT:  All right.  Then let me start -- let

3    me go through some of the other questions.  Let me start

4    with 9, which, of course, is that you recognized Mr. Michel,

5    and so you feel that you can be impartial in this case, fair

6    and impartial to both sides?

7                PROSPECTIVE JUROR 0022:  Yes, Your Honor.

8                THE COURT:  All right.  13 and 14 were witnesses

9    that were identified by the government and also by the

10   defense.  They may not be called, or they may be called.

11   Their names may come up in documents or something.

12               Do you know any of them personally, or is it

13   strictly by reputation?

14               PROSPECTIVE JUROR 0022:  Strictly by reputation

15   and as public figures, Your Honor.

16               THE COURT:  Okay.  And in terms of reputation, can

17   you indicate which individuals, or do you need your card

18   back?

19               I can give it back to you.  It's not a problem.

20               PROSPECTIVE JUROR 0022:  So should I read the

21   individuals' names?

22               THE COURT:  Yes.  If you can put them on the --

23               PROSPECTIVE JUROR 0022:  On the record?

24               THE COURT:  Indicate to me which ones you're

25   talking about that you recognize, as I understand,
```

1   reputation, news reports, or something you've --

2          PROSPECTIVE JUROR 0022:  Correct.  So for 13 I

3   recognized two individuals, Leonardo DiCaprio, the actor,

4   and General McMaster.

5          THE COURT:  You need to speak up so everyone can

6   hear you.  Leonardo DiCaprio.

7          PROSPECTIVE JUROR 0022:  And General McMaster.

8          And then for 14, it's a long list.  Steven Bannon,

9   Richard Gates, Rudy Giuliani, Jeff Sessions, Swiss Beatz,

10  Jim Carrey, Ben Carson, Chris Christie, Jeff Daniels, Will

11  Ferrell, Jamie Foxx, Chuck Grassley, Paris Hilton, Jessie

12  Jackson, Kim Kardashian, Alicia Keys, Lindsey Lohan, Rence

13  Priebus, Busta Rhymes, PSY, Martin Scorsese, Brittany

14  Spears, Eric Trump, Ivanka Trump, Mark Wahlberg, Kanye West,

15  and Xi Jinping.

16         In terms of organizations, Boies Schiller,

17  Sotheby's, and the movie Wolf of Wall Street.

18         THE COURT:  Okay.  So in terms of -- let me start

19  with the government's -- Leonardo DiCaprio.  Do you know him

20  from his movies?  Is that --

21         PROSPECTIVE JUROR 0022:  Yes, Your Honor.

22         THE COURT:  Is there anything else that you've

23  read about him, or you just know him from the movies?

24         PROSPECTIVE JUROR 0022:  Know him from the movies,

25  Your Honor.

1         THE COURT:  Okay.  Anything that would make a

2    difference in terms of your making decisions about his

3    credibility based on the fact that you recognize him as --

4         PROSPECTIVE JUROR 0022:  No, not at all, Your

5    Honor.

6         THE COURT:  You need to wait until I finish --

7         PROSPECTIVE JUROR 0022:  Sorry.

8         THE COURT:  -- so we have a good record.

9         And the other is McMaster.  And that, I take it,

10   you've read some material about him, or how would you --

11   what was the source?

12        PROSPECTIVE JUROR 0022:  I only know him from news

13   reports.

14        THE COURT:  Okay.  So what I'm going to ask for

15   both, the two from the government and then the long list

16   from the defense, as I said, some may be called, some may

17   not.  Mr. Giuliani is not going to be called, but there may

18   be material in a document about their names.

19        So the question is, this is based on your knowing

20   them and their reputation and formed an opinion about their

21   reputation -- and I take it you have formed an opinion about

22   their reputation?

23        PROSPECTIVE JUROR 0022:  About...

24        THE COURT:  The group of people you've identified.

25        PROSPECTIVE JUROR 0022:  I think it's worth

1    highlighting, Your Honor, I work -- I'm senior counsel for

2    technology and telecom policy for Senator Bryant Schatz from

3    Hawaii --

4              THE COURT:  Okay.

5              PROSPECTIVE JUROR 0022:  -- the Democratic senator

6    from Hawaii.

7              THE COURT:  Okay.

8              PROSPECTIVE JUROR 0022:  I don't know -- yes.

9              THE COURT:  So what we're trying to do is to --

10   whatever the outside source that you know about them where

11   you may or may not have developed an opinion about them,

12   what we want you to do is to not -- is to put aside whatever

13   opinions you have, if you've developed them, or whatever

14   information you've gotten, and to wait and let the witness

15   come, if they're going to testify, listen to the testimony

16   in the courtroom in the present and come to your own

17   conclusions, not based on what somebody else has said about

18   them, but based on your own conclusions as to whether or not

19   you could credit the testimony.

20             So what we're trying to do is have you consider

21   the witness's, you know, testimony as to whether it's

22   trustworthy or not depending on whether you've developed an

23   opinion or not, and this -- you know, your opinions are

24   based on this reputation.

25             But would you wait to consider whether a

1   particular thing that they're testifying about as part of

2   their testimony is accurate and whether you would credit it

3   or not by waiting until you actually hear the witness make

4   -- present the testimony?

5          So we're trying to separate out what you might

6   know about them from other sources, and have you come to

7   your own conclusions by listening to their testimony,

8   observing their demeanor, and making your own conclusions as

9   to whether or not you accept their testimony or not and not

10  be influenced by these other third-party discussions that

11  you may -- or information that you've received.

12         So the question is whether you can separate those

13  out -- wait -- not have the person before they get up on the

14  stand have you either slightly believing them or not

15  believing them based on this outside information, but

16  strictly based on whatever it is they actually say in court.

17  So do you think you could do that?

18         PROSPECTIVE JUROR 0022:  I do think I can do that.

19  I'm confident I can do that, Your Honor, separate it.

20         THE COURT:  And would that be true of all of the

21  people you have listed?

22         PROSPECTIVE JUROR 0022:  That would be true of all

23  the people I've listed.

24         THE COURT:  All right.  And 15 is whether -- in

25  this case you may hear testimony from law enforcement

1    officers.  There will be FBI agents and others.  And, again,

2    what we want you to do is to not make decisions about

3    whether they're credible or not, but to wait for the

4    individual officers to get on the stand and make a decision

5    at that point as to whether you want to credit the testimony

6    and how much of it.

7         So my question was whether, just based on their

8    status, you would have either -- you know, be more inclined

9    to believe them or not believe them before they said

10   anything.  So the question for 15 was:  Would you be

11   inclined to give greater or lesser weight to a law

12   enforcement officer's testimony than that of other witnesses

13   just by their status as law enforcement?

14        So are you indicating you don't think you could

15   treat them like everybody else?  You'd be more inclined to

16   believe them or not believe them just because they're law

17   enforcement?

18             PROSPECTIVE JUROR 0022:  I think I wrote down --

19   for 16?

20             THE COURT:  I'm sorry?  I have --

21             PROSPECTIVE JUROR 0022:  I have bad handwriting.

22   I apologize.

23             THE COURT:  I have 15 down.  Did I get it wrong?

24             PROSPECTIVE JUROR 0022:  I think I have 16 down.

25             THE COURT:  16.

 1                    PROSPECTIVE JUROR 0022:  No, that's on me, and I

 2     think --

 3                    THE COURT:  I didn't read your handwriting

 4     correctly then.

 5                    PROSPECTIVE JUROR 0022:  Apologies.

 6                    THE COURT:  All right.  So let me just ask.  I

 7     take it, then, based on what you're telling me, you would

 8     treat law enforcement -- you would make a decision based on

 9     their testimony, not based on the fact that they're law

10     enforcement; is that correct?

11                    PROSPECTIVE JUROR 0022:  Yes, Your Honor.

12                    THE COURT:  All right.  Then 16, this is the one

13     where either you or somebody close to you is involved with

14     law enforcement.  And I gave a long list.  Is that you or

15     somebody else?

16                    PROSPECTIVE JUROR 0022:  Both.  My -- following

17     graduation from law school, I spent about ten months as a

18     public defender in the State of Connecticut.

19                    My wife currently is in the front office at the

20     D.C. Attorney General's office.  We have several friends

21     that are lawyers and work for various agencies, from a

22     prosecutor to the IRS.

23                    THE COURT:  Okay.  So after law school you spent

24     ten months with the public defender.  Was it the federal one

25     or the local?

```
 1                    PROSPECTIVE JUROR 0022:  State, local.

 2                    THE COURT:  State one.  And did you actually

 3         handle cases that went to court?

 4                    PROSPECTIVE JUROR 0022:  One case I participated

 5         in trial.

 6                    THE COURT:  Okay.  Do you remember what the charge

 7         was?

 8                    PROSPECTIVE JUROR 0022:  It was a domestic

 9         violence charge related to -- the allegations were related

10         to throwing a beer can, a full beer can.

11                    THE COURT:  Okay.  Was there anything about that

12         experience or your work at PDS that you think would

13         influence you in this case?

14                    PROSPECTIVE JUROR 0022:  No, Your Honor.

15                    THE COURT:  All right.  And you indicated that

16         your wife works for the Attorney General's office.  Is she

17         an administrator, or is she an attorney?

18                    PROSPECTIVE JUROR 0022:  She's an attorney in the

19         front office, but she doesn't handle criminal matters.

20                    THE COURT:  So does she have a portfolio within

21         the AG's office?

22                    PROSPECTIVE JUROR 0022:  She reviews and works

23         with the divisions, none of which are criminal.

24                    THE COURT:  I'm sorry, she reviews and works?

25                    PROSPECTIVE JUROR 0022:  So she's in the front
```

 1    office.

 2              THE COURT:  So she deals with other parts of the

 3    office that do not do criminal work?

 4              PROSPECTIVE JUROR 0022:  Correct, Your Honor.

 5              THE COURT:  Is she reviewing litigation decisions?

 6    Is that some of what she's doing?

 7              PROSPECTIVE JUROR 0022:  Yes, Your Honor.

 8              THE COURT:  Okay.  Anything about her work that

 9    you think would affect your consideration of the evidence in

10    this case?

11              PROSPECTIVE JUROR 0022:  No, Your Honor.

12              THE COURT:  And you also mentioned you have

13    friends with IRS.

14              PROSPECTIVE JUROR 0022:  IRS, yes.

15              THE COURT:  And IRS obviously has different

16    components.  I mean, is it the tax --

17              PROSPECTIVE JUROR 0022:  It's not.  It's

18    nonprofit.  I also don't think it's criminal.

19              THE COURT:  I'm sorry?

20              PROSPECTIVE JUROR 0022:  I was just using that as

21    an example.  But for the IRS, the person works with a

22    nonprofit component of IRS and not criminal.

23              THE COURT:  So they would make decisions as to

24    whether they're 501(c) entities or not; is that correct?

25              PROSPECTIVE JUROR 0022:  Correct.

1          THE COURT:  Okay.  Were there any others that you

2     viewed as potentially law enforcement?

3          PROSPECTIVE JUROR 0022:  We have a friend that is

4     -- I can't remember if she -- I think she's with the D.C.

5     Attorney General's office who's doing some of the January

6     6th prosecutions.  And we have a friend, close friend, who

7     is formerly --

8          MR. KENNER:  Sorry, Your Honor, I can't hear.

9          THE COURT:  You have to speak into the microphone.

10          PROSPECTIVE JUROR 0022:  I'll speak up.

11          We have a friend who -- I think she's with the

12     D.C. Attorney General's office doing some of the January 6th

13     prosecutions.

14          I also have a former friend -- a friend from law

15     school who formerly was with the D.C. Attorney General's

16     office doing domestic violence stuff.  But, again, I don't

17     think any of these would bias my decisions or ability to

18     serve.

19          THE COURT:  Okay.  I thought that the January 6th

20     cases were mostly done by the U.S. Attorney's Office.  I

21     don't know of any that would be the AG's office.

22          PROSPECTIVE JUROR 0022:  No, correct.  I may have

23     misspoke.  Yes, the D.C. U.S. Attorney's Office.

24          THE COURT:  All right.  So, again, it's the same

25     thing.  Is there anything about their work or any

1    discussions you've had with them that you think would

2    influence you in this case in any way?

3              PROSPECTIVE JUROR 0022:  No, Your Honor.

4              THE COURT:  All right.  17 is whether you or

5    somebody close to you was employed by the Courts, the D.C.

6    Superior Court, or the U.S. District Court.  Is that you or

7    somebody else?

8              PROSPECTIVE JUROR 0022:  That was in the past.  Is

9    it worth speaking to that in the past?

10             THE COURT:  Yes.

11             PROSPECTIVE JUROR 0022:  Okay.  I, for three

12   months, served as an extern or intern for Judge Bates on

13   this court.

14             My wife clerked for Judge Boasberg on this court,

15   Judge Tatel, and Justice Ginsburg.

16             Is it just me or is it --

17             THE COURT:  In terms of -- in terms of your own

18   work, did you work on any criminal cases with Judge Bates,

19   to your knowledge?  Do you remember?

20             PROSPECTIVE JUROR 0022:  I can't recall.

21             THE COURT:  How long ago would it have been?

22             PROSPECTIVE JUROR 0022:  13 years ago.

23             THE COURT:  Okay.  And in terms of your wife's

24   clerkships where she's had it on this court, the Court of

25   Appeals, and the Supreme Court, anything about her work or

1    discussions about criminal cases or anything that you think

2    would have any bearing on this case?

3              PROSPECTIVE JUROR 0022:  No, Your Honor.

4              THE COURT:  Okay.  19 is whether you or somebody

5    close to you was employed by a criminal defense attorney

6    involved in any way of the defense of a criminal case.  So

7    would that be your PDS?

8              PROSPECTIVE JUROR 0022:  Yes.

9              THE COURT:  All right.  And there's no other

10   connection?

11             PROSPECTIVE JUROR 0022:  No.

12             THE COURT:  All right.  And 20 is whether you or

13   somebody close to you was a lawyer, members of your family.

14   So it's yourself and your wife.  Are there other family

15   members that are in the legal profession?

16             PROSPECTIVE JUROR 0022:  My family members:  My

17   father and my father-in-law.

18             THE COURT:  Do they do any criminal work?

19             PROSPECTIVE JUROR 0022:  No.

20             THE COURT:  Okay.  From yourself, what are you

21   doing at this point in terms of what's your job?

22             PROSPECTIVE JUROR 0022:  I work for a U.S.

23   senator, Brian Schatz from Hawaii.  I'm doing -- I'm very

24   focused on tech and telecom policy.  I've spent years prior

25   to this job working with large Internet providers.  So I'm

1     sort of an FCC, Federal Communications Commission, law

2     expert and focused on social media and FCC work.

3                    THE COURT:  So in your -- once you graduated,

4     besides -- did you have any other jobs between when you

5     graduated and the short stint at PDS and working for the

6     senator, did you have other legal jobs?

7                    PROSPECTIVE JUROR 0022:  So my legal jobs have

8     been working with Hogan Lovells doing essentially tech and

9     telecom law, Federal Communications Commission work in

10    particular; and I spent seven years as in-house counsel for

11    Frontier Communications, a large Internet provider.

12                   THE COURT:  Okay.  So basically communications,

13    telecommunications, is your area of expertise?

14                   PROSPECTIVE JUROR 0022:  Yes, Your Honor.

15                   THE COURT:  All right.  And have you or anybody

16    close to you worked in accounting, forensic accounting,

17    banking, or banking regulations?

18                   PROSPECTIVE JUROR 0022:  My dad and sister, or

19    both my sisters, have a small family personal accounting

20    business.  I worked for my dad for about a year and a half

21    20 years ago.

22                   THE COURT:  What did you do?

23                   PROSPECTIVE JUROR 0022:  Personal taxes, small

24    business taxes.

25                   THE COURT:  So basically --

1          PROSPECTIVE JUROR 0022:  Basic accounting.

2          THE COURT:  -- you provided -- you were like a tax

3    preparer?

4          PROSPECTIVE JUROR 0022:  Correct.

5          THE COURT:  Okay.  And you indicated that these

6    were for small businesses.

7          PROSPECTIVE JUROR 0022:  Individuals and small

8    businesses.

9          THE COURT:  Did you do any work on -- for anybody

10    that would have been a company that was overseas or an

11    individual overseas that you can recall?

12          PROSPECTIVE JUROR 0022:  Very limited.

13          You know, for instance, an individual may have had

14    foreign investment income from a, you know, mutual fund

15    overseas.  So nothing complicated with respect to overseas.

16          THE COURT:  So would these be income taxes they

17    would be filing or business taxes?

18          PROSPECTIVE JUROR 0022:  Personal income taxes,

19    small business, personal property taxes.  Very basic.

20    Something a college student -- you'd trust a college student

21    with.

22          THE COURT:  Okay.  24 is whether you or somebody

23    close to you worked in a state, federal regulatory agency,

24    commission, governing law enforcement, national security,

25    banking, foreign affairs or campaign finance.  So is it

1    anything additional?  Is that you or somebody else?

2            PROSPECTIVE JUROR 0022:  Is this the -- there was

3    a FARA question, and maybe I'm jumping the gun.  Maybe

4    that's 28.

5            THE COURT:  Sure.  There is 28, which is -- well,

6    that relates to one of the offenses is a conspiracy to

7    violate and actual violations of the Foreign Agents

8    Registration Act.

9            PROSPECTIVE JUROR 0022:  Okay.  I don't think I

10   have anything to add for 24 --

11           THE COURT:  Okay.

12           PROSPECTIVE JUROR 0022:  -- other than what we've

13   already discussed.

14           THE COURT:  Okay.  And I'll get to 28 in a second.

15           Okay.  And so 28 is -- this relates to you.  Have

16   you or any person or entity with which you frequently

17   interacted ever been subject to this law or considered this

18   law at length?

19           PROSPECTIVE JUROR 0022:  My senator introduced a

20   bill last Congress titled "Identifying Propaganda On Our

21   Airwaves" which requires broadcasters to look up in the FARA

22   database whether an entity financially backing programming

23   is on the FARA list.  I don't want to exaggerate the extent

24   to which I've considered FARA, but I have done some recent

25   work generally with respect to the database and to the

1    extent communications companies interact with foreign

2    agents.

3              THE COURT:  So you would have looked it up in

4    general.  This would be an expansion of FARA into another

5    area, if I understood what you're saying, in terms of --

6              PROSPECTIVE JUROR 0022:  Essentially, yes.

7              THE COURT:  Okay.  So in looking at that and

8    preparing -- did you prepare the legislation?

9              PROSPECTIVE JUROR 0022:  Yes, Your Honor.

10             THE COURT:  So you would have looked at what the

11   requirements were for FARA; is that correct?

12             PROSPECTIVE JUROR 0022:  Yes.

13             THE COURT:  If you were going to describe FARA,

14   how would you describe it in your own words?

15             PROSPECTIVE JUROR 0022:  If you're a foreign agent

16   or lobbying on behalf of a foreign agent, basically backed

17   by a foreign government, you have to -- an obligation to

18   report -- self-report to the government in the FARA database

19   that you are doing so.

20             THE COURT:  Okay.  So for this and some of the

21   other areas, the Court will obviously be giving you

22   instructions.  So are you willing to commit that you'll

23   follow my instructions, not what you may have researched,

24   or, you know, have your own ideas about some of the laws

25   that may be at issue here, but follow what I set out as the

1    law?

2              PROSPECTIVE JUROR 0022:  Yes, Your Honor.

3              THE COURT:  Okay.  And I guess, just generally,

4    putting all together all of the questions and the

5    information and contacts that you've had, if you took them

6    all together, do you believe that you can be fair and

7    impartial in this case to both sides?

8              PROSPECTIVE JUROR 0022:  Yes, Your Honor.

9              THE COURT:  All right.  Any questions?

10             MR. KELLER:  Good afternoon, sir.

11             Why did you leave the public defender's office

12   after ten months?

13             PROSPECTIVE JUROR 0022:  I graduated law school in

14   2010 during the economic downturn.  I had a year to do

15   whatever.  I went to the public defender's office to get

16   experience in a courtroom.  The law firm paid for it.

17   During the economic downturn, they said here's -- you know,

18   they basically paid us not to work for them, and I did that,

19   and worked with Judge Bates.

20             MR. KELLER:  During that period at the public

21   defender's office, what were your opinions of the

22   prosecutors that you dealt with?

23             PROSPECTIVE JUROR 0022:  The courthouse in New

24   Haven, Connecticut, was sort of known for negotiating -- you

25   know, did not have a lot of trials, and I had good

1    relationships with the prosecutors in that courthouse.

2              You know, I think something like 99 percent of

3    cases were -- ended in plea agreements.  I had a cordial

4    working -- good working relationships with the prosecutors

5    in the New Haven courthouse.

6              MR. KELLER:  And specifically with the case that

7    you mentioned that went to trial that you were involved in,

8    the domestic violence case, what were your opinions of the

9    law enforcement that was involved in that case?

10             PROSPECTIVE JUROR 0022:  I don't -- I don't recall

11   any particular opinion with respect to law enforcement, you

12   know, in that case.  It was a simple issue of a witness -- a

13   domestic violence witness recanting.  There was no opinion

14   -- I didn't have any opinions with respect to law

15   enforcement in the case.  They conducted themselves fairly.

16             MR. KELLER:  Thank you.  Nothing further, Your

17   Honor.

18             THE COURT:  Mr. Kenner?

19             MR. KENNER:  Thank you, Your Honor.

20             Let me start with your work where 99 percent of

21   the cases that you worked on or that that office worked on

22   ended in plea agreements.  Is that correct?

23             PROSPECTIVE JUROR 0022:  Yes.

24             MR. KENNER:  All right.  And did any of these plea

25   agreements involve cooperation agreements?

