<pre>
 1                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2
       * * * * * * * * * * * * * * *   )
 3     UNITED STATES OF AMERICA,       )    Criminal Action
                                       )    No. 19-00148-1
 4                     Plaintiff,      )
                                       )
 5        vs.                          )
                                       )
 6     PRAKAZREL MICHEL,               )    Washington, D.C.
                                       )    March 30, 2023
 7                     Defendant.      )    2:04 p.m.
                                       )    **AFTERNOON SESSION**
 8     * * * * * * * * * * * * * * *   )

 9

10                     TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY,
11                   UNITED STATES DISTRICT JUDGE

12


13
       APPEARANCES:
14
       FOR THE GOVERNMENT:      JOHN D. KELLER, ESQ.
15                              U.S. DEPARTMENT OF JUSTICE
                                1301 New York Avenue, Northwest
16                              Suite 1016
                                Washington, D.C. 20530
17
                                SEAN F. MULRYNE, ESQ.
18                              NICOLE RAE LOCKHART, ESQ.
                                U.S. DEPARTMENT OF JUSTICE
19                              Public Integrity Section
                                1400 New York Avenue, Northwest
20                              Washington, D.C. 20005

21
       FOR THE DEFENDANT:       DAVID E. KENNER, ESQ.
22                              ALON ISRAELY, ESQ.
                                KENNER LAW FIRM
23                              16633 Ventura Boulevard
                                Encino, California 91436
24

25
</pre>

1    APPEARANCES, CONT'D:

2    FOR THE DEFENDANT:        CHARLES R. HASKELL, ESQ.
                               LAW OFFICES OF CHARLES R.
3                                HASKELL, P.A.
                               641 Indiana Avenue, Northwest
4                              Washington, D.C. 20004

5
     REPORTED BY:             LISA EDWARDS, RDR, CRR
6                             Official Court Reporter
                              United States District Court for the
7                               District of Columbia
                              333 Constitution Avenue, Northwest
8                             Room 6706
                              Washington, D.C. 20001
9                             (202) 354-3269

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                                   Direct      Cross        Red.

4

WITNESSES FOR THE GOVERNMENT:
5
Robert Heuchling                      5          107
6

7    EXHIBITS RECEIVED IN EVIDENCE                          PAGE

8
     Government's Exhibit No. 575                            8
9    Government's Exhibit No. 577                           12
     Government's Exhibit No. 511                           13
10   Government's Exhibit No. 260                           15
     Government's Exhibit No. 578                           16
11   Government's Exhibit No. 510                           19
     government's Exhibit No. 251                           19
12   Government's Exhibit Nos. 105 and 266                  21
     Government's Exhibit No. 730                           30
13   Government's Exhibit No. 240                           37
     Government's Exhibit No. 553                           39
14   Government's Exhibit No. 250                           40
     Government's Exhibit No. 734                           72
15   Government's Exhibit No. 432                           82
     Government's Exhibit No. 433                           83
16   Government's Exhibit No. 434                           83
     Government's Exhibit No. 435                           83
17   Government's Exhibit No. 436                           84
     Government's Exhibit No. 443                           84
18   Government's Exhibit No. 444                           85
     Government's Exhibit No. 449                           85
19   Government's Exhibit No. 450                           85
     Government's Exhibit No. 420                           85
20   Government's Exhibit No. 426                           86
     Government's Exhibit No. 428                           86
21   Government's Exhibit No. 460                           91
     Government's Exhibit No. 461                           94
22   Government's Exhibit No. 462                           95
     Government's Exhibit No. 463                           95
23   Government's Exhibit No. 732                           97
     Government's Exhibit No. 730                          100
24   Government's Exhibit No. 738                          102
25

```
 1                THE COURT:  Good afternoon, everyone.
 2                MR. KENNER:  Good afternoon, your Honor.
 3                MR. MULRYNE:  Good afternoon, your Honor.
 4                THE COURT:  Let me make one comment.  I think it
 5      would -- so we don't keep getting objections about
 6      "beneficial owner," why don't you indicate what evidence you
 7      have about who the owner is.  He keeps object- -- Mr. Kenner
 8      has objected.  So instead of using that terminology, if you
 9      have evidence about who is the owner, why don't you put on
10      that.  It also may be helpful for the jury as to what a
11      beneficial owner is.
12                MR. MULRYNE:  Thank you, your Honor.
13                THE COURTROOM DEPUTY:  Ready?
14                THE COURT:  Yes.
15                (Whereupon, the jury entered the courtroom at 2:05
16      p.m. and the following proceedings were had:)
17                THE COURT:  Everyone may be seated.
18                Take your time.  I know it's a little squeezed on
19      the corner there.  Good afternoon, everyone.
20                THE JURY:  Good afternoon.
21                THE COURT:  Thank you for being on time.  I
22      appreciate it.
23                We're ready to proceed and continue with the
24      direct.
25                MR. MULRYNE:  Thank you, your Honor.
```

```
 1          (ROBERT HEUCHLING, GOVERNMENT WITNESS, PREVIOUSLY SWORN.)

 2                      CONTINUED DIRECT EXAMINATION

 3     BY MR. MULRYNE:

 4     Q.   Good afternoon, Agent Heuchling.

 5     A.   Good afternoon, Mr. Mulryne.

 6     Q.   Agent Heuchling, just very quickly, before we move

 7     forward, I just want to go backwards one moment.

 8              You testified a couple of times in your -- this

 9     morning, during your earlier testimony, you were asked about

10     beneficial owner, and specifically you explained Mr. Low as

11     being the beneficiary, or the person receiving or benefiting

12     from the funds of Alsen Chance and Blackstone.

13              Could you just describe briefly the evidence that

14     you've reviewed and encountered during the investigation

15     that supports that fact?

16     A.   Yes.  So throughout the investigation, we uncovered

17     evidence indicative of Mr. Low being the beneficial owner of

18     both the Blackstone and the Alsen Chance accounts.  And by

19     "beneficial owner," I mean that he was the person who

20     ultimately benefited from those funds, meaning he had a

21     controlling -- or the majority controlling interest, so he

22     could direct those funds into and out of those accounts.

23     Those funds were primarily used for his purposes to benefit

24     things or causes that he --

25              THE COURT:  Are you objecting to his explanation?
```

1          MR. KENNER:  Your Honor, most respectfully, the

2     court reporter is blocking my view of the witness.

3          THE COURT REPORTER:  Can you see now, counsel?

4          MR. KENNER:  No problem.

5          THE COURT:  You can pick up -- I stopped you in

6     the middle of the sentence because I saw him standing.  So

7     go back to wherever you were.

8          THE WITNESS:  I think I was saying that just

9     throughout the investigation, based on the transactions we

10    saw into and out of the Alsen Chance and the Blackstone

11    accounts, it was indicative that Mr. Low was, as we refer to

12    it, as the beneficial owner, meaning that he had the

13    controlling interest in those accounts.  The money that

14    flowed into and out of those accounts were primarily for his

15    benefit.  So they would go to causes or to other accounts at

16    his direction for his -- you know, for his purposes.

17    BY MR. MULRYNE:

18    Q.  Thank you, Agent Heuchling.

19          Are you familiar, during your investigation -- so

20    now -- you know, where we left off, we were talking about

21    the 2012 time period.  You had testified about events,

22    emails, communications leading up to the June 2020

23    fundraising event in Miami, including a financial

24    transaction in June of 2012.

25          And then we were talking about events,

1    communications, financial transactions leading up to the

2    event in Washington, D.C., in September of 2012.  And I

3    believe that's where we left off.

4              Do you recall that?

5    A.  Yes.  That sounds right.

6    Q.  Okay.  So let me ask you, are you familiar as a result

7    of your investigation with an individual named Low Hock

8    Peng?

9    A.  Yes.  Low Hock Peng is the Chinese name.  The American

10   name is Larry Low.  And that's Jho Low's father.

11   Q.  And during your investigation, did you learn of efforts

12   that were made in August-September of 2012 by the Defendant

13   and others to get Mr. Low and Mr. Low's father into the

14   September fundraising event?

15   A.  Yes.

16             MR. MULRYNE:  If we could pull up Government's

17   Exhibit 575, marked for identification.

18             THE COURT:  Everybody slow down, please.

19             MR. MULRYNE:  Yes, your Honor.

20             THE WITNESS:  Yes, your Honor.

21             MR. MULRYNE:  And if we may zoom in on that

22   exhibit.  And this has not been admitted as of yet.  This is

23   just for identification.

24   BY MR. MULRYNE:

25   Q.  Agent Heuchling, do you recognize this as an email

1    involving the Defendant, Mr. White and others for the

2    upcoming September fundraising in event in D.C.?

3    A.  I do.

4    Q.  Was this obtained from Mr. White during the

5    investigation?

6    A.  It was.

7            MR. MULRYNE:  Your Honor, move to admit Government

8    Exhibit 575 into evidence.

9            MR. KENNER:  No objection.

10           THE COURT:  I'll admit 575 without objection.

11           (Whereupon, Government's Exhibit No. 575 was

12    entered into evidence.)

13    BY MR. MULRYNE:

14    Q.  Agent Heuchling, before we scroll down or look at

15    any other parts of this, we see the subject here is "Vitals

16    needed."

17           Are you familiar with why political campaigns,

18    Obama Victory Fund, for example, would request vitals?  And

19    I suppose, if I may, can you first -- do you know what

20    "vitals" means in this context?

21    A.  Yes.  So vitals refers to certain identifying

22    information that would uniquely identify a person.  So it

23    might be their date of birth, their Social Security number,

24    passport number, that kind of information.

25    Q.  And so the question I started:  Do you know why a

1    political campaign, like Obama Victory Fund, would be

2    requesting vital information?

3    A.  Yes.  For two reasons.  The first is, the campaigns will

4    conduct a vetting process to make decisions on whether they

5    want certain individuals at fundraising events, their

6    picture taken with the president, for example, if that

7    person may be considered a liability to the campaign for

8    something in their background, as well as some -- the Secret

9    Service requires this information for any person that would

10   be meeting with the president or in a certain reach of the

11   president.

12   Q.  If we scroll down to the bottom here of Page 1 into Page

13   2 -- and we saw the email there at the bottom of Page 1 that

14   continues into Page 2.  It's from Eric Feigenbaum.  Just

15   once again, to refresh everyone, who is Mr. Feigenbaum?

16   A.  Mr. Feigenbaum was a high-level fundraising officer at

17   the Obama campaign.

18   Q.  And so we see a list here of a number of individuals.

19   Among those individuals you may see there, towards the

20   middle bottom, Dato Larry, Low Hock Peng.  Do you see where

21   that is?

22   A.  I do.  And I'll just point out that Dato is a Malaysian

23   term similar to "sir" in English usage.

24   Q.  All right.  And then we see some other names,

25   Mr. Al-Husseiny, whom you've testified about, as well as

1    Mr. Bekkedam.  Is that right?

2    A.  Yes.  I see those names.

3    Q.  Mr. Bekkedam you said was Mr. Michel's financial advisor

4    at the time?

5    A.  Correct.

6          THE COURT:  You're speeding up again.  Please slow

7    down in terms of our getting anything.  You're overdoing the

8    poor court reporter, but also so the jury can absorb the

9    information.  You're going way too fast.

10          MR. MULRYNE:  Thank you, your Honor.

11          THE COURT:  Sorry to keep interrupting, but you

12    want them to be able to hear and absorb the information.

13          MR. MULRYNE:  Understood.  Thank you, your Honor.

14          THE COURT:  Go ahead.

15    BY MR. MULRYNE:

16    Q.  Agent Heuchling, the other individuals who are listed

17    there, are they familiar at all to you based on your

18    investigation?

19    A.  The majority of the names listed there are straw donors

20    that we identified in the course of our investigation,

21    individuals who received funds from the Defendant and gave

22    those funds to the campaign.

23          MR. MULRYNE:  Could we scroll back up to Page 1

24    and move toward the top, middle of the top of Page 1.  If we

25    can just zoom into that entire -- perfect.  Thank you,

1    Ms. Orozo.

2    BY MR. MULRYNE:

3    Q.  Agent Heuchling, we see an email there from Mr. White to

4    the Defendant September 10th, 2012, writing, "Here is what

5    we need.  Also send names of the people who are definitely

6    not coming."

7             And then we see the Defendant responds with a list

8    of names again.  Is that right?

9    A.  Yes.  And just to be clear, those redactions were not in

10   the original email.  We applied those redactions to protect

11   certain identifying information of the individuals.

12   Q.  Okay.  And for those individuals there in that email,

13   some of which have redactions, again, are you familiar with

14   the names of some of those individuals?

15   A.  Yes.  All those individuals -- I take that back.  The

16   top four individuals are all straw donors that we identified

17   in the investigation.  And the bottom two names,

18   Mr. Rousseau and Mr. Al-Husseiny, are associates of the

19   Defendant.

20   Q.  In addition to efforts during this time to get Larry

21   Low, Jho Low's father, into the D.C. September fundraising

22   event, were there also efforts to get Mohamed Al-Husseiny

23   into that event?

24   A.  Yes, there were.

25             MR. MULRYNE:  Pulling up what's been marked for

1     identification, not yet admitted, as Government's Exhibit

2     577.

3     BY MR. MULRYNE:

4     Q.  Agent Heuchling, is this again an email exchange

5     involving the Defendant, Mr. Rousseau, Mr. Al-Husseiny and

6     Mr. White pertaining to the same subject matter?

7     A.  Yes, it is.

8             MR. MULRYNE:  Move to admit Government Exhibit 577

9     into evidence.

10             MR. KENNER:  No objection.

11             THE COURT:  I'll admit 577 without objection.

12             (Whereupon, Government's Exhibit No. 577 was

13     entered into evidence.)

14     BY MR. MULRYNE:

15     Q.  So, Agent Heuchling, we see there at the bottom here --

16             MR. MULRYNE:  Maybe better yet, Ms. Orozo, can we

17     go to Page 2.  And then if we can zoom in on that top email.

18     BY MR. MULRYNE:

19     Q.  Agent Heuchling, do you see an email from

20     Mr. Al-Husseiny to Mr. Rousseau on August 19th, 2012?

21     A.  I do.

22     Q.  And what is it that Mr. Al-Husseiny is providing

23     Mr. Rousseau?

24     A.  Mr. Al-Husseiny is sending Mr. Rousseau a copy of his

25     passport.

1            MR. MULRYNE:  If we can pull back and go to Page 1

2    of the exhibit.  And then if we can zoom in to that top

3    portion.

4    BY MR. MULRYNE:

5    Q.  What does Mr. Rousseau do with that information from

6    Mr. Al-Husseiny?

7    A.  Mr. Rousseau forwards that information to the Defendant.

8    Q.  And then what does the Defendant do with the

9    information?

10   A.  The Defendant forwards it to Mr. White.

11           MR. MULRYNE:  If we could please pull up

12   Government Exhibit 511 for identification.

13   BY MR. MULRYNE:

14   Q.  Agent Heuchling, just going through a few of these,

15   these types of emails, this one, again, the Defendant,

16   Mr. Rousseau; this one including Mr. Tan, involving Mr. Low

17   and Larry -- and Mr. Low's father.  Is that right?

18   A.  That is correct.

19           MR. MULRYNE:  All right.  The Government moves to

20   admit Government Exhibit 511 into evidence.

21           MR. KENNER:  No objection.

22           THE COURT:  Then I'll admit 511 without objection.

23           (Whereupon, Government's Exhibit No. 511 was

24   entered into evidence.)

25

14

1      BY MR. MULRYNE:

2      Q.  And just looking here at the bottom of Page 1, Agent

3      Heuchling, we see an email from Mr. Tan to Mr. Rousseau on

4      August 21st, 2012.  What is the subject of this email chain?

5      A.  The subject is passport of Low Taek Jho and Low Hock

6      Peng.

7      Q.  And what does Mr. Rousseau do with that email from

8      Mr. Tan?

9      A.  Mr. Rousseau forwards it to Mr. Michel, the Defendant.

10     Q.  And then what does the Defendant do with that

11     information?

12     A.  The Defendant forwards it to Mr. White.

13     Q.  And we see there, written underneath, where it mentions

14     attachments, Low Hock Peng.  Is that right?

15     A.  That is correct.

16     Q.  And that is who again?

17     A.  That's Mr. Low -- Jho Low's father.

18           MR. MULRYNE:  If we can pull up Government Exhibit

19     260 for identification.

20     BY MR. MULRYNE:

21     Q.  Here, Agent Heuchling, do we see an email exchange

22     involving Mr. Feigenbaum, Mr. White and the Defendant

23     involving Larry -- Mr. Low's father?

24     A.  Yes, we do.

25           MR. MULRYNE:  Move to admit Government Exhibit

```
 1    260.

 2              MR. KENNER:  No objection.

 3              THE COURT:  I'll admit 260 without objection.

 4              (Whereupon, Government's Exhibit No. 260 was

 5    entered into evidence.)

 6              MR. MULRYNE:  If we can blow up the lower half of

 7    this email.

 8    BY MR. MULRYNE:

 9    Q.  So, Agent Heuchling, we see the Defendant emailing

10    Mr. White on August 28th, 2012.  And we won't go through all

11    this information, but just generally, what is the Defendant

12    providing Mr. White here?

13    A.  The Defendant is sending Mr. White a short description

14    of Mr. Low's business and personal background.  It's almost

15    like a short résumé.

16              MR. MULRYNE:  All right.  And if we go up to the

17    upper portion -- if we blow up the top half of this

18    document.

19    BY MR. MULRYNE:

20    Q.  What does Mr. White do with the Defendant's email below

21    about Larry Low?

22    A.  Mr. White forwards the email to Mr. Feigenbaum, as well

23    as a Mr. Rufus Gifford.  And Mr. Gifford was

24    Mr. Feigenbaum's boss at this time.

25    Q.  Okay.  And then if we look at the top of the email
```

1    chain, August 28th, 2012, Mr. Feigenbaum responds to

2    Mr. White.  And I know it's a little bit difficult to read

3    with that -- those symbols in there, but what is it that

4    Mr. Feigenbaum replies?

5    A.  "Got it.  Will get Jho's dad vetted ASAP."

6    Q.  Agent Heuchling, to be clear, may foreign nationals

7    attend political or campaign events such as this?

8    A.  Yes, they may.

9    Q.  Can foreign nationals contribute or donate to political

10    campaigns in order to attend events like this?

11    A.  No, they may not.

12           MR. MULRYNE:  If we could pull up Government

13    Exhibit 578 for identification.

14    BY MR. MULRYNE:

15    Q.  Do you recognize this as an email chain involving the

16    Defendant and Mr. White, again, regarding the same subject

17    matter we've just been talking about?

18    A.  Yes, I do.

19           MR. MULRYNE:  Move to admit Government Exhibit

20    578.

21           MR. KENNER:  No objection.

22           THE COURT:  I'll admit 578 without objection.

23           (Whereupon, Government's Exhibit No. 578 was

24    entered into evidence.)

25           MR. MULRYNE:  Can we scroll to Page 2, please.

1    BY MR. MULRYNE:

2    Q.  So we'll just start here at the bottom of Page 2, the

3    lower half, Agent Heuchling.

4            Do you see down there Mr. Feigenbaum emails

5    Mr. White and others on September 11th, 2012?

6    A.  Yes.

7    Q.  And you may see the reference there to Barry Bekkedam,

8    Edgar Mejia.

9            MR. MULRYNE:  Can we scroll to the next page,

10   Page 3, I believe.  If we could just blow up that whole

11   email.

12   BY MR. MULRYNE:

13   Q.  So we see it again here, Agent Heuchling.

14   Mr. Feigenbaum to Mr. White and others, September 11th.  And

15   what is it that Mr. Feigenbaum is requesting of Mr. White?

16   A.  Mr. Feigenbaum is sending Mr. White an email requesting

17   certain information from some of the individuals who at this

18   point were slated to attend the fundraiser in September.

19   Q.  And at the very bottom, who's the individual we see

20   there?

21   A.  The last name on that list is Larry Low, Jho Low's

22   father.

23   Q.  All right.  And Mr. Mejia and Mr. Toussaint, do you

24   recognize those names?

25   A.  Yes.  Those are names of straw donors.

1          MR. MULRYNE:  Can we move up to the -- back up to

2     the second page of this email.

3     BY MR. MULRYNE:

4     Q.  If we look at the top half of Page 2, we see the

5     Defendant responding to Mr. White, providing personal

6     identifying information of Mr. Toussaint.  Is that correct?

7     A.  That's correct.

8          MR. MULRYNE:  And if we go to Page 1 of the

9     exhibit.  If we can just blow up the front page here.

10    BY MR. MULRYNE:

11    Q.  We see the Defendant and Mr. White continue to exchange

12    emails.  And then what is it that Mr. White runs -- writes

13    to the Defendant there at the top?

14    A.  Mr. White writes:  "Okay.  Waiting on Jho's dad passport

15    number and date of birth."

16         MR. MULRYNE:  Can we pull back, please.

17         All right.  Can we move to Government Exhibit 510

18    for identification.

19    BY MR. MULRYNE:

20    Q.  Do you recognize this as an email from the Defendant to

21    Mr. White also on September 11th, 2012?

22    A.  I do.

23         MR. MULRYNE:  Move to admit Government Exhibit

24    510.

25         MR. KENNER:  No objection.

 1          THE COURT:  I'll admit 510 without objection.

 2          (Whereupon, Government's Exhibit No. 510 was

 3     entered into evidence.)

 4     BY MR. MULRYNE:

 5     Q.  What is the Defendant providing to Mr. White in this

 6     email?

 7     A.  The Defendant is sending Mr. White Low Hock Peng, or

 8     Jho's father's, passport information and date of birth,

 9     which are redacted for this -- for our purposes.

10     Q.  Okay.  And the last email on this matter.

11          MR. MULRYNE:  If we could pull up Government

12     Exhibit 251 for identification.

13     BY MR. MULRYNE:

14     Q.  Do you recognize this as an email to Mr. White also

15     related to Larry Low?

16     A.  Yes, I do.

17          MR. MULRYNE:  Move to admit Government Exhibit 251

18     into evidence.

19          MR. KENNER:  No objection.

20          THE COURT:  I'll admit 251 without objection.

21          (Whereupon, Government's Exhibit No. 251 was

22     entered into evidence.)

23          MR. MULRYNE:  If we could publish, please.

24     BY MR. MULRYNE:

25     Q.  Agent Heuchling, the email from the Defendant to

1    Mr. White on September 11th, 2012, what's the subject?

2    A.  Low passport.

3              MR. MULRYNE:  And if we could just scroll down to

4    Page No. 3 of the exhibit.

5    BY MR. MULRYNE:

6    Q.  What is it here that the Defendant is sending to

7    Mr. White?

8    A.  This appears to be a photograph or a scan of Low's

9    father's passport.

10   Q.  And from what country has this passport been issued?

11   A.  It's a Malaysian passport.

12             MR. MULRYNE:  Thank you, Ms. Orozo.

13   BY MR. MULRYNE:

14   Q.  Agent Heuchling, so now -- we've been talking about the

15   lead-up to the September fundraising event in Washington,

16   D.C., in September 2012.

17             Did the FBI obtain photographs from that

18   fundraising event during its investigation?

19   A.  Yes, we did.

20   Q.  Prior to your testimony here today, did you have an

21   opportunity to view Government Exhibits 105 and 266?

22   A.  I did.

23   Q.  And are those photographs from the Washington, D.C.,

24   fundraising event?

25   A.  They are.

1          MR. MULRYNE:  Your Honor, Government moves to

2     admit Government Exhibits 105 and 266 into evidence.

3          MR. KENNER:  I don't see what they are, your

4     Honor.  The screen is blank.

5          MR. MULRYNE:  Sure.  We can pull those up for

6     identification.  105 and 266.

7          MR. KENNER:  Thank you for 105.  Thank you for

8     266.

9          I have no objection to either one, your Honor.

10         THE COURT:  All right.  Then I'll admit 105

11     without objection and 266.

12         (Whereupon, Government's Exhibit Nos. 105 and 266

13     were entered into evidence.)

14         MR. MULRYNE:  And to be clear, 105 is a

15     multi-document exhibit.

16         MR. KENNER:  Can I see the rest of the

17     multi-document --

18         MR. MULRYNE:  Sure.

19         Can we scroll, Ms. Orozo, just to the next few

20     pictures in 105.

21         That's the entirety of the exhibit.

22         MR. KENNER:  Thank you, your Honor.  I have no

23     objection to any of them.

24         THE COURT:  All right.  So the full scope of the

25     exhibit in 105 is admitted without objection.

```
 1              MR. MULRYNE:  Can we move to publish Government
 2    Exhibit 105, please.
 3              MR. KENNER:  No objection, your Honor.
 4              THE COURT:  They're showing it.  I've admitted it.
 5    BY MR. MULRYNE:
 6    Q.  Agent Heuchling, looking at the first page, the first
 7    photo of Exhibit 105, who is that on the right-hand side?
 8    A.  That's the Defendant, Mr. Michel.
 9    Q.  And who's the person there on the left-hand side?
10    A.  That's Jho Low's father.
11    Q.  Larry Low?
12    A.  Yes.  That's correct.
13    Q.  Do you happen to know who's there in the middle?
14    A.  That's Sylvia White, Mr. White's wife.
15              MR. MULRYNE:  Can we go to Page 2 of the exhibit.
16    BY MR. MULRYNE:
17    Q.  So we see President Obama here shaking hands with the
18    Defendant.  And who's the other person in this photograph?
19    A.  That's a partial face view of Jho Low's father.
20              MR. MULRYNE:  Page 3 of the exhibit.
21    BY MR. MULRYNE:
22    Q.  What do we see here?
23    A.  That's Jho Low's father shaking hands with the
24    president.
25    Q.  With the Defendant in the background?
```

1    A.  Yes.  That's correct.

2    Q.  Agent Heuchling, during your investigation, did you

3    become familiar with what's known in this political

4    fundraising context as the clutch?

5    A.  I did.

6    Q.  What is the clutch?

7    A.  So the clutch literally is a handshake between one

8    individual and another, often referred to as a handshake

9    with the president.

10           Also, kind of colloquially it means -- or in

11   campaign circles, the clutch is an event that usually

12   precedes the main event with the president where a small

13   select group of individuals gets some private time with the

14   president.  It's highly coveted for those individuals to

15   have that kind of personal experience with the president.

16   Q.  Do all campaign event attendees get to participate in

17   the clutch?

18   A.  No.  As I was saying, it's usually a select few that get

19   to be part of the clutch.

20           MR. MULRYNE:  Page 4 of the exhibit.

21   BY MR. MULRYNE:

22   Q.  Who's this individual in front of President Obama?

23   A.  That's Mr. Al-Husseiny.

24           MR. MULRYNE:  Page 5.

25

```
 1    BY MR. MULRYNE:
 2    Q.  Do we see a picture of -- is this the D.C. event, as you
 3    understood it?
 4    A.  Yes.
 5              MR. MULRYNE:  Page 6, I believe.
 6    BY MR. MULRYNE:
 7    Q.  Agent Heuchling, we see President Obama there on one
 8    side.  Do you know the individual across from President
 9    Obama wearing the -- what seems to be a yellow tie?
10    A.  Yes.  That's Mr. White.
11              MR. MULRYNE:  Next page.
12    BY MR. MULRYNE:
13    Q.  So looking at this photograph, we see President Obama
14    there in the middle.  To his right, our left, who's the
15    person to the right of President Obama?
16    A.  That's the Defendant, Mr. Michel.
17    Q.  And then the person immediately to the left of President
18    Obama on his other side, who is that?
19    A.  That's Jho Low's father.
20    Q.  And then the two individuals on their outside, to the
21    right of Mr. Michel, the Defendant, on the far left, in
22    other words?
23    A.  Yeah.  That's Mr. Al-Husseiny.
24    Q.  And then, lastly, the individual with the red tie next
25    to Larry Low on the right-hand side of this photograph?
```

1     A.  That's Mr. Rousseau.

2               MR. MULRYNE:  Next page, please.

3     BY MR. MULRYNE:

4     Q.  Is this another angle of the same individuals?

5     A.  It is, one where you can read their nametags.

6     Q.  And again, we see that's Larry Low immediately to the

7     left of the president?

8     A.  Correct.

9               MR. MULRYNE:  Next page.

10    BY MR. MULRYNE:

11    Q.  Here we see the president shaking the Defendant's hand.

12    And then who's immediately just beyond the president near

13    the Defendant?

14    A.  That's Jho Low's father, Larry Low.

15              MR. MULRYNE:  Is there another photo?  I believe

16    that might be it.

17              Thank you, Ms. Orozo.

18    BY MR. MULRYNE:

19    Q.  So, Agent Heuchling, we just saw the September event in

20    Washington, D.C.  Fast-forwarding a couple months to

21    November of 2012, did the Defendant receive an additional

22    amount of money from a foreign entity in or around that

23    time?

24    A.  Yes.  On Election Day 2012, so November 6th, the

25    Defendant received $11 million from Blackstone.

1          MR. MULRYNE:  If we can now pull up what's been

2     marked as -- I'm sorry -- marked and admitted as Government

3     Exhibit 601.

4     BY MR. MULRYNE:

5     Q.  Agent Heuchling, can you tell us, what's reflected in

6     this summary chart?

7     A.  So this is a chart showing some of the straw donors that

8     Mr. Michel used to donate funds to the Obama Victory Fund,

9     noting that Mr. Michel donated approximately $865,000 to the

10    Obama Victory Fund from June to September 2012 using straw

11    donors.

12    Q.  And in 2012, how much money, approximately, in total did

13    the Defendant receive from Blackstone and Alsen Chance?

14    A.  He received approximately $21 million total from

15    Blackstone and Alsen Chance.

16    Q.  And of that $21 million that the Defendant had received

17    from those entities, how much of that money was provided to

18    straw donors?

19    A.  Approximately $865,000 to approximately 21 straw donors.

20    Q.  So to this point, Agent Heuchling, we've been talking

21    primarily about Obama Victory Fund 2012, OVF.

22          During your investigation, did you come to learn

23    about an independent expenditure-only committee called Black

24    Men Vote?

25    A.  I did.

1    Q.  And can you just tell us briefly, what is Black Men

2    Vote?

3    A.  Black Men Vote is a super political action committee, or

4    a super PAC.

5    Q.  Did the Defendant make any contributions to Black Men

6    Vote during the same 2012 election cycle?

7    A.  Yes, he did; more than $1 million in contributions.

8              MR. MULRYNE:  Can we pull up what's been marked

9    and admitted as Government Exhibit 664.

10   BY MR. MULRYNE:

11   Q.  And this summary exhibit here, Agent Heuchling, can you

12   tell the jury, what does this reflect?

13   A.  This reflects the donations that Mr. Michel made to the

14   Black Men Vote super PAC.

15   Q.  So we see that $250,000 on September 7th, 2012;

16   $400,000, October 12, 2012; and then what was that last

17   contribution there?

18   A.  $475,000 on October 24th, 2012, for a total of

19   approximately 1.125 million from funds that Mr. Michel

20   received from a foreign source that he gave to the

21   super PAC.

22   Q.  So that approximate 1.125 million represented here, did

23   this money come from either Blackstone and/or Alsen Chance?

24   A.  Yes.  It can all be traced back to either Blackstone or

25   Alsen Chance.

1    Q.  Now, in addition --

2              MR. KENNER:  Excuse me, your Honor.  I object.

3    Did this witness do that or is he saying it could be done?

4              THE COURT:  Why don't you answer the question?

5              THE WITNESS:  It can be traced back.  I did trace

6    it back, and others confirmed that tracing as well.  Yeah.

7    Directly back.  It's fairly straightforward.

8    BY MR. MULRYNE:

9    Q.  Traced back --

10             MR. KENNER:  Move to strike the last comment.

11             THE COURT:  I'll leave it alone.

12             Can you pick up on your questioning?

13             MR. MULRYNE:  Yes, your Honor.

14   BY MR. MULRYNE:

15   Q.  Now, in addition to these three payments, did the

16   Defendant make a -- another contribution to Black Men Vote

17   around this time?

18   A.  He did.  So the Defendant made a $100,000 contribution

19   to Black Men Vote around this time.  However, these funds

20   came in a cashier's check, and we were unable to trace this

21   particular set of funds, this particular $100,000, back to

22   the Blackstone or the Alsen Chance funds.  So out of an

23   abundance of caution, to be fair, we do not have that money

24   reflected here on our tracing.

25   Q.  And was there any problem in tracing this $1.1 million

1   here?

2   A.  No.  This tracing is solid.

3   Q.  Agent Heuchling, so you've testified about the $875,000

4   or so that the Defendant received from Mr. Low's entities

5   and contributed to Obama Victory Fund.  You've testified

6   about the over $1 million that the Defendant received from

7   Mr. Low's entities and contributed to Black Men Vote.

8           In terms of the remaining amount of money, of the

9   20 -- approximate $21 million that the Defendant received

10  from Mr. Low, what happened to that money?

11  A.  Mr. Low -- I'm sorry.  The Defendant gave some of those

12  funds to others, but the majority of that money he pocketed

13  for himself.

14  Q.  So, Agent Heuchling, I now want to turn your attention

15  to a different topic here.  So we've been talking about the

16  $21 million that the Defendant received.

17          Did you learn during your investigation of efforts

18  involving the Defendant to address the taxability of that

19  $21 million?

20  A.  Yes, I did.

21  Q.  Showing you what's been marked for identification as

22  Government Exhibit 730, do you recognize that as an email

23  chain in April 2013 involving the Defendant, Mr. Tan and

24  Mr. Rousseau concerning this issue of the taxes on the 21

25  million?

 1    A.  I do.

 2              MR. MULRYNE:  Your Honor, move to admit Government

 3    Exhibit 730 into evidence.

 4              MR. KENNER:  No objection.

 5              THE COURT:  I'll admit 730 without objection.

 6              (Whereupon, Government's Exhibit No. 730 was

 7    entered into evidence.)

 8              MR. MULRYNE:  If we can enlarge the bottom

 9    portion, the bottom half.  Thank you, Ms. Orozo.

10    BY MR. MULRYNE:

11    Q.  So here we see an April 4th email from Mr. Rousseau that

12    says -- and I'm not going to read this, Agent Heuchling, in

13    its entirety, but it says, "Attached is a sample letter that

14    you will need from Eric."

15              We see a reference again to a letter.  In

16    Paragraph 4, for example, it reads, "Is there a gift letter

17    or note by the foreigner?"

18              Do you also see in here references to Blackstone,

19    Alsen Chance?

20    A.  Yes.

21    Q.  And then in terms of the amounts of money reflected

22    here, what do you understand those monies to be?

23    A.  So just under the last paragraph there, you see

24    1 million, 9 million and 11 million.  Those are amounts that

25    the Defendant received into his accounts, BRB and PJ 2012,

1    from Alsen Chance and Blackstone.

2    Q.  And those being the amounts that you've covered thus far

3    in your testimony?

4    A.  Yes.  Those are the funds that were sent to the

5    Defendant in June and August of 2012.

6    Q.  And again, we won't read through the entire email.  But

7    what do you understand this email from Mr. Rousseau to be

8    about?

9    A.  This is a letter from Mr. Rousseau to Mr. Tan discussing

10   the need for a gift letter or some -- a document from

11   Mr. Tan or Mr. Low so that the Defendant can account for

12   his -- the fund he received as a gift.

13   Q.  And you said that this is an email to Mr. Tan.  I think

14   we'll see that in a moment when we scroll up.  But we do see

15   multiple references in this email about -- naming Tan by

16   name.  Is that correct?

17   A.  Yeah, we do.

18   Q.  Or -- I'm sorry -- Eric by name, where it reads, for

19   example, "You will need from Eric," the top line there?

20   A.  Yes.

21   Q.  And then at the very bottom, it reads, "To Eric's

22   people, this should be easy to answer."

23            Do you see that?

24   A.  Yes, I do.  Yes.

25   Q.  One last question before we move up the chain.  In the

1    second paragraph, it reads, "To review the points raised by

2    Marcum."

3              Do you know what is Marcum?

4    A.  Yes.  Marcum is a fairly large accounting firm -- they

5    do tax work as well -- based in Florida.

6              MR. MULRYNE:  Can we move to the top half of this

7    email, please.

8    BY MR. MULRYNE:

9    Q.  Agent Heuchling, we see there -- below the top email

10   exchange, we see what purports to be an email from Mr. Tan

11   to Mr. Rousseau -- do you see that? -- on April 5th, 2013?

12   A.  I do.

13   Q.  Okay.  And we won't go through all the responses here.

14   But is there anything that strikes you as odd as to that

15   response?

16   A.  Yes.  This email purports to be from Eric Tan.  Yet

17   you'll see that it refers to Eric in the third person.

18   You'll see that this is indicative of some other emails

19   where it appears that someone else may have been using

20   Mr. Tan's email address and that perhaps Mr. Low was using

21   Mr. Tan's email address.

22             MR. KENNER:  Move to strike, your Honor.  "Perhaps

23   he was using Mr. Low's email address."

24             THE COURT:  Yes.  I think that's too iffy.  So I

25   will -- unless you can be more specific.  If not, I will

1      strike that portion.

2                  MR. KENNER:  Thank you, your Honor.

3                  THE COURT:  So we're only -- someone else may have

4      been using Mr. Tan's email address.  And you should then --

5      that's fine.  But then not consider whether or not Mr. Low

6      was using or managing Mr. Tan's email address.  So that

7      portion is not part of it.

8      BY MR. MULRYNE:

9      Q.  Agent Heuchling, what does Mr. Rousseau do with this

10     email upon receipt from Mr. Tan?

11     A.  Mr. Tan forwards it -- sorry.  Mr. Tan forwards --

12     sorry.  Mr. Rousseau forwards it to Mr. Michel, the

13     Defendant.

14                 MR. MULRYNE:  One moment, your Honor.

15                 Your Honor, I don't think the email was published.

16                 THE COURT:  Oh, I'm sorry.

17                 MR. MULRYNE:  My fault.  I did not check.

18                 THE COURT:  Our habit is you have to say to

19     publish it so that we actually put it up.  I didn't notice

20     that it -- why don't I give the jury a few moments so they

21     can take a look at it.  Do you want to start at the bottom,

22     moving up?

23                 MR. MULRYNE:  Sure.

24     BY MR. MULRYNE:

25     Q.  We'll just cover briefly, Agent Heuchling, what you just

 1    testified about.  If we go to the bottom portion of this

 2    first page.  And my apologies that it wasn't up.

 3              So, Agent Heuchling, this first portion down here,

 4    you had noted the monetary amounts reflecting what you've

 5    testified about previously?

