<pre>
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
       * * * * * * * * * * * * * * *   )
 3    UNITED STATES OF AMERICA,         )      Criminal Action
                                        )      No. 19-00148-1
 4                    Plaintiff,        )
                                        )
 5      vs.                             )
                                        )
 6    PRAKAZREL MICHEL,                 )      Washington, D.C.
                                        )      March 31, 2023
 7                    Defendant.        )      2:19 p.m.
                                        )      AFTERNOON SESSION
 8     * * * * * * * * * * * * * * *   )

 9

10                     TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY,
11                  UNITED STATES DISTRICT JUDGE

12

13

      APPEARANCES:
14
      FOR THE GOVERNMENT:       JOHN D. KELLER, ESQ.
15                              U.S. DEPARTMENT OF JUSTICE
                                1301 New York Avenue, Northwest
16                              Suite 1016
                                Washington, D.C. 20530
17
                                SEAN F. MULRYNE, ESQ.
18                              NICOLE RAE LOCKHART, ESQ.
                                U.S. DEPARTMENT OF JUSTICE
19                              Public Integrity Section
                                1400 New York Avenue, Northwest
20                              Washington, D.C. 20005

21
      FOR THE DEFENDANT:        DAVID E. KENNER, ESQ.
22                              ALON ISRAELY, ESQ.
                                KENNER LAW FIRM
23                              16633 Ventura Boulevard
                                Encino, California 91436
24

25
</pre>

1    APPEARANCES, CONT'D:

2    FOR THE DEFENDANT:       CHARLES R. HASKELL, ESQ.
                             LAW OFFICES OF CHARLES R.
3                               HASKELL, P.A.
                             641 Indiana Avenue, Northwest
4                            Washington, D.C. 20004

5
     REPORTED BY:            LISA EDWARDS, RDR, CRR
6                            Official Court Reporter
                             United States District Court for the
7                               District of Columbia
                             333 Constitution Avenue, Northwest
8                            Room 6706
                             Washington, D.C. 20001
9                            (202) 354-3269

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

|                                      | Direct | Cross | Red. |
|--------------------------------------|--------|-------|------|
| WITNESSES FOR THE GOVERNMENT:        |        |       |      |
| Eric Feigenbaum                      | 6      | 22    |      |
| Neville Richardson                   | 54     | 73    | 81   |

| EXHIBITS RECEIVED IN EVIDENCE        | PAGE |
|--------------------------------------|------|
| Government's Exhibit No. 458         | 65   |

```
 1                 THE COURT:  Good afternoon, everyone.

 2                 MR. KENNER:  Good afternoon, your Honor.

 3                 THE COURT:  Before we start, I have a suggestion

 4      about the motion for contempt.  I think what I was going to

 5      do is sever the motion, have them open it up as a

 6      miscellaneous case and ship it off to -- well, they'll

 7      assign another judge to it.  And then it just makes it

 8      easier, neater.  It's not part of this.  And they'll wait

 9      until, you know, the case is done.  It will be randomly

10      assigned to whoever, you know, is up.

11                 MR. KENNER:  Your Honor, can you wait until next

12      week and let me meet and confer with Mr. Keller?

13                 THE COURT:  Sure.  No problem.

14                 MR. KENNER:  Thank you.

15                 THE COURT:  And certainly Mr. Michel -- but I want

16      you to understand, I have no problem whatsoever

17      suggesting -- doing that.  It's a neat way of not having

18      any -- you know, any potential appearance of conflict.

19                 (Whereupon, the jury entered the courtroom at 2:20

20      p.m. and the following proceedings were had:)

21                 THE COURT:  Juror in Seat No. 7, do you want to

22      put whatever you have there someplace else?  It looks like

23      you're squished into your seat.  Do you want to put that

24      someplace?

25                 JUROR NO. 7:  Okay.  Yeah.
```

```
 1                THE COURT:  All right.  I didn't want you to be
 2      too squeezed into the seat.
 3                Good afternoon, members of the jury.
 4                THE JURY:  Good afternoon.
 5                THE COURT:  We're ready to proceed.
 6                And the next witness is?
 7                MR. MULRYNE:  Good afternoon, your Honor.  Thank
 8      you.
 9                The United States calls Eric Feigenbaum to the
10      stand.
11                (Thereupon, Eric Feigenbaum entered the courtroom
12      and the following proceedings were had:)
13                THE COURT:  Sir, if you would step up over here.
14      If you would step up and we'll swear you in.
15                THE COURTROOM DEPUTY:  Would you raise your right
16      hand, please.
17                ERIC FEIGENBAUM, GOVERNMENT WITNESS, SWORN.
18                THE COURTROOM DEPUTY:  Please be seated.
19                THE COURT:  Please be seated.  You can move the
20      chair around, or move it up.  You can take your mask off, as
21      we have to be able to hear you.  And if you'd adjust the
22      microphone to make sure we can hear you.
23                Allow counsel to finish their question even if you
24      know what they're asking you before you start to answer.
25      And they should do the same for you.  If you hear the word
```

1     "objection," or you see counsel start to stand, they're

2     going to object.  If you have not started to answer, don't.

3     If you're in the middle of your answer, please step.  Let me

4     hear the objection and then I'll tell you whether you can

5     answer.  All right?

6                 THE WITNESS:  Okay.

7                 THE COURT:  Proceed.

8                 MR. MULRYNE:  Thank you, your Honor.

9                 MR. KENNER:  Your Honor, before counsel proceeds,

10    I'm having trouble seeing the witness.

11                THE COURT REPORTER:  Oh, sorry.  I'll move over.

12                MR. KENNER:  No problem.  I appreciate it.  Thank

13    you.

14                        DIRECT EXAMINATION

15    BY MR. MULRYNE:

16    Q.  Good afternoon, Mr. Feigenbaum.

17    A.  Good afternoon.

18    Q.  Can you please state and spell your full name for the

19    Court and the court reporter.

20    A.  Eric Feigenbaum.

21                THE COURT:  You need to speak up louder.  What you

22    probably could do is move -- you can move the microphone up.

23                THE WITNESS:  Eric Feigenbaum, E-R-I-C,

24    F-E-I-G-E-N-B-A-U-M.

25                THE COURT:  You're still too low.  Think about

```
 1    talking to somebody at the back door.  All right?
 2            THE WITNESS:  Okay.
 3    BY MR. MULRYNE:
 4    Q.  Mr. Feigenbaum, in what city and state do you reside?
 5    A.  Falmouth, Maine.
 6    Q.  And how are you currently employed?
 7    A.  I'm the director of public affairs for an electric
 8    utility in Maine.
 9    Q.  Okay.  Taking you back to the year 2012, at that time,
10    did you work on behalf of any political campaigns?
11    A.  Yes.  I worked for Obama for America.
12    Q.  And at the risk of asking an obvious question, Obama for
13    America, what kind of political campaign was that?
14    A.  That was the presidential reelection campaign of
15    President Obama.
16    Q.  What was your position/title on the campaign?
17    A.  I was the Mid-Atlantic finance director.
18    Q.  And as the Mid-Atlantic finance director, did you work
19    with or supervise a team of other campaign officials?
20    A.  Yes, I did.
21    Q.  Supervise?
22    A.  Yes.
23    Q.  All right.  And approximately how big was the team?
24    A.  I think there were four or five of us.
25    Q.  And what is it that you all did in your roles?
```

1    A.  We raised money for the campaign, usually through

2    various kinds of fundraising events.

3    Q.  Can you explain to the jury, at least in summary, what

4    were some of the types of fundraising events?  What were

5    some of the ways in which you raised that money for the

6    campaign?

7    A.  Sure.  We did multiple different kinds of events,

8    everything from larger, lower-dollar rally-style events to

9    smaller higher-dollar events, you know, dinners and that

10   type of thing, receptions --

11   Q.  Okay.  As among the events, the fundraising events, on

12   which you and your team worked in 2012, was there an event

13   here in Washington, D.C., in September of 2012?

14   A.  Yes.

15   Q.  And where was that event held?

16   A.  It was at the home of Frank and Sylvia White in

17   Washington, D.C.

18   Q.  And who is Frank and Sylvia White?

19   A.  They were -- Mr. White in particular was a volunteer

20   fundraiser on the campaign.  That's the capacity in which I

21   knew him.

22   Q.  Okay.  And what did you and your team do to help in

23   regard to that event?

24   A.  We would have done any number of things to make the

25   event logistics work well.  You know, send out invitations,

1    make sure the catering and parking and those types of

2    arrangements were taken care of.  We would have kept the

3    guest list.  We would have collected information from guests

4    in order to vet them pre to the event.  We would have worked

5    in advance with any campaign surrogates for their logistics,

6    those types of things.

7    Q.  Let me show you what's been previously admitted into

8    evidence as Government Exhibit 509.  And if -- at any point,

9    if you have trouble seeing anything on the screen, please

10   let us know.

11             Mr. Feigenbaum, do you recognize that as an

12   invitation to the event at Mr. White's home for

13   September 14th, 2012?

14   A.  Yes.

15   Q.  And I would note at the bottom -- toward the bottom, we

16   see there's contact information for yourself.  Do you see

17   that?

18   A.  Yes.

19   Q.  And why would you be included on the invitation?

20   A.  Usually -- well, we would always have a campaign contact

21   on the invitation for people to send in their RSVPs or get

22   more information.

23   Q.  Okay.  And if we could just take a moment, looking at

24   the bottom of the first page of 509, at the very bottom,

25   with that block -- and we'll enlarge it here in a moment --

1    it says, "Paid for by Obama Victory Fund 2012."

2                What is Obama Victory Fund 2012?

3    A.  The Obama Victory Fund 2012 was a joint fundraising

4    committee.  There was an agreement between Obama for

5    America, the Democratic National Committee and the state

6    Democratic parties you see listed there in the box.

7    Q.  Okay.

8                MR. MULRYNE:  If we can go to Page 2 of

9    Exhibit 509.

10   BY MR. MULRYNE:

11   Q.  And before we look at any of this in particular,

12   Mr. Feigenbaum, this form here generally, what is this form?

13   A.  This would have been a donor information contribution

14   form that was usually attached to the invitation.

15   Q.  Okay.  What's the purpose of the donor information form?

16   A.  To collect information from the donors, including their

17   contact information, the information that the campaign is

18   required to collect for reporting purposes, and then some

19   people also use it as a way to make their contribution by

20   credit card.

21               MR. MULRYNE:  Can we zoom in to the upper half?

22   Thank you, Ms. Orozco.

23   BY MR. MULRYNE:

24   Q.  So a few questions, Mr. Feigenbaum.

25               First, for a joint fundraising committee, such as

1    Obama Victory Fund, are there contribution limits as to how

2    much any -- the amount a particular person could give the

3    campaign?

4    A.  Yeah.  I don't recall the exact contribution limit for

5    the Obama Victory Fund 2012, but it would have been, as I

6    recall, the sum of the contribution limits that applied to

7    the Obama campaign, the Democratic National Committee, and

8    then the state parties that were the parties to the Obama

9    Victory Fund.

10    Q.  Okay.  And looking at this form, we see there's some

11    empty lines here asking for first name, last name, address,

12    employer.  Again, what's the purpose of that portion of the

13    form?

14    A.  We would collect the information, obviously, so we had a

15    record of who had contributed, and then the campaign is

16    required by law to collect certain information to report to

17    the Federal Election Commission.  I think, as I recall, it

18    was name, address, employer and occupation is what we were

19    required to use our best efforts to try to collect from the

20    donors.

21    Q.  So you just testified that the campaign was required to

22    collect information of the contributors and provide that to

23    the FEC.  Is that right?

24    A.  We were required to use our best efforts to try to

25    collect that information.  Yes.

1    Q.  Okay.  And if -- and, in fact, if we look here at the

2    paragraph just above the line for first name, last name, you

3    may see there in the middle of the paragraph there's the

4    line that begins:  "Federal law requires us to use our best

5    efforts to collect and report the name, mailing address,

6    occupation and employer of individuals whose contributions

7    exceed $200 in an election cycle."

8            Is that essentially what you were just referring

9    to?

10   A.  Yes.

11   Q.  And in addition to the donor form that we see here that

12   contributors could fill out, what were other ways in which

13   the campaign would go about collecting contributor

14   information?

15   A.  The donor form, I'd say, was the primary way.  That was

16   always the preference, if we could have a donor fill out a

17   form either in advance or at the time of the event.  If we

18   didn't have one in advance, we would try to get the

19   information either at the event or after the fact, for

20   example, by reaching out to the donor directly.

21   Q.  Contacting the donors directly?

22   A.  Correct.

23   Q.  Was it important for the campaign to receive true and

24   accurate information of the contributors?

25   A.  Yes.

Feigenbaum - DIRECT - By Mr. Mulryne

```
1    Q.   Why was that important to the campaign?

2    A.   We were, as I said, required by federal law to collect

3    that information and transmit it to the FEC.

4    Q.   And did it -- well, before I ask the next question, if I

5    may, let me point you to the paragraph below those -- the

6    contributor information.  So this section here.  So,

7    Mr. Feigenbaum, if you read along with me, it reads:

8    "Federal law prohibits foreign nationals, except lawfully

9    admitted permanent residents of the U.S., from contributing

10   to OVF 2012.  By signing below, I certify that I am a U.S.

11   citizen or lawfully admitted permanent resident of the U.S.;

12   the funds I am donating are not being provided to me by

13   another person or entity for the purpose of making this

14   contribution; and that my contribution shall be allocated as

15   stated below."

16            Did you follow me on that?

17   A.   Yes.

18   Q.   Okay.  Would it have been -- so I'm looking at this.

19   Would it have been a concern to the campaign if it received

20   any contribution from a foreign national?

21   A.   Yes, it would have.

22   Q.   What would the problem there be?

23   A.   Well, as you just read, federal law prohibits foreign

24   nationals from contributing to the campaign.

25   Q.   And had the campaign knowingly received a contribution
```

1    from a foreign national, what would the campaign have done

2    with that money?

3    A.  We wouldn't have knowingly accepted a contribution from

4    a foreign national.  And, you know, I would imagine we would

5    have refunded it if we found out later that we had

6    inadvertently accepted one.

7    Q.  And then looking -- we see there in the same paragraph I

8    just read, the mention of "The funds I am donating are not

9    being provided to me by another person for the purpose of

10    making this contribution."

11            Are you familiar with what's known as a conduit

12    contribution?

13    A.  Yes.

14    Q.  Okay.  And same questions as before:  Would it matter to

15    the campaign if it knowingly knew it was receiving conduit

16    contributions?

17    A.  Yes.  We wouldn't knowingly have accepted conduit

18    contributions.

19    Q.  Why is that?

20    A.  Because they are prohibited.

21    Q.  Okay.

22            MR. MULRYNE:  Let me pull up Government Exhibit

23    578, previously admitted.

24    BY MR. MULRYNE:

25    Q.  So Mr. Feigenbaum, if we can --

 1              MR. MULRYNE:  If we can go to the bottom of this

 2     exhibit, please.  I'm sorry.  The bottom of the last page.

 3     BY MR. MULRYNE:

 4     Q.  This is broken up, as you may see, Mr. Feigenbaum, so

 5     we'll go to the page just before this one.  I think it will

 6     be Page 3.  And then we can scroll back down to here.

 7              MR. MULRYNE:  Thank you, Ms. Orozco.  Just up a

 8     little bit more.

 9     BY MR. MULRYNE:

10     Q.  So, Mr. Feigenbaum, here we see -- do you see here an

11     email dated September 11th, 2012, where you're emailing

12     Frank White?

13     A.  Yes.

14     Q.  And we see some other individuals copied on here.  Were

15     those individuals with whom you worked on the campaign?

16     A.  Yes.

17     Q.  And okay.  The request here in the subject line, as you

18     may see, is "Vitals still needed."

19              Do you see that?

20     A.  Yes.

21     Q.  So you may have mentioned this in passing moments ago,

22     but what are vitals and what was the purpose of the campaign

23     receiving that information?

24     A.  So vitals referred to certain personal information that

25     the campaign would request for certain types of events,

1    usually smaller events where a campaign surrogate, such as

2    the president or vice president, for example, was in

3    attendance, and we would use those vitals first to pass

4    along to the Secret Service so they could conduct security

5    checks, and then also to conduct vetting from the campaign

6    perspective.

7    Q.  What do you mean by vetting from the campaign

8    perspective?

9    A.  The campaign through, you know -- had an entity within

10   it that would use the information contained in the vitals to

11   do sort of a check and look for any reasons why somebody

12   shouldn't be allowed to attend an event.

13   Q.  Okay.  And did that vetting also extend to the

14   contributions and whether or not the campaign would accept

15   the contributions?

16   A.  I was on the fundraising side and not part of the

17   vetting team.  I'm really not exactly sure what -- the

18   protocols that they were using.

19   Q.  Okay.  So looking at this email, we see a few names

20   listed.  Just note at the bottom that name Larry Low Hock

21   Peng.  Do you see that?

22   A.  Yes.

23   Q.  Okay.

24           MR. MULRYNE:  If we can scroll up on this email,

25   please.

1    BY MR. MULRYNE:

2    Q.  Do you see here this email chain, Mr. White sends it on

3    to Mr. Michel, Mr. Pras Michel?  Do you see that?

4    A.  On my screen I see -- it looks like an email from

5    Mr. Michel to Mr. White.

6    Q.  Okay.  And do you see below where it says Randall

7    Toussaint -- there's an email address fwj?

8    A.  Yes.

9    Q.  Okay.  And you see below in the chain that's your email

10   with -- Mr. Feigenbaum, yourself, to Mr. White down at the

11   bottom.  Is that right?

12   A.  Yes.  I see that at the bottom.

13   Q.  Okay.  At some point --

14           MR. MULRYNE:  Take that down.  Thank you,

15   Ms. Orozco.

16   BY MR. MULRYNE:

17   Q.  At some point in the lead-up to this event in

18   Washington, D.C., in September of 2012, did you come to

19   learn about a foreign national who was possibly going to

20   attend the event at Mr. White's home?

21   A.  Yes.

22           MR. MULRYNE:  Can we pull up what's been

23   previously admitted as Government Exhibit 260.  If we can

24   zoom in to the bottom portion of this first.

25

1    BY MR. MULRYNE:

2    Q.  So, Mr. Feigenbaum, a moment ago, that email that you

3    saw, that you had sent, mentioned this Low Hock Peng.  Do

4    you recall that?

5    A.  Yes.

6    Q.  And here we see an email from Mr. Michel to Mr. White on

7    August 28th with information about Mr. Larry Low.  Is that

8    right?

9    A.  Yes.

10            MR. MULRYNE:  If we scroll up, please, to the

11   upper half.

12   BY MR. MULRYNE:

13   Q.  Do you see here Mr. White sends that email below on to

14   you and Rufus Gifford?

15   A.  Yes.

16   Q.  Who is Rufus Gifford?

17   A.  At the time, he was the national finance director for

18   Obama for America.

19   Q.  Was he your supervisor at this time?

20   A.  Yes.

21   Q.  Okay.  So this individual, Larry Low, that we saw

22   referenced here in the other email, was that the foreign

23   national who was being vetted to attend the event in

24   September 2012?

25   A.  I believe so.  Yes.

1    Q.  All right.  And then we see your response at the top,

2    August 28th, 2012, to Mr. White.  And you write:  "Got it.

3    Will get Jho's dad vetted ASAP."

4            Did I read that correctly?

5    A.  I believe so, despite the extra characters in there.

6    Q.  It's a little tricky.

7            The reference to Jho's dad, who did you understand

8    Jho to be?

9    A.  I'm not exactly sure.  It was a long time ago.  I don't

10   exactly remember who I understood that to be at the time.

11   Q.  So there was vetting for a foreign national to attend

12   this event.

13            Let me ask you, was it in any way prohibited for a

14   foreign national to attend a political campaign event?

15   A.  It wasn't prohibited by law for a foreign national to

16   attend an event, but not contribute.  The prohibition was on

17   contributions, as I recall.

18   Q.  And that was my next question.  Could a foreign national

19   contribute, or someone contribute on their behalf, in order

20   for them to attend the event?

21   A.  No.  A foreign national couldn't contribute and attend

22   an event.

23   Q.  Ultimately, was a campaign event held in D.C. at

24   Mr. White's house in September 2012?

25   A.  Yes.

1    Q.  And did you attend that event?

2    A.  I believe I did.  Yes.

3                MR. MULRYNE:  If we can pull up what's been

4    previously admitted as Government Exhibit 105.  And if we

5    can scroll to the -- can we go to maybe the fourth screen --

6    fourth photograph.  One more, please.  No. 5.

7    BY MR. MULRYNE:

8    Q.  Mr. Feigenbaum, do you generally recognize this

9    photograph as being a depiction, a picture, from that event?

10   A.  Yes.  That's what it looks like.

11               MR. MULRYNE:  All right.  And if we can go back to

12   Page No. 2, photo No. 2.

13   BY MR. MULRYNE:

14   Q.  Mr. Feigenbaum, we see a picture here with three

15   individuals.  Obviously, you know President Obama.  Do you

16   recognize either of the other two individuals in the photo?

17   A.  I recognize the one in the middle as the Defendant.  I'm

18   not 100 percent certain about the other one.

19               MR. KENNER:  Move to strike "Defendant," your

20   Honor, and ask the witness to refer to him by the name.

21               THE COURT:  If you could use what the name is.

22               THE WITNESS:  My apologies.

23               I recognize the one in the middle as Mr. Michel.

24               MR. MULRYNE:  If we can go to the next picture,

25   No. 3.

1    BY MR. MULRYNE:

2    Q.  So again, we see the same three individuals in this

3    photo?

4    A.  Yes.

5    Q.  Anyone else present that we can see, at least in the

6    photograph?

7    A.  Not that I can see.  No.

8    Q.  Mr. Feigenbaum, are you familiar with what's known in

9    sort of this political context as the clutch?

10   A.  Yes.

11   Q.  And what is the clutch?

12   A.  A clutch is a name for a small pre-reception, usually on

13   the front end, before another larger event where a smaller

14   group would gather, usually with the campaign surrogate who

15   is attending the event.

16   Q.  And just to be clear, what do you mean by campaign

17   surrogate?

18   A.  In this case, the surrogate was the president.  In other

19   cases, other, you know, administration officials or campaign

20   officials would appear on behalf of the campaign.

21   Q.  And is the clutch something that all attendees are

22   entitled to receive or is it something more exclusive?

23   A.  No.  Usually it was reserved for people who had either

24   contributed at a certain higher amount or were, you know,

25   the hosts of the event or something like that.

Feigenbaum - DIRECT - By Mr. Mulryne

1    Q.  What do you mean by host of the event?

2    A.  The people who either hosted the event at their home or

3    helped raise money for the event, something like that.

4            THE COURT:  Please keep your voice up.

5            THE WITNESS:  Sure.

6            THE COURT:  Thank you.

7            MR. MULRYNE:  No further questions, your Honor.

8            THE COURT:  All right.  Cross.

9            MR. KENNER:  Thank you.

10                    CROSS-EXAMINATION

11    BY MR. KENNER:

12    Q.  Good afternoon, Mr. Feigenbaum.

13    A.  Good afternoon.

14    Q.  Remind me again of what your title was during this

15    campaign.

16    A.  Mid-Atlantic finance director for Obama for America.

17    Q.  Okay.  Let me start with the question of, who was the

18    host of the event at Mr. White's house?

19    A.  Mr. White physically hosted the event at his home.

20    Q.  And who did the invitation come from?

21    A.  The campaign prepared an invitation to the event, as we

22    saw previously.

