## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 19-148-1 (CKK) |
| | ) | |
| PRAKAZREL MICHEL (1), | ) | **Evidentiary Hearing: December 14, 2023** |
| | ) | **Oral Argument Requested** |
| | ) | |
| Defendant. | ) | |

---

### DEFENDANT PRAKAZREL MICHEL'S REPLY IN SUPPORT OF HIS
### MOTION FOR NEW TRIAL

M. Scott Peeler (*pro hac vice*)
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas, 42nd Fl
New York, NY 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
scott.peeler@afslaw.com

Peter Zeidenberg (Bar No. 440803)
Michael F. Dearington (Bar No. 5223987)
David M. Tafuri (*pro hac vice*)
Sarah "Cissy" Jackson (*pro hac* vice)
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20006-5344
Telephone: (202) 857-6000
Facsimile:  (202) 857-6395
peter.zeidenberg@afslaw.com
michael.dearington@afslaw.com
david.tafuri@afslaw.com
cissy.jackson@afslaw.com

*Counsel for Defendant Prakazrel Michel*

# TABLE OF CONTENTS

ARGUMENT ............................................................................................................. 1

I.    The Government's argument that the jury's verdict was not influenced by its awareness that two federal judges had found that Michel conspired with others is meritless. ................................................................................................ 1

    A.    The curative-admissibility doctrine did not permit the admission of the basis or nature of the crime-fraud rulings. .......................................... 2

    B.    The Court's repeated statements in front of the jury that Michel conspired with others constituted plain error. ........................................... 5

    C.    The jury's awareness that two federal judges believed Michel was guilty was not harmless error, and it is well-settled that these types of errors are extremely prejudicial. ......................................................... 7

II.    The Government does not dispute that Agent Heuchling opined about Michel's guilt on at least 25 occasions, and its refrain that this was harmless error is meritless. ................................................................................................. 8

III.    *Strickland* requires a new trial because Kenner was woefully ineffective, undermining the verdict's reliability ................................................................ 11

    A.    Kenner's errors caused substantial prejudice under *Strickland*. .............. 11

    B.    The Government's attempt to justify Kenner's nine categories of ineffective assistance of counsel is futile. ................................................ 15

        1.    Kenner's closing argument, drafted using a novel AI program, was frivolous and ineffectual, and it helped the Government's case. ...................................................................... 15

        2.    The Government does not dispute that Kenner failed to familiarize himself with the charged statutes before or during trial. .................................................................................. 16

        3.    Kenner's lack of familiarity with the facts also prejudiced the defense. ................................................................................. 16

        4.    Kenner's failure to move to sever the two unrelated schemes is indefensible. ............................................................. 17

        5.    Kenner's failure to object to Agent Heuchling's improper overview testimony and testimony opining that Michel was guilty was deficient. .................................................................... 18

        6.    The Government does not dispute that Kenner failed to object to obvious hearsay, including the testimony of Matthew Pottinger. ...................................................................... 19

7.      The Government's argument that Michel and
        Higginbotham's attorney-client privileged communications
        were subject to the crime-fraud exception or order is
        unsupported by the law and the order itself. ............................... 20

8.      Kenner failed to object to other damaging, inadmissible
        evidence. .................................................................................. 21

9.      Kenner failed to adequately prepare Michel for testimony. ........ 22

IV.     *Cuyler* also requires a new trial because Kenner had two conflicts of interest
        that adversely affected his performance at trial. .................................................. 22

A.      Kenner's use of an AI tool in which he appears to have had a
        financial interest adversely affected the closing argument. .................... 22

B.      Kenner also had a conflict of interest due to the contempt charges
        prosecutors filed one month before trial, which adversely affected
        his trial performance. ............................................................................... 22

V.      The Government is not entitled to privileged documents. ................................... 24

CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blunt v. United States*,
244 F.2d 355 (D.C. Cir. 1957) ................................................................................7, 8

*Hemphill v. New York*,
595 U.S. 140 (2022) ...............................................................................................2, 3

*People v. Hudson*,
333 N.W.2d 12 (Mich. Ct. App. 1982) ...................................................................7, 8

*Quercia v. United States*,
289 U.S. 466 (1933) ................................................................................................6, 8

*Strickland v. Washington*,
466 U.S. 668 (1984) ........................................................................................ *passim*

*United States v. Brown*,
921 F.2d 1304 (D.C. Cir. 1990) .....................................................................2, 3, 4, 5

*United States v. Burkley*,
591 F.2d 903 (D.C. Cir. 1978) ...................................................................................18

*United States v. Childs*,
598 F.2d 169 (D.C. Cir. 1979) ...........................................................................3, 4, 5

*United States v. Eiland*,
738 F.3d 338 (D.C. Cir. 2013) ........................................................................3, 9, 18

*United States v. Gooch*,
665 F.3d 1318 (D.C. Cir. 2012) .................................................................................18

*United States v. Gray-Burriss*,
251 F. Supp. 3d 13 (D.D.C. 2017), *aff'd*, 920 F.3d 61 (D.C. Cir. 2019) ...........16, 23

*United States v. Gray-Burriss*,
791 F.3d 50 (D.C. Cir. 2019) .....................................................................................23

*United States v. Hampton*,
718 F.3d 978 (D.C. Cir. 2013) ...................................................................................11

*United States v. Lance*,
853 F.2d 1177 (5th Cir. 1988) .....................................................................................6

*United States v. Lefsih*,
    867 F.3d 459 (4th Cir. 2017) ................................................................................7

*United States v. Liddy*,
    509 F.2d 428 (D.C. Cir. 1974) ..............................................................................6

*United States v. Martinez*,
    988 F.2d 685 (7th Cir. 1993) ................................................................................3

*United States v. Meili Lin*,
    326 F.R.D. 214 (N.D. Cal. 2018) ...................................................................17, 18

*United States v. Miller*,
    738 F.3d 361 (D.C. Cir. 2013) ..................................................................9, 10, 18

*United States v. Moore*,
    651 F.3d 30 (D.C. Cir. 2011) .........................................................................10, 11

*United States v. Olano*,
    507 U.S. 725 (1993)..............................................................................................6

*United States v. Richardson*,
    161 F.3d 728 (D.C. Cir. 1998) .......................................................................17, 18

*United States v. Shark*,
    51 F.3d 1072 (D.C. Cir. 1995) ............................................................................23

*United States v. Strake*r,
    258 F. Supp. 3d 151 (D.D.C. 2017) ...............................................................24, 25

*United States v. Taylor*,
    139 F.3d 924 (D.C. Cir. 1998) ............................................................................23

*United States v. Tracy*,
    12 F.3d 1186 (2d Cir. 1993)..................................................................................6

*United States v. White*,
    887 F.2d 267 (D.C. Cir. 1989) ............................................................................20

*United States v. Williams*,
    827 F.3d 1134 (D.C. Cir. 2016) ......................................................................8, 11

*United States v. Winston*,
    447 F.2d 1236 (D.C. Cir. 1971) ...............................................................2, 3, 4, 5

**Statutes**

18 U.S.C. § 951............................................................................................................14, 16

iv

18 U.S.C. § 1014.........................................................................................................................14

**Other Authorities**

D.C. Rule of Professional Conduct 1.6.......................................................................................25

Fed. R. Crim. P. 8 .......................................................................................................................17, 18

Fed. R. Crim. P. 14 .....................................................................................................................18

Fed. R. Evid. 403 ........................................................................................................................21

The Government does not actually assert that Michel received a fair trial, and its justifications for the egregious errors of counsel that led to the convictions fall flat. It was clear throughout the trial that Kenner failed to effectively represent Michel. Kenner was unfamiliar with the facts and allegations, developed no legitimate theories, themes, or defenses, and was ignorant of the rules of evidence, all while laboring under two conflicts of interest.

