# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 19-148-1 (CKK) |
| | ) | |
| PRAKAZREL MICHEL (1), | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| Defendant. | ) | |

---

## DEFENDANT PRAKAZREL MICHEL'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION FOR JUDGMENT OF ACQUITTAL

M. Scott Peeler (*pro hac vice*)
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas, 42nd Fl
New York, NY 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
scott.peeler@afslaw.com

Peter Zeidenberg (Bar No. 440803)
Michael F. Dearington (Bar No. 5223987)
David M. Tafuri (*pro hac vice*)
Sarah "Cissy" Jackson (*pro hac* vice)
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20006-5344
Telephone: (202) 857-6000
Facsimile:  (202) 857-6395
peter.zeidenberg@afslaw.com
michael.dearington@afslaw.com
david.tafuri@afslaw.com
cissy.jackson@afslaw.com

*Counsel for Defendant Prakazrel Michel*

## <u>TABLE OF CONTENTS</u>

ARGUMENT ............................................................................................................... 1

    I.     Count 1 fails because there was insufficient evidence to prove that Michel conspired with Low to violate campaign finance laws. ......................................... 1

    II.    Counts 2 and 3 fail because there was insufficient evidence that Michel knowingly caused others to file false reports with the FEC. ................................. 6

    III.   Count 4 fails because there was insufficient evidence that Michel's statement to the FEC was false and intended to obstruct the FEC's investigation. ........................................................................................................ 8

    IV.   Count 12 fails because the evidence that Michel conspired to make false statements to banks does not violate the statute. ...................................................... 9

    V.    Count 10 fails because there was no evidence that Michel acted at the "direction or control" of the Chinese government. ................................................ 12

    VI.   Count 8 fails because Michel engaged in no lobbying himself, and therefore had no duty to register, and he did not aid and abet anyone else's failure to register. ........................................................................................................ 17

    VII.   Count 7 fails because there was insufficient evidence that Michel conspired with anyone to effect any of the charged objects of the conspiracy. ......................................................................................................... 19

         A.     Michel did not conspire with anyone to violate FARA. .......................... 19

         B.     There was insufficient evidence of an agreement between Michel and any alleged co-conspirator to lobby the Trump administration under the direction or control of the Chinese government. .................... 21

         C.     There was insufficient evidence to prove conspiracy to commit money laundering.................................................................................... 21

    VIII.  The Government's novel FARA conspiracy theory violates the *Gebardi* principle. .......................................................................................................... 23

    IX.   At a minimum, the verdict was against the weight of the evidence, warranting a new trial. ......................................................................................... 25

CONCLUSION.......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ciminelli v. United States*,
    598 U.S. 306 (2023)....................................................................................................5

*Gebardi v. United States*,
    287 U.S. 112 (1932)...................................................................................23, 24, 25

*Rosemond v. United States*,
    572 U.S. 65 (2014)....................................................................................................18

*United States v. Castle*,
    925 F.2d 831 (5th Cir. 1991) ..................................................................................24

*United States v. Concord Mgmt. & Consulting, LLC.*,
    347 F. Supp. 3d 38 (D.D.C. 2018) ..........................................................................4

*United States v. Cross*,
    766 F.3d 1 (D.C. Cir. 2013) .....................................................................................5

*United States v. Devoll*,
    39 F.3d 575 (5th Cir. 1994) ...............................................................................10, 11

*United States v. Doost*,
    3 F.4th 432 (D.C. Cir. 2021) ..................................................................................23

*United States v. Hsia*,
    176 F.3d 517 (D.C. Cir. 1999) .................................................................................7

*United States v. Krilich*,
    159 F.3d 1020 (7th Cir. 1998) ...............................................................................11

*United States v. Loutos*,
    284 F. Supp. 2d 942 (N.D. Ill. 2003) .....................................................................10

*United States v. Manafort*,
    318 F. Supp. 3d 1 (D.D.C. 2018)............................................................................22

*United States v. Rafiekian*,
    991 F.3d 529 (4th Cir. 2021) ..................................................................................13

*United States v. Swanquist*,
    161 F.3d 1064 (7th Cir. 1998) ...............................................................................10

*United States v. Zeigler*,
994 F.2d 845 (D.C. Cir. 1993) ................................................................................3, 7

**Statutes**

18 U.S.C. § 2 ...............................................................................................................6

18 U.S.C. § 1001 .........................................................................................................6

18 U.S.C. § 1014 .............................................................................................9, 10, 11

18 U.S.C. § 1519 .........................................................................................................6

18 U.S.C. § 1956 ..................................................................................................21, 22

22 U.S.C. § 611 .........................................................................................................17

**Other Authorities**

11 C.F.R. § 104.8(c) ...................................................................................................7

Fed. R. Crim. P. 12 ...................................................................................................23

Press Release, U.S. Entertainer Convicted of Engaging in Foreign Influence
Campaign, Dept. of Justice (Apr. 26, 2023),
https://www.justice.gov/opa/pr/us-entertainer-convicted-engaging-foreign-
influence-campaign ...................................................................................................5

The Government's Opposition to Michel's Motion for Judgment of Acquittal relies on a plethora of cherry-picked transcript citations and trial exhibits in a vain attempt to support the jury's verdict. Upon close inspection, however, the Government's reliance on those citations and trial exhibits is misplaced, as they do not establish what the Government claims they do. The Government's failure to rebut the arguments in Michel's Motion for Judgment of Acquittal confirms that the Court should grant the motion.

## ARGUMENT

I.   **Count 1 fails because there was insufficient evidence to prove that Michel conspired with Low to violate campaign finance laws.**

Count 1 alleged a conspiracy between Michel and Low to violate federal campaign finance laws by funneling millions of dollars of Low's money to straw donors who then contributed the money to the Obama reelection campaign so that Michel and Low could "gain access to, and influence with" then-President Obama. ECF 84 ¶ 22. While there was abundant evidence that Low wired funds to Michel, and that Michel then gave the funds to others to donate to the Obama campaign, there was a complete lack of evidence of any agreement between Low and Michel to do this, much less evidence that Low acted "knowingly and willfully" in order to evade campaign finance laws that prohibit contributions by foreigners. None of the evidence cited by the Government fills this chasm.

