```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,
                                          Criminal Action
 4              Plaintiff,                No. 1: 19-00148-1

 5         vs.                            Washington, DC
                                          January 10, 2024
 6   PRAKAZREL MICHEL,
                                          9:08 a.m.
 7              Defendant.
     _____/
 8

 9            TRANSCRIPT OF EVIDENTIARY MOTION
         BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
10                UNITED STATES DISTRICT JUDGE

11
     APPEARANCES:
12
     For the Plaintiff:      JOHN D. KELLER, ESQ.
13                           U.S. DEPARTMENT OF JUSTICE
                             1301 New York Avenue Northwest
14                           Suite 1016
                             Washington, DC  20530
15
                             NICOLE RAE LOCKHART, ESQ.
16                           U.S. DEPARTMENT OF JUSTICE
                             Public Integrity Section
17                           1400 New York Avenue Northwest
                             WAshington, DC  20005
18
     For the Defendant:      PETER ROBERT ZEIDENBERG
19                           MICHAEL F. DEARINGTON
                             DAVID M. TAFURI
20                           ARENT FOX, LLP
                             1717 K Street, NW
21                           Washington, DC 20006

22
     Court Reporter:         SHERRY LINDSAY
23                           Official Court Reporter
                             U.S. District & Bankruptcy Courts
24                           333 Constitution Avenue, NW
                             Room 6710
25                           Washington, DC 20001
```

1                              TABLE OF CONTENTS

2                                   WITNESSES

3       Alon Israely

4            Direct examination by Ms. Lockhart          5
             Cross-examination by Mr. Dearington         28
5

6                                   EXHIBITS

7       Defense Exhibit 15                               90
        Defense Exhibit 16                               93
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      P R O C E E D I N G S

2            THE COURTROOM DEPUTY:  Criminal case 19-148, the

3    *United States versus Pras Michel.*

4            Counsel, would you please identify yourselves for the

5    record, starting with the government.

6            MS. LOCKHART:  Good afternoon, Your Honor.  Nicole

7    Lockhart and John Keller on behalf of the United States.

8            THE COURT:  All right.  Good morning.

9            MR. ZEIDENBERG:  Good morning, Your Honor.  Peter

10   Zeidenberg, Michael Dearington and David Tafuri on behalf of

11   Mr. Michel.

12           THE COURT:  All right.  Good morning.  So in terms of

13   the masks, if you are speaking, obviously, take them off,

14   because we won't be able to get a record.  We'll proceed today

15   with the witness who wasn't -- I believe we are going to be

16   taking one of the government witnesses out of turn and I

17   understand there is no objection to that; is that correct?

18           MR. ZEIDENBERG:  That is correct, Your Honor.

19           THE COURT:  All right.  Then I have -- I have to do a

20   hard stop between 11:20 and 11:30.  I am a chair of the DC

21   Commission on Judicial Disabilities and Tenure.  And they meet

22   in Superior Court.  So as the chair, I have to be there for the

23   meeting.  These are monthly meetings.

24           Tomorrow, I have it open completely, just devoted

25   completely to this, in terms of there won't be any

```
1    interruptions or any other cases at all.  That won't create any
2    issues for us.  So we'll go as far as we can.  If the court
3    reporter needs a break to let us know.  If not, I will do the
4    morning without a break since we are stopping at 11:20 or so.
5              All right.  So let's proceed.  I have all of the
6    papers.  I have looked at them.  I don't think -- I have an
7    argument to start with.  I think we should move to the witness
8    testimony.  And, of course, at the end, you can summarize what
9    the testimony is if that is acceptable to the parties.
10             MS. LOCKHART:  Yes, Your Honor.
11             THE COURT:  All right.  Then let's proceed with the
12   witness.
13             MS. LOCKHART:  Yes, Your Honor.  We'll be calling
14   Alon Israely.
15             THE COURT:  Okay.
16             All right.  Sir, if you would step up over here,
17   please.
18             If you would remain standing so we can swear you in.
19             THE COURTROOM DEPUTY:  Will you raise your right
20   hand, please?
21             Do you solemnly swear that the testimony you will be
22   giving in this hearing will be the truth, the whole truth and
23   nothing but the truth, so help you God?
24                        ALON ISRAELY, sworn
25             THE WITNESS:  I do.
```

1          THE COURTROOM DEPUTY:  Please be seated.

2          THE COURT:  Go ahead and sit down.  You can take your

3   mask off so we can get a record.  You know the drill in terms

4   of the microphones since you sat through the trial.  And make

5   sure you pay attention, if there are objections, so that you

6   don't go ahead and answer before I get an opportunity to

7   consider it.  And, obviously, let everybody finish their

8   questions before you start to answer.  And they should do the

9   same thing for you.

10          Go ahead.

11          MS. LOCKHART:  Yes, Your Honor.

12                        DIRECT EXAMINATION

13   BY MS. LOCKHART:

14      Q.  Good morning, Mr. Israely.

15      A.  Good morning.

16      Q.  Can you please state and spell your name for the

17   record?

18      A.  Alon Israely; A-L-O-N, I-S-R-A-E-L-Y.

19          THE COURT:  You need to speak up a little bit more or

20   move the microphone up.  That is probably better.

21   BY MS. LOCKHART:

22      Q.  Mr. Israely, how did you become involved with

23   Mr. Michel's defense team?

24      A.  I was asked by Mr. Kenner to help with discovery.  I

25   am a discovery expert.  I work with lawyers for the past 20

1    years on discovery issues.  And so considering the volume of

2    discovery, in this case he asked that I assist.

3         Q.  And are you a lawyer yourself?

4         A.  I am.

5         Q.  Have you practiced previously?

6         A.  Only in the capacity as a discovery expert in part of

7    trial teams in that manner.

8         Q.  Do you know about when you joined the team in this

9    capacity?

10        A.  I would say shortly after Mr. Kenner was hired.  I

11   think maybe the first or second status conference that Her

12   Honor had called.

13        Q.  Were there other people who were members of

14   Mr. Michel's defense team?

15        A.  I'm sorry.  One more time?

16        Q.  Were there other people who were members of

17   Mr. Michel's defense team?

18        A.  Yes.  There were several members of the defense team.

19        Q.  I would like to go through them with you.  Was Charles

20   Haskell one of those people?

21        A.  Yes.  He was acting as local counsel.

22        Q.  How did Mr. Haskell contribute to the defense team?

23   What was his role?

24        A.  He had different roles throughout the process.

25   Primarily in the beginning, he was acting as a local counsel

1    doing the filings, working to finalize motions and then file

2    them.  And as we got closer to trial and he took on more work,

3    such as -- more work.

4        Q.  Okay.  What about Kriss Anne Carlstrom?

5        A.  She was part of the team.  She is an attorney.  She

6    was a contracted attorney and was working on the team almost

7    from a -- a good portion of the time pretrial.  And she was

8    like a Relativity expert.  That was the discovery database that

9    we used.  So she spent a lot of time there.

10       Q.  Did she engage substantively with some of the facts

11   underlying the case and some of the legal theories?

12       A.  Yes, very much so.

13       Q.  What about Katherine Lestelle?

14       A.  Ms. Lestelle is an investigator.  And she was a part

15   of the defense team.  She did a lot of work.  Like as an

16   investigator, she would work and then she also helped with

17   pretty much any task that Mr. Kenner had assigned her.

18       Q.  Was she also engaged substantively with the facts of

19   the case and helping to review discovery and those things?

20       A.  Yes.

21       Q.  What about Lois Heaney?

22       A.  Ms. Heaney is a jury consultant.  And she was

23   involved -- she was -- she drove the mock trial and all of the

24   prep and work that went into that.  And she was also in the

25   office a lot working with Mr. Kenner.

1        Q.  Let's take a pause there and talk about the mock trial

2   that you just mentioned.  What was that?

3        A.  It was like a wedding.  It was a lot of work, a lot of

4   prep.  It was done here in the DC area.  It was a mock trial.

5   So opening statements, closing statements, jurors, or, you

6   know, simulated jurors were brought in from a pool of people.

7   It was an entire production.

8        Q.  And were there multiple jury panels?

9        A.  Yes.  I recall I think there were three.

10       Q.  And for the substantive work of making the

11  presentation of the opening and the closing, who was handling

12  that?

13       A.  Mr. Kenner was driving it.  And then others were

14  assigned different areas.  Ms. Carlstrom was assigned areas.

15  Ms. Heaney helped with a number of things.  I think at the

16  time, there was another attorney as well.  Mr. Maddix and

17  Ms. Lestelle and then paralegals helping out as well.

18       Q.  And that kind of model you just described with these

19  others assisting -- but I think you described Mr. Kenner as

20  driving it.  Was that consistent with the broader experience

21  throughout trial and preparation?

22       A.  Yes.

23       Q.  And what was the result of the mock trial -- I guess,

24  first, when did that occur?

25       A.  I think it was in January before the trial.

 1        Q.  So 2023?

 2        A.  Yeah.  A few months before the trial.

 3        Q.  Okay.  And did you get feedback from those mock

 4   jurors?

 5        A.  Yeah, a lot of feedback.  That was a big portion of

 6   why it was done, feedback as to different lines of argument,

 7   strategies, theories of the case.

 8        Q.  Did you incorporate that feedback going forward?

 9        A.  Yes.  That was a critical component of the defense at

10   trial and preparing for the defense at trial.

11        Q.  You mentioned Mr. Maddix, what was his role more

12   generally?

13        A.  He was an attorney, again contracted attorney.

14   Mr. Kenner has a small law firm.  So he had contracted

15   attorneys for this particular case knowing the size of the

16   case.  And he was working on different issues and different

17   witnesses assigned to those and then handing back work product

18   that would then be reviewed by Mr. Kenner and others.

19        Q.  When you say it was reviewed by Mr. Kenner, what do

20   you mean by that?  Was Mr. Kenner taking that and just reading

21   whatever Mr. Maddix or Ms. Carlstrom did in court or what do

22   you mean by review?

23        A.  He was not just taking it and using it.  Mr. Kenner

24   was deeply in the weeds on everything that was done, I caution

25   to say micromanaging things.  And so it would come back, he

1   would delve into it, a lot of times he directed what he wanted,

2   specifically with respect to certain issues or certain

3   witnesses.  And then whoever was assigned that task would then

4   delve into it, very much like a partner and junior associates

5   and attorneys and those kinds of things, kind of that same

6   model.

7        Q.  Did that kind of style of management of the team, was

8   that both at trial and in the lead up in preparation to trial

9   in the mock trial you described?

10       A.  Yeah.  And the entire time, Mr. Kenner was like the

11   director driving everything.  He would -- many times Mr. Kenner

12   would remember things that, you know, others wouldn't.  We

13   would go look it up and find he was right.  He had very

14   specific things that he was looking for or wanted.  He would

15   give guidance to whomever was assigned that task and then when

16   we were here, would break out into sessions with that person to

17   delve deeper into it.

18       Q.  Is there an individual named Paul Paladino or

19   Palagrino (ph)?  I'm not sure of his last name.

20       A.  I don't know his last name either.  He was -- I think

21   he is an ex-DA or federal prosecutor maybe.  I think he is from

22   the Miami area.  I don't remember exactly.  He was brought

23   in -- I am not sure whether -- I think maybe Mr. Michel had

24   brought him in or somehow he was brought in later on.  So

25   before the trial, but during the trial.  And he was there to

1    assist as well.

2         Q.  Did he have any specific roles that you recall?

3         A.  I think he was focused mostly on preparation, so

4    preparing Mr. Michel for cross.  And I think primarily that and

5    then just generally assisting with issues.  So him and

6    Mr. Kenner would discuss certain issues.  I think they were

7    both senior attorneys so --

8         Q.  And you mentioned Paul's role in preparing Mr. Michel

9    for cross-examination.  I would like to talk about the

10    preparation of Mr. Michel more generally to testify at trial.

11    Were there conversations both in the team you described and

12    with Mr. Michel about the possibility of him testifying?

13         A.  Yes.

14         Q.  Do you know about when those started?

15         A.  They started early.  That was a topic of discussion

16    that was brought up every once in a while, even before the mock

17    trial and then throughout, all of the way up until, you know,

18    the night before.

19         Q.  What was the nature of those conversations?

20         A.  Whether he would testify, if he did, what that would

21    be like, pros and cons of testifying, those kinds of things.

22         Q.  Were there substantive discussions about the kind of

23    scope of what it would look like, including mock direct

24    examinations or I think you mentioned mock cross-examinations

25    by Paul?

1        A.  Can you clarify that question?

2        Q.  I can, yeah.  These conversations, did they include

3    discussing the substantive topics about what Mr. Michel would

4    testify about at trial?

5        A.  Yes.

6        Q.  Did you recall whether there was sort of a mock or

7    practice direct examination of Mr. Michel?

8        A.  Yes.  There were direct examination preparation, as

9    well as cross.

10        Q.  Did those happen before trial, during trial, both?

11        A.  Both.  Some of them happened pretrial.  Some -- a good

12    amount happened during trial and close to when Mr. Michel

13    actually testified.

14        Q.  Okay.  Going back to our broader team of people, were

15    there also additional people hired through a company called

16    Haystack?

17        A.  Yes.  Haystack is an e-discovery vendor.  And they

18    provide both technology and human resources.  And so they have

19    a very large staffing department.  And through that staffing

20    department, they provided Ms. Carlstrom and Mr. Maddix.  And

21    then through the technology side of the company, they provided

22    project managers, technical search experts, folks who can just

23    handle the back end of the discovery database.

24        Q.  And that discovery database, that was through

25    Relativity that you mentioned earlier?

1     A.   That was the brand that was used for this case, yes.

2     Q.   Would you task those individuals through Haystack, not

3    Ms. Carlstrom and Mr. Maddix, we have discussed them, but the

4    others, what would you task them with doing?

5     A.   They were pretty integral in ensuring that the

6    databases were working.  They would be tasked with searches, so

7    many times Mr. Kenner would independently task the manager or

8    managers at the company.  He would ask for certain searches be

9    run and foldered -- the results of which would be foldered in

10   the database, so he could then access or others could access

11   those.  There was a good amount of work like that done early on

12   and all of the way through trial.

13    Q.   Was the result of their work, the folders they

14   described, were they then reviewed by the team or Mr. Kenner?

15    A.   By everyone.  By Mr. Kenner usually first and then as

16   he needed something -- as he needed to delve into something

17   deeper, he would assign it to others.  Sometimes he would

18   assign it directly to someone.  And then the results of that

19   work would then get moved to Mr. Kenner.

20    Q.   So a number of people we discussed.  Were there team

21   meetings to discuss the case in advance of trial?

22    A.   Yes, a lot of meetings.

23    Q.   So let's talk about frequency.  So before mock trial,

24   so before January 2023, how often would you say the team was

25   meeting?

DIRECT EXAMINATION OF ALON ISRAELY

1    A.  I would say -- excuse me -- I would say it went in

2    stages.  There were meetings that were set.  I think from when

3    I started, so early on, I think there was maybe one to two a

4    week.  And then as we got closer to trial, they were pretty

5    much on a daily basis, some of them would last hours.  They

6    were Teams meetings.  Microsoft Teams was the collaboration

7    software that was used.  And they were -- everybody was up on

8    the screen.  And there were usually -- everyone -- pretty much

9    everyone you mentioned, as well as the Haystack folks.

10    Q.  What was the purpose of those meetings?

11    A.  To prep for trial.  You know, just to go over the

12   issues, there was a lot of pretrial motion practice, as you

13   know.  And so just to ensure that everything was being done to

14   the -- you know, the most effective way.  So just to keep

15   things on track, a lot of times they were just status

16   conferences, get together to ensure that everyone is doing

17   whatever they need to do to see whether there were new tasks

18   that had to be done.  Kind of your --

19    Q.  Was Mr. Kenner leading those meetings?

20    A.  Yes.  And he called them.  And he would usually drive

21   them.  I mean, he wasn't dictatorial.  Everyone would join in

22   and do what they needed to do, but he would -- he was the one

23   who drove them.

24    Q.  Would you discuss discovery or facts that the team had

25   discovered during those meetings?

1          A.  Yes.

2          Q.  What about legal strategies?

3          A.  Yes.

4          Q.  And any discussion of kind of the relevant law or --

5     that is charged in the superseding indictment?

6          A.  Yes.  I mean, all of the above.

7          Q.  And then regarding motion practice, how was that

8     divided or handled amongst the team?

9          A.  Mr. Kenner had an idea as to the motions that he

10    wanted to file.  And so those were early on.  He worked with

11    the prosecution to set a schedule.  It was a pretty aggressive

12    schedule from my perspective.  And so he would assign different

13    folks, different areas of each of those motions, whether it be

14    research or a lot of it was discovery, find this stuff and

15    discovery.  And, you know, there was millions of documents, so

16    a lot of it was find these documents, find these issues in the

17    documents, bubble those up and then you use them as part of the

18    motion drafting.

19         Mr. Kenner would usually drive what he wanted in the

20    motions.  Parts of those motions would get written by other

21    individuals or even himself where he would dictate what he

22    wanted.  And then he would always do the -- a review, usually a

23    draft review and then a final review.  And then almost always

24    have a read through.  He did better that way.  So we would have

25    a read through where he would have it on the screen.  He would

1  stop, let's add this, let's do this, let's change this.  And

2  then at the end of that process, I usually would go in and

3  put -- I will call copy editing, but it was a little more than

4  that, ensuring that it met the rules -- Your Honor's rules.

5  And then it would get sent to Mr. Haskell to file.

6      Q.  Regarding the statutes charged in the case, was it

7  your impression that Mr. Kenner was familiar with those

8  statutes?

9      A.  Yes.

10      Q.  Were there times in which Mr. Kenner tasked some of

11  the team with doing additional research so that he could better

12  understand some of the statutes or get additional information?

13      A.  Yes.

14      Q.  And how would -- what would that look like?  What kind

15  of work product would be given back to Mr. Kenner?

16      A.  To the extent Mr. Kenner needed a more deep dive to --

17  into particular charges or statutes, he would assign that in a

18  particular manner.  He would say with respect to the FARA

19  charge, I want to find this, that or the other.  And then

20  whoever would work on it would go do that, whether it was in

21  Westlaw or in the discovery database.  They would bring back

22  either a draft or a bullet points.  And then Mr. Kenner would

23  assign -- or he would review that and he would assign someone

24  to then draft it more formally.  And then he would take that

25  draft and do his final edits and checks.

DIRECT EXAMINATION OF ALON ISRAELY

1    He knew a lot of the law just from practicing a long time.

2    So he knew a lot of the law and it was usually a nuance.

3    Of FARA, not as much.  So there was a lot of work there.

4    But, otherwise, he kind of knew what he wanted beforehand and

5    would just hone it.

6    Q.  And for the FARA example that you just mentioned, I

7    think you said Mr. Kenner didn't have as much experience with;

8    is that right?

9    A.  Correct.  He knew the law, but he didn't have a lot

10   of -- I don't think much of anyone had a lot of experience with

11   it.  I think when we first looked at the cases, there were only

12   like a dozen or so cases in the entire history of the United

13   States.

14   Q.  It sounds like from your description that he then took

15   steps to become more familiar based on the number of cases

16   looked up or additional research done; is that right?

17   A.  Yes.  With respect to FARA, he joked that he is now a

18   FARA expert.

19   Q.  One additional question on the Teams meetings in the

20   lead up to trial.  Was Mr. Michel present for those?

21   A.  Yes.  I don't know if he was present for every single

22   one, but he was at a number of them.

23   Q.  At those meetings that Mr. Michel was present, did he

24   contribute to the meetings?

25   A.  Yes.

1        Q.   How would he contribute?

2        A.   Usually, clarifying facts, giving more color to facts

3   and to parts of the record.  If we had questions about certain

4   documents or discovery, he would be able to clarify that.

5        Q.   Did Mr. Michel also have ideas or opinions about the

6   legal strategy of the case?

7        A.   He did, yeah.

8        Q.   And were those opinions or ideas taken into account in

9   crafting the legal strategy going forward?

10       A.   Yes.

11       Q.   So you have described how generally kind of the team

12  reviewed discovery.  And Mr. Michel also contributed facts of

13  his own.  In reviewing discovery, how did you go about -- you

14  described the volume of discovery.  How did the team go about

15  kind of culling down important information from that database?

16       A.   We would run searches, find relevant documents, pull

17  facts or information from those documents, make outlines, make

18  notes, draft motions and a lot of witness binders were built.

19  So closer towards trial, every witness had a binder.

20  Mr. Kenner likes a lot of things in paper.  So you may remember

21  all of the boxes of binders.  And so it was primarily that

22  process, kind of once we found a set of documents that were

23  relevant, it would go through a process and work product would

24  be created.  And then ultimately a witness binder would be

25  built with respect to witness binders.  Motions, same kind of

1    thing.

2        Q.   Did that include for witnesses you mentioned like

3    grand jury testimony?

4        A.   Grand jury testimony, 302s, all of the seized items,

5    pretty much it ran the gamut.

6        Q.   And was Mr. Kenner also reviewing these materials that

7    the team was assembling?

8        A.   Yes.  Mr. Kenner reviewed almost everything -- a lot.

9        Q.   You mentioned witness outlines.  How were witness

10   outlines handled among the team?

11       A.   Usually we would start with a meeting.  A witness

12   would be assigned to one or more individuals.  Different areas

13   of the either direct or cross that Mr. Kenner wanted to focus

14   on was discussed with whoever was assigned that.  They would go

15   off and do their work, bring back whatever work product they

16   had put together.  And then that would get integrated into some

17   larger model for Mr. Kenner.  So he would then have meetings

18   back and forth, a lot of individual breakouts on those.

19       Q.   Were there times when multiple individuals were

20   assigned to the same task?  So, for example, preparing a

21   cross-examination for George Higginbotham or Elliott Broidy or

22   something like that?

23       A.   Yeah.  Especially for key witnesses, multiple people

24   were assigned a similar or the same task.  I asked Mr. Kenner

25   about that once as I thought maybe there was, you know, extra

1    work being done, and he would describe to me that he wanted to

2    be able to get all of the different perspectives because he,

3    you know, respected everyone's different way of thinking about

4    things.  And then he would consolidate them and kind of create

5    his own version.  He would have -- usually he would dictate

6    what he wanted or have his paralegal to put the final one

7    together.

8         Q.  And is that paralegal, was that Corrie Campbell?

9         A.  Yeah, Mr. Campbell.

10        Q.  I am going to shift gears a little bit to talk about

11   artificial intelligence and the use of a program at trial.

12        But, first, are you familiar with the company CaseFile

13   Connect?

14        A.  I am.  I am one of its owners.

15        Q.  And how much of the business do you own?

16        A.  I own a third.

17        Q.  Is CaseFile Connect an artificial intelligence

18   company?

19        A.  No.  CaseFile Connect is a social justice company.  We

20   send tablets to incarcerated individuals so they can work on

21   their discovery.  It is very hard to bring in tens and

22   sometimes hundreds of boxes and review video.  And so we have a

23   tablet that gets sent and that data is loaded there.  And then

24   an incarcerated individual can work on their case.

25        Q.  And was CaseFile Connect used at all or technology

1   during this trial?

2        A.   No.

3        Q.   Concerning a company called EyeLevel.AI, are you

4   familiar with that company?

5        A.   I am.

6        Q.   How are you familiar with that company?

7        A.   A good friend of mine is one of its founders.  And I

8   am -- I helped them and understand their technology.

9        Q.   And did -- was EyeLevel.AI and its technology used

10  during trial?

11       A.   Yes.

12       Q.   Do you have any financial stake in EyeLevel.AI?

13       A.   No, I don't.

14       Q.   And how was -- I guess first for the Court if you can

15  describe what that program was and how it was used during

16  trial?

17       A.   Sure.  EyeLevel is an enterprise grade AI system.  It

18  is called a RAG system, retrieval augmented generation.  It was

19  used primarily as a search and retrieval tool.  So it was a

20  force multiplier.  I am probably first and foremost a legal

21  technologist, so I tried to bring to bear as much technology as

22  I can.  And it was used -- only the transcripts for trial were

23  loaded, none of the discovery.  And it was used in order to

24  search -- do faster searches.  It is nice because you can talk

25  to it in natural language.  It is not a direct ChatGPT.  So it

1    is not like you talk to ChatGPT.  It is -- you load your

2    private or enterprise or corporate use.  You load your private

3    data.  And it uses technologies in order to act in the same way

4    that a ChatGPT does, so that when you get the answers back, it

5    gives you context and full flavor.  So it was used primarily --

6    you know, a number of the prompts or queries that we did were,

7    who testified when?  When this person testified, did they speak

8    about this issue?  Was this exhibit number marked?  Most of it

9    was used in that capacity after trial.  We were usually a day

10   behind because the transcripts had to get loaded.  It was

11   primarily used that way.

12        Q.  Who had access to the program to be able to type in

13   the inputs?

14        A.  It was mostly me.  I think there are a couple others

15   who I had maybe sent the URL to in order to do their own,

16   whether they did or not I am not sure.  But I was mostly

17   sitting in front of it.

18        Q.  Was Mr. Kenner inputting things into EyeLevel.AI?

19        A.  He was not inputting it directly.  He would sometimes

20   say, why didn't you ask the virtual associate or why didn't you

21   ask the system if, you know, what we get from that?

22        Q.  Virtual associate, is that a nickname?

23        A.  That is something I gave it.  He didn't say that.  He

24   would say, you know, ask the system, ask the AI.  And I would

25   type it in.  It was done usually instead of going through the

1    transcripts and doing control F, which is like a find function

2    where you can only use a string, one word.  You can ask it in a

3    contextual manner.  And a lot of times we would say, what page

4    or line of the transcript was it.

5         Q.  So it sounds like you used it as a tool through trial?

6         A.  It was a tool just like Relativity, like Westlaw.

7         Q.  Had you used the program previously?

8         A.  Not in trial.

9         Q.  Turning to EyeLevel AI's use during closing argument,

10   to what extent was the program used during closing?

11        A.  It was used as a preparation.  We did not say, give us

12   a closing and it gave us a closing.  I know the press likes to

13   say that has happened, but that didn't happen.  In fact, even

14   the way the responses come back, it would say, here are the

15   things you consider.  So you would have to then draft your own.

16   We used it to give us a sense of things.  You know, what -- you

17   know, I am an emotional attorney that loves my client and wants

18   to, whatever, give me a sample closing.  And a lot of the

19   responses were kind of law school 101, you know, make sure that

20   you mention that your client is innocent before proven guilty,

21   so, you know, presumption of innocence.

22        And I think we asked a couple questions about FARA.  And

23   so make sure that you say that your client had no knowledge.

24   So it would really kind of recite the elements of the test.  It

25   didn't do a legal analysis where it takes the facts and the

1    rule and gives you an analysis.  So it is a helper tool, makes

2    sure that we were getting everything, that we weren't missing

3    anything.  It was very good at giving you a nice summary.  I

4    mean, that is what some of these tools are very good at.

5         So we would ask it, what would be the closing argument or

6    the defense on Count 1, Count 2, Count 3?  And a lot of that

7    was used because it would nicely give you a sentence:  Count 1

8    is.  So that was primarily how it was used with respect to

9    closing.  But it was used very little.  Most of the closing was

10   just traditional preparation and building PowerPoints and

11   outlines.

12        Q.  If I am understanding you, it sounds like it was used

13   like as a go-by or to give you ideas of things that could be

14   considered in crafting a closing argument or throughout trial?

15        A.  Yeah.  It is a tool to help you ideate, absolutely.  I

16   don't think any of the -- anything was used verbatim, frankly.

17   If so, it was stuff that I would call law school 101, something

18   you learn in trial ed.

19        Q.  I take it it wasn't intended to be -- and I think you

20   said this, the output of what came back, it wasn't taken and

21   then read without providing any legal signals or considering

22   whether it was a good idea to use or something like that?

23        A.  No way.  In fact, Mr. Kenner wasn't involved too much

24   in that part of it.  A lot of it was just play.  We were just

25   wondering what the AI would say and would it give us any

1   additional ideas.

2        The way it physically outputs responses, you could not use

3   it as a closing.  It doesn't -- you would have to cut and paste

4   and edit and form your own so it with worked as an actual

5   closing.  Plus, we had an entire PowerPoint that you all

6   reviewed.  And I think Mr. Keller took out a number of things

7   he didn't like or that didn't match the rules.  And it didn't

8   do any of that.

9        Q.  Okay.  Are you aware of a press release issued after

10  trial regarding the use of AI during trial?

11       A.  Yes.

12       Q.  And that press release, there is a line identifying

13  technology partner CaseFile Connect.  Does CaseFile Connect

14  have any business relationship with EyeLevel.AI?

15       A.  No.

16       Q.  Are you aware of why that language was included in

17  that press release?

18       A.  Yes.  I specifically asked that it be put there.  I

19  probably should not have, considering what became of it.  But

20  it was just me being opportunistic as a business person.  I

21  knew that EyeLevel was doing a press release.  And I think even

22  the earlier drafts were, you know, work with our client or

23  customer, Kenner Law Firm.  And I suggested that they use

24  CaseFile Connect because I wanted to get some free press for my

25  company.

1    Q.   Separately, you mentioned your friend, is that Neil

2    Katz?

3    A.   Correct.

4    Q.   He also, subsequent to trial, had a social media post

5    saying that his company, EyeLevel.AI, helped draft closing

6    arguments.  Is that accurate?

7    A.   I wouldn't have put it that way.  I think Mr. Katz is

8    a business person.  He is in the marketing and advertising

9    world.  I would call that puffery.  It was helpful in our

10   preparation.  I wouldn't say that it drafted closing arguments.

11   Q.   Okay.  For closing more generally, you described a

12   closing at the mock trial, kind of mock closing.  Was the team

13   contributing generally to kind of what should be included in

14   the closing arguments, both facts and legal theories?

15   A.   Yes.

16   Q.   Were members of the team sort of drafting sections for

17   Mr. Kenner's consideration?

18   A.   Yes.

19   Q.   Did he ever kind of do beyond the mock trial, practice

20   sections of it to see how they would sound or get other's

21   input?

22   A.   I recall he did.  He wasn't going up in front of us

23   and doing a number of different practice sessions, but, yeah,

24   he would try certain things.

25   Q.   Okay.  I want to turn to the contempt proceeding.  I

1    don't want to get into the substance of the contempt proceeding
2    at all.  But after the contempt motion was filed and that began
3    in early March, did you see or view any difference in
4    Mr. Kenner's performance in terms of his preparation or
5    anything else?
6        A.  No.
7        Q.  Did he direct the team to be less aggressive in their
8    defense of Mr. Michel?
9        A.  No.  I think, if anything, he was more aggressive.  I
10   don't think he was bothered by it.  He mentioned that he has
11   been doing this 50-plus years and he has dealt with worse.
12       Q.  Were there any conversations about how he needed to
13   get the judge's favor or the prosecutors' favor through the
14   lens of the contempt proceeding?
15       A.  Like kowtow to --
16       Q.  Yeah.  That he should modify his performance in order
17   to get their favor?
18       A.  No.  I don't think that happened.  I mean, being here
19   and seeing the interaction between Her Honor and Mr. Kenner, I
20   don't think that happened.  But, no, he never said anything
21   like that.
22       Q.  Okay.  Throughout trial, were you paid for your work?
23       A.  No.
24       Q.  Did you think during trial that payment was coming?
25       A.  Yes, I was promised payment.

1        Q.  Did you modify your behavior in any way because
2    payment was still coming and you hadn't received payment yet?
3        A.  No.  I mean, we just worked hard.
4        Q.  Was everyone on the team under the assumption,
5    operating under the belief that they were going to be paid for
6    their work?
7        A.  Yes.
8        Q.  Were there any modifications and decisions or choices
9    not to do things because payment wasn't coming through or that
10   payment wasn't being received?
11       A.  Not that I know of.
12           MS. LOCKHART:  Nothing else from us, Your Honor.
13           THE COURT:  All right.  Cross.
14           THE WITNESS:  Your Honor, can I get a quick cup of
15   water or --
16           THE COURT:  Sure.
17           MR. DEARINGTON:  Good morning, Your Honor.
18           THE COURT:  Good morning.
19                       CROSS-EXAMINATION
20   BY MR. DEARINGTON:
21       Q.  Good morning, Mr. Israely.
22       A.  Good morning.
23       Q.  I understand Mr. Israely is under a bit of a time
24   crunch --
25           THE COURT:  Can you speak into the microphone?

CROSS-EXAMINATION OF ALON ISRAELY                    29

1              MR. DEARINGTON:  Yes.  I'm sorry, Your Honor.

2              I understand Mr. Israely is hoping to expedite his

3    testimony for travel purposes, so I have prepared some binders

4    which I hope will streamline the process, given that we are not

5    in the trial setting.

