```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
      *  *  *  *  *  *  *  *  *  *  *  *  *  *     )
 3    UNITED STATES OF AMERICA,                    )    Criminal Action
                                                   )    No. 19-00148-1
 4                       Plaintiff,                )
                                                   )
 5        vs.                                      )
                                                   )
 6    PRAKAZREL MICHEL,                            )    Washington, D.C.
                                                   )    January 11, 2024
 7                       Defendant.                )    1:51 p.m.
                                                   )    AFTERNOON SESSION
 8    *  *  *  *  *  *  *  *  *  *  *  *  *  *     )

 9

10                  TRANSCRIPT OF EVIDENTIARY HEARING
              BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
11                    UNITED STATES DISTRICT JUDGE

12

13

      APPEARANCES:
14
      FOR THE GOVERNMENT:      JOHN D. KELLER, ESQ.
15                             U.S. DEPARTMENT OF JUSTICE
                               1301 New York Avenue, Northwest
16                             Suite 1016
                               Washington, D.C. 20530
17
                               NICOLE RAE LOCKHART, ESQ.
18                             U.S. DEPARTMENT OF JUSTICE
                               Public Integrity Section
19                             1400 New York Avenue, Northwest
                               Washington, D.C. 20005
20

21    FOR THE DEFENDANT:       PETER R. ZEIDENBERG, ESQ.
                               MICHAEL F. DEARINGTON, ESQ.
22                             ARENTFOX SCHIFF
                               1717 K Street, Northwest
23                             Washington, D.C. 20006

24

25
```

```
 1      APPEARANCES, CONT'D:

 2      FOR DAVID E. KENNER:      BARRY BOSS, ESQ.
                                  COZEN O'CONNOR
 3                                1200 19th Street, Northwest
                                  Washington, D.C. 20036
 4

 5      REPORTED BY:             LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
 6                               United States District Court for the
                                    District of Columbia
 7                               333 Constitution Avenue, Northwest
                                 Room 6706
 8                               Washington, D.C. 20001
                                 (202) 354-3269
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

                              I N D E X

2

3
                                    Direct      Cross        Red.

4

5    WITNESSES FOR THE DEFENDANT:

6    David E. Kenner                     4

7
     EXHIBITS RECEIVED IN EVIDENCE                             PAGE

8
     Defendant's Exhibit No. 38                                 6

9
     Defendant's Exhibit No. 39                                 7

10
     Defendant's Exhibit No. 474                               78

11
     Defendant's Exhibit Nos. 14, 17 and 107                  107

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    THE COURT:  Good afternoon again.

2                    THE WITNESS:  Good afternoon, your Honor.

3                    THE COURT:  One thing --

4                    MR. ZEIDENBERG:  Your Honor, I mentioned -- I

5      neglected to mention to the Court earlier today, but I did

6      mention to your courtroom deputy before the break, that

7      Ms. Zaki, who was supposed to be our next witness, has

8      contracted COVID.  And --

9                    THE COURT:  That's fine.  I have no problem doing

10     it by Zoom.  My law clerk let me know last -- yesterday in

11     my meeting.  That's not a problem.

12                   MR. ZEIDENBERG:  Okay.

13                   THE COURT:  I'm sorry she got COVID.

14                   There's one exhibit that -- I want to make sure

15     that I have all of the exhibits.

16                   I actually do.  I'm all set.  Go ahead.

17                   MR. ZEIDENBERG:  Good afternoon.

18                        CONTINUED DIRECT EXAMINATION

19     BY MR. ZEIDENBERG:

20     Q.  Good afternoon, Mr. Kenner.

21     A.  Good afternoon, Mr. Zeidenberg.

22     Q.  I'm showing you what's been marked as Defendant's

23     Exhibit No. 3, an email from Liquori Campbell, whom you've

24     called Quori -- you've referenced this Quori -- to the

25     Kenner Law Firm staff.
```

```
 1                    I take it that includes you?

 2                    THE COURT:  So this is 38?

 3                    MR. ZEIDENBERG:  Yes.

 4                    THE COURT:  I have it.

 5                    THE WITNESS:  I'm sorry.  Staff?  I assume, yes, I

 6       would think that would include me.

 7       BY MR. ZEIDENBERG:

 8       Q.  Yes.

 9                    And it was the forwarding of an email from Bill

10       Maddix to you on April 10th at 6:42.

11                    Do you see that?

12       A.  Yes.

13       Q.  So --

14                    THE COURT:  Is this 38 or 38?

15                    MR. ZEIDENBERG:  This is 38, your Honor.

16                    THE COURT:  I see at the bottom.  I'm sorry.

17       BY MR. ZEIDENBERG:

18       Q.  So the top email on the 11th is Quori emailing the staff

19       that morning at 1:06 a.m. the final version of the

20       Higginbotham cross.

21                    Do you see that?

22       A.  Yes, sir.

23                    MR. ZEIDENBERG:  I move to introduce 38.

24                    MS. LOCKHART:  No objection.

25                    THE COURT:  I'll admit it.
```

```
 1              (Whereupon, Defendant's Exhibit No. 38 was entered
 2    into evidence.)
 3    BY MR. ZEIDENBERG:
 4    Q.  If the record reflects that the Higginbotham
 5    cross-examination began that morning of the 11th, that would
 6    have meant that you would have only had a chance to see this
 7    final draft after you woke up that morning and before you
 8    got to court.  Correct?
 9    A.  If those times are accurate, yes.
10              Can I make reference to the exhibit?
11    Q.  I'm sorry?
12    A.  Can I make reference to the exhibit?
13              THE COURT:  If it goes to the question he asked.
14    If not, you can wait until the Government does it on cross.
15              THE WITNESS:  Yes.  This was restricted to the
16    Higginbotham log.  My recollection is that was a notebook
17    that Mr. Higginbotham kept in which he logged various
18    meetings and conversations.  I was not referring to the
19    whole cross.  You'll see I asked for help on these
20    submissions that was due to the Court at 7:30 on the
21    Higginbotham log.
22              There was litigation about whether it would be
23    admissible or not admissible.
24    BY MR. ZEIDENBERG:
25    Q.  It says cross.
```

1    A.  "Request for help on 7:30 a.m. submission on

2    Higginbotham log."  That's the subject from Bill Maddix to

3    me.

4    Q.  That's the lower email.  If you look at the top.

5    A.  You'd have to scroll up so I can see it.

6    Q.  Oh, I'm sorry.

7    A.  The top says "Subject:  Final version, Higginbotham

8    cross continued/request for help on 7:30 a.m. submission on

9    Higginbotham log."

10             That referred to a submission that the Court had

11   requested with regard to whatever issue we were litigating

12   about the admissibility of the Higginbotham log.  That's my

13   recollection.

14   Q.  Showing you what's been marked Defense Exhibit 39, do

15   you see that email from Kathy Lestelle to the staff?

16   A.  Yes.

17   Q.  "Pras direct, Q & A"?

18   A.  Yes.

19             MR. ZEIDENBERG:  I move to introduce 39.

20             MS. LOCKHART:  No objection.

21             THE COURT:  I'll admit it.

22             (Whereupon, Defendant's Exhibit No. 39 was entered

23   into evidence.)

24   BY MR. ZEIDENBERG:

25   Q.  And this was, fair to say, part of the direct exam for

1    Mr. Michel's direct from -- coming from Ms. Lestelle?

2    A.  I believe Ms. Lestelle was reviewing questions and

3    answers that had been given to her by me that I had received

4    from people including Bill Maddix and others in the room.

5    And this was of normal importance, as you see.  And the

6    subject was "FARA Q/A with questions and answers."  This was

7    with reference to her review of the FARA questions and

8    answers that were available at that time.

9    Q.  And as a defense attorney of 55-plus years' experience,

10   you were comfortable in passing along this direct

11   examination to your jury consultant -- I'm sorry -- to

12   Ms. Lestelle, your PI, for her input on that?

13   A.  Yes.

14          Let me say this about that:  I've told you about

15   the players' list that Ms. Lestelle put together.  She also

16   put together -- and I know you have a copy of it -- a

17   document called the Issues List.  That Issues List is, I

18   believe, 1,600 pages long.  And that's the inconsistency

19   chart where she laid out all of the testimony and what was

20   consistent with each other.  That was a work in progress

21   from before we came to D.C.  And that 1,600 pages was pretty

22   complete.

23   Q.  Would you agree with me that an issues list or

24   spreadsheet requires someone to understand for it to be

25   really useful -- it requires for someone who's putting it

 1    together to understand the law and the facts both.  Correct?

 2    A.  I believe she understood the law, and I know she

 3    understood the facts.

 4    Q.  Showing you what's been marked as Defense Exhibit No.

 5    53, it's an email from Kriss Anne Carlstrom to Lonny,

 6    yourself and the rest of the team.

 7              Do you see that?

 8              THE COURT:  What happened to 52?

 9              MR. ZEIDENBERG:  Oh, I'm sorry.

10              MR. BOSS:  Your Honor, I think this is getting

11    into the subject matter of the contempt proceedings.

12              MR. ZEIDENBERG:  I'm not going to ask him anything

13    about that.

14              THE COURT:  Well, I don't have what -- the

15    documents, either.  For refreshing recollection, we had one

16    that we added, which was 51, and then 52 we're not using.

17              MR. ZEIDENBERG:  I'm sorry, your Honor.  This is a

18    belated edition.

19              THE COURT:  Is it 52 or 53?

20              MR. ZEIDENBERG:  53.

21              THE COURT:  So you're skipping 52?

22              MR. ZEIDENBERG:  Yes.

23              THE COURT:  It was going to be for refreshing and

24    then we wound up not using it.  But all right.

25

1    BY MR. ZEIDENBERG:

2    Q.  Do you see that this email was sent to you by

3    Ms. Carlstrom?

4    A.  I see that it was from Ms. Carlstrom.  And it was to

5    Mr. Israely, myself, Catherine Lestelle, Bill Maddix,

6    Liquori Campbell and Christina Wynter.

7              MR. ZEIDENBERG:  I move to introduce Exhibit 53.

8              MS. LOCKHART:  Your Honor, we don't have an

9    objection to its admission.  I guess we'll see what

10   Mr. Kenner says about the attachment.

11             But it is unclear the timeframe that this

12   Relativity log purports to cover.  So I would just note that

13   for the Court's consideration of this exhibit.

14             THE COURT:  It doesn't indicate that.

15   BY MR. ZEIDENBERG:

16   Q.  According to the second page of this, I believe this is

17   what Ms. Carlstrom calls the Relativity log.  Do you see

18   that on the first page?

19             THE COURT:  Yes.  But in terms of discussing the

20   admissibility, what I'm asking him and what I thought she

21   had come up with is it doesn't have dates.  Am I missing

22   dates in here?  It has times in terms of the total usage of

23   time, but I don't see anything that indicates the timeframe

24   for this, which I believe is her objection.

25             Is that correct or not?

1          MS. LOCKHART:  Your Honor, I think that's right.

2     We have not been objecting to documents that include

3     Mr. Kenner on them with just communications amongst the team

4     members.

5          My concern here is that, as counsel is now doing,

6     is highlighting the amount of time that each purported user,

7     I assume, is going to argue they have used Relativity in

8     total in the total span of the case.  It's unclear, and I

9     don't think Mr. Kenner can tell us, how this document was

10    produced, what period of time it covered, were documents

11    available in some other way to understand fully the scope of

12    what this document purports to show.

13         THE COURT:  Well, I think the biggest problem to

14    start with is it doesn't indicate to us when this timeframe

15    was.

16         MR. ZEIDENBERG:  Well, I would suggest, your

17    Honor, that goes to the weight of the exhibit, not --

18         THE COURT:  No, it doesn't.  I mean, I can't tell

19    whether this was before, after, what --

20         MR. ZEIDENBERG:  Your Honor --

21         THE COURT:  It would seem to me you would need to

22    have at least some dates in terms of --

23         MR. ZEIDENBERG:  Well, this --

24         THE COURT REPORTER:  Counsel, please don't talk

25    over the Judge.  It's not going to be clear in the record.

```
 1                 THE COURT:  I'm questioning whether it talks about
 2      the number of -- the usage, the hours.  It does not indicate
 3      any particular dates.  It's a Relativity log; and although
 4      it has all the different people, I'm not sure they were
 5      working on this particular case.
 6                 MR. ZEIDENBERG:  Your Honor, just to put it in
 7      context, March 3rd, 2023, was the date that the Bloomberg
 8      story was published.  And I believe actually that was the
 9      date the Government filed its motion for contempt, show
10      cause.
11                 THE COURT:  All right.
12                 MR. ZEIDENBERG:  And that the two gentlemen or
13      individuals identified in their -- in the email are the
14      Bloomberg reporters.
15                 And Kriss Anne Carlstrom -- I think it's pretty
16      clear from this that once that show-cause order was -- or
17      motion was filed, she got on and took a look at the
18      Relativity and came up with these numbers.  And obviously,
19      it went through March 3rd.
20                 Now, if the Government wants to put on other
21      witnesses or if we want to subpoena someone from Relativity
22      or Ms. Carlstrom to come down to explain her search, we can
23      do that.  But I think that the Court certainly in a hearing
24      such as this can accept this for the value it wishes to
25      place on it.  Maybe it doesn't put a lot of weight on it.
```

1    But you see the names --

2            THE COURT:  Can I ask you a question, a more basic

3    question?  What's the point of it?

4            MR. ZEIDENBERG:  The point of this, your Honor, is

5    that if you look at it, Mr. Israely, who claimed that he

6    spent hours and hours working, has six hours working on

7    Relativity, six and a half.  Mr. Maddix, on the other hand,

8    131 hours.  Ms. Carlstrom, 189.

9            And most pertinent, your Honor, is Mr. Kenner, who

10   testified previously about, you know, the extensive research

11   he did on Relativity leading up to decamping for Washington,

12   has three hours.

13           THE COURT:  Frankly, when you had Mr. Israely

14   here, you could have shown it to him and asked him.  So in

15   terms of him, you had the document.  He would have been the

16   best one.

17           Mr. Kenner -- I don't know if Mr. Kenner looking

18   at this is going to be able to tell you anything.  So I'm

19   not admitting a document that he isn't in a position to

20   understand or be able to comment on.

21           MR. ZEIDENBERG:  Well, your Honor --

22           THE COURT:  If you want to show it to him and see

23   if he has some understanding of what this is, that's one

24   thing.  Otherwise, I don't see admitting it.

25           The purpose, as I understand, is how long they

Kenner - DIRECT - By Mr. Zeidenberg

1    were on Relativity.  All we know is it would have been March

2    3rd.  I don't know whether this covers before -- up to March

3    3rd or what.

4              MR. ZEIDENBERG:  Well, your Honor, it certainly

5    wouldn't be anything after March 3rd, obviously.  So we're

6    talking about up to March 3rd.

7              THE COURT:  So that's -- but you're assuming that.

8    What bothers me about this is it doesn't have a date other

9    than the email.  It attaches it in the back, which indicates

10   the accounts in Relativity and shows the different --

11   presumably, the hours that they've been using it in terms of

12   different kinds of things.

13             I don't know whether it's only for March 3rd.  I

14   don't know whether it's for all of the period up to March

15   3rd.

16             If you want to show it to him and see before I

17   admit it or consider it as to whether he knows what

18   anything -- what this is or what his position would be on

19   it.  But I'm not going to admit something that he can't talk

20   about.

21             MR. ZEIDENBERG:  Your Honor, separate and apart

22   from this, I would like to say that I would urge the Court

23   to reconsider treating this hearing with an evidentiary

24   standard no different than it would have at a trial.

25             I think that the Court could take judicial --

1    could take notice of these things.  I think that we could

2    admit documents and should be permitted to admit documents

3    that the Court has some basis to believe are reliable.  I

4    mean, it wasn't fabricated.

5              THE COURT:  No.  But the point is that it should

6    also be something that's probative.

7              I'm not -- this is an important hearing for

8    Mr. Michel.  And the Government obviously has an interest as

9    well.  I don't.  But it seems to me that you would follow

10   the expectations of what you would do for a hearing on a

11   motion for a new trial that is an evidentiary hearing so

12   that you have the information in order to apply it to the

13   standards and issues that you have raised.

14             I do not see admitting things that I would not

15   admit generally in any other proceedings, if that's what

16   you're asking me to do.  I don't believe in having documents

17   or materials in here that are not going to be useful and are

18   not frankly documents that you would ordinarily consider by

19   the Court.

20             So if you're asking me to be more lenient, my

21   answer is probably no.  But I'll do it document by document.

22             I'm not going to make -- the concern I have here

23   is for what you wish to use it for, I don't know that Mr.

24   Kenner, since you're using it through him -- that Mr. Kenner

25   is in a position to be able to say much about it.  So all we

```
1    have is what you have presumably received from them, because

2    it's from Ms. Carlstrom, and that's it.  And we don't have

3    any other context.

4             Now, if the Government has anything else to say

5    about it...

6             MS. LOCKHART:  No, your Honor.

7             THE COURT:  So are you still objecting to it or

8    not?

9             MR. ZEIDENBERG:  So --

10            THE COURT:  I'm asking her.

11            Are you objecting to it or not?

12            MS. LOCKHART:  Yes, your Honor.  I think, as shown

13   by the highlights here, this is being used to impeach both

14   Mr. Israely, who as your Honor noted is no longer on the

15   stand, and Mr. Kenner in terms of their testimony about the

16   amount of time that they spent on Relativity reviewing

17   discovery.

18            And my objection is that this is a document --

19   Relativity is a technical database; and there can be

20   different databases, different ways that reports are

21   generated.  And so I think based on the highlight he's

22   holding this out to show that they did not in fact spend

23   hours and hours reviewing this discovery.

24            In this document, we have no idea if that is what

25   it says at all because of the nature in which this report
```

Kenner - DIRECT - By Mr. Zeidenberg

1    was provided as an attachment to an email.

2         THE COURT:  So the only thing you can do is ask if

3    he's familiar with the document or has seen it or has some

4    familiarity as to its meaning.  If he doesn't, then I'm not

5    admitting it, at least through this witness, because you are

6    using it to impeach, in essence.  And you certainly should

7    have asked Mr. Israely when he was here about it.  He was

8    the expert and he's the one who is most familiar with these

9    materials.  He would have been the perfect witness to have

10   asked.

11        But at any rate, you can ask him if he has any --

12   has seen this before, has any familiarity with it

13   whatsoever.

14        Have you seen this document before, sir?

15        THE WITNESS:  I believe in the course of recently

16   reviewing things that were going to be utilized I think I

17   did see this.  I didn't see it at the time it was written.

18   I didn't see it before recently.

19        I don't know.  The only comment that I could make

20   from this is in my view it corroborates what I previously

21   said:  Mr. Israely spent six and a half hours; I spent three

22   hours and seven minutes.

23        In the context of my testimony, I already

24   explained I would ask questions of Mr. Israely who would

25   translate them into Relativity-speak, and Mr. Mosely or

1    Kriss Anne Carlstrom, who's on here, or Bill Maddix, 131

2    hours, Kriss Anne, 189 hours -- that this just corroborates

3    what I've said:  I did not myself -- I was not good at using

4    Relativity.  So I used Mr. Israely to transverse the

5    difference between Relativity-language and my language.

6            And as I told you before, Mr. Israely wasn't doing

7    a lot of the searches.  He was on these conference calls

8    with Relativity telling them what I meant by the question

9    that I asked in English that he would translate to them into

10   Relativity-speak.  Then Mr. Maddix, Ms. Carlstrom, others

11   listed here would go on and do the actual searches.

12           THE COURT:  So do you know whether this is --

13   relates to a specific request for one search or a

14   compilation of searches that would have been done over a

15   period of time?

16           THE WITNESS:  I have no idea, your Honor.  This

17   was not my area.

18           MR. ZEIDENBERG:  If I may, your Honor, on that

19   point, given that Mr. Maddix has 131 hours and Ms. Carlstrom

20   has 189 hours on the same printout, it seems pretty unlikely

21   that it would be a single search, since that's weeks and

22   weeks of time.

23           THE COURT:  Well, it could be a single search in

24   the sense of with a specific issue.  You have presented it

25   as if this was all of the searches they have done.  At least

 1      that's my understanding of what you want to argue.

 2                  MR. ZEIDENBERG:  It's not.

 3                  THE COURT:  My understanding is he doesn't know --

 4                  MR. ZEIDENBERG:  It's not.

 5                  THE COURT:  -- whether it's a search about one

 6      question he came up with, which could be over a different

 7      time, or whether it's basically a summary of all of their

 8      searches through Relativity.

 9                  MR. ZEIDENBERG:  That's not what I'm trying to do,

10      your Honor.

11                  I think Mr. Kenner answered the question, that

12      this number, approximately three hours, sounds about right

13      to you for the amount of time you spent on Relativity?

14                  THE COURT:  Well, let me just ask it this way:  Is

15      that about the right amount that you used Relativity

16      throughout the course of your preparation for the case?

17                  MS. LOCKHART:  Well, I'm sorry to interrupt, your

18      Honor.

19                  I think it's the correct amount of time up until

20      March 3rd, which is --

21                  THE COURT:  Right.  Up until March 3rd.

22                  Would this be the total time or would this be

23      around a particular issue that you were requesting they

24      search?

25                  THE WITNESS:  I have no recollection today of the

1   answer to that question.

2   BY MR. ZEIDENBERG:

3   Q.  But you did say when the Judge was asking you about this

4   document -- you said that it appeared to be corroborative of

5   your testimony?

6   A.  With respect to the percentage of time Mr. Israely and

7   myself spent directly on Relativity, I understand that.  But

8   I don't know anything about how this search was done.  I

9   don't know over what period of time it was done.  I don't

10  know when it was done.  And I would not have reviewed it at

11  the time.  If anybody did, it would be Mr. Israely.  This

12  was his business.

13  Q.  And --

14  A.  He understood this stuff.  I didn't.

15  Q.  Okay.  And because he understood it and you didn't, and

16  you weren't familiar with the -- with using Relativity, you

17  did not spend much time on Relativity.  Correct?

18  A.  I believe I already said that.  But yes.

19  Q.  Okay.

20          THE COURT:  I think the problem that I have with

21  admitting it --

22          MR. ZEIDENBERG:  Okay.  And we can --

23          THE COURT:  Sir, if you talk at the same time,

24  we're not having a record.  And you should be aware that all

25  court reporters are instructed if there's two of us talking,

1    the only one that's going to get reported in the transcript
2    is what I say and not what you say.  So it's not useful for
3    us to talk at the same time.  But you obviously wanted to
4    add something, so go ahead.
5            MR. ZEIDENBERG:  I was going to say we can move
6    on.
7            THE COURT:  So you're not asking to have it
8    admitted?
9            MR. ZEIDENBERG:  That's fine.
10           THE COURT:  That solves that.  Let's go on.
11   BY MR. ZEIDENBERG:
12   Q.  I want to talk about the legal research that went into
13   the trial prep.
14   A.  Okay.
15   Q.  Okay?  Did you feel like you had a firm grasp with the
16   criminal statutes at play in this case?
17   A.  Yes.
18   Q.  Who was responsible for the legal research in the case?
19   A.  I don't know who I specifically asked.  I asked that --
20   first of all, I read the statutes.  I asked for there to be
21   a Westlaw or a LexisNexis search on the statutes.  I read
22   the cases that were returned from that search.  I read the
23   notes that were included and I reviewed the legislative
24   history.  And I continued to refine my knowledge of it for
25   all of the time before the trial.

```
 1   Q.  Would it surprise you that -- if I told you we reviewed

 2   all the files that you gave us and that we were unable to

 3   find any memos circulated to your team on campaign finance

 4   laws?

 5   A.  If --

 6   Q.  If that's --

 7   A.  No.  It wouldn't surprise me.

 8   Q.  Or on the FEC regulations regarding donor reporting

 9   requirements?

10   A.  No.  I believe they were all reading the same material I

11   read that was available on either Westlaw or LexisNexis.  I

12   know we spent four days a week for at least a six-month

13   period of time in going over the meaning of the statutes,

14   discussing cases that have been decided under them.

15            You know better than I do, Mr. Zeidenberg, this

16   was a relatively new advent.  I believe there were only a

17   total of four cases that went to trial on these subjects,

18   especially FARA, during the time that Mr. Michel's case was

19   present.

20            I believe of those four trials, there were two

21   acquittals and two convictions.  I don't remember the total

22   number of FARA cases that were filed.  There were a number

23   of them resolved by plea.  I want -- my recollection

24   somewhere in the back of my mind says that there may have

25   been 18 or 20 cases filed since 2018 under FARA.  All but
```

1    four of them were resolved with a plea.

2              That's my current recollection.

3    Q.  But a Westlaw search on FARA or on any other of the

4    statutes involved doesn't apply the law to the facts of this

5    case.  So --

6    A.  No, it doesn't.

7    Q.  What I'm asking is, if I could, is if there were memos

8    done in which there was an application of the law to the

9    facts of 951, campaign finance laws, FARA, the bank fraud

10   statute, because we didn't see them.

11   A.  Did you review Kathy Lestelle's 1,600-page list --

12   Q.  She had an issue --

13   A.  -- Issues List?

14   Q.  Yes.  What I'm talking about are legal memos which apply

15   the law to the facts and give an analysis about what the law

16   requires and what the facts under these circumstances would

17   show.

18   A.  I did that innumerable times with my team meetings four

19   times a week, with my own research, with my own people that

20   I worked with.  I was very conversant with what the laws

21   were.

22   Q.  But there were no memos circulated to the team.

23   A.  The original motions were done with a Mr. Mark McBride.

24   There were -- as I recall, we submitted drafts to each

25   other, mostly by phone.  I'm not a tech guy.  It's a lot

1    harder for me to do an email than most people.  I'd rather

2    pick up the phone and talk.  And that's what I did most of

3    the time.

4    Q.  Did you begin looking for a FARA expert midway through

5    trial?

6    A.  Did I begin looking for one?  No.  I began looking for

7    one before the trial started.  There were several suggested

8    to me.  I believe one was from Miami, who I talked to.  He

9    was not available.  There were two or three other experts

10   that were not available.

11           I did not believe that I could properly call a

12   FARA expert as a witness.  I was more concerned with getting

13   knowledge that an expert may have.

14           And I think the incident that you're referring to

15   is when we were out here in D.C., we met a very lovely

16   gentleman that was a good friend of Mr. Michel's.  We met

17   with him three or four times.  He was trying to find an

18   expert for us, and during the trial he came up with -- I'm

19   sorry -- I don't remember her name.  But you've mentioned

20   it.

21   Q.  Ms. Zaki?

22   A.  Ms. Zaki.  He talked to Lonny about it.  My

23   understanding was she was an expert in FARA, not so much for

24   using her as an expert in the trial, although I will confess

25   I knew I was out of the time constraint, but I always could

1    have subpoenaed the Court for permission to file an expert

2    report out of time.

3              But I didn't want to use it for that purpose.  I

4    wanted to get any additional knowledge that I might feel

5    that I didn't have.

6              The first thing Ms. Zaki said when she came into

7    the room is:  I am not an expert on FARA.  In fact, my

8    relationship to FARA is I practice law and I have -- I don't

9    remember whether she said she had her own firm or worked for

10   another firm, but she described that she had processed

11   applications through FARA for many of her own clients.  And

12   that was of no relevance or use to me.

13             She was a lovely lady, and I was a lot more polite

14   than the way I'm describing her right now.  But in essence,

15   after I heard that she wasn't an expert, as far as I was

16   concerned we could have ended the meeting right then.  We

17   didn't.  And I had a very nice, polite conversation with

18   her; and I may have even said, We'll call you if we want you

19   to testify.

20             And that was the extent of it.

21   Q.  So fair to say midway through the trial, April 13th is

22   when you met with Ms. Zaki.  Does that sound about right?

23   A.  I don't recall the date, but it was during the trial.

24   Q.  Well, do you recall notifying the Court in the evening

25   after meeting Ms. Zaki and indicating that you wanted to

1    call her as a witness?

2    A.  I may have done that, but I don't recall.

3    Q.  And if the Court issued a minute order on April -- at

4    7:03 p.m. on April the 13th saying -- if I may, it says --

5    this is a copy of the minute order at approximately 7:03

6    p.m. on April 13th:

7         "Defense counsel identified a new witness, Jasmine

8    Zaki, to Government counsel and chambers for the first time.

9    Defense counsel indicates that Zaki is a former registered

10   agent who would be put on to testify about her experience as

11   an agent.  She would not be put up as an expert.

12        "The Court takes this as a statement to mean that

13   Zaki has previously registered as an agent of a foreign

14   principal under FARA or a foreign government under 18 USC

15   951.

16        "In either case, defense counsel shall identify to

17   chambers the principals and/or governments for whom she's

18   registered as an agent with the Attorney General.

19        "Additionally, defense counsel shall explain via

20   proffer to chambers if offered as a fact witness what facts

21   related to the allegations in the superseding indictment or

22   the Government's allegations in their case in chief she has

23   witnessed and/or, two, if offered to elicit some opinion

24   testimony, what Federal Rule of Evidence would permit such

25   opinion testimony."

1              So that's entered on 4-13-2023.  Does that refresh

2     your recollection as to when that meeting would have taken

3     place?

4     A.  It really doesn't.  But I accept what's on the document.

5              THE COURT:  I will just indicate the Court will

6     take judicial notice of a docket entry in the court in this

7     particular case.

8     BY MR. ZEIDENBERG:

9     Q.  So on April 13th, the trial had been going on for over

10    two weeks.  Right?

11    A.  That's correct.

12    Q.  And it was at this point it struck you it would be

13    helpful to have a witness who was intimately familiar with

14    FARA?

15    A.  No.  As I described before, I had talked to other

16    experts in the field.  While they gave me a lot of

17    information, I didn't seek to call them as expert witnesses.

18    As you can see by the Court's memorandum, she was not

19    intended to be called as an expert witness.  The Court

20    wanted more information.  I did not take the time to develop

21    that information, because after I read the Court's minute

22    order I was more convinced than ever that I was not going to

23    call her.

24    Q.  So you didn't have --

25    A.  It wasn't consistent with my strategy to call her for

 1    those purposes.

 2    Q.  Okay.  You never did consult with an expert on FARA in

 3    this case.  Correct?

 4    A.  That's not correct.

 5    Q.  Who -- when I say "consult," I don't mean that you just

 6    spoke to them on the phone and asked them if they could be

 7    an expert.  I'm talking about actually engaged somebody to

 8    work with your team and to help you with the FARA issues.

 9    You never did that?

10    A.  I don't believe I did.

11    Q.  The same thing --

12    A.  I believed I understood the FARA issues to the extent

13    necessary to try this case successfully.

14              THE COURT:  You said something about it not

15    fitting in with your strategy.  What did you mean by that?

16              THE WITNESS:  That the strategy that I intended to

17    use in Mr. Michel's case had to do with the commonality of

18    his both not being aware of or having any intent to violate

19    the federal election rules.

20              It was also my strategy that Mr. Michel is not the

21    one that filled out, nor did he even know of, the financial

22    affidavits that the donors that he gave money to signed

23    saying under penalty of perjury that it was their own money.

24    He didn't know that that happened.

25              That was -- that was in connection with my belief

1    in Mr. Michel and the facts that he did not have any

2    knowledge or intent to violate FARA.  That's part of the

3    elements of FARA.  I didn't think they were present.

4            My overriding strategy was to connect Mr. Michel's

5    naïveté in the political world and try to cast him as a

6    person who communicated to the community through his art,

7    through his music and through his speaking on behalf of the

8    community.

9    BY MR. ZEIDENBERG:

10   Q.  And yet despite this strategy to just claim, as you

11   said, naïveté and lack of knowledge, on or about April 13th,

12   midway through the trial, you thought maybe we should talk

13   to this Zaki woman and see what she can tell us about FARA?

14   A.  Counsel, I assume, like you, during a trial if somebody

15   is presented to me as someone that could be helpful, I will

16   talk to them.

17           I did talk to Ms. Zaki.  I read the Court's

18   memorandum.  I didn't feel that it was consistent at that

19   point with my strategy of going with the defense that

20   Mr. Michel did not commit knowingly the violations of the

21   FEC or FARA.

22   Q.  You asked her --

23   A.  That was what my strategy was at the trial.

24   Q.  Nevertheless, you asked her to send you an engagement

25   agreement.  Correct?

1    A.  I probably did.  First of all, she's a lovely, lovely

2    lady.  She would have been very difficult to have been brief

3    and abrupt with.

4            We had a conversation.  I didn't feel it

5    comfortable to say, No, I'm not interested.  I engaged in

6    conversation with her.  She made it clear what she did and

7    what she didn't do.  And I thought about the possibility of

8    calling her.

9            I submitted the memo that you saw to the Court.

10   The Court responded the way it did.  And upon further

11   reflection, it didn't add anything to my theory of the

12   defense, my strategy as to how I thought I would get an

13   acquittal.  And I still think I should have gotten the

14   acquittal.

