**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA

v.

PRAKAZREL MICHEL (1),
        Defendant.

---

Criminal No. 19-148-1 (CKK)

**MEMORANDUM OPINION**
(April 12, 2024)

On April 26, 2023, a jury convicted Defendant Prakazrel Michel ("Michel") of ten counts

related to his conduct in three schemes involving conduit contributions, witness tampering, and

foreign lobbying.  *See* ECF No. 273 (verdict form).  Before the Court is Michel's [309] Motion for

Judgment of Acquittal ("Motion" or "Mot.").   Michel moves under Federal Rule of Criminal

Procedure 29 ("Rule 29") for a judgment of acquittal on eight counts—Counts 1, 2, 3, 4, 7, 8, 10,

and 12—arguing that the evidence at trial was insufficient as a matter of law to sustain his

convictions as to those counts.  *See generally* Mot.  The Government opposes this motion in its

entirety.  *See* Gov't Resp., ECF No. 320.  Upon careful consideration of the briefing, relevant

legal authorities, and record as a whole, the Court shall **DENY** Michel's [309] Motion for

Judgment of Acquittal.[1]

---

[1] The Court's consideration has primarily focused on the following documents:

- Superseding Indictment, ECF No. 84;
- Michel's Motion for Judgment of Acquittal ("Mot."), ECF No. 309;
- The Government's Response to Motion for Judgment of Acquittal ("Gov't Resp."), ECF No. 320;
- Michel's Reply to Government's Response to Motion for Judgment of Acquittal ("Reply"), ECF No. 328;
- The Government's Supplemental Response to Motion for Judgment of Acquittal ("Gov't Suppl."), ECF No. 351;
- Michel's Opposition to Government's Supplemental Response ("Def.'s Opp'n to Suppl."), ECF No. 352; and
- The Government's Reply to Michel's Opposition to Supplemental Response ("Gov't Reply to

# I.     BACKGROUND

The Court detailed the factual background of this case at length in previous opinions and incorporates those discussions herein.  *See, e.g.*, *United States v. Michel*, No. 19-148-1, 2022 WL 4119774, at *1–5 (D.D.C. Sept. 9, 2022); *United States v. Michel*, No. 19-148-1, 2023 WL 2388501, at *1–2 (D.D.C. Mar. 6, 2023).  The Court refers the reader to those opinions for further background information.

In summary, on June 10, 2021, a superseding indictment charged Michel with ten counts related to his conduct involving three schemes between June 2012 and January 2018.  *See* ECF No. 84.  Specifically, Michel was charged by indictment with: (1) Conspiracy to Defraud the United States and to Make Illegal Foreign and Conduit Contributions (Count 1); (2) Concealment of Material Facts (Count 2); (3) two counts of Making a False Entry in a Record (Counts 3 and 4); (4) two counts of Witness Tampering (Counts 5 and 6); (5) Conspiracy to Serve as an Unregistered Agent of a Foreign Principal and a Foreign Government and to Commit Money Laundering (Count 7); (6) Unregistered Agent of a Foreign Principal and Aiding and Abetting (Count 8); (7) Agent of a Foreign Government (Count 10); and (8) Conspiracy to Make False Statements to Banks (Count 12).  *See generally id.*

Trial began on March 27, 2023, and a jury returned guilty verdicts on all counts on April 26, 2023.  ECF No. 273.  At the conclusion of the Government's case on April 17, 2023, counsel for Michel orally moved for judgment of acquittal under Rule 29.  4/17/2023 AM Trial Tr. at 42:5–10.  Defense counsel filed a written memorandum in support of the motion that same day.  *See* ECF No. 268.  The Court held the motion in abeyance, "pending further order of the Court, and at

Suppl."), ECF No. 353.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCrR 47(f).

least until the return of a verdict in this case." Minute Order (Apr. 17, 2023).  Following the return

of the guilty verdicts on April 26, 2023, the Court ordered Michel to file "his supplemental Rule

29 motion and any other post-trial motion" by June 9, 2023.  Minute Order (Apr. 26, 2023).  After

a series of extensions, Michel filed the pending Rule 29 motion on October 16, 2023.  *See* ECF

No. 309.  The Government filed its opposition on November 6, 2023, ECF No. 320, and Michel

filed his reply on November 13, 2023, ECF No. 328.  The Court requested supplemental briefing

from the parties in February 2024, *see* Minute Order (Feb. 14, 2024), which the parties filed in

February and March 2024, *see* ECF No. 351; ECF No. 352; ECF No. 353.  With the Motion fully

briefed, the Court turns to its resolution.

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 29(a) provides, in relevant part, that "[a]fter the

government closes its evidence or after the close of all the evidence, the court on the defendant's

motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to

sustain a conviction."  Fed. R. Crim. P. 29(a).  "To succeed on a Rule 29 motion, a defendant must

clear a 'very high' hurdle."  *United States v. Hale-Cusanelli*, 628 F. Supp. 3d 320, 324 (D.D.C.

2022) (TNM) (quoting *United States v. Pasha*, 797 F.3d 1122, 1135 n.9 (D.C. Cir. 2015)).

Granting a defendant's Rule 29 motion "is appropriate only when there is *no* evidence upon which

a reasonable juror might fairly conclude guilt beyond a reasonable doubt."  *United States v. Weisz*,

718 F.2d 413, 438 (D.C. Cir. 1983) (citing *United States v. Reese*, 561 F.2d 894, 898 (D.C. Cir.

1977)).  Judgment of acquittal is inappropriate where "any reasonable factfinder could conclude

that the evidence, viewed most favorably to the government, satisfied each element [of the offense]

beyond a reasonable doubt."  *United States v. Slatten*, 865 F.3d 767, 781 (D.C. Cir. 2017) (citing

*United States v. Kayode*, 254 F.3d 204, 212 (D.C. Cir. 2001)).

In essence, a motion for judgment of acquittal should be granted only when, in "viewing the evidence most favorably to the government and according the government the benefit of all legitimate inferences therefrom, a reasonable juror *must necessarily* have had a reasonable doubt as to the defendant['s] guilt."  *Weisz*, 718 F.2d at 437–38 (citing *United States v. Singleton*, 702 F.2d 1159, 1162–63 (D.C. Cir. 1983)).  In ruling on a Rule 29 motion, the Court "must presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences."  *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983).

## III.    DISCUSSION

Michel contends that the Government's evidence at trial did not meet the Rule 29 standard for eight of the ten counts for which he was convicted.  *See generally* Mot.  Michel does not contest the sufficiency of the evidence as it relates to Counts 5 and 6, which involved witness tampering. *See id.*  For the following reasons, the Court concludes that the Government's evidence at trial was sufficient to support each guilty verdict at issue and therefore each disputed jury verdict shall stand.

### A.  Count 1: Conspiracy to Defraud the United States and to Make Illegal Foreign and Conduit Contributions

To begin, Count 1 of the operative indictment charged Michel with Conspiracy to Defraud the United States and to Make Illegal Foreign and Conduit Contributions, in violation of 18 U.S.C. § 371.  *See* ECF No. 84 ¶¶ 20–74.  It alleged that, from June 2012 to June 2015, Michel and Low Taek Jho ("Low") "knowingly conspired with each other and with others" to:

> (a) knowingly defraud the United States by impairing, obstructing, and defeating the lawful functions of a department or agency of the United States; to wit, the FEC's [(Federal Election Commission's)] ability to administer federal regulations concerning source and dollar restrictions in federal elections, including the prohibitions applicable to foreign nationals and straw donors (also known as "conduits" or "straw contributors");

     (b) knowingly and willfully make foreign contributions directly and indirectly, aggregating to $25,000 and more in a calendar year, in violation of [52 U.S.C. §§ 30121, 30109(d)(1)(A)]; and

     (c) knowingly and willfully make contributions to a candidate for federal office in the names of other persons, aggregating to $25,000 and more in a calendar year, in violation of [52 U.S.C. §§ 30122, 30109(d)(1)(A), (D)].

*See id.* ¶ 21.  The Federal Election Campaign Act ("FECA") proscribes foreign contributions (i.e., contributions made by a foreign national), 52 U.S.C. § 30121, and conduit contributions (i.e., making a contribution "in the name of another person"), *id.* § 30122.  Count 1, in brief terms, charged Michel with a 2012 conspiracy with Low (and others) to make foreign and conduit contributions, and to obstruct the lawful functions of the Federal Election Commission ("FEC").  *See* ECF No. 84 ¶ 21.

     Michel concedes that the evidence at trial showed that Low "wired millions of dollars" to Michel, and that Michel used a "portion of that money to make campaign contributions."  Mot. at 12; *see* Reply at 1 ("[T]here was abundant evidence that Low wired funds to Michel, and that Michel then gave the funds to others to donate to the Obama campaign[.]").  Michel, however, claims that there was "no evidence of an agreement between Low and Michel to make illegal campaign contributions" or that Michel "would use straw donors to make these contributions."  Mot. at 12.  Michel further contends that there was no evidence that Low "knew that the donations would violate campaign finance laws," and therefore Low could not have conspired with Michel to violate those laws.  *Id.* at 16.

     To prove conspiracy under Section 371, the Government was required to establish that Michel and Low made an agreement to violate campaign finance laws—by making foreign and conduit contributions—and that both Michel and Low intentionally joined in that agreement.  *See United States v. Treadwell*, 760 F.2d 327, 333 (D.C. Cir. 1985) ("To establish a criminal conspiracy under section 371, the government must prove beyond a reasonable doubt that: (1) two

or more persons formed an agreement either to commit an offense against or defraud the United States; (2) the defendant knowingly participated in the conspiracy with the intent to commit at least one of the offenses charged or to defraud the United States; and (3) at least one overt act was committed in furtherance of the common scheme.").  Direct evidence of the conspiratorial agreement, however, is not required; the jury can infer a "conspiratorial agreement from the circumstances and the defendant's knowledge." *United States v. Moore*, 651 F.3d 30, 97 (D.C. Cir. 2011) (citing *United States v. Childress*, 58 F.3d 693, 710 (D.C. Cir. 1995)); *see United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996) ("It is well established that an agreement sufficient to support a conspiracy conviction can be inferred from circumstantial evidence.").

Furthermore, as it is the conspiratorial agreement that Section 371 "punishes, a single agreement may have multiple objects." *Treadwell*, 760 F.2d at 336 (citing *Braverman v. United States*, 317 U.S. 49, 53–54 (1942)).  To prove an agreement, the Government is not required to show that the conspirators agreed on the specific details of their criminal scheme, but the Government must show the "essential nature of the plan." *Treadwell*, 760 F.2d at 336 (quoting *Blumenthal v. United States*, 332 U.S. 539, 557 (1947)).  Additionally, the jury need only find that one object of the conspiracy was sufficiently supported by the evidence. *See United States v. Washing.*, 106 F.3d 983, 1007 (D.C. Cir. 1997) ("[I]t is a well-established principle that when a jury is instructed on multiple acts that may legally form the basis for a conviction, a general verdict must be sustained so long as the evidence is sufficient with respect to any one of the acts charged."); *see Griffin v. United States*, 502 U.S. 46, 56–57 (1991) ("[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as Turner's indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged."); *id.* at 57 ("We agree with the vast majority of the Federal Courts of Appeals, which have made no exception

to the *Turner* rule for multiple-object and multiple-overt-act conspiracies."); *see, e.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1302 (2d Cir. 1991) ("A conspiracy conviction based on a multi-object conspiracy may be upheld so long as evidence is sufficient with respect to at least one of the criminal objectives.").

With respect to Count 1, Michel's claim of insufficient evidence is unavailing, as there was more than an adequate basis for the jury to reasonably conclude that an agreement to make illegal campaign contributions existed between Michel and Low beyond a reasonable doubt. At trial, the Government presented evidence that the 2012 conspiracy arose from Low's desire to make contributions to President Barack Obama's reelection campaign. Gov't Ex. 290 (J. Rousseau email to Low regarding Obama's campaign "[f]undraiser" and "donating"); 4/3/2023 AM Trial Tr. at 92:22–93:11 (L. DiCaprio testifying that "[Low] or possibly a group of other partners of his were going to give a significant contribution to the Democratic party . . . to the tune of $20 to $30 million"). The Government's evidence demonstrated that Low sought a personal audience with President Obama. *See* Gov't Ex. 290 (J. Rousseau email to Low stating, "They also guarantee you a maximum 15 minutes audience with the President (one on one) that's huge brother[.]"). While Michel maintained at trial that Low simply desired a photograph with President Obama, Michel conceded that he received funds from Low to "help [Low]" and used portions of those funds to contribute to Obama's campaign. *See* 4/18/2023 PM Trial Tr. at 66:13–20 (Michel testifying that he received $1 million from Low and "put $150,000 of donation to get Jho Low into the [June 2012] event. Jho Low can't get into the event. So now we got to try to figure out how to get him to the next event."); *id.* at 88:4–5 (Michel testifying that "[Low] sent me my money. He sent me money for me to help him, again, get him a photo").