```
 1                   PROSPECTIVE JUROR 0022:  I don't recall.  It was

 2     12 -- you know, it was, whatever, 13 years ago.  Quite

 3     possibly.  And if I wasn't working regarding plea agreements

 4     directly, I was working with other attorneys with respect to

 5     plea agreements.

 6                   MR. KENNER:  Okay.  What do you understand a

 7     cooperation agreement to be?

 8                   PROSPECTIVE JUROR 0022:  A reduced sentence in

 9     exchange for testimony.

10                   MR. KENNER:  Do you have any --

11                   THE COURT:  Mr. Kenner, you need to speak up so

12     everyone can hear you.

13                   MR. KENNER:  I'm sorry, Your Honor.

14                   Do you have any personal views with respect to

15     witnesses who testify under a plea agreement?

16                   PROSPECTIVE JUROR 0022:  I think it's relevant

17     evidence.

18                   MR. KENNER:  Do you think it goes to the weight of

19     the evidence?

20                   PROSPECTIVE JUROR 0022:  Yes.

21                   MR. KENNER:  Do you have --

22                   THE COURT:  You'll get an instruction if there are

23     cooperating witnesses or whatever in terms of how you are to

24     consider the testimony, just for your own information.  You

25     will get an instruction from the Court as to how you are to
```

1    consider the testimony of --

2             PROSPECTIVE JUROR 0022:  And I do feel like I

3    could handle an instruction from the Court and consider it

4    fairly.

5             MR. KENNER:  Do you spend time in Hawaii in

6    connection with your work for the senator?

7             PROSPECTIVE JUROR 0022:  I have gone for a week.

8    I've been working here for a year, and anticipate I will in

9    the future as well.

10            MR. KENNER:  Okay.  There was a case related to

11   this one that was heard by Judge Kobayashi in the Federal

12   Court in Hawaii.  Did you -- are you familiar with the name

13   Nickie Lum Davis?

14            PROSPECTIVE JUROR 0022:  No.

15            MR. KENNER:  You haven't read anything about her?

16            PROSPECTIVE JUROR 0022:  No.

17            MR. KENNER:  Thank you.

18            With regard to your knowledge of FARA, have you

19   ever done any work on behalf of a foreign individual --

20            PROSPECTIVE JUROR 0022:  No.

21            MR. KENNER:  -- with regard to FARA issues?

22            PROSPECTIVE JUROR 0022:  No.

23            MR. KENNER:  Your only connection with FARA, then,

24   is in connection with your work for the senator?

25            PROSPECTIVE JUROR 0022:  Yes.

1          MR. KENNER:  Can you give me an idea of how much

2     time you spent in dealing with researching or whatever you

3     did to become familiar with FARA?

4          PROSPECTIVE JUROR 0022:  Maybe eight hours.

5          MR. KENNER:  Maybe what?  I'm sorry?

6          PROSPECTIVE JUROR 0022:  Eight hours.  I was

7     working on a team as well, and FARA's not the heart of the

8     legislation.  The heart of the legislation is really FCC

9     authority over communication entities to ensure there is no

10    foreign influence.

11         MR. KENNER:  Okay.  Did you read those parts of

12    the FARA law that has to do with backing or trying to

13    influence a political campaign?

14         PROSPECTIVE JUROR 0022:  I don't recall.

15         MR. KENNER:  Okay.  Do you have any feelings about

16    working on FARA that would impact your ability to be fair

17    and impartial to someone charged with a violation of it?

18         PROSPECTIVE JUROR 0022:  No, I don't have any

19    preconceived notions about FARA.

20         MR. KENNER:  Did you know anything about FARA

21    before you worked on the assignment with the senator?

22         PROSPECTIVE JUROR 0022:  Really, no.  No, I

23    didn't.

24         MR. KENNER:  Have you had any involvement in

25    campaign fundraising issues?

1          PROSPECTIVE JUROR 0022:  Very limited.  Our office

2     has also worked on legislation with respect to crypto

3     currency and campaign finance.

4          MR. KENNER:  Have you yourself ever worked on

5     behalf of any campaign?

6          PROSPECTIVE JUROR 0022:  No.  I have given

7     donations.

8          MR. KENNER:  Okay.  Have you yourself ever

9     provided paperwork to the Federal Elections Commission?

10          PROSPECTIVE JUROR 0022:  No.

11          MR. KENNER:  What familiarity, if any, do you have

12     with the Federal Elections Commission?

13          PROSPECTIVE JUROR 0022:  Limited.  As part of this

14     legislation, we've gotten some technical input on campaign

15     donations and how they treat crypto currency with respect to

16     campaign donations.

17          MR. KENNER:  Okay.  As a lawyer -- how long have

18     you been working as a lawyer in -- I think you described it

19     in the Senate?

20          PROSPECTIVE JUROR 0022:  The Senate, I've been

21     working for a year.

22          MR. KENNER:  Have you ever -- outside of the list

23     of witnesses or potential witnesses or possible witnesses,

24     have you ever heard of the name "George Higginbotham"?

25          PROSPECTIVE JUROR 0022:  I'd have to look it up.

1    I don't know.

2              THE COURT:  Well, we definitely don't want you

3    looking it up.

4              PROSPECTIVE JUROR 0022:  It's not a solid no, but

5    I don't think so.

6              MR. KENNER:  Okay.  What was your position before

7    you worked in the Senate?  What were you doing?

8              PROSPECTIVE JUROR 0022:  I was vice president of

9    federal regulatory affairs for Frontier Communications, an

10   Internet provider in 25 states, advising on Federal

11   Communications Commission's rules and compliance; and in

12   addition to advocating on behalf of the company to the FCC,

13   and sometimes Congress.

14             MR. KENNER:  Does any of your work involve

15   enforcing regulations, or just in legislating them?

16             PROSPECTIVE JUROR 0022:  Work now, certainly

17   exercising oversight of Federal Communications Commission

18   enforcement and Federal Trade Commission enforcement of

19   regulations.

20             We do not enforce directly, but do consider --

21   certainly consider enforcement authorities as well as how

22   those are exercised.

23             MR. KENNER:  Nothing further.

24             THE COURT:  All right.  You can step down, sir,

25   and we'll give you further instructions.

```
1                I assume there are no issues.
2                MR. KELLER:  None from the government, Your Honor.
3                MR. KENNER:  Your Honor, I would move to excuse
4      this juror for cause.
5                THE COURT:  Based on what?
6                MR. KENNER:  Based upon his work in the regulatory
7      environment, his personally looking at the FARA regulations.
8                THE COURT:  He's indicated he can separate it out,
9      and as a practical matter, it's been very tangential in
10     terms of the FARA issues, and the regulatory -- the fact
11     that it's -- you know, that he's -- it's all about
12     telecommunications, which is not the issue here.
13               So I absolutely would not excuse him.  I think he
14     should -- he definitely is one to be kept.
15               MR. KENNER:  Thank you, Your Honor.
16               THE COURT:  May I mention again -- whoops.  Okay.
17     That's not a juror, right?
18               THE LAW CLERK:  Correct.
19               THE COURT:  Mr. Kenner, I don't have any problem
20     with you developing things that they bring up and going on
21     and asking additional things, but you ask things they've
22     never written down.  Okay?  This is not your opportunity to
23     go through.  If they haven't said there is anything or given
24     any hint that they have, you know -- or not answered
25     something they should.
```

1          We're spending a lot of time going through

2     questions that you cherry-pick that you want to know whether

3     they have that they haven't written down.  And the whole

4     point of this is to pick and discuss the things that they

5     are providing as information.

6          Now, if it's related, I don't have a problem, or

7     they've indicated that they've not been as careful about

8     what they've written down, besides my misreading his

9     question number.  But we're going to be here for a long time

10    while you go through this.

11         It's not an appropriate process.  It's not the way

12    I've set it out in terms of doing it, and I've asked you not

13    to do this.  You've repeated also questions that you

14    yourself have asked or I've asked, and it's a straight

15    question.

16         I don't have any problem with permutations of what

17    I've asked.  You're not stuck with that.

18         But this is going well beyond what's necessary and

19    taking a lot of time in terms of away from the trial, and,

20    frankly, the jurors who are hanging around.  This is their

21    third day.

22         So I would ask that you follow my rules about how

23    we've set this up.  And I've left it very liberal in terms

24    of something tangential, but you're getting into things that

25    they've said nothing about, and there's no indication that

1    they would have anything to do with it.

2              I think at this point, it's 1:00, so we'll break

3    for lunch.  We now have 31 people.

4              MR. KENNER:  Your Honor, may I address one issue

5    very briefly?

6              THE COURT:  Yes.

7              MR. KENNER:  Your Honor, in rereviewing your

8    rules, I came across a rule that says you have to reserve a

9    seat for a family member 72 hours before the start of the

10   trial.  My wife is now planning to come out next week, --

11             THE COURT:  I'm sure that we can -- you know,

12   there's a floating thing.  There's -- hopefully, either --

13   whenever we do opening statements or you do opening

14   statements, we will have an overflow courtroom, so we will

15   set something up so your wife can have a seat.

16             MR. KENNER:  Thank you, Your Honor.

17             THE COURT:  All right.  The parties are excused

18   until 2:00.  And hopefully we can choose a jury today.

19             (Lunch recess taken)

20

21

22

23

24

25

```
 1                 A F T E R N O O N   S E S S I O N
 2            THE COURT:  All right.  Good afternoon.
 3            COUNSEL IN UNISON:  Good afternoon, Your Honor.
 4            THE COURT:  I have emailed you the instructions on
 5       the charges themselves, and so you can take a look at it.
 6       We'll give you hard copies as well at the end.  They're
 7       printing them out.
 8            THE LAW CLERK:  Would you like the next juror,
 9       Your Honor?
10            THE COURT:  Yes, let's go.
11            If you would step over here to my left.  Please
12       come up here and sit down.  You can put your things down,
13       make yourself comfortable.
14            All right.  You can take your mask off so we can
15       hear what your answers are.
16            PROSPECTIVE JUROR 0246:  Okay.
17            THE COURT:  So you can take it down.  You can take
18       it down.
19            This is Juror 0246, and they're 27, 33, and 36,
20       and 36 is -- relates to the length of the trial and whether
21       there's some issue for you.
22            Can you tell me, is there a problem in terms of if
23       you were selected sitting through the trial?
24            PROSPECTIVE JUROR 0246:  Say what?
25            THE COURT:  Okay.  36 you've listed, which is the
```

1      length of the trial and whether you have a problem with

2      being able to serve as a juror for the whole trial.  So

3      there is -- is there an issue with that?

4              PROSPECTIVE JUROR 0246:  Yes.  I have problem with

5      some people, co-workers who I used to work with, and

6      sometimes the neighbors and my husband, so I do have some

7      issues going on with my husband.

8              THE COURT:  Okay.  So I'm not sure what -- what

9      that means in terms of your being able to be a juror.  Are

10     these things that are taking your time?  Is that what you're

11     saying?  And you couldn't sit?  It's not clear to me what

12     the co-workers and your husband have to do with your --

13             PROSPECTIVE JUROR 0246:  Okay.  My husband is an

14     alcoholic, and sometimes he gets bruises sometimes, and --

15     but he tried to do better now.  I've been having problems

16     with him in a long time, but he's gone to -- they had to see

17     him to -- place every six months for help because he had

18     been in the Army, and he do have an alcoholic problem.

19             THE COURT:  Okay.  So are you indicating you need

20     to be at home and can't be here for the jury trial?  It's

21     not clear to me what the connection is.

22             PROSPECTIVE JUROR 0246:  At home.  Sometime, you

23     know --

24             THE COURT:  No, no, no.  Let me just ask you, the

25     trial will last most of April.  So you put No. 36 down, and

1    36 says -- let me read it to you again.  We expect the case

2    to take approximately four weeks, which is certainly through

3    April, and there's certain days where we will not be

4    sitting, and I told you which ones they are.

5              But the question was:  Does anyone have any

6    pressing commitment that would make sitting on this jury a

7    hardship?  And you put 36 down.

8              So it's not clear to me.  Is it because you feel

9    you need to be at home, and you cannot be here, or what is

10   the issue with your possibly serving as a juror for the

11   length of time of the trial?

12             PROSPECTIVE JUROR 0246:  Well, most of the time I

13   think I need to be home.  I'm retired.  I got health

14   problem, and so...

15             THE COURT:  So you're indicating that you can't

16   sit based on the different issues you have at home.  Is that

17   what you're saying?

18             PROSPECTIVE JUROR 0246:  Yes.

19             THE COURT:  All right.  Any additional questions

20   to be asked?

21             MR. KELLER:  No, Your Honor.

22             MR. KENNER:  No, Your Honor.

23             THE COURT:  All right.  Then let me excuse you at

24   this time, and we'll give you further instructions.  All

25   right.