 6    A.  Yes.  Those are the funds -- or three of the four

 7    transactions that the Defendant received into his account in

 8    June, August and November of 2012 from Blackstone and Alsen

 9    Chance.

10    Q.  And we see references to Blackstone and Alsen Chance in

11    that Paragraph 4.

12              You also noted -- you noted that -- we saw here

13    several references to Eric by name, though this email is

14    addressed to Mr. Tan, to your understanding.  Is that right?

15    A.  Yes.  That's correct.

16    Q.  All right.  And you already testified moments ago about

17    Marcum being an accounting firm.  Is that right?

18    A.  That's correct.

19    Q.  And then --

20              MR. MULRYNE:  If we can just return to the top

21    portion.

22    BY MR. MULRYNE:

23    Q.  And I understood you moments ago to, again, note the

24    response from Mr. Tan that refers to Eric Tan by name in the

25    email that purports to be from Mr. Tan.  Is that right?

1     A.  That's correct.

2              MR. MULRYNE:  Can we pull up Government Exhibit

3     107 for identification.

4     BY MR. MULRYNE:

5     Q.  Agent Heuchling, is this a letter you recovered during

6     your investigation that is addressed to the Defendant and

7     Mr. Bekkedam pertaining to the same issue of taxability?

8     A.  Yes, it is.

9              MR. MULRYNE:  Move to admit Government Exhibit

10    107.

11             MR. KENNER:  No objection.

12             THE COURT:  I'll admit 107 without objection.

13             (Whereupon, Government's Exhibit No. 107 was

14    entered into evidence.)

15             THE COURT:  You can publish it.

16    BY MR. MULRYNE:

17    Q.  Agent Heuchling, so we see on the letterhead Blackstone

18    and Alsen Chance.  Those are the entities associated with

19    Mr. Low.  Is that right?

20    A.  That's correct.

21    Q.  And then the date on this, April 5th, 2013.  Again, who

22    are the recipients?

23    A.  This letter is addressed to the Defendant, Mr. Michel,

24    and Mr. Bekkedam, his accountant.

25    Q.  We see in the first paragraph it reads, "In response to

1    your inquiry for further details surrounding my gift to

2    Pras, it is my hope that this letter outlines some of the

3    specific points raised by your tax counsel."

4          Do you see that?

5    A.  I do.

6    Q.  And then -- I won't read all of this, but in the next

7    portion we see again references to money, to BRB Holdings

8    and PJ 2012.  Do you see all those?

9    A.  I do.

10   Q.  Is that -- does that reflect the transactions that we

11   saw much of earlier?

12   A.  Yes.

13   Q.  All right.  And again, to your understanding, what's the

14   import of this letter?

15   A.  So this is a letter purportedly from Mr. Tan to

16   Mr. Michel, the Defendant, and his financial advisor,

17   indicating that the funds that were sent to the Defendant

18   from Blackstone and Alsen Chance were gifts.  The import

19   here is that if these are gifts as opposed to income, then

20   Mr. -- the Defendant could potentially save himself $6 to $7

21   million that he would not then owe the IRS if it were

22   income.

23   Q.  And who does it appear or purport to have the signature

24   at the bottom of this letter?

25   A.  That appears to be Mr. Tan's signature.

1           MR. MULRYNE:  Can we pull up Government Exhibit

2    240.  If we can just zoom in to the -- more or less the

3    whole thing so we can take a look.  This is for

4    identification.

5    BY MR. MULRYNE:

6    Q.  Is this an email from Mr. Bekkedam, the Defendant's

7    financial advisor, to the Defendant on August 21st, 2012?

8    A.  Yes.

9    Q.  And does this make reference to the matter we've just

10   been discussing?

11   A.  It does.

12          MR. MULRYNE:  Your Honor, move to admit Government

13   Exhibit 240 into evidence.

14          MR. KENNER:  No objection.

15          THE COURT:  All right.  I'll admit 240 without

16   objection.

17          (Whereupon, Government's Exhibit No. 240 was

18   entered into evidence.)

19   BY MR. MULRYNE:

20   Q.  Agent Heuchling, so an email from Mr. Bekkedam to the

21   Defendant.  What's the subject of this email?

22   A.  The subject is Pras project/tasks, et cetera.

23   Q.  All right.  And then the first line there says, "Pras,

24   this is a list of things we need to do."

25          And can you --

```
 1                 MR. MULRYNE:  If we scroll down or call out --
 2    BY MR. MULRYNE:
 3    Q.  Can you read for us, Agent Heuchling, Paragraph No. 7
 4    once it appears on your screen?
 5    A.  Yes.  "7.  Letters from Joe indicating the gift to both
 6    BRB Holdings and PJ Holdings."
 7    Q.  By this point in early to mid-August 2012, had BRB
 8    Holdings and PJ Holdings received monies from the entities
 9    associated with Mr. Low?
10    A.  Yes, they had.  And this email indicates that both
11    Mr. Bekkedam and the Defendant at this time associated those
12    funds that he -- the Defendant received with Mr. Low.
13    Q.  Any reference in this email or this portion to Eric Tan?
14    A.  None.
15                 MR. MULRYNE:  If pull up Government Exhibit 553
16    for identification.  And if we just maybe zoom in on the
17    upper half of this document.
18    BY MR. MULRYNE:
19    Q.  Is this an email from Mr. Bekkedam to the Defendant on
20    September 3rd, 2012, again, touching on this issue --
21    A.  Yes.
22    Q.  -- of tax?
23    A.  Yes, it is.
24                 MR. MULRYNE:  Move to admit Government Exhibit 553
25    into evidence.
```

 1                 MR. KENNER:  No objection.

 2                 THE COURT:  I'll admit Exhibit 553 without

 3     objection.

 4                 (Whereupon, Government's Exhibit No. 553 was

 5     entered into evidence.)

 6     BY MR. MULRYNE:

 7     Q.  So, Agent Heuchling, looking at the first paragraph,

 8     second sentence, where it begins, "What day," we see there

 9     it reads, "What day will be most -- what day will we be most

10     likely meeting with Mohamed and Joe?"

11                 Did I read that correctly?

12     A.  You did.

13     Q.  And then if we drop down to the second paragraph

14     beginning with "See below," can you just read that for the

15     jury, please?

16     A.  "See below what we need to get from Joe.  This is

17     complicated, but hugely important.  I've done all the

18     homework and understand what we need.  I will clean it up

19     and shorten it up to present to Joe.  I can't express how

20     important this is in terms of tax treatment."

21     Q.  And we won't go through it, but do you understand the

22     remainder of the email to deal again with this issue of the

23     taxability of that foreign money?

24     A.  Yes.

25     Q.  Lastly on this point --

Heuchling - DIRECT - By Mr. Mulryne

```
 1              MR. MULRYNE:  If we could pull up Government

 2     Exhibit 250 for identification.

 3     BY MR. MULRYNE:

 4     Q.  And do you recognize this?

 5              MR. MULRYNE:  If we could perhaps just scroll --

 6     zoom in to the upper half just so we can take a look at it,

 7     Ms. Orozo.  Thank you.

 8     BY MR. MULRYNE:

 9     Q.  Do you recognize this as an email chain between the

10     Defendant and Mr. Bekkedam on or about August 1st, 2012 --

11     I'm sorry -- October 1st, 2012?  I'm sorry.

12     A.  Yes.  October 1st.

13              MR. MULRYNE:  The Government moves to admit

14     Government 250.

15              MR. KENNER:  No objection.  I'm sorry, your Honor.

16              THE COURT:  All right.  I'll admit 250 without

17     objection.

18              (Whereupon, Government's Exhibit No. 250 was

19     entered into evidence.)

20              MR. MULRYNE:  And if we can go to Page 2.  We're

21     going to try to go to Page 2 and we're going to try to zoom

22     in on an email sent around 7:12 a.m. from the Defendant.

23              THE WITNESS:  Yes.  I see it.

24     BY MR. MULRYNE:

25     Q.  So, Agent Heuchling, here we see the Defendant to
```

1    Mr. Bekkedam.  Reading that bottom line of this email -- can

2    you read that for the jury, please?

3    A.  Yes.  This is from the Defendant to Mr. Bekkedam.

4    "Also, I'll keep you posted on this next and last wire

5    coming in from Jho."

6              So again, indicating at this time that Mr. Michel

7    and Mr. Bekkedam both knew that the funds that Mr. Michel

8    was receiving were coming from Mr. Low.

9    Q.  Any reference to Eric Tan in here?

10             MR. KENNER:  Excuse me, your Honor.  I'm going to

11   object and move to strike that last answer.  It says, "and

12   last wire coming in from Jho."  It doesn't say from Mr. Low.

13             THE COURT:  Well, it says from Jho.  I'm not sure

14   what your objection is.  He's basically indicating what it

15   says there.

16             MR. KENNER:  I'll withdraw the objection.  That's

17   fine.

18             THE WITNESS:  If it's helpful, J-H-O is how Jho

19   Low spelled his first name.

20   BY MR. MULRYNE:

21   Q.  As -- similar to what we see here in this email from the

22   Defendant?

23   A.  Yeah.  Correct.

24   Q.  Any reference to Eric Tan in this email?

25   A.  No.  None.

1          MR. MULRYNE:  If we can pull that down, please,

2     Ms. Orozo.  Thank you.

3     BY MR. MULRYNE:

4     Q.  So, Agent Heuchling, I want to now move sort of to

5     another area here.  We've just -- we were looking at these

6     emails, talking about the taxability of the $21 million the

7     Defendant received.

8          Going back to the campaigns for a moment, the

9     Obama Victory Fund 2012, Black Men Vote, what, if anything,

10    did those political committees have to report or provide to

11    the Federal Election Commission?

12    A.  So both the Obama Victory Fund as well as Black Men

13    Vote, or any campaign committee or political action

14    committee, had to file semi-regular or regular FEC filings,

15    so they had to file paperwork with the FEC.

16    Q.  And you mentioned this earlier, but just for anyone who

17    may have forgotten, what is the Federal Election Commission,

18    or the FEC?

19    A.  So the FEC is an independent agency of the U.S.

20    Government charged with enforcing and enacting federal

21    election campaign law.

22    Q.  Prior to your testimony here today, did you have an

23    opportunity to review Government Exhibits 693, 521, 518 and

24    520?

25    A.  I did.

```
 1    Q.  And are those FEC filings made by the Obama Victory Fund

 2    in this 2012-2013 period?

 3    A.  Yes, they are.

 4    Q.  And are those exhibits voluminous?

 5    A.  Yes.  Each one is thousands of pages.

 6    Q.  I'll spare us all from going through all of those.

 7              MR. MULRYNE:  But if I may, let me pull up what's

 8    previously been admitted as Government Exhibits 693 and 518.

 9    We'll just look through a few portions of these.

10              THE COURTROOM DEPUTY:  It's not coming up.

11              MR. MULRYNE:  I think we're working on it.

12              It will just take one moment, your Honor.

13              THE COURT:  Sure.  No problem.

14              MR. KENNER:  I have no objection, your Honor.

15              THE COURT:  I think they've already been admitted.

16              MR. KENNER:  Oh, okay.

17              MR. MULRYNE:  They have.

18              MR. KENNER:  Then I don't have any further

19    objection.

20    BY MR. MULRYNE:

21    Q.  So we have Government's Exhibit 693.

22              MR. MULRYNE:  And we can pull up 518 after this,

23    if necessary, Mr. Orozco.

24    BY MR. MULRYNE:

25    Q.  Agent Heuchling, do you recognize this form here, the
```

```
 1    FEC form 3X, report of receipts and disbursements?  I'm just
 2    referencing the top.  Generally speaking, what kinds of
 3    information is reported and reflected in this type of FEC
 4    report?
 5    A.  So the FEC form 3X is a report that campaign funds have
 6    to file with the FEC on a regular basis.  It details the
 7    funds that they have received from donors in a certain time
 8    period, as well as disbursements or payments they have made
 9    out through vendors in that same time period.
10    Q.  Okay.  And this Exhibit 693, was this a filing by the
11    Obama Victory Fund 2012?
12    A.  Yes, it was.
13              MR. MULRYNE:  If we could just quickly pull up
14    Government Exhibit 518.
15    BY MR. MULRYNE:
16    Q.  Agent Heuchling, do you recognize this as Government
17    Exhibit 518, all previously admitted?
18    A.  I do.
19              MR. MULRYNE:  If we can do a callout on these,
20    please.
21              Your Honor, just one moment.
22              THE COURT:  Sure.
23              (Mr. Mulryne confers with co-counsel privately.)
24              MR. MULRYNE:  Your Honor, we're just experiencing
25    a tech issue which may or may not --
```

```
1              THE COURT:  I'm sorry?

2              MR. MULRYNE:  We're experiencing a technical issue

3    with these --

4              THE COURT:  Do you want to use the ELMO?  Is that

5    easier?

6              MR. MULRYNE:  We were considering it.  We just may

7    need to pull out our hard copies.

8              THE COURT:  Okay.

9              MR. MULRYNE:  May I have the Court's indulgence

10   for one moment?

11             THE COURT:  No problem.

12             Mr. Mulryne, if you think it's going to take a

13   little bit of time, I can take the afternoon break now.  If

14   you're ready to go, then I won't.  I'll wait a few minutes.

15             MR. MULRYNE:  I don't have my clock on me, your

16   Honor, but if we're around that time, that may be helpful.

17             THE COURT:  Okay.  Why don't we do that and we'll

18   get the tech issue taken care of.

19             MR. MULRYNE:  Thank you, your Honor.

20             THE COURT:  So it's five to 3:00.  So ten after

21   3:00.  So leave your notebooks there.  Take your time.  I

22   don't want you to rush.

23             (Whereupon, the jury exited the courtroom at 2:56

24   p.m. and the following proceedings were had:)

25             THE COURT:  I'll add an additional five minutes --
```

Heuchling - DIRECT - By Mr. Mulryne

```
 1      I should have -- so that you get a break, too.
 2                  MR. MULRYNE:  We appreciate it.  Thank you, your
 3      Honor.
 4                  MR. KENNER:  Thank you, your Honor.
 5                  MR. MULRYNE:  Our apologies for the tech issue.
 6                  THE COURT:  No problem.
 7                  (Thereupon a recess was taken, after which the
 8      following proceedings were had:)
 9                  THE COURT:  Were you able to resolve those?
10                  MR. MULRYNE:  I think so, your Honor.  I think
11      we're going to be able to use the computer again.
12                  THE COURT:  The ELMO?
13                  MR. MULRYNE:  I don't think we're going to need
14      the ELMO.  We're going to give it a try.
15                  THE COURTROOM DEPUTY:  Ready?
16                  THE COURT:  Yes.
17                  (Whereupon, the jury entered the courtroom at 3:28
18      p.m. and the following proceedings were had:)
19                  THE COURT:  Everybody can sit down.
20                  Good afternoon, everyone.
21                  THE JURY:  Good afternoon.
22                  THE COURT:  I think everybody is ready.
23                  I think we can proceed.  Go ahead.  We're still on
24      the direct.
25                  MR. MULRYNE:  Thank you, your Honor.  Sorry,
```

 1    again, about the technical issue.

 2    BY MR. MULRYNE:

 3    Q.  Good afternoon again, Agent Heuchling.

 4    A.  Good afternoon.

 5    Q.  I think we're going to -- I think this will work.  We're

 6    going to try to revert back to the computer.  So we're going

 7    to pull up Government Exhibits 693 and 518, both of which

 8    have been previously admitted.

 9    A.  Yes.  I see them.

10    Q.  Agent Heuchling, do you recognize these, then, as --

11    those FEC form 3Xs that you were testifying about a moment

12    ago?

13    A.  Yes, I do.

14    Q.  Okay.  And again, I know you testified, but just due to

15    the interruption, can you tell us, what generally -- what

16    kind of information is reported by a campaign in these

17    forms?

18    A.  An FEC form 3X is a form that campaigns use to report to

19    the FEC on a regular basis the donations that they have

20    received during a certain time period and also the

21    disbursements they have made, you know, to vendors or the

22    like during the same time period.

23    Q.  All right.

24          MR. MULRYNE:  And if we can do a -- we're going to

25    do a callout here of these two exhibits.

1    BY MR. MULRYNE:

2    Q.  If you're able to read that, Agent Heuchling, what's the

3    time period covered by these reports submitted by the Obama

4    Victory Fund?

5    A.  Yes.  So both of these reports cover a time period June

6    1, 2012, to June 30th, 2012.

7    Q.  So would that include a report of all the contribution

8    information related to these campaigns during that period?

9    A.  So that would cover all the donations the campaigns

10   received, yes, in June of 2012.

11   Q.  And just very briefly, before we move on, so we have two

12   reports with the same period.  We see they were filed on

13   different dates.  Is that right?

14   A.  Yeah.  That's correct.

15   Q.  And what is 518 in relation to 593?

16   A.  So 518, or the form on the right side, that's called an

17   amended FEC form 3X, an amended form.  The form on the left,

18   or Government Exhibit 693, is the original form.

19   Q.  And for your purposes, for the FBI's purposes of this

20   investigation, is the information in each of these forms

21   substantially the same?

22   A.  Yes.  As it pertains to our investigation, these reports

23   are materially similar.

24          MR. MULRYNE:  Pulling up Government Exhibit 687,

25   previously admitted.

1    BY MR. MULRYNE:

2    Q.  Agent Heuchling, before we take a closer look at this

3    and some additional excerpts from the report, we see this is

4    labeled as Schedule A itemized receipts up in the upper

5    left-hand corner.

6               Do you see that?

7    A.  I do.

8    Q.  First off, does this come from the reports that we just

9    saw?  In other words, is this part of the report exhibits we

10   just saw?

11   A.  Yes.  So as we mentioned, these reports are thousands of

12   pages.  This is one of the pages from that FEC form 3X.

13   Q.  And generally speaking, what information is reflected on

14   the Schedule A itemized receipts form?

15   A.  So the Schedule A includes boxes that record the

16   donation or donor -- donations received by the campaign.  So

17   it includes the donor name, the date of the donation, the

18   amount of donation and other identifying information for the

19   donor.

20              THE COURT:  That was 687, right?

21              MR. MULRYNE:  That was, your Honor.

22              And we now have on the screen 687 and Exhibit 688,

23   both of which are previously admitted.

24   BY MR. MULRYNE:

25   Q.  Agent Heuchling, can you tell us in these two exhibits,

1    these excerpts from the Obama Victory Fund report that you

2    just testified about, what is reflected in these two

3    entries?

4    A.  On the left, Government's Exhibit 687, that is the

5    information that the campaign recorded and submitted to the

6    FEC for Mr. -- Dr. Moise.  Dr. Moise was one of the straw

7    donors.

8            On the right, Exhibit 688, we see the

9    transactional information the campaign recorded and

10   submitted to the FEC for Ms. Claudine Oriol.  She was also a

11   straw donor.

12           And I will point out that the information on these

13   FEC forms, you'll notice it's the same information that is

14   collected on the donor forms that were sent with the

15   invitation for the campaign events.

16   Q.  All right.  And so the money that's reflected in these

17   entries from Oriol and Dr. Moise, based on your

18   investigation, where did those monies come from?

19           MR. KENNER:  Objection.  Calls for a conclusion.

20   No foundation.

21           THE COURT:  I think he can provide the process he

22   went through before coming to a conclusion.

23           MR. MULRYNE:  Sure.

24   BY MR. MULRYNE:

25   Q.  Agent Heuchling, let me ask you this:  You've testified

 1    earlier you've had an opportunity to review financial

 2    records in this case?

 3    A.  I have.

 4    Q.  And you've had an opportunity -- have you had an

 5    opportunity to examine money flows from one entity, one

 6    individual, to another?

 7    A.  Yes, I have.  And I did.

 8    Q.  All right.  And you mentioned that Dr. Moise and

 9    Ms. Oriol are straw donors.  Is that correct?

10    A.  That is correct.

11    Q.  So the monies reflected here, based on your examination,

12    review and understanding of the financial records, from

13    where did these monies come?

14    A.  Those funds came from Jho Low and then from Jho Low to

15    the Defendant and then from the Defendant to the straw

16    donors.

17            MR. MULRYNE:  If we can pull up Government's

18    Exhibits 521 and 520, side by side.  And both of these have

19    been previously admitted.

20    BY MR. MULRYNE:

21    Q.  So, Agent Heuchling, just very briefly, same questions

22    as before:  What are we looking at with these two documents?

23    A.  These are FEC form 3Xs as well as for the Obama Victory

24    Fund 2012.

25            THE COURT:  Can you slow down again?  You're

1    starting to pick up speed.

2              THE WITNESS:  Yes, your Honor.  These are FEC form

3    3Xs for the Obama Victory Fund 2012.

4    BY MR. MULRYNE:

5    Q.  So, Agent Heuchling, just pulling out -- highlighting

6    some information on the front of these two exhibits, what's

7    the time period of the information contained herein in these

8    reports?

9    A.  So these reports both cover the time period from August

10   1st to August 31st, 2012.

11   Q.  And again, we see that the filing dates of these reports

12   are different even though they cover the same period.  Why

13   is that?

14   A.  So the report on the right, Government Exhibit 520, is

15   an amended report.  So it was filed later than the original

16   report.

17   Q.  Okay.  And the same question as I asked you about the

18   first two reports.  Is the information -- for your

19   investigative purposes in this case, is the information

20   contained in each of these reports substantially the same?

21   A.  Yes.  As it pertains to my investigation, these reports

22   are similar.

23   Q.  All right.

24             MR. MULRYNE:  So we're now showing four exhibits

25   on the screen, all of which have been previously admitted.

1    We have Government Exhibits 689, 686, 692 and 691.

2    BY MR. MULRYNE:

3    Q.  Agent Heuchling, I won't ask you to have to go through

4    all the information in all four of these, but can you just

5    tell us, who are these individuals?  What's reflected in

6    these exhibits?

7    A.  These are four individuals who are all straw donors.

8    Each one of them received funds from the Defendant and

9    subsequently donated those funds to the Obama Victory Fund.

10   Q.  Are those contributions with those monies from the

11   Defendant reflected in these entries?

12   A.  Yes, they are.

13   Q.  And to be clear, these four entries, these exhibits,

14   these are all excerpts from the filings we looked at just a

15   moment ago.  Is that right?

16   A.  Yes.  As we mentioned, those filings are thousands of

17   pages; and these are excerpts from individual pages on those

18   forms.

19   Q.  All right.  And one last set here.  These are three more

20   exhibits, all of which have been previously admitted,

21   Government Exhibits 690, 567 and 568.  Same questions as

22   before, Agent Heuchling.  What are we -- what do we see

23   reflected in these entries generally?

24   A.  Again, these are the recordings that the campaign made

25   for three straw donors.  Each one received funds from the

 1     Defendant and then subsequently donated those funds to the

 2     Obama Victory Fund.

 3     Q.  Agent Heuchling, just one clarification.  I'm looking at

 4     Government Exhibit 568, the one in the bottom right-hand

 5     corner for a Joseph Ronquillo.  Do you see that?

 6     A.  I do.

 7     Q.  All right.  And we see in that particular one at the

 8     bottom -- in the middle bottom portion of the entry it says,

 9     "Aggregate year to date, $40,000."

10               What's reflected in that box?

11     A.  So if an individual does not donate all of their

12     money -- or chooses to break up the donation over a period

13     of time, the aggregate year to date is the summary of the

14     amount of money that person has donated to the campaign over

15     that year as opposed to just the amount they donated at this

16     particular instance.

17     Q.  And so in the case of Mr. Ronquillo, as reflected in

18     this exhibit, how much money did he donate in total during

19     this year, this cycle?

20     A.  $40,000.

21     Q.  Okay.  And the other individuals that we see here,

22     Mr. Toussaint, Mr. Kromka, how much did they each

23     contribute?

24     A.  Mr. Toussaint is recorded as donating $40,000.  And

25     Mr. Kromka, $40,000.

1    Q.  And for all -- for these --

2    A.  Sorry.  I'm just trying to read the screen.  I

3    apologize.  It appears that Mr. Toussaint donated 45,000 --

4    or 4500 [sic] in aggregate, but $40,000 on this particular

5    date.

6    Q.  And for all of these contributions that we've seen, how

7    did the amounts that are contributed here -- that are

8    reflected in these entries, for these and the other exhibits

9    we just looked at, how did those compares to the monies that

10   they received from the Defendant?

11   A.  So again, each of the straw donors received a certain

12   amount of money from the Defendant.  And the amount of money

13   reflected here on the campaign -- on the FEC forms is the

14   same amount of money that they received from the Defendant.

15             MR. MULRYNE:  If we can go to -- we're going to

16   pull up Government Exhibits, I believe, 235 and 236.

17   BY MR. MULRYNE:

18   Q.  Agent Heuchling, here up on the screen -- and it does

19   include a couple of callout boxes to hopefully help everyone

20   be able to read these.

21             Government Exhibits 235 and 236, these are FEC

22   form 3Xs as well, the report of receipts and disbursements.

23   Is that right?

24   A.  That's correct.

25   Q.  And --

```
 1                    THE COURT:  Are these already admitted?
 2                    MR. MULRYNE:  These are.  I'm sorry, your Honor.
 3          These are previously admitted.
 4                    THE COURT:  All right.  Go ahead.
 5                    MR. KENNER:  That's correct.
 6          BY MR. MULRYNE:
 7          Q.  And from which political campaign committee were these
 8          reports submitted to the FEC?
 9          A.  These are the form 3Xs from Black Men Vote.
10          Q.  All right.  And to the extent you're able to read that,
11          the period in which this report on the left, Government
12          Exhibit 235 -- that covers what period?
13          A.  It appears to be September 5th, 2012, to September 30th,
14          2012.
15          Q.  And how about Government Exhibit 236, the filing on the
16          right?
17          A.  That covers a period of October 1st, 2012, to
18          October 17th, 2012.
19          Q.  So now up on the screen we have -- these are excerpts
20          from each of those respective exhibits, Exhibit 235 and 236.
21          Is that right, Agent Heuchling?
22          A.  Correct.
23          Q.  And so for Exhibit 235, that particular filing, what do
24          we see reflected there in that callout box?
25          A.  You see a donation from the Defendant, Mr. Michel, for
```

1    $250,000 to Black Men Vote.

2    Q.  All right.  And that seems to be dated September 7th,

3    2012?

4    A.  That's correct.

5    Q.  And then looking on the right in Exhibit 236, what's

6    reflected in that callout box?

7    A.  You see a donation reflected from SPM Holdings for

8    $400,000 dated October 12th, 2012, to Black Men Vote.

9    Q.  What is SPM Holdings or is SPM 2012 Holdings?  Are you

10   familiar with that at all?

11   A.  I am.  SPM Holdings was one of the holding companies or

12   accounts that Mr. Michel used to move some of his money

13   around and hold some of his money.

14   Q.  Okay.  The monies that are reflected here in these

15   entries, based on your review and understanding of the

16   financial records and the money flows through those

17   accounts, where did these monies that the Defendant

18   contributed to Black Men Vote come from?

19   A.  These funds can be traced back to the funds that the

20   Defendant, Mr. Michel, received from Jho Low.

21            MR. MULRYNE:  Can we move on to Government

22   Exhibits 237 and 238, both of which have been previously

23   admitted.

24   BY MR. MULRYNE:

25   Q.  Same questions as before, Agent Heuchling.  What's this

1    report that we see up in front of us?

2    A.  These are additional FEC form 3Xs for Black Men Vote.

3    Q.  And if you look there, do these two reports relate to

4    the same -- cover the same time period in 2012?

5    A.  Yes, they do.  Late October 2012, October 18th, 2012 --

6    sorry -- October 18th, 2012, to November 26th, 2012.

7    Q.  And the filing on the right, the 238, is that an amended

8    version of the form on the left, 237?

9    A.  That's correct.

10   Q.  Same question I asked you before regarding OVF.  For

11   purposes of your investigation, was the information in both

12   of these versions of this report substantially the same?

13   A.  Yes.  That's correct.

14   Q.  So what do we see in this callout coming from Exhibit

15   237?

16   A.  So this shows that SPM Holdings, LLC, is recorded as

17   donating $475,000 on October 24th, 2012, to Black Men Vote.

18   And you'll see, if you look at the aggregate to date, a

19   total of $875,000 has been donated by SPM Holdings by this

20   time.

21   Q.  And that aggregate year to date, that is specific to SPM

22   Holdings.  Is that correct?

23   A.  Yes.  That's correct.

24   Q.  And can you remind the jury, what was the total amount

25   of money -- well, let me back up first.

1          This money here, based, again, on your review of

2     the financial documents and the money flows, where did this

3     money that the Defendant contributed come from?

4     A.  That money came from Mr. Low.

5     Q.  And can you remind the jury, in total, approximately how

6     much money from Mr. Low did the Defendant contribute to

7     Black Men Vote in 2012?

8     A.  Just over $1.1 million.

9     Q.  Agent Heuchling, we're talked about activities, events,

10     communication, money transfers in 2012 leading up to the

11     fundraising events and the election.  We've just gone over

12     these FEC filings related to Obama Victory Fund, Black Men

13     Vote, relevant to that period.

14          I now want to move you forward into another topic.

15     So fast-forwarding to 2015, in or about April of 2015, did

16     the FEC, the Federal Election Commission, receive a

17     complaint at all about some of these contributions to Black

18     Men Vote that we had just reviewed?

19     A.  Yes.  In April 2015, the FEC received a complaint

20     related to some of the contributions into Black Men Vote.

21     Q.  And what, if anything, did the FEC do in response to

22     that complaint?

23     A.  In response, the FEC wrote letters of inquiry to both

24     the Defendant as well as to the corporate entities SPM

25     Holdings, PJ 2012, that had made donations to Black Men

1    Vote.

2              MR. MULRYNE:  Can we pull up what's been already

3    admitted as Government Exhibit 584.  If we can just zoom

4    into the text of -- from the recipient line down, perhaps,

5    to the bottom.

6    BY MR. MULRYNE:

7    Q.  Government Exhibit 584, previously admitted, we see,

8    Agent Heuchling, this is a letter dated April 22nd, 2015.

9    To whom is this addressed?

10   A.  This is addressed to the Defendant.

11   Q.  All right.  And then, in the first paragraph, it reads,

12   "The Federal Election Commission received a complaint that

13   indicates you may have violated the Federal Election

14   Campaign Act of 1971."

15             Continuing on:  "A copy of the complaint is

16   enclosed.  We have numbered this matter MUR 6930.  Please

17   refer to this number in all future correspondence."

18             That reference there to MUR, M-U-R, in FEC

19   parlance, do you know what that means?

20   A.  I do.  It means matter under review.

21   Q.  All right.  And then the second paragraph, under what I

22   just read, can you please read that for the jury?

23   A.  "Under the Act, you have the opportunity to demonstrate

24   in writing that no action should be taken against you in

25   this matter.  Please submit any factual or legal materials

1    that you believe are relevant to the Commission's analysis

2    of this matter.  Where appropriate, statements should be

3    submitted under oath.  Your response, which should be

4    addressed to the general counsel's office, must be submitted

5    within 15 days of receipt of this letter.  If no response is

6    received within 15 days, the Commission may take further

7    action based on the available information."

8    Q.  Okay.

9            MR. MULRYNE:  If we can pull up Government

10   Exhibit 585, previously admitted.

11   BY MR. MULRYNE:

12   Q.  Agent Heuchling, is this substantially the same as the

13   FEC request letter that we just saw a moment ago that was

14   addressed to the Defendant?

15   A.  Yes, it is.

16   Q.  To whom is this addressed?

17   A.  This is addressed to SPM 2012 Holdings, but sent to its

18   registered address in Delaware.

19   Q.  Okay.  So to whom do you understand the recipient of

20   this to be?

21   A.  The ultimate recipient was either the Defendant or the

22   Defendant's legal counsel.

23   Q.  Okay.  In response to these requests, these FEC request

24   letters, did the Defendant provide a response?

25   A.  He did.

1              MR. MULRYNE:  If we can pull up Government

2      Exhibit 246, previously admitted.

3      BY MR. MULRYNE:

4      Q.  So, Agent Heuchling, here we see a letter dated -- or a

5      memo dated June 15th, 2015.  Just generally, what is it that

6      we're looking at here?

7      A.  This is the response that the Defendant and his counsel

8      wrote to the letter of inquiry they received from the FEC.

9      And you'll see the MUR number, the matter under review,

10     matches the number we had seen previously.

11     Q.  So we're not going to go through this all in detail, but

12     generally, did the Defendant dispute the alleged violations

13     of campaign finance law as it related to this matter?

14     A.  Yes, he did.

15     Q.  All right.  And to be clear, did this MUR, this matter

16     under review, involve allegations that were different and

17     distinct than those in this case?

18     A.  Yes.  The allegations from this complaint are not what

19     we were investigating.

20     Q.  All right.  As noted in this response letter, did the

21     Defendant reference in -- a declaration that he was

22     submitting to the FEC that was attached to this -- or

23     accompanied this letter?

24     A.  Yes.

25              MR. MULRYNE:  Can we pull up what's been

 1    previously admitted as Government Exhibit 245.

 2    BY MR. MULRYNE:

 3    Q.  Agent Heuchling, what is this document that we're

 4    looking at?

 5    A.  This is the declaration of the Defendant made in

 6    response to the complaint that the FEC had received and the

 7    letters that the FEC had sent to the Defendant.

 8              MR. MULRYNE:  If we can zoom in to the first

 9    paragraph.

10              THE COURT:  I'm sorry.  This is what number?

11              MR. MULRYNE:  This is Government Exhibit 245, your

12    Honor.

13              THE COURT:  245.  Okay.

14    BY MR. MULRYNE:

15    Q.  So looking at the first paragraph, Agent Heuchling, it

16    reads, "My name is Prakazrel (Pras) Michel.  In September

17    and October of 2012 I had made four contributions to an

18    independent" --

19              THE COURT REPORTER:  If you could slow down,

20    please.

21              MR. MULRYNE:  Yes, ma'am.

22    BY MR. MULRYNE:

23    Q.  "I made four contributions to an independent

24    expenditure-only committee called Black Men Vote.  The first

25    two contributions, totaling $350,000, were made from my

1    personal account in my own name.  The second two

2    contributions, totaling $875,000, were made from SPM

3    Holdings, LLC, a Delaware incorporated limited liability

4    company."

5            Did I read that correctly, Agent?

6    A.  You did.

7            MR. MULRYNE:  If we could pull back.  And if we

8    can just zoom in to Paragraph 2 and Paragraph 3.

9    BY MR. MULRYNE:

10   Q.  So, Agent Heuchling, we're not going to go through all

11   of this.  But here, do we see the Defendant providing

12   information in terms of SPM Holdings and the account, the

13   monies, associated with that entity?

14   A.  Yes.

15   Q.  All right.  Just one note.  In Paragraph 3, do you see

16   reference to SPM Holdings in terms of net income?

17   A.  I do.

18   Q.  Do you see any reference in here, from what you can

19   tell, about any sort of foreign gift?

20   A.  No.  There's no reference to a foreign gift.

21           MR. MULRYNE:  If we can go to Paragraph 4 at the

22   bottom of Page 1.  That cover -- comes into Page 2.

23   BY MR. MULRYNE:

24   Q.  And here in Paragraph 4, does the Defendant claim to

25   have had no knowledge or understanding about reporting

1   requirements of federal political committees?

2   A.  He does.

3            MR. MULRYNE:  If we can go to Page 5 -- I'm

4   sorry -- Page 2, Paragraph 5.

5   BY MR. MULRYNE:

6   Q.  Here in Paragraph 5, can you please read that for the

7   jury?

8   A.  "I had no reason to hide the true source of my donations

9   to Black Men Vote, nor did I wish to diminish the disclosure

10  of source or amounts of my contributions to Black Men Vote

11  as being attributable to myself.  To the contrary, I had

12  every reason and desire to take full credit for the full

13  amount of the contributions that I made to Black Men Vote.

14            "I declare under penalties of perjury that the

15  foregoing is true and correct to the best of my present

16  knowledge, information and belief."

17  Q.  Agent Heuchling, you testified earlier that the monies,

18  but for approximately $100,000, but that more than $1.1

19  million that the Defendant contributed to Black Men Vote

20  came from Jho Low.  Correct?

21  A.  Yes.  That's correct.

22  Q.  In that paragraph or this declaration, do you see any

23  reference to Jho Low?

24  A.  No.  None.

25  Q.  Alsen Chance?

```
 1   A.  No.  None.

 2   Q.  Blackstone?

 3   A.  No.  None.

 4   Q.  Eric Tan?

 5   A.  No.  None.

 6        THE COURT:  Before you go on to another area, I'm

 7   going to let the jury stand and stretch.  I see a couple of

 8   you wiggling around in your chairs.  You're obviously

 9   getting tired.  So stand and stretch.  I think everybody

10   can, if you wish.

11        That's one of my responsibilities, is to watch.

12   You looked like you needed a little break here.

13        (Laughter.)

14   BY MR. MULRYNE:

15   Q.  Agent Heuchling, looking again at Paragraph 5, where it

16   says, "I had no reason to hide the true source of my

17   donations," based on your --

18        THE COURT:  Slow down.  You're going way too fast.

19        MR. MULRYNE:  Yes, your Honor.

20        THE COURT:  I have very good court reporters.

21   When they're struggling, you're going too fast.

22        MR. MULRYNE:  Yes, your Honor.

23   BY MR. MULRYNE:

24   Q.  Based on your investigation and review of the financial

25   records and otherwise, did the Defendant, in fact, attempt
```

1    to hide the true source of those donations to Black Men

2    Vote?

3              MR. KENNER:  Objection, your Honor.  Calls for

4    speculation.  No foundation.

5              THE COURT:  I think it's sort of an ultimate

6    decision.  But you can ask him other questions as to how he

7    would reach -- or how he would see them not including

8    information that he should, if that's what your point is.

9    BY MR. MULRYNE:

10   Q.  Agent Heuchling, during your investigation, did you see

11   occasions or opportunities in which the Defendant did not

12   disclose Mr. Low as the source of the funds?

13             MR. KENNER:  Objection, your Honor.

14             THE COURT:  No.  I'll allow that.

15             THE WITNESS:  Yes.  Both here and on the other

16   election forms that we've seen as well as here, he was given

17   an opportunity to explain where the funds came from.  And

18   instead, he says, "I had no reason to hide the true source

19   of the donations."

20   BY MR. MULRYNE:

21   Q.  And did not identify Mr. Low?

22   A.  Yes.  He did not identify Mr. Low.

23   Q.  Or Alsen Chance or Blackstone?

24   A.  No.  Neither.

25   Q.  So, Agent Heuchling, we've now talked about this FEC

1    matter in 2015, and now I want to fast-forward to the last

2    portion that we highlighted at the beginning of your

3    testimony.