23    Q.  Okay.

24            MR. KENNER:  Can we see that exhibit again, the

25    invitation?

```
 1                THE COURT:  This is Exhibit --
 2                MR. KENNER:  509, your Honor.
 3                THE COURT:  -- 509.
 4     BY MR. KENNER:
 5     Q.  Do you see Exhibit 509?
 6     A.  Yes.
 7     Q.  And on the top it says:  "Obama for America."  Correct?
 8     A.  Yes.
 9     Q.  And underneath that, I see Frank White and a little
10     symbol and the name Joel Rousseau.  Do you see that?
11     A.  Yes.
12     Q.  Are those the hosts of that event?
13     A.  Yeah.  Usually we would refer to the people listed in
14     that manner as members of a host committee or cohost,
15     something to that effect.
16     Q.  But this invitation that was sent to people said that
17     Frank White and Joel Rousseau were hosting an event on
18     behalf of Mr. Obama.  Isn't that correct?
19     A.  They were being invited to an event for which Mr. White
20     and Mr. Rousseau were part of the host committee.
21     Q.  Why didn't you list the whole host committee?
22     A.  It was a long time ago at this point.  I'm not sure I
23     remember.
24     Q.  Mr. Feigenbaum, isn't it true that this was an event
25     that was thrown by Mr. Frank White and Mr. Joel Rousseau?
```

1          MR. MULRYNE:  Objection, your Honor.  Asked and

2     answered and argumentative.

3          THE COURT:  He's answered the question as best he

4     recalls.

5     BY MR. KENNER:

6     Q.  Just -- just to be sure, there's no indication that

7     Mr. Pras Michel is inviting anybody to anything.  Isn't that

8     true?

9          MR. MULRYNE:  Objection, your Honor.  Calls for

10    speculation --

11         THE COURT:  Well, are you going --

12         MR. MULRYNE:  -- and information beyond the

13    knowledge.

14         THE COURT:  -- by what's on the invitation --

15         MR. KENNER:  Yes.

16         THE COURT:  -- or are you going by just in

17    general?

18         MR. KENNER:  On the invitation.

19         THE COURT:  Okay.  So looking at the invitation,

20    is there anything that indicates that Mr. Michel is

21    involved?

22         THE WITNESS:  No.

23    BY MR. KENNER:

24    Q.  Based upon your work on the campaign and the vetting or

25    attempts at vetting that you did, did you understand that

1    Mr. White had solicited the assistance of Mr. Michel in

2    bringing donors and raising money?

3    A.  I don't specifically recall at this point.

4    Q.  Did -- do you recall Mr. White ever having told you

5    that?

6    A.  I don't specifically recall at this point.

7    Q.  Okay.  You talked about information that you need for

8    vitals.  Correct?

9    A.  Yes.

10   Q.  Does that go beyond just what's on the form that you

11   showed us?

12   A.  Yes.  The -- so vitals refer to, as I recall, Social

13   Security number and date of birth in most cases, which we

14   wouldn't have asked people to list on the form like that.

15   Q.  Are those questions on the form, the Social Security

16   number and the date of birth?

17   A.  I don't believe so.  No.

18   Q.  How did you ask for that information, then?

19   A.  We would sometimes contact the donors directly and ask

20   them for it, most often.  Sometimes someone else would pass

21   the information along that they had collected.

22   Q.  So you include a form for them to fill out, knowing that

23   you need a Social Security number and a date of birth, but

24   you don't ask those questions on the form?

25   A.  Correct.

1    Q.  So somebody else can waste their time reaching out to

2    the donors to get those two answers?

3              MR. MULRYNE:  Objection.  Relevance,

4    argumentative.

5              THE COURT:  Certainly the way you phrased it, I'll

6    sustain it.

7    BY MR. KENNER:

8    Q.  Sir, you were involved in vetting high-dollar donors.

9    Is that correct?

10   A.  I was involved in -- our team was involved in collecting

11   the information necessary for the campaign to vet donors.

12   Q.  All right.  What information -- what is the difference

13   between -- if any -- between -- the difference that you need

14   to collect information about for a high-dollar donor rather

15   than a non-high-dollar donor?

16   A.  I don't remember the sort of threshold that was used,

17   but it was only for higher-dollar events that we would

18   needed to collect information like Social Security number

19   and date of birth in order to conduct that kind of vetting.

20   And certainly any event where someone would be in closer

21   proximity to, for example, the president or vice president,

22   where the Secret Service required certain information to do

23   security vetting.

24   Q.  Is there anything on this form that you asked people to

25   fill out that would enable the Secret Service to vet them in

1    terms of protecting the president?

2            MR. MULRYNE:  Objection, your Honor.  Calls for

3    speculation.

4            THE COURT:  Well, it calls for him knowing what

5    the Secret Service does.  I'll sustain it.

6    BY MR. KENNER:

7    Q.  Were you aware of what criteria the Secret Service used

8    to evaluate high-dollar donors?

9    A.  No.  I was only aware of the information that we were

10   required to provide them, the types of information.

11   Q.  Okay.  So you're telling me that all you were required

12   to provide them was the answers to the questions on this

13   form plus a date of birth plus a Social Security number?

14   A.  I believe that's correct.  And just to clarify, I think,

15   for the Secret Service, we only would provide, you know,

16   kind of the name, date of birth and Social Security number.

17   They didn't need all the other information on this form.

18   That was for the campaign's purposes.

19   Q.  Okay.  Did you ever get anything back from the Secret

20   Service as a result of their vetting that caused you to be

21   alerted that somebody was a danger to the president?

22   A.  Rarely we were told that information had been found that

23   had raised some concern.  We usually weren't given the

24   specific nature of the concern and told either that somebody

25   could or couldn't attend an event as a result.

1    Q.  Do you recall, with regard to this specific event at

2    Mr. White's house, whether you received any information from

3    the Secret Service about anyone specifically at that event

4    that posed a danger to the president?

5    A.  I don't recall at this point.

6    Q.  Does "I don't recall" mean you may have or you may not

7    have?  You just don't know?

8    A.  I don't recall.  It was 11 years ago now.  I'm not sure.

9    Q.  I mean, in your job, sir, isn't the security of the

10   president of the United States a significant issue to you?

11          MR. MULRYNE:  Objection, your Honor.  Relevance,

12   argumentative.

13          THE COURT:  He's already answered this in terms of

14   going on, questioning what his answer is.  So I'll sustain

15   it.

16   BY MR. KENNER:

17   Q.  Can you tell me how many high-dollar events there were

18   in 2012?

19   A.  I didn't have a lot of visibility in what was going on

20   in other regions.  But from the perspective of our region,

21   we had, you know, dozens of high-dollar -- what I would

22   classify as high-dollar events during the 2012 election

23   cycle.

24   Q.  So you would have had dozens of events where there were

25   $40,000 contributions from people?

1    A.  We had a number of high-dollar events with similar

2    contribution limits.

3    Q.  I'm looking for some kind of a quantification.  You've

4    used the word "dozens" and then you've just said "some."  Is

5    it "some" meaning you don't know or do you recall there were

6    dozens?

7    A.  To the best of my recollection, I think dozens

8    accurately describes the approximate number.

9    Q.  Okay.  I want to ask you some questions -- I understand

10   the concern about a foreign national or a nonpermanent

11   resident.  Are you aware of what criteria, if any, you hold

12   donors to, or bundlers to, to determine whether a particular

13   individual is a nonresident of the United States or from

14   overseas?

15   A.  For events where we were required to collect vetting

16   information, for example, we would collect U.S. Social

17   Security number and date of birth; and in cases where

18   someone couldn't provide a U.S. Social Security number, they

19   could provide a green card number to show that they were --

20   or a green card facsimile to show that they were a permanent

21   resident.

22            And I think those were the kinds of information

23   that we collected that showed people were lawful citizens or

24   permanent residents.

25   Q.  All right, sir.  Thank you for the answer, but that's

1    not an answer to the question that I'm asking.

2              What I'm -- what I'm looking to get is, let's

3    assume that I am a bundler and I seek to get financial

4    donations from other people at an event to bundle and give

5    to the campaign.  Okay?  And the person at the end of the

6    table here, at the end of the defense table, says to me

7    they're going to come, and here's the contribution.

8              What efforts would you demand that I made to

9    determine whether or not she's a foreign resident?

10   A.  You're asking what the campaign would require you as a

11   bundler to do to verify that that person is not prohibited

12   from making a contribution?  Do I understand that correctly?

13   Q.  Let's start there.  Yes.

14   A.  There was not a, you know, requirement -- the campaign

15   didn't require that the fundraisers do that sort of

16   investigation.  That was work that the campaign would do in

17   the vetting process.

18   Q.  Okay.  So if a person is making contributions or the

19   like, you, the campaign, would do the vetting with regard to

20   whether they were a foreign national or not?

21   A.  Yeah.  I believe that's right.  Again, I wasn't involved

22   in the vetting protocols and processes specifically.  But I

23   know that the campaign would look at all sorts of different

24   things in determining whether or not it was allowable to

25   accept a contribution from someone.

Feigenbaum - CROSS - By Mr. Kenner

1    Q.  All right.  You're very familiar with the FEC rules, or

2    you were at the time?

3    A.  I think at the time I was much more familiar than I am

4    today.

5    Q.  All right.  Are you aware of any FEC rule that puts the

6    burden on a person who brings money from other people to

7    bundle for an event?  Are there any rules that require that

8    person to -- that's doing that to vet the people they're

9    getting the money from to determine whether or not they're

10   U.S. citizens or foreign nationals or otherwise?

11            MR. MULRYNE:  Objection.

12            THE COURT:  Is there an objection?

13            MR. MULRYNE:  Objection, your Honor.  Relevance

14   and legal opinion.

15            THE COURT:  It does seem to me you'd have to be

16   familiar with the rules or the statutes relating to it.

17   He's not been presented that way.  So I'll sustain it.

18   BY MR. KENNER:

19   Q.  May I ask it this way:  Are you aware of any FEC rules

20   that place upon the burden of a bundler [sic] the

21   investigation of whether or not a person that's bringing

22   money is a foreign national, a U.S. citizen or otherwise?

23   Are you aware of any regulation that requires that?

24            MR. MULRYNE:  Same objection.

25            THE COURT:  I still think -- you're rewording it,

1  but you're asking the same thing in terms of his awareness

2  about -- I'm not going off on relevance, but in terms of his

3  knowledge about what the rules and regulations are.  He

4  hasn't presented himself as being familiar with that.

5          MR. KENNER:  All right.

6  BY MR. KENNER:

7  Q.  Can we at least agree, sir, that, in your view, it is

8  the campaign itself that's responsible for vetting whether a

9  person is a foreign national or not as opposed to the

10  individual bringing the money?

11          MR. MULRYNE:  Objection --

12  BY MR. KENNER:

13  Q.  That's what you said.

14          MR. MULRYNE:  Objection.  Relevance and calling

15  for opinion.

16          THE COURT:  I won't go off on relevance, but I do

17  think you're asking his opinion about materials that -- in

18  an area that he wasn't working in.

19          MR. KENNER:  Your Honor, he's already testified

20  that it was the campaign's responsibility to do this kind of

21  vetting.  I can --

22          THE COURT:  Yes.  But you're asking him about a

23  specific kind of vetting.  He answered in the -- in general

24  terms.  You're asking about specific things that they would

25  have done as part of the process for vetting.  And you don't

 1    have -- you know, he hasn't indicated that that's what he

 2    does.  He keeps pointing out that he was in finance.

 3    BY MR. KENNER:

 4    Q.  Sir, I am not -- and I apologize if I misled you.  I am

 5    not asking anything about your familiarity with the kind of

 6    vetting.  I'm just following up on your answer that it was

 7    the campaign's responsibility to do vetting with respect to

 8    whether or not someone is an American citizen or a foreign

 9    national.

10             MR. MULRYNE:  Opinion and apparently asked and

11    answered.

12             THE COURT:  You're asking the same thing that I've

13    just indicated is a problem.

14             MR. KENNER:  But he's testified to that on direct.

15             THE COURT:  And I explained to you what he's

16    testified to.  He's talked about a general thing in terms of

17    the campaign.

18             You're getting into specifics about what they

19    would have vetted for, not just sort of generally.  He's

20    indicated he didn't do -- his area is financing, not the

21    other.  He said they didn't do -- finance didn't do vetting,

22    that the campaign did.

23             But he did not indicate -- and you've asked

24    specifically the type of vetting that was done.  That is --

25    you haven't set a groundwork that he'd know this.

```
1              MR. KENNER:  I apologize.

2              THE COURT:  Plus, it's beyond -- I've already made

3    my ruling several times.

4              MR. KENNER:  Okay.  May I just be clear, I am not

5    asking him anything -- at least I'm not intending to ask him

6    anything about the vetting process.  I am only asking him

7    the question of whether, based on his experience at the

8    campaign, it was the campaign as opposed to the bundler that

9    was responsible to do whatever vetting they chose to do.

10             THE COURT:  He's given an answer to that already.

11   That specific question he's already asked and answered.

12   BY MR. KENNER:

13   Q.  Your answer was yes.  Is that right?

14             THE COURT:  No.

15             MR. MULRYNE:  Asked and answered, your Honor.

16             THE COURT:  They've heard the answer.  We're not

17   going to keep going back over the same thing, at least from

18   this witness.  You may be able to get it from others, but

19   not from this witness.

20             What you're trying to do is to get -- in terms of

21   the vetting as to the bundler.  You asked one question.  He

22   gave an answer.  You then are going back in terms of who's

23   responsible for it.  And I've indicated several times

24   several reasons why that is not appropriate for this

25   witness.
```

1    BY MR. KENNER:

2    Q.  Mr. Feigenbaum, based on your experience in this

3    campaign, who is it -- who is the -- where is the ultimate

4    decision that's made -- who makes it with regard to who can

5    come to an event and who gets invited to an event?

6    A.  Certainly the campaign didn't have control over who

7    could be invited to an event.  You know, we would create an

8    invitation for an event and it could be sent to anyone

9    without the campaign's knowledge as to who could attend an

10   event.

11        The criteria were different based on the kinds of

12   events.  For, you know, a large rally in a big hotel

13   ballroom, there was relatively, you know, less scrutiny,

14   obviously, about individual donors.  And then smaller

15   events, for example, where people like the president or vice

16   president were attending, there was more information

17   required, more scrutiny, more vetting done.

18        And, you know, in the event that there was a

19   security concern, it was the Secret Service's call, at the

20   end of the day, as to who was or wasn't allowed to attend an

21   event.

22   Q.  What I'm trying to find out, sir, is it the campaign who

23   has the ultimate decision over who is allowed to come to the

24   event?

25   A.  Yes.

1          THE COURT:  Which event?  I mean, he indicated --

2          MR. KENNER:  A fundraiser.

3          THE COURT:  -- a whole series -- excuse me a

4     minute.  He's indicated a whole series of different events.

5     So which event are you talking about?

6     BY MR. KENNER:

7     Q.  In a $40,000-a-plate fundraiser, for example, the one

8     held at the home of Mr. Frank White with an invitation from

9     him and Mr. Rousseau, whose decision was it as to who could

10    come?  Was it the campaign's?

11    A.  The campaign would work with the Secret Service and

12    develop a final guest list, and only those people were

13    allowed to attend the event.

14    Q.  Okay.  Are you aware of any information that was

15    submitted, by way of form or otherwise, that suggested that

16    there was a reason that anybody at Mr. White's home that

17    night that should not have been allowed to be there?

18    A.  I don't recall.

19    Q.  By the way, just to -- I'll try to briefly cover this,

20    if I can.  The emails that you were referring to with the

21    Government -- and, you know, I'll go through even some more

22    of them --

23          THE COURT:  Mr. Kenner, can you keep your voice up

24    just a little bit?

25          MR. KENNER:  Yes.  I'm sorry, your Honor.

1          THE COURT:  Thank you.

2    BY MR. KENNER:

3    Q.  So you would agree, then, that the campaign's head of

4    vetting or other senior leadership made the decision if

5    someone was or was not allowed to attend an event?

6          MR. MULRYNE:  Your Honor, objection on asked and

7    answered.

8          THE COURT:  I think he's answered it.  You've

9    asked it in several ways and he's answered it in several

10   ways.  You've put different facts in different ones.  So

11   it's asked and answered at this point.

12   BY MR. KENNER:

13   Q.  Did people that did make those decisions pass those

14   decisions on to you?

15   A.  Certainly in the event that someone was not allowed to

16   attend an event, we were told that they weren't allowed to

17   attend an event so we could ensure that they didn't, in

18   fact, attend.

19   Q.  But you were the recipient of the result of the vetting.

20   That information went to you so that you could make a

21   decision about whether or not they should be there?

22   A.  No.  I don't think that's exactly right.  We usually

23   weren't given the results of vetting unless there were an

24   issue that would need to either be resolved or for which the

25   person would not be able to attend an event.

```
1              THE COURT:  If you could keep your voice up.

2    BY MR. KENNER:

3    Q.  Have you ever made the statement that the campaign's

4    head of vetting or other senior leadership --

5              MR. MULRYNE:  Objection, your Honor.  Defense

6    seems to be reading from a document that I'm not sure is

7    being admitted or is admissible.

8              MR. KENNER:  I am -- I'm reading from a document

9    to ask him whether or not he said this.

10             THE COURT:  Well, you need to also indicate to the

11   Government what you're reading.

12             MR. KENNER:  Yes.  I'm relating [sic] to an

13   FBI 302 authored by Robert Heuchling.

14             THE COURT:  We've gone through this issue in terms

15   of how you can use the 302s.  So why don't you wait until he

16   gets the 302 out.

17   BY MR. KENNER:

18   Q.  Without regard to --

19             THE COURT:  Let him get it out --

20             MR. KENNER:  Oh, I'm sorry.

21             THE COURT:  -- so he can take a look at it.

22             MR. KENNER:  I apologize, your Honor.

23             MR. MULRYNE:  Your Honor, may I get the date on

24   that 302 again?

25             THE COURT:  Yes.
```

```
1              MR. KENNER:  Certainly.  May 1st of 2018.  And the
2    statement is on Page 3 of the three-page report.
3              MR. MULRYNE:  Okay, your Honor.  I do have the
4    report.
5              THE COURT:  Okay.
6              MR. KENNER:  May I now inquire about it, your
7    Honor?
8              THE COURT:  You can inquire.  Now, keep in mind
9    how you cannot use these.  But go ahead.
10   BY MR. KENNER:
11   Q.  Did you make a statement that the campaign --
12             MR. MULRYNE:  Objection, your Honor.  This is
13   calling for hearsay, introducing an out-of-court prior
14   statement.
15             THE COURT:  That's what I thought you were getting
16   at.  Okay.  Can you pick up?
17             (Whereupon, the following proceedings were had at
18   sidebar outside the presence of the jury:)
19             THE COURT:  I think -- we've gone through this
20   before in terms of statements -- in terms of using a
21   statement within the 302.  It's the agent's statement, not
22   his.  All right?  So impeachment and various other things --
23   you're asking something on the outside.  But it's not clear
24   to me what your point of it is.
25             MR. KENNER:  My point is, I don't want to
```

1    inconvenience this man and re-call him later.  I will ask

2    Agent Heuchling about this report and what he said.  I want

3    to give the witness a chance to affirm or deny that he made

4    that statement.

5            THE COURT:  Can I point out that I think you may

6    have problems in terms of trying to do the impeachment in

7    this way?

8            But what is the topic that's in this 302?

9            MR. KENNER:  The topic of the 302 is

10   Mr. Feigenbaum's role in the campaign in 2012.

11           THE COURT:  And what's different than what he's

12   already said?

13           MR. KENNER:  I am asking him whether or not the

14   information that was assembled by the people that did the

15   vetting was then passed on to him for decision.  He has not

16   answered that question.  That's what he said.  And I just

17   want to ask him, did he say it or did he not say it?

18           THE COURT:  Mr. Mulryne?

19           MR. MULRYNE:  Your Honor, I guess I'm unclear,

20   then, what portion of this 302 on Page 2 the defense is

21   looking to use.  The question hasn't been asked to the

22   witness.  The witness first must be asked the question and

23   provide an inconsistent statement before any reference to

24   any of the statements in here can be used to impeach.

25           So I guess I'm unclear if the question has already

Feigenbaum - CROSS - By Mr. Kenner

1    been asked, then -- whether or not anything in here is

2    actually inconsistent with what's been said.

3            MR. KENNER:  Perhaps you're unclear because you're

4    looking at Page 2 and I made reference to the statement

5    being on Page 3.  I apologize if you misunderstood what I

6    said.  But it's right on the top of Page 3.  It's not on

7    Page 2.

8            MR. MULRYNE:  Okay.  I do see it.

9            THE COURT:  And as a practical matter, what he's

10   indicated is that they would give him information, as I

11   understood it, if it was somebody that they didn't think

12   should attend.  So -- I don't have it in front of me.  So

13   does this say something different?

14           MR. MULRYNE:  Your Honor, I believe Mr. Feigenbaum

15   just testified that the information may or may not be passed

16   to him, depending on the circumstances.  If that's true,

17   then I don't believe what's in the 302 is any different.

18           THE COURT:  So what's different in the 302,

19   Mr. Kenner?

20           MR. KENNER:  He makes that blanket statement.  He

21   doesn't say "depending on the circumstances."  He just --

22           THE COURT:  Now you're talking about what's in the

23   302 or what he gave as an answer?

24           MR. KENNER:  I'm talking about what's in the 302.

25           THE COURT:  Which I don't have in front of me.  So

1    that's why I'm asking you.  Just tell me what it is.

2            MR. KENNER:  It's the statement, "The decision

3    with regard to vetting was then passed on to Feigenbaum."

4            THE COURT:  I'm not sure that I would see this as

5    an inconsistent statement.  It's not as if he said he never

6    got the information.  It indicates that -- you know, I don't

7    know what the question was.

8            What's the question?

9            MR. KENNER:  The question -- let me ask it in

10   terms of --

11           THE COURT:  What's on the question?  What was the

12   question?

13           MR. KENNER:  The question is --

14           THE COURT:  Is it there or not?  You don't have a

15   question.  So it's not the grand jury.  Never mind.

16           It wouldn't have had a question -- or did it -- in

17   the 302.

18           Did the 302 have a question?

19           MR. MULRYNE:  It doesn't, your Honor.  It just

20   reads:  "The campaign's head of vetting or other senior

21   leadership made the decision if someone was or was not

22   allowed to attend an event."  And then it reads:  "The

23   decision was then passed to Feigenbaum."

24           I'll repeat it again, your Honor.

25           THE COURT:  Okay.

```
 1              MR. MULRYNE:  It reads -- this paragraph in the

 2     302 reads:  "The campaign's head of vetting or other senior

 3     leadership made the decision if someone was or was not

 4     allowed to attend an event.  The decision was then passed to

 5     Feigenbaum."

 6              THE COURT:  Okay.  So what's inconsistent?  He

 7     said that the people who did -- higher-ups in the vetting

 8     group did it.  It would have been passed on -- they would

 9     have made a decision about whether or not they could come.

10     And he has indicated he would be told if they were not able

11     to come.

12              I don't see any inconsistency here.

13              MR. KENNER:  No.  He's --

14              THE COURT:  You're trying to -- if you're trying

15     to do an impeachment.

16              MR. KENNER:  Your Honor, he's indicated that only

17     in some circumstances --

18              THE COURT:  Right.

19              MR. KENNER:  -- did they do this.  This is a

20     blanket statement that they --

21              THE COURT:  No.  It's not a blanket statement.

22              What it says is that they pass on -- as I have

23     read it, they make a decision as to whether or not they can

24     come or attend or whatever, and they pass it on.

25              And what he said is that they pass on if they
```

 1     can't attend.

 2               MR. KENNER:  I'll move on, your Honor.

 3               THE COURT:  Okay.

 4               (Whereupon, the following proceedings were had in

 5     open court:)

 6     BY MR. KENNER:

 7     Q.  Do you have any recollection of whether or not

 8     Mr. Michel was asked by Mr. White to work with him to raise

 9     money?

10     A.  I don't have any specific recollection of that.  No.

11               MR. KENNER:  May I use that same page number just

12     to refresh recollection, your Honor?  May I put it on your

13     screen and the witness's screen?

14               THE COURT:  Okay.  If you've got some --

15     presumably, some other portion of that page.