The Government took full advantage, introducing all manner of improper and inadmissible evidence throughout the trial, resulting in a one-sided proceeding replete with extraordinary errors and unfair prejudice. As a result, when it deliberated, the jury was aware that two federal judges—the grand jury judge and the presiding judge—believed Michel was guilty, which is literally unprecedented. The jury had also heard the case agent erroneously provide overview testimony, a tactic condemned by the D.C. Circuit as clear error, as well as the case agent's improper opinion testimony on at least 25 occasions that Michel was guilty. And the jury was also exposed to a welter of inadmissible prejudicial evidence against Michel. On the other side of the ledger, the jury heard none of Michel's many compelling defenses, identified for the first time in these post-trial motions. The unfair trial was the inevitable byproduct of ineffective assistance of counsel, coupled with prosecutors who seized every opportunity to exploit Kenner's ineffectiveness.

The unprecedented degree of prejudicial errors during trial, coupled with the lack of effective representation and defense, require a new trial in the interests of justice.

## ARGUMENT

I.    **The Government's argument that the jury's verdict was not influenced by its awareness that two federal judges had found that Michel conspired with others is meritless.**

The Government does not dispute that the jury was aware that two federal judges concluded that Michel had conspired with others. The combination of these errors is unprecedented, as was the resulting prejudice. The jury was improperly influenced by the beliefs of two federal judges,

1

whose opinions about Michel's guilt naturally would have impacted—if not trumped—their own.

### A.   The curative-admissibility doctrine did not permit the admission of the basis or nature of the crime-fraud rulings.

The Government tries to justify its repeated, improper introduction of the grand jury judge's crime-fraud ruling into evidence, over the defense's objection, by citing the curative-admissibility doctrine. The Government contends that Kenner "opened the door" by questioning Agent Lidsky about whether he followed protocols to protect privilege—which he testified he did—and that the Government could therefore "cure" the purported prejudice by introducing evidence that the grand jury judge found that Michel had committed crimes. But the D.C. Circuit has held that this type of "oversimplification" and misapplication of the doctrine "for injection of prejudice" is improper. *United States v. Winston*, 447 F.2d 1236, 1240 (D.C. Cir. 1971).

In *United States v. Brown*, 921 F.2d 1304 (D.C. Cir. 1990), cited by the Government, the D.C. Circuit explained that the curative-admissibility doctrine is available only when "the introduction of inadmissible or irrelevant evidence by one party justifies or 'opens the door to' admission of otherwise inadmissible evidence." *Id.* at 1307. The court held that a "precondition for curative admissibility," however, is that the original statement was inadmissible. *Id.* Importantly, the court cautioned: "Even if defense counsel had opened the door . . . , it does not follow that *all* subsequent evidence is admissible. As this court has long recognized: 'Opening the door is one thing. But what comes through the door is another.'" *Id.* (quoting *Winston*, 447 F.2d at 1240). "Everything cannot come through the door." *Winston*, 447 F.2d at 1240. Rather, "the range of otherwise-inadmissible evidence that may be squeezed through an 'open door' is limited." *Brown*, 921 F.2d at 1308.[1]

---

[1] The Government's reliance on *Hemphill v. New York*, 595 U.S. 140, 152 (2022), Opp. at 4, is unhelpful, as *Hemphill* did not address the curative-admissibility doctrine under federal law.

Indeed, when one party "opens the door," the doctrine permits inadmissible evidence "*only to the extent necessary* to remove any unfair prejudice which might otherwise have ensued from the original evidence." *Brown*, 921 F.2d at 1307 (emphasis added) (quoting *Winston*, 447 F.2d at 1240). Thus, in *Brown*, the court held that even if the defense had opened the door to the issue of a witness's credibility, "it only did so to the extent of admitting evidence that rehabilitated that credibility," and no further than that. *Id.* "An 'open door' does not give an opponent unbridled license to introduce otherwise inadmissible evidence into the trial, nor does it justify receipt of rebuttal evidence merely because it is in the same category of excludable evidence as the evidence previously offered." *United States v. Martinez*, 988 F.2d 685, 702 (7th Cir. 1993)). "Rebuttal evidence is admissible only to the extent necessary to combat evidence in chief . . . ." *United States v. Childs*, 598 F.2d 169, 174 (D.C. Cir. 1979).

The Government's argument that the jury needed to learn that the grand jury judge believed Michel was guilty in order to rebut a suggestion that Agent Lidsky failed to respect Michel's privileges is a non-sequitur and contravenes the well-settled precedents cited above. As an initial matter, Kenner's questions to Agent Lidsky about the steps he took to secure and review evidence were proper, because they provided background about the investigation. Indeed, the Government asserts in its Opposition brief that the "'description of investigative techniques provide[s] useful background information.'" Opp. at 11 (quoting *United States v. Eiland*, 738 F.3d 338, 352 (D.C. Cir. 2013)). The admissibility of testimony about how evidence was secured, segregated, and reviewed was admissible and required no rejoinder, particularly since Agent Lidsky testified that the Government did not violate any privileges. Thus, the Government failed to satisfy the

---

Rather, the Supreme Court rejected New York's version of the curative-admissibility doctrine when it clashed with the Sixth Amendment's Confrontation Clause. *Hemphill*, 595 U.S. at 153.

"precondition for curative admissibility." *Brown*, 921 F.2d at 1307.

In addition, Kenner's questions and Agent Lidsky's responses were not unfairly prejudicial to the Government. Opp. at 5. To the contrary, Kenner asked if Agent Lidsky took steps "to avoid interfering with the attorney-client relationship" after reviewing the Google search warrant return, and Lidsky clarified that he took those steps "prior to reading the material." Tr. 4/17 PM at 13–14. When asked about his review of Higginbotham's notebook, Agent Lidsky testified that, before his review, "because of the attorney-client privilege issue, it went to the filter team . . . I received pieces of it later that were deemed relevant and non-privileged." *Id.* at 24–25. The Government's argument that Kenner "implied, or directly stated, that the investigators had improperly intruded upon the defendant's attorney-client privilege with George Higginbotham, his attorney," Opp. at 2, is unsupported by the record. Agent Lidsky testified that he followed procedures to protect privilege, eliminating any impression that he committed misconduct, and he instead gave the impression that he was a fair investigator. No rebuttal was warranted.

Even if Kenner had "opened the door" and gave the impression that Agent Lidsky improperly reviewed privileged materials, the curative-admissibility doctrine would have only permitted evidence "necessary to remove any unfair prejudice which might have otherwise ensued from the original evidence." *Brown*, 921 F.2d at 1307; *Winston*, 447 F.2d at 1240; *see Childs*, 598 F.2d at 174. At most, this would have permitted a single question from the prosecutor to Agent Lidsky about whether a court order had permitted him to review the materials at issue—not evidence about the *nature*, *basis*, or *reasons* for that court order. There was no need for the Government to introduce evidence—through three leading questions, no less—that the grand jury judge issued a "crime fraud order . . . because there was probable cause to believe that Mr. Michel involved Mr. Higginbotham in criminal activity," or that the grand jury judge found that "Mr.