Tellingly, the Government *does not deny* that it misled the jury into thinking that Low was aware of the prohibition on foreigners making campaign contributions. *See* Def. Br. at 5–8. As Michel's opening brief established, the prosecutor and case agent gave the false impression that Low had received an invitation to an Obama fundraiser from Joel Rousseau on June 10, 2012, the second page of which included the prohibition on foreigners making contributions and would have made Low aware of the prohibition, when in fact Rousseau had removed the second page with the

prohibition before sending the invitation to Low (Ex. 291). *Id.* Michel's opening brief dedicated four pages to explaining how the prosecutor and case agent tricked the jury in this way (which they could do only because defense counsel was inattentive and unfamiliar with the evidence). *Id.* That the Government misled the jury about this evidence was especially damaging because, not only did it give the jury the false impression that Low was aware of the prohibition on foreign contributions, but it concealed the exculpatory nature of the evidence, *i.e.*, that Rousseau had deliberately *prevented* Low from knowing about the prohibition—the obvious reason being that Low was unaware of the prohibition and would not have contributed if he knew it was illegal. By failing to address Michel's argument, the Government concedes that it misled the jury in this way.[1]

The Government's reliance on Rousseau's May 29, 2012 email to Low asserting that Low could lawfully donate to a Super PAC through a U.S. corporation even as a foreigner, Ex. 290, is of no help to the Government and instead supports acquittal. Rousseau led Low to believe that his contributions were lawful by advising Low that "being a foreigner is not a problem as long as u owned corporation in US . . . All donation can be made to the Super Pack [*sic*] and it can be unlimited." Ex. 290. There is no reason that a foreign national such as Low would have read this email as an indication that it would be illegal for Low to make the contributions, rather than Rousseau's approval of the contributions as legitimate. Indeed, neither Rousseau nor anyone else advised Low, who would be unfamiliar with arcane U.S. campaign finance laws, that because he was a foreign national, he could not contribute to an election campaign. As noted above, Rousseau instead removed the page of the Obama fundraiser invitation he sent to Low that would have included the prohibition (Ex. 291). Rousseau's May 29, 2012 email, particularly when reviewed

---

[1] Even if the Court were to deny the Motion for Judgment of Acquittal on Count 1, the Government's concession that it manipulated key evidence on this count at a minimum warrants a new trial.

with his June 10, 2012 email, was part of an effort to mislead Low into thinking that he could lawfully make campaign donations so that Low would continue contributing.[2]

The Government's reliance on testimony from Leonardo DiCaprio that "[Low] mentioned in passing that he or possibly a group of other partners of his were going to give a significant contribution to the Democratic party[,]" Tr. 4/3 AM at 93; *see* Opp. at 2, also supports acquittal. Far from evidencing criminal intent, this evidence rebuts the argument that Low believed his conduct was wrongful. Low would not casually mention to an acquaintance, in a public setting, his intent to engage in a criminal conspiracy to violate U.S. campaign finance laws. To the contrary, this offhand remark strongly suggests that Low thought such contributions were lawful.

Nor does the fact that Rousseau told Low that making contributions to the Obama campaign would enable him to meet President Obama suggest anything nefarious. Opp. at 2–3. Most people who contribute significant sums to political campaigns or PACs are interested in meeting the politician, which explains why politicians attend fundraisers in person in order to "press the flesh." Low's reasons for contributing do not evince a knowledge and intent to evade campaign finance laws.

The Government also claims that Low's willfulness is demonstrated "by his efforts to conceal himself as the source of the contributions," *id.* at 4, but it points only to communications that did not involve Low. The Government points to a June 19, 2012 email string that Low was

---

[2] The Government's contention that "[i]f Low had believed that he could make the contributions himself—as a foreigner—there would have been no reason for him to funnel the money through Michel," Opp. at 3, amounts to rank, self-serving speculation. *See United States v. Zeigler*, 994 F.2d 845, 850 (D.C. Cir. 1993) (reversing conviction because "[o]nly speculation supports [defendant's] conviction"). This speculation also ignores the most obvious reason for Low's contributing through others, which is for convenience, and because Michel had the access and contacts to contribute to the fundraiser and coordinate access to President Obama on Low's behalf.

3

not privy to, Ex. 294, and the Government does not explain how an email that Low did not send or receive is indicative of Low's state of mind, much less how it evinces his effort at concealment. So too with the April 5, 2013 letter from Tan to Michel, which the Government characterizes as an agreement "to falsely claim that the money for the political contributions was a 'gift' to Michel from Tan." Opp. at 4 (citing Ex. 107). But the letter, just like the June 19th email, does not involve Low; it is a letter from Tan to Michel. Again, the Government does not explain how a letter from Tan to Michel is proof of a conspiratorial agreement between Michel and Low, in which Low knew and intended to violate U.S. campaign finance laws.

The Government's fallback argument—that even if the evidence of Low's willfulness is lacking on the FECA objects, the mens rea standard is lower for the conspiracy to obstruct the FEC, Opp. at 5—fares no better. The Government relies on *United States v. Concord Management & Consulting, LLC.*, 347 F. Supp. 3d 38, 53 (D.D.C. 2018), for this argument, but ignores *Concord*'s ruling that even if willfulness is not required, "the government must, at a minimum, show that [the conspirators] knew what 'lawful governmental functions' it was allegedly impeding or obstructing." *Id.* at 56. Thus, the Government's failure to prove Low's knowledge or intent to obstruct the FEC is fatal to Count 1. There was no evidence that Low ever agreed to violate campaign finance laws by participating in a conduit scheme, and the Opposition points to nothing in the trial record that demonstrates that Low was aware of the conduit scheme and agreed to participate in it. Therefore, Count 1 fails as a matter of law.

In another stunning retreat, the Government stakes out a new theory that Michel conspired with Rousseau, rather than Low. But the Government charged Michel with conspiring with Low, alleging that "the object of the conspiracy was for MICHEL and LOW to gain access to, and influence with, [then-President Obama] and his administration, by secretly funneling money from

Low through Michel." ECF No. 84 ¶ 22. The Indictment also alleged that only "MICHEL and

LOW carried out the conspiracy." *Id.* ¶ 23. In fact, the Indictment refers to Rousseau merely as

"Associate A," confirming that he and his role were known to the grand jury, but the grand jury

did not identify him as a co-conspirator. And at trial, the Government made clear its theory that

Low and Michel conspired together, driving this point home in its closing:

> What was this about? It was about President Obama. It was about fundraising. It's
> about Jho Low, Pras Michel. And you see the multiple references here to donations,
> political contributions. And what is exactly here at the bottom about what Jho Low
> can get out of it? At the bottom there, it's about an audience with President Obama.