6              THE COURT:  Certainly.

7              MR. DEARINGTON:  I don't plan to specifically ask the

8    witness to authenticate every document, but the government --

9              THE COURT:  Are these exhibits or what are they?

10             MR. DEARINGTON:  These are exhibits, Your Honor.  And

11   I would like to --

12             May I approach?

13             THE COURT:  Yes.

14             If you will hand it to Ms. Patterson.

15             MR. DEARINGTON:  I would like to enter them into the

16   record.

17             THE COURT:  Okay.  Has the other side had an

18   opportunity to review them?

19             MR. DEARINGTON:  Not in this compilation, given time

20   constraints.  I would propose if the government has any

21   objections, they raise them as we go and we can discuss.

22             THE COURT:  If helps to have this -- to do this in

23   advance so they know what is in there and we can do this more

24   expeditiously.  But let's proceed with the way you have done

25   it.

 1              MR. DEARINGTON:  Understood, Your Honor.

 2              THE COURT:  This doesn't give then an opportunity to

 3      double check.

 4              Do you have a list of the exhibit list so we can --

 5              MR. DEARINGTON:  No.  If Your Honor would like, we

 6      can go one document at a time if that is preferable.

 7              THE COURT:  However you want to do it.  Usually you

 8      provide an exhibit list, so if I admit something Ms. Patterson

 9      keeps track of it so we know what is part of the case and what

10      is not part of the case.

11              So you don't have an exhibit list at all?

12              MR. DEARINGTON:  No, Your Honor.  And if the Court

13      would object to us actually just moving everything at once, we

14      can do it the more traditional way.

15              THE COURT:  I don't have any problem doing that,

16      however, if you haven't shown it to the government, it depends

17      on whether they would agree.  They need to look at it.

18              So can I suggest that in going forward, you make sure

19      that if you are going to use exhibits, which is fine I would

20      have expected that, that you make sure you share it so we know

21      whether they agree or don't.  You can come in and say, yes,

22      they agree, no, they don't agree and we can move this along.

23      You also need an exhibit list.  We should not have to write one

24      up for you.

25              MR. DEARINGTON:  Absolutely, Your Honor.  We can

CROSS-EXAMINATION OF ALON ISRAELY

```
1    provide that following today based on what has been admitted or

2    not admitted.  So I appreciate that concern, Your Honor.

3                 May I approach the witness?

4          THE COURT:  Yes.

5          THE WITNESS:  I don't get it up on the screen?

6          MR. DEARINGTON:  No.  But I will be hopefully using

7    the ELMO.

8          THE COURT:  You can use either the ELMO or an

9    electronic way of doing it.

10         THE WITNESS:  That is fine.

11         MR. DEARINGTON:  My preference would be to use the

12   ELMO and everybody else has a copy of the binder.

13         THE COURT:  That is fine, however you want to do it.

14         MR. DEARINGTON:  Great.

15   BY MR. DEARINGTON:

16         Q.  Good morning, Mr. Israely.

17         A.  Good morning.

18         Q.  When did you graduate law school?

19         A.  2000.

20         Q.  How would you characterize your current profession?

21         A.  Legal technologist.

22         Q.  Okay.  And I heard you testify to that effect earlier.

23   So fair to say you are not a practicing lawyer?

24         A.  Sure.

25         Q.  Okay.  And how did you come to meet Mr. Kenner?
```

1        A.   I have known Mr. Kenner since I was young.

2        Q.   Approximately how old?

3        A.   Maybe I was 17.

4        Q.   And how did you come to meet him?

5        A.   I am friends with his daughter.

6        Q.   How did you become friendly with his daughter?

7        A.   Just we are in the same neighborhood, same temple.

8        Q.   So fair to say that you grew up in Mr. Kenner's

9   neighborhood?

10       A.   Nearby, yeah.  Los Angeles is a small neighborhood.

11       Q.   Did you attend school with Mr. Kenner's daughter?

12       A.   No.

13       Q.   So how long, roughly, have you known Mr. Kenner?

14       A.   I would say 35 years, 30 years -- 30, 35 years, a long

15   time.

16       Q.   You two are close?

17       A.   We are close now, yes.

18       Q.   And I understand that you have counsel with respect to

19   this matter; is that accurate?

20       A.   Correct.

21       Q.   And have you, separate from your counsel, had

22   discussions with Mr. Kenner about today's proceedings?

23       A.   Generally.

24       Q.   And by generally, what do you mean?

25       A.   We discussed having to come testify.  And we -- I

1    reviewed the motions that were made and we had discussed that

2    at some high level.

3         Q.   Can you think of anything specifically about the

4    motions that you discussed with Mr. Kenner?

5         A.   Mr. Kenner asked my opinion as to what I thought of

6    the motions and some of the allegations made.  Mostly what I

7    said so far.

8         Q.   When was your most recent discussion directly with

9    Mr. Kenner?

10        A.   I think we had a call a few days ago or last week.  He

11   was preparing for this.  And so he wanted to get my opinion.

12        Q.   Your opinion on what precisely?

13        A.   On what I thought of his -- you know, whether I

14   thought he did a good job and whether I thought he was -- you

15   know, if I thought any of the allegations were -- my opinion

16   about some of what was said in the motion.

17        Q.   And did he ask you how you might testify today?

18        A.   No.

19        Q.   But he asked you what your opinion would be about

20   certain matters relative to our motions?

21        A.   He asked what I thought of the motion.

22        Q.   And anything else you guys discussed?

23        A.   And I volunteered information to him.

24        Q.   What type of information?

25        A.   Since the motion was filed, I called him and said, can

1    you believe, you know, what some of this says?  This is crazy.

2         Q.  And did you ask Mr. Kenner about his testimony?

3         A.  No.

4         Q.  Did you ask him about his opinions in reaction to the

5    motions?

6         A.  No.  I didn't need to.  I knew his opinion.

7         Q.  Understood.  Anything you discussed with Mr. Kenner

8    during that call or since we filed the motions?

9         A.  No.  I tried to keep -- we talk about business.  I

10   tried to keep all of this outside of the purview of discussion.

11        Q.  How many times would this case have come up in

12   conversations with Mr. Kenner since we filed our motion?

13        A.  A handful.

14        Q.  What would be a handful in your view?

15        A.  Three or four.

16        Q.  So your testimony is you discussed with Mr. Kenner,

17   the post-trial motions in Mr. Michel's case three to four times

18   since we filed the post-trial motions?

19        A.  Yeah, mostly early on before I was subpoenaed.

20        Q.  And then again last week before these hearings?

21        A.  Yeah.  As a logistics call more than anything else.

22        Q.  Okay.  And you mentioned you are business partners

23   with Mr. Kenner; correct?

24        A.  Correct.

25        Q.  You and Mr. Kenner both have an interest in CaseFile

1   Connect?

2        A.  Correct.

3        Q.  Along with a third person called Brian Schrader?

4        A.  Correct.

5        Q.  Any other business interest you have had in the past

6   with Mr. Kenner directly or indirectly?

7        A.  No.

8        Q.  You testified about when your assistance with this

9   case began.  Does July 2021 sound approximately correct?

10       A.  Sure.

11       Q.  And --

12       A.  I feel like it took a couple of years of my life, so

13  it sounds right.

14       Q.  And in your capacity as an owner of Business

15  Intelligence Associates, BIA; is that right?

16       A.  What is the question?

17       Q.  You joined the case in your capacity as an owner of

18  BIA, Business Intelligence Associates; correct?

19       A.  Not as an owner of BIA.  I joined as a discovery

20  expert.

21       Q.  You had no interest in BIA?

22       A.  Yeah, I owned BIA.  But I did not join in the capacity

23  as an owner.  I joined the case as a discovery expert employed

24  by BIA.

25       Q.  And did Mr. Kenner retain BIA at a time when you owned

1    BIA to help with Mr. Michel's case?

2        A.   Yes.  He had retained the company before.  But, yes,

3    for this case he did.

4        Q.   During the pendency of the case as BIA was retained by

5    Mr. Kenner, you sold BIA to Haystack; correct?

6        A.   Correct.

7        Q.   And was that around September of 2022?

8        A.   Yes.

9        Q.   And the Haystack personnel continued to work on the

10   case at that time; correct?

11       A.   Correct.

12       Q.   Okay.  I would like to talk a little bit about the

13   defense team.  Because Ms. Lockhart walked through some of

14   these defense team members and I would like to seek some

15   clarity on their roles and backgrounds.  If you could turn to

16   Tab 1, which I would move to admit as Exhibit 1.

17       A.   I see my bio, yeah.

18       Q.   Yes.  Is that an accurate picture of your LinkedIn

19   profile?

20           THE COURT:  He is going to need time to take a look

21   at it.

22   BY MR. DEARINGTON:

23       Q.   Yes, take as much time as you need.

24       A.   I assume so, it looks --

25           THE COURT:  Take a look at it, since he is obviously,

CROSS-EXAMINATION OF ALON ISRAELY

1    asking you if it is accurate, unless you are already familiar

2    with it.

3    BY MR. DEARINGTON:

4        Q.  Yes.  Mr. Israely, if I am ever moving too quickly, it

5    is for your benefit, so please stop me.

6        A.  I appreciate that.  Yes, it looks accurate.

7        Q.  You have never litigated a case as an attorney;

8    correct?

9        A.  No.

10       Q.  You have never tried a case as an attorney; correct?

11       A.  I have been part of the trial team, but not as the

12   primary attorney.

13       Q.  Well, were you a secondary attorney?

14       A.  No.  As an expert, as I said.

15       Q.  As an e-discovery specialist; correct?

16       A.  Correct.

17       Q.  At the outset when you joined Mr. Michel's defense

18   team, you didn't have a substantive role in the case beyond

19   helping with the e-discovery; is that fair?

20       A.  That is fair, correct.

21       Q.  But at some point, you were listed as an attorney by

22   Mr. Kenner and started taking on more of a junior attorney

23   role; correct?

24       A.  Well, after I think the third or fourth status

25   conference, Her Honor had asked who I was and whether I would

1    be involved.  And I said, yes.  And I think it was determined

2    that I should be pro hac-ed because I was going to be on a lot

3    of the status conferences and likely sitting at counsel table.

4        Q.  That was just not a nominal characterization, you also

5    did play a role of attorney in this case; correct?

6        A.  I would say I was more of a coordinator.  So I helped

7    coordinate the other attorneys.  I didn't do a lot of

8    substantive work.  I wasn't doing necessarily research and

9    drafting -- doing first drafts of things.

10       Q.  You did indicate in a phone call with the government

11   recently however that you were the one who researched FARA; is

12   that correct?

13       A.  I did some of the FARA research, yeah, primarily

14   because I was interested.

15       Q.  Understood.  And you sat at counsel table during the

16   trial; is that correct?

17       A.  That is correct.

18       Q.  Okay.  If you can turn to tab 2.  Does that appear to

19   be -- take your time.  Does that appear to be a picture of

20   Mr. Kenner's former law firm web page?

21       A.  Yes, this looks like an old website.

22       Q.  Does he have a current website?

23       A.  I don't think so.  He has wanted to put one together.

24       Q.  Do you know why he stopped using the website?

25       A.  Because Mr. Kenner has people call him for cases.  He

1    doesn't need a website to market himself.  He is very well

2    known in the community.  And so if he has clients, they usually

3    come through referrals.

4         Q.  And his reputation, therefore, is very important to

5    him, would you say?

6         A.  Yes.

7         Q.  And at the outset, when you joined the case, did you

8    have confidence in Mr. Kenner's ability to prosecute the

9    defense from a defense perspective?

10        A.  Yes.

11        Q.  And is part of that is because he had a -- what you

12   called a storied career, such as high profile cases such as

13   representing Snoop Dogg and others in the '90s?

14        A.  Partly.

15        Q.  Did you think that would translate to a case like this

16   involving FARA and FEC-type allegations and so forth?

17        A.  Well, I knew that he had been successful in a lot of

18   white collar crimes or he had been involved in complicated

19   cases, so I thought this is a complicated case, he is probably

20   going to be --

21        Q.  You said successful in white collar crimes, you mean

22   criminal defense; right?

23        A.  Yes.  Sorry.

24        Q.  Can you think of a successful white collar criminal

25   defense case that you had been thinking about at that time?

1      A.   I know he had -- I don't know something specific.   I

2  remember there was a -- some -- I don't recall the names of the

3  cases.  I know there were some complicated schemes that he

4  defended --

5      Q.   Okay.  But --

6      A.   -- financial schemes and --

7      Q.   But not --

8      A.   -- and --

9      Q.   So was it your view that would translate well to a

10 case of this complexity and of this nature?

11     A.   Yeah.  I just knew Mr. Kenner of being a seasoned

12 attorney, a good criminal defense attorney, someone who I would

13 call if I ever got in trouble.  And it wasn't out of the

14 ordinary that he would have an entertainment client with a

15 complicated case.

16     Q.   Has he ever served as your attorney?

17     A.   No.

18          MR. DEARINGTON:  And again, Your Honor, I am going to

19 not move everything at this time.  Maybe if it makes sense at

20 the end, we can deal with any objections unless the government

21 would like to stand and object on this.  But I am going to flip

22 to tab number 3.

23          MS. LOCKHART:  So, Your Honor, I'd like to be heard

24 with -- beginning with Exhibit number 3.  There seem to be kind

25 of a tranche of documents of which it seems unlikely

1    Mr. Israely is going to have personal familiarity with.  It is

2    a number of LinkedIn pages for other individuals on the team.

3    There is email communications in here from my quick review that

4    he is not on.  So I'd like to flag that for the Court that we

5    do object to Mr. Israely going over documents or being asked

6    about documents that he has no personal knowledge of.

7                THE COURT:  If that is the case, then I would agree

8    with her.  I mean, he is looking at them for the first time.

9    It does look like some of these things -- he can indicate

10   whether he knows anything about it.  But it sounds like you are

11   asking him about things about other attorneys.  And he may not

12   know particular things, which makes it less useful in terms of

13   doing this, because you are asking him about other people.

14               MR. DEARINGTON:  Your Honor, I would respond that

15   given this is not a trial, it is a proceeding --

16               THE COURT:  Let's get stuff that is relevant.

17               MR. DEARINGTON:  Sure, Your Honor.

18               THE COURT:  It isn't relevant to get him to talk

19   about people that are other attorneys in the case.

20               MR. DEARINGTON:  Yes.

21               THE COURT:  Basically, get the information from them

22   directly.

23               MR. DEARINGTON:  That is fine, Your Honor.

24               THE COURT:  I mean, it depends on which ones you are

25   talking about.

1          MR. DEARINGTON:  Some of this, again, was just meant

2     to streamline the refreshing of recollections about the

3     backgrounds of these attorneys.  Certainly we don't need to if

4     we don't have to and and we can just ask the questions.

5          THE COURT:  So I don't know what is in here.  You can

6     decide how you are going to do it.  If you ask him about other

7     attorneys and other documents that talk about other attorneys,

8     I don't see it as being particularly relevant and doubtful that

9     he is going to know necessarily, recognize each one of these

10    things.  I don't see how that is going to move this case along.

11         MR. DEARINGTON:  Understood, Your Honor.  Our

12    position would be, it would go to weight.  It is an evidentiary

13    hearing.  But that said, I don't think we need to go through --

14         THE COURT:  It would help if you had shown it to the

15    government to start with, so we can weed out what is not going

16    to be admitted or they have objections to.  And then we can

17    proceed instead of going document by document, which as a

18    practical matter takes more time.

19         MR. DEARINGTON:  Yes, Your Honor.  Part of that,

20    apologies to the Court and the government, due to the

21    reordering of witnesses and we were in a little bit of a rush.

22    We will certainly do that tomorrow.

23         THE COURT:  Definitely do a witness list -- I have a

24    witness list, I mean the exhibit list.

25         MR. DEARINGTON:  An exhibit list, understood, Your

 1    Honor.

 2            THE COURT:  So we have -- we have talked

 3    about Exhibit 1 and 2.  I would agree that 3 seems to be about

 4    somebody else.

 5            MR. DEARINGTON:  Okay.  Understood, Your Honor.

 6    BY MR. DEARINGTON:

 7        Q.  So Ms. Kriss Anne Carlstrom, was she also on the case?

 8        A.  Yes.

 9        Q.  When she joined the case, she was a document review

10    attorney who worked for Haystack; correct?

11        A.  Correct.

12        Q.  This was her first trial as well?

13        A.  I don't know.

14        Q.  You are not aware of any other trials she has had, are

15    you?

16        A.  I am not aware either way.

17        Q.  She graduated law school and became an attorney around

18    2019.  Does that sound consistent with your understanding?

19        A.  I really don't know her background.

20        Q.  She joined the team and you weren't aware of her

21    background?

22        A.  She was vetted by Haystack.  I trust their vetting.

23    She is an attorney.  And she was interviewed by Mr. Kenner.

24    And she had strong Relativity skills.  That was enough for me.

25        Q.  And are you aware that she describes herself as an

1   e-discovery legal analyst?  Rather, let me reframe that.  Is

2   she a legal analyst engaged in e-discovery?

3       A.  I guess, yeah.

4       Q.  And I take it you are unaware one way or another

5   whether she has worked on a criminal case before Mr. Michel's?

6       A.  I am not sure whether she has or not.

7       Q.  Are you aware that her background was in health

8   regulatory compliance and hospital operations?

9       A.  Yeah, I knew she had experience in the health -- the

10  health industry.

11      Q.  And was she engaged by the defense team around

12  September 2022?

13      A.  If you say so.  I mean, I don't remember, but --

14      Q.  Well, if you don't know --

15      A.  I don't remember, but --

16      Q.  Okay.  But that sounds ballpark; right?

17      A.  Sure.

18      Q.  And that would have been less -- roughly two months

19  before the original November trial date; is that right, one to

20  two months?

21      A.  Yeah.  I remember she was around for a few months

22  before the mock trial.

23      Q.  And her initial role was to review the millions of

24  documents that had not been reviewed before trial; is that

25  correct?

CROSS-EXAMINATION OF ALON ISRAELY                    45

1         A.   No.   She was -- Mr. Kenner needed more than a review

2    attorney.   It is a particular type of attorney.   And so with my

3    assistance, we went to Haystack and asked for a specific

4    profile.   Someone who was not a review attorney, but better

5    than a review attorney, someone who could do substantive work,

6    someone who has good research skills.   And there were a number

7    of people brought up by them because they are a staffing

8    attorney and she was one of the ones that was chosen.

9         Q.   So fair to say that the defense team and Mr. Kenner as

10   lead counsel; correct?

11        A.   Yes.

12        Q.   Mr. Kenner and the defense team were beefing up about

13   two months before trial and that is why they and you retained

14   Ms. Carlstrom?

15        A.   I don't know if I would describe it as beefing up.

16        Q.   How would you describe it?

17        A.   Mr. Kenner needed more people.   What happened was it

18   was determined that the volume of data, as much as we knew it

19   was a lot, it was determined that we actually had to go through

20   a lot more than we thought.   At first we thought we could take

21   typical methods in order to cull data down.   But the state of

22   the data, the way that it is collected in a criminal case by

23   law enforcement and the way it goes through the process before

24   it is produced makes it so you can't -- you can't take

25   advantage of the some of the technologies off the bat, so you

CROSS-EXAMINATION OF ALON ISRAELY

1   have to do a lot of prep work in order to code it and do some

2   things.  So that is a lot of what we did early on.  Once we saw

3   that we actually need people to review, almost put eyes on

4   every document and do much more deep research, Mr. Kenner

5   determined that he needed more people.

6        Q.  That was approximately two months before the original

7   trial date?

8        A.  I don't remember when.

9        Q.  Approximately, you can't say?

10            THE COURT:  He doesn't remember.  He doesn't

11   remember, move on.

12            THE WITNESS:  You would have to look -- I know that

13   she was working or others were working before.  And then at one

14   point, she was brought on -- she was allotted more hours.  I

15   actually think she was brought on earlier.  And then maybe

16   around that September is when she almost came on full-plus

17   time.

18   BY MR. DEARINGTON:

19        Q.  Christina Winters, she was a part of the defense team?

20        A.  She was a receptionist/office manager.  I don't know

21   if I would call her part of the defense team.

22        Q.  Not a licensed attorney; is that fair?

23        A.  No.

24        Q.  Did you help hire her to Mr. Kenner's law firm?

25        A.  I did in that I helped him post the job description.

CROSS-EXAMINATION OF ALON ISRAELY

1        Q.  Mr. Haskell, you said, was -- you testified was local

2   counsel, but also took on some more substantive roles during

3   trial; is that fair?

4        A.  Yeah.  I think he was instrumental during trial.

5        Q.  Was his specialization DUI defense in criminal related

6   practice?

7        A.  I knew him as a local criminal defense attorney and a

8   smart guy.

9        Q.  He attended trial?

10       A.  Yes.

11       Q.  And then Bill Maddix, you also referenced; correct?

12       A.  Correct.

13       Q.  He was a contract attorney who worked for Haystack,

14   but he worked remotely in Minnesota; is that right?

15       A.  I don't know where he was physically, but he did work

16   remotely.

17       Q.  And are you aware that his practice relates to

18   Minnesota malpractice cases?

19       A.  Maybe at the time.

20       Q.  But he was not a criminal lawyer; right?

21       A.  I thought he was a criminal attorney or at least he

22   had experience in a criminal defense domain.  That was my own

23   presumption maybe.

24       Q.  Did you ever look at his website, his law firm

25   website?

CROSS-EXAMINATION OF ALON ISRAELY

1        A.   No.   Again, he was -- went to a staffing company, give

2   them our criteria, interviewed them.   Mr. Kenner was happy with

3   them, that was all I needed.

4        Q.   And he did a substantial amount of work during trial

5   remotely; correct?

6        A.   Well, he worked completely remotely, so, yeah, all of

7   the work he did was remote.

8        Q.   In that, would you characterize that as a substantial

9   amount of work?

10       A.   I think we all worked substantial.   We were pulling

11  20-hour days.

12       Q.   And then Lois Heaney you testified about; correct?

13       A.   Correct.

14       Q.   She was a trial consultant who had often worked with

15  Mr. Kenner in the past?

16       A.   Correct.

17       Q.   She was not a lawyer?

18       A.   I don't think she was an attorney, no.

19       Q.   And then Katherine Lestelle, she was a private

20  investigator who worked with the defense; is that right?

21       A.   Correct.

22       Q.   She also worked frequently with Mr. Kenner?

23       A.   Yes.

24       Q.   Also not a lawyer; right?

25       A.   She is not, but she is a seasoned investigator.   She

1    knows a lot more than many attorneys.  She was instrumental in

2    finding facts and preparing.

3         Q.  And she attended trial?

4         A.  Yes, most of the time.

5         Q.  And then I think you testified about a Liquori or

6    Corrie Campbell; right?

7         A.  Correct.

8         Q.  Is that Mr. Kenner's former bodyguard?

9         A.  He is Mr. Kenner's paralegal.

10        Q.  Was he always Mr. Kenner's paralegal?

11        A.  I don't know how they started.

12        Q.  Okay.  Are they fairly close?

13        A.  Yes, they are very close.  I think he has been with

14   him 17 years or something like that.

15        Q.  And he attended trial as well; right?

16        A.  Yes.

17        Q.  Okay.  I would like to talk to you a bit about trial

18   preparations now that we have established the core of the team.

19   So starting with legal memos and legal research.  Are you aware

20   of any formal legal memos or legal analysis prepared prior to

21   trial related to the FEC statutes and regulations charged in

22   the indictment?

23        A.  Like a big law firm memo where you would write a memo

24   to file or what are you asking me?

25        Q.  Let's start with a legal memo.  What would you

 1    characterize as a legal memo?

 2        A.  A draft of a motion, an outline.

 3        Q.  So I will correct my question there.  Not something

 4    that is a filing with a court, but rather something that is --

 5        A.  Yeah, an internal document.

 6        Q.  An internal attorney work product document --

 7        A.  Correct.

 8        Q.  -- that analyzes the FEC statutes and regulations and

 9    how they might apply to this case or defenses that could be

10    raised?

11        A.  Right.

12        Q.  Do you recall any of those being prepared?

13        A.  I recall versions of those.  So I am familiar with a

14    legal memo.  I have worked for 20 years in the civil domain and

15    with mostly AM Law 200 firms.  And so usually a legal memo is a

16    battalion of associates who do a bunch of work and put together

17    an internal memo for, you know, whatever purposes the client or

18    the -- so that was not -- that kind of formality was not,

19    because we just -- Mr. Kenner didn't have that staff.  But he

20    had a version of -- what I would call a version of that through

21    outlines and research documents.

22        Q.  Well, I guess my research documents, are you saying

23    legal research documents that analyze the charged statutes and

24    the facts and discuss strategy related to those?

25        A.  Yeah.  Mostly in the form of drafts of motions.

1     Q.  Okay.  So back to -- we are talking about motions and

2  nothing else?

3     A.  Well, you know, I say drafts of motions.  They didn't

4  necessarily turn into motions, but they started in that manner

5  or we might want to write a motion about this or we want to

6  figure out this aspect, let's start a draft of that.

7     Q.  And Mr. Maddix was primarily involved with drafting

8  filings; is that correct?

9     A.  No.  Him, Mr. Kenner, Ms. Carlstrom.

10    Q.  Can you identify or recall any draft filings -- let's

11 say substantive filings like motions or other briefs that

12 Mr. Kenner himself drafted?

13    A.  Yeah, a lot.

14    Q.  Which ones?

15    A.  Some of the early stuff, the motion to dismiss, some

16 of the others.

17    Q.  Now, I thought that someone named Mr. McBride, Mark

18 McBride drafted the motion to dismiss.  Am I correct?

19    A.  Mr. McBride was also a longtime associate of

20 Mr. Kenner's.  And he would be assigned to do early drafts or

21 what you would call a memo to file for Mr. Kenner.

22    Q.  So when you say Mr. Kenner drafted a motion to

23 dismiss, might you have been mistaken and Mr. McBride did it?

24    A.  No.  Mr. Kenner would get on a call with either

25 Mr. McBride or myself or Mr. Campbell and he would dictate.

1    Mr. Kenner didn't physically draft them in that he wouldn't

2    type them into the keyboard.  But he would talk and someone

3    would type.  He is not a great typist so --

4         Q.  Understood.  But --

5         A.  A lot of times the initial --

6              THE COURT:  Go ahead.  You are stepping on each

7    other's lines, so we can keep track.  Not only record, but so I

8    can keep track of it.  Let him finish his answer before you

9    move on.

10             And let him finish his question.  You can pick up.  I

11   interrupted you.

12             THE WITNESS:  A lot of times the initial spark or

13   content would come from Mr. Kenner in that he would dictate.

14   Ms. Winters may have even been involved in part of this.  He

15   would dictate something or give an outline or bullet points.

16   And those would then get assigned to Mr. McBride or others to

17   then expand out.  That would come back to Mr. Kenner.  He would

18   continue to do some dictating and that is how much of -- a lot

19   of this stuff was drafted.

20   BY MR. DEARINGTON:

21        Q.  Okay.  So when you say Mr. Kenner drafted motions, you

22   mean he dictated orally things?

23        A.  Correct.  Correct.

24        Q.  Do you remember a time when Mr. Kenner also outsourced

25   certain briefing help to the Cochran Law Firm?

1      A.  No.

2      Q.  No?  Around 2022?

3      A.  For this case?  I have no knowledge of that.

4      Q.  Okay.  Same question I had before about legal analysis

5  and written work product, but as to the other statutes charged

6  in the indictment -- superseding indictment.  Are you aware of

7  any such work product prior to trial?

8      A.  Are you asking me if memos to file were written on a

9  count-by-count basis?

10     Q.  Or to the client, internal work product memos

11  analyzing the statutes in the indictment and how they might

12  apply to the facts or allegations?

13     A.  From my experience, most of the interactions between

14  Mr. Michel or between Mr. Michel and Mr. Kenner were through

15  in-person meetings or phone calls.

16     Q.  That is not what I am asking, Mr. Israely.  I am

17  asking if you are aware of any memo or legal analysis relating

18  to the charged statutes and how the facts or allegations might

19  apply, prepared prior to trial?

20     A.  Let me clarify what you mean.  Are you asking whether

21  Mr. Kenner drafted a memo and then handed it to Mr. Michel to

22  review?

23     Q.  I guess I am asking the types of work product that

24  engaged with the statutes and the facts at the same time in

25  order to inform strategy that were prepared before trial?

1        A.   Mostly in outline form.

2        Q.   We are talking about motions again; is that right?

3        A.   Not necessarily.  Outline form like, for example,

4   maybe the FARA stuff, because, again, that was something I was

5   more involved with, where there were a number of bullet points

6   and other outlines put together to help Mr. Kenner discuss that

7   with either the team or Mr. Michel, that he would use that did

8   either -- was not necessarily created for a motion, but for his

9   own edification.

10       Q.   And you are talking about a document that would

11  include legal analysis?

12       A.   I am not sure what you mean by legal analysis.

13       Q.   I guess I am wondering -- we have received what is the

14  defense file.  And we are trying to find legal memos that

15  engage the facts.  And we are having trouble finding anything.

16  And I am wondering if they don't exist.

17       A.   I don't know.  It seems like you are asking me whether

18  he took an AM Law-type process to write a bunch of legal memos

19  to himself, I think that was done.

20       Q.   Not what I am asking, but I think we can move on from

21  there.

22            So you had a call with the government prosecutors in the

23  case in the last couple of days; is that correct?

24       A.   Yes.

25       Q.   Ms. Lockhart asked you whether you thought today --

1    whether you thought Mr. Kenner was familiar with the charged

2    statutes?

3         A.  Correct.

4         Q.  But during that call, isn't it true that you said he

5    was familiar with "most of the charged statutes"?

6         A.  I don't remember if I said most, but --

7         Q.  Fair to say that --

8         A.  I think I -- if I said most, it was probably because I

9    was setting aside FARA.

10        Q.  So Mr. Kenner was not familiar with FARA?

11        A.  I mean, familiarity is a degree; right?  So he knew it

12   and he understood it.  He didn't know the nuances.  He got to

13   know it very quickly.

14        Q.  Okay.  Do you recall an instance when in 2022, when

15   you were thinking about retaining Richard Malone?

16        A.  Yes.

17        Q.  Do you recall telling Mr. Malone there were no money

18   laundering charges in this case and then you had to correct

19   that you had gone back to the indictment and there were money

20   laundering charges?

21        A.  I don't remember that.  There were a lot of

22   interactions with Mr. Malone.  It wasn't brief.  There was a

23   Daubert hearing.  So he was -- many, many meetings, back and

24   forth, documents, he had access to a lot of documents.  I don't

25   recall saying that.  If --

1    Q.  Okay.  We can come back to that.

2         I want to ask you about our allegation that there was no

3    motion to sever in the case.  You are familiar with that?

4    A.  Yes.

5    Q.  And do you know why there was no motion to sever by

6    Mr. Kenner's defense team?

7    A.  That was, like I said, I was not involved in the

8    substantive -- the deep weeds, substantive stuff procedurally

9    like that, so I don't really remember.  The only thing I recall

10   is maybe if it was brought up, I think maybe either Mr. Kenner

11   or -- thought that it was already attempted by previous

12   counsel.  And that he didn't -- I remember mostly a statute of

13   limitations discussions and that was attempted.  And that it

14   didn't make sense to try to do it again, because he had

15   reviewed all of the motion practice.  But I don't remember much

16   about the severance issue.

17        I mean, I am familiar with it based on your motion, but I

18   don't remember much discussions around it.

19   Q.  So are you saying that Mr. Kenner had been aware that

20   the prior counsel had moved to sever and the Court denied the

21   motion to sever and that may have been why --

22   A.  I think.  And that is only in trying to remember

23   after -- in thinking about your -- you know, seeing it in your

24   motion, I tried to remember to myself, like was that -- did

25   that even come up?  And then I thought, well, maybe it did and,

1    you know, the other guys tried it and -- but that is about the

2    most thought I gave it.  But I don't remember any substantive

3    discussions and conversations about that.

4        Q.  Would it surprise you to learn that the prior motion

5    to sever related to the first indictment, which did not include

6    the 2017 allegations?

7        A.  I wouldn't -- nothing surprises me after this

8    experience.

9        Q.  So would you agree that if someone were to move to

10   sever the 2012 from the 2017 allegations in the superseding

11   indictment, that would have been Mr. Kenner and the defense

12   team because he came on when the superseding indictment was

13   pending; is that right?

14       A.  Well, he was the attorney.  So if you are asking me,

15   that he would be in charge of making any kind of discussion

16   then, obviously, yeah.

17       Q.  Okay.  Fair to say there was no legal analysis you are

18   aware of related to the decision whether or not to sever?