15   Q.  I want to talk to you about one of the legal issues that

16   came up or could have come up during trial, and that is

17   severance.

18           Can you tell us what considerations went into your

19   decision not to move to sever the campaign finance charges

20   from the FARA charges?

21   A.  Certainly.  I considered doing that.  I went in and

22   looked at the D.C. Circuit rulings on that -- on severance

23   motions.  There were a scant number that were granted.  I

24   was from California.  I was new to this district, new to her

25   Honor.  I didn't want to file a motion that I knew

1    statistically had virtually no chance of being granted and

2    might put me in disrepute with the Court in front of whom I

3    was going to be trying this case.

4    Q.  Mr. Kenner, you filed motions to call as witnesses

5    former President Clinton, former President Obama, former

6    President Trump.  Right?

7    A.  Yes.  And I thought they should have been granted.

8    Q.  And when those were denied, you filed motions to

9    reconsider those?

10   A.  Yes, I did.

11   Q.  And yet you thought that it was too much of a Hail Mary

12   to file a motion to sever?

13   A.  Yes.  I felt I had good grounds to subpoena President

14   Trump.  He was the head of the Executive Branch of the

15   government during the time of the latter set of activities

16   in Mr. Michel's case.  He would have the most knowledge

17   about who, if anybody, came to meet with him as the head of

18   the Executive Branch.

19          I discovered that he never met with Mr. Michel.  I

20   discovered that he met with Mr. Wynn on a particular

21   occasion, asking that this fellow, Mr. Guo, be extradited

22   back to China.

23          I knew that he had another meeting -- I believe it

24   was the next day, and my recollection tells me that it might

25   have been with Mr. Broidy and that -- I don't remember his

Kenner - DIRECT - By Mr. Zeidenberg

1     name right now, but someone from the government came running

2     down when advised by one of the junior White House counsel

3     that the president was about to have this meeting, and he

4     came down to advise that this was not an Executive Branch

5     matter; it was a State Department matter, which, by the way,

6     the evidence showed is where Mr. Michel went with the

7     information.

8              In fact, Attorney General Sessions, who was the

9     Attorney General at the time of these offenses, testified in

10    this case and testified that in his opinion Mr. Michel

11    didn't do anything inappropriate, that he brought the issue

12    to the State Department, not to the Executive Branch.

13             I did that to distinguish between -- my strategy

14    was to separate Mr. Broidy and Nickie Lum Davis, who also at

15    one point was a cooperating witness with the Government who

16    then moved to withdraw her plea, withdrew her cooperation.

17    And I was not able to call her because she had a Fifth

18    Amendment claim.

19             I was not able to call Mr. Frank White because he

20    allegedly had a Fifth Amendment claim.  While my

21    recollection is I didn't agree with the way that they got

22    there, I believe the Government indicated that Mr. White was

23    the subject of a separate investigation that was still

24    ongoing in the Southern District of New York.

25             And my recollection tells me that Mr. Michel was

Kenner - DIRECT - By Mr. Zeidenberg

1    indicated to also be part of that investigation.

2         So because the Government had --

3    Q.  The --

4    A.  -- an ongoing investigation, that was the basis for

5    Mr. White's taking immunity.  We were able to read his

6    transcript from the preliminary hearing.

7         Your Honor was kind enough to allow us to do that.

8         But we were not able to develop it.

9    Q.  Mr. Kenner, we would love to get your testimony finished

10   today.  And so if you could confine your questions, if you

11   could -- or your answers to answering my question.  It was

12   not:  Explain your rationale for subpoenaing Mr. Trump.  And

13   we'll hopefully wrap up this afternoon and won't make you

14   come back another day.

15        My question is -- I'll ask it differently:  Were

16   you aware that cases can only be joined if they are of the

17   same or similar character or based on the same act or

18   transaction or are connected with or constitute a common

19   scheme or plan?

20   A.  Yes.  And her Honor had granted a motion made by the

21   Government to join the cases.  There was the original case

22   number from the 2012 days.  There was a superseding

23   indictment, which I believe had another case.

24        My recollection -- I could be wrong -- I believe

25   there was a motion to join made by the Government.

1    Q.  Was it your view that FARA lobbying schemes of the Trump
2    Administration to remove Guo from -- have him extradited
3    back to China was somehow similar to the campaign election
4    donations given to the Obama Administration?
5    A.  I know you don't like me to say it, but my strategy was
6    to combine the two to show Mr. Michel's naïveté and that he
7    did not knowingly, willfully or intentionally violate either
8    set of statutes.
9    Q.  Did you consider the prejudice to Mr. Michel of
10   combining two schemes that are separated by six years
11   involving two presidential administrations and what a jury
12   would think if he's involved in two separate criminal
13   schemes?
14   A.  Yes.  I considered that.
15   Q.  And you thought that that was -- what?  Not significant?
16   A.  My thought was that my strategy of trying to combine the
17   two to demonstrate Mr. Michel's naïveté in the political
18   field would make a consistent position over a number of
19   years and would bootstrap both arguments.
20   Q.  Did -- so it's -- what you're saying now is you thought
21   it was advantageous to have them together and not that you
22   thought that the Judge would deny a motion to sever?
23   A.  No.  I believe, as I said to you before, that I wanted
24   to use each of those separate events to show the continuing
25   naïveté of Mr. Michel and his lack of knowledge or intent to

1    violate the law in either situation.  I felt that that --

2    each would bootstrap the other and that strategy would be

3    successful with the jury.

4    Q.  If you had succeeded in severing the cases, that would

5    have meant you would have had to do two trials.  Correct?

6    A.  Yes, although I never considered that.

7    Q.  Did the fact that you had entered into a flat fee

8    arrangement with Mr. Michel make it -- you inclined to not

9    want to have to do two trials and only get paid the same

10   $750,000?

11   A.  To be candid with you, I became good friends with

12   Mr. Michel.  I dedicated 14 months to working with

13   Mr. Michel.  I liked him.  I wanted to win the case.  I

14   spent my own money to do that.

15          Would I have stopped if I thought it was to his

16   advantage strategically to sever those two cases?  Would I

17   have not done it because there would have been a second

18   trial?  Absolutely not.  I committed myself.  I not only put

19   the ante on the table, but I called every hand as we went

20   along.  I spent $1,400,000.  I would have not have stopped

21   to do a severance motion because I would have to do another

22   trial.

23   Q.  Did you talk about that decision not to sever in your

24   strategy with Mr. Michel?

25   A.  Absolutely.

1    Q.  And you explained to him that it would be advantageous

2    to have both cases together because then the jury would see

3    that he's very naïve because he got involved in two

4    separate, unrelated schemes?

5    A.  Yes.  I did discuss that with him.

6         I also discussed with him that with regard to the

7    2018, I believe, or '19 events that his description in the

8    memos that he wrote to me was that what he was doing was

9    working with two other people in the case, Joel Rousseau and

10   Frank White, to bilk Mr. Jho Low out of $20 million on the

11   guise that they were going to get him a photograph with the

12   president.  That's what he said that his intent was.  He

13   never thought about FARA.  He never thought about or cared

14   about whether this Chinese citizen got a return.

15        And it was his position, which I totally believed

16   in, that he was working on behalf of the American government

17   to get a hostage released from China.  It was --

18   Mr. Sessions was anxious to accomplish that.  And he did

19   accomplish that.  And I thought that was an important part

20   of the case.

21   Q.  I want to talk to you about the use of the Government's

22   overview witness.

23        Do you recall that the Government's first witness

24   at trial was Agent Heuchling?

25   A.  I think it's "Heuchling."

```
 1                    MR. ZEIDENBERG:  Is that correct?
 2                    MS. LOCKHART:  That's correct.  Special Agent
 3       Heuchling.
 4                    THE COURT:  Can we spell it?
 5                    MS. LOCKHART:  H-E-U-C-H-L-I-N-G.  It's like a pop
 6       quiz.  Agent Heuchling.
 7                    THE WITNESS:  I'm having the same difficulty with
 8       the name as you're having.
 9       BY MR. ZEIDENBERG:
10       Q.  We'll call him the case agent.
11                    Do you recall the Government called him twice,
12       once at the start of the trial to testify about campaign
13       finance violations and the second time in the middle of the
14       trial to testify about the FARA-related charges?
15       A.  Yes.  My recollection is that they asked the Court for
16       permission to do that.  The Court granted that permission,
17       and that is what they did.
18       Q.  And do you recall that the case agent was used as an
19       overview witness by the Government to testify about how the
20       investigation was conducted and what it found?
21       A.  Yes, I do.
22       Q.  Did it occur to you to object to the use of an overview
23       witness?
24       A.  Yes, it did.  And I believe I did object on several
25       occasions.  My strategy became that he was the closest
```

1    person I could get to what happened with Mr. Frank White and

2    how he was the culprit because I couldn't call Frank White.

3    All I had was his testimony from the grand jury, and I

4    wanted to use him in the same way to try to reach issues

5    that were otherwise unreachable to me because the ability to

6    get to them in different ways was denied to me.

7    Q.  So my question is:  Did it occur to you to object to his

8    use as an overview witness?  Not that he'd be called as a

9    witness at trial, but that he'd be used as an overview

10    witness.

11    A.  Yes.  I believe my recollection is that I did.  I then

12    decided strategy-wise to stop fighting that fight because I

13    wanted to use him for the same purpose.  I wanted to get to

14    the defense side of what he knew and the defense theory that

15    I chose to use.  So I kind of had to play both of those

16    against each other.

17    Q.  Were you aware that the D.C. Circuit has condemned the

18    use of overview witnesses?

19    A.  Yes.  I made an objection on that basis.

20    Q.  Well, the record will reflect if an objection was or was

21    not lodged.

22    A.  Yes.

23    Q.  But you're saying that you knew?

24    A.  My recollection is that I knew that.  Yes.

25    Q.  Okay.  Do you recall Agent Heuchling?

1    A.  "Heuchling."

2    Q.  The case agent testifying on the very first day of

3    trial, March 30th, in the morning.

4         The question was:  "All right.  Agent

5    Heuchling" -- I'm going to butcher that.  I apologize.  But

6    fortunately, he's not here to correct me.

7         "Understanding that that was the conduct involving

8    the Defendant, Mr. Low, in 2017 that you were investigating,

9    can you tell us generally, then, what was the conduct that

10   you were investigating involving the Defendant related to

11   2012?"

12        And he answered:  "In 2012, the Defendant

13   conspired with Mr. Low to bring more than $20 million into

14   the United States, and then the Defendant subsequently used

15   those funds from a foreign source to donate a portion to a

16   campaign committee associated with the president -- sorry --

17   then-President Obama, who was running for reelection, as

18   well as to make contributions to a -- illegal contributions

19   to a super PAC."

20        Do you see that?

21   A.  Yes.

22   Q.  And then it goes on to say:  "The Defendant also used a

23   series of straw donors, more than 20 straw donors, to give

24   those funds to the campaign in violation of federal law."

25        Do you see that?

```
 1    A.  Yes.  I see that.

 2             And may I just make one comment?

 3    Q.  Let me ask you a question.  I'm just asking right now if

 4    you see it.

 5    A.  Okay.  Yes.  I see it.

 6    Q.  You did not object to that testimony, did you?

 7    A.  My recollection is that I did initially make an

 8    objection.  I may be wrong about that.  That's my current

 9    recollection.

10             I do want to indicate that frankly I don't

11    Monday-morning quarterback my cases when I'm done with them.

12    I'm done with them.  But in looking at this, I probably

13    should have said "allegedly," or made an objection that it

14    should have said "allegedly" conspired and "allegedly" gave

15    money to straw donors.

16             Why now I didn't do that, I don't recall.  But if

17    that's grounds for ineffective assistance of counsel, then I

18    would hope the Court would grant the motion.

19    Q.  So you would agree, now, looking at it, you can see that

20    he testified, the case agent, on the very first day that

21    your client, Mr. Michel, was making illegal contributions to

22    a super PAC and conspired with others?

23    A.  And I should have made an objection to use the word

24    "allegedly."

25             THE COURT:  She's objecting.  Don't go any
```

Kenner - DIRECT - By Mr. Zeidenberg

```
 1    further.
 2              What's the objection?
 3              MS. LOCKHART:  Asked and answered, cumulative.
 4    The transcripts are in the record.  We've already gone over
 5    this section.
 6              THE COURT:  He's already indicated what he would
 7    at this point in looking at it -- what his view of it is.
 8    So let's move on.
 9    BY MR. ZEIDENBERG:
10    Q.  So you would agree, would you not, at least looking at
11    it now that that is not appropriate testimony for the agent
12    to have given.  Correct?
13    A.  I would agree that I should have made the objection that
14    it should have had the word "allegedly" before the crime.
15    Q.  I'd like to refer you to the next section of the agent's
16    testimony on Page 138.
17              THE WITNESS:  Counsel, may I have just one second?
18              Thank you.
19    BY MR. ZEIDENBERG:
20    Q.  I want to draw your attention at the outset of this to
21    the agent's persistent and consistent reference to straw
22    donors.  And the question is:  "What does the Defendant do
23    with a portion of the money soon after receipt?"
24              And the answer:  "So the Defendant transfers those
25    funds to straw donors, and those straw donors consequently
```

1    donate to the Obama Victory Fund."

2              Question:  "So we see a few individuals named

3    here.  What, if anything, would the individuals, the straw

4    donors, the conduits whom you identified, how did the monies

5    that they received from the Defendant compare to the monies

6    that they then provided to the Obama Victory Fund?"

7              "So in almost every instance, when the Defendant

8    provided money to straw donors, the straw donors provided

9    the exact same amount of money to the Obama Victory Fund."

10             Now, my question is:  Did it occur to you to

11   object to the use of "straw donors"?

12   A.  My recollection now -- I don't have a current

13   recollection of what I thought then.

14   Q.  Well, if you never objected, do you see it now?  And --

15   A.  It's not on the screen now.  I saw it when it was.

16   Q.  Seeing the testimony now and the reference to straw

17   donors, do you find that objectionable in retrospect?

18             MS. LOCKHART:  Your Honor, objection.  What's

19   dispositive in the legal analysis is his considerations in

20   the moment as part of his strategy of why he chose to object

21   or not to object.

22             What is not relevant is him here sitting eight

23   months after the fact considering in the broad light of day

24   whether a standalone excerpted piece of testimony would be

25   objectionable.

```
1          THE COURT:  I think she's correct.  The look is at
2    the time, not now.
3          MR. ZEIDENBERG:  Well, what I'm asking --
4          THE COURT:  As to whether he considered -- it
5    should be in terms of whether he made a decision -- what his
6    thinking was at the time in terms of when these statements
7    were made by the agent.  That's the pertinent portion.
8          And whether or not he has something to say now
9    about it --
10          MR. ZEIDENBERG:  Well --
11          THE COURT:  -- is less relevant and probative
12    than, frankly, why he didn't do something or did do --
13    decided not to do something at the time, which is not
14    something you're going over.
15          MR. ZEIDENBERG:  Well, your Honor, to determine if
16    someone made a mistake, they often will say in looking at
17    it, as he did previously, "I should have said 'allegedly.'"
18          That's his looking at it now.
19          THE COURT:  Right.
20          MR. ZEIDENBERG:  In retrospect --
21          THE COURT:  The point is, she's correct about the
22    fact that you've skipped to the end.  And it's on the
23    record.  So I'll consider it the way it is.  But the point
24    is that the focus of the question is at the time what his
25    thinking was.
```

1           Now, it may be that he didn't give any thought to

2    it and let it go and now he's thinking maybe he shouldn't

3    have.

4           But the focus is:  What did he do and why did he

5    do something or not do something?  That's the focus.

6           You've skipped to the second part now, you know,

7    quarterbacking, "Should you have done something," which I'm

8    not suggesting is totally irrelevant.  I'm just suggesting

9    that you're switching the focus.

10          MR. ZEIDENBERG:  Very well.

11          THE COURT:  Let's get to the focus of where he's

12   supposed to.

13          We've moved on as far as I'm concerned.  We've

14   taken these two things.  You've got your testimony that you

15   have.  Let's move ON.

16          MR. ZEIDENBERG:  If I may just ask this one

17   question.

18   BY MR. ZEIDENBERG:

19   Q.  Do you find the term "straw donors" as an appropriate

20   term for the agent to be testifying to without objection?

21          MS. LOCKHART:  Your Honor, same objection.

22          THE COURT:  Sustained.

23   BY MR. ZEIDENBERG:

24   Q.  Do you think the term "straw donors" is a legal

25   conclusion?

```
 1            MS. LOCKHART:  Your Honor, same objection.
 2            THE COURT:  At this point, I think I'm going to go
 3   with the testimony that he has that you've already asked
 4   about what his thinking is at this point.  We don't need to
 5   go any further.
 6   BY MR. ZEIDENBERG:
 7   Q.  What I'm asking is, did you recognize at the time that
 8   that was objectionable or was there a strategic reason why
 9   you were not objecting when you saw and heard the term
10   "straw donors"?
11   A.  Yes.  There was a strategic objective, which I've
12   explained to you --
13   Q.  That --
14   A.  -- that I wanted to be able to ask the same kind of
15   questions of Agent Heuchling with regard to my side of the
16   case and what I could bring out since I couldn't get Frank
17   White; I couldn't get President Trump; I couldn't get Frank
18   White.
19   Q.  So --
20   A.  That was the strategy.  I couldn't object to what I was
21   going to strategically do myself.
22   Q.  If you could explain how you thought it advanced your
23   effort by allowing the agent to testify these were straw
24   donors.  How did that advance your case?
25   A.  I don't think that particular thing advanced my case.
```

1          My lack of objection was to effectuate my strategy

2     of doing the same kinds of questions.  I couldn't very well

3     object when the Government did it and then do the same thing

4     myself.  That was my strategy at the time.

5     Q.  Showing you the transcript from April 13th, Page 33,

6     Question [sic]:  "So the allegations we were looking at as

7     related to Mr. Michel, Mr. Broidy, Ms. Davis and

8     Mr. Higginbotham in 2017 were allegations that Mr. Michel,

9     Mr. Broidy, Ms. Davis and Mr. Higginbotham were working with

10    and on behalf of Mr. Low to influence the U.S. government,

11    the Department of Justice to drop the investigation into

12    Mr. Low and into 1MDB, as well as we uncovered that the same

13    individuals were working on behalf of and with Mr. Low and

14    on behalf of the Chinese government to influence the White

15    House and the administration of then-President Trump to

16    deport the Chinese national who was in the United States

17    back to China."

18          Do you see that?

19    A.  Absolutely.

20          THE COURT REPORTER:  I'm sorry, counsel.  For

21    clarity of the record, you characterized that as a question.

22          MR. ZEIDENBERG:  Yes.

23    BY MR. ZEIDENBERG:

24    Q.  I'm saying, do you see that testimony?

25    A.  I do.

1    Q.  And you did not object to that question or that answer,

2    did you?

3    A.  No.  I did not intentionally as part of my strategy.

4              MS. LOCKHART:  Your Honor, there is a note above.

5    I'm not able to pull the transcript up as quickly where it

6    looks like the Court says, "Go ahead.  You can answer."  And

7    just for the record, I'd like to see what's above it.  I'm

8    not able to pull it up.

9              THE COURT:  Can you pull it up so we can see what

10   else is there?

11             MR. ZEIDENBERG:  (Complies.)

12             MS. LOCKHART:  I see.  Understood, your Honor.

13   BY MR. ZEIDENBERG:

14   Q.  Was there a strategic reason that you had to not

15   objecting to this testimony?

16   A.  Yes.  Because I was trying to get to strategically the

17   separation of Nickie Lum Davis and Mr. Broidy from

18   Mr. Michel.

19             The evidence in the case, including evidence that

20   was discovered perhaps by Mr. Pottinger -- I don't recall

21   exactly at the moment -- but it was Nickie Lum Davis and

22   Mr. Broidy who were influencing the president.  Mr. Michel

23   was not -- never met with the president and wouldn't know

24   who Mr. Michel was.  He never went to the Executive Branch

25   of the government.

1           As Jeff Sessions testified, who was then Attorney

2    General, he, Mr. Michel, came to the State Department, which

3    in his view was the appropriate thing to do.

4           My second observation is that I wanted to argue,

5    and therefore I didn't object -- and a big part of my

6    strategy was to argue that Mr. Michel was working not on

7    behalf of the Chinese government, but on behalf of the

8    American government, and that in fact he had negotiated the

9    release of a Chinese-held hostage literally on the

10   request -- I think it was at the request of Mr. Sessions.

11   I'm not sure who.

12          But I believe, and I think the evidence showed,

13   and my strategy was to establish that Mr. Michel not only

14   was not working on behalf of China, but was, in fact,

15   working on behalf of the United States.

16   Q.  But Agent Heuchling is saying the exact opposite right

17   there.  He's saying that we uncovered that the same

18   individuals, including Mr. Michel and his alleged

19   co-conspirators, were working on behalf of the Chinese

20   government to influence the White House.

21          So how does that advance your case to not object

22   when he testifies like that?

23   A.  It opened the door to my arguing that Mr. Michel was

24   working on behalf of the United States, not on behalf of

25   China, and it was my intention ultimately and my strategy to

1    separate Ms. Nickie Lum Davis and Mr. Broidy from

2    Mr. Michel.

3            Nickie Lum Davis and Mr. Broidy were the ones that

4    were in contact with the president, not Mr. Michel.  He

5    never went to the Executive Branch.  He went where he was

6    supposed to, to the State Department.

7    Q.  Did it occur to you at the time to object to this

8    testimony?

9    A.  I don't recall my intention at the time, except to say I

10   didn't feel I could object to this and then try to take this

11   as an entree into the questions that I wanted to ask.  The

12   questions that I wanted to ask, I didn't think that that

13   interest would be furthered by objecting to this testimony

14   and then trying to do the same thing on the defense side of

15   the case.

16   Q.  So are you saying that it's your testimony that you

17   thought that if you objected to the case agent getting on

18   the stand and making a categorization about his opinion

19   about the guilt of Mr. Michel working on behalf of the

20   Chinese government to influence the White House, somehow you

21   would be precluded from introducing evidence that he was not

22   doing that?

23           MS. LOCKHART:  Objection.  Asked and answered.

24           THE COURT:  You have asked it a couple of times.

25   You obviously don't like the answer.

```
 1              MR. ZEIDENBERG:  I'm just trying to understand
 2    if --
 3              THE COURT:  Excuse me.  He's indicated -- you
 4    asked the question.  He gave you an explanation.  You're
 5    going back and indicating, Well, in essence, how could you
 6    possibly think that?
 7              So if you're asking him to reaffirm what he has
 8    already said -- is that what you're asking?  You did ask
 9    him, and he gave you the answer.
10              Would you give the same answer or a different one
11    to his question?
12              THE WITNESS:  The same answer.
13              THE COURT:  Let's move on.
14    BY MR. ZEIDENBERG:
15    Q.  I'd like to go back for a second to March 30th,
16    Page 126.
17              THE COURT:  One thing in terms of perhaps putting
18    some of this in context in terms of the objection that was
19    made relating to discussing what his current thinking is as
20    opposed to what he thought at the time is I think if you
21    look at the standard -- and I think it's in the *Strickland*
22    standard -- is hindsight is not the issue that it is at the
23    time.
24              So I think you need to focus on what reasons he
25    did or didn't have at the time for doing it.
```

Kenner - DIRECT - By Mr. Zeidenberg

1              Going back and saying, "Well, now I would have

2      done this or that" is I don't think part of the strategy --

3      or part of the standard.  So if it's not part of the

4      standard, let's not waste time on it --

5              MR. ZEIDENBERG:  Understood.

6              THE COURT:  -- just in terms of your moving

7      forward.

8              MR. ZEIDENBERG:  Understood.

9      BY MR. ZEIDENBERG:

10     Q.  Referring to this testimony that I've got highlighted,

11     "Agent Heuchling, just to pause here" -- this is the

12     question:  "Just to pause here for a minute before we go on,

13     we've had many references to President Obama during your

14     investigation.  Any allegations that President Obama or his

15     administration knew of or was involved in any criminal

16     activities?"

17             Answer:  "No.  In the course of the investigation,

18     we uncovered nothing to indicate that either the former

19     president or his administration was aware of the Defendant's

20     illegal activities."

21             Do you see that?

22     A.  Yes.

23     Q.  You did not object to that?

24     A.  I did not object to it.  I would say, however, that the

25     fact -- our position on the defense side was that President

1    Obama did not know anything about this, that it was Frank

2    White who was leading Jho Low to believe that the president

3    was involved in these conversations.

4         I believe Mr. Michel was very clear in his

5    testimony that although Frank White said things in his

6    presence about what the president knew or the president did,

7    Mr. Michel testified that he didn't believe anything that

8    Frank White said about the president being involved, that he

9    had known President Obama and it was his opinion that

10   President Obama would not be involved in this kind of a

11   scheme.

12   Q.  My question isn't so much about President Obama; it's

13   about Mr. Michel and the fact that the agent testified that

14   the administration wasn't aware of the Defendant's illegal

15   activities.

16        And my question is:  Did it occur to you at the

17   time to object to the agent categorizing his activities as

18   being illegal?

19   A.  I don't have a current recollection.  I didn't do that,

20   which is -- according to the transcript, I didn't do that.

21   The only thing that I can say is the same thing I've been

22   saying over and over again:  I didn't want to be objecting

23   to Agent Heuchling because I intended to use him to exploit

24   the defense.

25        I should have, by the way, said "purported

```
 1    illegal" --
 2              THE COURT:  That's not the standard.  Don't add
 3    stuff that isn't asked.  You've indicated whatever your
 4    thoughts were or were not at the time.
 5    BY MR. ZEIDENBERG:
 6    Q.  I'd like to direct your attention to April 13th in the
 7    morning.  Question --
 8              THE COURT:  Excuse me.  You need to put a page
 9    number --
10    BY MR. ZEIDENBERG:
11    Q.  "Are you" --
12              THE COURT:  Sir, sir.  April 13th.  Page and line?
13              MR. ZEIDENBERG:  I'm sorry.  Page 38.  I
14    apologize, your Honor.
15              THE COURT:  No problem.
16    BY MR. ZEIDENBERG:
17    Q.  "Are you aware whether Mr. Michel took any trips related
18    to the allegations you were investigating?
19              "Yes.  Mr. Michel took numerous trips in 2017 to
20    China, Hong Kong, to Thailand.
21              "Was that by himself or with others?
22              Some trips as far as I know were by himself, but
23    others were with the co-conspirators, Mr. Broidy, Ms. Davis,
24    Mr. Higginbotham."
25              Do you see that?
```

```
 1    A.  Yes.
 2              THE COURT:  Lines 11 through 18.
 3              Go ahead.
 4    BY MR. ZEIDENBERG:
 5    Q.  Did it occur to you that it was inappropriate for the
 6    agent to categorize these individuals as co-conspirators?
 7              MS. LOCKHART:  Objection, your Honor.  That
 8    includes a legal conclusion that is currently part of the
 9    briefing for the motion for new trial.
10              THE COURT:  In terms of whether they're
11    co-conspirators or whether you can label them as the
12    co-conspirators?
13              MS. LOCKHART:  Whether it's improper to use the
14    term "co-conspirators" here, your Honor.
15              THE COURT:  I can't hear you.
16              MS. LOCKHART:  Whether it was inappropriate for
17    Agent Heuchling to refer to them as co-conspirators here.
18              THE COURT:  I think pending the Court making a
19    decision, I will let you ask the question in terms of -- as
20    long as you stick to the time.
21    BY MR. ZEIDENBERG:
22    Q.  I'm asking at the time.  You didn't object, correct?
23    A.  It doesn't say I did.
24    Q.  And I'm asking, at the time, did it occur to you to
25    object?
```

```
1    A.  I honestly don't recall.

2    Q.  Was there a strategic --

3              THE COURT:  I didn't hear that.

4              THE WITNESS:  I honestly don't recall.

5    BY MR ZEIDENBERG:

6    Q.  So you're not aware of any strategic reason for not

7    objecting to the agent's referring to Broidy, Davis and

8    Higginbotham as co-conspirators?

9    A.  The only thing I can say is that it was my position and

10   my strategy to establish that Mr. Broidy, Ms. Davis and

11   Mr. Higginbotham were co-conspirators with each other, not

12   with Mr. Michel, in order to -- and they were, in fact, the

13   people that were working on getting this to the Executive

14   Branch, not Mr. Michel.

15   Q.  But you see here, do you not, that he's referring to

16   Mr. Michel along with his co-conspirators.  Correct?

17   A.  Yes.  And I knew there was documentary evidence to prove

18   that, and I saw no reason to object to it here.

19   Q.  That same date, on Page 41, Line 13 to Line 18,

20   Question:  "And what is Anicorn?

21              Anicorn is a shell company that Mr. Michel had set

22   up.  Primarily, it is used to receive these funds from --

23   for Mr. Michel and then to distribute those funds out to

24   both Mr. Michel's other accounts and also to the other

25   co-conspirators."
```

1          You did not object to that?

2    A.  No.  There was documentary evidence that established

3    that Anicorn was a company that was set up for Mr. Michel to

4    receive funds from --

5    Q.  What I'm talking about is the reference to Mr. Michel's

6    co-conspirators.

7          Do you see that?

8    A.  Yes.  And Monday-morning quarterbacking, again, I say I

9    should --

10          THE COURT:  Don't think of what you're thinking

11    now.

12          THE WITNESS:  Okay.

13          THE COURT:  Did you have any thoughts about it at

14    the time?

15          THE WITNESS:  I don't have any thoughts about

16    that.

17          THE COURT:  I didn't hear that.  I'm sorry.

18          THE WITNESS:  I don't have any thoughts

19    specifically about this.

20    BY MR. ZEIDENBERG:

21    Q.  So there wasn't a particular strategic reason to not

22    object to that?

23    A.  I don't recall.  I would assume there was, but I don't

24    recall it today.

25    Q.  Page 42, same date, Line 8 through 17.

```
 1                    "Question:  So Mr. Michel almost immediately" --

 2                    THE COURT REPORTER:  I'm sorry, counsel.  That's

 3         an answer, not a question.  It's not going to be clear in

 4         the record.

 5         BY MR. ZEIDENBERG:

 6         Q.  Do you see that the transcript -- that it says

 7         "Question" --

 8                    THE COURT:  No.  It's an answer.  What she's

 9         pointing out to you is you're describing it as a question,

10         and it's not.

11                    MR. ZEIDENBERG: My apologies.

12         BY MR. ZEIDENBERG:

13         Q.  "Question:  After the Anicorn account received almost

14         $3 million, where did it go after that?

15                    "Answer:  So Mr. Michel almost immediately sent

16         himself in two transactions $1.3 million.  And he sends that

17         to another account that he had called Artemus, LLC.  In

18         addition, he almost immediately paid out the other

19         co-conspirators in his scheme, Ms. Davis, Mr. Higginbotham

20         and Mr. Broidy."

21                    Do you see that?

22         A.  Yes.

23         Q.  And then skipping a sentence, "So, in effect, Mr. Michel

24         gets $2.8 million and almost immediately, almost the same

25         day or the day after, is paying out his co-conspirators."
```

```
 1              You did not object to that?

 2   A.  No, I didn't.  And if I can explain my recollection from

 3   that time.

 4   Q.  Please.

 5   A.  The Government had given us a lot of discovery about

 6   these financial transactions.  They exchanged exhibits.

 7   They had very specific charts that followed the money and

 8   would support what was said here.

 9              I didn't think it was to my advantage, although

10   later on cross-examination I did try to recast some of that

11   chart.  But I didn't think it would be effective for me to

12   object to something that I had already seen copious exhibits

13   that documented it.

14   Q.  My question, Mr. Kenner, is not to question whether the

15   money went in the direction the agent testified to.  My

16   question is specifically his use of the term

17   "co-conspirators" to describe Davis, Higginbotham and

18   Broidy.  That part of it.  Was there a strategic reason that

19   you had to not object to the use of that term in describing

20   the other individuals?

21   A.  I don't have a current recollection.  Looking at this, I

22   probably should have said "alleged."  I didn't.  I don't --

23   if the Judge thinks that's ineffective assistance of

24   counsel, she'll grant this motion.

25              THE COURT:  The whole point, Mr. Kenner, is you
```

1    don't have to discuss, despite his having asked, early on

2    about what you thought now.  The issue is what you're

3    thinking at the time.  If you remember it, fine.  If you

4    don't, just say so.

5                THE WITNESS:  Thank you.

6                THE COURT:  Whether or not somebody thinks it is

7    or is not ineffective assistance of counsel isn't what

8    you're being asked, nor is it useful.

9                THE WITNESS:  Thank you, your Honor.  I apologize.

10   BY MR. ZEIDENBERG:

11   Q.  Referring you to the testimony from the same date, April

12   13th, Page 46, Lines 4 through 9.

13               THE COURT:  I would say the earlier one also on

14   Page 42, it's Lines 6 through 17.  So Lines 4 through 9.

15   BY MR. ZEIDENBERG:

16   Q.  "Question:  What happened after Mr. Michel received the

17   $3 million?"  I'm sorry.  I think I read that one wrong.