The evidence at trial also supported a reasonable inference that Low was aware of the applicable campaign finance laws. Joel Rousseau, a club promoter who introduced Low and Michel, informed Low via email in May 2012 that "being a foreigner is not a problem" to contribute to the Obama campaign *if* Low "owned [a] corporation in [the] US." Gov't's Ex. 290 at 1 ("1-being a foreigner is not a problem as long u owned corporation in US just like George Sorros etc…. All donation can be made to the Super Pack and it can be unlimited."); *id.* ("Very important though, anyone donating more than $40K will need to be vetted[.]"). The jury heard testimony that a foreign national—like Low—cannot contribute to a presidential candidate's campaign or a super PAC (a political action committee), but a U.S. corporation can donate to a super PAC, using its corporate funds, so long as the corporation is not used as a cover for the foreign national to make contributions. *See* 3/30/2023 AM Trial Tr. at 98:1–25. A jury could reasonably infer from Rousseau's email to Low, discussing President Obama's fundraiser and donations, that Rousseau and Low were aware of the general prohibition on foreign contributions. *See* Gov't's Ex. 290 (J. Rousseau stating that "being a foreigner is not a problem as long as [Low] owned [a] corporation in [the] US"). Similarly, Michel admitted during cross-examination that he was aware of this prohibition. *See* 4/18/2023 PM Trial Tr. at 80:6–8. Michel further testified that he (Michel) provided money to other people to make contributions to the Obama campaign in their names, and that he did so because he had already reached his maximum contribution limit. *Id.* at 82:5–10. And, although Michel stated his belief that the money given to these individuals was his own money—and therefore he could do what he'd like with it—he conceded that he received the money from Low. *Id.* at 69:16–70:5 (Michel testifying that "[t]he money came from Jho Low"); *id.* at 68:17–23 (Michel testifying that "it was [his] discretion to use [his] money that Jho Low gave [him] to figure out how to get [Low] in this photo").

Lastly, the evidence at trial demonstrated that those involved in the 2012 conspiracy sought to conceal Low as the true source of the funds. *See* Gov't's Ex. 294 at 2 (email string between E. Tan and J. Rousseau with Tan stating "one of them whom you know who is a Malaysian citizen. Pls keep name off e-mails. (to meet with the main guy + be at the event)"). FBI Special Agent Robert Heuchling testified at length regarding Low's use of a proxy—Eric Tan—for his financial transactions during the applicable time period. *See* 3/30/2023 AM Trial Tr. at 110:5–7 (Agent Heuchling testifying that "Eric Tan was an associate of Jho Low who acted as a proxy or a cut out often in Mr. Low's financial transactions and dealings"); *id.* at 113:7–17 (Agent Heuchling testifying that there were "many instances in which [Low's] name was intentionally kept off documents or emails"); *id.* at 137:23–138:14 (testimony that Tan was the "signatory on the Alsen Chance account" but Low was the "primary recipient or beneficial recipient of the funds that float out of the Alsen Chance account"); *id.* at 138:15–20 (testimony that "$600,000 from Alsen Chance to [Michel]" and "[Michel] transfer[ed] those funds to straw donors" who in turn donated to the Obama Victory Fund); 3/30/2023 PM Trial Tr. at 5:16–22 (Agent Heuchling testifying that the investigation revealed that Low was the "beneficial owner" of the Blackstone and Alsen Chance accounts; "he was the person who ultimately benefited from those funds, meaning he had a controlling—or the majority controlling interest, so he could direct those funds into and out of those accounts"). Overall, the evidence at trial provided an ample basis for the jury to reasonably infer the requisite agreement between Michel and Low, as well as the requisite intent to participate in such an agreement.

In sum, although the jury was not permitted to find Michel guilty based solely on "mere speculation," the jury was "entitled to draw a vast range of reasonable inferences from [the] evidence." *United States v. Teffera*, 985 F.2d 1082, 1085 (D.C. Cir. 1993) (quoting *United States*

*v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990)).  The Court concludes that the Government presented more than sufficient circumstantial evidence of an agreement to conspire, and that the jury was not asked to "cross[] the line from permissible inference to improper speculation." *Teffera*, 985 F.2d at 1088.  The verdict for Count 1 therefore stands.

### B.  Counts 3 and 4: Making a False Entry in a Record

Michel was also convicted of two counts of Making a False Entry in a Record, in violation of 18 U.S.C. §§ 1519 and 2.  ECF No. 84 ¶¶ 77–80; ECF No. 273.  Section 1519 provides criminal liability for anyone who "knowingly . . . conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States[.]"  18 U.S.C. § 1519.  The Court will address each count in turn.

#### 1.  Count 3: Obama Victory Fund

Count 3 alleged that Michel caused the Obama Victory Fund to make false statements in a report to the FEC "that falsely listed the names of straw donors as the true sources of the contributions."  ECF No. 84 ¶ 78.  Michel concedes that there was evidence he provided approximately $40,000 to multiple straw donors each, who in turn attended one of two campaign fundraising events for President Obama and made contributions in that same amount.  Mot. at 16.  However, Michel claims that there was no evidence that he "caused" any false statements to be made to the FEC.  Reply at 6.

But the Government did not charge Michel with directly making false statements to the FEC (as Michel was not the one who submitted the statements to the agency).  Instead, the Government relied on 18 U.S.C. § 2 in conjunction with Section 1519 to charge Michel with causing the Obama Victory Fund to file false reports with the FEC.  *See* ECF No. 84 ¶ 78; *see also*

*United States v. Singh*, 979 F.3d 697, 717 (9th Cir. 2020) (discussing a conviction pursuant to these sections). Section 2(b) "makes it an offense to deliberately cause another person to perform an act that would violate federal criminal law." *United States v. Curran*, 20 F.3d 560, 566 (3d Cir. 1994); *see* 18 U.S.C. § 2(b). In the federal election law context, the Government must prove that the individual charged with "causing an innocent intermediary to make a false statement to the FEC . . . knew of the [political committee's] reporting obligations, that he attempted to frustrate those obligations, and that he knew his conduct was unlawful." *United States v. Trie*, 21 F. Supp. 2d 7, 14 (D.D.C. 1998) (PLF) (quoting *Curran*, 20 F.3d at 569). Notably, the D.C. Circuit has found that "the simple interposition of conduits to sign the checks is certainly enough to 'cause' a committee to make false statements in its report [to the FEC]." *United States v. Hsia*, 176 F.3d 517, 523 (D.C. Cir. 1999); *United States v. Kanchanalak*, 192 F.3d 1037, 1042 (D.C. Cir. 1999) (reaffirming *Hsia*'s finding).

In this case, there was sufficient evidence for a jury to reasonably conclude beyond a reasonable doubt that Michel caused the Obama Victory Fund to make false entries on campaign disclosures forms to the FEC. At trial, seven straw donors testified that they received approximately $30,000 to $40,000 from Michel for the specific purpose of attending a President Obama fundraising event and/or contributing to the Obama campaign. *See* 3/31/2023 AM Trial Tr. at 110:5–14 (J. Toussaint testifying that he received $40,000 from Michel to contribute to the campaign and attend the fundraising event); *id.* at 128:13–24 (T. Wright testifying that Michel purchased her $40,000 ticket to attend the fundraising event); 3/31/2023 PM Trial Tr. at 61:2–62:2 (N. Richardson testifying that he received $40,000 from Michel for the fundraising event); 4/3/2023 AM Trial Tr. at 134:12–135:4 (R. Moise testifying that Michel provided him with $30,000 to contribute to the Obama campaign); 4/3/2023 PM Trial Tr. at 21:5–18 (R. Kromka

testifying that Michel provided him and his husband, J. Ronquillo, $40,000 each to contribute to the campaign); *id.* at 50:21–51:23 (D. Sugarman testifying that he and his wife received $75,000 from Michel to contribute to the campaign and attend the event); *see also id.* at 72:2–73:25 (J. Brewer testifying that he received $32,000 from Michel to contribute to the campaign, though he returned the funds).  Some of these straw donors testified that Michel asked them to contribute to the campaign because Michel had already reached his campaign contribution limit.  *See* 3/31/2023 AM Trial Tr. at 128:17–21 (T. Wright testifying that Michel gave her the funds because "he had reached his contribution cap, I believe, or max contribution, the amount he could make"); 4/3/2023 PM Trial Tr. at 21:5–10 (R. Kromka testifying that Michel "had mentioned to me that he had maxed out his contributions to the Obama re-election campaign and asked me if I would be willing to contribute to that campaign [with his money]").  Michel also testified during cross examination that he provided the funds to the straw donors to make the contributions in their names.  *See* 4/18/2023 PM Trial Tr. at 82:5–14 ("Q: You gave money to other people to make contributions in their names; right? A: Yes, correct. Q: Because you were maxed out and you couldn't give any more money, right? A: Right. Q: So in order to get around the limit, you gave your money to other people to make contributions in their names? A: Right. I gave my money to these people to make contribution.").  Additionally, at least some of these straw donors were given specific instructions on how to contribute to the Obama Victory Fund.  *See* 3/31/2023 AM Trial Tr. at 131:18–132:4 (T. Wright testifying that she mailed the check to an address given by Michel); 4/3/2023 PM Trial Tr. at 51:9–19 (D. Sugarman testifying that he received instructions from "somebody that Pras put me in contact with").

After the straw donors made their contributions using Michel's money, the Obama Victory Fund reported each contribution to the FEC as though the straw donor was the true contributor.

*See* 3/31/2023 PM Trial Tr. at 11:10–20 (E. Feigenbaum testifying that the campaign was required by law to collect certain information from each donor to report to FEC); *id.* at 11:10–12:22 (testimony that the campaign would use its "best efforts" to collect donor information for its FEC report).  Eric Feigenbaum, the Mid-Atlantic Finance Director of the Obama for America campaign, testified that while the "primary" method for obtaining donor information was through donor forms, the campaign would utilize other methods as well, including contacting the donor directly after the event.  *Id.* at 12:15–22.  The jury was presented with evidence that the Obama Victory Fund did in fact obtain information—such as names, addresses, employer information—about the straw donors and submit that information on itemized receipts to the FEC.  *See* Gov't's Ex. 567 (FEC Form listing R. Kromka's information and donation); Gov't's Ex. 568 (FEC Form listing J. Ronquillo's information and donations); Gov't's Ex. 686 (FEC Form listing T. Wright's information and donation); Gov't's Ex. 687 (FEC Form listing R. Moise's information and donation); Gov't's Ex. 689 (FEC Form listing D. Sugarman's information and donation); Gov't's Ex. 690 (FEC Form listing R. Toussaint's information and donation); Gov't's Ex. 692 (FEC Form listing N. Richardson's information and donation).

Finally, the evidence was sufficient to support a reasonable inference that Michel was aware of the campaign's reporting requirements.  Michel testified that he played an "active" role in the 2012 campaign and was aware of campaign contribution limits.  *See* 4/18/2023 AM Trial Tr. at 81:15–16; 4/18/2023 PM Trial Tr. at 81:16–82:10.  He received an invitation for one of the fundraising events from Frank White, the campaign's National Vice Chair of Finance, which included the certification that the donated funds were not provided by another for purposes of making the contribution.  *See* Gov't's Ex. 258 (email from F. White to Michel); Gov't's Ex. 509 (copy of September 2012 event invite).  Michel also provided the campaign with information about

the straw donors and other attendees at the fundraising events.  *See* Gov't's Ex. 575 (email from Michel to F. White regarding information of various individuals); Gov't's Ex. 578 (email chain between Michel and F. White regarding "vitals" for attendees).  This evidence was sufficient for a jury to make a justifiable inference that Michel was aware of the Obama Victory Fund's reporting contributions.  *See United States v. Harris*, 435 F.2d 74, 88–89 (D.C. Cir. 1970) (citation omitted) ("[F]requently, guilty knowledge is incapable of direct proof and is established, if at all by circumstantial evidence."); *Campbell*, 702 F.2d at 264 (the jury's function includes "drawing justifiable inferences").