```
1              PROSPECTIVE JUROR 0246:  Okay.
2              THE COURT:  Thank you.
3              Is somebody going to say something?
4              MR. KELLER:  No objection to excusing the juror,
5      Your Honor.
6              MR. KENNER:  No objection.
7              THE COURT:  All right.  I'll excuse 0246.
8              All right.  Sir, if you'll step up over here.
9              All right.  If you'd step up and make yourself
10     comfortable, and you can take your mask down so that we can
11     actually hear your answers.
12             All right.  This is Juror No. 0112, and the
13     question is 20.  And so 20 is whether you or somebody close
14     to you is a lawyer, work for a lawyer, or ever studied law.
15     Is that you or somebody else?
16             PROSPECTIVE JUROR 0112:  That is my best friend.
17             THE COURT:  All right.  So your best friend is an
18     attorney?
19             PROSPECTIVE JUROR 0112:  Yes, but she doesn't
20     practice.  She works for a legal research company, I
21     believe, but she mostly just publishes books.
22             THE COURT:  Okay.  And do you know if your friend
23     has ever done any criminal work?
24             PROSPECTIVE JUROR 0112:  I believe that her
25     company does things with, like, indigent defendants on death
```

1     row, but we don't really talk about it.  But she's never

2     done, like, in-court anything.

3                    THE COURT:  Okay.  So she doesn't do anything in

4     terms of trials --

5                    PROSPECTIVE JUROR 0112:  No, absolutely not.

6                    THE COURT:  -- or in-court things?

7                    And do you know the name of the -- the legal

8     research, the name of the company?

9                    PROSPECTIVE JUROR 0112:  Fast Case.

10                   THE COURT:  Okay.  And is that -- do you know if

11    she's had any other legal jobs?

12                   PROSPECTIVE JUROR 0112:  I believe it's just that.

13                   THE COURT:  Okay.  Have you had discussions with

14    her about criminal issues or trials or the criminal justice

15    system or anything of that nature?

16                   PROSPECTIVE JUROR 0112:  I don't believe so.

17    Nothing specifically.

18                   Of course, just as friends, you talk about topics

19    that come up in the news over the years.  I've known her

20    since, like, 2017, but I don't have anything in my mind

21    about that.

22                   THE COURT:  Okay.  I'm asking the question to make

23    sure there's nothing about your friend's being an attorney

24    and your conversations with her about legal issues, if

25    you've had those conversations, as to whether that would in

1    any way influence your consideration of the evidence in this

2    case?

3              PROSPECTIVE JUROR 0112:  I don't recall the

4    conversations, so I can't imagine it would.

5              THE COURT:  Okay.  Mr. Keller.

6              MR. KELLER:  Good afternoon, sir.

7              PROSPECTIVE JUROR 0112:  Hello.

8              MR. KELLER:  I see that you do publishings for the

9    National Academy of --

10             PROSPECTIVE JUROR 0112:  Yes, the proceedings of

11   the National Academies of Science.

12             MR. KELLER:  What are the types of publications

13   that you work on?

14             PROSPECTIVE JUROR 0112:  We really just have one

15   journal.  The proceedings itself is the journal.  So just

16   various scientific -- not really -- just single

17   disciplinary, just -- we have a lot of different sections,

18   but it's just that journal where authors, like researchers,

19   submit their study, and that gets published.

20             MR. KELLER:  Have you worked in any other fields

21   other than publishing?

22             PROSPECTIVE JUROR 0112:  Yes.  I previously worked

23   at the IMF as an administrative assistant before that; and

24   briefly after college I was a teacher here in D.C.

25             MR. KELLER:  No further questions, Your Honor.

1              THE COURT:  Mr. Kenner.

2              MR. KENNER:  Yes.  Can you describe what you did

3      at the IMF?

4              PROSPECTIVE JUROR 0112:  Sure.  Again,

5      administrative assistant, just general procedures, like

6      filing reports, getting the prior sign-offs on various --

7      I'm sorry, I'm blanking -- on the various -- it was very

8      bureaucratic, so the various procedures required for the

9      economists I worked for to go to the countries, to go on a

10     mission, brief them on what they think they need to be

11     doing.

12             I worked in the technical assistant division of

13     the monetary and capital markets department, if that helps.

14             MR. KENNER:  Yes.  Thank you.

15             Do you -- has any of the subject matters that you

16     worked on there or published reports about that had to do

17     with the banking system?

18             PROSPECTIVE JUROR 0112:  I believe, yes.  I

19     believe that was some of the topics that the economists were

20     going to the countries to discuss with them, like its

21     liquidity and things like that.  But that really didn't

22     touch my job.  I wasn't editing for content; it was really

23     more of just formatting the paper to fit IMF style

24     regulations, style guide.

25             MR. KENNER:  Did you read the reports though?

1          PROSPECTIVE JUROR 0112:  No.

2          MR. KENNER:  In what you do, you don't have to

3     read the report?

4          PROSPECTIVE JUROR 0112:  I'm not reading for

5     content.  I'm reading the words to see if they fit in the

6     space.  Like I'm not being asked to proofread.

7          MR. KENNER:  Thank you.

8          Can you tell me if there are occasions where you

9     and your best friend, who is an attorney, talk about a

10    subject and then she'll go to do some research on it to

11    further the discussion?

12         PROSPECTIVE JUROR 0112:  No.  The conversations

13    generally are just chitchatting.  And then we move on to

14    whatever show we're watching, it's in the middle of a

15    commercial or something like that, and it's Bar Rescue or

16    something.  Just idle conversation.

17         MR. KENNER:  Do you have any connection with any

18    Asian countries in connection -- when I say -- have you

19    looked at reports dealing with Asian countries that you've

20    read?

21         PROSPECTIVE JUROR 0112:  No.  My economist --

22    we're generally working in much more western hemisphere, in

23    Africa, a lot more lower on the development scale.  I don't

24    think I've worked with an economist who -- actually, there

25    was some in India, I believe.

```
1                    MR. KENNER:  Thank you.

2                    I have no further questions.

3                    THE COURT:  All right.  You can step down, sir,

4        and we'll give you further instructions.

5                    MR. KENNER:  Defense would pass for cause, Your

6        Honor.

7                    MR. KELLER:  Agreed, Your Honor.

8                    THE COURT:  All right.  So we'll keep, then, 0112.

9                    If you would step up over here.  If you'd come

10       over here.

11                   All right.  If you can step up, make yourself

12       comfortable.  Please be seated, and you can take your mask

13       off to answer the questions so we can actually hear your

14       answers.

15                   This is Juror No. 0994, and the question is 33.

16       So you've been a trial juror in a criminal case before; is

17       that correct?

18                   PROSPECTIVE JUROR 0994:  Correct.

19                   THE COURT:  And how long ago would that have been,

20       approximately?

21                   PROSPECTIVE JUROR 0994:  Six, seven years ago.

22                   THE COURT:  Okay.  Is that the only time?

23                   PROSPECTIVE JUROR 0994:  Yes, ma'am.

24                   THE COURT:  And was it this court or the local

25       court across the street or some other court?
```

```
 1                    PROSPECTIVE JUROR 0994:  It was this court.
 2                    THE COURT:  I'm sorry?
 3                    PROSPECTIVE JUROR 0994:  It was this court.
 4                    THE COURT:  Okay.  Federal court.
 5                    Do you remember what the charges were about?
 6                    PROSPECTIVE JUROR 0994:  It was a gun possession
 7       charge.
 8                    THE COURT:  Okay.
 9                    PROSPECTIVE JUROR 0994:  And something that had
10       taken place on U.S. Park property, so it was therefore a
11       federal --
12                    THE COURT:  A federal case?
13                    PROSPECTIVE JUROR 0994:  Yes.
14                    THE COURT:  Okay.  And without telling us the
15       verdict, was the jury actually able to reach a verdict?
16                    PROSPECTIVE JUROR 0994:  Yes.
17                    THE COURT:  And were you the foreperson?
18                    PROSPECTIVE JUROR 0994:  Yes.
19                    THE COURT:  And was there anything about the --
20       your experience as a trial juror, either based on the trial
21       proceedings themselves or the process of deliberations and
22       coming to a judgment on the case, that you think would
23       affect your consideration of the evidence in this case?
24                    PROSPECTIVE JUROR 0994:  No.
25                    THE COURT:  All right.  Mr. Keller.
```

```
 1                    MR. KELLER:  Good afternoon, sir.

 2                    PROSPECTIVE JUROR 0994:  Good afternoon.

 3                    MR. KELLER:  Is it correct that you work for

 4     Procore?

 5                    PROSPECTIVE JUROR 0994:  Yes, it is.

 6                    MR. KELLER:  What kind of work does Procore do?

 7                    PROSPECTIVE JUROR 0994:  We're a construction

 8     software development organization.  We have one product.

 9     It's the -- the tag line is to unite everybody on one

10     construction platform, cost savings, that kind of thing.

11                    MR. KELLER:  And you do technical software work

12     for this company?

13                    PROSPECTIVE JUROR 0994:  Correct.  I'm a program

14     manager.  I don't actually code.

15                    MR. KELLER:  Okay.  With respect to your prior

16     jury service, do you recall how long deliberations were in

17     that case?

18                    PROSPECTIVE JUROR 0994:  This is going back a few

19     years, but I think it was about two or three days.

20                    MR. KELLER:  And do you recall how long the actual

21     trial was?

22                    PROSPECTIVE JUROR 0994:  I think it was about four

23     days.

24                    MR. KELLER:  No further questions.  Thank you.

25                    THE COURT:  Mr. Kenner.
```

1           MR. KENNER:  Do you recall the subject matter of

2     the prior trial?

3           THE COURT:  Asked and answered.

4           MR. KENNER:  Oh, I'm sorry.

5           No questions, Your Honor.

6           THE COURT:  All right.  Then let me ask you to

7     step down.  We'll give you further instructions, and we'll

8     get back to you.

9           PROSPECTIVE JUROR 0994:  Thank you.

10          THE COURT:  Thank you.  He said gun possession on

11    U.S. Park property.

12          MR. KENNER:  Thank you.

13          I pass for cause, Your Honor.

14          MR. KELLER:  Agreed, Your Honor.

15          THE COURT:  All right.  So we'll retain him, so

16    we're keeping him.

17          If you would step up over here, please.  If you'd

18    come over to the side.  Just come over here.

19          Please step up and go ahead and sit down.  And you

20    can take your mask off when you answer questions so that we

21    can get a record.

22          All right, this is Juror No. 0082.  Questions 5,

23    14, 16, 20, 33.  And I believe that's 42?

24          PROSPECTIVE JUROR 0082:  The catch-all?

25          THE COURT:  The catch-all question, right.

1          Let me start with the catch-all question.  What

2     didn't you remember, or what did you want to bring to our

3     attention?

4          PROSPECTIVE JUROR 0082:  So it's more of a

5     concern.  So I have a dog that's kind of elderly.  She's 13.

6     She was in the hospital last week.  She's out of the

7     hospital.  She's recovering fine, but then last night she

8     woke me up again with similar symptoms, so I don't expect

9     that there will be an emergent situation where I need to

10    take her to a hospital that day, but I don't -- I can't

11    guarantee that won't happen.

12         THE COURT:  Okay.  Do you have like a dog walker

13    or anything while you're at work?

14         PROSPECTIVE JUROR 0082:  Yeah, I do.  Yeah.

15         THE COURT:  So you do have somebody else that you

16    can call on in terms of if there is an issue?

17         PROSPECTIVE JUROR 0082:  I have someone that will

18    walk the dog, yes.

19         THE COURT:  Okay.  All right.  Starting with

20    Question 5, Question 5 related to, based on my description

21    of sort of the background of what the charges were about, I

22    asked you if anybody was familiar with the facts of the case

23    from any particular source.  So how are you familiar with

24    the case?

25         PROSPECTIVE JUROR 0082:  So I am a lawyer at the

1    Securities and Exchange Commission in the division of

2    investment management, and in that connection I worked on an

3    application that we received from Goldman Sachs relating to

4    their guilty plea in the Jho Low matter.  So that's my

5    familiarity with it.

6          THE COURT:  Okay.  So did you have something to do

7    with it, or are you just aware of it because of your firm?

8          PROSPECTIVE JUROR 0082:  Well, I work for the

9    government, so I'm aware of it.  We granted Goldman Sachs's

10   relief.

11         So under the Investment Company Act, you cannot

12   act as an investment advisor to an investment company if

13   you've been convicted of a crime.  And Goldman Sachs, one of

14   their affiliates had pleaded guilty in connection with that

15   case, so they needed to get exemptive relief.  So we go

16   through a process in which we -- they file an application,

17   and then they agree to comply with certain conditions, and

18   if they agree to that, then we grant them exemptive relief.

19         THE COURT:  Is that a process you're involved in,

20   or is it just something you know about?

21         PROSPECTIVE JUROR 0082:  It's something that we

22   do; I'm involved in it, yes.

23         THE COURT:  But do you personally do it?

24         PROSPECTIVE JUROR 0082:  Yes, I worked on the

25   application we negotiated with Goldman Sachs.

1        THE COURT:  And have you worked on this particular

2   application?

3        PROSPECTIVE JUROR 0082:  Yes.

4        THE COURT:  Is there anything else that you know

5   about the case, or is that generally what you --

6        PROSPECTIVE JUROR 0082:  I believe that -- when I

7   was working on that or shortly thereafter someone referred

8   me to a report, a news report, on it, so I watched that.  I

9   didn't look at this particular case, but, you know, it's

10  related so...

11       THE COURT:  Okay.  So in terms of it being

12  related, is this something that you would be able to

13  separate out, or is this something that because of your work

14  you would see yourself as being associated with it?

15       PROSPECTIVE JUROR 0082:  I can probably separate

16  it out.

17       THE COURT:  Let me at this point let counsel just

18  ask around this particular issue as to how connected it

19  actually is.  You would know factually more than I do.

20       MR. KELLER:  Good afternoon, sir.

21       So as part of the materials that you reviewed, did

22  you get some kind of summary of the underlying conduct --

23       PROSPECTIVE JUROR 0082:  Yes.

24       MR. KELLER:  -- in the case?

25       And did that extend beyond Goldman Sachs or was

1    that only limited to Goldman Sachs and their employees?

2           PROSPECTIVE JUROR 0082:  I would definitely say it

3    was focused on Goldman Sachs and their employees, but, you

4    know, it also talked about Jho Low and a number of other

5    characters that were involved.

6           MR. KELLER:  Did you -- based on your work there,

7    do you have an opinion as to whether or not you think Jho

8    Low was involved in that offense or whether or not he's

9    guilty of crimes based on his involvement in that conduct?

10          PROSPECTIVE JUROR 0082:  I believe he is guilty of

11   those crimes, yes.

12          MR. KELLER:  Do you believe you'd be able to set

13   aside your knowledge and belief and evaluate this case based

14   purely on what's presented in the courtroom?

15          PROSPECTIVE JUROR 0082:  I could probably do that,

16   yes.

17          MR. KELLER:  That's all I have on this, Your

18   Honor.

19          THE COURT:  Mr. Kenner, is there anything you want

20   to ask specifically about just this point as to whether we

21   need to go any further?

22          MR. KENNER:  Yes, thank you.

23          Did you receive reports that were pertinent to

24   that review that came from the Department of Justice?

25          PROSPECTIVE JUROR 0082:  Yes.

1          MR. KENNER:  And did any of the reports come from

2     the public integrity unit at the Department of Justice?

3          PROSPECTIVE JUROR 0082:  I don't recall.  I don't

4     believe so, but I don't recall.

5          MR. KENNER:  Can you tell me what -- were these

6     reports summaries of the events?

7          PROSPECTIVE JUROR 0082:  There was a -- well,

8     there was a Statement of Facts that was agreed to by Goldman

9     Sachs.  I think that was the primary thing we looked at.

10    And that went through a number of different iterations, so

11    that was something that was -- I believe it was negotiated

12    with DOJ.

13         MR. KENNER:  Okay.  So DOJ was involved in making

14    your determination about how to deal with Goldman Sachs?

15         PROSPECTIVE JUROR 0082:  Yes, but Goldman Sachs

16    pled guilty to it, so they agreed to it as well.  They

17    agreed to what the facts were.

18         MR. KENNER:  Okay.  What specifically did they

19    plead guilty to?

20         PROSPECTIVE JUROR 0082:  Okay.  So we're going

21    back a couple of years now that I worked on this, but I

22    believe it was the foreign court practices, bribery, but I

23    think that there was also theft of money, but I'm not

24    entirely 100 percent on that.

25         But if the trial were to go on, it's possible I

1   would have greater recollections of it so...

2          MR. KENNER:  Okay.  Did any of your conversations

3   or discussions involve FARA, the federal Foreign

4   Registration Agents Act [sic]?

5          PROSPECTIVE JUROR 0082:  Could you repeat that one

6   more time?

7          MR. KENNER:  Yes, FARA, the federal Foreign Agent

8   Registration Act?

9          PROSPECTIVE JUROR 0082:  I don't recall any

10  mention of that.

11         MR. KENNER:  Do you know what FARA is?

12         PROSPECTIVE JUROR 0082:  I think I've read about

13  it, but, you know, I'm certainly no expert on that.

14         MR. KENNER:  Okay.  And that wasn't any part of

15  the work that you did?

16         PROSPECTIVE JUROR 0082:  I don't recall that being

17  any part of the work that I did.

18         MR. KENNER:  Okay.

19         THE COURT:  Just sticking to this particular

20  question.

21         MR. KENNER:  Yes, I understand, Your Honor.

22         THE COURT:  We'll get to other things.

23         And let me know if you think we shouldn't go any

24  further.

25         MR. KENNER:  Sir, are you -- did you make yourself

1   familiar with the facts about what Goldman Sachs did in

2   connection with Jho Low?

3           PROSPECTIVE JUROR 0082:  I certainly did at that

4   time, yes.

5           MR. KENNER:  And did you form opinions as to

6   whether or not what you were reading in their application or

7   what you saw from the government was true?

8           PROSPECTIVE JUROR 0082:  I believed it to be true,

9   and Goldman Sachs was saying it was true.

10          MR. KENNER:  Okay.  Tell me what it is that you

11   believed to be true.

12          MR. KELLER:  Your Honor, I'm sorry to interrupt

13   Mr. Kenner, at least for the government, I don't believe we

14   need to go any further with this witness.

15          THE COURT:  All right.  Mr. Kenner, do you agree?

16          MR. KENNER:  Yes.

17          THE COURT:  All right.  Let me ask you to step

18   down then.  Thank you.  We'll give you further instruction.

19          I called on you because, frankly, you know more of

20   the details than I do, so I just wanted to make sure that if

21   there was a problem, that we nipped it in the bud and moved

22   on.

23          MR. KELLER:  Yes, Your Honor.  Given his knowledge

24   with the underlying -- at least a piece of the underlying

25   investigation, his involvement professionally, the

1    government would move to strike for cause.

2              THE COURT:  Any objection?

3              MR. KENNER:  Agree, Your Honor.

4              THE COURT:  You agree?

5              MR. KENNER:  Agreed.

6              THE COURT:  All right.  Then so 0082 is excused.

7              All right.  If you would step up over here to my

8    right.  You can come up and sit down, sir.  Make yourself

9    comfortable.

10             PROSPECTIVE JUROR 0599:  Thank you.

11             THE COURT:  You can take your mask off in order to

12   answer so that we can make sure we have a record.  Okay?

13             PROSPECTIVE JUROR 0599:  Yes, ma'am.

14             THE COURT:  This is Juror No. 0599, and it's

15   Questions 16, 22, 29, and 36.

16             So let me start with 36, which is --

17             PROSPECTIVE JUROR 0599:  There were others on the

18   front there.

19             THE COURT:  Okay.  Oh, and 13 and 14, okay.  I

20   looked at the one end.

21             Let me start with 36, which is related to the

22   length of the trial.  Is there an issue with that?

23             PROSPECTIVE JUROR 0599:  Yes, ma'am.

24             THE COURT:  If you could speak into the microphone

25   so everybody can hear you.