4            And this concerns investigative actions in 2018,

5    2019 and actions by the Defendant and others.

6    Approximately -- again, please remind us.  When did this

7    investigation involving the Defendant begin?

8    A.  So the larger investigation into Jho Low and 1MDB

9    started in 2015.  But we became aware of the Defendant and

10   funds that he had received probably mid- to late summer

11   2017.

12   Q.  So in January of 2018, did the FBI and the DOJ Office of

13   the Inspector General -- did you meet and interview the

14   Defendant?

15   A.  Yes, we did; in early January 2018 at his studio in Los

16   Angeles.

17   Q.  All right.  And just generally, what was discussed

18   during that interview?

19   A.  So at that interview, we discussed primarily -- or

20   exclusively the activity that the Defendant had undertaken

21   in 2017.  We did not at that time discuss the activity in

22   2012 that we were also investigating the Defendant for.

23   Q.  Okay.  As we said earlier, the 2017 conduct and

24   allegations we'll talk about a little bit later, at another

25   time.

1          Was a grand jury subpoena issued to the Defendant

2     on or about February 1st, 2018?

3     A.  Yes.  That's correct.

4     Q.  And just for the jury's benefit, what is a grand jury

5     subpoena?

6     A.  A federal grand jury subpoena is an order given to

7     someone that requires them to provide certain records or

8     documents to the grand jury or present themselves for

9     testimony to the grand jury.

10    Q.  What types of records were requested of the Defendant in

11    that grand jury subpoena?

12    A.  So in this subpoena we requested records related to both

13    the conduct in 2012 that was under investigation as well as

14    to that in 2017.  We requested financial records and

15    transaction documents specifically identifying some of the

16    straw donor transactions that we were aware of at that time.

17    We also requested certain records related to the

18    incorporation and the accounts of SPM; for example, PJ 2012.

19    Those kind of documents.

20    Q.  As an agent and an investigator, are you familiar with

21    what it means when an investigation is overt?

22    A.  Yes.  So generally, in criminal investigations, we'll

23    have two phases.  One will be a covert phase; one will be an

24    overt phase.  In the covert phase, generally the subject is

25    unaware that he or she is under investigation.  And we try

1    to limit our investigative actions such that we do not make

2    him or her aware of the investigation.

3              In the overt phase, we take certain steps.  It

4    might be interviewing the subject.  It might include

5    conducting a search warrant on the subject's, you know,

6    residence or home -- sorry -- or business.  But it -- we

7    take certain actions we know will make the Defendant or the

8    subject aware of the ongoing investigation.

9    Q.  So by this point, sometime in February of 2018, was this

10   investigation overt to the Defendant?

11   A.  Yes.  You know, as soon as the Defendant had received

12   the subpoena, he would have been aware of the investigation,

13   specifically of the investigation into the 2012 conduct.

14   And he would have known that he was the subject of an

15   investigation by the Federal Bureau of Investigation.

16   Q.  Did the Defendant, through counsel, provide a response

17   to the grand jury subpoena request?

18   A.  Yes, he did.

19   Q.  And did that come in in approximately mid-April of 2018?

20   A.  Yes.  That's correct.

21   Q.  And did that response include a response to the

22   allegations, the requests, pertaining to the alleged conduit

23   contributions in 2012?

24   A.  Yes.  It included records and documents related to the

25   conduct in 2012.

1    Q.  So fast-forwarding ahead just a few months now into

2    November of 2018, did the Government meet with the

3    Defendant's then-counsel, Barry Pollock?

4    A.  Yes, we did.

5    Q.  And what was the purpose of that meeting with the

6    Defendant's then-counsel in November of 2018?

7    A.  Generally, it was to make counsel aware of the

8    allegations against the Defendant, Mr. Michel, specifically

9    including the 2012 election violations.

10    Q.  Agent Heuchling, I'd like to show you now what's marked

11    for identification as Government Exhibit 734.  This has not

12    been admitted into evidence.

13           Agent Heuchling --

14           MR. KENNER:  Excuse me, your Honor.  May I just

15    have a moment to look at it?

16           MR. MULRYNE:  That's not --

17           MR. KENNER:  It's already published.

18           THE COURT:  It's not admitted yet.

19           MR. KENNER:  Your Honor, I think we got this

20    sometime last week.  I will not object to --

21           THE COURT:  I can't hear you.

22           MR. KENNER:  I believe we got this last week.  And

23    I don't have an objection to it.

24           THE COURT:  Are you asking to have it admitted?

25           MR. MULRYNE:  Yes, your Honor.  The Government

1    would move to admit Government Exhibit 734.

2              THE COURT:  My understanding is there's no

3    objection.  So I'll admit it without objection.

4              (Whereupon, Government's Exhibit No. 734 was

5    entered into evidence.)

6              MR. MULRYNE:  If we could publish Exhibit 734.

7    This does have some animation on it in terms of just

8    movement.

9              THE COURT:  You're mumbling.  We can't hear you.

10   Keep in mind, we have a court reporter to pick up.  Sorry to

11   be such a pain.

12             MR. MULRYNE:  No.  Understood, your Honor.  Sorry

13   for the mumbles.

14   BY MR. MULRYNE:

15   Q.  So, Agent Heuchling, what we see on this chart here

16   reflecting events in 2018 and 2019, you just mentioned the

17   interview with the Defendant in 2018 -- January 2018; the

18   subpoena issued February 1st, 2018; the response by the

19   Defendant in April; and then the meeting with the

20   Defendant's counsel in November.

21             Was there another meeting with Defendant's counsel

22   at the time, some months thereafter?

23   A.  Yes.  In 2019.

24   Q.  All right.  In April of 2019?

25   A.  That's correct.

1   Q.  And did you and prosecutors participate in that meeting?

2   A.  I did.  We did.

3   Q.  And can you tell us what was said or what was shared in

4   that meeting with defense counsel?

5   A.  So at this meeting, again, it was explained to defense

6   counsel the charges against the Defendant.  This time,

7   however, it was made explicitly clear to the Defendant's

8   counsel that there was an intent to charge the Defendant

9   very soon, or try to seek an indictment on the Defendant

10  very soon.

11          And if I recall, the Defendant's counsel was shown

12  a copy of a draft indictment.  So at this time, the

13  Defendant, through his Defendant's counsel, would have been,

14  you know, very much aware of the evidence that we had

15  collected against him.

16          THE COURT:  If I could clarify, was this a meeting

17  just with counsel or counsel and Mr. Michel?

18          THE WITNESS:  I don't believe Mr. Michel was

19  there, ma'am.

20          THE COURT:  Okay.

21  BY MR. MULRYNE:

22  Q.  So to your recollection, it was the Defendant's counsel.

23  Is that right?

24  A.  Yes.  That's right.  Defendant's counsel, myself and

25  other investigators and prosecutors.

1    Q.  So the meeting with Defendant's counsel occurs in April

2    of 2019.  Did a grand jury issue an indictment involving the

3    Defendant, charging him for acts related in this case soon

4    thereafter?

5    A.  Yes.  In May of 2019.

6    Q.  All right.  And then approximately two weeks or so after

7    the indictment in May of 2019, did the Government provide

8    discovery to the Defendant and his counsel?

9    A.  Yes.

10   Q.  And can you tell the jury generally, in a criminal case,

11   what is discovery?

12   A.  Discovery is the Government's obligation to provide

13   certain evidence and records, documents that it has

14   collected, to the defendant so that he or she may prepare an

15   appropriate defense of the charges against him or her.

16          In this case, the discovery would have included

17   copies of our FBI 302s, our interview reports with all the

18   individuals that we had interviewed as witnesses, as well as

19   copies of grand jury transcripts, so the testimony that

20   certain witnesses gave in the grand jury.  It would have

21   included bank records.  It would have included some of the

22   emails that we had discovered in our investigation as well

23   as, you know, many other records.

24          Generally, the defendant is given a fairly large

25   slice of our investigative file.

1     Q.  So the Defendant was indicted in the case in May 2019.

2     And then, several months later, was there a status hearing

3     in the case, in July of 2019?

4     A.  Yes, there was.

5     Q.  So, Agent Heuchling, we have an outline here of some

6     investigative acts, some case-related activities that

7     occurred.

8            I want to back you up sort of toward the front end

9     of this timeline.  Between the time that the Defendant

10    received the grand jury subpoena in early February of 2018

11    and between the Defendant's response to that subpoena in

12    mid-April of 2018, did an individual named Rudolph Moise

13    receive a call from the Defendant?

14    A.  Yes, he did.

15    Q.  All right.  And we saw reference to Dr. Moise earlier in

16    some of the summary exhibits and the FEC filings.  Who is

17    Dr. Moise as it relates to this investigation?

18    A.  Dr. Moise is a doctor in Florida who received $30,000

19    from the Defendant and donated those funds to the Obama

20    Victory Fund.

21    Q.  When did that call with Dr. Moise and the Defendant

22    occur?

23    A.  Valentine's Day.  February 14th.

24    Q.  And did the -- let me ask you this:  Why did it matter

25    to the FBI whether or not the Defendant had contacted

 1    Dr. Moise?

 2    A.  So when we became aware of this call, it was immediately

 3    of concern to us.  In the course of our investigations,

 4    anytime we are alerted and learn that the Defendant is

 5    reaching out to potential witnesses in our investigation, we

 6    get concerned that the Defendant may be trying to influence

 7    or obstruct with our investigation, maybe influence the --

 8    witnesses' testimony down the road.

 9    Q.  Did the FBI ultimately interview Dr. Moise?

10    A.  We did.

11    Q.  And did that occur after the phone call sometime?

12    A.  Yes.  That's correct.

13    Q.  During that interview with the FBI, did Dr. Moise

14    provide information relevant to the call and the number that

15    had reached out to him?

16    A.  Yes.  He provided the phone number that reached out to

17    him and identified the Defendant as the caller.

18    Q.  Ultimately, did the Government seek and obtain records

19    related to that phone number that Dr. Moise reported as the

20    number that called him -- from which the Defendant called

21    him?

22    A.  We did.

23         MR. MULRYNE:  If we could pull up what's been

24    already admitted, previously admitted, as Government Exhibit

25    589.

1     BY MR. MULRYNE:

2     Q.  Agent Heuchling, first, just as a general matter, what

3     is it that we're looking at?  What type of document is this,

4     this Government Exhibit 589?

5     A.  This is subscriber information.  These are records that

6     law enforcement can get from telephone providers related to

7     the subscriber or the user of a telephone number.

8     Q.  And so for this -- well, first off, let me ask you, the

9     number that's associated with this subscriber information,

10    do you understand that to be the number from which the

11    Defendant called Dr. Moise?

12    A.  Yes.  That's correct.

13    Q.  And who's the name associated with this -- this number,

14    this phone, as listed here in this subscriber information?

15    A.  So according to this record, this phone number is

16    associated with a Jennifer Campbell.

17    Q.  Did the FBI attempt to identify Ms. Campbell?

18    A.  Yes, we did.  We conducted a fairly reasonable

19    investigation.  However, there are multiple -- or many

20    Jennifer Campbells in the United States.  It's a common

21    name.

22            And Ms. Campbell did not provide any accurate

23    information on this -- or the person who purported to be

24    Ms. Campbell did not provide any accurate information on

25    this form.  For example, if you look at the phone number

1      that she listed or the work phone number she listed, those

2      numbers obviously don't come back to anything.

3              She also listed her address as the same location

4      that the phone was purchased.  That's a cell phone store in

5      St. Louis Park, Minnesota.

6              THE COURT:  You're picking up too much speed.

7      Slow down.

8              THE WITNESS:  Yes.  Yes, your Honor.

9              So I was just saying that we conducted an

10     investigation into this number.  We were not able to

11     identify with specificity a Jennifer Campbell that had

12     purchased this phone.  The phone numbers that she listed for

13     herself were not accurate, or were not real numbers.  As

14     well, the address that she listed came back to the same

15     address that the phone was purchased at.

16             MR. MULRYNE:  If we can just scroll down to the

17     lower portion of this page.

18     BY MR. MULRYNE:

19     Q.  Agent Heuchling, if you see this, for one, we see the

20     number there, that 612 number ending in 8078.  Is that the

21     number associated with this account?

22     A.  Yes, it is.

23     Q.  And then immediately under that, we see the MSISDN

24     active period from February 2nd, 2018, to July 2nd, 2018.

25             Do you know what that information reflects?

1    A.   That reflects the time that the phone was actively used

2    on the phone network.

3    Q.   You said that Dr. Moise was called on February 14th.  So

4    approximately how long before that call was this phone

5    activated?

6    A.   About two weeks.

7    Q.   And is that around the time -- that February 2nd, is

8    that around the time the Defendant received the grand jury

9    subpoena in this case?

10   A.   It is.  It's one day after.

11            MR. MULRYNE:  We can take that down.  Thank you.

12   BY MR. MULRYNE:

13   Q.   Throughout 2018, were witnesses -- did witnesses in this

14   case testify before the grand jury?

15   A.   Yes, they did.

16   Q.   And did those witnesses include individuals who were

17   identified as straw donors or conduits?

18   A.   Yes.

19   Q.   That had received money from the Defendant?

20   A.   Yes.

21   Q.   And contributed to Obama Victory Fund?

22   A.   That's correct.

23   Q.   Did your investigation continue into 2019?

24   A.   It did.

25   Q.   And during your investigation, did you learn that

1    several individuals had received letters from a law firm,

2    from legal counsel, that purported to represent the

3    Defendant?

4    A.  Yes.  We learned that a law firm called Miller Barondess

5    had sent letters to some of the straw donors on behalf of

6    the Defendant.

7         MR. MULRYNE:  If we can pull back up Government

8    Exhibit 734, I believe this is.  This is an exhibit that was

9    previously admitted.  Government Exhibit 734.

10   BY MR. MULRYNE:

11   Q.  Agent Heuchling, so you said a moment ago that the law

12   firm -- what was the name of that law firm?

13   A.  Miller Barondess.

14   Q.  And what, if anything, was common about several of the

15   individuals who had received these letters from the law firm

16   Miller Barondess?

17   A.  They were straw donors that had been identified in the

18   course of our investigation.

19   Q.  During your investigation, did you receive copies of

20   many of those letters from the firm Miller Barondess?

21   A.  We did.

22   Q.  And during that investigation, did you obtain many of

23   those letters from the conduits or straw donors directly?

24   A.  Yes.  Both.

25        MR. MULRYNE:  Your Honor, at this time, the

1      Government moves to admit several exhibits.  I can state

2      these off.

3                  THE COURT:  Why don't we do them one at a time.

4      They've not been admitted before, presumably?

5                  MR. MULRYNE:  I'm sorry, your Honor?

6                  THE COURT:  I assume they haven't been admitted

7      before?  Or they have?

8                  MR. MULRYNE:  No.  These have not.  These

9      exhibits, no.

10                 Exhibit 432, 433, 434, 435, 436, 443, 444, 449,

11     445, 420, 426 and 428.

12                 MR. KENNER:  Your Honor, would your Honor prefer

13     that I take the time to go to the hard copies of the

14     exhibits to look at them?

15                 THE COURT:  Whatever you wish.  Either put them up

16     or -- however you need to review them.  I assume you've seen

17     them before, but of course you want to look at it again.

18                 MR. KENNER:  I don't know by memory which exhibits

19     those are.

20                 THE COURT:  That's fine.

21                 Mr. Mulryne, how do you wish to do it?  What's the

22     most expeditious way?  For him to look at the paper or for

23     you to put them up?

24                 MR. MULRYNE:  Your Honor, if I may, I may have not

25     mentioned 450.  If I didn't, I also meant Exhibit 450.

 1                    THE COURT:  You left that one out.

 2                    MR. MULRYNE:  Your Honor, we can scroll through

 3        them on the screen, if that might be most efficient.

 4        Whatever is quickest.

 5                    THE COURT:  Mr. Kenner, do you want to do it that

 6        way?  He'll put them up on the screen.

 7                    MR. KENNER:  That's fine.  Either way is fine with

 8        me, your Honor.

 9                    THE COURT:  All right.  Why don't we do that.

10                    MR. MULRYNE:  So these are not -- these are not

11        yet admitted.

12                    THE COURT:  These have not been admitted, so

13        they're simply for a review to find out Mr. Kenner's

14        position.

15                    If you could indicate on the records which ones

16        we're looking at.

17                    MR. MULRYNE:  This is 432, your Honor.

18                    MR. KENNER:  No objection.

19                    THE COURT:  Then I'll admit Government

20        Exhibit 432.

21                    (Whereupon, Government's Exhibit No. 432 was

22        entered into evidence.)

23                    MR. MULRYNE:  433.

24                    MR. KENNER:  Can you make that slightly larger?

25                    THE COURT:  Can you read that, Mr. Kenner?

```
1                    MR. KENNER:  Yes, your Honor.  Thank you.

2              I have no objection to this exhibit.

3              THE COURT:  I'll admit Government's Exhibit 433

4     without objection.

5                    (Whereupon, Government's Exhibit No. 433 was

6     entered into evidence.)

7              THE COURT:  Is this 434?

8              MR. MULRYNE:  434.

9              THE COURT:  Mr. Kenner?

10             MR. KENNER:  Oh, I'm sorry.  No objection.

11             THE COURT:  I'll admit Government's Exhibit 434

12    without objection.

13                   (Whereupon, Government's Exhibit No. 434 was

14    entered into evidence.)

15             THE COURT:  I assume we're moving to 4 --

16             MR. MULRYNE:  435.

17             THE COURT:  -- 435.

18             MR. KENNER:  No objection.

19             THE COURT:  I'll admit 435 without objection.

20                   (Whereupon, Government's Exhibit No. 435 was

21    entered into evidence.)

22             MR. KENNER:  No objection to 436.

23             THE COURT:  I'm sorry?

24             MR. KENNER:  No objection, your Honor.

25             THE COURT:  All right.  I'll admit 435 without
```

1      objection.

2                      THE COURT REPORTER:  436?

3                      THE COURT:  435.  And then -- are we now putting

4      forth -- I believe that the one he just spoke about was 435.

5                      Now you've put on 436.  Is that correct?

6                      MR. MULRYNE:  That's correct.

7                      THE COURT:  Mr. Kenner, what's your --

8                      MR. KENNER:  No objection to 436, your Honor.

9                      THE COURT:  Then I'll admit Government's

10     Exhibit 436 without objection.

11                     (Whereupon, Government's Exhibit No. 436 was

12     entered into evidence.)

13                     THE COURT:  Which is the next one?

14                     MR. KENNER:  437.  And I have no objection.

15                     MR. MULRYNE:  This is 443.

16                     MR. KENNER:  Oh, I'm sorry.

17                     MR. MULRYNE:  They go out of order slightly.

18                     THE COURT:  So 443, Mr. Kenner, you don't have an

19     objection?

20                     MR. KENNER:  No, your Honor.

21                     THE COURT:  All right.  I'll admit 443 without

22     objection.

23                     (Whereupon, Government's Exhibit No. 443 was

24     entered into evidence.)

25                     THE COURT:  This is 444.

```
1              MR. KENNER:  No objection to 444, your Honor.

2              THE COURT:  I'll admit 444 without objection.

3              (Whereupon, Government's Exhibit No. 444 was

4    entered into evidence.)

5              THE COURT:  This is 449?

6              MR. MULRYNE:  Yes.  449, your Honor.

7              MR. KENNER:  No objection, your Honor.

8              THE COURT: All right.  I'll admit 449.

9              (Whereupon, Government's Exhibit No. 449 was

10   entered into evidence.)

11             MR. MULRYNE:  450.

12             MR. KENNER:  No objection, your Honor.

13             THE COURT:  All right.  I'll admit 450 without

14   objection.

15             (Whereupon, Government's Exhibit No. 450 was

16   entered into evidence.)

17             THE COURT:  You had 445, 420, 426 and 428.

18             MR. MULRYNE:  That's correct, your Honor.

19             THE COURT:  Are you doing those next?

20             MR. MULRYNE:  This is 420.

21             MR. KENNER:  No objection, your Honor.

22             THE COURT:  All right.  Hold on a second.

23             All right.  420 is admitted without objection.

24             (Whereupon, Government's Exhibit No. 420 was

25   entered into evidence.)
```

```
1              MR. MULRYNE:  426.

2              MR. KENNER:  No objection, your Honor.

3              THE COURT:  I'll admit 426 without objection.

4              (Whereupon, Government's Exhibit No. 426 was

5    entered into evidence.)

6              THE COURT:  What's the next one?

7              MR. MULRYNE:  428.

8              MR. KENNER:  No objection.

9              THE COURT:  I'll admit 428 without objection.

10             (Whereupon, Government's Exhibit No. 428 was

11   entered into evidence.)

12             MR. MULRYNE:  And, your Honor, I'll withdraw 445.

13             THE COURT:  Okay.  We've gone through all the

14   ones.

15             MR. KENNER:  Thank you for that, your Honor.

16             THE COURT:  No problem.

17   BY MR. MULRYNE:

18   Q.  Agent Heuchling, so now with the admitted exhibits, I

19   just want to show you one of these letters.  Let me turn to

20   Government Exhibit 449, just admitted.

21             Agent Heuchling, what are we looking at here?

22   A.  This is one of the letters that was sent from Miller

23   Baroness to counsel representing the Defendant to one of

24   the straw donors; in this case, Dr. Moise.

25   Q.  All right.  We see the "Regard" line here is loan
```

1    repayment.

2              Do you see that?

3    A.  I do.

4    Q.  All right.  And can you read the first paragraph for us,

5    please?

6    A.  "Dear Mr. Moise:  This firm is litigation counsel for

7    Mr. Pras Michel.  The purpose of this letter is to put you

8    on notice that you are in breach of your contractual

9    obligations to Mr. Michel and request you immediately pay

10   all amounts owed to my client."

11   Q.  And then if you could continue the second paragraph,

12   please.

13   A.  "Mr. Michel loaned you $30,000 and you have failed to

14   repay any portion of that loan.  This is a material breach

15   of your contractual obligation.  Be advised that you must

16   pay the entire amount of $30,000 to my client immediately."

17   Q.  Agent Heuchling, can you tell us, generally -- I won't

18   ask you to read the whole thing here, but what does the

19   letter threaten to do if this amount is not paid, the

20   $30,000 is not paid back?

21   A.  The letter threatens Dr. Moise with both legal action as

22   well as financial damages if Dr. Moise does not repay the

23   Defendant.

24   Q.  And how much money in 2012 did Dr. Moise receive from

25   the Defendant based on the records?

1    A.  $30,000.

2    Q.  And how much of that money did Dr. Moise contribute to

3    the Obama Victory Fund shortly upon receiving that money?

4    A.  $30,000.

5    Q.  Agent Heuchling, did some of the individuals receive

6    followup letters in addition to an initial letter?

7    A.  Yes.  They received a second letter as well.

8              MR. MULRYNE:  Can we pull up Government

9    Exhibit 450, which has just been admitted.  If we can just

10   zoom in there generally.

11   BY MR. MULRYNE:

12   Q.  Agent Heuchling, we won't read this.  But what's the

13   import of this letter?

14   A.  So this is a followup to the previous letter, very

15   similar in tone and nature, again, threatening Dr. Moise

16   that if he does not repay the Defendant $30,000, he'll be

17   subject to both legal action and, you know, financial

18   penalties.

19             MR. KENNER:  Your Honor, I move to strike the word

20   "threatening."  It's a legal letter.

21             THE COURT:  I'm going to leave it alone.  They can

22   read the letter and come to their own conclusions as to --

23   you can substitute another word for "threatening," but

24   obviously indicating consequences, presumably.

25             MR. MULRYNE:  Thank you, your Honor.

1    BY MR. MULRYNE:

2    Q.  Agent Heuchling, these letters we see in early March of

3    2019 -- and there were other letters sent to other

4    individuals, other conduits, in February/March of 2019.  Is

5    that right?

6    A.  Yes.  Other straw donors received letters very similar

7    in nature to this -- this one and the other one we looked

8    at.

9    Q.  So for these amounts that are being requested to be paid

10   back but from these individuals, how long between the timing

11   of these letters and the timing in which the Defendant

12   actually provided these monies to these straw donors?

13   A.  So the straw donors received funds from the Defendant in

14   2012, and now they're receiving these legal demand letters

15   in 2019.

16        MR. MULRYNE:  Can we go back to Government

17   Exhibit 734.

18   BY MR. MULRYNE:

19   Q.  And these letters that are being provided to these

20   individuals, these conduits, were those letters sent out

21   between the two meetings that the Government had with

22   Defendant's defense counsel regarding this case, this

23   investigation?

24   A.  Yes.  That is right.  So the Defendant would have been

25   aware of, you know, at least in part, of the scope of the

1    investigation that we had conducted.

2    Q.  Moving to another matter here, during this

3    investigation, did the FBI learn about several text messages

4    that were sent from a previously unknown number to a couple

5    of individuals involved in this investigation?

6    A.  Yes, we did.

7    Q.  All right.  Are you familiar with an individual named

8    Neville Richardson?

9    A.  I am.

10   Q.  Who is Mr. Richardson?

11   A.  Mr. Richardson is a California businessman who we later

12   came to learn was also a straw donor who received funds from

13   the Defendant and provided those funds to the Obama Victory

14   Fund.

15   Q.  Did Mr. Richardson provide records to the Government

16   during the course of its investigation?

17   A.  Yes, he did.

18           MR. MULRYNE:  If we could pull up Government

19   Exhibit 460.

20           THE COURT:  Has that been admitted or not?

21           MR. MULRYNE:  This has not been admitted, your

22   Honor.

23   BY MR. MULRYNE:

24   Q.  Agent Heuchling, is this the -- a text message that

25   Mr. Richardson received from a number ending in 9240?

1    A.  It is.

2    Q.  And did Mr. Richardson provide this text message to the

3    Government during its investigation?

4    A.  Yes, he did.

5              MR. MULRYNE:  Your Honor, the Government moves to

6    admit Government Exhibit 460 into evidence.

7              MR. KENNER:  No objection, your Honor.

8              THE COURT:  All right.  I'll admit 460 without

9    objection.

10             (Whereupon, Government's Exhibit No. 460 was

11   entered into evidence.)

12             MR. MULRYNE:  And move to publish, your Honor.

13             THE COURT:  Yes.

14   BY MR. MULRYNE:

15   Q.  So, Agent Heuchling, here we're looking at this text

16   message that Mr. Richardson received from a number -- a

17   phone number ending in 9240.  Could you please read this to

18   the jury?

19   A.  Yes.  "Mr. Richardson, listen.  It is strongly advised

20   you do the right with our camaraderie.  He is going court

21   all this week starting tomorrow and, as of now, DOJ doesn't

22   know definitively about you and the transaction from 2012.

23   But all of that can change by tomorrow, not only that, but

24   press will be there.

25             "Now, I'm sure you, nor your clients, want to be

Heuchling - DIRECT - By Mr. Mulryne

1    mentioned in the media that you owe him 50K.  Not a good

2    look, Mr. Richardson.  So to alleviate damages to you,

3    contact him before 1:00 p.m. tomorrow.  Just remember, once

4    you're mentioned, there's no turning back.  I'm not sure if

5    it's worth 50K.  BTW, I wouldn't mention this to anyone.

6    Best."

7    Q.  So, Agent Heuchling, we see there in that highlighted

8    portion where it says, "As of now, DOJ doesn't know

9    definitively about you and the transaction from 2012."

10          First question:  Was there a transaction involving

11   the Defendant and Mr. Richardson in 2012?

12   A.  Yes.  Mr. Richardson was a straw donor in 2012.

13   Q.  And the portion there about "As of now, DOJ doesn't know

14   definitively about you," this text message, was this sent on

15   or about July 14th, 2019?

16   A.  On July 14th, 2019.

17   Q.  At that time, did the FBI -- had the FBI interviewed

18   Mr. Richardson?

19   A.  No, we had not.

20   Q.  And had Mr. Richardson testified before a grand jury?

21   A.  No, he had not.

22   Q.  By that time, had the FBI identified Mr. Richardson

23   definitively as a straw donor?

24   A.  No.  At that time, the FBI was not aware of the fact

25   that Mr. Richardson was a straw donor.

1          And I'll point out that, at this time, the

2     Defendant, through the fact that we had given him discovery,

3     would have been aware of the fact that we did not know

4     Mr. Richardson was a straw donor.  And in fact, the only two

5     people who would know Mr. Richardson was a straw donor at

6     this point would be the Defendant and Mr. Richardson

7     himself.

8     Q.  So, Agent Heuchling, you -- we just went over the text

9     message sent to Mr. Richardson on July 14th, 2019.

10          Was a text message also sent that day close in

11    time to Frank White?

12    A.  Yes, it was.

13    Q.  All right.  And you testified about Frank White earlier.

14    Was Mr. White interviewed during this investigation?

15    A.  He was.

16    Q.  Did he testify before a grand jury during this

17    investigation?

18    A.  He did.

19    Q.  And were those records produced to the Defendant and

20    defense counsel -- and his then-defense counsel shortly

21    after indictment?

22    A.  Yes.  So again, the Defendant would have been aware that

23    Mr. White had been interviewed, as well as that he had

24    provided testimony in the grand jury.  The Defendant also

25    would have been aware of exactly what Mr. White had told the

1    FBI and told the grand jury.

2            MR. MULRYNE:  Can we pull up what's marked for

3    identification, not yet admitted, as Government

4    Exhibits 461, 462 and 463.

5            THE COURT:  I'm sorry.  Are those ones we've done

6    or not?

7            MR. MULRYNE:  They have not been admitted, your

8    Honor.

9            THE COURT:  What are they again?

10           MR. MULRYNE:  461, 462 and 463.

11           THE COURT:  I assume you need to put them up so

12   Mr. Kenner can look at them.

13           MR. MULRYNE:  Yes, your Honor.

14           MR. KENNER:  Thank you, your Honor.

15           THE COURT:  We're looking at 461.  Is that

16   correct?

17           MR. MULRYNE:  That's correct, your Honor.

18           MR. KENNER:  No objection, your Honor.

19           THE COURT:  All right.  I'll admit Government's

20   Exhibit 461 without objection.

21           (Whereupon, Government's Exhibit No. 461 was

22   entered into evidence.)

23           MR. MULRYNE:  We're now looking at 462, your

24   Honor.  The Government would move to admit Government

25   Exhibit 462.

1            THE COURT:  Mr. Kenner is reading it.

2            MR. KENNER:  No objection, your Honor.

3            THE COURT:  I'll admit 462 without objection.

4            (Whereupon, Government's Exhibit No. 462 was

5     entered into evidence.)

6            MR. MULRYNE:  And turning now to 463, which the

7     Government moves to admit.

8            MR. KENNER:  No objection.

9            THE COURT:  I'll admit 463 without objection.

10           (Whereupon, Government's Exhibit No. 463 was

11    entered into evidence.)

12           MR. MULRYNE:  If we can pull up Government

13    Exhibits 462 and 463 side by side, please.

14    BY MR. MULRYNE:

15    Q.  Agent Heuchling, were these text messages -- these were

16    sent on July 14th, 2019, around the same day as the texts

17    sent to Mr. Richardson.  Is that correct?

18    A.  Yes.  These are text messages sent from the same number

19    that sent texts to Mr. Richardson.  But these are the text

20    messages that were sent to Mr. White.

21    Q.  So, Agent Heuchling, recognizing that these look perhaps

22    a bit odd and are sort of broken up strangely, these

23    documents, how were they obtained from Mr. White?

24    A.  So as I had testified earlier, these were obtained via

25    screenshot.  So we took screenshots of Mr. White's cell

 1    phone.

 2              MR. MULRYNE:  Okay.  If we can pull up for

 3    identification Government Exhibit 732.  This has not been

 4    admitted yet.  If we can zoom in on that.

 5              MR. KENNER:  Your Honor, it shouldn't be on the

 6    monitor.

 7              MR. MULRYNE:  Yes.  This has not yet been

 8    admitted.

 9              THE COURT:  It hasn't been admitted.

10              Dorothy, we need to take that off, please.

11              MR. KENNER:  But it is on the monitor.

12              THE COURT:  She's taking it off.  It takes a

13    second to do it.

14    BY MR. MULRYNE:

15    Q.  Agent Heuchling, what is Government Exhibit 732?

16    A.  So Government Exhibit 732 -- as you just saw, the text

17    messages, because of the nature in which we had to take the

18    screenshots, were broken up.  So this is a fusion of those

19    text messages.  But it is an accurate representation of what

20    was in those text messages.

21              THE COURT:  So you put them all together?

22              THE WITNESS:  Yes.  Yes, your Honor.

23              THE COURT:  Are they the exact same wording as the

24    earlier one?

25              THE WITNESS:  Exact same wording, you know, same

1    grammar.  Yes, ma'am.

2              MR. KENNER:  No objection, your Honor.

3              THE COURT:  I'll admit 732 without objection.

4              (Whereupon, Government's Exhibit No. 732 was

5    entered into evidence.)

6              MR. MULRYNE:  We'd move to publish, your Honor.

7              THE COURT:  Yes.  Go ahead.

8    BY MR. MULRYNE:

9    Q.   So, Agent Heuchling, this message that was sent on July

10   14th, 2019, from the number ending in 9240 to Mr. White, can

11   you please read this for the jury?

12   A.   Yes.  It was sent to Frank White.  "Frank, listen, you

13   know what's happening with our camaraderie is insignificant

14   and political.  Now we know you've been brought in as a

15   witness, but make no mistake, you being protected.  They

16   know about the arranged visits both times, arranged calls

17   made from one high-end elected official to another foreign

18   official, and think everything else that was done to assure

19   the deal would go through:

20             "Now you saving grace is our friend.  He's the

21   only one who knows it all.  So it's only right you make it

22   right, being that he's the reason you walked away with over

23   50M.  Understand we're not saying break any laws, but you

24   can get creative.  If that means buying him out of Dusable

25   or whatever, you not only owe him that cause he helped you

1    make a lot of money, but he also kept his mouth shut.  I'm

2    sure you want to keep like that.  So Frank, do something.

3    Even if doing it through your lawyer, work it out so

4    everything remains bury."

5    Q.  Agent Heuchling, going up to the top of this message,

6    I'm looking at the second sentence, the second line, where

7    it reads, "Now, we know you been brought in as a witness but

8    make no mistake, you being protected."

9            You've been brought in as a witness.  By this

10   point, July 19th -- I'm sorry -- July 14th, 2019, had

11   Mr. White been a witness in the Government's investigation?

12   A.  Yes.  Not only he had been brought into the grand jury

13   as well and -- you know, generally, the grand jury

14   proceedings are supposed to be secret.  But the Defendant

15   would have been aware of the fact that he had been brought

16   in because it would have been clear from our discovery that

17   Mr. White had testified in the grand jury.

18   Q.  Discovery that was produced prior to this period?

19   A.  That's correct.

20   Q.  Upon learning of these text messages and this number

21   ending in 9240, did the FBI undertake any investigative

22   actions to try to identify the sender of those messages?

23   A.  Yes, we did.

24   Q.  And what, if anything, did the FBI learn about this

25   number and the associated cell phone?

1   A.  So we learned that it was a phone number or phone that

2   had been purchased with cash.  We learned that the phone had

3   been purchased at 580 Eighth Avenue in Midtown Manhattan on

4   July 14th.  And we learned that it had been purchased in

5   such a way that its buyer was anonymous.

6   Q.  As an FBI agent and an investigator, are you familiar

7   with what's known as a burner phone?

8   A.  Yes, I am.

9   Q.  What is a burner phone?

10  A.  A burner phone is a phone that someone uses usually for

11  a short period of time.  It's usually a phone that's

12  purchased with cash or purchased in such a way that the

13  identity of the user of that phone is not known or remains

14  unknown, especially to law enforcement.

15  Q.  Was this number and this phone a burner phone?

16  A.  It was a burner phone.  It was used in a manner -- it

17  was used in a manner that would indicate it was a burner

18  phone.

19  Q.  To your recollection, and based on the review of

20  records, essentially how long was this phone in service?

21  A.  This phone was in service for less than 24 hours.  Just

22  July 14th.

23  Q.  Showing you what's been marked for identification, not

24  yet admitted, as Government Exhibit 430.

25          During this investigation, did the FBI obtain a

1   search warrant to review the Defendant's personal cell

2   phone?

3   A.  We did.

4   Q.  And is this exhibit, the information reflected in

5   here -- was this recovered as part of that search warrant?

6   A.  Yes.  This is a partial extraction of some of the data

7   from the Defendant's cell phone.

8           MR. MULRYNE:  Your Honor, the Government moves to

9   admit Government Exhibit 430.

10          MR. KENNER:  No objection.

11          THE COURT:  I'll admit, without objection, 430.

12          (Whereupon, Government's Exhibit No. 430 was

13   entered into evidence.)

14          MR. MULRYNE:  We'd move to publish, your Honor.

15          THE COURT:  Go ahead.

16  BY MR. MULRYNE:

17  Q.  Agent Heuchling, does this document reflect exchanges

18  between the number ending in 9240 and the Defendant's

19  personal cell phone?

20  A.  It does.

21  Q.  All right.  And so if you'll follow me, looking at the

22  bottom here, No. 5 -- I believe this goes in chronological

23  order.  We see from the 9240 number to the Defendant's cell

24  phone, "Yo, Bro."

25          Do you see that?

1     A.  I do.

2     Q.  And then how does the Defendant respond?

3     A.  The Defendant replies:  "Who's this?"  Four question

4     marks.

5     Q.  All right.  We then see the 9240 burner phone number

6     texting, "Your guardian angel."

7            How does the Defendant respond?

8     A.  "Who the F is this?"

9     Q.  And then how does the -- what's the final message from

10    the Defendant?

11    A.  Three question marks.

12    Q.  All right.  Agent Heuchling, other than the text message

13    to Mr. White, Mr. Richardson and this exchange, were there

14    any other substantive communications associated with that

15    cell phone, the one ending in 9240?

16    A.  No.  None.

17    Q.  Based on your investigation -- and you may have

18    mentioned this moments ago -- where was this cell phone,

19    this burner phone, purchased?

20    A.  It was purchased at 580 Eighth Avenue, which is between

21    38th and 39th Streets in Midtown Manhattan.  It's in the

22    Garment District.

23            MR. MULRYNE:  Pulling up what's marked for

24    identification as Government Exhibit 738, not yet admitted.