16               MR. KENNER:  Yes.

17               THE COURT:  This should be shown to you -- it's to

18     refresh recollection.  This is to -- they're going to show

19     it to you.  Take a look at it.  Read it, and then he'll ask

20     you a question.  Okay?  Read it to yourself.

21               MR. MULRYNE:  We're showing it on the screen, your

22     Honor?

23               MR. KENNER:  Just to the witness.

24               THE COURT:  As I understand, Mr. Kenner is doing

25     it.

```
 1              MR. KENNER:  We're just putting it up for the
 2     witness and the judge.
 3              THE COURT:  Do you want him to read all of it?  Or
 4     a portion?
 5              MR. KENNER:  No.
 6     BY MR. KENNER:
 7     Q.  If you could just read the third paragraph.
 8              THE COURT:  That's it?  What does that have to do
 9     with the question you asked about Mr. Michel?
10              MR. KENNER:  I'm sorry.  It's Page 3.  And it is
11     on the screen.  The third paragraph.
12              THE COURT:  What popped up says nothing about
13     Mr. Michel.  Isn't that the question you asked?
14              MR. KENNER:  Yes.
15              THE COURT:  Okay.  I don't see it here.
16              Now we have something.
17              So once you finish reading it, you can look up, or
18     look over at Mr. Kenner, and he has a question.
19     BY MR. KENNER:
20     Q.  Did reading that third paragraph refresh your
21     recollection about whether Mr. -- whether or not you were
22     told that Mr. Michel was asked by Mr. White to work with him
23     to raise money?
24     A.  It seems plausible that that -- that I said that.  But
25     it doesn't specifically refresh my recollection at this
```

```
 1    point.
 2    Q.  Okay.  That's fair.
 3             Did you deal a lot with Frank White during the
 4    campaign?
 5    A.  Yes.  Mr. White was one of the larger bundlers for the
 6    campaign, and we did work together.
 7             THE COURT:  Keep your voice up.
 8             THE WITNESS:  I'm sorry.
 9    BY MR. KENNER:
10    Q.  I didn't hear your answer, sir.
11    A.  My apologies.
12             Yes.  Mr. White was one of the larger bundlers for
13    the campaign, and I worked together with him in that
14    capacity.
15             MR. KENNER:  May I ask that Exhibit -- to put up
16    Exhibit 575, please?  It's already admitted, your Honor.
17             And could you go to the --
18    BY MR. KENNER:
19    Q.  Do you recognize the two pages or the two screenshots
20    that are Exhibit 575?
21             THE COURT:  Do you need to have them enlarged?
22             THE WITNESS:  Sure.  That would be helpful.  Thank
23    you.
24             They appear to be a list of attendees for the
25    event.
```

1    BY MR. KENNER:

2    Q.  Is this an email, the second page, that you wrote to

3    Mr. White?

4    A.  The page I'm looking at -- I can't see -- yeah.  It

5    looks like -- I can't see the email address at the top, but

6    I see my signature at the bottom.

7    Q.  All right.  And do you see that it was sent to Frank

8    White?

9    A.  Yes.

10   Q.  And was this sent on September 10th of 2012?

11   A.  Yes.

12   Q.  And is the subject "Vitals needed"?

13   A.  Yes.

14   Q.  So you sent Mr. White an email saying that you still

15   needed vitals for Mohamed Ahmed Badaway or -- I think

16   that's -- that what it says here.  Mohamed Ahmed

17   B-A-D-A-W-A-Y.

18   A.  Yes.  It appears so.

19   Q.  Do you recall that to be the person who's also known as

20   Mohamed Al-Husseiny?

21   A.  I don't know.  I see that the last name is listed as

22   Al-Husseiny.  Yes.

23   Q.  And did you also ask Mr. White to provide the vitals for

24   Fred Ardehali?

25   A.  Yes.  It appears so.

```
1    Q.  And also as to Caroline Bajan?

2    A.  Yes.  It appears to.

3    Q.  And you asked for the vitals with regard to Barry

4    Bekkedam?

5    A.  Yes.

6    Q.  And Vincent Carroll?

7    A.  Yes.

8    Q.  And Daniel Lauture?

9    A.  Yes.

10   Q.  And Larry -- Low I will call him -- Low Hock Peng?

11   A.  I see Dato Larry Low Hock -- and then it's cut off after

12   that.

13   Q.  Do you remember that name specifically?

14   A.  No.

15   Q.  And you asked for the vitals for Edgar Mejia?

16   A.  Yes.

17   Q.  And Benjamin Patterson?

18   A.  Yes.

19   Q.  And Brenda Robinson?

20   A.  Yes.

21   Q.  And Joel Rousseau?

22   A.  Yes.

23   Q.  And Mr. H. -- I'm sorry -- William Rutherford?

24   A.  Yes.

25   Q.  And Neda Shojai?
```

1    A.  Yes.

2    Q.  And Randall Toussaint?

3    A.  Yes.

4    Q.  And the event that we're talking about at Mr. White's

5    house was on September the 14th of 2012?

6    A.  I believe that's correct, from the invitation.

7    Q.  And as of September 10th of 2012 at five minutes to 5:00

8    in the afternoon, you still didn't have the vitals for any

9    of the people on this list?

10   A.  It appears so.

11   Q.  And are you aware these are all people that attended the

12   event at Mr. White's house?

13   A.  I don't recall specifically who of these people ended up

14   attending the event.

15   Q.  All right.  Do you recall why you were asking for the --

16   excuse me one moment.

17            Can you tell me why you were asking four days

18   before the event on Mr. Joel Rousseau, who's one of the

19   hosts of the event on the invitation?

20   A.  It wasn't unusual for us to be seeking this sort of

21   information in the days leading up to the event.

22   Q.  Did you ask for the vitals on Mr. White?

23   A.  I'm sure we either asked for them at the time or had

24   them previously.

25   Q.  As of September 10th, 2012, you hadn't asked him yet.

1    Is that true?

2    A.  I don't know specifically.

3    Q.  Let me ask you, in your role, do you have any role in

4    how the seating assignments get made for where people would

5    sit at an event?

6    A.  Yes.  If there were seating -- you know, specific

7    seating assignments for an event, that would be -- the

8    campaign would be the one generally to decide where people

9    were going to be seated, in most cases.

10   Q.  I'm going to show you Exhibit 105 that's been admitted.

11   And on --

12            MR. KENNER:  Excuse me one moment, your Honor.

13   BY MR. KENNER:

14   Q.  On Page 5 of that exhibit, do you see a table with a lot

15   of people seated around it?

16   A.  Yes.

17   Q.  Do you recognize President Obama?

18   A.  Yes.

19   Q.  Do you recognize Mr. Michel?

20   A.  Yes.

21   Q.  Do you recognize Mr. White?

22   A.  I'm not sure I can see Mr. White in this photo.

23   Q.  He's -- if you look at the photo --

24            THE COURT:  You're speaking to the side.

25            MR. KENNER:  I'm sorry.

1    BY MR. KENNER:

2    Q.  As you look at the photo across -- directly across from

3    President Obama, do you see Frank White?

4    A.  Yes.  I can see him in this photo now.

5    Q.  And in front of all these people, there appears to be

6    nametags -- or a name in front of each of the seats.  Is

7    that correct?

8    A.  It appears so.  Yes.

9    Q.  And your testimony is that the campaign would have made

10   the decision as to where the people were seated at this

11   event?

12   A.  Yeah.  Ultimately, it was the campaign, in concert

13   sometimes with the Secret Service, about where people would

14   sit.

15   Q.  Okay.  Let me finally move to the question of the

16   Federal Election Commission.

17           Did you take specific training, in connection with

18   your position with the Obama campaign, with the Federal

19   Election Commission?

20   A.  As I recall, we didn't receive training directly from

21   the Federal Election Commission, but we did receive some

22   training from the campaign, I believe.

23   Q.  And do you know whether Mr. White received any such

24   training?

25   A.  I'm not aware.

1          MR. MULRYNE:  Objection.  Relevance.

2          THE COURT:  He's already answered it.

3     BY MR. KENNER:

4     Q.  Is -- was training required for all the people that were

5     involved in campaign finance?

6     A.  Do you mean on the campaign, the people -- the employees

7     of the campaign?

8     Q.  Yes.

9     A.  Yes.  I believe it was.

10    Q.  And the bundlers, the people -- the significant bundlers

11    that raise lots of money?

12    A.  I'm not aware of training that others may have received.

13    Q.  Based on your frequent dealings with Mr. White, did he

14    appear to you to be versed in regulations from the Federal

15    Election Commission?

16          MR. MULRYNE:  Objection.  Relevance.

17          THE COURT:  You're making -- you're asking a

18    question about what he knows about somebody else, and it's

19    an opinion.  So I'll sustain it.

20          MR. KENNER:  Thank you, sir.  I have no further

21    questions.

22          THE COURT:  Redirect?

23          MR. MULRYNE:  Your Honor, no further questions at

24    this time.

25          THE COURT:  Can he be excused?  Counsel, can he be

1    excused?

2              MR. KENNER:  Yes, your Honor.

3              THE COURT:  Mr. Mulryne, I'm assuming he can be

4    excused.  Is that correct?

5              MR. MULRYNE:  Yes, your Honor.

6              THE COURT:  Thank you.

7              (Witness excused.)

8              THE COURT:  Your next witness?

9              MR. MULRYNE:  Your Honor, the Government calls

10    Neville Richardson.

11             (Thereupon, Neville Richardson entered the

12    courtroom and the following proceedings were had:)

13             THE COURT:  Sir, if you would step up over here.

14    We're going to swear you in, so you can remain standing.

15    Raise your right hand and she'll swear you in.

16        NEVILLE RICHARDSON, GOVERNMENT WITNESS, SWORN.

17             THE COURTROOM DEPUTY:  Please be seated.

18             THE COURT:  You can sit down.  You can move the

19    chair around.  You need to make sure you speak into the

20    microphone.  And you can take your mask down so we can

21    actually hear you.

22             THE WITNESS:  Okay.

23             THE COURT:  All right.  A few other rules:  Please

24    let counsel finish their question, even if you know what

25    they're asking you, before you start to answer.  They should

1    do the same for you.

2          If you hear the word "objection" or, more

3    importantly, you see counsel at the table start to stand,

4    they're objecting.  If you haven't started to answer, don't.

5    If you're in the middle of your answer, please stop.  Let me

6    hear the objection.  And then I'll tell you whether you can

7    answer.  All right?

8          THE WITNESS:  Thank you.

9          THE COURT:  And speak in a nice, loud, clear voice

10   so we can hear you.  It's late in the afternoon and we're

11   all getting tired.

12         THE WITNESS:  All right.

13         THE COURT:  Go ahead.

14         MR. MULRYNE:  Thank you, your Honor.

15                       DIRECT EXAMINATION

16   BY MR. MULRYNE:

17   Q.  Good afternoon, Mr. Richardson.

18   A.  Good afternoon.

19   Q.  Can you please state and spell your full name for the

20   Court and the court reporter.

21   A.  Sure.  Neville Richardson, N-E-V-I-L-L-E,

22   R-I-C-H-A-R-D-S-O-N.

23   Q.  In what city and state do you reside?

24   A.  Hercules, California.

25   Q.  And what is it that you do for a living?

```
 1   A.  I own a registered investment advisory, so I'm a

 2   financial advisor.

 3   Q.  And as a financial advisor, just very generally, what is

 4   it that you do?

 5   A.  I invest my clients' assets, plan for retirement for my

 6   clients.

 7   Q.  We're going to be talking specifically about some events

 8   back in 2012.  During 2012, did you have the same

 9   occupation?

10   A.  I did.

11   Q.  Are you familiar with an individual named Prakazrel

12   Michel or Pras Michel?

13   A.  Yes.

14   Q.  All right.  Do you see Mr. Michel here in the courtroom

15   today?

16   A.  I do.

17   Q.  Can you please identify him by where he's sitting and an

18   article of clothing?

19   A.  Sure.  The gentleman in a blue suit sitting directly

20   behind you there.

21            MR. KENNER:  Stipulate referring to Mr. Michel,

22   your Honor.

23            THE COURT:  All right.  There's no dispute that

24   he's identified Mr. Michel.

25
```

Richardson - DIRECT - By Mr. Mulryne

1   BY MR. MULRYNE:

2   Q.  Can you tell the jury approximately when and where you

3   first met Mr. Michel?

4   A.  At a fundraising event in Washington, D.C.

5   Q.  Who else was present at that fundraising event?

6   A.  There were a number of people present.  The guest of

7   honor was POTUS, who arrived later.

8   Q.  You said POTUS.  Are you referring to President Obama?

9   A.  Correct.

10  Q.  Okay.  We're going to talk more about that event in a

11  moment.  But before we do, who all -- who initially

12  introduced you to Mr. Michel?

13  A.  We have a mutual friend, and Michel had a movie that he

14  did with him, and his name was Rob Willis.

15  Q.  Rob Willis, also known by some as Rob Wisdom?

16  A.  Correct.

17  Q.  And how is it that you knew Mr. Willis?

18  A.  We went to high school together and college together.

19  Q.  All right.  We're going to talk more in a moment about

20  this event in September of 2012, the fundraising event you

21  just referenced.

22  A.  Yeah.

23  Q.  Prior to that event, had you had any association with

24  Mr. Michel?

25  A.  Not -- not that I can recollect.  I know I was present

1    for the opening of the Skid Row premiere, and I believe he

2    was there, but I don't recall speaking to him.  But only

3    through Rob I would hear about things they would do --

4    Q.  Okay.

5    A.  -- entertainment stuff.  Yeah.

6    Q.  Okay.  Subsequent to that September 2012 fundraising

7    event, did you and the Defendant strike up a relationship?

8    A.  After, yeah.  Uh-huh.

9    Q.  And can you just describe briefly to the jury the nature

10   of that relationship?

11   A.  We talked a lot about entertainment stuff.  We both had,

12   you know, an affinity for music, so we shared a lot of ideas

13   about some of the artists that we worked closely with,

14   things of that nature.

15   Q.  Okay.  So now turning your attention to the lead-up to

16   that September 2020 fundraising event -- 2012; I'm sorry --

17   how was it that that event came to your attention initially?

18   A.  As I recollect, Rob Willis told me there was an event in

19   D.C. that, you know, might be good for me to go.  And -- you

20   know, I didn't really think much about it until later.  You

21   know, he asked me if I thought more about it.

22            And I said:  I'm thinking about it.  I don't know.

23            And then he told me how much it cost.

24            And I said:  No.  I'll probably not go.  I

25   probably won't go.

 1    Q.  What was the amount that he told you it would cost to

 2    attend that event?

 3    A.  40,000.

 4    Q.  What was your reaction to that amount of money?

 5    A.  I just told him it's not something I'm going to do at

 6    this time, you know.  It's just not something I feel like

 7    doing.

 8              MR. KENNER:  I'm sorry.  I --

 9              THE COURT:  You're dropping your voice, sir.

10              THE WITNESS:  Oh, I apologize.  I told him it's

11    not something I would do.

12    BY MR. MULRYNE:

13    Q.  Did you view that amount of money as being expensive?

14    A.  For me, yeah.

15    Q.  Did you have any -- did Mr. Willis follow up with you

16    all about the event after that initial discussion?

17    A.  Yeah.  Probably about a week later.

18    Q.  And what was it that Mr. Willis conveyed to you?

19    A.  He said there's still a seat available; are you sure you

20    don't want to go?  If you do, Pras will cover it.

21              MR. KENNER:  Objection.  Move to strike.  Hearsay.

22              MR. MULRYNE:  Effect on the listener, your Honor.

23              THE COURT:  I'm sorry?

24              MR. MULRYNE:  Effect on the listener, your Honor.

25              THE COURT:  All right.  I'll leave it in that

1    context in terms of it -- I mean, in terms of it not being

2    admitted for the truth of the matter asserted but just on

3    the effect on the Defendant -- not the Defendant, but this

4    witness.

5              MR. MULRYNE:  Yes, your Honor.

6              THE COURT:  All right.  So it's not being admitted

7    for the truth of the matter of whether or not that was said,

8    but based on what -- based on that information, what this

9    witness might or might not do.

10   BY MR. MULRYNE:

11   Q.  So, Mr. Richardson, you said that Mr. Willis had said

12   that Pras would cover it.  Is that what you said?

13   A.  Correct.

14   Q.  Okay.  What was your reaction to that?

15             MR. KENNER:  Excuse me, your Honor.  The question

16   was, "Is that what he said?  Correct?"  On that, I would

17   object to it and move to strike.  What he thought after he

18   heard it is...

19             THE COURT:  He's indicating -- to get to the

20   point, since we discussed this, what the reaction is, which

21   is what is the evidence, is what his reaction is.  I've

22   indicated that the statement about what -- "Pras would cover

23   it" is not being admitted for the truth of the matter, that

24   that's what Mr. Michel said.  It's being admitted to

25   indicate what it is that the witness did based on -- in

```
 1    terms of what his reaction was to what he was told.
 2    BY MR. MULRYNE:
 3    Q.  Mr. Richardson, so what was your reaction upon being
 4    told that?
 5    A.  My reaction was that I would think about it.
 6              And then a couple of days later, I told him:
 7    Okay.  I'll go.
 8    Q.  And did you ultimately receive a check --
 9    A.  I did.
10    Q.  -- from Mr. Michel?
11    A.  I did.
12              MR. MULRYNE:  If we could pull up Government
13    Exhibit 424.
14              One moment, your Honor.  This has been --
15    Government Exhibit 424 has been previously admitted, your
16    Honor.
17              THE COURT:  Okay.
18              MR. MULRYNE:  If we may publish to the jury.
19    BY MR. MULRYNE:
20    Q.  Mr. Richardson, we may be able to blow that up a bit.
21    But do you recognize -- what is this?
22    A.  That looks to be the check that I received.
23    Q.  All right.  If we see -- toward the bottom left-hand
24    corner, do you see there where it's written "Prakazrel
25    Michel"?
```

1    A.  I do.

2    Q.  What's the amount of the check?

3    A.  40,000.

4    Q.  And to whom is it addressed?

5    A.  Richardson Capital.

6    Q.  What's Richardson Capital Management?

7    A.  That was the company I used for all entertainment -- any

8    entertainment projects.

9    Q.  So upon receiving this check from Mr. Michel, what is it

10   that you did with this $40,000?

11   A.  I deposited it and waited for it to clear.

12   Q.  And what did you do upon it being deposited?  What did

13   you do with the check then?  I'm sorry.  What did you do

14   with the funds, the $40,000?

15   A.  I -- with a card, I paid for the dinner event.

16   Q.  The fundraising event in September 2012?

17   A.  Correct.

18   Q.  Okay.  And approximately how much money did you -- did

19   you provide to the -- for the fundraising event?

20   A.  Very close to the 40,000.  A little bit south of that,

21   minus travel and hotel expense.

22   Q.  So the remaining amount that you did not submit to --

23   for the fundraising event, what did you do with that

24   remaining money?

25   A.  Travel, hotel expense.

1    Q.  Travel and hotel for what?  Your trip to D.C.?

2    A.  Correct.

3              MR. MULRYNE:  You can take that down.

4    BY MR. MULRYNE:

5    Q.  Did you in fact attend the event in Washington, D.C.?

6    A.  I did.

7    Q.  Do you recall where it was held?

8    A.  It was at a penthouse apartment, I believe, in Northwest

9    Washington, D.C., if I recall correctly.

10    Q.  Did you see Mr. Michel there?

11    A.  I did.

12    Q.  And did you interact with him at this event?

13    A.  I did.

14    Q.  All right.  And then you testified moments ago that you

15    and Mr. Michel thereafter became friends.  Is that correct?

16    A.  That's accurate.

17    Q.  All right.  I want to fast-forward.  So that was

18    September of 2012.  Moving ahead to 2019, around that time,

19    did Mr. Michel reach out to you again about the $40,000 that

20    he had given you back in 2012?

21    A.  Yes.

22    Q.  And can you tell the jury about when Mr. Michel reached

23    out to you about that money?

24    A.  I think the initial request was a request saying --

25              THE COURT:  You need to keep your voice up.

1          THE WITNESS:  -- he may need that back or

2    something of that nature.  And I was kind of -- a little,

3    you know, confused about that and kind of, you know, waited

4    for more communication.  Then I finally did receive more

5    communication via letter from his attorney.

6    BY MR. MULRYNE:

7    Q.  Okay.  Just focusing for a moment on that first outreach

8    from Mr. Michel, when he reached out to you, did you

9    understand he was referring to wanting back the $40,000 he

10   gave you in 2012?

11   A.  Yes.

12   Q.  Okay.  During that conversation, did he mention the

13   possibility of something being made public, if not for

14   receiving the money back?

15   A.  As I recall, I think what he was -- I can only -- you

16   know, I'm kind of asked to, you know, speculate here.  I

17   think he was saying that --

18          MR. KENNER:  Object.  Move to --

19          THE COURT:  You should not speculate.

20          THE WITNESS:  All right.

21          THE COURT:  Testify as to what you know or

22   remember.

23          THE WITNESS:  He may have sent a text -- I'm

24   trying to recall -- saying that if his lawyer has to get

25   involved, it may be a public matter, or something of that

1    nature.

2    BY MR. MULRYNE:

3    Q.  What was your initial reaction to Mr. Michel reaching

4    out to you about wanting this money back?

5    A.  I didn't fully understand it.  And, you know, I was

6    definitely -- had an adverse reaction.

7    Q.  What was that last part?  I'm sorry.

8    A.  I had an adverse reaction to it.

9    Q.  What do you mean by "adverse reaction"?

10   A.  I didn't understand it to be a loan.

11   Q.  The money that he gave you in 2012?

12   A.  Understood -- correct.

13   Q.  Let me show you, Mr. Richardson, what's marked as

14   Government Exhibit 458.

15           THE COURT:  Is that admitted?

16           MR. MULRYNE:  This has not been previously

17   admitted.  This is just for identification, your Honor.

18           MR. KENNER:  May I just have a moment, your Honor?

19           MR. MULRYNE:  And it is a multipage document.

20           THE COURT:  Did you get a chance to read all of it

21   or did they move it too fast?

22           THE WITNESS:  It's okay.  Yes.  We're okay.  Thank

23   you for asking.

24   BY MR. MULRYNE:

25   Q.  Mr. Richardson, do you recognize this as a text exchange

1    between you and Mr. Michel in February of 2019?

2    A.  I do.

3             MR. MULRYNE:  Your Honor, move to admit Government

4    Exhibit 458.

5             MR. KENNER:  No objection.

6             THE COURT:  I'll admit 458 without objection.

7             (Whereupon, Government's Exhibit No. 458 was

8    entered into evidence.)

9             MR. MULRYNE:  If we can go back to the second page

10   and publish, please.

11   BY MR. MULRYNE:

12   Q.  So, Mr. Richardson, we see here, is this a screenshot

13   from your phone with the text exchange with Mr. Michel?

14   A.  Yes.

15   Q.  All right.  And we won't go through this entire thing.

16   But if -- we may read just a little bit here.

17            So the first text from Mr. Michel:  "Yo, Bro.  As

18   a courtesy, I thought I'd let you know what's about to

19   happen.  My lawyer is going to be getting in touch with you

20   in the next couple of days and a criminal complaint and

21   charges will be filed.  Just a heads-up.  I tried to avoid

22   this, but I'm left with no choice."

23            I'm not asking you to read your entire response,

24   but again, what was your reaction here, Mr. Richardson?

25   A.  Basically, I just didn't understand what it was about.

 1    And I just responded:  "I'm not sure what you're thinking.

 2    That's crazy."

 3              And that was it.

 4    Q.  And in the box there at the bottom, I see you wrote

 5    about -- "We have no choice but to protect me and my brand

 6    from slander or libel."

 7              Is that right?

 8    A.  That is correct.

 9              MR. MULRYNE:  Can we go to the next page?

10    BY MR. MULRYNE:

11    Q.  As we do that, let me ask, why is it that you included

12    that about protecting yourself from slander, libel?  What

13    was your thought there?