Michel used an attorney to help commit his crimes." Tr. 4/17 PM at 43–45. Nor did the doctrine allow the Court to instruct the jury that "another judge found that there was probable cause to believe that Mr. Higginbotham assisted Mr. Michel in the commission of a crime based on the information that the government provided to that particular judge." Tr. 4/18 AM at 48–49.[2] This merely amplified and bolstered Agent Lidsky's testimony about the crime-fraud ruling.

The "[c]urative admissibility' is a shield, not a sword," and the "government may not shore up a prosecution by pushing through the open door evidence not 'necessary to remove any unfair prejudice' created by defense counsel's tactics." *Brown*, 921 F.2d at 1307–08. The Government did exactly that. As the D.C. Circuit has observed, the curative-admissibility doctrine is "dangerously prone to overuse," *Childs*, 598 F.2d at 174, and it "carries with it an oversimplification," *Winston*, 447 F.2d at 1240. "The doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice." *Winston*, 447 F.2d at 1240. Nowhere do these principles have greater currency than here, where the Government subverted the doctrine to inform the jury that another federal judge believed Michel was guilty.

### B. The Court's repeated statements in front of the jury that Michel conspired with others constituted plain error.

The Court repeatedly stated in front of the jury that Michel, Higginbotham, and others conspired to commit crimes, when the Court ruled on hearsay objections. Doing so exacerbated the prejudice from the jury's awareness of the crime-fraud rulings. The Government's argument that this was not an error or plain error is meritless.

The two cases the Government cites to argue that the Court's statements were proper

---

[2] The Government erroneously refers to this as a "curative instruction," Opp. at 6, but the instruction itself was improper and warranted a mistrial. A curative instruction would have instructed the jury to disregard evidence of the grand jury judge's crime fraud ruling. Instead, the jury was instructed that it should not rely "simply" on that evidence, meaning it should consider other evidence as well as the crime-fraud ruling.

reached the opposite conclusion. *United States v. Tracy*, 12 F.3d 1186 (2d Cir. 1993), explained:

> We agree with [the defendant] that the court's statements were inappropriate. …
> And there is every need for the judge not to couch his rulings in terms that may
> unduly influence the jury. Thus, where … the preconditions to admissibility include
> elements of the offenses with which the defendants are charged, disclosure to the
> jury that the government has established those elements to the satisfaction of the
> judge is especially inappropriate. When the government has persuaded the judge
> that the prerequisites for admission of coconspirator statements have been
> established, the judge should make his … findings outside the presence of the jury,
> and the jury should not be told what facts the judge believes have been established.

*Id.* at 1200. Similarly, in *United States v. Lance*, 853 F.2d 1177, 1183 (5th Cir. 1988), also cited

by the Government, the court observed: "We do not encourage a trial judge to make his preliminary

findings concerning the admissibility of a co-conspirator's declaration in the presence of the jury;

everyone here agrees that it would be preferable for the judge to avoid similar trial rulings." *Id.* By

now, it is well-established in the case law that such statements constitute prejudicial error.

The Government's retreat to the plain error review standard—due to Kenner's failure to

object to the Court's statements (further evidence of his ineffectiveness)—fares no better. It was

clear error for the Court to comment in front of the jury about a defendant's guilt. Nearly one

hundred years ago, in *Quercia v. United States*, 289 U.S. 466, 470 (1933), the Supreme Court

"emphasized the duty of the trial judge to use great care that an expression of opinion upon the

evidence . . . should not be one-sided." *Id.* The D.C. Circuit has similarly stated that while "[a]

federal judge has inherent authority not only to comment on the evidence . . . [w]hat is required,

however, are reins of restraint" such that the court does not "tilt or oversteer the jury." *United*

*States v. Liddy*, 509 F.2d 428, 438 (D.C. Cir. 1974). The Government's suggestion that this

question is unsettled is belied by case law to the contrary.

This error, coupled with the introduction of evidence that the grand jury judge also believed

Michel conspired, easily satisfies the plain error standard and affected Michel's substantial rights.

*See United States v. Olano*, 507 U.S. 725, 732 (1993) (plain error standard requires that error is

"plain" and affects "substantial rights" such that it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings").[3] This is particularly prejudicial because of the obvious danger that the jury would give undue weight to a judge's views. *See* Def. Br. at 9–10.

> **C.     The jury's awareness that two federal judges believed Michel was guilty was not harmless error, and it is well-settled that these types of errors are extremely prejudicial.**

The Government's contention that it was "harmless" for the jury to be aware of the views of two federal judges that Michel had conspired with others strains credibility. Small wonder why the Government disregards the ample case law cited in Michel's opening brief that confirmed that these types of errors are of the *most* prejudicial variety.[4]

The fact that the views of *two federal judges* were made known to the jury is literally unprecedented. The closest analogue the defense could find for this rare type of error is *People v. Hudson*, 333 N.W.2d 12 (Mich. Ct. App. 1982), where the Michigan Court of Appeals reversed the defendant's conviction because the trial court informed the jury that there was a probable cause finding. *See* Def. Br. at 10. While *Hudson* is correct,[5] the prejudice there pales in comparison to the prejudice here, where the jury learned that *two judges* believed Michel was guilty. More than

---

[3] The Government's argument that the Court's statements were in the context of evidentiary rulings, and not meant to influence the jury, conflates the court's intent in making the statements with their impact on the jury. *See, e.g.*, *United States v. Lefsih*, 867 F.3d 459, 469 (4th Cir. 2017) ("We have no reason to believe that the district court intended to convey a negative impression of Lefsih to the jury, or to lend the 'imprimatur' of its office to the case against him.").

[4] *See* Def. Br. at 9–10 (collecting cases); *see also Blunt v. United States*, 244 F.2d 355, 365 (D.C. Cir. 1957) ("When it is the judge who undertakes to supplement the evidence, the harm is even greater than when the prosecutor does it, for 'the influence of the trial judge on the jury is necessarily and properly of great weight, and … his lightest word or intimation is received with deference, and may prove controlling.'").

[5] The Government argues that other Michigan decisions have "narrowed the scope of *Hudson* and cast doubt on its broad pronouncement of error," Opp. at 5 n.1, but it cites only decisions with facts found to be *distinguishable* from the facts in *Hudson*. Of course, a court's conclusion that facts sub judice are distinguishable from those in a precedent does not "narrow" the precedent's holding or cast doubt on it. *Hudson* remains good law in Michigan.

simply doubling the prejudice in *Hudson*, each judge's views that Michel conspired confirmed and bolstered the other judge's views in the eyes of the jury. The jury no doubt felt constrained to find Michel guilty because an acquittal would have been at odds with the views of two federal judges.

The Court's purportedly "curative" instruction, given the next day, amplified and bolstered evidence of the grand jury judge's finding, leaving the jury free to consider the grand jury judge's view that Michel had conspired as evidence of guilt. Even if the Court had given an appropriate curative instruction, courts have held that jury instructions in these circumstances are incapable of curing the prejudice. *See, e.g.*, *Quercia*, 289 U.S. at 472 (court's instruction that its "opinion of the evidence was not binding on the jury," where the court did not withdraw that opinion, did not cure); *Blunt*, 244 F.2d at 366 ("The harm was not cured, as the Government suggests, by including in the charge the standard instruction that it was for the jury to find the facts and that they were not bound by his comments. . . . Such admonitions (as were given) may offset brief or minor departures from strict judicial impartiality, but cannot be considered sufficient here.").