Tr. 4/20 AM at 19. Were there any doubt, the Government issued a press release immediately

following the verdict, with quotes from the case agents, in which it stated: "Michel also conspired

*with Low* to orchestrate and conceal a foreign and conduit contribution scheme in which they

funneled millions of dollars of Low's money into the 2012 U.S.," with no reference to Rousseau.[3]

The Court should reject the Government's invitation to accept the verdict on Count 1 based

on an alternative theory—a conspiracy between Michel and Rousseau, with no identified object—

that was not alleged in the Indictment or even advanced at trial. *Ciminelli v. United States*, 598

U.S. 306, 316–17 (2023) ("With profuse citations to the records below, the Government asks us to

cherry-pick facts presented to a jury charged on [one] theory and apply them to the elements of a

different … theory in the first instance. In other words, the Government asks us to assume not only

the function of a court of first view, but also of a jury. That is not our role. Accordingly, we decline

the Government's request to affirm Ciminelli's convictions on alternative grounds"). This would

also constitute a fatal variance from the Indictment, further requiring reversal. *United States v.*

---

[3] Press Release, U.S. Entertainer Convicted of Engaging in Foreign Influence Campaign, Dept. of Justice (Apr. 26, 2023), https://www.justice.gov/opa/pr/us-entertainer-convicted-engaging-foreign-influence-campaign.

*Cross*, 766 F.3d 1, 5 (D.C. Cir. 2013) (holding that a "variance would, of course, be prejudicial if there were insufficient evidence for a reasonable jury to find Cross guilty of the conspiracy charged in the indictment beyond a reasonable doubt").

The Government's pivot to a new uncharged theory betrays the weakness of its charged theory, which must be reversed due to the insufficient evidence that Low acted knowingly, willfully, and/or with intent to obstruct campaign finance laws, belying the charged conspiracy.

## II.    Counts 2 and 3 fail because there was insufficient evidence that Michel knowingly caused others to file false reports with the FEC.

Counts 2 and 3 alleged that Michel caused the Obama Victory Fund to report falsely to the FEC the names of straw donors as being the true source of the contributions, in violation of 18 U.S.C. §§ 1519, 1001(a)(1), and 2. ECF No. 84 ¶¶ 76–78. While there was evidence that Michel gave money to others who then donated those funds to the Obama Victory Fund, which reported these donors as the true source of the funds, the Government cites no evidence for its contention that "Michel caused the Obama Victory Fund to misattribute the contribution to the straw donor." Opp. at 7. The absence of this evidence is fatal to Counts 2 and 3.

Despite immunizing and calling the conduit contributors to testify, the Government never asked any of them what, if anything, Michel told them to report to the Obama Victory Fund about the source of their funds. And despite eliciting much testimony about the donor cards that each donor supposedly received at the two fundraisers at issue, the Government did not ask Eric Feigenbaum, the Obama Campaign fundraiser, whether the cards were, in fact, filled out, collected, or what they indicated. Without knowing this information, it is not possible to conclude, beyond a reasonable doubt, that Michel "caused" any false statements to be made.

That "Michel was aware of the campaign committee's reporting requirements" and had received copies of the "donor forms that explained the committee's federal legal obligation to

report all contributions over $200," Opp. at 7–8, is of no help to the Government. The question is not whether Michel was aware of the Committee's reporting requirements; the question is whether Michel caused the Committee to make false statements. The only reason the Government would not have asked the alleged straw donor witnesses whether Michel told them to respond to the questions on the donor cards by indicating that they were the source of the contributions is that he did not do so. A conviction cannot be based on speculation that Michel caused the straw donors to indicate that they were the source of the contributions or that they did so. *Zeigler*, 994 F.2d at 850.

The Government's reliance on *United States v. Hsia*, 176 F.3d 517, 523 (D.C. Cir. 1999), is misplaced. In *Hsia*, the court concluded on motion to dismiss that the allegation that the defendant instructed straw donors to write checks and the defendant herself then "forwarded the checks to the campaign," and "instructed others to solicit the straw donors but conveyed the checks to the committee herself," was sufficient to state the causation element and survive dismissal. *Id.* at 521. The court cited an FEC regulation stating that "[a]bsent evidence to the contrary, any contribution made by check, money order, or other written instrument shall be reported as a contribution by the last person signing the instrument prior to delivery to the candidate or committee." *Id.* at 523 (citing 11 C.F.R. § 104.8(c)). Thus, the allegation that the defendant interposed on conduits "to sign the checks," and then passed them directly to the campaigns herself, was sufficient at the motion to dismiss stage to allege causation. *Id.*

The *Hsia* decision is inapposite. *Hsia* held that the allegations were sufficient to survive motion to dismiss because, unlike here, the defendant herself required the straw donors to sign checks and then the defendant submitted the checks to the campaign, which, absent other evidence, would have assumed that the signatories of the checks were the contributors based on 11 C.F.R. § 104.8(c). *Id.* Here, in contrast, Michel did not collect and submit checks from the straw donors to

the campaigns, and he was not privy to the way in which the donors contributed or what information they provided to the campaigns. In fact, the Obama Campaign fundraiser, Eric Feigenbaum, did not even testify that the campaign looked at contributor checks to identify the source of the donations. Rather, he testified that the "primary way" the campaign identified the source of contributions was by reviewing the "donor forms," and if there was no donor form, the campaign would "get the information either at the event or after the fact, for example, by reaching out to the donor directly." Tr. 3/31 PM at 12. In these circumstances, the Government had to prove that Michel required the donors to indicate on their donor forms or otherwise inform the campaign that each was the true source of the contribution. The Government introduced no such evidence, presumably because it did not exist. The absence of evidence to prove beyond a reasonable doubt that Michel caused the campaign to make false statements to the FEC requires reversal on Counts 2 and 3.

### III.   Count 4 fails because there was insufficient evidence that Michel's statement to the FEC was false and intended to obstruct the FEC's investigation.

Count 4 alleged that Michel made a false statement to the FEC in a 2012 declaration in response to allegations in a private complaint, Ex. 243, when he stated that he had no reason to conceal that two contributions that SPM Holdings LLC (SPM) made to Black Men Vote (BMV) were attributable to him. Def. Br. at 11–13; *see* Ex. 245. This was true. Michel wanted credit for the contributions, and he had no reason to conceal his identity from the FEC, which is why he publicly made two other contributions to BMV worth $350,000 in his own name. *Id.* The Government acknowledges that the issue investigated by the FEC was whether Michel "anonymize[d] himself" as the source of contributions to BMV, and not whether he anonymized Low as a source of contributions, Opp. at 8, and it does not dispute Agent Heuchling's concession that the FEC was investigating "allegations that were different and distinct from those in this

case.," Tr. 3/30 PM at 62. The Government refuses to acknowledge, however, that Count 4 conflated Michel's statement that he had no reason to conceal *himself* from the FEC with a statement that Michel had no reason to conceal *Low* from the FEC—when Michel never made the latter statement, which was outside the scope of the complaint and the FEC's investigation.