19       A.  Not that I am aware.  But I want to be clear, I was

20   not second chair, so I didn't have -- I was primarily neck deep

21   in discovery for a big -- you know, a long period of time.  So

22   I was not -- Mr. Kenner had a lot of discussions outside of my

23   purview about procedural issues and substantive issues with the

24   case.  I wasn't his partner.  He didn't bring me into

25   discussions many times.

1        Q.  Understood.  If you could please turn to tab 9 of your

2   binder and let me know when you are there.

3              MS. LOCKHART:  Your Honor, just for your awareness, I

4   think this is another document that it is unclear from the

5   document itself that Mr. Israely is going to have personal

6   knowledge of.

7              MR. DEARINGTON:  Your Honor, I'd like to ask the

8   question and lay some foundation before the objection if

9   possible, because I think it will move more quickly.

10             MS. LOCKHART:  That is fine, just for the Court's

11  awareness.

12             THE COURT:  Fine.  Each of these -- some of these

13  documents whether he knows anything about it or has seen this

14  before.

15             MR. DEARINGTON:  Absolutely, Your Honor.  That was

16  going to be my first question.

17             THE COURT:  Let him have an opportunity to review it

18  before you ask.

19             THE WITNESS:  I think this is a document that was

20  provided to me by Mr. Denaro.

21  BY MR. DEARINGTON:

22        Q.  Do you recall when it was provided to you by

23  Mr. Denaro?

24        A.  No.  Before trial.

25        Q.  How long before trial?

1        A.  I don't remember.  Not long before trial, I don't

2   remember.

3        Q.  I would to like ask you some questions about

4   Mr. Denaro.  Is that Joel Denaro?

5        A.  Correct.

6        Q.  And is he a law school friend of yours who practices

7   criminal law in Miami?

8        A.  Correct.

9        Q.  And Mr. Denaro messaged you after seeing an article in

10  Bloomberg in March 2023; is that right?

11       A.  Maybe.

12       Q.  Maybe he messaged you or --

13       A.  Maybe he messaged me.  I had talked to him about the

14  case.

15       Q.  Okay.  The reason you asked -- you asked Mr. Denaro to

16  come out to California and meet with the defense team; is that

17  correct?

18       A.  Mr. Kenner needed someone to prep Mr. Michel on cross.

19  And I suggested Mr. Denaro.  And Mr. Michel and Mr. Kenner

20  agreed to have him come out.  They agreed to his fee, which I

21  paid.  I was supposed to get paid back for, I had not.  So,

22  yeah, he was brought out to help prep for cross.

23       Q.  And the meeting took place in Mr. Kenner's offices in

24  Encino, California?

25       A.  Correct.

1      Q.  It was about ten days before trial, does that sound

2  right?

3            THE COURT:  He had a meeting with just Mr. Denaro?  A

4  meeting with Mr. Michel?  What kind of a meeting?

5            THE WITNESS:  Mr. Denaro, Mr. Michel, myself,

6  Mr. Kenner and I think Ms. Heaney was there as well.

7  BY MR. DEARINGTON:

8      Q.  Was that approximately ten days before trial?

9      A.  No, that was long before trial.  I don't think it was

10  ten days before.

11      Q.  Could you give me an estimate?

12      A.  I would have to check.  I booked him a hotel, so I

13  could probably find the hotel records, but I recall it being --

14  I thought it was before the mock trial, but I don't know.  I

15  would have to check.

16      Q.  Would it surprise you --

17      A.  It feels like ten days -- it wasn't ten days.  I feel

18  like ten days before, we were like -- I was putting equipment

19  together and shipping things out.  I think it was before that.

20      Q.  In the months before trial, would you say?

21      A.  I would say month, two months, yeah.

22      Q.  Would it surprise you to hear that he didn't see any

23  trial binders, witness binders, any sort of hard copy material

24  in the defense room?

25      A.  Well, he was only in Mr. Kenner's office.  I don't

CROSS-EXAMINATION OF ALON ISRAELY

1    know what he saw or what he didn't see.

2        Q.  Were you using binders during that meeting related to

3    this case?

4        A.  I think at the time, it was mostly electronic.

5        Q.  And if a document was to be viewed, you would pull it

6    up electronically?

7        A.  Usually, pull it up on -- Mr. Kenner has a big screen

8    in his office.  We would usually bring it up on the big screen.

9    Sometimes things would get printed.

10       Q.  Mr. Denaro's practice area includes money laundering

11   statutes; is that right?

12       A.  Sure.  I think that he is primarily involved -- from

13   my understanding, primarily involved in what I would call

14   cartel -- drug-cartel-type cases.

15       I don't know his -- we are friends.  I don't know much of

16   his practice.

17       Q.  How long have you known Mr. Denaro?

18       A.  A long time.  I was in his wedding, since law school,

19   20-some years.

20       Q.  Do you recall Mr. Kenner saying during that meeting

21   that he was having trouble understanding the money laundering

22   allegations?

23       A.  No.

24       Q.  You don't remember?

25       A.  I don't remember.  Honestly I don't remember much of

1   what happened at that meeting, except for prep.

2       Q.  And did Mr. Denaro recommend that you retain an FEC

3   expert at the time, Richard Clew?

4       A.  Yeah.  He suggested we speak to Mr. Clew.  And I think

5   Mr. Kenner and Mr. Clew had a number of conversations.

6       Q.  Okay.  I want to talk a little bit about the mock

7   trial that you touched on with Ms. Lockhart.

8       So Mr. Kenner asked Mr. Maddix to draft the opening

9   statement for the government a few days before the mock trial;

10  is that right?

11      A.  I don't know.

12      Q.  Okay.

13      A.  I mean I know that a lot of people helped work on the

14  mock trial preparation.  I don't know specifically who was

15  tasked with what.  As I said, I was coordinating and at the

16  time I was doing a lot of logistics coordination for the mock

17  trial.

18      Q.  Do you remember who drafted the mock opening for the

19  government?

20      A.  No.

21          MR. DEARINGTON:  Is the ELMO on?

22          Perfect.  Thank you.

23          THE COURT:  What exhibit is this?

24          MR. DEARINGTON:  I'm sorry?

25          THE COURT:  What exhibit is this?

```
 1              MR. DEARINGTON:  This is actually just to refresh
 2    Mr. Israely's recollection.
 3              THE COURT:  Okay.  But what is it?  For the record,
 4    we need some identification of it.  So what is it?
 5              MR. DEARINGTON:  Sure.  I am happy to proffer.  This
 6    is an email from Mr. Maddix to Mr. Kenner and --
 7              THE COURT:  So you need to find out whether he even
 8    knows anything about it.
 9              MR. DEARINGTON:  Right, that is what I was going to
10    ask, Your Honor.
11    BY MR. DEARINGTON:
12        Q.  So, Mr. Israely, do you recognize this email?
13        A.  Can I see the --
14        Q.  Yes.  I'm sorry.
15        A.  -- like header.
16        Q.  Okay.  Do you recognize this email?
17        A.  I see that it is an email and I am a recipient.
18        Q.  Is that your email address, one of your email
19    addresses that I have underlined?
20              THE COURT:  Can you into speak the microphone?  I am
21    having problems figuring out the record here.
22              MR. DEARINGTON:  Yes, Your Honor.
23              THE WITNESS:  That is an email address I used at the
24    time, yes.
25    BY MR. DEARINGTON:
```

1       Q.  Any reason to think that you didn't receive this

2  email?

3       A.  I am sure I received it.  I received thousands of

4  emails on this case.

5       Q.  Does this appear to be an email from Mr. Maddix to

6  Mr. Kenner and others on the defense team?

7       A.  Yes.

8       Q.  Does Mr. Maddix say, "Attached is my final draft of

9  the government opening statement for the 2017 charges."  And he

10 provides a copy; is that right?

11      A.  That is what it says, yes.

12      Q.  Okay.  And then he references drafting -- finalizing a

13 draft closing for the defense; is that right?

14              THE COURT:  We can't see that.

15              THE WITNESS:  I can't see that, but sure.

16              Yep.

17 BY MR. DEARINGTON:

18      Q.  So does that refresh your recollection about whether

19 Mr. Maddix prepared the draft openings for the government in

20 connection with the mock trial?

21      A.  Not really.  Because you have to understand that there

22 were tons of emails like this, draft this, here is a final,

23 here is that.  So it -- I mean, based on this it looks like he

24 was involved in drafting some parts of this.

25      But like I said, you know, he was involved in drafting a

```
 1    lot of things.
 2              THE COURT:  Who is the he?
 3              THE WITNESS:  Mr. Maddix.  He was assigned tasks and
 4    then he would deliver work product.
 5    BY MR. DEARINGTON:
 6         Q.  Does this appear to be an email from Mr. Maddix on
 7    January 24th on -- again, to Mr. Kenner, to you and others on
 8    the defense team?
 9         A.  It looks like it, yes.
10         Q.  Does it appear that he is again attaching a draft
11    closing for the government?
12         A.  Yes.
13         Q.  Would this have been days before the mock trial?
14         A.  You tell me.  I mean, if January 24th was a few days
15    before mock trial, again, I don't remember the specific dates
16    of everything, then, sure.
17         Q.  Late January, does that sound right for the mock
18    trial?
19         A.  I think so, yeah.
20              THE COURT:  Can I ask when it talks about draft
21    government opening, is this pretending to be the government?
22    Is that it?
23              THE WITNESS:  Yes, Your Honor.
24              THE COURT:  Or in response to the government, to a
25    government argument?
```

1          THE WITNESS:  This is a simulated opening thinking

2     about what the government would do.

3          THE COURT:  Okay.

4          THE WITNESS:  I think it was close.

5     BY MR. DEARINGTON:

6     Q.  And at that time, Mr. Maddix had only been part of the

7     case for a few months; is that right?

8     A.  Probably.

9     Q.  Do you recall Kriss Anne Carlstrom helping draft

10    defense opening and closings for the mock as well?

11    A.  Yes.

12    Q.  When you were at the mock trial, you were originally

13    meant to play the part of the government; is that right?

14    A.  That's correct.

15    Q.  Even though Mr. Maddix drafted the government's

16    opening and closing?

17    A.  Well, I was there physically.

18    Q.  And Mr. Maddix was not; right?

19    A.  Correct.

20    Q.  And then did you assign it to Kriss Anne Carlstrom the

21    day of the mock?

22    A.  I didn't assign it.  We had a discussion and thought

23    she would be better at it than I was.

24    Q.  But she had not drafted it or planned before the mock

25    to do the government opening; right?

1     A.  No.  She was involved in the preparation.  I don't

2    know if she was specifically involved in that part.  It was

3    more of needing an actor than anything else.  I think

4    Mr. Campbell acted as an expert.

5     Q.  Fair to say that Ms. Carlstrom just read the script

6    that had been drafted by Mr. Maddix to the jurors?

7     A.  I think she made it her own.  She worked on it for

8    some period of time.  She took what he and others had -- you

9    know, it is not like Bill or Mr. Maddix just wrote the thing

10   and handed it off.  He worked with Mr. Kenner on honing it and

11   making what it needed to be based on what Mr. Kenner wanted.

12   And then when I bowed out at acting, because I am not a good

13   actor, Ms. Carlstrom took it, made it her own, took notes, did

14   some research, talked to Mr. Maddix and then played that part.

15     Now, we are talking about the mock trial.

16     Q.  Sure.  Let's move past the mock trial.  So talking

17   about trial preparations and specifically direct and cross exam

18   outlines for witnesses.  Can you identify for me any cross exam

19   outlines that Mr. Kenner prepared before trial?

20        THE COURT:  Are we talking about the mock trial?  Are

21   we talking about the trial?

22        MR. DEARINGTON:  Your Honor, the actual trial.

23        THE COURT:  Okay.

24        THE WITNESS:  Like I said, Mr. Kenner acted as a

25   director to make a reference to trial.  He was like Scorsese.

1   He just directed everybody.  And so -- I don't -- you know, a

2   lot of times he would dictate, so I remember a lot of that.

3   BY MR. DEARINGTON:

4       Q.  So you can remember specific outlines that were

5   prepared for cross-examination before trial?

6       A.  I don't really remember anything specific.  A lot of

7   this is a blur.  But I do remember a lot of work getting put in

8   by the entire team, including Mr. Kenner, who was directing the

9   team to prep for cross, for direct, for witnesses.

10      Q.  So I am talking about outlines.  Are you aware of --

11          THE COURT:  Something in writing?

12  BY MR. DEARINGTON:

13      Q.  Something in writing, a written outline of questions,

14  for cross-examination prepared prior to trial, are you aware of

15  any?

16      A.  I am sure there were some.  I don't recall of any

17  specific ones, but I know -- I mean, there were outlines for

18  cross.

19      Q.  You have seen outlines for cross-examinations that

20  were prepared prior to trial?

21      A.  I think so, yeah.

22      Q.  But you are not sure?

23      A.  I am not sure.

24      Q.  And that would extend not to Mr. Kenner's work

25  product, but to the defense team.  You are not sure whether you

1    have seen cross-exam outlines prior to trial?

2         A.   There were a lot of outlines.  I don't remember

3    specifically which there were and which there were not.  I

4    think I produced to you guys a few hundred emails.  That was

5    just what I still had.  Most of the others were in the BIA

6    email and Mr. Kenner's files.

7         Q.   You don't recall in your production any

8    cross-examination outlines prepared prior to trial, do you?

9         A.   I just produced what I had.  I didn't review

10   everything.

11        Q.   Okay.

12        A.   There were no privilege issues.  I didn't think it was

13   necessary for me to do a review in the typical manner in

14   discovery.  And so I just gave you everything I had.

15        Q.   Okay.  Just one clarifying question about

16   Ms. Carlstrom at the mock.  She had never done an opening

17   statement mock or real prior to the mock trial that you are

18   aware of; right?

19        A.   I don't know.

20        Q.   Do you know if she has ever stood up in a courtroom

21   and spoken prior to the mock trial?

22        A.   I don't know.  You would have to ask her.

23             THE COURT:  If I could ask a clarification, you

24   indicated in terms of whatever potential written outlines in

25   terms of -- since it sounds like the team were not always in

1    one place, were the outlines, you know, written up

2    electronically?  Were they done through emails or how were any

3    written product done, other than Mr. Kenner's, as you have

4    testified, dictations?

5              THE WITNESS:  Many -- from what I recall, we would

6    have these Teams meetings where people would be up on screens.

7    And then everyone would -- people would take notes.  I don't

8    know if everybody, but people would take notes and emails were

9    exchange afterwards.  And then --

10             THE COURT:  What would be the content of the emails,

11   roughly?

12             THE WITNESS:  Usually summarization of the meetings,

13   issues, that strategy that we had figured out, issues that had

14   to be researched further, that kind of thing.  I do recall

15   there being outlines.  I just don't recall who specifically

16   drafted them.

17             THE COURT:  And they would have been, what,

18   electronic, written or what?

19             THE WITNESS:  They would have been like in Word

20   documents or in email form.  They would be in Mr. Kenner's

21   files.

22   BY MR. DEARINGTON:

23   Q.  So you recall -- you just testified, I believe, you

24   recall outlines that were written in electronic form.  Did you

25   mean before trial or during trial?

CROSS-EXAMINATION OF ALON ISRAELY

1          A.  I would say both, but definitely during trial.

2          Q.  But you testified previously you are uncertain whether

3     they were -- existed before trial or are you changing your

4     testimony?

5          A.  I just don't remember.  I -- my recollection is that

6     we had a lot of written work product, whether they were

7     specifically outlines or notes or -- I mean, I think some of

8     the stuff I turned over to you guys were my notes about things

9     so --

10         Q.  Would you have had a copy of a cross-examination

11    outline, if it existed prior to trial in your emails or

12    otherwise?

13         A.  If it was emailed to me, then I would have had it.

14         Q.  So if it wasn't in your production to us, then you

15    didn't have it and it didn't exist?

16         A.  Unless it was in my BIA or Haystack email, in which

17    case I have no access to that.  There is a good -- almost

18    probably 70 or 80 percent of my time, I was using that email,

19    the -- not my personal email, but my BIA, Haystack email, so it

20    would be there.  But almost every email I was on, someone on

21    the team was also on.

22         Q.  So Mr. Kenner, if such a cross-examination outline

23    existed in writing electronically, it would have been in

24    Mr. Kenner's emails and thus presumably produced to us?

25         A.  Presumably.

CROSS-EXAMINATION OF ALON ISRAELY

1    Q.  You mentioned earlier that Mr. Kenner drove the

2    regular meetings that were occurring; is that right?

3    A.  Correct.

4    Q.  Would it surprise you to hear from one of the

5    participants in the call that that person's experience was that

6    you did most of the talking during those meetings?

7    A.  I like to talk, but I don't -- I mean, that would --

8    well, maybe, I don't know.

9    Q.  And that Mr. Kenner infrequently spoke during the

10   meetings?

11   A.  He is a man of few words, so that wouldn't surprise

12   me.  No.  Again, I was coordinating a lot of it.  A lot of

13   times, I would discuss things on the -- I am a corporate guy,

14   so I would -- I can manage a meeting best, so it wouldn't

15   surprise me, no.

16   Q.  And Mr. Kenner often when he would call to dictate

17   something would have a phone conversation that lasted 5 seconds

18   or so, is that consistent with your recollection?

19   A.  No, definitely not.

20   Q.  So well perhaps because you have a close relationship

21   with Mr. Kenner, it is different.  Are you aware of whether he

22   would have phone conversations with members of the team where

23   he would just say, do X, and hang up the phone?

24   A.  You would have to ask him.

25   Q.  Fair to say Mr. Maddix was a key member of the defense

1   team?

2        A.   Sure.

3        Q.   He drafted briefs, he drafted many examination

4   outlines; correct?

5        A.   Correct.

6        Q.   A few days before the trial began, Mr. Kenner asked

7   Mr. Maddix to draft an opening and closing argument for him.

8   Do you recall that?

9             THE COURT:  Are we talking about the mock trial or

10  the actual trial?

11            MR. DEARINGTON:  I'm sorry, Your Honor.  I moved on

12  from the mock trial.

13            THE COURT:  So the real trial?

14            MR. DEARINGTON:  Yes, exactly.

15            THE WITNESS:  That is possible, yes.

16  BY MR. DEARINGTON:

17       Q.   Mr. Maddix drafted a number of the key

18  cross-examination outlines; is that correct?

19       A.   The first drafts of them, yes.

20       Q.   When you say that -- during trial, now we'll talk

21  about during trial, the cross-examination outlines.  I believe

22  you said that Mr. Kenner -- testified to the effect that

23  Mr. Kenner would crowd source thoughts for what you called a

24  model that he used as the final for cross-examinations during

25  trial; is that right?

CROSS-EXAMINATION OF ALON ISRAELY

1          A.   Sure.

2          Q.   Have you seen copies of these final models that

3    Mr. Kenner used?

4          A.   A lot of that crowd sourcing was oral, you know, it

5    would be war room-type engagement.  And then that would then

6    get distilled by someone, whoever was assigned that task into

7    some written form, I presume.

8          Q.   So when you referred to a model that I think

9    aggregated different thoughts for cross-examinations, was there

10   a singular document that would reflect the cross-examination

11   that Mr. Kenner would use during trial?

12         A.   I don't think anything in this case came down to a

13   singular document.  It wasn't that neat and perfect.  You know,

14   there were a number of different documents.  Even his -- the

15   binders that he would bring in were, you know, a combination of

16   documents put together.  There was never this -- again, I go

17   back to like working with AM Law guys and large firms where

18   everything was nice and tidy and neat.  It was a conglomeration

19   of documents put together.  A lot of it, you know -- Mr. Kenner

20   would be up two, three hours before everyone else at 4:00 in

21   the morning working on notating.  He had a lot of notes and a

22   lot of -- so that was the process that I witnessed.

23         Q.   But Mr. Maddix, by contrast, would draft a formal

24   written Word document that contained cross-examination

25   questions of key witnesses; correct?

1      A.   Yes, there were a number of those.

2      Q.   In your testimony, are you saying that Mr. Kenner did

3  not do that?

4      A.   No.  I am saying that Mr. Maddix did that.  I don't

5  know whether Mr. Kenner -- Mr. Kenner was not the guy to sit at

6  a computer and type.

7      Q.   Right.  He dictated and directed.

8      A.   So he would dictate.  He would make notes to himself.

9  He would take the work product and then expand on it so he

10  could use it in court.

11      Q.   And Ms. Carlstrom, she also prepared some cross

12  outlines during trial; is that right?

13      A.   I think so, yeah.

14      Q.   Do you recall whether she helped prepare for Agent

15  Houseling's (ph) testimony?

16      A.   I don't recall.  I think it is Heuchling; isn't it?  I

17  don't recall.  We were all involved in preparing for every

18  witness, from Broidy to Heuchling, to all of them, a lot of FEC

19  witnesses.  So everybody had a part in putting together

20  preparation for each witness.  It was not this person was

21  assigned that, this person was assigned that, it was kind of --

22  maybe it started with someone who owned it and then it

23  eventually turned into a collaborative effort.

24      Q.   Understood.  Do you recall Ms. Carlstrom drafting a

25  cross-exam outline for Leonardo DiCaprio?

1    A.  I would say, same answer.  I don't know if she was the

2    one that started it.  And then from there it was a

3    collaborative effort or if someone else started it and she took

4    it on again.  I think that especially in the war room during

5    trial, a number of people were working on a number of

6    witnesses.

7    Q.  And is it true that Mr. Maddix and Ms. Carlstrom and

8    Corrie Campbell all worked on cross-examination outlines during

9    trial?

10    A.  Yes, I would say so.

11    Q.  And Corrie Campbell is not a lawyer; correct?

12    A.  No, he is a paralegal.  Nothing was worked on without

13    going through David, though Mr. Kenner.  I'm sorry.  Mr. Kenner

14    would do the final review of everything.  And like I said, many

15    times he would be working on it for a few hours, either in a

16    breakout room or in the morning.

17    Q.  Were you part of the Kenner Law Firm staff

18    distribution list over email?

19    A.  Yes.

20    Q.  Okay.  Do you recall a time when Mr. Maddix was

21    assigned to draft a theory of the defense document in

22    connection with proposed jury instructions?

23    A.  No.  He might have, but I don't recall that.

24    Q.  If you could turn to Exhibit 14, please, tab 14, and

25    let me know when you are ready.

1          A.   Okay.

2          Q.   This bottom level email, Monday, April 17th, are you

3     AI@KennerLaw.com?

4          A.   Yes, not to be confused with the other one involved in

5     this case.

6          Q.   Correct, yes.  So do you recall does that appear to be

7     a true and accurate email that you would have sent on

8     April 17th, 2023, from your KennerLaw.com email address?

9          A.   Yes.

10              THE COURT:  You are not speaking into the microphone

11     so that we can hear you and get a good record.

12              MR. DEARINGTON:  Thank you, Your Honor.

13              THE WITNESS:  Yes.

14     BY MR. DEARINGTON:

15          Q.   And here, when you say she requested that we send a

16     proposed theory of defense instruction, what we are claiming

17     and not in argument form, are you referring to the Court had

18     requested such an instruction; is that right?

19          A.   It seems so, yes.

20          Q.   And then if you look up here -- and this is on

21     April 17th, 2023, Mr. Maddix says, "I don't have any jury guide

22     manuals and have never written an instruction for the theory of

23     defense."  Do you see that?

24          A.   Yes.  But I also see this is a reply.  Do you have the

25     whole thread?

1      Q.  I am just asking about this document.

2      A.  Okay.

3      Q.  So do you recall -- and does that appear to be an

4   email you received on April 17th, 2023 from Mr. Maddix?

5      A.  It looks like it.

6      Q.  So Mr. Maddix was assigned to come up with a theory of

7   the defense for the jury instructions; is that right?

8      A.  I would say he was assigned that, but not necessarily

9   exclusively.

10      Q.  But he indicated to you he had never done that before;

11   right?

12      A.  That is what it says.

13      Q.  And he ultimately sent his thoughts for -- provided a

14   theory of defense.  Do you recall that?

15      A.  I don't recall.  But if you say so, if you have

16   something to show me, then maybe.

17      Q.  Would it surprise you to learn that Mr. Maddix said he

18   was never -- something to the effect of he was never really

19   sure what the themes and defenses --

20          MS. LOCKHART:  Your Honor, I have to object to this

21   style of questioning where we are injecting statements from

22   other individuals --

23          THE COURT:  What you are doing is you are asking him

24   the credibility of another witness' statement.  You can't do

25   that.

1          MR. DEARINGTON:  I can reframe, Your Honor.

2          THE COURT:  Move on in terms of not asking -- I have

3   been waiting for an objection from you.  In terms of asking

4   him, would it surprise you to know -- you are asking him about

5   conversations presumably you have had with other witnesses in

6   terms of whether he is agreeing or not, which is commenting on

7   the statements of others in essence asking whether they are

8   credible or not.  That is not appropriate.

9          MR. DEARINGTON:  Okay.  Your Honor, understood.  Let

10  me try it a different way.

11  BY MR. DEARINGTON:

12       Q.  Did you ever have a discussion or do you recall a

13  discussion with Mr. Maddix where the themes of defense and

14  theories of defense were provided to him prior to trial?

15       A.  I don't recall.

16       Q.  Okay.  I would like to ask you about the motion for

17  order to show cause related to contempt.  So you're aware of a

18  contempt proceeding pending against Mr. Kenner?

19       A.  Yes.

20       Q.  And did he, Mr. Kenner, according to your

21  understanding, agree to give Bloomberg reporters log-in

22  information related to certain discovery in this case?

23          MS. LOCKHART:  Your Honor, this -- the underlying

24  facts supporting the contempt proceeding have been referred to

25  a separate judge and to a separate office.  And for the

 1    purposes of the claims made in the motion for a new trial,

 2    whether, in fact, what actually happened, I don't think is

 3    actually relevant.  What would matter is to the extent that

 4    there was a conflict that Mr. Kenner or others were operating

 5    under or to the extent that their performance was deficient

 6    under a Strickland analysis and they were modifying the

 7    performance in some way.

 8         THE COURT:  If you are asking him if that is what

 9    happened, that is not an appropriate thing to be injected in

10    here.  The argument, as I understood it, is there would be some

11    conflict, which is a legal issue.  So I am not sure what you

12    are asking him in terms of whether he understands the

13    underlying -- it doesn't matter whether he does or not.  It

14    wasn't part of the case.  It got -- once it got filed, it got

15    moved to another judge, other people.  And they dealt with it

16    after the trial.

17         MR. DEARINGTON:  I mean, just for the record to

18    preserve it for the record, Your Honor, our view is that the

19    underlying facts inform whether and to the extent -- to what

20    extent Mr. Kenner actually did have a conflict.  For example,

21    if the underlying allegations that were made in the motion were

22    completely meritless then perhaps there is a solid argument he

23    didn't have a conflict, he knew he had done nothing wrong.

24         THE COURT:  Okay.  I will let you respond.

25         MS. LOCKHART:  Your Honor, I think the conflict is

1    not as a result of whether the facts are true or not.  It is

2    that the contempt motion was filed and that it was pending in

3    that period before it was referred over.  And that, of course,

4    while it was still pending after the referral, whether he

5    modified his performance in some way because he was concerned

6    or trying to curry favor.  But the underlying facts are

7    irrelevant.

8              THE COURT:  I would agree.  To my mind, the conflict

9    and the way it is written up is in the context of the contempt

10   proceeding itself, not whether or not he or somebody was

11   provided information for that article.

12             MR. DEARINGTON:  Your Honor, I mean, our view would

13   be that there are allegations of contempt and then there are

14   facts and whether they --

15             THE COURT:  The point is, you are getting into

16   something that I don't think, one, this is the appropriate

17   witness to discuss it, since he not one that is involved in the

18   contempt proceedings, as far as I know.  Is he?  Are you

19   involved in it?

20             THE WITNESS:  Not anymore.

21             THE COURT:  Okay.

22             MR. DEARINGTON:  So Your Honor --

23             THE COURT:  So my point is, the conflict as far as

24   you wrote it up is the conflict in terms of the interest in

25   terms of contempt proceedings and how that would affect here.

1   Whether or not it occurred, you know, who actually provided or

2   more than one person provided the information is a factual

3   issue that the other judge is dealing with in the other

4   contempt thing.  I don't see how this implicates in any way the

5   conflict here.  You are totally missing, I think, the import of

6   whatever conflict you want to make.

7               MR. DEARINGTON:  May I respond, Your Honor?

8               THE COURT:  Go ahead.

9               MR. DEARINGTON:  So our view again, just for the

10  record, is that the actual facts are what form the conflict.

11  And one fact is that there was a motion for an order to show

12  cause.  And, yes, there is another proceeding dealing with that

13  to a different end.  But the facts that underlie the conflict

14  we believe existed are relevant.  And that is why we are

15  developing them here.

16              THE COURT:  And the fact is what?  Whether or not

17  Mr. Kenner provided this information to the news media?  Is

18  that what you view as the fact?

19              MR. DEARINGTON:  The circumstances in which he

20  provided them and whether and how he responded and --

21              THE COURT:  The point is you are asking him about

22  what Mr. Kenner did, something that is in a totally separate

23  proceeding.  And as far as I am concerned, this is not the

24  witness to ask relating to that.  And number 2, I don't see,

25  since we went to a great deal of trouble to completely exclude,

1    not discuss, have a totally different team, totally different

2    judge as soon as it came up, out of it.  And no further

3    discussion was ever had about what was said, most of which were

4    comments by Mr. Michel and not the attorneys in the article as

5    I recall correctly, having read it once.  So I don't see -- I

6    do not see any relevance of asking him in terms of whether or

7    not it is true that Mr. Kenner provided this information to the

8    news media, which is what you are getting at.  I do not see

9    that as being relevant here, at least the way you have done it.

10   You are basically dragging the contempt proceeding into this

11   trial.  Not doing it.

12          MR. DEARINGTON:  May I proffer the areas I was

13   planning to cover for the record, just so the record is

14   complete on this issue?

15          THE COURT:  Of course you can, for the record.

16          MR. DEARINGTON:  Thank you, Your Honor.  So we were

17   getting into what Mr. Israely knew about the underlying facts

18   of Mr. Kenner's conduct.

19          THE COURT:  You keep saying facts, so let me ask you

20   what it is that you think he -- what facts are you asking

21   about?

22          MR. DEARINGTON:  Well, it is our understanding that

23   Mr. Israely was -- had an understanding from discussions with

24   Mr. Kenner about what it is Mr. Kenner had done vis-a-vis

25   Bloomberg.  Then when Your Honor required Mr. Kenner to make a

1  filing to respond to the allegations, our understanding based

2  on discovery, is that Mr. Israely was involved himself

3  personally in helping prepare that filing.  Our understanding

4  is that the filing had inaccuracies in it.  And these are some

5  of the areas we would like to discuss, because we think that

6  they inform the nature of the conflict.

7          THE COURT:  It was an equivocation in terms of the

8  filing, I would characterize it that way.  It was no answer to

9  a question that was asked.  And based -- certainly based on

10  that, I immediately sent it off to the -- they asked for

11  contempt and we -- it went off to a different judge and I

12  didn't get into it.  So I am still having trouble -- how you

13  would tie it into what happened in this case in terms of

14  whatever it is that happened relating to the contempt

15  proceedings.  So I am -- you have made your proffer.  And I am

16  missing the point here in terms of what the connection is.

17          MR. DEARINGTON:  Okay.  Understood.  And your ruling

18  is respectfully noted, so I can move on from the questions.

19          THE COURT:  Your objection is noted for the record.

20          MR. DEARINGTON:  Thank you, Your Honor.

21  BY MR. DEARINGTON:

22     Q.  I guess I have one other question on that topic that I

23  think does not go outside the scope of your ruling, but the

24  government surely will object if they think it does --

25          Isn't it true?

CROSS-EXAMINATION OF ALON ISRAELY

1      THE COURT:  Let me ask you one question.  What is the

2  point of asking the question?

3      MR. DEARINGTON:  To establish --

4      THE COURT:  Why drag in the contempt or what they

5  filed or what they didn't do?  What is your purpose to asking

6  it?

7      MR. DEARINGTON:  Well, our view, Your Honor, is that

8  Mr. Kenner at the start of trial had a contempt motion against

9  him by the same prosecutors who were proceeding against him and

10 there are facts that are currently not in the record that show

11 how serious that contempt motion is.  And Mr. Kenner knew that.

12 And Mr. Israely has information about Mr. Kenner's state of

13 mind, which impacts the very conflict Mr. Kenner had at trial,

14 which proceeded for a few days until Your Honor recused and

15 transferred.

16     THE COURT:  We transferred it almost immediately.

17 And, frankly, based on what you have said, it confirms my view

18 that it is not relevant to the proceedings here.  I do -- the

19 issue of the conflict, whether there is a conflict legally is a

20 different issue.