18   No, I didn't.

19               THE COURT:  Is there an objection?

20               MS. LOCKHART:  Your Honor, objection to

21   cumulative.  These all go to the general bucket under

22   Defendant's motion for new trial regarding whether

23   Mr. Kenner should have objected to Agent Heuchling's

24   testimony.

25               We've gone over many versions and many different

60

1    excerpts from Agent Heuchling's testimony, and Mr. Kenner

2    has consistently given his answer.  And here's another

3    example regarding co-conspirators, which I think Mr. Kenner

4    has already addressed.

5          So I think at this point it's just cumulative of

6    what Mr. Kenner's already testified to.

7          THE COURT:  He may have a different reason in

8    terms of each of these questions, so I will allow it to go

9    forward as long as we stick --

10          MR. ZEIDENBERG:  I'm sorry.

11   BY MR. ZEIDENBERG:

12   Q.  In the interest of trying to expedite things,

13   Mr. Kenner, let me try it this way:  Throughout the agent's

14   testimony, he consistently refers to Broidy, Higginbotham

15   and Davis as co-conspirators.  And if you'll take that --

16   this is just one more example.  You never objected to that

17   term.  Correct?

18   A.  Correct.

19   Q.  And what I'm asking is, at the time, at trial, did it

20   occur to you to object to his description, his consistent

21   description of those individuals as co-conspirators?  Did

22   that ever occur to you?

23   A.  I don't recall.

24   Q.  Was there a strategic reason you had for not objecting

25   to that term?

Kenner - DIRECT - By Mr. Zeidenberg

 1    A.  The same one I've repeatedly said.  I didn't want to be

 2    objecting to the very kinds of questions I was going to be

 3    asking Agent Heuchling in cross-examination.  And that was a

 4    strategical choice.

 5    Q.  I have to move on to a different part of the trial, and

 6    that is the testimony of Matthew Pottinger.

 7              Do you recall his testimony?

 8    A.  Not specifically, no.  I know he testified.

 9    Q.  Okay.  Referring you to -- I'm referring to April 11th,

10    the afternoon, Page 80 to 87.  I'm not going to be reading

11    that entire section, but excerpts from that section.

12              THE COURT:  So you'll give us the lines when you

13    get to it?

14              MR. ZEIDENBERG:  Yes.

15    BY MR. ZEIDENBERG:

16    Q.  Directing your attention to Page 80, Line 19, to the

17    bottom, "Question" --

18              THE COURT:  I'm sorry.  I didn't hear what you

19    said.  Line 18 --

20              MR. ZEIDENBERG:  Line 19 on the bottom and going

21    on to the next page, 81.

22    BY MR. ZEIDENBERG:

23    Q.  "Directing your attention to the May-June" --

24    A.  Counsel, excuse me.  Can you tell me who it is that's

25    asking the questions before I --

 1          MR. ZEIDENBERG:  I'm asking you to take a look at

 2     the highlighted portion.

 3          THE COURT:  What he's asking is, is this direct?

 4     Cross?  What?  Who is asking these questions?  Is it direct?

 5          MR. ZEIDENBERG:  This is the Government.  Direct

 6     examination.  There we go.

 7          THE WITNESS:  Thank you.

 8     BY MR. ZEIDENBERG:

 9     Q.  Okay?

10     A.  Yes.

11     Q.  "Directing your attention to the May-June 2017

12     timeframe, do you recall there being a request with regard

13     to China regarding a Chinese national who was in the United

14     States named Guo Wengui or Mr. Guo?

15          Answer:  "I do.

16          "How did that matter come to your attention?"

17          Answer:  "I do.  It came to my attention in a

18     meeting in the Oval Office.  There were a handful of staff

19     who were meeting with the president.  And the president

20     mentioned during this meeting that he had received some

21     information about Guo Wengui at dinner the previous night.

22     So he had some things he wanted to tell us about that."

23          Do you see that testimony?

24     A.  Yes.  Absolutely.

25     Q.  And you did not object to that testimony?

1    A.  No.  I thought that was helpful testimony.  The meeting

2    he had, that President Trump had -- the day before, he had

3    this meeting that was set up with Mr. Broidy -- was a

4    meeting with Steve Wynn.  They had dinner in the Oval Office

5    the day before this happened.  Mr. Wynn had brought with him

6    some documents and he had kept a copy of some of those

7    documents on the president's desk and on his secretary's

8    desk.

9            One of those documents was the red notice about

10   Mr. Guo.  And the other documents were documents

11   reflective -- they were screenshots of messages between

12   Nickie Lum Davis and Broidy and others.  Never with

13   Mr. Michel were those messages discussed, their scheme to

14   get this matter to the attention of the president.  And

15   there was a lot of pressure on getting that done at the

16   time.

17   Q.  Right.

18   A.  I thought that strategically helped separate Mr. Michel

19   from the scheme that they had to --

20   Q.  A couple questions about that.

21           First of all, did this -- did it occur to you at

22   the time that this testimony was hearsay?

23   A.  I don't recall whether it occurred to me at the time.

24   Q.  Just going back --

25   A.  There was testimony I didn't want to object to, but I

1   don't --

2   Q.  Mr. Pottinger is testifying about a conversation he had

3   with the president the previous day.

4   A.  Yes.

5   Q.  Did that strike you at the time -- do you remember if it

6   occurred to you that that might be hearsay?

7            MS. LOCKHART:  Asked and answered, your Honor.

8            THE COURT:  He answered.  He also thought -- he

9   made a comment that he thought the testimony was helpful.

10  He --

11           MR. ZEIDENBERG:  I said --

12           THE COURT:  He felt that it was helpful.  And

13  hearsay, obviously, he doesn't want to object to if you

14  think it's helpful.

15           MR. ZEIDENBERG:  That's two different questions,

16  your Honor, respectfully.  One is whether you recognize it

17  as hearsay and one is whether you decide not to object.

18           THE COURT:  Excuse me.  You asked him at the time

19  in terms of this testimony and what he was thinking about

20  it, et cetera.  And he has given you the answer of why he

21  thought it was helpful.

22           So whether he thought it was hearsay or didn't

23  think it was hearsay, frankly, I don't think is that

24  pertinent.  Let us move on unless you have something else

25  that goes along with this, which I saw at the bottom.  Let's

 1    move to that.

 2    BY MR. ZEIDENBERG:

 3    Q.  Did you think it was helpful to your case that Mr. Wynn

 4    was involved in lobbying the Trump Administration for the

 5    return or the extradition of Mr. Guo?

 6    A.  Yes, because he wasn't prosecuted for it.

 7    Q.  You're aware, Mr. Kenner, that Elliott Broidy, the

 8    co-conspirator, alleged co-conspirator of Mr. Michel,

 9    enlisted Steve Wynn to lobby the Trump Administration?

10    A.  Yes.  Absolutely.  And in fact, I think at some point my

11    recollection is they were on Steve Wynn's yacht somewhere in

12    the Mediterranean, where the two of them made a call to the

13    president while he was on Air Force One.  It wasn't the

14    president that answered.  I want to say it was Mr. Gates,

15    but my recollection is uncertain about that.  And they

16    literally told him the call was inappropriate and don't call

17    back.

18    Q.  Did it occur to you that Mr. Michel could be held

19    criminally responsible for the conduct of alleged

20    co-conspirators including those that aren't indicted?

21    A.  I don't think Mr. Michel was aware that Mr. Wynn was an

22    alleged co-conspirator.

23    Q.  Was it your understanding that an individual has to have

24    the knowledge to be --

25    A.  No.

1    Q.  -- to be held criminally responsible?  He has to know

2    the identity of his alleged co-conspirators?

3    A.  No.  He absolutely does not.

4    Q.  Okay.  So did it occur to you that if Mr. Broidy

5    pursuant to a conspiracy with Mr. Michel enlisted another

6    party such as Steve Wynn to effectuate a lobbying -- an

7    illegal lobbying effort that Mr. Michel could be convicted

8    for that?

9    A.  He could be, but I didn't think that the case was going

10   in that direction.  And I thought it was helpful to draw the

11   distinction of -- I do believe that Mr. Wynn, Mr. Broidy and

12   Nickie Lum Davis and Mr. Higginbotham were involved in an

13   attempt to influence the Executive Branch of the government.

14   I do not believe Mr. Michel was.  I do not believe the

15   evidence supported that.  My strategy was to separate him

16   from the people that were going to the White House, which he

17   wasn't.

18   Q.  You heard Mr. Broidy testify that Mr. Michel and he had

19   agreed to this, to the effort to --

20           THE COURT:  Sorry.  Who agreed to what?  There's

21   two "he's" in here.

22           MR. ZEIDENBERG:  I'll rephrase, your Honor.

23   BY MR. ZEIDENBERG:

24   Q.  You heard Mr. Broidy testify, did you not, that he had

25   an agreement with Mr. Michel to work to have Mr. Guo

1   extradited to China?

2   A.  I believe -- at least my recollection is that at the

3   time Mr. Michel met with Mr. Broidy initially, he was

4   looking for a new lawyer for Jho Low at Jho Low's request.

5   He thought at the time Mr. Broidy was a lawyer.  That's why

6   he went to his office in the first place.

7           And I believe that he indicated that the

8   $3 million he brought there, he thought it was for legal

9   fees.

10          THE COURT:  It's 3:25.  I want to let you finish

11  if there's something more with this particular testimony.

12          MR. ZEIDENBERG:  No, your Honor.

13          THE COURT:  We should take a break because we're

14  going to go to 5:00.  This is probably as good a time as

15  any.  I have 5:35.  So at 20 of 4:00 we'll come back.  We'll

16  take a 15-minute break.

17          THE WITNESS:  Thank you, your Honor.

18          (Thereupon a recess was taken, after which the

19  following proceedings were had:)

20          THE COURT:  Resuming the direct.  Proceed.

21          MR. ZEIDENBERG:  Thank you, your Honor.

22  BY MR. ZEIDENBERG:

23  Q.  I'd like to turn your attention to a transcript, the

24  same transcript of April 11th, 2023, Page 86, starting at

25  Line 22.

1          I take it -- I'll ask you to take a look at the

2    question:  "In addition to the meetings that you have

3    already testified about, did you" -- just for context, these

4    are questions to Mr. Pottinger -- "in addition to the

5    meetings that you have already testified about, did you also

6    have a later meeting at the end of the summer or fall of

7    2017 at the White House with Steve Wynn?

8          "Answer:  I did."

9          Page 87.  "Question:  What precipitated that

10   meeting?

11         "For me, it was an unexpected meeting.  I received

12   a cell phone call from the chief of staff of the White House

13   or from his office asking me to come down to the west wing

14   for a meeting.  I arrived, and Mr. Wynn was there waiting;

15   and we had a brief conversation.

16         "What was the general topic of the meeting?

17         "The topic was how to extradite Guo Wengui from

18   the United States, which Mr. Wynn had said the Chinese

19   government had asked him to do."

20         Do you see that?

21   A.  Yes.

22   Q.  You did not object to that testimony?

23   A.  I don't recall, but it doesn't reflect an objection, nor

24   would I have made one had I thought about it.

25   Q.  Did it occur to you at the time that this was all

1    hearsay?

2    A.  Yes.  But I felt that it was beneficial testimony for

3    Mr. Michel.

4    Q.  Okay.  And I just want to make sure I understand your

5    theory on that, because you would agree with me that the

6    Government alleged a scheme between Mr. Michel, Broidy,

7    Higginbotham and Davis with Mr. Low to -- for the

8    extradition of Guo back to China.  Right?

9    A.  That was what was charged.  Yes.

10   Q.  That was what was charged.

11   A.  Yes, sir.

12   Q.  And then the testimony from Mr. Broidy was that to

13   advance that scheme, he was -- while we was on his yacht, he

14   got on the phone to Steve Wynn and asked him to help at the

15   Trump Administration with this effort.  Right?

16   A.  Yes.

17   Q.  And you thought the testimony, hearsay testimony, from

18   Mr. Pottinger to testify that Wynn in fact asked him to try

19   and get Guo to go back to China, you thought that was

20   helpful to Mr. Michel?

21   A.  My recollection at this time is that the Government's

22   case was not argued in a way that pulled Mr. Wynn into part

23   of this conspiracy.  In fact, my recollection is there

24   wasn't much mention of Mr. Wynn at all.  And when I tried to

25   bring it up, my recollection is that there were some

1    objections to it.

2              But I thought the Government's approach was not

3    asking the jury to include Mr. Wynn in this conspiracy.  The

4    Government didn't present its case that way and I didn't

5    defend the case that way.  It simply wasn't necessary.

6    Q.  Mr. Wynn was not available at trial for the Government.

7    Right?

8    A.  I tried for the better part of seven months to subpoena

9    Mr. Wynn.  We were unsuccessful.  Mr. Wynn had moved from

10   Las Vegas to someplace else in Las Vegas and then to

11   someplace in Miami.  He was harder to serve than President

12   Trump or others in the government.

13   Q.  Did it occur to you, Mr. Kenner, that if Wynn was not

14   going to be a witness at trial that there was a missing link

15   in the Government's chain of proof without him?

16   A.  No.  I don't think the Government wanted to include him

17   in the conspiracy.  They didn't present the case that way.

18   Q.  They presented Wynn's testimony through Matthew

19   Pottinger.

20   A.  Yes.

21   Q.  Without objection from you.

22   A.  Correct.  I didn't want to object to it.  I believed

23   that the approach we were taking at trial was that Mr. Wynn

24   was not a part of this conspiracy.  I don't believe the

25   Government ever argued to the jury that Mr. Wynn was a part

1    of this conspiracy.  It just simply strategically was not

2    something I felt I needed to deal with.  That's my best

3    recollection.

4    Q.  Isn't this conversation that Pottinger testified to

5    combined with Broidy's testimony that he called him up and

6    asked him to help direct evidence that Wynn was a

7    co-conspirator?

8    A.  The Government did not argue the case that way.  The

9    Government was literally avoiding getting into much of

10   anything with Mr. Wynn.  And I followed suit.  This case was

11   not about Mr. Wynn being part of the conspiracy.  The

12   Government never argued that.

13   Q.  So you thought this was helpful to you that in fact --

14             THE COURT:  He's asked and answered it.  Let's

15   move on.  It's getting late and you're getting repetitious.

16             MR. ZEIDENBERG:  Very well.

17             THE COURT:  He's given his theory.

18   BY MR. ZEIDENBERG:

19   Q.  I'd like to direct your attention to your testimony from

20   April 6th.

21             THE COURT:  Is that still Mr. Pottinger or

22   somebody else?

23             MR. ZEIDENBERG:  Page 76.

24             THE COURT:  Who's the witness?

25             MR. ZEIDENBERG:  I'm sorry?

1              THE COURT:  Who's the witness?  Is this

2      Mr. Pottinger still?

3              MR. ZEIDENBERG:  No.  This is actually a colloquy

4      with the Court on Page 76 on April 6th, 2023, in the

5      morning.

6              THE COURT:  If you'd wait a second.

7              Go ahead.

8      BY MR. ZEIDENBERG:

9      Q.  You had raised an objection and you said, "Same

10     objection, your Honor."

11             And the Court ruled, "He can certainly testify as

12     to what Mr. Michel did as a co-conspirator statement.  And

13     at this point, there's sufficient evidence that the

14     Government has put on for the Court to consider them as

15     co-conspirator statements and enough for a conspiracy in

16     order to be able to do so."

17             Do you see that?

18     A.  I see it.  I don't know what witness we're referring to

19     or what the testimony is.

20     Q.  I'm sorry?

21     A.  I don't know what testimony we're talking about or what

22     the statement is.  I see that there was an objection and the

23     Court ruled on it.  I don't recall that specific colloquy

24     with the Court.

25     Q.  Did you by any chance read the -- our new trial motion?

```
1    A.  Some time ago, yes.

2    Q.  So my question is:  This was -- to put this in context,

3    the Court made a ruling and this ruling was done in the

4    presence of the jury.  My question is:  Did it occur to you

5    to object to the Court making this ruling in the presence of

6    the jury?

7    A.  What witness was this in connection with that the Judge

8    made the ruling?  I didn't see that on the page.

9    Q.  This was during the testimony of Mr. Higginbotham.

10   A.  Okay.

11            THE COURT:  It was in response to an objection

12   that Mr. Kenner made.

13            THE WITNESS:  Yes.

14   BY MR. ZEIDENBERG:

15   Q.  Yes.  My question is, though:  Did the Court's ruling in

16   the jury's presence that the testimony was admissible as a

17   co-conspirator statement -- I'm asking, did it occur to you

18   to object to that ruling being done or to ask for a curative

19   instruction?

20   A.  I don't recall.  I know with regard to Mr. Higginbotham

21   I was still during the trial trying to establish an

22   attorney-client relationship.  The Judge said that she would

23   revisit that at the close of the evidence.

24            Apparently, this ruling was the point at which the

25   Judge decided that the advice-of-counsel defense would not
```

1    be available, although I didn't stop trying.

2    Q.  You don't recall at the time having any concerns about

3    the Court making a ruling in the jury's presence about

4    Mr. Higginbotham and Mr. Michel being co-conspirators?

5    A.  Did I have -- I don't recall.  She was making a ruling

6    to an objection, and I don't have any recollection of

7    thinking there was a reason to object to it.

8    Q.  Directing your attention to Page 20, April 6th, Lines --

9    starting at Line 16 --

10   A.  Excuse me, counsel.  Are you referring in that last

11   exhibit to the Court indicating that there was a separate

12   proceeding in which Mr. Michel -- I'm sorry --

13   Q.  No.  We'll get to that.

14   A.  Okay.

15   Q.  We'll get to that.

16        This is from April 6th, Page 20, Line 16:  "Based

17   on the work for Low, the 1MDB work and the work I'm on

18   trying to get the Chinese national extradited, did you have

19   concerns about FARA?"

20        I'm sorry.  These questions are to

21   Mr. Higginbotham, for context.

22        "Answer:  I did have concerns about FARA, yes.

23        "Question:  Did you share those with the

24   Defendant?

25        "Answer:  I did, on more than one occasion.

1          "Question:  And what was Mr. Michel's response

2     when you raised FARA?

3          "Answer:  Also very dismissive.  You know, I

4     remember one time he said something to the effect of 'I

5     don't want to register for FARA, you know.  I travel a lot

6     and I get stopped coming in and out of airport, and it's all

7     just like very much an inconvenience -- seemed like very

8     much an inconvenience.'

9          "Question:  Did Mr. Michel ever ask you when you

10    raised it, 'What is FARA?  I don't know what FARA is'?

11         "Answer:  Oh, no.  There was -- he was aware of

12    what FARA was."

13         Do you see that testimony?

14    A.  Yes.

15         THE COURT:  That's 1 through 5, for the record.

16         THE WITNESS:  Yes.

17    BY MR. ZEIDENBERG:

18    Q.  That goes on to page --

19         MR. ZEIDENBERG:  Correct, your Honor.  Up to Line

20    5, Page 21.

21    BY MR. ZEIDENBERG:

22    Q.  You did not object to this testimony based on the

23    attorney-client privilege, did you?

24    A.  I did initially make an objection on attorney-

25    client privilege.  I was trying to establish during the trial

1    because the Judge -- her Honor gave me the opportunity to

2    revisit the question of the attorney-client relationship.  I

3    tried constantly to get to that attorney-client

4    relationship.  The Judge didn't agree with it.

5                And that had to do with -- do you want to wait

6    until later for the crime fraud exception?  That's my

7    recollection.

8    Q.  Did it occur to you at the time to object when the

9    Government was asking Mr. Higginbotham about communications

10   he had with his former client, Mr. Michel?

11   A.  The Judge had just ruled that he was a co-conspirator, I

12   believe.  I'm not -- I don't remember the date of the

13   previous testimony you showed me.

14   Q.  That came later.

15   A.  Okay.  So your question is?

16   Q.  My question was:  Did it occur to you to object?

17   A.  I did object on the basis that there was an

18   attorney-client privilege.  The Judge did not grant that

19   position.

20   Q.  Well, the record will reflect whether there were

21   objections lodged.

22                THE COURT:  I believe what he's saying is that you

23   had raised this issue preliminarily along with a series of

24   other issues.

25                Is that correct, Mr. Kenner?

```
 1              THE WITNESS:  Yes, your Honor.

 2              THE COURT:  And I made a ruling on that.  And I

 3    believe that it was revisited at some point in the context

 4    of some other thing that came up.  So I had already made a

 5    ruling.

 6              Most of my rulings, you don't have to keep popping

 7    up, making the same objection if I've already ruled in

 8    writing, made it clear it's a continuing objection.  I don't

 9    know whether I did in this case, but I usually do,

10    especially if I do an opinion.

11              MR. ZEIDENBERG:  Can I pass this up to the Court?

12    She needs a copy.

13              (Tenders document to the Court.)

14              May I approach the witness, your Honor?

15              THE COURT:  Yes.

16              MR. ZEIDENBERG:  This is too much for the ELMO.

17    BY MR. ZEIDENBERG:

18    Q.  I'm showing you what's -- it's from trial, Government's

19    Exhibit 474 from trial.

20    A.  Yes.  Would you like me to review it?  I don't have a

21    current recollection of it.

22    Q.  I'm sorry?

23    A.  Would you like me to review it?  I do not have a current

24    recollection about it.

25    Q.  You can take a look at that and see if it refreshes your
```

```
 1          recollection.
 2                    THE COURT:  Go ahead.  Take your time.  Tell me
 3          when you're finished.
 4                    THE WITNESS:  Thank you.
 5                    Oh, my goodness.  Let me try with my glasses.  I
 6          can't even read the print.
 7                    Counsel, the print is really too small.  2094,
 8          2095.  So again, I can start reading on 2096.  I can read
 9          that.
10          BY MR. ZEIDENBERG:
11          Q.  I'm not going to ask any specific questions about this
12          exhibit, which was introduced by the Government during the
13          trial.
14                    MR. ZEIDENBERG:  Your Honor, I would move to
15          introduce 474.
16                    THE COURT:  Okay.
17                    (Whereupon, Defendant's Exhibit No. 474 was
18          entered into evidence.)
19          BY MR. ZEIDENBERG:
20          Q.  My question, Mr. Kenner, is:  Do you remember the
21          Government introducing this lengthy exhibit at trial?
22          A.  I don't recall it currently today.  But I believe they
23          did introduce something about forfeitures filed in the
24          Central District of California against Jho Low in an
25          unrelated proceeding to this one.
```

1    Q.  And just to perhaps refresh your recollection, the

2    Government introduced this through the case agent as

3    being -- coming from Nickie Lum Davis's Google drive?

4    A.  Yes.  I believe so.

5    Q.  And it was a combination of screenshots and text

6    messages and other --

7    A.  Yes.  I recall that.

8    Q.  And when the Government asked -- moved to admit it, you

9    asked to review it?

10    A.  Yes.

11    Q.  And had you reviewed it, that exhibit, prior to them

12    moving to introduce it?

13    A.  I had reviewed it.  It was a lengthy document, and I

14    wanted to refresh my recollection in court when they were

15    going to ask questions about it.

16    Q.  Did you recognize this document as potentially very

17    prejudicial to Mr. Michel?

18    A.  I believed this document was very beneficial to my

19    theory of the defense for Mr. Michel.  If you go through

20    this, you will see that these are communications between

21    Nickie Lum Davis, Mr. Broidy and others.  There is no

22    reference in this exhibit to my recollection about

23    Mr. Michel.

24         I thought -- and my strategy was -- to use this,

25    as I said before, to cut the conspiracy at Broidy, Nickie

 1    Lum Davis, and that Mr. Michel was trying to get a

 2    $20 million fee for a photo op with the president.

 3    Q.  I'd like to direct your attention to the last couple

 4    pages.  It's got a DOJ number of -- well, I can put it up

 5    here on the ELMO, actually.

 6             THE COURT:  You need to do it for the record so

 7    when we go back and look at it I can tell what pages you're

 8    referring to.

 9             MR. ZEIDENBERG:  Yes.  It has a Bates number DOJ

10    of 112120.  I've got it up on the ELMO.

11    BY MR. ZEIDENBERG:

12    Q.  So this is the document that you said you thought was

13    beneficial?

14    A.  Can I see the whole page that you're showing?

15    Q.  I'm showing you a page that has --

16             THE COURT:  Do you have an extra copy of the

17    written version?  It would be easier to give it to him so he

18    has --

19             MR. ZEIDENBERG:  He has that in front of him.

20             THE COURT:  Do you have it in front of you?  It's

21    the last couple of pages.  It's the third page in from the

22    back.  It looks like this.  At the bottom, it says, DOJ

23    112120.  It's the one on the left.

24             THE WITNESS:  112120.  Thank you.

25

Kenner - DIRECT - By Mr. Zeidenberg

1    BY MR. ZEIDENBERG:

2    Q.  Are we there?

3    A.  Yes.

4    Q.  This was read by the Government in its closing argument.

5    Do you remember that?

6    A.  I don't recall it today, no.

7    Q.  This was one of the key arguments they made on behalf of

8    the 951 foreign agent charge.

9        Do you recall that?

10   A.  I know --

11       THE COURT:  Are you asking if he recalls including

12   this in their closing statement?  What?

13       MR. ZEIDENBERG:  In the closing statement by the

14   Government to sustain the evidence on a foreign agent.

15   BY MR. ZEIDENBERG:

16   Q.  They read from this, where it says "From. T.I. Friedman,

17   Freedom," which the agent inferred or implied was, in fact,

18   Low, said:  "I just need a straight answer if it can or

19   cannot be done.  No point dragging people out.  That's not

20   how it works in C.  We are dealing with serious guys and

21   making promises since Mon," M-O-N," and now it's Wengui is

22   terrible.  We are seen as a complete joke to them."

23       And then:  "I should never have vouched for these

24   guys.  Now I am in hot soup and he has walked away with the

25   dough doing nothing while my relations will definitely

1    suffer now in C."

2           And then going to the next page -- and at trial --

3    A.  I can't read the page that's on the screen.

4    Q.  There we go.

5           And at trail, this was read verbatim with the

6    language:  "Bro, I don't give a fuck.  This is fucking

7    irresponsible.  You guys don't fucking understand whom you

8    are dealing with.  They will fucking put a bullet through

9    our heads any part of the globe for jerking them around.

10   And now we have taken part of their money and not delivered

11   what was promised since money.  I don't think you understand

12   how serious this shit is.  Try taking money from Putin and

13   promising him and not delivering.  Same story."

14          Was it your view that this was helpful testimony

15   or helpful evidence to Mr. Michel?

16   A.  This particular -- it does not reference Mr. Michel.

17   You're telling me -- although I don't recall currently --

18   you're telling me this was sent by Mr. Low to someone.  I

19   don't know who that someone was from this document.  It

20   doesn't refer to Mr. Michel.  I don't know who it was

21   written to.  As I said, I don't recall at the moment.

22   Q.  It was taken off of Nickie Lum Davis's, Mr. Michel's

23   alleged co-conspirator's, Google Drive.

24   A.   Yes.  And it supported my theory that Nickie Lum Davis

25   solicited a contact that she had which was -- I'm -- it's

1    been a long time -- on Mr. Broidy, and that this evidenced

2    the fact that the pressure that was being put on was to

3    Nickie Lum Davis and Elliott Broidy, not from Mr. Michel.

4         So yes.  I did think that this was helpful and

5    supported my position in the case.

6    Q.  And you understood that Nickie Lum Davis is alleged to

7    be a co-conspirator of Mr. Michel's?  You knew that?

8    A.  I knew that.  I also knew she was not going to be a

9    witness.  I also know that she wasn't going to and didn't

10   testify in this trial.

11        And my strategic decision at the time was that

12   this would further my argument that Mr. Michel was involved

13   in getting $20 million for a picture.  Nickie Lum Davis

14   recruited Elliott Broidy and whoever else they may have

15   dealt with to use Mr. Broidy's connection with the Trump

16   White House to get President -- then-President Trump to

17   extradite Mr. Guo.  So yes.  I thought this was helpful to

18   me.

19   Q.  Did it occur to you to try to exclude it?

20   A.  I don't recall now.

21   Q.  Did --

22   A.  I --

23   Q.  Do you see in the middle of this exhibit, starting at

24   Page 112104, there are references to Pras New York, 2013?

25   A.  I'm sorry.  What pages?

```
 1                THE COURT:  What page are you looking at?
 2                MR. ZEIDENBERG:  It's 112104 and 112105.
 3                THE COURT:  So a couple -- a number of pages
 4      earlier.
 5                THE WITNESS:  112 --
 6                MR. ZEIDENBERG:  I can put it on the ELMO, your
 7      Honor.
 8                THE COURT:  Say this again.  It's 112102?
 9                MR. ZEIDENBERG:  104 and 105.
10      BY MR. ZEIDENBERG:
11      Q.  Do you see that?
12      A.  I see the one that's on the screen right now.  I don't
13      know what number it is.
14      Q.  And were you aware that in that same compilation exhibit
15      that was admitted which had that threatening language with
16      the individual the Government implied was Low having text
17      exchanges with Mr. Michel was not helpful to his case?
18      A.  This was dated in 2013, and it was written with regard
19      to the events in the 2012 time period.  It was not written
20      with regard to anything that had to do with President Trump.
21      Q.  What makes you think this was written in 2012 or 2013?
22      A.  Well, show me the page that was just on the screen.
23      That's the date that I saw.
24      Q.  That's simply the name he has from who it's coming from.
25      It's not the date this was sent.
```

1    A.  Well, can you show it to me?  My screen is blank now.  I

2    thought I read that as a date.  If it's wrong, show it to me

3    and I'll tell you I'm wrong.

4              THE COURT:  Could you put it back up so he can see

5    it?

6    BY MR. ZEIDENBERG:

7    Q.  I want to ask you a little bit about your closing

8    argument.

9    A.  Excuse me one moment.

10   Q.  That was on April 20th, starting on Page 10.

11             THE COURT:  Page 10 of what?

12             MR. ZEIDENBERG:  Page 10, Line 5.

13             THE COURT:  What is this?

14             MR. ZEIDENBERG:  April 20th, the closing argument.

15   BY MR. ZEIDENBERG:

16   Q.  You started off by saying, "Ladies and gentlemen, this

17   case started back in 2012 when there was, as the Government

18   characterizes it, an effort to funnel foreign money to

19   President Obama's reelection campaign."

20   A.  I see that there.

21   Q.  Do you see that?

22   A.  Yes.

23   Q.  Did you think that was a helpful statement in your

24   closing argument about the defense of Mr. Michel, that the

25   case was an effort to funnel foreign money to President

1    Obama's reelection campaign?

2    A.  I had to deal with it.  It was an alleged count.  And I

3    said:  As the Government characterizes it, it was that kind

4    of an effort.  And that's accurate then and it's accurate

5    now.  That's how the Government characterized it.

6    Q.  Just a bit down that same -- right in the beginning, you

7    said, "In 2012" --

8            MR. ZEIDENBERG:  I'm sorry, your Honor.  It's

9    starting on Line 15.

10   BY MR. ZEIDENBERG:

11   Q.  "In 2012, Mr. Michel was trying to arrange to get a

12   photograph for someone named Jho Low.  This was not about an

13   attempt to influence the United States government or its

14   position on anything.  I don't really think that it mattered

15   what happened in the election insofar as Jho Low was

16   concerned.

17           "Jho Low in 2012 wanted a photograph.  That's what

18   the entire case was about at this time."

19           Do you see that?

20   A.  Yes.

21   Q.  Was it your belief that the campaign finance violations

22   require the Government to prove that the donations were made

23   in order to influence the United States government?

24   A.  I'm not sure I follow your question.

25   Q.  Well, I'll ask it again.

1          Did you think that the campaign finance violations

2     required the Government to show that the donations were made

3     to influence the government?  In other words, they wanted --

4     the donations have to have been made to influence, to cause

5     influence, with the government?

6     A.  My recollection is that donations from certain kinds of

7     people were not allowed from -- I believe Mr. Jho Low was in

8     that category.  At least that's my recollection.

9          What Jho Low wanted was a photograph.  And what

10    this was, as I understood it and as Mr. Michel explained to

11    me and wrote in his -- dictated in his own words, that his

12    involvement in this case in 2012 was for the express purpose

13    of conning Jho Low with the assistance of Frank White, who

14    was senior to Mr. Michel, into believing that they could get

15    a photograph of him with the president.

16         And pursuant to that con, I believe he said that

17    Frank White said he would have done it for -- I want to say

18    2,000; it might have been 20,000.  I don't recall.

19         Mr. Michel said that he had told Mr. White not to

20    say anything, just follow his lead, that he had quoted $20

21    million.  I believe it was at an after party to Jho Low's

22    30th birthday party, which was held in a 50,000-square-foot

23    tent outside of Nevada.

24         In a hotel room after that, Mr. Michel and

25    Mr. White pulled Mr. Low aside and had the conversation in

1    which Mr. Michel said:  Yes, we can do this.  Right, Frank?