Overall, the evidence presented allowed a reasonable jury to conclude that Michel knowingly caused the Obama Victory Fund to make false entries on campaign disclosure forms to the FEC.  Accordingly, the jury verdict for Count 3 stands.

2.  Count 4: Michel's FEC Declaration

Next, Count 4 alleged that Michel submitted "a declaration to the FEC claiming that he made four contributions" to a super PAC called Black Men Vote ("BMV") and "he had no reason to conceal the true source of the contributions," when in fact Michel knew that the true source of the contributions was Low.  ECF No. 84 ¶ 80.  Specifically, in June 2015, Michel filed a declaration with the FEC, in which he confirmed that "[he] made four contributions to an independent expenditure only committee called Black Men Vote" in September and October 2012. Gov't's Ex. 245 ¶ 1.  The first two contributions (totaling $350,000) were made "from a personal account in [his] own name."  *Id.*  The second two contributions (totaling $875,000) were made from SPM Holdings, LLC ("SPM"), an entity established in July 2012 "for the sole purpose of consolidating, investing, and protecting all of [Michel's] personal assets."  *Id.* ¶¶ 1–2.  According to Michel's declaration, the "sole consideration" for using SPM for the final two contributions was

"cash flow." *Id.* ¶ 3.  He stated "[he] had no reason to hide the true source of [his] donations to Black Men Vote nor did [he] wish to diminish the disclosure of source or amounts of [his] contributions to Black Men Vote as being attributable to [himself]." *Id.* ¶ 5.

The impetus for submitting the declaration was a complaint filed before the FEC in April 2015, alleging, among other things, that Michel used his company, SPM, to anonymize himself as the true source of $875,000 in contributions to BMV.  Gov't Ex. 243 at 2, 8.  As previously discussed, federal law prohibits contributions "in the name of another."   52 U.S.C. § 30122. Though not discovered in 2015, it was later revealed that the funds Michel used to contribute to BMV originated from Low.  *See* Gov't Ex. 600; Gov't Ex. 664; 3/30/2023 PM Trial Tr. at 27:3–25 (Agent Heuchling testifying that the BMV contributions "can all be traced back to either Blackstone or Alsen Chance").

In the Motion, Michel argues that the evidence was insufficient on Count 4 because the statements in his FEC declaration were not false, nor were they intended to obstruct the FEC's 2015 investigation.  Mot. at 18.  Michel emphasizes that the FEC complaint in 2015 did not allege that he or his company (SPM) used "foreign money to make contributions, nor was such an allegation being investigated by the FEC" at that time.  *Id.* at 18–19; *see* Gov't Ex. 584 (FEC letter to Michel regarding complaint).  Michel contends that Count 4 therefore fails because the Government did not prove that Michel concealed that the funds were from Low with the intent to obstruct the FEC's investigation.  Mot. at 19.

Section 1519 is not as limited in scope as Michel claims.  *See id.* ("The FEC was not investigating the source of Michel's funds.").  As stated by the Supreme Court, Section 1519 "covers conduct intended to impede any federal investigation or proceeding, including one not even on the verge of commencement."  *Yates v. United States*, 574 U.S. 528, 547 (2015).  Circuit

courts have also concluded that the existence of a federal investigation is not required for criminal liability to attach. *See, e.g.*, *United States v. Yielding*, 657 F.3d 688, 711 (8th Cir. 2011) ("Congress thereby sought to extend the prohibition to situations in which the accused does not act directly with respect to a pending matter, but acts either in contemplation of a future matter or in relation to a pending matter."); *id.* (Section 1519 "does not allow a defendant to escape liability for shredding documents with intent to obstruct a foreseeable investigation . . . just because the investigation has not yet commenced"); *United States v. Kernell*, 667 F.3d 746, 753 (6th Cir. 2012) (agreeing with *Yielding*'s interpretation of § 1519); *United States v. Gray*, 642 F.3d 371, 379 (2d Cir. 2011) ("§ 1519 does not require the existence or likelihood of a federal investigation."); *Singh*, 979 F.3d at 719 ("[T]he mere fact that the defendant contemplated an investigation satisfies this element."); *United States v. Moyer*, 674 F.3d 192, 206 (3d Cir. 2012). Accordingly, Michel could be held liable under Section 1519 if he intended to "impede" or "obstruct" a *future* investigation. *Yates*, 574 U.S. at 547.

At trial, the Government provided evidence that Michel's contributions to BMV originated from Low. Agent Heuchling testified that more than $1.1 million of the funds contributed to BMV came from Low. *See* 3/30/2023 PM Trial Tr. at 65:17–21. Since the funds came from Low, a foreign national who could not legally contribute to super PACs, *see* 52 U.S.C. § 30121, a jury could have reasonably concluded that Michel made his statements with the intent to impede or obstruct any investigation into the source of the contributions in the future, *see Singh*, 979 F.3d at 719 ("From this evidence, a jury could reasonably infer that Singh contemplated an investigation due to unlawful activity and intended to direct that investigation away from himself.").

Michel also argues that his statements in his FEC declaration were not false. Mot. at 18 ("[H]is declaration was not false[.]"); Reply at 9 ("[I]t alleges that Michel's declaration was false,

when in fact it was not.").  In his declaration, Michel claimed that he was the "true source" of all the donations to BMV, and that the funds from SPM were derived from his income and investments.  Gov't's Ex. 245 ¶¶ 3, 5.

As an initial matter, various circuit courts have accepted that an omission can satisfy Section 1519's actus reus element.  *See, e.g.*, *United States v. Taohim*, 529 F. App'x 969, 974 (11th Cir. 2013) (per curiam); *Moyer*, 674 F.3d at 207; *United States v. Schmeltz*, 667 F.3d 685, 688 (6th Cir. 2011); *Singh*, 979 F.3d at 717 ("[A]n omission satisfies § 1519's actus reus element, especially since terms such as 'conceal' and 'false entry,' specifically listed in the statute, refer to similar actions.").  Therefore, Michel's omission—the failure to include Low as the true source of the funds—can satisfy the actus reus element of Section 1519.  *See id.*  Evidence at trial revealed that over $1.1 million of the contributions to BMV originated from Low, not Michel's legitimate business income.  *See* Gov't's Ex. 600; Gov't's Ex. 664.  A jury could have reasonably inferred that Michel concealed Low's connection to the funds by claiming that he (Michel) was the true source of the funds and that the funds were derived from his income and business expenditures. *See* Gov't's Ex. 245 ¶ 3 (discussing SPM's net income, investments amount, and cash amount); *id.* ¶ 5 (stating he was the "true source" of the donations to the BMV).  Accordingly, the verdict for Count 4 will remain undisturbed.  *See Taohim*, 529 F. App'x at 974 ("A jury rationally could have concluded . . . that Taohim anticipated that the garbage record book would be reviewed in a future agency proceeding and that he ordered it falsified for that reason.").

### C.  Count 2: Concealment of Material Facts

Count 2 of the operative indictment charged Michel with Concealment of Material Facts, in violation of 18 U.S.C. §§ 1001(a)(1) and 2.  ECF No. 84 ¶¶ 75–76.  In general, Count 2 involves similar facts as Counts 3 and 4, alleging that Michel: (1) caused the Obama Victory Fund to make

reports to the FEC that "falsely listed the names of straw donors as the true sources of the contributions"; (2) caused BMV to make similarly false reports to the FEC that falsely listed Michel as the true source of the contributions; and (3) submitted a declaration to the FEC that "falsely claimed that Michel made four contributions to [BMV] . . . and that he had no reason to conceal the true source of the contributions," when in fact the true source was Low.  *Id.* ¶ 76.

Section 1001(a)(1) imposes criminal liability on anyone who, "in any matter within the jurisdiction [of the United States]," "knowingly and willfully—falsifies, conceals, or covers up by any trick, scheme, or device a material fact."  18 U.S.C. § 1001(a)(1).  As with Count 3, since Michel did not author either of the reports from the Obama Victory Fund or BMV, the Government relied on Section 2 in conjunction with Section 1001(a)(1) to charge Michel with causing the Obama Victory Fund and BMV to file false reports with the FEC.  ECF No. 84 ¶ 76 ("[Michel] caus[ed] [the Obama Victory Fund] to make false statements in reports of receipts and disbursements filed with the FEC . . . [and] caus[ed] [BMV] to make false statements in reports of receipts and disbursements filed with the FEC[.]").

Michel challenges the sufficiency of the evidence for Count 2 by reiterating the same arguments he raised for Counts 3 and 4.  *See* Mot. at 20 ("Count 2 suffers from the same infirmities as do Counts 3 and 4[.]").  For similar reasons that the evidence was sufficient for Count 3 and Count 4, *see supra* Section III.B, the Court concludes that Michel's claim of insufficient evidence is unavailing.  Although the evidence need only be sufficient to support one of the acts alleged in the charge, the evidence was sufficient to support all three acts charged in Count 2.  *See Washing.*, 106 F.3d at 1007 ("[I]t is a well-established principle that when a jury is instructed on multiple acts that may legally form the basis for a conviction, a general verdict must be sustained so long as the evidence is sufficient with respect to any one of the acts charged.").

To begin, the jury was presented with evidence that Michel paid over $865,000 to various straw donors to contribute to the Obama Victory Fund and/or attend an Obama campaign event. *See* Mot. at 16; *see also* Gov't Ex. 601 (chart reflecting some straw donors who received funds from Michel to contribute to the Obama Victory Fund); 4/18/2023 PM Trial Tr. at 82:5–14 (Michel confirming that he provided money to others "to make contributions in their names").  The Obama Victory Fund then submitted itemized receipts to the FEC that reflected the straw donors as the true source of the contributions.  *See, e.g.*, Gov't Ex. 690 (FEC Form reflecting R. Toussaint's information and contribution).  At trial, Michel testified that the funds he used to pay the straw donors were funds given to him by Low to assist Low in getting a photo with President Obama. 4/18/2023 PM Trial Tr. at 67:9–68:11; *id.* at 70:4–5.

Similarly, Michel (and his company) contributed over $1.1 million to BMV, and BMV, in turn, submitted itemized receipts to the FEC that reflected Michel, or his company (SPM), as the true source of the contributions.  *See* Gov't Ex. 236 at 6 (FEC Form reflecting Michel's information and contribution); *id.* (FEC Form reflecting SPM's contribution); Gov't Ex. 237 at 6 (FEC Form reflecting SPM's contribution).  Then, in June 2015, Michel submitted a declaration with the FEC that stated he was the "true source" of the contributions to BMV, that the funds were from his legitimate income, and that he had "no reason" to conceal the source of the contributions, that source being him.  Gov't Ex. 245 ¶¶ 3, 5.  But the jury was presented with evidence that the $1.1 million in contributions to BMV also originated from Low.  *See* 3/30/2023 PM Trial Tr. at 27:22–28:7 (Agent Heuchling testifying that he and others traced the contributions back to Low); *see also* Gov't Ex. 600; Gov't Ex. 664.  Again, Michel did not reveal that information to the FEC in his declaration, claiming instead that he was the "true source" of the contributions and that the funds were derived from legitimate income.  Gov't Ex. 245 ¶¶ 3, 5.

Overall, the evidence was sufficient for a jury to reasonably conclude beyond a reasonable doubt that Michel caused the Obama Victory Fund and BMV to falsely report donor information to the FEC.  *See, e.g.*, *Hsia*, 176 F.3d at 523 ("[T]he simple interposition of conduits to sign the checks is certainly enough to 'cause' a committee to make false statements in its reports."); *United States v. Hopkins*, 916 F.2d 207, 215 (5th Cir. 1990) ("While it may be true that the Hopkins themselves did not make the reports, it is clear that they deliberately caused those reports to contain false information.  The evidence showed that by keeping him unaware of their scheme, the Hopkins caused another individual . . . to report to the [FEC] that the contributions to the political action committee were from individuals.").  A jury could also reasonably conclude that Michel submitted a declaration to the FEC that falsely claimed he was the source of the contributions to conceal from the FEC Low's connection to the funds.  *Teffera*, 985 F.2d at 1085 (jury is entitled to "draw a vast range of reasonable inferences from [the] evidence").  The jury's verdict on Count 2 therefore stands.