```
 1              PROSPECTIVE JUROR 0599:  Yes.  There we go.  How's
 2       that?  Is that better?
 3              THE COURT:  Better.
 4              PROSPECTIVE JUROR 0599:  I run a small association
 5       management company, and we are only a few employees.
 6              THE COURT:  You're going to have to speak up.
 7       They can't hear you.
 8              PROSPECTIVE JUROR 0599:  Only a few employees, and
 9       one who is recovering from surgery recently.  We have
10       recently signed contracts to host events in person again,
11       finally, and those events I'm under contract for are the
12       first week of June and then the first week of July.  I'm
13       just rolling out sponsorships, trying to get this on sale
14       for my members to participate, and I would face a loss on
15       these events if I were having to sit for four weeks.
16              Again, a very small operation.
17              THE COURT:  The loss would be that you wouldn't be
18       able to prepare for these events in June and July.  Is that
19       what you're indicating?
20              PROSPECTIVE JUROR 0599:  That's correct.
21              THE COURT:  And I take it that with the limited
22       number of employees and one person out, you're indicating
23       other people can't do the work?
24              PROSPECTIVE JUROR 0599:  Not exclusively, no.
25              THE COURT:  All right.  Any questions?
```

```
 1            MR. KELLER:  No, Your Honor.

 2            MR. KENNER:  No, Your Honor.

 3            THE COURT:  All right.  You can step down, sir.

 4    We'll give you further instructions.

 5            PROSPECTIVE JUROR 0599:  Thank you.

 6            MR. KELLER:  No objection to excusing the juror,

 7    Your Honor.

 8            MR. KENNER:  No objection, Your Honor.

 9            THE COURT:  All right.  I'll excuse 0599.

10            THE LAW CLERK:  Ready for the next juror?

11            THE COURT:  Next one, yes.

12            THE LAW CLERK:  All right.

13            THE COURT:  If you'd step up over here next to me.

14    I'd ask you to step up and you can be seated.  Leave your

15    things.  You can probably put some of them on the top there.

16            All right.  You can take your mask off while you

17    answer the questions so we make sure we have a record.  All

18    right?

19            PROSPECTIVE JUROR 0080:  Yes.

20            THE COURT:  This is Juror No. 0080, and it's No.

21    25, which is whether you or somebody close to you has ever

22    been a victim or a witness of a similar crime as the one

23    charged in this case.  And we made it fairly broad in terms

24    of financial crimes, investment fraud, identity theft, or

25    campaign finance violations.
```

1          So could you explain which category it fits in?

2    Is it you or somebody else?

3          PROSPECTIVE JUROR 0080:  Myself and my mother,

4    identity theft.

5          MR. KENNER:  I'm sorry, I can't --

6          THE COURT:  You need to speak right into the

7    microphone.  If you tilt it down just a teeny bit.

8          PROSPECTIVE JUROR 0080:  Okay.  So it was myself

9    and my mother, identity theft.

10          THE COURT:  Okay.  Identity theft?

11          PROSPECTIVE JUROR 0080:  Yes.

12          THE COURT:  Okay.  And can you just tell us, you

13    know, what happened?

14          PROSPECTIVE JUROR 0080:  Well, for me, one day I

15    come home, there's mail in my mailbox from a bank that I do

16    not associate with at all.  It had my name, my address, all

17    of my information.  So I called the bank, and some -- and

18    the young lady told me that someone with my name opened up a

19    bank account under my name.  And I started getting mail -- I

20    got their ATM card to my home, so I called -- had to call

21    the bank again to have everything -- have them to stop it.

22    Then I had to get in contact with the credit bureaus to let

23    them know that that was not me.  And I'm still monitoring it

24    to this day.

25          THE COURT:  Okay.  And did that ever get resolved?

```
 1                    PROSPECTIVE JUROR 0080:  No.  Still dealing with
 2      it.
 3                    THE COURT:  I'm sorry?
 4                    PROSPECTIVE JUROR 0080:  I'm still dealing with it
 5      now.
 6                    THE COURT:  So have you had any losses connected
 7      to it, or is it --
 8                    PROSPECTIVE JUROR 0080:  No losses, it's just --
 9                    THE COURT:  Somebody's opening an account --
10                    PROSPECTIVE JUROR 0080:  Somebody's opening an
11      account with my name, and that kind of makes me leery of
12      anything that comes to my house if I don't know anything
13      about it.
14                    THE COURT:  Okay.  So we ask some of these
15      questions in terms of a broad financial -- this does not --
16      the case doesn't include any kind of charges related to the
17      kind of situation that you've spoken about.  But in the
18      sense -- well, I shouldn't say that.  Let me word it
19      differently.
20                    There's -- I've given you a description of what
21      the case is about in sort of general terms.  From your
22      perspective, did you identify in any way what happened to
23      you with what I described, or did you see them as totally
24      different?
25                    PROSPECTIVE JUROR 0080:  I believe it's different.
```

1          THE COURT:  Okay.  Would you be able to separate

2     out what's happened to you in terms of somebody opening this

3     bank account in your name from whatever evidence that we

4     present in this particular case, which may include people

5     using other people's names, not exactly in the way you've

6     just spoken about, but would you be able to separate out

7     what your event happened with whatever evidence is here?

8          Because what we want you to do is to listen to the

9     evidence and make a decision based on what's presented in

10    the courtroom and not bring in any personal experiences that

11    you have.

12         Do you think you could do that?

13         PROSPECTIVE JUROR 0080:  To be honest, that's

14    going to be hard.  Because, like I said, I'm still going

15    through it now, and because someone used someone else's

16    name, what made me think about the case with me, because

17    somebody else used my name and opened up a bank account.

18         THE COURT:  Okay.  Do we want to go any further,

19    or do you want to ask some questions?

20         MR. KELLER:  If I could just ask a couple, Your

21    Honor.

22         THE COURT:  Sure.  Go ahead.

23         MR. KELLER:  Good afternoon, ma'am.

24         If you heard evidence in this case that financial

25    activity that was conducted in someone else's name was done

1    with their knowledge as opposed to what sounds like was in

2    your case where you had no knowledge of the fact that people

3    were using your name to open an account; is that right?

4         PROSPECTIVE JUROR 0080:  Uh-huh.  Right, no, I

5    didn't know.

6         MR. KELLER:  So if you heard evidence that in this

7    case there were financial transactions or maybe accounts

8    opened in the names of other people, but those other people

9    knew about it and agreed to it, would that be different

10   enough where you think your personal experience wouldn't

11   really weigh in to your consideration?

12        MR. KENNER:  Your Honor, I object to this

13   question.

14        THE COURT:  No, I think in terms of whether her

15   distinctions -- I mean, he's just asking in general terms.

16   This is not necessarily what the evidence will be presented,

17   but we're trying to figure out how much of a connection

18   you're going to be making.  Okay?

19        So it's just exploring things.  It's not telling

20   her what the evidence is.  Okay?

21        Go ahead.

22        PROSPECTIVE JUROR 0080:  Okay.  Sir, you're asking

23   me am I going to be -- to differentiate between the two

24   because you're saying that someone knew that an account was

25   opened, then I'm going to have to believe it.

1          THE COURT:  I think what we're getting at -- let

2     me put it this way.  From your perspective, somebody opened

3     the account.  You didn't know about it.  You did not

4     authorize it.

5          PROSPECTIVE JUROR 0080:  Right.

6          THE COURT:  Would it make any difference to you in

7     terms of your being concerned about being a juror and

8     separating the two things out if people opened accounts or

9     did financial transactions in other people's names, but

10    those people had agreed to that -- their names being used?

11    Would that make a difference to you, or does it not make any

12    difference at all, and you still would be concerned based on

13    your own experience?

14         PROSPECTIVE JUROR 0080:  I still would be

15    concerned.

16         MR. KELLER:  No additional questions, Your Honor.

17         THE COURT:  Mr. Kenner, anything?

18         MR. KENNER:  No, Your Honor.

19         THE COURT:  All right.  You can step down.

20         PROSPECTIVE JUROR 0080:  Thank you.

21         THE COURT:  And we'll give you further

22    instructions.

23         MR. KENNER:  Move to strike for cause, Your Honor.

24         MR. KELLER:  No objection, Your Honor.

25         THE COURT:  All right.  0080 is stricken for

```
 1    cause.

 2              All right.  If you would step up over here,

 3    please.

 4              Yes, please step up, and make yourself

 5    comfortable.  Go ahead.

 6              This is Juror No. 0585.  Okay.  13, 17, 32, 33,

 7    and 36.

 8              So let me start with 36, which is the length of

 9    the trial.  What seems to be the issue?

10              PROSPECTIVE JUROR 0585:  I'm an hourly employee --

11              THE COURT:  Okay.  If you could talk into the mic.

12    I'm sorry.

13              PROSPECTIVE JUROR 0585:  Sorry.  I get paid

14    hourly, so financially it would be very tough on me.

15              THE COURT:  What do you do, sir?

16              PROSPECTIVE JUROR 0585:  I'm a -- I do coffee.

17    I'm into coffee production.

18              THE COURT:  So you work for yourself, or you work

19    for somebody else that only pays you hourly?

20              PROSPECTIVE JUROR 0585:  I work for a company.

21              THE COURT:  I'm sorry?

22              PROSPECTIVE JUROR 0585:  I work for a company.

23              THE COURT:  Okay.  And the company only pays you

24    if you actually show up for work?

25              PROSPECTIVE JUROR 0585:  Exactly, yes.
```

```
 1              THE COURT:  Any questions?
 2              MR. KELLER:  No, Your Honor.
 3              THE COURT:  Mr. Kenner?
 4              MR. KENNER:  No, Your Honor.
 5              THE COURT:  All right.  You can step down, and
 6    we'll give you further instructions.
 7              PROSPECTIVE JUROR 0585:  Thank you.
 8              MR. KELLER:  No objection to excusing the juror,
 9    Your Honor.
10              MR. KENNER:  No objection.
11              THE COURT:  All right.  Then I'll excuse 0585.
12              All right.  If you would step up over here,
13    please.  If you come around and step up over here, yes.
14              Please come up and sit down.
15              PROSPECTIVE JUROR 0838:  Yes, ma'am.
16              THE COURT:  Thank you.  And you can pull your mask
17    down when you answer the questions --
18              PROSPECTIVE JUROR 0838:  Okay.
19              THE COURT:  -- so that we can get a record.
20              So this is Juror No. 0838, and it's 13, 14, 16,
21    20, 21, 22, 23, 26, 29, and 36.
22              So let me start with the last one, which is 36.
23              PROSPECTIVE JUROR 0838:  Sure.
24              THE COURT:  What seems to be the problem with the
25    length of the trial?
```

```
 1              PROSPECTIVE JUROR 0838:  My father had a stroke
 2     about ten days ago.  He was just released to go home from GW
 3     ICU, and I am his sole caretaker.  And he's at home now, and
 4     every hour that I'm here costs me $35 an hour for Georgetown
 5     Home Health nurses, so every day here costs me $350 for me
 6     to make $57.
 7              Also, he's 86, he just had a stroke.  I would hate
 8     for something to happen over the next month while I'm here
 9     that's detrimental.  I just would never forgive myself.  And
10     I have proof, if you need it.
11              THE COURT:  Do you work?  Will you be able to stay
12     home from your work?
13              PROSPECTIVE JUROR 0838:  Yes.  I would stay home
14     -- I stay home during the day right now, and then the night
15     nurses come -- they were supposed to come at night, but now
16     I have them 24/7.
17              THE COURT:  Okay.  So your idea is that you would
18     be home -- you would be the caretaker for your father?
19              PROSPECTIVE JUROR 0838:  Yes, I am the caretaker.
20              THE COURT:  And then, do you work at night, is
21     that what you're saying?  Or you work during the day?  I'm
22     not quite sure.
23              PROSPECTIVE JUROR 0838:  I usually work during the
24     day but I took over to take care of him because he just came
25     home.
```

1          THE COURT:  Were you planning on staying home for

2     a period of time?

3          PROSPECTIVE JUROR 0838:  For the next two weeks

4     until we decide what to do with him, either go to a skilled

5     nursing facility -- we want him to go to NRH, but he's not

6     eligible yet.  So we're all -- the family's just trying to

7     figure out what to do right now.

8          THE COURT:  All right.  Any questions?

9          MR. KELLER:  No, Your Honor.

10          MR. KENNER:  No, Your Honor.

11          THE COURT:  All right.  You can step down, and

12     we'll give you further instructions.

13          PROSPECTIVE JUROR 0838:  Okay.

14          THE COURT:  Anybody going to say anything?

15          MR. KELLER:  No objection to excusing the juror.

16          MR. KENNER:  No objection, Your Honor.

17          THE COURT:  All right.  Then I'll excuse 0838.

18          Sir, if you'd step up over here.  If you'd come up

19     and sit down, please.  Make yourself comfortable.  And

20     you've got your mask off.

21          Okay.  So this is 0819, and you've put down

22     Questions 1, 4, 5, 10, 13, 14, 15, 16, 22, 29, 35, 36, 39,

23     and 42.

24          So in terms of 1 and 4, the first one is whether

25     you accept the fact that although Mr. Michel has been

1    charged in an indictment, that doesn't mean that you're to

2    conclude that he's guilty, that he is presumed to be

3    innocent, and it's the government's burden to prove him

4    guilty beyond a reasonable doubt; and Mr. Michel doesn't

5    have to prove his innocence or produce any evidence.

6          So the question is whether you believe that you'd

7    be unable to follow those principles of law if you were

8    selected?  So is that correct?

9          PROSPECTIVE JUROR 0819:  I generally would give,

10   Your Honor, more credence to law enforcement and what they

11   say as a personal bias, and that goes to a later question

12   that was asked as well.

13         THE COURT:  So are you indicating that you're not

14   accepting the presumption of innocence, or in terms of --

15   I'm trying to figure out what it has to do with this, but

16   I'll get to the law enforcement.

17         The other one is -- 4 is if you've heard the

18   arguments of the lawyers, instructions, and you have

19   reasonable doubt, then it would be your duty to vote not

20   guilty.  Are you indicating you wouldn't be able to do that?

21         PROSPECTIVE JUROR 0819:  I appreciate that our

22   system allows for the presumption of innocence, and, you

23   know, I follow that as well.  I look at the evidence, and I

24   look at why I believe what evidence will lead me to conclude

25   that they are not guilty of the crime that they're being

1    charged with.

2           THE COURT:  So I'm not quite clear why you put 1

3    and 4 down then.  It sounds like you're accepting them.  Or

4    you're not accepting them?

5           The question was to try to find out whether people

6    would follow, you know, the very basic precepts in a

7    criminal case.

8           PROSPECTIVE JUROR 0819:  I think as a matter of

9    law, I understand what the law says, and I appreciate that.

10   However, I think as a personal bias of mine, separate from

11   the law --

12          THE COURT:  Okay.

13          PROSPECTIVE JUROR:  -- I tend to work backward and

14   not necessarily presume innocence, understanding that that's

15   what the law allows for.  But I try to work back as to why I

16   believe that they are not guilty, if that makes sense.

17          THE COURT:  So you've indicated a personal bias.

18   Is there a basis for this or some reason why you've

19   developed this view?

20          PROSPECTIVE JUROR 0819:  I just have it.

21          THE COURT:  Okay.  And you said something about

22   law enforcement in terms of you would give greater credence

23   and not be able to treat them, law enforcement officers who

24   testify, the same as anybody else?

25          PROSPECTIVE JUROR 0819:  Yes.  I mean, I think

```
 1    that law enforcement have an understanding of what the law
 2    is.  Not to say that no one else does, but, I mean, I think
 3    their word against any other person's, I think in my mind,
 4    again, as a personal bias of mine, I think I tend to give
 5    that greater credence, whether, you know, intentional or
 6    more accurate or not.
 7            THE COURT:  Okay.  And what's the reason you can't
 8    sit for the trial, the length of the trial?
 9            PROSPECTIVE JUROR 0819:  Well, I -- first of all,
10    I have a vacation that's scheduled.  That would be the
11    second week in May.  I understand that it's expected to go
12    four weeks.  I know that the selection process has carried
13    out, I think, longer than a lot of us anticipated, so I
14    don't know if that would be the same for the trial, but I do
15    have personal plans scheduled for the second week in May,
16    much of it that is not refundable, so there's that.
17            And then, you know, I mean, I understand that it's
18    true of many people, but, you know, it's very hard for me to
19    be away from my job for that long.
20            THE COURT:  What do you do?
21            PROSPECTIVE JUROR 0819:  I work in news media.
22            THE COURT:  What do you do in news media?
23            PROSPECTIVE JUROR 0819:  I'm an editor.
24            THE COURT:  For whom?
25            PROSPECTIVE JUROR 0819:  Fox.
```

```
1              THE COURT:  So nobody else would be able to do the
2       job if you were selected?
3              PROSPECTIVE JUROR 0819:  I'm not saying that.
4              THE COURT:  Would you get paid?
5              PROSPECTIVE JUROR 0819:  To my understanding, yes.
6              THE COURT:  Okay.  Any other questions?
7              MR. KELLER:  Not from the government, Your Honor.
8              THE COURT:  Mr. Kenner.
9              MR. KENNER:  No, Your Honor.
10             THE COURT:  You can step down, and we'll give you
11      further instructions.
12             MR. KELLER:  The government would move to strike
13      for cause based on the answers on presumption of innocence.
14             MR. KENNER:  Agreed.
15             THE COURT:  A couple of them.
16             MR. KENNER:  Agree, Your Honor.
17             THE COURT:  All right.  I will make no comments.
18      He is excused.
19             If you would step up here and make yourself
20      comfortable.  You can take your mask down so we can hear
21      what your answers are.
22             PROSPECTIVE JUROR 0192:  Okay.
23             THE COURT:  Okay.  This is Juror No. 0192, 33 and
24      36.
25             So you've been a juror before?
```

```
1                    PROSPECTIVE JUROR 0192:  Yes.