25            THE COURT:  738?

1          MR. MULRYNE:  738.  Yes, your Honor.

2          THE COURT:  It's not on the list.

3          MR. KENNER:  No objection, your Honor.

4          THE COURT:  Can you describe what it is?  I'll

5     admit it without objection, but we don't have this on the

6     list.  So if you could just describe what it is.

7          (Whereupon, Government's Exhibit No. 738 was

8     entered into evidence.)

9          MR. MULRYNE:  Yes, your Honor.  So the Government

10     moves to admit, without objection, and we would ask to

11     publish.

12     BY MR. MULRYNE:

13     Q.  Agent Heuchling, this photograph that we're looking at,

14     can you tell us what's depicted in this --

15          THE COURT:  Wait until it gets published.

16     BY MR. MULRYNE:

17     Q.  -- photograph, which hopefully will be up in just a

18     moment?

19     A.  Would you like me to answer?

20          THE COURT:  Go ahead.

21     BY MR. MULRYNE:

22     Q.  Yes, please.

23     A.  I apologize.

24          That is the store that we had identified the phone

25     was purchased from.

1    Q.  All right.  And based on your investigation, again,

2    where was this located?

3    A.  Between 38th and 39th Street in Manhattan.

4    Q.  And based on your investigation, where was the Defendant

5    on the day that this phone was purchased and these texts

6    were sent?

7    A.  The Defendant was on the island of Manhattan.

8    Q.  All right.  In fact, does the Defendant have residence

9    in Manhattan, at least at this time?

10   A.  He did.

11   Q.  All right.  Agent Heuchling, during your investigation,

12   did the FBI obtain cell site records, geolocation

13   information, in order to attempt to identify the user of

14   this phone?

15   A.  Yes, we did.

16   Q.  And can you tell us, based on -- well, let me first show

17   you Government Exhibit 737, which has not been admitted.

18            Agent Heuchling, does this exhibit show the

19   location of the store in relation to the Defendant's cell

20   phone?

21   A.  So -- yes.  But just to be clear, I think you had asked

22   me if we had obtained the cell site data for the burner

23   phone.  But we also obtained the cell site data for

24   Mr. Michel's iPhone.

25   Q.  Okay.  And --

```
 1                MR. KENNER:  Your Honor -- your Honor, excuse me.
 2      I'm going to object to this exhibit.  I believe that there
 3      is a witness that the Government will be calling that will
 4      address the issue of the reliability of these kinds of data.
 5      And without that as a predicate, I would object to this
 6      agent testifying on this subject.
 7                THE COURT:  Are you going to have somebody that's
 8      going to give more of an explanation?
 9                MR. MULRYNE:  We do, your Honor.  However, that
10      testimony will be expert -- that testimony pertains to cell
11      site data writ large.  This particular exhibit relates to
12      information that this witness reviewed and has personal
13      knowledge.
14                THE COURT:  He would have personal knowledge of
15      what it shows.  But the question that I assume is the
16      objection is how you would come up with this kind of
17      information.
18                MR. KENNER:  Yes.
19                THE COURT:  Is that your objection, Mr. Kenner?
20                MR. KENNER:  Yes, your Honor.
21                THE COURT:  All right.
22                MR. MULRYNE:  I can lay a foundation, your Honor.
23                THE COURT:  Go ahead and try.
24      BY MR. MULRYNE:
25      Q.  All right.  Agent Heuchling, the information that's
```

1    reflected in here, what's reflected in Government

2    Exhibit 737, how is it that you reviewed or compiled this

3    information?

4    A.  So the address of the store is fairly straightforward.

5    The cell tower location, we reviewed the cell site records

6    for Mr. Michel's iPhone.  I'm not claiming to be an expert

7    on cell phone analysis.  However, this was fairly

8    straightforward.  I looked at the latitude and the longitude

9    for the cell tower that Mr. Michel's phone was pinging on at

10   this time.  And I plotted that latitude and longitude onto a

11   map.

12           I'm not doing any analysis -- like, specific

13   analysis.  I'm just looking at the raw data and putting it

14   on a map.

15   Q.  And so that longitude --

16           MR. KENNER:  Your Honor -- again, I object, your

17   Honor.

18           THE COURT:  I don't think it's going to work

19   through this witness.  You'll have to come back to it.  You

20   can certainly indicate -- we'll hold it in abeyance in terms

21   of getting it fully admitted.  But you can get some

22   information as to what he did.  And then we'll get the

23   expert to explain how you go about coming up with this kind

24   of information so you don't have to re-call him.

25           MR. MULRYNE:  All right, your Honor.

```
1              We can take that down.

2              One moment, your Honor.

3              THE COURT:  Sure.

4              MR. MULRYNE:  Your Honor, the Government has no

5    further questions at this time.

6              THE COURT:  All right.

7              MR. KENNER:  Your Honor, may I take a very brief

8    bathroom break before I start?

9              THE COURT:  Certainly.

10             MR. KENNER:  Thank you.

11             THE COURT:  How much do you need?

12             It's 25 of.

13             MR. KENNER:  Five minutes, your Honor.

14             THE COURT:  Okay.  We'll give a break to the jury

15   as well.

16             MR. KENNER:  Thank you.

17             THE COURT:  So a little over -- it will probably

18   be closer to ten minutes by the time we get back.

19             But yes.  We're on a break.

20             (Whereupon, the jury exited the courtroom at 4:34

21   p.m. and the following proceedings were had:)

22             THE COURT:  We're on our break.  The rest of you,

23   don't go too far.

24             (Thereupon a recess was taken, after which the

25   following proceedings were had:)
```

1          THE COURT:  The jury will be in in a second.

2          (Whereupon, the jury entered the courtroom at 4:43

3     p.m. and the following proceedings were had:)

4          THE COURT:  Everybody can sit down.

5          Mr. Kenner?

6                    CROSS-EXAMINATION

7     BY MR. KENNER:

8     Q.  Good afternoon, Agent.  How are you?

9     A.  I'm doing well.  Good afternoon.

10    Q.  I'm glad you are.

11          You did quite an extensive investigation in this

12    case, as I gather.  Is that correct?

13    A.  Yes.  That's correct.

14    Q.  Let me start with, first, Mr. Barry Bekkedam.  Did you

15    interview Barry Bekkedam?

16    A.  I did.

17    Q.  And did the results of that interview play a part in

18    your coming to the conclusions you came to with regard to

19    your testimony?

20    A.  I believe so.  I believe Mr. Bekkedam provided us

21    records and documents, as well as testimony.  Yes.

22    Q.  Okay.  And you considered the testimony that he provided

23    in coming to the conclusions that you've told this jury

24    about?

25    A.  Yes.

1    Q.  Did he testify at the grand jury?

2    A.  I actually don't recall.

3    Q.  Okay.  Let me ask about Mr. Frank White.  Did you

4    interview Mr. Frank White?

5    A.  Yes.

6    Q.  Did you -- were you present when he testified at the

7    grand jury?

8    A.  I was not.

9    Q.  All right.  Did you read his grand jury testimony?

10   A.  I read parts of it, if not the entire thing.  Yes.

11   Q.  All right.  And is your conclusions and testimony today

12   related in part upon things that Frank White has told you?

13   A.  Yes.

14   Q.  And is it related in part on things that Mr. Frank White

15   testified to at the grand jury?

16   A.  Yes.

17   Q.  Sir, who else did you -- who all have you interviewed in

18   this case?

19   A.  Mr. Kenner, I really wouldn't know where to start that.

20   I've probably interviewed dozens, if not hundreds, of people

21   in this investigation.

22   Q.  Okay.  And you prepared notes from all of those

23   interviews?

24   A.  Yes.  Notes and 302s, interview reports.  Yes.

25   Q.  Okay.  Let's -- let me ask you some things about

1    Mr. White.

2              What did you learn from Mr. White that informs

3    your testimony today?

4    A.  Do you want me to tell you what Mr. White told me?

5    Q.  Yes.

6              MR. MULRYNE:  Objection, your Honor.  Hearsay.

7              THE COURT:  I'll sustain it.

8              MR. KENNER:  May I have a sidebar, your Honor?

9              THE COURT:  Go ahead.

10             (Whereupon, the following proceedings were had at

11   sidebar outside the presence of the jury:)

12             THE COURT:  Can you hear me?

13             MR. MULRYNE:  Yes.  Yes, your Honor.

14             THE COURT:  Government, tell me why you think it's

15   hearsay.

16             MR. MULRYNE:  Your Honor, it's asking for what

17   Mr. White told the agent, which is an out-of-court statement

18   for a witness who's not here in court.

19             THE COURT:  Okay.  And why do you think that --

20   it's a very broad thing.  Mr. White may have said a whole

21   bunch of different things, Mr. Kenner.

22             In terms of what -- in terms of what his own role,

23   as well as others, I don't see why it's not hearsay and what

24   exception it would be.

25             Mr. Kenner?  Can you hear, Mr. Kenner?

1          MR. KENNER:  (Inaudible.)

2          THE COURT:  Mr. Kenner, can you hear me?

3          MR. KENNER:  Can you hear me now, your Honor?

4          THE COURT:  Yes.  Okay.  So did you hear what the

5     Government said?

6          MR. KENNER:  Yes.  I heard what the Government

7     said, your Honor.

8          But -- I can ask a more specific question.  But my

9     position is that if Mr. Frank White's grand jury testimony

10    and statements to this officer informed his testimony today,

11    I'm entitled to probe whatever it is that he considered to

12    come up with the testimony that he gave today.  And Frank

13    White is a large part of that.

14         THE COURT:  But as a practical matter, the

15    questions were very specific about what they had from

16    Mr. White in terms of what he answered.  And they were very

17    specific around documents and some various other things.

18         So in terms of what evidence we have in the

19    record, it's quite specific, and you made no objections to

20    any of the evidence --

21         MR. KENNER:  No --

22         THE COURT:  Excuse me.

23         -- any of the evidence that came in about what

24    materials there were from Mr. White, which did not include

25    what he said at the grand jury or anything else.

1           So I don't think that that works in terms of

2    his -- a general question of whether he might have

3    considered it in this case, which is a very broad statement

4    and question.

5           The evidence that the jury has relates to very

6    specific things around what investigation they did with

7    Mr. White and what information they got from him.  And

8    that's the evidence that we have here.

9           You're asking for clear hearsay, as far as I can

10   tell.  And I know that Mr. White is not coming, so you can't

11   bring all of this testimony through him, through this

12   witness.

13          MR. KENNER:  Your Honor --

14          THE COURT:  Which I assume is your effort.

15          MR. KENNER:  Your Honor, with all due respect,

16   Mr. White testified at the grand jury under a proffer

17   agreement and with immunity.  I --

18          THE COURT:  Well, I don't know in terms of -- is

19   Mr. White -- did he indicate he was going to plead the Fifth

20   or something?  I don't know what he did.

21          MR. KENNER:  I was told by his counsel that I

22   should be prepared in the event he takes the Fifth.

23          THE COURT:  Well, if -- I don't know enough about

24   whether he had an immunity grant which would cover the

25   testimony that he would bring.  So if it covered it, he

1    can't plead the Fifth to whatever it is if he has an

2    immunity, you know, agreement.

3            But the point is that you are bringing out -- you

4    asked very general questions.  Obviously, he didn't ignore

5    what was -- he didn't indicate he had read all of it.  But

6    the evidence that's presented to the jury, that the jury has

7    considered, is very specific as to Mr. White.  And in terms

8    of -- most of it was documents and materials that provided.

9            As far as I know, there was no testimony of what

10   he said in the grand jury.  Am I correct, Government

11   counsel?

12           MR. MULRYNE:  Yes, your Honor.

13           THE COURT:  So I don't think you get to bring it

14   out at this point.

15           I think what I will do at this point is send them

16   home.  We can have a more fulsome discussion.  But you

17   cannot, I think, get out what Mr. White would say by doing

18   it through the grand jury when that's not the testimony that

19   we have in front of the jury.

20           The special agent did not discuss what was said in

21   the grand jury.

22           Government counsel was very careful not to bring

23   that up.  So a generalized question, Did you look at this,

24   Did it have some consideration, obviously he didn't ignore

25   it.  But that isn't what -- he didn't give opinions today.

1    He didn't come in and give opinions as to the credibility or

2    anything else of Mr. White.  What he talked about was very

3    specific things that related to things that he had brought,

4    et cetera, that he had provided in terms of -- that turned

5    out to be exhibits.

6           But anyway, it's getting too close to the end.

7    It's probably better to just send them home and we can have

8    a further discussion.

9           MR. KENNER:  Thank you, your Honor.

10          MR. MULRYNE:  Thank you, your Honor.

11          (Whereupon, the following proceedings were had in

12   open court:)

13          THE COURT:  I think the best thing to do at this

14   point for the last five minutes before 5:00, which is when I

15   would break anyway, I'm going to excuse you for this

16   evening.  Let me ask you to come back at -- if you'd be in

17   the jury room by 9:15 tomorrow.  We'll come and get you.

18          My sense is since there have been news reporters

19   around the case that there may be news reports.  So I'd ask

20   that you be particularly vigilant not to read anything

21   online, paper or anything else, not to listen to any

22   programs or talking heads or anything else that may be

23   talking about this case.  I don't know that they will.  But

24   I want you to be very careful not to hear anything.  I want

25   you to be making decisions based only on what you hear in

1      the courtroom.  Okay?

2                  Everyone take care and be well.  See you tomorrow.

3                  THE JURY:  Thank you.

4                  (Whereupon, the jury exited the courtroom at 4:52

5      p.m. and the following proceedings were had:)

6                  THE COURT:  I think what I'm going to do is ask

7      you to step out so we can have a conversation without you

8      hearing what's going on.

9                  THE WITNESS:  Yes, your Honor.

10                 THE COURT:  Thank you.

11                 You can come back in afterwards.  I just don't

12     want you in here while we're talking about this.

13                 THE WITNESS:  Yes, ma'am.

14                 (Thereupon, Special Agent Robert Heuchling retired

15     from the courtroom and the following proceedings were had:)

16                 THE COURT:  Mr. Kenner, as I understand it, what

17     you want him to do is to testify as to what Mr. White said

18     in the grand jury.  That doesn't work.  Is that what you're

19     asking?  They were very careful, as I said, about the

20     testimony.  He did not say anything about what was said in

21     the grand jury.  They were very specific about his providing

22     things on his phone and various other things.

23                 I don't see it opening the door for you to be able

24     to do it.  And it's clear hearsay in terms of bringing in an

25     out-of-court statement.

1    If Mr. White, you know, decides to testify, or

2 whoever is going to call him or not call him, if he has an

3 immunity agreement, he's not in a position to plead the

4 Fifth as to what is covered by the immunity agreement.

5    So as far as I'm concerned, I don't -- give me a

6 good reason why this is not hearsay or some exception.

7    MR. KENNER:  Your Honor, what I would ask the

8 Court to do is allow me to submit a document to you.  I

9 think at this point what I would like to do is to raise the

10 issue of whether or not Mr. White even has the right to

11 claim immunity in his testimony in this court.

12    THE COURT:  Well, we're not at the immunity stage.

13 Where we are at this point is whether this witness -- if you

14 want to give me that and we can talk about it, fine.  But

15 whether or not he has immunity is a separate issue.

16    What I want is a resolution as to whether you can

17 proceed with these questions.

18    MR. KENNER:  Your Honor --

19    THE COURT:  If you want to give me some more

20 information as to whether you can ask this agent about his

21 information, what they would have said -- his repeating what

22 Mr. White said in the grand jury, which is what you asked

23 him to say, I don't see how this gets in.

24    So if you want to brief that tonight, fine.

25 Otherwise, I'll hear whatever arguments you've got.

 1           MR. KENNER:  Your Honor, would the Court permit

 2     the question of:  What did you learn from Mr. White that

 3     specifically formed the basis of your testimony today?

 4           THE COURT:  But the point is that he didn't

 5     include any questions.  You know, you're asking him

 6     something in terms of a broad thing, which is not the

 7     testimony he gave.

 8           The testimony he gave -- and your question is too

 9     broad -- was very specific, had nothing to do with the grand

10     jury.  I mean, correct me if, you know, I'm wrong.  You all

11     know the case better, and what you ask.  As far as I know,

12     it was all around specific exhibits.

13           Mr. Mulryne?

14           MR. MULRYNE:  Yes, your Honor.

15           With respect to Mr. White, we asked about the

16     collection of documents, documents that he provided to the

17     Government.  There was no questions regarding statements

18     that he had given previously.

19           We also talked about him, in terms of the

20     interviews and the grand jury testimony, simply as an event

21     to establish the timeline, when these interviews occurred,

22     when this grand jury testimony occurred.

23           But there was no questions to elicit any hearsay.

24     There were no questions to elicit any out-of-court prior

25     statements by Mr. White.

1          And I would just note, your Honor, just as a point

2     of clarification, I know that there's a reference to an

3     immunity agreement.  As I recall, Mr. White received no

4     immunity agreement in connection with this case.  It was a

5     proffer agreement by which he agreed to be interviewed or to

6     give statements under a proffer.  But there was no

7     immunization for any sort of criminal liability.

8          THE COURT:  Okay.  Then we don't need to worry

9     about an immunity agreement.

10         But the point is whether or not he knows other

11    information -- and he may know -- all of these investigators

12    know a lot of other information.  The testimony he has

13    provided did not include anything about the grand jury.

14         So there wasn't a question about whether the grand

15    jury influenced him.  You're asking something that they

16    didn't bring out.  All they brought out were the documents.

17    And that's what he testified to.

18         So I don't see -- he may have opinions about him

19    based on reading -- he didn't say he read all of it -- parts

20    of it.  That's irrelevant to what was presented to the jury.

21         The jury only heard nonhearsay, what documents

22    were provided from Mr. White, period.  What he -- so views

23    he's got outside of that, which is not evidence in the case,

24    does not get to be brought in by you.

25         MR. KENNER:  Your Honor, I expect that there will

 1    be evidence that Mr. White received money from Jho Low

 2    directly.  This witness knows about it.  He's testified that

 3    he thinks the money that went to Mr. Michel came from Jho

 4    Low.

 5              I think it's relevant for me to --

 6              THE COURT:  Well, it's not a matter of relevance.

 7    The point is it's hearsay.  He did not testify about

 8    anything in the grand jury.  You want to bring in from this

 9    witness what Mr. White said in the grand jury.  That's

10    classic hearsay, as far as I can see.  I don't see any

11    exceptions to it.

12              The fact that he may know some things, this

13    witness, about Mr. White from other things, that's not the

14    testimony that he brought.  And he didn't rely on it because

15    all he talked about was documents.

16              Now, sure, he knows all these other things, and

17    that may be part of his, you know, view of Mr. White and

18    what's involved.

19              But that's not the testimony that he's -- we have

20    in front of the jury.  The jury has the collection of

21    documents, period.  Okay?  So I don't see bringing out

22    through this witness -- now, he's around.  If it turns out,

23    at some later point, somehow there's other information that

24    comes up that makes it pertinent, you can bring him back up

25    and discuss it.

1          MR. KENNER:  Thank you.

2          THE COURT:  But I don't see your asking him to

3     tell this jury what Mr. White said in the grand jury.  And

4     that's what you asked him.

5          MR. KENNER:  I will not ask that question.

6          THE COURT:  All right.  Then we're done for this

7     evening.  There's no immunity, so you don't need to worry

8     about that.  All right?

9          MR. KENNER:  Your Honor, may I just make one

10    comment?

11         Could your Honor ask the Government to follow your

12    order with regard to the 7:30 p.m. deadline for sending

13    missives to the Court?

14         THE COURT:  I think that -- it may have been that

15    we got out so late, frankly, but I would ask that both

16    parties try and do the 7:30 so there's enough time for

17    people to get -- be able to look at it and come back the

18    following morning.

19         I think it was a thing back and forth that we did.

20         MR. MULRYNE:  That's right, your Honor.

21         MR. KENNER:  Thank you.

22         THE COURT:  Am I expecting any missives this

23    evening or not?  Should I be looking for them?

24         MR. KENNER:  Not from me, your Honor.

25         MR. KELLER:  Your Honor, there's one issue that we

1      raised previously with respect to a witness who may testify

2      tomorrow, Mr. Loic Gouzer, about his potential invocation of

3      the Fifth Amendment on cross-examination, depending on

4      whether the defense asks him specific questions.

5              THE COURT:  Well, I suggested you have a

6      discussion with Mr. Kenner as to what -- a proffer as to

7      what you're going to ask and whether he's getting into it in

8      terms of -- and then we can deal with it with his -- you

9      know, with his counsel.

10             What would be the Fifth Amendment issue for him?

11     I don't know enough about -- I don't know what his testimony

12     is, frankly.

13             MR. KELLER:  So we've had that conversation

14     pursuant to your Court's direction.

15             The Fifth Amendment issue is whether on

16     cross-examination -- an effort to impeach the witness with

17     prior instances of conduct that are the subject of an

18     ongoing investigation.  So if the defense counsel asks

19     specific questions about the witness's conduct, which is

20     currently the subject of an ongoing federal investigation,

21     the witness intends to invoke his Fifth Amendment right.

22             THE COURT:  Okay.  My suggestion is, then, that

23     you -- I don't know which one wants it.  Since you want to

24     cross-examine him about it --

25             MR. KENNER:  Yes.

1          THE COURT:  -- my suggestion is that you, by 7:30

2     tonight, tell me why -- it sounds like something extrinsic

3     in terms of why you think it's appropriate to get into this

4     in terms of doing it.

5          Then I can make a decision as to whether he's,

6     one, got a Fifth Amendment right, and, two, whether or not

7     there's a way of doing it in such a way that he doesn't wind

8     up having a problem with it.  And then I'll go back and

9     look at -- I haven't had a Fifth Amendment problem for a

10    while, so I'll go back and look at whether there's a way of

11    carving it in such a way that we don't -- you don't

12    generally have them plead the Fifth in front of the jury and

13    not get an answer.

14          MR. KENNER:  No.

15          THE COURT:  So you write up what you want to ask

16    and why you think it's important to come in.

17          Why do you think they shouldn't get to, in a

18    nutshell?

19          MR. KELLER:  Your Honor, so I think we can

20    shortcut this.  I actually think there's arguably a basis

21    under Federal Rule of Evidence 608 for them to ask the

22    questions.  I also think the rule specifically provides that

23    the witness does not forfeit his Fifth Amendment right by

24    testifying on other matters on direct.

25          But in order to ensure completeness of the record

 1    and to avoid any issue, the Government is prepared to

 2    immunize the witness if he does indeed need to invoke -- or

 3    decides that he needs to invoke on cross-examination.

 4            THE COURT:  All right.

 5            MR. KELLER:  But --

 6            THE COURT:  Which is usually what you wind up

 7    having to do as a remedy.

 8            MR. KELLER:  So the Government has a motion and a

 9    proposed order that we would submit to the Court before 7:30

10    tonight, in response to the Court's question about whether

11    you would receive any missives.

12            THE COURT:  Okay.  So submit it beforehand.

13            And you respond.

14            MR. KENNER:  Okay.

15            THE COURT:  I'll take a look at it.

16            Usually, as I recall in these instances, if there

17    is an appropriate area of cross-examination, which you seem

18    to indicate it may be, if it is, then the way to do it is to

19    immunize the witness, and then he can ask the question and,

20    you know, he doesn't get to plead the Fifth.

21            MR. KELLER:  Agreed, your Honor.

22            The one issue that I wanted to raise is that this

23    is not the kind of traditional situation in which the

24    Government is providing immunity to a witness in exchange

25    for their testimony or to allow their testimony that would

1    be something --

2                THE COURT:  Right.

3                MR. KELLER:  -- for which the defense would

4    impeach them for.  This is a situation in which the defense

5    is asking questions that may necessitate -- or that the

6    Government may exercise its judgment to move for immunity.

7                And so depending on how the Court wants to handle

8    it -- I just don't want to be in a situation where -- I

9    would either prefer to actually do it on the record in front

10   of the jury in real-time as the defense asks the questions

11   so it's very clear to the jury the scope of the immunity and

12   why the immunity grant is being given; or, because of the

13   circumstances, if we're all going to agree to do it outside

14   the presence of the jury, that the defense not be able to

15   inquire into the immunity agreement as part of

16   cross-examination.

17               THE COURT:  Well, the first question is, one, if

18   it's appropriate to ask the question.  It sounds like you

19   think it probably is in terms of an area of impeachment.

20               The second question is, if he's given immunity,

21   then -- you know, and a narrow immunity, which we could put

22   on -- certainly on the record -- I would -- generally it's

23   done outside of the jury in terms of doing it so that he

24   answers the question and doesn't plead the Fifth.

25               On the other hand, I suppose, if Mr. Kenner wants

1    to bring out that he's giving testimony out of some sort of

2    immunity -- it depends on what the immunity agreement is.

3    So I don't know what your immunity -- the immunity is -- is

4    it this investigation or immunity that he will not be

5    charged based on his testimony?  But he could be charged

6    based on other evidence, which I assume is the immunity you

7    would be giving.

8            MR. KELLER:  That's correct, your Honor.

9    Statutory immunity for his testimony.

10           THE COURT:  Okay.  So if the immunity is a very

11   narrow one relating to the testimony, then, you know, I'll

12   hear from Mr. Kenner whether he does or does not wish to

13   bring that out and how far into it we get.

14           But why don't you produce the motion and I'll look

15   at it.  And then one issue is, you know, if it's a very

16   narrow immunity based on what he says today will not be used

17   as part of the investigation, but it doesn't preclude the

18   Government from still charging him, which would mean he

19   wouldn't -- presumably, he wouldn't be in a position to

20   plead the Fifth.  But we first have to start with whether

21   it's appropriate.

22           I take it you're going to put in the papers what

23   he wants to ask?  I mean, I don't know enough about this, so

24   that's why I'm asking.  In other words, what the

25   impeachment -- generally what the impeachment is.

1          MR. KELLER:  Yes, your Honor.  Yes, your Honor.

2          THE COURT:  Or we can ask Mr. Kenner to put in --

3    you know, maybe it's better, Mr. Kenner, for you to indicate

4    what you're planning on asking that you think he's going to

5    plead the Fifth to, or that both of you think he's going to

6    plead the Fifth to, so I make the decision in context.

7          MR. KENNER:  Your Honor, it's the Government's

8    witness.  If they want to do this, they should be the ones

9    to write --

10          THE COURT:  But you're the one who's asking the

11   question.  All I'm asking from you is, what is it that you

12   are going to ask that may prompt the Fifth Amendment?

13   That's all I'm asking --

14          MR. KENNER:  Okay.

15          THE COURT:  -- so I know whether it's appropriate

16   impeachment for you to be able to do it.

17          If it is, then you should get to be able to do it,

18   and we need to deal with the Fifth Amendment issue, and they

19   want to resolve it by an immunity agreement.  So then the

20   next question is whether you get to bring out, you know,

21   what they're proposing, a very narrow immunity agreement.

22          MR. KENNER:  Your Honor, may I suggest that, as

23   you have requested of the defense on numerous occasions,

24   that you ask the Government to provide a proffer to me of

25   what his testimony is anticipated to be?

1              THE COURT:  I assume that you have had this

2      discussion.  Have you not?

3              MR. ISRAELY:  No.

4              THE COURT:  You haven't discussed what he's being

5      called for?

6              THE COURT REPORTER:  I'm sorry?

7              THE COURT:  Everybody needs to be quiet, wherever

8      you're -- whoever you are.

9              We do need to have some discussion between the

10     Government and Mr. Kenner as to why this is appropriate

11     impeachment of him.  Okay?  So he knows why he's doing it.

12     Or is it totally unrelated with what --

13             MR. KELLER:  It's totally unrelated to the

14     subject -- I'm sorry, your Honor.  It is completely

15     unrelated to the subject matter of his testimony on direct.

16             THE COURT:  Okay.

17             MR. KELLER:  It is purely impeachment.  It is a

18     collateral matter.

19             THE COURT:  Okay.  Well, then, I don't need the

20     rest.

21             Then there's no reason for you to get a proffer.

22     If you're going to be asking what it is that you're going

23     to impeach -- if you want to file it *ex parte*, fine.  All I

24     need to know is what it is you want to impeach him on so

25     that I can make a decision that it's an appropriate

1    impeachment, standing alone, with nothing to do with

2    whatever it is that they're going to ask him.

3              So if this is to impeach him, then I need to know

4    what it is that you're planning on doing.  So I would like

5    that by 7:30 tonight, short, you know, and you can do it

6    under seal if you want.  Okay?  So I know at least what it

7    is.

8              You file your motion so I can make a decision.

9    And indicate what, if you're doing immunity, the narrow

10   immunity or whatever it is that you're planning on doing.

11             And the only issue is I decide whether it's

12   impeachment -- appropriate impeachment.  If I decide that,

13   then you decide whether you want to do this limited

14   immunity.  And if you do the limited immunity, then the

15   question is whether that's brought out in front of the jury.

16   Is that the -- basically, the scenario?

17             MR. KELLER:  That's all correct, your Honor.

18             The order -- the proposed -- the motion and the

19   order under the statute, 18 USC Section 6002, 6003, the --

20   the immunity is not limited to any topic.  It's just that if

21   the defense counsel asks questions and the witness feels

22   that he should or must invoke -- he's represented by

23   counsel.

24             Counsel may actually be here.  I'm not sure.

25             THE COURT:  Somebody is standing up, so I assume

1     that's counsel.

2             MS. IMES:  That's me, your Honor.  Linda Imes,

3     counsel for Loic Gouzer.

4             THE COURT:  Okay.  So she's there.

5             One of the questions -- the other possibility is

6     to simply ask the questions that are going to be on cross

7     and see whether he is -- outside of the presence of the

8     jury, and see if he's going to assert his Fifth Amendment,

9     and then we can -- in terms of what the nature would be --

10    and then make a decision then.  That takes extra time, so I

11    was hoping to skip over having to do this outside of the

12    presence of the jury.

13            But where is he in the collection of witnesses,

14    Mr. Keller?

15            MR. KELLER:  So we will likely have to put him on

16    out of order tomorrow, your Honor.  He would either be after

17    the cross-examination and redirect of the current witness or

18    he might be -- there might be one more witness between the

19    current witness and this witness, your Honor.

20            THE COURT:  All right.  I mean, since at this

21    point, I can't make a ruling, I would ask that Mr. Kenner,

22    whatever it is you're planning on bringing up that, as I

23    understand it, is impeachment -- that has nothing to do with

24    potentially what his testimony is, but it is some other

25    investigation that he supposedly is under.

1          So if you want to bring that up, what I would ask

2     is generally what you're going to be asking him so I can

3     figure out, yes, it's appropriate impeachment, or not.

4          We'll then move -- you know, you file your motion.

5     And I'll combine the two things and make a decision as to

6     whether he has -- you can impeach him and there's a Fifth

7     Amendment right here.  Then you can make some decisions

8     about what you want to do with your immunity.

9          MR. KELLER:  Thank you, your Honor.

10         MR. KENNER:  Your Honor, the Government --

11         THE COURT:  That would be my view.

12         MR. KENNER:  Excuse me.  The Government concedes

13    that it's relevant impeachment.

14         THE COURT:  Well, I'm assuming it is in terms of

15    doing it.  But I still would like to see what it is so that,

16    in making a decision here in terms of what the parameters

17    are of the Fifth Amendment -- whether it's just a blanket

18    Fifth Amendment or it's something that is not fully that.

19    So I need something from you for that.  They're not

20    objecting, as I understand it, assuming that it's as you

21    have discussed it.

22         MR. KELLER:  Correct, your Honor.  I mean, there

23    may be questions that, in the Government's view, are a

24    bridge too far and the Government may object.  But in

25    principle, the idea of the defense impeaching the witness

 1    based on specific instances of conduct, the Government

 2    agrees that may be permissible under the rule.

 3              THE COURT:  All right.  So just give me the

 4    parameters of what you're asking about.  I'll wait --

 5              MR. KENNER:  I'm sorry, your Honor.

 6              THE COURT:  I'm sorry?

 7              MR. KENNER:  I'm sorry.  I didn't hear what you

 8    said.

 9              THE COURT:  What I would ask is that you just give

10    me the parameters of what you're asking.  You can do it

11    under seal --

12              MR. KENNER:  Thank you.

13              THE COURT:  -- just so I have it.

14              They've indicated in general that they see this

15    topic as something that is appropriate impeachment.

16    Assuming I agree with that, then the next thing is I will --

17    you'll file your motion.  I'll make a ruling to hopefully --

18    tonight or early tomorrow morning, and then you can make

19    your decisions about immunity or lack of immunity and what

20    it consists of.

21              MR. KELLER:  Thank you, your Honor.

22              MR. KENNER:  Thank you, your Honor.

23              THE COURT:  Anything else besides that?  Hopefully

24    not.

25              MR. KELLER:  No, your Honor.

1               THE COURT:  All right.  The parties are excused.

2               MR. KELLER:  Thank you, your Honor.

3               (Proceedings concluded.)

1                              **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4      certify that the foregoing constitutes a true and accurate

5      transcript of my stenographic notes, and is a full, true,

6      and complete transcript of the proceedings produced to the

7      best of my ability.