14    A.  Well, I just didn't understand what -- why his lawyer

15    was contacting me.  And I didn't want any -- anything to

16    affect, you know, my reputation or my brand.  That's all.

17    That's all I was really saying.

18    Q.  And I should have asked.  This text exchange that we're

19    looking at here, did you understand this, again, to relate

20    back to the $40,000 in 2012?

21    A.  Correct.

22    Q.  And Mr. Michel's request that you repay this money?

23    A.  Correct.

24    Q.  All right.  So looking here -- I think this is Page 3.

25    I won't read that whole part there, but you see the

1    Defend- -- I'm sorry -- Mr. Michel texting you following up

2    on this issue.  Is that right?

3    A.  Correct.

4         MR. MULRYNE:  Can we just scroll down to the next

5    exchange.

6    BY MR. MULRYNE:

7    Q.  So here on the top of Page 4, Mr. Richardson, you may

8    see where you wrote back to Mr. Michel, "We spoke in detail

9    about a resolution, but you went left."

10        What can you tell us about your conversation with

11   Mr. Michel about a resolution?

12   A.  You know, I truly don't remember any resolution.  I just

13   was adamant that I don't owe anything and I really didn't

14   want to be involved with whatever drama that was going on.

15        MR. MULRYNE:  If we could just scroll down

16   further, please.  We're on to Page 5.

17   BY MR. MULRYNE:

18   Q.  The two of you are continuing to text about this issue

19   of the $40,000 repayment?

20   A.  Uh-huh.

21        THE COURT REPORTER:  Is that a yes?

22        THE WITNESS:  Yes.  Yes.

23   BY MR. MULRYNE:

24   Q.  Mr. Richardson, did there come a point where you

25   received a letter from a law firm purporting to represent

1    Mr. Michel?

2    A.  I did.

3    Q.  All right.  Let me show you what's been marked as -- let

4    me show you what's been previously admitted as Government

5    Exhibit 436.

6            MR. MULRYNE:  If we can just zoom in to the entire

7    body of this.  Perfect.  Thank you, Ms. Johnson.

8    BY MR. MULRYNE:

9    Q.  So, Mr. Richardson, here we see a letter dated

10   February 27th, 2019, addressed to you.  The regard line

11   there reads:  "Loan repayment."

12            And did you understand this to be a letter

13   requesting that you repay the $40,000 that you had received

14   from the Defen- -- Mr. Michel in 2012?

15   A.  Yes.

16   Q.  All right.  And what does this letter suggest would be

17   the consequences for not repaying?

18   A.  Just penalties, fees on top of what is being requested.

19   Q.  Do you see the third paragraph referenced a

20   breach-of-contract lawsuit?

21   A.  Correct.

22   Q.  All right.  At any point, did -- were you ever told that

23   that $40,000 back in 2012 was a loan?

24   A.  No.

25   Q.  Did you ever understand it to be a loan?

```
 1   A.  Not to my understanding.  No.

 2   Q.  All right.  Putting aside the $40,000 in 2012, had the

 3   Defendant -- I'm sorry -- had Mr. Michel ever given you

 4   money on any other occasions?

 5   A.  No.

 6   Q.  All right.  Had Mr. Michel ever offered to loan you

 7   money on any other occasions?

 8   A.  No.

 9   Q.  Had he ever asked you for a loan?

10   A.  On occasion.  A couple of occasions.

11   Q.  All right.  And what was your response to his request

12   for a loan?

13   A.  I couldn't do it at the time.  It was just too much for

14   me at the time.

15   Q.  All right.  Apart from the $40,000, did any substantial

16   money ever exchange hands between you and Mr. Michel?

17   A.  No.  We never exchanged any money.  I mean, we might

18   have hung out a couple of times where he covered maybe

19   dinner or drinks, once at Nobu, once at Soho House.  But

20   other than that, no.

21   Q.  Anything approximating thousands, let alone --

22   A.  No.

23   Q.  -- tens of thousands of dollars?

24   A.  Never.

25   Q.  Did you and Mr. Michel ever consummate or ever be
```

1    involved in any business dealings?

2    A.  We talked about a few things, but nothing was ever

3    executed.

4    Q.  Any business dealings that ever involved money

5    exchanging hands?

6    A.  Never exchanging any money.

7              MR. MULRYNE:  If we can go to Page 1 of this

8    document.  I believe that's Page 3 of Government

9    Exhibit 436.

10   BY MR. MULRYNE:

11   Q.  Did you receive a followup letter from the same law firm

12   again requesting the $40,000 repayment?

13   A.  I did.

14   Q.  All right.  And again, what was your reaction to all of

15   this?

16   A.  Well, I didn't feel like it had merit, so it wasn't an

17   actionable item for me.

18   Q.  All right.  These letters are dated February and March

19   of 2019.  Mr. Michel had given you that money -- we saw the

20   check -- in 2012.  During those seven -- approximate seven

21   years in between, did Mr. Michel ever talk to you about the

22   money?

23   A.  No.

24   Q.  Did he ever ask for repayment on that money prior to

25   early 2019?

```
 1   A.  No.
 2   Q.  So we're just looking there, moments ago, in early 2019.
 3   And -- I'm sorry.  Before we conclude on this thought --
 4         MR. MULRYNE:  Well, strike that, your Honor.
 5   BY MR. MULRYNE:
 6   Q.  So we were just looking there in early 2019.
 7   Fast-forwarding a few months to July of 2019 --
 8   A.  Okay.
 9   Q.  -- did you receive a text message from an unfamiliar
10   number?
11   A.  Yes.
12         MR. MULRYNE:  If we could pull up Government's
13   Exhibit 460, previously admitted.
14   BY MR. MULRYNE:
15   Q.  So, Mr. Richardson, we see at the top there was the
16   number ending in 9240.  Did you recognize that number?
17   A.  I did not.
18   Q.  All right.  This text message here, do you mind reading
19   it for the jury, please?
20   A.  "Mr. Richardson" --
21   Q.  If you could just speak into the microphone.
22         THE COURT:  Use the microphone --
23         THE WITNESS:  Okay.  Sorry.  I apologize.
24         THE COURT:  -- in front of you.  Just turn it.
25         THE WITNESS:  "Mr. Richardson, listen.  It is
```

1    strongly advised you do the right thing and pay -- our

2    camaraderie."  This -- oh, sorry.  Sorry.  I don't have my

3    contacts.

4             "That you do right with our comrade [sic].  He is

5    going court all this week starting tomorrow and, as of now,

6    the DOJ doesn't know definitely [sic] about your transaction

7    from 2012.  But all of that can change by tomorrow.  Not

8    only -- the press will be there.  Now, I'm sure you don't

9    want your clients to be mentioned in the middle of that.

10   You owe him 50K.  Not a good look.  So" --

11   Q.  Mr. Richardson, if -- I apologize.  If I may interrupt

12   you just one moment.

13            Going back up to the upper portion there, where it

14   references "As of now, DOJ doesn't know definitively about

15   you and the transaction from 2012" -- did you understand

16   that to be a reference to the transaction -- the money that

17   Mr. Michel gave you in 2012?

18   A.  I can only assume.  I mean, I could only assume that.  I

19   don't know, but that's all I could think it would be.

20   Q.  Did you have any other transactions from 2012 that had

21   come up around this time in 2019?

22   A.  No.  No.

23   Q.  All right.  And the part there about "As of now, DOJ

24   doesn't know definitely about you," by this point, had the

25   FBI or anyone with the Department of Justice reached out to

```
1    you --

2    A.  No.

3    Q.  -- regarding this matter?

4    A.  No.

5    Q.  Had anyone interviewed you?

6    A.  No.

7    Q.  All right.  Was it some time later in which you were

8    approached by the FBI?

9    A.  Yes.

10   Q.  Okay.  And then just going back to the bottom of that

11   email -- I'm sorry.  I had interrupted you, Mr. Richardson.

12   A.  Sure.

13   Q.  I believe it finishes at the bottom beginning, "Just

14   remember, once you're mentioned there's no turning back.

15   I'm not sure if it's worth 50K.  BTW, I wouldn't mention

16   this to anyone.  Best."

17            Did I read that correctly?

18   A.  You did.

19            MR. MULRYNE:  One moment, your Honor.

20            No further questions, your Honor.

21            THE COURT:  Cross.

22            MR. KENNER:  Thank you, your Honor.

23                       CROSS-EXAMINATION

24   BY MR. KENNER:

25   Q.  Good afternoon, Mr. Richardson.
```

```
 1    A.  Good afternoon.
 2    Q.  You said you received 40,000 from Pras to attend the
 3    event.  Correct?
 4    A.  That is correct.
 5              THE COURT:  You can -- his whole name, Pras
 6    Michel.
 7              MR. KENNER:  Mr. Michel.  I'm sorry.
 8    BY MR. KENNER:
 9    Q.  You received that money into your business bank account.
10    Is that correct?
11    A.  That is correct.
12    Q.  And your understanding was that that money was intended
13    to be used as a donation to the Obama Victory Fund?
14    A.  I wouldn't say that.  I knew that it was for the dinner
15    that I was attending, so I can't say I knew directly what
16    fund or where it was going.  I knew it was to pay for a
17    dinner.
18    Q.  Okay.  In fact, you -- and I'm not saying this to be
19    critical of you -- your donation for that dinner was
20    $40,000, is that correct, not $50,000?  I'm sorry --
21    A.  As I testified --
22    Q.  I apologize.  I'm messing you up.  Let me start that
23    again.
24              The donation that you made was less than the
25    $40,000 that you received.  I think you said --
```

1    A.  That is correct.

2    Q.  And how much less than the $40,000 you received was the

3    contribution?

4    A.  I honestly do not remember, but I would say it couldn't

5    have been less than 1500 or so.

6    Q.  Okay.

7    A.  And I'm just estimating.

8    Q.  Okay.  And much later, you received a text message about

9    the money.  Correct?

10   A.  Yes.

11   Q.  And the text message that was just shown to you, the

12   last one, you didn't know who was sending that message, did

13   you?

14   A.  I did not.

15   Q.  You didn't recognize the number it came from?

16   A.  I do not.  Still don't.

17   Q.  Did you have doubts at the time that that even came

18   or -- from Mr. Michel?

19   A.  I did.

20   Q.  And what was the basis of those doubts?

21   A.  The amount, if it was referring to the event, was

22   different.  Just -- it just didn't sound like it was coming

23   from him, so I didn't -- I just thought it was just

24   suspicious.

25   Q.  Did you observe that the language in that email was very

1    different than the language in other emails that you and

2    Mr. Michel would exchange?

3    A.  I did.

4    Q.  So even as you sit here today, you have no idea who sent

5    those texts?

6    A.  That is correct.

7    Q.  Now, I want to talk to you a little bit -- and thank you

8    for that, by the way.

9            You at some point entered into a proffer agreement

10    with the Government?

11    A.  I believe so.  Yes.

12    Q.  And in that proffer agreement, did the Government -- did

13    you understand that proffer agreement to mean that nothing

14    you said in that interview could be held against you or used

15    against you, except in very limited circumstances?

16    A.  It was at the discretion of my attorney.  So I can't say

17    that I fully understood anything.

18    Q.  I get it.

19            And then there came a time that you testified in

20    front of the grand jury.  Is that correct?

21    A.  That --

22    Q.  Do you remember coming to this courthouse and going into

23    a room where there were about 17 people?

24    A.  No.  That never happened.

25    Q.  Are you saying you did not testify on May 5th of 2021 in

1    front of a grand jury?

2    A.  In front of a grand jury?  No, I did not.

3         MR. KENNER:  Maybe I'm confused.  May I have a

4    moment?

5    BY MR. KENNER:

6    Q.  You're right.  I'm wrong.

7         In fact, though, you did do an interview in the

8    presence of a court reporter.  And Mr. Mulryne from the

9    Department of Justice, who was just asking you questions,

10   was there.

11   A.  That's accurate.

12   Q.  All right.  And did you say during that interview -- let

13   me recall that -- withdraw that.

14        Did you tell Mr. Mulryne in that interview --

15        MR. MULRYNE:  Objection, your Honor.  It seems

16   like it's going to be calling for hearsay.

17        THE COURT:  Well, instead of working from that,

18   depending on what you're trying to do, can you --

19        MR. KENNER:  Yes, your Honor.

20        THE COURT:  -- just ask him a question in terms of

21   what you want the question to be and then --

22        MR. KENNER:  All right.

23        THE COURT:  -- whatever else you're bringing up

24   with the discussion with Mr. Mulryne.

25        MR. KENNER:  Yes.  Let me ask it differently,

1    then.

2    BY MR. KENNER:

3    Q.  When you did this interview with Mr. Mulryne on May 5th

4    of 2021, did you feel threatened in any way by Mr. Michel?

5    A.  No.  I made it clear that at no point did I ever feel

6    threatened or intimidated by Mr. Michel.  I made that very

7    clear.

8    Q.  And did Mr. Mulryne suggest to you --

9         MR. KENNER:  And I'm asking this to get his

10   reaction to it.

11        THE COURT:  That's not appropriate.  In terms of

12   getting the lawyer's reaction to something?

13        MR. KENNER:  No.  His reaction, your Honor.  Not

14   the lawyer's reaction.

15        THE COURT:  Can we have a discussion so we --

16        MR. KENNER:  Absolutely.

17        (Whereupon, the following proceedings were had at

18   sidebar outside the presence of the jury:)

19        THE COURT:  What are you getting at?  So we don't

20   keep going back and forth with objections.

21        MR. KENNER:  In this interview, the witness was

22   asked the question, Did there come a later time when you

23   were approached by FBI agents?

24        And the answer is:  Correct.  I got a phone call

25   from Justin Herd, who was with Sean Fern.  And they said

Richardson - CROSS - By Mr. Kenner

1    they wanted to talk to me because they believed I was

2    potentially a witness and I was threatened in some manner.

3    And I told them that's not the case, and they kind of were

4    very insistent on talking to me about that.

5              THE COURT:  That's totally -- completely -- he's

6    indicated he was not intimidated or threatened by

7    Mr. Michel.  So you have an answer for that.

8              Why would you get into the rest of this?  All of

9    it is hearsay, for one thing.

10             And there's no probative value.  He's made it

11   quite clear that Mr. Michel didn't threaten -- or he didn't

12   feel intimidated.  That's what you want as the answer.  Why

13   are you getting into something that's going to bring up a

14   whole bunch of, you know, hearsay issues?

15             MR. KENNER:  I'm not offering this for the truth

16   of the matter, but only for his reaction after --

17             THE COURT:  And what -- what relevance does his

18   reaction have when, as a practical matter, he's already told

19   you that he was not threatened and never felt intimidated by

20   Mr. Michel?

21             So the issue of whether Mr. Michel threatened or

22   intimidated him clearly is relevant and probative.  What

23   other people or what other, you know, FBI agents, or

24   whatever, called and raised some issue goes off on, frankly,

25   403 in terms of issues that are confusing when what you have

1    is that nobody threatened or intimidated him.

2          So I don't see going down this other path.

3          Plus, it's a whole bunch of hearsay.  And in terms

4    of saying it's a state of mind of asking things, he's

5    already indicated his state of mind.  His state of mind was

6    that he wasn't threatened or intimidated by Mr. Michel.

7          What his reaction was to the FBI agents is not

8    probative, and it's most definitely 403.  So I don't see how

9    this comes in.

10         MR. MULRYNE:  Your Honor, in addition, I just

11   think -- the Government continues to object to the extent

12   that defense counsel is using various exhibits, reports and

13   otherwise, without first establishing whether an

14   inconsistent statement has been made or to refresh in an

15   appropriate manner.  Otherwise, it appears we're just

16   continuing -- the defense is continuing to insert -- or

17   attempt to ask the witnesses to insert hearsay into the

18   record.

19         THE COURT:  Okay.  Anyway, you can't go through

20   this.  We're at the end of it.

21         MR. KENNER:  Thank you.

22         (Whereupon, the following proceedings were had in

23   open court:)

24         THE COURT:  I'll sustain the objection.

25

1    BY MR. KENNER:

2    Q.  I guess just one final question, just so the record is

3    clear:  You do not now and never have felt threatened or

4    intimidated by Mr. Michel.  Is that a correct statement?

5    A.  Never.  Not at all.

6    Q.  By the way, just to test my own eyes, did I -- was it

7    you that I observed giving a hug to Mr. Michel downstairs

8    today?

9            MR. MULRYNE:  Objection, your Honor.  Relevance.

10           THE COURT:  It's totally outside of the court and

11   you -- it isn't relevant for a number of different reasons.

12           MR. KENNER:  I have nothing further.

13           THE COURT:  Redirect.

14           MR. MULRYNE:  If we could pull up again what's

15   been admitted as Government Exhibit 458.  If we can scroll

16   down to Page 2.

17                  REDIRECT EXAMINATION

18   BY MR. MULRYNE:

19   Q.  And so, Mr. Richardson, just following up on the

20   questions that -- the questions, the testimony about feeling

21   threatened:  You did not feel physically threatened by

22   Mr. Michel, did you?

23   A.  No.  Not at all.

24   Q.  But did you have any concerns about reputational harm

25   based on these actions?

1    A.  I always want to protect my brand from anything that can

2    possibly be in the news.  So I would say yes, in a sense.

3    Yes.

4    Q.  And you have clients for whom you work on behalf -- as a

5    financial manager.  Is that right?

6    A.  Correct.  So when you -- when there are matters of

7    having outstanding debt, loans or anything, that just looks

8    bad on your business.  So, you know, I don't -- I try to

9    avoid all of that at all costs.

10   Q.  And is it true that it would look bad for business if

11   there's lawsuits against you for some sort of financial

12   impropriety?

13   A.  I would say so.

14   Q.  I just wanted to clarify one thing that you testified

15   about moments ago.

16             MR. MULRYNE:  Take that down, please.  If we can

17   go back to Government Exhibit 460, previously admitted.

18   BY MR. MULRYNE:

19   Q.  If I may clarify, because I don't know if I heard this

20   correctly.  This text message, you did understand that this

21   seemed to be referencing Mr. Michel and the $40,000 in 2012.

22   Is that right?

23   A.  That's what I assumed.  I couldn't imagine anything else

24   that it could be about, so I would have to say yes.

25             MR. MULRYNE:  One moment, your Honor.

```
 1                 No further questions.

 2                 THE COURT:  Can he be excused?

 3                 MR. KENNER:  No objection.

 4                 THE COURT:  You're excused, sir.

 5                 THE WITNESS:  Thank you.

 6                 (Witness excused.)

 7                 THE COURT:  We're going to be stopping at this

 8       point.

 9                 So, members of the jury, you had asked about

10       the -- next week.  So let me just indicate that Wednesday,

11       April 5th, we will be stopping at around 11:30.  Okay?

12       Certainly -- definitely before noon.  So we'll be sitting in

13       the morning but not in the afternoon.

14                 On Friday, April 7th, we'll be off all day, so you

15       don't need to come to the court.

16                 Monday, April 10th, you will also be off all day

17       and will not need to come to the court.

18                 April 12th, we will be stopping at 11:00 in order

19       to accommodate an appointment at 12:45.  Okay?

20                 So those are the dates.  And I'll go over them

21       again at the beginning of next week.

22                 I don't think I have anything that I need to stop

23       for in the evening other than these, but I'll double-check

24       my calendar and make sure.  Like this evening I do have

25       something shortly.
```

1        So let me let you go at this point.  Have a good

2    weekend.  Don't worry about this case.  Don't talk about it.

3    Take care.  And be well.

4        THE JURY:  Thank you.

5        (Whereupon, the jury exited the courtroom at 4:03

6    p.m. and the following proceedings were had:)

7        THE COURT:  Just a couple of things.

8        Ms. Carlstrom, whom I granted *pro hac vice* to

9    appear, has not entered an appearance.  So either she's in

10   the case or she's not.  If she's not in the case -- if she's

11   in the case, she needs to sign -- fill in an appearance.  If

12   she's not in the case, then I'll simply revoke the *pro hac*

13   *vice*.

14       MR. HASKELL:  Your Honor, she is in the case.

15   We're having issues with her ECF account and trying to get

16   it worked out with the clerk.  As soon as she gets that

17   worked out, she intends to file her notice of appearance.

18       THE COURT:  Okay.  She needs to get moving.  We've

19   had a --

20       MR. HASKELL:  I understand, your Honor.  We're

21   going to work on that later this afternoon.

22       THE COURT:  All right.  I expect something by

23   Monday.

24       MR. HASKELL:  Yes, your Honor.

25       THE COURT:  The other thing.  Mr. Kenner, I know

 1    you wanted to have a seat for your wife.  Where do you want

 2    her to sit?  In terms of -- so I make sure -- I mean, you

 3    need to sort of look out there in terms of where you want

 4    her, what she gets to look at.  And that will be permanently

 5    hers.  Everybody has to sit around her.

 6              MR. KENNER:  (Indicating.)

 7              THE COURT:  Or you can let me know Monday morning.

 8              MR. KENNER:  Okay.

 9              THE COURT:  But I would look -- the problem with

10    doing the aisles is everybody comes in and out.  So you may

11    want to have her in further.  Just a suggestion.

12              MR. KENNER:  Thank you.

13              THE COURT:  Also, please do not thank witnesses

14    when you like their answer.  Okay?  That's not appropriate

15    to say "Thank you for that answer."

16              Any issues over the weekend?

17              MR. KENNER:  No, your Honor.

18              THE COURT:  Government?

19              MR. KELLER:  I don't anticipate any, your Honor.

20              THE COURT:  Okay.  And you'll give us the -- you

21    know, you'll share with us the list that you give to him so

22    I can take a look if I need any, you know, instructions or

23    anything else to be ready.

24              MR. KELLER:  Yes, your Honor.

25              THE COURT:  Okay.  If there's nothing else,

1    everybody have a good weekend.  Take care.  Be well.

2            MR. MULRYNE:  You, too.  Thank you, your Honor.

3            THE COURT:  See you Monday.

4            MR. MULRYNE:  Thank you.

5            MR. KENNER:  Thank you, your Honor.

6            (Proceedings concluded.)

1                        **CERTIFICATE**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                   Dated this 31st day of March, 2023.