In these circumstances, and given the numerous weaknesses in the Government's case that effective counsel would have exposed, these extraordinary and unprecedented errors were not harmless,[6] and they also affected Michel's substantial rights. The Court must grant a new trial, so that a jury free of such weighty influence can fairly reach a verdict.

## II.    The Government does not dispute that Agent Heuchling opined about Michel's guilt on at least 25 occasions, and its refrain that this was harmless error is meritless.

Michel's opening brief demonstrated that it was plain error for the Government to use Agent Heuchling to provide an overview of the evidence and opine on more than two dozen

---

[6] *See, e.g.*, *United States v. Williams*, 827 F.3d 1134, 1161 (D.C. Cir. 2016) (noting that "the 'harmless error test … is not a mere sufficiency-of-the-evidence inquiry,' but requires reversal if the properly admitted evidence is 'even slightly ambiguous' and there is any risk that the error might not be harmless").

occasions his belief that Michel was guilty. Def. Br. at 12–20. The Government's argument that its violation of clearly settled D.C. Circuit precedent was "harmless" is unpersuasive.

Critically, the Government does not (and cannot) deny that Agent Heuchling testified on at least 25 occasions—identified in Michel's opening brief—that he believed Michel was guilty of the charged schemes. Def. Br. at 19. Nor does it deny that Agent Heuchling testified that Michel was guilty of the alleged conduit scheme on at least 17 occasions, including by testifying that Michel "conspired with Low," made "illegal contributions to a Super PAC," gave "funds to the campaign in violation of federal law," and engaged in "illegal activities," as well as testimony on 14 occasions that Michel received money from Low and then transferred it to "straw donors" or "cutouts" who donated it to the Obama Victory Fund. Def. Br. at 15–17. Nor does the Government deny that Agent Heuchling testified as to his opinion that Michel, Broidy, Lum Davis, and Higginbotham "were working on behalf and with Mr. Low and on behalf of the Chinese government to influence the White House and the administration of then President Trump to deport a Chinese national who was in the United States back to China." Def. Br. at 18; Tr. 4/13 AM at 33. The Government also does not deny that Agent Heuchling repeatedly referred to Michel, Broidy, Lum Davis, and Higginbotham as "co-conspirators" in relation to the alleged unregistered lobbying schemes, making clear to the jury his belief, based on his investigation and expertise, that Michel conspired as charged. Def. Br. at 18–19. The Government does not even address this evidence[7] or dispute that the D.C. Circuit has condemned this practice and held it to be plain error. *See United States v. Eiland*, 738 F.3d 338, 352–53 (D.C. Cir. 2013); *United States v. Miller*, 738 F.3d 361, 373 (D.C. Cir. 2013).

---

[7] The Government's citation to case law indicating that a case agent can testify about investigative techniques, Opp. at 11, is a red herring. Agent Heuchling provided overview and opinion testimony about Michel's purported guilt—not testimony about investigative techniques.

The Government's attempt to distinguish Agent Heuchling's improper testimony about Michel's guilt from the case agent's reference to the alleged co-conspirators as "criminals" in *Moore* is unavailing. Opp. at 12; *see United States v. Moore*, 651 F.3d 30, 60 (D.C. Cir. 2011). A co-conspirator *is* a criminal, and Agent Heuchling's more precise reference to alleged co-conspirators as "co-conspirators" was *more* prejudicial than if he called them criminals, since "co-conspirator" embraces the specific conspiracies charged in Michel's indictment. Moreover, Agent Heuchling's testimony was exponentially more prejudicial than the case agent's testimony in *Moore*, because Agent Heuchling also testified that he believed Michel himself—not just the alleged co-conspirators—to be guilty of the charged crimes. *See* Def. Br. at 15–19.

The Government's argument that Agent Heuchling's testimony was "based on admissible, or already admitted, evidence," Opp. at 12, is belied by the record. As an initial matter, this argument does not address Agent Heuchling's repeated opinion testimony that Michel was guilty, which is improper even if based on admissible evidence identified for the jury—which it was not. For instance, Agent Heuchling testified that his opinions were based on his "investigation," including "witness interviews"—which are inadmissible—and without identifying the specific evidence he relied on so that the jury could assess his conclusions. *See, e.g.*, Tr. 3/30 AM at 87, 91, 110; Tr. 3/30 PM at 5. This is quintessential erroneous overview and opinion testimony. *See Moore*, 651 F.3d at 56 (noting that overview testimony "pose[s] the risk that otherwise inadmissible evidence might be introduced"); *Miller*, 738 F.3d at 373 (when the "government agent's testimony [i]s broadly based on his 'knowledge of the entire investigation' . . . 'the jury ha[s] no way of verifying [the agent's] inferences or of independently reaching its own interpretations'" of the evidence). Indeed, Agent Heuchling even commented on the *strength* of inadmissible hearsay and opinions, testifying that he traced funds to entities associated with

Michel, and that unidentified "others confirmed that tracing as well," which was "straightforward" and "is solid." Def. Br. at 18 n.6 (quoting Tr. 3/30 PM at 28–29); *see Moore*, 651 F.3d at 59 (concluding that the case agent "impermissibly commented on the strength" of the evidence).[8]

These plain errors, committed on over two dozen occasions, were not harmless, particularly when viewed in combination with the improper evidence cited above in § I. *See United States v. Hampton*, 718 F.3d 978, 984 (D.C. Cir. 2013) (case agent's interpretations and overview of wire tap evidence was not harmless and required reversal); *Williams*, 827 F.3d at 1162 (same).[9] Accordingly, the Court must grant a new trial.

## III.   *Strickland* requires a new trial because Kenner was woefully ineffective, undermining the verdict's reliability.

Kenner was ineffective in at least nine ways. *See* Def. Br at 20–41. Any one of his errors would warrant a new trial, but together they leave no doubt. The Government's strained attempts to justify Kenner's obvious failures betray its aim of preserving the unconstitutional verdict rather than testing its case in a fair trial. *Strickland* commands otherwise.

### A.   Kenner's errors caused substantial prejudice under *Strickland*.

The Government principally argues that Kenner's ineffectiveness did not cause Michel

---

[8] Tellingly, the Government believes its best examples of Agent Heuchling tying his "straw donor" conclusion testimony to admissible evidence is where he used two charts the Government created that themselves failed to identify admissible evidence on which their conclusions were based. *See* Opp. at 12 (citing Exs. 666 & 667). The Government also fails to provide a valid basis for Agent Heuchling to testify on at least 14 occasions that he believed Michel had used "straw donors," alerting the jury to his belief that Michel was guilty of the charged straw donor scheme.