The Government devotes the bulk of its response to arguing that the letter drafted by Michel's attorneys and sent to the FEC was false—rather than the declaration itself. Opp. at 9 ("Michel's attorneys submitted a response to the FEC providing, *inter alia,* that '[n]one of SPM Holdings' income consisted of any funds transferred by Mr. Michel or from any other individual, let alone such transfers for the purpose of making political contributions.'"). While it is understandable that the Government seeks to shift attention away from the declaration statement charged in Count 4, the Indictment does not allege that the attorney letter was false; it alleges that Michel's declaration was false, when in fact it was not. ECF No. 84 ¶ 80.

Even if the statement were false, moreover, it could not have obstructed the FEC's investigation because, in 2015 neither the FEC nor DOJ was investigating Michel's relationship with Low, or whether Low was funneling money to Michel. As noted, the Government does not dispute Agent Heuchling's concession at trial that the FEC was investigating "allegations that were different and distinct from those in this case[.]" Tr. 3/30 PM at 62. Therefore, even if Michel's declaration could be construed as stating that he had no reason to conceal where *he* obtained funding, such a statement would not have interfered with the FEC's investigation into whether SPM's contributions should have been attributed to Michel instead of SPM.

## IV.   Count 12 fails because the evidence that Michel conspired to make false statements to banks does not violate the statute.

As demonstrated in Michel's opening brief, 18 U.S.C. § 1014, applies only to false statements made "for the purpose of influencing in any way the action of" an FDIC-insured bank

"upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor." The Government's attempt to apply this statute to misrepresentations made in "account opening documents" fails because § 1014 does not apply to such misrepresentations; it "applies only to actions involving lending transactions." *United States v. Devoll*, 39 F.3d 575, 580 (5th Cir. 1994).

The Government's claim that misrepresentations made "to persuade banks to open and maintain accounts" satisfies § 1014 is without support. The Government's reliance on *United States v. Loutos*, 284 F. Supp. 2d 942 (N.D. Ill. 2003), for the proposition that § 1014 proscribes *any* false statement to a bank made with the intent to influence a federally insured bank is misplaced. Opp. at 11. *Loutos* involved a defendant who, after pleading guilty, sought to withdraw his guilty plea to a § 1014 count. In rejecting this effort, the district court gave cursory consideration to the defendant's claim of actual innocence and gave a truncated list of the elements of § 1014 that omitted any reference to the types of transactions to which it applied. *Id.* at 961. But the cases relied on by the district court in *Loutos* make clear that § 1014 has been consistently held to apply only to lending-related activities.

For example, in *United States v. Swanquist*, 161 F.3d 1064 (7th Cir. 1998), a precedent to which *Loutos* would have been required to adhere, and which was cited by *Loutos*, the Seventh Circuit affirmed a conviction for § 1014 because the jury was properly instructed that it had to find that the alleged false statement to a federally insured bank was made "with the intent to influence the action of the financial institution in *issuing, approving,* or *renewing* loans." *Id.* at 1076. As noted, *Devoll* also rejected the Government's claim "that section 1014 does not require proof that

a false statement was for the purpose of influencing a financial institution in connection with its lending activities . . . We reject that interpretation and conclude, as previously noted, that *section 1014 applies only to actions involving lending transactions*." *Devoll*, 39 F.3d at 579–80 (emphasis added).

The only other case the Government cites, *United States v. Krilich*, 159 F.3d 1020 (7th Cir. 1998), is easily distinguishable. In *Krilich*, the defendant caused others to make false statements to a federally insured bank "so that he could tap bond proceeds held in trust by banks . . . Krilich's statements . . . were designed to induce a financial institution to disburse money, so they are within the reach of § 1014." *Id.* at 1028. Here, in contrast, there was no such attempt to "induce a financial institution to disburse money." Instead, the Government claims that "lie[s] about the reason that [a] prior bank closed Michel's accounts, and [ ] false representations about the purpose of the desired accounts and the activities of the related businesses" fall within the ambit of § 1014. There is no support for such a sweeping interpretation of § 1014. No court has ever adopted the Government's tortured interpretation of § 1014 in the 75 years since the statute was enacted, and this Court should not be the first.[4]

---

[4] Without citing any authority, the Government argues in a footnote that Michel's insufficiency argument should be "construed" as an untimely motion to dismiss. Opp. at 10 n.3. But Michel does not move to dismiss Count 12; he moves for judgment of acquittal on Count 10, based on insufficiency of the evidence, which is a different standard than the motion to dismiss standard. Moreover, Count 12, contrary to the evidence at trial, alleged language from the statute that signified lending activities. *See* ECF No. 84 ¶ 159 (alleging that Michel conspired to make false statements to banks to influence, *inter alia*, a "loan, and insurance agreement and application for insurance and a guarantee, and any change and extension of any of the same" – language that tracks the statute). In any event, the Government fails to adequately develop its argument in the footnote and has therefore waived its argument.

**V.     Count 10 fails because there was no evidence that Michel acted at the "direction or control" of the Chinese government.**

The Government failed to introduce evidence that Michel agreed to act at the "direction or control" of the Chinese government, requiring acquittal on Count 10. The Government was required to prove that Michel "acted pursuant to an agreement to operate subject to the direction or control of the PRC and that the PRC or a PRC official or officials directed or controlled the person's actions." Tr. 4/24 AM at 87. The Government failed to do so because the evidence showed unequivocally that Michel and the other co-conspirators were working at the direction or control only of Low, not the Chinese government. None of the snippets of testimony or trial exhibits cited by the Government establish the requisite "direction or control." Instead, they show that Michel, Broidy, and Higginbotham were working for Low to accomplish tasks that Low identified. It was Low that paid for this effort, and it was Low that Michel and Broidy were trying to satisfy—not anyone from the Chinese government. To the extent that Michel sought to convey signs of progress to the Chinese embassy, it was in order to mollify Low so that he would continue to fund these efforts.

As Michel's opening brief detailed, the Government's key cooperating witness, Elliott Broidy, testified that he attended the meeting with a possible Chinese government official, Sun Lijun, because he understood doing so was "part of my engagement with Jho Low." Tr. 4/4 AM at 91. Broidy's testimony was explicit that he was working at the direction of Low, and if Low wanted him to meet with a Chinese government official, he felt compelled to comply. Broidy agreed to try and assist Sun in arranging meetings in Washington, D.C. because this was part of his agreement with Low. *Id.* And Broidy's testimony about this meeting made clear that he received no "direction" from Sun. Instead, Sun "asked if [Broidy] could be helpful in trying to

ensure that [Sun] receives [ ] meetings" and then spoke "generally" about Guo's extradition and

why it was warranted. *Id.* The Government fails to address any of this testimony.