21     All right.  Let's proceed.  Anything else?

22     MR. DEARINGTON:  So I just have one or two more

23 questions on the contempt that are within the scope of the

24 government's questions to Mr. Israely about the conflict

25 because they did ask questions about the contempt issue.

CROSS-EXAMINATION OF ALON ISRAELY

1           THE COURT:  Go ahead.

2    BY MR. DEARINGTON:

3       Q.  Mr. Kenner, isn't it true, told you that he had been

4    stressed by the motion for order to show cause?

5       A.  I don't remember that he told me he was stressed

6    because of that.  I know he was stressed because of money.

7       Q.  You don't remember him indicating that he had been

8    stressed, maybe not the word stressed, but conveying he had

9    been stressed by the motion?

10      A.  No.  I think the only stress was the fact that he had

11   very little time to deal with it and move on.

12      Q.  Do you recall the conversation Mr. Kenner had in the

13   hallway either inside the courtroom or outside the courtroom

14   with Mr. Keller about the contempt motion?

15      A.  No.

16          THE COURT:  At what point in time?

17   BY MR. DEARINGTON:

18      Q.  After the motion had been filed, so during trial.

19      A.  With Mr. Keller?

20          THE COURT:  Before it had been sent to a different

21   judge?

22   BY MR. DEARINGTON:

23      Q.  This would have been prior to when it was -- I can ask

24   the witness --

25          THE COURT:  I am putting it in context.  I am trying

CROSS-EXAMINATION OF ALON ISRAELY

1    to figure out when it is supposedly this conversation took

2    place, so he knows what you are asking about.  I can't tell

3    whether this is a discussion before it got sent off to the

4    other judge or when.

5              MR. DEARINGTON:  Yes, Your Honor.  That would be part

6    of my question.  But I do have -- just for the record, the

7    government produced in discovery a declaration of Mr. Keller

8    that relates to this incident.

9              THE COURT:  You are going too fast and not at the

10   microphone.

11             MR. DEARINGTON:  For the record, Mr. Keller, the

12   government, produced a declaration of Mr. Keller to the defense

13   that speaks about this incident.  I think if we could move to

14   admit that, it would cover a lot of the ground I was about to

15   ask about.

16             THE COURT:  All right.

17             MS. LOCKHART:  Your Honor, it describes a

18   conversation between Mr. Keller and Mr. Kenner.  This would be

19   a line of examination for Mr. Kenner and to ask him about that.

20   But this is not the witness for this.

21             THE COURT:  So if this is a conversation that

22   Mr. Keller had with Mr. Kenner, then that -- I don't see how

23   this -- you just asked him whether he had the conversation.

24             MR. DEARINGTON:  I was asking him if he was privy to

25   it, if he was there and a percipient witness to the

1    conversation.

2              THE WITNESS:  I was not.  I didn't know they talked,

3    honestly.

4              MR. DEARINGTON:  That resolves my question, Your

5    Honor.

6              And the government I suppose objects to introduction

7    of the declaration.

8              MS. LOCKHART:  From this witness, yes.

9              THE COURT:  Through this witness I don't see -- since

10   he didn't know anything about it, I don't see admitting it.

11             MR. DEARINGTON:  Understood, Your Honor.

12             THE COURT:  You can bring it up at a later point, if

13   it is appropriate.

14   BY MR. DEARINGTON:

15        Q.  Mr. Kenner did not want to be removed as defense

16   counsel around the time of the motion for order to show cause;

17   is that correct?  Is that your understanding?

18        A.  I know that he wanted Mr. Michel to be able to speak

19   to get advice from an independent counsel.  I -- I don't think

20   Mr. Kenner wanted to be excused from the case, no.

21        Q.  Right.  That is my question.  Mr. Kenner did not want

22   to be excused from the case?

23        A.  It would only -- I don't remember anything specific.

24        Q.  He did not indicate in front of members of the defense

25   team, including yourself, that he wanted to avoid being excused

1    from the case?

2         A.  Maybe he said -- I don't remember.  I know that

3    Mr. Kenner wanted to finish the case.  He worked hard on it.

4    He wanted to see it through.

5         Q.  I'd like to turn to the EyeLevel issues that you

6    testified about previously.  If you could turn to Exhibit 15 in

7    your binder, please, and let me know when you are ready.

8         A.  Yep.

9         Q.  I am going to ask a preliminary question before we get

10   to this document.  Do you recall a May 10th, 2023, press

11   release issued by EyeLevel relating to this case?

12        A.  Yes.

13        Q.  And then looking at this document, is that your email

14   address, Loni@AVIZONG.com?

15        A.  Yes.

16        Q.  So you received this email from Mr. Neil Katz?

17        A.  Yes.

18             MR. DEARINGTON:  I would like to move this exhibit

19   into evidence, Your Honor, marked as Exhibit 15.

20             MS. LOCKHART:  No objection.

21             THE COURT:  All right.  Then I will admit Exhibit 16,

22   which you would characterize as what? so Patterson has

23   something on her record.

24             MR. ZEIDENBERG:  This would be Bates label ending

25   4415.

CROSS-EXAMINATION OF ALON ISRAELY

1          MR. DEARINGTON:  I'm sorry, Your Honor.  It is marked

2     as Exhibit 15.

3          THE COURT:  Is it one five or one six?

4          MR. DEARINGTON:  15.

5          (Whereupon, Defense Exhibit No. 15 was admitted.)

6          THE COURT:  15 is just edit the following document,

7     is that what you are saying?

8          MR. DEARINGTON:  Correct.

9          THE COURT:  That is what you have asked to have

10    admitted?

11         MR. DEARINGTON:  Yes.

12         THE COURT:  All right.

13    BY MR. DEARINGTON:

14         Q.  So Mr. Israely, is this an email from Mr. Katz in

15    which he is inviting you to revise or edit the press release

16    that would later release by EyeLevel?

17         A.  Yes, he wanted me to review it.

18         Q.  Did you review it?

19         THE COURT:  Excuse me.  Who is Neil Katz?

20         THE WITNESS:  Mr. Katz is the founder and COO of

21    EyeLevel.  They are an artificial intelligence company.

22         THE COURT:  Okay.

23    BY MR. DEARINGTON:

24         Q.  And EyeLevel, on that topic, is written by Neil Katz

25    and Benjamin Fletcher; is that right?

CROSS-EXAMINATION OF ALON ISRAELY

1        A.  Correct.

2        Q.  Are they both part owners to your understanding?

3            THE COURT:  You speeding up doesn't help.  I know you

4    have got the time thing, but going faster doesn't help either

5    the court reporter or my, frankly, observing it.

6            MR. DEARINGTON:  I think, in full disclosure, we are

7    not going to wrap up this topic today with Mr. Israely so I

8    will slow down and hopefully we can proceed in the morning so I

9    understand --

10           THE WITNESS:  I am not -- I have a bar mitzvah to go

11   to so --

12           THE COURT:  I guess the question is whether you

13   are -- I had put aside tomorrow.  Are you available or not

14   available?  Is that why this was --

15           THE WITNESS:  Yeah, that is why I was moved to this

16   morning.  I understand you have a short day today so --

17           THE COURT:  Okay.  Go as far as you can.  They

18   certainly have redirect.  It may be that we need to put not

19   tomorrow but some other date when he can be available on, if

20   you can't finish it today.  I do have a hard stop, because we

21   have too many topics at the meeting to skip it.

22           MR. DEARINGTON:  Understood, Your Honor.

23           THE COURT:  Proceed.  But going faster doesn't help

24   in terms of my absorbing what you are trying to ask, frankly,

25   and to get a record --

```
 1                 MR. DEARINGTON:  Yes, Your Honor.
 2                 THE COURT:  -- so the court reporter can get this
 3      down.
 4                 So let's pick up.
 5      BY MR. DEARINGTON:
 6          Q.  You are extremely close to Neil Katz; is that correct?
 7          A.  Sure.
 8          Q.  You have known him for 30 years or so?
 9          A.  Correct.
10          Q.  Would you say he is like a brother to you?
11          A.  Yeah.
12          Q.  And you want him to succeed at EyeLevel; right?
13          A.  Yes.
14          Q.  And is Mr. Kenner also very close with Mr. Katz?
15          A.  Yes.
16          Q.  He has known Mr. Katz since Mr. Katz was a kid; is
17      that right?
18          A.  Yes.
19          Q.  How is that so?
20          A.  Mr. Kenner and Mr. Katz's father are friends.
21          Q.  Okay.  And going back to the press release, so if you
22      can turn to tab 16, please, in your binder.
23          A.  Yes.
24          Q.  Is that a true and correct copy of an email from
25      Mr. Katz to you, Alon Israely on May 24th, 2023?
```

1          A.  It looks like.

2               MR. DEARINGTON:  I would like to move this into

3     evidence, Your Honor.

4               MS. LOCKHART:  No objection.

5               THE COURT:  All right.  Then I will admit Defense

6     Exhibit 16.

7               (Whereupon, Defense Exhibit No. 16 was admitted.)

8     BY MR. DEARINGTON:

9          Q.  If you look at the May 3rd, 2023, email, which is the

10    3rd one down.  Do you see that?

11         A.  Yes.

12         Q.  From Mr. Katz.  I'm sorry.  Let me withdraw that.  The

13    fourth email down, which is from you on May 3rd, 2023.  Do you

14    see that?

15              THE COURT:  Is this the one on the bottom?

16              MR. DEARINGTON:  Bottom of the first page?

17              THE COURT:  Put it on the ELMO so we can see what you

18    are talking about.  That would help.

19              THE WITNESS:  Yes.

20    BY MR. DEARINGTON:

21         Q.  Do you see that, Mr. Israely?

22         A.  Yes.

23         Q.  Did you say, "I wanted to make my changes to you first

24    before sending it to David?"  Is that right?

25         A.  Yes.

CROSS-EXAMINATION OF ALON ISRAELY

1          Q.  Were you referencing changes to the draft press

2     release relating to the use of EyeLevel technology in this

3     case?

4          A.  Likely, yes.

5          Q.  Did you, in fact, send the press release to David?

6          A.  I either sent it to him or read it for him.

7          Q.  Does David refer to Mr. Kenner, the leading counsel?

8          A.  Mr. Kenner, yes.  And that was a review for privilege.

9     I mean, I knew there was going to be post trial motions and --

10         Q.  And that is end Bates label 44146.

11         A.  Yeah.

12         Q.  And if you could turn to tab 17 in your binder,

13    please.

14         A.  Yes.

15         Q.  Is that a copy of the press release that ultimately

16    issued?

17         A.  It looks like it.

18              THE COURT:  Take a moment to look at it.

19              THE WITNESS:  Yes.

20    BY MR. DEARINGTON:

21         Q.  That was on May 10th, 2023 issued by EyeLevel;

22    correct?

23         A.  Yes.

24         Q.  So after the verdict in this case; right?

25         A.  Yes.

CROSS-EXAMINATION OF ALON ISRAELY

1          Q.   And you approved this press release; correct?

2          A.   Yes.

3          Q.   If you could read from the first paragraph, please,

4     for the record?

5          A.   After Washington, DC?

6          Q.   Correct.

7          A.   "EyeLevel.AI's litigation assistance technology made

8     history last week becoming the first use of generative AI in a

9     federal trial.  The case involved Pras Michel, a former member

10    of the hiphop band, the Fugees, who was on trial for

11    international fraud charges."

12         Q.   Do you agree that the use of AI in this case made

13    history in Mr. Michel's case?

14         Let me frame it this way:  Was it indeed the first use of

15    generative AI in a federal trial?

16              THE COURT:  You need to speak into the microphone.

17    Please move over.

18    BY MR. DEARINGTON:

19         Q.   Was it, indeed, the first use of generative AI in a

20    federal trial that you are aware of?

21         A.   I don't know.  Not that I am aware of.

22         Q.   You are not aware of other cases where that has

23    happened prior to this?

24         A.   I am not of whether it was or was not.

25         Q.   Okay.  And earlier you testified on direct examination

1    that use of this tool is just like using Relativity or Westlaw?

2        A.  It is another legal technology tool, yes.

3        Q.  And yet this was the first time EyeLevel is touting --

4    and you were part of this drafting process for this press

5    release -- that it was used in a federal trial; right?

6        Let me --

7            THE COURT:  Are you -- he has indicated he doesn't

8    know one way or the other.  So that is what he said.  That is

9    what this article says.  Are you asking him whether it was or

10   was not, he has already indicated he doesn't know.

11           MR. DEARINGTON:  I can move on, Your Honor.

12   BY MR. DEARINGTON:

13       Q.  Can you please read the first sentence of the second

14   paragraph?

15       A.  "EyeLevel litigation assistance tools were developed

16   in partnership with experts in discovery litigation and legal

17   data management and launched with technology partner CaseFile

18   Connect."

19       Q.  And you testified earlier that you and Mr. Schrader

20   and Mr. Kenner own CaseFile Connect; is that right?

21       A.  Correct.

22       Q.  And did you and Mr. Schrader assist with the use of

23   the EyeLevel technology in this case?

24       A.  Not Mr. Schrader.

25       Q.  Just you?

CROSS-EXAMINATION OF ALON ISRAELY

1          A.   Yes.

2          Q.   And so you own a piece of CaseFile Connect and you

3     helped with the assistance of the use of the EyeLevel

4     technology in this case; correct?

5          A.   Correct.

6          Q.   Is that what you meant by the partnership reference in

7     this sentence and the launch with CaseFile Connect?

8          A.   Like I said earlier, I was just using CaseFile Connect

9     instead of Alon Israely because I wanted to get some free press

10    for my company.

11         Q.   In fairness to you, you weren't lying here; right?

12         A.   I don't think I was, no.

13         Q.   Because you own CaseFile Connect and you helped use

14    this tool with EyeLevel; correct?

15         A.   Correct.

16         Q.   And this was a big deal for EyeLevel, right, that it

17    could now tout that its technology was a first in a federal

18    trial to be used involving generative AI; right?

19         A.   They thought it was.

20              THE COURT:  If you could talk about -- there are

21    several technologies, at least two technologies here.  So in

22    your question, you need to be specific about which technology

23    you are talking about.

24    BY MR. DEARINGTON:

25         Q.   Sure.  I think if we could just stipulate that when I

1    refer to the AI or the EyeLevel product, we are talking about

2    the input/output generative AI product that was used in

3    Mr. Michel's case.

4         A.  The EyeLevel product, correct.

5         Q.  The EyeLevel product, yes.

6         If you look at the third paragraph on the second page, can

7    you please read that paragraph, beginning this is an

8    absolute --

9         A.  The one that starts, "Far from" or "EyeLevel lit

10   assist"?

11        Q.  It should be the top of the 2nd page.  "This is an

12   absolute" --

13        A.  This is an absolute -- "'This is an absolute game

14   changer for complex litigation' said Michel's lead attorney,

15   David Kenner.  'The system turns hours or days of legal work

16   into seconds.  This is a look into the future of how cases will

17   be conducted.'"

18        Q.  And did Mr. Kenner add that quote to the press

19   release?

20        A.  I think Neil or someone on his team put the quote in

21   and Mr. Kenner approved it, like is typical with press

22   releases.

23        Q.  Okay.  And this press release was beneficial to

24   EyeLevel, in your view?

25        A.  They thought so.  I mean, press releases are press

1    releases.  They have never gotten me extra business.

2        Q.  Okay.  That you know of.

3        A.  That I know of.  Put it this way, a press release

4    never had someone say, hey, I want to buy your stuff.

5        Q.  Based on your earlier testimony, just to summarize, is

6    it fair to say that you, Mr. Kenner and Mr. Katz are all very

7    close and have known each other for many decades?

8        A.  Yes.

9        Q.  Are you aware of whether Mr. Kenner also wanted to

10   help Mr. Katz and EyeLevel and see them succeed?

11       A.  I am not aware specifically, but I can only assume.

12       Q.  Okay.  And why would you assume that?

13       A.  Because he knows him and he likes him.

14           MR. DEARINGTON:  Your Honor, I know you have a hard

15   stop.  I think this is an okay stopping point.

16           THE COURT:  How much more do you have?

17           MR. DEARINGTON:  Well, we have just kind of scratched

18   the surface on the EyeLevel stuff, which is the remainder of

19   our cross.

20           THE COURT:  Roughly how long?

21           MR. DEARINGTON:  Probably another hour.

22           THE WITNESS:  An hour?

23           THE COURT:  Definitely can't do --

24           MR. DEARINGTON:  Certainly we are not going to finish

25   right now.

CROSS-EXAMINATION OF ALON ISRAELY

1           THE COURT:  I'm sorry.  It is 20 after.  If you

2     can -- if we are going to wind up having to redo this at

3     another time doing another 10 minutes isn't going to help.

4           So let's discuss how we are going to proceed.

5           MR. DEARINGTON:  It is not an hour, but it is more

6     than 10 minutes.

7           THE COURT:  I have found that lawyers are not good at

8     estimating their time.  I usually double it.

9           MR. DEARINGTON:  Which was why I was being

10    hyperbolic.

11          THE COURT:  Let me just say, in terms of -- obviously

12    he cannot be here tomorrow.  So we'll proceed with your picking

13    up with your witnesses, presumably.  And I will schedule

14    something at some point when he is available, soon after.  It

15    has to be before January 24th, because I start trials again.

16          MS. LOCKHART:  I think Mr. Israely is gone for the

17    rest of this weekend.  We have not talked to him about a

18    schedule for next week.  But I know that I am certainly

19    available next week to come and finish this.

20          THE WITNESS:  Your Honor, I know you usually don't

21    like the remote --

22          THE COURT:  I'm sorry?

23          THE WITNESS:  I know you don't usually like the

24    remote hearings, but I'd be available --

25          THE COURT:  You can have a discussion of whether that

CROSS-EXAMINATION OF ALON ISRAELY                 101

1    is an appropriate accommodation or not.  I will leave it to you

2    in terms of when you do it.  Obviously, people don't want to

3    drag this on for too long.

4             You need to speak into the microphone.

5             MR. ZEIDENBERG:  I know Mr. Israely has an engagement

6    over the weekend on the West Coast.  I am just wondering if we

7    could -- and his travel plans are actually for tomorrow if that

8    is right -- if we could maybe get a half hour, 45 minutes

9    tomorrow morning with Mr. Israely, if he could change his

10   departure flight, maybe we could wrap up.  He won't have to fly

11   back here.

12            THE COURT:  You know, I get in early so I can do it

13   whenever.  But we do need to coordinate it with --

14            THE WITNESS:  This is a bar mitzvah that has been

15   planned for a year.  I have so many family obligations.  I

16   can't afford -- I am already on a very tight schedule.  I tried

17   to look at the -- there is like no flights available.

18            THE COURT:  Where are you going?

19            THE WITNESS:  I have to go to Las Vegas and then

20   Seattle.  It just -- I mean, this has been rescheduled.  I was

21   prepared back, you know, two months ago and then a month ago.

22   I -- you know, my opinion is this AI thing is just like a --

23   this is not substantive, but I will do whatever the Court --

24            THE COURT:  If you can't do it, I am not going to --

25            THE WITNESS:  It would make it so difficult for me to

1   have to rearrange everything.  I am happy to Zoom in at

2   anyone's convenience.

3              THE COURT:  All right.  What I will do is --

4              THE WITNESS:  I can do Monday right after the event

5   or I guess that is a holiday but --

6              THE COURT:  Then it is too hard to get everybody in,

7   in terms of the court reporters and everybody else.

8              So my suggestion is we stop at this point.  I would

9   ask that you -- since you are in the middle of testimony, not

10  discuss the testimony with anybody or the case.  Okay.  And

11  that includes the lawyers, but Mr. Kenner or anybody else in

12  the case.  We'll resume tomorrow promptly at 9:00 with whatever

13  your witness is on.  I am leaving, but you can stay and have a

14  discussion about what looks like a time frame that you can do

15  this.  I am not enthused about Zoom.  But if that is the best

16  way to do it, we can consider that.  If you want to have him

17  here in person, I think that is probably better in terms of

18  doing it for this kind of examination.

19             And I will look at the schedule.  Give me times.  You

20  can -- Ms. Patterson can tell you when I am available.  It is

21  important to get it done before the 24th, because I start a

22  codefendant case, which goes into February.  And then I have a

23  trial calendar that just goes on.  So we need to get it done

24  beforehand.  It doesn't sound like it is going to take that

25  long in terms of between your finishing.  But they, obviously,

1    have redirect.

2              MS. LOCKHART:  Redirect will be very limited at this

3    point.  We'll see the next hour, but it won't take long.

4              THE COURT:  All right.  So let me excuse you at this

5    time.  I am -- and I will see you tomorrow morning, first thing

6    tomorrow morning at 9:00.  Whatever you can work out, tell

7    Ms. Patterson what looks like days and times.  If I can move

8    some stuff around on my calendar, I will.

9              THE WITNESS:  Thank you, Your Honor.

10             THE COURT:  Parties are excused.

11             I would ask that you -- all exhibits that you have,

12   kindly share with each other.  I frankly didn't think I need to

13   put something out about it, but, obviously, I did.  So do that.

14   And please provide an exhibit list.  Ms. Patterson has a form

15   that she does that describes it, makes it clear what gets

16   admitted and what doesn't get admitted.  So she'll give you the

17   form and whoever is doing any exhibits, whether it is the

18   defense or the government.

19             All right.  Parties are excused.

20             MR. DEARINGTON:  Thank you.

21             MR. ZEIDENBERG:  Thank you.

22             (Proceedings concluded at 11:25 a.m.)

23

24

25

CROSS-EXAMINATION OF ALON ISRAELY

1                    C E R T I F I C A T E

2

3              I, SHERRY LINDSAY, Official Court Reporter, certify

4       that the foregoing constitutes a true and correct transcript of

5       the record of proceedings in the above-entitled matter.

6

7

8

9

10                              Dated this 15th day of January, 2024.

11

12                              _____
                                Sherry Lindsay, RPR
13                              Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. DEARINGTON: **[34]**   28/20
31/15 36/22 37/3 43/6 46/18 52/20
58/21 60/7 63/11 63/25 64/17 65/5
66/5 68/3 68/12 70/22 73/16 77/14
79/11 84/21 86/2 86/17 86/22
88/14 90/13 90/23 92/5 93/8 93/20
94/20 95/18 96/12 97/24
BY MS. LOCKHART: **[2]**   5/13 5/21
MR. DEARINGTON: **[74]**   28/17 29/1
29/7 29/10 29/15 29/19 30/1 30/5
30/12 30/25 31/6 31/11 31/14
40/18 41/14 41/17 41/20 41/23
42/1 42/11 42/19 42/25 43/5 58/7
58/15 62/21 62/24 63/1 63/5 63/9
63/22 67/22 73/11 73/14 77/12
79/1 79/9 80/17 81/12 81/22 82/7
82/9 82/19 83/12 83/16 83/22
84/17 84/20 85/3 85/7 85/22 87/5
87/11 87/24 88/4 88/11 89/18 90/1
90/4 90/8 90/11 91/6 91/22 92/1
93/2 93/16 96/11 99/14 99/17
99/21 99/24 100/5 100/9 103/20
MR. ZEIDENBERG: **[5]**   3/9 3/18
89/24 101/5 103/21
MS. LOCKHART: **[17]**   3/6 4/10 4/13
5/11 28/12 40/23 58/3 58/10 78/20
79/23 80/25 87/17 88/8 89/20 93/4
100/16 103/2
THE COURT: **[118]**
THE COURTROOM DEPUTY: **[3]**   3/2
4/19 5/1
THE WITNESS: **[35]**   4/25 28/14
31/5 31/10 46/12 52/12 58/19 60/5
63/23 64/15 65/3 65/23 66/1 66/4
67/24 70/5 70/12 70/19 73/15
77/13 81/20 88/2 90/20 91/10
91/15 93/19 94/19 99/22 100/20
100/23 101/14 101/19 101/25 102/4
103/9

**'**

'90s **[1]**   39/13
'The **[1]**   98/15
'This **[1]**   98/13

**1**

10 **[3]**   1/5 100/3 100/6
101 **[2]**   23/19 24/17
1016 **[1]**   1/14
10th **[2]**   89/10 94/21
11:20 **[2]**   3/20 4/4
11:25 **[1]**   103/22
11:30 **[1]**   3/20
1301 **[1]**   1/13
14 **[2]**   76/24 76/24
1400 **[1]**   1/17
148 **[1]**   3/2
15 **[7]**   2/7 89/6 89/19 90/2 90/4
90/5 90/6
15th **[1]**   104/10
16 **[5]**   2/7 89/21 92/22 93/6 93/7
17 **[3]**   32/3 49/14 94/12
1717 **[1]**   1/20
17th **[4]**   77/2 77/8 77/21 78/4
19-00148-1 **[1]**   1/4
19-148 **[1]**   3/2

**2**

20 **[3]**   5/25 50/14 100/1
20-hour **[1]**   48/11
20-some **[1]**   61/19
200 **[1]**   50/15
2000 **[1]**   31/19
20001 **[1]**   1/25
20005 **[1]**   1/17
20006 **[1]**   1/21
2012 **[1]**   57/10
2017 **[3]**   57/6 57/10 64/9
2019 **[1]**   43/18
2021 **[1]**   35/9

2022 **[4]**   36/7 44/12 53/2 55/14
2023 **[11]**   1/6 36/21 72/24 75/23
77/21 78/4 89/10 92/25 93/9 93/13
94/21
2024 **[2]**   1/5 104/10
20530 **[1]**   1/14
24th **[5]**   65/7 65/14 92/25 100/15
102/21
28 **[1]**   2/4
2nd **[1]**   98/11

**3**

30 **[3]**   32/14 32/14 92/8
302s **[1]**   19/4
333 **[1]**   1/24
35 **[2]**   32/14 32/14
3rd **[3]**   93/9 93/10 93/13

**4**

44146 **[1]**   94/10
4415 **[1]**   89/25
45 **[1]**   101/8
4:00 **[1]**   74/20

**5**

50-plus **[1]**   27/11

**6**

6710 **[1]**   1/24

**7**

70 **[1]**   71/18

**8**

80 percent **[1]**   71/18

**9**

90 **[1]**   2/7
93 **[1]**   2/7
9:00 **[1]**   103/6
9:00 with **[1]**   102/12
9:08 **[1]**   1/6

**A**

a.m **[2]**   1/6 103/22
ability **[1]**   39/8
able **[5]**   3/14 18/4 20/2 22/12
88/18
about **[107]**
about Exhibit **[1]**   43/3
above **[2]**   15/6 104/5
above-entitled **[1]**   104/5
absolute **[4]**   98/8 98/12 98/13
98/13
absolutely **[3]**   24/15 30/25 58/15
absorbing **[1]**   91/24
acceptable **[1]**   4/9
access **[5]**   13/10 13/10 22/12
55/24 71/17
accommodation **[1]**   101/1
according **[1]**   79/20
account **[1]**   18/8
accurate **[6]**   26/6 32/19 36/18
37/1 37/6 77/7
act **[1]**   22/3
acted **[2]**   67/4 67/24
acting **[3]**   6/21 6/25 67/12
Action **[1]**   1/3
actor **[2]**   67/3 67/13
actual **[4]**   25/4 67/22 73/10 82/10
actually **[11]**   12/13 30/13 45/19
46/3 46/15 63/1 80/2 80/3 80/20
82/1 101/7
add **[2]**   16/1 98/18
additional **[6]**   12/15 16/11 16/12
17/16 17/19 25/1
address **[4]**   63/18 63/23 77/8
89/14
addresses **[1]**   63/19
admit **[5]**   30/8 36/16 87/14 89/21
93/5

admitted **[8]**   31/1 31/2 42/16 90/5
90/7 90/9 90/16 91/16
admitting **[1]**   88/10
advance **[2]**   13/21 29/23
advantage **[1]**   45/25
advertising **[1]**   26/8
advice **[1]**   88/19
affect **[1]**   81/25
afford **[1]**   101/16
after **[16]**   6/10 22/9 25/9 27/2
37/24 56/23 57/7 59/9 80/16 81/4
86/18 94/24 95/5 100/1 100/14
102/4
afternoon **[1]**   3/6
afterwards **[1]**   70/9
again **[16]**   9/13 34/20 40/18 42/1
48/1 54/2 54/4 56/14 65/7 65/10
65/15 72/12 74/16 76/4 82/9
100/15
against **[3]**   79/18 85/8 85/9
Agent **[1]**   75/14
aggregated **[1]**   74/9
aggressive **[3]**   15/11 27/7 27/9
ago **[3]**   33/10 101/21 101/21
agree **[10]**   30/17 30/21 30/22
30/22 41/7 43/3 57/9 79/21 81/8
95/12
agreed **[2]**   59/20 59/20
agreeing **[1]**   79/6
ahead **[6]**   5/2 5/6 5/10 52/6 82/8
86/1
AI **[13]**   21/17 22/24 24/25 25/10
77/3 95/8 95/12 95/15 95/19 97/18
98/1 98/2 101/22
AI's **[1]**   23/9
all **[38]**   3/8 3/12 3/19 4/1 4/5
4/5 4/11 4/16 7/23 11/17 13/12
15/6 18/21 19/4 20/2 20/25 25/5
27/2 28/13 30/11 34/10 48/3 48/6
48/10 56/15 75/17 75/18 76/8
85/21 87/16 89/21 90/12 93/5 99/6
102/3 103/4 103/11 103/19
allegation **[1]**   56/2
allegations **[11]**   33/6 33/15 39/16
53/12 53/18 57/6 57/10 61/22
80/21 81/13 84/1
allotted **[1]**   46/14
almost **[8]**   7/6 15/23 19/8 46/3
46/16 71/17 71/20 85/16
Alon **[6]**   2/3 4/14 4/24 5/18 92/25
97/9
along **[3]**   30/22 35/3 42/10
already **[4]**   37/1 56/11 96/10
101/16
also **[22]**   7/16 7/18 7/24 12/15
18/5 18/12 19/6 26/4 30/23 38/4
43/7 47/2 47/11 48/22 48/24 51/19
52/24 71/21 75/11 77/24 92/14
99/9
always **[4]**   15/22 15/23 49/10
69/25
am **[65]**   3/20 5/25 6/4 10/23 20/10
20/14 20/14 21/5 21/8 21/20 22/16
23/17 24/12 32/5 37/4 40/18 40/21
43/16 44/6 50/13 50/15 51/18
53/16 53/16 53/23 54/12 54/13
54/16 54/18 54/20 56/17 57/19
63/5 63/17 63/20 64/3 67/12 68/10
68/16 68/23 72/13 74/17 75/4 78/1
80/11 82/23 84/12 84/15 84/15
86/25 86/25 89/9 91/10 95/21
95/24 99/11 100/18 101/6 101/16
101/24 102/1 102/13 102/15 102/20
103/5
AMERICA **[1]**   1/3
among **[1]**   19/10
amongst **[1]**   15/8
amount **[4]**   12/12 13/11 48/4 48/9
analysis **[9]**   23/25 24/1 49/20
53/4 53/17 54/11 54/12 57/17 80/6
analyst **[2]**   44/1 44/2
analyze **[1]**   50/23

**A**

analyzes [1]  50/8
analyzing [1]  53/11
Angeles [1]  32/10
Anne [4]  7/4 43/7 66/9 66/20
another [10]  8/16 44/4 58/4 78/24
  80/15 82/12 96/2 99/21 100/3
  100/3
answer [5]  5/6 5/8 52/8 76/1 84/8
answers [1]  22/4
any [41]  3/25 4/1 4/1 7/17 11/2
  15/4 21/12 24/16 24/21 24/25 25/8
  25/14 27/3 27/12 28/1 28/8 29/20
  30/15 33/15 35/5 40/20 43/14
  49/20 50/12 51/10 53/7 53/17 57/2
  57/15 60/22 60/23 64/1 67/18
  68/15 68/16 69/7 70/2 77/21 82/4
  83/6 103/17
anybody [2]  102/10 102/11
anymore [1]  81/20
anyone [1]  17/10
anyone's [1]  102/2
anything [19]  24/3 24/16 27/5
  27/9 27/20 33/3 33/22 34/7 34/21
  41/10 54/15 58/13 63/8 67/3 68/6
  74/12 85/21 88/10 88/23
apologies [1]  42/20
appear [7]  38/18 38/19 64/5 65/6
  65/10 77/6 78/3
APPEARANCES [1]  1/11
apply [3]  50/9 53/12 53/19
appreciate [2]  31/2 37/6
approach [2]  29/12 31/3
appropriate [5]  79/8 80/9 81/16
  88/13 101/1
approved [2]  95/1 98/21
approximately [5]  32/2 35/9 46/6
  46/9 60/8
April [4]  77/2 77/8 77/21 78/4
April 17th [4]  77/2 77/8 77/21
  78/4
are [134]
area [3]  8/4 10/22 61/10
areas [6]  8/14 8/14 15/13 19/12
  83/12 84/5
ARENT [1]  1/20
argument [10]  4/7 9/6 23/9 24/5
  24/14 65/25 73/7 77/17 80/10
  80/22
arguments [3]  26/6 26/10 26/14
around [9]  36/7 43/17 44/11 44/21
  46/16 53/2 56/18 88/16 103/8
article [4]  59/9 81/11 83/4 96/9
artificial [3]  20/11 20/17 90/21
as [98]  3/22 4/2 4/2 6/6 6/21
  6/25 7/2 7/3 7/15 8/16 8/17 8/19
  9/6 11/1 12/8 12/9 13/15 13/16
  14/4 14/9 14/9 14/12 15/9 15/17
  17/3 17/7 19/25 21/19 21/21 21/21
  23/5 23/11 24/13 25/3 25/4 25/20
  29/21 33/5 34/21 35/14 35/17
  35/19 35/19 35/23 35/23 36/4
  36/16 36/23 36/23 37/7 37/10
  37/11 37/14 37/14 37/15 37/21
  39/12 39/12 40/16 42/8 42/17
  43/12 43/25 45/9 45/15 45/18
  45/18 47/7 48/8 49/15 50/1 53/5
  60/6 62/15 66/10 67/4 67/24 70/3
  73/24 80/10 81/1 81/18 81/18
  81/23 81/23 82/18 82/23 82/23
  83/2 83/2 83/4 83/9 88/15 89/19
  89/22 90/2 91/7 91/17
aside [2]  55/9 91/13
ask [34]  13/8 22/20 22/21 22/24
  22/24 23/2 24/5 29/7 33/17 34/2
  34/4 42/4 42/6 56/2 58/7 58/18
  59/3 63/10 65/20 69/22 69/23
  72/24 79/16 82/24 83/19 85/1
  85/25 86/23 87/15 87/19 89/9
  91/24 102/9 103/11
asked [20]  5/24 6/2 19/24 23/22