2    Or words to that effect.  And -- but it's going to be

3    expensive.

4              How much?

5              Pras said $20 million.

6              Jho Low said:  Okay, and walked back from the

7    balcony where they were into the suite of the hotel where he

8    had a Ferrari rebuilt inside the hotel so guests could hear

9    the hum of the engine.

10   Q.  I want to take you away from this -- the trial for a

11   second and ask you a legal question, your understanding of

12   the law.  Okay?

13   A.  Now or then?

14   Q.  At the time, was it your understanding at the time of

15   the trial that campaign -- to violate the campaign finance

16   laws that were charged, the Government needed to prove that

17   the donation was made in an attempt to influence the

18   recipient?

19   A.  No.

20   Q.  Okay.  So the reason for the donation did not matter.

21   Correct?

22   A.  Correct.  But this wasn't supposed to be a donation to

23   the campaign.  That's what they told Jho Low, because

24   otherwise they'd have no basis to say, We're going to get --

25   be able to get you the photo.

Kenner - DIRECT - By Mr. Zeidenberg

1           This was a con, frankly, by Mr. Michel and
2   Mr. White to get $20 million from Jho Low.
3   Q.  Well, Mr. Michel was alleged to have directly given
4   money to the campaign and to the Obama Victory Fund.
5   Correct?
6   A.  Yes.
7   Q.  And was it your view that there was a defense to that
8   depending on why he gave that money?
9   A.  No.
10  Q.  Was it your view that there was a defense to that if he
11  gave that money to other donors who donated it and said it
12  was coming from them --
13          THE COURT:  Okay.  You have too many "he's" and
14  "them's."  We need to know who these people are.
15          MR. ZEIDENBERG:  Sorry, your Honor.  I'll
16  rephrase.
17  BY MR. ZEIDENBERG:
18  Q.  Was it your understanding at the time of the trial that
19  the purpose for the donations mattered?
20  A.  No.
21  Q.  It's irrelevant, right?
22  A.  Yes.
23  Q.  And so when you say that the purpose was to arrange for
24  a photograph, that would not be a defense to the case, would
25  it?

90

1    A.  If it was a con to get money from Jho Low that was

2    unconnected to anything else, if Jho Low as a private

3    citizen wanted to pay $20 million notwithstanding that he

4    couldn't make a contribution to the campaign, if he was

5    willing to pay $20 million because Mr. Michel set that price

6    under the guise of Mr. White would be able to do it, I mean,

7    that's what happened.

8    Q.  I want to turn to Page 41.

9    A.  By the way, I might add, I don't think they had any idea

10   at the time they quoted this $20 million -- Mr. Michel

11   quoted $20 million whether they would ever be able to get a

12   photograph with President Obama.

13            THE COURT:  What is this?

14            MR. ZEIDENBERG:  This is from the closing

15   argument.

16            THE COURT:  Okay.

17            MR. ZEIDENBERG:  It's on the same date, Page 41,

18   starting on Line 2, going to Line 8.

19   BY MR. ZEIDENBERG:

20   Q.  "What is important is that the president was not being

21   influenced by Mr. Michel.  The president was not being

22   influenced by the People's Republic of China.  The president

23   was not being influenced by Jho Low.  The president was not

24   being influenced by Guo Wengui.  The president was being

25   influenced by Mr. Steve Wynn, the casino magnate, as you

Kenner - DIRECT - By Mr. Zeidenberg

1    heard."

2          This is from your closing.

3    A.  Yes.  I have see it.

4    Q.  Okay.  Did it occur to you -- and I think I know the

5    answer to this from your earlier testimony; you don't have

6    to repeat it all, but I just want to make sure it's

7    consistent -- that you thought that Steve Wynn, despite his

8    having been contacted by Broidy to help him in the effort to

9    have Guo extradited, you thought that he was somehow -- this

10   was --

11         THE COURT:  You're back to the too many "he's"

12   with too many people.

13   BY MR. ZEIDENBERG:

14   Q.  You thought that the fact that Mr. Wynn was doing this

15   was exculpatory for Mr. Michel.  Is that right?

16   A.  I thought that the Government was not arguing the case

17   in a way that they tried to bring Mr. Wynn in as a

18   co-conspirator in this case.  They didn't -- I'm not sure

19   what your question was.

20         I made this statement.  I didn't think I had to

21   worry about Steve Wynn, because that's not where the

22   Government was going in my case.  I don't know what they did

23   elsewhere.

24         MR. ZEIDENBERG:  The Court's indulgence for one

25   second.

1    BY MR. ZEIDENBERG:

2    Q.  I want to talk to you about a conflict of interest.  And

3    I'm wrapping up, for your benefit and the Court's, even

4    though you have not asked.

5          The Government filed a motion for order to show

6    cause on March 3rd, arguing that you should be held in

7    contempt because of the release of information.

8          Do you remember that?

9    A.  Yes.

10   Q.  And the Court assigned this to another prosecutor and

11   judge eventually after --

12         THE COURT:  I do not assign anything.  This was

13   sent back.

14         The process, you should know, is that I recused

15   myself.  It was sent back to the Clerk's Office and their

16   system, and they randomly reassigned it to another judge.

17   It had nothing to do with the prosecutor, although it came

18   to somebody totally independent.  I didn't decide who the

19   judge was.  It was done through the proper procedures that

20   they have at the Court.

21         When you recuse yourself and you are requesting

22   that it be reassigned, they do it on the wheel; and whoever

23   gets it, gets it.

24         MR. ZEIDENBERG:  I didn't mean to suggest

25   otherwise by my question --

1          THE COURT:  I wanted to make sure the record was

2     clear.

3          MR. ZEIDENBERG:  -- in any way.

4     BY MR. ZEIDENBERG:

5     Q.  The Court on the morning of April 3rd said it would

6     inquire -- indicated it wanted to inquire of Mr. Michel to

7     see if he was comfortable with you proceeding as his counsel

8     despite the potential conflict of interest.

9          Do you recall that?

10    A.  Yes.  There had been prior discussions about it.  I know

11    I wanted to advise the Court that I didn't think that it

12    would cause me to be any less vigorous in my defense, but

13    that I wanted to bring it to the Court's attention.  I think

14    I said the Government might be thinking that this was going

15    to make me moderate my defense.

16    Q.  And prior to calling Mr. Michel up to the bench, which

17    she had indicated -- the Court had indicated it would do,

18    you spoke with Mr. Michel about what was going to happen.

19    Correct?

20    A.  Absolutely.

21    Q.  And isn't it true that you told Mr. Michel that he

22    should just tell the Judge that he loved his lawyer?

23    A.  I don't recall saying that.  And that's not what

24    Mr. Michel said.

25    Q.  He said he was happy with his lawyer.  He didn't

Kenner - DIRECT - By Mr. Zeidenberg

1   understand everything that was going on, but he was happy

2   with his lawyer.

3   A.  Yes.  And based upon that, that he didn't understand, I

4   asked the Judge to adjourn the trial long enough for me to

5   get independent counsel or for the Court to provide

6   independent counsel to Mr. Michel before he was called up to

7   respond to her questions.

8   Q.  Well, the record will reflect whether that's in fact

9   what happened.  But we'll leave it for what the transcript

10  says about that.

11          You did not want Mr. Michel to replace you as

12  counsel, did you?

13  A.  Did I want him to?  No.  I thought I was doing a very

14  effective job.  Mr. Michel thought I was doing a very

15  effective job.  And he wanted me to continue and I wanted to

16  continue.  And I do not believe in any way, shape or form

17  that the filing of that request for a contempt charge had

18  any impact on the aggressiveness with which I believe I

19  tried this case.

20  Q.  But in terms of what Mr. Michel understood, you

21  indicated to Mr. Michel that he should just tell the Court

22  that he was happy with you?

23  A.  I said if he wanted me to continue to be his lawyer, he

24  had to let the Court know that.  And he chose the words to

25  express that by, and they're on the record.  The record

1    speaks for itself.

2    Q.  But you didn't explain to Mr. Michel what the nature of

3    the potential conflict of interest was, did you?

4    A.  I absolutely did.  I asked for time -- in addition to

5    having previously talked to him the night before, I asked

6    for a recess to allow me to go into our room that had been

7    assigned to us by the Court so that I could further explain

8    it to him before he came up to discuss it with the Judge.

9    And I did that.  The Judge was kind enough to give me time

10   to do that, and I did do it.  And that's it.

11   Q.  I want to just -- and this is the -- I think we're just

12   about done.  I want to talk about your closing and the use

13   of AI.

14        You were in the war room when Mr. Israely was

15   using the EyeLevel program?

16   A.  At times, yes.

17   Q.  And he was asking it questions and it was coming back

18   with answers?

19   A.  When you say it was coming back with answers, it was a

20   supplement to the word search, which was pretty much the

21   standard way that searches were done.  AI was kind of brand

22   new at the time and it was designed to deal with conceptual

23   questions rather than word searches.

24        Mr. Israely did talk to a fellow named Neil Katz

25   who was at that time developing a company that was going to

Kenner - DIRECT - By Mr. Zeidenberg

1    be in the AI.

2    Q.  You know Neil Katz, rights?

3    A.  I think I've known Neil Katz since he was 6 years old.

4    He went to NYU with my daughter and with Mr. Neil Katz and

5    with Mr. Lonny Israely and I believe with -- I don't --

6    Q.  And first of all, you asked everyone on the trial team

7    to send you a version of the closing.  Correct?

8    A.  Yes.

9    Q.  And that would be --

10   A.  Not a version of it; what they thought should be

11   included in it.

12   Q.  Okay.  And did you write anything?  Did you go to the

13   computer and actually write out a closing?

14   A.  No.  I wouldn't do that.  I think Mr. Israely was at the

15   computer and I was telling him -- as I said, I'm not -- I'm

16   an old war horse.  I'm not a technical-conversant guy.  I

17   relied on Lonny, which was the reason he was there, to

18   assist me in doing a lot of things.  And one of the things

19   he assisted me with was working and typing what we were

20   discussing about the closing argument.

21   Q.  And so the output from the AI program that made its way

22   into your closing -- do you remember -- did you read about

23   that?

24   A.  I read about it in some articles.  It wasn't anything

25   other than some lyrics that the AI had included in a

1    page-and-a-half document.  And I ended up messing up those

2    lyrics.  I attributed a Puff Daddy song to Mr. Michel.  So I

3    didn't actually -- I misused the lyrics, but I did not use

4    anything else from that.

5    Q.  Did you show that part of the closing to Mr. Michel

6    before you gave it?

7              THE COURT:  I'm sorry.  Did you show what?

8              THE WITNESS:  I discussed it with him --

9              THE COURT:  Could you repeat what --

10             MR. ZEIDENBERG:  I'm sorry.

11   BY MR. ZEIDENBERG:

12   Q.  I put up on the ELMO for you to see the demonstrative

13   that was introduced earlier by Mr. Dearington.  And it takes

14   a portion -- at the top part is the AI output and the bottom

15   part is the closing statement.

16             Do you see that?

17   A.  Yes.

18   Q.  And it has the lyrics, as you mentioned, to "Every

19   single day, every time I pray, I will be missing you."

20             And that's -- it was misattributed?

21   A.  Yes.  That was -- I think they called him Puff Daddy at

22   that time.  That was a Puff Daddy lyric.  That was not

23   Mr. Michel's.  I messed it up in the closing argument.  If

24   that's incompetence of counsel, the Court should grant the

25   motion.

1    Q.  I take it you didn't show this part of the closing to

2    Mr. Michel before you gave it?

3    A.  I discussed it with him, but I think at the time -- I

4    really don't recall.  I told him that the AI had spat out

5    some lyrics and I think I told him I was going to use those

6    lyrics in my closing.  I didn't actually use the right

7    lyrics.  I misattributed a song from someone else to

8    Mr. Michel.

9    Q.  Just a couple more questions, Mr. Kenner, I promise.

10   You've been very patient.

11           MR. ZEIDENBERG:  Could I just have one moment,

12   your Honor?

13           THE COURT:  Certainly.

14   BY MR. ZEIDENBERG:

15   Q.  So I want to show you from the defense closing -- this

16   is regarding Mr. Wynn.  This is from the defense closing on

17   April 20th, Page 53.  And this was given, obviously, right

18   before --

19           THE COURT:  You need to speak in the microphone so

20   people get a record.

21   BY MR. ZEIDENBERG:

22   Q.  This was given, obviously, right before your closing,

23   because yours came after.

24           THE COURT:  Whose closing is it?

25           MR. ZEIDENBERG:  This is the Government's closing.

1            THE COURT:  And what lines are you looking at?

2            MR. ZEIDENBERG:  Page 53, starting on Line 3.

3     BY MR. ZEIDENBERG:

4     Q.  And it says, "And that includes Mr. Broidy's efforts by

5     reaching out to Steve Wynn.  Steve Wynn was a casino

6     magnate, a political -- a businessperson, someone with

7     political connections and influence with the Trump

8     Administration.

9            "So Mr. Broidy, Mr. Michel and the co-conspirators

10    essentially enlist Steve Wynn.  Mr. Broidy introduces him

11    through Steve Wynn's wife, Andrea.  And as you see here in

12    this text message, he introduces this issue of Guo and the

13    extradition to Mr. Wynn, seeking Mr. Wynn's help, figuring

14    the more leverage, the more political contacts the

15    co-conspirators have, all the better to try to make this

16    happen on behalf of the Chinese government.

17           "And so in the weeks, months that follow, lots of

18    text messages between Mr. Broidy and Mr. Wynn, all about the

19    effort to get Guo out of the United States."

20           Do you see that?

21    A.  Yes.

22    Q.  The next paragraph:  "And you heard testimony about the

23    other efforts that Wynn -- Mr. Wynn took regarding this

24    issue.  In May-June of 2017, you heard the testimony of

25    Matthew Pottinger, the national security official, who said

1    that he learned from President Trump that Mr. Wynn had met

2    with the president and had raised this issue."

3    A.  I see that.

4    Q.  You said that the reason you made the reference to

5    Mr. Wynn and that you said it in your closing is that this

6    was helpful to you because Wynn -- the Government never

7    argued that Wynn was part of the conspiracy.

8    A.  That's not what I said.  I said the Government --

9            THE COURT:  He's correcting you in terms of what

10   he thinks he said.

11           THE WITNESS:  I'm sorry?

12   BY MR. ZEIDENBERG:

13   Q.  The Government did allege that Wynn was part of the

14   conspiracy, didn't they?

15   A.  I don't recall.  I haven't reviewed this.  But it's

16   clear that they mentioned Mr. Wynn.  They did not mention

17   Mr. Wynn in the context of convicting him in terms of this

18   conspiracy.  He was never charged with the conduct that he

19   did.  The Government was not arguing that Mr. Wynn should be

20   found guilty of this conspiracy.

21   Q.  No.  Was it your opinion, though, that Mr. Wynn had to

22   actually be charged in the indictment to be an alleged -- to

23   be a co-conspirator?

24   A.  No.  He could be an unindicted co-conspirator.

25   Q.  Okay.  And here in their closing argument, that's

1    exactly what the Government is arguing, isn't it?

2    A.  In connection with Mr. Broidy.  Mr. Wynn -- Mr. Broidy

3    introduces him through Steve Wynn's wife, Andrea.  And as

4    you see here in this text message, he introduces this issue

5    of Guo and the extradition to Mr. Wynn, seeking Mr. Wynn's

6    help.

7              My theory at the time was that Mr. Wynn was

8    seeking to open additional casinos in Macau.  He needed to

9    curry favor with the Chinese government.  That's what my

10   theory was about why he would have been involved, not to be

11   part of a conspiracy with --

12   Q.  Mr. Kenner, this argument was given at the closing

13   argument of the trial --

14   A.  I see that.

15   Q.  -- of Mr. Michel, not of Mr. Broidy.

16   A.  I understand that.  But Mr. Wynn was an unindicted

17   co-conspirator, and the focus of the Government's argument

18   was not that he should be -- he wasn't charged in this case.

19   Q.  What's the legal significance to Mr. Michel about Wynn

20   being charged or not charged formally?

21   A.  Mr. Wynn could testify or have his testimony taken as an

22   unindicted co-conspirator.  That's what happened here.  He

23   was not the focus in this case.  There was no need to argue

24   about what Mr. Wynn did because it was all in connection

25   with Mr. Broidy and Ms. Nickie Lum Davis.  It was never in

1    connection with Pras Michel.  I don't think Pras Michel ever

2    laid eyes on or met Mr. --

3    Q.  Take a look at Page 56, which I have up on the screen,

4    starting at Line 2:  "And then there was the phone call.

5    Elliott Broidy testified that he was on a boat with Mr. Wynn

6    in or around August of 2017 and they made a personal direct

7    call to President Trump to check on the status of Guo's

8    extradition.

9          "All of these efforts by Mr. Wynn came because

10   Mr. Broidy, Mr. Michel and the co-conspirators introduced

11   this to him and essentially made him a de facto member of

12   their efforts to try to get Guo extradited.  All for the

13   benefit of the Chinese government."

14         That was the Government's theory.

15   A.  That was an argument that the Government made, yes.  And

16   it is my position -- the phone call that they're referring

17   to, as I recall, was the phone call from Mr. Wynn's yacht

18   which he was on with Mr. Broidy and both of their wives.

19   The call was made from the boat directly to Air Force One to

20   talk to Mr. Trump.

21         My recollection is it was answered by Mr. Gates,

22   if I have the right person, who literally said, "This is

23   totally inappropriate" and hung up on him.

24   Q.  And is it still your testimony that not objecting to

25   Mr. Pottinger's testimony about his conversations with

Kenner - DIRECT - By Mr. Zeidenberg

1    Mr. Wynn and Mr. Wynn's efforts to get Guo extradited was a

2    smart, strategic move?

3              MS. LOCKHART:  Objection.  Asked and answered.

4              THE COURT:  You have asked him several items --

5              MR. ZEIDENBERG:  I'm asking him in light of --

6    seeing and remembering what the Government's theory is.

7              THE COURT:  Excuse me.  Does it make any

8    difference in terms of the second argument that they have

9    brought up as to your theory at the time, not what you think

10   now, but at the time?  Does it change your view in terms of

11   your strategy at the trial?

12             THE WITNESS:  I haven't reviewed anything from the

13   trial.  I put that file to bed after the trial was over.  I

14   don't have a current recollection of what I did and what I

15   didn't do at the time.

16             But it is certainly consistent with my belief that

17   the conspiracy was between Mr. Broidy, Ms. Lum Davis and

18   Mr. Wynn.  It did not include Mr. Michel.

19             And nothing in these references that you're

20   showing me have anything to do with Mr. Michel being

21   involved in the case.

22             MR. ZEIDENBERG:  I have nothing further, your

23   Honor.

24             THE COURT:  All right.  In terms of -- we'll

25   proceed, of course, because it's not the end of the day.

Kenner - DIRECT - By Mr. Zeidenberg

1     But we need to probably discuss what other arrangements need

2     to be made in terms of other timing for it.  I don't know

3     whether -- since we're obviously not going to finish today.

4     So are people available?  I have a short little period

5     tomorrow.  Are people available or are we picking another

6     date?  I'm just throwing it out for you to think of.  And I

7     think you should pick up and proceed with your

8     cross-examination.

9          MS. LOCKHART:  Well, your Honor, to that point, we

10    don't have any cross-examination.

11         THE COURT:  You're not going to ask any questions?

12         MS. LOCKHART:  No, your Honor.

13         THE COURT:  Then let me take about -- let's see --

14    let me come back at five of 5:00.  I want to go back and

15    make sure I don't have any questions.

16         THE WITNESS:  What time did your Honor say to come

17    back?

18         THE COURT:  It's quarter of.  I'm asking, can you

19    wait ten minutes?

20         THE WITNESS:  Certainly.

21         THE COURT:  So I'm saying, let me go back, look at

22    my notes and make sure there's nothing I want to ask since

23    we're presumably excusing him.  And then we'll talk about

24    who else you want to call so we can work out a schedule.

25    Okay?

1          MR. KENNER:   Thank you.

2          (Thereupon a recess was taken, after which the

3    following proceedings were had:)

4          THE COURT:  I don't have any additional questions.

5    I wanted to go through what your motion had to see whether

6    there was something additionally I wished to ask.  There

7    isn't anything.

8          So can he be excused altogether?

9          MR. ZEIDENBERG:  Yes, your Honor.

10          THE COURT:  Because as I understand it, you're

11    finished with your questioning.

12          You're not going to have any cross.

13          MS. LOCKHART:  Yes, your Honor.

14          THE COURT:  So that's the end of it in terms of

15    Mr. Kenner.  Right?

16          MR. ZEIDENBERG:  It is for Mr. Kenner.

17          THE COURT:  I'm asking you.  You're the ones who

18    asked him to come.  Are you finished with him?

19          MR. ZEIDENBERG:  Yes.

20          THE COURT:  Can he be excused?

21          MR. ZEIDENBERG:  Yes.

22          THE COURT:  Then you're excused.

23          THE WITNESS:  Thank you, your Honor.

24          (Witness excused.)

25          THE COURT:  What are we doing about any other

1    witnesses?

2              MR. ZEIDENBERG:  Before we get to that, your

3    Honor, I would just clean up that we move to introduce three

4    exhibits that we've identified but didn't apparently move to

5    introduce.

6              THE COURT:  One second.  Hold on.  Here it is.

7    Which ones are you talking about?

8              MR. ZEIDENBERG:  14, 17 and 45.

9              THE COURT:  Any objections?

10             MS. LOCKHART:  If I could have just a moment, your

11   Honor.

12             THE COURT:  Sure.

13             Do you have the book there so you can take a look

14   at it?

15             MS. LOCKHART:  I don't believe all of them are

16   included in the book, your Honor.

17             THE COURT:  14 is in the book.  Do you have it?

18             You can show it to them.  It may be faster so they

19   know what you're talking about.

20             MR. DEARINGTON:  (Tenders document to opposing

21   counsel.)

22             MS. LOCKHART:  No objection to any of these, your

23   Honor.

24             THE COURT:  So you're agreeing to 14 to be

25   admitted.

```
1                What were the others?  I'm sorry, sir.

2                MR. ZEIDENBERG:  17 and 45.

3                THE COURT:  17:  Any objection?

4                MS. LOCKHART:  No objection.

5                THE COURT:  And 45 was the flat fee agreement.

6                MS. LOCKHART:  No objection.

7                THE COURT:  Then I'll admit that.  So I'm

8       admitting, 14, 17 and 45.

9                   (Whereupon, Defendant's Exhibit Nos. 14, 17 and 45

10      were entered into evidence.)

11               MR. ZEIDENBERG:  As for the witnesses, your Honor,

12      from the defense perspective, we have two witnesses left;

13      and they're going to be very, very short.

14               THE COURT:  Okay.

15               MR. ZEIDENBERG:  Mr. Haskell, which we anticipate,

16      you know, less than half an hour, perhaps significantly, and

17      then Ms. Zaki, who will also be very brief, but would have

18      to testify remotely.

19               THE COURT:  Right.  And remote is not a problem

20      from this perspective.

21               Sorry.  Who is the remote witness?

22               MR. ZEIDENBERG:  Ms. Zaki.

23               THE COURT:  And the Government?  At this point, is

24      there somebody additional?

25               MR. KELLER:  We did, your Honor.  We had two
```

1    witnesses who flew across the country and were here today

2    but who are flying out tomorrow and are unable to change

3    their arrangements.  And so we don't really have much

4    choice.  We're not going to call them.

5              THE COURT:  No.  Not at all.  We'll set this

6    another time.  I'm not going to have this shortchanged.

7              MR. KELLER:  We're not going to ask them to fly

8    back across the country for brief testimony, and I don't

9    think it's outcome-dispositive.  So we relied on

10   representations about the length of the testimony, and maybe

11   that was shortsighted.

12             THE COURT:  Well, part of it was when we

13   originally set this up I didn't have on my calendar the

14   commission hearing, which took off the afternoon.

15   Otherwise -- because we originally had scheduled it for two

16   days, which is what you asked for, and you only actually got

17   a day and a half.

18             So I'm more than happy to put this extra half day

19   someplace in here.  Or you could do it by Zoom if you don't

20   want to fly them here.

21             MR. KELLER:  We'll talk to the witnesses, I guess.

22   Whatever Zoom -- or whatever date we set for the hearing

23   with Mr. Haskell and Ms. Zaki virtually, we'll talk to the

24   witnesses about whether or not they're available and

25   consider having them appear virtually.  But we're not going

1     to have them fly back out for testimony.

2          THE COURT:  Your witnesses are who?

3          MR. KELLER:  It's Liquori Campbell and Kathy

4     Lestelle.

5          THE COURT:  I'd rather not have decisions made

6     based on whether they wanted to fly out or not.  I want to

7     have the full record that I should have.  So my feeling is

8     that we'll work something out.

9          That's as long as we can try and do something

10    before the 24th, because I start a trial.  But I certainly

11    have taken time out of the trial to have these.  So tell me

12    when these people are available and we'll do it.

13         MR. KELLER:  Like I said, your Honor, I think

14    we'll -- so the Government's preference would be to do this

15    tomorrow if we can with Mr. Haskell and Ms. Zaki.

16         THE COURT:  Are they available tomorrow?

17         MR. ZEIDENBERG:  We have not confirmed with

18    Mr. Haskell.  But --

19         THE COURT:  It would have to be in the afternoon.

20    I have a plea in the morning and then something that may

21    take a little bit of time, although not a lot, at 1:30.  But

22    we could probably start after the plea and then continue

23    into the afternoon.  The one in the afternoon is going to go

24    to trial.  It should be quick.  There's one little issue

25    that may come up with it, but it shouldn't be more than half

```
 1    an hour.  The plea will take some more time.
 2                MR. ZEIDENBERG:  Perhaps we could set that
 3    tentatively for tomorrow, then.
 4                THE COURT:  Why don't you ask your witnesses?
 5                MR. ZEIDENBERG:  He's --
 6                MR. DEARINGTON:  I actually just got an email from
 7    him.  I'm reading it contemporaneously, reporting it out.
 8    Let me just take a look.
 9                Yeah.  The witness is available tomorrow after
10    10:00 a.m., so the afternoon timing should be okay with him.
11    That's Mr. Haskell.
12                THE COURT:  My plea starts at 9:00.  It's a
13    January 6th case, so it's either very short or long.
14                MR. ZEIDENBERG:  Very short.
15                THE COURT:  Not necessarily in terms of the
16    statement of offense.
17                And then I have a 1:30, which should take no more
18    than half an hour.  So we could try something like -- we
19    could do, like, 11:30 to 12:30 or 2:00 or the rest of the
20    afternoon.  I don't have anything after 2:00.
21                MR. ZEIDENBERG:  I would prefer the afternoon.
22                THE COURT:  Does that work?
23                MR. KELLER:  (Nods head in the affirmative.)
24                THE COURT:  Then we could do 2:00 for the two
25    witnesses.
```

1    MR. ZEIDENBERG:  And just to confirm, your Honor

2    indicated -- I want to make sure we understand your

3    preference or willingness to indulge argument.  But you

4    said, I thought -- if you could just remind us -- that you

5    just wanted to have argument on the testimony but not on

6    the --

7    THE COURT:  No.  Not necessarily.  I mean, I

8    didn't see a legal argument to start with.  That's why I

9    said to you it seemed to me this was set as an evidentiary

10   hearing.  I didn't specifically set something up as a

11   motions hearing as such.

12   What I will do is I'm -- I'll let you make

13   arguments tomorrow based on what has come in, quick ones, in

14   terms of things that you want.  I would give consideration

15   as to whether you should get a transcript of this, because I

16   certainly will in terms of -- to be able to look through and

17   see what the testimony is.  Any order I do is going to have

18   to have some references to what's occurred today in addition

19   to the trial testimony.

20   I might or might not ask for findings of fact and

21   conclusions of law based on the evidence that's come in.

22   But let me give it some thought overnight.  Sometimes it's

23   useful and sometimes it's not.  It's useful sometimes to get

24   people to focus on what they view as important to make sure

25   I consider it in the context of what you're raising.

1    Obviously, it puts this off some.  It puts off the decision.

2    But I'll give it some thought tonight.

3              MR. ZEIDENBERG:  Okay.

4              THE COURT:  We'll see you tomorrow at 2:00.

5              And if I'm going to do this, which I'm sort of

6    leaning towards, I would set another timeframe for it.  You

7    wouldn't be doing an argument tomorrow.

8              MR. ZEIDENBERG:  We would not?

9              THE COURT:  You would not, unless somebody feels

10   strongly about doing it.  I assumed you wanted to finish --

11   try and make sure we get through the whole afternoon with

12   all the witnesses.

13             What I would do is get the transcripts; and then

14   if -- generally, what I do in terms of a motions hearing

15   when there's evidentiary, is I potentially would schedule a

16   hearing to come and say "Answer this" or "Answer that" or

17   I'd have something specific, not just sort of a generalized

18   argument.  Okay?  So there's different options here.  If

19   you've got preferences you would like to make, I'm happy to

20   hear them.

21             MR. ZEIDENBERG:  Well, I think my preference,

22   without having spoken with anyone else, is that at the

23   conclusion of all the witnesses tomorrow, I'd like an

24   opportunity to argue -- I mean, briefly; I'm not going to --

25   and make --

1          THE COURT:  I do not see a long argument because,

2     frankly, I'm going to have to go back and take a look at

3     exactly what everybody said.  I've taken notes.  I'll go

4     back and look at things that I've noted that need to be

5     there.

6          From the Government's perspective, do you have any

7     preferences?

8          I also thought, frankly, it might be better to

9     actually do the proposed findings of fact just around what's

10    in -- there are facts that are included in the motion that I

11    don't know that have come out or that I would like to have

12    better identified, which is why I was thinking of proposed

13    findings of fact and conclusions of law strictly around what

14    evidence has come in.  You've already responded generally.

15    But in terms of the evidence that has come in, where people

16    have argued certain evidence to support it as to whether it

17    actually -- the record has supported it or not, which is why

18    I was thinking of findings.

19         MR. KELLER:  Your Honor, no preference on whether

20    the Court wants to hear limited argument tomorrow.  And

21    whatever the Court decides would be helpful in terms of

22    findings of fact or conclusions of law, no preference there,

23    either.

24         I would just note -- I know the Court is as aware

25    of this as anyone -- as the parties -- I mean, we're

1    approaching a year from the trial, and this trial took place

2    something like five years after indictment.  So our

3    preference would just be to move things along as

4    expeditiously as possible without sacrificing substance.

5         THE COURT:  Well, I also would like to resolve it.

6    I will do it as quickly as I can and try and do it before

7    things really pick up in terms of longer trials that I have.

8    So I will need to get them out -- get this out before that

9    occurs from my perspective.

10        All right.  I'll see you all tomorrow at 2:00.  We

11   have the two witnesses which you said were not that long.

12   You should see whether your witnesses are available at all.

13   I'd prefer in person, but I don't have a problem doing a

14   video if that works, if that's a better way of doing it and

15   making sure we get everything.

16        MR. KELLER:  We'll check.  Thank you, your Honor.

17        THE COURT:  The parties are excused, then.

18        MR. ZEIDENBERG:  Thank you, your Honor.

19        (Proceedings concluded.)

20

21

22

23

24

25

1                        **<u>CERTIFICATE</u>**

2

3              I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10             Dated this 22nd day of January, 2024.