### D.  Count 10: Agent of a Foreign Government

Count 10 charged Michel with Agent of a Foreign Government, in violation of 18 U.S.C. § 951.  ECF No. 84 ¶¶ 154–55.  It alleged that Michel "knowingly, without notifying the Attorney General as required by law, acted as an agent of a foreign government and foreign official, specifically, the PRC Government and PRC [Vice Minister Sun Lijun], and aided and abetted Broidy's, Higginbotham's, and Lum Davis's actions as agents of the PRC Government and [Vice Minister Sun]," by agreeing to operate in the United States "at the direction" of Vice Minister Sun "in executing a back-channel lobbying campaign to convince the [Trump] Administration to return [Guo Wengui, a Chinese national,] to the PRC."  *Id.* ¶ 155.  Per Section 951, it is a crime to "act[] in the United States as an agent of a foreign government without prior notification to the Attorney

General."  18 U.S.C. § 951(a).  An "agent of a foreign government" is defined to mean "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official."  *Id.* § 951(d).

Michel claims that the evidence is "plainly deficient" with respect to Count 10 because, according to him, there was no evidence that he "agreed to act at the direction or control of the Chinese government."  Mot. at 25.  Similarly, Michel claims that there was no evidence that he aided and abetted Elliot Broidy, George Higginbotham, or Nickie Lum Davis in agreeing to act "at the direction or control of the Chinese government."  *Id.*  According to Michel, the evidence "showed unequivocally that Michel and the other[s] [] were working at the direction or control only of Low, not the Chinese government."  Reply at 12.  Michel primarily relies on the Fourth Circuit's standard articulated in *United States v. Rafiekian*, 991 F.3d 529, 538 (4th Cir. 2021) ("*Rafiekian I*"), and in *United States v. Rafiekian*, 68 F.4th 177, 184 (4th Cir. 2023) ("*Rafiekian II*") to support his contentions that there was a lack of "direction or control" by the PRC government.  Mot. at 25–26, 27–28.  Because the Court finds the Fourth Circuit case to be instructive, the Court shall briefly summarize the factual background of that case before addressing the Fourth Circuit's conclusions.

In July 2016, Bijan Rafiekian was an executive at a consulting and lobbying firm—the Flynn Intel Group ("FIG").  *Rafiekian II*, 68 F.4th at 180.  That month, the Turkish government had asked the Department of Justice ("DOJ") to extradite a Turkish national who resided in Pennsylvania, claiming he was a terrorist and blaming him for a failed coup against Turkish President Recep Tayyip Erdogan.  *Id.* at 180–81.  The DOJ only placed the request under review. *Id.* at 181.  Also in July 2016, Rafiekian and Lt. General Michael Flynn began communicating with Ekim Alptekin, a Turkish businessman with Turkish officials contacts, about hiring FIG for

a project related to "Turkey's security and stability." *Id.*  During this time frame, Rafiekian shared a list of action items for the potential project—referred to as "Project Truth"—with Alptekin, who shared the action items with Turkey's Foreign Affairs Minister. *Id.*  After discussing the matter with Alptekin, Rafiekian also shared the belief that the Turkish national was a "threat," and therefore supported FIG working on behalf of the Turkish government "to discredit [the Turkish national] in the eyes of the American public." *Id.*  By early August 2016, Alptekin, Rafiekian, and Flynn continued discussions of Project Truth, and, on August 10, Alptekin informed them that he had spoken with the Turkish Ministers of Economy and Foreign Affairs, and had received approval to discuss various aspects of the contract with FIG. *Id.*  After August 10, however, the Turkish government's interest in Project Truth ceased. *Id.*  But on August 11, Rafiekian emailed Alptekin to discuss a new project, this time called "Operation Confidence." *Id.*  Rafiekian also emailed FIG employees and informed them that FIG was going to be engaged by a "Dutch client" for Operation Confidence, when in fact the company supporting the project was owned and operated exclusively by Alptekin. *Id.* at 182.  The goal of Operation Confidence was to restore confidence in Turkey's trade and investment climate, and the mechanism for doing so was discrediting the Turkish national because it would "contextualize the actions President Erdogan had taken in response to the coup attempt," actions that many in the United States "viewed as unjustifiably harsh." *Id.*  Although Project Truth and Operation Confidence shared a similar focus, there was one key distinction: the client. *Id.*  The Turkish government would have been the client for Project Truth, while the sole client for Operation Confidence was the company owned by Alptekin. *Id.*

The FIG team worked on the Operation Confidence through the rest of August and into September 2016. *Id.*  During this time, Flynn and Rafiekian elected not to register their activities with the federal government. *Id.*  In September 2016, a meeting was held in New York that

included Flynn, Rafiekian, Alptekin, and two Turkish officials, as well as other FIG employees. *Id.* at 183. One member of the FIG team who attended the meeting testified at trial that the meeting was about "Turkey's displeasure with [the Turkish national] and its desire for his extradition." *Id.* By November 2016, the DOJ began an investigation into whether FIG or anyone related to the entity had an obligation to register under the Foreign Agents Registration Act ("FARA"). *Id.* Ultimately, Rafiekian was charged with, *inter alia*, violating 951. *Id.* at 184. His trial began in July 2019, and a jury convicted him on all counts. *Id.* at 185.

On appeal for the second time, the question before the Fourth Circuit in *Rafiekian II* was whether the district court abused its discretion in determining that a new trial was warranted based on the weight of the evidence. *Id.* at 190. The Fourth Circuit concluded it had not, noting that the district court's conclusion was supported by its own reasonable inferences of the evidence. *Id.* Of relevance here, the Fourth Circuit reaffirmed the standard articulated in *Rafiekian I*, stating:

> To fall within § 951's ambit, as we made clear in *Rafiekian I*, a person must do more than act in parallel with a foreign government's interests or pursue a mutual goal. Instead, a person must agree to operate subject to the *direction or control* of the foreign government. To exercise "direction or control" under § 951's definition, the foreign government need not dictate every particular act taken by the agent, but the agreement between the government and the agent "cannot be one-sided"—that is, "a person does *not* become an 'agent' for purposes of § 951 *simply by acting in accordance with foreign interests* or by privately pledging allegiance." There must be a foreign government or official on one end of the line.

*Id.* at 184 (quoting *Rafiekian I*, 991 F.3d at 538, 540–41) (quotation cleaned up). As such, to convict Rafiekian under Section 951, the Government had to prove that he acted subject to the "direction or control" of the Turkish government, "not simply that his actions aligned with Turkey's interests." *Rafiekian II*, 68 F.4th at 184 (citing *Rafiekian I*, 991 F.3d at 538–41). Relying on this standard for determining when an individual operates subject to the "direction or control" of a foreign government, Michel claims there is "even less evidence of an agreement" and

"direction or control" in this case than in *Rafiekian II*.  Mot. at 28.  A review of the trial transcripts reveals otherwise.

To begin, Michel testified during cross-examination that he met with the PRC Vice Minister of Public Security, Sun Lijun, on more than one occasion in 2017, and that he was the sole non-Chinese official in one of those meetings.  4/19/2023 AM Trial Tr. at 36:23–37:4 (testimony that Michel met with Vice Minister Sun in China in May 2017); *id.* at 38:2–7 (testimony that Michel met with Vice Minister Sun in New York City in 2017); *id.* at 39:3–5 (Michel confirming he was the only non-Chinese official in the NYC meeting).  Michel further testified that Vice Minister Sun asked for his help, and that he specifically agreed to help Vice Minister Sun.  *See id.* at 37:8–11 ("Q: And Vice Minister Sun asked you and Mr. Broidy and Ms. Lum Davis to help him get meetings with U.S. Government officials.  Right?  A: Correct."); *id.* at 37:12–14 ("Q: And help get this alleged Chinese criminal Guo Wengui to get him sent back to China.  Right?  A: Correct."); *id.* at 37:20–38:1 ("Q: You, Mr. Broidy, and Ms. Lum Davis agreed to help try to set up the meetings for Vice Minister Sun.  Right?  A: Well, my help is in connecting and relaying the information back and forth.  Yes.  Q: To help Vice Minister Sun?  A: Right, because he was supposed to meet with FBI Director Comey.").  Michel also confirmed that he received materials regarding Guo (the Chinese national), either directly from the PRC government or from Low who obtained them from the PRC government.  *See id.* at 69:5–9 (Michel confirming he sent himself an email "with the information that Low had given [him] from the Chinese government about Guo"); Gov't's Ex. 395 (copy of the email and attachments); 4/19/2023 AM Trial Tr. at 73:21–74:7 (Michel stating Vice Minister Sun gave him a letter addressed to Attorney General Jeff Sessions from the Chinese ambassador); Gov't's Ex. 652 at 2 (copy of the May 2017 letter to Attorney General Sessions).  Moreover, in July 2017, Michel directed Higginbotham to go to the

Chinese embassy in Washington, D.C.  *See* 4/19/2023 AM Trial Tr. at 44:23–45:4 ("Q: So the day after [July 15], when the deadline was missed, when Guo had not been sent back to China, you send George Higginbotham to meet with the Chinese ambassador.  Right? A: Yes. Q: To deliver the message that the National Security Council was working on the deportation of Guo.  Right? A: Based on the message I got from Elliot Broidy.").  Lastly, Michel requested a meeting with FBI Special Agent Andrew Zitman to discuss Guo and to inform him that Vice Minister Sun "is trying to get in contact with someone in the administration."  *Id.* at 42:20–23 (Michel testifying that he "thought it would be important to reach out to the FBI agent with an urgent matter, which was" about Vice Minister Sun's efforts); *id.* at 43:3–5 ("This is the message, so Lijun can meet with someone to help resolve their political issues.").

Additional testimony at trial suggested that these efforts to extradite Guo to China were on behalf of the PRC government.  For instance, Higginbotham testified that the Guo project was based on China's desire to extradite Guo and China's willingness to pay for it.  4/6/2023 AM Trial Tr. at 63:4–17 (testimony that Michel "present[ed] a story that seemed at the time quite fantastic involving this Guo Wengui . . .; you know, the release of various prisoners and what the Chinese government would be prepared to do in the event that Guo [] was returned; and the possibility that it would be quite lucrative if we were able to work achieve [sic] the extradition of Guo Wengui."); *id.* at 74:14–18 (Higginbotham confirming that Michel "referenc[ed] what China was willing to do to try and get Mr. Guo back").  Higginbotham believed that the funds for this project would be from the PRC government, albeit passed through Low.  *Id.* at 63:24–64:2 ("Q: And who would pay that money? A: Well, it would be coming from Jho Low, but I would guess, because it was at the behest of the Chinese government, it would be the Chinese.").  Higginbotham also confirmed that Michel had asked him to meet with the Chinese ambassador at the Chinese embassy in D.C.

in July 2017.  *Id.* at 65:3–14.  Higginbotham stated that the purpose of this meeting was "to make the Chinese ambassador feel more comfortable that work was actually taking place and progress was taking place with the extradition of Guo Wengui."  *Id.* at 67:11–14.

Similarly, Broidy testified that the PRC government was interested in extraditing Guo back to China.  4/4/2023 AM Trial Tr. at 46:6–19.  And Broidy confirmed that it was Vice Minister Sun who elicited his help.  *Id.* at 47:12–17 ("A: I also, at the request of Vice Minister Sun—he was trying to set up meetings through official channels, and I—he asked me if I would help him. He wasn't having any luck.  So I also attempted to do that.  He wanted to pitch his idea that he described to me to Attorney General Sessions, for example."); *see id.* at 91:1–6 (testimony that Vice Minister Sun asked Broidy for his help in organizing meetings with U.S. government officials).   In exchange for assisting in the efforts to extradite Guo, Broidy believed that he could receive additional money from Low.  *Id.* at 47:20–48:3 ("I think Nickie said they might throw us a bone or something if we—that Jho Low might.").  While Broidy conceded that he felt obligated to assist Vice Minister Sun on the Guo project due to his engagement with Low, Broidy nonetheless agreed to assist a Chinese government official and met with that same foreign official on more than one occasion.  *See id.* at 91:23–92:3 (Broidy testifying that he "felt that it was part of [his] engagement with Jho Low; that I was there, and I thought I would try to help [Vice Minister Sun] assist with getting the meetings."); *id.* at 90:6–19 (Broidy testifying that he and others met with Vice Minister Sun in China); *id.* at 93:12–14 (Broidy testifying that he met with Vice Minister Sun "just one-on-one" in D.C.).   Broidy's testimony demonstrated that he tried on multiple occasions to set up meetings for Vice Minister Sun.  *Id.* at 134:11–15 (testimony that Vice Minister Sun was "depressed," "upset," and "embarrassed" that he "didn't get any of the meetings that weren't set up either through his official channel or through my efforts").  Following his second

meeting with Vice Minister Sun, Broidy again tried to arrange meetings for Vice Minister Sun with government officials. *See id.* at 134:16–19.