2                    THE COURT:  And 36 is the length of the trial.

3       What is the issue?

4                    PROSPECTIVE JUROR 0192:  I have diabetes and

5       neuropathy.  I have problems walking, and I need to stand up

6       several times a day for my arthritis in my knees.

7                    THE COURT:  Okay.  So if we took regular breaks

8       for you --

9                    PROSPECTIVE JUROR 0192:  Not enough.

10                   THE COURT:  Well --

11                   PROSPECTIVE JUROR 0192:  Go ahead.

12                   THE COURT:  I'm not saying stand up and walk out.

13      I'm sorry.

14                   PROSPECTIVE JUROR 0192:  Yes, I would have to get

15      up -- it's like every 30, 45 minutes, I need to stand up.  I

16      need to stand up now.

17                   THE COURT:  How often would you need to do the 30

18      or 45 minutes?

19                   PROSPECTIVE JUROR 0192:  Probably four or five

20      times a day.

21                   THE COURT:  So in the course of, say, from 9:00 to

22      5:00, obviously we'd -- you'd have a lunch break.  How many

23      times would you expect to get up and walk around?

24                   PROSPECTIVE JUROR 0192:  Probably three or four

25      times.
```

1         THE COURT:  Any questions?

2         MR. KELLER:  No, Your Honor.

3         THE COURT:  Mr. Kenner?

4         MR. KENNER:  No, Your Honor.

5         THE COURT:  All right.  You can step down.  We'll

6    give you further instructions.

7         PROSPECTIVE JUROR 0192:  Okay.

8         THE COURT:  Anybody going to say anything?

9         MR. KELLER:  No objection to excusing the juror,

10   Your Honor.

11        MR. KENNER:  No objection.

12        THE COURT:  All right.  I'll excuse 0192.

13        THE COURTROOM DEPUTY:  Excused?

14        THE COURT:  She's excused.

15        If you would step up over here.  Just come around.

16   Yes.  Either way.  You can come that way.  That's fine.

17        All right.  And you can step up.  Yes, make

18   yourself comfortable.  You may want to put your coat just on

19   the back there.  That will make it easier for you.

20        PROSPECTIVE JUROR 0456:  Thank you.

21        THE COURT:  All right.  And you can take your mask

22   off in answering the questions so we can get a -- can hear

23   you and get a record.

24        PROSPECTIVE JUROR 0456:  Okay.

25        THE COURT:  So this is Juror No. 0456, and it's

1    No. 16 and 29.

2              So 16 is whether you or somebody close to you is

3    involved in law enforcement.  Is that you or somebody else?

4              PROSPECTIVE JUROR 0456:  Someone else.  I have --

5    my youngest brother, he just --

6              MR. KENNER:  Excuse me, Your Honor, I can't hear.

7              PROSPECTIVE JUROR 0456:  I'm sorry.

8              THE COURT:  We have a large group out here to

9    hear.

10             PROSPECTIVE JUROR 0456:  Okay.  My younger brother

11   just got -- I believe he was in the cadet program.  I think

12   he's an officer now.  And my godmother was a -- I believe

13   she was a correctional officer.  And then my mother does

14   911.  That doesn't really count too much, but she's still

15   around.

16             THE COURT:  Okay.  So is that -- in terms of

17   attending the cadet program, is that for the D.C.

18   Metropolitan Police Department?

19             PROSPECTIVE JUROR 0456:  Yes.

20             THE COURT:  Okay.  And then you think your --

21             PROSPECTIVE JUROR 0456:  My godmother.

22             THE COURT:  Your godmother would be the

23   correctional officer?

24             PROSPECTIVE JUROR 0456:  Yes.

25             THE COURT:  And then your mother does 911

1    emergency calls?

2              PROSPECTIVE JUROR 0456:  Yes.

3              THE COURT:  So we ask these questions to make sure

4    that there's nothing about their connection with law

5    enforcement that would affect your consideration of the

6    evidence in the case.  We will have witnesses from law

7    enforcement that will be taking the stand and testifying,

8    and we want to make sure that you treat them like you would

9    anybody else.  That means you don't decide before they say

10   anything that they're more believable or less believable

11   based on the fact that they're law enforcement.

12             So do you have any concerns about that based on

13   the fact that you have some family members or your godmother

14   that are involved in law enforcement?

15             PROSPECTIVE JUROR 0456:  No, I don't have any

16   concerns about that.

17             THE COURT:  So you would be able to treat the law

18   enforcement, when they testified, like everybody else and

19   make a decision once they testify as to their believability?

20             PROSPECTIVE JUROR 0456:  Absolutely.

21             THE COURT:  All right.  And 29 is whether you have

22   strong opinions about money from foreign countries being

23   used to influence the outcome of elections or to seek

24   political favors from elected officials in such a way as to

25   affect your fairness and impartiality as a juror in this

1   case.

2          So let me ask it in two questions.  The first is

3   you've indicated you have strong opinions; is that correct?

4          PROSPECTIVE JUROR 0456:  Yes.

5          THE COURT:  Most people have opinions.  The

6   question is whether your opinions are such that they're

7   actually going to affect how you consider the evidence.  In

8   other words, you can't put your opinions aside, listen to

9   the evidence and make a decision based just on the evidence

10  presented without bringing in your own views of the topic.

11  Can you do that, or not?

12         PROSPECTIVE JUROR 0456:  Yes, I can do that.  I

13  don't -- I just person -- it's my personal opinion, and I

14  don't think that I'll have an issue with looking at the

15  evidence and everything without putting my personal bias in

16  it when it comes to making a decision for that.

17         THE COURT:  Okay.  So even though you put this

18  down that you thought it might affect it, you're indicating

19  to me that you can put aside your strong opinions about this

20  topic and listen to the evidence and come to your own

21  conclusions about it based on the evidence, not based on any

22  other information you may have?

23         PROSPECTIVE JUROR 0456:  Yes.

24         THE COURT:  All right.  Mr. Keller.

25         MR. KELLER:  No questions, Your Honor.

1            THE COURT:  Mr. Kenner?

2            MR. KENNER:  Good afternoon.  How are you?

3            PROSPECTIVE JUROR 0456:  I'm good.  How are you

4    this afternoon?

5            MR. KENNER:  Can you tell me what your opinions

6    are with regard to foreign money coming into the United

7    States to influence the government?

8            PROSPECTIVE JUROR 0456:  Yes.  I just think that

9    it's unfair because I feel as though we have the money and

10   the resources here, so we should be able to take from the

11   money and the resources that we have here first before we go

12   out to get any type of outside help to influence something.

13           MR. KENNER:  I'm sorry, I'm having trouble hearing

14   you.

15           PROSPECTIVE JUROR 0456:  Sorry.  I just think that

16   it's unfair because we have the money and the resources here

17   already, so I feel like we should pull from that first

18   before we even think about, you know, pulling from outside

19   help.

20           MR. KENNER:  Okay.  So you think that money to

21   influence the United States government should come from

22   people within the United States rather than from people

23   outside the United States.  Is that a fair statement?

24           PROSPECTIVE JUROR 0456:  Yes, that's a fair

25   statement, I believe.  Yes.

1          MR. KENNER:  And when you -- in regards to that

2     opinion, do you believe that it would be more difficult for

3     you to set aside any personal views and sit on a case like

4     this as opposed to some other case that doesn't involve

5     that?

6          PROSPECTIVE JUROR 0456:  I personally don't think

7     so.  For me, I don't think that would be an issue.

8          THE COURT:  The question is, you are in this case,

9     not some other case.  So we want to make sure that in this

10     case it would not influence you, your opinions.

11          PROSPECTIVE JUROR 0456:  No, not in this case, it

12     wouldn't influence my opinion.

13          MR. KENNER:  No further questions.

14          THE COURT:  All right.  You can step down, and

15     we'll give you further instructions.

16          PROSPECTIVE JUROR 0456:  Okay.

17          THE COURT:  All right.  We have 35 people without

18     counting -- there was a juror, which is No. 36, 0701, she

19     had doctors' appointments, but we can accommodate her on

20     April 12th.  Her doctor is 12:45.  If we stopped at 11:00,

21     which works for me for my commission meeting, so we've left

22     her in.

23          The other one we did not make a final decision was

24     No. 37, Line 37, 0497.  He is the individual who is

25     traveling this Friday but coming back Sunday, so he'd be

1     available for the trial.

2            His flight is at 4:30, so he'd have to leave here

3     -- we'd have to stop earlier to -- in order to accommodate

4     him to get to the airport.  It is National, so it's not that

5     far from the courthouse.  So the question is whether to

6     leave him in or not.

7            We had sort of left him in to make sure we didn't

8     have any problems in terms of having enough jurors.

9            I generally do at least one more.  35 is what we

10    need.  I generally do at least one, maybe one other than

11    that, because every once in a while you get -- you have them

12    in the box, you're about to swear them in, you ask them is

13    there anything else they haven't brought up and somebody

14    brings up something else.  And I don't want to have -- you

15    know, I want to make sure that we have enough people and

16    there's not an issue.  But he was one we sort of left in the

17    wings.

18           So do people have views about just putting him in

19    the pool, in which case we have 36.

20           MR. KELLER:  Your Honor, if we put him into the

21    pool and we were going to break at, say, 2:30 on Friday,

22    would we be able to just go straight through that day and

23    not stop for lunch?

24           THE COURT:  That I think is hard -- we'd have to

25    do some stopping because we switch court reporters, and not

1    eating lunch for me isn't going to be an issue, but it may

2    be for some others, issues for some other people --

3                MR. KENNER:  Yes, Your Honor.

4                THE COURT:  -- or some others from a health

5    perspective.

6                What we can do -- there's obviously no reason to

7    have an afternoon break.  I don't know that he needs to

8    leave at 2:30 to get a flight at 4:30, but we'd certainly

9    need to probably stop at 3:00.  I mean, from here to

10   National is not that far.

11               MR. KELLER:  I would prefer to excuse him then so

12   that we can have a full day on Friday.

13               MR. KENNER:  I agree, Your Honor.

14               THE COURT:  All right.  So let's -- I think he's

15   -- this is No. 37, 0497.  We had held on to him, and we're

16   going to excuse him.  I wanted to make sure we had enough

17   people.

18               THE COURTROOM DEPUTY:  Okay.  And we're going to

19   keep 36, right?

20               THE COURT:  Yes, we had that one.  That one we're

21   keeping.

22               So we have 35.  My suggestion, although it will

23   probably take forever, I would try one more just to have an

24   extra one just in case somebody at the last minute brings

25   anything up that means that we have to excuse them.  35 is

1    15 in the box, 10 and 6, and then two and two for

2    alternates.  So I would just have one more, and then

3    hopefully it won't take us that long to do it.  Once we get

4    that, we'll move to the ceremonial courtroom and proceed.  I

5    have a -- we probably should be able to get through choosing

6    the peremptory and getting a preliminary instruction at a

7    minimum.  I think we should get one more.  As I said,

8    hopefully it won't take forever.

9            If you would step up over here, please, next to my

10   -- next to me.  Just come on through the center or around

11   the side, whichever works for you.

12           If you'd come over here, and if you'd step up.

13   And you can put your things down, and if you'd go ahead and

14   sit.  Go ahead and sit down, make yourself comfortable.  And

15   you can take your mask down when we ask questions so that we

16   can actually hear you when you speak into the microphone.

17   All right?

18           This is Juror No. 0835, and it's Questions 16, 32,

19   and 36.

20           16 was the question about whether you or somebody

21   close to you was employed by law enforcement.  So is that

22   you or somebody else?

23           You can take it down.  It's hard for us to hear in

24   the courtroom.

25           Is it you or somebody else with the law

1    enforcement question?  Was that a -- it looks like a 6.  Was

2    that supposed to be a 5?

3              PROSPECTIVE JUROR 0835:  I think I made a mistake

4    when I wrote that.  I think --

5              MR. KENNER:  I can't hear you.

6              THE COURT:  You have to speak into the -- take

7    your time -- into the microphone.  16 is whether you or

8    somebody close to you was employed by a law enforcement

9    agency, and then I gave you examples of police department,

10   FBI, U.S. Attorney's Office, those kinds of places.

11             PROSPECTIVE JUROR 0835:  No, so I think I mixed up

12   because I know someone who is actually a criminal lawyer and

13   now he is a journalist, and he used to work here.  So that's

14   why I was confused if I was.

15             THE COURT:  So your answer is somebody who is a

16   lawyer.

17             PROSPECTIVE JUROR 0835:  Yes, yes.  That was a

18   fact.

19             THE COURT:  Is that a friend, or is that a

20   relative?

21             PROSPECTIVE JUROR 0835:  It's -- no, no, it's just

22   a friend.

23             THE COURT:  Okay.  So you have a friend who is an

24   attorney; is that correct?

25             PROSPECTIVE JUROR 0835:  He was an attorney.  Now

1    he's not doing that anymore.  He's a journalist.

2              MR. KENNER:  Your Honor, I'm sorry, I can't hear

3    the witness.

4              THE COURT:  I think what you have to do is you

5    have to -- instead of talking to me, you need to talk to

6    them so we make sure that we can hear you.  Okay?  Talk as

7    if you're talking to somebody.

8              PROSPECTIVE JUROR 0835:  Do I have to repeat?

9              THE COURT:  Yes.  You have a friend who is an

10   attorney?

11             PROSPECTIVE JUROR 0835:  Yes.

12             THE COURT:  And is the person working as an

13   attorney right now?

14             PROSPECTIVE JUROR 0835:  No, no more.  He's more a

15   journalist now.

16             THE COURT:  Okay.

17             PROSPECTIVE JUROR 0835:  Working here for some

18   trials.  That's why I was just wondering if I had to write

19   the number you were just asking.

20             THE COURT:  Okay.  So your friend is now a

21   journalist, and is -- is your friend covering trials, is

22   that what you're saying?

23             PROSPECTIVE JUROR 0835:  Yes, he's covered trials

24   here in this court.

25             THE COURT:  So have you seen him in the

 1   courthouse?

 2            PROSPECTIVE JUROR 0835:  I know he's here every

 3   day because I'm a good friend of his wife.

 4            THE COURT:  Okay.

 5            PROSPECTIVE JUROR 0835:  And even the wife, just

 6   because of -- for me, that's the first time I even come

 7   here, you know.  She wanted me to -- we did a visit two

 8   weeks ago just to know where the courthouse is to be sure

 9   that I wasn't completely confused, and so she showed me the

10   courthouse.  We had just a small -- we came in the -- with

11   the public, you know, see what was going on.  And that was

12   it.  You know?

13            THE COURT:  Okay.

14            PROSPECTIVE JUROR 0835:  She lives nearby.

15   Actually, she is a next door neighbor.  So I don't know if

16   I'm confusing because I wrote this number.

17            THE COURT:  That's all right.  Not a problem.  As

18   long as we get the information.

19            PROSPECTIVE JUROR 0835:  Okay.

20            THE COURT:  So your friend who is now the

21   journalist, and he's in the courthouse covering trials.  Is

22   that correct?

23            PROSPECTIVE JUROR 0835:  Yes.

24            THE COURT:  But you haven't seen him yet?

25            PROSPECTIVE JUROR 0835:  No, no.  No, no.

1          THE COURT:  Let's assume you ran into him in the

2    hall or he showed up in the courtroom.  We want to make sure

3    that you would not talk about the case with him --

4          PROSPECTIVE JUROR 0835:  No, no, absolutely not.

5          THE COURT:  Okay.

6          PROSPECTIVE JUROR 0835:  Actually, he's not in the

7    courthouse.  I know he's in another room with a journalist

8    and the press and media.  I know that.  He told me.

9          THE COURT:  But if you saw him, either in the

10   courthouse or elsewhere, I want to make sure that you agree

11   you would not discuss this case if you were selected.

12         PROSPECTIVE JUROR 0835:  I promise that.

13         THE COURT:  Okay.

14         PROSPECTIVE JUROR 0835:  I already put my hand on

15   it for the oath.  I made it already.  Even though my husband

16   and family and friends, as you asked us to do.

17         THE COURT:  Okay.

18         PROSPECTIVE JUROR 0835:  Okay.

19         THE COURT:  You indicated that he was an attorney

20   and worked as an attorney before that; is that correct?

21         PROSPECTIVE JUROR 0835:  Yes, yes.

22         THE COURT:  Do you know if he did any criminal

23   cases before?

24         PROSPECTIVE JUROR 0835:  I don't have a lot of

25   decision, no.  I can't exactly say that I know exactly what

1    was involved.

2              MR. KENNER:  Sorry.

3              THE COURT:  Okay.

4              MR. KENNER:  Excuse me, Your Honor.  I'm having

5    trouble hearing her.

6              PROSPECTIVE JUROR 0835:  I don't have many

7    details.  I much more familiar with his wife than himself

8    for all the cases he's speaking about in a blog he has.

9              THE COURT:  She's talking about she knows more

10   about -- she's a friend really more of his wife.  And she's

11   not really knowledgeable about any of what he would have

12   done as an attorney before he became a journalist.

13             MR. KENNER:  Thank you.

14             THE COURT:  So let me move to 32.

15             32 is if you've been on a grand jury, and 33 is if

16   you've been a trial juror, and you've indicated both.

17             So the first group would be, you would be in a

18   group of people, you know, about 16 people, no more than 23,

19   and the government would present evidence, and you, as part

20   of the grand jury, would decide whether or not to charge a

21   person based on the evidence they presented.  So is that

22   something you participated in?

23             PROSPECTIVE JUROR 0835:  Never.  Citizen in the

24   United States for one year only.  I'm a French citizen.

25             THE COURT:  Was there a reason why you put No. --

1     let me make sure I'm reading the right thing.

2              32 -- oh, you put it down in order to tell me that

3     you've never served as a grand juror; is that correct?

4              PROSPECTIVE JUROR 0835:  Yes, yes, that's correct.

5              THE COURT:  Okay.  So have you served as a juror?

6              PROSPECTIVE JUROR 0835:  Never.

7              THE COURT:  Okay.  So neither one of them?

8              PROSPECTIVE JUROR 0835:  No.

9              THE COURT:  Okay.  So you put it down to tell me

10    that that was not what you had done; is that correct?

11             PROSPECTIVE JUROR 0835:  Correct.

12             THE COURT:  Okay.  Any questions?

13             MR. KELLER:  Good afternoon, ma'am.

14             PROSPECTIVE JUROR 0835:  Good afternoon.

15             MR. KELLER:  Are you currently working?

16             PROSPECTIVE JUROR 0835:  No, I'm retired.

17             MR. KELLER:  And what did you retire from, what

18    kind of work?

19             PROSPECTIVE JUROR 0835:  I've been a French

20    teacher at the international -- Washington International

21    School for 19 years.

22             MR. KELLER:  No other questions.  Thank you, Your

23    Honor.

24             THE COURT:  Mr. Kenner.

25             MR. KENNER:  How long have you lived -- I'm sorry,

1    how long have you lived in D.C.?

2              PROSPECTIVE JUROR 0835:  Since 2001.

3              MR. KENNER:  And were you living in France before

4    you came to the United States?

5              PROSPECTIVE JUROR 0835:  No.  I lived in many

6    countries, you know, in Africa as well, and Indonesia as

7    well, but I left France when I was pretty young.

8              MR. KENNER:  Okay.  Can you tell me what countries

9    in Africa you --

10             PROSPECTIVE JUROR 0835:  You want me to list it?

11             MR. KENNER:  Please.

12             PROSPECTIVE JUROR 0835:  So we start with

13   Indonesia where my older daughter was born.  And then we

14   moved to different countries in Africa, like Algeria,

15   Mauritania, Gabon, Djibouti, and we went back -- we left

16   Djibouti in 2000 and had one year in -- was one year in New

17   York at the French American School of Mamaroneck, and then,

18   at my husband was already here in Washington, D.C., I moved

19   to my husband to be with him in 2001, and I had the chance

20   to have a position at the Washington International School.

21             MR. KENNER:  Thank you.

22             I have no further questions, Your Honor.

23             THE COURT:  All right.  You can step down.  Thank

24   you.  And we'll give you further instructions.  All right?

25   We'll be telling you more what to do.

1          PROSPECTIVE JUROR 0835:  Okay.  Okay.

2          THE COURT:  So you can step down.  All right.

3     Presumably we have 36.

4          MR. KELLER:  Pass for cause, Your Honor.

5          MR. KENNER:  Pass for cause, Your Honor.

6          THE COURT:  All right.  So let me just wait for

7     Ms. Patterson to come back.  What I'm going to do is I'm

8     going to have you go down to the ceremonial courtroom.  We

9     will move those that are left off to the left side so

10    they're separate -- Dorothy, what I'd like to do is we will

11    move to the ceremonial courtroom.

12         THE COURTROOM DEPUTY:  What are we doing with her?

13         THE COURT:  What?  Oh, we're keeping her.

14         THE COURTROOM DEPUTY:  Keeping her.

15         THE COURT:  We'll move to the ceremonial

16    courtroom.  They will sit at the tables which are still up.

17    We'll move the group that's already in there that we haven't

18    talked to off to the left, okay?

19         THE COURTROOM DEPUTY:  Okay.

20         THE COURT:  We'll bring the group from Judge

21    Cooper's who are the ones -- we basically have 36, as I

22    understand it.  Is that what you have, too?

23         THE COURTROOM DEPUTY:  That's what I have too.

24         THE COURT:  Okay.  We'll move the group who has

25    not been excused from Judge Cooper's into the ceremonial

1    courtroom in the center, and you'll do them according to the

2    list, so they can look up and see who they are, okay?  And

3    we'll do the peremptories in there.  And then I'll ask

4    whether -- before we swear them in, I'll ask whether we can

5    -- well, we can swear them in there.  I'll ask if there's

6    anything else.

7           If they don't bring up anything else, we can

8    excuse the group we've never spoken to as well as the rest.

9           THE COURTROOM DEPUTY:  Okay.

10           THE COURT:  Okay?  So we'll do our usual thing and

11    then put them in the box.

12           Should we bring them back here and put them in the

13    box or do it here?

14           THE COURTROOM DEPUTY:  I would bring them back

15    here and put them in the box.

16           THE COURT:  So you will recamp in the ceremonial

17    courtroom, set yourselves up.

18           Do they have the strike sheets?

19           THE COURTROOM DEPUTY:  Yes.  Do you have the

20    strike sheets?

21           THE COURT:  You should have the strike sheets.

22    You should start looking at them.

23           We will bring the group that we have who has not

24    been excused.  Do not worry about who the alternate is

25    because we don't know who they are -- they're not going to

1    be in those seats.  The alternates are -- the numbers -- I

2    think it was 3, 7, and 12 are the alternates.  So you're

3    going to strike everybody.  Don't worry about the

4    alternates.

5            You'll then know who's sitting in 3, 7, and 12, so

6    those will be the alternates, and so you can either strike

7    the alternates, those that are in the seats, or those who

8    would replace them.  Okay?

9            MR. KELLER:  So we -- initially we will only

10   strike the first -- the defense will strike ten, we'll

11   strike 6, and then we'll go to our alternate strikes?

12           THE COURT:  You'll do the 6.  They'll do the 10.

13   Okay?  And then we'll see who's left in terms -- at that

14   point we'll be able to figure out who's in the alternate

15   seats, since it's not 13 and 14 and 15 automatically, and

16   then you can strike those that are in those seats or those

17   that would replace them, which would be obviously 13, 14,

18   and 15.

19           MR. KELLER:  And, again, those are 3, 7, and 12,

20   Your Honor?

21           THE COURT:  Right.  Okay?

22           And then once we do that, I will ask them whether

23   there's anything else that needs to be, you know, brought to

24   our attention.  Hopefully nothing.  I can excuse the group

25   that's been hanging around which we didn't need to reach,

1  which are still some people.

2       I will bring them back here, and we'll put them in

3  the jury box.  We've added the additional chair, and I can

4  do the preliminary instruction.

5       What I would ask is when you fill them out, you'll

6  notice you do the line -- you know, where they -- what line

7  so we know what page we're on, makes it easier, so then the

8  jury number.  So don't do they're Line 3 or 40 or whatever

9  and then the jury number.  You need to do race and gender,

10 as you think they are.  And a pass is a strike.  Okay?  And

11 then based on that you can exchange -- each one of you fill

12 it out separately, exchange it so you can look at it.  If

13 there's no issues, then give it to Ms. Patterson, who will

14 give it to me.  And then we'll figure out for you which ones

15 are left and where -- you know, where they're going to be.

16 Okay?

17       Any questions?

18       MR. KENNER:  Your Honor -- I'm sorry.

19       MR. KELLER:  Just to be clear, there's no changing

20 strikes after we exchange lists, right?

21       THE COURT:  No, you can't.

22       MR. KELLER:  Right.

23       THE COURT:  The only thing I just want to make

24 sure there's no issues once you take a look at it.

25       MR. KELLER:  Got it.

1              THE COURT:  Okay?  So if there's no issues -- this

2      is the time to raise any issues, if you're going to raise

3      them, because then we'll figure out who are the alternates,

4      do the strikes of the alternates.  You can see.

5              So you also can see who has been stricken.  You

6      know, you shift them, not only to make sure there's no

7      issues, but also you'll be able to see who has been stricken

8      and who's left.  And then we'll be able to figure out --

9      we'll tell you which jurors are sitting in the seats that

10     are the alternates.

11             Dorothy, is that going to work?

12             THE COURTROOM DEPUTY:  Yes.

13             MR. KENNER:  Your Honor?

14             THE COURT:  Yes.

15             MR. KENNER:  May I request that we meet down there

16     in 30 minutes?  I need time to discuss the last group of

17     jurors with my client, and I need time to read the jury

18     instructions.

19             THE COURT:  The jury instructions you can wait on.

20     It's going to take you some time to go through them.

21             MR. KENNER:  Okay.

22             THE COURT:  I would not do that now.  There's not

23     enough time.  We need to -- people have been hanging around

24     a long time.  This is the third day for a number of people

25     that have come here that have never -- we're not speaking to

1    them.  So it's basically a group that's been waiting to be

2    heard, and we don't need to reach them.

3             So we'll start at -- we'll begin the process at

4    4:00.  So it's 3:30.  That includes you getting your act

5    together and getting down there.

6             MR. KENNER:  Yes, that's fine.  Thank you, Your

7    Honor.

8             THE COURT:  So you get all set up.  We'll move

9    them.  So during this period it's going to take a little bit

10   of time to frankly get them down there, you to get down

11   there, and we'll start at that point with doing the

12   peremptories.

13            (Recess taken)

14            THE COURT:  Good afternoon, again, for those I've

15   seen, and good afternoon to those I have not seen.  Thank

16   you all for your patience.  You've been an excellent jury.

17            So what we have is we have the individuals that we

18   have not reached, I believe, over here, and that's because

19   it looks as if we've spoken to enough people who we have not

20   excused that we may not need to reach you, but I want to

21   make sure before I let you go.

22            And in the center we have those that we have

23   spoken to and have not excused.  All right?

24            THE COURTROOM DEPUTY:  Yes.

25            THE COURT:  So we're moving to the next process,