8

9

10                    Dated this 30th day of March, 2023.

11

12             <u>/s/ Lisa Edwards, RDR, CRR</u>
             Official Court Reporter
13           United States District Court for the
               District of Columbia
14           333 Constitution Avenue, Northwest
             Washington, D.C. 20001
15           (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$100,000** [3] - 28:18, 28:21, 65:18
**$11** [1] - 25:25
**$21** [6] - 26:14, 26:16, 29:9, 29:16, 29:19, 42:6
**$250,000** [2] - 27:15, 57:1
**$30,000** [7] - 75:18, 87:13, 87:16, 87:20, 88:1, 88:4, 88:16
**$350,000** [1] - 63:25
**$40,000** [5] - 54:9, 54:20, 54:24, 54:25, 55:4
**$400,000** [2] - 27:16, 57:8
**$475,000** [2] - 27:18, 58:17
**$865,000** [2] - 26:9, 26:19
**$875,000** [3] - 29:3, 58:19, 64:2

## /

**/s** [1] - 132:12

## 1

**1** [12] - 9:12, 9:13, 10:23, 10:24, 13:1, 14:2, 18:8, 27:7, 29:6, 30:24, 48:6, 64:22
**1.1** [3] - 28:25, 59:8, 65:18
**1.125** [2] - 27:19, 27:22
**100** [1] - 3:23
**1016** [1] - 1:16
**102** [1] - 3:24
**105** [12] - 3:12, 20:21, 21:2, 21:6, 21:7, 21:10, 21:12, 21:14, 21:20, 21:25, 22:2, 22:7
**107** [5] - 3:5, 35:3, 35:10, 35:12, 35:13
**10th** [1] - 11:4
**11** [1] - 30:24
**11th** [4] - 17:5, 17:14, 18:21, 20:1
**12** [2] - 3:9, 27:16
**12th** [1] - 57:8
**13** [1] - 3:9
**1301** [1] - 1:15

**1400** [1] - 1:19
**14th** [10] - 75:23, 79:3, 92:15, 92:16, 93:9, 95:16, 97:10, 98:10, 99:4, 99:22
**15** [3] - 3:10, 61:5, 61:6
**15th** [1] - 62:5
**16** [1] - 3:10
**16633** [1] - 1:23
**17th** [1] - 56:18
**18** [1] - 127:19
**18th** [2] - 58:5, 58:6
**19** [2] - 3:11, 3:11
**19-00148-1** [1] - 1:3
**1971** [1] - 60:14
**19th** [2] - 12:20, 98:10
**1:00** [1] - 92:3
**1MDB** [1] - 68:8
**1st** [7] - 40:10, 40:11, 40:12, 52:10, 56:17, 69:2, 72:18

## 2

**2** [12] - 9:13, 9:14, 12:17, 16:25, 17:2, 18:4, 22:15, 40:20, 40:21, 64:8, 64:22, 65:4
**20** [1] - 29:9
**20001** [2] - 2:8, 132:14
**20004** [1] - 2:4
**20005** [1] - 1:20
**2012** [70] - 6:21, 6:24, 7:2, 7:12, 11:4, 12:20, 14:4, 15:10, 16:1, 17:5, 18:21, 20:1, 20:16, 25:21, 25:24, 26:10, 26:12, 26:21, 27:6, 27:15, 27:16, 27:18, 30:25, 31:5, 34:8, 36:8, 37:7, 38:7, 38:20, 40:10, 40:11, 42:9, 44:11, 48:6, 48:10, 51:24, 52:3, 52:10, 56:13, 56:14, 56:17, 56:18, 57:3, 57:8, 57:9, 58:4, 58:5, 58:6, 58:17, 59:7, 59:10, 59:25, 61:17, 63:17, 68:22, 69:13, 69:18, 70:13, 70:23, 70:25, 71:9, 87:24, 89:14, 91:22, 92:9, 92:11, 92:12
**2012-2013** [1] - 43:2

**2013** [3] - 29:23, 32:11, 35:21
**2015** [7] - 59:15, 59:19, 60:8, 62:5, 68:1, 68:9
**2017** [4] - 68:11, 68:21, 68:23, 69:14
**2018** [17] - 68:4, 68:12, 68:15, 69:2, 70:9, 70:19, 71:2, 71:6, 72:16, 72:17, 72:18, 75:10, 75:12, 78:24, 79:13
**2019** [19] - 68:5, 72:16, 72:23, 72:24, 74:2, 74:5, 74:7, 75:1, 75:3, 79:23, 89:3, 89:4, 89:15, 92:15, 92:16, 93:9, 95:16, 97:10, 98:10
**202** [2] - 2:9, 132:15
**2020** [1] - 6:22
**2023** [2] - 1:6, 132:10
**20530** [1] - 1:16
**21** [3] - 3:12, 26:19, 29:24
**21st** [2] - 14:4, 37:7
**22nd** [1] - 60:8
**235** [5] - 55:16, 55:21, 56:12, 56:20, 56:23
**236** [5] - 55:16, 55:21, 56:15, 56:20, 57:5
**237** [3] - 57:22, 58:8, 58:15
**238** [2] - 57:22, 58:7
**24** [1] - 99:21
**240** [5] - 3:13, 37:2, 37:13, 37:15, 37:17
**245** [3] - 63:1, 63:11, 63:13
**246** [1] - 62:2
**24th** [2] - 27:18, 58:17
**25** [1] - 106:12
**250** [5] - 3:14, 40:2, 40:14, 40:16, 40:18
**251** [5] - 3:11, 19:12, 19:17, 19:20, 19:21
**260** [5] - 3:10, 14:19, 15:1, 15:3, 15:4
**266** [7] - 3:12, 20:21, 21:2, 21:6, 21:8, 21:11, 21:12
**26th** [1] - 58:6
**28th** [2] - 15:10, 16:1
**2:04** [1] - 1:7
**2:05** [1] - 4:15
**2:56** [1] - 45:23

**2nd** [3] - 78:24, 79:7

## 3

**3** [5] - 17:10, 20:4, 22:20, 64:8, 64:15
**30** [2] - 1:6, 3:12
**302s** [2] - 74:17, 108:24
**30th** [3] - 48:6, 56:13, 132:10
**31st** [1] - 52:10
**333** [2] - 2:7, 132:14
**354-3269** [2] - 2:9, 132:15
**37** [1] - 3:13
**38th** [2] - 101:21, 103:3
**39** [1] - 3:13
**39th** [2] - 101:21, 103:3
**3:00** [2] - 45:20, 45:21
**3:28** [1] - 46:17
**3rd** [1] - 38:20
**3X** [5] - 44:1, 44:5, 47:18, 48:17, 49:12
**3Xs** [6] - 47:11, 51:23, 52:3, 55:22, 56:9, 58:2

## 4

**4** [6] - 23:20, 30:16, 34:11, 64:21, 64:24, 83:15
**40** [1] - 3:14
**420** [6] - 3:19, 81:11, 85:17, 85:20, 85:23, 85:24
**426** [6] - 3:20, 81:11, 85:17, 86:1, 86:3, 86:4
**428** [6] - 3:20, 81:11, 85:17, 86:7, 86:9, 86:10
**430** [4] - 99:24, 100:9, 100:11, 100:12
**432** [5] - 3:15, 81:10, 82:17, 82:20, 82:21
**433** [5] - 3:15, 81:10, 82:23, 83:3, 83:5
**434** [6] - 3:16, 81:10, 83:7, 83:8, 83:11, 83:13
**435** [9] - 3:16, 81:10, 83:16, 83:17, 83:19, 83:20, 83:25, 84:3, 84:4

**436** [8] - 3:17, 81:10, 83:22, 84:2, 84:5, 84:8, 84:10, 84:11
**437** [1] - 84:14
**443** [6] - 3:17, 81:10, 84:15, 84:18, 84:21, 84:23
**444** [6] - 3:18, 81:10, 84:25, 85:1, 85:2, 85:3
**445** [3] - 81:11, 85:17, 86:12
**449** [7] - 3:18, 81:10, 85:5, 85:6, 85:8, 85:9, 86:20
**45,000** [1] - 55:3
**450** [7] - 3:19, 81:25, 85:11, 85:13, 85:15, 88:9
**4500** [1] - 55:4
**460** [5] - 3:21, 90:19, 91:6, 91:8, 91:10
**461** [6] - 3:21, 94:4, 94:10, 94:15, 94:20, 94:21
**462** [8] - 3:22, 94:4, 94:10, 94:23, 94:25, 95:3, 95:4, 95:13
**463** [7] - 3:22, 94:4, 94:10, 95:6, 95:9, 95:10, 95:13
**4:34** [1] - 106:20
**4:43** [1] - 107:2
**4:52** [1] - 114:4
**4th** [1] - 30:11

## 5

**5** [7] - 3:5, 23:24, 65:3, 65:4, 65:6, 66:15, 100:22
**50K** [2] - 92:1, 92:5
**50M** [1] - 97:23
**510** [5] - 3:11, 18:17, 18:24, 19:1, 19:2
**511** [5] - 3:9, 13:12, 13:20, 13:22, 13:23
**518** [6] - 42:23, 43:8, 43:22, 44:14, 44:17, 47:7, 48:15, 48:16
**520** [3] - 42:24, 51:18, 52:14
**521** [2] - 42:23, 51:18
**553** [5] - 3:13, 38:15, 38:24, 39:2, 39:4
**567** [1] - 53:21
**568** [2] - 53:21, 54:4
**575** [5] - 3:8, 7:17, 8:8, 8:10, 8:11

**577** [5] - 3:9, 12:2, 12:8, 12:11, 12:12
**578** [5] - 3:10, 16:13, 16:20, 16:22, 16:23
**580** [2] - 99:3, 101:20
**584** [2] - 60:3, 60:7
**585** [1] - 61:10
**589** [2] - 76:25, 77:4
**593** [1] - 48:15
**5:00** [1] - 113:14
**5th** [3] - 32:11, 35:21, 56:13

**6**

**6** [2] - 24:5, 36:20
**6002** [1] - 127:19
**6003** [1] - 127:19
**601** [1] - 26:3
**608** [1] - 121:21
**612** [1] - 78:20
**641** [1] - 2:3
**664** [1] - 27:9
**6706** [1] - 2:8
**686** [1] - 53:1
**687** [4] - 48:24, 49:20, 49:22, 50:4
**688** [2] - 49:22, 50:8
**689** [1] - 53:1
**690** [1] - 53:21
**691** [1] - 53:1
**692** [1] - 53:1
**693** [6] - 42:23, 43:8, 43:21, 44:10, 47:7, 48:18
**6930** [1] - 60:16
**6th** [1] - 25:24

**7**

**7** [3] - 36:20, 38:3, 38:5
**72** [1] - 3:14
**730** [6] - 3:12, 3:23, 29:22, 30:3, 30:5, 30:6
**732** [6] - 3:23, 96:3, 96:15, 96:16, 97:3, 97:4
**734** [8] - 3:14, 71:11, 72:1, 72:4, 72:6, 80:8, 80:9, 89:17
**737** [2] - 103:17, 105:2
**738** [5] - 3:24, 101:24, 101:25, 102:1, 102:7
**7:12** [1] - 40:22

**7:30** [5] - 119:12, 119:16, 121:1, 122:9, 127:5
**7th** [2] - 27:15, 57:2

**8**

**8** [1] - 3:8
**8078** [1] - 78:20
**82** [1] - 3:15
**83** [3] - 3:15, 3:16, 3:16
**84** [2] - 3:17, 3:17
**85** [4] - 3:18, 3:18, 3:19, 3:19
**86** [2] - 3:20, 3:20

**9**

**9** [1] - 30:24
**91** [1] - 3:21
**91436** [1] - 1:23
**9240** [8] - 90:25, 91:17, 97:10, 98:21, 100:18, 100:23, 101:5, 101:15
**94** [1] - 3:21
**95** [2] - 3:22, 3:22
**97** [1] - 3:23
**9:15** [1] - 113:17

**A**

**a.m** [1] - 40:22
**abeyance** [1] - 105:20
**ability** [1] - 132:7
**able** [12] - 10:12, 46:9, 46:11, 48:2, 55:20, 56:10, 78:10, 114:23, 119:17, 123:14, 125:16, 125:17
**absorb** [2] - 10:8, 10:12
**abundance** [1] - 28:23
**accompanied** [1] - 62:23
**according** [1] - 77:15
**account** [5] - 31:11, 34:7, 64:1, 64:12, 78:21
**accountant** [1] - 35:24
**accounting** [2] - 32:4, 34:17
**accounts** [10] - 5:18,

5:22, 6:11, 6:13, 6:14, 6:15, 10:25, 57:12, 57:17, 69:18
**accurate** [5] - 77:22, 77:24, 78:13, 96:19, 132:4
**Act** [2] - 60:14, 60:23
**Action** [1] - 1:3
**action** [6] - 27:3, 42:13, 60:24, 61:7, 87:21, 88:17
**actions** [5] - 68:4, 68:5, 70:1, 70:7, 98:22
**activated** [1] - 79:5
**active** [1] - 78:24
**actively** [1] - 79:1
**activities** [2] - 59:9, 75:6
**activity** [2] - 68:20, 68:21
**acts** [2] - 74:3, 75:6
**add** [1] - 45:25
**addition** [4] - 11:20, 28:1, 28:15, 88:6
**additional** [4] - 25:21, 45:25, 49:3, 58:2
**address** [12] - 29:18, 32:20, 32:21, 32:23, 33:4, 33:6, 61:18, 78:3, 78:14, 78:15, 104:4, 105:4
**addressed** [9] - 34:14, 35:6, 35:23, 60:9, 60:10, 61:4, 61:14, 61:16, 61:17
**admit** [53] - 8:7, 8:10, 12:8, 12:11, 13:20, 13:22, 14:25, 15:3, 16:19, 16:22, 18:23, 19:1, 19:17, 19:20, 21:2, 21:10, 30:2, 30:5, 35:9, 35:12, 37:12, 37:15, 38:24, 39:2, 40:13, 40:16, 72:1, 72:3, 81:1, 82:19, 83:3, 83:11, 83:19, 83:25, 84:9, 84:21, 85:2, 85:8, 85:13, 86:3, 86:9, 91:6, 91:8, 94:19, 94:24, 95:3, 95:7, 95:9, 97:3, 100:9, 100:11, 102:5, 102:10
**admitted** [48] - 7:22, 12:1, 21:25, 22:4, 26:2, 27:9, 43:8, 43:15, 44:17, 47:8, 48:25, 49:23, 51:19,

52:25, 53:20, 56:1, 56:3, 57:23, 60:3, 60:7, 61:10, 62:2, 63:1, 71:12, 71:18, 71:24, 76:24, 80:9, 81:4, 81:6, 82:11, 82:12, 85:23, 86:18, 86:20, 88:9, 90:20, 90:21, 94:3, 94:7, 96:4, 96:8, 96:9, 99:24, 101:24, 103:17, 105:21
**advised** [2] - 87:15, 91:19
**advisor** [3] - 10:3, 36:16, 37:7
**AFTERNOON** [1] - 1:7
**afternoon** [14] - 4:1, 4:2, 4:3, 4:19, 4:20, 5:4, 5:5, 45:13, 46:20, 46:21, 47:3, 47:4, 107:8, 107:9
**afterwards** [1] - 114:11
**agency** [1] - 42:19
**Agent** [95] - 5:4, 6:18, 7:25, 8:14, 11:3, 12:4, 12:15, 12:19, 13:14, 14:2, 14:21, 15:9, 16:6, 17:3, 17:13, 19:25, 22:6, 23:2, 24:7, 25:19, 26:5, 26:20, 27:11, 29:3, 29:14, 30:12, 32:9, 33:9, 33:25, 34:3, 35:5, 35:17, 37:20, 38:3, 39:7, 40:25, 42:4, 43:25, 44:16, 47:3, 47:10, 48:2, 49:2, 49:25, 50:25, 51:21, 52:5, 53:3, 53:22, 54:3, 55:18, 56:21, 57:25, 59:9, 60:8, 61:12, 62:4, 63:3, 63:15, 64:5, 64:10, 65:17, 66:15, 67:10, 67:25, 71:10, 71:13, 72:15, 75:5, 77:2, 78:19, 80:11, 86:18, 86:21, 87:17, 88:5, 88:12, 89:2, 90:24, 91:15, 92:7, 93:8, 95:15, 95:21, 96:15, 97:9, 98:5, 100:17, 101:12, 102:13, 103:11, 103:18, 104:25, 107:8, 114:14
**agent** [9] - 5:6,

10:16, 20:14, 69:20, 99:6, 104:6, 109:17, 112:20, 115:20
**Aggregate** [1] - 54:9
**aggregate** [4] - 54:13, 55:4, 58:18, 58:21
**ago** [7] - 34:16, 34:23, 47:12, 53:15, 61:13, 80:11, 101:18
**agree** [2] - 123:13, 130:16
**agreed** [2] - 117:5, 122:21
**agreement** [12] - 111:17, 112:2, 115:3, 115:4, 117:3, 117:4, 117:5, 117:9, 123:15, 124:2, 125:19, 125:21
**agrees** [1] - 130:2
**ahead** [9] - 10:14, 46:23, 56:4, 71:1, 97:7, 100:15, 102:20, 104:23, 109:9
**AI** [10] - 9:25, 11:18, 11:22, 12:5, 12:20, 12:22, 12:24, 13:6, 23:23, 24:23
**AI-Husseiny** [10] - 9:25, 11:18, 11:22, 12:5, 12:20, 12:22, 12:24, 13:6, 23:23, 24:23
**alerted** [1] - 76:4
**allegations** [5] - 62:16, 62:18, 68:24, 70:22, 71:8
**alleged** [2] - 62:12, 70:22
**alleviate** [1] - 92:2
**allow** [3] - 67:14, 115:8, 122:25
**almost** [1] - 15:14
**ALON** [1] - 1:22
**alone** [3] - 28:11, 88:21, 127:1
**Alsen** [16] - 5:12, 5:18, 6:10, 26:13, 26:15, 27:23, 27:25, 28:22, 30:19, 31:1, 34:8, 34:10, 35:18, 36:18, 65:25, 67:23
**amended** [4] - 48:17, 52:15, 58:7
**Amendment** [13] - 120:3, 120:10, 120:15, 120:21, 121:6, 121:9, 121:23, 125:12, 125:18, 128:8, 129:7, 129:17,

129:18
**AMERICA** [1] - 1:3
**American** [1] - 7:9
**amount** [12] - 25:22, 29:8, 49:18, 54:14, 54:15, 55:12, 55:14, 58:24, 65:13, 87:16, 87:19
**amounts** [8] - 30:21, 30:24, 31:2, 34:4, 55:7, 65:10, 87:10, 89:9
**analysis** [4] - 61:1, 105:7, 105:12, 105:13
**angel** [1] - 101:6
**Angeles** [1] - 68:16
**angle** [1] - 25:4
**animation** [1] - 72:7
**anonymous** [1] - 99:5
**answer** [5] - 28:4, 31:22, 41:11, 102:19, 121:13
**answered** [1] - 110:16
**answers** [1] - 123:24
**anticipated** [1] - 125:25
**anytime** [1] - 76:4
**anyway** [2] - 113:6, 113:15
**apologies** [2] - 34:2, 46:5
**apologize** [2] - 55:3, 102:23
**appear** [1] - 36:23
**APPEARANCES** [1] - 2:1
**aPPEARANCES** [1] - 1:13
**applied** [1] - 11:10
**appreciate** [2] - 4:22, 46:2
**appropriate** [12] - 61:2, 74:15, 121:3, 122:17, 123:18, 124:21, 125:15, 126:10, 126:25, 127:12, 129:3, 130:15
**approximate** [2] - 27:22, 29:9
**April** [12] - 29:23, 30:11, 32:11, 35:21, 59:15, 59:19, 60:8, 70:19, 72:19, 72:24, 74:1, 75:12
**area** [4] - 42:5, 66:6, 122:17, 123:19
**arguably** [1] - 121:20
**arguments** [1] -

115:25
**arranged** [2] - 97:16
**ASAP** [1] - 16:5
**assert** [1] - 128:8
**associated** [10] - 35:18, 38:9, 38:11, 64:13, 77:9, 77:13, 77:16, 78:21, 98:25, 101:14
**associates** [1] - 1:18
**assume** [9] - 81:6, 81:16, 83:15, 94:11, 104:15, 111:14, 124:6, 126:1, 127:25
**assuming** [3] - 129:14, 129:20, 130:16
**assure** [1] - 97:18
**Attached** [1] - 30:13
**attached** [1] - 62:22
**attachments** [1] - 14:14
**attempt** [3] - 66:25, 77:17, 103:13
**attend** [1] - 16:7, 16:10, 17:18
**attendees** [1] - 23:16
**attention** [1] - 29:14
**attributable** [1] - 65:11
**August** [12] - 7:12, 12:20, 14:4, 15:10, 16:1, 31:5, 34:8, 37:7, 38:7, 40:10, 52:9, 52:10
**August-September** [1] - 7:12
**available** [1] - 61:7
**Avenue** [7] - 1:15, 1:19, 2:3, 2:7, 99:3, 101:20, 132:14
**avoid** [1] - 122:1
**aware** [14] - 68:9, 69:16, 70:2, 70:8, 70:12, 71:7, 73:14, 76:2, 89:25, 92:24, 93:3, 93:22, 93:25, 98:15

**B**

**background** [3] - 9:8, 15:14, 22:25
**backwards** [1] - 5:7
**bank** [1] - 74:21
**Baroness** [5] - 80:4, 80:13, 80:16, 80:20, 86:23

**Barry** [4] - 17:7, 71:3, 107:14, 107:15
**based** [22] - 6:9, 10:17, 32:5, 50:17, 51:11, 57:15, 59:1, 61:7, 66:17, 66:24, 87:25, 99:19, 101:17, 103:1, 103:4, 103:16, 113:25, 117:19, 124:5, 124:6, 124:16, 130:1
**basis** [4] - 44:6, 47:19, 116:3, 121:20
**bathroom** [1] - 106:8
**became** [2] - 68:9, 76:2
**become** [1] - 23:3
**BEFORE** [1] - 1:10
**beforehand** [1] - 122:12
**begin** [1] - 68:7
**beginning** [2] - 39:14, 68:2
**begins** [1] - 39:8
**behalf** [1] - 80:5
**Bekkedam** [16] - 10:1, 10:3, 17:7, 35:7, 35:24, 37:6, 37:20, 38:11, 38:19, 40:10, 41:1, 41:3, 41:7, 107:14, 107:15, 107:20
**belief** [1] - 65:16
**below** [4] - 15:20, 32:9, 39:14, 39:16
**beneficial** [6] - 4:6, 4:11, 5:10, 5:17, 5:19, 6:12
**beneficiary** [1] - 5:11
**benefit** [3] - 5:23, 6:15, 69:4
**benefited** [1] - 5:20
**benefiting** [1] - 5:11
**best** [4] - 65:15, 92:6, 113:13, 132:7
**better** [4] - 12:16, 113:7, 116:11, 125:3
**between** [11] - 23:7, 40:9, 75:9, 75:11, 89:10, 89:21, 100:18, 101:20, 103:3, 126:9, 128:18
**beyond** [1] - 25:12
**birth** [3] - 8:23, 18:15, 19:8
**bit** [4] - 16:2, 45:13, 68:24, 95:22
**Black** [27] - 26:23, 27:1, 27:3, 27:5, 27:14, 28:16, 28:19,

29:7, 42:9, 42:12, 56:9, 57:1, 57:8, 57:18, 58:2, 58:17, 59:7, 59:12, 59:17, 59:20, 59:25, 63:24, 65:9, 65:10, 65:13, 65:19, 67:1
**Blackstone** [17] - 5:12, 5:18, 6:10, 25:25, 26:13, 26:15, 27:23, 27:24, 28:22, 30:18, 31:1, 34:8, 34:10, 35:17, 36:18, 66:2, 67:23
**blank** [1] - 21:4
**blanket** [1] - 129:17
**blocking** [1] - 6:2
**blow** [4] - 15:6, 15:17, 17:10, 18:9
**boss** [1] - 15:24
**bottom** [21] - 9:12, 9:13, 9:20, 11:17, 12:15, 14:2, 17:2, 17:19, 30:8, 30:9, 31:21, 33:21, 34:1, 36:24, 41:1, 54:4, 54:8, 60:5, 64:22, 100:22
**Boulevard** [1] - 1:23
**box** [3] - 54:10, 56:24, 57:6
**boxes** [2] - 49:15, 55:19
**BRB** [4] - 30:25, 36:7, 38:6, 38:7
**breach** [2] - 87:8, 87:14
**break** [10] - 45:13, 46:1, 54:12, 66:12, 97:23, 106:8, 106:14, 106:19, 106:22, 113:15
**bridge** [1] - 129:24
**brief** [2] - 106:7, 115:24
**briefly** [5] - 5:13, 27:1, 33:25, 48:11, 51:21
**bring** [11] - 111:11, 111:25, 112:13, 112:22, 117:16, 118:8, 118:24, 124:1, 124:13, 125:20, 129:1
**bringing** [4] - 112:3, 114:24, 118:21, 128:22
**Bro** [1] - 100:24
**broad** [4] - 109:20, 111:3, 116:6, 116:9
**broken** [2] - 95:22,

96:18
**brought** [10] - 97:14, 98:7, 98:9, 98:12, 98:15, 113:3, 117:16, 117:24, 118:14, 127:15
**BTW** [1] - 92:5
**bunch** [1] - 109:21
**Bureau** [1] - 70:15
**burner** [9] - 99:7, 99:9, 99:10, 99:15, 99:16, 99:17, 101:5, 101:19, 103:22
**bury** [1] - 98:4
**business** [2] - 15:14, 70:6
**businessman** [1] - 90:11
**buyer** [1] - 99:5
**buying** [1] - 97:24
**BY** [106] - 2:5, 5:3, 6:17, 7:24, 8:13, 10:15, 11:2, 12:3, 12:14, 12:18, 13:4, 13:13, 14:1, 14:20, 15:8, 15:19, 16:14, 17:1, 17:12, 18:3, 18:10, 18:19, 19:4, 19:13, 19:24, 20:5, 20:13, 22:5, 22:16, 22:21, 23:21, 24:1, 24:6, 24:12, 25:3, 25:10, 25:18, 26:4, 27:10, 28:8, 28:14, 30:10, 32:8, 33:8, 33:24, 34:22, 35:4, 35:16, 37:5, 37:19, 38:2, 38:18, 39:6, 40:3, 40:8, 40:24, 41:20, 42:3, 43:20, 43:24, 44:15, 47:2, 48:1, 49:1, 49:24, 50:24, 51:20, 52:4, 53:2, 55:17, 56:6, 57:24, 60:6, 61:11, 62:3, 63:2, 63:14, 63:22, 64:9, 64:23, 65:5, 66:14, 66:23, 67:9, 67:20, 72:14, 73:21, 77:1, 78:18, 79:12, 80:10, 86:17, 88:11, 89:1, 89:18, 90:23, 91:14, 95:14, 96:14, 97:8, 100:16, 102:12, 102:16, 102:21, 104:24, 107:7

**C**

**California** [2] - 1:23,

90:11
**caller** [1] - 76:17
**callout** [6] - 44:19,
47:25, 55:19, 56:24,
57:6, 58:14
**camaraderie** [2] -
91:20, 97:13
**campaign** [20] - 9:1,
9:7, 9:17, 10:22, 16:7,
23:11, 23:16, 42:13,
42:21, 44:5, 47:16,
49:16, 50:5, 50:9,
50:15, 53:24, 54:14,
55:13, 56:7, 62:13
**Campaign** [1] -
60:14
**campaigns** [7] -
8:17, 9:3, 16:10, 42:8,
47:18, 48:8, 48:9
**Campbell** [5] - 77:16,
77:17, 77:22, 77:24,
78:11
**Campbells** [1] -
77:20
**cannot** [1] - 112:17
**care** [2] - 45:18,
114:2
**careful** [3] - 112:22,
113:24, 114:19
**carving** [1] - 121:11
**case** [22] - 51:2,
52:19, 54:17, 62:17,
74:3, 74:10, 74:16,
75:1, 75:3, 75:6, 79:9,
79:14, 86:24, 89:22,
107:12, 108:18,
111:3, 113:19,
113:23, 116:11,
117:4, 117:23
**case-related** [1] -
75:6
**cash** [2] - 99:2, 99:12
**cashier's** [1] - 28:20
**causes** [2] - 5:24,
6:15
**caution** [1] - 28:23
**cell** [18] - 78:4,
95:25, 98:25, 100:1,
100:7, 100:19,
100:23, 101:15,
101:18, 103:12,
103:19, 103:22,
103:23, 104:10,
105:5, 105:7, 105:9
**certain** [14] - 8:21,
9:5, 9:10, 11:11,
17:17, 44:7, 47:20,
55:11, 69:7, 69:17,
70:3, 70:7, 74:13,
74:20

**certainly** [3] -
105:20, 106:9, 123:22
**CERTIFICATE** [1] -
132:1
**certify** [1] - 132:4
**cetera** [2] - 37:22,
113:4
**chain** [6] - 14:4,
16:1, 16:15, 29:23,
31:25, 40:9
**chairs** [1] - 66:8
**Chance** [16] - 5:12,
5:18, 6:10, 26:13,
26:15, 27:23, 27:25,
28:22, 30:19, 31:1,
34:9, 34:10, 35:18,
36:18, 65:25, 67:23
**change** [1] - 91:23
**charge** [1] - 73:8
**charged** [3] - 42:20,
124:5
**charges** [2] - 73:6,
74:15
**charging** [1] - 74:3,
124:18
**CHARLES** [2] - 2:2,
2:2
**chart** [3] - 26:6, 26:7,
72:15
**check** [2] - 28:20,
33:17
**Chinese** [1] - 7:9
**chooses** [1] - 54:12
**chronological** [1] -
100:22
**circles** [1] - 23:11
**circumstances** [1] -
123:13
**claim** [2] - 64:24,
115:11
**claiming** [1] - 105:6
**clarification** [2] -
54:3, 117:2
**clarify** [1] - 73:16
**classic** [1] - 118:10
**Claudine** [1] - 50:10
**clean** [1] - 39:18
**clear** [11] - 11:9,
16:6, 21:14, 53:13,
62:15, 73:7, 98:16,
103:21, 111:9,
114:24, 123:11
**client** [2] - 87:10,
87:16
**clients** [1] - 91:25
**clock** [1] - 45:15
**close** [2] - 93:10,
113:6
**closer** [2] - 49:2,
106:18

**clutch** [6] - 23:4,
23:6, 23:7, 23:11,
23:17, 23:19
**co** [1] - 44:23
**co-counsel** [1] -
44:23
**collateral** [1] -
126:18
**collected** [3] - 50:14,
73:15, 74:14
**collection** [3] -
116:16, 118:20,
128:13
**COLLEEN** [1] - 1:10
**colloquially** [1] -
23:10
**Columbia** [2] - 2:7,
132:13
**COLUMBIA** [1] - 1:1
**combine** [1] - 129:5
**coming** [11] - 11:6,
41:5, 41:8, 41:12,
43:10, 50:22, 58:14,
105:23, 107:18,
107:23, 111:10
**comment** [3] - 4:4,
28:10, 119:10
**Commission** [5] -
42:11, 42:17, 59:16,
60:12, 61:6
**Commission's** [1] -
61:1
**committee** [1] -
26:23, 27:3, 42:13,
42:14, 56:7, 63:24
**committees** [2] -
42:10, 65:1
**common** [2] - 77:20,
80:14
**communication** [1] -
59:10
**communications** [3]
- 6:22, 7:1, 101:14
**companies** [1] -
57:11
**company** [1] - 64:4
**compares** [1] - 55:9
**compiled** [1] - 105:2
**complaint** [7] -
59:17, 59:19, 59:22,
60:12, 60:15, 62:18,
63:6
**complete** [1] - 132:6
**completely** [1] -
126:14
**completeness** [1] -
121:25
**complicated** [1] -
39:17
**computer** [2] -

46:11, 47:6
**concedes** [1] -
129:12
**concern** [1] - 76:3
**concerned** [2] - 76:6,
115:5
**concerning** [1] -
29:24
**concerns** [1] - 68:4
**concluded** [1] -
131:3
**conclusion** [2] -
50:19, 50:22
**conclusions** [4] -
88:22, 107:18,
107:23, 108:11
**conduct** [8] - 9:4,
68:23, 69:13, 70:13,
70:25, 120:17,
120:19, 130:1
**conducted** [3] -
77:18, 78:9, 90:1
**conducting** [1] -
70:5
**conduit** [1] - 70:22
**conduits** [4] - 79:17,
80:23, 89:4, 89:20
**confers** [1] - 44:23
**confirmed** [1] - 28:6
**connection** [1] -
117:4
**consequences** [1] -
88:24
**consider** [1] - 33:5
**consideration** [1] -
112:24
**considered** [5] - 9:7,
107:22, 110:11,
111:3, 112:7
**considering** [1] -
45:6
**consists** [1] - 130:20
**constitutes** [1] -
132:4
**Constitution** [2] -
2:7, 132:14
**CONT'D** [1] - 2:1
**contact** [1] - 92:3
**contacted** [1] - 75:25
**contained** [2] - 52:7,
52:20
**context** [3] - 8:20,
23:4, 125:6
**continue** [4] - 4:23,
18:11, 79:23, 87:11
**CONTINUED** [1] -
5:2
**continues** [1] - 9:14
**continuing** [1] -
60:15

**contractual** [2] -
87:8, 87:15
**contrary** [1] - 65:11
**contribute** [4] - 16:9,
54:23, 59:6, 88:2
**contributed** [7] -
29:5, 29:7, 55:7,
57:18, 59:3, 65:19,
79:21
**contribution** [4] -
27:17, 28:16, 28:18,
48:7
**contributions** [13] -
27:5, 27:7, 53:10,
55:6, 59:17, 59:20,
63:17, 63:23, 63:25,
64:2, 65:10, 65:13,
70:23
**controlling** [3] -
5:21, 6:13
**conversation** [2] -
114:7, 120:13
**copies** [5] - 45:7,
74:17, 74:19, 80:19,
81:13
**copy** [3] - 12:24,
60:15, 73:12
**corner** [3] - 4:19,
49:5, 54:5
**corporate** [1] - 59:24
**correct** [48] - 10:5,
13:18, 14:15, 18:6,
18:7, 22:12, 23:1,
25:8, 31:16, 34:15,
34:18, 35:1, 35:20,
41:23, 48:14, 51:9,
51:10, 55:24, 56:5,
56:22, 57:4, 58:9,
58:13, 58:22, 58:23,
65:15, 65:20, 65:21,
69:3, 70:20, 72:25,
76:12, 77:12, 79:22,
84:5, 84:6, 85:18,
94:16, 94:17, 95:17,
98:19, 107:12,
107:13, 112:10,
116:10, 124:8,
127:17, 129:22
**correctly** [2] - 39:11,
64:5
**correspondence** [1]
- 60:17
**counsel** [38] - 6:3,
36:3, 44:23, 61:22,
62:7, 70:16, 71:3,
71:6, 71:7, 72:20,
72:21, 73:4, 73:6,
73:8, 73:11, 73:13,
73:17, 73:22, 73:24,
74:1, 74:8, 80:2,

86:23, 87:6, 89:22,
93:20, 111:21,
112:11, 112:22,
120:9, 120:18,
127:21, 127:23,
127:24, 128:1, 128:3
  **counsel's** [1] - 61:4
  **country** [1] - 20:10
  **couple** [5] - 5:8,
25:20, 55:19, 66:7,
90:4
  **course** [5] - 10:20,
76:3, 80:18, 81:17,
90:16
  **Court** [9] - 2:6, 2:6,
115:8, 116:1, 119:13,
122:9, 123:7, 132:12,
132:13
  **court** [11] - 6:2, 10:8,
66:20, 72:10, 91:20,
109:17, 109:18,
113:12, 114:25,
115:11, 116:24
  **COURT** [209] - 1:1,
4:1, 4:4, 4:14, 4:17,
4:21, 5:25, 6:3, 6:5,
7:18, 8:10, 10:6,
10:11, 10:14, 12:11,
13:22, 15:3, 16:22,
19:1, 19:20, 21:10,
21:24, 22:4, 28:4,
28:11, 30:5, 32:24,
33:3, 33:16, 33:18,
35:12, 35:15, 37:15,
39:2, 40:16, 41:13,
43:13, 43:15, 44:22,
45:1, 45:4, 45:8,
45:11, 45:17, 45:20,
45:25, 46:6, 46:9,
46:12, 46:16, 46:19,
46:22, 49:20, 50:21,
51:25, 56:1, 56:4,
63:10, 63:13, 63:19,
66:6, 66:18, 66:20,
67:5, 67:14, 71:18,
71:21, 71:24, 72:2,
72:9, 73:16, 73:20,
78:6, 81:3, 81:6,
81:15, 81:20, 82:1,
82:5, 82:9, 82:12,
82:19, 82:25, 83:3,
83:7, 83:9, 83:11,
83:15, 83:17, 83:19,
83:23, 83:25, 84:2,
84:3, 84:7, 84:9,
84:13, 84:18, 84:21,
84:25, 85:2, 85:5,
85:8, 85:13, 85:17,
85:19, 85:22, 86:3,
86:6, 86:9, 86:13,

86:16, 88:21, 90:20,
91:8, 91:13, 94:5,
94:9, 94:11, 94:15,
94:19, 95:1, 95:3,
95:9, 96:9, 96:12,
96:21, 96:23, 97:3,
97:7, 100:11, 100:15,
101:25, 102:2, 102:4,
102:15, 102:20,
104:7, 104:14,
104:19, 104:21,
104:23, 105:18,
106:3, 106:6, 106:9,
106:11, 106:14,
106:17, 106:22,
107:1, 107:4, 109:7,
109:9, 109:12,
109:14, 109:19,
110:2, 110:4, 110:14,
110:22, 111:14,
111:18, 111:23,
112:13, 113:13,
114:6, 114:10,
114:16, 115:12,
115:19, 116:4, 117:8,
118:6, 119:2, 119:6,
119:14, 119:22,
120:5, 120:22, 121:1,
121:15, 122:4, 122:6,
122:12, 122:15,
123:2, 123:17,
124:10, 125:2,
125:10, 125:15,
126:1, 126:4, 126:6,
126:7, 126:16,
126:19, 127:25,
128:4, 128:20,
129:11, 129:14,
130:3, 130:6, 130:9,
130:13, 130:23, 131:1
  **Court's** [3] - 45:9,
120:14, 122:10
  **COURTROOM** [3] -
4:13, 43:10, 46:15
  **courtroom** [8] - 4:15,
45:23, 46:17, 106:20,
107:2, 114:1, 114:4,
114:15
  **cover** [8] - 33:25,
48:5, 48:9, 52:9,
52:12, 58:4, 64:22,
111:24
  **covered** [4] - 31:2,
48:3, 111:25, 115:4
  **covers** [2] - 56:12,
56:17
  **covert** [2] - 69:23,
69:24
  **coveted** [1] - 23:14
  **creative** [1] - 97:24

  **credibility** [1] - 113:1
  **credit** [1] - 65:12
  **criminal** [3] - 69:22,
74:10, 117:7
  **Criminal** [1] - 1:3
  **CROSS** [1] - 107:6
  **cross** [8] - 120:3,
120:16, 120:24,
122:3, 122:17,
123:16, 128:6, 128:17
  **Cross** [1] - 3:3
  **CROSS-
EXAMINATION** [1] -
107:6
  **cross-examination**
[6] - 120:3, 120:16,
122:3, 122:17,
123:16, 128:17
  **cross-examine** [1] -
120:24
  **CRR** [2] - 2:5, 132:3,
132:12
  **current** [2] - 128:17,
128:19
  **cycle** [2] - 27:6,
54:19

# D

  **D.C** [13] - 1:6, 1:16,
1:20, 2:4, 2:8, 7:2,
8:2, 11:21, 20:16,
20:23, 24:2, 25:20,
132:14
  **dad** [2] - 16:5, 18:14
  **damages** [2] - 87:22,
92:2
  **data** [6] - 100:6,
103:22, 103:23,
104:4, 104:11, 105:13
  **date** [10] - 8:23,
18:15, 19:8, 35:21,
49:17, 54:9, 54:13,
55:5, 58:18, 58:21
  **Dated** [1] - 132:10
  **dated** [5] - 57:2,
57:8, 60:8, 62:4, 62:5
  **dates** [2] - 48:13,
52:11
  **Dato** [2] - 9:20, 9:22
  **DAVID** [1] - 1:21
  **days** [2] - 61:5, 61:6
  **deadline** [1] - 119:12
  **deal** [4] - 39:22,
97:19, 120:8, 125:18
  **Dear** [1] - 87:6
  **decide** [3] - 127:11,
127:12, 127:13
  **decides** [2] - 115:1,

122:3
  **decision** [8] - 67:6,
121:5, 125:6, 126:25,
127:8, 128:10, 129:5,
129:16
  **decisions** [4] - 9:4,
113:25, 129:7, 130:19
  **declaration** [3] -
62:21, 63:5, 65:22
  **declare** [1] - 65:14
  **Defendant** [155] -
1:7, 7:12, 8:1, 10:21,
11:4, 11:7, 11:19,
12:5, 13:7, 13:8,
13:10, 13:15, 14:9,
14:10, 14:12, 14:22,
15:9, 15:11, 15:13,
16:16, 18:5, 18:11,
18:13, 18:20, 19:5,
19:7, 19:25, 20:6,
22:8, 22:18, 22:25,
24:16, 24:21, 25:13,
25:21, 25:25, 26:13,
26:16, 27:5, 28:16,
28:18, 29:4, 29:6,
29:9, 29:11, 29:16,
29:18, 29:23, 30:25,
31:5, 31:11, 33:13,
34:7, 35:6, 35:23,
36:16, 36:17, 36:20,
37:7, 37:21, 38:11,
38:12, 38:19, 40:10,
40:22, 40:25, 41:3,
41:22, 42:7, 51:15,
53:8, 53:11, 54:1,
55:10, 55:12, 55:14,
56:25, 57:17, 57:20,
59:3, 59:6, 59:24,
60:10, 61:14, 61:21,
61:24, 62:7, 62:12,
62:21, 63:5, 63:7,
64:11, 64:24, 65:19,
66:25, 67:11, 68:5,
68:7, 68:9, 68:14,
68:20, 68:22, 69:1,
69:10, 70:7, 70:10,
70:11, 70:16, 71:8,
72:17, 72:19, 73:6,
73:8, 73:9, 73:13,
74:3, 74:8, 75:1, 75:9,
75:13, 75:19, 75:21,
75:25, 76:4, 76:6,
76:17, 76:20, 77:11,
77:8, 79:19, 80:3,
80:6, 86:23, 87:23,
87:25, 88:16, 89:11,
89:13, 89:24, 90:13,
92:11, 93:2, 93:6,
93:19, 93:22, 93:24,
98:14, 101:2, 101:3,

101:7, 101:10, 103:4,
103:7, 103:8
  **defendant** [2] -
74:14, 74:24
  **DEFENDANT** [2] -
1:21, 2:2
  **Defendant's** [21] -
15:20, 25:11, 37:6,
61:22, 71:3, 71:6,
72:20, 72:21, 73:7,
73:11, 73:13, 73:22,
73:24, 74:1, 75:11,
89:22, 100:1, 100:7,
100:18, 100:23,
103:19
  **defense** [15] - 73:4,
73:5, 74:15, 89:22,
93:20, 120:4, 120:18,
123:3, 123:4, 123:10,
123:14, 125:23,
127:21, 129:25
  **definitely** [1] - 11:5
  **definitively** [4] -
91:22, 92:9, 92:14,
92:23
  **Delaware** [2] - 61:18,
64:3
  **demand** [1] - 89:14
  **demonstrate** [1] -
60:23
  **DEPARTMENT** [2] -
1:15, 1:18
  **depicted** [1] - 102:14
  **DEPUTY** [3] - 4:13,
43:10, 46:15
  **describe** [3] - 5:13,
102:4, 102:6
  **description** [1] -
15:13
  **desire** [1] - 65:12
  **detail** [1] - 62:11
  **details** [2] - 36:1,
44:6
  **different** [5] - 29:15,
48:13, 52:12, 62:16,
109:21
  **difficult** [1] - 16:2
  **diminish** [1] - 65:9
  **direct** [5] - 4:24,
5:22, 46:24, 121:24,
126:15
  **Direct** [1] - 3:3
  **DIRECT** [1] - 5:2
  **direction** [2] - 6:16,
120:14
  **directly** [3] - 28:7,
80:23, 118:2
  **disbursements** [4] -
44:1, 44:8, 47:21,
55:22