11

12              /s/ Lisa Edwards, RDR, CRR
                Official Court Reporter
13              United States District Court for the
                  District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$200** [1] - 12:7
**$40,000** [16] - 28:25, 61:10, 61:14, 62:19, 63:9, 66:20, 67:19, 68:13, 68:23, 69:2, 69:15, 70:12, 74:20, 74:25, 75:2, 82:21
**$50,000** [1] - 74:20

## /

**/s** [1] - 87:12

## 1

**1** [1] - 70:7
**100** [1] - 20:18
**1016** [1] - 1:16
**105** [2] - 20:4, 50:10
**10th** [4] - 47:10, 49:7, 49:25, 83:16
**11** [1] - 28:8
**11:00** [1] - 83:18
**11:30** [1] - 83:11
**11th** [1] - 15:11
**12:45** [1] - 83:19
**12th** [1] - 83:18
**1301** [1] - 1:15
**1400** [1] - 1:19
**14th** [2] - 9:13, 49:5
**1500** [1] - 75:5
**16633** [1] - 1:23
**17** [1] - 76:23
**19-00148-1** [1] - 1:3
**1st** [1] - 39:1

## 2

**2** [7] - 10:8, 20:12, 40:20, 41:4, 41:7, 81:16
**20001** [2] - 2:8, 87:14
**20004** [1] - 2:4
**20005** [1] - 1:20
**2012** [41] - 7:9, 8:12, 8:13, 9:13, 10:1, 10:2, 10:3, 11:5, 13:10, 15:11, 17:18, 18:24, 19:2, 19:24, 28:18, 28:22, 40:10, 47:10, 49:5, 49:7, 49:25, 55:8, 56:20, 57:6, 57:16, 61:16, 62:18, 62:20, 63:10, 64:11, 66:20, 68:14, 68:23,

69:2, 70:20, 72:7, 72:15, 72:17, 72:20, 82:21
**2018** [1] - 39:1
**2019** [9] - 62:18, 65:1, 68:10, 70:19, 70:25, 71:2, 71:6, 71:7, 72:21
**202** [2] - 2:9, 87:15
**2020** [1] - 57:16
**2021** [2] - 76:25, 78:4
**2023** [2] - 1:6, 87:10
**20530** [1] - 1:16
**22** [1] - 3:5
**260** [1] - 17:23
**27th** [1] - 68:10
**28th** [2] - 18:7, 19:2
**2:19** [1] - 1:7
**2:20** [1] - 4:19

## 3

**3** [8] - 15:6, 20:25, 39:2, 41:5, 41:6, 45:10, 66:24, 70:8
**302** [14] - 38:13, 38:16, 38:24, 39:21, 40:8, 40:9, 40:20, 41:17, 41:18, 41:23, 41:24, 42:17, 42:18, 43:2
**302s** [1] - 38:15
**31** [1] - 1:6
**31st** [1] - 87:10
**333** [2] - 2:7, 87:14
**354-3269** [2] - 2:9, 87:15

## 4

**4** [1] - 67:7
**40,000** [4] - 58:3, 61:3, 61:20, 74:2
**40,000-a-plate** [1] - 36:7
**403** [2] - 79:25, 80:8
**424** [2] - 60:13, 60:15
**436** [2] - 68:5, 70:9
**458** [6] - 3:9, 64:14, 65:4, 65:6, 65:7, 81:15
**460** [2] - 71:13, 82:17
**4:03** [1] - 84:5

## 5

**5** [3] - 20:6, 50:14, 67:16

**509** [6] - 9:8, 9:24, 10:9, 23:2, 23:3, 23:5
**50K** [2] - 72:10, 73:15
**54** [1] - 3:6
**575** [2] - 46:16, 46:20
**578** [1] - 14:23
**5:00** [1] - 49:7
**5th** [3] - 76:25, 78:3, 83:11

## 6

**6** [1] - 3:5
**641** [1] - 2:3
**65** [1] - 3:9
**6706** [1] - 2:8

## 7

**7** [2] - 4:21, 4:25
**73** [1] - 3:6
**7th** [1] - 83:14

## 8

**81** [1] - 3:6

## 9

**91436** [1] - 1:23
**9240** [1] - 71:16

## A

**ability** [1] - 87:7
**able** [5] - 5:21, 34:18, 37:25, 43:10, 60:20
**absolutely** [1] - 78:16
**accept** [2] - 16:14, 30:25
**accepted** [3] - 14:3, 14:6, 14:17
**accommodate** [1] - 83:19
**account** [2] - 74:9, 84:15
**accurate** [4] - 12:24, 62:16, 77:11, 87:4
**accurately** [1] - 29:8
**Action** [1] - 1:3
**actionable** [1] - 70:17
**actions** [1] - 81:25
**adamant** [1] - 67:13

**addition** [2] - 12:11, 80:10
**address** [5] - 11:11, 11:18, 12:5, 17:7, 47:5
**addressed** [2] - 61:4, 68:10
**adjust** [1] - 5:21
**administration** [1] - 21:19
**admissible** [1] - 38:7
**admit** [2] - 65:3, 65:6
**admitted** [20] - 9:7, 13:9, 13:11, 14:23, 17:23, 20:4, 38:7, 46:16, 50:10, 59:2, 59:6, 59:23, 59:24, 60:15, 64:15, 64:17, 68:4, 71:13, 81:15, 82:17
**advance** [3] - 9:5, 12:17, 12:18
**adverse** [3] - 64:6, 64:8, 64:9
**advised** [1] - 72:1
**advisor** [2] - 55:2, 55:3
**advisory** [1] - 55:1
**affairs** [1] - 7:7
**affect** [1] - 66:16
**affinity** [1] - 57:12
**affirm** [1] - 40:3
**afternoon** [17] - 4:1, 4:2, 5:3, 5:4, 5:7, 6:16, 6:17, 22:12, 22:13, 49:8, 54:10, 54:17, 54:18, 73:25, 74:1, 83:13, 84:21
**AFTERNOON** [1] - 1:7
**Agent** [1] - 40:2
**agent's** [1] - 39:21
**agents** [3] - 78:23, 79:23, 80:7
**ago** [8] - 15:21, 18:2, 19:9, 23:22, 28:8, 62:14, 71:2, 82:15
**agree** [2] - 32:7, 37:3
**agreement** [4] - 10:4, 76:9, 76:12, 76:13
**ahead** [3] - 39:9, 54:13, 62:18
**Ahmed** [2] - 47:15, 47:16
**aisles** [1] - 85:10
**AI** [2] - 47:20, 47:22
**Al-Husseiny** [2] - 47:20, 47:22
**alerted** [1] - 27:21
**allocated** [1] - 13:14

**allow** [1] - 5:23
**allowable** [1] - 30:24
**allowed** [10] - 16:12, 35:20, 35:23, 36:13, 36:17, 37:5, 37:15, 37:16, 42:22, 43:4
**ALON** [1] - 1:22
**alone** [1] - 69:21
**America** [7] - 7:11, 7:13, 10:5, 18:18, 22:16, 23:7
**AMERICA** [1] - 1:3
**American** [1] - 33:8
**amount** [8] - 11:2, 21:24, 58:1, 58:4, 58:13, 61:2, 61:22, 75:21
**answer** [23] - 5:24, 6:2, 6:3, 6:5, 28:14, 29:25, 30:1, 33:6, 34:10, 34:13, 34:16, 34:22, 41:23, 46:10, 53:25, 54:4, 54:5, 54:7, 78:24, 79:7, 79:12, 85:14, 85:15
**answered** [13] - 24:2, 24:3, 28:13, 32:23, 33:11, 34:11, 34:15, 37:7, 37:8, 37:9, 37:11, 40:16, 52:2
**answers** [2] - 26:2, 27:12
**anticipate** [1] - 85:19
**anyway** [1] - 80:19
**apart** [1] - 69:15
**apartment** [1] - 62:8
**apologies** [2] - 20:22, 46:11
**apologize** [8] - 33:4, 34:1, 38:22, 41:5, 58:10, 71:23, 72:11, 74:22
**appear** [2] - 41:20, 46:24, 52:14, 84:9
**appearance** [4] - 4:18, 84:9, 84:11, 84:17
**APPEARANCES** [1] - 2:1
**aPPEARANCES** [1] - 1:13
**applied** [1] - 11:6
**appointment** [1] - 83:19
**appreciate** [1] - 6:12
**approached** [2] - 73:8, 78:23
**appropriate** [4] - 34:24, 78:11, 80:15, 85:14

**approximate** [2] - 29:8, 70:20
**approximating** [1] - 69:21
**April** [4] - 83:11, 83:14, 83:16, 83:18
**Ardehali** [1] - 47:24
**area** [2] - 32:18, 33:20
**argumentative** [3] - 24:2, 26:4, 28:12
**arrangements** [1] - 9:2
**arrived** [1] - 56:7
**article** [1] - 55:18
**artists** [1] - 57:13
**ASAP** [1] - 19:3
**aside** [1] - 69:2
**assembled** [1] - 40:14
**asserted** [1] - 59:2
**assets** [1] - 55:5
**assign** [1] - 4:7
**assigned** [1] - 4:10
**assignments** [2] - 50:4, 50:7
**assistance** [1] - 25:1
**association** [1] - 56:23
**assume** [3] - 30:3, 72:18
**assumed** [1] - 82:23
**assuming** [1] - 53:3
**Atlantic** [3] - 7:17, 7:18, 22:16
**attached** [1] - 10:14
**attempt** [1] - 80:17
**attempts** [1] - 24:25
**attend** [26] - 16:12, 17:20, 18:23, 19:11, 19:14, 19:16, 19:20, 19:21, 20:1, 27:25, 35:9, 35:20, 36:13, 37:5, 37:16, 37:17, 37:18, 37:25, 41:12, 42:22, 43:4, 43:24, 44:1, 58:2, 62:5, 74:2
**attendance** [1] - 16:3
**attended** [1] - 49:11
**attendees** [2] - 21:21, 46:24
**attending** [4] - 21:15, 35:16, 49:14, 74:15
**attention** [2] - 57:15, 57:17
**attorney** [2] - 63:5, 76:16
**August** [2] - 18:7, 19:2
**authored** [1] - 38:13

**available** [1] - 58:19
**Avenue** [5] - 1:15, 1:19, 2:3, 2:7, 87:14
**avoid** [2] - 65:21, 82:9
**aware** [10] - 27:7, 27:9, 29:11, 31:5, 31:19, 31:23, 36:14, 49:11, 51:25, 52:12
**awareness** [1] - 32:1

**B**

**B-A-D-A-W-A-Y** [1] - 47:17
**bad** [2] - 82:8, 82:10
**Badaway** [1] - 47:15
**Bajan** [1] - 48:1
**ballroom** [1] - 35:13
**bank** [1] - 74:9
**Barry** [1] - 48:3
**based** [9] - 24:24, 34:7, 35:2, 35:11, 52:13, 59:8, 59:25, 81:25
**basis** [1] - 75:20
**became** [1] - 62:15
**BEFORE** [1] - 1:10
**beginning** [2] - 73:13, 83:21
**begins** [1] - 12:4
**behalf** [5] - 7:10, 19:19, 21:20, 23:18, 82:4
**behind** [1] - 55:20
**Bekkedam** [1] - 48:4
**below** [6] - 13:5, 13:10, 13:15, 17:6, 17:9, 18:13
**Benjamin** [1] - 48:17
**best** [7] - 11:19, 11:24, 12:4, 24:3, 29:7, 73:16, 87:7
**between** [6] - 10:4, 26:13, 65:1, 69:16, 70:21
**beyond** [3] - 24:12, 25:10, 34:2
**big** [2] - 7:23, 35:12
**birth** [7] - 25:13, 25:16, 25:23, 26:19, 27:13, 27:16, 29:17
**bit** [6] - 15:8, 36:24, 60:20, 61:20, 65:16, 76:7
**blanket** [3] - 41:20, 43:20, 43:21
**block** [1] - 9:25
**blow** [1] - 60:20

**blue** [1] - 55:19
**body** [1] - 68:7
**bottom** [15] - 9:15, 9:24, 15:1, 15:2, 16:20, 17:11, 17:12, 17:24, 47:6, 60:23, 66:4, 73:10, 73:13
**Boulevard** [1] - 1:23
**box** [2] - 10:6, 66:4
**brand** [3] - 66:5, 66:16, 82:1
**breach** [1] - 68:20
**breach-of-contract** [1] - 68:20
**Brenda** [1] - 48:19
**briefly** [2] - 36:19, 57:9
**bring** [1] - 79:13
**bringing** [4] - 25:2, 31:21, 32:10, 77:23
**brings** [1] - 31:6
**Bro** [1] - 65:17
**broken** [1] - 15:4
**BTW** [1] - 73:15
**bunch** [2] - 79:14, 80:3
**bundle** [2] - 30:4, 31:7
**bundler** [5] - 30:3, 30:11, 31:20, 34:8, 34:21
**bundlers** [5] - 29:12, 46:5, 46:12, 52:10
**burden** [2] - 31:6, 31:20
**business** [5] - 70:1, 70:4, 74:9, 82:8, 82:10
**BY** [69] - 2:5, 6:15, 7:3, 10:10, 10:23, 14:24, 15:3, 15:9, 17:1, 17:16, 18:1, 18:12, 20:7, 20:13, 21:1, 22:11, 23:4, 24:5, 24:23, 26:7, 27:6, 28:16, 31:18, 32:6, 32:12, 33:3, 34:12, 35:1, 36:6, 37:2, 37:12, 38:2, 38:17, 39:10, 44:6, 45:6, 45:19, 46:9, 46:18, 47:1, 50:13, 51:1, 52:3, 54:16, 56:1, 58:12, 59:10, 60:2, 60:19, 62:4, 63:6, 64:2, 64:24, 65:11, 66:10, 67:6, 67:17, 67:23, 68:8, 70:10, 71:5, 71:14, 73:24, 74:8, 77:5,

78:2, 81:1, 81:18, 82:18

**C**

**calendar** [1] - 83:24
**California** [2] - 1:23, 54:24
**camaraderie** [1] - 72:2
**campaign** [68] - 7:13, 7:14, 7:16, 7:19, 8:1, 8:6, 8:20, 9:5, 9:20, 10:17, 11:3, 11:7, 11:15, 11:21, 12:13, 12:23, 13:1, 13:19, 13:24, 13:25, 14:1, 14:15, 15:15, 15:22, 15:25, 16:1, 16:5, 16:7, 16:9, 16:14, 19:14, 19:23, 21:14, 21:16, 21:19, 21:20, 22:15, 22:21, 24:24, 26:11, 30:5, 30:10, 30:14, 30:16, 30:19, 30:23, 32:8, 33:17, 33:22, 34:8, 35:3, 35:6, 35:22, 36:11, 39:11, 40:10, 46:4, 46:6, 46:13, 50:8, 51:9, 51:12, 51:18, 51:22, 52:5, 52:6, 52:7
**campaign's** [9] - 27:18, 32:20, 33:7, 35:9, 36:10, 37:3, 38:3, 42:20, 43:2
**campaigns** [1] - 7:10
**cannot** [1] - 39:9
**capacity** [2] - 8:20, 46:14
**Capital** [2] - 61:5, 61:6
**card** [4] - 10:20, 29:19, 29:20, 61:15
**care** [3] - 9:2, 84:3, 86:1
**Carlstrom** [1] - 84:8
**Caroline** [1] - 48:1
**Carroll** [1] - 48:6
**case** [10] - 4:6, 4:9, 21:18, 79:3, 84:2, 84:10, 84:11, 84:12, 84:14
**cases** [4] - 21:19, 25:13, 29:17, 50:9
**catering** [1] - 9:1
**caused** [1] - 27:20
**certain** [6] - 11:16,

15:24, 15:25, 20:18, 21:24, 26:22
**certainly** [7] - 4:15, 26:5, 26:20, 35:6, 37:15, 39:1, 83:12
**CERTIFICATE** [1] - 87:1
**certify** [2] - 13:10, 87:4
**chain** [2] - 17:2, 17:9
**chair** [2] - 5:20, 53:19
**chance** [2] - 40:3, 64:20
**change** [1] - 72:7
**characters** [1] - 19:5
**charges** [1] - 65:21
**CHARLES** [2] - 2:2, 2:2
**check** [8] - 16:11, 60:8, 60:22, 61:2, 61:9, 61:13, 70:20, 83:23
**checks** [1] - 16:5
**choice** [2] - 65:22, 66:5
**chose** [1] - 34:9
**circumstances** [4] - 41:16, 41:21, 43:17, 76:15
**citizen** [3] - 13:11, 31:22, 33:8
**citizens** [2] - 29:23, 31:10
**city** [2] - 7:4, 54:23
**clarify** [3] - 27:14, 82:14, 82:19
**classify** [1] - 28:22
**clear** [9] - 21:16, 34:4, 39:23, 54:9, 61:11, 78:5, 78:7, 79:11, 81:3
**clearly** [1] - 79:22
**clerk** [1] - 84:16
**clients** [3] - 55:6, 72:9, 82:4
**clients'** [1] - 55:5
**close** [1] - 61:20
**closely** [1] - 57:13
**closer** [1] - 26:20
**clothing** [1] - 55:18
**clutch** [4] - 21:9, 21:11, 21:12, 21:21
**cohost** [1] - 23:14
**collect** [13] - 10:16, 10:18, 11:14, 11:16, 11:19, 11:22, 11:25, 12:5, 13:2, 26:14, 26:18, 29:15, 29:16
**collected** [3] - 9:3,

25:21, 29:23
**collecting** [2] - 12:13, 26:10
**COLLEEN** [1] - 1:10
**college** [1] - 56:18
**Columbia** [2] - 2:7, 87:13
**COLUMBIA** [1] - 1:1
**coming** [2] - 75:22, 76:22
**Commission** [5] - 11:17, 51:16, 51:19, 51:21, 52:15
**committee** [5] - 10:4, 10:25, 23:14, 23:20, 23:21
**Committee** [2] - 10:5, 11:7
**communication** [2] - 63:4, 63:5
**company** [1] - 61:7
**complaint** [1] - 65:20
**complete** [1] - 87:6
**completely** [1] - 79:5
**comrade** [1] - 72:4
**concern** [5] - 13:19, 27:23, 27:24, 29:10, 35:19
**concerns** [1] - 81:24
**concert** [1] - 51:12
**conclude** [1] - 71:3
**concluded** [1] - 86:6
**conduct** [3] - 16:4, 16:5, 26:19
**conduit** [3] - 14:11, 14:15, 14:17
**confer** [1] - 4:12
**conflict** [1] - 4:18
**confused** [2] - 63:3, 77:3
**confusing** [1] - 79:25
**connection** [1] - 51:17
**consequences** [1] - 68:17
**constitutes** [1] - 87:4
**Constitution** [2] - 2:7, 87:14
**consummate** [1] - 69:25
**CONT'D** [1] - 2:1
**contact** [4] - 9:16, 9:20, 10:17, 25:19
**contacting** [2] - 12:21, 66:15
**contacts** [1] - 72:3
**contained** [1] - 16:10
**contempt** [1] - 4:4
**context** [2] - 21:9, 59:1

**continues** [1] - 80:11
**continuing** [3] - 67:18, 80:16
**contract** [1] - 68:20
**contribute** [4] - 19:16, 19:19, 19:21
**contributed** [2] - 11:15, 21:24
**contributing** [2] - 13:9, 13:24
**contribution** [17] - 10:13, 10:19, 11:1, 11:4, 11:6, 13:14, 13:20, 13:25, 14:3, 14:10, 14:12, 29:2, 30:7, 30:12, 30:25, 75:3
**contributions** [8] - 12:6, 14:16, 14:18, 16:14, 16:15, 19:17, 28:25, 30:18
**contributor** [2] - 12:13, 13:6
**contributors** [3] - 11:22, 12:12, 12:24
**control** [1] - 35:6
**conversation** [2] - 63:12, 67:10
**conveyed** [1] - 58:18
**copied** [1] - 15:14
**corner** [1] - 60:24
**correct** [35] - 12:22, 23:7, 23:18, 25:8, 25:25, 26:9, 27:14, 49:6, 51:7, 53:4, 56:9, 56:16, 59:13, 59:16, 61:17, 62:2, 62:15, 64:12, 66:8, 66:21, 66:23, 67:3, 68:21, 74:3, 74:4, 74:10, 74:11, 74:20, 75:1, 75:9, 76:6, 76:20, 78:24, 81:4, 82:6
**correctly** [5] - 19:4, 30:12, 62:9, 73:17, 82:20
**cost** [2] - 57:23, 58:1
**costs** [1] - 82:9
**counsel** [7] - 5:23, 6:1, 6:9, 52:25, 53:24, 54:3, 80:12
**couple** [5] - 60:6, 65:20, 69:10, 69:18, 84:7
**COURT** [136] - 1:1, 4:1, 4:3, 4:13, 4:15, 4:21, 5:1, 5:5, 5:13, 5:19, 6:7, 6:11, 6:21, 6:25, 20:21, 22:4, 22:6, 22:8, 23:1, 23:3,

24:3, 24:11, 24:14, 24:16, 24:19, 26:5, 27:4, 28:13, 31:12, 31:15, 31:25, 32:16, 32:22, 33:12, 33:15, 34:2, 34:10, 34:14, 34:16, 36:1, 36:3, 36:23, 37:1, 37:8, 38:1, 38:10, 38:14, 38:19, 38:21, 38:25, 39:5, 39:8, 39:15, 39:19, 40:5, 40:11, 40:18, 41:9, 41:18, 41:22, 41:25, 42:4, 42:11, 42:14, 42:25, 43:6, 43:14, 43:18, 43:21, 44:3, 44:14, 44:17, 44:24, 45:3, 45:8, 45:12, 45:15, 46:7, 46:21, 50:24, 52:2, 52:17, 52:22, 52:25, 53:3, 53:6, 53:8, 53:13, 53:18, 53:23, 54:9, 54:13, 55:23, 58:9, 58:23, 58:25, 59:6, 59:19, 60:17, 62:25, 63:19, 63:21, 64:15, 64:20, 65:6, 67:21, 71:22, 71:24, 73:21, 74:5, 77:17, 77:20, 77:23, 78:11, 78:15, 78:19, 79:5, 79:17, 80:19, 80:24, 81:10, 81:13, 83:2, 83:4, 83:7, 84:7, 84:18, 84:22, 84:25, 85:7, 85:9, 85:13, 85:18, 85:20, 85:25, 86:3
**Court** [6] - 2:6, 2:6, 6:19, 54:20, 87:12, 87:13
**court** [10] - 6:19, 39:13, 44:5, 54:20, 72:5, 77:8, 80:23, 81:10, 83:15, 83:17
**courtesy** [1] - 65:18
**courthouse** [1] - 76:22
**courtroom** [5] - 4:19, 5:11, 53:12, 55:14, 84:5
**COURTROOM** [3] - 5:15, 5:18, 53:17
**cover** [4] - 36:19, 58:20, 59:12, 59:22
**covered** [1] - 69:18
**crazy** [1] - 66:2
**create** [1] - 35:7
**credit** [1] - 10:20

**Criminal** [1] - 1:3
**criminal** [1] - 65:20
**criteria** [3] - 27:7, 29:11, 35:11
**critical** [1] - 74:19
**cross** [2] - 22:8, 73:21
**Cross** [1] - 3:3
**CROSS** [2] - 22:10, 73:23
**CROSS-EXAMINATION** [2] - 22:10, 73:23
**CRR** [3] - 2:5, 87:3, 87:12
**cut** [1] - 48:11
**cycle** [2] - 12:7, 28:23

**D**

**D.C** [15] - 1:6, 1:16, 1:20, 2:4, 2:8, 8:13, 8:17, 17:18, 19:23, 56:4, 57:19, 62:1, 62:5, 62:9, 87:14
**dad** [2] - 19:3, 19:7
**danger** [2] - 27:21, 28:4
**Daniel** [1] - 48:8
**date** [8] - 25:13, 25:16, 25:23, 26:19, 27:13, 27:16, 29:17, 38:23
**Dated** [1] - 87:10
**dated** [3] - 15:11, 68:9, 70:18
**dates** [1] - 83:20
**Dato** [1] - 48:11
**DAVID** [1] - 1:21
**days** [4] - 49:17, 49:21, 60:6, 65:20
**deal** [1] - 46:3
**dealings** [2] - 52:13, 70:1, 70:4
**debt** [1] - 82:7
**decide** [1] - 50:8
**decision** [14] - 35:4, 35:23, 36:9, 37:4, 37:21, 40:15, 42:2, 42:21, 42:23, 43:3, 43:4, 43:9, 43:23, 51:10
**decisions** [2] - 37:13, 37:14
**Defen** [1] - 68:14
**Defend** [1] - 67:1
**Defendant** [7] - 1:7, 20:17, 20:19, 57:7,

59:3, 69:3
**DEFENDANT** [2] - 1:21, 2:2
**defense** [5] - 30:6, 38:5, 40:20, 80:12, 80:16
**definitely** [4] - 64:6, 72:6, 80:8, 83:12
**definitively** [2] - 72:14, 72:24
**demand** [1] - 30:8
**Democratic** [3] - 10:5, 10:6, 11:7
**deny** [1] - 40:3
**Department** [2] - 72:25, 77:9
**DEPARTMENT** [2] - 1:15, 1:18
**depiction** [1] - 20:9
**deposited** [2] - 61:11, 61:12
**DEPUTY** [3] - 5:15, 5:18, 53:17
**describe** [1] - 57:9
**describes** [1] - 29:8
**despite** [1] - 19:5
**detail** [1] - 67:8
**determine** [3] - 29:12, 30:9, 31:9
**determining** [1] - 30:24
**develop** [1] - 36:12
**difference** [2] - 26:12, 26:13
**different** [13] - 8:7, 30:23, 35:11, 36:4, 37:10, 40:11, 41:13, 41:17, 41:18, 75:22, 76:1, 81:11
**differently** [1] - 77:25
**dinner** [5] - 61:15, 69:19, 74:14, 74:17, 74:19
**dinners** [1] - 8:9
**DIRECT** [2] - 6:14, 54:15
**Direct** [1] - 3:3
**direct** [1] - 33:14
**directly** [7] - 12:20, 12:21, 25:19, 51:2, 51:20, 55:19, 74:15
**director** [5] - 7:7, 7:17, 7:18, 18:17, 22:16
**discretion** [1] - 76:16
**discussed** [1] - 59:20
**discussion** [3] - 58:16, 77:24, 78:15