[9] The Government argues that Agent Heuchling's reference to Broidy and Higginbotham as co-conspirators was harmless because the jury was aware that they had each pled guilty. Opp. at 13. But Higginbotham pled guilty only to the bank false statements conspiracy—not the alleged unregistered lobbying schemes for which Agent Heuchling referred to him as a co-conspirator. And Broidy pled guilty only to conspiring to violate FARA by acting as an agent of Low—not conspiring to act as an agent of a foreign government, as Agent Heuchling contended. This argument also does not address Agent Heuchling's reference to others as co-conspirators, including Michel and Lum Davis, or his testimony opining that Michel was guilty.

prejudice under *Strickland* because evidence of Michel's purported guilt was "overwhelming." Opp. at 15–16. This argument views the evidence just as the jury did—without examining the numerous meritorious defenses that Kenner failed to develop and present. *See* ECF No. 309. Kenner's ineffectiveness caused substantial prejudice, undermining confidence in the verdict.[10]

Due to his ineffective performance at trial, Kenner failed to develop obvious arguments and central defenses to each count in the indictment, which, if properly presented, would have likely raised reasonable doubt in the mind of a juror. Examples include:

- **Alleged Campaign Finance Scheme (Counts 1–4)**

  o There was no evidence that Michel and Low had an agreement or even discussion to use straw donors to make illegal campaign contributions. ECF No. 309 at 4–5. Low lacked knowledge and willfulness to violate campaign finance laws, and the case agent misled the jury into thinking Low had this *mens rea* by giving the false impression that Low had received an emailed invitation to an Obama fundraiser that indicated that contributions must be made by U.S. citizens, when in fact this page of the invitation had been removed before it was sent to Low, evincing an intent to keep Low from knowing he was not permitted to make contributions. *Id.* at 5–8. Kenner should have realized this, and could have exposed the case agent on cross-examination for trying to trick the jury, which would have been devastating to the Government's case and credibility. Other evidence showed Low had been misled to believe that he could legally make campaign contributions, like when Rousseau advised Low he could make such contributions if he owned a corporation," like George Soros. *Id.* at 8–9.

  o There was no evidence Michel caused anyone to file a false report with the FEC, and the Government failed to introduce any of the donor cards the campaign relied on to determine the source of each of the purported straw donor's contributions. *Id.* at 9–10. Nor did the Government ask any of the alleged straw donor witnesses whether they had filled out a donor card or submitted it to the campaign, or otherwise informed the campaign about the source of the contributions. *Id.* at 10. The critical link between Michel and the alleged false statements to the FEC was missing.

  o In context, Michel's declaration to the FEC that he had no reason to hide that donations from his entities to a super PAC came from him was truthful, and not meant to obstruct

---

[10] The Court must grant a new trial if Kenner's ineffective performance "undermine[s] confidence in the outcome," meaning "a *reasonable probability* that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland v. Washington*, 466 U.S. 668, 693–94 (1984). Michel need not demonstrate that Kenner's "deficient conduct more likely than not altered the outcome of the case," even though it likely did. *Id.*; *see also id.* at 696 (noting also *Strickland*'s prejudice standard is a "guide" and not a "mechanical rule[]," and "the ultimate focus of the inquiry must be on the fundamental fairness of the proceeding").

the FEC's investigation into whether he used his entities to conceal that *he* was making the donations. *Id.* at 10–13. The Government took this statement out of context years later in alleging that Michel was really telling the FEC that he did not receive funds from Low, when that was nether part of the FEC's investigation nor at issue in the investigation or in his declaration. *Id.*

- **Alleged Witness Tampering (Counts 5–6)**

  o Both of the July 14, 2019 text messages the Government charged in Counts 5 and 6 as attempts to influence witness testimony by the alleged straw donor recipients of the messages were clearly only attempts to extract money from the recipients. The July 14, 2019 text message to Neville Richardson, who had not even been identified as a witness (Count 5) threatened to report Richardson to the authorities if he did not pay Michel $50,000, the amount Richardson had received from Michel in 2012 and that Michel had demanded he pay back to Michel. *See* Ex. 460 ("So to alleviate damages to you contact him before 1pm tomorrow. Just remember once you're mention [sic] theres [sic] no turning back I'm not sure if its [sic] worth 50k." (emphasis added)). And the July 14, 2019 text message to Frank White (Count 6) made clear that the sender wanted White to find a way to pay Michel money. The sender stated, "we're not saying break any laws, but you can get creative. If that means buying him out of Dusable or whatever, you not only owe him that cause he help you make a lot of money but he also kept his mouth shut, I'm sure you want to keep like that. So Frank do something even if doing it thru your lawyer work it out so everything remains bury." Exs. 461–63. The sender even offered the idea of buying Michel out of DuSable Capital Management, a private equity firm run by White in which Michel had a stake, *see* Ex. 102 at 6, to get Michel money, and proposed that White could do so through his lawyer to keep the payment "bur[ied]." Ex. 463.[11] These demands for money made sense because Michel had just been charged two months earlier, his assets were previously frozen, and he needed money for his defense. Indeed, Michel had asked Richardson for money just months earlier. *See* Ex. 458. A threat to extract money is not one to influence testimony.

- **Alleged FARA Scheme (Counts 7 & 8)**

  o There was no evidence that Michel himself lobbied the U.S. government, as the Government tacitly concedes by not challenging this assertion in its Opposition to Michel's Motion for Judgement of Acquittal, *see* ECF No. 320 at 16–17, and he was therefore under no obligation to register with the Attorney General, ECF No. 309 at 23.

  o There was also no evidence that Michel aided and abetted Broidy's, Higginbotham's, or Lum Davis's alleged FARA violations. This is because there was no evidence that anyone other than Broidy had engaged in lobbying, and, as to Broidy, there was no evidence that Michel intended for Broidy not to register. ECF No. 309 at 23–24. To the contrary, Broidy testified that he had never had a discussion with Michel or anyone else about whether he should register under FARA. *Id.* at 24.

---

[11] Notably, the July 14, 2019 text messages also bore no resemblance to Michel's text messages. While the July 14, 2019 messages included grammatical errors and largely failed to use apostrophes for contractions, Ex. 460–63, Michel's text messages used proper grammar and punctuation, including apostrophes throughout, Ex. 458. Kenner also failed to point this out.

o There was also no agreement between Michel and an alleged co-conspirator for anyone to violate FARA. *Id.* at 25–28.

- **Alleged Agent of the Chinese Government (Counts 7 & 10)**

  o There was no evidence that Michel had agreed to operate as an agent of China subject to the "direction or control" of the Chinese government, as required to violate 18 U.S.C. § 951. ECF No. 309 at 18–21. Michel, Broidy, Higginbotham, and Lum Davis acted at the request of Low, as Broidy testified, not the Chinese government, and Low was the one who financed the efforts to extradite Guo, not the Chinese government. *Id.*

  o Broidy testified that he met with the possible Chinese government official as "part of [his] engagement with Low," *id.* at 20, not the Chinese. He also stated this in his Statement of Offense, introduced by the Government. *Id.* (citing Ex. 532 at 1).

- **Alleged Money Laundering Conspiracy (Count 7)**

  o Michel did not conspire to conceal the proceeds of a FARA violation, because at most the alleged unregistered lobbying scheme generated proceeds that were distributed to alleged confederates for their efforts, but there were no downstream transactions conducted to conceal each alleged conspirator's proceeds after receipt. *Id.* at 29–30.

  o The evidence also showed that transactions were to conceal the source of the funds as coming from Low to avoid seizure of such funds as fruits of the 1MDB scandal, not to conceal that they were related to the alleged FARA violations, as charged. *Id.* at 30–31. Indeed, Broidy testified that he was concerned with whether the funds used to pay him were "untainted" by 1MDB, and this was also the concern of Michel and Lum Davis. *Id.* at 31.

  o The evidence also did not support the alleged concealment and promotional money laundering conspiracies because the payments were allegedly in exchange for lobbying, not *unregistered* lobbying, and there was no evidence that the payments were conditioned on Broidy not registering under FARA. *Id.* at 31–32.

- **Alleged Bank False Statements Conspiracy (Count 12)**

  o Neither Michel nor Higginbotham agreed to, or did, make a false statement to a bank in order to obtain a loan or other funding, which is required to violate the bank false statement statute. *See* 18 U.S.C. § 1014. Rather, they allegedly lied to convince a bank to open an account, which does not violate the statute.