Under direct examination by the Government, Broidy made clear that it was Low whose

direction he worked under:

> Q: Did you understand that in exchange for assisting in those efforts to extradite this Chinese
> individual, that you could potentially receive more money from Jho Low?
> A: I think Nickie said they might throw us a bone or something if we – that Jho Low might.
> Q: And did you understand that throwing you a bone, as you just testified, to mean Mr. Low
> would provide you more money in assisting on the Guo extradition?
> A. Yes.
> Q. Did you understand the Guo extradition to also be important to Mr. Low?
> A. Definitely.

Tr. 4/4 AM at 47–48.

And even if Broidy had mixed motives in trying to help Sun arrange meetings in

Washington, that would not equate to his working subject to the "direction or control" of the

Chinese government. A person "does not become an 'agent' for purposes of § 951 simply by acting

in accordance with foreign interests." *United States v. Rafiekian*, 991 F.3d 529, 541 (4th Cir. 2021).

And if there were any doubt as to who directed Broidy's actions—Low or the Chinese

government—it is resolved by Broidy's Statement of Offense, a document drafted by the

prosecutors in this case and filed as part of Broidy's plea agreement. That Statement of Offense

made explicit that "BROIDY, Davis and [Michel] also agreed to lobby the Administration and the

DOJ to arrange for the removal and return of [] PRC National [Guo] . . . ***on behalf of a Foreign

National [Low].***" Ex. 532 at 1 (emphasis added). Thus, Broidy viewed himself as working only

on behalf of Low, not the Chinese government, which is critical because Broidy was the one with

access to lobby the Trump Administration.

There is no ambiguity here: Broidy testified that he lobbied DOJ and the administration at

the direction of Low, and the Government—at least at the time of Broidy's plea agreement—

agreed. It was not until post-trial briefing, when the Government realized the glaring lack of evidence of Chinese government direction or control, that it scrubbed the record in an attempt to cherry-pick stray remarks and exhibits to try and salvage this Count. That post-hoc attempt is unavailing.

The Government points to the following transcript cites as evidence that Michel and Broidy worked under the direction or control of the Chinese government:

- Tr. 4/19 AM at 36–38, 37, 39–41: Meeting with Sun in Shenzhen, China, attended by Michel, Broidy, and Davis where, the Government contends, "Michel agreed to help persuade the United States government to send" Guo back to China. Opp. at 12. The Government overlooks the most critical point of this meeting—why it occurred in the first place. In its cross-examination of Michel, the Government established that this meeting occurred only because Low wanted it to happen: "Q: And you agreed to meet with Vice Minister Sun Lijun *because Low asked you to. Right?* A. Correct." Tr. 4/19 AM at 36–38 (emphasis added). The fact that Michel and Broidy agreed to help Sun secure meetings with U.S. government officials does not answer the critical question of *why* they agreed to assist. Their help was not because they had to take direction from the Chinese government; it was because they had a business arrangement with Low and agreed to help Low with the 1MDB forfeiture case and the extradition of Guo. If Low wanted them to meet with a Chinese official, they felt obligated to do so. They worked subject to Low's direction or control, not Sun's or the Chinese government's.

- Tr. 4/6 AM at 63: The Government cites this excerpt from Higginbotham's direct testimony as evidence that purports to demonstrate the Chinese government's direction or control of the alleged co-conspirators; in reality, it shows the opposite. Higginbotham describes how Michel explained to him the Chinese government's interest in the extradition of Guo, and the fact that this would be a potentially "lucrative" engagement. But Higginbotham made clear that "the success fees that were referenced in the contracts that we've gone over dealt with the return of Guo Wengui." Tr. 4/6 AM at 64. In other words, Higginbotham testified that they were contractually obligated to Low to try to secure Guo's return to China, and their success fee from Low was contingent on their ability to perform. Again, this demonstrates that they were working for Low, not the Chinese government.

- Tr. 4/6 AM at 46–47: This excerpt pertains to Broidy's description of the meeting in Shenzhen, attended by Broidy, Michel, Low, and Sun. Broidy, as indicated above, attended this meeting because he understood it to be "part of my engagement with Jho Low" and agreed to assist Sun to try to secure meetings in Washington, D.C. Given that Broidy testified that he only attended the meeting because of his obligation to Low, this excerpt offers no support for the Government's contention that it was actually the Chinese government under whose direction he worked.

- Tr. 4/19 AM at 43: The Government does not explain how Michel's testimony that he was "trying to help" himself by assisting with the Guo extradition provides proof beyond a reasonable doubt that he was working under the direction or control of the Chinese government.

- Tr. 4/19 AM at 37, 41–43: The government points to this excerpt of Michel's cross-examination to show that Michel assisted Sun by "relaying informations [*sic*] back and forth . . . and requested a meeting the FBI agent assigned to the Guo matter to selectively disclose information about Michel's contacts with Vice Minister Sun." Opp. at 13. But, once again, the Government omits *why* he had agreed to meet with Sun: "Q. And you agreed to meet with Vice Minister Sun Lijun because Mr. Low asked you to. Right? A. Correct." Tr. 4/19 AM at 37. Again, it is clear that Michel agreed to meet with Sun and to assist him was because he was told to do so by Low. All of this conduct was part of Michel's and Broidy's agreement with Low, and their success fee was to be paid by Low.

- Tr. 4/19 AM at 44–45: The Government posits that the fact that Michel sent Higgingbotham into the Chinese embassy to report on the progress on the Guo extradition helps demonstrate the Chinese government's direction or control over the co-conspirators. But Higginbotham did not receive any direction from anyone in the embassy. To the contrary, Higginbotham testified that Michel wanted his DOJ business card because "Jho Low is someone who was very impressed by images and appearances. . . . And having my business card and showing that I was working for the Department of Justice would be – he would be impressed by that." Tr. 4/6 AM at 67. It was Low that Michel sought to impress, not the Chinese government, who were not shown the business card. And when asked why Michel wanted him to visit the Embassy, Higginbotham made clear it was done in an attempt to placate Low: "Q. Why did Mr. Michel tell you -- or what did Mr. Michel tell you about why he wanted you to go meet with the Chinese ambassador? A. Well, I'm not exactly sure the exact dollar amount of money that had come in up until this point in time, but money had started flowing from Jho Low on these two matters, and there hadn't been any progress in the extradition of Jho Low [sic]. And so it was to make the Chinese ambassador feel more comfortable that work was actually taking place and progress was taking place with the extradition of Guo." *Id.* The Government's cross-examination of Michel made clear that it understood that the meeting was done in order to placate Low: "Q: So the day after that, when the deadline was missed, when Guo had not been sent back to China, you send George Higginbotham to meet with the Chinese Ambassador. Right? Yes. Q. To deliver the message that the National Security Council was working on the deportation of Guo. Right? A. Based on the message I got from Elliott Broidy. Q. And Mr. Low told you that he was happy about that meeting. Right? A. I don't remember if he was happy or not." Tr. 4/19 AM at 45. Clearly the Government had evidence to indicate that the outcome of this meeting was conveyed to Low and Low was pleased. Most importantly, Higginbotham simply reported that the administration "was working towards the extradition of Guo Wengui, and that it was going to happen presently." Tr. 4/6 AM at 67. Higginbotham did not testify that he received any directions from anyone at the Embassy.