**B**

back [21]  9/17 9/25 12/14 12/23
  16/15 16/21 19/15 19/18 22/4
  23/14 24/20 51/1 52/17 55/19
  55/23 56/1 59/21 74/17 92/21
  101/11 101/21
background [3]  43/19 43/21 44/7
backgrounds [2]  36/15 42/3
ballpark [1]  44/16
band [1]  95/10
Bankruptcy [1]  1/23
bar [2]  91/10 101/14
based [10]  17/15 31/1 56/17 64/23
  67/11 84/1 84/9 84/9 85/17 99/5
basically [2]  41/21 83/10
basis [2]  14/5 53/9
bat [1]  45/25
Bates [2]  89/24 94/10
battalion [1]  50/16
be [87]  3/14 3/15 3/22 3/25 4/13
  4/21 4/22 5/1 9/18 11/21 13/6
  13/8 13/9 14/18 15/13 16/15 18/4
  18/24 18/24 19/12 20/2 22/12 24/5
  24/13 24/19 25/18 26/13 27/7 28/5
  31/6 31/11 33/19 34/14 38/1 38/2
  38/2 38/19 38/19 39/20 40/23

**C**

25/18 33/5 33/19 33/21 37/25 41/5
  84/9 84/10 87/23 90/9
asking [28]  37/1 41/11 41/13
  49/24 53/8 53/16 53/17 53/20
  53/23 54/17 54/20 57/14 78/1
  78/23 79/2 79/3 79/4 79/7 80/8
  80/12 82/21 83/6 83/20 85/2 85/5
  87/2 87/24 96/9
aspect [1]  51/6
assembling [1]  19/7
assign [8]  13/17 13/18 15/12
  16/17 16/23 16/23 66/20 66/22
assigned [19]  7/17 8/14 8/14 9/17
  10/3 10/15 19/12 14/19 19/20
  19/24 51/20 52/16 65/3 74/6 75/21
  75/21 76/21 78/6 78/8
assist [4]  6/2 11/1 96/22 98/10
assistance [5]  35/8 45/3 95/7
  96/15 97/3
assisting [2]  8/19 11/5
associate [3]  22/20 22/22 51/19
associates [4]  10/4 35/15 35/18
  50/16
assume [3]  36/24 99/11 99/12
assumption [1]  28/4
Attached [1]  64/8
attaching [1]  65/10
attempted [2]  56/11 56/13
attend [1]  32/11
attended [3]  47/9 49/3 49/15
attention [1]  5/5
attorney [32]  7/5 7/6 8/16 9/13
  9/13 23/17 37/7 37/10 37/12 37/13
  37/21 37/22 38/5 40/12 40/12
  40/16 43/10 43/17 43/23 45/2 45/2
  45/4 45/5 45/8 46/22 47/7 47/13
  47/21 48/18 50/6 57/14 98/14
attorneys [11]  9/15 10/5 11/7
  38/7 41/11 41/19 42/3 42/7 42/7
  49/1 83/4
augmented [1]  21/18
authenticate [1]  29/8
available [8]  91/13 91/14 91/19
  100/14 100/19 100/24 101/17
  102/20
Avenue [3]  1/13 1/17 1/24
AVIZONG.com [1]  89/14
avoid [1]  88/25
aware [24]  25/9 25/16 43/14 43/16
  43/20 43/25 44/7 47/17 49/19 53/6
  53/17 56/19 57/18 57/19 68/10
  68/14 69/18 72/21 79/17 95/20
  95/21 95/22 99/9 99/12
awareness [2]  58/3 58/11

**C**

40/24 42/12 42/16 43/3 50/9 51/20
  57/... 59/... 63/9 64/5 65/6
  65/21 66/23 67/11 70/10 70/10
  70/14 70/20 71/20 74/5 74/20
  76/15 77/4 77/6 78/3 80/9 80/10
  81/13 87/5 87/18 88/15 88/18
  88/20 88/22 89/24 91/18 91/19
  94/9 97/18 97/22 98/11 98/17
  100/12 100/15 100/24 103/2
bear [1]  21/21
became [2]  25/19 43/17
because [35]  3/14 20/2 21/24
  22/10 24/7 25/24 28/1 28/9 36/13
  38/2 38/14 38/25 39/11 41/13 45/7
  50/19 54/4 55/8 56/14 57/12 58/9
  64/21 67/12 72/20 81/5 84/5 85/25
  86/6 86/6 91/20 97/9 97/13 99/13
  100/15 102/21
become [5]  5/22 17/15 32/6
becoming [1]  95/8
beefing [2]  45/12 45/15
been [30]  27/11 31/1 37/11 39/17
  39/18 39/25 44/18 44/24 49/13
  51/23 52/14 56/19 56/21 57/11
  65/13 66/6 67/6 70/17 70/19 71/23
  79/3 79/24 86/3 86/7 86/9 86/18
  86/20 86/23 101/14 101/20
before [58]  1/9 5/6 5/8 8/25 9/2
  10/25 11/16 11/18 12/10 13/23
  13/24 23/20 34/19 34/20 36/2 44/5
  44/19 44/22 44/24 45/13 45/23
  46/6 46/13 52/8 53/4 53/25 58/8
  58/14 58/18 58/24 58/25 59/1 60/1
  60/8 60/9 60/10 60/14 60/18 60/19
  60/20 62/9 65/13 65/15 66/24
  67/19 68/5 70/25 71/3 73/6 74/20
  78/10 81/3 86/20 87/3 89/9 93/24
  100/15 102/21
beforehand [2]  17/4 102/24
began [3]  27/2 35/9 73/6
beginning [3]  6/25 40/24 98/7
behalf [2]  3/7 3/10
behavior [1]  28/1
behind [1]  22/10
being [14]  14/13 20/1 25/20 27/18
  28/10 40/11 41/5 42/8 50/12 60/13
  70/15 83/9 88/25 100/9
belief [1]  28/5
believe [5]  3/15 34/1 70/23 73/21
  82/14
beneficial [1]  98/23
benefit [1]  37/5
Benjamin [1]  90/25
best [2]  72/14 102/15
better [6]  5/20 15/24 16/11 45/4
  66/23 102/17
between [6]  3/20 27/19 53/13
  53/14 87/18 102/25
beyond [2]  26/19 37/18
BIA [13]  35/15 35/18 35/19 35/21
  35/22 35/24 35/25 36/1 36/4 36/5
  69/5 71/16 71/19
big [6]  9/5 49/23 57/21 61/7 61/8
  97/16
Bill [2]  47/11 67/9
binder [7]  18/19 18/24 31/12 58/2
  89/7 92/22 94/12
binders [8]  18/18 18/21 18/25
  29/3 60/23 60/23 61/2 74/15
bio [1]  36/17
bit [7]  5/19 20/10 28/23 36/12
  42/21 49/17 62/6
Bloomberg [3]  59/10 79/21 83/25
blur [1]  68/7
bodyguard [1]  49/8
booked [1]  60/12
both [10]  10/8 11/7 11/11 12/10
  12/11 12/18 26/14 34/25 71/1 91/2
bothered [1]  27/10
bottom [3]  77/2 93/15 93/16
bowed [1]  67/12
boxes [2]  18/21 20/22

**B**

brand [1] 137/1
break [3] 4/3 4/4 10/16
breakout [1] 76/16
breakouts [1] 19/18
Brian [1] 35/3
brief [1] 55/22
briefing [1] 52/25
briefs [2] 51/11 73/3
bring [8] 16/21 19/15 20/21 21/21
57/24 61/8 74/15 88/12
broader [2] 8/20 12/14
Broidy [2] 19/21 75/18
brother [1] 92/10
brought [10] 8/6 10/22 10/24
10/24 11/16 45/7 46/14 46/15
56/10 59/22
bubble [1] 15/17
building [1] 24/10
built [2] 18/18 18/25
bullet [3] 16/22 52/15 54/5
bunch [1] 50/16 54/18
business [10] 20/15 25/14 25/20
26/8 34/9 34/22 35/5 35/14 35/18
99/1
buy [1] 99/4

**C**

calendar [2] 102/23 103/8
California [2] 59/16 59/24
call [18] 16/3 24/17 26/9 33/10
34/8 34/21 38/10 38/25 40/13
46/21 50/20 51/21 51/24 54/22
55/4 61/13 72/5 72/16
called [9] 6/12 12/15 14/20 21/3
21/18 33/25 35/3 39/12 73/23
calling [1] 4/13
calls [1] 53/15
came [5] 24/20 46/16 57/12 74/12
83/2
Campbell [7] 20/8 20/9 49/6 51/25
67/4 76/8 76/11
can [77] 4/2 4/4 4/18 5/2 5/3
5/16 12/1 12/2 12/22 20/20 20/24
21/14 21/22 21/24 23/2 23/2 28/14
28/25 29/21 29/23 30/4 30/6 30/14
30/18 30/21 30/22 30/25 31/8 33/3
33/25 38/18 39/24 40/20 41/9 42/2
42/5 42/15 42/16 51/10 52/7 52/8
52/10 54/20 56/1 63/13 63/20
65/20 67/18 68/4 72/14 77/11 79/1
83/15 84/18 86/23 88/12 91/8
91/17 91/19 92/2 92/22 93/17
96/11 96/13 98/6 99/11 100/2
100/25 101/12 102/4 102/13 102/14
102/16 102/20 102/20 103/6 103/7
can't [11] 45/24 45/24 46/9 64/14
64/15 78/24 87/2 91/20 99/23
101/16 101/24
cannot [1] 100/12
capacity [6] 6/6 6/9 22/9 35/14
35/17 35/22
career [1] 39/12
Carlstrom [16] 7/4 8/14 9/21
12/20 13/3 43/7 45/14 51/9 66/9
66/20 67/5 67/13 69/16 75/11
75/24 76/7
cartel [2] 61/14 61/14
case [72] 3/2 6/2 7/11 7/19 9/7
9/15 9/16 13/1 13/21 16/6 18/6
20/24 30/9 30/10 34/11 34/17 35/9
35/17 35/23 36/1 36/3 36/4 36/10
37/7 37/10 37/18 38/5 39/7 39/15
39/19 39/25 40/10 40/15 41/7
41/19 42/10 43/7 43/9 44/5 45/22
50/9 53/3 54/23 55/18 56/3 57/24
59/14 61/3 64/4 66/7 71/17 74/12
77/5 79/22 80/14 84/13 88/20
88/22 89/1 89/3 89/11 94/3 94/24
95/9 95/12 95/13 96/23 97/4 98/3
102/10 102/12 102/22

CaseFile [14] 20/12 20/17 20/19
96/17 96/20 97/2 97/7 97/8 97/13
97/17 96/20 97/2 97/7 97/8 97/13
cases [12] 4/1 17/11 17/12 17/15
38/25 39/12 39/19 40/3 47/18
61/14 95/22 98/16
cause [4] 79/17 82/12 86/4 88/16
caution [1] 9/24
certain [9] 10/2 10/2 11/6 13/8
18/3 26/24 32/20 52/25 79/22
certainly [7] 29/6 42/3 42/22
84/9 91/18 99/24 100/18
certify [1] 104/3
chair [3] 3/20 3/22 57/20
change [2] 16/1 101/9
changer [1] 98/14
changes [2] 93/23 94/1
changing [1] 71/3
characterization [1] 38/4
characterize [5] 31/20 48/8 50/1
84/8 89/22
charge [2] 16/19 57/15
charged [8] 15/5 16/6 49/21 50/23
53/5 53/18 55/1 55/5
charges [5] 16/17 55/18 55/20
64/9 95/11
Charles [1] 6/19
ChatGPT [3] 21/25 22/1 22/4
check [3] 30/3 60/12 60/15
checks [1] 16/25
choices [1] 28/8
chosen [1] 45/8
Christina [1] 46/19
circumstances [1] 82/19
civil [1] 50/14
claiming [1] 77/16
claims [1] 80/1
clarification [1] 69/23
clarify [3] 12/1 18/4 53/20
clarifying [2] 18/2 69/15
clarity [1] 36/15
clear [2] 57/19 103/15
Clew [3] 62/3 62/4 62/5
client [7] 23/17 23/20 23/23
25/22 40/14 50/17 53/10
clients [1] 39/2
close [10] 12/12 32/16 32/17
49/12 49/13 66/4 72/20 92/6 92/14
99/7
closer [3] 7/2 14/4 18/19
closing [23] 8/5 8/11 23/9 23/10
23/12 23/12 23/18 24/5 24/9 24/9
24/14 25/3 25/5 26/5 26/10 26/11
26/12 26/12 26/14 64/13 65/11
66/16 73/7
closings [1] 66/10
Coast [1] 101/6
Cochran [1] 52/25
code [1] 46/1
codefendant [1] 102/22
collaboration [1] 14/6
collaborative [2] 75/23 76/3
collar [3] 39/18 39/21 39/24
collected [1] 45/22
COLLEEN [1] 1/9
color [1] 18/2
COLUMBIA [1] 1/1
combination [1] 74/15
come [16] 9/25 23/14 30/21 31/25
32/4 32/25 34/11 39/3 52/13 52/17
56/1 56/25 59/16 59/20 78/6
100/19
coming [3] 27/24 28/2 28/9
commenting [1] 79/6
comments [1] 83/4
Commission [1] 3/21
communications [1] 41/3
community [1] 39/2
company [15] 12/15 12/21 13/8
20/12 20/18 20/19 21/3 21/4 21/6
25/25 26/5 36/2 48/1 90/21 91/17
compilation [1] 29/19

complete [1] 83/14
completing [1] 25 48/6
80/22 82/25
complex [1] 98/14
complexity [1] 40/10
compliance [1] 44/8
complicated [4] 39/18 39/19 40/3
40/15
component [1] 9/9
computer [1] 75/6
concern [1] 31/2
concerned [2] 81/5 82/25
Concerning [1] 21/3
concluded [1] 103/22
conduct [1] 83/18
conducted.' [1] 98/17
conference [2] 6/11 37/25
conferences [2] 14/16 38/3
confidence [1] 39/8
confirms [1] 85/17
conflict [17] 80/4 80/11 80/20
80/23 80/25 81/8 81/23 81/24 82/5
82/6 82/10 82/13 84/6 85/13 85/19
85/19 85/24
confused [1] 77/4
conglomeration [1] 74/18
Connect [14] 20/13 20/17 20/19
20/25 25/13 25/13 25/24 35/1
96/18 96/20 97/2 97/7 97/8 97/13
connection [6] 64/20 76/22 84/16
cons [1] 11/21
consider [3] 5/7 23/15 102/16
consideration [1] 26/17
considered [2] 24/14
considering [3] 6/1 24/21 25/19
consistent [3] 8/20 43/18 72/18
consolidate [1] 20/4
constitutes [1] 104/4
Constitution [1] 1/24
constraints [1] 29/20
consultant [2] 7/22 48/14
contained [1] 74/24
contempt [22] 26/25 27/1 27/2
27/14 79/17 79/18 79/24 81/2 81/9
81/13 81/18 81/25 82/4 83/10
84/11 84/14 85/4 85/8 85/11 85/23
85/25 86/14
content [2] 52/13 70/10
CONTENTS [1] 2/1
context [3] 22/5 81/9 86/25
contextual [1] 23/3
continue [1] 52/18
continued [1] 36/9
contract [1] 47/13
contracted [3] 7/6 9/13 9/14
contrast [1] 74/23
contribute [3] 6/22 17/24 18/1
contributed [1] 18/12
contributing [1] 26/13
control [1] 23/1
convenience [1] 102/2
conversation [7] 72/17 86/12 87/1
87/18 87/21 87/23 88/1
conversations [9] 11/11 11/19
12/2 27/12 34/12 57/3 62/5 72/22
79/5
conveying [1] 86/8
COO [1] 90/20
coordinate [2] 38/7 101/13
coordinating [2] 62/15 72/12
coordination [2] 62/16
coordinator [1] 38/6
copies [1] 74/2
copy [7] 16/3 31/12 60/23 64/10
71/10 92/24 94/15
core [1] 49/18
corporate [2] 22/2 72/13
correct [75] 3/17 3/18 17/9 26/3
32/20 34/23 34/24 35/2 35/4 35/9
35/18 36/5 36/6 36/10 36/11 37/8
37/10 37/15 37/16 37/20 37/23
38/5 38/12 38/16 38/17 43/10

**C**

**correct... [49]** 43/11 44/25 45/10 47/11 47/12 48/5 48/12 48/13 48/16 48/21 49/7 50/3 50/7 51/8 51/18 52/23 52/23 54/23 55/3 55/18 59/5 59/8 59/17 59/25 66/14 66/19 72/3 73/4 73/5 73/18 74/25 76/11 77/6 88/17 90/8 91/1 92/6 92/9 92/24 94/22 95/1 95/6 96/21 97/4 97/5 97/14 97/15 98/4 104/4
**correctly [1]** 83/5
**Corrie [4]** 20/8 49/6 76/8 76/11
**could [26]** 13/10 13/10 16/11 24/13 25/2 36/15 45/5 45/20 50/9 58/1 60/11 60/13 69/23 75/10 76/24 87/13 89/6 94/12 95/3 97/17 97/20 97/25 101/7 101/8 101/9 101/10
**counsel [14]** 3/4 6/21 6/25 32/18 32/21 38/3 38/15 45/10 47/2 56/12 56/20 88/16 88/19 94/7
**count [6]** 24/6 24/6 24/6 24/7 53/9 53/9
**couple [4]** 22/14 23/22 35/12 54/23
**course [3]** 4/8 81/3 83/15
**court [20]** 1/1 1/22 1/23 3/22 4/2 9/21 21/14 30/12 41/4 42/20 50/4 56/20 75/10 77/17 91/5 92/2 101/23 102/7 104/3 104/13
**Court's [1]** 58/10
**courtroom [3]** 69/20 86/13 86/13
**Courts [1]** 1/23
**cover [2]** 83/13 87/14
**crafting [2]** 18/9 24/14
**crazy [1]** 34/1
**create [2]** 4/1 20/4
**created [2]** 18/24 54/8
**credibility [1]** 78/24
**credible [1]** 79/8
**crimes [2]** 39/18 39/21
**criminal [13]** 1/3 3/2 39/22 39/24 40/12 44/5 45/22 47/5 47/7 47/20 47/21 47/22 59/7
**criteria [1]** 48/2
**critical [1]** 9/9
**cross [32]** 2/4 11/4 11/9 11/24 12/9 19/13 19/21 28/13 28/19 59/18 59/22 67/17 67/18 68/5 68/9 68/14 68/18 68/19 69/1 69/8 71/10 71/22 73/18 73/21 73/24 74/9 74/10 74/24 75/11 75/25 76/8 99/19
**cross-exam [2]** 69/1 75/25
**cross-examination [14]** 2/4 11/9 19/21 28/19 68/5 68/14 69/8 71/10 71/22 73/18 73/21 74/10 74/24 76/8
**cross-examinations [4]** 11/24 68/19 73/24 74/9
**crowd [2]** 73/23 74/4
**crunch [1]** 28/24
**cull [1]** 45/21
**culling [1]** 18/15
**cup [1]** 28/14
**current [2]** 31/20 38/22
**currently [1]** 85/10
**curry [1]** 81/6
**customer [1]** 25/23
**cut [1]** 25/3

**D**

**DA [1]** 10/21
**daily [1]** 14/5
**data [6]** 20/23 22/3 45/18 45/21 45/22 96/17
**database [6]** 7/8 12/23 12/24 13/10 16/21 18/15
**databases [1]** 13/6
**date [3]** 44/19 46/7 91/19
**Dated [1]** 104/10

**dates [1]** 65/15
**Document [1]** 108/1
**daughter [3]** 32/5 32/6 32/11
**DAVID [7]** 1/19 3/10 76/13 93/24 94/5 94/7 98/15
**day [4]** 22/9 66/21 91/16 104/10
**days [16]** 33/10 48/11 54/23 60/1 60/8 60/10 60/17 60/17 60/18 62/9 65/13 65/14 73/6 85/14 98/15 103/7
**DC [8]** 1/5 1/14 1/17 1/21 1/25 3/20 8/4 95/5
**deal [4]** 40/20 82/25 86/11 97/16
**dealing [2]** 82/3 82/12
**dealt [2]** 27/11 80/15
**DEARINGTON [3]** 1/19 2/4 3/10
**decades [1]** 99/7
**decide [1]** 42/6
**decision [1]** 57/18
**decisions [1]** 28/8
**declaration [3]** 87/7 87/12 88/7
**deep [4]** 16/16 46/4 56/8 57/20
**deeper [2]** 10/17 13/17
**deeply [1]** 9/24
**Defendant [2]** 1/7 1/18
**defended [1]** 40/4
**defense [54]** 2/7 2/7 5/23 6/14 6/17 6/18 6/22 7/15 9/9 9/10 24/6 27/8 36/13 36/14 37/17 39/9 39/9 39/22 39/25 40/12 44/11 45/9 45/12 46/19 46/21 47/5 47/7 47/22 48/20 54/14 56/6 57/11 59/16 60/24 64/6 64/13 65/8 66/10 68/25 72/25 76/21 77/16 77/23 78/7 78/14 79/13 79/14 87/12 88/15 88/24 90/5 93/5 93/7 103/18
**defenses [2]** 50/9 78/19
**deficient [1]** 80/5
**definitely [4]** 42/23 71/1 72/19 99/23
**degree [1]** 55/11
**deliver [1]** 65/4
**delve [4]** 10/1 10/4 10/17 13/16
**Denaro [11]** 58/20 58/23 59/4 59/4 59/9 59/15 59/19 60/3 60/5 61/17 62/2
**Denaro's [1]** 61/10
**denied [1]** 56/20
**department [4]** 1/13 1/16 12/19 12/20
**departure [1]** 101/10
**depends [2]** 30/16 41/24
**describe [4]** 20/1 21/15 45/15 45/16
**described [8]** 8/18 8/19 10/9 10/11 13/14 18/11 18/14 26/11
**describes [3]** 43/25 87/17 103/15
**description [2]** 17/14 46/25
**determined [4]** 38/1 45/18 45/19 46/5
**developed [1]** 96/15
**developing [1]** 82/15
**devoted [1]** 3/24
**DiCaprio [1]** 75/25
**dictate [8]** 15/21 20/5 51/25 52/13 52/15 68/22 72/16 75/8
**dictated [2]** 52/22 75/7
**dictating [1]** 52/18
**dictations [1]** 70/4
**dictatorial [1]** 14/21
**did [82]** 5/22 6/22 7/10 7/15 8/24 9/3 9/8 9/21 10/7 11/2 11/20 12/2 12/6 12/10 15/24 17/23 18/5 18/7 18/13 18/14 19/2 21/9 22/6 22/7 22/16 23/11 26/19 26/22 27/3 27/7 27/24 28/1 31/18 31/25 32/4 34/22 32/11 33/14 33/17 34/2 34/4 35/22 35/25 36/3 38/5 38/10 38/13 39/7 39/15 46/2 46/24 46/25 47/15 47/24 48/4 48/7 51/23 54/7 56/24 56/25 57/5 62/2 66/20 67/13 70/20 72/6 75/2 75/4 79/12 79/20 80/20

82/22 85/25 88/15 88/21 88/24 90/7 92/21 94/9 96/2 98/18 103/13
**didn't [35]** 17/7 17/9 22/20 22/20 22/23 23/13 23/25 25/7 25/7 25/7 34/6 37/18 38/7 50/19 51/3 52/1 55/12 56/12 56/14 57/20 57/24 60/22 61/1 64/1 66/22 69/9 69/12 71/15 71/15 80/23 84/12 85/5 88/2 88/10 103/12
**difference [1]** 27/3
**different [21]** 6/24 8/14 9/6 9/16 9/16 15/12 15/13 19/12 20/2 20/3 26/23 72/21 74/9 74/14 79/10 82/13 83/1 83/1 84/11 85/20 86/20
**difficult [1]** 101/25
**direct [11]** 2/4 5/12 11/23 12/7 12/8 19/13 21/25 27/7 67/17 68/9 95/25
**directed [3]** 10/1 68/1 75/7
**directing [1]** 68/8
**directly [5]** 13/18 22/19 33/8 35/6 41/22
**director [2]** 10/11 67/25
**Disabilities [1]** 3/21
**disclosure [1]** 91/6
**discovered [1]** 14/25
**discovery [32]** 5/24 5/25 6/1 6/2 6/6 7/8 7/19 12/17 12/23 12/24 14/24 15/14 15/15 16/21 18/4 18/12 18/13 18/14 20/21 21/23 35/19 35/23 37/15 37/19 44/1 44/2 57/21 69/14 79/22 84/2 87/7 96/16 84/5 100/4 102/10
**discuss [12]** 11/6 13/21 14/24 29/21 50/24 54/6 72/13 81/17 83/1 84/5 100/4 102/10
**discussed [9]** 13/3 13/20 19/14 32/25 33/1 33/4 33/22 34/7 34/16
**discussing [1]** 12/3
**discussion [12]** 11/15 15/4 33/8 34/10 57/15 66/22 79/12 79/13 83/3 87/3 100/25 102/14
**discussions [8]** 11/22 32/22 56/13 56/18 57/3 57/22 57/25 83/23
**dismiss [3]** 51/15 51/18 51/23
**distilled [1]** 74/6
**distribution [1]** 76/18
**DISTRICT [4]** 1/1 1/1 1/10 1/23
**dive [1]** 16/16
**divided [1]** 15/8
**do [102]** 3/19 4/3 4/21 4/25 5/8 6/8 9/19 9/21 11/14 14/17 14/22 14/22 15/22 16/1 16/20 16/25 19/15 20/15 21/12 21/24 22/15 23/25 25/8 26/19 28/9 29/22 29/23 30/4 30/7 30/14 31/13 32/24 38/7 38/24 41/5 42/6 42/22 42/23 45/5 46/1 46/1 46/4 50/12 50/16 51/20 52/18 52/24 55/14 55/17 56/5 56/14 58/22 61/20 62/18 63/12 63/16 66/2 66/9 66/25 68/7 69/8 69/13 69/20 70/14 72/23 73/8 75/3 75/14 75/24 76/14 76/20 77/6 77/23 77/24 78/3 78/14 78/24 79/12 83/6 83/8 85/5 85/18 86/12 87/6 89/10 90/20 93/13 93/21 95/12 99/16 99/23 101/2 101/12 101/13 101/23 101/24 102/2 102/4 102/14 102/16 103/13
**document [21]** 29/8 30/6 42/17 42/17 43/9 46/4 50/5 50/6 54/10 58/4 58/5 58/19 61/5 74/10 74/13 74/24 76/21 78/1 89/10 89/13 90/6
**documents [22]** 15/15 15/16 15/17 16/4 18/16 18/17 18/22 40/25 41/5 41/6 42/7 44/24 50/21 50/22 50/23 55/24 55/24 58/13 70/20 74/14 74/16 74/19
**does [22]** 22/4 25/13 35/9 38/18 38/19 38/22 41/9 43/18 60/1 64/5 64/8 64/18 65/6 65/10 65/17 77/6 78/3 80/13 84/23 84/24 94/7

**D**

does... [1]  103/15
doesn't [13]  25/3 30/2 39/1 46/10
46/10 80/13 91/3 91/4 91/23 96/7
96/10 102/24 103/16
Dogg [1]  39/13
doing [19]  7/1 13/4 14/16 16/11
23/1 25/21 26/23 27/11 30/15 31/9
38/8 38/9 41/13 62/16 78/23 83/11
100/3 102/18 103/17
domain [2]  47/22 50/14
don't [100]  4/6 5/6 10/20 10/22
17/10 17/21 21/13 24/16 27/1
27/10 27/18 27/20 29/7 30/11
30/15 30/21 30/22 31/5 38/23 40/1
40/2 42/3 42/4 42/5 42/8 42/10
42/13 43/13 43/19 44/13 44/14
44/15 45/15 46/8 46/20 47/15
48/18 49/11 54/16 54/17 55/6
55/21 55/24 56/9 56/15 56/18 57/2
59/1 59/1 60/9 60/14 60/25 61/15
61/15 61/24 61/25 62/21 62/11
62/14 65/15 67/1 68/1 68/6 68/16
69/2 69/7 69/19 69/22 70/7 70/15
71/5 72/7 72/8 74/12 75/4 75/16
75/17 76/1 76/23 77/21 78/15
79/15 80/2 81/16 82/4 82/24 83/5
86/5 86/7 87/22 88/9 88/10 88/19
88/23 89/2 95/21 97/12 100/20
100/23 101/2
done [20]  8/4 9/6 9/24 13/11
14/13 14/18 17/16 20/1 22/25
29/24 54/19 69/16 70/2 70/3 78/10
80/23 83/9 83/24 102/21 102/23
double [2]  30/3 100/8
doubtful [1]  42/8
down [8]  5/2 18/15 45/21 74/12
91/8 92/3 93/10 93/13
dozen [1]  17/12
draft [23]  15/23 16/22 16/24
16/25 18/18 23/15 26/5 50/2 51/6
51/10 52/1 62/8 64/8 64/13 64/19
64/22 65/10 65/20 66/9 73/7 74/23
76/21 94/1
drafted [15]  26/10 51/12 51/18
51/22 52/19 52/21 53/21 62/18
66/15 66/24 67/6 70/16 73/3 73/3
73/17
drafting [9]  15/18 26/16 38/9
51/7 64/12 64/24 64/25 75/24 96/4
drafts [6]  25/22 38/9 50/25 51/3
51/20 73/19
drag [2]  85/4 101/3
dragging [1]  83/10
drill [1]  5/3
drive [2]  14/20 15/19
driving [3]  8/13 8/20 10/11
drove [3]  7/23 14/23 72/1
drug [1]  61/14
drug-cartel-type [1]  61/14
due [1]  42/20
DUI [1]  47/5
during [32]  10/25 12/10 12/12
14/25 21/1 21/10 21/15 23/9 23/10
25/10 27/24 34/8 36/4 38/15 47/2
47/4 48/4 55/4 61/2 61/20 70/25
71/1 72/6 72/9 73/20 73/21 73/24
74/11 75/12 76/4 76/8 86/18