11

12         <u>/s/ Lisa Edwards, RDR, CRR</u>
           Official Court Reporter
13         United States District Court for the
             District of Columbia
14         333 Constitution Avenue, Northwest
           Washington, D.C. 20001
15         (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$1,400,000** [1] - 35:20
**$20** [11] - 36:10, 39:13, 80:2, 83:13, 87:20, 88:5, 89:2, 90:3, 90:5, 90:10, 90:11
**$750,000** [1] - 35:10

## '

**'19** [1] - 36:7
**'allegedly** [1] - 43:17
**'What** [1] - 75:10

## /

**/s** [1] - 115:12

## 1

**1** [1] - 75:15
**1,600** [2] - 8:18, 8:21
**1,600-page** [1] - 23:11
**1.3** [1] - 57:16
**10** [3] - 85:10, 85:11, 85:12
**1016** [1] - 1:16
**104** [1] - 84:9
**105** [1] - 84:9
**107** [2] - 3:11
**10:00** [1] - 110:10
**10th** [1] - 5:10
**11** [2] - 1:6, 54:2
**112** [1] - 84:5
**112102** [1] - 84:8
**112104** [2] - 83:24, 84:2
**112105** [1] - 84:2
**112120** [3] - 80:10, 80:23, 80:24
**11:30** [1] - 110:19
**11th** [4] - 5:18, 6:5, 61:9, 67:24
**1200** [1] - 2:3
**126** [1] - 50:16
**12:30** [1] - 110:19
**13** [1] - 55:19
**1301** [1] - 1:15
**131** [3] - 13:8, 18:1, 18:19
**138** [1] - 41:16
**13th** [9] - 25:21, 26:4, 26:6, 27:9,

29:11, 46:5, 53:6, 53:12, 59:12
**14** [7] - 3:11, 35:12, 106:8, 106:17, 106:24, 107:8, 107:9
**1400** [1] - 1:19
**15** [1] - 86:9
**15-minute** [1] - 67:16
**16** [2] - 74:9, 74:16
**17** [8] - 3:11, 56:25, 59:14, 106:8, 106:17, 107:3, 107:8, 107:9
**1717** [1] - 1:22
**18** [5] - 22:25, 26:14, 54:2, 55:19, 61:19
**189** [3] - 13:8, 18:2, 18:20
**19** [2] - 61:16, 61:20
**19-00148-1** [1] - 1:3
**19th** [1] - 2:3
**1:06** [1] - 5:19
**1:30** [2] - 109:21, 110:17
**1:51** [1] - 1:7
**1MDB** [2] - 46:12, 74:17

## 2

**2** [2] - 90:18, 102:4
**2,000** [1] - 87:18
**2.8** [1] - 57:24
**20** [5] - 22:25, 39:23, 67:15, 74:8, 74:16
**20,000** [1] - 87:18
**20001** [2] - 2:8, 115:14
**20005** [1] - 1:19
**20006** [1] - 1:23
**20036** [1] - 2:3
**2012** [10] - 33:22, 39:11, 39:12, 84:19, 84:21, 85:17, 86:7, 86:11, 86:17, 87:12
**2013** [3] - 83:24, 84:18, 84:21
**2017** [7] - 39:8, 46:8, 53:19, 62:11, 68:7, 99:24, 102:6
**2018** [2] - 22:25, 36:7
**202** [2] - 2:8, 115:15
**2023** [3] - 12:7, 67:24, 72:4
**2024** [2] - 1:6, 115:10
**20530** [1] - 1:16
**2094** [1] - 78:7
**2095** [1] - 78:8
**2096** [1] - 78:8
**20th** [4] - 85:10,

85:14, 98:17, 115:10
**21** [1] - 75:20
**22** [1] - 67:25
**24th** [1] - 109:10
**2:00** [5] - 110:19, 110:20, 110:24, 112:4, 114:10

## 3

**3** [5] - 4:23, 57:14, 59:17, 67:8, 99:2
**30th** [3] - 39:3, 50:15, 87:22
**33** [1] - 46:5
**333** [2] - 2:7, 115:14
**354-3269** [2] - 2:8, 115:15
**38** [3] - 3:8, 5:2, 5:14, 5:15, 5:23, 6:1, 53:13
**39** [4] - 3:9, 7:14, 7:19, 7:22
**3:25** [1] - 67:10
**3rd** [12] - 12:7, 12:19, 14:2, 14:3, 14:5, 14:6, 14:13, 14:15, 19:20, 19:21, 92:6, 93:5

## 4

**4** [3] - 3:6, 59:12, 59:14
**4-13-2023** [1] - 27:1
**41** [3] - 55:19, 90:8, 90:17
**42** [2] - 56:25, 59:14
**45** [5] - 106:8, 107:2, 107:5, 107:8, 107:9
**46** [1] - 59:12
**474** [4] - 3:10, 77:19, 78:15, 78:17
**4:00** [1] - 67:15

## 5

**5** [3] - 75:15, 75:20, 85:12
**50,000-square-foot** [1] - 87:22
**51** [1] - 9:16
**52** [4] - 9:8, 9:16, 9:19, 9:21
**53** [6] - 9:5, 9:19, 9:20, 10:7, 98:17, 99:2
**55-plus** [1] - 8:9
**56** [1] - 102:3
**5:00** [2] - 67:14,

104:14
**5:35** [1] - 67:15

## 6

**6** [3] - 3:8, 59:14, 96:3
**6706** [1] - 2:7
**6:42** [1] - 5:10
**6th** [5] - 71:20, 72:4, 74:8, 74:16, 110:13

## 7

**7** [1] - 3:9
**76** [2] - 71:23, 72:4
**78** [1] - 3:10
**7:03** [2] - 26:4, 26:5
**7:30** [3] - 6:20, 7:1, 7:8

## 8

**8** [2] - 56:25, 90:18
**80** [2] - 61:10, 61:16
**81** [1] - 61:21
**86** [1] - 67:24
**87** [2] - 61:10, 68:9

## 9

**9** [2] - 59:12, 59:14
**951** [3] - 23:9, 26:15, 81:8
**9:00** [1] - 110:12

## A

**a.m** [4] - 5:19, 7:1, 7:8, 110:10
**ability** [2] - 38:5, 115:7
**able** [15] - 13:18, 13:20, 15:25, 32:17, 32:19, 33:5, 33:8, 45:14, 47:5, 47:8, 72:16, 88:25, 90:6, 90:11, 111:16
**abrupt** [1] - 30:3
**absolutely** [8] - 35:18, 35:25, 46:19, 62:24, 65:10, 66:3, 93:20, 95:4
**accept** [2] - 12:24, 27:4
**accomplish** [2] - 36:18, 36:19

**according** [2] - 10:16, 52:20
**account** [2] - 57:13, 57:17
**accounts** [2] - 14:10, 55:24
**accurate** [4] - 6:9, 86:4, 115:4
**acquittal** [2] - 30:13, 30:14
**acquittals** [1] - 22:21
**act** [1] - 33:17
**Action** [1] - 1:3
**activities** [5] - 31:15, 51:16, 51:20, 52:15, 52:17
**actual** [1] - 18:11
**add** [4] - 21:4, 30:11, 53:2, 90:9
**added** [1] - 9:16
**addition** [5] - 57:18, 68:2, 68:4, 95:4, 111:18
**additional** [4] - 25:4, 101:8, 105:4, 107:24
**additionally** [2] - 26:19, 105:6
**addressed** [1] - 60:4
**adjourn** [1] - 94:4
**administration** [4] - 46:15, 51:15, 51:19, 52:14
**Administration** [6] - 34:2, 34:4, 65:4, 65:9, 69:15, 99:8
**administrations** [1] - 34:11
**admissibility** [2] - 7:12, 10:20
**admissible** [3] - 6:23, 73:16
**admission** [1] - 10:9
**admit** [5] - 5:25, 7:21, 14:17, 14:19, 15:2, 15:15, 79:8, 107:7
**admitted** [3] - 21:8, 84:15, 106:25
**admitting** [6] - 13:19, 13:24, 15:14, 17:5, 20:21, 107:8
**advance** [3] - 45:24, 48:21, 69:13
**advanced** [2] - 45:22, 45:25
**advantage** [2] - 35:16, 58:9
**advantageous** [2] - 34:21, 36:1
**advent** [1] - 22:16

**advice** [1] - 73:25
**advice-of-counsel** [1] - 73:25
**advise** [2] - 32:4, 93:11
**advised** [1] - 32:2
**affidavits** [1] - 28:22
**afternoon** [15] - 4:1, 4:2, 4:17, 4:20, 4:21, 33:13, 61:10, 108:14, 109:19, 109:23, 110:10, 110:20, 110:21, 112:11
**AFTERNOON** [1] - 1:7
**Agent** [13] - 36:24, 37:2, 37:6, 38:25, 39:4, 45:15, 48:16, 51:11, 52:23, 54:17, 59:23, 60:1, 61:3
**agent** [21] - 26:10, 26:11, 26:13, 26:18, 37:10, 37:18, 39:2, 40:20, 41:11, 43:7, 44:20, 45:23, 49:17, 52:13, 52:17, 54:6, 58:15, 79:2, 81:8, 81:14, 81:17
**agent's** [4] - 41:15, 41:21, 55:7, 60:13
**aggressiveness** [1] - 94:18
**ago** [1] - 73:1
**agree** [7] - 8:23, 32:21, 40:19, 41:10, 41:13, 69:5, 76:4
**agreed** [2] - 66:19, 66:20
**agreeing** [1] - 106:24
**agreement** [3] - 29:25, 66:25, 107:5
**ahead** [6] - 4:16, 21:4, 47:6, 54:3, 72:7, 78:2
**AI** [7] - 95:13, 95:21, 96:1, 96:21, 96:25, 97:14, 98:4
**Air** [2] - 65:13, 102:19
**airport** [1] - 75:6
**allegations** [6] - 26:21, 26:22, 46:6, 46:8, 51:14, 53:18
**allege** [1] - 100:13
**alleged** [12] - 48:18, 58:22, 65:8, 65:19, 65:22, 66:2, 69:6, 82:23, 83:6, 86:2, 89:3, 100:22
**allegedly** [6] - 32:20,

40:13, 40:14, 40:24, 41:14
**allow** [3] - 33:7, 60:8, 95:6
**allowed** [1] - 87:7
**allowing** [1] - 45:23
**almost** [7] - 42:7, 57:1, 57:13, 57:15, 57:18, 57:24
**altogether** [1] - 105:8
**Amendment** [2] - 32:18, 32:20
**AMERICA** [1] - 1:3
**American** [2] - 36:16, 48:8
**amount** [6] - 11:6, 16:16, 19:13, 19:15, 19:19, 42:9
**analysis** [2] - 23:15, 42:19
**Andrea** [2] - 99:11, 101:3
**Anicorn** [4] - 55:20, 55:21, 56:3, 57:13
**Anne** [4] - 9:5, 12:15, 18:1, 18:2
**answer** [26] - 15:21, 20:1, 41:24, 47:1, 47:6, 49:25, 50:9, 50:10, 50:12, 51:17, 57:3, 57:8, 57:15, 60:2, 62:15, 62:17, 64:20, 68:8, 74:22, 74:25, 75:3, 75:11, 81:18, 91:5, 112:16
**answered** [10] - 19:11, 39:12, 41:3, 49:23, 64:7, 64:8, 65:14, 71:14, 102:21, 103:3
**answering** [1] - 33:11
**answers** [6] - 8:3, 8:6, 8:8, 33:11, 95:18, 95:19
**ante** [1] - 35:19
**anticipate** [1] - 107:15
**anxious** [1] - 36:18
**apart** [1] - 14:21
**apologies** [1] - 57:11
**apologize** [3] - 39:5, 53:14, 59:9
**appear** [1] - 108:25
**APPEARANCES** [1] - 2:1
**aPPEARANCES** [1] - 1:13
**appeared** [1] - 20:4

**application** [1] - 23:8
**applications** [1] - 25:11
**apply** [3] - 15:12, 23:4, 23:14
**approach** [3] - 70:2, 70:23, 77:14
**approaching** [1] - 114:1
**appropriate** [3] - 41:11, 44:19, 48:3
**April** [21] - 5:10, 25:21, 26:3, 26:4, 26:6, 27:9, 29:11, 46:5, 53:6, 53:12, 59:11, 61:9, 67:24, 71:20, 72:4, 74:8, 74:16, 85:10, 85:14, 93:5, 98:17
**area** [1] - 18:17
**ARENTFOX** [1] - 1:22
**argue** [4] - 11:7, 19:1, 48:4, 48:6, 71:8, 101:23, 112:24
**argued** [5] - 69:22, 70:25, 71:12, 100:7, 113:16
**arguing** [5] - 48:23, 91:16, 92:6, 100:19, 101:1
**argument** [21] - 81:4, 83:12, 85:8, 85:14, 85:24, 90:15, 96:20, 97:23, 100:25, 101:12, 101:13, 101:17, 102:15, 103:8, 111:3, 111:5, 111:8, 112:7, 112:18, 113:1, 113:20
**arguments** [3] - 34:19, 81:7, 111:13
**arrange** [2] - 86:11, 89:23
**arrangement** [1] - 35:8
**arrangements** [2] - 104:1, 108:3
**arrived** [1] - 68:14
**art** [1] - 29:6
**Artemus** [1] - 57:17
**articles** [1] - 96:24
**aside** [1] - 87:25
**assign** [1] - 92:12
**assigned** [2] - 92:10, 95:7
**assist** [1] - 96:18
**assistance** [4] - 40:17, 58:23, 59:7, 87:13

**assisted** [1] - 96:19
**associated** [1] - 39:16
**assume** [4] - 5:5, 11:7, 29:14, 56:23
**assumed** [1] - 112:10
**assuming** [1] - 14:7
**attaches** [1] - 14:9
**attachment** [2] - 10:10, 17:1
**attempt** [3] - 66:13, 86:13, 88:17
**attention** [13] - 41:20, 53:6, 61:16, 61:23, 62:11, 62:16, 62:17, 63:14, 67:23, 71:19, 74:8, 80:3, 93:13
**Attorney** [4] - 26:18, 32:8, 32:9, 48:1
**attorney** [7] - 8:9, 73:22, 75:23, 75:24, 76:2, 76:3, 76:18
**attorney-client** [6] - 73:22, 75:23, 75:24, 76:2, 76:3, 76:18
**attributed** [1] - 97:2
**August** [1] - 102:6
**available** [14] - 8:8, 11:11, 22:11, 24:9, 24:10, 70:6, 74:1, 104:4, 104:5, 108:24, 109:12, 109:16, 110:9, 114:12
**Avenue** [4] - 1:15, 1:19, 2:7, 115:14
**avoiding** [1] - 71:9
**aware** [13] - 20:24, 28:18, 33:16, 38:17, 51:19, 52:14, 53:17, 55:6, 65:7, 65:21, 75:11, 84:14, 113:24

**B**

**balcony** [1] - 88:7
**bank** [1] - 23:9
**BARRY** [1] - 2:2
**based** [8] - 16:21, 33:17, 74:16, 75:22, 94:3, 109:6, 111:13, 111:21
**basic** [1] - 13:2
**basis** [5] - 15:3, 33:4, 38:19, 76:17, 88:24
**Bates** [1] - 80:9
**became** [2] - 35:11, 37:25

**bed** [1] - 103:13
**BEFORE** [1] - 1:10
**began** [2] - 6:5, 24:6
**begin** [2] - 24:4, 24:6
**beginning** [1] - 86:6
**behalf** [15] - 29:7, 36:16, 46:10, 46:13, 46:14, 48:7, 48:14, 48:15, 48:19, 48:24, 49:19, 81:7, 99:16
**belated** [1] - 9:18
**belief** [3] - 28:25, 86:21, 103:16
**bench** [1] - 93:16
**beneficial** [3] - 69:2, 79:18, 80:13
**benefit** [2] - 92:3, 102:13
**best** [3] - 13:16, 71:2, 115:7
**better** [6] - 22:15, 70:8, 99:15, 113:8, 113:12, 114:14
**between** [7] - 18:5, 32:13, 63:11, 69:6, 79:20, 99:18, 103:17
**big** [1] - 48:5
**biggest** [1] - 11:13
**bilk** [1] - 36:10
**Bill** [5] - 5:9, 7:2, 8:4, 10:5, 18:1
**birthday** [1] - 87:22
**bit** [3] - 85:7, 86:6, 109:21
**blank** [1] - 85:1
**Bloomberg** [2] - 12:7, 12:14
**boat** [2] - 102:5, 102:19
**book** [3] - 106:13, 106:16, 106:17
**bootstrap** [2] - 34:19, 35:2
**BOSS** [2] - 2:2, 9:10
**bothers** [1] - 14:8
**bottom** [6] - 5:16, 61:17, 61:20, 64:25, 80:22, 97:14
**Branch** [8] - 31:14, 31:18, 32:4, 32:12, 47:24, 49:5, 55:14, 66:13
**brand** [1] - 95:21
**break** [3] - 4:6, 67:13, 67:16
**brief** [4] - 30:2, 68:15, 107:17, 108:8
**briefing** [1] - 54:9
**briefly** [1] - 112:24
**bring** [5] - 39:13,

45:16, 69:25, 91:17, 93:13

**Bro** [1] - 82:6
**broad** [1] - 42:23
**Broidy** [42] - 31:25, 32:14, 46:7, 46:9, 47:17, 47:22, 49:1, 49:3, 53:23, 55:7, 55:10, 57:20, 58:18, 60:14, 63:3, 63:12, 65:7, 66:4, 66:11, 66:18, 66:24, 67:3, 67:5, 69:6, 69:12, 79:21, 79:25, 83:1, 83:3, 83:14, 91:8, 99:9, 99:10, 99:18, 101:2, 101:15, 101:25, 102:5, 102:10, 102:18, 103:17
**Broidy's** [3] - 71:5, 83:15, 99:4
**brought** [4] - 32:11, 63:5, 67:8, 103:9
**bucket** [1] - 59:21
**bullet** [1] - 82:8
**business** [1] - 20:12
**businessperson** [1] - 99:6
**butcher** [1] - 39:5
**BY** [66] - 2:5, 4:19, 5:7, 5:17, 6:3, 6:24, 7:24, 10:1, 10:15, 20:2, 21:11, 27:8, 29:9, 37:9, 41:9, 41:19, 44:18, 44:23, 45:6, 46:23, 47:13, 50:14, 51:9, 53:5, 53:10, 53:16, 54:4, 54:21, 55:5, 56:20, 57:5, 57:12, 59:10, 59:15, 60:11, 61:15, 61:22, 62:8, 65:2, 66:23, 67:22, 71:18, 72:8, 73:14, 75:17, 75:21, 77:17, 78:10, 78:19, 80:11, 81:1, 81:15, 84:10, 85:6, 85:15, 86:10, 89:17, 90:19, 91:13, 92:1, 93:4, 97:11, 98:14, 98:21, 99:3, 100:12

---

## C

**calendar** [1] - 108:13
**California** [2] - 30:24, 78:24
**campaign** [16] - 22:3, 23:9, 30:19,

34:3, 37:12, 39:16, 39:24, 85:19, 86:1, 86:21, 87:1, 88:15, 88:23, 89:4, 90:4
**Campbell** [3] - 4:23, 10:6, 109:3
**candid** [1] - 35:11
**cannot** [1] - 81:19
**cared** [1] - 36:13
**Carlstrom** [11] - 9:5, 10:3, 10:4, 10:17, 12:15, 12:22, 13:8, 16:2, 18:1, 18:10, 18:19
**case** [57] - 11:8, 12:5, 19:16, 21:16, 21:18, 22:18, 23:5, 26:16, 26:22, 27:7, 28:3, 28:13, 28:17, 31:3, 31:16, 32:10, 33:21, 33:23, 35:13, 36:9, 36:20, 37:10, 37:19, 39:2, 40:20, 45:16, 45:24, 45:25, 47:19, 48:21, 49:15, 49:17, 65:3, 66:9, 69:22, 70:4, 70:5, 70:17, 71:8, 71:10, 77:9, 79:2, 83:5, 84:17, 85:17, 85:25, 86:18, 87:12, 89:24, 91:16, 91:18, 91:22, 94:19, 101:18, 101:23, 103:21, 110:13
**cases** [11] - 21:22, 22:14, 22:17, 22:22, 22:25, 33:16, 33:21, 35:4, 35:16, 36:2, 40:11
**casino** [2] - 90:25, 99:5
**casinos** [1] - 101:8
**cast** [1] - 29:5
**categorization** [1] - 49:18
**categorize** [1] - 54:6
**categorizing** [1] - 52:17
**category** [1] - 87:8
**Catherine** [1] - 10:5
**cell** [1] - 68:12
**Central** [1] - 78:24
**certain** [2] - 87:6, 113:16
**certainly** [10] - 12:23, 14:4, 17:6, 30:21, 72:11, 98:13, 103:16, 104:20, 109:10, 111:16

**CERTIFICATE** [1] - 115:1
**certify** [1] - 115:4
**cetera** [1] - 64:20
**chain** [1] - 70:15
**chambers** [3] - 26:8, 26:17, 26:20
**chance** [3] - 6:6, 31:1, 72:25
**change** [2] - 103:10, 108:2
**character** [1] - 33:17
**characterized** [2] - 46:21, 86:5
**characterizes** [2] - 85:18, 86:3
**charge** [2] - 81:8, 94:17
**charged** [8] - 69:9, 69:10, 88:16, 100:18, 100:22, 101:18, 101:20
**charges** [3] - 30:19, 30:20, 37:14
**chart** [2] - 8:19, 58:11
**charts** [1] - 58:7
**check** [2] - 102:7, 114:16
**chief** [2] - 26:22, 68:12
**China** [12] - 31:22, 34:3, 36:17, 46:17, 48:14, 48:25, 53:20, 62:13, 67:1, 69:8, 69:19, 90:22
**Chinese** [13] - 36:14, 46:14, 46:16, 48:7, 48:9, 48:19, 49:20, 62:13, 68:18, 74:18, 99:16, 101:9, 102:13
**Chinese-held** [1] - 48:9
**choice** [2] - 61:4, 108:4
**chose** [3] - 38:15, 42:20, 94:24
**Christina** [1] - 10:6
**Circuit** [2] - 30:22, 38:17
**circulated** [2] - 22:3, 23:22
**circumstances** [1] - 23:16
**citizen** [2] - 36:14, 90:3
**claim** [3] - 29:10, 32:18, 32:20
**claimed** [1] - 13:5
**clarity** [1] - 46:21

**clean** [1] - 106:3
**clear** [8] - 11:25, 12:16, 30:6, 52:4, 57:3, 77:8, 93:2, 100:16
**clerk** [1] - 4:10
**Clerk's** [1] - 92:15
**client** [8] - 40:21, 73:22, 75:23, 75:24, 76:2, 76:3, 76:10, 76:18
**clients** [1] - 25:11
**Clinton** [1] - 31:5
**close** [1] - 73:23
**closest** [1] - 37:25
**closing** [26] - 81:4, 81:12, 81:13, 85:7, 85:14, 85:24, 90:14, 91:2, 95:12, 96:7, 96:13, 96:20, 96:22, 97:5, 97:15, 97:23, 98:1, 98:6, 98:15, 98:16, 98:22, 98:24, 98:25, 100:5, 100:25, 101:12
**co** [39] - 48:19, 53:23, 54:6, 54:11, 54:12, 54:14, 54:17, 55:8, 55:11, 55:16, 55:25, 56:6, 57:19, 57:25, 58:17, 60:3, 60:15, 60:21, 65:8, 65:20, 65:22, 66:2, 71:7, 72:12, 72:15, 73:17, 74:4, 76:11, 82:23, 83:7, 91:18, 99:9, 99:15, 100:23, 100:24, 101:17, 101:22, 102:10
**co-conspirator** [14] - 65:8, 65:22, 71:7, 72:12, 72:15, 73:17, 76:11, 83:7, 91:18, 100:23, 100:24, 101:17, 101:22
**co-conspirator's** [1] - 82:23
**co-conspirators** [24] - 48:19, 53:23, 54:6, 54:11, 54:12, 54:14, 54:17, 55:8, 55:11, 55:16, 55:25, 56:6, 57:19, 57:25, 58:17, 60:3, 60:15, 60:21, 65:20, 66:2, 74:4, 99:9, 99:15, 102:10
**COLLEEN** [1] - 1:10
**colloquy** [2] - 72:3, 72:23
**Columbia** [2] - 2:6,

115:13
**COLUMBIA** [1] - 1:1
**combination** [1] - 79:5
**combine** [2] - 34:6, 34:16
**combined** [1] - 71:5
**combining** [1] - 34:10
**comfortable** [3] - 8:10, 30:5, 93:7
**coming** [7] - 8:1, 75:6, 79:3, 84:24, 89:12, 95:17, 95:19
**comment** [4] - 13:20, 17:19, 40:2, 64:9
**commission** [1] - 108:14
**commit** [1] - 29:20
**committed** [1] - 35:18
**committee** [1] - 39:16
**common** [1] - 33:18
**commonality** [1] - 28:17
**communicated** [1] - 29:6
**communications** [3] - 11:3, 76:9, 79:20
**community** [2] - 29:6, 29:8
**company** [2] - 55:21, 56:3, 95:25
**compare** [1] - 42:5
**compilation** [2] - 18:14, 84:14
**complete** [3] - 8:22, 81:22, 115:6
**complies** [1] - 47:11
**computer** [2] - 96:13, 96:15
**con** [3] - 87:16, 89:1, 90:1
**conceptual** [1] - 95:22
**concern** [2] - 11:5, 15:22
**concerned** [4] - 24:12, 25:16, 44:13, 86:16
**concerns** [3] - 74:2, 74:19, 74:22
**concluded** [1] - 114:19
**conclusion** [3] - 44:25, 54:8, 112:23
**conclusions** [3] - 111:21, 113:13, 113:22

**condemned** [1] - 38:17

**conduct** [4] - 39:7, 39:9, 65:19, 100:18

**conducted** [1] - 37:20

**conduits** [1] - 42:4

**conference** [1] - 18:7

**confess** [1] - 24:24

**confine** [1] - 33:10

**confirm** [1] - 111:1

**confirmed** [1] - 109:17

**conflict** [3] - 92:2, 93:8, 95:3

**connect** [1] - 29:4

**connected** [1] - 33:18

**connection** [6] - 28:25, 73:7, 83:15, 101:2, 101:24, 102:1

**connections** [1] - 99:7

**conning** [1] - 87:13

**consequently** [1] - 41:25

**consider** [7] - 14:17, 15:18, 34:9, 43:23, 72:14, 108:25, 111:25

**consideration** [2] - 10:13, 111:14

**considerations** [2] - 30:18, 42:19

**considered** [4] - 30:21, 34:14, 35:6, 43:4

**considering** [1] - 42:23

**consistent** [8] - 8:20, 27:25, 29:18, 34:18, 41:21, 60:20, 91:7, 103:16

**consistently** [2] - 60:2, 60:14

**conspiracy** [15] - 66:5, 69:23, 70:3, 70:17, 70:24, 71:1, 71:11, 72:15, 79:25, 100:7, 100:14, 100:18, 100:20, 101:11, 103:17

**conspirator** [14] - 65:8, 65:22, 71:7, 72:12, 72:15, 73:17, 76:11, 83:7, 91:18, 100:23, 100:24, 101:17, 101:22

**conspirator's** [1] - 82:23

**conspirators** [24] -

48:19, 53:23, 54:6, 54:11, 54:12, 54:14, 54:17, 55:8, 55:11, 55:16, 55:25, 56:6, 57:19, 57:25, 58:17, 60:3, 60:15, 60:21, 65:20, 66:2, 74:4, 99:9, 99:15, 102:10

**conspired** [3] - 39:13, 40:14, 40:22

**constantly** [1] - 76:3

**constitute** [1] - 33:18

**constitutes** [1] - 115:4

**Constitution** [2] - 2:7, 115:14

**constraint** [1] - 24:25

**consult** [2] - 28:2, 28:5

**consultant** [1] - 8:11

**CONT'D** [1] - 2:1

**contact** [2] - 49:4, 82:25

**contacted** [1] - 91:8

**contacts** [1] - 99:14

**contemporaneousl y** [1] - 110:7

**contempt** [4] - 9:11, 12:9, 92:7, 94:17

**context** [10] - 12:7, 16:3, 17:23, 50:18, 68:3, 73:2, 74:21, 77:3, 100:17, 111:25

**continue** [4] - 94:15, 94:16, 94:23, 109:22

**continued** [1] - 21:24

**CONTINUED** [1] - 4:18

**continued/request** [1] - 7:8

**continuing** [2] - 34:24, 77:8

**contracted** [1] - 4:8

**contribution** [1] - 90:4

**contributions** [3] - 39:18, 40:21

**conversant** [2] - 23:20, 96:16

**conversation** [7] - 25:17, 30:4, 30:6, 64:2, 68:15, 71:4, 87:25

**conversations** [3] - 6:18, 52:3, 102:25

**convicted** [1] - 66:7

**convicting** [1] - 100:17

**convictions** [1] -

22:21

**convinced** [1] - 27:22

**cooperating** [1] - 32:15

**cooperation** [1] - 32:16

**copious** [1] - 58:12

**copy** [5] - 8:16, 26:5, 63:6, 77:12, 80:16

**correct** [27] - 6:8, 10:25, 19:19, 20:17, 27:11, 28:3, 28:4, 29:25, 35:5, 37:1, 37:2, 39:6, 41:12, 43:1, 43:21, 54:22, 55:16, 60:17, 60:18, 70:22, 75:19, 76:25, 88:21, 88:22, 89:5, 93:19, 96:7

**Correct** [1] - 9:1

**correcting** [1] - 100:9

**corroborates** [2] - 17:20, 18:2

**corroborative** [1] - 20:4

**counsel** [25] - 11:5, 11:24, 26:7, 26:8, 26:9, 26:16, 26:19, 29:14, 32:2, 40:17, 41:17, 46:20, 57:2, 58:24, 59:7, 61:24, 73:25, 74:10, 78:7, 93:7, 94:5, 94:6, 94:12, 97:24, 106:21

**count** [1] - 86:2

**country** [2] - 108:1, 108:8

**couple** [6] - 49:24, 63:20, 80:3, 80:21, 84:3, 98:9

**course** [4] - 17:15, 19:16, 51:17, 103:25

**Court** [50] - 2:5, 2:6, 4:5, 6:20, 7:10, 12:23, 14:22, 14:25, 15:3, 15:19, 25:1, 25:24, 26:3, 26:12, 27:5, 27:19, 30:9, 30:10, 31:2, 37:15, 37:16, 40:18, 47:6, 54:18, 72:4, 72:11, 72:14, 72:23, 72:24, 73:3, 73:5, 74:3, 74:11, 77:11, 77:13, 92:10, 92:20, 93:5, 93:11, 93:17, 94:5, 94:21, 94:24, 95:7, 97:24, 113:20, 113:21,

113:24, 115:12, 115:13

**COURT** [170] - 1:1, 4:1, 4:3, 4:9, 4:13, 5:2, 5:4, 5:14, 5:16, 5:25, 6:13, 7:21, 9:8, 9:14, 9:19, 9:21, 9:23, 10:14, 10:19, 11:13, 11:18, 11:21, 11:24, 12:1, 12:11, 13:2, 13:13, 13:22, 14:7, 15:5, 16:7, 16:10, 17:2, 18:12, 18:23, 19:3, 19:5, 19:14, 19:21, 20:20, 20:23, 21:7, 21:10, 27:5, 28:14, 37:4, 40:25, 41:6, 43:1, 43:4, 43:11, 43:19, 43:21, 44:11, 44:22, 45:2, 46:20, 47:9, 49:24, 50:3, 50:13, 50:17, 51:6, 53:2, 53:8, 53:12, 53:15, 54:2, 54:10, 54:15, 54:18, 55:3, 56:10, 56:13, 56:17, 57:2, 57:8, 58:25, 59:6, 59:13, 59:19, 60:7, 61:12, 61:18, 62:3, 64:8, 64:12, 64:18, 66:20, 67:10, 67:13, 67:20, 71:14, 71:17, 71:21, 71:24, 72:1, 72:6, 73:11, 75:15, 76:22, 77:2, 77:15, 78:2, 78:16, 80:6, 80:16, 80:20, 81:11, 84:1, 84:3, 84:8, 85:4, 85:11, 85:13, 89:13, 90:13, 90:16, 91:11, 92:12, 93:1, 97:7, 97:9, 98:13, 98:19, 98:24, 99:1, 100:9, 103:4, 103:7, 103:24, 104:11, 104:13, 104:18, 104:21, 105:4, 105:10, 105:14, 105:17, 105:20, 105:22, 105:25, 106:6, 106:9, 106:12, 106:17, 106:24, 107:3, 107:5, 107:7, 107:14, 107:19, 107:23, 108:5, 108:12, 109:2, 109:5, 109:16, 109:19, 110:4, 110:12, 110:15, 110:22, 110:24, 111:7, 112:4, 112:9,