As demonstrated above, this is not a case where Michel and others "simply [acted] in accordance with foreign interests" or "privately pledg[ed] alliance." *Rafiekian II*, 68 F.4th at 184 (quoting *Rafiekian I*, 991 F.3d at 540). Michel and others actively and intentionally sought to assist the PRC government and Vice Minister Sun on the Guo matter, and met with Vice Minister Sun on more than one occasion and sometimes privately. *See supra* pp. 24–27. There was sufficient evidence for a jury to reasonable conclude beyond a reasonable doubt that Michel acted as an agent of a foreign government and foreign official, in violation of Section 951. And, while Low was also involved and continued to pay Michel and the others for their efforts, there was sufficient evidence for the jury to draw the reasonable inference that Low was acting as an intermediary between the PRC government and Michel and the others. *See, e.g.*, 4/19/2023 AM Trial Tr. at 78:2–21 (Michel confirming he received information from Low regarding "Chinese envoys and a request from" Chinese President Xi Jinping "for a meeting or a call with President Trump" for Michel to convey this information to Lum Davis, who will convey it to Broidy, who will in turn convey to President Trump); *id.* at 69:5–9 (Michel confirming he received official information about Guo from Low who had received it from the PRC government); *Teffera*, 985 F.2d at 1085 (jury is entitled to "draw a vast range of reasonable inferences from [the] evidence"). Unlike in *Rafiekian I*, this case had a "foreign government or official on one end of the line," and therefore a jury could reasonably conclude that Michel's conduct "falls within § 951's ambit." *Rafiekian I*, 991 F.3d at 539, 540. The verdict on Count 10 shall therefore stand.

**E.  Count 8: Unregistered Agent of a Foreign Principal & Aiding and Abetting**

Count 8 charged Michel with Unregistered Agent of a Foreign Principal and Aiding and Abetting, in violation of 22 U.S.C. §§ 612, 618 (FARA) and 18 U.S.C. § 2.  ECF No. 84 ¶¶ 150–51.  Specifically, it alleged that Michel "knowingly and willfully, without registering with the Attorney General as required by law, acted as an agent of a foreign principal, and aided and abetted Broidy's, Higginbotham's, and Lum Davis's knowing and willful unregistered actions as agents of a foreign principal [(Low)] . . . by executing an unregistered, back-channel lobbying campaign to resolve the 1MDB investigation favorably for Low."  *Id.* ¶ 151.

FARA provides that "[n]o person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement[.]"  22 U.S.C. § 612(a).  FARA's definition of an "agent of a foreign principal" is broad; it encompasses anyone "who directly or through any other person": (a) "engages within the United States in political activities for or in the interests of such foreign principal"; (b) "acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal"; (c) "solicits, collects, disburses, or dispenses contributions, loans, money, or other things of value for or in the interest of such foreign principal"; or (d) "represents the interests of such foreign principal before any agency or official of the Government of the United States."  *Id.* § 611(c)(1).  FARA's definition of a "foreign principal" is similarly broad, encompassing foreign governments, foreign political parties, and other combinations of foreign persons or groups doing business outside the United States.  *Id.* § 611(b).  In essence, "nearly anyone who represents the political or public-relations interests of a foreign principal in the United States is covered under FARA."  *Att'y Gen. of U.S. v. Wynn*, 636 F. Supp. 3d 96, 98 (D.D.C. 2022) (JEB); *see United States v. McGoff*, 831 F.2d 1071, 1074 (D.C. Cir. 1987).  This

broad scope of persons aligns with FARA's purpose, which is to "prevent covert influence over U.S. policy by foreign principals," by ensuring that the public "is informed of the true source or sponsor behind the information being disseminated for its consideration." *United States v. Craig*, 401 F. Supp. 3d 49, 54 (D.D.C. 2019) (ABJ); *McGoff*, 831 F.2d at 1074 ("The idea is a frequently recurring one in modern government: public disclosure is needed in order for the public (and, at times, the Government itself) accurately to evaluate such activities."). While FARA is a "disclosure statute," *Wynn*, 636 F. Supp. 3d at 98, its prohibition applies to actions, *see* 22 U.S.C. § 612(a) ("No person shall *act* as an agent of a foreign principal unless" one is registered or is exempt from registration) (emphasis added). FARA does not prohibit being a foreign agent; it prohibits one from acting as an undisclosed foreign agent. *See* 22 U.S.C. § 612(a); *see also United States v. Manafort*, 318 F. Supp. 3d 1, 4 (D.D.C. 2018) (ABJ) (same).

In his Motion, Michel challenges the sufficiency of the evidence as it relates to his purported obligation to register under FARA. *See* Mot. at 29–30. According to Michel, the Government did not prove that he "himself lobbied the U.S. government 'to resolve the 1MDB investigation favorably for Low,'" and therefore Michel had no obligation to register under FARA. *Id.* at 30 (quoting ECF No. 84 ¶ 151). Michel further contends that he did not aid and abet Broidy's, Higginbotham's, and Lum Davis's knowing and willful unregistered lobbying activities to resolve the 1MDB investigation favorably for Low. *Id.*

To begin, Michel does not dispute that he was providing services for Low as it relates to the 1MDB investigation against Low. At trial, the Government presented evidence that Michel entered into a contract with Pheng Laogumnerd ("Pheng") in May 2017. *See* Gov't's Ex. 439 (copy of May 2017 contract); 4/19/2023 AM Trial Tr. at 32:19–20 (Michel testifying that Ex. 439 is a "contract with me, Anicorn and Pheng that was written or negotiated by Mr. Higginbotham").

By its express terms, the contract provided a €280 million "success fee" in the event that Michel's services cultivated in an agreement by "[DOJ], [FBI] and any other relevant US Government agencies," as well as authorities in other countries, "**to drop all civil and/or criminal cases and/or cease investigations and/or removal of any INTERPOL Red Notice (or other forms of international notices and/or actions)**" within the United States and other countries against Low and related family by September 31, 2017, "with [] no wrongdoing whatsoever; [] no admission of guilt; [] no forfeiture of any further assets other than previous artworks directly owned by [Low][.]" Gov't Ex. 439 at 2 (emphasis in original). Although the contract was signed by Michel and Pheng, *id.* at 5; 4/6/2023 AM Trial Tr. at 47:20–48:1, the jury heard testimony that Pheng was Low's proxy—"[m]erely a straw man; someone who was close to Jho Low that helped anonymize Jho Low as part of these transactions," 4/6/2023 AM Trial Tr. at 52:8–9 (testimony from Higginbotham); *see also* 4/4/2023 AM Trial Tr. at 80:17–21 (Broidy testifying that Low "had a source of the funds, a guy called [Pheng] . . . who was going to be putting up the money for this purpose"). While Michel maintained at trial that Pheng "paid [him] for an investment," and as a consequence of that "investment," Michel had to help Low find legal representation for the 1MDB matter, 4/19/2023 AM Trial Tr. at 17:11–17, Michel conceded that he was assisting Low with his legal matters, *id.* at 21:22–25 ("[I]n order for me to initiate this business transaction from Pheng, which brought to me by Jho Low, I understood I had to do something for Jho Low, which is help him with his legal affairs."). As such, Michel had, at a minimum, an agency relationship with Low. *See* 22 U.S.C. § 611(c)(1).

Evidence at trial also demonstrated that Michel had a significant role in the 1MDB scheme. First, he actively sought out other individuals who could assist Low on the 1MDB matter. *See* 4/6/2023 AM Trial Tr. at 7:7–10 (Higginbotham testifying that Michel "approached [him] about

trying to help him identify an attorney that had the ability to resolve a civil forfeiture matter for Jho Low having to do with the 1MDB case"); *id.* at 24:17–22 (Higginbotham testifying that "Michel was excited that that was the kind of person [(R. Guiliani)] that could assist in this resolution of the 1MDB matter for Jho Low."); 4/4/2023 AM Trial Tr. at 67:22–25 (Broidy testifying that Michel "was putting a team together . . . [Michel] was looking for people to be on the team to work on the [1MDB] matter"). It was Michel who recommended Broidy to work on the 1MDB matter for Low. 4/18/2023 PM Trial Tr. at 99:2–4. And, while Michel claimed at trial that Broidy joined the 1MDB team "to help advise [Low's] legal team and how to deal with civil forfeiture," *id.* at 100:2–4, ample testimony—including Michel's own testimony—suggested that the real reason Broidy became involved was because of Broidy's "close relationship with President Trump," *id.* at 98:24–99:4 ("Q: And you knew that [Broidy] had a close relationship with President Trump; right? A: Yes. Q: And that's why he's the one that you recommended to Jho Low; right? A: Yes."); 4/4/2023 AM Trial Tr. at 43:11–13 (Broidy confirming that he and Michel agreed to "use [Broidy's] access and influence with the [Trump] administration on behalf of" Low); *id.* at 68:4–8 (Broidy testifying that when he met Michel, Michel's "emphasis was on [Broidy's] relationships with the administration [and] Congress.").[2] Broidy testified that he "sought to use the relationships [he] had in the administration and government to—in the hopes of helping resolve the 1MDB matter." 4/4/2023 AM Trial Tr. at 44:18–20.

After seeking out and enlisting others to assist on the 1MDB matter, Michel then served as a supervisor and intermediary. According to Broidy, Michel would supervise his efforts by receiving updates from Lum Davis. *See* 4/4/2023 AM Trial Tr. at 137:22–24 (Broidy testifying

---

[2] While Broidy did plead guilty to one count of conspiracy to violate FARA, and, because of that plea agreement, agreed to cooperate with the Government during the investigation of this case, *see* 4/4/2023 AM Trial Tr. at 48:16–24, the Court must presume that the jury properly carried out its function in evaluating the credibility of each witness who testified at trial, *see Campbell*, 702 F.2d at 264.

that when he would provide updates to Lum Davis, she would in turn provide updates to Michel); *id.* at 112:4–10 (same).  Broidy believed the purpose of these updates was for Michel to then provide the information to Low.  *Id.* at 112:16–18.  Broidy also testified that Michel was pressuring him and Lum Davis on Low's behalf.  *See id.* at 116:10–12 ("I believe that Mr. Low was pressuring [] in this chain of conversations, pressuring Mr. Michel, who was pressuring Nickie, who was pressuring me.").  Broidy further testified that Michel (and Low) approved of a specific lobbying effort by Broidy involving President Trump and Malaysian Prime Minister Najib Razak.  *See id.* at 95:8–12 ("Q: So ultimately this idea of setting up a golf game between President Trump and the prime minister, Prime Minister Najib, did you learn that Mr. Michel and Mr. Low approved that idea? A: Yes.").  Broidy also received 1MDB talking points from Lum Davis and sought to share them with the staff of Secretary of State Rex Tillerson.  *See id.* at 108:4–9; Gov't's Ex. 455 (copy of talking points).  According to Broidy, the content of the talking points was provided by Lum Davis, who had received the information from Michel or Low.  *Id.* at 109:13–20.

Overall, the evidence at trial showed that Michel was involved in the 1MDB scheme on behalf of Low, primarily as a messenger, facilitator, and intermediary.  *See, e.g.*, 4/19/2023 AM Trial Tr. at 78:12–14 (Michel testifying "I'm just a messenger.  I'm bringing one message to another, because part of my agreement from the investment—from Pheng is to try to help Jho Low with his legal issue."); 4/4/2023 AM Trial Tr. at 93:23–25 (Broidy confirming that he believed Michel "to be the facilitator between Mr. Low and Ms. Lum Davis and [himself]"); *id.* at 67:22–25 (Broidy testifying that Michel was putting "a team together" for Low).

The parties dispute whether there was sufficient evidence at trial to convict Michel on Count 8 for directly lobbying the Trump administration (or other government officials).  *Compare* Gov't's Suppl. at 4 ("[T]he evidence also established that Michel personally engaged in registrable

activities as Low's agent."), *with* Def.'s Opp'n to Suppl. at 2–3 (arguing Michel did not lobby the Trump administration). But the Court need not make that determination. The Superseding Indictment charged Michel with violating FARA himself *and* with aiding and abetting Broidy's, Higginbotham's, and Lum Davis's violations of FARA. *See* ECF No. 84 ¶ 151. The evidence at trial provided more than an ample basis for the jury to reasonably conclude beyond a reasonable doubt that Michel aided and abetted Broidy's FARA violation.