```
1    so sit back and relax.

2              (Pause)

3              THE COURTROOM DEPUTY:  Are you ready?

4              MR. HASKELL:  Yes, the defense is.

5              THE COURTROOM DEPUTY:  Is the government ready?

6              MS. LOCKHART:  A few more minutes.

7              (Pause)

8              THE COURT:  All right, have you all traded?

9              MR. KELLER:  Yes, Your Honor.  We have, Your

10   Honor.

11             MR. KENNER:  Yes.

12             THE COURT:  If there are no issues, then if you

13   would bring it up so that Ms. Patterson and I can review it.

14             MR. KENNER:  Excuse me, Your Honor, may we be

15   heard at the sidebar?

16             THE COURT:  I'm sorry?

17             MR. KENNER:  Can we be heard at sidebar?  I can

18   mute it.

19             (The following is a bench conference

20              held outside the hearing of the jury)

21             MR. KENNER:  Your Honor, I wanted to for the

22   record make a Batson motion as five out of the six strikes

23   by the government are African-American.

24             THE COURT:  Okay.  So we'll convene to the other

25   courtroom in terms of who everybody is, okay, because you're
```

1      not going to be able to do it here.

2                  MR. KENNER:  Thank you.

3                  (Pause)

4                  THE COURT:  I can understand Black and White.

5      What's L?  Mr. Kenner, what is L?

6                  MR. KENNER:  Latin.

7                  THE COURT:  You have B, for Black, presumably, W

8      for White.  What is L?  You've got two Ls.

9                  MR. KENNER:  Latin.  Latino.

10                 THE COURT:  Oh, Latin.  Okay.

11                 Okay.  So all right.  So in terms of Batson, there

12     are three steps.  First, the defendant has to establish a

13     prima facie case of discrimination.  The government then has

14     to offer race neutral justification for each challenged

15     strike.  And then finally the Court has to consider all the

16     circumstances that bear upon the issue that's to determine

17     whether there has been purposeful discrimination.

18                 So let me start by saying I do my own review of

19     what I think the races are, and -- so let me take a look at

20     whether I agree.

21                 Okay.  So my -- I also do race and gender when

22     people come through.  So I would agree that the designations

23     seem to be correct in terms of the government.  In terms of

24     doing the whole venire, I've counted them up.  We have 55

25     percent Black, 45 percent White, one Asian and one -- I only

1    had one Latin.  So I think there's enough just based on the

2    venire.

3              So what I would do is move to -- and let me get --

4    I can give it back to you.  You can hold on to it.  We need

5    to go through each one and have you indicate why you have a

6    race neutral explanation for it.

7              Do you need it back, or do you know what they are?

8              MR. KELLER:  No, Your Honor, I've got notes.

9              THE COURT:  You know what they are?

10             MR. KELLER:  I know which jurors they are.

11             THE COURT:  Okay.  Then it's -- we'll start with

12   Juror No. 531.  Okay.  What's your reason for this one?

13             MR. KELLER:  So Juror No. 531 sat on a jury that

14   was unable to reach a verdict.

15             THE COURT:  All right.  187?

16             MR. KELLER:  187, I believe, was the youngest

17   juror remaining on the panel and seemed uninterested in the

18   process, worked at Target.  This is a complex financial

19   case.  He didn't seem to have interest in the process or any

20   experience dealing with more complicated international or

21   financial issues at all.

22             THE COURT:  Okay.  So one was unable to reach a

23   verdict, and 187, which is on Line 8 -- yes, Line 8 --

24   interested, works at Target, seemed to have an interest in

25   the process or --

1          I mean, there are a number of them that I can't

2     say are experienced in dealing with more complicated

3     international or financial issues, but all right.

4          MR. KELLER:  Your Honor, just so the record's

5     clear, I believe he was the youngest member left on the

6     panel, and also I couldn't quite hear Your Honor speaking

7     for the record.  I said seemed uninterested in the process.

8          THE COURT:  That's what you said.

9          MR. KELLER:  Okay.

10         THE COURT:  Okay.  Let's go through the rest.

11         MR. KELLER:  739?

12         THE COURT:  Right.

13         MR. KELLER:  Had a daughter in corrections, who

14    had been in corrections for at least seven years, said she

15    had never discussed her daughter's work despite the fact

16    that I believe the daughter lived in the home, which I found

17    not to be credible, and also appeared to have hostility

18    toward the government during the voir dire.

19         THE COURT:  In what way?

20         MR. KELLER:  In terms of her answers and the way

21    that she was looking at the government and body language.

22         THE COURT:  Okay.  And 858?

23         MR. KELLER:  858 was on a jury where she said she

24    served in a jury that engaged in deliberations for six

25    weeks, and then returned a mixed verdict as to different

1    defendants.

2              THE COURT:  And in terms of a mixed verdict, I

3    mean, it was a co-defendant case.

4              MR. KELLER:  Right.  My understanding was that she

5    said some defendants they reached some verdicts on, and some

6    defendants they reached contrary verdicts on.

7              THE COURT:  They reached verdicts on all of them.

8    It's just that, as I understood it -- I did not understand

9    it to be -- I can go back and look at my notes.  I thought

10   she said they reached verdicts.  It took them a long time.

11   The verdicts differed, as I understood it.

12             MR. KELLER:  Right, not guilty and guilty was my

13   understanding.

14             THE COURT:  Okay.

15             MR. KELLER:  They found some of the defendants not

16   guilty.

17             THE COURT:  So it's based on the fact that they've

18   found some not guilty?

19             MR. KELLER:  And the six-week deliberation, which

20   is an extremely long deliberation, in my view.

21             THE COURT:  All right.  And the next one is, what,

22   287?

23             MR. KELLER:  287, I believe, was the only juror in

24   the venire that had resided in the Caribbean, an area where

25   the defendant has done a fair amount of work.  And I expect

1    there to be testimony in the case about his philanthropic

2    work in Haiti.  She had no information about her brother's

3    work at the World Bank, no information about her niece's

4    work for, I believe it was Morgan Stanley, or another

5    financial institution.  I believe she said she had no

6    interest in her brother's work at the World Bank.

7               Again, this is a case that's going to involve a

8    fair amount of testimony about international financial

9    transactions.

10              THE COURT:  All right.

11              So, Mr. Kenner, this kicks it back to you in terms

12   of your being able to come up with anything that -- I mean,

13   in terms of some other comparisons with where those that are

14   struck, that there are those that are White that fit the

15   same category; otherwise, they've given explanations.

16              MR. KENNER:  Your Honor, let me start by saying

17   out of the 36 jurors that made it into the final pool --

18              THE COURT:  It's actually 35, it turns out.

19              MR. KENNER:  I'm sorry?

20              THE COURT:  I had counted the person we had

21   excused for the flight.

22              MR. KENNER:  Okay, 35.  15 of them were Black, 17

23   were White --

24              THE COURT:  Well, I have a different calculation.

25   We did -- it's 55 percent Black, 45 percent White.  Okay?

1      One Latin and one Hispanic.

2             MR. KENNER:  We're talking now about the people

3      who qualified --

4             THE COURT:  I'm talking about the whole panel, the

5      whole venire, is 55 percent Black and 45 percent White.

6             MR. KENNER:  Yes, Your Honor.  And of those 35

7      that are still in the pool --

8             THE COURT:  Right.  I'm talking about the venire

9      of the 35.  The 35:  55 percent are Black, 45 percent,

10     roughly -- these are rough -- are White.  There's an Asian

11     and a Latin in there.

12            So you made out your prima facie case to start

13     with.  He has given explanations for all of them.

14            Now, the only way that you can have a challenge to

15     his explanation is for you to point to a White person who

16     had the same reasons or the same characteristics that he has

17     that he has explained that, you know, he left -- he didn't

18     strike but struck the one that was Black.  That's the next

19     step.

20            MR. KENNER:  Let's start with 581.  I believe --

21            THE COURT:  581.  There's no 581.  There's 531,

22     unable to reach a verdict.

23            MR. KENNER:  Unable to reach a verdict.

24            THE COURT:  Okay.

25            MR. KENNER:  My recollection -- I have not gone

1    through all of my notes, but I think there were a number of

2    White jurors --

3            THE COURT:  You're not going to be able to do "a

4    number of White jurors" that way.  You're going to have to

5    be very specific, Mr. Kenner, about finding a White juror

6    that was unable to reach a verdict.  There were very few, as

7    I recall.

8            I can go back and take a look at my notes, but

9    there were very few that I recall.  Most of them were able

10   to reach a verdict that were on it; and, frankly, not too

11   many people were prior jurors.

12           But can you point to anybody -- he has an unable

13   to reach a verdict, lack of sophistication, the corrections,

14   and not knowing about particular jobs, six weeks in a

15   deliberation, the Caribbean issue.

16           So if you can point to Whites comparably that have

17   the same sort of characteristics, generally speaking, then

18   you can -- you know, then there's a question as to why they

19   struck the Black and not the White.

20           But you're going to have to come up with -- I

21   mean, I can go back and look at my notes.  I assume you've

22   got a whole group of people, including a jury consultant,

23   that you have some information there.  So go through and

24   look.  You kept track of their races.  Look and see if

25   there's a White person.

1    MR. KENNER:  Yes, there is a White juror, 0492,

2    who indicated she never talks to her husband; she doesn't

3    know what he does.  That person was not stricken, although

4    that was the basis of --

5    THE COURT:  Which, 0492?

6    All right.  You have notes, too, so it's up to you

7    to point out.  I can't remember.  I remember there was

8    somebody who did not discuss, but I remember, as I recall,

9    somebody had somebody in intelligence or something.  I mean,

10   I'd have to take a look.

11   Do you remember?  Do you have notes?

12   MR. KENNER:  I have --

13   THE COURT:  0492.

14   MR. KENNER:  I can tell you, Your Honor --

15   THE COURT:  What did her husband do?

16   MR. KENNER:  0287.

17   THE COURT:  We're switching around.  Didn't you

18   want 0492?  Or are we coming up with a different one?

19   You posited somebody that you said did not -- she

20   did not speak to her husband about the job.  Which one is

21   that?

22   MR. KENNER:  0492.

23   THE COURT:  Okay.  And what was the husband's job?

24   MR. KENNER:  Her husband's job was financial, and

25   she said she never talks to her husband and does not know

1      what he does.

2                THE COURT:  Okay.

3                MR. KENNER:  Juror No. 28 -- I'm sorry, 0287 is

4      Black and doesn't -- the basis for that strike was because

5      she didn't talk to her husband about his work.

6                THE COURT:  No, that's -- the one about not having

7      discussions was 739.  0287 is the Caribbean person, as I

8      recall -- is what Mr. Keller said.

9                MR. KENNER:  Yes, but she said she doesn't know

10     what her husband does at the bank that he works for.

11               THE COURT:  Yes, but that's not the reason he

12     gave.  Let's go by the reason -- you have to look at the

13     reason he gave, Mr. Kenner.  So let's not switch around.

14               You have indicated that the person who said they

15     didn't talk to their family, didn't discuss, was 739.  Is

16     that correct, Mr. Keller?

17               MR. KELLER:  So 739, the basis was that I believed

18     she was hostile to the government based on the voir dire and

19     her body language, and that I didn't find it credible, her

20     answers, about not discussing her daughter's work in the

21     corrections department despite the fact that her daughter

22     had worked in corrections for a long time.

23               THE COURT:  Okay.  And Mr. Kenner has come up with

24     0492, indicating that this is somebody who didn't talk --

25     who's White who didn't discuss her -- the job of her

1    husband.

2              MR. KELLER:  So my recollection of 0492 was that

3    her husband was at FinCEN, which is a regulatory -- a

4    financial regulatory agency, which, I think, would favor the

5    government in this case.  I also thought she didn't reflect

6    any hostility or appear to be biased toward the government

7    in any way, and I believe she was Hispanic or Latino.

8              THE COURT:  Let me look at 0492.

9              What Line is 0492, Mr. Kenner?  Or Mr. Keller?

10             MR. HASKELL:  No. 47, Your Honor.

11             THE COURT:  Okay.  I have her as Hispanic, not as

12   White.

13             (Pause)

14             THE COURT:  Yes, she was definitely Hispanic.  She

15   taught Spanish literature.  I remember her.  So I would put

16   her -- if you're making the distinction, we only had, I

17   think, either one or two Latinas.  If you're trying to make

18   a distinction between White and Black, that one doesn't

19   work.

20             So do you have another one besides 0492?  He's

21   also given additional reasons, which -- in terms of her

22   discussion about it.

23             There's also -- he's given different reasons for

24   739 in terms of -- let me look at what I wrote down for her.

25             MR. KENNER:  Your Honor, with regard to 0739, this

1    was a juror who believed that people were guilty until

2    proven innocent.  There was no challenge to that juror.

3              With regard to body language, that's not in the

4    record, Your Honor, and there was no motion made to

5    cross-examine the person or to follow-up questions with that

6    person.

7              Essentially what I'm hearing is that based on the

8    way -- or based on body language, the government made a

9    decision that that body language equalled animosity towards

10   the government.

11             THE COURT:  They're entitled to look at demeanor.

12   You can't necessarily knock it out.

13             The point that I would make is they've come up

14   with reasons of their own.  Okay?  None of these are things

15   that you would say:  Oh, absolutely you cannot use those as

16   reasons.  By themselves, they are not discriminatory

17   reasons.  Okay?  Unable to, you know, reach a verdict, not

18   sophisticated, none of these things suggest in them that

19   there's a racial bias, so the reasons don't -- so you have

20   to come up with something else.

21             The one that you have come up with, which is 0492,

22   is not White, so in terms of your -- if you're making the