**disclose** [1] - 67:12
**disclosure** [1] - 65:9
**discovered** [1] - 74:22
**discovery** [7] - 74:8, 74:11, 74:12, 74:16, 93:2, 98:16, 98:18
**discuss** [3] - 68:21, 112:20, 118:25
**discussed** [4] - 68:17, 68:19, 126:4, 129:21
**discussing** [2] - 31:9, 37:10
**discussion** [5] - 112:16, 113:8, 120:6, 126:2, 126:9
**dispute** [1] - 62:12
**distinct** [1] - 62:17
**district** [1] - 132:13
**District** [4] - 2:6, 2:7, 101:22, 132:13
**DISTRICT** [3] - 1:1, 1:1, 1:11
**doctor** [1] - 75:18
**document** [9] - 15:18, 21:15, 21:17, 31:10, 38:17, 63:3, 77:3, 100:17, 115:8
**documents** [17] - 51:22, 59:2, 69:8, 69:15, 69:19, 70:24, 74:13, 95:23, 107:21, 110:17, 112:8, 116:16, 117:16, 117:21, 118:15, 118:21
**DOJ** [4] - 68:12, 91:21, 92:8, 92:13
**donate** [4] - 16:9, 26:8, 54:11, 54:18
**donated** [8] - 26:9, 53:9, 54:1, 54:14, 54:15, 55:3, 58:19, 75:19
**donating** [2] - 54:24, 58:17
**donation** [6] - 49:16, 49:17, 49:18, 54:12, 56:25, 57:7
**donations** [9] - 27:13, 47:19, 48:9, 49:16, 59:25, 65:8, 66:17, 67:1, 67:19
**done** [6] - 28:3, 39:17, 94:5, 97:18, 119:6, 123:23
**donor** [12] - 49:16, 49:17, 49:19, 50:11, 50:14, 69:16, 90:12,

92:12, 92:23, 92:25, 93:4, 93:5
**donors** [22] - 10:19, 11:16, 17:25, 26:7, 26:11, 26:18, 26:19, 44:7, 50:7, 51:9, 51:16, 53:7, 53:25, 55:11, 79:17, 80:5, 80:17, 80:23, 86:24, 89:6, 89:12, 89:13
**door** [1] - 114:23
**dorothy** [1] - 96:10
**down** [21] - 7:18, 8:14, 9:12, 10:7, 17:4, 20:3, 34:3, 38:1, 39:13, 42:1, 46:19, 51:25, 60:4, 63:19, 66:18, 76:8, 78:7, 78:16, 79:11, 106:1, 107:4
**dozens** [1] - 108:20
**Dr** [20] - 50:6, 50:17, 51:8, 75:15, 75:17, 75:18, 75:21, 76:1, 76:9, 76:13, 76:19, 77:11, 79:3, 86:24, 87:21, 87:22, 87:24, 88:2, 88:15
**draft** [1] - 73:12
**drop** [1] - 39:13
**due** [2] - 47:14, 111:15
**during** [29] - 5:9, 5:14, 6:19, 7:11, 8:4, 11:20, 20:18, 23:2, 26:22, 27:6, 29:17, 35:5, 47:20, 47:22, 48:8, 54:18, 67:10, 68:18, 76:13, 79:25, 80:19, 80:22, 90:2, 90:16, 91:3, 93:14, 93:16, 99:25, 103:11
**Dusable** [1] - 97:24

# E

**early** [5] - 38:7, 68:15, 75:10, 89:2, 130:18
**easier** [1] - 45:5
**easy** [1] - 31:22
**Edgar** [1] - 17:8
**Edwards** [1] - 132:12
**EDWARDS** [2] - 2:5, 132:3
**efficient** [1] - 82:3
**effort** [2] - 111:14, 120:16
**efforts** [4] - 7:11,

11:20, 11:22, 29:17
**Eighth** [2] - 99:3, 101:20
**either** [8] - 21:9, 27:23, 27:24, 61:21, 81:15, 82:7, 123:9, 128:16
**elected** [1] - 97:17
**election** [5] - 27:6, 42:21, 59:11, 67:16, 71:9
**Election** [5] - 25:24, 42:11, 42:17, 59:16, 60:12, 60:13
**elicit** [2] - 116:23, 116:24
**ELMO** [3] - 45:4, 46:12, 46:14
**email** [56] - 7:25, 9:13, 11:3, 11:10, 11:12, 12:4, 12:17, 12:19, 14:3, 14:4, 14:7, 14:21, 15:7, 15:20, 15:22, 15:25, 16:15, 17:11, 17:16, 18:2, 18:20, 19:6, 19:10, 19:14, 19:25, 29:22, 30:11, 31:6, 31:7, 31:13, 31:15, 32:7, 32:9, 32:10, 32:16, 32:20, 32:21, 32:23, 33:4, 33:6, 33:10, 33:15, 34:13, 34:25, 37:6, 37:20, 37:21, 38:10, 38:13, 38:19, 39:22, 40:9, 40:22, 41:1, 41:21, 41:24
**emailing** [1] - 15:9
**emails** [7] - 6:22, 13:15, 17:4, 18:12, 32:18, 42:6, 74:22
**enacting** [1] - 42:20
**Encino** [1] - 1:23
**enclosed** [1] - 60:16
**encountered** [1] - 5:14
**end** [3] - 75:8, 97:17, 113:6
**ending** [7] - 78:20, 90:25, 91:17, 97:10, 98:21, 100:18, 101:15
**enforcement** [2] - 77:6, 99:14
**enforcing** [1] - 42:20
**English** [1] - 9:23
**enlarge** [1] - 30:8
**ensure** [1] - 121:25
**entered** [36] - 4:15, 8:12, 12:13, 13:24,

15:5, 16:24, 19:3, 19:22, 21:13, 30:7, 35:14, 37:18, 39:5, 40:19, 46:17, 72:5, 82:22, 83:6, 83:14, 83:21, 84:12, 84:24, 85:4, 85:10, 85:16, 85:25, 86:5, 86:11, 91:11, 94:22, 95:5, 95:11, 97:5, 100:13, 102:8, 107:2
**entire** [4] - 10:25, 31:6, 87:16, 108:10
**entirety** [2] - 21:21, 30:13
**entities** [6] - 26:17, 29:4, 29:7, 35:18, 38:8, 59:24
**entitled** [1] - 110:11
**entity** [3] - 25:22, 51:5, 64:13
**entries** [7] - 50:3, 50:17, 53:11, 53:13, 53:23, 55:8, 57:15
**entry** [1] - 54:8
**Eric** [12] - 9:14, 30:14, 31:18, 31:19, 32:16, 32:17, 34:13, 34:24, 38:13, 41:9, 41:24, 66:4
**Eric's** [1] - 31:21
**especially** [1] - 99:14
**ESQ** [6] - 1:14, 1:17, 1:18, 1:21, 1:22, 2:2
**essentially** [1] - 99:20
**establish** [1] - 116:21
**et** [2] - 37:22, 113:4
**evening** [3] - 113:16, 119:7, 119:23
**event** [16] - 6:23, 7:2, 7:14, 8:2, 11:22, 11:23, 20:15, 20:18, 20:24, 23:11, 23:12, 23:16, 24:2, 25:19, 111:22, 116:20
**events** [9] - 6:21, 6:25, 9:5, 16:7, 16:10, 50:15, 59:9, 59:11, 72:16
**EVIDENCE** [1] - 3:7
**Evidence** [1] - 121:21
**evidence** [58] - 4:6, 4:9, 5:13, 5:17, 8:8, 8:12, 12:9, 12:13, 13:20, 13:24, 15:5, 16:24, 19:3, 19:18, 19:22, 21:2, 21:13,

15:5, 16:24, 19:3, 19:22, 21:13, 30:7, 35:14, 37:18, 39:5, 40:19, 46:17, 72:5, 82:22, 83:6, 83:14, 83:21, 84:12, 84:24, 85:4, 85:10, 85:16, 85:25, 86:5, 86:11, 91:11, 94:22, 95:5, 95:11, 97:5, 100:13, 102:8, 107:2
**entire** [4] - 10:25, 31:6, 87:16, 108:10

30:3, 30:7, 35:14, 37:13, 37:18, 38:25, 39:5, 40:19, 71:12, 72:5, 73:14, 74:13, 82:22, 83:6, 83:14, 83:21, 84:12, 84:24, 85:4, 85:10, 85:16, 85:25, 86:5, 86:11, 91:6, 91:11, 94:22, 95:5, 95:11, 97:5, 100:13, 102:8, 110:18, 110:20, 110:23, 111:5, 111:8, 112:6, 117:23, 118:1, 124:6
**ex** [1] - 126:23
**exact** [2] - 96:23, 96:25
**exactly** [1] - 93:25
**EXAMINATION** [2] - 5:2, 107:6
**examination** [7] - 51:11, 120:3, 120:16, 122:3, 122:17, 123:16, 128:17
**examine** [2] - 51:5, 120:24
**example** [6] - 8:18, 9:6, 30:16, 31:19, 69:18, 77:25
**exception** [2] - 109:24, 115:6
**exceptions** [1] - 118:11
**excerpts** [5] - 49:3, 50:1, 53:14, 53:17, 56:19
**exchange** [6] - 12:4, 14:21, 18:11, 32:10, 101:13, 122:24
**exchanges** [1] - 100:17
**exclusively** [1] - 68:20
**excuse** [7] - 28:2, 41:10, 71:14, 104:1, 110:22, 113:15, 129:12
**excused** [1] - 131:1
**exercise** [1] - 123:6
**Exhibit** [144] - 3:8, 3:9, 3:9, 3:10, 3:10, 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 3:15, 3:16, 3:16, 3:17, 3:17, 3:18, 3:18, 3:19, 3:19, 3:20, 3:20, 3:21, 3:21, 3:22, 3:22, 3:23, 3:23, 3:24, 7:17, 8:8, 8:11, 12:1, 12:8,

12:12, 13:12, 13:20, 13:23, 14:18, 14:25, 15:4, 16:13, 16:19, 16:23, 18:17, 18:23, 19:2, 19:12, 19:17, 19:21, 21:12, 22:2, 22:7, 26:3, 27:9, 29:22, 30:3, 30:6, 35:2, 35:9, 35:13, 37:1, 37:13, 37:17, 38:15, 38:24, 39:2, 39:4, 40:2, 40:18, 43:21, 44:10, 44:14, 44:17, 48:18, 48:24, 49:22, 50:4, 50:8, 52:14, 54:4, 56:12, 56:15, 56:20, 56:23, 57:5, 58:14, 60:3, 60:7, 61:10, 62:2, 63:1, 63:11, 71:11, 72:1, 72:4, 72:6, 76:24, 77:4, 80:8, 80:9, 81:10, 81:25, 82:20, 82:21, 83:3, 83:5, 83:11, 83:13, 83:20, 84:10, 84:11, 84:23, 85:3, 85:9, 85:15, 85:24, 86:4, 86:10, 86:20, 88:9, 89:17, 90:19, 91:6, 91:10, 94:20, 94:21, 94:25, 95:4, 95:10, 96:3, 96:15, 96:16, 97:4, 99:24, 100:9, 100:12, 101:24, 102:7, 103:17, 105:2
  **exhibit** [18] - 7:22, 13:2, 18:9, 20:4, 21:15, 21:21, 21:25, 22:15, 22:20, 23:20, 27:11, 54:18, 80:8, 83:2, 100:4, 103:18, 104:2, 104:11
  **exhibits** [19] - 43:4, 47:25, 49:9, 49:25, 52:6, 52:24, 53:6, 53:13, 53:20, 55:8, 56:20, 75:16, 81:1, 81:9, 81:14, 81:18, 86:18, 113:5, 116:12
  **EXHIBITS** [1] - 3:7
  **Exhibits** [13] - 20:21, 21:2, 42:23, 43:8, 47:7, 51:18, 53:1, 53:21, 55:16, 55:21, 57:22, 94:4, 95:13
  **exited** [3] - 45:23, 106:20, 114:4
  **expect** [1] - 117:25
  **expecting** [1] -

119:22
  **expeditious** [1] - 81:22
  **expenditure** [2] - 26:23, 63:24
  **expenditure-only** [2] - 26:23, 63:24
  **experience** [1] - 23:15
  **experiencing** [2] - 44:24, 45:2
  **expert** [3] - 104:10, 105:6, 105:23
  **explain** [2] - 67:17, 105:23
  **explained** [2] - 5:10, 73:5
  **explanation** [2] - 5:25, 104:8
  **explicitly** [1] - 73:7
  **express** [1] - 39:19
  **extensive** [1] - 107:11
  **extent** [1] - 56:10
  **extra** [1] - 128:10
  **extraction** [1] - 100:6
  **extrinsic** [1] - 121:2

## F

  **face** [1] - 22:19
  **fact** [9] - 5:15, 66:25, 92:24, 93:2, 93:3, 93:4, 98:15, 103:8, 118:12
  **factual** [1] - 60:25
  **failed** [1] - 87:13
  **fair** [1] - 28:23
  **fairly** [6] - 28:7, 32:4, 74:24, 77:18, 105:4, 105:7
  **familiar** [10] - 6:19, 7:6, 8:17, 10:17, 11:13, 23:3, 57:10, 69:20, 90:7, 99:6
  **far** [10] - 24:21, 31:2, 106:23, 111:9, 112:9, 115:5, 116:11, 118:10, 124:13, 129:24
  **fast** [6] - 10:9, 59:15, 66:18, 66:21, 68:1, 71:1
  **Fast** [1] - 25:20
  **fast-forward** [1] - 68:1
  **fast-forwarding** [2] - 59:15, 71:1
  **Fast-forwarding** [1] -

25:20
  **father** [12] - 7:10, 7:13, 11:21, 13:17, 14:17, 14:23, 17:22, 22:10, 22:19, 22:23, 24:19, 25:14
  **father's** [2] - 19:8, 20:9
  **fault** [1] - 33:17
  **FBI** [18] - 20:17, 68:12, 74:17, 75:25, 76:9, 76:13, 77:17, 90:3, 92:17, 92:22, 92:24, 94:1, 98:21, 98:24, 99:6, 99:25, 103:12
  **FBI's** [1] - 48:19
  **February** [8] - 69:2, 70:9, 72:18, 75:10, 75:23, 78:24, 79:3, 79:7
  **February/March** [1] - 89:4
  **FEC** [37] - 42:14, 42:15, 42:18, 42:19, 43:1, 44:1, 44:3, 44:5, 44:6, 47:11, 47:18, 47:19, 48:17, 49:12, 50:6, 50:10, 50:13, 51:23, 52:2, 55:13, 55:21, 56:8, 58:2, 59:12, 59:16, 59:19, 59:21, 59:23, 60:18, 61:13, 61:23, 62:8, 62:22, 63:6, 63:7, 67:25, 75:16
  **Federal** [7] - 42:11, 42:17, 59:16, 60:12, 60:13, 70:15, 121:21
  **federal** [4] - 42:20, 65:1, 69:6, 120:20
  **Feigenbaum** [11] - 9:14, 9:15, 9:16, 14:22, 15:22, 16:1, 16:4, 17:4, 17:14, 17:15, 17:16
  **Feigenbaum's** [1] - 15:24
  **few** [7] - 13:14, 21:19, 23:18, 33:20, 43:9, 45:14, 71:1
  **Fifth** [23] - 111:19, 111:22, 112:1, 115:4, 120:3, 120:10, 120:15, 120:21, 121:6, 121:9, 121:12, 121:23, 122:20, 123:24, 124:20, 125:5, 125:6, 125:12, 125:18, 128:8, 129:6,

129:17, 129:18
  **figure** [1] - 129:3
  **file** [8] - 42:14, 42:15, 44:6, 74:25, 126:23, 127:8, 129:4, 130:17
  **filed** [2] - 48:12, 52:15
  **filing** [5] - 44:10, 52:11, 56:15, 56:23, 58:7
  **filings** [6] - 42:14, 43:1, 53:14, 53:16, 59:12, 75:16
  **final** [1] - 101:9
  **finance** [1] - 62:13
  **financial** [13] - 6:23, 7:1, 10:3, 36:16, 37:7, 51:1, 51:12, 57:16, 59:2, 66:24, 69:14, 87:22, 88:17
  **fine** [4] - 33:5, 41:17, 81:20, 82:7, 115:14, 115:24, 126:23
  **firm** [9] - 32:4, 34:17, 80:1, 80:4, 80:12, 80:15, 80:20, 87:6
  **FIRM** [1] - 1:22
  **first** [25] - 8:19, 9:3, 22:6, 34:2, 34:3, 35:25, 37:23, 39:7, 41:19, 49:8, 52:18, 58:25, 60:11, 63:8, 63:15, 63:24, 77:2, 77:8, 87:4, 92:10, 103:16, 107:14, 123:17, 124:20
  **five** [4] - 45:20, 45:25, 106:13, 113:14
  **Florida** [2] - 32:5, 75:18
  **flowed** [1] - 6:14
  **flows** [3] - 51:5, 57:16, 59:2
  **follow** [2] - 100:21, 119:11
  **following** [12] - 4:16, 45:24, 46:8, 46:18, 106:21, 106:25, 107:3, 109:10, 113:11, 114:5, 114:15, 119:18
  **followup** [2] - 88:6, 88:14
  **FOR** [5] - 1:1, 1:14, 1:21, 2:2, 3:4
  **foregoing** [2] - 65:15, 132:4
  **foreign** [8] - 16:6, 16:9, 25:22, 27:20, 39:23, 64:19, 64:20,

97:17
  **foreigner** [1] - 30:17
  **forfeit** [1] - 121:23
  **forgotten** [1] - 42:17
  **form** [20] - 43:25, 44:1, 44:5, 47:11, 47:18, 48:16, 48:17, 48:18, 49:12, 49:14, 51:23, 52:2, 55:22, 56:9, 58:2, 58:8, 77:25
  **formed** [1] - 116:3
  **forms** [7] - 47:17, 48:20, 50:13, 50:14, 53:18, 55:13, 67:16
  **forth** [2] - 84:4, 119:19
  **forward** [3] - 5:7, 59:14, 68:1
  **forwarding** [3] - 25:20, 59:15, 71:1
  **forwards** [8] - 13:7, 13:10, 14:9, 14:12, 15:22, 33:11, 33:12
  **foundation** [3] - 50:20, 67:4, 104:22
  **four** [9] - 11:16, 34:6, 52:24, 53:4, 53:7, 53:13, 63:17, 63:23, 101:3
  **Frank** [11] - 93:11, 93:13, 97:12, 98:2, 108:3, 108:4, 108:12, 108:14, 110:9, 110:12
  **frankly** [2] - 119:15, 120:12
  **friend** [1] - 97:20
  **front** [10] - 18:9, 23:22, 52:6, 58:1, 75:8, 112:19, 118:20, 121:12, 123:9, 127:15
  **full** [4] - 21:24, 65:12, 132:5
  **fully** [2] - 105:21, 129:18
  **fulsome** [1] - 112:16
  **Fund** [21] - 8:18, 9:1, 26:8, 26:10, 26:21, 29:5, 42:9, 42:12, 43:1, 44:11, 48:4, 50:1, 51:24, 52:3, 53:9, 54:2, 59:12, 75:20, 79:21, 88:3, 90:14
  **fund** [1] - 31:12
  **fundraiser** [1] - 17:18
  **fundraising** [11] - 6:23, 7:14, 8:2, 9:5, 9:16, 11:21, 20:15,

20:18, 20:24, 23:4, 59:11

**funds** [33] - 5:12, 5:20, 5:22, 5:23, 10:21, 10:22, 26:8, 27:19, 28:19, 28:21, 28:22, 29:12, 31:4, 34:6, 36:17, 38:12, 41:7, 44:5, 44:7, 51:14, 53:8, 53:9, 53:25, 54:1, 57:19, 67:12, 67:17, 68:10, 75:19, 89:13, 90:12, 90:13

**fusion** [1] - 96:18
**future** [1] - 60:17

## G

**Garment** [1] - 101:22
**gather** [1] - 107:12
**General** [1] - 68:13
**general** [5] - 61:4, 77:2, 111:2, 112:4, 130:14
**generalized** [1] - 112:23
**generally** [20] - 15:11, 44:2, 47:15, 49:13, 53:23, 62:5, 62:12, 68:17, 69:22, 69:24, 71:7, 74:10, 74:24, 87:17, 88:10, 98:13, 121:12, 123:22, 124:25, 129:2
**geolocation** [1] - 103:12
**Gifford** [2] - 15:23
**gift** [7] - 30:16, 31:10, 31:12, 36:1, 38:5, 64:19, 64:20
**gifts** [2] - 36:18, 36:19
**given** [7] - 67:16, 69:6, 74:24, 93:2, 116:18, 123:12, 123:20
**glad** [1] - 107:10
**Gouzer** [2] - 120:2, 128:3
**GOVERNMENT** [3] - 1:14, 3:4, 5:1
**Government** [108] - 8:7, 12:8, 13:12, 13:19, 13:20, 14:18, 14:25, 16:12, 16:19, 18:17, 18:23, 19:11, 19:17, 20:21, 21:1, 21:2, 22:1, 26:2, 27:9,

29:22, 30:2, 35:2, 35:9, 37:1, 37:12, 38:15, 38:24, 40:1, 40:13, 40:14, 42:20, 42:23, 43:8, 44:14, 44:16, 47:7, 48:18, 48:24, 52:14, 53:1, 53:21, 54:4, 55:16, 55:21, 56:11, 56:15, 57:21, 60:3, 60:7, 61:9, 62:1, 63:1, 63:11, 71:2, 71:11, 71:25, 72:1, 74:7, 76:18, 76:24, 77:4, 80:7, 80:9, 81:1, 82:19, 86:20, 88:8, 89:16, 89:21, 90:15, 90:18, 91:3, 91:5, 91:6, 94:3, 94:24, 95:7, 95:12, 96:3, 96:15, 96:16, 99:24, 100:8, 100:9, 101:24, 102:9, 103:17, 104:3, 105:1, 106:4, 110:5, 110:6, 112:10, 112:22, 116:17, 119:11, 122:1, 122:8, 122:24, 123:6, 124:18, 125:24, 126:10, 129:10, 129:12, 129:24, 130:1
**government** [1] - 109:14
**government's** [31] - 3:8, 3:9, 3:9, 3:10, 3:10, 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 3:15, 3:16, 3:16, 3:17, 3:17, 3:18, 3:18, 3:19, 3:19, 3:20, 3:20, 3:21, 3:21, 3:22, 3:22, 3:23, 3:23
**Government's** [47] - 3:24, 7:16, 8:11, 12:1, 12:12, 13:23, 15:4, 16:23, 19:2, 19:21, 21:12, 30:6, 35:13, 37:17, 39:4, 40:18, 43:21, 50:4, 51:17, 72:4, 74:12, 82:21, 83:3, 83:5, 83:11, 83:13, 83:20, 84:9, 84:11, 84:23, 85:3, 85:9, 85:15, 85:24, 86:4, 86:10, 91:10, 94:19, 94:21, 95:4, 95:10, 97:4, 98:11, 100:12, 102:7, 125:7, 129:23
**grace** [1] - 97:20

**grammar** [1] - 97:1
**grand** [41] - 69:1, 69:4, 69:6, 69:8, 69:9, 69:11, 70:17, 74:2, 74:19, 74:20, 75:10, 79:8, 79:14, 92:20, 93:16, 93:24, 94:1, 98:12, 98:13, 98:17, 108:1, 108:7, 108:9, 108:15, 110:9, 110:25, 111:16, 112:10, 112:18, 112:21, 114:18, 114:21, 115:22, 116:9, 116:20, 116:22, 117:13, 117:14, 118:8, 118:9, 119:3
**grant** [2] - 111:24, 123:12
**group** [1] - 23:13
**guardian** [1] - 101:6

## H

**habit** [1] - 33:18
**half** [8] - 15:6, 15:17, 17:3, 18:4, 30:9, 32:6, 38:17, 40:6
**hand** [7] - 22:7, 22:9, 24:25, 25:11, 49:5, 54:4, 123:25
**handle** [1] - 123:7
**hands** [2] - 22:17, 22:23
**handshake** [2] - 23:7, 23:8
**hard** [2] - 45:7, 81:13
**HASKELL** [2] - 2:2, 2:3
**heads** [1] - 113:22
**hear** [13] - 10:12, 71:21, 72:9, 109:12, 109:25, 110:2, 110:3, 110:4, 113:24, 113:25, 115:25, 124:12, 130:7
**heard** [2] - 110:6, 117:21
**hearing** [2] - 75:2, 114:8
**hearsay** [9] - 109:6, 109:15, 109:23, 111:9, 114:24, 115:6, 116:23, 118:7, 118:10
**help** [1] - 55:19
**helped** [1] - 97:25
**helpful** [3] - 4:10, 41:18, 45:16

**hereby** [1] - 132:3
**herein** [1] - 52:7
**herself** [1] - 78:13
**Heuchling** [97] - 3:5, 5:4, 5:6, 6:18, 7:25, 8:14, 10:16, 11:3, 12:4, 12:15, 12:19, 13:14, 14:3, 14:21, 15:9, 16:6, 17:3, 17:13, 19:25, 20:14, 22:6, 23:2, 24:7, 25:19, 26:5, 26:20, 27:11, 29:3, 29:14, 30:12, 32:9, 33:9, 33:25, 34:3, 35:5, 35:17, 37:20, 38:3, 39:7, 40:25, 42:4, 43:25, 44:16, 47:3, 47:10, 48:2, 49:2, 49:25, 50:25, 51:21, 52:5, 53:3, 53:22, 54:3, 55:18, 56:21, 57:25, 59:9, 60:8, 61:12, 62:4, 63:3, 63:15, 64:10, 65:17, 66:15, 67:10, 67:25, 71:10, 71:13, 72:15, 75:5, 77:2, 78:19, 80:11, 86:18, 86:21, 87:17, 88:5, 88:12, 89:2, 90:24, 91:15, 92:7, 93:8, 95:15, 95:21, 96:15, 97:9, 98:5, 100:17, 101:12, 102:13, 103:11, 103:18, 104:25, 114:14
**HEUCHLING** [1] - 5:1
**hide** [4] - 65:8, 66:16, 67:1, 67:18
**high** [2] - 9:16, 97:17
**high-end** [1] - 97:17
**high-level** [1] - 9:16
**highlighted** [2] - 68:2, 92:7
**highlighting** [1] - 52:5
**highly** [1] - 23:14
**himself** [3] - 29:13, 36:20, 93:7
**Hock** [6] - 7:7, 7:9, 9:20, 14:5, 14:14, 19:7
**hold** [3] - 57:13, 85:22, 105:20
**holding** [1] - 57:11
**Holdings** [17] - 36:7, 38:6, 38:8, 57:7, 57:9, 57:11, 58:16, 58:19,

58:22, 59:25, 61:17, 64:3, 64:12, 64:16
**home** [3] - 70:6, 112:16, 113:7
**homework** [1] - 39:18
**Honor** [146] - 4:2, 4:3, 4:12, 4:25, 6:1, 7:19, 7:20, 8:7, 10:10, 10:13, 21:1, 21:4, 21:9, 21:22, 22:3, 28:2, 28:13, 30:2, 32:22, 33:2, 33:14, 33:15, 37:12, 40:15, 41:10, 43:12, 43:14, 44:21, 44:24, 45:16, 45:19, 46:3, 46:4, 46:10, 46:25, 49:21, 52:2, 56:2, 63:12, 66:19, 66:22, 67:3, 67:13, 71:14, 71:19, 71:25, 72:12, 78:8, 80:25, 81:5, 81:12, 81:24, 82:2, 82:8, 82:17, 83:1, 83:24, 84:8, 84:20, 85:1, 85:6, 85:7, 85:12, 85:18, 85:21, 86:2, 86:12, 86:15, 88:19, 88:25, 90:22, 91:5, 91:7, 91:12, 94:8, 94:13, 94:14, 94:17, 94:18, 94:24, 95:2, 96:5, 96:22, 97:2, 97:6, 100:8, 100:14, 102:1, 102:3, 102:9, 104:1, 104:9, 104:20, 104:22, 105:16, 105:17, 105:25, 106:2, 106:4, 106:7, 106:13, 109:6, 109:8, 109:16, 110:9, 110:3, 110:7, 111:13, 111:15, 112:12, 113:9, 113:10, 114:9, 115:7, 115:18, 116:1, 116:14, 117:1, 117:25, 119:9, 119:11, 119:20, 119:24, 119:25, 121:19, 122:21, 124:8, 125:1, 125:7, 125:22, 126:14, 127:17, 128:2, 128:16, 128:19, 129:9, 129:10, 129:22, 130:5, 130:21, 130:22, 130:25, 131:2
**HONORABLE** [1] - 1:10

**hope** [1] - 36:2
**hopefully** [4] - 55:19, 102:17, 130:17, 130:23
**hoping** [1] - 128:11
**hours** [1] - 99:21
**hugely** [1] - 39:17
**hundreds** [1] - 108:20
**Husseiny** [10] - 9:25, 11:18, 11:22, 12:5, 12:20, 12:22, 12:24, 13:6, 23:23, 24:23

## I

**idea** [1] - 129:25
**identification** [19] - 7:17, 7:23, 12:1, 13:12, 14:19, 16:13, 18:18, 19:12, 21:6, 29:21, 35:3, 37:4, 38:16, 40:2, 71:11, 94:3, 96:3, 99:23, 101:24
**identified** [7] - 10:20, 11:16, 76:17, 79:17, 80:17, 92:22, 102:24
**identify** [7] - 8:22, 67:21, 67:22, 77:17, 78:11, 98:22, 103:13
**identifying** [5] - 8:21, 11:11, 18:6, 49:18, 69:15
**identity** [1] - 99:13
**iffy** [1] - 32:24
**ignore** [2] - 112:4, 112:24
**IMES** [1] - 128:2
**Imes** [1] - 128:2
**immediately** [7] - 24:17, 25:6, 25:12, 76:2, 78:23, 87:9, 87:16
**immunity** [38] - 111:17, 111:24, 112:2, 115:3, 115:4, 115:11, 115:12, 115:15, 117:3, 117:4, 117:9, 119:7, 122:24, 123:6, 123:11, 123:12, 123:15, 123:20, 123:21, 124:2, 124:3, 124:4, 124:6, 124:9, 124:10, 124:16, 125:19, 125:21, 127:9, 127:10, 127:14, 127:20, 129:8, 130:19

**immunization** [1] - 117:7
**immunize** [2] - 122:2, 122:19
**impeach** [6] - 120:16, 123:4, 126:23, 126:24, 127:3, 129:6
**impeaching** [1] - 129:25
**impeachment** [13] - 123:19, 124:25, 125:16, 126:11, 126:17, 127:1, 127:12, 128:23, 129:3, 129:13, 130:15
**import** [3] - 36:14, 36:18, 88:13
**important** [3] - 39:17, 39:20, 121:16
**IN** [1] - 3:7
**inaudible** [1] - 110:1
**include** [8] - 48:7, 55:19, 70:4, 70:21, 79:16, 110:24, 116:5, 117:13
**included** [4] - 70:24, 74:16, 74:21
**includes** [2] - 49:15, 49:17
**including** [4] - 6:23, 13:16, 67:7, 71:9
**income** [3] - 36:19, 36:22, 64:16
**incorporated** [1] - 64:3
**incorporation** [1] - 69:18
**indeed** [1] - 122:2
**independent** [4] - 26:23, 42:19, 63:18, 63:23
**Indiana** [1] - 2:3
**indicate** [9] - 4:6, 82:15, 99:17, 105:20, 111:19, 112:5, 122:18, 125:3, 127:9
**indicated** [1] - 130:14
**indicates** [2] - 38:10, 60:13
**indicating** [5] - 36:17, 38:5, 41:6, 41:14, 88:24
**indicative** [3] - 5:17, 6:11, 32:18
**indicted** [1] - 75:1
**indictment** [5] - 73:9, 73:12, 74:2, 74:7, 93:21

**individual** [11] - 7:7, 17:19, 23:8, 23:22, 24:8, 24:24, 51:6, 53:17, 54:11, 75:12, 90:7
**individuals** [27] - 9:5, 9:18, 9:19, 10:16, 10:21, 11:11, 11:12, 11:14, 11:15, 11:16, 17:17, 23:13, 23:14, 24:20, 25:4, 53:5, 53:7, 54:21, 74:18, 79:16, 80:1, 80:15, 88:5, 89:4, 89:10, 89:20, 90:5
**indulgence** [1] - 45:9
**influence** [2] - 76:6, 76:7
**influenced** [1] - 117:15
**information** [56] - 8:22, 8:24, 9:2, 9:9, 10:9, 10:12, 11:11, 13:5, 13:7, 13:9, 14:11, 15:11, 17:17, 18:6, 19:8, 44:3, 47:16, 48:8, 48:20, 49:13, 49:18, 50:5, 50:9, 50:12, 50:13, 52:6, 52:7, 52:18, 52:19, 53:4, 58:11, 61:7, 64:12, 65:16, 67:8, 76:14, 77:5, 77:9, 77:14, 77:23, 77:24, 78:25, 100:4, 103:13, 104:12, 104:17, 104:25, 105:3, 105:22, 105:24, 111:7, 115:20, 115:21, 117:11, 117:12, 118:23
**informed** [1] - 110:10
**informs** [1] - 109:2
**initial** [1] - 88:6
**inquire** [1] - 123:15
**inquiry** [3] - 36:1, 59:23, 62:8
**insignificant** [1] - 97:13
**Inspector** [1] - 68:13
**instance** [1] - 54:16
**instances** [3] - 120:17, 122:16, 130:1
**instead** [2] - 4:8, 67:18
**Integrity** [1] - 1:19
**intends** [1] - 120:21
**intent** [1] - 73:8

**interest** [2] - 5:21, 6:13
**interrupting** [1] - 10:11
**interruption** [1] - 47:15
**interview** [11] - 68:13, 68:18, 68:19, 72:17, 74:17, 76:9, 76:13, 107:15, 107:17, 108:4, 108:24
**interviewed** [7] - 74:18, 92:17, 93:14, 93:23, 108:17, 108:20, 117:5
**interviewing** [1] - 70:4
**interviews** [3] - 108:23, 116:20, 116:21
**investigating** [2] - 62:19, 68:22
**investigation** [66] - 5:14, 5:16, 6:9, 6:19, 7:7, 7:11, 8:5, 10:18, 10:20, 11:17, 20:18, 23:2, 26:22, 29:17, 35:6, 48:20, 48:22, 50:18, 52:21, 58:11, 66:24, 67:10, 68:7, 68:8, 69:13, 69:21, 69:25, 70:2, 70:8, 70:10, 70:12, 70:13, 70:15, 74:22, 75:17, 76:5, 76:7, 77:19, 78:10, 79:23, 79:25, 80:18, 80:19, 80:22, 89:23, 90:1, 90:3, 90:5, 90:16, 91:3, 93:14, 93:17, 98:11, 99:25, 101:17, 103:1, 103:4, 103:11, 107:11, 108:21, 111:6, 120:18, 120:20, 124:4, 124:17, 128:25
**Investigation** [1] - 70:15
**investigations** [2] - 69:22, 76:3
**investigative** [6] - 52:19, 68:4, 70:1, 74:25, 75:6, 98:21
**investigator** [2] - 69:20, 99:6
**investigators** [2] - 73:25, 117:11
**invitation** [1] - 50:15
**invocation** [1] - 120:2

**invoke** [4] - 120:21, 122:2, 122:3, 127:22
**involve** [1] - 62:16
**involved** [2] - 90:5, 118:18
**involving** [11] - 8:1, 12:5, 13:16, 14:22, 14:23, 16:15, 29:18, 29:23, 68:7, 74:2, 92:10
**iPhone** [2] - 103:24, 105:6
**irrelevant** [1] - 117:20
**IRS** [1] - 36:21
**island** [1] - 103:7
**ISRAELY** [2] - 1:22, 126:3
**issue** [21] - 29:24, 35:7, 38:20, 39:22, 44:25, 45:2, 45:18, 46:5, 47:1, 74:2, 104:4, 115:10, 115:15, 119:25, 120:10, 120:15, 122:1, 122:22, 124:15, 125:18, 127:11
**issued** [3] - 20:10, 69:1, 72:18
**itemized** [2] - 49:4, 49:14

## J

**January** [3] - 68:12, 68:15, 72:17
**Jennifer** [3] - 77:16, 77:20, 78:11
**JHO** [1] - 41:18
**Jho** [22] - 7:10, 11:21, 14:5, 14:17, 17:21, 22:10, 22:19, 22:23, 24:19, 25:14, 41:5, 41:12, 41:13, 41:18, 51:14, 57:20, 65:20, 65:23, 68:8, 118:1, 118:3
**Jho's** [3] - 16:5, 18:14, 19:8
**Joe** [4] - 38:5, 39:10, 39:16, 39:19
**JOHN** [1] - 1:14
**Joseph** [1] - 54:5
**JUDGE** [1] - 1:11
**judgment** [1] - 123:6
**July** [11] - 75:3, 78:24, 92:15, 92:16, 93:9, 95:16, 97:9,

98:10, 99:4, 99:22
**June** [9] - 6:22, 6:24, 26:10, 31:5, 34:8, 48:5, 48:6, 48:10, 62:5
**JURY** [4] - 1:10, 4:20, 46:21, 114:3
**jury** [83] - 4:10, 4:15, 10:8, 27:12, 33:20, 39:15, 41:2, 45:23, 46:17, 58:24, 59:5, 60:22, 65:7, 66:7, 69:1, 69:4, 69:6, 69:8, 69:9, 69:11, 70:17, 74:2, 74:10, 74:19, 74:20, 75:10, 79:8, 79:14, 91:18, 92:20, 93:16, 93:24, 94:1, 97:11, 98:12, 98:13, 98:17, 106:14, 106:20, 107:1, 107:2, 107:23, 108:1, 108:7, 108:9, 108:15, 109:11, 110:9, 110:25, 111:5, 111:16, 112:6, 112:10, 112:18, 112:19, 112:21, 113:17, 114:4, 114:18, 114:21, 115:22, 116:10, 116:20, 116:22, 117:13, 117:15, 117:20, 117:21, 118:8, 118:9, 118:20, 119:3, 121:12, 123:10, 123:11, 123:14, 123:23, 127:15, 128:8, 128:12
**jury's** [1] - 69:4
**JUSTICE** [2] - 1:15, 1:18