**dispute** [1] - 55:23
**District** [3] - 2:6, 2:7, 87:13
**district** [1] - 87:13
**DISTRICT** [3] - 1:1, 1:1, 1:11
**document** [4] - 38:6, 38:8, 64:19, 70:8
**DOJ** [3] - 72:6, 72:14, 72:23
**dollar** [11] - 8:8, 8:9, 26:8, 26:14, 26:15, 26:17, 27:8, 28:17, 28:21, 28:22, 29:1
**dollars** [1] - 69:23
**donating** [2] - 13:12, 14:8
**donation** [3] - 74:13, 74:19, 74:24
**donations** [1] - 30:4
**done** [6] - 4:9, 8:24, 14:1, 32:25, 33:24, 35:17
**donor** [8] - 10:13, 10:15, 12:11, 12:15, 12:16, 12:20, 26:14, 26:15
**donors** [11] - 10:16, 11:20, 12:21, 25:2, 25:19, 26:2, 26:8, 26:11, 27:8, 29:12, 35:14
**door** [1] - 7:1
**double** [1] - 83:23
**double-check** [1] - 83:23
**doubts** [2] - 75:17, 75:20
**down** [11] - 15:6, 17:10, 17:14, 53:18, 53:20, 62:3, 67:4, 67:15, 80:2, 81:16, 82:16
**downstairs** [1] - 81:7
**dozens** [5] - 28:21, 28:24, 29:4, 29:6, 29:7
**drama** [1] - 67:14
**drinks** [1] - 69:19
**dropping** [1] - 58:9
**during** [7] - 22:14, 28:22, 46:3, 55:8, 63:12, 70:20, 77:12

**E**

**early** [3] - 70:25, 71:2, 71:6
**easier** [1] - 4:8

**ECF** [1] - 84:15
**Edgar** [1] - 48:15
**EDWARDS** [2] - 2:5, 87:3
**Edwards** [1] - 87:12
**effect** [4] - 23:15, 58:22, 58:24, 59:3
**efforts** [4] - 11:19, 11:24, 12:5, 30:8
**either** [9] - 12:17, 12:19, 20:16, 21:23, 22:2, 27:24, 37:24, 49:23, 84:9
**Election** [5] - 11:17, 51:16, 51:19, 51:21, 52:15
**election** [2] - 12:7, 28:22
**electric** [1] - 7:7
**email** [16] - 15:11, 16:19, 16:24, 17:2, 17:4, 17:7, 17:9, 18:2, 18:6, 18:13, 18:22, 47:2, 47:5, 47:14, 73:11, 75:25
**emailing** [1] - 15:11
**emails** [2] - 36:20, 76:1
**employed** [1] - 7:6
**employees** [1] - 52:6
**employer** [3] - 11:12, 11:18, 12:6
**empty** [1] - 11:11
**enable** [1] - 26:25
**Encino** [1] - 1:23
**end** [5] - 21:13, 30:5, 30:6, 35:20, 80:20
**ended** [1] - 49:13
**ending** [1] - 71:16
**enlarge** [1] - 9:25
**enlarged** [1] - 46:21
**ensure** [1] - 37:17
**entered** [4] - 4:19, 5:11, 53:11, 65:8, 76:9, 84:9
**entertainment** [4] - 57:5, 57:11, 61:7, 61:8
**entire** [3] - 65:15, 65:23, 68:6
**entitled** [1] - 21:22
**entity** [2] - 13:13, 16:9
**Eric** [5] - 3:5, 5:9, 5:11, 6:20, 6:23
**ERIC** [2] - 5:17, 6:23
**ESQ** [6] - 1:14, 1:17, 1:18, 1:21, 1:22, 2:2
**essentially** [1] - 12:8
**establishing** [1] -

80:13
**estimating** [1] - 75:7
**evaluate** [1] - 27:8
**evening** [2] - 83:23, 83:24
**event** [87] - 8:12, 8:15, 8:23, 8:25, 9:4, 9:12, 12:17, 12:19, 16:12, 17:17, 17:20, 18:23, 19:12, 19:14, 19:16, 19:20, 19:22, 19:23, 20:1, 20:9, 21:13, 21:15, 21:25, 22:1, 22:2, 22:3, 22:18, 22:19, 22:21, 23:12, 23:17, 23:19, 23:24, 26:20, 27:25, 28:1, 28:3, 30:4, 31:7, 35:5, 35:7, 35:8, 35:10, 35:18, 35:21, 35:24, 36:1, 36:5, 36:13, 37:5, 37:15, 37:16, 37:17, 37:25, 42:22, 43:4, 46:25, 49:4, 49:12, 49:14, 49:18, 49:19, 49:21, 50:5, 50:7, 51:11, 56:4, 56:5, 56:10, 56:20, 56:23, 57:7, 57:16, 57:17, 57:18, 58:2, 58:16, 61:15, 61:16, 61:19, 61:23, 62:5, 62:12, 74:3, 75:21
**events** [19] - 8:2, 8:4, 8:7, 8:8, 8:9, 8:11, 15:25, 16:1, 26:17, 28:17, 28:22, 28:24, 29:1, 29:15, 35:12, 35:15, 36:4, 55:7
**EVIDENCE** [1] - 3:8
**evidence** [3] - 9:8, 59:21, 65:8
**exact** [1] - 11:4
**exactly** [4] - 16:17, 19:9, 19:10, 37:22
**EXAMINATION** [5] - 6:14, 22:10, 54:15, 73:23, 81:17
**example** [6] - 12:20, 16:2, 26:21, 29:16, 35:15, 36:7
**exceed** [1] - 12:7
**except** [2] - 13:8, 76:15
**exchange** [6] - 64:25, 65:13, 66:18, 67:5, 69:16, 76:2
**exchanged** [1] - 69:17

**exchanging** [2] - 70:5, 70:6
**exclusive** [1] - 21:22
**excuse** [4] - 36:3, 49:16, 50:12, 59:15
**excused** [5] - 52:25, 53:1, 53:4, 53:7, 83:2, 83:4, 83:6
**executed** [1] - 70:3
**exhibit** [3] - 15:2, 22:24, 50:14
**Exhibit** [22] - 3:9, 9:8, 10:9, 14:22, 17:23, 20:4, 23:1, 23:5, 46:15, 46:16, 46:20, 50:10, 60:13, 60:15, 64:14, 65:4, 65:7, 68:5, 70:9, 71:13, 81:15, 82:17
**exhibits** [1] - 80:12
**EXHIBITS** [1] - 3:7
**exited** [1] - 84:5
**expect** [1] - 84:22
**expense** [2] - 61:21, 61:25
**expensive** [1] - 58:13
**experience** [2] - 34:7, 35:2
**explain** [1] - 8:3
**explained** [1] - 33:15
**extend** [1] - 16:13
**extent** [1] - 80:11
**extra** [1] - 19:5
**eyes** [1] - 81:6

**F**

**F-E-I-G-E-N-B-A-U-M** [1] - 6:24
**facsimile** [1] - 29:20
**fact** [6] - 12:1, 12:19, 37:18, 62:5, 74:18, 77:7
**facts** [1] - 37:10
**fair** [1] - 46:2
**Falmouth** [1] - 7:5
**familiar** [7] - 14:11, 21:8, 31:1, 31:3, 31:16, 32:4, 55:11
**familiarity** [1] - 33:5
**fast** [3] - 62:17, 64:21, 71:7
**fast-forward** [1] - 62:17
**fast-forwarding** [1] - 71:7
**FBI** [6] - 38:13, 72:25, 73:8, 78:23,

79:23, 80:7
**February** [3] - 65:1, 68:10, 70:18
**FEC** [5] - 11:23, 13:3, 31:1, 31:5, 31:19
**Federal** [5] - 11:17, 51:16, 51:18, 51:21, 52:14
**federal** [4] - 12:4, 13:2, 13:8, 13:23
**fees** [1] - 68:18
**Feigenbaum** [26] - 3:5, 5:9, 5:11, 6:16, 6:20, 6:23, 7:4, 9:11, 10:12, 10:24, 13:7, 14:25, 15:4, 15:10, 17:10, 18:2, 20:8, 20:14, 21:8, 22:12, 23:24, 35:2, 41:14, 42:3, 42:23, 43:5
**FEIGENBAUM** [1] - 5:17
**Feigenbaum's** [1] - 40:10
**felt** [2] - 79:19, 81:3
**Fern** [1] - 78:25
**few** [5] - 10:24, 16:19, 53:23, 70:2, 71:7
**file** [1] - 84:17
**filed** [1] - 65:21
**fill** [5] - 12:12, 12:16, 25:22, 26:25, 84:11
**final** [2] - 36:12, 81:2
**finally** [2] - 51:15, 63:4
**finance** [7] - 7:17, 7:18, 18:17, 22:16, 33:2, 33:21, 52:5
**financial** [5] - 30:3, 55:2, 55:3, 82:5, 82:11
**financing** [1] - 33:20
**finish** [5] - 5:23, 45:17, 53:24
**finishes** [1] - 73:13
**firm** [2] - 67:25, 70:11
**FIRM** [1] - 1:22
**first** [11] - 9:24, 10:25, 11:11, 12:2, 16:3, 17:24, 40:22, 56:3, 63:7, 65:17, 80:13
**five** [2] - 7:24, 49:7
**focusing** [1] - 63:7
**follow** [2] - 13:16, 58:15
**following** [11] - 4:20, 5:12, 33:6, 39:17,

44:4, 53:12, 67:1,
78:17, 80:22, 81:19,
84:6
  **followup** [1] - 70:11
  **FOR** [5] - 1:1, 1:14,
1:21, 2:2, 3:4
  **foregoing** [1] - 87:4
  **foreign** [19] - 13:8,
13:20, 13:23, 14:1,
14:4, 17:19, 18:22,
19:11, 19:14, 19:15,
19:18, 19:21, 29:10,
30:9, 30:20, 31:10,
31:22, 32:9, 33:8
  **form** [18] - 10:12,
10:14, 10:15, 11:10,
11:13, 12:11, 12:15,
12:17, 25:10, 25:14,
25:15, 25:22, 25:24,
26:24, 27:13, 27:17,
36:15
  **forth** [1] - 78:20
  **forward** [1] - 62:17
  **forwarding** [1] - 71:7
  **four** [2] - 7:24, 49:17
  **fourth** [2] - 20:5,
20:6
  **Frank** [10] - 8:16,
8:18, 15:12, 23:9,
23:17, 23:25, 36:8,
46:3, 47:7, 51:3
  **frankly** [1] - 79:24
  **Fred** [1] - 47:24
  **frequent** [1] - 52:13
  **Friday** [1] - 83:14
  **friend** [1] - 56:13
  **friends** [1] - 62:15
  **front** [9] - 21:13,
41:12, 41:25, 51:5,
51:6, 71:24, 76:20,
77:1, 77:2
  **full** [3] - 6:18, 54:19,
87:5
  **fully** [2] - 64:5, 76:17
  **fund** [1] - 74:16
  **Fund** [7] - 10:1, 10:2,
10:3, 11:1, 11:5, 11:9,
74:13
  **fundraiser** [3] - 8:20,
36:2, 36:7
  **fundraisers** [1] -
30:15
  **fundraising** [14] -
8:2, 8:4, 8:11, 10:3,
10:25, 16:16, 56:4,
56:5, 56:20, 57:6,
57:16, 61:16, 61:19,
61:23
  **funds** [3] - 13:12,
14:8, 61:14

  **fwj** [1] - 17:7

## G

  **gather** [1] - 21:14
  **general** [3] - 24:17,
32:23, 33:16
  **generally** [5] - 10:12,
20:8, 33:19, 50:8,
55:3
  **gentleman** [1] -
55:19
  **Gifford** [2] - 18:14,
18:16
  **given** [6] - 27:23,
34:10, 37:23, 62:20,
69:3, 70:19
  **government** [1] -
85:18
  **GOVERNMENT** [4] -
1:14, 3:4, 5:17, 53:16
  **Government** [18] -
9:8, 14:22, 17:23,
20:4, 36:21, 38:11,
53:9, 60:12, 60:15,
64:14, 65:3, 68:4,
70:8, 76:10, 76:12,
80:11, 81:15, 82:17
  **Government's** [2] -
65:7, 71:12
  **government's** [1] -
3:9
  **grand** [4] - 42:15,
76:20, 77:1, 77:2
  **granted** [1] - 84:8
  **green** [2] - 29:19,
29:20
  **groundwork** [1] -
33:25
  **group** [2] - 21:14,
43:8
  **guess** [3] - 40:19,
40:25, 81:2
  **guest** [3] - 9:3,
36:12, 56:6
  **guests** [1] - 9:3

## H

  **hac** [2] - 84:8, 84:12
  **half** [2] - 10:21,
18:11
  **hand** [3] - 5:16,
53:15, 60:23
  **hands** [2] - 69:16,
70:5
  **harm** [1] - 81:24
  **HASKELL** [5] - 2:2,
2:3, 84:14, 84:20,

84:24
  **head** [4] - 37:3, 38:4,
42:20, 43:2
  **heads** [1] - 65:21
  **heads-up** [1] - 65:21
  **hear** [10] - 5:21, 5:22,
5:25, 6:4, 46:10,
53:21, 54:2, 54:6,
54:10, 57:3
  **heard** [3] - 34:16,
59:18, 82:19
  **hearsay** [7] - 39:13,
58:21, 77:16, 79:9,
79:14, 80:3, 80:17
  **held** [5] - 8:15,
19:23, 36:8, 62:7,
76:14
  **help** [1] - 8:22
  **helped** [1] - 22:3
  **helpful** [1] - 46:22
  **Hercules** [1] - 54:24
  **Herd** [1] - 78:25
  **hereby** [1] - 87:3
  **Heuchling** [2] -
38:13, 40:2
  **high** [9] - 26:8,
26:14, 26:15, 27:8,
28:17, 28:21, 28:22,
29:1, 56:18
  **high-dollar** [7] -
26:8, 26:14, 27:8,
28:17, 28:21, 28:22,
29:1
  **higher** [4] - 8:9,
21:24, 26:17, 43:7
  **higher-dollar** [2] -
8:9, 26:17
  **higher-ups** [1] - 43:7
  **himself** [1] - 32:4
  **Hock** [4] - 16:20,
18:3, 48:10, 48:11
  **hold** [1] - 29:11
  **home** [7] - 8:16,
9:12, 17:20, 22:2,
22:19, 36:8, 36:16
  **honestly** [1] - 75:4
  **honor** [1] - 56:7
  **Honor** [66] - 4:2,
4:11, 5:7, 6:8, 6:9,
20:20, 22:7, 23:2,
24:1, 24:9, 27:2,
28:11, 31:13, 32:19,
34:15, 36:25, 37:6,
38:5, 38:22, 38:23,
39:3, 39:7, 39:12,
40:19, 41:14, 42:19,
42:24, 43:16, 44:2,
44:12, 44:22, 46:16,
50:12, 52:23, 53:2,
53:5, 53:9, 54:14,

55:22, 58:22, 58:24,
59:5, 59:15, 60:14,
60:16, 64:17, 64:18,
65:3, 71:4, 73:19,
73:20, 73:22, 77:15,
77:19, 78:13, 80:10,
81:9, 82:25, 84:14,
84:20, 84:24, 85:17,
85:19, 85:24, 86:2,
86:5
  **HONORABLE** [1] -
1:10
  **host** [5] - 22:1,
22:18, 23:14, 23:20,
23:21
  **hosted** [2] - 22:2,
22:19
  **hosting** [1] - 23:17
  **hosts** [3] - 21:25,
23:12, 49:19
  **hotel** [4] - 35:12,
61:21, 61:25, 62:1
  **house** [5] - 19:24,
22:18, 28:2, 49:5,
49:12
  **House** [1] - 69:19
  **hug** [1] - 81:7
  **hung** [1] - 69:18
  **Husseiny** [2] - 47:20,
47:22

## I

  **idea** [1] - 76:4
  **ideas** [1] - 57:12
  **identification** [1] -
64:17
  **identified** [1] - 55:24
  **identify** [1] - 55:17
  **imagine** [2] - 14:4,
82:23
  **impeach** [1] - 40:24
  **impeachment** [3] -
39:22, 40:6, 43:15
  **important** [2] -
12:23, 13:1
  **importantly** [1] -
54:3
  **impropriety** [1] -
82:12
  **IN** [1] - 3:8
  **inadvertently** [1] -
14:6
  **include** [1] - 25:22
  **included** [2] - 9:19,
66:11
  **including** [1] - 10:16
  **inconsistency** [1] -
43:12

  **inconsistent** [5] -
40:23, 41:2, 42:5,
43:6, 80:14
  **inconvenience** [1] -
40:1
  **Indiana** [1] - 2:3
  **indicate** [4] - 33:23,
38:10, 59:25, 83:10
  **indicated** [12] - 33:1,
33:13, 33:20, 34:23,
36:1, 36:4, 41:10,
43:10, 43:16, 59:22,
79:6, 80:5
  **indicates** [2] - 24:20,
42:6
  **indicating** [2] -
59:19, 85:6
  **indication** [1] - 24:6
  **individual** [5] -
18:21, 29:13, 32:10,
35:14, 55:11
  **individuals** [6] -
12:6, 15:14, 15:15,
20:15, 20:16, 21:2
  **information** [46] -
9:3, 9:16, 9:22, 10:13,
10:15, 10:16, 10:17,
11:14, 11:16, 11:22,
11:25, 12:14, 12:19,
12:24, 13:3, 13:6,
15:23, 15:24, 16:10,
18:7, 24:12, 25:7,
25:18, 25:21, 26:11,
26:12, 26:14, 26:18,
26:22, 27:9, 27:10,
27:17, 27:22, 28:2,
29:16, 29:22, 35:16,
36:14, 37:20, 40:14,
41:10, 41:15, 42:6,
49:21, 59:8
  **initial** [3] - 58:16,
62:24, 64:3
  **inquire** [2] - 39:6,
39:8
  **insert** [2] - 80:16,
80:17
  **insistent** [1] - 79:4
  **instead** [1] - 77:17
  **instructions** [1] -
85:22
  **Integrity** [1] - 1:19
  **intended** [1] - 74:12
  **intending** [1] - 34:5
  **intends** [1] - 84:17
  **interact** [1] - 62:12
  **interrupt** [1] - 72:11
  **interrupted** [1] -
73:11
  **interview** [6] - 76:14,
77:7, 77:12, 77:14,

78:3, 78:21
**interviewed** [1] -
73:5
**intimidated** [8] -
78:6, 79:6, 79:12,
79:19, 79:22, 80:1,
80:6, 81:4
**introduced** [1] -
56:12
**introducing** [1] -
39:13
**invest** [1] - 55:5
**investigation** [2] -
30:16, 31:21
**investment** [1] - 55:1
**invitation** [9] - 9:12,
9:19, 9:21, 10:14,
22:20, 22:21, 22:25,
23:16, 24:14, 24:18,
24:19, 35:8, 36:8,
49:6, 49:19
**invitations** [1] - 8:25
**invited** [3] - 23:19,
35:5, 35:7
**inviting** [1] - 24:7
**involved** [10] - 24:21,
26:8, 26:10, 30:21,
52:5, 63:25, 67:14,
70:1, 70:4
**is..** [1] - 59:18
**ISRAELY** [1] - 1:22
**issue** [7] - 28:10,
37:24, 38:14, 67:2,
67:18, 79:21, 79:24
**issues** [4] - 79:14,
79:25, 84:15, 85:16
**item** [1] - 70:17
**itself** [1] - 32:8

## J

**Jho** [1] - 19:8
**Jho's** [2] - 19:3, 19:7
**job** [1] - 28:9
**Joel** [5] - 23:10,
23:17, 23:25, 48:21,
49:18
**JOHN** [1] - 1:14
**Johnson** [1] - 68:7
**joint** [2] - 10:3, 10:25
**JUDGE** [1] - 1:11
**judge** [2] - 4:7, 45:2
**July** [1] - 71:7
**juror** [1] - 4:21
**JUROR** [1] - 4:25
**JURY** [3] - 1:10, 5:4,
84:4
**jury** [16] - 4:19, 5:3,
8:3, 39:18, 42:15,

56:2, 57:9, 60:18,
62:22, 71:19, 76:20,
77:1, 77:2, 78:18,
83:9, 84:5
**Justice** [2] - 72:25,
77:9
**JUSTICE** [1] - 1:15,
1:18
**Justin** [1] - 78:25

## K

**keep** [8] - 22:4,
34:17, 36:23, 38:1,
39:8, 46:7, 62:25,
78:20
**keeps** [1] - 33:2
**Keller** [1] - 4:12
**KELLER** [3] - 1:14,
85:19, 85:24
**Kenner** [5] - 36:23,
41:19, 44:24, 45:18,
84:25
**KENNER** [110] - 1:21,
1:22, 4:2, 4:11, 4:14,
6:9, 6:12, 20:19, 22:9,
22:11, 22:24, 23:2,
23:4, 24:5, 24:15,
24:18, 24:23, 26:7,
27:6, 28:16, 31:18,
32:5, 32:6, 32:12,
32:19, 33:3, 33:14,
34:1, 34:4, 34:12,
35:1, 36:2, 36:6,
36:25, 37:2, 37:12,
38:2, 38:8, 38:12,
38:17, 38:20, 38:22,
39:1, 39:6, 39:10,
39:25, 40:9, 40:13,
41:3, 41:20, 41:24,
42:2, 42:9, 42:13,
43:13, 43:16, 43:19,
44:2, 44:6, 44:11,
44:16, 44:23, 45:1,
45:5, 45:6, 45:10,
45:14, 45:19, 46:9,
46:15, 46:18, 47:1,
50:12, 50:13, 50:25,
51:1, 52:3, 52:20,
53:2, 55:21, 58:8,
58:21, 59:15, 63:18,
64:18, 65:5, 73:22,
74:24, 74:7, 74:8,
77:3, 77:5, 77:19,
77:22, 77:25, 78:2,
78:9, 78:13, 78:16,
78:21, 79:15, 80:21,
81:1, 81:12, 83:3,
85:6, 85:8, 85:12,
85:17, 86:5

**kept** [1] - 9:2
**kind** [11] - 7:13,
26:19, 27:16, 29:3,
32:20, 32:23, 33:5,
63:2, 63:3, 63:16,
79:3
**kinds** [4] - 8:2, 8:7,
29:22, 35:11
**knowing** [2] - 25:22,
27:4
**knowingly** [4] -
13:25, 14:3, 14:15,
14:17
**knowledge** [3] -
24:13, 32:3, 35:9
**known** [4] - 14:11,
21:8, 47:19, 56:15
**knows** [1] - 52:18
**KOLLAR** [1] - 1:10
**KOLLAR-KOTELLY**
[1] - 1:10
**KOTELLY** [1] - 1:10