These basic defenses would have been obvious to any competent defense attorney, and each had a reasonable probability of establishing reasonable doubt as to each count. But Kenner failed to adequately develop or argue *any* of these defenses, causing Michel substantial prejudice that warrants reversal under *Strickland*. This is in addition to the extraordinary prejudice caused by Kenner's failure to object to obvious hearsay and other inadmissible evidence. The

Government's argument that evidence of guilt was "overwhelming" ignores all of these meritorious defenses, because they were never presented to the jury. In these circumstances, Michel amply satisfies the prejudice prong of the *Strickland* test.

**B.     The Government's attempt to justify Kenner's nine categories of ineffective assistance of counsel is futile.**

The Government fails to demonstrate that the nine fundamental ways in which Kenner was ineffective meet an "objective standard of reasonableness."

1.    Kenner's closing argument, drafted using a novel AI program, was frivolous and ineffectual, and it helped the Government's case.

The evidence strongly suggests that Kenner drafted the closing argument using a novel AI program in which he appears to have had a financial interest—a subject to be explored at the upcoming evidentiary hearing. But whether the closing argument was the product of Kenner's use of AI or his own creation does not impact the fact that the closing argument was the result of ineffective assistance of counsel, as it ignored virtually all of Michel's most obvious and compelling defenses and instead made frivolous and counter-productive arguments.

In arguing that Kenner's closing argument was "constitutionally []effective," the Government fails to address that Kenner's first substantive statement was an admission of guilt. *See* Def. Br. at 22 ("Ladies and gentleman, this case started back in 2012 when there was, as the government characterizes it, an effort to funnel money to President Obama's reelection campaign."). The Government also defends Kenner's argument that Michel's intent in funneling money to the Obama Campaign was to get Low a photograph with President Obama rather than to influence United States policy, Opp. at 17–18, but ignores that this was not a legally valid defense. And while the Government questions whether Kenner conflated the alleged straw-donor and FARA schemes in his closing argument, this conflation is evident from Kenner's argument that Michel did not "attempt to influence the United States Government or its position on anything,"

Def. Br. at 22, an argument that describes an element of FARA—not the conduit charges.

The Government also fails to address Kenner's two frivolous defenses to the § 951 charges, namely: (1) Steve Wynn attempted to lobby the Trump Administration, even though the Government contended that Broidy used Wynn for that purpose as part of the conspiracy; and (2) the lobbying scheme was unsuccessful, because Guo was not extradited, even though the success of the alleged scheme was not an element of the charged offense. *Id.* at 23–24. Kenner also neglected to make the most obvious argument regarding the § 951 charge, which was that neither Michel nor any of his alleged co-conspirators had agreed to act at the "direction or control" of the Chinese government. The Government insists that Kenner made this argument, but none of the trial transcript pages it cites support this assertion, and Kenner never even used the words "direction or control" during his closing argument.

   2.   <u>The Government does not dispute that Kenner failed to familiarize himself with the charged statutes before or during trial</u>.

Faced with evidence that Kenner missed key arguments and defenses after failing to familiarize himself with the charged statutes, the Government merely argues that *Strickland* does not require perfection. Opp. at 20–21. True enough, but Kenner's performance had to be objectively reasonable, and it was not. Kenner missed every colorable defense due to his failure to familiarize himself with the charged statutes and evidence.[12]

   3.   <u>Kenner's lack of familiarity with the facts also prejudiced the defense</u>.

Michel's opening brief demonstrated that Kenner was unfamiliar with the facts and allegations and outsourced the defense to e-discovery vendor attorneys without himself studying

---

[12] For this reason, the Government's reliance on *United States v. Gray-Burriss*, 251 F. Supp. 3d 13 (D.D.C. 2017), *aff'd*, 920 F.3d 61 (D.C. Cir. 2019), is misplaced. There, while trial counsel had represented before trial that they were ill-prepared, the district court did not grant a new trial because trial counsel's performance proved otherwise; it was not deficient. Here, in contrast, Kenner's performance was plainly deficient in at least nine ways.

the case. Def. Br. at 25–26, 28. The Government's argument that this can be permissible in some cases overlooks the devastating consequences wreaked in this case. Indeed, the Government has no response to the specific examples of ways in which Kenner failed to cross-examine key witnesses like Higginbotham or Broidy about known defenses. *See id.* at 27–28. And, as discussed above, Kenner's unfamiliarity with the evidence and the law meant he overlooked nearly every obvious and meritorious defense. *See supra* § III.A.

       4.   <u>Kenner's failure to move to sever the two unrelated schemes is indefensible</u>.

Kenner's failure to move to sever the alleged conduit and unregistered lobbying schemes caused severe prejudice. Def. Br. at 29–32. The Government's claim that the schemes were properly joined, Opp. at 23–25, is easily dispatched.

The Government does not dispute that two schemes cannot be joined under Rule 8(a) if they "are discrete" and "do not constitute parts of a common scheme or plan." *United States v. Richardson*, 161 F.3d 728, 734 (D.C. Cir. 1998). Nor does the Government dispute that two schemes are improperly joined if "commission of one of the offenses neither depended upon nor necessarily led to the commission of the other, and proof of the one act neither constituted nor depended upon proof of the other." *United States v. Meili Lin*, 326 F.R.D. 214, 219–20 (N.D. Cal. 2018). As the D.C. Circuit has explained: "Where there is no *substantial overlap in evidence* and particularly where the evidence necessary to prove each of the offenses would be inadmissible in a trial of the other, judicial economy does not favor joinder." *Richardson*, 161 F.3d at 734. And the Government does not dispute that "the elements" and "temporal proximity" of the schemes are also relevant factors that bear on whether the schemes are properly joined. *Meili Lin*, 326 F.R.D. at 218. To be joined, the schemes must be "connected together or constitut[e] parts of a common scheme or plan." *Richardson*, 161 F.3d at 733.

The Government disregards these basic principles in erroneously arguing that joinder was

appropriate merely because Low, his money, and politics were "commonalities" in both schemes. Opp. at 24. But Rule 8(a) does not turn on whether any "commonalities" can be identified between the schemes. Instead, the schemes must have depended on each other, involve substantial overlapping evidence, and include the same elements or temporal proximity—none of which existed here. *Richardson*, 161 F.3d at 734; *Meili Lin*, 326 F.R.D. at 218. The two schemes were five years apart, involved none of the same evidence, and involved different alleged actors except for Michel and Low. In fact, if the two schemes were tried apart, none of the evidence or allegations from one scheme would have been admissible in the trial on the other scheme. This was yet another instance of Kenner's ineffective performance severely prejudicing Michel.[13]

     5.   <u>Kenner's failure to object to Agent Heuchling's improper overview testimony and testimony opining that Michel was guilty was deficient.</u>

The Government briefly argues that Kenner did not err in failing to object to Agent Heuchling's improper overview testimony and opinion that Michel was guilty, which he stated on at least 25 occasions. Opp. at 26. This argument is frivolous, as it is already established as a matter of law that use of an overview witness and opinion testimony about a defendant's guilt constitute plain and obvious error. *See Eiland*, 738 F.3d at 352–53; *Miller*, 738 F.3d at 373.