- Tr. 4/19 AM at 41: This excerpt purportedly demonstrates that Michel, Broidy, and Davis worked together on the Guo extradition. But that the three worked cooperatively is not in

dispute; what is in dispute is whether they worked at the "direction or control" of the Chinese government, and on this point, the excerpt is of no help to the Government.

- Tr. 4/4 AM at 141–42; Tr. 4/11 PM at 81: These citations concern Broidy's lobbying efforts with the Trump administration, and how he enlisted Steve Wynn to assist by lobbying then-President Trump. Again, these references do not advance the Government's argument. There is no dispute that the administration was lobbied to extradite Guo; the question was whether this was done at the direction or control of the Chinese government, and these excerpts shed no light on that question.

The trial exhibits cited by the Government offer no more support than the transcript excerpts.

- Ex. 145 at 1; Ex. 297 at 41–42; Ex. 395; Ex. 474 at 21: The Government makes no attempt to explain how any of these exhibits touch even remotely on the question of direction or control. They are all evidence of the lobbying efforts, but those efforts are not in question; the question is whether the efforts were performed under the direction or control of the Chinese government. They were not.

- Ex. 474 at 31: This is part of the exhibit, taken from Lum Davis's Google Drive account, which is comprised of photos, screenshots and text messages. This message, from "T1freedom"— whom Agent Heuchling was unable to identify but whom the Government appears to believe is Low—appears to be evidence of Low's growing desperation and frustration that Michel has been unable to effectuate the extradition of Guo. Even if *Low* was hoping to please the Chinese government and was growing increasingly concerned about a lack of progress on the Guo matter, this exhibit is not evidence that Michel, Broidy, or Davis were working under Chinese government direction or control.

- Ex. 395: This is a document purportedly "prepared by the PRC government advocating for the return of  Guo and provided to Broidy and Lum Davis to be passed on to the President of the United States." Opp. at 13. Again, it is undisputed that the Chinese government sought the return of Guo to China. The question is whether Michel or Broidy worked under the direction or control of the Chinese government, or whether the direction came from Low. As the accompanying excerpt cited by the Government makes clear, Exhibit 395 was given to Michel not by an agent of the Chinese government, but by Low: "Then Jho Low sent me what you have right now and I passed it over to Elliott – to Nickie, and then Nickie passed it to Elliott Broidy." Opp. at 13–14. The Government offers no explanation why, if Michel had been working at the direction or control of the Chinese government, it was Low that passed this document to Michel, and not a Chinese government official.

Unable to identify any portions of the trial record to support its position, the Government ultimately reverts to a series of eye-popping *ipse dixit* assertions that would certainly clinch its case *if there was record support* for any of them. But for none of these bald assertions does the government reference a single citation to the record that supports the assertion. Instead, the

Government peppers its brief with damning assertions, such as: "Michel and his co-conspirators knew unmistakably that they were working for the PRC government"; "They took direction from Sun and the PRC government in exchange for future payment"; "Broidy's ultimate agreement to act at the direction or control of the PRC government is dispositive"; and "Michel and his co-conspirators . . . agreed to work at Sun's direction." Opp. at 14–15. Yet there is not a single citation to the trial record that supports any of these assertions. Instead, these naked assertions demonstrate the paucity of evidence of the question of direction or control.

## VI.   Count 8 fails because Michel engaged in no lobbying himself, and therefore had no duty to register, and he did not aid and abet anyone else's failure to register.

Michel argued in his opening brief that he did not have to register under FARA because he did not personally lobby anyone in the Government, nor did he aid and abet anyone else's failure to register. Def. Br. at 29–31.

Although the Government contends that Michel acted as an "agent" of Low within the meaning of FARA, and contends that he was therefore required to register, the Government makes the dispositive concession that Michel himself did not *personally* engage in the lobbying activities that would have required him to register, and thus he certainly did not willfully fail to register. *See* Opp. at 16–17. Indeed, the Government does not dispute Michel's contention that he neither "engage[d] within the United States in political activities for or in the interests of [Low]," or "within the United States represent[ed] the interests of such foreign principal before any agency or official of the Government of the United States." 22 U.S.C. § 611(1)(i), (iv); *see* Opp. at 17 (referring to Michel's role in the lobbying as "indirect"). The Government's concession contradicts the allegation in the Indictment that Michel himself personally engaged in lobbying. ECF No. 84

¶ 151.[5] This concession also means that the Government must retreat to a theory that Michel aided and abetted Broidy's and Lum Davis's alleged failures to register under FARA.

The Government's contention that Michel aided and abetted Broidy's and Lum Davis's alleged failure to register is deficient because it merely recounts evidence that Michel enlisted Broidy to lobby the administration on behalf of Low. Opp. at 17. It describes at length how Michel brought Broidy and Davis to meet Low and contends that Michel acted as a "facilitator" between Low, Lum Davis, and Broidy. *Id.* at 18. But the Government points to no evidence that Michel aided and abetted Broidy's and Davis's failure to register under FARA. Even accepting *arguendo* that Michel was aware that Broidy should have registered, mere awareness of another's failure to register does not mean one "aided and abetted" that failure.

Indeed, in another critical concession, the Government does not dispute that to prove that Michel aided and abetted Broidy's or Lum Davis's alleged FARA violations, it had to prove that Michel *intended* for Broidy or Lum Davis to *not* register under FARA, willfully, and that it failed to prove this fact beyond a reasonable doubt. *See* Def. Br. at 23–24; *accord Rosemond v. United States*, 572 U.S. 65, 76 (2014). Indeed, the only purported evidence of willfulness the jury was pointed to was the testimony of Higginbotham, who, as recounted in Michel's opening brief, testified that while he "ha[d] concerns about FARA" and indicated to Michel that registration might be necessary, Michel did not share those concerns. Tr. 4/6 AM at 20–21; Def. Br. at 26. Broidy, as a cooperating witness, testified unequivocally that there had been no agreement or even discussion between himself and Michel (or Low, Lum Davis, or Higginbotham, for that matter) about whether to register under FARA, let alone agreeing that he should *not* register. Michel had

---

[5] The Government's concession also undermines its argument that Michel and Higginbotham agreed not to register, Opp. at 19, since neither of them actually had an obligation to do so.

never discussed Broidy's or Lum Davis's registration *vel non* with anyone. The Government argues that Broidy himself did not want to register because it would make his efforts more "difficult," Opp. at 18, but this is probative only of Broidy's intent not to register—not Michel's intent for Broidy not to register—and the Government cites no evidence that could impute this intent to Michel. For instance, Broidy and Michel never discussed whether Broidy should register, let alone the possibility that registration could make Broidy's effort more difficult.[6]

Thus, the Government's failure to introduce any evidence that Michel encouraged Broidy or Lum Davis to lobby while willfully intending that Broidy or Lum Davis not register under FARA—or that they even discussed whether they should register—is fatal to its aiding-and-abetting charge in Count 8. The evidence on Count 8 was thus insufficient.