**E**

e-discovery [5]  12/17 37/15 37/19
44/1 44/2
each [7]  15/13 42/9 52/6 58/12
75/20 99/7 103/12
earlier [9]  12/25 25/22 31/22
46/15 72/1 95/25 96/19 97/8 99/5
early [10]  11/15 13/11 14/3 15/10
27/3 34/19 46/2 51/15 51/20
101/12
ed [2]  24/18 38/2
edification [1]  54/9

edit [3]  25/4 90/6 90/15
judgment [1]  103/12
edits [1]  16/25
effect [3]  31/22 73/22 78/18
effective [1]  14/14
effort [2]  75/23 76/3
either [13]  10/20 16/22 19/13
31/8 43/16 51/24 54/7 54/8 56/10
76/15 86/13 91/4 94/6
electronic [4]  31/9 61/4 70/18
70/24
electronically [3]  61/6 70/2
71/23
elements [1]  23/24
Elliott [1]  19/21
ELMO [5]  31/7 31/8 31/12 62/21
93/17
else [13]  27/5 28/12 31/12 33/22
34/21 43/4 51/2 67/3 74/20 76/3
85/21 102/7 102/11
email [29]  41/3 63/6 63/12 63/16
63/17 63/18 63/18 63/23 64/2 64/5
65/6 69/6 70/20 71/16 71/18 71/19
71/19 71/20 76/18 77/2 77/7 77/8
78/4 89/13 89/16 90/14 92/24 93/9
93/13
emailed [1]  71/13
emails [8]  64/4 64/22 69/4 70/2
70/8 70/10 71/11 71/24
emotional [1]  23/17
employed [1]  35/23
Encino [1]  59/24
end [6]  4/8 12/23 16/2 40/20
82/13 94/10
ending [1]  89/24
enforcement [1]  45/23
engage [2]  7/10 54/15
engage the [1]  54/15
engaged [4]  7/18 44/2 44/11 53/24
engagement [2]  74/5 101/5
enough [1]  43/24
ensure [2]  14/13 14/16
ensuring [2]  13/5 16/4
enter [1]  29/15
enterprise [2]  21/17 22/2
entertainment [1]  40/14
enthused [1]  102/15
entire [5]  8/7 10/10 17/12 25/5
68/8
entitled [1]  104/5
equipment [1]  60/18
equivocation [1]  84/7
especially [2]  19/23 76/4
ESQ [2]  1/12 1/15
essence [1]  79/7
establish [1]  85/3
established [1]  49/18
estimate [1]  60/11
estimating [1]  100/8
even [19]  11/16 15/21 23/13 25/21
52/14 56/25 63/7 66/15 74/14
event [1]  102/4
eventually [1]  75/23
ever [8]  26/19 37/4 40/13 40/16
47/24 69/20 79/12 83/3
every [7]  11/16 17/21 18/19 29/8
46/4 71/20 75/17
everybody [8]  5/7 14/7 31/12 68/1
70/8 75/19 102/6 102/7
everyone [8]  13/15 14/8 14/9
14/16 14/21 28/4 70/7 74/20
everyone's [1]  20/3
everything [13]  9/24 10/11 14/13
19/8 24/2 30/13 40/19 65/16 69/10
69/14 74/18 76/14 102/1
evidence [2]  89/19 93/3
evidentiary [2]  1/9 42/12
ex [1]  10/21
ex-DA [1]  10/21
exactly [2]  10/22 73/14
exam [4]  67/12 67/18 69/1 75/25
examination [22]  2/4 2/4 5/12

11/9 12/7 12/8 19/21 28/19 68/5
68/7 68/8 69/23 71/21 73/3 73/18
73/21 74/10 74/24 76/8 87/19
95/25 102/18
examinations [5]  11/24 11/24
68/19 73/24 74/4
example [4]  17/6 19/20 54/3 68/20
except [1]  62/1
exchange [1]  70/9
exclude [1]  82/25
exclusively [1]  78/9
excuse [3]  14/1 90/19 103/4
excused [5]  88/20 88/22 88/25
103/10 103/19
exhibit [24]  2/7 2/7 22/8 30/4
30/8 30/11 30/23 36/16 40/24
42/24 42/25 43/3 62/23 62/25
76/24 89/6 89/18 89/19 89/21 90/2
90/5 93/6 93/7 103/14
Exhibit 14 [1]  76/24
Exhibit 15 [3]  89/6 89/19 90/2
Exhibit 16 [1]  89/21
exhibits [6]  2/6 29/9 29/10 30/19
103/11 103/17
exist [2]  54/16 71/15
existed [4]  71/3 71/11 71/23
82/14
expand [2]  52/17 75/9
expected [1]  30/20
expedite [1]  29/2
expeditiously [1]  29/24
experience [8]  8/20 17/7 17/10
44/9 47/22 53/13 57/8 72/5
expert [9]  5/25 6/6 7/8 17/18
35/20 35/23 37/14 62/3 67/4
experts [2]  12/22 96/16
extend [1]  68/24
extent [6]  16/16 23/10 80/3 80/5
80/19 80/20
extra [2]  19/25 99/1
extremely [1]  92/6
EyeLevel [24]  21/17 23/9 25/21
89/5 89/11 90/16 90/21 90/24
92/12 94/2 94/21 96/3 96/15 96/23
97/3 97/14 97/16 98/1 98/4 98/5
98/9 98/24 99/10 99/18
EyeLevel.AI [6]  21/3 21/9 21/12
22/18 25/14 26/5
EyeLevel.AI's [1]  95/7
eyes [1]  46/3

**F**

fact [8]  23/13 24/23 80/2 82/11
82/16 82/18 86/10 94/5
facts [26]  7/10 7/18 14/24 18/2
18/2 18/12 18/17 23/25 26/14 49/2
50/24 53/12 53/18 53/24 54/15
79/24 80/19 81/1 81/6 81/14 82/10
82/13 83/17 83/19 83/20 85/10
factual [1]  82/2
fair [12]  31/23 32/8 37/19 37/20
45/9 46/22 47/3 55/7 57/17 67/5
72/25 99/6
fairly [1]  49/12
fairness [1]  97/11
familiar [12]  16/7 17/15 20/12
21/4 21/6 37/1 50/13 55/1 55/5
55/10 56/3 56/17
familiarity [2]  41/1 55/11
family [1]  101/15
far [7]  4/2 33/7 81/18 81/23
82/23 91/17 98/9
FARA [12]  16/18 17/3 17/6 17/17
17/18 23/22 38/11 38/13 39/16
54/4 55/9 55/10
fast [1]  87/9
faster [3]  21/24 91/4 91/23
father [1]  92/20
favor [4]  27/13 27/13 27/17 81/6
February [1]  102/22
FEC [5]  39/16 49/21 50/8 62/2
75/18

**F**

FEC-type [1]   39/16
federal [6]   10/21 95/9 95/15
95/20 96/5 97/17
fee [1]   59/20
feedback [4]   9/3 9/5 9/6 9/8
feel [2]   35/12 60/17
feels [1]   60/17
few [11]   9/2 33/10 44/21 62/9
65/14 66/7 69/4 72/11 73/6 76/15
85/14
figure [2]   51/6 87/1
figured [1]   70/13
figuring [1]   63/21
file [7]   7/1 15/10 16/5 49/24
51/21 53/8 54/14
filed [9]   27/2 33/25 34/8 34/12
34/18 80/14 81/2 85/5 86/18
files [1]   69/6 70/21
filing [5]   50/4 84/1 84/3 84/4
84/8
filings [4]   7/1 51/8 51/10 51/11
final [8]   15/23 16/25 20/6 64/8
64/22 73/24 74/2 76/14
finalize [1]   7/1
finalizing [1]   64/12
financial [2]   21/12 40/6
find [10]   10/13 15/14 15/16 15/16
16/19 18/16 23/1 54/14 60/13 63/7
finding [2]   49/2 54/15
fine [6]   30/19 31/10 31/13 41/23
58/10 58/12
finish [7]   5/7 52/8 52/10 89/3
91/20 99/24 100/19
finishing [1]   102/25
firm [8]   9/14 25/23 38/20 46/24
47/24 49/23 52/25 76/17
firms [2]   50/15 74/17
first [24]   6/11 8/24 13/15 17/11
20/12 21/14 21/20 38/9 41/8 43/12
45/20 57/5 58/16 73/19 93/16
93/23 95/3 95/8 95/14 95/19 96/3
96/13 97/17 103/5
five [1]   90/3
flag [1]   41/4
flavor [1]   22/5
Fletcher [1]   90/25
flight [1]   101/10
flights [1]   101/17
flip [1]   40/21
fly [1]   101/10
focus [1]   19/13
focused [1]   11/3
foldered [2]   13/9 13/9
folders [1]   13/13
folks [3]   12/22 14/9 15/13
following [2]   31/1 90/6
force [1]   21/20
foregoing [1]   104/4
foremost [1]   21/20
form [11]   25/4 50/25 54/1 54/3
70/20 70/24 74/7 77/17 82/10
103/14 103/17
formal [2]   49/20 74/23
formality [1]   50/18
formally [1]   16/24
former [3]   38/20 49/8 95/9
forth [3]   19/18 39/16 55/24
forward [3]   9/8 18/9 30/18
found [2]   18/22 100/7
foundation [1]   58/8
founder [1]   90/20
founders [1]   21/7
four [2]   34/15 34/17
fourth [2]   37/24 93/13
FOX [1]   1/20
frame [2]   95/14 102/14
frankly [5]   24/16 85/17 91/5
91/24 103/12
fraud [1]   95/11
free [2]   25/24 97/9

frequency [1]   13/23
frequent [2]   38/2 8/2
friend [3]   21/7 26/1 59/6
friendly [1]   32/6
friends [3]   32/5 61/15 92/20
front [2]   22/17 26/22 88/24
Fugees [1]   95/10
full [3]   22/5 46/16 91/6
full-plus [1]   46/16
function [2]   23/1
further [2]   70/14 83/2
future [1]   98/16

**G**

game [1]   98/13
gamut [1]   19/5
gave [4]   22/23 23/12 57/2 69/14
gears [1]   20/10
generally [8]   9/12 11/5 11/10
18/11 26/11 26/13 32/23 32/24
generation [1]   21/18
generative [5]   95/8 95/15 95/19
97/18 98/2
George [1]   19/21
get [43]   3/14 5/3 5/6 9/3 13/19
14/16 15/20 16/5 16/12 19/16 20/2
22/4 22/10 22/21 25/24 26/20 27/1
27/13 27/17 28/14 31/5 33/11
41/16 41/18 41/21 51/24 52/16
59/21 61/9 74/6 77/11 84/12 88/19
89/9 91/25 92/2 97/9 101/8 101/12
102/6 102/21 102/23 103/16
gets [2]   20/23 103/15
getting [5]   24/2 68/7 81/15 83/8
83/17
give [14]   10/15 23/11 23/16 23/18
24/7 24/13 24/25 30/2 48/1 52/15
60/11 79/21 102/19 103/16
given [4]   16/15 29/4 29/19 41/15
gives [2]   22/5 24/1
giving [3]   4/22 18/2 24/3
go [27]   4/2 5/2 5/6 5/10 6/19
10/13 14/11 16/2 16/20 18/13
18/14 18/23 19/14 24/13 29/21
30/6 42/12 42/13 45/19 52/6 74/16
82/8 84/23 86/1 91/10 91/17
101/19
go-by [1]   24/13
God [1]   4/23
goes [3]   45/23 102/22 102/23
going [40]   3/15 9/8 12/14 18/9
20/10 22/25 26/22 28/5 30/18
30/19 36/20 38/2 39/20 40/18
40/21 41/1 41/5 42/6 42/9 42/10
42/15 42/17 58/5 58/16 63/9 76/13
87/9 89/9 91/4 91/7 91/23 92/21
94/9 99/24 100/2 100/3 100/4
101/18 101/24 102/24
gone [2]   55/19 100/16
good [26]   3/6 3/8 3/9 3/12 5/14
5/15 7/7 12/11 13/11 21/7 24/3
24/4 24/22 28/17 28/18 28/21
28/22 31/16 31/17 33/14 40/12
45/6 67/12 71/17 77/11 100/7
got [9]   7/2 14/4 40/13 55/12
80/14 80/14 80/14 87/3 91/4
gotten [1]   99/1
government [27]   3/5 3/16 29/8
29/20 30/16 38/10 40/20 42/15
42/20 54/22 62/9 62/19 64/9 64/19
65/11 65/21 65/21 65/24 65/25
66/2 66/13 66/25 84/24 87/7 87/12
88/6 103/18
government's [2]   66/15 85/24
grade [1]   21/17
graduate [1]   31/18
graduated [1]   43/17
grand [2]   19/3 19/4
great [3]   31/14 52/3 82/25
grew [1]   32/8
ground [1]   87/14
guess [9]   8/23 21/14 44/3 50/22

53/23 54/13 84/22 91/12 102/5
guidance [1]   8/22
guide [1]   77/21
guilty [1]   23/20
guy [3]   47/8 72/13 75/5
guys [5]   33/22 57/1 69/4 71/8
74/17

**H**

hac [1]   38/2
hac-ed [1]   38/2
had [92]   6/12 6/24 7/17 9/14
10/13 10/23 14/18 14/24 15/9
17/10 18/3 18/19 19/16 22/10
22/12 22/15 23/7 23/23 25/5 26/4
29/17 32/21 33/1 35/3 35/5 35/21
36/2 37/25 39/11 39/17 39/18
39/25 40/1 42/14 43/14 43/24 44/9
44/24 45/19 47/22 48/14 50/20
53/4 54/22 55/18 55/19 55/24
56/14 56/19 56/20 57/22 59/13
59/21 60/3 62/5 66/6 66/22 66/24
67/6 67/8 69/5 69/9 69/14 69/16
70/13 70/13 71/6 71/10 71/13
74/21 75/19 77/17 78/10 79/5
80/23 83/3 83/23 83/24 84/4 85/8
85/13 86/3 86/7 86/8 86/10 86/12
86/18 86/20 87/22 87/23 91/13
99/4
hadn't [1]   28/2
half [1]   101/8
hallway [1]   86/13
hand [2]   4/20 29/14
handed [2]   53/21 67/10
handful [2]   34/13 34/14
handing [1]   9/17
handle [1]   12/23
handled [2]   15/8 19/10
handling [1]   8/11
hang [1]   72/23
happen [2]   12/10 23/13
happened [12]   12/11 12/12 23/13
27/18 27/20 45/17 62/1 80/2 80/9
84/13 84/14 95/23
happy [3]   48/2 63/5 102/1
hard [8]   3/20 20/21 28/3 60/23
89/3 91/20 99/14 102/6
has [32]   9/14 23/13 27/10 27/11
29/17 29/20 31/1 31/12 38/23
38/25 39/2 40/16 41/6 43/14 44/5
44/6 45/6 49/13 58/13 61/7 69/20
85/12 89/22 92/16 95/22 96/7
96/10 100/15 101/5 101/14 101/20
103/14
Haskell [4]   6/20 6/22 16/5 47/1
have [142]
haven't [1]   30/16
having [7]   32/25 54/15 61/21
63/21 83/5 84/12 100/2
Haystack [12]   12/16 12/17 13/2
14/9 36/5 36/9 43/10 43/22 45/3
47/13 71/16 71/19
he [273]
header [1]   63/15
health [3]   44/7 44/9 44/10
Heaney [5]   7/21 7/22 8/15 48/12
60/6
hear [2]   60/22 72/4 77/11
heard [2]   31/22 40/23
hearing [3]   4/22 42/13 55/23
hearings [2]   34/20 100/24
help [15]   4/23 5/24 24/15 36/1
42/14 46/24 52/25 54/6 59/22 91/3
91/4 91/23 93/18 99/10 100/3
helped [10]   7/16 8/15 21/8 26/5
38/6 46/25 62/13 75/14 97/3 97/13
helper [1]   24/1
helpful [2]   26/9
helping [5]   7/19 8/17 37/19 86/5
84/3
helps [1]   29/22
her [16]   6/11 7/17 27/19 37/25

**H**

her... [12]    41/8 43/12 43/19
43/20 44/7 44/23 46/21 46/24 67/7
67/13 69/22 89/23
here [24]    4/16 8/4 10/16 23/14
27/18 41/3 42/5 63/21 64/22 64/23
77/15 77/20 80/10 81/25 82/5
82/15 83/9 84/16 85/18 97/11
97/21 100/12 101/11 102/17
herself [1]    43/25
Heuchling [2]    75/16 75/18
hey [1]    99/4
Higginbotham [1]    19/21
high [2]    33/2 39/12
him [48]    10/24 11/5 11/12 32/4
33/23 33/25 34/4 38/25 39/5 41/11
41/13 41/18 42/6 46/25 47/7 49/14
51/9 52/8 52/10 58/17 59/13 59/20
60/12 72/24 73/7 78/23 79/4 79/4
79/14 80/8 80/12 82/21 83/6 85/9
85/9 86/7 87/19 87/23 87/24 92/8
92/12 94/6 94/6 96/9 99/13 99/13
100/17 102/16
himself [6]    15/21 39/1 51/12
54/19 75/8 84/2
hiphop [1]    95/10
hire [1]    46/24
hired [2]    6/10 12/15
his [38]    6/23 9/11 10/19 10/20
16/25 18/13 20/5 20/6 26/5 27/4
27/16 29/2 32/5 32/6 33/13 34/2
34/4 34/6 39/4 47/5 47/17 47/24
47/24 52/8 52/10 54/8 57/24 59/20
61/8 61/15 61/16 61/18 74/14
78/13 81/5 98/20 101/7 101/9
history [3]    17/12 95/8 95/13
holiday [1]    102/5
hone [1]    17/5
honestly [2]    61/25 88/3
honing [1]    67/10
Honor [64]    3/6 3/9 3/18 4/10 4/13
5/11 6/12 27/19 28/12 28/14 28/17
29/1 29/10 30/1 30/5 30/12 30/25
31/2 37/25 40/18 40/23 41/14
41/17 41/23 42/11 42/19 43/1 43/5
58/3 58/7 58/15 63/10 63/22 65/23
67/22 73/11 77/12 78/20 79/1 79/9
79/23 80/18 80/25 81/12 81/22
82/7 83/16 83/25 84/20 85/7 85/14
87/5 87/17 88/5 88/11 89/19 90/1
91/22 92/1 93/3 96/11 99/14
100/20 103/9
Honor's [1]    16/4
HONORABLE [1]    1/9
hope [1]    29/4
hopefully [2]    31/6 91/8
hoping [1]    29/2
hospital [1]    44/8
hotel [2]    60/12 60/13
hour [6]    48/11 99/21 99/22 100/5
101/8 103/3
hours [5]    14/5 46/14 74/20 76/15
98/15
Houseling's [1]    75/15
how [47]    5/22 6/22 13/24 15/7
16/14 18/1 18/11 18/13 18/14 19/9
20/15 21/6 21/14 21/15 24/8 26/20
27/12 31/20 31/25 32/2 32/4 32/6
32/13 33/17 34/11 42/6 42/10
45/16 49/11 50/9 52/18 53/11
53/18 58/25 61/17 70/2 81/25 82/4
82/20 84/12 85/11 87/22 92/19
98/16 99/16 99/20 100/4
however [4]    30/7 30/16 31/13
38/11
human [1]    12/18
hundred [1]    69/4
hundreds [1]    20/22
hyperbolic [1]    100/10

**I**

I'd [5]    40/23 41/4 58/7 89/5
100/24
I'm [11]    6/15 10/19 29/1 62/24
63/14 73/11 76/13 90/1 93/12
100/1 100/22
I-S-R-A-E-L-Y [1]    5/18
idea [2]    15/9 24/22
ideas [4]    18/5 18/8 24/13 25/1
ideate [1]    24/15
identification [1]    63/4
identify [3]    3/4 51/10 67/18
identifying [1]    25/12
immediately [2]    84/10 85/16
impacts [1]    85/13
implicates [1]    82/4
import [1]    82/5
important [3]    18/15 39/4 102/21
impression [1]    16/7
inaccuracies [1]    84/4
incarcerated [2]    20/20 20/24
incident [2]    87/8 87/13
include [4]    12/2 19/2 54/11 57/5
included [2]    25/16 26/13
includes [2]    61/10 102/11
including [3]    11/23 68/8 88/25
incorporate [1]    9/8
indeed [2]    95/14 95/19
independent [1]    88/19
independently [1]    13/7
indicate [3]    38/10 41/9 88/24
indicated [4]    69/24 78/10 96/7
96/10
indicating [1]    86/7
indictment [9]    15/5 49/22 53/6
53/6 53/11 55/19 57/5 57/11 57/12
indirectly [1]    35/6
individual [3]    10/18 19/18 20/24
individuals [7]    13/2 15/21 19/12
19/19 20/20 41/2 78/22
industry [1]    44/10
inform [3]    53/25 80/19 84/6
information [12]    16/12 18/15
18/17 33/23 33/24 41/21 79/22
81/11 82/2 82/17 83/7 85/12
infrequently [1]    72/9
initial [3]    44/23 52/5 52/12
injected [1]    80/9
injecting [1]    78/21
innocence [1]    23/21
innocent [1]    23/20
input [2]    26/21 98/2
input/output [1]    98/2
inputs [1]    22/13
inputting [2]    22/18 22/19
inside [1]    86/13
instance [1]    55/14
instead [3]    22/25 42/17 97/9
instruction [3]    77/16 77/18 77/22
instructions [2]    76/22 78/7
instrumental [2]    47/4 49/1
integral [1]    13/5
integrated [1]    19/16
Integrity [1]    1/16
intelligence [5]    20/11 20/17
35/15 35/18 90/21
intended [1]    24/19
interaction [1]    27/19
interactions [2]    53/13 55/22
interest [4]    34/25 35/5 35/21
81/24
interested [1]    38/14
internal [4]    50/5 50/6 50/17
53/10
international [1]    95/11
interrupted [1]    52/11
interruptions [1]    4/1
interviewed [3]    43/23 48/2
introduction [1]    88/6
investigator [4]    7/14 7/16 48/20
48/25

inviting [1]    90/15
involve [3]    23/23 24/23
38/1 39/18 51/7 52/14 54/5 56/7
61/12 61/13 64/24 64/25 67/1 67/2
75/17 77/4 81/17 81/19 84/2 95/9
involving [2]    39/16 97/18
irrelevant [1]    81/7
is [305]
isn't [6]    41/18 55/4 75/16 84/25
86/3 100/3
Israely [29]    2/3 4/14 4/24 5/14
5/18 5/22 28/21 28/23 29/2 31/16
37/4 41/1 41/5 53/16 58/5 63/12
83/17 83/23 84/2 85/12 85/24
90/14 91/7 92/25 93/21 97/9
100/16 101/5 101/9
Israely's [1]    63/2
issue [8]    22/8 56/16 80/11 82/3
83/14 85/19 85/20 85/25
issued [4]    25/9 89/11 94/16 94/21
issues [14]    4/2 6/1 9/16 10/2
11/5 11/6 14/12 15/16 57/23 57/23
69/12 70/13 70/13 89/5
it [380]
items [1]    19/4
its [4]    20/14 21/7 21/9 97/17
itself [2]    58/5 81/10

**J**

January [8]    1/5 8/25 13/24 65/7
65/14 65/17 100/15 104/10
January 2023 [1]    13/24
January 24th [3]    65/7 65/14
100/15
job [2]    33/14 46/25
Joel [1]    59/4
JOHN [1]    1/12 3/7
join [2]    14/21 35/22
joined [8]    6/8 35/17 35/19 35/23
37/17 39/7 43/9 43/20
joked [1]    17/17
judge [8]    1/10 79/25 80/15 82/3
83/2 84/11 86/21 87/4
judge's [1]    27/13
Judicial [1]    3/21
July [1]    35/9
July 2021 [1]    35/9
junior [2]    10/4 37/22
jurors [4]    8/5 8/6 9/4 67/6
jury [7]    7/22 8/8 19/3 19/4 76/22
77/21 78/7
just [61]    3/24 8/2 8/18 9/20 9/23
11/5 12/22 14/11 14/13 14/14
14/15 17/1 17/5 17/6 23/6 24/10
24/24 24/24 25/20 28/3 30/13 32/7
38/4 40/11 42/1 42/4 50/19 58/3
58/10 60/3 63/1 67/5 67/9 68/1
69/5 69/9 69/14 69/15 70/15 70/23
71/5 72/23 78/1 80/17 82/9 83/13
85/22 87/6 87/23 90/6 96/1 96/25
97/8 97/25 99/5 99/17 100/11
101/6 101/20 101/22 102/19
justice [3]    1/13 1/16 20/19

**K**

Katherine [2]    7/13 48/19
Katz [15]    26/2 26/7 89/16 90/14
90/19 90/20 90/24 92/6 92/14
92/16 92/16 92/25 93/12 99/6
99/10
Katz's [1]    92/20
keep [6]    14/14 34/9 34/10 52/7
52/8 83/19
keeps [1]    30/9
KELLER [10]    1/12 3/7 25/6 86/14
86/19 87/7 87/11 87/12 87/18
87/22
Kenner [150]
Kenner's [21]    26/17 27/4 32/8
32/11 38/20 39/8 46/24 49/8 49/9
49/10 51/20 56/6 59/23 60/25
68/24 69/6 70/3 70/20 71/24 83/18

## K

Kenner's... [1]  85/12
Kenner [2]  77/3 77/8
KennerLaw.com [2]  77/3 77/8
key [4]  19/23 72/25 73/17 74/25
keyboard [1]  52/2
kid [1]  92/16
kind [26]  8/18 10/5 10/7 11/22
14/18 15/4 16/14 17/4 18/11 18/15
18/22 18/25 20/4 23/19 23/24
26/12 26/13 26/19 40/24 50/18
57/15 60/4 70/14 75/21 99/17
102/18
kindly [1]  103/12
kinds [2]  10/5 11/21
knew [16]  17/1 17/2 17/4 17/9
25/21 34/6 39/17 40/11 44/9 45/18
47/7 55/11 80/23 83/17 85/11 94/9
know [104]  4/3 5/3 6/8 8/6 10/12
10/20 11/14 11/17 14/11 14/13
14/14 15/15 17/21 19/25 20/3 22/6
22/21 22/24 23/12 23/16 23/17
23/19 23/21 25/22 28/11 29/23
30/9 30/20 33/13 33/15 34/1 38/24
40/1 40/1 40/3 41/12 42/5 42/9
43/13 43/19 44/14 45/15 46/12
46/20 47/15 49/11 50/17 51/3
54/17 55/12 55/13 56/5 56/23 57/1
57/21 58/2 60/14 61/1 61/15 61/15
62/11 62/13 62/14 64/25 67/2 67/9
68/1 68/17 69/19 69/20 69/22 70/1
70/8 72/8 74/4 74/13 74/15 74/19
75/5 76/1 76/25 79/4 81/18 82/1
86/6 88/2 88/10 88/18 89/2 89/7
91/3 95/21 96/8 96/10 99/2 99/3
99/14 100/18 100/20 100/23 101/5
101/12 101/21 101/22
knowing [1]  9/15
knowledge [4]  23/23 41/6 53/3
58/6
known [7]  32/1 32/13 39/2 61/17
92/8 92/16 99/7
knows [6]  41/10 49/1 58/13 63/8
87/2 99/13
KOLLAR [1]  1/9
KOLLAR-KOTELLY [1]  1/9
KOTELLY [1]  1/9
kowtow [1]  27/15
Kriss [4]  7/4 43/7 66/9 66/20

## L

label [2]  89/24 94/10
language [2]  21/25 25/16
large [2]  12/19 74/17
larger [1]  1/20
Las [1]  101/19
last [7]  10/19 10/20 14/5 33/10
34/20 54/23 95/8
lasted [1]  72/17
Late [1]  65/17
later [3]  10/24 88/12 90/16
launch [1]  97/7
launched [1]  96/17
laundering [4]  55/18 55/20 61/10
61/21
law [23]  9/14 15/4 17/1 17/2 17/9
23/19 24/17 25/23 31/18 38/20
43/17 45/23 46/24 47/24 49/23
50/15 52/25 54/18 59/6 59/7 61/18
74/17 76/17
Law-type [1]  54/18
lawyer [6]  6/3 31/23 47/20 48/17
48/24 76/11
lawyers [3]  5/25 100/7 102/11
lay [1]  58/8
lead [4]  10/8 17/20 45/10 98/14
leading [2]  14/19 94/7
learn [3]  24/18 57/4 78/17
least [3]  47/21 83/9 97/21
leave [1]  101/1
leaving [1]  102/13
legal [31]  7/11 15/2 18/6 18/9

21/20 23/25 24/21 26/14 31/21
49/25 50/1 50/14 50/15 50/23
53/17 54/11 54/12 54/14 54/18
57/17 80/11 96/2 96/16 98/15
legally [1]  85/19
lens [1]  27/14
Leonardo [1]  75/25
less [3]  27/7 41/12 44/18
Lestelle [4]  7/13 7/14 8/17 48/19
53/20 58/2 58/17 76/25 79/9 80/24
83/19 85/1 89/7 93/12 95/14 96/6
100/11 103/4
let's [16]  4/5 4/11 8/1 13/23
16/1 16/1 16/1 29/24 41/16 49/25
51/6 51/10 67/16 85/21 92/4 100/4
level [2]  33/2 77/2
licensed [1]  46/22
life [1]  35/12
like [85]  6/19 7/8 7/15 8/3 10/4
10/10 11/9 11/21 11/23 13/11
16/14 17/12 17/14 19/2 19/22 22/1
23/1 23/5 23/6 23/6 24/12 24/13
24/22 25/7 27/15 27/21 29/11
29/15 30/5 35/12 36/12 36/14
38/21 39/15 40/21 40/23 41/4 41/9
41/10 49/14 49/17 49/23 51/11
54/3 54/17 56/7 56/9 56/24 58/7
59/3 60/17 60/18 60/18 63/15
64/22 64/23 64/25 65/9 67/9 67/24
67/25 69/25 70/19 72/7 74/17
76/14 78/5 79/16 84/5 89/5 89/18
92/10 93/1 93/2 94/17 96/1 97/8
98/21 100/21 100/23 101/17 101/22
102/14 102/24 103/7
likely [2]  38/3 94/4
likes [3]  18/20 23/12 99/13
limitations [1]  56/13
limited [1]  103/2
LINDSAY [3]  1/22 104/3 104/12
line [3]  23/4 25/12 87/19
lines [2]  9/6 52/7
LinkedIn [2]  18/18 41/2
Liquori [1]  49/5
list [11]  30/4 30/4 30/8 30/11
30/23 42/23 42/24 42/24 42/25
76/18 103/14
listed [1]  37/21
lit [1]  98/9
litigated [1]  37/7
litigation [3]  95/7 96/15 96/16
litigation' [1]  98/14
little [8]  5/19 16/3 20/10 24/9
36/12 42/21 62/6 86/11
LLP [1]  1/20
load [2]  22/1 22/2
loaded [3]  20/23 21/23 22/10
local [4]  6/21 6/25 47/1 47/7
LOCKHART [6]  1/15 2/4 3/7 36/13
54/25 62/7
log [1]  79/21
log-in [1]  79/21
logistics [2]  34/21 62/16
Lois [2]  7/21 48/12
long [11]  17/1 32/13 32/14 57/21
58/25 59/1 60/9 61/17 61/18 99/20
101/3 102/25 103/3
longtime [1]  51/19
Loni [1]  89/14
look [16]  10/13 11/23 16/14 30/17
36/20 36/25 41/9 46/12 47/24
77/20 93/9 94/18 98/6 98/16
101/17 102/19
looked [3]  4/6 17/11 17/16
looking [3]  10/14 41/8 89/13
looks [10]  36/24 37/6 38/21 64/23
65/9 78/5 93/1 94/17 102/14 103/7
Los [1]  32/10
lot [57]  7/9 7/15 7/25 8/3 8/3
9/5 10/11 12/24 14/12 14/15 15/14
15/16 17/1 17/2 17/3 17/9 17/10

18/18 18/20 19/8 19/18 23/3 23/18
24/7 24/9 39/9 44/13 44/24 45/19
45/20 46/1 46/2 49/1 51/13 52/5
52/12 52/18 55/21 55/24 57/22
62/13 62/16 65/1 68/2 68/2 68/6
68/7 69/2 71/6 72/12 72/12 74/4
74/19 74/21 74/22 75/18 87/14
loves [1]  23/17
lying [1]  97/11