113:1, 114:5, 114:17

**court** [4] - 6:8, 20:25, 27:6, 79:14

**Court's** [8] - 10:13, 27:18, 27:21, 29:17, 73:15, 91:24, 92:3, 93:13

**courtroom** [1] - 4:6

**cover** [1] - 10:12

**covered** [1] - 11:10

**covers** [1] - 14:2

**COVID** [2] - 4:8, 4:13

**COZEN** [1] - 2:2

**crime** [2] - 41:14, 76:6

**Criminal** [1] - 1:3

**criminal** [3] - 21:16, 34:12, 51:15

**criminally** [2] - 65:19, 66:1

**Cross** [1] - 3:3

**cross** [12] - 5:20, 6:5, 6:14, 6:19, 6:25, 7:8, 58:10, 61:3, 62:4, 104:8, 104:10, 105:12

**cross-examination** [5] - 6:5, 58:10, 61:3, 104:8, 104:10

**CRR** [3] - 2:5, 115:3, 115:12

**culprit** [1] - 38:2

**cumulative** [3] - 41:3, 59:21, 60:5

**curative** [1] - 73:18

**current** [9] - 23:2, 40:8, 42:12, 50:19, 52:19, 58:21, 77:21, 77:23, 103:14

**curry** [1] - 101:9

**cut** [1] - 79:25

# D

**D.C** [11] - 1:6, 1:16, 1:19, 1:23, 2:3, 2:8, 8:21, 24:15, 30:22, 38:17, 115:14

**Daddy** [3] - 97:2, 97:21, 97:22

**database** [1] - 16:19

**databases** [1] - 16:20

**date** [14] - 12:7, 12:9, 14:8, 25:23, 55:19, 56:25, 59:11, 76:12, 84:23, 84:25, 85:2, 90:17, 104:6, 108:22

**Dated** [1] - 115:10

**dated** [1] - 84:18

dates [4] - 10:21, 10:22, 11:22, 12:3
daughter [1] - 96:4
DAVID [1] - 2:2
David [1] - 3:6
Davis [24] - 32:14, 46:7, 46:9, 47:17, 47:21, 49:1, 49:3, 53:23, 55:7, 55:10, 57:19, 58:17, 60:15, 63:12, 66:12, 69:7, 79:21, 80:1, 82:24, 83:3, 83:6, 83:13, 101:25, 103:17
Davis's [2] - 79:3, 82:22
days [3] - 22:12, 33:22, 108:16
de [1] - 102:11
deal [3] - 71:2, 86:2, 95:22
dealing [2] - 81:20, 82:8
dealt [1] - 83:15
Dearington [1] - 97:13
DEARINGTON [3] - 1:21, 106:20, 110:6
decamping [1] - 13:11
decide [2] - 64:17, 92:18
decided [4] - 22:14, 38:12, 43:13, 73:25
decides [1] - 113:21
decision [6] - 30:19, 35:23, 43:5, 54:19, 83:11, 112:1
decisions [1] - 109:5
dedicated [1] - 35:12
defend [1] - 70:5
Defendant [11] - 1:7, 39:8, 39:10, 39:12, 39:14, 39:22, 41:22, 41:24, 42:5, 42:7, 74:24
DEFENDANT [2] - 1:21, 3:5
Defendant's [12] - 3:8, 3:9, 3:10, 3:11, 4:22, 6:1, 7:22, 51:19, 52:14, 59:22, 78:17, 107:9
defense [23] - 8:9, 26:7, 26:9, 26:16, 26:19, 29:19, 30:12, 38:14, 49:14, 51:25, 52:24, 73:25, 79:19, 85:24, 89:7, 89:10, 89:24, 93:12, 93:15,

98:15, 98:16, 107:12
Defense [2] - 7:14, 9:4
definitely [1] - 81:25
delivered [1] - 82:10
delivering [1] - 82:13
demonstrate [1] - 34:17
demonstrative [1] - 97:12
denied [2] - 31:8, 38:6
deny [1] - 34:22
DEPARTMENT [2] - 1:15, 1:18
Department [5] - 32:5, 32:12, 46:11, 48:2, 49:6
deport [1] - 46:16
deputy [1] - 4:6
describe [1] - 58:17
described [2] - 25:10, 27:15
describing [3] - 25:14, 57:9, 58:19
description [3] - 36:7, 60:20, 60:21
designed [1] - 110:6
desk [2] - 63:7, 63:8
despite [4] - 29:10, 59:1, 91:7, 93:8
determine [1] - 43:15
develop [2] - 27:20, 33:8
developing [1] - 95:25
dictated [1] - 87:11
difference [2] - 18:5, 103:8
different [14] - 12:4, 14:10, 14:12, 14:24, 16:20, 19:6, 38:6, 50:10, 59:25, 60:7, 61:5, 64:15, 112:18
differently [1] - 33:15
difficult [1] - 30:2
difficulty [1] - 37:7
dinner [2] - 62:21, 63:4
direct [13] - 7:17, 7:25, 8:1, 8:10, 53:6, 62:3, 62:4, 62:5, 67:20, 71:6, 71:19, 80:3, 102:6
DIRECT [1] - 4:18
Direct [1] - 3:3
directing [4] - 61:16, 61:23, 62:11, 74:8
direction [2] - 58:15,

66:10
directly [3] - 20:7, 89:3, 102:19
discovered [3] - 31:19, 31:20, 47:20
discovery [3] - 16:17, 16:23, 58:5
discuss [4] - 36:5, 59:1, 95:8, 104:1
discussed [4] - 36:6, 63:13, 97:8, 98:3
discussing [4] - 10:19, 22:14, 50:19, 96:20
discussions [1] - 93:10
dismissive [1] - 75:3
dispositive [2] - 42:19, 108:9
disrepute [1] - 31:2
distinction [1] - 66:11
distinguish [1] - 32:13
distribute [1] - 55:23
District [5] - 2:6, 2:6, 32:24, 78:24, 115:13
district [2] - 30:24, 115:13
DISTRICT [3] - 1:1, 1:1, 1:11
docket [1] - 27:6
document [7] - 8:17, 11:9, 11:12, 13:15, 13:19, 15:21, 16:18, 16:24, 17:3, 17:14, 20:4, 27:4, 77:13, 79:13, 79:16, 79:18, 80:12, 82:19, 97:1, 106:20
documentary [2] - 55:17, 56:2
documented [1] - 58:13
documents [12] - 9:15, 11:2, 11:10, 15:2, 15:16, 15:18, 63:6, 63:7, 63:9, 63:10
DOJ [3] - 80:4, 80:9, 80:22
donate [2] - 39:15, 42:1
donated [1] - 89:11
donation [3] - 88:17, 88:20, 88:22
donations [6] - 34:4, 86:22, 87:2, 87:4, 87:6, 89:19
done [21] - 18:14,

18:25, 20:8, 20:9, 20:10, 23:8, 23:23, 26:2, 35:17, 40:11, 40:12, 44:7, 51:2, 63:15, 73:3, 73:18, 81:19, 87:17, 92:19, 95:12, 95:21
donor [2] - 22:8
donors [17] - 28:22, 39:23, 40:15, 41:22, 41:25, 42:4, 42:8, 42:11, 42:17, 44:19, 44:24, 45:10, 45:24, 89:11
door [1] - 48:23
dough [1] - 81:25
down [5] - 12:22, 32:2, 32:4, 68:13, 86:6
draft [1] - 6:7
drafts [1] - 23:24
dragging [1] - 81:19
draw [2] - 41:20, 66:10
drive [1] - 79:3
Drive [1] - 82:23
drop [1] - 46:11
due [1] - 6:20
during [12] - 22:18, 24:18, 25:23, 29:14, 30:16, 31:15, 51:13, 62:20, 73:9, 73:21, 75:25, 78:12

**E**

early [1] - 59:1
easier [1] - 80:17
edition [1] - 9:18
EDWARDS [2] - 2:5, 115:3
Edwards [1] - 115:12
effect [3] - 57:23, 75:4, 88:2
effective [3] - 58:11, 94:14, 94:15
effectuate [2] - 46:1, 66:6
effort [9] - 45:23, 66:7, 66:19, 69:15, 85:18, 85:25, 86:4, 91:8, 99:19
efforts [5] - 99:4, 99:23, 102:9, 102:12, 103:1
eight [1] - 42:22
either [6] - 9:15, 22:11, 26:16, 34:7, 35:1, 51:18, 110:13,

113:23
election [3] - 28:19, 34:3, 86:15
elements [1] - 29:3
elicit [1] - 26:23
Elliott [4] - 65:7, 83:3, 83:14, 102:5
ELMO [5] - 77:16, 80:5, 80:10, 84:6, 97:12
elsewhere [1] - 91:23
email [12] - 4:23, 5:9, 5:18, 7:4, 7:15, 9:5, 10:2, 12:13, 14:9, 17:1, 24:1, 110:6
emailing [1] - 5:18
end [4] - 43:22, 68:6, 103:25, 105:14
ended [2] - 25:16, 97:1
engaged [2] - 28:7, 30:5
engagement [1] - 29:24
engine [1] - 88:9
English [1] - 18:9
enlist [1] - 99:10
enlisted [2] - 65:9, 66:5
entered [6] - 6:1, 7:22, 27:1, 35:7, 78:18, 107:10
entire [2] - 61:11, 86:18
entree [1] - 49:11
entry [1] - 27:6
especially [2] - 22:18, 77:10
ESQ [5] - 1:14, 1:17, 1:21, 1:21, 2:2
essence [2] - 17:6, 25:14, 50:5
essentially [2] - 99:10, 102:11
establish [4] - 48:13, 55:10, 73:21, 75:25
established [1] - 56:2
et [1] - 64:20
evening [1] - 25:24
events [3] - 34:24, 36:7, 84:19
eventually [1] - 92:11
EVIDENCE [1] - 3:7
evidence [21] - 6:2, 7:23, 32:6, 47:19, 48:12, 49:21, 55:17, 56:2, 66:15, 71:6,

72:13, 73:23, 78:18, 81:14, 82:15, 107:10, 111:21, 113:14, 113:15, 113:16
**Evidence** [1] - 26:24
**evidenced** [1] - 83:1
**evidentiary** [4] - 14:23, 15:11, 111:9, 112:15
**EVIDENTIARY** [1] - 1:10
**exact** [2] - 42:9, 48:16
**exactly** [3] - 47:21, 101:1, 113:3
**exam** [1] - 7:25
**EXAMINATION** [1] - 4:18
**examination** [7] - 6:5, 8:11, 58:10, 61:3, 62:6, 104:8, 104:10
**example** [2] - 60:3, 60:16
**except** [1] - 49:9
**exception** [1] - 76:6
**excerpted** [1] - 42:24
**excerpts** [2] - 60:1, 61:11
**exchanged** [1] - 58:6
**exchanges** [1] - 84:17
**exclude** [1] - 83:19
**exculpatory** [1] - 91:15
**excuse** [7] - 50:3, 53:8, 61:24, 64:18, 74:10, 85:9, 103:7
**excused** [5] - 105:8, 105:20, 105:22, 105:24, 114:17
**excusing** [1] - 104:23
**Executive** [8] - 31:14, 31:18, 32:4, 32:12, 47:24, 49:5, 55:13, 66:13
**exhibit** [12] - 4:14, 6:10, 6:12, 10:13, 11:17, 74:11, 78:12, 78:21, 79:11, 79:22, 83:23, 84:14
**Exhibit** [13] - 3:8, 3:9, 3:10, 3:11, 4:23, 6:1, 7:14, 7:22, 9:4, 10:7, 77:19, 78:17, 107:9
**exhibits** [4] - 4:15, 58:6, 58:12, 106:4
**EXHIBITS** [1] - 3:7
**expectations** [1] -

15:10
**expedite** [1] - 60:12
**expeditiously** [1] - 114:4
**expensive** [1] - 88:3
**experience** [2] - 8:9, 26:10
**expert** [15] - 17:8, 24:4, 24:12, 24:13, 24:18, 24:23, 24:24, 25:1, 25:7, 25:15, 26:11, 27:17, 27:19, 28:2, 28:7
**experts** [2] - 24:9, 27:16
**explain** [7] - 12:22, 26:19, 33:12, 45:22, 58:2, 95:2, 95:7
**explained** [4] - 17:24, 36:1, 45:12, 87:10
**explanation** [1] - 50:4
**exploit** [1] - 52:23
**express** [2] - 87:12, 94:25
**extensive** [1] - 13:10
**extent** [2] - 25:20, 28:12
**extra** [2] - 80:16, 108:18
**extradite** [2] - 68:17, 83:17
**extradited** [7] - 31:21, 34:2, 67:1, 74:18, 91:9, 102:12, 103:1
**extradition** [5] - 65:5, 69:8, 99:13, 101:5, 102:8
**EyeLevel** [1] - 95:15
**eyes** [1] - 102:2

**F**

**fabricated** [1] - 15:4
**fact** [24] - 16:22, 25:7, 26:20, 32:8, 35:7, 42:23, 43:22, 48:8, 48:14, 51:25, 52:13, 55:12, 65:10, 69:18, 69:23, 71:13, 81:17, 83:2, 91:14, 94:8, 111:20, 113:9, 113:13, 113:22
**facto** [1] - 102:11
**facts** [9] - 9:1, 9:3, 23:4, 23:9, 23:15, 23:16, 26:20, 29:1,

113:10
**fair** [2] - 7:25, 25:21
**fall** [1] - 68:6
**familiar** [4] - 17:3, 17:8, 20:16, 27:13
**familiarity** [2] - 17:4, 17:12
**far** [3] - 25:15, 44:13, 53:22
**FARA** [33] - 8:6, 8:7, 22:18, 22:22, 22:25, 23:3, 23:9, 24:4, 24:12, 24:23, 25:7, 25:8, 25:11, 26:14, 27:14, 28:2, 28:8, 28:12, 29:2, 29:3, 29:13, 29:21, 30:20, 34:1, 36:13, 37:14, 74:19, 74:22, 75:2, 75:5, 75:10, 75:12
**FARA-related** [1] - 37:14
**faster** [1] - 106:18
**favor** [1] - 101:9
**FEC** [2] - 22:8, 29:21
**federal** [2] - 28:19, 39:24
**Federal** [1] - 26:24
**fee** [3] - 35:7, 80:2, 107:5
**fees** [1] - 67:9
**fellow** [2] - 31:21, 95:24
**felt** [5] - 31:13, 35:1, 64:12, 69:2, 71:2
**Ferrari** [1] - 88:8
**few** [1] - 42:2
**field** [2] - 27:16, 34:18
**Fifth** [2] - 32:17, 32:20
**fight** [1] - 38:12
**fighting** [1] - 38:12
**figuring** [1] - 99:13
**file** [4] - 25:1, 30:25, 31:12, 103:13
**filed** [8] - 12:9, 12:17, 22:22, 22:25, 31:4, 31:8, 78:23, 92:5
**files** [1] - 22:2
**filing** [1] - 94:17
**filled** [1] - 28:21
**final** [3] - 5:19, 6:7, 7:7
**finance** [7] - 22:3, 23:9, 30:19, 37:13, 86:21, 87:1, 88:15
**financial** [2] - 28:21, 58:6

**findings** [5] - 111:20, 113:9, 113:13, 113:18, 113:22
**fine** [3] - 4:9, 21:9, 59:3
**finish** [3] - 67:10, 104:3, 112:10
**finished** [4] - 33:9, 78:3, 105:11, 105:18
**Firm** [1] - 4:25
**firm** [3] - 21:15, 25:9, 25:10
**first** [1] - 10:18, 21:20, 25:6, 26:8, 30:1, 36:23, 39:2, 40:20, 63:21, 67:6, 96:6
**fitting** [1] - 28:15
**five** [2] - 104:14, 114:2
**flat** [2] - 35:7, 107:5
**flew** [1] - 108:1
**fly** [4] - 108:7, 108:20, 109:1, 109:6
**flying** [1] - 108:2
**focus** [9] - 43:24, 44:4, 44:5, 44:9, 44:11, 50:24, 101:17, 101:23, 111:24
**follow** [4] - 15:9, 86:24, 87:20, 99:17
**followed** [2] - 58:7, 71:10
**following** [2] - 67:19, 105:3
**FOR** [5] - 1:1, 1:14, 1:21, 2:2, 3:5
**Force** [2] - 65:13, 102:19
**foregoing** [1] - 115:4
**foreign** [7] - 26:13, 26:14, 39:15, 81:8, 81:14, 85:18, 85:25
**forfeitures** [1] - 78:23
**form** [1] - 94:16
**formally** [1] - 101:20
**former** [6] - 26:9, 31:5, 51:18, 76:10
**fortunately** [1] - 39:6
**forward** [2] - 51:7, 60:9
**forwarding** [1] - 5:9
**four** [6] - 22:12, 22:17, 22:20, 23:1, 23:18, 24:17
**Frank** [12] - 32:19, 36:10, 38:1, 38:2, 45:16, 45:17, 52:1, 52:5, 52:8, 87:13,

87:17, 88:1
**frankly** [8] - 13:13, 15:18, 40:10, 43:12, 64:23, 89:1, 113:2, 113:8
**fraud** [2] - 23:9, 76:6
**Freedom** [1] - 81:17
**Friedman** [1] - 81:16
**friend** [1] - 24:16
**friends** [1] - 35:11
**front** [3] - 31:2, 80:19, 80:20
**fuck** [1] - 82:6
**fucking** [2] - 82:6, 82:7, 82:8
**full** [2] - 109:7, 115:5
**fully** [1] - 11:11
**Fund** [4] - 42:1, 42:6, 42:9, 89:4
**funds** [6] - 39:15, 39:24, 41:25, 55:22, 55:23, 56:4
**funnel** [2] - 85:18, 85:25
**furthered** [1] - 49:13

**G**

**gates** [2] - 65:14, 102:21
**general** [2] - 59:21, 68:16
**General** [4] - 26:18, 32:8, 32:9, 48:2
**generalized** [1] - 112:17
**generally** [4] - 15:15, 39:9, 112:14, 113:14
**generated** [1] - 16:21
**gentleman** [1] - 24:16
**gentlemen** [2] - 12:12, 85:16
**given** [12] - 8:3, 18:19, 34:4, 41:12, 58:5, 60:2, 64:20, 71:17, 89:3, 98:17, 98:22, 101:12
**glasses** [1] - 78:5
**globe** [1] - 82:9
**goodness** [1] - 78:5
**Google** [2] - 79:3, 82:23
**government** [21] - 26:14, 31:15, 32:1, 36:16, 46:10, 46:14, 47:25, 48:7, 48:8, 48:20, 49:20, 66:13, 68:19, 70:12, 86:13,

86:23, 87:3, 87:5,
99:16, 101:9, 102:13
  **GOVERNMENT** [1] -
1:14
  **Government** [50] -
6:14, 12:9, 12:20,
15:8, 16:4, 26:8,
32:15, 32:22, 33:2,
33:21, 33:25, 37:11,
37:19, 46:3, 58:5,
62:5, 69:6, 70:4, 70:6,
70:16, 70:25, 71:8,
71:9, 71:12, 72:14,
76:9, 78:12, 78:21,
79:2, 79:8, 81:4,
81:14, 84:16, 85:17,
86:3, 86:5, 86:22,
87:2, 88:16, 91:16,
91:22, 92:5, 93:14,
100:6, 100:8, 100:13,
100:19, 101:1,
102:15, 107:23
  **Government's** [13] -
26:22, 36:21, 36:23,
69:21, 70:2, 70:15,
77:18, 98:25, 101:17,
102:14, 103:6,
109:14, 113:6
  **governments** [1] -
26:17
  **grand** [1] - 38:3
  **grant** [4] - 40:18,
58:24, 76:18, 97:24
  **granted** [5] - 30:23,
31:1, 31:7, 33:20,
37:16
  **grasp** [1] - 21:15
  **grounds** [2] - 31:13,
40:17
  **guess** [2] - 10:9,
108:21
  **guests** [1] - 88:8
  **guilt** [1] - 49:19
  **guilty** [1] - 100:20
  **guise** [2] - 36:11,
90:6
  **Guo** [19] - 31:21,
34:2, 62:14, 62:21,
63:10, 65:5, 66:25,
68:17, 69:8, 69:19,
83:17, 90:24, 91:9,
99:12, 99:19, 101:5,
102:12, 103:1
  **Guo's** [1] - 102:7
  **guy** [2] - 23:25,
96:16
  **guys** [3] - 81:20,
81:24, 82:7

# H

  **H-E-U-C-H-L-I-N-G**
[1] - 37:5
  **Hail** [1] - 31:11
  **half** [8] - 13:7, 17:21,
97:1, 107:16, 108:17,
108:18, 109:25,
110:18
  **hand** [2] - 13:7,
35:19
  **handful** [1] - 62:18
  **happy** [5] - 93:25,
94:1, 94:22, 108:18,
112:19
  **harder** [2] - 24:1,
70:11
  **Haskell** [5] - 107:15,
108:23, 109:15,
109:18, 110:11
  **head** [3] - 31:14,
31:17, 110:23
  **heads** [1] - 82:9
  **hear** [7] - 54:15,
55:3, 56:17, 61:18,
88:8, 112:20, 113:20
  **heard** [7] - 25:15,
45:9, 66:18, 66:24,
91:1, 99:22, 99:24
  **HEARING** [1] - 1:10
  **hearing** [12] - 12:23,
14:23, 15:7, 15:10,
15:11, 33:6, 108:14,
108:22, 111:10,
111:11, 112:14,
112:16
  **hearsay** [8] - 63:22,
64:6, 64:13, 64:17,
64:22, 64:23, 69:1,
69:17
  **held** [5] - 48:9,
65:18, 66:1, 87:22,
92:6
  **help** [9] - 6:19, 7:1,
7:8, 28:8, 69:14, 71:6,
91:8, 99:13, 101:6
  **helped** [1] - 63:18
  **helpful** [19] - 27:13,
29:15, 63:1, 64:9,
64:12, 64:14, 64:21,
65:3, 66:10, 69:20,
71:13, 82:14, 82:15,
83:4, 83:17, 84:17,
85:23, 100:6, 113:21
  **hereby** [1] - 115:3
  **Heuchling** [13] -
36:24, 36:25, 37:3,
37:6, 38:25, 39:1,
39:5, 45:15, 48:16,

51:11, 52:23, 54:17,
61:3
  **Heuchling's** [2] -
59:23, 60:1
  **Higginbotham** [24] -
5:20, 6:4, 6:16, 6:17,
6:21, 7:2, 7:7, 7:9,
7:12, 46:8, 46:9,
53:24, 55:8, 55:11,
57:19, 58:17, 60:14,
66:12, 69:7, 73:9,
73:20, 74:4, 74:21,
76:9
  **highlight** [1] - 16:21
  **highlighted** [2] -
51:10, 62:2
  **highlighting** [1] -
11:6
  **highlights** [1] - 16:13
  **himself** [3] - 53:21,
53:22, 57:16
  **hindsight** [1] - 50:22
  **history** [1] - 21:24
  **hold** [1] - 106:6
  **holding** [1] - 16:22
  **honestly** [2] - 55:1,
55:4
  **Hong** [1] - 53:20
  **Honor** [70] - 4:2, 4:4,
5:15, 9:10, 9:17, 10:8,
11:1, 11:17, 11:20,
12:6, 13:4, 13:9,
13:21, 14:4, 14:21,
16:6, 16:12, 16:14,
18:16, 18:18, 19:10,
19:18, 30:25, 33:7,
33:20, 42:18, 43:15,
44:21, 45:1, 47:4,
47:12, 53:14, 54:7,
54:14, 59:9, 59:20,
64:7, 64:16, 66:22,
67:12, 67:17, 67:21,
72:10, 75:19, 76:1,
77:1, 77:14, 78:14,
84:7, 86:8, 89:15,
98:12, 103:23, 104:9,
104:12, 104:16,
105:9, 105:13,
105:23, 106:3,
106:11, 106:16,
106:23, 107:11,
107:25, 109:13,
111:1, 113:19,
114:16, 114:18
  **HONORABLE** [1] -
1:10
  **hope** [1] - 40:18
  **hopefully** [1] - 33:13
  **horse** [1] - 96:16
  **hostage** [2] - 36:17,

48:9
  **hot** [1] - 81:24
  **hotel** [3] - 87:24,
88:7, 88:8
  **hour** [3] - 107:16,
110:1, 110:18
  **hours** [16] - 12:2,
13:6, 13:8, 13:12,
14:11, 16:23, 17:21,
17:22, 18:2, 18:19,
18:20, 19:12
  **House** [8] - 32:2,
46:15, 48:20, 49:20,
66:16, 68:7, 68:12,
83:16
  **hum** [1] - 88:9
  **hung** [1] - 102:23

# I

  **idea** [3] - 16:24,
18:16, 90:9
  **identified** [5] - 12:13,
26:7, 42:4, 106:4,
113:12
  **identify** [1] - 26:16
  **identity** [1] - 66:2
  **illegal** [7] - 39:18,
40:21, 51:20, 52:14,
52:18, 53:1, 66:7
  **immediately** [4] -
57:1, 57:15, 57:18,
57:24
  **immunity** [1] - 33:5
  **impact** [1] - 94:18
  **impeach** [2] - 16:13,
17:6
  **implied** [2] - 81:17,
84:16
  **importance** [1] - 8:5
  **important** [4] - 15:7,
36:19, 90:20, 111:24
  **improper** [2] - 54:13
  **IN** [1] - 3:7
  **inappropriate** [5] -
32:11, 54:5, 54:16,
65:16, 102:23
  **incident** [1] - 24:14
  **inclined** [1] - 35:8
  **include** [5] - 5:6,
11:2, 70:3, 70:16,
103:18
  **included** [5] - 21:23,
96:11, 96:25, 106:16,
113:10
  **includes** [3] - 5:1,
54:8, 99:4
  **including** [5] - 8:4,
47:19, 48:18, 65:20,

81:11
  **incompetence** [1] -
97:24
  **inconsistency** [1] -
8:18
  **inconvenience** [2] -
75:7, 75:8
  **independent** [3] -
92:18, 94:5, 94:6
  **indicate** [6] - 10:14,
11:14, 12:2, 27:5,
40:10, 51:18
  **indicated** [11] -
32:22, 33:1, 41:6,
50:3, 53:3, 67:7, 93:6,
93:17, 94:21, 111:2
  **indicates** [3] - 10:23,
14:9, 26:9
  **indicating** [3] -
25:25, 50:5, 74:11
  **indicted** [1] - 65:20
  **indictment** [4] -
26:21, 33:23, 100:22,
114:2
  **individual** [2] -
65:23, 84:16
  **individuals** [8] -
12:13, 42:2, 42:3,
46:13, 48:18, 54:6,
58:20, 60:21
  **indulge** [1] - 111:3
  **indulgence** [1] -
91:24
  **ineffective** [3] -
40:17, 58:23, 59:7
  **inferred** [1] - 81:17
  **influence** [12] -
46:10, 46:14, 48:20,
49:20, 66:13, 86:13,
86:23, 87:3, 87:4,
87:5, 88:17, 99:7
  **influenced** [5] -
90:21, 90:22, 90:23,
90:24, 90:25
  **influencing** [1] -
47:22
  **information** [7] -
15:12, 27:17, 27:20,
27:21, 32:7, 62:21,
92:7
  **innumerable** [1] -
23:18
  **input** [1] - 8:12
  **inquire** [2] - 93:6
  **inside** [1] - 88:8
  **insofar** [1] - 86:15
  **instance** [1] - 42:7
  **instructed** [1] -
20:25
  **instruction** [1] -

73:19

**Integrity** [1] - 1:18
**intended** [3] - 27:19, 28:16, 52:23
**intent** [4] - 28:18, 29:2, 34:25, 36:12
**intention** [2] - 48:25, 49:9
**intentionally** [2] - 34:7, 47:3
**interest** [6] - 15:8, 49:13, 60:12, 92:2, 93:8, 95:3
**interested** [1] - 30:5
**interrupt** [1] - 19:17
**intimately** [1] - 27:13
**introduce** [8] - 5:23, 7:19, 10:7, 78:15, 78:23, 79:12, 106:3, 106:5
**introduced** [4] - 78:12, 79:2, 97:13, 102:10
**introduces** [4] - 99:10, 99:12, 101:3, 101:4
**introducing** [2] - 49:21, 78:21
**investigating** [3] - 39:8, 39:10, 53:18
**investigation** [7] - 32:23, 33:1, 33:4, 37:20, 46:11, 51:14, 51:17
**involved** [12] - 23:4, 34:12, 36:3, 51:15, 52:3, 52:8, 52:10, 65:4, 66:12, 83:12, 101:10, 103:21
**involvement** [1] - 87:12
**involving** [3] - 34:11, 39:7, 39:10
**irrelevant** [2] - 44:8, 89:21
**irresponsible** [1] - 82:7
**is'** [1] - 75:10
**Israely** [15] - 10:5, 13:5, 13:13, 16:14, 17:7, 17:21, 17:24, 18:4, 18:6, 20:6, 20:11, 95:14, 95:24, 96:5, 96:14
**issue** [13] - 7:11, 18:24, 19:23, 23:12, 32:11, 50:22, 59:2, 76:23, 99:12, 99:24, 100:2, 101:4, 109:24
**issued** [1] - 26:3

**Issues** [3] - 8:17, 23:13
**issues** [7] - 8:23, 15:13, 28:8, 28:12, 30:15, 38:4, 76:24
**it..** [1] - 16:5
**items** [1] - 103:4
**itself** [1] - 95:1

## J

**January** [3] - 1:6, 110:13, 115:10
**Jasmine** [1] - 26:7
**Jeff** [1] - 48:1
**jerking** [1] - 82:9
**Jho** [18] - 36:10, 52:2, 67:4, 78:24, 86:12, 86:15, 86:17, 87:7, 87:9, 87:13, 87:21, 88:6, 88:23, 89:2, 90:1, 90:2, 90:23
**job** [2] - 94:14, 94:15
**Joel** [1] - 36:9
**JOHN** [1] - 1:14
**join** [2] - 33:21, 33:25
**joined** [1] - 33:16
**joke** [1] - 81:22
**Judge** [15] - 11:25, 20:3, 34:22, 58:23, 73:7, 73:22, 73:25, 76:1, 76:4, 76:11, 76:18, 93:22, 94:4, 95:8, 95:9
**judge** [3] - 92:11, 92:16, 92:19
**JUDGE** [1] - 1:11
**judicial** [2] - 14:25, 27:6
**June** [3] - 61:23, 62:11, 99:24
**junior** [1] - 32:2
**jury** [9] - 8:11, 34:11, 35:3, 36:2, 38:3, 70:3, 70:25, 73:4, 73:6
**jury's** [2] - 73:16, 74:3
**Justice** [1] - 46:11
**JUSTICE** [1] - 1:15, 1:18

## K

**Kathy** [3] - 7:15, 23:11, 109:3
**Katz** [4] - 95:24, 96:2, 96:3, 96:4

**keep** [1] - 77:6
**KELLER** [9] - 1:14, 107:25, 108:7, 108:21, 109:3, 109:13, 110:23, 113:19, 114:16
**KENNER** [2] - 2:2, 105:1
**Kenner** [30] - 3:6, 4:20, 4:25, 10:10, 11:3, 11:9, 13:9, 13:17, 15:24, 16:15, 19:11, 31:4, 33:9, 58:14, 58:25, 59:23, 60:1, 60:3, 60:13, 65:7, 70:13, 73:12, 76:25, 78:20, 98:9, 101:12, 105:15, 105:16
**Kenner's** [1] - 60:6
**kept** [2] - 6:17, 63:6
**key** [1] - 81:7
**kind** [7] - 33:7, 38:15, 45:14, 52:10, 86:3, 95:9, 95:21
**kinds** [4] - 14:12, 46:2, 61:2, 87:6
**knowingly** [2] - 29:20, 34:7
**knowledge** [8] - 21:24, 24:13, 25:4, 29:2, 29:11, 31:16, 34:25, 65:24
**known** [2] - 52:9, 96:3
**knows** [1] - 14:17
**KOLLAR** [1] - 1:10
**KOLLAR-KOTELLY** [1] - 1:10
**Kong** [1] - 53:20
**KOTELLY** [1] - 1:10
**Kriss** [4] - 9:5, 12:15, 18:1, 18:2

## L

**label** [1] - 54:11
**lack** [3] - 29:11, 34:25, 46:1
**ladies** [1] - 85:16
**lady** [2] - 25:13, 30:2
**laid** [2] - 8:19, 102:2
**language** [4] - 18:5, 82:6, 84:15
**Las** [2] - 70:10
**last** [4] - 4:10, 74:10, 80:3, 80:21
**late** [1] - 71:15
**latter** [1] - 31:15

**law** [14] - 4:10, 9:1, 9:2, 23:4, 23:8, 23:15, 25:8, 35:1, 39:24, 88:12, 111:21, 113:13, 113:22
**Law** [1] - 4:25
**laws** [4] - 22:4, 23:9, 23:20, 88:16
**lawyer** [6] - 67:4, 67:5, 93:22, 93:25, 94:2, 94:23
**lead** [1] - 87:20
**leading** [2] - 13:11, 52:2
**leaning** [1] - 112:6
**learned** [1] - 100:1
**least** [7] - 11:22, 17:5, 18:25, 22:12, 41:10, 67:2, 87:8
**leave** [1] - 94:9
**left** [2] - 80:23, 107:12
**legal** [11] - 21:12, 21:18, 23:14, 30:15, 42:19, 44:24, 54:8, 67:8, 88:11, 101:19, 111:8
**legislative** [1] - 21:23
**length** [1] - 108:10
**lengthy** [2] - 78:21, 79:13
**lenient** [1] - 15:20
**less** [3] - 43:11, 93:12, 107:16
**Lestelle** [7] - 7:15, 8:1, 8:2, 8:12, 8:15, 10:5, 109:4
**Lestelle's** [1] - 23:11
**leverage** [1] - 99:14
**LexisNexis** [2] - 21:21, 22:11
**light** [2] - 42:23, 103:5
**limited** [1] - 113:20
**line** [2] - 53:12, 61:20
**Line** [15] - 55:19, 56:25, 61:16, 61:19, 67:25, 74:9, 74:16, 75:19, 85:12, 86:9, 90:18, 99:2, 102:4
**lines** [2] - 61:12, 99:1
**Lines** [5] - 54:2, 59:12, 59:14, 74:8
**link** [1] - 70:14
**Liquori** [3] - 4:23, 10:6, 109:3
**Lisa** [1] - 115:12
**LISA** [2] - 2:5, 115:3
**list** [3] - 8:15, 8:23,