The federal aiding and abetting statute states that a person who "aids, abets, counsels, commands, induces or procures" the commission of a federal offense "is punishable as a principal." 18 U.S.C. § 2(a). This provision "reflects a centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission." *Rosemond v. United States*, 572 U.S. 65, 70 (2014) (citing J. Hawley & M. McGregor, Criminal Law 81 (1899)). To be liable under Section 2 for aiding and abetting, the person must: (1) "take[] an affirmative act in furtherance of th[e] offense" (2) with the "intent of facilitating the offense's commission." *Id.* at 71 (citation omitted). For the first requirement, a defendant can be found guilty under Section 2 "without proof that he participated in each and every element of the offense." *Id.* at 73 (citation omitted); *id.* at 74 ("The division of labor between two (or more) confederates thus has no significance[.]"). For the second requirement, the intent "must go to the specific and entire crime charged[.]" *Id.* at 76. For purposes of this statute, a person "who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission." *Id.* at 77.

In his Motion, Michel does not dispute that the evidence showed that Broidy did lobby the Trump administration.[3] *See* Mot. at 30 ("[T]he Government introduced evidence only that Broidy

---

[3] In his supplemental briefing, Michel now argues that Broidy did not engage in registrable conduct under FARA. *See* Def.'s Opp'n to Suppl. at 8.

lobbied the U.S. Government to end the investigation into the 1MDB[.]").   Nor does Michel dispute that Broidy was an agent of Low.   *See* Def.'s Opp'n to Suppl. at 7 ("Broidy was Low's agent[.]").   As discussed above, Michel served a pivotal role in the 1MDB scheme, working as a facilitator and intermediary between Low and Broidy.   *See supra* pp. 30–32.   Michel was the one who: introduced Broidy to Low because of Broidy's connections to the Trump administration, supervised Broidy's actions (and pressured him), and approved of Broidy's lobbying efforts (at least approved of one effort in particular).   *See supra* pp. 30–32.   As a result, a jury could have reasonably concluded that the affirmative act requirement for Section 2 liability was satisfied.   *See United States v. Ali*, 718 F.3d 929, 936 (D.C. Cir. 2013) ("All that is necessary is to show some participation which at least encourages the principal offender to commit the offense[.]").

As for the intent requirement, the evidence also indicated that Michel intended for Broidy to act as an undisclosed agent of Low.   Evidence at trial demonstrated that Michel was aware of FARA.   Higginbotham testified that he shared his "concerns about FARA" with Michel on multiple occasions.   4/6/2023 AM Trial Tr. at 20:19–21; 4/11/2023 AM Trial Tr. at 26:10–15 (testimony that he communicated that information to Michel on "numerous occasions").   Although Michel was "very dismissive" when these concerns were raised, Michel never questioned what FARA was. 4/6/2023 AM Trial Tr. at 20:23–21:18.   Higginbotham further confirmed that "[t]here was definitely an attempt to anonymize what we were doing across the board, and FARA would have pretty much announced, you know, officially that we were involved in this—in these activities."   *Id.* at 21:19–23.   According to Higginbotham, Michel did not want to register for FARA in part because he was concerned that registration "could cause him to be stopped" at airports.   4/11/2023 AM Trial Tr. at 17:5–7.   Similarly, Broidy testified that while he was aware that FARA registration was required for himself, Michel, and Lum Davis, Broidy deliberately

chose not to register because he wanted to keep the 1MDB matter confidential to increase his likelihood of success. 4/4/2023 AM Trial Tr. at 86:15–18 (Broidy testifying that he realized registration under FARA was required for himself, Michel, and others); *id.* at 87:18–88:4 (testimony that Broidy intentionally did not want anyone to know he was working on behalf of Low because it would "make it very difficult [to be successful with the 1MDB engagement] if I disclosed that, so I chose to keep it confidential").

In all, the Court concludes that the jury was presented with more than sufficient direct and circumstantial evidence to reasonably conclude that Michel aided and abetted Broidy's violations of FARA.[4] The verdict on Count 8 therefore stands.

## F. Count 7: Conspiracy to Serve as an Unregistered Agent of a Foreign Principal and a Foreign Government and to Commit Money Laundering

Count 7 charged Michel with a conspiracy that had four unlawful objects. *See generally* ECF No. 84 ¶ 105. The first unlawful object was to act as an unregistered agent of a foreign principal (Low) in violation of FARA. *Id.* ¶ 105(a). The second object was to act as an agent of a foreign government (the PRC government) in violation of Section 951. *Id.* ¶ 105(b). The third unlawful object was to commit international money laundering to promote a specified unlawful activity, also known as "promotional money laundering," in violation of 18 U.S.C. § 1956(a)(2)(A). *Id.* ¶ 105(c). The fourth and final unlawful object was to commit money laundering to conceal the proceeds of a specified unlawful activity, also referred to as "concealment money laundering," in violation of 18 U.S.C. § 1956(a)(1)(B). *Id.* ¶ 105(d). The Court shall address each object in turn below. The evidence need only be sufficient as to one unlawful object for Michel's conviction to stand. *See, e.g.*, *Griffin*, 502 U.S. at 56–57; *Bilzerian*,

---

[4] The jury was provided with an aiding and abetting instruction for certain counts, including Count 8. *See* Final Jury Instructions, ECF No. 290, at 71, 73.

926 F.2d at 1302 ("A conspiracy conviction based on a multi-object conspiracy may be upheld so long as evidence is sufficient with respect to at least one of the criminal objectives.").

The Court shall begin by reiterating its previous discussion on conspiracy. *See supra* pp. 5–7. To prove conspiracy, the Government was required to establish that Michel and at least one other person made an agreement to commit one or more of the above objects. *See Treadwell*, 760 F.2d at 333 ("To establish a criminal conspiracy under section 371, the government must prove beyond a reasonable doubt that: (1) two or more persons formed an agreement either to commit an offense against or defraud the United States; (2) the defendant knowingly participated in the conspiracy with the intent to commit at least one of the offenses charged or to defraud the United States; and (3) at least one overt act was committed in furtherance of the common scheme."). The jury can infer a "conspiratorial agreement from the circumstances and the defendant's knowledge." *Moore*, 651 F.3d at 97 (citing *Childress*, 58 F.3d at 710); *Gatling*, 96 F.3d at 1518 ("It is well established that an agreement sufficient to support a conspiracy conviction can be inferred from circumstantial evidence."); *see also United States v. Shi*, 991 F.3d 198, 205 (D.C. Cir. 2021) ("In other words, since a conspiracy is by nature secret, the jury may fairly infer the existence of the agreement through either direct or circumstantial evidence."). The "existence of a tacit or mutual understanding between coconspirators" is also sufficient evidence of an agreement. *Rafiekian I*, 991 F.3d at 547–48 (quoting Fourth Circuit case law in support). The Government need not show that the co-conspirators agreed on every aspect of their criminal object, but the Government must show the "essential nature of the plan." *Treadwell*, 760 F.2d at 336 (quoting *Blumenthal*, 332 U.S. at 557).

1.  <u>FARA Object</u>

First, Michel challenges the sufficiency of the evidence with respect to the FARA object. Mot. at 32. He reiterates some of his previous arguments from Count 8, arguing that there was insufficient evidence to prove that Michel and another "agreed" to violate FARA. *Id.* He emphasizes that neither Higginbotham nor Broidy, who were witness for the Government, testified that there was an explicit agreement to not register under FARA. *Id.*

Evidence at trial indicated that Broidy never formed an explicit agreement with another to not register under FARA. *See* 4/4/2023 PM Trial Tr. at 55:14–16 (Broidy testifying that he never told Michel not to register under FARA); *id.* at 56:7–11 (Broidy testifying that he never "fe[lt] like [he] ever entered into an agreement to not register under FARA with [] Michel [or others]."). However, there was sufficient evidence for a reasonable jury to conclude that there was a "tacit or mutual understanding" between Michel and Higginbotham to not register under FARA so that their efforts on behalf of Low would go undetected, and to ensure that their funding from Low would not be rejected by banks. *See, e.g.*, 4/6/2023 AM Trial Tr. at 20:16–23 (Higginbotham testifying that he shared his "concerns about FARA" "on more than one occasion" but Michel was "very dismissive"); *id.* at 21:19–23 (Higginbotham testifying that "[t]here was definitely an attempt to anonymize what we were doing across the board, and FARA would have pretty much announced, you know, officially that we were involved in this—in these activities"); *id.* at 7:25–8:13 (Higginbotham confirming that he "lie[d] to the banks" at the direction of Michel to conceal the true source of the funds (Low) because Low was "toxic to a bank"). Accordingly, there was sufficient evidence for the jury to conclude that Michel conspired with others (at least with Higginbotham) to violate FARA. It is of no consequence whether or not Michel and Higginbotham completed the substantive offense of violating FARA. *Salinas v. United States*, 522 U.S. 52, 65

(1997) ("It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.").

2. Section 951 Object

As for the Section 951 object, Michel claims, as he did for Count 10, that there was no evidence that he and another agreed for Broidy (or another) to lobby the United States at the direction or control of the PRC government. Mot. at 35. Michel does not raise any new arguments in this regard, merely reciting the same reasons he raised for Count 10. *Id.*; *see also* Reply at 21 ("For the reasons outlined in § V above, the Government failed to prove this object of the Count 7 conspiracy.").

As this Court already addressed, there was sufficient evidence for a jury to conclude that Michel acted as an agent of a foreign government and foreign official, in violation of Section 951. *See supra* Section III.D. Therefore, the question is whether there was sufficient evidence of a conspiratorial agreement between Michel and others to lobby the Trump administration or other governmental officials under the direction or control of the PRC government and Vice Minister Sun. The Court concludes there was.

Evidence at trial showed that Michel, Broidy, Lum Davis, Higginbotham, and Low worked together to resolve the Guo matter on behalf of the PRC government. *See* 4/4/2023 AM Trial Tr. at 89:19–90:15 (Broidy testifying that he, Michel, and Lum Davis traveled to China to meet with Low and Vice Minister Sun); *id.* at 91:7–10 (Broidy testifying that during this meeting Vice Minister Sun discussed "his proposal, extradition of Guo."); *id.* at 92:25–93:2 (Broidy confirming that he, Michel, and Lum Davis were "working on both these issues; that being the 1MDB matter and the Guo extradition"); *see also* 4/6/2023 AM Trial Tr. at 65:3–10 (Higginbotham testifying

that Michel asked him to meet with the Chinese ambassador in Washington, D.C.); *id.* at 67:6–14 (Higginbotham testifying that he was sent "to make the Chinese ambassador feel more comfortable that work was actually taking place and progress was taking place with the extradition of Guo Wengui").

Additionally, Michel obtained various documents prepared by the PRC government, advocating for the extradition of Guo, and then provided these documents to Broidy and Lum Davis to be passed on to government officials, including President Trump. *See* Gov't's Ex. 395; 4/19/2023 AM Trial Tr. at 40:7–9 (Michel confirming that Ex. 395 is a "document outlining all the reasons to send Guo back to China from China's perspective"); *id.* at 41:10–15 (Michel testifying that "Jho Low sent me what you have right now and I passed it over to Elliot—to Nickie and then Nickie passed it to Elliot Broidy.  And then Elliot Broidy passed to Steven Wynn and everyone else [including the President of the United States]"); *see also id.* at 73:8–74:7 (Michel testifying that he received a letter from the Chinese ambassador to Attorney General Sessions directly from Vice Minister Sun).  According to Broidy, Michel served as the "facilitator" between Low and Lum Davis and Broidy with respect to the 1MDB and Guo matters.  *See* 4/4/2023 AM Trial Tr. at 93:17–25.  In sum, the jury could have reasonably concluded that Michel conspired with others to lobby the U.S. government at the direction and control of the PRC government and Vice Minister Sun.

### 3.  Money Laundering Objects

Count 7 also charged Michel with conspiring to commit: (1) international promotional money laundering based on his agreement to have Low transfer funds from foreign accounts to accounts in the United States to promote the unlawful lobbying activity; and (2) concealment

money laundering for agreeing to pay Broidy through his wife's law firm (Colfax) to conceal the source and purpose of the funds.  *See* ECF No. 84 ¶¶ 105(c)&(d), 109–10.

Promotional money laundering is defined as the transfer of funds "to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A).  The elements of a conspiracy to violate Section 1956(a)(2)(A) are: the defendant "(1) conspired; (2) to transport funds between the U.S. and another country; (3) with intent to promote the carrying on of specified unlawful activity." *United States v. Krasinski*, 545 F.3d 546, 550 (7th Cir. 2008) (citing *United States v. Pierce*, 224 F.3d 158, 162 (2d Cir. 2000)).  Concealment money laundering, on the other hand, requires the Government to prove: "(1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of unlawful activity; (3) the defendant knew that the proceeds derived from unlawful activity; and (4) the defendant knew 'that the transaction [was] designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity.'"  *United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007) (quoting 18 U.S.C. § 1956(a)(1)(B)(i)).