23   distinction between Whites and Blacks, she is not White.

24             So what's the next one?  Do you have anything else

25   on any of the others?

1              MR. KENNER:  Your Honor, I don't have anything

2     other than that.

3              THE COURT:  Is that the only one?  Is that the

4     only one you're actually challenging of the ones that he has

5     stricken?

6              MR. KENNER:  Yes, Your Honor.  And, you know, the

7     fact that five out of 35 of their -- five strikes are

8     against Blacks.

9              THE COURT:  Okay.  Hold on.  I'm sorry, what are

10    you saying?

11             MR. KENNER:  I'm saying that out of the 35 jury

12    venire, five of the government's challenges, peremptory

13    challenges, were to Black people.  That's a rather high

14    percentage, and I think that of and by itself --

15             THE COURT:  All that does is get you an initial

16    one to review it, which is why we're discussing this.  It's

17    55 to 45 percent.  Five out of the six was sufficient to get

18    out of the first step.  So we move to Step 2, which is to

19    find out his reasons.  He's given reasons.  In and of

20    themselves, there's no racial animus associated with his

21    reasons in terms of what he's come up with.  Okay?

22             So then you would look at, okay, where do we

23    compare two?  You're given one comparison, which is a

24    Latina, 0492, in terms of indicating that she also did not

25    discuss matters with her relative.  And they had posited

1     that 739 also did not talk to, you know, her relatives

2     either.

3             In terms of the hostility -- I'd have to go back

4     and look at my notes more carefully, because I did write

5     stuff down on some other things.  In terms of whether there

6     was any hostility, in terms of demeanor, it's something that

7     you can certainly consider.  But I don't see it, quite

8     frankly, matching up.

9             Do you have any others?  So let me go back and

10    look more carefully at my notes.  But do you have any others

11    you want to bring up, or is that it?

12            MR. KENNER:  No, Your Honor.

13            THE COURT:  Okay.  And do you want to say -- is

14    there anything else, Mr. Keller, that you want to bring up

15    in terms of the distinctions of why you didn't strike 0492

16    versus 739?

17            MR. KELLER:  Your Honor, I'll just reiterate, the

18    spouse -- the family member of 0492 worked at FinCEN, which

19    is a government regulatory agency as part of the U.S.

20    Treasury Department, which frankly would regulate some of

21    the exact transactions that are at issue in this case, and

22    so I believe that made that juror distinguishable from Juror

23    739 and made her more favorable to the government.

24            I also thought she had a very friendly demeanor,

25    as opposed to the perception of hostility from Juror 739.

1          THE COURT:  All right.  Let me take a break, and

2     I'll come back.  So don't go away.

3          (Recess taken)

4          THE COURT:  What I did is go back and look at my

5     notes.  I do write down race as they come up.  I will mark

6     down if I think people will not want to be jurors, since

7     that occasionally creates problems at a later time.

8          So I've looked at -- I've indicated to you the

9     three steps.  The first is that you have to make a prima

10    facie case, which I've indicated was sufficient based on the

11    split of 55 to 45.

12         The second is to hear what their specific reasons

13    were, which the Court -- I don't substitute my -- I cannot

14    substitute my reasons for what the government has come up

15    with, and that's case law.

16         There is case law in terms of body language, that

17    you can take that into account as long as I have actually

18    observed the body language, and that it's not -- I'm not

19    accepting the -- in this case the government's

20    representation as to what it was, so it has to be something

21    that I have noticed in terms of 739, who is the Black juror,

22    where the government has said that she was hostile, et

23    cetera.  I did note that she did not want to be a juror, did

24    not want to be here, nor did she want to participate.  In

25    terms of these are notes that I took myself at the time.

1          And I do that because, as I indicated, sometimes

2     when you choose these jurors, they create problems because

3     they don't want to actually participate in the process.  So

4     I did note that she was not particularly cooperative.

5          For 439, which is the comparator that Mr. Kenner

6     has come up with, although she's -- I listed her as

7     Hispanic, I would consider her in the White category for

8     purposes of this discussion.  She was friendly in her

9     demeanor.  She was the interpreter.  She was smiling the

10    whole time.  I noted her demeanor as well as being very --

11    initially we had a little trouble understanding her, but she

12    was very friendly, very -- you know, very friendly in terms

13    of dealing with -- and even when we asked her to repeat

14    things because we were having trouble understanding her to

15    start with, she was very happy to do so.

16         So I'll find that based on the government's

17    characterizations of the two prospective jurors and their

18    body language, the demeanor, I think their representation of

19    the two is frankly accurate based on my own observation,

20    more importantly my notes, which I took at the time, and my

21    recollection.  So I'll credit the government's justification

22    and find that the government did not, in terms of 0739,

23    strike her because of race.

24         So then we go to -- beyond the makeup of the

25    venire as a whole, which gets to the other four strikes, no

1    other challenges have been brought up by Mr. Kenner in terms

2    of reasons that would suggest that there was pretext or

3    racial animus in terms of the government striking the

4    remaining challenged prospective jurors, which would have

5    been the other four.  So I'll accept the government's

6    justification and find that they did not strike due to race

7    and deny the Batson motion.

8              So let me take a few moments to do our sheets, and

9    then we'll go back to figuring out -- we will let you know

10   which ones are the alternates.

11             MR. KENNER:  Your Honor, may I make one comment?

12             THE COURT:  Sure.

13             MR. KENNER:  With respect -- yes.

14             THE COURT:  You need to speak up.

15             MR. KENNER:  What Your Honor described about

16   demeanor had to do with what people said and the --

17             THE COURT:  No, no, not what people said.  In

18   terms of the manner -- in terms of what's said, but the

19   manner in which she said it, the body language.  It was

20   clear to me that she was -- both what she said and the

21   manner in which she said it.  And I took notes of 739, as I

22   did of 439, both as to what that woman said and her demeanor

23   as well.

24             MR. KENNER:  Your Honor, just so I have a clear

25   record.  Would Your Honor describe the body language that

1    you observed so it's part of the record?

2              THE COURT:  I just did.  I just did.

3              MR. KENNER:  Okay.

4              THE COURT:  I went through 439 was very friendly

5    in her demeanor.  She was the interpreter.  She was smiling

6    the whole time.  She was very receptive to being requested

7    to repeat things when she could not -- when we were having a

8    little bit of trouble understanding her.  She was very

9    polite and friendly to both, both the Court as well as to

10   both counsel who asked questions.

11             739 gave very short responses, was, in her

12   responses and her manner, my conclusion, which I wrote, is

13   that she didn't want to be here, did not want to

14   participate, and would not want to be a juror.

15             And I keep notes like that because I have found

16   that if people don't want to be jurors and participate in a

17   trial, they occasionally can create problems at a later

18   point.

19             So given the difference in the demeanor based on

20   my recollection, which is supported by my notes at the time,

21   in terms of just physically how they dealt with things as

22   well as, you know, the manner in which they responded to

23   things, which showed a demeanor and a viewpoint which the

24   only way you can accept it is not based on what the

25   government says, but it's only by my observations and my

1    recollection.  So that's why I went and took the time to go

2    back and look at my notes to see.

3                MR. KENNER:  Thank you, Your Honor.  I appreciate

4    it.

5                THE COURT:  Okay.  So let's --

6                MR. KELLER:  Your Honor, I apologize for

7    interrupting.  Just to clarify, the juror that you

8    referenced as the kind of comparable that the defense

9    offered, I believe it's juror 492, not juror 439.

10               THE COURT:  Yes.  My handwriting is not good.

11   Sorry.

12               All right.  Let me take out the individuals who

13   are -- and it was the interpreter that you were talking

14   about, right?  The one who was an interpreter with FinCEN?

15               MR. KENNER:  Yes, Your Honor.

16               THE COURT:  All right.  Let me just -- so we can

17   figure out who is going to be in the alternate seats.

18               (Pause)

19               THE COURT:  Mr. Kenner, you made this a lot more

20   difficult by not listing the page and the line.

21               (Pause)

22               THE COURT:  So what I'm doing is knocking out both

23   of them, and then we can go back in terms of what seat

24   they're in.

25               So what we're going to do, if you get your list,

1    is to -- Dorothy is going to -- she's going to -- have you

2    looked at it and knocked off the people on your list to be

3    able to figure out who's left as seated or not?  In other

4    words, do you need these lists back to figure out who is

5    actually left?

6              MR. KELLER:  No, Your Honor.

7              THE COURT:  Okay.  Mr. Kenner, do you?

8              MR. KENNER:  No, Your Honor.

9              THE COURT:  Okay.  Perfect.

10             THE COURTROOM DEPUTY:  Okay, in seat 1, 0272.

11             THE COURT:  Hold on one second.  Seat 1, if you'd

12    give the line and the Juror number.

13             THE COURTROOM DEPUTY:  Okay.

14             Seat 1, Line 3, 0272.

15             In seat No. 2, Line 7, 0965.

16             Seat No. 3, Line 15, 0625.

17             Seat No. 4, Line 19, 0658.

18             Seat No. 5, Line 23, 0968.

19             In seat 6, Line 24, 0296.

20             Seat No. 7, Line 26, 0540.

21             Seat No. 8, Line 36, 0701.

22             Seat No. 9, Line 43, 0307.

23             Seat No. 10, Line No. 45, 0249.

24             Seat 11, Line 47, 0492.

25             Seat No. 12, Line 51, 0469.

1          Seat No. 13, Line 54, 0802.

2          Seat No. 14, Line 55, 0724.

3          And Seat No. 15, Line 64, 0649.

4          THE COURT:  All right.  So you can see who the

5     alternates are, and obviously --

6          MR. KENNER:  Excuse me, Your Honor.  We have

7     different numbers, Your Honor.  I'd like to get it

8     reconciled.

9          Could I ask Your Honor to either have it read back

10    and --

11         THE COURT:  Why don't I make the suggestion.  Let

12    me hand you the two strike sheets and make sure you've

13    struck the right ones on your sheet.

14         MR. KENNER:  Okay.

15         THE COURT:  Dorothy, if you could give them to --

16    okay.

17         And then it's whoever is the survivor, so just

18    make sure you've knocked everybody out.

19         He needs to have both of them, Dorothy.

20         Mr. Keller, do you agree in terms of who's left?

21         MR. KENNER:  Do we have seat assignments, Your

22    Honor, for this group?

23         THE COURT:  What do you mean, seat assignments?

24    Of course, they say the, you know, 1 through whatever.  When

25    we go back, you'll see who is left and you'll be able to

1    look at them.

2              MR. KELLER:  Your Honor, we had one of the jurors

3    that you listed -- or, I'm sorry, that Ms. Patterson listed

4    as being struck by the defense.

5              THE COURT:  And who is that?

6              MR. KELLER:  Seat 4, 0658, Line 19.

7              THE COURTROOM DEPUTY:  What was that again?  Seat

8    No. 4?

9              THE COURT:  Seat No. 4, 654, Line 19?  I don't

10   have that person struck.

11             MR. KELLER:  658.

12             THE COURT:  Mr. Kenner, do you have that person

13   struck?

14             MR. KENNER:  Let me check one moment.

15             THE COURT:  Just look at your list.

16             MR. KENNER:  Yes, we did, Your Honor.

17             (Pause)

18             THE COURT:  Are you talking about a peremptory, or

19   for cause?

20             MR. KELLER:  Your Honor --

21             THE COURT:  So the dispute in terms of the one

22   juror, is that for cause or --

23             MR. KELLER:  I believe it was a defense

24   peremptory, Your Honor.

25             MR. KENNER:  It was, Your Honor.

1          THE COURT:  Oh, peremptory.  Okay.  All right.

2   Sorry.  I was looking at cause.  That's okay.  So we have to

3   look.

4          So 658 was the defense, okay.  So that moves it.

5          Okay.  That is correct.  It's a peremptory,

6   Dorothy.  I missed one.

7          Okay.  So we need to -- we're up to -- so let's go

8   through what seats they're in again.  Okay?  Let's just go

9   through what seats they're in.

10          Is there some other discrepancy, or is that it?

11          THE COURTROOM DEPUTY:  That's the only one.

12          THE COURT:  Is that it?  From both?  Mr. Kenner,

13   is that --

14          MR. KENNER:  Yes, Your Honor.

15          THE COURT:  Okay.  So let's, so the record is

16   clear, on the record, Dorothy, do them again and which seat

17   they would be in so we have something on the record as to

18   what they are.

19          THE COURTROOM DEPUTY:  Please stop me if

20   somebody's wrong in the process.

21          MR. KENNER:  Can we have a moment?  I think there

22   is still something wrong.

23          We're good, Your Honor.

24          THE COURT:  Okay.  Let's, for the record, since we

25   don't -- I don't want to have the transcript have the wrong

1    seats, so let's do it again.

2              THE COURTROOM DEPUTY:  Okay.  In seat No. 1, Line

3    3, 0272.

4              Seat No. 2, Line 7, Juror No. 0965.

5              Seat No. 3, Line 15, 02 -- I mean, sorry -- 0625.

6              Seat No. 4, Line 23, 0968.

7              In seat No. 5, Line 24, 0296.

8              Seat No. 6, Line 26, 0540.

9              Seat No. 7, Line 36, 0701.

10             Seat No. 8, Line 43, 0307.

11             Seat No. 9, Line 45, 0249.

12             Seat No. 10, Line 47, 0492.

13             Seat No. 11, Line 51, 0469.

14             In Seat No. 12, Line 54, 0802.

15             Seat No. 13, Line 55, 0724.

16             Seat No. 14, Line 64, 0649.

17             Seat No. 15, Line 65, 0032.

18             THE COURT:  All right.  Then, okay, so we'll go

19   back.  You can figure out where -- who's in 3, 7, and 12,

20   which I believe are the alternates.  You can strike those or

21   those who would replace them.

22             If you want to fill it out now -- if you want to

23   fill it out and not have to go back there, it will be

24   faster, unless you need to see them.

25             Let me see what they are.  Have they filled them?