### K

**keep** [5] - 4:5, 10:11, 41:4, 72:10, 98:2
**keeps** [1] - 4:7
**KELLER** [19] - 1:14, 119:25, 120:13, 121:19, 122:5, 122:8, 122:21, 123:3, 124:8, 125:1, 126:13, 126:17, 127:17, 128:15, 129:9, 129:22, 130:21, 130:25, 131:2
**Keller** [1] - 128:14
**KENNER** [111] - 1:21, 1:22, 4:2, 6:1, 6:4,

8:9, 12:10, 13:21, 15:2, 16:21, 18:25, 19:19, 21:3, 21:7, 21:16, 21:22, 22:3, 28:2, 28:10, 30:4, 32:22, 33:2, 35:11, 37:14, 39:1, 40:15, 41:10, 41:16, 43:14, 43:16, 43:18, 46:4, 50:19, 56:5, 67:3, 67:13, 71:14, 71:17, 71:19, 71:22, 81:12, 81:18, 82:7, 82:18, 82:24, 83:1, 83:10, 83:18, 83:22, 83:24, 84:8, 84:14, 84:16, 84:20, 85:1, 85:7, 85:12, 85:21, 86:2, 86:8, 86:15, 88:19, 91:7, 94:14, 94:18, 95:2, 95:8, 96:5, 96:11, 97:2, 100:10, 102:3, 104:1, 104:18, 104:20, 105:16, 106:7, 106:10, 106:13, 106:16, 107:7, 109:8, 110:1, 110:3, 110:6, 110:21, 111:13, 111:15, 111:21, 113:9, 115:7, 115:18, 116:1, 117:25, 119:1, 119:5, 119:9, 119:21, 119:24, 120:25, 121:14, 122:14, 125:7, 125:14, 125:22, 129:10, 129:12, 130:5, 130:7, 130:12, 130:22
**Kenner** [23] - 4:7, 82:5, 82:25, 83:9, 84:7, 84:18, 94:12, 95:1, 104:19, 107:5, 108:19, 109:21, 109:25, 110:2, 114:16, 120:6, 123:25, 124:12, 125:2, 125:3, 126:10, 128:21
**Kenner's** [1] - 82:13
**kept** [1] - 98:1
**kind** [8] - 8:24, 23:10, 23:15, 47:16, 69:19, 104:16, 105:23, 122:23
**kinds** [2] - 44:2, 104:4
**knowledge** [4] - 64:25, 65:16, 104:13, 104:14

**known** [4] - 23:3, 70:14, 99:7, 99:13
**knows** [5] - 97:21, 117:10, 118:2, 118:16, 126:11
**KOLLAR** [2] - 1:10
**KOLLAR-KOTELLY** [1] - 1:10
**KOTELLY** [1] - 1:10
**Kromka** [2] - 54:22, 54:25

### L

**labeled** [1] - 49:4
**lack** [1] - 130:19
**large** [4] - 32:4, 74:24, 104:11, 110:13
**larger** [2] - 68:8, 82:24
**Larry** [12] - 7:10, 9:20, 11:20, 13:17, 14:23, 15:21, 17:21, 19:15, 22:11, 24:25, 25:6, 25:14
**last** [14] - 17:21, 19:10, 27:16, 28:10, 30:23, 31:25, 41:4, 41:11, 41:12, 53:19, 68:1, 71:20, 71:22, 113:14
**lastly** [2] - 24:24, 39:25
**late** [3] - 58:5, 68:10, 119:15
**latitude** [2] - 105:8, 105:10
**laughter** [1] - 66:13
**LAW** [2] - 1:22, 2:2
**law** [9] - 42:21, 62:13, 77:6, 80:1, 80:4, 80:11, 80:12, 80:15, 99:14
**laws** [1] - 97:23
**lawyer** [1] - 98:3
**lay** [1] - 104:22
**lead** [1] - 20:15
**lead-up** [1] - 20:15
**leading** [3] - 6:22, 7:1, 59:10
**learn** [10] - 7:11, 26:22, 29:17, 76:4, 79:25, 90:3, 90:12, 98:24, 109:2, 116:2
**learned** [4] - 80:4, 99:1, 99:2, 99:4
**learning** [1] - 98:20
**least** [3] - 89:25, 103:9, 127:6

**leave** [3] - 28:11, 45:21, 88:21
**left** [13] - 6:20, 7:3, 22:9, 24:14, 24:17, 24:21, 25:7, 48:17, 49:5, 50:4, 56:11, 58:8, 82:1
**left-hand** [2] - 22:9, 49:5
**legal** [7] - 60:25, 61:22, 80:2, 87:21, 88:17, 88:20, 89:14
**less** [2] - 37:2, 99:21
**letter** [27] - 30:13, 30:15, 30:16, 31:9, 31:10, 35:5, 35:23, 36:2, 36:14, 36:15, 36:24, 60:8, 61:5, 61:13, 62:4, 62:8, 62:20, 62:23, 87:7, 87:19, 87:21, 88:6, 88:7, 88:13, 88:14, 88:20, 88:22
**letterhead** [1] - 35:17
**letters** [19] - 38:5, 59:23, 61:24, 63:7, 80:1, 80:5, 80:15, 80:20, 80:23, 86:19, 86:22, 88:6, 89:2, 89:3, 89:6, 89:11, 89:14, 89:19, 89:20
**level** [1] - 9:16
**liability** [3] - 9:7, 64:3, 117:7
**likely** [2] - 39:10, 128:15
**limit** [1] - 70:1
**limited** [4] - 64:3, 127:13, 127:14, 127:20
**Linda** [1] - 128:2
**line** [6] - 31:19, 37:23, 41:1, 60:4, 86:25, 98:6
**LISA** [2] - 2:5, 132:3
**Lisa** [1] - 132:12
**list** [6] - 9:18, 11:7, 17:21, 37:24, 102:2, 102:6
**listed** [8] - 10:16, 10:19, 77:14, 78:1, 78:3, 78:12, 78:14
**listen** [3] - 91:19, 97:12, 113:21
**literally** [1] - 23:7
**litigation** [1] - 87:6
**LLC** [2] - 58:16, 64:3
**loan** [2] - 86:25, 87:14
**loaned** [1] - 87:13

**located** [1] - 103:2
**location** [3] - 78:3, 103:19, 105:5
**LOCKHART** [1] - 1:18
**Loic** [2] - 120:2, 128:3
**longitude** [3] - 105:8, 105:10, 105:15
**look** [24] - 8:14, 15:25, 18:4, 33:21, 37:3, 40:6, 43:9, 49:2, 58:3, 58:18, 71:15, 77:25, 81:14, 81:17, 81:22, 92:2, 94:12, 95:21, 112:23, 119:17, 121:9, 121:10, 122:15, 124:14
**looked** [5] - 53:14, 55:9, 66:12, 89:7, 105:8
**looking** [23] - 14:2, 22:6, 24:13, 39:7, 42:5, 51:22, 54:3, 57:5, 62:6, 63:4, 63:15, 66:15, 77:3, 82:16, 86:21, 91:15, 94:15, 94:23, 98:6, 100:21, 102:13, 105:13, 119:23
**Los** [1] - 68:15
**Louis** [1] - 78:5
**Low** [47] - 5:10, 5:17, 6:11, 7:7, 7:9, 7:10, 7:13, 9:20, 11:21, 13:16, 14:5, 14:14, 14:17, 15:21, 17:21, 19:7, 19:15, 20:2, 22:11, 24:25, 25:6, 25:14, 29:10, 29:11, 31:11, 32:20, 33:5, 35:19, 38:9, 38:12, 41:8, 41:12, 41:19, 51:14, 57:20, 59:4, 59:6, 65:20, 65:23, 67:12, 67:21, 67:22, 68:8, 118:1, 118:4
**Low's** [17] - 7:10, 7:13, 11:21, 13:17, 14:17, 14:23, 15:14, 17:21, 20:8, 22:10, 22:19, 22:23, 24:19, 25:14, 29:4, 29:7, 32:23
**lower** [2] - 15:6, 17:3, 78:17

# M

**ma'am** [4] - 63:21, 73:19, 97:1, 114:13
**main** [1] - 23:12
**majority** [3] - 5:21, 10:19, 29:12
**Malaysian** [2] - 9:22, 20:11
**managing** [1] - 33:6
**Manhattan** [5] - 99:3, 101:21, 103:3, 103:7, 103:9
**manner** [2] - 99:16, 99:17
**map** [2] - 105:11, 105:14
**March** [3] - 1:6, 89:2, 132:10
**Marcum** [4] - 32:2, 32:3, 32:4, 34:17
**marked** [10] - 7:17, 11:25, 26:2, 27:8, 29:21, 71:10, 94:2, 99:23, 101:23
**marks** [2] - 101:4, 101:11
**matches** [1] - 62:10
**material** [1] - 87:14
**materially** [1] - 48:23
**materials** [3] - 60:25, 110:24, 112:8
**matter** [19] - 12:6, 16:17, 19:10, 37:9, 60:16, 60:20, 60:25, 61:2, 62:9, 62:13, 62:15, 68:1, 75:24, 77:2, 90:2, 110:14, 118:6, 126:15, 126:18
**matters** [1] - 121:24
**mean** [6] - 5:19, 116:10, 124:18, 124:23, 128:20, 129:22
**meaning** [2] - 5:20, 6:12
**means** [6] - 8:20, 23:10, 60:19, 60:20, 69:21, 97:24
**meant** [1] - 81:25
**media** [1] - 92:1
**meet** [2] - 68:13, 71:2
**meeting** [10] - 9:10, 39:10, 71:5, 72:19, 72:21, 73:1, 73:4, 73:5, 73:16, 74:1
**meetings** [1] - 89:21
**Mejia** [2] - 17:8,

17:23
**memo** [1] - 62:5
**memory** [1] - 81:18
**Men** [27] - 26:24, 27:1, 27:3, 27:5, 27:14, 28:16, 28:19, 29:7, 42:9, 42:12, 56:9, 57:1, 57:8, 57:18, 58:2, 58:17, 59:7, 59:12, 59:18, 59:20, 59:25, 63:24, 65:9, 65:10, 65:13, 65:19, 67:1
**mention** [1] - 92:5
**mentioned** [9] - 42:16, 49:11, 51:8, 53:16, 72:16, 81:25, 92:1, 92:4, 101:18
**mentions** [1] - 14:13
**message** [10] - 90:24, 91:2, 91:16, 92:14, 93:9, 93:10, 97:9, 98:5, 101:9, 101:12
**messages** [9] - 90:3, 95:15, 95:18, 95:20, 96:17, 96:19, 96:20, 98:20, 98:22
**Miami** [1] - 6:23
**Michel** [24] - 14:9, 22:8, 24:16, 24:21, 26:8, 26:9, 27:13, 27:19, 33:12, 35:23, 36:16, 41:6, 41:7, 56:25, 57:12, 57:20, 63:16, 71:8, 73:17, 73:18, 87:7, 87:9, 87:13, 118:3
**MICHEL** [1] - 1:6
**Michel's** [4] - 10:3, 103:24, 105:6, 105:9
**mid** [4] - 38:7, 68:10, 70:19, 75:12
**mid-April** [2] - 70:19, 75:12
**mid-August** [1] - 38:7
**middle** [6] - 6:6, 9:20, 10:24, 22:13, 24:14, 54:8
**Midtown** [2] - 99:3, 101:21
**might** [8] - 8:23, 25:16, 70:4, 82:3, 111:2, 128:18
**Miller** [5] - 80:4, 80:13, 80:16, 80:20, 86:22
**million** [19] - 25:25, 26:14, 26:16, 27:7,

27:19, 27:22, 28:25, 29:6, 29:9, 29:16, 29:19, 29:25, 30:24, 36:21, 42:6, 59:8, 65:19
**mind** [1] - 72:10
**Minnesota** [1] - 78:5
**minutes** [5] - 45:14, 45:25, 106:13, 106:18, 113:14
**missives** [3] - 119:13, 119:22, 122:11
**mistake** [2] - 97:15, 98:8
**Mohamed** [2] - 11:22, 39:10
**Moise** [22] - 50:6, 50:17, 51:8, 75:12, 75:15, 75:17, 75:18, 75:21, 76:1, 76:9, 76:13, 76:19, 77:11, 79:3, 86:24, 87:6, 87:21, 87:22, 87:24, 88:2, 88:15
**moment** [14] - 5:7, 31:14, 33:14, 42:8, 43:12, 44:21, 45:10, 47:11, 53:15, 61:13, 71:15, 80:11, 102:18, 106:2
**moments** [4] - 33:20, 34:16, 34:23, 101:18
**monetary** [1] - 34:4
**money** [37] - 6:13, 25:22, 26:12, 26:17, 27:23, 28:23, 29:8, 29:10, 29:12, 30:21, 36:7, 39:23, 50:16, 51:5, 54:12, 54:14, 54:18, 55:12, 55:14, 57:12, 57:13, 57:16, 58:25, 59:1, 59:2, 59:3, 59:4, 59:6, 59:10, 79:19, 87:24, 88:2, 88:3, 98:1, 118:1, 118:3
**monies** [12] - 30:22, 38:8, 50:18, 51:11, 51:13, 53:10, 55:9, 57:14, 57:17, 64:13, 65:17, 89:12
**monitor** [2] - 96:6, 96:11
**months** [4] - 25:20, 71:1, 72:22, 75:2
**morning** [3] - 5:9, 119:18, 130:18
**most** [6] - 6:1, 39:9, 81:22, 82:3, 112:8

**motion** [6] - 122:8, 124:14, 127:8, 127:18, 129:4, 130:17
**mouth** [1] - 98:1
**move** [33] - 5:6, 8:7, 10:24, 12:8, 14:25, 16:19, 18:1, 18:17, 18:23, 19:17, 22:1, 28:10, 30:2, 31:25, 32:6, 32:22, 35:9, 37:12, 38:24, 41:11, 42:4, 48:11, 57:12, 57:21, 59:14, 72:1, 88:19, 91:12, 94:24, 97:6, 100:14, 123:6, 129:4
**movement** [1] - 72:8
**moves** [8] - 13:19, 21:1, 40:13, 81:1, 91:5, 95:7, 100:8, 102:10
**moving** [3] - 33:22, 83:15, 90:2
**MR** [401] - 4:2, 4:3, 4:12, 4:25, 5:3, 6:1, 6:4, 6:17, 7:16, 7:19, 7:21, 7:24, 8:7, 8:9, 8:13, 10:10, 10:13, 10:15, 10:23, 11:2, 11:25, 12:3, 12:8, 12:10, 12:14, 12:16, 12:18, 13:1, 13:4, 13:11, 13:13, 13:19, 13:21, 14:1, 14:18, 14:20, 14:25, 15:2, 15:6, 15:8, 15:16, 15:19, 16:12, 16:14, 16:19, 16:21, 16:25, 17:1, 17:9, 17:12, 18:1, 18:3, 18:8, 18:10, 18:16, 18:19, 18:23, 18:25, 19:4, 19:11, 19:13, 19:17, 19:19, 19:23, 19:24, 20:3, 20:5, 20:12, 20:13, 21:1, 21:3, 21:5, 21:7, 21:14, 21:16, 21:18, 21:22, 22:1, 22:3, 22:5, 22:15, 22:16, 22:20, 22:21, 23:20, 23:21, 23:24, 24:1, 24:5, 24:6, 24:11, 24:12, 25:2, 25:3, 25:9, 25:10, 25:15, 25:18, 26:1, 26:4, 27:8, 27:10, 28:2, 28:8, 28:10, 28:13, 28:14, 30:2, 30:4, 30:8, 30:10, 32:6, 32:8,

32:22, 33:2, 33:8, 33:14, 33:17, 33:23, 33:24, 34:20, 34:22, 35:2, 35:4, 35:9, 35:11, 35:16, 37:1, 37:5, 37:12, 37:14, 37:19, 38:1, 38:2, 38:15, 38:18, 38:24, 39:1, 39:6, 40:1, 40:3, 40:5, 40:8, 40:13, 40:15, 40:20, 40:24, 41:10, 41:16, 41:20, 42:1, 42:3, 43:7, 43:11, 43:14, 43:16, 43:17, 43:18, 43:20, 43:22, 43:24, 44:13, 44:15, 44:19, 44:24, 45:2, 45:6, 45:9, 45:15, 45:19, 46:2, 46:4, 46:5, 46:10, 46:13, 46:25, 47:2, 47:24, 48:1, 48:24, 49:1, 49:21, 49:24, 50:19, 50:23, 50:24, 51:17, 51:20, 52:4, 52:24, 53:2, 55:15, 55:17, 56:2, 56:5, 56:6, 57:21, 57:24, 60:2, 60:6, 61:9, 61:11, 62:1, 62:3, 62:25, 63:2, 63:8, 63:11, 63:14, 63:21, 63:22, 64:7, 64:9, 64:21, 64:23, 65:3, 65:5, 66:14, 66:19, 66:22, 66:23, 67:3, 67:9, 67:13, 67:20, 71:14, 71:16, 71:17, 71:19, 71:22, 71:25, 72:6, 72:12, 72:14, 73:21, 76:23, 77:1, 78:16, 78:18, 79:11, 79:12, 80:7, 80:10, 80:25, 81:5, 81:8, 81:12, 81:18, 81:24, 82:2, 82:7, 82:10, 82:17, 82:18, 82:23, 82:24, 83:1, 83:8, 83:10, 83:16, 83:18, 83:22, 83:24, 84:6, 84:8, 84:14, 84:15, 84:16, 84:17, 84:20, 85:1, 85:6, 85:7, 85:11, 85:12, 85:18, 85:20, 85:21, 86:1, 86:2, 86:7, 86:8, 86:12, 86:15, 86:17, 88:8, 88:11, 88:19, 88:25, 89:1, 89:16, 89:18, 90:18, 90:21, 90:23, 91:5, 91:7,

91:12, 91:14, 94:2, 94:7, 94:10, 94:13, 94:14, 94:17, 94:18, 94:23, 95:2, 95:6, 95:8, 95:12, 95:14, 96:2, 96:5, 96:7, 96:11, 96:14, 97:2, 97:6, 97:8, 100:8, 100:10, 100:14, 100:16, 101:23, 102:1, 102:3, 102:9, 102:12, 102:16, 102:21, 104:1, 104:9, 104:18, 104:20, 104:22, 104:24, 105:16, 105:25, 106:4, 106:7, 106:10, 106:13, 106:16, 107:7, 109:6, 109:8, 109:13, 109:16, 110:1, 110:3, 110:6, 110:21, 111:13, 111:15, 111:21, 112:12, 113:9, 113:10, 115:7, 115:18, 116:1, 116:14, 117:25, 119:1, 119:5, 119:9, 119:20, 119:21, 119:24, 119:25, 120:13, 120:25, 121:14, 121:19, 122:5, 122:8, 122:14, 122:21, 123:3, 124:8, 125:1, 125:7, 125:14, 125:22, 126:3, 126:13, 126:17, 127:17, 128:15, 129:9, 129:10, 129:12, 129:22, 130:5, 130:7, 130:12, 130:21, 130:22, 130:25, 131:2
**MS** [1] - 128:2
**MSISDN** [1] - 78:23
**Mulryne** [5] - 5:5, 44:23, 45:12, 81:21, 116:13
**MULRYNE** [274] - 1:17, 4:3, 4:12, 4:25, 5:3, 6:17, 7:16, 7:19, 7:21, 7:24, 8:7, 8:13, 10:10, 10:13, 10:15, 10:23, 11:2, 11:25, 12:3, 12:8, 12:14, 12:16, 12:18, 13:1, 13:4, 13:11, 13:13, 13:19, 14:1, 14:18, 14:20, 14:25, 15:6, 15:8, 15:16, 15:19, 16:12, 16:14, 16:19,

16:25, 17:1, 17:9, 17:12, 18:1, 18:3, 18:8, 18:10, 18:16, 18:19, 18:23, 19:4, 19:11, 19:13, 19:17, 19:23, 19:24, 20:3, 20:5, 20:12, 20:13, 21:1, 21:5, 21:14, 21:18, 22:1, 22:5, 22:15, 22:16, 22:20, 22:21, 23:20, 23:21, 23:24, 24:1, 24:5, 24:6, 24:11, 24:12, 25:2, 25:3, 25:9, 25:10, 25:15, 25:18, 26:1, 26:4, 27:8, 27:10, 28:8, 28:13, 28:14, 30:2, 30:8, 30:10, 32:6, 32:8, 33:8, 33:14, 33:17, 33:23, 33:24, 34:20, 34:22, 35:2, 35:4, 35:9, 35:16, 37:1, 37:5, 37:12, 37:19, 38:1, 38:2, 38:15, 38:18, 38:24, 39:6, 40:1, 40:3, 40:5, 40:8, 40:13, 40:20, 40:24, 41:20, 42:1, 42:3, 43:7, 43:11, 43:17, 43:20, 43:22, 43:24, 44:13, 44:15, 44:19, 44:24, 45:2, 45:6, 45:9, 45:15, 45:19, 46:2, 46:5, 46:10, 46:13, 46:25, 47:2, 47:24, 48:1, 48:24, 49:1, 49:21, 49:24, 50:23, 50:24, 51:17, 51:20, 52:4, 52:24, 53:2, 55:15, 55:17, 56:2, 56:6, 57:21, 57:24, 60:2, 60:6, 61:9, 61:11, 62:1, 62:3, 62:25, 63:2, 63:8, 63:11, 63:14, 63:21, 63:22, 64:7, 64:9, 64:21, 64:23, 65:3, 65:5, 66:14, 66:19, 66:22, 66:23, 67:9, 67:20, 71:16, 71:25, 72:6, 72:12, 72:14, 73:21, 76:23, 77:1, 78:16, 78:18, 79:11, 79:12, 80:7, 80:10, 80:25, 81:5, 81:8, 81:24, 82:2, 82:10, 82:17, 82:23, 83:8, 83:16, 84:6, 84:15, 84:17, 85:6, 85:11, 85:18, 85:20,

86:1, 86:7, 86:12, 86:17, 88:8, 88:11, 88:25, 89:1, 89:16, 89:18, 90:18, 90:21, 90:23, 91:5, 91:12, 91:14, 94:2, 94:7, 94:10, 94:13, 94:17, 94:23, 95:6, 95:12, 95:14, 96:2, 96:7, 96:14, 97:6, 97:8, 100:8, 100:14, 100:16, 101:23, 102:1, 102:9, 102:12, 102:16, 102:21, 104:9, 104:22, 104:24, 105:25, 106:4, 109:6, 109:13, 109:16, 112:12, 113:10, 116:14, 119:20
**multi** [2] - 21:15, 21:17
**multi-document** [2] - 21:15, 21:17
**multiple** [2] - 31:15, 77:19
**mumbles** [1] - 72:13
**mumbling** [1] - 72:9
**MUR** [5] - 60:16, 60:18, 62:9, 62:15
**must** [3] - 61:4, 87:15, 127:22

## N

**name** [14] - 7:9, 7:10, 17:21, 31:16, 31:18, 34:13, 34:24, 41:19, 49:17, 63:16, 64:1, 77:13, 77:21, 80:12
**named** [3] - 7:7, 75:12, 90:7
**names** [9] - 9:24, 10:2, 10:19, 11:5, 11:8, 11:14, 11:17, 17:24, 17:25
**nametags** [1] - 25:5
**naming** [1] - 31:15
**narrow** [5] - 123:21, 124:11, 124:16, 125:21, 127:9
**nationals** [2] - 16:6, 16:9
**nature** [4] - 88:15, 89:7, 96:17, 128:9
**near** [1] - 25:12
**necessary** [1] - 43:23
**necessitate** [1] -

123:5
**need** [22] - 11:5, 30:14, 31:10, 31:19, 37:24, 39:16, 39:18, 45:7, 46:13, 81:16, 94:11, 96:10, 106:11, 117:8, 119:7, 122:2, 125:18, 126:9, 126:19, 126:24, 127:3, 129:19
**needed** [2] - 8:16, 66:12
**needs** [2] - 122:3, 126:7
**net** [1] - 64:16
**network** [1] - 79:2
**Neville** [1] - 90:8
**New** [2] - 1:15, 1:19
**news** [2] - 113:18, 113:19
**next** [13] - 17:9, 21:19, 24:11, 24:24, 25:2, 25:9, 36:6, 41:4, 84:13, 85:19, 86:6, 125:20, 130:16
**NICOLE** [1] - 1:18
**none** [7] - 38:14, 41:25, 65:24, 66:1, 66:3, 66:5, 101:16
**nonhearsay** [1] - 117:21
**Northwest** [5] - 1:15, 1:19, 2:3, 2:7, 132:14
**Nos** [2] - 3:12, 21:12
**note** [4] - 30:17, 34:23, 64:15, 117:1
**notebooks** [1] - 45:21
**noted** [4] - 34:4, 34:12, 62:20
**notes** [3] - 108:22, 108:24, 132:5
**nothing** [3] - 116:9, 127:1, 128:23
**notice** [3] - 33:19, 50:13, 87:8
**noting** [1] - 26:9
**November** [7] - 25:21, 25:24, 34:8, 58:6, 71:2, 71:6, 72:20
**number** [36] - 8:23, 8:24, 9:18, 18:15, 60:17, 62:9, 62:10, 63:10, 76:14, 76:16, 76:19, 76:20, 77:7, 77:9, 77:10, 77:13, 77:15, 77:25, 78:1, 78:10, 78:20, 78:21, 90:4, 90:25, 91:16,

91:17, 95:18, 97:10, 98:20, 98:25, 99:1, 99:15, 100:18, 100:23, 101:5
**numbered** [1] - 60:16
**numbers** [3] - 78:2, 78:12, 78:13
**numerous** [1] - 125:23
**nutshell** [1] - 121:18

## O

**oath** [1] - 61:3
**Obama** [29] - 8:18, 9:1, 9:17, 22:17, 23:22, 24:7, 24:9, 24:13, 24:15, 24:18, 26:8, 26:10, 26:21, 29:5, 42:9, 42:12, 43:1, 44:11, 48:3, 50:1, 51:23, 52:3, 53:9, 54:2, 59:12, 75:19, 79:21, 88:3, 90:13
**object** [8] - 4:7, 28:2, 41:11, 71:20, 104:2, 104:5, 105:16, 129:24
**objected** [1] - 4:8
**objecting** [2] - 5:25, 129:20
**objection** [83] - 8:9, 8:10, 12:10, 12:11, 13:21, 13:22, 15:2, 15:3, 16:21, 16:22, 18:25, 19:1, 19:19, 19:20, 21:9, 21:11, 21:23, 21:25, 22:3, 30:4, 30:5, 35:11, 35:12, 37:14, 37:16, 39:1, 39:3, 40:15, 40:17, 41:14, 41:16, 43:14, 43:19, 50:19, 67:3, 67:13, 71:23, 72:3, 82:18, 83:2, 83:4, 83:10, 83:12, 83:18, 83:19, 83:22, 83:24, 84:1, 84:8, 84:10, 84:14, 84:19, 84:22, 85:1, 85:2, 85:7, 85:12, 85:14, 85:21, 85:23, 86:2, 86:3, 86:8, 86:9, 91:7, 91:9, 94:18, 94:20, 95:2, 95:3, 95:8, 95:9, 97:2, 97:3, 100:10, 100:11, 102:3, 102:5, 102:10, 104:16, 104:19, 109:6

**objections** [2] - 4:5, 110:19
**obligation** [2] - 74:12, 87:15
**obligations** [1] - 87:9
**obstruct** [1] - 76:7
**obtain** [5] - 20:17, 76:18, 80:22, 99:25, 103:12
**obtained** [5] - 8:4, 95:23, 95:24, 103:22, 103:23
**obviously** [5] - 66:8, 78:2, 88:24, 112:4, 112:24
**occasions** [2] - 67:11, 125:23
**occur** [2] - 75:22, 76:11
**occurred** [3] - 75:7, 116:21, 116:22
**occurs** [1] - 74:1
**October** [12] - 27:16, 27:18, 40:11, 40:12, 56:17, 56:18, 57:8, 58:5, 58:6, 58:17, 63:17
**odd** [2] - 32:14, 95:22
**OF** [6] - 1:1, 1:3, 1:10, 1:15, 1:18, 2:2
**Office** [1] - 68:12
**office** [1] - 61:4
**officer** [2] - 9:16, 110:10
**OFFICES** [1] - 2:2
**official** [3] - 97:17, 97:18, 132:12
**Official** [1] - 2:6
**often** [1] - 23:8
**once** [3] - 9:15, 38:4, 92:3
**one** [57] - 4:4, 5:7, 13:15, 13:16, 21:9, 23:7, 24:7, 25:5, 31:25, 33:14, 43:5, 43:12, 44:21, 45:10, 49:12, 50:6, 51:5, 53:8, 53:19, 53:25, 54:3, 54:4, 54:7, 57:11, 64:15, 66:11, 69:23, 78:19, 79:10, 81:3, 82:1, 84:4, 84:13, 86:6, 86:19, 86:22, 86:23, 89:7, 96:24, 97:17, 97:21, 101:15, 106:2, 119:9, 119:25, 120:23, 121:6, 122:22, 123:17, 124:11,

124:15, 125:10, 128:5, 128:18
**ones** [4] - 82:15, 86:14, 94:5, 125:8
**ongoing** [3] - 70:8, 120:18, 120:20
**online** [1] - 113:21
**open** [1] - 113:12
**opening** [1] - 114:23
**opinions** [3] - 112:25, 113:1, 117:18
**opportunities** [1] - 67:11
**opportunity** [7] - 20:21, 42:23, 51:1, 51:4, 51:5, 60:23, 67:17
**opposed** [2] - 36:19, 54:15
**order** [11] - 16:10, 69:6, 84:17, 100:23, 103:13, 119:12, 121:25, 122:9, 127:18, 127:19, 128:16
**original** [3] - 11:10, 48:18, 52:15
**Oriol** [3] - 50:10, 50:17, 51:9
**Orozco** [1] - 43:23
**Orozo** [8] - 11:1, 12:16, 20:12, 21:19, 25:17, 30:9, 40:7, 42:2
**otherwise** [2] - 66:25, 115:25
**out-of-court** [3] - 109:17, 114:25, 116:24
**outline** [1] - 75:5
**outlines** [1] - 36:2
**outside** [7] - 24:20, 109:11, 117:23, 123:13, 123:23, 128:7, 128:11
**overdoing** [1] - 10:7
**overt** [4] - 69:21, 69:24, 70:3, 70:10
**OVF** [2] - 26:21, 58:10
**owe** [3] - 36:21, 92:1, 97:25
**owed** [1] - 87:10
**own** [3] - 64:1, 88:22, 109:22
**owner** [8] - 4:6, 4:7, 4:9, 4:11, 5:10, 5:17, 5:19, 6:12

## P

**P.A** [1] - 2:3
**p.m** [9] - 1:7, 4:16, 45:24, 46:18, 92:3, 106:21, 107:3, 114:5, 119:12
**PAC** [3] - 27:4, 27:14, 27:21
**page** [10] - 17:9, 18:2, 18:9, 22:6, 23:20, 24:11, 25:2, 25:9, 34:2, 78:17
**PAGE** [1] - 3:7
**Page** [25] - 9:12, 9:13, 9:14, 10:23, 10:24, 12:17, 13:1, 14:2, 16:25, 17:2, 17:10, 18:4, 18:8, 20:4, 22:15, 22:20, 23:24, 24:5, 40:20, 40:21, 64:22, 65:3, 65:4
**pages** [5] - 43:5, 49:12, 53:17
**paid** [3] - 87:19, 87:20, 89:9
**pain** [1] - 72:11
**paper** [2] - 81:22, 113:21
**papers** [1] - 124:22
**paperwork** [1] - 42:15
**Paragraph** [11] - 30:16, 34:11, 38:3, 64:8, 64:15, 64:21, 64:24, 65:4, 65:6, 66:15
**paragraph** [12] - 30:23, 32:1, 35:25, 39:7, 39:13, 60:11, 60:21, 63:9, 63:15, 65:22, 87:4, 87:11
**parameters** [3] - 129:16, 130:4, 130:10
**Park** [1] - 78:5
**parlance** [1] - 60:19
**part** [12] - 23:19, 33:7, 49:9, 89:25, 100:5, 107:17, 108:12, 108:14, 110:13, 118:17, 123:15, 124:17
**parte** [1] - 126:23
**partial** [2] - 22:19, 100:6
**participate** [2] - 23:16, 73:1
**particular** [7] -

28:21, 54:7, 54:16, 55:4, 56:23, 104:11
**particularly** [1] - 113:20
**parties** [2] - 119:16, 131:1
**parts** [3] - 8:15, 108:10, 117:19
**passport** [9] - 8:24, 12:25, 14:5, 18:14, 19:8, 20:2, 20:9, 20:10, 20:11
**pay** [2] - 87:9, 87:16
**payments** [2] - 28:15, 44:8
**penalties** [2] - 65:14, 88:18
**Peng** [6] - 7:8, 7:9, 9:20, 14:6, 14:14, 19:7
**people** [5] - 11:5, 31:22, 93:5, 108:20, 119:17
**perfect** [1] - 10:25
**perhaps** [5] - 32:20, 32:22, 40:5, 60:4, 95:21
**period** [24] - 6:21, 43:2, 44:8, 44:9, 47:20, 47:22, 48:3, 48:5, 48:8, 48:12, 52:7, 52:9, 52:12, 54:12, 56:11, 56:12, 56:17, 58:4, 59:13, 78:24, 98:18, 99:11, 117:22, 118:21
**perjury** [1] - 65:14
**permissible** [1] - 130:2
**permit** [1] - 116:1
**person** [12] - 5:11, 5:19, 8:22, 9:7, 9:9, 22:9, 22:18, 24:15, 24:17, 32:17, 54:14, 77:23
**personal** [8] - 15:14, 18:5, 23:15, 64:1, 100:1, 100:19, 104:12, 104:14
**pertaining** [3] - 12:6, 35:7, 70:22
**pertains** [3] - 48:22, 52:21, 104:10
**pertinent** [1] - 118:24
**phase** [4] - 69:23, 69:24, 70:3
**phases** [1] - 69:23
**phone** [49] - 76:11, 76:16, 76:19, 77:14,

77:15, 77:25, 78:1, 78:4, 78:12, 78:15, 79:1, 79:2, 79:4, 91:17, 96:1, 98:25, 99:1, 99:2, 99:7, 99:9, 99:10, 99:11, 99:13, 99:15, 99:16, 99:18, 99:20, 99:21, 100:2, 100:7, 100:19, 100:24, 101:5, 101:15, 101:18, 101:19, 102:24, 103:5, 103:14, 103:20, 103:23, 105:7, 105:9, 114:22
**photo** [2] - 22:7, 25:15
**photograph** [6] - 20:8, 22:18, 24:13, 24:25, 102:13, 102:17
**photographs** [2] - 20:17, 20:23
**pick** [4] - 6:5, 28:12, 52:1, 72:10
**picking** [1] - 78:6
**picture** [2] - 9:6, 24:2
**pictures** [1] - 21:20
**pinging** [1] - 105:9
**PJ** [6] - 30:25, 36:8, 38:6, 38:8, 59:25, 69:18
**Plaintiff** [1] - 1:4
**planning** [4] - 125:4, 127:4, 127:10, 128:22
**play** [1] - 107:17
**plead** [9] - 111:19, 112:1, 115:3, 121:12, 122:20, 123:24, 124:20, 125:5, 125:6
**plotted** [1] - 105:10
**pocketed** [1] - 29:12
**point** [23] - 9:22, 17:18, 26:20, 38:7, 39:25, 50:12, 67:8, 70:9, 93:1, 93:6, 98:10, 112:3, 112:14, 112:15, 113:14, 115:9, 115:13, 116:4, 117:1, 117:10, 118:7, 118:23, 128:21
**points** [2] - 32:1, 36:3
**political** [11] - 8:17, 9:1, 16:7, 16:9, 23:3, 27:3, 42:10, 42:13, 56:7, 65:1, 97:14
**Pollock** [1] - 71:3
**poor** [1] - 10:8
**portion** [16] - 13:3, 15:17, 30:9, 33:1,

33:7, 34:1, 34:3,
34:21, 36:7, 38:13,
54:8, 68:2, 78:17,
87:14, 92:8, 92:13
  **portions** [1] - 43:9
  **position** [4] - 82:14,
110:9, 115:3, 124:19
  **possibility** [1] -
128:5
  **posted** [1] - 41:4
  **potential** [2] - 76:5,
120:2
  **potentially** [2] -
36:20, 128:24
  **practical** [1] - 110:14
  **PRAKAZREL** [1] -
1:6
  **Prakazrel** [1] - 63:16
  **Pras** [5] - 36:2,
37:22, 37:23, 63:16,
87:7
  **precedes** [1] - 23:12
  **preclude** [1] - 124:17
  **predicate** [1] - 104:5
  **prefer** [2] - 81:12,
123:9
  **prepare** [1] - 74:14
  **prepared** [3] -
108:22, 111:22, 122:1
  **presence** [4] -
109:11, 123:14,
128:7, 128:12
  **present** [4] - 39:19,
65:15, 69:8, 108:6
  **presented** [2] -
112:6, 117:20
  **president** [11] - 9:6,
9:10, 9:11, 22:24,
23:9, 23:12, 23:14,
23:15, 25:7, 25:11,
25:12
  **President** [7] -
22:17, 23:22, 24:7,
24:8, 24:13, 24:15,
24:17
  **press** [1] - 91:24
  **presumably** [3] -
81:4, 88:24, 124:19
  **previous** [1] - 88:14
  **PREVIOUSLY** [1] -
5:1
  **previously** [21] -
34:5, 43:8, 44:17,
47:8, 48:25, 49:23,
51:19, 52:25, 53:20,
56:3, 57:22, 60:7,
61:10, 62:2, 62:10,
63:1, 76:24, 80:9,
90:4, 116:18, 120:1
  **primarily** [4] - 5:23,