## L

**language** [2] - 75:25,
76:1
**large** [1] - 35:12
**larger** [4] - 8:8,
21:13, 46:5, 46:12
**Larry** [5] - 16:20,
18:7, 18:21, 48:10,
48:11
**last** [6] - 11:11, 12:2,
15:2, 47:21, 64:7,
75:12
**late** [1] - 54:10
**Lauture** [1] - 48:8
**law** [8] - 11:16, 12:4,
13:2, 13:8, 13:23,
19:15, 67:25, 70:11
**LAW** [1] - 1:22, 2:2
**lawful** [1] - 29:23
**lawfully** [2] - 13:8,
13:11
**lawsuit** [1] - 68:20
**lawsuits** [1] - 82:11
**lawyer** [3] - 63:24,
65:19, 66:14
**lawyer's** [2] - 78:12,
78:14
**lead** [2] - 17:17,
57:15
**lead-up** [2] - 17:17,
57:15
**leadership** [4] - 37:4,
38:4, 42:21, 43:3
**leading** [1] - 49:21
**learn** [1] - 17:19

**least** [5] - 8:3, 21:5,
32:7, 34:5, 34:17
**leave** [1] - 58:25
**left** [3] - 60:23,
65:22, 67:9
**left-hand** [1] - 60:23
**legal** [1] - 31:14
**less** [4] - 35:13,
74:24, 75:2, 75:5
**letter** [6] - 63:5,
67:25, 68:9, 68:12,
68:16, 70:11
**letters** [1] - 70:18
**libel** [2] - 66:6, 66:12
**limit** [1] - 11:4
**limited** [1] - 76:15
**limits** [3] - 11:1,
11:6, 29:2
**line** [4] - 12:2, 12:4,
15:17, 68:10
**lines** [1] - 11:11
**LISA** [2] - 2:5, 87:3
**Lisa** [1] - 87:12
**list** [7] - 9:3, 23:21,
25:14, 36:12, 46:24,
49:9, 85:21
**listed** [4] - 10:6,
16:20, 23:13, 47:21
**listen** [1] - 71:25
**listener** [2] - 58:22,
58:24
**living** [1] - 54:25
**loan** [7] - 64:10,
68:11, 68:23, 68:25,
69:6, 69:9, 69:12
**loans** [1] - 82:7
**LOCKHART** [1] -
1:18
**logistics** [2] - 8:25,
9:5
**look** [16] - 10:11,
12:1, 16:11, 30:23,
38:21, 44:19, 45:17,
45:18, 50:23, 51:2,
72:10, 82:10, 85:3,
85:4, 85:9, 85:22
**looking** [15] - 9:23,
11:10, 13:18, 14:7,
16:19, 24:19, 29:3,
30:2, 40:21, 41:4,
47:4, 66:19, 66:24,
71:2, 71:6
**looks** [6] - 4:22,
17:4, 20:10, 47:5,
60:22, 82:7
**loud** [1] - 54:9
**louder** [1] - 6:21
**Low** [7] - 16:20, 18:3,
18:7, 18:21, 48:10,
48:11

**low** [1] - 6:25
**lower** [1] - 8:8
**lower-dollar** [1] - 8:8

## M

**mailing** [1] - 12:5
**Maine** [2] - 7:5, 7:8
**man** [1] - 40:1
**Management** [1] -
61:6
**manager** [1] - 82:5
**manner** [3] - 23:14,
79:2, 80:15
**March** [3] - 1:6,
70:18, 87:10
**marked** [2] - 64:13,
68:3
**mask** [2] - 5:20,
53:20
**materials** [1] - 32:17
**matter** [9] - 14:14,
41:9, 59:2, 59:7,
59:23, 63:25, 73:3,
79:16, 79:18
**matters** [1] - 82:6
**mean** [16] - 16:7,
21:16, 22:1, 28:6,
28:9, 36:1, 52:6, 59:1,
64:9, 69:17, 72:18,
76:13, 85:2
**meaning** [1] - 29:5
**meet** [1] - 4:12
**Mejia** [3] - 5:3,
23:14, 83:9
**members** [1] - 5:3,
23:14, 83:9
**mention** [3] - 14:8,
63:12, 73:15
**mentioned** [4] -
15:21, 18:3, 72:9,
73:14
**merit** [1] - 70:16
**message** [6] - 71:9,
71:18, 75:8, 75:11,
75:12, 82:20
**messing** [1] - 74:22
**met** [1] - 56:3
**MICHEL** [63] - 1:6
**Michel** [63] - 4:15,
17:3, 17:5, 18:6,
20:23, 24:7, 24:20,
25:1, 44:8, 45:9,
45:13, 45:22, 50:19,
55:12, 55:14, 55:21,
55:24, 56:3, 56:12,
56:13, 56:24, 59:24,
60:10, 60:25, 61:9,
62:10, 62:15, 62:19,
62:22, 63:8, 64:3,

65:1, 65:13, 65:17, 67:1, 67:8, 67:11, 68:1, 68:14, 69:3, 69:6, 69:16, 69:25, 70:19, 70:21, 72:17, 74:6, 74:7, 75:18, 76:2, 78:4, 78:6, 79:7, 79:11, 79:20, 79:21, 80:6, 81:4, 81:7, 81:22, 82:21

**Michel's** [1] - 66:22

**microphone** [5] - 5:22, 6:22, 53:20, 71:21, 71:22

**Mid** [3] - 7:17, 7:18, 22:16

**Mid-Atlantic** [3] - 7:17, 7:18, 22:16

**middle** [6] - 6:3, 12:3, 20:17, 20:23, 54:5, 72:9

**might** [4] - 57:19, 59:9, 69:17

**mind** [6] - 39:8, 42:15, 71:18, 80:4, 80:5

**minus** [1] - 61:21

**minute** [1] - 36:4

**minutes** [1] - 49:7

**miscellaneous** [2] - 4:6

**misled** [1] - 33:4

**misunderstood** [1] - 41:5

**Mohamed** [3] - 47:15, 47:16, 47:20

**moment** [14] - 9:23, 9:25, 18:2, 49:16, 50:12, 56:11, 56:19, 60:14, 63:7, 64:18, 72:12, 73:19, 77:4, 82:25

**moments** [4] - 15:21, 62:14, 71:2, 82:15

**Monday** [4] - 83:16, 84:23, 85:7, 86:3

**money** [34] - 8:1, 8:5, 14:2, 22:3, 25:2, 31:6, 31:9, 31:22, 32:10, 44:9, 45:23, 52:11, 58:4, 58:13, 61:18, 61:24, 62:23, 63:14, 64:4, 64:11, 66:22, 69:4, 69:7, 69:16, 69:17, 70:4, 70:6, 70:19, 70:22, 70:24, 72:16, 74:9, 74:12, 75:9

**months** [1] - 71:7

**morning** [2] - 83:13,

85:7

**most** [4] - 25:13, 25:20, 50:9, 80:8

**motion** [2] - 4:4, 4:5

**move** [14] - 5:19, 5:20, 6:11, 6:22, 20:19, 44:2, 51:15, 53:18, 58:21, 59:17, 63:18, 64:21, 65:3

**movie** [1] - 56:13

**moving** [2] - 62:18, 84:18

**MR** [219] - 4:2, 4:11, 4:14, 5:7, 6:8, 6:9, 6:12, 6:15, 7:3, 10:8, 10:10, 10:21, 10:23, 14:22, 14:24, 15:1, 15:3, 15:7, 15:9, 16:24, 17:1, 17:14, 17:16, 17:22, 18:1, 18:10, 18:12, 20:3, 20:7, 20:11, 20:13, 20:19, 20:24, 21:1, 22:7, 22:9, 22:11, 22:24, 23:2, 23:4, 24:1, 24:5, 24:9, 24:12, 24:15, 24:18, 24:23, 26:3, 26:7, 27:2, 27:6, 28:11, 28:16, 31:11, 31:13, 31:18, 31:24, 32:5, 32:6, 32:11, 32:12, 32:14, 32:19, 33:3, 33:10, 33:14, 34:1, 34:4, 34:12, 34:15, 35:1, 36:2, 36:6, 36:25, 37:2, 37:6, 37:12, 38:2, 38:5, 38:8, 38:12, 38:17, 38:20, 38:22, 38:23, 39:1, 39:3, 39:6, 39:10, 39:12, 39:25, 40:9, 40:13, 40:19, 41:3, 41:8, 41:14, 41:20, 41:24, 42:2, 42:9, 42:13, 42:19, 43:1, 43:13, 43:16, 43:19, 44:2, 44:6, 44:11, 44:16, 44:21, 44:23, 45:1, 45:5, 45:6, 45:10, 45:14, 45:19, 46:9, 46:15, 46:18, 47:1, 50:12, 50:13, 50:25, 51:1, 52:1, 52:3, 52:16, 52:20, 52:23, 53:2, 53:5, 53:9, 54:14, 54:16, 55:21, 56:1, 58:8, 58:12, 58:21, 58:22, 58:24, 59:5,

59:10, 59:15, 60:2, 60:12, 60:18, 60:19, 62:3, 62:4, 63:6, 63:18, 64:2, 64:16, 64:18, 64:19, 64:24, 65:5, 65:9, 65:9, 65:11, 66:9, 66:10, 67:4, 67:6, 67:15, 67:17, 67:23, 68:6, 68:8, 70:7, 70:10, 71:4, 71:5, 71:12, 71:14, 73:19, 73:22, 73:24, 74:7, 74:8, 77:3, 77:5, 77:15, 77:19, 77:22, 77:25, 78:2, 78:9, 78:13, 78:16, 78:21, 79:15, 80:10, 80:21, 81:1, 81:9, 81:12, 81:14, 81:18, 82:16, 82:18, 82:25, 83:3, 84:14, 84:20, 84:24, 85:6, 85:8, 85:12, 85:17, 85:19, 85:24, 86:2, 86:4, 86:5

**MULRYNE** [107] - 1:17, 5:7, 6:8, 6:15, 7:3, 10:8, 10:10, 10:21, 10:23, 14:22, 14:24, 15:1, 15:3, 15:7, 15:9, 16:24, 17:1, 17:14, 17:16, 17:22, 18:1, 18:10, 18:12, 20:3, 20:7, 20:11, 20:13, 20:24, 21:1, 22:7, 24:1, 24:9, 24:12, 26:3, 27:2, 28:11, 31:11, 31:13, 31:24, 32:11, 32:14, 33:10, 34:15, 37:6, 38:5, 38:23, 39:3, 39:12, 40:19, 41:8, 41:14, 42:19, 43:1, 44:21, 52:1, 52:16, 52:23, 53:5, 53:9, 54:14, 54:16, 56:1, 58:12, 58:22, 58:24, 59:5, 59:10, 60:2, 60:12, 60:18, 60:19, 62:3, 62:4, 63:6, 64:2, 64:16, 64:19, 64:24, 65:3, 65:9, 65:11, 66:9, 66:10, 67:4, 67:6, 67:15, 67:17, 67:23, 68:6, 68:8, 70:7, 70:10, 71:4, 71:5, 71:12, 71:14, 73:19, 77:15, 80:10, 81:9, 81:14, 81:18, 82:16, 82:18, 82:25, 86:2, 86:4

**Mulryne** [7] - 40:18, 53:3, 77:8, 77:14, 77:24, 78:3, 78:8

**multipage** [1] - 64:19

**multiple** [1] - 8:7

**music** [1] - 57:12

**must** [1] - 40:22

**mutual** [1] - 56:13

**N**

**name** [19] - 6:18, 11:11, 11:18, 12:2, 12:5, 16:20, 20:20, 20:21, 21:12, 23:10, 27:16, 47:21, 48:13, 51:6, 54:19, 56:14, 74:5

**named** [1] - 55:11

**names** [1] - 16:19

**nametags** [1] - 51:6

**National** [2] - 10:5, 11:7

**national** [16] - 13:20, 14:1, 14:4, 17:19, 18:17, 18:23, 19:11, 19:14, 19:15, 19:18, 19:21, 29:10, 30:20, 31:22, 32:9, 33:9

**nationals** [3] - 13:8, 13:24, 31:10

**nature** [5] - 27:24, 57:9, 57:14, 63:2, 64:1

**neat** [1] - 4:17

**neater** [1] - 4:8

**necessary** [1] - 26:11

**Neda** [1] - 48:25

**need** [16] - 6:21, 25:7, 25:23, 26:13, 27:17, 37:24, 38:10, 46:21, 53:19, 62:25, 63:1, 83:15, 83:17, 83:22, 85:3, 85:22

**needed** [4] - 15:18, 26:18, 47:12, 47:15

**needs** [2] - 84:11, 84:18

**never** [9] - 42:5, 42:15, 69:17, 69:24, 70:6, 76:24, 79:19, 81:3, 81:5

**NEVILLE** [2] - 53:16, 54:21

**Neville** [4] - 3:6, 53:10, 53:11, 54:21

**New** [2] - 1:15, 1:19

**news** [1] - 82:2

**next** [1] - 4:11, 5:6, 13:4, 19:18, 20:24, 53:8, 65:20, 66:9, 67:4, 83:10, 83:21

**nice** [1] - 54:9

**NICOLE** [1] - 1:18

**night** [1] - 36:17

**NO** [1] - 4:25

**nobody** [1] - 80:1

**Nobu** [1] - 69:19

**non** [1] - 26:15

**non-high-dollar** [1] - 26:15

**nonpermanent** [1] - 29:10

**nonresident** [1] - 29:13

**noon** [1] - 83:12

**Northwest** [6] - 1:15, 1:19, 2:3, 2:7, 62:8, 87:14

**note** [2] - 9:15, 16:20

**notes** [1] - 87:5

**nothing** [5] - 45:12, 70:2, 76:13, 81:12, 85:25

**notice** [1] - 84:17

**number** [19] - 8:24, 25:13, 25:16, 25:23, 26:18, 27:13, 27:16, 29:1, 29:8, 29:17, 29:18, 29:19, 44:11, 56:6, 71:10, 71:16, 75:15, 81:11

**O**

**Obama** [21] - 7:11, 7:12, 7:15, 10:1, 10:2, 10:3, 10:4, 11:1, 11:5, 11:7, 11:8, 18:18, 20:15, 22:16, 23:7, 23:18, 50:17, 51:3, 51:18, 56:8, 74:13

**object** [4] - 6:2, 59:17, 63:18, 80:11

**objecting** [1] - 54:4

**objection** [27] - 6:1, 6:4, 24:1, 24:9, 26:3, 27:2, 28:11, 31:11, 31:12, 31:13, 31:24, 32:11, 32:14, 37:6, 38:5, 39:12, 52:1, 52:16, 54:2, 54:6, 58:21, 65:5, 65:6, 77:15, 80:24, 81:9, 83:3

**objections** [1] - 78:20

observe [1] - 75:25
observed [1] - 81:7
obvious [1] - 7:12
obviously [3] - 11:14, 20:15, 35:14
occasion [1] - 69:10
occasions [3] - 69:4, 69:7, 69:10
occupation [3] - 11:18, 12:6, 55:9
OF [6] - 1:1, 1:3, 1:10, 1:15, 1:18, 2:2
offered [1] - 69:6
offering [1] - 79:15
OFFICES [1] - 2:2
official [1] - 87:12
Official [1] - 2:6
officials [3] - 7:19, 21:19, 21:20
often [1] - 25:20
once [4] - 45:17, 69:19, 73:14
one [23] - 12:18, 14:6, 15:5, 20:6, 20:17, 20:18, 20:23, 34:21, 36:7, 46:5, 46:12, 49:16, 49:18, 50:8, 50:12, 60:14, 72:12, 73:19, 75:12, 79:9, 81:2, 82:14, 82:25
ones [1] - 37:10
open [3] - 4:5, 44:5, 80:23
opening [1] - 57:1
opinion [5] - 31:14, 32:15, 32:17, 33:10, 52:19
opposed [2] - 32:9, 34:8
order [4] - 9:4, 19:19, 26:19, 83:18
Orozco [3] - 10:22, 15:7, 17:15
otherwise [5] - 31:10, 31:22, 36:15, 80:13, 80:15
out-of-court [1] - 39:13
outreach [1] - 63:7
outside [4] - 39:18, 39:23, 78:18, 81:10
outstanding [1] - 82:7
overseas [1] - 29:14
OVF [1] - 13:10
owe [2] - 67:13, 72:10
own [2] - 55:1, 81:6

P

P.A [1] - 2:3
p.m [3] - 1:7, 4:20, 84:6
page [10] - 9:24, 15:2, 15:5, 39:2, 44:11, 44:15, 47:2, 47:4, 65:9, 66:9
PAGE [1] - 3:8
Page [17] - 10:8, 15:6, 20:12, 39:2, 40:20, 41:4, 41:5, 41:6, 41:7, 45:10, 50:14, 66:24, 67:7, 67:16, 70:7, 70:8, 81:16
pages [1] - 46:19
paid [1] - 61:15
Paid [1] - 10:1
paragraph [9] - 12:2, 12:3, 13:5, 14:7, 43:1, 45:7, 45:11, 45:20, 68:19
parking [1] - 9:1
part [3] - 4:8, 16:16, 23:20, 32:25, 64:7, 66:25, 72:23
particular [4] - 8:19, 10:11, 11:2, 29:12
parties [3] - 10:6, 11:8
pass [6] - 16:3, 25:20, 37:13, 43:22, 43:24, 43:25
passed [6] - 40:15, 41:15, 42:3, 42:23, 43:4, 43:8
passing [1] - 15:21
path [1] - 80:2
Patterson [1] - 48:17
pay [2] - 72:1, 74:16
penalties [1] - 68:18
Peng [3] - 16:21, 18:3, 48:10
penthouse [1] - 62:8
people [33] - 9:21, 10:19, 21:23, 22:2, 23:13, 23:16, 25:14, 26:24, 28:25, 29:23, 30:4, 31:6, 31:8, 35:15, 36:12, 37:13, 40:14, 43:7, 49:9, 49:11, 49:13, 50:4, 50:8, 50:15, 51:5, 51:10, 51:13, 52:4, 52:6, 52:10, 56:6, 76:23, 79:23
percent [1] - 20:18

perfect [1] - 68:7
perhaps [1] - 41:3
permanent [4] - 13:9, 13:11, 29:20, 29:24
permanently [1] - 85:4
person [12] - 11:2, 13:13, 14:9, 30:5, 30:11, 30:18, 31:6, 31:8, 31:21, 32:9, 37:25, 47:19
personal [1] - 15:24
perspective [3] - 16:6, 16:8, 28:20
phone [2] - 65:13, 78:24
photo [7] - 20:12, 20:16, 21:3, 50:22, 50:23, 51:2, 51:4
photograph [3] - 20:6, 20:9, 21:6
phrased [1] - 26:5
physically [2] - 22:19, 81:21
pick [1] - 39:16
picture [3] - 20:9, 20:14, 20:24
place [1] - 31:20
Plaintiff [1] - 1:4
plan [1] - 55:5
plausible [1] - 45:24
plus [4] - 27:13, 34:2, 80:3
point [21] - 9:8, 13:5, 17:13, 17:17, 23:22, 25:3, 25:6, 28:5, 37:11, 39:24, 39:25, 40:5, 46:1, 59:20, 67:24, 68:22, 72:24, 76:9, 78:5, 83:8, 84:1
pointing [1] - 33:2
political [4] - 7:10, 7:13, 19:14, 21:9
popped [1] - 45:12
portion [6] - 11:12, 17:24, 40:20, 44:15, 45:4, 72:13
posed [1] - 28:4
position [1] - 51:18
position/title [1] - 7:16
possibility [1] - 63:13
possibly [2] - 17:19, 82:2
potential [1] - 4:18
potentially [1] - 79:2
POTUS [2] - 56:7, 56:8

practical [2] - 41:9, 79:18
PRAKAZREL [1] - 1:6
Prakazrel [2] - 55:11, 60:24
Pras [8] - 17:3, 24:7, 55:12, 58:20, 59:12, 59:22, 74:2, 74:5
pre [2] - 9:4, 21:12
pre-reception [1] - 21:12
preference [1] - 12:16
premiere [1] - 57:1
prepared [1] - 22:21
presence [3] - 39:18, 77:8, 78:18
present [4] - 21:5, 56:5, 56:6, 56:25
presented [2] - 31:17, 32:4
president [11] - 16:2, 21:18, 26:21, 27:1, 27:21, 28:4, 28:10, 35:15, 35:16
President [5] - 7:15, 20:15, 50:17, 51:3, 56:8
presidential [1] - 7:14
press [1] - 72:8
presumably [1] - 44:15
previously [11] - 9:7, 14:23, 17:23, 20:4, 22:22, 49:24, 60:15, 64:16, 68:4, 71:13, 82:17
primary [1] - 12:15
pro [2] - 84:8, 84:12
probative [3] - 79:10, 79:22, 80:8
problem [6] - 4:13, 4:16, 6:12, 13:22, 33:13, 85:9
problems [1] - 40:6
proceed [2] - 5:5, 6:7
Proceedings [1] - 86:6
proceedings [9] - 4:20, 5:12, 39:17, 44:4, 53:12, 78:17, 80:22, 84:6, 87:6
proceeds [1] - 6:9
process [3] - 30:17, 32:25, 34:6
processes [1] - 30:22
produced [1] - 87:6

proffer [3] - 76:9, 76:12, 76:13
prohibited [4] - 14:20, 19:13, 19:15, 30:11
prohibition [1] - 19:16
prohibits [2] - 13:8, 13:23
projects [1] - 61:8
protect [2] - 66:5, 82:1
protecting [2] - 27:1, 66:12
protocols [2] - 16:18, 30:22
provide [9] - 11:22, 27:10, 27:12, 27:15, 29:18, 29:19, 40:23, 47:23, 61:19
provided [2] - 13:12, 14:9
proximity [1] - 26:21
public [3] - 7:7, 63:13, 63:25
Public [1] - 1:19
publish [2] - 60:18, 65:10
pull [6] - 14:22, 17:22, 20:3, 60:12, 71:12, 81:14
purporting [1] - 67:25
purpose [5] - 10:15, 11:12, 13:13, 14:9, 15:22
purposes [2] - 10:18, 27:18
put [5] - 4:22, 4:23, 37:10, 44:12, 46:15
puts [1] - 31:5
putting [2] - 45:1, 69:2

Q

quantification [1] - 29:3
questioning [1] - 28:14
questions [14] - 10:24, 14:14, 22:7, 25:15, 25:24, 27:12, 29:9, 52:21, 52:23, 73:20, 77:9, 81:20, 83:1
quite [1] - 79:11

## R

**R-I-C-H-A-R-D-S-O-N** [1] - 54:22
**RAE** [1] - 1:18
**raise** [6] - 5:15, 22:3, 44:8, 45:23, 52:11, 53:15
**raised** [4] - 8:1, 8:5, 27:23, 79:24
**raising** [1] - 25:2
**rally** [2] - 8:8, 35:12
**rally-style** [1] - 8:8
**Randall** [2] - 17:6, 49:2
**randomly** [1] - 4:9
**rarely** [1] - 27:22
**rather** [1] - 26:14
**RDR** [3] - 2:5, 87:3, 87:12
**re** [1] - 40:1
**re-call** [1] - 40:1
**reach** [1] - 62:19
**reached** [3] - 62:22, 63:8, 72:25
**reaching** [3] - 12:20, 26:1, 64:3
**reaction** [20] - 58:4, 59:14, 59:20, 59:21, 60:1, 60:3, 60:5, 64:3, 64:6, 64:8, 64:9, 65:24, 70:14, 78:10, 78:12, 78:13, 78:14, 79:16, 79:18, 80:7
**read** [14] - 13:7, 13:23, 14:8, 19:4, 43:23, 44:19, 44:20, 45:3, 45:7, 64:20, 65:16, 65:23, 66:25, 73:17
**reading** [6] - 38:6, 38:8, 38:11, 45:17, 45:20, 71:18
**reads** [6] - 13:7, 42:20, 42:22, 43:1, 43:2, 68:11
**ready** [2] - 5:5, 85:23
**really** [4] - 16:17, 57:20, 66:17, 67:13
**reason** [1] - 36:16
**reasons** [3] - 16:11, 34:24, 81:11
**receive** [8] - 12:23, 21:22, 51:20, 51:21, 60:8, 63:4, 70:11, 71:9
**RECEIVED** [1] - 3:8
**received** [13] - 13:19, 13:25, 28:2, 51:23,