The Government's claim that it was *strategic* for Kenner to permit Agent Heuchling to opine about Michel's guilt and provide overview testimony based on inadmissible evidence defies reason. There is no conceivable benefit to eliciting an FBI agent's opinion about a defendant's

---

[13] Rule 14 also warranted severance. Joinder of the two schemes implicated all three types of prejudice that Rule 14 was meant to avoid: "1) the jury may cumulate evidence of the separate crimes; 2) the jury may improperly infer a criminal disposition and treat the inference as evidence of guilt; 3) the defendant may become 'embarrassed or confounded' in presenting different defenses to the different charges." *United States v. Gooch*, 665 F.3d 1318, 1336 (D.C. Cir. 2012). The lack of severance here led to substantial "criminal propensity prejudice," which would have been avoided if severed. *United States v. Burkley*, 591 F.2d 903, 919–20 (D.C. Cir. 1978).

guilt or to introducing damaging, and otherwise inadmissible evidence.[14] Nor does the Government address Kenner's needless elicitation of incriminating testimony, such as when Kenner referred to "the time period of the conspiracy" in a question posed to Higginbotham, or asked Agent Heuchling his opinion about when "Michel was violating the FARA laws," and whether it was a "fair statement" that "Michel was in violation of FARA." Def. Br. at 32–33. No effective trial counsel would needlessly elicit incriminating and inadmissible testimony from government witnesses—but Kenner did.

And, as the Government notes, Kenner also failed to object to the Court's co-conspirator hearsay rulings made in front of the jury—yet another example of his ineffectiveness.

6. <u>The Government does not dispute that Kenner failed to object to obvious hearsay, including the testimony of Matthew Pottinger.</u>

The Government does not dispute that Pottinger's testimony was virtually all inadmissible hearsay, and it admits that Pottinger "testified about information learned from others through the course of . . . meetings," Opp. at 27, which is textbook hearsay. The Government's failure to contest that Pottinger's prejudicial inadmissible testimony cited in Michel's brief was inadmissible hearsay concedes the point.[15]

---

[14] The Government's argument that Kenner could not have cross-examined Agent Heuchling about his investigation relating to Frank White unless Agent Heuchling first offered overview testimony and opinions of guilt on direct examination is a non-sequitur. Opp. at 26. Moreover, Kenner would have been better off not asking Agent Heuchling about White in the trial transcript pages cited by the Government, because the questions and responses did not support any legitimate defenses.

[15] Again, the Government tries in vain to frame Kenner's failure to object to hearsay as a strategic decision, so that he could cross Pottinger about whether the Chinese government had a direct line of communication with the Trump Administration about Guo's extradition, which would "undercut" the allegation that Broidy and Wynn were engaged in back-channel lobbying. Opp. at 27. But the transcript pages the Government cites consist only of more damaging hearsay from Pottinger suggesting the "lines of communication" between the Chinese government and the Trump administration may have resulted from Wynn's alleged back-channel lobbying of Trump. *See* Tr. 4/11/23 PM at 92.

7.  The Government's argument that Michel and Higginbotham's attorney-client privileged communications were subject to the crime-fraud exception or order is unsupported by the law and the order itself.

Michel demonstrated in his opening brief that Kenner failed to object to attorney-client privileged communications between Michel and his then-attorney, Higginbotham, that formed the basis of the Government's proof of willfulness under FARA. Def. Br. at 36–37. The Government's contention that the conversation was embraced by the crime-fraud exception and ruling is meritless, because the conversation was not in furtherance of a crime, let alone one identified in the crime-fraud ruling. *Id.* at 38.

To the contrary, Higginbotham purportedly recommended that Michel register under FARA, but did not say that Michel was required to register. *Id.* at 36–37. And even if Higginbotham had told Michel he was required to register, and Michel had dismissed Higginbotham's concerns, the D.C. Circuit held in *United States v. White*, 887 F.2d 267, 272 (D.C. Cir. 1989), that this type of conversation would still not be subject to the crime-fraud exception, because the legal advice was intended to prevent unlawful conduct, not promote it, even if Michel did not follow the advice. *See id.* at 37–38 n.34. The Government disregards this case in its brief. In any event, Michel did not himself engage in any unregistered lobbying—as the Government now appears to acknowledge in its Opposition to Michel's Motion for Judgement of Acquittal by failing to argue otherwise—foreclosing the Government's argument that the conversation was in furtherance of a FARA violation or any other crime. Michel had no duty to register.

Nor did the crime-fraud ruling embrace the privileged conversation, as the Government insists. The Government argues that the ruling applied to crimes "described in the government's motion," Opp. at 29, but neither the Government's crime-fraud motion nor the crime-fraud ruling even referenced FARA. *See* Exs. A & B (redacted and unredacted sealed versions). Rather, the crime-fraud motion and order related to alleged bank fraud committed by convincing banks to

open accounts (which is not bank fraud), and the alleged use of money embezzled by Low to make illegal campaign contributions—not alleged FARA violations. Exs. A & B.

The filter team should not have informed the prosecution team about the privileged conversation, and the prosecution team should not have introduced it at trial. Kenner was ineffective for not seeking to suppress the statement, and all fruits of the statement. At a minimum, he was ineffective in not objecting to the introduction of the privileged conversation at trial. His failure to object was severely prejudicial, since the privileged conversation was the sole basis for the Government's closing argument on the willfulness element under FARA. Def. Br. at 37.

### 8.   Kenner failed to object to other damaging, inadmissible evidence.

The Government fails to justify Kenner's failure to object to the introduction of one of the most prejudicial pieces of evidence—the 33-page mishmash of communications and screenshots found on Lum Davis's Google Drive (Ex. 474), for which the Government laid no proper foundation, and which was unfairly prejudicial. Def. Br. at 38–40. The Government asserts that Michel has not taken the position that an objection would be successful, Opp. at 28, but this is incorrect. The reason Kenner's failure to object was prejudicial is, of course, because the Court would have sustained an objection to such evidence. Indeed, a proper objection for lack of foundation, and under Rule 403, should have been sustained by the Court. As Agent Heuchling admitted, the identity of the senders and recipients was unknown, which invited the jury to speculate about the authenticity, authorship, recipient, or meaning of the communications. And the unfair prejudice was extraordinary, as the Government later argued that the messages were "between the co-conspirators" and at "the direction from the Chinese government" and Low. Def. Br. at 40. Kenner did not object, apparently because he had not reviewed the 33-page document in advance of trial, which, after apologizing, he observed was "quite a lengthy document," and he needed "time to review it." Tr. 4/13 AM at 91–92. This, too, was ineffective.

9. <u>Kenner failed to adequately prepare Michel for testimony</u>.

The Government argues that Kenner adequately prepared Michel for his testimony because Michel told the Court he would testify, and Kenner gave him "the topics he would ask me about," despite that Kenner and Michel "never went through questions and answers" ahead of the testimony. ECF No. 310-3 ¶ 11; *see* Opp. at 30. Merely providing topics for a direct examination does not prepare a defendant to testify about those topics, let alone for cross-examination. Kenner's failure to prepare Michel for his cross-examination was plainly ineffective.

## IV. *Cuyler* also requires a new trial because Kenner had two conflicts of interest that adversely affected his performance at trial.

### A. Kenner's use of an AI tool in which he appears to have had a financial interest adversely affected the closing argument.

The Government protests that, even if Kenner used an AI tool in which he had a financial interest to draft his closing arguments, it did not adversely affect the closing argument. But the Government fails to address the myriad ways in which the closing argument was ineffective, by missing every meritorious argument and defense and making only frivolous and unhelpful arguments. *See* Def. Br. at 22–24; *supra* § III.A. The Government's argument is meritless.