## VII. Count 7 fails because there was insufficient evidence that Michel conspired with anyone to effect any of the charged objects of the conspiracy.

### A. Michel did not conspire with anyone to violate FARA.

The essence of conspiracy is an agreement to violate the law. Here, the Government failed to introduce evidence that Michel agreed with anyone not to register under FARA. Broidy, the Government's most critical witness, testified that he never discussed any aspect of FARA with Michel, let alone that he discussed *not* registering under FARA. Tr. 4/4 PM at 54–56. The

---

[6] The Government makes other *ipse dixit* assertions in an effort to fill the flaw in its theory due to the lack of any evidence that Michel intended for Broidy or Lum Davis not to register. *See* Opp. at 18. Specifically, the Government opines that "[r]egistration was at odds with the scheme," and the alleged "coconspirators were trading on Broidy's reputation and relationships with high-level government officials," so "[o]uting Broidy as a paid pawn of Low would have rendered Broidy's efforts useless." *Id.* The Government continues: "Such a disclosure would also have ended the payments from Low, both because Low was unlikely to pay for overtly ineffectual lobbying and because financial institutions were unlikely to accept funds associated with Low." *Id.* The glaring problem with this explanation is it is a theory untethered to the evidence. No one testified about whether Michel wanted Broidy to register or not, and there was no evidence from which a jury could infer beyond a reasonable doubt that Michel had even thought about whether Broidy should register—much less intended for him *not* to register.

Government argues that "Michel didn't need to tell Broidy not to register under FARA, [ ] because they both understood their representation of Low would frustrate the objectives of their scheme." Opp. at 18. The Government then quotes Broidy's trial testimony: "I thought it would be very – make it very difficult [to be successful with the engagement] if I disclosed [the representation of Low through FARA] so I chose to keep it confidential." *Id.*

But Broidy's testimony is of no help to the Government on the question of whether Michel and Broidy agreed with the decision not to register. Indeed, Broidy's testimony is solely about his own state of mind *Id.* ("***I*** thought it would be very – make it very difficult" . . . if I disclosed . . . so ***I chose*** to keep it confidential." (emphasis added)). It is telling that the Government never asked Broidy if this was a decision that he had ever discussed with Michel, whether Michel understood and agreed with the decision not to register, or if Michel and he were of the same mind that registering would be problematic to the success of the lobbying effort. Without this testimony— which Broidy was in an ideal position to provide—there is insufficient evidence to conclude, beyond a reasonable doubt, that Michel agreed with what appears to be a unilateral decision by Broidy not to register.

Higginbotham's testimony was no more helpful than Broidy's. First, Higginbotham and Michel discussed whether *Michel* had to register under FARA, not Broidy. Higginbotham testified that he (Higginbotham) did not believe that he had to register because he was not "the one that was actually performing the services that would fall under – that would fall under FARA." Tr. 4/11 AM at 22. There was no testimony elicited about whether Higginbotham and Michel discussed whether Broidy was required to register.

Second, Higginbotham's testimony about Michel's response to Higginbotham's suggestion that FARA registration might be required completely refutes the Government's argument.

Michel's reluctance to register under FARA was not, as the Government speculates, because doing so would be counterproductive to Broidy's lobbying efforts. Rather, the decision not to register was made due to convenience: "Q. And what was Mr. Michel's response when you raised FARA? A. Also very dismissive. You know, I remember one time he said something to the effect of 'I don't want to register for FARA because, you know, I travel a lot, and I get stopped coming in and out of airports, and it just all seemed like a very much inconvenience.'" Tr. 4/6 AM at 20–21. Higginbotham's testimony directly refutes the Government's contention that Michel "tacitly" agreed with Broidy not to register under FARA because it would be counter-productive to their lobbying efforts. According to Higginbotham, that consideration never crossed Michel's mind. Michel's decision was far more mundane: he did not think it was required and doing so would be an unnecessary inconvenience. This is not evidence of an agreement to commit a FARA violation.

With no evidence of an agreement between Michel and any of the alleged co-conspirators not to register under FARA, there was insufficient evidence on this object of Count 7.

### B. There was insufficient evidence of an agreement between Michel and any alleged co-conspirator to lobby the Trump administration under the direction or control of the Chinese government.

For the reasons outlined in § V above, the Government failed to prove this object of the Count 7 conspiracy.

### C. There was insufficient evidence to prove conspiracy to commit money laundering.

In order to establish concealment money laundering, 18 U.S.C. § 1956(a)(1)(B), the jury was instructed that the Government had to prove that Michel "conducted or intended to conduct a financial transaction involving property that represented the proceeds of a specified unlawful activity, in this case . . . [a] violation of the Foreign Agents Registration Act (FARA)." Tr. 4/24 AM at 75–76. Here, the monies at issue were not "proceeds" of a FARA violation; the monies sent

by Low were meant to pay *for* the lobbying activities. This was the cost of paying for the work to be done, and the funds did not represent "proceeds" of the offense as defined by the statute, *i.e.*, "property derived from or obtained or retained . . . through some form of unlawful activity." 18 U.S.C. § 1956(c)(9). The Government appears not to contest this point, and it fails to address any of the cases Michel cites in his brief for this proposition. Def. Br. at 29–30.

Instead, the Government argues that the evidence "that Michel and his co-conspirators agreed to disguise payments from Low as legitimate legal fees paid to Colfax – rather than fees for Broidy's illegal lobbying – was sufficient to prove the concealment money laundering object." Opp. at 21. But the testimony from the Government's witnesses confirmed that these transactions were not executed to conceal proceeds of FARA violations but rather to help ensure that Low's funds would not be seized due the Government's forfeiture efforts related to 1MDB. Rather than refute Broidy's testimony, recounted in Michel's opening brief, Def. Br. at 31, where Broidy made clear that he was concerned that monies he received from Low could be seized by the Government, the Government instead simply ignores it, conceding the point.