## M

Maddix [32]  8/16 9/11 9/21 12/20
13/3 47/11 51/7 62/8 63/6 64/5
64/8 64/19 65/3 65/6 66/6 66/15
66/18 67/6 67/9 67/14 72/25 73/7
73/17 74/23 75/6 76/7 76/20 77/21
78/4 78/6 78/17 79/13
made [9]  33/1 33/6 67/7 67/13
80/1 80/21 84/15 95/7 95/12
make [14]  5/4 18/17 18/17 23/19
23/23 30/18 30/20 56/14 67/25
75/8 82/6 83/25 93/23 101/25
makes [5]  24/1 40/19 41/12 45/24
103/15
making [3]  8/10 57/15 67/11
Malone [3]  55/15 55/17 55/22
malpractice [1]  47/18
man [1]  72/11
manage [1]  72/14
management [2]  10/7 96/17
manager [2]  13/7 46/20
managers [2]  12/22 13/8
manner [5]  6/7 16/18 23/3 51/4
69/13
manuals [1]  77/22
many [13]  10/11 13/7 34/11 49/1
55/23 55/23 57/25 70/5 73/3 76/14
91/21 99/7 101/15
March [2]  27/3 59/10
Mark [1]  51/17
marked [3]  22/8 89/19 90/1
market [1]  39/1
marketing [1]  26/8
mask [1]  5/3
masks [1]  3/13
match [1]  25/7
material [1]  60/23
materials [1]  19/6
matter [5]  32/19 42/18 80/3 80/13
104/5
matters [1]  33/20
may [14]  18/20 29/12 31/3 41/11
52/14 56/21 82/7 83/12 89/10
91/18 92/25 93/9 93/13 94/21
May 24th [1]  92/25
May 3rd [2]  93/9 93/13
maybe [25]  6/11 10/21 10/23 14/3
19/25 22/15 32/3 40/19 46/15
47/19 47/23 54/4 56/10 56/10
56/25 59/11 59/12 59/13 72/8
75/22 78/16 86/8 89/2 101/8
101/10
McBride [6]  51/17 51/18 51/19
51/23 51/25 52/16
me [42]  14/1 20/1 22/14 23/18
25/20 37/5 43/24 44/1 49/24 53/8
53/20 54/17 57/7 57/14 57/24 58/2
58/20 59/13 61/18 62/13 68/18
69/13 71/13 72/12 72/15 76/25
78/16 79/10 83/19 85/1 86/5 89/7
90/17 90/19 93/12 95/14 96/6 99/1
100/11 101/25 102/19 103/4
mean [30]  9/20 9/22 14/21 15/6
24/4 27/18 28/3 32/24 39/21 41/8
41/24 42/24 44/13 52/22 53/20
54/12 55/11 56/17 62/13 64/23
65/14 68/17 70/25 71/7 72/7 80/17
81/12 94/9 98/25 101/20
meant [3]  42/1 66/13 97/6
media [3]  26/4 82/17 83/8
meet [4]  3/21 31/25 32/4 59/16
meeting [12]  3/23 13/25 19/11

**M**

meeting... [9]   59/23 60/3 60/4
60/4 61/2 61/20 62/1 72/14 91/21
meetings [19]   3/23 13/21 13/22
14/2 14/6 14/10 14/19 14/25 17/19
17/23 17/24 19/17 53/15 55/23
70/6 70/12 72/2 72/6 72/10
member [2]   72/25 95/9
members [7]   6/13 6/16 6/18 26/16
36/14 72/22 88/24
memo [10]   49/23 49/23 49/25 50/1
50/14 50/15 50/17 51/21 53/17
53/21
memos [6]   49/19 49/20 53/8 53/10
54/14 54/18
mention [1]   23/20
mentioned [13]   8/2 9/11 11/8
11/24 12/25 14/9 17/6 19/2 19/9
26/1 27/10 34/22 72/1
meritless [1]   80/22
messaged [3]   59/9 59/12 59/13
met [1]   16/4
methods [1]   45/21
Miami [2]   10/22 59/7
MICHAEL [2]   1/19 3/10
MICHEL [27]   1/6 3/3 3/11 10/23
11/4 11/8 11/10 11/12 12/3 12/7
12/12 17/20 17/23 18/5 18/12 27/8
53/14 53/14 53/21 54/7 59/18
59/19 60/4 60/5 83/4 88/18 95/9
Michel's [10]   5/23 6/14 6/17
34/17 36/1 37/17 44/5 95/13 98/3
98/14
micromanaging [1]   9/25
microphone [7]   5/20 28/25 63/20
77/10 87/10 95/16 101/4
microphones [1]   5/4
Microsoft [1]   14/6
middle [1]   102/9
might [7]   33/17 50/9 51/5 51/23
53/11 53/18 76/23
millions [2]   15/15 44/23
mind [2]   81/8 85/13
mine [1]   21/7
Minnesota [2]   47/14 47/18
minutes [3]   100/3 100/6 101/8
missing [3]   24/2 82/5 84/16
mistaken [1]   51/23
mitzvah [2]   91/10 101/14
mock [38]   7/23 8/1 8/4 8/23 9/3
10/9 11/16 11/23 11/24 12/6 13/23
26/12 26/12 26/19 44/22 60/14
62/6 62/9 62/14 62/16 62/18 64/20
65/13 65/15 65/17 66/10 66/12
66/21 66/24 67/15 67/16 67/20
69/16 69/17 69/17 69/21 73/9
73/12
model [5]   8/18 10/6 9/17 73/24
74/8
models [1]   74/2
modifications [1]   28/8
modified [1]   81/5
modify [2]   27/16 28/1
modifying [1]   80/6
moment [1]   94/18
Monday [2]   77/2 102/4
money [5]   55/17 55/19 61/10 61/21
86/6
month [2]   60/21 101/21
monthly [1]   3/23
months [10]   9/2 44/18 44/20 44/21
45/13 46/6 60/20 60/21 66/7
101/21
more [35]   5/19 6/15 7/2 7/3 9/11
11/10 16/3 16/16 16/24 17/15 18/2
19/12 26/11 27/9 29/23 30/14
34/21 37/22 38/6 42/18 45/1 45/17
45/20 46/4 46/5 46/14 47/2 49/1
54/5 58/9 67/3 82/2 85/22 99/16
100/5
morning [19]   3/8 3/9 3/12 4/4

5/14 5/15 28/17 28/18 28/21 28/22
28/24 28/25 71/14 81/18 83/9
91/16 101/9 103/5 103/6
most [13]   14/14 22/8 24/9 33/8
49/4 53/13 55/5 55/6 55/8 57/2
69/5 72/6 83/3
mostly [10]   11/3 22/14 22/16 33/6
34/19 50/15 50/25 54/1 56/12 61/4
motion [34]   1/9 14/12 15/7 15/18
27/2 33/16 33/21 33/25 34/12 50/2
51/5 51/15 51/18 51/22 54/8 56/3
56/5 56/15 56/17 56/21 56/24 57/4
79/16 80/1 80/21 81/2 82/11 85/8
85/11 86/4 86/9 86/14 86/18 88/16
motions [23]   7/1 15/9 15/13 15/20
15/20 18/18 18/25 33/1 33/4 33/6
33/20 34/5 34/8 34/17 34/18 50/25
51/1 51/3 51/4 51/11 52/21 54/2
94/9
move [21]   4/7 5/20 30/22 36/16
40/19 42/10 46/11 52/9 54/20 57/6
58/9 67/6 79/2 84/18 86/11 87/13
89/18 93/2 95/17 96/11 103/7
moved [5]   13/19 56/20 73/11 80/15
91/15
moving [2]   30/13 37/4
Mr [11]   2/4 20/9 28/21 28/23
34/25 55/22 60/4 63/6 75/5 86/19
99/10
Mr. [295]
Mr. Campbell [2]   51/25 67/4
Mr. Clew [2]   62/4 62/5
Mr. Denaro [10]   58/20 58/23 59/4
59/9 59/15 59/19 60/3 60/5 61/17
62/2
Mr. Denaro's [1]   61/10
Mr. Haskell [3]   6/22 16/5 47/1
Mr. Israely [21]   5/14 5/22 29/2
31/16 37/4 41/1 41/5 53/16 58/5
63/12 83/17 83/23 84/2 85/12
85/24 90/14 91/7 93/21 100/16
101/5 101/9
Mr. Israely's [1]   63/2
Mr. Katz [9]   26/7 90/14 90/20
92/14 92/16 92/16 92/25 93/12
99/6
Mr. Katz's [1]   92/20
Mr. Keller [7]   25/6 86/14 87/7
87/11 87/12 87/18 87/22
Mr. Kenner [144]
Mr. Kenner's [21]   26/17 27/4 32/8
32/11 38/20 39/8 46/24 49/8 49/9
49/10 51/20 56/6 59/23 60/25
68/24 69/6 70/3 70/20 71/24 83/18
85/12
Mr. Maddix [31]   8/16 9/11 9/21
12/20 13/3 51/7 62/8 63/6 64/5
64/8 64/19 65/3 65/6 66/6 66/15
66/18 67/6 67/9 67/14 72/25 73/7
73/17 74/23 75/4 76/7 76/20 77/21
78/4 78/6 78/17 79/13
Mr. Malone [1]   55/17
Mr. McBride [4]   51/17 51/19 51/25
52/16
Mr. McBride did [1]   51/23
Mr. Michel [23]   3/11 10/23 11/4
11/8 11/10 11/12 12/3 12/7 12/12
17/20 17/23 18/5 18/12 27/8 53/14
53/14 53/21 54/7 59/18 59/19 60/5
83/4 88/18
Mr. Michel's [9]   5/23 6/14 6/17
34/17 36/1 37/17 44/5 95/13 98/3
Mr. Neil [1]   89/16
Mr. Schrader [3]   96/19 96/22
96/24
Ms [1]   2/4
Ms. [27]   7/14 7/22 8/14 8/15 8/17
9/21 12/20 13/3 29/14 30/8 36/13
43/7 45/14 51/9 52/14 54/25 60/6
62/7 67/5 67/13 69/16 75/11 75/24
76/7 102/20 103/7 103/14
Ms. Carlstrom [12]   8/14 9/21

12/20 13/3 45/14 51/9 67/5 67/13
69/16 76/7 102/20
Ms. Heaney [3]   7/22 8/15 60/6
Ms. Kriss [1]   43/7
Ms. Lestelle [2]   7/14 8/17
Ms. Lockhart [3]   36/13 54/25 62/7
Ms. Patterson [5]   29/14 30/8
102/20 103/7 103/14
Ms. Winters [1]   52/14
much [21]   7/12 7/17 10/4 14/5
14/8 17/3 17/7 17/10 19/5 20/15
21/21 24/23 36/23 45/18 46/4
52/18 56/15 56/18 61/15 61/25
99/16
multiple [3]   8/8 19/19 19/23
multiplier [1]   21/20
my [38]   15/12 23/17 25/24 31/11
33/5 33/11 33/15 35/12 36/17 41/3
45/2 47/22 50/3 50/22 53/13 57/22
58/16 61/13 64/8 71/5 71/8 71/16
71/18 71/19 71/19 81/8 81/23
85/17 87/6 88/4 88/21 91/5 91/24
93/23 97/10 101/22 102/8 103/8
myself [3]   51/25 56/24 60/5

**N**

name [3]   5/16 10/19 10/20
named [2]   10/18 51/17
names [1]   40/2
natural [1]   21/25
nature [3]   11/19 40/10 84/6
Nearby [1]   32/10
neat [2]   74/13 74/18
necessarily [6]   38/8 42/9 51/4
54/3 54/8 78/8
necessary [1]   69/13
neck [1]   57/20
need [20]   5/19 14/17 30/17 30/23
34/6 36/20 36/23 39/1 42/3 42/13
46/3 63/4 63/7 91/18 95/16 97/22
101/4 101/13 102/23 103/12
needed [11]   13/16 13/16 14/22
16/16 27/12 45/1 45/17 46/5 48/3
59/18 67/11
needing [1]   67/3
needs [1]   4/3
neighborhood [3]   32/7 32/9 32/10
Neil [6]   26/1 89/16 90/19 90/24
92/6 98/20
never [11]   27/20 37/7 37/10 69/16
74/16 77/22 78/10 78/18 78/18
99/1 99/4
new [4]   1/13 1/17 14/17 80/1
news [2]   82/17 83/8
next [3]   100/18 100/19 103/3
nice [3]   21/24 24/3 74/18
nicely [1]   24/7
nickname [1]   22/22
NICOLE [2]   1/15 3/6
night [1]   11/18
no [66]   1/4 3/17 20/19 21/2 21/13
23/23 24/23 25/15 27/6 27/9 27/18
27/20 27/23 28/3 30/5 30/12 30/22
31/6 32/12 33/18 34/3 34/6 34/9
35/7 35/21 37/9 37/14 40/17 41/6
45/1 46/23 48/1 48/18 51/9 51/24
53/1 53/2 53/3 55/17 56/2 56/5
57/17 58/24 60/9 61/23 62/20 67/1
69/12 71/17 72/12 72/15 72/19
75/4 76/12 76/23 83/2 84/8 86/10
86/15 88/20 89/20 90/5 93/4 93/7
97/12 101/17
nominal [1]   38/4
none [1]   21/23
Northwest [2]   1/13 1/17
not [136]
notating [1]   74/21
noted [2]   84/18 84/19
notes [8]   18/18 67/13 70/7 70/8
71/7 71/8 74/21 75/8
nothing [6]   4/23 28/12 51/2 57/7
76/12 80/23

**N**

**November [1]** 44/19
**now [8]** 17/17 32/17 49/18 51/17
67/15 73/20 97/17 99/25
**nuance [1]** 17/2
**nuances [1]** 55/12
**number [20]** 8/15 13/20 17/15
17/22 22/6 22/8 25/6 26/23 40/22
40/24 41/2 45/6 54/5 62/5 73/17
74/14 75/1 76/5 76/5 82/24
**NW [2]** 1/20 1/24

**O**

**object [5]** 30/13 40/21 41/5 78/20
84/24
**objection [6]** 3/17 58/8 79/3
84/19 89/20 93/4
**objections [4]** 5/5 29/21 40/20
42/16
**objects [1]** 88/6
**obligations [1]** 101/15
**observing [1]** 91/5
**obviously [8]** 3/13 5/7 36/25
57/16 100/11 101/2 102/25 103/13
**occur [1]** 8/24
**occurred [1]** 82/1
**occurring [1]** 72/2
**off [8]** 3/13 5/3 19/15 45/25
67/10 84/10 84/11 87/3
**office [5]** 7/25 46/20 60/25 61/8
79/25
**offices [1]** 59/23
**Official [3]** 1/23 104/3 104/13
**often [3]** 13/24 48/14 72/16
**okay [52]** 4/15 7/4 9/3 12/14 25/9
26/11 26/25 27/22 29/17 31/22
31/25 34/22 36/12 38/18 40/5 43/5
44/16 49/12 49/17 51/1 52/21 53/4
55/14 56/1 57/17 59/15 62/6 62/12
63/3 63/16 64/12 66/3 67/23 69/11
69/15 76/20 77/1 78/2 79/9 79/16
80/24 81/21 84/17 90/22 91/17
92/21 95/25 98/23 99/2 99/12
99/15 102/10
**old [2]** 32/2 38/21
**once [7]** 11/16 18/22 19/25 30/13
46/2 80/14 83/5
**one [40]** 3/16 6/15 6/20 14/3
14/22 17/19 17/22 19/12 20/6
20/14 21/7 23/2 30/6 30/23 38/11
38/23 42/9 44/4 44/19 45/8 46/13
63/18 69/15 70/1 72/4 76/2 77/4
81/16 81/17 82/2 82/11 84/22 85/1
85/22 90/3 90/3 93/10 93/15 96/8
98/9
**ones [4]** 41/24 45/8 51/14 68/17
**only [12]** 6/6 17/11 21/22 23/2
52/7 56/9 56/22 60/25 66/6 86/10
88/23 99/11
**open [1]** 3/24
**opening [12]** 8/5 8/11 62/8 62/18
64/9 65/21 66/1 66/10 66/16 66/25
69/16 73/7
**openings [1]** 64/19
**operating [2]** 28/5 80/4
**operations [1]** 44/8
**opinion [7]** 33/5 33/11 33/12
33/15 33/19 34/6 101/22
**opinions [3]** 18/5 18/8 34/4
**opportunistic [1]** 25/20
**opportunity [4]** 5/6 29/18 30/2
58/17
**oral [1]** 74/4
**orally [1]** 52/22
**order [11]** 21/23 22/3 22/15 27/16
45/21 46/1 53/25 79/17 82/11 86/4
88/16
**ordinary [1]** 40/14
**original [2]** 44/19 46/6
**originally [1]** 66/12
**other [34]** 4/1 6/13 6/16 15/20

16/19 29/17 35/5 38/7 41/2 41/11
42/12 47/1 81/16 81/20 81/2 81/4
51/11 53/5 54/6 57/1 70/3 77/4
78/22 79/5 80/15 82/3 82/3 84/22
87/4 91/19 95/22 96/8 99/7 103/12
**other's [2]** 26/20 52/7
**others [18]** 8/13 8/19 9/18 10/12
13/4 13/10 13/17 22/14 39/13
46/13 51/16 52/16 64/6 65/7 67/8
69/5 79/7 80/4
**otherwise [2]** 17/4 71/12
**our [16]** 12/14 25/22 26/9 33/20
34/12 42/11 48/2 56/2 80/18 81/12
82/9 83/22 84/1 84/3 85/7 99/19
**out [20]** 3/16 8/17 10/16 25/6
40/13 42/15 51/6 52/17 59/16
59/20 59/22 60/19 63/7 63/21
67/12 70/13 83/2 87/1 103/6
103/13
**outline [8]** 50/2 52/15 54/1 54/3
68/13 71/11 71/22 75/25
**outlines [25]** 18/17 19/9 19/10
24/11 50/21 54/6 67/18 67/19 68/4
68/10 68/17 68/19 69/1 69/2 69/8
69/24 70/1 70/15 70/24 71/7 73/4
73/18 73/21 75/12 76/8
**output [2]** 24/20 98/2
**outputs [1]** 25/2
**outset [2]** 37/17 39/7
**outside [4]** 34/10 57/22 84/23
86/13
**outsourced [1]** 52/24
**over [8]** 4/16 14/11 41/5 71/8
76/18 81/3 95/17 101/6
**own [14]** 18/13 20/5 20/15 20/16
22/15 23/15 25/4 47/22 54/9 67/7
67/13 96/20 97/2 97/13
**owned [3]** 35/22 35/25 75/22
**owner [4]** 35/14 35/17 35/19 35/23
**owners [2]** 20/14 91/2

**P**

**page [5]** 23/3 38/20 93/16 98/6
98/11
**pages [1]** 41/2
**paid [4]** 27/22 28/5 59/21 59/21
**Paladino [1]** 10/18
**Palagrino [1]** 10/19
**panels [1]** 8/8
**paper [1]** 18/20
**papers [1]** 4/6
**paragraph [4]** 95/3 96/14 98/6
98/7
**paralegal [1]** 20/6 20/8 49/9
49/10 76/12
**paralegals [1]** 8/17
**part [23]** 6/6 7/5 7/14 15/17
24/24 30/9 30/10 37/11 39/11
42/19 46/19 46/21 52/14 66/6
66/13 67/2 67/14 75/19 76/17
80/14 87/5 91/2 96/4
**participants [1]** 72/5
**particular [5]** 9/15 16/17 16/18
41/12 45/2
**particularly [1]** 42/8
**parties [3]** 4/9 103/10 103/19
**Partly [1]** 39/14
**partner [4]** 10/4 25/13 57/24
96/17
**partners [1]** 34/22
**partnership [2]** 96/16 97/6
**parts [3]** 15/20 18/3 64/24
**past [4]** 5/25 35/5 48/15 67/16
**paste [1]** 25/3
**Patterson [6]** 29/14 30/8 89/22
102/20 103/7 103/14
**Paul [2]** 10/18 11/25
**Paul's [1]** 11/8
**pause [1]** 8/1
**pay [1]** 5/5
**payment [6]** 27/24 27/25 28/2 28/2
28/9 28/10

**pendency [1]** 36/4
**pending [2]** 114/6 119/19
**people [22]** 6/13 6/16 6/20 8/6
12/14 12/15 13/20 19/23 38/25
41/13 41/19 45/7 45/17 46/3 46/5
62/13 70/6 70/7 70/8 76/5 80/15
101/2
**percent [1]** 71/18
**percipient [1]** 87/25
**perfect [2]** 62/22 74/13
**performance [5]** 27/4 27/16 80/5
80/7 81/5
**perhaps [2]** 72/20 80/22
**period [3]** 57/21 67/8 81/3
**person [10]** 10/16 22/7 25/20 26/8
35/3 53/15 75/20 75/21 82/2
102/17
**person's [1]** 72/5
**personal [4]** 41/1 41/6 58/5 71/19
**personally [1]** 84/3
**personnel [1]** 36/9
**perspective [2]** 15/12 39/9
**perspectives [1]** 20/2
**PETER [2]** 1/18 3/9
**ph [2]** 10/19 75/15
**phone [5]** 38/10 53/15 72/17 72/22
72/23
**physically [4]** 25/2 47/15 52/1
66/17
**pick [2]** 52/10 92/4
**picking [1]** 100/12
**picture [2]** 36/18 38/19
**piece [1]** 97/2
**place [3]** 59/23 70/1 87/2
**Plaintiff [2]** 1/4 1/12
**plan [1]** 29/7
**planned [2]** 66/24 101/15
**planning [1]** 83/13
**plans [1]** 101/7
**play [3]** 24/24 38/5 66/13
**played [1]** 67/14
**please [16]** 3/4 4/17 4/20 5/1
5/16 37/5 58/1 76/24 89/7 92/22
94/13 95/3 95/17 96/13 98/7
103/14
**plus [3]** 25/5 27/11 46/16
**point [13]** 37/21 46/14 81/15
81/23 82/21 84/16 85/2 86/16
88/12 99/15 100/14 102/8 103/3
**points [3]** 16/22 52/15 54/5
**pool [1]** 8/6
**portion [2]** 7/7 9/5
**position [1]** 42/12
**possibility [1]** 11/12
**possible [2]** 58/9 73/15
**post [5]** 26/4 34/17 34/18 46/25
94/9
**post-trial [2]** 34/17 34/18
**potential [1]** 69/24
**PowerPoint [1]** 25/5
**PowerPoints [1]** 24/10
**practical [1]** 42/18
**practice [10]** 12/7 14/12 15/7
26/19 26/23 47/6 47/17 56/15
61/10 61/16
**practiced [1]** 6/5
**practices [1]** 59/6
**practicing [2]** 17/1 31/23
**PRAKAZREL [1]** 1/6
**Pras [2]** 3/3 95/9
**precisely [1]** 33/12
**preferable [1]** 30/6
**preference [1]** 31/11
**preliminary [1]** 89/9
**prep [8]** 7/24 8/4 14/11 46/1
59/18 59/22 62/1 68/9
**preparation [12]** 8/21 10/8 11/3
11/10 12/8 23/11 24/10 26/10 27/4
62/14 67/1 75/20
**preparations [2]** 49/18 67/17
**prepare [2]** 75/14 84/3
**prepared [13]** 29/3 49/20 50/12

**P**

prepared... [10]   53/19 53/25
  64/19 67/19 68/5 68/14 68/20 69/8
  75/11 101/21
preparing [7]   9/10 11/4 11/8
  19/20 33/11 49/2 75/17
present [3]   17/20 17/21 17/23
presentation [1]   8/11
preserve [1]   80/18
press [21]   23/12 25/9 25/12 25/17
  25/21 25/24 89/10 90/15 92/21
  94/1 94/5 94/15 95/1 96/4 97/9
  98/18 98/21 98/23 98/25 98/25
  99/3
presumably [4]   71/24 71/25 79/5
  100/13
presume [1]   74/7
presumption [2]   23/21 47/23
pretending [1]   65/21
pretrial [3]   7/7 12/11 14/12
pretty [6]   7/17 13/5 14/4 14/8
  15/11 19/5
previous [1]   56/11
previously [4]   6/5 23/7 71/2 89/6
primarily [12]   6/25 11/4 18/21
  21/19 22/5 22/11 24/8 38/13 51/7
  57/20 61/12 61/13
primary [1]   37/12
printed [1]   61/9
prior [15]   49/20 53/7 53/19 56/20
  57/4 68/14 68/20 69/1 69/8 69/17
  69/21 71/11 79/14 86/23 95/23
private [3]   22/2 22/2 48/19
privilege [2]   69/12 94/8
privy [1]   87/24
pro [1]   38/2
probably [10]   5/20 21/20 25/19
  39/19 55/8 60/13 66/8 71/18 99/21
  102/17
problem [1]   30/15
problems [1]   63/21
procedural [1]   57/23
procedurally [1]   56/8
proceed [10]   3/14 4/5 4/11 29/24
  42/17 85/21 91/8 91/23 100/4
  100/12
proceeded [1]   85/14
proceeding [11]   26/25 27/1 27/14
  41/15 79/18 79/24 81/10 82/12
  82/23 83/10 85/9
proceedings [7]   32/22 81/18 81/25
  84/15 85/18 103/22 104/5
process [9]   6/24 16/2 18/22 18/23
  29/4 45/23 54/18 74/22 96/4
produced [6]   45/24 69/4 69/9
  71/24 87/7 87/12
product [18]   9/17 16/15 18/23
  19/15 50/6 53/5 53/7 53/10 53/23
  65/4 68/25 70/3 71/6 75/9 98/1
  98/2 98/4 98/5
production [3]   8/7 69/7 71/14
profession [1]   31/20
proffer [3]   63/5 83/12 84/15
profile [3]   36/19 39/12 45/4
program [5]   20/11 21/15 22/12
  23/7 23/10
project [1]   12/22
promised [1]   27/25
promptly [1]   102/12
prompts [1]   22/6
propose [1]   29/20
proposed [2]   76/22 77/16
pros [1]   11/21
prosecute [1]   39/8
prosecution [1]   15/11
prosecutor [1]   10/21
prosecutors [2]   54/22 85/9
prosecutors' [1]   27/13
proven [1]   23/20
provide [4]   12/18 30/8 31/1
  103/14

provided [12]   12/20 12/21 58/20
  59/8 81/22 82/4 82/4 82/6 82/17
  82/17 82/20 83/7
provides [1]   64/10
providing [1]   24/21
Public [1]   1/16
puffery [1]   26/9
pull [3]   18/16 61/5 61/7
pulling [1]   48/10
purpose [2]   14/10 85/5
purposes [3]   29/3 50/17 80/1
purview [2]   34/10 57/23
put [18]   16/3 19/16 20/6 25/18
  26/7 38/23 46/3 50/16 54/6 68/7
  74/16 74/19 91/13 91/18 93/17
  98/20 99/3 103/13
putting [3]   60/18 75/19 86/25

**Q**

queries [1]   22/6
question [19]   12/1 17/19 35/16
  50/3 52/10 53/4 58/8 58/16 69/15
  84/9 84/22 85/1 85/2 87/6 88/4
  88/21 89/9 91/12 97/22
questioning [1]   78/21
questions [11]   5/8 18/3 23/22
  42/4 59/3 68/13 74/25 84/18 85/23
  85/24 85/25
quick [2]   28/14 41/3
quickly [3]   37/4 55/13 58/9
quote [2]   98/18 98/20

**R**

RAE [1]   1/15
RAG [1]   21/18
raise [2]   4/19 29/21
raised [1]   50/10
ran [1]   19/5
rather [2]   44/1 50/4
reaction [1]   34/4
read [9]   15/24 15/25 24/21 67/5
  83/5 94/6 95/3 96/13 98/7
reading [1]   9/20
ready [2]   76/25 89/7
real [2]   69/17 73/13
really [6]   23/24 43/19 56/9 64/21
  68/6 78/18
rearrange [1]   102/1
reason [2]   59/15 64/1
recall [39]   8/9 11/2 12/6 26/22
  40/2 50/12 50/13 51/10 55/14
  55/17 55/25 56/9 58/22 60/13
  61/20 66/9 68/16 69/7 70/5 70/14
  70/15 70/22 70/24 73/8 75/14
  75/16 75/17 75/24 76/20 76/23
  77/6 78/3 78/14 78/15 79/12 79/15
  83/5 86/12 89/10
receive [1]   64/1
received [7]   28/2 28/10 54/13
  64/3 64/3 78/4 89/16
recent [1]   33/8
recently [1]   38/11
receptionist [1]   46/20
receptionist/office [1]   46/20
recipient [1]   63/17
recite [1]   23/24
recognize [3]   42/9 63/12 63/16
recollection [4]   63/2 64/18 71/5
  72/18
recollections [1]   42/2
recommend [1]   62/2
record [24]   3/5 3/14 5/3 5/17
  18/3 29/16 52/7 63/3 63/21 77/11
  80/17 80/18 82/10 83/13 83/13
  83/15 84/19 85/10 87/6 87/11
  89/23 91/25 95/4 104/5
records [1]   60/13
recused [1]   85/14
redirect [3]   91/18 103/1 103/2
redo [1]   100/2
refer [2]   94/7 98/1
reference [2]   67/25 97/6

referenced [1]   47/11
references [1]   117/19
referencing [1]   94/1
referral [1]   81/4
referrals [1]   39/3
referred [3]   74/8 79/24 81/3
referring [1]   77/17
reflect [1]   74/10
reframe [2]   44/1 79/1
refresh [2]   63/1 64/18
refreshing [1]   42/2
regarding [3]   15/7 16/6 25/10
regular [1]   72/2
regulations [2]   49/21 50/8
regulatory [1]   44/8
related [8]   47/5 49/21 50/24 57/5
  57/18 61/2 79/17 79/22
relates [2]   47/17 87/8
relating [5]   53/17 82/24 84/14
  89/11 94/2
relationship [2]   25/14 72/20
relative [1]   33/20
Relativity [5]   7/8 12/25 23/6
  43/24 96/1
release [16]   25/9 25/12 25/17
  25/21 89/11 90/15 90/16 92/21
  94/2 94/5 94/15 95/1 96/5 98/19
  98/23 99/3
releases [3]   98/22 98/25 99/1
relevance [1]   83/6
relevant [10]   15/4 18/16 18/23
  41/16 41/18 42/8 80/3 82/14 83/9
  85/18
remain [1]   4/18
remainder [1]   99/18
remember [37]   10/12 10/22 18/20
  40/2 44/13 44/15 44/21 46/8 46/10
  46/11 52/24 55/6 55/21 56/9 56/12
  56/15 56/18 56/22 56/24 57/2 59/1
  59/2 61/24 61/25 61/25 62/18
  65/15 68/2 68/4 68/6 68/7 69/2
  71/5 86/5 86/7 88/23 89/2
remote [3]   48/7 100/21 100/24
remotely [4]   47/14 47/16 48/5
  48/6
removed [1]   88/15
reordering [1]   42/21
reply [1]   77/24
reporter [7]   1/22 1/23 4/3 91/5
  92/2 104/3 104/13
reporters [2]   79/21 102/7
representing [1]   39/13
reputation [1]   39/4
requested [2]   77/15 77/18
required [1]   83/25
rescheduled [1]   101/20
research [12]   15/14 16/11 17/16
  38/8 38/13 45/6 46/4 49/19 50/21
  50/22 50/23 67/14
researched [2]   38/11 70/14
resolves [1]   88/4
resources [1]   12/18
respect [6]   10/2 16/18 17/17
  18/25 24/8 32/18
respected [1]   20/3
respectfully [1]   84/18
respond [4]   41/14 80/24 82/7 84/1
responded [1]   82/20
response [1]   65/24
responses [3]   23/14 23/19 25/2
rest [1]   100/17
result [3]   8/23 13/13 81/1
results [2]   13/9 13/18
resume [1]   102/12
retain [2]   35/25 62/2
retained [3]   36/2 36/4 45/13
retaining [1]   55/15
retrieval [2]   21/18 21/19
review [23]   7/19 9/22 15/22 15/23
  15/23 16/22 20/22 29/18 41/3 43/9
  44/23 45/1 45/4 45/5 46/3 53/22
  58/17 69/9 69/13 76/14 90/17

**R**

review... [2]  90/18 94/8
reviewed [9]  9/18 9/19 13/14
18/12 19/8 25/6 33/1 44/24 56/15
reviewing [2]  18/13 19/6
revise [1]  90/15
Richard [2]  55/15 62/3
right [68]  3/8 3/12 3/19 4/5 4/11
4/16 4/19 10/3 11/23 17/8 17/16 28/13
35/13 35/15 39/22 44/16 44/19
47/14 47/20 48/20 48/24 49/6
49/15 50/11 54/2 55/11 57/13
59/10 60/2 61/11 62/10 63/9 64/10
64/13 65/17 66/7 66/13 66/18
66/25 69/18 72/2 73/25 75/7 75/12
77/18 78/7 78/11 85/21 87/16
88/21 89/21 90/12 90/25 92/12
92/17 93/5 93/24 94/24 96/5 96/20
97/11 97/16 97/18 99/25 101/8
102/3 102/4 103/4 103/19
ROBERT [1]  1/18
role [7]  6/23 9/11 11/8 37/18
37/23 38/5 44/23
roles [4]  6/24 11/2 36/15 47/2
room [5]  1/24 60/24 74/5 76/4
76/16
room-type [1]  74/5
roughly [4]  32/13 44/18 70/11
99/20
RPR [1]  104/12
rule [1]  24/1
rules [3]  16/4 16/4 25/7
ruling [2]  84/17 84/23
run [2]  13/9 18/16
rush [1]  42/21