23:11
**List** [3] - 8:17, 23:13
**listed** [1] - 18:11
**literally** [4] - 48:9, 65:16, 71:9, 102:22
**litigating** [1] - 7:11
**litigation** [1] - 6:22
**LLC** [1] - 57:17
**lobby** [1] - 65:9
**lobbying** [4] - 34:1, 65:4, 66:6, 66:7
**LOCKHART** [31] - 1:17, 5:24, 7:20, 10:8, 11:1, 16:6, 16:12, 19:17, 37:2, 37:5, 41:3, 42:18, 44:21, 45:1, 47:4, 47:12, 49:23, 54:7, 54:13, 54:16, 59:20, 64:7, 103:3, 104:9, 104:12, 105:13, 106:10, 106:15, 106:22, 107:4, 107:6
**lodged** [1] - 38:21, 76:21
**log** [8] - 6:16, 6:21, 7:2, 7:9, 7:12, 10:12, 10:17, 12:3
**logged** [1] - 6:17
**Lonny** [4] - 9:5, 24:22, 96:5, 96:17
**look** [16] - 7:4, 12:17, 13:5, 43:1, 50:21, 62:1, 68:1, 77:25, 80:7, 102:3, 104:21, 106:13, 110:8, 111:16, 113:2, 113:4
**looked** [1] - 30:22
**looking** [13] - 13:17, 24:4, 24:6, 40:12, 40:19, 41:7, 41:10, 43:16, 43:18, 46:6, 58:21, 67:4, 84:1, 99:1
**looks** [2] - 47:6, 80:22
**love** [1] - 33:9
**loved** [1] - 93:22
**lovely** [4] - 24:15, 25:13, 30:1
**low** [8] - 39:8, 39:13, 46:10, 46:12, 46:13, 69:7, 82:18, 87:25
**Low** [19] - 36:10, 52:2, 67:4, 74:17, 78:24, 81:18, 84:16, 86:12, 86:15, 86:17, 87:7, 87:9, 87:13, 88:6, 88:23, 89:2, 90:1, 90:2, 90:23

**Low's** [2] - 67:4, 87:21
  **lower** [1] - 7:4
  **Lum** [17] - 32:14, 47:17, 47:21, 49:1, 49:3, 63:12, 66:12, 79:3, 79:21, 80:1, 82:22, 82:24, 83:3, 83:6, 83:13, 101:25, 103:17
  **lyric** [1] - 97:22
  **lyrics** [7] - 96:25, 97:2, 97:3, 97:18, 98:5, 98:6, 98:7

## M

**Macau** [1] - 101:8
  **Maddix** [8] - 5:10, 7:2, 8:4, 10:5, 13:7, 18:1, 18:10, 18:19
  **magnate** [2] - 90:25, 99:6
  **March** [13] - 12:7, 12:19, 14:1, 14:2, 14:5, 14:6, 14:13, 14:14, 19:20, 19:21, 39:3, 50:15, 92:6
  **mark** [1] - 23:23
  **marked** [3] - 4:22, 7:14, 9:4
  **Mary** [1] - 31:11
  **material** [1] - 22:10
  **materials** [2] - 15:17, 17:9
  **matter** [6] - 9:11, 32:5, 62:16, 63:14, 88:20
  **mattered** [2] - 86:14, 89:19
  **Matthew** [3] - 61:6, 70:18, 99:25
  **May-June** [3] - 61:23, 62:11, 99:24
  **McBride** [1] - 23:23
  **mean** [10] - 11:18, 15:4, 26:12, 28:5, 28:15, 90:6, 92:24, 111:7, 112:24, 113:25
  **meaning** [2] - 17:4, 22:13
  **meant** [3] - 6:6, 18:8, 35:5
  **Mediterranean** [1] - 65:12
  **meet** [1] - 31:17
  **meeting** [17] - 4:11, 25:16, 25:25, 27:2, 31:23, 32:3, 62:18,

62:19, 62:20, 63:1, 63:3, 63:4, 68:6, 68:10, 68:11, 68:14, 68:16
  **meetings** [4] - 6:18, 23:18, 68:2, 68:5
  **member** [1] - 102:11
  **members** [1] - 11:4
  **memo** [1] - 30:9
  **memorandum** [2] - 27:18, 29:18
  **memos** [5] - 22:3, 23:7, 23:14, 23:22, 36:8
  **mention** [4] - 4:5, 4:6, 69:24, 100:16
  **mentioned** [5] - 4:4, 24:19, 62:20, 97:18, 100:16
  **message** [2] - 99:12, 101:4
  **messages** [4] - 63:11, 63:13, 79:6, 99:18
  **messed** [1] - 97:23
  **messing** [1] - 97:1
  **met** [9] - 24:15, 24:16, 25:22, 31:19, 31:20, 47:23, 67:3, 100:1, 102:2
  **Miami** [2] - 24:8, 70:11
  **MICHAEL** [1] - 1:21
  **Michel** [108] - 15:8, 28:20, 29:1, 29:20, 31:19, 32:6, 32:10, 32:25, 34:9, 34:25, 35:8, 35:12, 35:13, 35:24, 40:21, 46:7, 46:8, 47:18, 47:22, 47:24, 48:2, 48:6, 48:13, 48:18, 48:23, 49:2, 49:4, 49:19, 52:4, 52:7, 52:13, 53:17, 53:19, 55:12, 55:14, 55:16, 55:21, 55:23, 56:3, 57:1, 57:15, 57:23, 59:16, 63:13, 63:18, 65:8, 65:18, 65:21, 66:5, 66:7, 66:14, 66:18, 66:25, 67:3, 69:3, 69:6, 69:20, 72:12, 74:4, 74:12, 75:9, 76:10, 79:17, 79:19, 79:23, 80:1, 82:15, 82:16, 82:20, 83:3, 83:12, 84:17, 85:24, 86:11, 87:10, 87:14, 87:19, 87:24, 88:1,

89:1, 89:3, 90:5, 90:10, 90:21, 91:15, 93:6, 93:16, 93:18, 93:21, 93:24, 94:6, 94:11, 94:14, 94:20, 94:21, 95:2, 97:2, 97:5, 98:2, 98:8, 99:9, 101:15, 101:19, 102:1, 102:10, 103:18, 103:20
  **MICHEL** [1] - 1:6
  **Michel's** [14] - 8:1, 22:18, 24:16, 28:17, 29:4, 31:16, 34:6, 34:17, 55:24, 56:5, 75:1, 82:22, 83:7, 97:23
  **microphone** [1] - 98:19
  **middle** [2] - 37:13, 83:23
  **midway** [3] - 24:4, 25:21, 29:12
  **might** [10] - 25:4, 31:2, 31:24, 64:6, 87:18, 90:9, 93:14, 111:20, 113:8
  **million** [16] - 36:10, 39:13, 57:14, 57:16, 57:24, 59:17, 67:8, 80:2, 83:13, 87:21, 88:5, 89:2, 90:3, 90:5, 90:10, 90:11
  **mind** [1] - 22:24
  **minute** [4] - 26:3, 26:5, 27:21, 51:12
  **minutes** [2] - 17:22, 104:19
  **misattributed** [2] - 97:20, 98:7
  **missing** [3] - 10:21, 70:14, 97:19
  **mistake** [1] - 43:16
  **misused** [1] - 97:3
  **moderate** [1] - 93:15
  **moment** [6] - 42:20, 47:21, 82:21, 85:9, 92:11, 106:10
  **Mon** [1] - 81:21
  **MON** [1] - 81:21
  **Monday** [2] - 40:11, 56:8
  **Monday-morning** [2] - 40:11, 56:8
  **money** [18] - 28:22, 28:23, 35:14, 40:15, 41:23, 42:8, 42:9, 58:7, 58:15, 82:10, 82:11, 82:12, 85:18, 85:25, 89:4, 89:8,

89:11, 90:1
  **monies** [2] - 42:4, 42:5
  **month** [1] - 22:12
  **months** [4] - 35:12, 42:23, 70:8, 99:17
  **morning** [10] - 5:19, 6:5, 6:7, 39:3, 40:11, 53:7, 56:8, 72:5, 93:5, 109:20
  **Mosely** [1] - 17:25
  **most** [6] - 13:9, 17:8, 24:1, 24:2, 31:16, 77:6
  **mostly** [1] - 23:25
  **motion** [18] - 12:9, 12:17, 15:11, 30:25, 31:12, 33:20, 33:25, 34:22, 35:21, 40:18, 54:9, 58:24, 59:22, 72:25, 92:5, 97:25, 105:5, 113:10
  **motions** [6] - 23:23, 30:23, 31:4, 31:8, 111:11, 112:14
  **move** [17] - 5:23, 7:19, 10:7, 21:5, 30:19, 41:8, 44:15, 50:13, 61:5, 64:24, 65:1, 71:15, 78:14, 103:2, 106:3, 106:4, 114:3
  **moved** [4] - 32:16, 44:13, 70:9, 79:8
  **moving** [2] - 51:6, 79:12
  **MR** [180] - 4:4, 4:12, 4:17, 4:19, 5:3, 5:7, 5:15, 5:17, 5:23, 6:3, 6:24, 7:19, 7:24, 9:9, 9:10, 9:12, 9:17, 9:20, 9:22, 10:1, 10:7, 10:15, 11:16, 11:20, 11:23, 12:6, 12:12, 13:4, 13:21, 14:4, 14:21, 16:9, 18:18, 19:2, 19:4, 19:9, 20:2, 20:22, 21:5, 21:9, 21:11, 27:8, 29:9, 37:1, 37:9, 41:9, 41:19, 43:3, 43:10, 43:15, 43:20, 44:10, 44:16, 44:18, 44:23, 45:6, 46:22, 46:23, 47:11, 47:13, 50:1, 50:14, 51:5, 51:8, 51:9, 53:5, 53:10, 53:13, 53:16, 54:4, 54:21, 55:5, 56:20, 57:5, 57:11, 57:12,

59:10, 59:15, 60:10, 60:11, 61:14, 61:15, 61:20, 61:22, 62:1, 62:5, 62:8, 64:11, 64:15, 65:2, 66:22, 66:23, 67:12, 67:21, 67:22, 71:16, 71:18, 71:23, 71:25, 72:3, 72:8, 73:14, 75:17, 75:19, 75:21, 77:11, 77:16, 77:17, 78:10, 78:14, 78:19, 80:9, 80:11, 80:19, 81:1, 81:13, 81:15, 84:2, 84:6, 84:9, 84:10, 85:6, 85:12, 85:14, 85:15, 86:8, 86:10, 89:15, 89:17, 90:14, 90:17, 90:19, 91:13, 91:24, 92:1, 92:24, 93:3, 93:4, 97:10, 97:11, 98:11, 98:14, 98:21, 98:25, 99:2, 99:3, 100:12, 103:5, 103:22, 105:1, 105:9, 105:16, 105:19, 105:21, 106:2, 106:8, 106:20, 107:2, 107:11, 107:15, 107:22, 107:25, 108:7, 108:21, 109:3, 109:13, 109:17, 110:2, 110:5, 110:6, 110:14, 110:21, 110:23, 111:1, 112:3, 112:8, 112:21, 113:19, 114:16, 114:18
  **MS** [30] - 5:24, 7:20, 10:8, 11:1, 16:6, 16:12, 19:17, 37:2, 37:5, 41:3, 42:18, 44:21, 45:1, 47:4, 47:12, 49:23, 54:7, 54:13, 54:16, 59:20, 64:7, 103:3, 104:9, 104:12, 105:13, 106:10, 106:15, 106:22, 107:4, 107:6
  **music** [1] - 29:7

## N

**name** [4] - 24:19, 32:1, 37:8, 84:24
  **named** [4] - 42:2, 62:14, 86:12, 95:24
  **names** [1] - 13:1
  **national** [4] - 46:16, 62:13, 74:18, 99:25

**nature** [2] - 16:25, 95:2
**naïve** [1] - 36:3
**naïveté** [5] - 29:5, 29:11, 34:6, 34:17, 34:25
**necessarily** [2] - 110:15, 111:7
**necessary** [2] - 28:13, 70:5
**need** [13] - 11:21, 45:4, 50:24, 53:8, 80:6, 81:18, 89:14, 98:19, 101:23, 104:1, 113:4, 114:8
**needed** [3] - 71:2, 88:16, 101:8
**needs** [1] - 77:12
**neglected** [1] - 4:5
**negotiated** [1] - 48:8
Neil [4] - 95:24, 96:2, 96:3, 96:4
**Nevada** [1] - 87:23
**never** [17] - 28:2, 28:9, 31:19, 35:6, 36:13, 42:14, 47:23, 47:24, 49:5, 60:16, 63:12, 71:12, 81:23, 100:6, 100:18, 101:25
**nevertheless** [1] - 29:24
**new** [10] - 15:11, 22:16, 26:7, 30:24, 54:9, 59:22, 67:4, 72:25, 95:22
**New** [4] - 1:15, 1:19, 32:24, 83:24
**next** [6] - 4:7, 31:24, 41:15, 61:21, 82:2, 99:22
**nice** [1] - 25:17
**Nickie** [16] - 32:14, 47:17, 47:21, 49:1, 49:3, 63:12, 66:12, 79:3, 79:21, 79:25, 82:22, 82:24, 83:3, 83:6, 83:13, 101:25
**NICOLE** [1] - 1:17
**night** [2] - 62:21, 95:5
**normal** [1] - 8:5
**Northwest** [6] - 1:15, 1:19, 1:22, 2:3, 2:7, 115:14
**Nos** [2] - 3:11, 107:9
**note** [3] - 10:12, 47:4, 113:24
**notebook** [1] - 6:16
**noted** [2] - 16:14, 113:4

**notes** [4] - 21:23, 104:22, 113:3, 115:5
**nothing** [6] - 51:18, 81:25, 92:17, 103:19, 103:22, 104:22
**notice** [3] - 15:1, 27:6, 63:9
**notifying** [1] - 25:24
**notwithstanding** [1] - 90:3
**number** [12] - 12:2, 19:12, 22:22, 30:23, 33:22, 34:18, 53:9, 80:4, 80:9, 84:3, 84:13
**numbers** [1] - 12:18
**numerous** [1] - 53:19
**NYU** [1] - 96:4

**O**

**O'CONNOR** [1] - 2:2
**Obama** [14] - 31:5, 34:4, 39:17, 42:1, 42:6, 42:9, 51:13, 51:14, 52:1, 52:9, 52:10, 52:12, 89:4, 90:12
**Obama's** [2] - 85:19, 86:1
**object** [39] - 37:22, 37:24, 38:7, 40:6, 42:11, 42:20, 42:21, 45:20, 46:3, 47:1, 48:5, 48:21, 49:7, 49:10, 51:23, 51:24, 52:17, 54:22, 54:25, 55:18, 56:1, 56:22, 58:1, 58:12, 58:19, 60:20, 62:25, 63:25, 64:13, 64:17, 68:22, 70:22, 73:5, 73:18, 74:7, 75:22, 76:8, 76:16, 76:17
**objected** [4] - 42:14, 49:17, 59:23, 60:16
**objecting** [12] - 11:2, 16:7, 16:11, 40:25, 45:9, 47:15, 49:13, 52:22, 55:7, 60:24, 61:2, 102:24
**objection** [37] - 5:24, 7:20, 10:9, 10:24, 16:18, 38:19, 38:20, 40:8, 40:13, 40:23, 41:2, 41:13, 42:18, 44:20, 44:21, 45:1, 46:1, 49:23, 50:18, 54:7, 59:19, 59:20,

68:23, 70:21, 72:9, 72:10, 72:22, 73:11, 74:6, 75:24, 77:7, 77:8, 103:3, 106:22, 107:3, 107:4, 107:6
**objectionable** [3] - 42:17, 42:25, 45:8
**objections** [3] - 70:1, 76:21, 106:9
**objective** [1] - 45:11
**observation** [1] - 48:4
**obviously** [10] - 12:18, 14:5, 15:8, 21:3, 49:25, 64:13, 98:17, 98:22, 104:3, 112:1
**occasion** [2] - 31:21, 74:25
**occasions** [1] - 37:25
**occur** [20] - 37:22, 38:7, 42:10, 49:7, 52:16, 54:5, 54:24, 60:20, 60:22, 63:21, 65:18, 66:4, 68:25, 70:13, 73:4, 73:17, 76:8, 76:16, 83:19, 91:4
**occurred** [3] - 63:23, 64:6, 111:18
**occurs** [1] - 114:9
**OF** [5] - 1:1, 1:3, 1:10, 1:15, 1:18
**offense** [1] - 110:16
**offenses** [1] - 32:9
**offered** [2] - 26:20, 26:23
**office** [2] - 67:6, 68:13
**Office** [3] - 62:18, 63:4, 92:15
**official** [2] - 99:25, 115:12
**Official** [1] - 2:5
**often** [1] - 43:16
**old** [2] - 96:3, 96:16
**ON** [1] - 44:15
**once** [2] - 12:16, 37:12
**One** [2] - 65:13, 102:19
**one** [42] - 4:3, 4:14, 9:15, 13:16, 13:23, 17:8, 18:13, 19:5, 21:1, 24:6, 24:7, 24:8, 28:21, 30:15, 32:2, 32:15, 40:2, 41:17, 44:16, 50:10, 50:17, 59:13, 59:17, 60:16,

61:1, 63:9, 64:16, 64:17, 68:24, 74:25, 75:4, 78:25, 80:23, 81:7, 84:12, 85:9, 91:24, 96:18, 98:11, 106:6, 109:23, 109:24
**ones** [4] - 49:3, 105:17, 106:7, 111:13
**ongoing** [2] - 32:24, 33:4
**op** [1] - 80:2
**open** [1] - 101:8
**opened** [1] - 48:23
**opinion** [7] - 26:23, 26:25, 32:10, 49:18, 52:9, 77:10, 100:21
**opportunity** [2] - 76:1, 112:24
**opposed** [1] - 50:20
**opposing** [1] - 106:20
**opposite** [1] - 48:16
**options** [1] - 112:18
**order** [10] - 12:16, 15:12, 26:3, 26:5, 27:22, 55:12, 72:16, 86:23, 92:5, 111:17
**ordinarily** [1] - 15:18
**original** [2] - 23:23, 33:21
**originally** [2] - 108:13, 108:15
**otherwise** [5] - 13:24, 38:5, 88:24, 92:25, 108:15
**outcome** [1] - 108:9
**outcome-dispositive** [1] - 108:9
**output** [2] - 96:21, 97:14
**outset** [1] - 41:20
**outside** [1] - 87:23
**Oval** [2] - 62:18, 63:4
**overnight** [1] - 111:22
**overriding** [1] - 29:4
**overview** [6] - 36:22, 37:19, 37:22, 38:8, 38:9, 38:18
**own** [7] - 23:19, 25:9, 25:11, 28:23, 35:14, 87:11

**P**

**p.m** [3] - 1:7, 26:4, 26:6
**PAC** [2] - 39:19, 40:22

**PAGE** [1] - 3:7
**Page** [26] - 41:16, 46:5, 50:16, 53:13, 55:19, 56:25, 59:12, 59:14, 61:10, 61:16, 67:24, 68:9, 71:23, 72:4, 74:8, 74:16, 75:20, 83:24, 85:10, 85:11, 85:12, 90:8, 90:17, 98:17, 99:2, 102:3
**page** [15] - 10:16, 10:18, 53:8, 53:12, 61:21, 73:8, 75:18, 80:14, 80:15, 80:21, 82:2, 82:3, 84:1, 84:22, 97:1
**page-and-a-half** [1] - 97:1
**pages** [7] - 8:18, 8:21, 80:4, 80:7, 80:21, 83:25, 84:3
**paid** [2] - 35:9, 57:18
**paragraph** [1] - 99:22
**part** [29] - 7:25, 29:2, 33:1, 36:19, 42:20, 44:6, 47:3, 48:5, 51:2, 51:3, 54:8, 58:18, 61:5, 69:22, 70:8, 70:24, 70:25, 71:11, 82:9, 82:10, 97:5, 97:14, 97:15, 98:1, 100:7, 100:13, 101:11, 108:12
**particular** [9] - 12:3, 12:5, 19:23, 27:7, 31:20, 45:25, 56:21, 67:11, 82:16
**parties** [2] - 113:25, 114:17
**party** [3] - 66:6, 87:21, 87:22
**pass** [1] - 77:11
**passing** [1] - 8:10
**patient** [1] - 98:10
**pause** [2] - 51:11, 51:12
**pay** [2] - 90:3, 90:5
**paying** [1] - 57:25
**penalty** [1] - 28:23
**pending** [1] - 54:18
**people** [17] - 8:4, 12:4, 23:19, 24:1, 36:9, 55:13, 66:16, 81:19, 87:7, 89:14, 91:12, 98:20, 104:4, 104:5, 109:12, 111:24, 113:15
**People's** [1] - 90:22

**percentage** [1] - 20:6
**perfect** [1] - 17:9
**perhaps** [5] - 47:20,
50:17, 79:1, 107:16,
110:2
**period** [7] - 11:10,
14:14, 18:15, 20:9,
22:13, 84:19, 104:4
**perjury** [1] - 28:23
**permission** [3] -
25:1, 37:16
**permit** [1] - 26:24
**permitted** [1] - 15:2
**persistent** [1] - 41:21
**person** [4] - 29:6,
38:1, 102:22, 114:13
**personal** [1] - 102:6
**perspective** [4] -
107:12, 107:20,
113:6, 114:9
**pertinent** [3] - 13:9,
43:7, 64:24
**PETER** [1] - 1:21
**phone** [8] - 23:25,
24:2, 28:6, 68:12,
69:14, 102:4, 102:16,
102:17
**photo** [2] - 80:2,
88:25
**photograph** [7] -
36:11, 86:12, 86:17,
87:9, 87:15, 89:24,
90:12
**PI** [1] - 8:12
**pick** [3] - 24:2, 104:7,
114:7
**picking** [1] - 104:5
**picture** [1] - 83:13
**piece** [1] - 42:24
**place** [4] - 12:25,
27:3, 67:6, 114:1
**Plaintiff** [1] - 1:4
**plan** [1] - 33:19
**play** [2] - 21:16,
38:15
**players'** [1] - 8:15
**plea** [7] - 22:23, 23:1,
32:16, 109:20,
109:22, 110:1, 110:12
**point** [21] - 13:3,
13:4, 15:5, 18:19,
27:12, 29:19, 32:15,
41:7, 43:21, 43:23,
45:2, 45:4, 58:25,
60:5, 65:10, 72:13,
73:24, 77:3, 81:19,
104:9, 107:23
**pointing** [1] - 57:9
**polite** [2] - 25:13,
25:17

**political** [5] - 29:5,
34:17, 99:6, 99:7,
99:14
**pop** [1] - 37:5
**popping** [1] - 77:6
**portion** [5] - 39:15,
41:23, 43:7, 62:2,
97:14
**position** [11] - 13:19,
14:18, 15:25, 34:18,
36:15, 51:25, 55:9,
76:19, 83:5, 86:14,
102:16
**possibility** [1] - 30:7
**possible** [1] - 114:4
**possibly** [1] - 50:6
**potential** [2] - 93:8,
95:3
**potentially** [2] -
79:16, 112:15
**Pottinger** [10] -
47:20, 61:6, 64:2,
68:4, 69:18, 70:19,
71:4, 71:21, 72:2,
99:25
**Pottinger's** [1] -
102:25
**practice** [1] - 25:8
**PRAKAZREL** [1] -
1:6
**Pras** [5] - 7:17,
83:24, 88:5, 102:1
**pray** [1] - 97:19
**precipitated** [1] -
68:9
**precluded** [1] - 49:21
**prefer** [2] - 110:21,
114:13
**preference** [6] -
109:14, 111:3,
112:21, 113:19,
113:22, 114:3
**preferences** [2] -
112:19, 113:7
**prejudice** [1] - 34:9
**prejudicial** [1] -
79:17
**preliminarily** [1] -
76:23
**preliminary** [1] -
33:6
**prep** [1] - 21:13
**preparation** [1] -
19:16
**presence** [5] - 52:6,
73:4, 73:5, 73:16,
74:3
**present** [4] - 22:19,
29:3, 70:4, 70:17
**presented** [3] -

18:24, 29:15, 70:18
**President** [23] - 31:5,
31:6, 31:13, 39:17,
45:17, 46:15, 51:13,
51:14, 51:25, 52:9,
52:10, 52:12, 63:2,
70:11, 83:16, 84:20,
85:19, 85:25, 90:12,
100:1, 102:7
**president** [25] - 32:3,
36:12, 39:16, 47:22,
47:23, 49:4, 51:19,
52:2, 52:6, 52:8,
62:19, 63:14, 64:3,
65:13, 65:14, 80:2,
87:15, 90:20, 90:21,
90:22, 90:23, 90:24,
100:2
**president's** [1] - 63:7
**presidential** [1] -
34:11
**pressure** [2] - 63:15,
83:2
**presumably** [3] -
14:11, 16:1, 104:23
**pretty** [4] - 8:21,
12:15, 18:20, 95:20
**previous** [3] - 62:21,
64:3, 76:13
**previously** [5] -
13:10, 17:20, 26:13,
43:17, 95:5
**price** [1] - 90:5
**primarily** [1] - 55:22
**principal** [1] - 26:14
**principals** [1] - 26:17
**print** [2] - 78:6, 78:7
**printout** [1] - 18:20
**private** [1] - 90:2
**privilege** [3] - 75:23,
75:25, 76:18
**probative** [2] - 15:6,
43:11
**problem** [7] - 4:9,
4:11, 11:13, 20:20,
53:15, 107:19, 114:13
**procedures** [1] -
92:19
**proceed** [3] - 67:20,
103:25, 104:7
**proceeding** [3] -
74:12, 78:25, 93:7
**proceedings** [5] -
9:11, 15:15, 67:19,
105:3, 115:6
**Proceedings** [1] -
114:19
**process** [1] - 92:14
**processed** [1] -
25:10

**produced** [2] -
11:10, 115:6
**proffer** [1] - 26:20
**program** [2] - 95:15,
96:21
**progress** [1] - 8:20
**promise** [1] - 98:9
**promised** [1] - 82:11
**promises** [1] - 81:21
**promising** [1] -
82:13
**proof** [1] - 70:15
**proper** [1] - 92:19
**properly** [1] - 24:11
**proposed** [2] -
113:9, 113:12
**prosecuted** [1] -
65:6
**prosecutor** [2] -
92:10, 92:17
**prove** [3] - 55:17,
86:22, 88:16
**provide** [1] - 94:5
**provided** [4] - 17:1,
42:6, 42:8
**Public** [1] - 1:18
**published** [1] - 12:8
**Puff** [3] - 97:2, 97:21,
97:22
**pull** [3] - 47:5, 47:8,
47:9
**pulled** [2] - 69:22,
87:25
**purported** [2] - 11:6,
52:25
**purports** [2] - 10:12,
11:12
**purpose** [6] - 13:25,
25:3, 38:13, 87:12,
89:19, 89:23
**purposes** [1] - 28:1
**pursuant** [2] - 66:5,
87:16
**put** [20] - 8:15, 8:16,
12:6, 12:20, 12:25,
26:10, 26:11, 31:2,
35:18, 53:8, 72:14,
73:2, 80:4, 82:8, 83:2,
84:6, 85:4, 97:12,
103:13, 108:18
**Putin** [1] - 82:12
**puts** [2] - 112:1
**putting** [2] - 8:25,
50:17

**Q**

**Q/A** [1] - 8:6
**quarter** [1] - 104:18

**quarterback** [1] -
40:11
**quarterbacking** [2] -
44:7, 56:8
**questioning** [2] -
12:1, 105:11
**questions** [26] - 8:2,
8:6, 8:7, 17:24, 33:10,
45:15, 46:2, 49:11,
49:12, 60:8, 61:2,
61:25, 62:4, 63:20,
64:15, 68:4, 74:20,
78:11, 79:15, 94:7,
95:17, 95:23, 98:9,
104:11, 104:15, 105:4
**quick** [2] - 109:24,
111:13
**quickly** [2] - 47:5,
114:6
**quiz** [1] - 37:6
**Quori** [3] - 4:24, 5:18
**quoted** [3] - 87:20,
90:10, 90:11

**R**

**RAE** [1] - 1:17
**raised** [6] - 15:13,
72:9, 75:2, 75:10,
76:23, 100:2
**raising** [1] - 111:25
**randomly** [1] - 92:16
**rate** [1] - 17:11
**rather** [3] - 24:1,
95:23, 109:5
**rationale** [1] - 33:12
**RDR** [3] - 2:5, 115:3,
115:12
**reach** [1] - 38:4
**reaching** [1] - 99:5
**read** [18] - 21:20,
21:21, 21:22, 22:11,
27:21, 29:17, 33:5,
59:17, 72:25, 78:6,
78:8, 81:4, 81:16,
82:3, 82:5, 85:2,
96:22, 96:24
**reading** [4] - 22:10,
61:10, 78:8, 110:7
**reaffirm** [1] - 50:7
**really** [7] - 8:25,
27:4, 78:7, 86:14,
98:4, 108:3, 114:7
**reason** [12] - 45:8,
47:14, 55:6, 55:18,
56:21, 58:18, 60:7,
60:24, 74:7, 86:20,
96:17, 100:4
**reasons** [1] - 50:24

**reassigned** [2] - 92:16, 92:22
**rebuilt** [1] - 88:8
**recast** [1] - 58:10
**receipt** [1] - 41:23
**receive** [2] - 55:22, 56:4
**received** [7] - 8:3, 16:1, 42:5, 57:13, 59:16, 62:20, 68:11
**RECEIVED** [1] - 3:7
**recently** [2] - 17:15, 17:18
**recess** [3] - 67:18, 95:6, 105:2
**recipient** [1] - 88:18
**recognize** [3] - 45:7, 64:16, 79:16
**recollection** [40] - 6:16, 7:13, 9:15, 19:25, 22:23, 23:2, 27:2, 31:24, 32:21, 32:25, 33:24, 37:15, 38:11, 38:24, 40:7, 40:9, 42:12, 42:13, 52:19, 58:2, 58:21, 65:11, 65:15, 67:2, 69:21, 69:23, 69:25, 71:3, 74:6, 76:7, 77:21, 77:24, 78:1, 79:1, 79:14, 79:22, 87:6, 87:8, 102:21, 103:14
**reconsider** [2] - 14:23, 31:9
**record** [19] - 6:4, 11:25, 20:24, 38:20, 41:4, 43:23, 46:21, 47:7, 57:4, 75:15, 76:20, 80:6, 93:1, 94:8, 94:25, 98:20, 109:7, 113:17
**recruited** [1] - 83:14
**recuse** [1] - 92:21
**recused** [1] - 92:14
**Red** [1] - 3:3
**red** [1] - 63:9
**reelection** [3] - 39:17, 85:19, 86:1
**refer** [3] - 41:15, 54:17, 82:20
**reference** [9] - 6:10, 6:12, 8:7, 41:21, 42:16, 56:5, 79:22, 82:16, 100:4
**referenced** [1] - 4:24
**references** [4] - 51:13, 83:24, 103:19, 111:18
**referred** [1] - 7:10

**referring** [12] - 6:18, 24:14, 51:10, 55:7, 55:15, 59:11, 61:9, 72:18, 74:10, 80:8, 102:16
**refers** [1] - 60:14
**refine** [1] - 21:24
**reflect** [4] - 38:20, 68:23, 76:20, 94:8
**reflection** [1] - 30:11
**reflective** [1] - 63:11
**reflects** [1] - 6:4
**refresh** [3] - 27:1, 79:1, 79:14
**refreshes** [1] - 77:25
**refreshing** [2] - 9:15, 9:23
**regard** [7] - 7:11, 36:6, 45:15, 62:12, 73:20, 84:18, 84:20
**regarding** [6] - 22:8, 59:22, 60:3, 62:13, 98:16, 99:23
**register** [1] - 75:5
**registered** [3] - 26:9, 26:13, 26:18
**regulations** [1] - 22:8
**related** [5] - 26:21, 37:14, 39:10, 46:7, 53:17
**relates** [1] - 18:13
**relating** [1] - 50:19
**relations** [1] - 81:25
**relationship** [4] - 25:8, 73:22, 76:2, 76:4
**relatively** [1] - 22:16
**Relativity** [23] - 10:12, 10:17, 11:7, 12:3, 12:18, 12:21, 13:7, 13:11, 14:1, 14:10, 16:16, 16:19, 17:25, 18:4, 18:5, 18:8, 18:10, 19:8, 19:13, 19:15, 20:7, 20:16, 20:17
**Relativity-language** [1] - 18:5
**Relativity-speak** [2] - 17:25, 18:10
**release** [2] - 48:9, 92:7
**released** [1] - 36:17
**relevance** [1] - 25:12
**relevant** [2] - 42:22, 43:11
**reliable** [1] - 15:3
**relied** [2] - 96:17, 108:9