An important distinction between promotional money laundering and concealment money laundering is that the former does not require the "proceeds" of unlawful activity to be generated, "followed by a financial transaction with those proceeds, for criminal liability to attach."  *United States v. Piervinanzi*, 23 F.3d 670, 680 (2d Cir. 1994).  "Instead, it penalizes an overseas transfer 'with the intent to promote the carrying on of specified unlawful activity.'"  *Id.* (quoting 18 U.S.C. § 1956(a)(2)(A)); *see United States v. Tajideen*, 319 F. Supp. 3d 445, 468 (D.D.C. 2018) (RBW) (adopting Second Circuit's analysis and holding). By contrast, concealment money laundering penalizes financial transactions that "involve[] the proceeds of specified unlawful activity," 18

U.S.C. § 1956(a)(1), meaning the proceeds of the specified unlawful activity must be first generated, and then the "defendant, knowing the proceeds to be tainted, conduct[s] or attempt[s] to conduct a financial transaction with [those] proceeds with the intent to promote specified unlawful activity, *Pervinanzi*, 23 F.3d at 679–80. For concealment money laundering, the D.C. Circuit has determined that the "offense of money laundering [pursuant to Section 1956(a)(1)] must be separate and distinct from the underlying offense that generated the money to be laundered." *United States v. Hall*, 613 F.3d 249, 254 (D.C. Cir. 2010) (citing other circuit court cases for support). With these principles in mind, the Court turns to the resolution of both conspiracy objects.

      i.    <u>Promotional Money Laundering Object</u>

With respect to the promotional money laundering object, Michel argues that the Government failed to prove that he and at least one other co-conspirator engaged in the transactions "with intent that they promote or conceal a FARA violation, as opposed to promoting or concealing payments for lobbying alone." Mot. at 38. Michel acknowledges that the evidence may show that he engaged in transactions to facilitate lobbying by Broidy, but argues that action alone is insufficient to prove his specific intent to engage in transactions with the aim of promoting or concealing a FARA violation. *Id.* Broadly, Michel contends that the evidence showed that the international transfers "were intended to promote lobbying—not unregistered lobbying." Reply at 23. The Court disagrees.

As an initial matter, the Court notes that Michel does not contest that he received foreign funds from Low. Nor could he. *See* Gov't Ex. 662 at 1 (listing wires from Lucky Mark to Michel's company, Anicorn); Gov't Ex. 439 (contract between Pheng and Michel); Gov't Ex. 681 (chart listing a timeline of trips taken in 2017 and transactions from Low that followed).

Second, the jury was presented with significant evidence that Michel and his co-conspirators in this case were specifically trying to ensure that their actions remain undetected by U.S. government officials.  *See supra* pp. 34–35, 37; *see also* 4/11/2023 AM Trial Tr. at 17:5–7 (Higginbotham testifying that Michel was concerned FARA registration would cause him to be stopped at airports); 4/6/2023 AM Trial Tr. at 52:8–9 (Higginbotham testifying that Pheng was used as a "straw man" specifically to "anonymize" Low for the financial transactions); *id.* at 16:15–20 (Higginbotham testifying that "[f]rom the very beginning of our interactions having to do with Jho Low we began to anonymize who he was, creating monikers for him, et cetera.  And there was a desire to be as private as possible, particularly with mentioning Jho Low, talking about Jho Low, discussing any of the matters that were associated with this—with these two matters."); 4/4/2023 AM Trial Tr. at 87:22–25 (Broidy testifying that he intentionally did not register under FARA because it would impede his success on the engagement with Low); 4/19/2023 AM Trial Tr. at 41:16–44:8 (Michel confirming that he did not inform Agent Zitman about his work with Low or Broidy lobbying Trump and the administration); 4/6/2023 AM Trial Tr. at 41:1–4 (Higginbotham testifying that Broidy wanted separation from Low and his financial transactions).

This evidence at trial provided an ample basis for the jury to reasonably conclude that Michel and others sought to lobby U.S. government officials in a manner that would not reveal their sponsor and client: Low.  This same evidence would have also provided the jury with a sufficient basis to reasonably conclude that an agreement existed that the money was intended to compensate for *undisclosed* lobbying efforts.  *See Shi*, 991 F.3d at 205 ("In other words, since a conspiracy is by nature secret, the jury may fairly infer the existence of the agreement through either direct or circumstantial evidence.").  As demonstrated by the evidence, Michel and the co-conspirators did not want the U.S. government to know about Low and the services rendered on

behalf of Low.   Accordingly, the jury could have reasonably inferred that the funds were transferred with the intent that the co-conspirators would not register under FARA (revealing Low as the foreign principal), as it would undermine their efforts in resolving the 1MDB investigation favorably for Low, as well as their efforts on extraditing Guo on behalf of Low and the PRC government.  *See also Manafort*, 318 F. Supp. 3d at 4–5 (concluding that international banking transactions can "promote," and the defendant can "realize proceeds" from, a FARA violation).

> ii.   Concealment Money Laundering Object

Next, with respect to the concealment money laundering object, Michel argues that the proceeds at issue were not proceeds of a FARA violation, but rather funds received from Low "to pay *for* the lobbying activities."  Reply at 21–22 (emphasis in original).  Michel further contends that the transactions were not executed to "conceal" the proceeds of a FARA violation, but rather to help ensure that the funds provided by Low would not be seized due to the ongoing forfeiture actions involving Low.  *Id.* at 22.  In this context, "proceeds" means "any property derived from or obtained or retained, directly or indirectly, through some sort of unlawful activity[.]"  18 U.S.C. § 1956(c)(9).  In addition, the offense of money laundering must be separate and distinct from the underlying offense (here, FARA violations) that generated the money to be laundered.  *Hall*, 613 F.3d at 254.

Again, the evidence showed that Michel and others were actively trying to ensure that the lobbying of President Trump and the Trump administration would be unregistered so as to not reveal Low as the foreign principal.  *See supra* pp. 34–35, 37.  Therefore, the proceeds were generated from an unlawful activity.  *See Manafort*, 318 F. Supp. 3d at 4–5 (concluding that a FARA violation can generate "proceeds"); *see* 18 U.S.C. § 1956(c)(7)(D) (defining "specified unlawful activity" to include "any felony violation of [FARA]").

Evidence at trial also revealed that the co-conspirators intentionally sought to conceal the true source of the funds derived from the unregistered lobbying efforts.  Broidy testified that he sought to receive "untainted funds" from Michel (who would receive the funds from Low) by directing Michel to provide the funds to Colfax, the law firm owned by Broidy's wife.  4/4/2023 AM Trial Tr. at 81:20–25; *id.* at 83:5–11 (explaining what Colfax is); *id.* at 80:22–25 (Broidy confirming that Michel and Lum Davis also "share[d] [his] concern about the cleanness, the untaintedness, of the money [from Low]"); *see also* Gov't's Ex. 306 (copy of draft "consulting agreement" between Anicorn (Michel's company) and Colfax).  Broidy also confirmed that this method (of transferring the funds to Colfax) was used for Lum Davis's payments.  *See* 4/4/2023 AM Trial Tr. at 81:23–82:1 ("And from there, we would pay Nickie her 30 percent fee.").

But transferring Low's money to Michel and then to Colfax was not necessary for Michel and the others to participate in the unregistered lobbying scheme.  Rather, sending the funds to Colfax only made it less likely for the U.S. government to uncover the truth by "concealing the nature and the source" of the proceeds as legitimate business income of a law firm.  *See* Gov't's Ex. 306 (draft consulting agreement); *see* 4/6/2023 AM Trial Tr. at 40:24–25 (Higginbotham testifying that Colfax was not providing services to Anicorn "[a]s far as [he] kn[e]w"); *id.* at 41:8–10 ("Q: But, again, there was no legitimate business relationship between Anicorn and Colfax? A: Not that I know of, and I was in a position to know."); *id.* at 41:5–9 (Higginbotham confirming that "these contracts and these layers of entities to be a way to provide [] separation" between Low and Broidy); *id.* at 44:23–45:1 (Higginbotham testifying that "Jho Low was toxic" and therefore anonymity as a client was sought).  Notably, Michel does not offer an innocent explanation for the transfers.  *See* Mot. at 37 ("[T]he evidence showed that transactions meant to conceal the source of funds was [meant] . . . to reduce the risk that those funds would be identified as coming from

44

Low and therefore seized as fruits of the 1MDB scandal[.]"); *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1474 (10th Cir. 1994) ("If transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute."); *see United States v. Law*, 528 F.3d 888, 896 (D.C. Cir. 2008) (adopting same principle).

The services provided by Michel and others generated the illegal proceeds (the unregistered lobbying), and it was the co-conspirators' desire to conceal the source of those funds (Low) by transferring them through a law firm (Colfax), which generated the money laundering offense. Accordingly, a jury could have reasonably concluded that the evidence was sufficient to convict Michel on the concealment money laundering object.

### 4. Legally Invalid Theory

Lastly, Michel argues that the Court should vacate the conviction on Count 7 because one of the objects was legally invalid. Mot. at 39. Specifically, Michel contends that the FARA object was legally invalid because the Government charged Michel *and* Low with conspiring with one another to willfully act as agents of a foreign principal, Low. *Id.*; *see* ECF No. 84 ¶ 105. Generally, Michel argues that because FARA contemplates two necessary actors (an agent and a foreign principal), but imposes liability only upon one (the agent), a conspiracy conviction between the agent and the foreign principal cannot stand because the foreign principal is left unpunished. Mot. at 39–42. Michel relies on the Supreme Court's *Gebardi v. United States* opinion to support his proposition that FARA reflects an affirmative legislative policy to leave the foreign principal unpunished. *Id.* at 39–40; *see generally Gebardi v. United States*, 287 U.S. 112 (1932).

It is well established that "[a] person . . . may be liable for conspiracy even though he was incapable of committing the substantive offense." *Salinas*, 522 U.S. at 64 (citing *United States v. Rabinowich*, 238 U.S. 78, 86 (1915)). "Incapacity of one to commit the substantive offense does

not necessarily imply that he may with impunity conspire with others who are able to commit it," as "one may plan that others shall do what he cannot do himself." *Gebardi*, 287 U.S. at 120–21.

There is, however, an exception to this principle: the affirmative legislative policy exception. The Supreme Court in *Gebardi* discusses this exception at length. There, the Supreme Court considered a conviction for conspiracy to violate the Mann Act, a statute that imposes a penalty for the interstate or foreign transportation of any woman or girl for any immoral purpose, including prostitution. *See id.* at 116–17; 18 U.S.C. § 2421. The government charged a man and a woman for conspiracy to violate the Mann Act, on the theory that the woman conspired to transport a woman—herself—by consenting to the man's transportation of her. *Gebardi*, 287 U.S. at 116. The Supreme Court reversed the convictions. *Id.* at 123. Although the statute "contemplates two persons," the Supreme Court could not "infer that the mere acquiescence of the woman transported was intended to be condemned by the general language [in the Act] punishing those who aid and assist the transporter[.]" *Id.* at 118–19. The question then became whether the woman, who has not violated the Mann Act by her consent, could be convicted of a conspiracy to violate it with a man. *Id.* at 119–20. The Supreme Court concluded that she could not. *Id.* at 123. It emphasized that "Congress set out in the Mann Act to deal with cases which frequently, if not normally, involve consent and agreement on the part of the woman to the forbidden transportation," but "this acquiescence . . . was not made a crime under the Mann Act itself." *Id.* at 121. Consequently, the "failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her mere consent, [was] evidence of an affirmative legislative policy to leave her acquiescence unpunished." *Id.* at 123. Because the woman in *Gebardi* merely consented to her own transportation, the Supreme Court ruled that her conviction for conspiracy to violate the Mann Act could not stand. *Id.*

Notably, the affirmative legislative policy exception has been extended to conspiracy charges under the Foreign Corrupt Practices Act ("FCPA") by two circuits.  *See United States v. Hoskins*, 902 F.3d 69, 83–84 (2d Cir. 2018) ("Congress did not intend for persons outside of the [FCPA's] carefully delimited categories to be subject to conspiracy or complicity liability."); *id.* at 84 ("FCPA contains no provision assigning liability to persons in the defendant's position— nonresident foreign nationals, acting outside American territory, who lack an agency relationship with a U.S. person, and who are not officers, directors, employees, or stockholders of American companies."); *United States v. Castle*, 925 F.2d 831, 831–32 (5th Cir. 1991) (holding that foreign officials cannot be prosecuted under Section 371 for conspiring to violate the FCPA).