```
 1              THE COURTROOM DEPUTY:  No, they haven't.

 2              THE COURT:  Okay.  Then have them fill it in.

 3              So you have two strikes.  Please put the line and

 4    the juror number on it so we can find these much more

 5    easily.

 6              (Pause)

 7              THE COURT:  Whenever you're ready, exchange them,

 8    and then give them to us again.

 9              (Pause)

10              THE COURT:  Folks, you have people -- this is

11    5:25 -- that are sitting back in the courtroom.

12              (Pause)

13              THE COURT:  Are you ready, Mr. Kenner?  He has to

14    be ready to exchange it.

15              (Pause)

16              THE COURTROOM DEPUTY:  So you're not striking

17    anyone?

18              MR. KELLER:  No.

19              THE COURTROOM DEPUTY:  They're not striking

20    anyone.

21              THE COURT:  Okay.

22              THE COURTROOM DEPUTY:  Should they just put

23    "pass"?

24              THE COURT:  Yes, you need to write "pass."

25              MR. KELLER:  On the first line, below?
```

```
 1                 THE COURT:  Below, where you have the alternates.

 2                 THE COURTROOM DEPUTY:  Just strike the line and

 3      say "pass."

 4                 THE COURT:  All right.  Mr. Kenner?

 5                 MR. KENNER:  Yes, Your Honor.

 6                 (Pause)

 7                 (Discussion off the record)

 8                 THE COURT:  Give it back.  It's not correct.  57

 9      is not the juror number you have written down.

10                 THE COURTROOM DEPUTY:  57 has already been

11      stricken.  Is that -- what's that number?

12                 MR. KENNER:  54, I think.

13                 THE COURT:  Oh, it's 54?  Okay.  So it's a "4."

14                 Okay, so he's striking Line 54, Juror No. 802, who

15      is in Seat 12.

16                 MR. KENNER:  Yes, Your Honor.

17                 THE COURTROOM DEPUTY:  Is that correct?

18                 MR. KENNER:  Yes.

19                 THE COURT:  Okay.  And who is the next one?

20                 THE COURTROOM DEPUTY:  64.

21                 THE COURT:  We did that, 54.  There's two.  What's

22      the second one?

23                 THE COURTROOM DEPUTY:  64.

24                 THE COURT:  64.  You can't do 64.  64 isn't an

25      alternate.
```

 1              THE COURTROOM DEPUTY:  No, 64 is seat No. 14,

 2      Judge.

 3              THE COURT:  There's two.  54 is seat No. 12, 802.

 4      So he can strike that one.

 5              What is the next alternate, which are 3, 7, and

 6      12, or those that are substituting for them, so presumably

 7      it wouldn't be 14 and 15, it would be beyond that.

 8              So what's the second one that he is trying to

 9      strike?

10              MR. KENNER:  Your Honor --

11              THE COURTROOM DEPUTY:  The next people we pick up

12      are 72 and --

13              THE COURT:  Okay.  So that's what I'm asking.

14              (Discussion off the record)

15              MR. KENNER:  Your Honor, we're happy with the one

16      strike.

17              THE COURT:  How can -- we're going to have 15

18      jurors, right?

19              THE COURTROOM DEPUTY:  Right.

20              THE COURT:  And the alternates --

21              THE COURTROOM DEPUTY:  -- are replacing.

22              THE COURT:  3, 7, and 12.  So he strikes 3, 7, 12,

23      or the substitutes, which would be after 15, right?  We

24      would substitute for 12.  There's the one after 15, the next

25      person.

1              THE COURTROOM DEPUTY:  Okay, for substitute No.

2     12, it would be Line 72.

3              THE COURT:  Right.  So that becomes 12.

4              THE COURTROOM DEPUTY:  That becomes 12.

5              THE COURT:  Okay.  And which is -- so is he

6     striking that one, or what's the second strike?

7              THE COURTROOM DEPUTY:  And the second strike is

8     64.  He has it on his sheet.

9              THE COURT:  Okay.  The second strike you have is

10    somebody in Seat 14?

11             MR. KENNER:  Yes.  I'll withdraw that.

12             THE COURT:  You can't strike 14.  They're not an

13    alternate.

14             THE COURTROOM DEPUTY:  Right.

15             THE COURT:  And they're not the substitute.

16             MR. KENNER:  I withdraw that challenge, Your

17    Honor.  We'll just have the one challenge.

18             THE COURT:  Okay.  So you need to give it back and

19    write "pass," or pick another number.

20             So the new 12 is Line 72, 0112.  That's the new --

21             THE COURTROOM DEPUTY:  No. 12.

22             THE COURT:  That's the new 12.  And he has struck

23    Line 54, which is juror 802.  All right?  Are we all set?

24    Yes?  No?

25             MR. KENNER:  Your Honor, I've never used this

1    system before, and I'm a little confused.  What did --

2             THE COURT:  The alternates are 3, 7, and 12.  You

3    can strike those or you can strike those who would have

4    substituted, which would have been 16, 17, or 18, one of

5    those, because the jury box has 15 people.  So you can't

6    strike somebody that's actually in the box.  That's not an

7    alternate.  So it has to be somebody who would substitute

8    for it, or the actual person who's in the alternate seat.

9    And you've done that with 12.

10            (Pause)

11            THE COURTROOM DEPUTY:  3, 7, and 12 are the

12   alternates; is that correct?

13            THE COURT:  Yes, 3, 7, and 12 are the alternates.

14   So the strikes now are in 3, 7, and 12, or those who would

15   have substituted if one of these were stricken, which would

16   be 16, 17, through 18.  If you want to knock out somebody,

17   if for some reason the alternate gets stricken and you want

18   to strike -- you know, you don't want the person who

19   potentially would substitute for them.

20            So you've stricken 12, and we've substituted a 12.

21   And as I understand it, you're passing after that.  Yes?

22   No?

23            THE COURTROOM DEPUTY:  0724 is seat No. 13.

24            MR. KENNER:  Okay.  Yes, Your Honor.

25            THE COURT:  Okay, or not?  I want to make sure

1     everybody's satisfied.

2              MR. KENNER:  Yes.

3              THE COURT:  Does it work?

4              MR. KENNER:  Yes.

5              THE COURT:  Okay.  All right.  So we're going to

6     go back to the other room.  She will put in the jury box the

7     people that -- the 15 people that are going to be the jury.

8     I will ask and sincerely hope nobody says anything before we

9     swear them in to make sure they're not going to bring

10    something else up, because obviously once they're sworn in,

11    we can't substitute them.

12             MR. KENNER:  Are we coming back here, Your Honor?

13             THE COURT:  That's it.  And hope.  And we will

14    excuse the rest and come back tomorrow for the preliminary

15    instruction.

16             MR. KENNER:  Thank you, Your Honor.

17             THE COURT:  Okay.  So let's just hope that this...

18             (This is the end of the bench conference)

19             (Recess taken)

20             THE COURT:  Thank you for your patience.  And

21    we're trying to not bring you back tomorrow, so we've

22    resolved the issues, I think.

23             All right.  Good afternoon, again.  We've, I

24    think, resolved our issues.  We did want to try and finish

25    this so we can let you go and not require anybody to return

1    tomorrow except those who have been selected to be part of

2    the trial as the jurors.

3              So Ms. Patterson is going to call out your juror

4    number, and you will be seated over there.  And these are

5    the people that the parties have chosen as fair and

6    impartial jurors.

7              THE COURTROOM DEPUTY:  In seat No. 1, which will

8    be the first seat on the floor over to my far right, in seat

9    No. 1, 0272.

10             THE COURT:  So that person should get up and move

11   over there.

12             THE COURTROOM DEPUTY:  In seat No. 2, 0965.

13             Seat No. 3, 0625.

14             Seat No. -- no, on the floor.

15             THE COURT:  We have one -- we'll have a different

16   configuration in the other courtroom, but we're just doing

17   it here since we have 15 people.

18             THE COURTROOM DEPUTY:  Seat No. 4, 0968.

19             Seat No. 5, 0296.

20             Seat No. 6, 0540.

21             Seat No. 7, 0701.

22             Seat No. 8, 0307.

23             You want to be the first seat in the box all the

24   way over to my right.

25             Seat No. 9, 0249.

```
 1                    Seat No. 10, 0492.

 2                    Seat No. 11, 0469.

 3                    Seat No. 12, 0112.

 4                    Seat No. 13, 0724.

 5                    Seat No. 14, 0649.

 6                    And Seat No. 15, 0032.

 7                    Is that agreeable to everyone?

 8                    THE COURT:  Is that everybody?

 9                    THE COURTROOM DEPUTY:  Is that agreeable by

10        everyone?

11                    MR. KELLER:  Yes.

12                    THE COURT:  Is that everybody?  Everybody

13        agreeable?

14                    Everybody's agreed.

15                    All right.  Members of the jury, you've been

16        chosen as a fair and impartial jury by the parties, and so

17        we'll be proceeding with you.  I'm going to swear you in in

18        a few moments, and then I will release you and to have you

19        come back tomorrow when we start the trial.

20                    We've spoken to all of you.  I want to make sure,

21        before I swear you in, that there's nothing you have not

22        told us that you think we need to know.  Once you're sworn

23        in, I cannot substitute anybody, so you will be the jury and

24        there's no substitutions of anybody.

25                    So have you told us everything that we need to
```

1    know?

2           All right.  I see no hands raised, so let me swear

3    them in, and we'll proceed tomorrow.

4           (Jury sworn)

5           THE COURT:  Okay.  So let me excuse -- let me

6    start with the middle group.  We have spoken to you, and we

7    are excusing you, and I thank you for your patience and your

8    willingness.

9           We're excusing you.  I believe you are the ones we

10   did not reach, but I told you we would speak only to as many

11   people as we actually needed.  So we're excusing you.  Of

12   course we'll mark you as having come for the special panel,

13   so I will talk to the jury office about hopefully not

14   calling you again at least for a year.

15          All right.  And I thank all of you.  I thank you

16   very much for your cooperation.  You all came back when you

17   were supposed to, and I appreciate it.

18          Take care and be well, everybody.

19          All right.  What we're going to do now is Ms.

20   Patterson is going to show you how to get in the back

21   corridor and where the jury room is, so when you come

22   tomorrow, you don't go into the courtroom.  We may be

23   discussing things you shouldn't hear.  You don't need to go

24   to the jury office.  We will call them and tell them you've

25   been selected so they'll mark you down to get paid, so don't

1    worry about that.

2              So you would -- you'll see -- you press a button,

3    the chambers will let you in and will show you where the

4    jury room is.  She's going to show you where that is.  Okay?

5              And I would ask, tomorrow -- you can come earlier,

6    but I would ask that you all be in the jury room by 9:00.

7    Okay?  And at 9:00 we'll proceed.

8              Anybody's missing, we can't go forward, so I would

9    ask, you know, everybody to make sure that you do arrive and

10   are ready to go.

11             Do not talk about the case, speculate about it,

12   don't worry about it.  If anybody asks you, you've been

13   selected for a criminal case, period.  Mouth sealed.  Okay?

14   And don't read anything or -- you know, if there's anything

15   that sounds familiar with this case, please put it aside.

16   Don't read it.  Don't look anything up on any of your

17   electronics.  All right?

18             We want to make sure you come without having

19   anything additional provided, and you listen to what's

20   presented in the courtroom.

21             All right?  So take care.  Be well.

22             And Ms. Patterson, if you'll follow her out,

23   she'll show you where to go.

24             (Jury exits courtroom)

25             THE COURT:  All right.  And thank you all for your

1    patience.  It was longer than we planned on.  We'll see you

2    tomorrow.  You can get in about, say, 8:45 and set up.  And

3    if there's no preliminary issues, I will start with the

4    preliminary instructions, strictly procedural, and then

5    we'll go to opening statements.  We've talked about the

6    timing of it.  If you have some question about what you

7    should say, you can send us something under our procedure,

8    but be careful about bringing something up if we haven't --

9    go back to my rulings in terms of what you can't say yet and

10   what you can talk about, and also if there's something up in

11   the air that we're not sure of, don't bring it up so we have

12   a problem at a later point.  Okay?

13            Anything else?

14            MR. KELLER:  Your Honor, the defense provided us a

15   PowerPoint that I believe they intend to use tomorrow with

16   opening.  It's about 18 slides.  The government objects to

17   the slides.

18            THE COURT:  If you looked at my procedures, I

19   think you'll see that slides have to be provided in advance

20   so the other side can take a look at them and see if there's

21   any objections to them.  If you haven't provided them -- I

22   realize that they're not evidence, but they occasionally

23   include things that are problems.  So unless they get a

24   chance to take a look at it and say it's okay, you can't use

25   them.

1          MR. KENNER:  They have them, Your Honor.

2          THE COURT:  Okay.  But they're going to have to

3     look at them and say it's not a problem.  If it is, you

4     don't get to use them, period.

5          MR. KELLER:  We've reviewed them and objected to

6     them, Your Honor.  They are a problem.

7          THE COURT:  Okay.  So are they a problem as

8     PowerPoints, or are they a problem as opening statements?

9          MR. KELLER:  They're a problem that they reference

10    evidence that we don't believe is admissible.

11         THE COURT:  Well, have I made rulings about these,

12    or is this stuff that hasn't come up yet?

13         MR. KELLER:  Some of it you've made rulings about.

14    Some of it has not come up yet.

15         THE COURT:  Okay.  The ones that have rulings,

16    there's no excuse for including anything in there,

17    especially in an opening statement.

18         And if you've got issues with other things, send

19    me something tonight.  I realize it's not a lot of time, but

20    I've got my procedures in terms of doing it.  Okay?

21         MR. KELLER:  Will do.

22         THE COURT:  Or have a discussion now if there's

23    going to be a problem.  There's no point in an opening

24    statement having a bunch of objections in the middle.  It's

25    not going to be very useful.

1          MR. KENNER:  I agree, Your Honor.

2          THE COURT:  Especially if I get stuck with it.

3          So I would have a discussion now.  You can

4    probably stay here, if you want, and we'll close the door at

5    a later point, and see whether you can work something out.

6          If you can't, send me -- you know, under our

7    procedures, send me what it is and I'll try and make a

8    ruling.  If there's any question about it, leave it out.

9    There's more than enough to talk about without including

10   anything.  Certainly nothing that I, you know, precluded or

11   said you need to develop a record.  Don't say anything.  And

12   if there's stuff, you know, that is questionable, you know,

13   I would leave it out.  Okay?

14         MR. KENNER:  Thank you, Your Honor.

15         THE COURT:  All right.  Anything else?

16         MR. KELLER:  No, Your Honor.

17         THE COURT:  All right.  Then the parties are

18   excused.  Take care.  See you tomorrow.

19         (Whereupon the hearing was

20          concluded at 5:50 p.m.)

21

22

23

24

25

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this ^  day of ^ , 2023.

9

10                              <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
13                              Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25