6:14, 26:21, 68:19
  **principle** [1] - 129:25
  **private** [1] - 23:13
  **privately** [1] - 44:23
  **probe** [1] - 110:11
  **problem** [8] - 6:4,
28:25, 43:13, 45:11,
46:6, 86:16, 121:8,
121:9
  **proceed** [3] - 4:23,
46:23, 115:17
  **Proceedings** [1] -
131:3
  **proceedings** [13] -
4:16, 45:24, 46:8,
46:18, 98:14, 106:21,
106:25, 107:3,
109:10, 113:11,
114:5, 114:15, 132:6
  **process** [2] - 9:4,
50:21
  **produce** [1] - 124:14
  **produced** [3] -
93:19, 98:18, 132:6
  **proffer** [6] - 111:16,
117:5, 117:6, 120:6,
125:24, 126:21
  **programs** [1] -
113:22
  **project/tasks** [1] -
37:22
  **prompt** [1] - 125:12
  **proposed** [2] -
122:9, 127:18
  **proposing** [1] -
125:21
  **prosecutors** [2] -
73:1, 73:25
  **protect** [1] - 11:10
  **protected** [2] -
97:15, 98:8
  **provide** [13] - 42:10,
50:21, 61:24, 69:7,
70:16, 74:7, 74:12,
76:14, 77:22, 77:24,
90:15, 91:2, 125:24
  **provided** [13] -
26:17, 76:16, 89:12,
89:19, 90:13, 93:24,
107:20, 107:22,
112:8, 113:4, 116:16,
117:13, 117:22
  **providers** [1] - 77:6
  **provides** [1] - 121:22
  **providing** [7] -
12:22, 15:12, 18:5,
19:5, 64:11, 114:21,
122:24
  **Public** [1] - 1:19
  **publish** [9] - 19:23,

22:1, 33:19, 35:15,
72:6, 91:12, 97:6,
100:14, 102:11
  **published** [3] -
33:15, 71:17, 102:15
  **pull** [34] - 7:16, 13:1,
13:11, 14:18, 16:12,
18:16, 19:11, 21:5,
26:1, 27:8, 35:2, 37:1,
38:15, 40:1, 42:1,
43:7, 43:22, 44:13,
45:7, 47:7, 51:17,
55:16, 60:2, 61:9,
62:1, 62:25, 64:7,
76:23, 80:7, 88:8,
90:18, 94:2, 95:12,
96:2
  **pulling** [4] - 11:25,
48:24, 52:5, 101:23
  **purchased** [12] -
78:4, 78:12, 78:15,
99:2, 99:3, 99:4,
99:12, 101:19,
101:20, 102:25, 103:5
  **purely** [1] - 126:17
  **purport** [1] - 36:23
  **purported** [2] -
77:23, 80:2
  **purportedly** [1] -
36:15
  **purports** [3] - 32:10,
32:16, 34:25
  **purpose** [2] - 71:5,
87:7
  **purposes** [5] - 5:23,
6:16, 19:9, 48:19,
52:19, 58:11
  **pursuant** [1] -
120:14
  **put** [13] - 4:9, 33:19,
81:15, 81:23, 82:6,
84:5, 87:7, 94:11,
96:21, 123:21,
124:22, 125:2, 128:15
  **putting** [2] - 84:3,
105:13

## Q

  **questioning** [1] -
28:12
  **questions** [21] -
51:21, 53:21, 57:25,
67:6, 106:5, 110:15,
112:4, 115:17, 116:5,
116:17, 116:23,
116:24, 120:4,
120:19, 121:22,
123:5, 123:10,
127:21, 128:5, 128:6,

129:23
  **quickest** [1] - 82:4
  **quickly** [2] - 5:6,
44:13
  **quiet** [1] - 126:7
  **quite** [2] - 107:11,
110:19

## R

  **RAE** [1] - 1:18
  **raise** [2] - 115:9,
122:22
  **raised** [3] - 32:1,
36:3, 120:1
  **raw** [1] - 105:13
  **RDR** [3] - 2:5, 132:3,
132:12
  **re** [1] - 105:24
  **re-call** [1] - 105:24
  **reach** [2] - 9:10, 67:7
  **reached** [2] - 76:15,
76:16
  **reaching** [1] - 76:5
  **read** [29] - 16:2, 25:5,
30:12, 31:6, 36:6,
38:3, 39:11, 39:14,
41:2, 48:2, 55:2,
55:20, 56:10, 60:22,
64:5, 65:6, 82:25,
87:4, 87:18, 88:12,
88:22, 91:17, 97:11,
108:9, 108:10, 112:5,
113:20, 117:19
  **reading** [3] - 41:1,
95:1, 117:19
  **reads** [9] - 30:16,
31:18, 31:21, 32:1,
35:25, 39:9, 60:11,
63:16, 98:7
  **ready** [5] - 4:13,
4:23, 45:14, 46:15,
46:22
  **real** [2] - 78:13,
123:10
  **real-time** [1] - 123:10
  **really** [1] - 108:19
  **reason** [7] - 65:8,
65:12, 66:16, 67:18,
97:22, 115:6, 126:21
  **reasonable** [1] -
77:18
  **reasons** [1] - 9:3
  **receipt** [2] - 33:10,
61:5
  **receipts** [4] - 44:1,
49:4, 49:14, 55:22
  **receive** [8] - 25:21,
26:13, 59:16, 75:13,

80:19, 87:24, 88:5,
122:11
  **RECEIVED** [1] - 3:7
  **received** [46] - 10:21,
25:25, 26:14, 26:16,
27:20, 29:4, 29:6,
29:9, 29:16, 30:25,
31:12, 34:7, 38:8,
38:12, 42:7, 44:7,
47:20, 48:10, 49:16,
53:8, 53:25, 55:10,
55:11, 55:14, 57:20,
59:19, 60:12, 61:6,
62:8, 63:6, 68:10,
70:11, 75:10, 75:18,
79:8, 79:19, 80:1,
80:15, 88:7, 89:6,
89:13, 90:12, 90:25,
91:16, 117:3, 118:1
  **receiving** [4] - 5:11,
41:8, 88:3, 89:14
  **recess** [2] - 46:7,
106:24
  **recipient** [3] - 60:4,
61:19, 61:21
  **recipients** [1] - 35:22
  **recognize** [11] -
7:25, 16:15, 17:24,
18:20, 19:14, 29:22,
40:4, 40:9, 43:25,
44:16, 47:10
  **recognizing** [1] -
95:21
  **recollection** [2] -
73:22, 99:19
  **record** [6] - 49:15,
77:15, 110:19,
121:25, 123:9, 123:22
  **recorded** [4] - 50:5,
50:9, 54:24, 58:16
  **recordings** [1] -
53:24
  **records** [23] - 51:2,
51:12, 57:16, 66:25,
69:7, 69:10, 69:12,
69:14, 69:17, 70:24,
74:13, 74:21, 74:23,
76:18, 77:5, 82:15,
87:25, 90:15, 93:19,
99:20, 103:12, 105:5,
107:21
  **recovered** [2] - 35:5,
100:5
  **red** [1] - 24:24
  **Red** [1] - 3:3
  **redacted** [1] - 19:9
  **redactions** [3] - 11:9,
11:10, 11:13
  **redirect** [1] - 128:17
  **refer** [2] - 6:11, 60:17

**reference** [14] - 17:7, 30:15, 37:9, 38:13, 41:9, 41:24, 60:18, 62:21, 64:16, 64:18, 64:20, 65:23, 75:15, 117:2

**references** [5] - 30:18, 31:15, 34:10, 34:13, 36:7

**referencing** [1] - 44:2

**referred** [1] - 23:8

**refers** [3] - 8:21, 32:17, 34:24

**reflect** [3] - 27:12, 36:10, 100:17

**reflected** [22] - 26:5, 28:24, 30:21, 44:3, 49:13, 50:2, 50:16, 51:11, 53:5, 53:11, 53:23, 54:10, 54:17, 55:8, 55:13, 56:24, 57:6, 57:7, 57:14, 100:4, 105:1

**reflecting** [2] - 34:4, 72:16

**reflects** [3] - 27:13, 78:25, 79:1

**refresh** [1] - 9:15

**Regard** [1] - 86:25

**regard** [2] - 107:18, 119:12

**regarding** [4] - 16:16, 58:10, 89:22, 116:17

**registered** [1] - 61:18

**regular** [4] - 42:14, 44:6, 47:19

**relate** [1] - 58:3

**related** [15] - 19:15, 48:8, 59:12, 59:20, 62:13, 69:12, 69:17, 70:24, 74:3, 75:6, 76:19, 77:6, 108:12, 108:14, 113:3

**relates** [3] - 75:17, 104:11, 111:5

**relating** [1] - 124:11

**relation** [2] - 48:15, 103:19

**relevance** [1] - 118:6

**relevant** [5] - 59:13, 61:1, 76:14, 118:5, 129:13

**reliability** [1] - 104:4

**rely** [1] - 118:14

**remainder** [1] - 39:22

**remaining** [1] - 29:8

**remains** [2] - 98:4, 99:13

**remedy** [1] - 122:7

**remember** [1] - 92:3

**remind** [3] - 58:24, 59:5, 68:6

**repay** [3] - 87:14, 87:22, 88:16

**repayment** [1] - 87:1

**repeating** [1] - 115:21

**replies** [2] - 16:4, 101:3

**report** [16] - 42:10, 44:1, 44:4, 44:5, 47:18, 48:7, 49:3, 49:9, 50:1, 52:14, 52:15, 52:16, 55:22, 56:11, 58:1, 58:12

**REPORTED** [1] - 2:5

**reported** [4] - 44:3, 47:16, 76:19

**reporter** [3] - 6:2, 10:8, 72:10

**Reporter** [2] - 2:6, 132:12

**REPORTER** [4] - 6:3, 63:19, 84:2, 126:6

**reporters** [1] - 66:20, 113:18

**reporting** [1] - 64:25

**reports** [17] - 48:3, 48:5, 48:12, 48:22, 49:8, 49:11, 52:8, 52:9, 52:11, 52:18, 52:20, 52:21, 56:8, 58:3, 74:17, 108:24, 113:19

**represent** [1] - 80:2

**representation** [1] - 96:19

**represented** [2] - 27:22, 127:22

**representing** [1] - 86:23

**request** [5] - 8:18, 61:13, 61:23, 70:17, 87:9

**requested** [6] - 69:10, 69:12, 69:14, 69:17, 89:9, 125:23

**requesting** [3] - 9:2, 17:15, 17:16

**requests** [2] - 61:23, 70:22

**requirements** [1] - 65:1

**requires** [2] - 9:9, 69:7

**residence** [2] - 70:6,

103:8

**resolution** [1] - 115:16

**resolve** [2] - 46:9, 125:19

**respect** [3] - 111:15, 116:15, 120:1

**respectfully** [1] - 6:1

**respective** [1] - 56:20

**respond** [3] - 101:2, 101:7, 122:13

**responding** [1] - 18:5

**responds** [2] - 11:7, 16:1

**response** [18] - 32:15, 34:24, 35:25, 59:21, 59:23, 61:3, 61:5, 61:23, 61:24, 62:7, 62:20, 63:6, 70:16, 70:21, 72:18, 75:11, 122:10

**responses** [1] - 32:13

**responsibilities** [1] - 66:11

**rest** [3] - 21:16, 106:22, 126:20

**result** [1] - 7:6

**results** [1] - 107:17

**retired** [1] - 114:14

**return** [1] - 34:20

**revert** [1] - 47:6

**review** [14] - 32:1, 42:23, 51:1, 51:12, 57:15, 59:1, 60:20, 62:9, 62:16, 66:24, 81:16, 82:13, 99:19, 100:1

**reviewed** [5] - 5:14, 59:18, 104:12, 105:2, 105:5

**Richardson** [22] - 90:8, 90:10, 90:11, 90:15, 90:25, 91:2, 91:16, 91:19, 92:2, 92:11, 92:12, 92:18, 92:20, 92:22, 92:25, 93:4, 93:5, 93:6, 93:9, 95:17, 95:19, 101:13

**right-hand** [3] - 22:7, 24:25, 54:4

**road** [1] - 76:8

**Robert** [2] - 3:5, 114:14

**ROBERT** [1] - 5:1

**role** [1] - 109:22

**Ronquillo** [2] - 54:5, 54:17

**room** [1] - 113:17

**Room** [1] - 2:8

**Rousseau** [19] - 11:18, 12:5, 12:20, 12:23, 12:24, 13:5, 13:7, 13:16, 14:3, 14:7, 14:9, 25:1, 29:24, 30:11, 31:7, 31:9, 32:11, 33:9, 33:12

**Rudolph** [1] - 75:12

**Rufus** [1] - 15:23

**Rule** [1] - 121:21

**rule** [2] - 121:22, 130:2

**ruling** [2] - 128:21, 130:17

**runs** [1] - 18:12

**rush** [1] - 45:22

**résumé** [1] - 15:15

## S

**sample** [1] - 30:13

**save** [1] - 36:20

**saving** [1] - 97:20

**saw** [12] - 6:6, 6:10, 9:13, 25:19, 34:12, 36:11, 49:9, 49:10, 61:13, 75:15, 96:16

**scan** [1] - 20:8

**scenario** [1] - 127:16

**Schedule** [3] - 49:4, 49:14, 49:15

**scope** [3] - 21:24, 89:25, 123:11

**screen** [9] - 21:4, 38:4, 49:22, 52:25, 55:2, 55:18, 56:19, 82:3, 82:6

**screenshot** [1] - 95:25

**screenshots** [2] - 95:25, 96:18

**scroll** [12] - 8:14, 9:12, 10:23, 16:25, 17:9, 20:3, 21:19, 31:14, 38:1, 40:5, 78:16, 82:2

**seal** [2] - 127:6, 130:11

**SEAN** [1] - 1:17

**search** [3] - 70:5, 100:1, 100:5

**seated** [1] - 4:17

**second** [14] - 18:2, 32:1, 39:8, 39:13, 60:21, 64:1, 85:22, 87:11, 88:7, 96:13,

98:6, 107:1, 123:20

**secret** [1] - 98:14

**Secret** [1] - 9:8

**Section** [2] - 1:19, 127:19

**Security** [1] - 8:23

**see** [104] - 6:3, 8:15, 9:18, 9:19, 9:20, 9:24, 10:2, 11:3, 11:7, 12:15, 12:19, 14:3, 14:13, 14:21, 15:9, 17:4, 17:7, 17:13, 17:19, 18:4, 18:11, 21:3, 21:16, 22:17, 22:22, 24:2, 24:7, 24:13, 25:6, 25:11, 27:15, 30:11, 30:15, 30:18, 30:23, 31:14, 31:23, 32:9, 32:10, 32:11, 32:17, 32:18, 34:10, 35:17, 35:25, 36:4, 36:7, 36:8, 39:8, 39:16, 40:23, 40:25, 41:21, 47:9, 48:12, 49:3, 49:6, 50:8, 52:11, 53:22, 54:5, 54:7, 54:21, 56:24, 56:25, 57:7, 58:1, 58:14, 58:18, 60:7, 62:4, 62:9, 64:11, 64:15, 64:18, 65:22, 66:7, 67:7, 67:10, 72:15, 78:19, 78:23, 86:25, 87:2, 89:2, 92:7, 100:23, 100:25, 101:5, 109:23, 114:2, 114:23, 115:23, 117:18, 118:10, 118:21, 119:2, 128:7, 128:8, 129:15, 130:14

**See** [1] - 39:14

**seek** [2] - 73:9, 76:18

**seem** [1] - 122:17

**select** [2] - 23:13, 23:18

**semi** [1] - 42:14

**semi-regular** [1] - 42:14

**send** [3] - 11:5, 112:15, 113:7

**sender** [1] - 98:22

**sending** [6] - 12:24, 15:13, 17:16, 19:7, 20:6, 119:12

**sense** [1] - 113:18

**sent** [22] - 31:4, 36:17, 40:22, 50:14, 61:17, 63:7, 80:5, 86:22, 89:3, 89:20, 90:4, 92:14, 93:9,

93:10, 95:16, 95:17,
95:18, 95:19, 95:20,
97:9, 97:12, 103:6
**sentence** [3] - 6:6,
39:8, 98:6
**separate** [1] - 115:15
**September** [21] - 7:2,
7:12, 7:14, 8:2, 11:4,
11:21, 17:5, 17:14,
17:18, 18:21, 20:1,
20:15, 20:16, 25:19,
26:10, 27:15, 38:20,
56:13, 57:2, 63:16
**Service** [1] - 9:9
**service** [2] - 99:20,
99:21
**SESSION** [1] - 1:7
**set** [2] - 28:21, 53:19
**several** [6] - 34:13,
75:2, 80:1, 80:14,
81:1, 90:3
**shaking** [3] - 22:17,
22:23, 25:11
**shared** [1] - 73:3
**short** [4] - 15:13,
15:15, 99:11, 127:5
**shortcut** [1] - 121:20
**shorten** [1] - 39:19
**shortly** [2] - 88:3,
93:20
**show** [4] - 71:10,
86:19, 103:16, 103:18
**showing** [5] - 22:4,
26:7, 29:21, 52:24,
99:23
**shown** [1] - 73:11
**shows** [2] - 58:16,
104:15
**shut** [1] - 98:1
**sic** [1] - 55:4
**side** [10] - 22:7, 22:9,
24:8, 24:18, 24:25,
48:16, 51:18, 95:13
**sidebar** [2] - 109:8,
109:11
**signature** [2] - 36:23,
36:25
**similar** [6] - 9:23,
41:21, 48:23, 52:22,
88:15, 89:6
**simply** [3] - 82:13,
116:20, 128:6
**sit** [2] - 46:19, 107:4
**site** [5] - 103:12,
103:22, 103:23,
104:11, 105:5
**situation** [3] -
122:23, 123:4, 123:8
**skip** [1] - 128:11
**slated** [1] - 17:18

**slice** [1] - 74:25
**slightly** [2] - 82:24,
84:17
**slow** [6] - 7:18, 10:6,
51:25, 63:19, 66:18,
78:7
**small** [1] - 23:12
**Social** [1] - 8:23
**solid** [1] - 29:2
**someone** [4] - 32:19,
33:3, 69:7, 99:10
**sometime** [3] - 70:9,
71:20, 76:11
**soon** [4] - 70:11,
73:9, 73:10, 74:3
**sorry** [31] - 10:11,
26:2, 29:11, 31:18,
33:11, 33:12, 33:16,
40:11, 40:15, 45:1,
46:25, 55:2, 56:2,
58:6, 63:10, 65:4,
70:6, 72:10, 72:12,
81:5, 83:10, 83:23,
84:16, 94:5, 98:10,
126:6, 126:14, 130:5,
130:6, 130:7
**sort** [7] - 42:4, 64:19,
67:5, 75:8, 95:22,
117:7, 124:1
**sounds** [3] - 7:5,
121:2, 123:18
**source** [7] - 27:20,
65:8, 65:10, 66:16,
67:1, 67:12, 67:18
**spare** [1] - 43:6
**speaking** [2] - 44:2,
49:13
**Special** [1] - 114:14
**special** [1] - 112:20
**specific** [17] - 32:25,
36:3, 58:21, 105:12,
110:8, 110:15,
110:17, 110:19,
111:6, 112:7, 113:3,
114:21, 116:9,
116:12, 120:4,
120:19, 130:1
**specifically** [6] -
5:10, 69:15, 70:13,
71:8, 116:3, 121:22
**specificity** [1] -
78:11
**speculation** [1] -
67:4
**speed** [2] - 52:1,
78:6
**speeding** [1] - 10:6
**spelled** [1] - 41:19
**SPM** [13] - 57:7, 57:9,
57:11, 58:16, 58:19,

58:21, 59:24, 61:17,
64:2, 64:12, 64:16,
69:18
**squeezed** [1] - 4:18
**St** [1] - 78:5
**stage** [1] - 115:12
**stand** [2] - 66:7, 66:9
**standing** [3] - 6:6,
127:1, 127:25
**start** [6] - 17:2,
33:21, 106:8, 107:14,
108:19, 124:20
**started** [2] - 8:25,
68:9
**starting** [2] - 52:1,
91:21
**state** [1] - 81:1
**statement** [3] -
109:17, 111:3, 114:25
**statements** [5] -
61:2, 110:10, 116:17,
116:25, 117:6
**States** [3] - 2:6,
77:20, 132:13
**STATES** [3] - 1:1,
1:3, 1:11
**status** [1] - 75:2
**statute** [1] - 127:19
**statutory** [1] - 124:9
**stenographic** [1] -
132:5
**step** [1] - 114:7
**steps** [1] - 70:3
**still** [3] - 46:23,
124:18, 129:15
**stopped** [1] - 6:5
**store** [4] - 78:4,
102:24, 103:19, 103:3
**straightforward** [3] -
28:7, 105:4, 105:8
**strangely** [1] - 95:22
**straw** [29] - 10:19,
11:16, 17:25, 26:7,
26:10, 26:18, 26:19,
50:6, 50:11, 51:9,
51:15, 53:7, 53:25,
55:11, 69:16, 79:17,
80:5, 80:17, 80:23,
86:24, 89:6, 89:12,
89:13, 90:12, 92:12,
92:23, 92:25, 93:4,
93:5
**Street** [1] - 103:3
**Streets** [1] - 101:21
**stretch** [1] - 66:7,
66:9
**strike** [5] - 28:10,
32:22, 33:1, 41:11,
88:19
**strikes** [1] - 32:14

**strongly** [1] - 91:19
**struggling** [1] -
66:21
**studio** [1] - 68:15
**subject** [18] - 8:15,
12:6, 14:4, 14:5,
16:16, 20:1, 37:21,
37:22, 69:24, 70:4,
70:8, 70:14, 88:17,
104:6, 120:17,
120:20, 126:14,
126:15
**subject's** [1] - 70:5
**submit** [4] - 60:25,
115:8, 122:9, 122:12
**submitted** [6] - 48:3,
50:5, 50:10, 56:8,
61:3, 61:4
**submitting** [1] -
62:22
**subpoena** [11] -
69:1, 69:5, 69:6,
69:11, 69:12, 70:12,
70:17, 72:18, 75:10,
75:11, 79:9
**subscriber** [4] -
77:5, 77:7, 77:9,
77:14
**subsequently** [2] -
53:9, 54:1
**substantially** [4] -
48:21, 52:20, 58:12,
61:12
**substantive** [1] -
101:14
**substitute** [1] - 88:23
**suggest** [1] - 125:22
**suggested** [1] -
120:5
**suggestion** [2] -
120:22, 121:1
**Suite** [1] - 1:16
**summary** [4] - 26:6,
27:11, 54:13, 75:16
**summer** [1] - 68:10
**super** [4] - 27:3,
27:4, 27:14, 27:21
**supports** [1] - 5:15
**suppose** [2] - 8:19,
123:25
**supposed** [1] - 98:14
**supposedly** [1] -
128:25
**surrounding** [1] -
36:1
**sustain** [1] - 109:7
**SWORN** [1] - 5:1
**Sylvia** [1] - 22:14
**symbols** [1] - 16:3

**T**

**Taek** [1] - 14:5
**Tan** [22] - 13:16,
14:3, 14:8, 29:23,
31:9, 31:11, 31:13,
31:15, 32:10, 32:16,
33:10, 33:11, 34:14,
34:24, 34:25, 36:15,
38:13, 41:9, 41:24,
66:4
**Tan's** [5] - 32:20,
32:21, 33:4, 33:6,
36:25
**tax** [4] - 32:5, 36:3,
38:22, 39:20
**taxability** [4] - 29:18,
35:7, 39:23, 42:6
**taxes** [1] - 29:24
**tech** [3] - 44:25,
45:18, 46:5
**technical** [2] - 45:2,
47:1
**telephone** [2] - 77:6,
77:7
**ten** [2] - 45:20,
106:18
**term** [1] - 9:23
**terminology** [1] - 4:8
**terms** [27] - 10:7,
29:8, 30:21, 39:20,
64:12, 64:16, 72:7,
105:20, 109:22,
110:16, 110:18,
111:1, 111:18, 112:7,
113:4, 114:24, 116:6,
116:19, 120:8, 121:3,
121:4, 123:19,
123:23, 128:9,
129:14, 129:16
**testified** [21] - 5:8,
6:21, 9:25, 29:3, 29:5,
34:1, 34:5, 34:16,
47:14, 50:2, 50:25,
65:17, 92:20, 93:13,
95:24, 98:17, 108:6,
108:15, 111:16,
117:17, 118:2
**testify** [7] - 79:14,
93:16, 108:1, 114:17,
115:1, 118:7, 120:1
**testifying** [3] - 47:11,
104:6, 121:24
**testimony** [44] - 5:9,
20:20, 31:3, 42:22,
68:3, 69:9, 74:19,
76:8, 93:24, 104:10,
107:19, 107:21,
107:22, 108:9,

108:11, 109:3, 110:9, 110:10, 110:12, 111:11, 111:25, 112:9, 112:18, 114:20, 115:11, 116:3, 116:7, 116:8, 116:20, 116:22, 117:12, 118:14, 118:19, 120:11, 122:25, 124:1, 124:5, 124:9, 124:11, 125:25, 126:15, 128:24

**text** [16] - 60:4, 90:3, 90:24, 91:2, 91:15, 92:14, 93:8, 93:10, 95:15, 95:18, 95:19, 96:16, 96:19, 96:20, 98:20, 101:12

**texting** [1] - 101:6

**texts** [3] - 95:16, 95:19, 103:5

**THE** [233] - 1:1, 1:10, 1:14, 1:21, 2:2, 3:4, 4:1, 4:4, 4:13, 4:14, 4:17, 4:20, 4:21, 5:25, 6:3, 6:5, 6:8, 7:18, 7:20, 8:10, 10:6, 10:11, 10:14, 12:11, 13:22, 15:3, 16:22, 19:1, 19:20, 21:10, 21:24, 22:4, 28:4, 28:5, 28:11, 30:5, 32:24, 33:3, 33:16, 33:18, 35:12, 35:15, 37:15, 39:2, 40:16, 40:23, 41:13, 41:18, 43:10, 43:13, 43:15, 44:22, 45:1, 45:4, 45:8, 45:11, 45:17, 45:20, 45:25, 46:6, 46:9, 46:12, 46:15, 46:16, 46:19, 46:21, 46:22, 49:20, 50:21, 51:25, 52:2, 56:1, 56:4, 63:10, 63:13, 63:19, 66:6, 66:18, 66:20, 67:5, 67:14, 67:15, 71:18, 71:21, 71:24, 72:2, 72:9, 73:16, 73:18, 73:20, 78:6, 78:8, 81:3, 81:6, 81:15, 81:20, 82:1, 82:5, 82:9, 82:12, 82:19, 82:25, 83:3, 83:7, 83:9, 83:11, 83:15, 83:17, 83:19, 83:23, 83:25, 84:2, 84:3, 84:7, 84:9, 84:13, 84:18, 84:21, 84:25, 85:2, 85:5,

85:8, 85:13, 85:17, 85:19, 85:22, 86:3, 86:6, 86:9, 86:13, 86:16, 88:21, 90:20, 91:8, 91:13, 94:5, 94:9, 94:11, 94:15, 94:19, 95:1, 95:3, 95:9, 96:9, 96:12, 96:21, 96:22, 96:23, 96:25, 97:3, 97:7, 100:11, 100:15, 101:25, 102:2, 102:4, 102:15, 102:20, 104:7, 104:14, 104:19, 104:21, 104:23, 105:18, 106:3, 106:6, 106:9, 106:11, 106:14, 106:17, 106:22, 107:1, 107:4, 109:7, 109:9, 109:12, 109:14, 109:19, 110:2, 110:4, 110:14, 110:22, 111:14, 111:18, 111:23, 112:13, 113:13, 114:3, 114:6, 114:9, 114:10, 114:13, 114:16, 115:12, 115:19, 116:4, 117:8, 118:6, 119:2, 119:6, 119:14, 119:22, 120:5, 120:22, 121:1, 121:15, 122:4, 122:6, 122:12, 122:15, 123:2, 123:17, 124:10, 125:2, 125:10, 125:15, 126:1, 126:4, 126:6, 126:7, 126:16, 126:19, 127:25, 128:4, 128:20, 129:11, 129:14, 130:3, 130:6, 130:9, 130:13, 130:23, 131:1

**themselves** [1] - 69:8

**then-counsel** [2] - 71:3, 71:6

**then-defense** [1] - 93:20

**thereafter** [2] - 72:22, 74:4

**Thereupon** [3] - 46:7, 106:24, 114:14

**they've** [3] - 43:15, 81:4, 130:14

**thinks** [1] - 118:3

**third** [1] - 32:17

**thousands** [3] - 43:5,

49:11, 53:16

**threaten** [1] - 87:19

**threatening** [3] - 88:15, 88:20, 88:23

**threatens** [1] - 87:21

**three** [5] - 28:15, 34:6, 53:19, 53:25, 101:11

**throughout** [3] - 5:16, 6:9, 79:13

**tie** [2] - 24:9, 24:24

**timeline** [2] - 75:9, 116:21

**timing** [2] - 89:10, 89:11

**tired** [1] - 66:9

**today** [9] - 20:20, 42:22, 108:11, 109:3, 110:10, 110:12, 112:25, 116:3, 124:16

**together** [1] - 96:21

**tomorrow** [8] - 91:21, 91:23, 92:3, 113:17, 114:2, 120:2, 128:16, 130:18

**tone** [1] - 88:15

**tonight** [5] - 115:24, 121:2, 122:10, 127:5, 130:18

**took** [1] - 95:25

**top** [15] - 10:24, 11:16, 12:17, 13:2, 15:17, 15:25, 18:4, 18:13, 31:19, 32:6, 32:9, 34:20, 44:2, 98:5

**topic** [4] - 29:15, 59:14, 127:20, 130:15

**total** [7] - 26:12, 26:14, 27:18, 54:18, 58:19, 58:24, 59:5

**totaling** [2] - 63:25, 64:2

**totally** [2] - 126:12, 126:13

**touching** [1] - 38:20

**Toussaint** [5] - 17:23, 18:6, 54:22, 54:24, 55:3

**toward** [2] - 10:24, 75:8

**towards** [1] - 9:19

**tower** [2] - 105:5, 105:9

**trace** [2] - 28:5, 28:20

**traced** [4] - 27:24, 28:5, 28:9, 57:19

**tracing** [4] - 28:6, 28:24, 28:25, 29:2

**traditional** [1] - 122:23

**transaction** [5] - 6:24, 69:15, 91:22, 92:9, 92:10

**transactional** [1] - 50:9

**transactions** [5] - 6:9, 7:1, 34:7, 36:10, 69:16

**transcript** [2] - 132:5, 132:6

**TRANSCRIPT** [1] - 1:10

**transcripts** [1] - 74:19

**transfers** [1] - 59:10

**treatment** [1] - 39:20

**TRIAL** [1] - 1:10

**true** [7] - 65:8, 65:15, 66:16, 67:1, 67:18, 132:4, 132:5

**try** [9] - 40:21, 46:14, 47:6, 69:25, 73:9, 98:22, 104:23, 119:16

**trying** [2] - 55:2, 76:6

**turn** [2] - 29:14, 86:19

**turned** [1] - 113:4

**turning** [2] - 92:4, 95:6

**turns** [1] - 118:22

**two** [20] - 9:3, 11:17, 24:20, 47:25, 48:11, 49:25, 50:2, 51:22, 52:6, 52:18, 58:3, 63:25, 64:1, 69:23, 74:6, 79:6, 89:21, 93:4, 121:6, 129:5

**type** [2] - 44:3, 77:3

**types** [2] - 13:15, 69:10

# U

**U.S** [3] - 1:15, 1:18, 42:19

**ultimate** [2] - 61:21, 67:5

**ultimately** [3] - 5:20, 76:9, 76:18

**unable** [1] - 28:20

**unaware** [1] - 69:25

**uncovered** [1] - 5:16

**under** [19] - 30:23, 60:20, 60:21, 60:23, 61:3, 62:9, 62:16, 65:14, 69:13, 69:25, 78:23, 111:16, 117:6,

121:21, 127:6, 127:19, 128:25, 130:2, 130:11

**underneath** [1] - 14:13

**understood** [4] - 10:13, 24:3, 34:23, 72:12

**undertake** [1] - 98:21

**undertaken** [1] - 68:20

**uniquely** [1] - 8:22

**united** [1] - 2:6

**United** [2] - 77:20, 132:13

**UNITED** [3] - 1:1, 1:3, 1:11

**unknown** [2] - 90:4, 99:14

**unless** [1] - 32:25

**unrelated** [3] - 126:12, 126:13, 126:15

**up** [85] - 6:5, 6:22, 7:1, 7:16, 10:6, 10:23, 11:25, 13:11, 14:18, 15:6, 15:16, 15:17, 16:12, 17:10, 18:1, 18:9, 19:11, 20:15, 21:5, 26:1, 27:8, 28:12, 31:14, 31:25, 33:19, 33:22, 34:2, 35:2, 37:1, 38:15, 39:18, 39:19, 40:1, 43:7, 43:10, 43:22, 44:13, 47:7, 48:24, 49:4, 51:17, 52:1, 54:12, 55:16, 55:18, 56:19, 58:1, 58:25, 59:10, 60:2, 61:9, 62:1, 62:25, 72:10, 75:8, 76:23, 78:6, 80:7, 81:15, 81:23, 82:6, 88:8, 90:18, 94:2, 94:11, 95:12, 95:22, 96:2, 96:18, 98:5, 101:23, 102:17, 104:16, 105:23, 110:12, 112:23, 118:24, 121:8, 121:15, 122:6, 127:25, 128:22, 129:1

**upcoming** [1] - 8:2

**upper** [4] - 15:17, 38:17, 40:6, 49:4

**usage** [1] - 9:23

**USC** [1] - 127:19

**user** [3] - 77:7, 99:13, 103:13

**uses** [1] - 99:10

## V

**Valentine's** [1] - 75:23
**various** [2] - 110:17, 114:22
**vendors** [2] - 44:9, 47:21
**Ventura** [1] - 1:23
**version** [1] - 58:8
**versions** [1] - 58:12
**vetted** [1] - 16:5
**vetting** [1] - 9:4
**via** [1] - 95:24
**Victory** [21] - 8:18, 9:1, 26:8, 26:10, 26:21, 29:5, 42:9, 42:12, 43:1, 44:11, 48:4, 50:1, 51:23, 52:3, 53:9, 54:2, 59:12, 75:20, 79:21, 88:3, 90:13
**view** [6] - 6:2, 20:21, 22:19, 118:17, 129:11, 129:23
**views** [1] - 117:22
**vigilant** [1] - 113:20
**violated** [1] - 60:13
**violations** [2] - 62:12, 71:9
**visits** [1] - 97:16
**vital** [1] - 9:2
**Vitals** [1] - 8:15
**vitals** [3] - 8:18, 8:20, 8:21
**voluminous** [1] - 43:4
**Vote** [27] - 26:24, 27:2, 27:3, 27:6, 27:14, 28:16, 28:19, 29:7, 42:9, 42:13, 56:9, 57:1, 57:8, 57:18, 58:2, 58:17, 59:7, 59:13, 59:18, 59:20, 60:1, 63:24, 65:9, 65:10, 65:13, 65:19, 67:2
**vs** [1] - 1:5

## W

**wait** [3] - 45:14, 102:15, 130:4
**waiting** [1] - 18:14
**walked** [1] - 97:22
**wants** [4] - 120:23, 123:7, 123:25, 124:23
**warrant** [3] - 70:5,

100:1, 100:5
**Washington** [10] - 1:6, 1:16, 1:20, 2:4, 2:8, 7:2, 20:15, 20:23, 25:20, 132:14
**watch** [1] - 66:11
**wearing** [1] - 24:9
**week** [3] - 71:20, 71:22, 91:21
**weeks** [2] - 74:6, 79:6
**white** [44] - 8:1, 8:4, 11:3, 12:6, 13:10, 14:12, 14:22, 15:10, 15:12, 15:13, 15:20, 15:22, 16:2, 16:16, 17:5, 17:14, 17:15, 17:16, 18:5, 18:11, 18:12, 18:14, 18:21, 19:5, 19:7, 19:14, 20:1, 20:7, 24:10, 93:14, 93:25, 95:20, 95:23, 97:10, 98:11, 98:17, 101:13, 109:20, 113:2, 114:17, 115:10, 115:22, 116:15, 117:3
**White** [31] - 22:14, 93:11, 93:13, 93:23, 97:12, 108:3, 108:4, 108:12, 108:14, 109:1, 109:2, 109:4, 109:17, 110:13, 110:16, 110:24, 111:7, 111:10, 111:16, 111:19, 112:7, 112:17, 115:1, 116:2, 116:25, 117:22, 118:1, 118:9, 118:13, 118:17, 119:3
**White's** [1] - 110:9
**white's** [2] - 22:14, 95:25
**whole** [4] - 17:10, 37:3, 87:18, 109:20
**wife** [1] - 22:14
**wiggling** [1] - 66:8
**wind** [2] - 121:7, 122:6
**wire** [2] - 41:4, 41:12
**wish** [5] - 65:9, 66:10, 81:15, 81:21, 124:12
**withdraw** [2] - 41:16, 86:12
**WITNESS** [14] - 5:1, 6:8, 7:20, 28:5, 40:23, 41:18, 52:2, 67:15, 73:18, 78:8, 96:22, 96:25, 114:9, 114:13

**witness** [30] - 6:2, 28:3, 97:15, 98:7, 98:9, 98:11, 104:3, 104:12, 105:19, 109:18, 111:12, 115:13, 118:2, 118:9, 118:13, 118:22, 120:1, 120:16, 120:21, 121:23, 122:2, 122:19, 122:24, 125:8, 127:21, 128:17, 128:18, 128:19, 129:25
**witness's** [1] - 120:19
**WITNESSES** [1] - 3:4
**witnesses** [7] - 74:18, 74:20, 76:5, 79:13, 79:16, 128:13
**witnesses'** [1] - 76:8
**word** [2] - 88:19, 88:23
**wording** [2] - 96:23, 96:25
**words** [3] - 24:22, 49:9, 124:24
**works** [1] - 111:1
**worry** [2] - 117:8, 119:7
**worth** [1] - 92:5
**writ** [1] - 104:11
**write** [2] - 121:15, 125:9
**writes** [2] - 18:12, 18:14
**writing** [2] - 11:4, 60:24
**written** [1] - 14:13
**wrote** [2] - 59:23, 62:8

## Y

**year** [5] - 54:9, 54:13, 54:15, 54:19, 58:21
**yellow** [1] - 24:9
**Yo** [1] - 100:24
**York** [2] - 1:15, 1:19

## Z

**zoom** [13] - 7:21, 10:25, 12:17, 13:2, 37:2, 38:16, 40:6, 40:21, 60:3, 63:8, 64:8, 88:10, 96:4