52:12, 60:22, 67:25, 68:13, 74:2, 74:9, 74:25, 75:2, 75:8
**receiving** [4] - 14:15, 15:23, 61:9, 63:14
**reception** [1] - 21:12
**receptions** [1] - 8:10
**recipient** [1] - 37:19
**recognize** [13] - 9:11, 20:8, 20:16, 20:17, 20:23, 46:19, 50:17, 50:19, 50:21, 60:21, 64:25, 71:16, 75:15
**recollect** [2] - 56:25, 57:18
**recollection** [7] - 29:7, 44:7, 44:10, 44:12, 44:18, 45:21, 45:25
**record** [3] - 11:15, 80:18, 81:2
**Red** [1] - 3:3
**REDIRECT** [1] - 81:17
**redirect** [2] - 52:22, 81:13
**reelection** [1] - 7:14
**refer** [3] - 20:20, 23:13, 25:12
**reference** [4] - 19:7, 40:23, 41:4, 72:16
**references** [1] - 72:14
**referencing** [1] - 82:21
**referred** [1] - 15:24
**referring** [6] - 12:8, 36:20, 55:21, 56:8, 63:9, 75:21
**refresh** [5] - 44:12, 44:18, 45:20, 45:25, 80:14
**refunded** [1] - 14:5
**regard** [8] - 8:23, 28:1, 30:19, 35:4, 38:18, 42:3, 48:3, 68:10
**regarding** [1] - 73:3
**region** [1] - 28:20
**regions** [1] - 28:20
**registered** [1] - 55:1
**regulation** [1] - 31:23
**regulations** [2] - 32:3, 52:14
**relate** [1] - 66:19
**relating** [2] - 31:16,

38:12
**relationship** [2] - 57:7, 57:10
**relatively** [1] - 35:13
**relevance** [10] - 26:3, 28:11, 31:13, 32:2, 32:14, 32:16, 52:1, 52:16, 79:17, 81:9
**relevant** [2] - 79:22, 81:11
**remain** [1] - 53:14
**remaining** [2] - 61:22, 61:24
**remember** [9] - 19:10, 23:23, 26:16, 48:13, 63:22, 67:12, 73:14, 75:4, 76:22
**remind** [1] - 45:24
**repay** [2] - 66:22, 68:13
**repaying** [1] - 68:17
**repayment** [4] - 67:19, 68:11, 70:12, 70:24
**repeat** [1] - 42:24
**report** [5] - 11:16, 12:5, 39:2, 39:4, 40:2
**REPORTED** [1] - 2:5
**REPORTER** [2] - 6:11, 67:21
**Reporter** [2] - 2:6, 87:12
**reporter** [3] - 6:19, 54:20, 77:8
**reporting** [1] - 10:18
**reports** [1] - 80:12
**represent** [1] - 67:25
**reputation** [1] - 66:16
**reputational** [1] - 81:24
**request** [6] - 15:17, 15:25, 62:24, 66:22, 69:11
**requested** [1] - 68:18
**requesting** [2] - 68:13, 70:12
**require** [3] - 30:10, 30:15, 31:7
**required** [12] - 10:18, 11:16, 11:19, 11:21, 11:24, 13:2, 26:22, 27:10, 27:11, 29:15, 35:17, 52:4
**requirement** [1] - 30:14
**requires** [2] - 12:4, 31:23
**reserved** [1] - 21:23
**reside** [2] - 7:4,

54:23
**resident** [4] - 13:11, 29:11, 29:21, 30:9
**residents** [2] - 13:9, 29:24
**resolution** [3] - 67:9, 67:11, 67:12
**resolved** [1] - 37:24
**respect** [1] - 33:7
**responded** [1] - 66:1
**response** [2] - 19:1, 65:23, 69:11
**responsibility** [2] - 32:20, 33:7
**responsible** [3] - 32:8, 34:9, 34:23
**rest** [1] - 79:8
**result** [3] - 27:20, 27:25, 37:19
**results** [1] - 37:23
**retirement** [1] - 55:5
**revoke** [1] - 84:12
**rewording** [1] - 31:25
**RICHARDSON** [1] - 53:16
**Richardson** [24] - 3:6, 53:10, 53:11, 54:17, 54:21, 59:11, 60:3, 60:20, 61:5, 61:6, 64:13, 64:25, 65:12, 65:24, 67:7, 67:24, 68:9, 71:15, 71:20, 71:25, 72:11, 73:11, 73:25, 81:19
**risk** [1] - 7:12
**Rob** [4] - 56:14, 56:15, 57:3, 57:18
**rob** [1] - 56:15
**Robert** [1] - 38:13
**Robinson** [1] - 48:19
**role** [3] - 40:10, 50:3
**roles** [1] - 7:25
**Room** [1] - 2:8
**room** [1] - 76:23
**Rousseau** [7] - 23:10, 23:17, 23:20, 23:25, 36:9, 48:21, 49:18
**Row** [1] - 57:1
**RSVPs** [1] - 9:21
**Rufus** [2] - 18:14, 18:16
**rule** [1] - 31:5
**rules** [6] - 31:1, 31:7, 31:16, 31:19, 32:3, 53:23
**ruling** [1] - 34:3
**Rutherford** [1] - 48:23

## S

**saw** [4] - 18:3, 18:21, 22:22, 70:19
**school** [1] - 56:18
**screen** [7] - 9:9, 17:4, 20:5, 44:13, 44:21, 45:11
**screenshot** [1] - 65:12
**screenshots** [1] - 46:19
**scroll** [7] - 15:6, 16:24, 18:10, 20:5, 67:4, 67:15, 81:15
**scrutiny** [2] - 35:13, 35:17
**SEAN** [1] - 1:17
**Sean** [1] - 78:25
**Seat** [1] - 4:21
**seat** [4] - 4:23, 5:2, 58:19, 85:1
**seated** [6] - 5:18, 5:19, 50:9, 50:15, 51:10, 53:17
**seating** [3] - 50:4, 50:6, 50:7
**seats** [1] - 51:6
**second** [2] - 47:2, 65:9
**Secret** [11] - 16:4, 26:22, 26:25, 27:5, 27:7, 27:15, 27:19, 28:3, 35:19, 36:11, 51:13
**section** [1] - 13:6
**Section** [1] - 1:19
**security** [4] - 16:4, 26:23, 28:9, 35:19
**Security** [8] - 25:13, 25:15, 25:23, 26:18, 27:13, 27:16, 29:17, 29:18
**see** [62] - 6:1, 9:16, 10:6, 11:10, 12:3, 12:11, 14:7, 15:4, 15:10, 15:14, 15:18, 15:19, 16:19, 16:21, 17:2, 17:3, 17:4, 17:6, 17:9, 17:12, 18:6, 18:13, 19:1, 20:14, 21:2, 21:5, 21:7, 22:24, 23:5, 23:9, 23:10, 41:8, 42:4, 43:12, 45:15, 47:4, 47:5, 47:6, 47:7, 47:21, 48:11, 50:14, 50:22, 51:3, 51:4, 54:3, 55:14, 60:23,

60:24, 62:10, 65:12, 66:4, 66:25, 67:8, 68:9, 68:19, 71:15, 80:2, 80:8, 86:3

**seeing** [2] - 6:10, 9:9

**seek** [1] - 30:3

**seeking** [1] - 49:20

**seem** [1] - 31:15

**send** [2] - 8:25, 9:21

**sending** [1] - 75:12

**sends** [2] - 17:2, 18:13

**senior** [4] - 37:4, 38:4, 42:20, 43:2

**sense** [1] - 82:2

**sent** [8] - 18:3, 23:16, 35:8, 47:7, 47:10, 47:14, 63:23, 76:4

**September** [15] - 8:13, 9:13, 15:11, 17:18, 18:24, 19:24, 47:10, 49:5, 49:7, 49:25, 56:20, 57:6, 57:16, 61:16, 62:18

**series** [2] - 36:3, 36:4

**Service** [10] - 16:4, 26:22, 26:25, 27:5, 27:7, 27:15, 27:20, 28:3, 36:11, 51:13

**Service's** [1] - 35:19

**SESSION** [1] - 1:7

**set** [1] - 33:25

**seven** [2] - 70:20

**sever** [1] - 4:5

**several** [5] - 34:3, 34:23, 34:24, 37:9

**shall** [1] - 13:14

**share** [1] - 85:21

**shared** [1] - 57:12

**ship** [1] - 4:6

**Shojai** [1] - 48:25

**shortly** [1] - 83:25

**show** [8] - 9:7, 29:19, 29:20, 44:18, 50:10, 64:13, 68:3, 68:4

**showed** [2] - 25:11, 29:23

**showing** [1] - 44:21

**shown** [2] - 44:17, 75:11

**sic** [3] - 31:20, 38:12, 72:6

**sic]** [1] - 72:4

**side** [2] - 16:16, 50:24

**sidebar** [2] - 39:18, 78:18

**sign** [1] - 84:11

**signature** [1] - 47:6

**significant** [2] - 28:10, 52:10

**signing** [1] - 13:10

**similar** [1] - 29:1

**simply** [1] - 84:12

**sit** [6] - 50:5, 51:14, 53:18, 76:4, 85:2, 85:5

**sitting** [3] - 55:17, 55:19, 83:12

**Skid** [1] - 57:1

**slander** [2] - 66:6, 66:12

**small** [1] - 21:12

**smaller** [4] - 8:9, 16:1, 21:13, 35:14

**Social** [8] - 25:12, 25:15, 25:23, 26:18, 27:13, 27:16, 29:16, 29:18

**Soho** [1] - 69:19

**solicited** [1] - 25:1

**someone** [10] - 19:19, 25:20, 26:20, 29:18, 30:25, 33:8, 37:5, 37:15, 42:21, 43:3

**someplace** [2] - 4:22, 4:24

**sometimes** [3] - 25:19, 25:20, 51:13

**soon** [1] - 84:16

**sorry** [22] - 6:11, 15:2, 36:25, 38:20, 45:10, 46:8, 48:23, 50:25, 57:16, 58:8, 58:23, 61:13, 64:7, 67:1, 69:3, 71:3, 71:23, 72:2, 73:11, 74:7, 74:20

**sort** [8] - 16:11, 21:9, 26:16, 30:15, 33:19, 49:20, 82:11, 85:3

**sorts** [1] - 30:23

**sound** [1] - 75:22

**south** [1] - 61:20

**speaking** [2] - 50:24, 57:2

**specific** [8] - 27:24, 28:1, 32:23, 32:24, 34:11, 44:10, 50:6, 51:17

**specifically** [10] - 25:3, 25:6, 28:3, 30:22, 33:24, 45:25, 48:13, 49:13, 50:2, 55:7

**specifics** [1] - 33:18

**speculate** [2] -

63:16, 63:19

**speculation** [2] - 24:10, 27:3

**spell** [2] - 6:18, 54:19

**squeezed** [1] - 5:2

**squished** [1] - 4:23

**stand** [3] - 5:10, 6:1, 54:3

**standing** [1] - 53:14

**start** [8] - 4:3, 5:24, 6:1, 22:17, 30:13, 53:25, 54:3, 74:22

**started** [2] - 6:2, 54:4

**starting** [1] - 72:5

**state** [9] - 6:18, 7:4, 10:5, 11:8, 54:19, 54:23, 80:4, 80:5

**statement** [17] - 38:3, 39:2, 39:11, 39:14, 39:21, 40:4, 40:23, 41:4, 41:20, 42:2, 42:5, 43:20, 43:21, 59:22, 80:14, 81:4

**statements** [2] - 39:20, 40:24

**STATES** [3] - 1:1, 1:3, 1:11

**States** [5] - 2:6, 5:9, 28:10, 29:13, 87:13

**statutes** [1] - 31:16

**stenographic** [1] - 87:5

**step** [4] - 5:13, 5:14, 6:3, 53:13

**still** [7] - 6:25, 15:18, 31:25, 47:14, 49:8, 58:19, 75:16

**stipulate** [1] - 55:21

**stop** [2] - 54:5, 83:22

**stopping** [3] - 83:7, 83:11, 83:18

**strike** [5] - 20:19, 57:7, 58:21, 59:17, 71:4

**strongly** [1] - 72:1

**stuff** [2] - 57:5, 57:11

**style** [1] - 8:8

**subject** [2] - 15:17, 47:12

**submit** [1] - 61:22

**submitted** [1] - 36:15

**subsequent** [1] - 57:6

**substantial** [1] - 69:15

**suggest** [2] - 68:16, 78:8

**suggested** [1] - 36:15

**suggesting** [1] - 4:17

**suggestion** [2] - 4:3, 85:11

**suit** [1] - 55:19

**Suite** [1] - 1:16

**sum** [1] - 11:6

**summary** [1] - 8:3

**supervise** [2] - 7:19, 7:21

**supervisor** [1] - 18:19

**surrogate** [4] - 16:1, 21:14, 21:17, 21:18

**surrogates** [1] - 9:5

**suspicious** [1] - 75:24

**sustain** [6] - 26:6, 27:5, 28:14, 31:17, 52:19, 80:24

**swear** [3] - 5:14, 53:14, 53:15

**SWORN** [2] - 5:17, 53:16

**Sylvia** [2] - 8:16, 8:18

**symbol** [1] - 23:10

---

# T

**table** [4] - 30:6, 50:14, 54:3

**team** [6] - 7:19, 7:23, 8:12, 8:22, 16:17, 26:10

**tens** [1] - 69:23

**terms** [22] - 27:1, 28:13, 32:1, 32:2, 32:24, 33:16, 34:20, 34:22, 38:14, 39:20, 40:6, 42:10, 59:1, 60:1, 77:20, 78:11, 79:25, 80:3, 85:2, 85:3

**test** [1] - 81:6

**testified** [9] - 11:21, 32:19, 33:14, 33:16, 41:15, 62:14, 74:21, 76:19, 82:14

**testify** [2] - 63:21, 76:25

**testimony** [2] - 51:9, 81:20

**text** [11] - 63:23, 64:25, 65:13, 65:17, 66:18, 67:18, 71:9, 71:18, 75:8, 75:11, 82:20

**texting** [1] - 67:1

**texts** [1] - 76:5

**THE** [166] - 1:1, 1:10,

1:14, 1:21, 2:2, 3:4, 4:1, 4:3, 4:13, 4:15, 4:21, 5:1, 5:4, 5:5, 5:13, 5:15, 5:18, 5:19, 6:6, 6:7, 6:11, 6:21, 6:23, 6:25, 7:2, 20:21, 20:22, 22:4, 22:5, 22:6, 22:8, 23:1, 23:3, 24:3, 24:11, 24:14, 24:16, 24:19, 24:22, 26:5, 27:4, 28:13, 31:12, 31:15, 31:25, 32:16, 32:22, 33:12, 33:15, 34:2, 34:10, 34:14, 34:16, 36:1, 36:3, 36:23, 37:1, 37:8, 38:1, 38:10, 38:14, 38:19, 38:21, 38:25, 39:5, 39:8, 39:15, 39:19, 40:5, 40:11, 40:18, 41:9, 41:18, 41:22, 41:25, 42:4, 42:11, 42:14, 42:25, 43:6, 43:14, 43:18, 43:21, 44:3, 44:14, 44:17, 44:24, 45:3, 45:8, 45:12, 45:15, 46:7, 46:8, 46:21, 46:22, 50:24, 52:2, 52:17, 52:22, 52:25, 53:3, 53:6, 53:8, 53:13, 53:17, 53:18, 53:22, 53:23, 54:8, 54:9, 54:12, 54:13, 55:23, 58:9, 58:10, 58:23, 58:25, 59:6, 59:19, 60:17, 62:25, 63:1, 63:19, 63:20, 63:21, 63:23, 64:15, 64:20, 64:22, 65:6, 67:21, 67:22, 71:22, 71:23, 71:24, 71:25, 73:21, 74:5, 77:17, 77:20, 77:23, 78:11, 78:15, 78:19, 79:5, 79:17, 80:19, 80:24, 81:10, 81:13, 83:2, 83:4, 83:5, 83:7, 84:4, 84:7, 84:18, 84:22, 84:25, 85:7, 85:9, 85:13, 85:18, 85:20, 85:25, 86:3

**thereafter** [1] - 62:15

**Thereupon** [2] - 5:11, 53:11

**they've** [1] - 34:16

**thinking** [2] - 57:22, 66:1

**third** [4] - 45:7, 45:11, 45:20, 68:19

**thousands** [2] - 69:21, 69:23
**threaten** [1] - 79:11
**threatened** [11] - 78:4, 78:6, 79:2, 79:6, 79:19, 79:21, 80:1, 80:6, 81:3, 81:21
**three** [3] - 20:14, 21:2, 39:2
**three-page** [1] - 39:2
**threshold** [1] - 26:16
**thrown** [1] - 23:25
**tired** [1] - 54:11
**title** [1] - 22:14
**today** [4] - 31:4, 55:15, 76:4, 81:8
**together** [4] - 46:6, 46:13, 56:18
**tomorrow** [2] - 72:5, 72:7
**top** [7] - 19:1, 23:7, 41:6, 47:5, 67:7, 68:18, 71:15
**topic** [2] - 40:8, 40:9
**totally** [2] - 79:5, 81:10
**touch** [1] - 65:19
**Toussaint** [2] - 17:7, 49:2
**toward** [2] - 9:15, 60:23
**training** [6] - 51:17, 51:20, 51:22, 51:24, 52:4, 52:12
**transaction** [3] - 72:6, 72:15, 72:16
**transactions** [1] - 72:20
**TRANSCRIPT** [1] - 1:10
**transcript** [2] - 87:5, 87:6
**transmit** [1] - 13:3
**travel** [3] - 61:21, 61:25, 62:1
**TRIAL** [1] - 1:10
**tricky** [1] - 19:6
**tried** [1] - 65:21
**trip** [1] - 62:1
**trouble** [2] - 6:10, 9:9
**true** [8] - 12:23, 23:24, 24:8, 41:16, 50:1, 82:10, 87:4, 87:5
**truly** [1] - 67:12
**truth** [4] - 59:2, 59:7, 59:23, 79:15
**try** [5] - 11:19, 11:24, 12:18, 36:19, 82:8
**trying** [8] - 34:20,

35:22, 40:6, 43:14, 63:24, 77:18, 84:15
**turn** [1] - 71:24
**turning** [2] - 57:15, 73:14
**two** [5] - 20:16, 26:2, 46:19, 67:18
**type** [2] - 8:10, 33:24
**types** [5] - 8:4, 9:1, 9:6, 15:25, 27:10

## U

**U.S** [9] - 1:15, 1:18, 13:9, 13:10, 13:11, 29:16, 29:18, 31:10, 31:22
**ultimate** [2] - 35:3, 35:23
**ultimately** [3] - 19:23, 51:12, 60:8
**unclear** [3] - 40:19, 40:25, 41:3
**underneath** [1] - 23:9
**understood** [4] - 19:10, 41:11, 64:12, 76:17
**unfamiliar** [1] - 71:9
**united** [1] - 2:6
**UNITED** [3] - 1:1, 1:3, 1:11
**United** [4] - 5:9, 28:10, 29:13, 87:13
**unless** [1] - 37:23
**unusual** [1] - 49:20
**up** [44] - 4:5, 4:10, 5:13, 5:14, 5:20, 6:21, 6:22, 14:22, 15:4, 15:7, 16:24, 17:17, 17:22, 18:10, 20:3, 22:4, 33:6, 36:23, 38:1, 39:16, 45:1, 45:12, 45:17, 46:7, 46:15, 49:13, 49:21, 53:13, 57:7, 57:15, 58:15, 60:12, 60:20, 62:25, 65:21, 67:1, 71:12, 72:13, 72:21, 74:22, 77:23, 79:13, 81:14, 81:19
**upper** [3] - 10:21, 18:11, 72:13
**ups** [1] - 43:7
**utility** [1] - 7:8

## V

**value** [1] - 79:10

**various** - 8:2, 39:22, 80:12
**Ventura** [1] - 1:23
**verify** [1] - 30:11
**versed** [1] - 52:14
**vet** [4] - 9:4, 26:11, 26:25, 31:8
**vetted** [3] - 18:23, 19:3, 33:19
**vetting** [36] - 16:5, 16:7, 16:13, 16:17, 19:11, 24:24, 24:25, 26:8, 26:19, 26:23, 27:20, 29:15, 30:17, 30:19, 30:22, 32:8, 32:21, 32:23, 32:25, 33:6, 33:7, 33:21, 33:24, 34:6, 34:9, 34:21, 35:17, 37:4, 37:19, 37:23, 38:4, 40:15, 42:3, 42:20, 43:2, 43:7
**via** [1] - 63:5
**vice** [5] - 16:2, 26:21, 35:15, 84:8, 84:13
**Victory** [7] - 10:1, 10:2, 10:3, 11:1, 11:5, 11:9, 74:13
**view** [2] - 32:7, 58:13
**Vincent** [1] - 48:6
**visibility** [1] - 28:19
**Vitals** [2] - 15:18, 47:12
**vitals** [12] - 15:22, 15:24, 16:3, 16:10, 25:8, 25:12, 47:15, 47:23, 48:3, 48:15, 49:8, 49:22
**voice** [7] - 22:4, 36:23, 38:1, 46:7, 54:9, 58:9, 62:25
**volunteer** [1] - 8:19
**vs** [1] - 1:5

## W

**wait** [3] - 4:8, 4:11, 38:15
**waited** [2] - 61:11, 63:3
**Washington** [12] - 1:6, 1:16, 1:20, 2:4, 2:8, 8:13, 8:17, 17:18, 56:4, 62:5, 62:9, 87:14
**waste** [1] - 26:1
**ways** [4] - 8:5, 12:12, 37:9, 37:10
**Wednesday** [1] -

83:10
**week** [5] - 4:12, 58:17, 72:5, 83:10, 83:21
**weekend** [3] - 84:2, 85:16, 86:1
**whatsoever** [1] - 4:16
**white** [6] - 18:6, 18:13, 19:2, 25:4, 47:23, 50:21
**White** [27] - 8:16, 8:18, 8:19, 15:12, 17:2, 17:5, 17:10, 22:19, 23:9, 23:17, 23:19, 23:25, 25:1, 36:8, 44:8, 45:22, 46:3, 46:5, 46:12, 47:3, 47:8, 47:14, 49:22, 50:22, 51:3, 51:23, 52:13
**White's** [7] - 9:12, 17:20, 19:24, 22:18, 28:2, 36:16, 49:12
**white's** [1] - 49:4
**whole** [7] - 23:21, 36:3, 36:4, 66:25, 74:5, 79:14, 80:3
**wife** [1] - 85:1
**William** [1] - 48:23
**Willis** [7] - 56:14, 56:15, 56:17, 57:18, 58:15, 58:18, 59:11
**Wisdom** [1] - 56:15
**withdraw** [1] - 77:13
**WITNESS** [22] - 5:17, 6:6, 6:23, 7:2, 20:22, 22:5, 24:22, 46:8, 46:22, 53:16, 53:22, 54:8, 54:12, 58:10, 63:1, 63:20, 63:23, 64:22, 67:22, 71:23, 71:25, 83:5
**witness** [19] - 5:6, 6:10, 20:20, 34:18, 34:19, 34:25, 40:3, 40:22, 44:23, 45:2, 53:7, 53:8, 59:4, 59:9, 59:25, 78:21, 79:2, 83:6
**witness's** [1] - 44:13
**witnesses** [2] - 80:17, 85:13
**WITNESSES** [1] - 3:4
**word** [3] - 5:25, 29:4, 54:2
**worry** [1] - 84:2
**worth** [1] - 73:15
**write** [1] - 19:2
**written** [1] - 60:24

**wrote** [3] - 47:2, 66:4, 67:8

## Y

**year** [1] - 7:9
**years** [2] - 28:8, 70:21
**yo** [1] - 65:17
**York** [2] - 1:15, 1:19
**yourself** [4] - 9:16, 17:10, 44:20, 66:12

## Z

**zoom** [3] - 10:21, 17:24, 68:6