### B. Kenner also had a conflict of interest due to the contempt charges prosecutors filed one month before trial, which adversely affected his trial performance.

Kenner's conflict of interest due to the prosecution team's contempt motion accusing him of willfully leaking discovery to Bloomberg reporters, which Kenner essentially admitted, imposed great stress and distraction on him. Def. Br. at 43–44. It also incentivized him to curry favor with the prosecution and pursue an unaggressive defense, as Michel's conviction could help Kenner demonstrate a lack of harm caused by his misconduct in the contempt proceeding. *Id.* at 47–48.[16]

---

[16] The Government's argument that Michel told the Court he was satisfied with counsel, Opp. at 34–35, ignores that he was coached to say that by his conflicted counsel, Kenner, and he nevertheless made clear on the record, "I don't really understand." Def. Br. at 46. The Government

The Government's attempt to analogize these facts to the mine-run of cases where *a court* threatens a litigant with *non-criminal* sanctions or contempt is unavailing. Opp. at 32–33. The Government points to *United States v. Gray-Burriss*, 791 F.3d 50 (D.C. Cir. 2019), where the court threatened *sanctions* against defense counsel for "nonfeasance" due to missed deadlines and the like. The D.C. Circuit reasoned that "[t]he mere fact that a court has threatened an attorney with contempt is insufficient to" show a conflict of interest between the attorney and defendant, because "all attorneys potentially face contempt citations," and the concern of being cited for contempt, or "friction between trial counsel and the court," does not create a conflict. *Id.* at 63. The court added that the "nonfeasance" accusation would have given defense counsel "every incentive to showcase their most engaged and assiduous lawyering on [their client's] behalf." *Id.* The two other cases cited by the Government, *United States v. Shark*, 51 F.3d 1072 (D.C. Cir. 1995), and *United States v. Taylor*, 139 F.3d 924, 930 (D.C. Cir. 1998), follow this same fact pattern.

Here, unlike in *Gray-Burriss*, *Shark*, and *Taylor*, Kenner faced a *criminal* contempt motion filed by the *prosecution*—not a mere threat of sanctions or civil contempt by a court. These two distinctions are critical. That Kenner faced *criminal* contempt and imprisonment raised the stakes drastically above that which "all attorneys potentially face" in litigation. *Gray-Burriss*, 791 F.3d at 63. Kenner would have known that the prosecution team held his fate in its hands.[17] In addition, the fact that the *prosecution team* was inclined to prosecute Kenner, unlike the court threats in *Gray-Burriss*, *Shark*, and *Taylor*—meant that Kenner had motive to curry favor with the

---

suggests that the Court then clarified the conflict further for him, Opp. at 35, but that is not reflected in the record, and, in any event, Michel never stated that he understood.

[17] For this reason, the prosecution team should have immediately referred the matter to another office, rather than filing a contempt motion just before trial. That office would have likely waited until the trial was over before taking action against Kenner. Instead, the prosecution team invited a *Cuyler* defect by threatening opposing counsel with prosecution just before and during trial.

prosecution, pitting his interests against Michel's. If the Court alone had threatened contempt, any conflict would be far less potent because the Court is neutral and not itself seeking Michel's conviction, unlike the prosecution team. For that reason, Kenner's conflict was far greater than the purported conflicts in cases where the court threatens an attorney with contempt. Kenner naturally would assume that if he angered the prosecutors, or secured an acquittal, the prosecutors would be highly motivated to prosecute him for contempt. On the other hand, if Kenner provided an ineffectual defense and Michel were convicted, the prosecutors might treat Kenner more leniently, since the leaks did not ultimately impact the proceeding.

Although the Government contends that its mid-trial recusal from the contempt proceeding "ameliorated" the conflict, this recusal was too little, too late. Moreover, the conflict of interest survived the recusal. An acquittal would still be an aggravating factor in his contempt proceeding, while conviction would be a mitigating factor. And, the prosecutors were still the primary witnesses against Kenner in the contempt proceeding, still capable of determining his fate.[18]

## V.    The Government is not entitled to privileged documents.

Without filing a motion, the Government requests an order that Michel has waived privilege "over those communications and work product relevant to the defendant's many claims" and "requests copies of all documents relevant to the defendant's claims." Opp.at 36. Not so.

*United States v. Strake*r, 258 F. Supp. 3d 151, 155 (D.D.C. 2017), cited by the Government, rejects the Government's argument and request. The Government demands all documents relevant

---

[18] In fact, the Government's filing strongly suggests that Kenner is still operating under a conflict of interest and aiming to curry favor with the prosecution. The docket in the contempt proceeding indicates that the contempt prosecutors continue to investigate Kenner for the alleged leak, and the prosecutors have obtained four continuances to support its continued investigation. It is unclear from the docket if the prosecutors intend to bring charges beyond mere contempt. Meanwhile, Kenner's counsel appears to be cooperating with the prosecution in this case—still currying favor—as the prosecution indicates in its Opposition that Kenner's counsel notified the prosecution of a subpoena Kenner received just hours before the Government filed its Opposition.

to the ineffective assistance of counsel claims, citing Rule 1.6(e) of the D.C. Rules of Professional Conduct. But, as *Straker* points out, that rule merely authorizes former counsel to disclose certain materials, it does not require it. *See Straker*, 258 F. Supp. 3d at 155. *Straker* also found overbroad the same type of request the Government makes here, *i.e.*, for any documents "relevant" to or that "relate[] to the defendant's claims of ineffective assistance." 258 F. Supp. 3d at 156. The Court noted that "[a] lawyer's ethical confidentiality obligation under D.C. Rule 1.6 is not waived when a former client files an ineffective assistance of counsel claim," and the rule permits limited disclosure only when "reasonably necessary to respond to specific allegations by the [former] client concerning the lawyer's representation of the client." *Id.* (emphasis in original). Moreover, the Government fails to identify the specific areas in which it contends Michel has waived privilege through his ineffective assistance of counsel claims, and any waiver in this case would be extraordinarily limited (if at all). The bulk of Michel's claims arise from Kenner's on-the-record ineffective assistance of counsel, such as when he failed to object to inadmissible evidence and failed to develop and argue nearly every obvious defense. These arguments do not waive privilege. The Government fails to develop its waiver argument, or even identify what types of communications it contends should be waived, and its request should therefore be denied.[19]

## CONCLUSION

Michel was found guilty following a one-sided trial, in which his ineffective, conflicted attorney failed to present his main defenses, and the jury's verdict was tainted by the influence of two federal judges and substantial inadmissible evidence. The Government's allegations against Michel remain untested, and the Court should rectify that by granting him a new, fair trial.

---

[19] If the Government seeks specific documents maintained by the defense, it should identify those specific documents and request them, and the defense can determine whether the documents are privileged and/or whether it will seek a protective order.

Dated: November 13, 2023

Respectfully submitted,

 /s/ Peter Zeidenberg
Peter Zeidenberg (Bar No. 440803)
Michael F. Dearington (Bar No. 5223987)
David M. Tafuri (*pro hac vice*)
Sarah "Cissy" Jackson (*pro hac* vice)
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20006-5344
Telephone: (202) 857-6000
Facsimile:  (202) 857-6395
peter.zeidenberg@afslaw.com
michael.dearington@afslaw.com
david.tafuri@afslaw.com
cissy.jackson@afslaw.com

M. Scott Peeler (*pro hac vice*)
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas, 42nd Fl
New York, NY 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
scott.peeler@afslaw.com

*Counsel for Defendant Prakazrel Michel*