To prove Michel conspired to violate the promotional money laundering statute, 18 U.S.C. § 1956(a)(2)(A), the Government was required to prove that Michel and at least one co-conspirator engaged in the transactions with the intent that they promote a FARA violation. As outlined *supra* §§ VI and VII(a), because there was insufficient evidence of a specific intent to violate FARA, this money laundering count, on which the FARA violation is premised, must also fail. Unlike in *United States v. Manafort*, 318 F. Supp. 3d 1, 6 (D.D.C. 2018), cited by the Government, where a district court upheld a promotional money laundering scheme in support of FARA violations at the motion to dismiss stage, the Government must point to actual evidence that the money transferred was meant not only to compensate for the lobbying efforts but also with the intent that

the lobbying efforts be conducted without registering. The Government presents no such evidence. All it proved was that the international transfers were intended to promote lobbying—not unregistered lobbying. That is insufficient as a matter of law.

## VIII. The Government's novel FARA conspiracy theory violates the *Gebardi* principle.

The verdict on Count 7 cannot stand because the FARA conspiracy object was legally invalid. Specifically, the Government improperly charged Michel with conspiring with Low to violate FARA by agreeing to act as an agent of Low, the alleged foreign principal, even though FARA evinces an affirmative legislative policy to leave the foreign principal unpunished. *See* Def. Br. at 32–36. Thus, under the *Gebardi* principle, the FARA conspiracy object is invalid. *Id.* The Government advances three counter-arguments, each of which is meritless.

First, the Government argues that Michel's argument is untimely because Michel's argument contends that Count 7 fails to state an offense, which should have been raised in a pretrial motion under Rule 12(b)(3)(B)(v). *See* Opp. at 22. The Government ignores, however, that the only reason Michel did not bring a pretrial motion for failure to state an offense is because his counsel was ineffective, as demonstrated in his motion for new trial. *See* ECF No. 310. Thus, even if Michel was required to assert this argument in a pretrial motion, and not just for insufficiency of the evidence, he has good cause to raise it now. *See* Fed. R. Crim. P. 12(c)(3) ("If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause."). Ineffective assistance of counsel constitutes good cause. *United States v. Doost*, 3 F.4th 432, 437 (D.C. Cir. 2021) ("Rule 12 excuses untimely indictment challenges, however, 'if the party shows good cause.' 'Good cause' includes ineffective assistance of counsel." (citation omitted)).

23

Second, the Government disregards the obvious parallel between this case and *Castle*, where the Fifth Circuit held that the *Gebardi* principle precluded a conspiracy between the bribe-payer and the bribe-receiving foreign official in violation of the FCPA. *See* Def. Br. at 33–36. Just like the FCPA, which Congress enacted to cover situations that *always* included a bribe-payer and a foreign official bribe-recipient, but chose to punish only the bribe-payer and not the foreign official, Congress enacted FARA to cover situations that *always* included a foreign agent and a foreign principal, but chose to punish only the foreign agent, not the foreign principal. In these circumstances, *Castle* concluded that the Government could not circumvent this affirmative legislative policy by charging a conspiracy between the bribe-payer and the foreign official. *United States v. Castle*, 925 F.2d 831, 831–32 (5th Cir. 1991). The Government fails to explain why this same principle does not apply squarely to a FARA conspiracy charged between a foreign agent and a foreign principal. Nor does it dispute that FARA's text and legislative history make clear that the foreign principal is outside the scope of FARA's punishments.[7]

The Government cherry-picks a statement from *Gebardi* that "[i]ncapacity of one to commit the substantive offense does not necessarily imply that he may with impunity conspire with others," but this statement is inapposite. Opp. at 23 (quoting *Gebardi v. United States*, 287 U.S. 112, 121 (1932)). The Court gave as an example a situation where a non-bankrupt person conspires to help a bankrupt person conceal assets. *Gebardi*, 287 U.S. at 121 n.5. But the Court made clear that the latter concept did not extend to situations where "the criminal object of the conspiracy" involves the agreement by the person who is a necessary actor under the statute but whom the statute left unpunished. *Id.* at 121. This is precisely the situation here. A FARA violation

---

[7] The Government's argument that FARA includes a provision for removal of a foreign national misses the mark. Opp. at 25 (citing 22 U.S.C. 618(c)). That provision applies to foreign nationals acting as foreign agents—not as foreign principals.

cannot exist without a foreign principal, yet Congress deliberately left the foreign principal unpunished. The Government cannot circumvent that limitation by charging the agent and principal with conspiracy.

Third, the Government argues that even if charging a foreign agent with conspiring with a foreign principal violates the *Gebardi* principle, it would be harmless error here because the Government proved the other objects of Count 7 beyond a reasonable doubt. Opp. at 26–27. Not so. As an initial matter, the legally invalid FARA conspiracy object charged in ¶ 105(a) of the Indictment also infects ¶ 105(c) and (d), which charged money laundering where the predicate specified unlawful activity was also the invalid FARA conspiracy, and the remaining object— conspiracy to act as an agent of China—was unsupported by sufficient evidence. In any event, for the reasons stated in Michel's opening brief and above, the evidence was insufficient to prove any of the objects in ¶ 105 (b), (c), and (d) beyond a reasonable doubt, and thus the defect in the FARA conspiracy object in ¶ 105(a) was not harmless. The Court should therefore reverse or at a minimum grant a new trial on Count 7.

## IX.    At a minimum, the verdict was against the weight of the evidence, warranting a new trial.

The Court should reject the Government's threadbare assertion in its conclusion that the verdict was not against the weight of evidence, Opp. at 27, and at a minimum grant a new trial on each count discussed above.

## CONCLUSION

For the reasons stated above, Michel respectfully requests that the Court acquit him on Counts 1–4, 7, 8, 10, and 12, or at a minimum grant a new trial on these counts.

Dated: November 13, 2023

Respectfully submitted,

 /s/ Peter Zeidenberg
Peter Zeidenberg (Bar No. 440803)
Michael F. Dearington (Bar No. 5223987)
David M. Tafuri (*pro hac vice*)
Sarah "Cissy" Jackson (*pro hac* vice)
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20006-5344
Telephone:  (202) 857-6000
Facsimile:  (202) 857-6395
peter.zeidenberg@afslaw.com
michael.dearington@afslaw.com
david.tafuri@afslaw.com
cissy.jackson@afslaw.com

M. Scott Peeler (*pro hac vice*)
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas, 42nd Fl
New York, NY 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
scott.peeler@afslaw.com

*Counsel for Defendant Prakazrel Michel*