**S**

said [27]  17/7 24/20 27/20 33/7
33/16 33/25 37/14 38/1 39/21
42/13 47/1 55/4 55/6 55/8 56/7
62/15 64/25 67/24 73/22 76/14
78/17 83/3 85/17 89/2 96/8 97/8
98/14
same [12]  5/9 10/5 18/25 19/20
19/24 22/3 32/7 32/7 53/4 53/24
76/1 85/9
sample [1]  23/18
sat [2]  5/4 38/15
saw [2]  46/2 61/1
say [50]  6/10 9/19 9/25 13/24
14/1 14/1 16/18 22/20 22/23 22/24
22/3 23/11 23/13 23/14 23/23
24/25 26/10 30/21 31/23 32/8
32/14 38/6 39/5 44/13 45/9 46/9
51/3 51/11 51/22 52/21 55/7 57/17
60/20 60/21 64/8 67/5 71/1 72/23
72/25 73/20 76/1 76/10 77/15 78/8
78/15 92/10 93/23 99/4 99/6
100/11
saying [9]  26/5 50/22 55/25 56/19
61/20 75/2 75/4 83/19 90/7
says [5]  34/1 64/11 77/21 78/12
96/9
schedule [6]  15/11 15/12 100/13
100/18 101/16 102/19
schemes [2]  40/3 40/6
school [7]  23/19 24/17 31/18
32/11 43/17 59/6 61/18
Schrader [4]  35/3 96/19 96/22
96/24
scope [3]  11/23 84/23 85/23
Scorsese [1]  67/25
scratched [1]  99/17
screen [5]  14/8 15/25 31/5 61/7
61/8
screens [1]  70/6
script [1]  67/5
search [3]  12/22 21/19 21/24
searches [4]  13/6 13/8 18/16
21/24
seasoned [2]  40/1 48/25

seated [1]  5/1
seated [1]  30/20
second [4]  6/11 57/20 96/13 98/6
secondary [1]  37/13
seconds [2]  72/17 98/16
Section [1]  1/16
sections [2]  26/16 26/20
see [30]  14/17 26/20 27/3 36/17
42/8 42/10 60/22 61/1 63/13 63/17
64/14 64/15 77/23 77/24 82/4
82/24 83/5 83/6 83/8 87/22 88/9
88/10 89/4 93/10 93/14 93/17
93/21 99/10 103/3 103/5
seeing [3]  27/19 56/23 59/9
seek [1]  36/14
seem [1]  40/24
seems [4]  40/25 43/3 54/17 77/19
seen [4]  58/13 68/19 69/1 74/2
seized [1]  19/4
send [3]  20/20 77/15 94/5
sending [1]  93/24
senior [1]  11/7
sense [3]  23/16 40/19 56/14
sent [9]  16/5 20/23 22/15 77/7
78/13 84/10 86/20 87/3 94/6
sentence [3]  24/7 96/13 97/7
separate [4]  32/21 79/25 79/25
82/22
Separately [1]  26/1
September [3]  36/7 44/12 46/16
September 2022 [1]  44/12
serious [1]  85/11
served [1]  40/16
sessions [2]  10/16 26/23
set [3]  14/2 15/11 18/22
setting [2]  29/5 55/9
sever [7]  56/3 56/5 56/20 56/21
57/5 57/10 57/18
several [2]  6/18 97/21
severance [1]  56/16
share [2]  30/20 103/12
she [66]  7/5 7/5 7/5 7/7 7/9 7/10
7/14 7/15 7/16 7/16 7/18 7/22
7/23 7/23 7/24 43/7 43/9 43/9
43/14 43/17 43/20 43/22 43/23
43/23 43/24 43/25 44/2 44/5 44/6
44/9 44/11 44/21 45/1 45/8 46/13
46/14 46/14 46/15 46/16 46/19
46/20 48/14 48/17 48/18 48/19
48/22 48/25 48/25 48/25 49/1 49/3
66/23 66/24 67/1 67/2 67/7 67/7
67/8 69/16 69/20 75/11 75/14 76/1
76/3 77/15 103/15
she'll [1]  103/16
SHERRY [1]  1/22 104/3 104/12
shift [1]  20/10
shipping [1]  60/19
short [1]  91/16
shortly [1]  6/10
should [8]  4/7 5/8 25/19 26/13
27/16 30/23 38/2 98/11
show [6]  78/16 79/17 82/11 85/10
86/4 88/16
shown [2]  30/16 42/14
side [2]  12/21 29/17
signals [1]  24/21
similar [1]  19/24
simulated [2]  8/6 66/1
since [15]  4/4 5/4 32/1 33/25
34/8 34/12 34/18 36/25 61/18
69/25 81/17 82/25 88/9 92/16
102/9
single [1]  17/21
singular [2]  74/10 74/13
Sir [1]  4/16
sit [2]  5/2 75/5
sitting [2]  22/17 38/3
six [1]  90/3
size [1]  9/15
skills [2]  43/24 45/6
skip [1]  91/21
slow [1]  91/8

small [2]  9/14 32/10
smart [1]  39/13
Snoop [1]  39/13
so [203]
so Patterson [1]  89/22
social [2]  20/19 26/4
software [1]  14/7
sold [1]  36/5
solemnly [1]  4/21
solid [1]  80/22
some [49]  7/10 7/11 12/11 12/11
14/5 16/10 16/12 19/16 24/4 25/24
29/3 33/2 33/6 33/16 34/1 36/13
36/14 37/21 38/13 40/2 40/3 41/9
42/1 45/25 46/1 47/2 51/15 51/15
52/18 58/8 58/12 59/3 61/19 63/4
64/24 67/8 67/14 68/16 71/7 74/7
75/11 80/7 80/10 81/5 84/4 91/19
97/9 100/14 103/8
somebody [2]  43/4 81/10
somehow [1]  10/24
someone [16]  13/18 16/23 40/12
45/4 45/5 45/6 51/17 52/2 57/9
59/18 71/20 74/6 75/22 76/3 98/20
99/4
something [23]  13/16 13/16 19/22
22/23 24/17 24/22 30/8 40/1 49/14
50/3 50/4 52/15 54/4 68/11 68/13
72/17 78/16 78/18 81/16 82/22
89/23 100/14 103/13
sometimes [4]  13/17 20/22 22/19
61/9
soon [2]  83/2 100/14
sorry [11]  6/15 29/1 39/23 62/24
63/14 73/11 76/13 90/1 93/12
100/1 100/22
sort [3]  12/6 26/16 60/23
sound [6]  26/20 35/9 43/18 60/1
65/17 102/24
sounds [7]  17/14 23/5 24/12 35/13
41/10 44/16 69/25
source [1]  73/23
sourcing [1]  74/4
spark [1]  52/12
speak [8]  5/19 22/7 28/25 62/4
63/20 88/18 95/16 101/4
speaking [2]  3/13 77/10
speaks [1]  87/13
specialist [1]  37/15
specialization [1]  47/5
specific [10]  10/14 11/2 40/1
45/3 65/15 68/4 68/6 68/17 88/23
97/22
specifically [11]  10/2 25/18 29/7
33/3 62/14 67/17 69/3 70/15
71/7 99/11
speeding [1]  91/3
spell [1]  5/16
spent [1]  7/9
spoke [1]  72/9
spoken [1]  69/21
staff [2]  50/19 76/17
staffing [4]  12/19 12/19 45/7
48/1
stages [1]  14/2
stake [1]  21/12
stand [1]  40/21
standing [1]  4/18
start [9]  4/7 5/8 19/11 42/15
49/25 51/6 85/8 100/15 102/21
started [9]  11/14 11/15 14/3
37/22 49/11 51/4 75/22 76/2 76/3
starting [2]  3/5 49/19
starts [1]  98/9
state [3]  5/16 45/21 85/12
statement [4]  62/9 64/9 69/17
78/24
statements [4]  8/5 8/5 78/21 79/7
STATES [6]  1/1 1/3 1/10 3/3 3/7
17/13
status [4]  6/11 14/15 37/24 38/3
statute [1]  56/12

**S**

statutes [14]   16/6 16/8 16/12
16/17 49/21 50/8 50/23 53/5 53/11
53/18 53/24 55/2 55/5 61/11
stay [1]   102/13
step [1]   4/16
stepping [1]   52/6
steps [1]   17/15
still [4]   28/2 69/5 81/4 84/12
stipulate [1]   97/25
stood [1]   69/20
stop [6]   3/20 16/1 37/5 91/20
99/15 102/8
stopped [1]   38/24
stopping [2]   4/4 99/15
storied [1]   39/12
strategies [2]   9/7 15/2
strategy [5]   18/6 18/9 50/24
53/25 70/13
streamline [2]   29/4 42/2
Street [1]   1/20
stress [1]   86/10
stressed [6]   86/4 86/5 86/6 86/8
86/8 86/9
Strickland [1]   80/6
string [1]   23/2
strong [1]   43/24
stuff [11]   15/14 24/17 41/16
51/15 52/19 54/4 56/8 71/8 99/4
99/18 103/8
style [2]   10/7 78/21
subpoenaed [1]   34/19
subsequent [1]   26/4
substance [1]   27/1
substantial [3]   48/4 48/8 48/10
substantive [13]   8/10 11/22 12/3
37/18 38/8 45/5 47/2 51/11 56/8
56/8 57/2 57/23 101/23
substantively [2]   7/10 7/18
succeed [2]   92/12 99/10
successful [3]   39/17 39/21 39/24
such [6]   7/3 39/12 39/12 53/7
71/22 77/18
suggest [1]   30/18
suggested [3]   25/23 59/19 62/4
suggestion [1]   102/8
Suite [1]   1/14
summarization [1]   70/12
summarize [2]   4/8 99/5
summary [1]   24/3
Superior [1]   3/22
superseding [4]   15/5 53/6 57/10
57/12
supporting [1]   79/24
suppose [1]   88/6
supposed [1]   59/21
supposedly [1]   87/1
sure [33]   5/5 10/19 10/23 21/17
22/16 23/19 23/23 24/2 28/16
30/18 30/20 31/24 35/10 41/17
44/6 44/17 54/12 61/12 63/5 64/3
64/15 65/16 67/16 68/16 68/22
68/23 68/25 73/2 74/1 78/19 80/11
92/7 97/25
surely [1]   84/24
surface [1]   99/18
surprise [8]   57/4 60/16 60/22
72/4 72/11 72/15 78/17 79/4
surprises [1]   57/7
swear [2]   4/18 4/21
sworn [1]   4/24
system [5]   21/17 21/18 22/21
22/24 98/15

**T**

tab [7]   36/16 38/18 40/22 58/1
76/24 92/22 94/12
table [3]   2/1 38/3 38/15
tablet [1]   20/23
tablets [1]   20/20
TAFURI [2]   1/19 3/10

take [18]   3/13 5/2 8/1 16/24
16/25 22/25 26/3 34/23 38/12 39/6
44/4 45/20 45/24 70/7 70/8 75/9
94/18 102/24 103/3
taken [2]   18/8 24/20
takes [2]   23/25 42/18
taking [4]   3/16 9/20 9/23 37/22
talk [16]   8/1 11/9 13/23 20/10
21/24 22/1 34/9 36/12 41/18 42/7
49/17 52/2 62/6 72/7 73/20 97/20
talked [5]   43/2 59/13 67/14 88/2
90/17
talking [14]   41/25 51/1 54/2
54/10 67/15 67/16 67/20 67/21
68/10 72/6 73/9 93/18 97/23 98/1
talks [1]   65/20
task [9]   7/17 10/3 10/15 13/2
13/4 13/7 19/20 19/24 74/6
tasked [3]   13/6 16/10 62/15
tasks [2]   14/17 65/3
team [54]   5/23 6/8 6/14 6/17 6/18
6/22 7/5 7/6 7/15 10/7 11/11
12/14 13/14 13/20 13/24 14/24
15/8 16/11 18/11 18/14 19/7 19/10
26/12 26/16 27/7 28/4 36/13 36/14
37/11 37/18 41/2 43/20 44/11 45/9
45/12 46/19 46/21 49/18 54/7 56/6
57/12 59/16 64/6 65/8 68/8 68/9
68/25 69/25 71/21 72/22 73/1 83/1
83/22 103/6
teams [5]   6/7 14/6 14/6 17/19
70/6
technical [1]   12/22
technologies [4]   22/3 45/25 97/21
97/21
technologist [2]   21/21 31/21
technology [15]   12/18 12/21 20/25
21/8 21/9 21/21 25/13 94/2 95/7
96/2 96/17 96/23 97/4 97/17 97/22
tell [4]   65/14 87/2 102/20 103/6
telling [1]   55/17
temple [1]   32/7
ten [6]   60/1 60/8 60/10 60/17
60/17 60/18
tens [1]   20/21
Tenure [1]   3/21
terms [23]   3/12 3/25 5/3 27/4
41/12 69/24 69/25 79/2 79/3 79/6
80/12 81/24 81/25 83/6 84/7 84/13
84/16 91/24 100/11 101/2 102/7
102/17 102/25
test [1]   23/24
testified [14]   12/13 22/7 22/7
35/8 47/1 48/12 49/5 70/4 70/23
71/2 73/22 89/6 95/25 96/19
testify [6]   11/10 11/20 12/4
31/22 32/25 33/17
testifying [2]   11/12 11/21
testimony [14]   4/8 4/9 4/21 19/3
19/4 29/3 34/2 34/16 71/4 75/2
75/15 99/5 102/9 102/10
than [11]   16/3 34/21 45/1 45/5
45/20 49/1 66/23 67/3 70/3 82/2
70/6
Thank [7]   62/22 77/12 83/16 84/20
103/9 103/20 103/21
that [552]
That's [1]   66/14
their [14]   5/7 13/13 19/15 20/21
20/24 21/8 22/25 27/7 27/17 28/6
36/15 43/22 80/5 100/8
them [32]   3/13 4/6 6/19 7/2 12/11
13/3 13/4 14/5 14/20 14/21 14/23
15/17 17/22 20/4 21/8 29/15 29/18
29/21 41/8 41/21 45/7 48/2 48/2
48/3 52/1 52/2 70/16 73/19 75/18
82/15 82/20 99/10
themes [2]   78/19 79/13
then [83]   3/19 4/11 7/1 7/16 8/13
8/17 9/17 10/18 10/3 10/3 10/15
11/5 11/17 12/21 13/10 13/14
13/15 13/18 13/19 14/4 15/7 15/17

15/22 15/23 15/23 16/2 16/5 16/19
16/21 16/22 17/24 17/24 18/24
19/16 19/17 20/4 20/23 23/15
24/21 30/2 34/20 41/7 42/16 46/13
46/15 47/11 48/12 48/19 49/5
52/16 52/17 53/21 55/18 56/25
57/16 64/12 65/4 65/16 66/20
67/12 67/14 70/7 70/9 71/13 71/14
74/5 74/5 75/9 75/22 76/2 77/20
78/16 80/22 81/13 83/25 87/22
89/13 89/21 93/5 101/19 101/21
102/6 102/22
theories [4]   7/11 9/7 26/14 79/14
theory [5]   76/21 77/16 77/22 78/6
78/14
there [86]   3/17 3/22 3/25 5/5
6/13 6/16 6/18 7/9 8/1 8/8 8/9
8/16 10/18 10/25 11/11 11/22 12/6
12/8 12/15 13/11 13/20 14/2 14/3
14/8 14/12 14/17 15/15 16/10 17/3
17/3 17/11 19/19 19/25 20/23
22/14 25/13 25/18 27/12 28/8
29/23 40/2 40/3 40/24 41/3 45/6
50/3 54/5 54/21 55/17 55/19 55/21
55/22 56/2 56/5 57/17 58/2 60/6
64/21 66/17 68/16 68/17 69/2 69/3
69/3 69/12 70/15 71/17 71/20 74/9
74/14 74/16 75/1 76/2 80/4 80/10
80/22 81/13 81/13 82/11 82/12
85/10 85/19 87/25 94/9 97/20
101/17
therefore [1]   39/4
these [19]   3/23 8/18 12/2 15/16
15/16 19/6 24/4 29/9 29/10 34/20
36/14 41/9 42/3 42/9 58/12 58/12
70/6 74/2 84/4
they [73]   3/21 5/8 11/6 11/15
12/2 12/17 12/18 12/20 12/21 13/5
13/6 13/13 13/14 14/4 14/5 14/7
14/15 14/17 14/21 16/21 19/14
19/15 20/20 22/7 22/16 25/23
26/20 28/5 29/9 29/21 29/23 30/17
30/17 30/21 30/22 30/22 39/2
42/16 45/7 45/13 49/11 49/12
49/13 50/9 51/3 51/4 53/11 54/16
59/20 70/22 70/17 70/19 70/20 71/3
71/6 79/7 80/6 80/15 81/14 84/6
84/10 84/24 85/4 85/5 85/25 88/2
90/21 91/2 91/17 97/19 98/25 99/1
102/25
thing [10]   5/9 19/1 56/9 67/9
70/14 80/9 82/4 91/4 101/22 103/5
things [29]   7/19 8/15 9/25 10/5
10/12 10/14 11/21 14/15 18/20
20/4 22/18 23/15 23/16 24/13 25/6
26/24 28/9 38/9 41/9 41/11 41/12
42/10 46/2 52/22 60/19 61/9 65/1
71/8 72/13
think [92]   4/6 4/7 6/11 8/9 8/15
8/19 8/25 10/20 10/21 10/23 11/3
11/4 11/6 11/24 14/2 14/3 17/7
17/10 17/11 22/14 23/22 24/4 24/16
24/19 25/6 25/21 26/7 27/9 27/10
27/18 27/20 27/24 33/3 33/10
37/24 38/1 38/23 39/15 39/24
42/13 46/15 47/4 48/10 48/18 49/5
49/13 54/19 54/20 55/8 56/10
56/22 58/4 58/9 58/19 60/6 60/9
60/19 61/4 61/12 62/4 64/1 65/19
66/4 67/3 67/7 68/21 69/4 69/12
71/7 74/8 74/12 75/13 75/16 76/4
80/2 80/25 81/16 82/5 83/20 84/5
84/23 84/24 86/10 87/13 88/19
91/6 97/12 97/25 98/20 99/15
100/16 102/17 103/12
thinking [5]   20/3 39/25 55/15
56/23 66/1
third [4]   20/16 35/3 37/24 98/6
this [156]
those [30]   6/20 7/19 9/3 9/17
10/5 11/14 11/19 11/21 12/10 13/2
13/11 14/10 14/19 14/25 15/10

**T**

those... [15]  15/13 15/17 15/20 16/7 17/20 17/23 18/8 18/17 19/18 50/12 50/13 50/24 52/16 72/6 75/1
though [2]  66/15 76/13
thought [21]  19/25 33/5 33/13 33/14 33/14 33/15 33/21 39/19 45/20 45/20 47/21 51/17 54/25 55/1 56/11 56/25 57/2 60/14 66/22 97/19 98/25
thoughts [3]  73/23 74/9 78/13
thousands [1]  64/3
thread [1]  77/25
three [4]  8/9 34/15 34/17 74/20
through [26]  5/4 6/19 12/15 12/19 12/21 12/24 13/2 13/12 15/24 15/25 18/23 22/25 23/5 27/13 28/9 36/13 39/3 42/13 45/19 45/23 50/20 53/14 70/2 76/13 88/9 89/4
throughout [5]  6/24 8/21 11/17 24/14 27/22
thus [1]  71/24
tidy [1]  74/18
tie [1]  84/13
tight [1]  101/16
time [43]  6/15 7/7 7/9 8/16 10/10 17/1 28/23 29/19 30/6 32/15 35/25 36/10 36/20 36/23 38/19 39/25 40/19 41/8 42/18 46/17 47/19 49/4 52/24 53/24 57/21 61/4 61/18 62/3 62/16 63/24 66/6 67/8 71/18 76/20 86/11 86/16 88/16 91/4 96/3 100/3 100/8 102/14 103/5
times [17]  10/1 10/11 13/7 14/15 16/10 19/19 23/3 34/11 34/17 52/5 52/12 57/25 68/2 72/13 76/15 102/19 103/7
today [7]  3/14 31/1 33/17 54/25 91/7 91/16 91/20
today's [1]  32/22
together [10]  14/16 19/16 20/7 38/23 50/16 54/6 60/19 74/16 74/19 75/19
told [2]  86/3 86/5
tomorrow [10]  3/24 42/22 91/13 91/19 100/12 101/7 101/9 102/12 103/5 103/6
tons [1]  64/22
too [6]  24/23 37/4 87/9 91/21 101/3 102/6
took [12]  7/2 17/14 25/6 35/12 47/2 54/18 59/23 67/8 67/13 67/13 76/3 87/1
tool [8]  21/19 23/5 23/6 24/1 24/15 96/1 96/2 97/14
tools [2]  24/4 96/15
top [1]  98/11
topic [4]  11/15 84/22 90/24 91/7
topics [2]  12/3 91/21
totally [4]  82/5 82/22 83/1 83/1
touched [1]  62/7
tout [1]  97/17
touting [1]  96/3
towards [1]  18/19
track [4]  14/15 30/9 52/7 52/8
traditional [2]  24/10 30/14
tranche [1]  40/25
transcript [3]  1/9 23/4 104/4
transcripts [3]  21/22 22/10 23/1
transferred [2]  85/15 85/16
translate [2]  39/15 40/9
travel [2]  29/3 101/7
trial [136]
trials [2]  43/14 100/15
tried [7]  21/21 34/9 34/10 37/10 56/24 57/1 101/16
trouble [5]  40/13 54/15 61/21 82/25 84/12
true [9]  55/4 76/7 77/7 81/1 83/7 84/25 86/3 92/24 104/4
trust [1]  43/22

truth [3]  4/22 4/22 4/23
truthful [1]  14/22
trying [5]  54/14 56/22 81/6 86/25 91/24
turn [11]  3/16 26/25 36/15 38/18 51/4 58/1 76/24 89/5 89/6 92/22 94/12
turned [2]  71/8 75/23
Turning [1]  23/9
turns [1]  98/15
two [11]  14/3 32/16 44/18 44/20 45/13 46/6 60/21 74/20 85/22 97/21 101/21
type [11]  22/12 22/25 33/24 39/16 45/2 52/2 52/3 54/18 61/14 74/5 75/6
types [1]  53/23
typical [3]  45/21 69/13 98/21
typist [1]  52/3

**U**

U.S [3]  1/13 1/16 1/23
ultimately [3]  18/24 78/13 94/15
unaware [1]  44/4
uncertain [1]  71/2
unclear [1]  58/4
under [5]  28/4 28/5 28/23 80/5 80/6
underlie [1]  82/13
underlined [1]  63/19
underlying [7]  7/11 79/23 80/13 80/19 80/21 81/6 83/17
understand [9]  3/17 16/12 21/8 28/23 29/2 32/18 64/21 91/9 91/16
understanding [11]  24/12 43/18 61/13 61/21 79/21 83/22 83/23 84/1 84/3 88/17 91/2
understands [1]  80/12
understood [15]  30/1 34/7 38/15 42/11 42/25 43/5 52/4 55/12 58/1 75/24 79/9 80/10 84/17 88/11 91/22
UNITED [6]  1/1 1/3 1/10 3/3 3/7 17/12
unless [3]  37/1 40/20 71/16
unlikely [1]  40/25
until [2]  11/17 85/14
up [42]  4/16 5/19 5/20 10/8 10/13 11/16 11/17 14/7 15/17 17/16 17/20 26/22 30/24 31/5 32/8 34/11 45/7 45/12 45/15 52/10 56/10 56/25 61/6 61/7 61/8 69/20 70/1 70/6 72/23 74/20 77/20 78/6 81/9 90/22 100/13 101/10
URL [1]  22/15
us [11]  4/2 4/3 23/11 23/12 23/16 24/25 26/22 28/12 30/13 71/14 71/24
use [24]  15/17 20/11 22/2 23/2 23/9 24/22 25/2 25/10 25/23 30/19 31/8 31/11 54/7 71/14 75/10 94/2 95/8 95/12 95/14 95/19 96/1 96/22 97/3 97/13
used [28]  7/9 13/1 14/7 20/25 21/9 21/15 21/19 21/22 21/23 22/5 22/9 22/11 23/5 23/7 23/10 23/11 23/16 24/7 24/9 24/12 24/16 63/23 73/24 74/3 96/5 97/18 98/2
useful [1]  41/12
uses [1]  22/3
using [7]  9/23 31/6 38/24 61/2 71/18 96/1 97/8
usually [3]  13/15 14/8 14/20 15/19 15/22 16/2 17/2 18/2 19/11 20/5 22/9 22/25 30/7 39/2 50/15 61/7 61/8 70/12 100/8 100/20 100/23

**V**

Vegas [1]  101/19
vendor [1]  12/17

verbatim [1]  24/16
verdict [1]  71/11
version [3]  20/5 50/20 50/20
versions [1]  50/13
versus [1]  3/3
very [18]  7/12 10/4 10/13 12/19 20/21 24/3 24/4 24/9 39/1 39/4 49/13 55/13 85/13 86/11 92/14 99/6 101/16 103/2
vetted [1]  43/22
vetting [1]  43/22
video [1]  20/22
view [10]  27/3 34/14 40/9 80/18 81/12 82/9 82/18 85/7 85/17 98/24
viewed [1]  61/5
virtual [2]  22/20 22/22
vis [2]  83/24 83/24
volume [3]  6/1 18/14 45/18
volunteered [1]  33/23
vs [1]  1/5

**W**

waiting [1]  79/3
walked [1]  36/13
want [17]  16/19 26/25 27/1 30/7 31/13 51/5 51/5 56/2 57/19 62/6 82/6 88/15 88/21 92/12 99/4 101/2 102/16
wanted [22]  10/1 10/14 15/10 15/19 15/22 17/4 19/13 20/1 20/6 25/24 33/11 38/23 67/11 88/18 88/20 88/25 89/3 89/4 90/17 93/23 97/9 99/9
wants [1]  23/17
war [2]  74/5 76/4
was [348]
Washington [6]  1/5 1/14 1/17 1/21 1/25 95/5
wasn't [16]  3/15 14/21 24/19 24/20 24/23 26/22 28/9 28/10 38/8 40/13 55/22 57/24 60/17 71/14 74/13 80/14
water [1]  28/15
way [30]  11/17 13/12 14/14 15/24 20/3 22/3 22/11 23/14 24/23 25/2 26/7 28/1 29/24 30/14 31/9 43/16 44/4 45/22 45/23 79/10 80/7 81/5 81/9 82/4 83/9 84/8 95/14 96/8 99/3 102/16
we [140]
we'll [7]  3/14 4/2 4/13 73/20 100/12 102/12 103/3
web [1]  38/20
website [6]  38/21 38/22 38/24 39/1 47/24 47/25
wedding [2]  8/3 61/18
weed [1]  42/15
weeds [2]  9/24 56/8
week [6]  14/4 33/10 34/20 95/8 100/18 100/19
weekend [2]  100/17 101/6
weight [1]  42/12
well [27]  8/16 8/17 11/1 12/9 14/9 37/13 37/24 39/1 39/17 40/9 43/12 44/14 48/6 49/15 50/22 51/3 56/25 57/14 60/6 60/25 66/10 66/17 72/8 72/20 83/22 85/7 99/17
went [6]  7/24 14/1 45/3 48/1 82/25 84/11
were [110]
weren't [3]  24/2 43/20 97/11
West [1]  101/6
Westlaw [3]  16/21 23/6 96/1
what [131]
whatever [11]  9/21 14/17 19/15 23/18 50/17 69/24 82/6 84/14 101/23 102/12 103/6
when [48]  9/10 10/15 11/14 12/12 14/2 17/11 19/19 22/4 22/7 22/7 31/18 33/8 35/8 35/25 37/17 39/7 43/9 46/8 46/16 51/22 52/21 52/24 55/14 55/14 57/12

**W**

**when... [21]** 58/2 58/22 65/20
66/12 67/12 72/16 73/20 74/8
76/20 76/25 77/15 83/25 86/23
87/1 87/4 89/7 91/19 97/25 100/14
101/2 102/20
**whenever [1]** 101/13
**where [14]** 15/21 15/25 23/2 23/25
47/15 49/23 54/5 70/6 72/22 74/17
78/21 79/13 95/22 101/18
**Whereupon [2]** 90/5 93/7
**whether [53]** 10/23 11/20 12/6
14/17 15/13 16/20 22/16 24/22
30/17 30/21 33/13 33/14 37/25
41/10 44/5 44/6 53/20 54/17 54/25
55/1 57/18 58/13 63/7 64/18 68/25
71/2 71/6 72/21 75/5 75/14 79/6
79/7 80/2 80/12 80/13 80/19 81/1
81/4 81/10 81/14 82/1 82/16 82/20
83/6 85/19 87/3 87/23 91/12 95/24
96/9 99/9 100/25 103/17
**whether Mr [1]** 75/5
**which [31]** 13/9 16/10 23/1 29/4
30/19 36/16 40/25 41/12 41/24
42/17 51/14 57/5 59/20 69/3 69/3
71/16 79/6 80/11 82/19 83/3 83/8
85/13 85/14 89/22 90/15 93/9
93/13 97/22 99/18 100/9 102/22
**while [2]** 11/16 81/4
**white [3]** 39/18 39/21 39/24
**who [31]** 3/15 6/13 6/16 8/11
12/22 14/23 22/7 22/12 22/15
37/25 38/11 40/12 43/10 45/4 45/5
45/6 47/13 48/14 48/20 50/16 59/6
62/14 62/18 65/2 68/8 70/15 75/22
82/1 85/9 90/19 95/10
**whoever [5]** 10/3 16/20 19/14 74/6
103/17
**whole [2]** 4/22 77/25
**whomever [1]** 10/15
**why [14]** 9/6 22/20 22/20 25/16
38/24 45/13 56/5 56/21 82/14 85/4
91/14 91/15 99/12 100/9
**will [25]** 4/3 4/19 4/21 4/22 16/3
29/4 29/14 31/6 42/22 50/3 58/9
80/24 84/24 89/21 91/8 93/5 98/16
100/13 101/1 101/23 102/3 102/19
103/2 103/5 103/8
**wind [1]** 100/2
**Winters [2]** 46/19 52/14
**withdraw [1]** 93/12
**within [1]** 85/23
**without [3]** 4/4 24/21 76/12
**witness [25]** 3/15 4/7 4/12 18/18
18/19 18/24 18/25 19/9 19/9 19/11
29/8 31/3 42/23 42/24 60/23 75/18
75/20 81/17 82/24 86/24 87/20
87/25 88/8 88/9 102/13
**witness' [1]** 78/24
**witnessed [1]** 74/22
**witnesses [14]** 2/2 3/16 9/17 10/3
19/2 19/23 42/21 67/18 68/9 74/25
75/19 76/6 79/5 100/13
**won't [5]** 3/14 3/25 4/1 101/10
103/3
**wondering [4]** 24/25 54/13 54/16
101/6
**word [4]** 23/2 70/19 74/24 86/8
**words [1]** 72/11
**work [46]** 5/25 7/2 7/3 7/15 7/16
7/24 8/3 8/10 9/17 13/11 13/13
13/19 16/15 16/20 17/3 18/23
19/15 19/15 20/1 20/20 20/24
25/22 27/22 28/6 36/9 38/8 45/5
46/1 47/15 48/4 48/7 48/9 50/6
50/16 53/5 53/7 53/10 53/23 62/13
65/4 68/7 68/24 71/6 75/9 98/15
103/6
**worked [18]** 15/10 25/4 28/3 43/10
44/5 47/13 47/14 48/6 48/10 48/14
48/20 48/22 50/14 67/7 67/10 76/8

76/12 89/3
76/22 77/6 83/3 99/20
13/6 46/13 46/13 74/17 74/21 76/5
76/15
**world [1]** 26/9
**worse [1]** 27/11
**would [236]**
**wouldn't [7]** 10/12 26/7 26/10
52/1 57/7 72/11 72/14
**wrap [2]** 91/7 101/10
**write [4]** 30/23 49/23 51/5 54/18
**writing [3]** 68/11 68/13 71/23
**written [15]** 15/20 53/5 53/8
68/13 69/24 70/1 70/3 70/18 70/24
71/6 74/7 74/24 77/22 81/9 90/24
**wrong [1]** 80/23
**wrote [2]** 67/9 81/24

**Y**

**yeah [35]** 9/2 9/5 10/10 12/2 18/7
19/23 20/9 24/15 26/23 27/16
32/10 34/19 34/21 35/22 36/17
38/13 40/11 44/3 44/9 44/21 47/4
48/6 50/5 50/25 51/13 57/16 59/22
60/21 62/4 65/19 68/21 75/13
91/15 92/11 94/11
**year [1]** 101/15
**years [10]** 6/1 27/11 32/14 32/14
32/14 35/12 49/14 50/14 61/19
92/8
**Yep [2]** 64/16 89/8
**yes [113]**
**yet [2]** 28/2 96/3
**York [2]** 1/13 1/17
**you [521]**
**you're [1]** 79/17
**young [1]** 32/1
**your [128]**
**yours [1]** 59/6
**yourself [2]** 6/3 88/25
**yourselves [1]** 3/4

**Z**

**ZEIDENBERG [2]** 1/18 3/10
**Zoom [2]** 102/1 102/15