**remember** [12] - 22:21, 24:19, 25:9, 31:25, 59:3, 64:5, 75:4, 76:12, 78:20, 81:5, 92:8, 96:22
**remembering** [1] - 103:6
**remind** [1] - 111:4
**remote** [2] - 107:19, 107:21
**remotely** [1] - 107:18
**remove** [1] - 34:2
**repeat** [2] - 91:6, 97:9
**repeatedly** [1] - 61:1
**repetitious** [1] - 71:15
**rephrase** [2] - 66:22, 89:16
**replace** [1] - 94:11
**report** [2] - 16:25, 25:2
**reported** [1] - 21:1
**REPORTED** [1] - 2:5
**REPORTER** [3] - 11:24, 46:20, 57:2
**Reporter** [2] - 2:5, 115:12
**reporters** [2] - 12:14, 20:25
**reporting** [2] - 22:8, 110:7
**reports** [1] - 16:20
**representations** [1] - 108:10
**Republic** [1] - 90:22
**request** [7] - 7:1, 18:13, 48:10, 62:12, 67:4, 94:17
**requested** [1] - 7:11
**requesting** [2] - 19:23, 92:21
**require** [1] - 86:22
**required** [1] - 87:2
**requirements** [1] - 22:9
**requires** [3] - 8:24, 8:25, 23:16
**research** [4] - 13:10, 21:12, 21:18, 23:19
**resolve** [1] - 114:5
**resolved** [2] - 22:23, 23:1
**respect** [1] - 20:6
**respectfully** [1] - 64:16
**respond** [1] - 94:7
**responded** [2] - 30:10, 113:14
**response** [2] - 73:11,

75:1
**responsible** [3] - 21:18, 65:19, 66:1
**rest** [2] - 9:6, 110:19
**restricted** [1] - 6:15
**resuming** [1] - 67:20
**retrospect** [2] - 42:17, 43:20
**return** [2] - 36:14, 65:5
**returned** [1] - 21:22
**review** [5] - 8:7, 23:11, 77:20, 77:23, 79:9
**reviewed** [7] - 20:10, 21:23, 22:1, 79:11, 79:13, 100:15, 103:12
**reviewing** [4] - 8:2, 16:16, 16:23, 17:16
**revisit** [2] - 73:23, 76:2
**revisited** [1] - 77:3
**rights** [1] - 96:2
**room** [5] - 8:4, 25:7, 87:24, 95:6, 95:14
**Room** [1] - 2:7
**Rousseau** [1] - 36:9
**Rule** [1] - 26:24
**ruled** [4] - 72:11, 72:23, 76:11, 77:7
**rules** [1] - 28:19
**ruling** [11] - 73:3, 73:5, 73:8, 73:15, 73:18, 73:24, 74:3, 74:5, 77:2, 77:5
**rulings** [2] - 30:22, 77:6
**running** [2] - 32:1, 39:17

**S**

**sacrificing** [1] - 114:4
**saw** [6] - 30:9, 42:15, 45:9, 55:18, 64:25, 84:23
**scant** [1] - 30:23
**schedule** [2] - 104:24, 112:15
**scheduled** [1] - 108:15
**scheme** [7] - 33:19, 52:11, 57:19, 63:13, 63:19, 69:6, 69:13
**schemes** [4] - 34:1, 34:10, 34:13, 36:4
**SCHIFF** [1] - 1:22
**scope** [1] - 11:11

**screen** [6] - 42:15, 82:3, 84:12, 84:22, 85:1, 102:3
**screenshots** [2] - 63:11, 79:5
**scroll** [1] - 7:5
**search** [11] - 12:22, 18:13, 18:21, 18:23, 19:5, 19:24, 20:8, 21:21, 21:22, 23:3, 95:20
**searches** [7] - 18:7, 18:11, 18:14, 18:25, 19:8, 95:21, 95:23
**second** [12] - 10:16, 35:17, 37:13, 41:17, 44:6, 48:4, 50:15, 72:6, 88:11, 91:25, 103:8, 106:6
**secretary's** [1] - 63:7
**Section** [1] - 1:18
**section** [4] - 41:5, 41:15, 61:11
**security** [1] - 99:25
**see** [79] - 5:11, 5:16, 5:21, 6:6, 6:19, 7:5, 7:15, 8:5, 9:7, 10:2, 10:4, 10:9, 10:17, 10:23, 13:1, 13:22, 13:24, 14:16, 15:14, 17:17, 17:18, 23:10, 27:18, 29:13, 36:2, 39:20, 39:25, 40:1, 40:4, 40:5, 40:19, 42:2, 42:14, 46:18, 46:24, 47:7, 47:9, 47:12, 51:21, 53:25, 55:15, 56:7, 57:6, 57:21, 62:23, 68:20, 72:17, 72:18, 72:22, 73:8, 75:13, 77:25, 79:20, 80:14, 83:23, 84:11, 84:12, 85:4, 85:20, 85:21, 86:19, 91:3, 93:7, 97:12, 97:16, 99:11, 99:20, 100:3, 101:4, 101:14, 104:13, 105:5, 111:8, 111:17, 112:4, 113:1, 114:10, 114:12
**seeing** [2] - 42:16, 103:6
**seek** [1] - 27:17
**seeking** [3] - 99:13, 101:5, 101:8
**seem** [1] - 11:21
**send** [2] - 29:24, 96:7
**sends** [1] - 57:16
**senior** [1] - 87:14

**sense** [1] - 18:24
**sent** [6] - 10:2, 57:15, 82:18, 84:25, 92:13, 92:15
**sentence** [1] - 57:23
**separate** [10] - 14:21, 32:14, 32:23, 34:12, 34:24, 36:4, 49:1, 63:18, 66:15, 74:11
**separated** [1] - 34:10
**separation** [1] - 47:17
**series** [2] - 39:23, 76:23
**serious** [2] - 81:20, 82:12
**serve** [1] - 70:11
**SESSION** [1] - 1:7
**Sessions** [2] - 32:8, 48:1
**sessions** [2] - 36:18, 48:10
**set** [14] - 4:16, 31:15, 34:8, 55:21, 56:3, 63:3, 90:5, 108:5, 108:13, 108:22, 110:2, 111:9, 111:10, 112:6
**seven** [2] - 17:22, 70:8
**sever** [5] - 30:19, 31:12, 34:22, 35:16, 35:23
**several** [3] - 24:7, 37:24, 103:4
**severance** [1] - 30:17, 30:22, 35:21
**severing** [1] - 35:4
**shall** [2] - 26:16, 26:19
**shape** [1] - 94:16
**share** [1] - 74:23
**shell** [1] - 55:21
**shit** [1] - 82:12
**short** [4] - 104:4, 107:13, 110:13, 110:14
**shortchanged** [1] - 108:6
**shortsighted** [1] - 108:11
**show** [19] - 11:12, 12:9, 12:16, 13:22, 14:16, 16:22, 23:17, 34:6, 34:24, 84:22, 85:1, 85:2, 87:2, 92:5, 97:5, 97:7, 98:1, 98:15, 106:18
**show-cause** [1] - 12:16

**showed** [3] - 32:6, 48:12, 76:13
**showing** [8] - 4:22, 7:14, 9:4, 46:5, 77:18, 80:14, 80:15, 103:20
**shown** [2] - 13:14, 16:12
**shows** [1] - 14:10
**sic** [1] - 46:6
**side** [4] - 38:14, 45:15, 49:14, 51:25
**signed** [1] - 28:22
**significance** [1] - 101:19
**significant** [1] - 34:15
**significantly** [1] - 107:16
**similar** [2] - 33:17, 34:3
**simply** [3] - 70:5, 71:1, 84:24
**single** [3] - 18:21, 18:23, 97:19
**sitting** [1] - 42:22
**situation** [1] - 35:1
**six** [5] - 13:6, 13:7, 17:21, 22:12, 34:10
**six-month** [1] - 22:12
**skipped** [2] - 43:22, 44:6
**skipping** [2] - 9:21, 57:23
**small** [1] - 78:7
**smart** [1] - 103:2
**solicited** [1] - 82:25
**solves** [1] - 21:10
**someone** [11] - 8:24, 8:25, 12:21, 29:15, 32:1, 43:16, 82:18, 82:19, 86:12, 98:7, 99:6
**someplace** [3] - 70:10, 70:11, 108:19
**sometimes** [3] - 111:22, 111:23
**somewhere** [2] - 22:24, 65:11
**song** [2] - 97:2, 98:7
**soon** [1] - 41:23
**sorry** [32] - 4:13, 5:5, 5:16, 6:11, 7:6, 8:11, 9:9, 9:17, 19:17, 24:19, 39:16, 46:20, 53:13, 56:17, 57:2, 59:17, 60:10, 61:18, 66:20, 71:25, 72:20, 74:12, 74:20, 77:22, 83:25, 86:8, 89:15, 97:7, 97:10, 100:11,

107:1, 107:21
**sort** [2] - 112:5, 112:17
**sound** [1] - 25:22
**sounds** [1] - 19:12
**soup** [1] - 81:24
**source** [1] - 39:15
**Southern** [1] - 32:24
**span** [1] - 11:8
**spat** [1] - 98:4
**speaking** [1] - 29:7
**speaks** [1] - 95:1
**special** [1] - 37:2
**specific** [6] - 18:13, 18:24, 58:7, 72:23, 78:11, 112:17
**specifically** [5] - 21:19, 56:19, 58:16, 61:8, 111:10
**spell** [1] - 37:4
**spend** [2] - 16:22, 20:17
**spent** [9] - 13:6, 16:16, 17:21, 19:13, 20:7, 22:12, 35:14, 35:20
**spoken** [1] - 112:22
**spreadsheet** [1] - 8:24
**staff** [6] - 4:25, 5:5, 5:18, 7:15, 62:18, 68:12
**stand** [2] - 16:15, 49:18
**standalone** [1] - 42:24
**standard** [7] - 14:24, 50:21, 50:22, 51:3, 51:4, 53:2, 95:21
**standards** [1] - 15:13
**start** [6] - 11:14, 37:12, 78:8, 109:10, 109:22, 111:8
**started** [3] - 24:7, 85:16, 85:17
**starting** [8] - 67:24, 74:9, 83:23, 85:10, 86:9, 90:18, 99:2, 102:4
**starts** [1] - 110:12
**State** [4] - 32:5, 32:12, 48:2, 49:6
**statement** [10] - 26:12, 72:12, 72:22, 73:17, 81:12, 81:13, 85:23, 91:20, 97:15, 110:16
**statements** [2] - 43:6, 72:15
**States** [11] - 2:6,

39:14, 46:16, 48:15, 48:24, 62:14, 68:18, 86:13, 86:23, 99:19, 115:13
**STATES** [3] - 1:1, 1:3, 1:11
**statistically** [1] - 31:1
**status** [1] - 102:7
**statute** [1] - 23:10
**statutes** [6] - 21:16, 21:20, 21:21, 22:13, 23:4, 34:8
**stenographic** [1] - 115:5
**Steve** [14] - 63:4, 65:9, 65:11, 66:6, 68:7, 69:14, 90:25, 91:7, 91:21, 99:5, 99:10, 99:11, 101:3
**stick** [2] - 54:20, 60:9
**still** [7] - 16:7, 30:13, 32:23, 71:21, 72:2, 73:21, 102:24
**stop** [2] - 38:12, 74:1
**stopped** [3] - 35:15, 35:20, 75:6
**story** [2] - 12:8, 82:13
**straight** [1] - 81:18
**strategic** [10] - 45:8, 45:11, 47:14, 55:2, 55:6, 56:21, 58:18, 60:24, 83:11, 103:2
**strategical** [1] - 61:4
**strategically** [5] - 35:16, 45:21, 47:16, 63:18, 71:1
**strategy** [29] - 27:25, 28:15, 28:16, 28:20, 29:4, 29:10, 29:19, 29:23, 30:12, 32:13, 34:5, 34:16, 35:2, 35:24, 37:25, 38:12, 42:20, 45:20, 46:1, 46:4, 47:3, 48:6, 48:13, 48:25, 51:2, 55:10, 66:15, 79:24, 103:11
**strategy-wise** [1] - 38:12
**straw** [15] - 39:23, 40:15, 41:21, 41:25, 42:3, 42:8, 42:11, 42:16, 44:19, 44:24, 45:10, 45:23
**Street** [2] - 1:22, 2:3
**Strickland** [1] - 50:21
**strictly** [1] - 113:13

**strike** [1] - 64:5
**strongly** [1] - 112:10
**struck** [1] - 27:12
**stuff** [2] - 20:14, 53:3
**subject** [5] - 7:2, 7:7, 8:6, 9:11, 32:23
**subjects** [1] - 22:17
**submission** [3] - 7:1, 7:8, 7:10
**submissions** [1] - 6:20
**submitted** [2] - 23:24, 30:9
**subpoena** [3] - 12:21, 31:13, 70:8
**subpoenaed** [1] - 25:1
**subpoenaing** [1] - 33:12
**subsequently** [1] - 39:14
**substance** [1] - 114:4
**succeeded** [1] - 35:4
**successful** [1] - 35:3
**successfully** [1] - 28:13
**suffer** [1] - 82:1
**sufficient** [1] - 72:13
**suggest** [2] - 11:16, 92:24
**suggested** [1] - 24:7
**suggesting** [1] - 44:8
**suit** [1] - 71:10
**suite** [1] - 88:7
**Suite** [1] - 1:16
**summary** [1] - 19:7
**summer** [1] - 68:6
**super** [2] - 39:19, 40:22
**superseding** [2] - 26:21, 33:22
**supplement** [1] - 95:20
**support** [2] - 58:8, 113:16
**supported** [4] - 66:15, 82:24, 83:5, 113:17
**supposed** [4] - 4:7, 44:12, 49:6, 88:22
**surprise** [2] - 22:1, 22:7
**sustain** [1] - 81:14
**sustained** [1] - 44:22
**switching** [1] - 44:9
**system** [1] - 92:16

## T

**T.I** [1] - 81:16
**table** [1] - 35:19
**talks** [1] - 12:1
**team** [7] - 9:6, 11:3, 22:3, 23:18, 23:22, 28:8, 96:6
**tech** [1] - 23:25
**technical** [2] - 16:19, 96:16
**technical-conversant** [1] - 96:16
**ten** [1] - 104:19
**tenders** [2] - 77:13, 106:20
**tent** [1] - 87:23
**tentatively** [1] - 110:3
**term** [9] - 44:19, 44:20, 44:24, 45:9, 54:14, 58:16, 58:19, 60:17, 60:25
**terms** [30] - 10:19, 10:22, 11:22, 13:15, 14:11, 16:15, 43:5, 43:6, 50:17, 50:18, 51:6, 54:10, 54:19, 60:8, 64:19, 94:20, 100:9, 100:17, 103:8, 103:10, 103:24, 104:2, 105:14, 110:15, 111:14, 111:16, 112:14, 113:15, 113:21, 114:7
**terrible** [1] - 81:22
**testified** [14] - 13:10, 32:9, 32:10, 40:20, 48:1, 52:7, 52:13, 58:15, 60:6, 61:8, 68:3, 68:5, 71:4, 102:5
**testifies** [1] - 48:22
**testify** [13] - 25:19, 26:10, 37:12, 37:14, 37:19, 45:23, 66:18, 66:24, 69:18, 72:11, 83:10, 101:21, 107:18
**testifying** [3] - 39:2, 44:20, 64:2
**testimony** [64] - 8:19, 16:15, 17:23, 20:5, 26:24, 26:25, 33:9, 38:3, 40:6, 41:11, 41:16, 42:16, 42:24, 44:14, 45:3, 46:24, 47:15, 49:8, 49:13, 49:16, 51:10, 52:5, 59:11, 59:24,

60:1, 60:14, 61:6, 61:7, 62:23, 62:25, 63:1, 63:22, 63:25, 64:9, 64:19, 67:11, 68:22, 69:2, 69:12, 69:17, 70:18, 71:5, 71:19, 72:19, 72:21, 73:9, 73:16, 75:13, 75:22, 76:13, 82:14, 91:5, 99:22, 99:24, 101:21, 102:24, 102:25, 108:8, 108:10, 109:1, 111:5, 111:17, 111:19
**text** [5] - 79:5, 84:16, 99:12, 99:18, 101:4
**Thailand** [1] - 53:20
**THE** [204] - 1:1, 1:10, 1:14, 1:21, 3:5, 4:1, 4:2, 4:3, 4:9, 4:13, 5:2, 5:4, 5:5, 5:14, 5:16, 5:25, 6:13, 6:15, 7:21, 9:8, 9:14, 9:19, 9:21, 9:23, 10:14, 10:19, 11:13, 11:18, 11:21, 11:24, 12:1, 12:11, 13:2, 13:13, 13:22, 14:7, 15:5, 16:7, 16:10, 17:2, 17:15, 18:12, 18:16, 18:23, 19:3, 19:5, 19:14, 19:21, 19:25, 20:20, 20:23, 21:7, 21:10, 27:5, 28:14, 28:16, 37:4, 37:7, 40:25, 41:6, 41:17, 43:1, 43:4, 43:11, 43:19, 43:21, 44:11, 44:22, 45:2, 46:20, 47:9, 49:24, 50:3, 50:12, 50:13, 50:17, 51:6, 53:2, 53:8, 53:12, 53:15, 54:2, 54:10, 54:15, 54:18, 55:3, 55:4, 56:10, 56:12, 56:13, 56:15, 56:17, 56:18, 57:2, 57:8, 58:25, 59:5, 59:6, 59:9, 59:13, 59:19, 60:7, 61:12, 61:18, 62:3, 62:7, 64:8, 64:12, 64:18, 66:20, 67:10, 67:13, 67:17, 67:20, 71:14, 71:17, 71:21, 71:24, 72:1, 72:6, 73:11, 73:13, 75:15, 75:16, 76:22, 77:1, 77:2, 77:15, 78:2, 78:4, 78:16, 80:6, 80:16, 80:20, 80:24, 81:11,

84:1, 84:3, 84:5, 84:8, 85:4, 85:11, 85:13, 89:13, 90:13, 90:16, 91:11, 92:12, 93:1, 97:7, 97:8, 97:9, 98:13, 98:19, 98:24, 99:1, 100:9, 100:11, 103:4, 103:7, 103:12, 103:24, 104:11, 104:13, 104:16, 104:18, 104:20, 104:21, 105:4, 105:10, 105:14, 105:17, 105:20, 105:22, 105:23, 105:25, 106:6, 106:9, 106:12, 106:17, 106:24, 107:3, 107:5, 107:7, 107:14, 107:19, 107:23, 108:5, 108:12, 109:2, 109:5, 109:16, 109:19, 110:4, 110:12, 110:15, 110:22, 110:24, 111:7, 112:4, 112:9, 113:1, 114:5, 114:17
**them's** [1] - 89:14
**then-President** [3] - 39:17, 46:15, 83:16
**theory** [11] - 30:11, 38:14, 69:5, 71:17, 79:19, 82:24, 101:7, 101:10, 102:14, 103:6, 103:9
**therefore** [1] - 48:5
**Thereupon** [2] - 67:18, 105:2
**they've** [1] - 14:11
**thinking** [12] - 43:6, 43:25, 44:2, 45:4, 50:19, 56:10, 59:3, 64:19, 74:7, 93:14, 113:12, 113:18
**thinks** [3] - 58:23, 59:6, 100:10
**third** [1] - 80:21
**thoughts** [4] - 53:4, 56:13, 56:15, 56:18
**threatening** [1] - 84:15
**three** [6] - 13:12, 17:21, 19:12, 24:9, 24:17, 106:3
**throughout** [2] - 19:16, 60:13
**throwing** [1] - 104:6
**timeframe** [5] - 10:11, 10:23, 11:14, 62:12, 112:6

**timing** [2] - 104:2, 110:10
**today** [9] - 4:5, 19:25, 33:10, 56:24, 78:22, 81:6, 104:3, 108:1, 111:18
**together** [5] - 8:15, 8:16, 9:1, 34:21, 36:2
**tomorrow** [12] - 104:5, 108:2, 109:15, 109:16, 110:3, 110:9, 111:13, 112:4, 112:7, 112:23, 113:20, 114:10
**tonight** [1] - 112:2
**took** [6] - 12:17, 53:17, 53:19, 99:23, 108:14, 114:1
**top** [4] - 5:18, 7:4, 7:7, 97:14
**topic** [2] - 68:16, 68:17
**total** [6] - 10:22, 11:8, 19:22, 22:17, 22:21
**totally** [4] - 36:15, 44:8, 92:18, 102:23
**towards** [1] - 112:6
**trail** [1] - 82:5
**transaction** [1] - 33:18
**transactions** [2] - 57:16, 58:6
**TRANSCRIPT** [1] - 1:10
**transcript** [12] - 21:1, 33:6, 46:5, 47:5, 52:20, 57:6, 67:23, 67:24, 94:9, 111:15, 115:5, 115:6
**transcripts** [2] - 41:4, 112:13
**transfers** [1] - 41:24
**translate** [2] - 17:25, 18:9
**transverse** [1] - 18:4
**travel** [1] - 75:5
**treating** [1] - 14:23
**trial** [54] - 14:24, 15:11, 21:13, 21:25, 22:17, 24:5, 24:7, 24:18, 24:24, 25:21, 25:23, 27:9, 29:12, 29:14, 29:23, 30:16, 35:18, 35:22, 36:24, 37:12, 37:14, 38:9, 39:3, 54:9, 59:22, 60:19, 61:5, 70:6, 70:14, 70:23, 72:25, 73:21, 75:25, 77:18,

77:19, 78:13, 78:21, 82:2, 83:10, 88:10, 88:15, 89:18, 94:4, 96:6, 101:13, 103:11, 103:13, 109:10, 109:11, 109:24, 111:19, 114:1
**trials** [4] - 22:20, 35:5, 35:9, 114:7
**tried** [5] - 69:24, 70:8, 76:3, 91:17, 94:19
**trips** [3] - 53:17, 53:19, 53:22
**true** [3] - 93:21, 115:4, 115:5
**Trump** [18] - 31:6, 31:14, 33:12, 34:1, 45:17, 46:15, 63:2, 65:4, 65:9, 69:15, 70:12, 83:15, 83:16, 84:20, 99:7, 100:1, 102:7, 102:20
**try** [16] - 28:13, 29:5, 38:4, 49:10, 58:10, 60:13, 69:18, 78:5, 82:12, 83:19, 99:15, 102:12, 109:9, 110:18, 112:11, 114:6
**trying** [14] - 19:9, 24:17, 31:3, 34:16, 47:16, 49:14, 50:1, 60:12, 73:21, 74:1, 74:18, 75:25, 80:1, 86:11
**turn** [2] - 67:23, 90:8
**twice** [1] - 37:11
**two** [27] - 12:12, 20:25, 22:20, 22:21, 24:9, 26:23, 27:10, 34:6, 34:10, 34:11, 34:12, 34:17, 35:5, 35:9, 35:16, 36:3, 36:9, 44:14, 57:16, 64:15, 65:12, 66:21, 107:12, 107:25, 108:15, 110:24, 114:11
**typing** [1] - 96:19

## U

**U.S** [3] - 1:15, 1:18, 46:10
**ultimately** [1] - 48:25
**unable** [2] - 22:2, 108:2
**uncertain** [1] - 65:15
**unclear** [2] - 10:11, 11:8

**unconnected** [1] - 90:2
**uncovered** [3] - 46:12, 48:17, 51:18
**under** [8] - 22:14, 22:25, 23:16, 26:14, 28:23, 59:21, 90:6
**understood** [11] - 9:2, 9:3, 20:14, 20:15, 28:12, 47:12, 51:5, 51:8, 83:6, 87:10, 94:20
**unexpected** [1] - 68:11
**unindicted** [3] - 100:24, 101:16, 101:22
**UNITED** [3] - 1:1, 1:3, 1:11
**United** [10] - 39:14, 46:16, 48:15, 48:24, 62:13, 68:18, 86:13, 86:23, 99:19, 115:13
**united** [1] - 2:6
**unless** [2] - 64:24, 112:9
**unlikely** [1] - 18:20
**unreachable** [1] - 38:5
**unrelated** [2] - 36:4, 78:25
**unsuccessful** [1] - 70:9
**up** [50] - 6:7, 7:5, 9:24, 10:21, 12:18, 13:11, 14:2, 14:6, 14:14, 19:6, 19:19, 19:21, 24:2, 24:18, 26:11, 30:16, 33:13, 47:5, 47:8, 47:9, 55:22, 56:3, 63:3, 69:25, 71:5, 75:19, 77:4, 77:7, 77:11, 80:4, 80:10, 85:4, 92:3, 93:16, 94:6, 95:8, 97:1, 97:12, 97:23, 102:3, 102:23, 103:9, 104:7, 106:3, 108:13, 109:25, 111:10, 114:7
**urge** [1] - 14:22
**usage** [2] - 10:22, 12:2
**USC** [1] - 26:14
**useful** [6] - 8:25, 15:17, 21:2, 59:8, 111:23
**user** [1] - 11:6
**utilized** [1] - 17:16

**V**

**value** [1] - 12:24
**various** [1] - 6:17
**Vegas** [2] - 70:10
**verbatim** [1] - 82:5
**version** [5] - 5:19, 7:7, 80:17, 96:7, 96:10
**versions** [1] - 59:25
**via** [1] - 26:19
**Victory** [4] - 42:1, 42:6, 42:9, 89:4
**video** [1] - 114:14
**view** [9] - 17:20, 34:1, 41:7, 48:3, 82:14, 89:7, 89:10, 103:10, 111:24
**vigorous** [1] - 93:12
**violate** [5] - 28:18, 29:2, 34:7, 35:1, 88:15
**violation** [1] - 39:24
**violations** [4] - 29:20, 37:13, 86:21, 87:1
**virtually** [3] - 31:1, 108:23, 108:25
**vouched** [1] - 81:23
**vs** [1] - 1:5

**W**

**wait** [4] - 6:14, 72:6, 76:5, 104:19
**waiting** [1] - 68:14
**walked** [2] - 81:24, 88:6
**wants** [2] - 12:20, 113:20
**war** [2] - 95:14, 96:16
**Washington** [7] - 1:6, 1:16, 1:19, 1:23, 2:8, 13:11, 115:14
**washington** [1] - 2:3
**waste** [1] - 51:4
**ways** [2] - 16:20, 38:6
**week** [2] - 22:12, 23:19
**weeks** [4] - 18:21, 18:22, 27:10, 99:17
**weight** [2] - 11:17, 12:25
**Wengui** [5] - 62:14, 62:21, 68:17, 81:21, 90:24
**west** [1] - 68:13

**Westlaw** [3] - 21:21, 22:11, 23:3
**whatsoever** [1] - 17:13
**wheel** [1] - 92:22
**white** [4] - 87:19, 87:25, 89:2, 90:6
**White** [20] - 32:2, 32:19, 32:22, 36:10, 38:1, 38:2, 45:17, 45:18, 46:14, 48:20, 49:20, 52:2, 52:5, 52:8, 66:16, 68:7, 68:12, 83:16, 87:13, 87:17
**White's** [1] - 33:5
**whole** [4] - 6:19, 58:25, 80:14, 112:11
**wife** [2] - 99:11, 101:3
**willfully** [1] - 34:7
**willing** [1] - 90:5
**willingness** [1] - 111:3
**win** [1] - 35:13
**wing** [1] - 68:13
**wise** [1] - 38:12
**wish** [1] - 15:23
**wished** [1] - 105:6
**wishes** [1] - 12:24
**withdraw** [1] - 32:16
**withdrew** [1] - 32:16
**witness** [27] - 4:7, 17:5, 17:9, 24:12, 26:1, 26:7, 26:20, 27:13, 27:19, 32:15, 36:22, 36:23, 37:19, 37:23, 38:8, 38:9, 38:10, 70:14, 71:24, 72:1, 72:18, 73:7, 77:14, 83:9, 105:24, 107:21, 110:9
**WITNESS** [30] - 4:2, 5:5, 6:15, 17:15, 18:16, 19:25, 28:16, 37:7, 41:17, 50:12, 55:4, 56:12, 56:15, 56:18, 59:5, 59:9, 62:7, 67:17, 73:13, 75:16, 77:1, 78:4, 80:24, 84:5, 97:8, 100:11, 103:12, 104:16, 104:20, 105:23
**witnessed** [1] - 26:23
**witnesses** [17] - 12:21, 27:17, 31:4, 38:18, 106:1, 107:11, 107:12, 108:1,

108:21, 108:24, 109:2, 110:4, 110:25, 112:12, 112:23, 114:11, 114:12
**WITNESSES** [1] - 3:5
**wives** [1] - 102:18
**woke** [1] - 6:7
**woman** [1] - 29:13
**word** [4] - 40:23, 41:14, 95:20, 95:23
**words** [4] - 87:3, 87:11, 88:2, 94:24
**works** [2] - 81:20, 114:14
**world** [1] - 29:5
**worry** [1] - 91:21
**wound** [1] - 9:24
**wrap** [1] - 33:13
**wrapping** [1] - 92:3
**write** [2] - 96:12, 96:13
**writing** [1] - 77:8
**written** [6] - 17:17, 80:17, 82:21, 84:18, 84:19, 84:21
**wrote** [2] - 36:8, 87:11
**Wynn** [58] - 31:20, 63:4, 63:5, 65:3, 65:9, 65:21, 66:6, 66:11, 68:7, 68:14, 68:18, 69:14, 69:18, 69:22, 69:24, 70:3, 70:6, 70:9, 70:13, 70:23, 70:25, 71:6, 71:10, 71:11, 90:25, 91:7, 91:14, 91:17, 91:21, 98:16, 99:5, 99:10, 99:13, 99:18, 99:23, 100:1, 100:5, 100:6, 100:7, 100:13, 100:16, 100:17, 100:19, 100:21, 101:2, 101:5, 101:7, 101:16, 101:19, 101:21, 101:24, 102:5, 102:9, 103:1, 103:18
**Wynn's** [8] - 65:11, 70:18, 99:11, 99:13, 101:3, 101:5, 102:17, 103:1
**Wynter** [1] - 10:6

**Y**

**yacht** [3] - 65:11, 69:13, 102:17
**year** [1] - 114:1

**years** [4] - 34:10, 34:19, 96:3, 114:2
**years'** [1] - 8:9
**yesterday** [1] - 4:10
**York** [4] - 1:15, 1:19, 32:24, 83:24
**yourself** [2] - 9:6, 92:21

**Z**

**Zaki** [15] - 4:7, 24:21, 24:22, 25:6, 25:22, 25:25, 26:8, 26:9, 26:13, 29:13, 29:17, 107:17, 107:22, 108:23, 109:15
**ZEIDENBERG** [169] - 1:21, 4:4, 4:12, 4:17, 4:19, 5:3, 5:7, 5:15, 5:17, 5:23, 6:3, 6:24, 7:19, 7:24, 9:9, 9:12, 9:17, 9:20, 9:22, 10:1, 10:7, 10:15, 11:16, 11:20, 11:23, 12:6, 12:12, 13:4, 13:21, 14:4, 14:21, 16:9, 18:18, 19:2, 19:4, 19:9, 20:2, 20:22, 21:5, 21:9, 21:11, 27:8, 29:9, 37:1, 37:9, 41:9, 41:19, 43:3, 43:10, 43:15, 43:20, 44:10, 44:16, 44:18, 44:23, 45:6, 46:22, 46:23, 47:11, 47:13, 50:1, 50:14, 51:5, 53:10, 53:13, 53:16, 54:4, 54:21, 55:5, 56:20, 57:5, 57:11, 57:12, 59:10, 59:15, 60:10, 60:11, 61:14, 61:15, 61:20, 61:22, 62:1, 62:5, 62:8, 64:11, 64:15, 65:2, 66:22, 66:23, 67:12, 67:21, 67:22, 71:16, 71:18, 71:23, 71:25, 72:3, 72:8, 73:14, 75:17, 75:19, 75:21, 77:11, 77:16, 77:17, 78:10, 78:14, 78:19, 80:9, 80:11, 80:19, 81:1, 81:13, 81:15, 84:2, 84:6, 84:9, 84:10, 85:6, 85:12, 85:14, 85:15, 86:8, 86:10, 89:15, 89:17, 90:14, 90:17, 90:19,

91:13, 91:24, 92:1,
92:24, 93:3, 93:4,
97:10, 97:11, 98:11,
98:14, 98:21, 98:25,
99:2, 99:3, 100:12,
103:5, 103:22, 105:9,
105:16, 105:19,
105:21, 106:2, 106:8,
107:2, 107:11,
107:15, 107:22,
109:17, 110:2, 110:5,
110:14, 110:21,
111:1, 112:3, 112:8,
112:21, 114:18

**Zeidenberg** [2] -
4:21, 22:15

**Zoom** [3] - 4:10,
108:19, 108:22