But to the Court's knowledge (and the parties do not suggest otherwise), no court has held that FARA evinces a similar affirmative legislative policy to leave the foreign principal unpunished as it relates to a conspiracy charge.  And the Court declines to do so here.  Assuming, without deciding, that foreign principals cannot be prosecuted for conspiring to violate FARA, the Court concludes that the conviction on Count 7 would stand nonetheless under the harmless-error principle.  Errors involving a general verdict that may rest on a legally invalid theory are subject to a harmless-error analysis.  *Skilling v. United States*, 561 U.S. 358, 414 (2010).  This analysis requires a "thorough examination of the record" to determine whether "beyond a reasonable doubt that the jury verdict would have been the same absent the error."  *Neder v. United States*, 527 U.S. 1, 19 (1999).  Here, there was ample evidence for the jury to conclude beyond a reasonable doubt that Michel conspired with others (not Low) to violate FARA.  *See supra* Section III.F.1. Similarly, there was ample evidence for the jury to conclude beyond a reasonable doubt that Michel conspired with others to violate Section 951 and the money laundering provisions.  *See supra* Sections III.F.2, III.F.3.  Accordingly, the Court concludes that the jury verdict would have been

the same absent the error of including Low as a co-conspirator.  As such, the verdict on Count 7 shall stand.

### G.  Count 12: Conspiracy to Make False Statements to Banks

The final count, Count 12, charged Michel with Conspiracy to Make False Statements to Banks, in violation of 18 U.S.C. § 371.  *See* ECF No. 84 ¶¶ 158–81.  It alleged that Michel and Higginbotham conspired to make false statements to FDIC-insured banks regarding the source and purpose of foreign wire transfers to open and maintain accounts at those institutions, in violation of 18 U.S.C. § 1014.  *Id.* ¶¶ 159–60.  Section 1014 criminalizes "mak[ing] any false statement or report . . . for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by the [FDIC] . . . upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee, or any change or extension for any of the same[.]"  18 U.S.C. § 1014.

In his Motion, Michel focuses on the applicability of Section 1014, claiming that the statute does not proscribe false statements made to induce a bank to accept a deposit.  Mot. at 21–22.  To support his claim, Michel emphasizes that the term "deposit" does not appear in the statute, *id.* at 22, and argues that the list of proscribed conduct under Section 1014 involve "a false statement to induce the bank to put its own funds in jeopardy," *id.* at 23.  As such, Michel maintains that Section 1014 applies only to lending-related transactions.  *See* Reply at 10 (quoting *United States v. Devoll*, 39 F.3d 575, 580 (5th Cir. 1994) for support).  Because Section 1014 does not proscribe, according to Michel, the conduct involved in this case (i.e., making false statements to influence a bank to open an account and accept deposits), the Court should acquit him on Count 12.  Mot. at 25.

In a related forfeiture proceeding, this Court briefly addressed whether Section 1014 imposes liability for statements made to influence a bank's decision on matters other than lending. *See United States v. $37,564,565.25 in Acct. No. XXXXXXXXXXX at Morgan Stanley et al.*, No. 18-cv-02795, 2019 WL 5269073, at *6–8 (D.D.C. Oct. 17, 2019).   There, the Court acknowledged that two circuits have limited Section 1014 liability to lending-related statements. *Id.* at *6; *see United States v. Krown*, 675 F.2d 46, 51 (2d Cir. 1982); *Devoll*, 39 F.3d at 579. However, the Court found that most circuit courts have extended Section 1014 liability "beyond [the] strict lending context" that Michel argues in favor for now.   *$37,564,565.25 in Acct. No. XXXXXXXXXXX*, 2019 WL 5269073, at *6; *see, e.g.*, *United States v. Agne*, 214 F.3d 47, 54 (1st Cir. 2000); *United States v. Pinto*, 646 F.2d 833, 838 (3d Cir. 1981); *United States v. Yoo*, 833 F.2d 488, 490 (3d Cir. 1987); *United States v. Bonnette*, 781 F.2d 357, 365 (4th Cir. 1986); *United States v. Tucker*, 773 F.2d 136, 139 (7th Cir. 1985); *United States v. Krilich*, 159 F.3d 1020, 1028 (7th Cir. 1998); *United States v. Boren*, 278 F.3d 911, 915 (9th Cir. 2002); *United States v. Stoddart*, 574 F.2d 1050, 1053 (10th Cir. 1978); *United States v. Wade*, 266 F.3d 574, 579–81 (10th Cir. 2001).

For instance, in *United States v. Krilich*, the defendant argued that Section 1014 only applies to statements "made to obtain loans or other extensions of credit," and therefore conduct that does not involve lending transactions, such as causing others to make false statements in applications presented to covered banks, does not violate the statute.   *Id.* at 1028.   The Seventh Circuit disagreed.[5]   Upon reviewing the plain language of Section 1014, the Seventh Circuit

---

[5] In his Reply, Michel appears to suggest that the Seventh Circuit has concluded that Section 1014 applies only to lending-related activities.   *See* Reply at 10.   He cites to *United States v. Swanquist*, 161 F.3d 1064 (7th Cir. 1998), and states that, there, the Seventh Circuit affirmed a conviction for Section 1014 "because the jury was properly instructed that it had to find that the alleged false statement . . . was made with intent to influence the action of the financial institution 'in issuing, approving, or renewing loans.'"   *Id.* (quoting *Swanquist*, 161 F.3d at 1076).   Not quite.   In *Swanquist*, the Seventh Circuit considered whether the jury

concluded that the statute is "straightforward and broad," and "applies to transactions other than loans[.]" *Id.* (stating Section 1014 "applies to 'any' statement made for the purpose of influencing in 'any' way the action of 'any' of the covered institutions in 'any' application").  In its analysis, the Seventh Circuit noted that the list of institutions enumerated in the statute include institutions that do not make loans.  *Id.* (listing several covered institutions).  But if such institutions are included in the statute, then Section 1014 "*must* cover statements that are not designed to influence an extension of credit—indeed, must cover statements that have nothing to do with the payment of money."[6]  *Id.* (emphasis in original).

Similarly, in *United States v. Wade*, the Sixth Circuit rejected the defendant's argument that Section 1014 liability is limited "to cases in which the defendant seeks to establish a debtor/creditor relationship through an application for a loan or credit."  266 F.3d at 579.  There, the defendant completed checking account applications that contained false statements, not applications for loans or credit.  *Id.*  Like the Seventh Circuit, the Sixth Circuit found that Section 1014 is "unambiguous and broad."  *Id.* (emphasizing that the statute proscribes "*any* false statement . . . for the purpose of influencing in *any* way the action of [covered institutions] upon *any* application").  The Sixth Circuit reasoned that the plain language of Section 1014 shows that

---

instructions given by the district court "constructively amended the superseding indictment and deprived [the defendant] of his right to be tried only on the charges returned by the grand jury."  *Swanquist*, 161 F.3d at 1076.  But the defendant in that case was charged by indictment with, *inter alia*, making false statements to financial institutions "to influence the approval, issuance, or renewal of loans in violation of § 1014." *Id.* at 1069.  Therefore, the Seventh Circuit was determining whether the jury instruction given by the district court was consistent with the conduct charged in the indictment, *id.* at 1076, not whether Section 1014's liability was limited to such conduct.

[6] Michel claims that *Krilich* is "easily distinguishable" because the defendant in that case caused others to make false statements designed to "induce a financial institution to disburse money," Reply at 11 (quoting *Krilich*, 159 F.3d at 1028), whereas here, Michel was convicted for making false statements to banks to influence them to open an account and maintain funds, *id.*  Michel misses the point that the Government made in its opposition, *see* Gov't's Opp'n at 11–12, as the Government quoted the portion of the *Krilich* opinion in which the Seventh Circuit concluded that Section 1014 "*must* cover statements that have *nothing to do with the payment of money*," *id.* at 12 (emphasis added) (quoting *Krilich*, 159 F.3d at 1028).

it applies to "any application," and therefore an application to open a checking account at a covered institution falls within the ambit of Section 1014.  *Id.* at 580.

Michel's contention that "[n]o court has ever adopted the Government's tortured interpretation of § 1014," Reply at 11, is without merit.  In fact, the conduct for which Michel was convicted of—opening an account and depositing funds—is what the Sixth Circuit concluded *does* fall within Section 1014's ambit.  *Wade*, 266 F.3d at 580 ("Thus, an application to open a checking account at a covered institution falls within the statute.").  In light of the circuit majority and the Sixth Circuit's *Wade* opinion, the Court concludes that Section 1014 does impose liability for false statements made to influence a covered institution on "any application," including an application to open an account and deposit funds.  *See* 18 U.S.C. § 1014.

Finally, the Court concludes that the rule of lenity does not apply in this case.  *See* Mot. at 24 (arguing that the rule of lenity "requires the Court to acquit Michel on Count 12").  As stated by the Supreme Court: "The rule of lenity applies only if, 'after seizing everything from which aid can be derived,' . . . [the court] can make 'no more than a guess as to what Congress intended.'" *United States v. Wells*, 519 U.S. 482, 499 (1997) (quoting *Reno v. Koray*, 515 U.S. 50, 65 (1995)). To invoke the rule of lenity, the "court must conclude that 'there is a *grievous* ambiguity or uncertainty in the statute.'" *United States v. Burwell*, 690 F.3d 500, 515 (D.C. Cir. 2012) (quoting *Muscarello v. United States*, 542 U.S. 125, 139 (1998)).  But, "[r]ead straightforwardly," Section 1014 "reveals no ambiguity."  *Wells*, 519 U.S. at 499.  The text of the statute is clear: it applies to "*any* false statement" made to "influenc[e] in *any* way the action of" a covered institution "upon *any* application."  18 U.S.C. § 1014 (emphasis added).  As such, "this is not a case of guesswork reaching out for lenity."  *Wells*, 519 U.S. at 499.  The rule of lenity offers no aid to Michel, as his

"problem is not that the statute is ambiguous, but that it is comprehensive." *Krilich*, 159 F.3d at 1028.

In sum, Section 1014 does proscribe the conduct for which Michel was charged and ultimately convicted. Accordingly, the jury's verdict on Count 12 stands.

### H. Motion for New Trial

Lastly, Michel claims that the Court should grant a new trial on each disputed count under Federal Rule of Criminal Procedure 33 ("Rule 33") "because the evidence was at least against the weight of evidence." Mot. at 43; *see* Fed. R. Crim. P. 33.

Under Rule 33(a), "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). In deciding a motion for a new trial, the Court has broad discretion. *United States v. Lam Kwong-Wah*, 924 F.2d 298, 308 (D.C. Cir. 1991). But the D.C. Circuit cautions that "granting a new trial motion is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred." *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (internal quotation marks and citation omitted). Contrary to the Government's burden at trial to prove guilt beyond a reasonable doubt, defendants bear the burden of proof under Rule 33 to demonstrate that a new trial is warranted. *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982).

Michel offers a blanket statement that the verdicts were against the weight of the evidence. *See* Mot. at 43. Michel presents no additional arguments—only directing the Court to review his previous arguments for judgment of acquittal—for the Court's consideration, despite bearing the burden under Rule 33. *Id.*; *see Mangieri*, 694 F.2d at 1285.

Based on the Court's review of the evidence and trial transcripts, as well as presiding over the trial itself, the Court cannot conclude that a "serious miscarriage of justice may have occurred."

*Wheeler*, 753 F.3d at 208 (citation omitted); *see also United States v. Ruiz*, 105 F.3d 1492, 1501 (1st Cir. 1997) ("Where a new trial motion is based upon the weight of the evidence, the court may not order a new trial unless it is quite clear that the jury has reached a seriously erroneous result."). The jury was presented with significant evidence demonstrating Michel's culpability for the charged offenses. The collective evidence is strong enough to satisfy the Court that the verdicts do not represent a miscarriage of justice. As such, Michel's request for a new trial on this basis is denied. The Court notes that Michel's [310] Motion for New Trial, asserting separate grounds for a new trial, remains pending before the Court.

## IV. CONCLUSION

After a five-week trial, a jury convicted Michel of ten counts. The Court has thoroughly reviewed the extensive evidence presented at trial and finds the evidence sufficient to withstand a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. Accordingly, Michel's [309] Motion for Judgment of Acquittal is **DENIED**. An appropriate Order accompanies this Memorandum Opinion.

Dated: April 12, 2024

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge
