```
1   IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
2

3   UNITED STATES OF AMERICA,     ) CRIMINAL ACTION NO.:
                                  ) 19-00148-1
4           Plaintiff,            )
        vs.                       )
5                                 )
    PRAKAZREL MICHEL,             ) Washington, D.C.
6                                 ) April 17th, 2023
            Defendant.            ) 9:02 a.m.
7   _____) Morning Session

8

9                   TRANSCRIPT OF JURY TRIAL
           BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
10                  UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  FOR THE GOVERNMENT:        John D. Keller, Esquire
                               U.S. Department of Justice
14                             1301 New York Avenue, NW
                               Suite 1016
15                             Washington, D.C. 20530

16                             Sean F. Mulryne, Esquire
                               Nicole Rae Lockhart, Esquire
17                             U.S. Department of Justice
                               Public Integrity Section
18                             1400 New York Avenue, NW
                               Washington, D.C. 20005
19

20  For the Defendant:         David E. Kenner, Esquire
                               Alon Israely, Esquire
21                             Kenner Law Firm
                               16633 Ventura Boulevard
22                             Encino, California 91436

23

24

25
```

1    <u>APPEARANCES (CONT'D)</u>:

2

3    FOR THE DEFENDANT:          Charles R. Haskell, Esquire
                                 Law Offices of Charles R.
4                                Haskell, P.A.
                                 641 Indiana Avenue, NW
5                                Washington, D.C. 20004

6    Reported by:                Christine T. Asif, RPR, FCRR
                                 Official Court Reporter
7                                United States District Court
                                 for the District of Columbia
8                                333 Contitution Avenue, NW
                                 Room 6507
9                                Washington, D.C., 20001
                                 (202) 354-3247

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                              INDEX
```

```
2    Witness Name                                      Page
3    Special Agent Robert Heuchling
4       Cross-examination By Mr. Kenner...........................   8
5       Redirect Examination By Ms. Lockhart.....................  34
6    Special Agent Harry Lidsky
7       Direct Examination By Mr. Kenner.........................  63
```

```
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S
 2            THE COURT:  Good morning, everyone.
 3            MR. KENNER:  Good morning, Your Honor.
 4            THE COURT:  All right.  Mr. Michel, are you feeling
 5     better?
 6            THE DEFENDANT:  Yes, Your Honor.  Thank you.
 7            THE COURT:  I hope so.
 8            All right.  We're missing two jurors, so let me just
 9     ask, do we have a list of your -- Mr. Kenner, of the -- your
10     witnesses and the order in which they are coming and whether
11     there's any issues with scheduling or otherwise?
12            MR. KENNER:  Your Honor, the -- I have talked to --
13     five or six times with Mr. Sessions.  He was trying to be here
14     today, but he couldn't.  He'll be here tomorrow morning.
15            THE COURT:  Okay.
16            MR. KENNER:  The rest of -- after the government
17     rests, it will be Mr. Lidsky that I suspect will take the
18     preponderance, if not all, of the day.  Then we will go to
19     Mr. Sessions.  And I will indicate later today where we will
20     go from there.
21            THE COURT:  Okay.  Does somebody have a 5th -- a
22     9th -- a problem in terms of their testifying?
23            MR. KENNER:  I'm sorry?
24            THE COURT:  A 5th Amendment right, do they have --
25     does somebody have -- are they going to be asserting a right
```

1   in terms of their not being able to testify?

2          MR. KENNER:  I believe that Mr. Dutta might do that,

3   Shomik Dutta.

4          THE COURT:  Have you spoken to his counsel?

5          MR. KENNER:  S-h-o-m-i-k.

6          Oh, no, I have -- I have not spoken to his counsel.

7   They sent an e-mail to me saying that the -- it was yesterday,

8   saying that they were -- they may make a motion to quash the

9   service.  And if not, they would probably take the 5th.

10         THE COURT:  Okay.  So we need that quickly.

11         MR. KENNER:  Yes.

12         THE COURT:  I have to say, the -- you know, the jury

13  is getting worried this is going to go into May, and they

14  haven't told us of conflicts in there.  So, you know, they're

15  obviously somewhat nervous about the length of the trial.

16  We've got, you know, two weeks here, but still.

17         Mr. Keller.

18         MR. KELLER:  Your Honor, Mr. Kenner, I thought

19  Mr. Dutta had been dropped from the last --

20         MR. KENNER:  Yeah.  Actually, you know what, I did

21  tell you that.  I apologize.  After I talked to Mr. Dutta's

22  counsel, I indicated to him and to Mr. Keller that I would not

23  be calling him.

24         THE COURT:  Okay.  So we have -- after Lidsky,

25  Sessions.  We have Cook, Kelly, and McMaster, are the ones I

```
1    have listed.  Is that still the list?

2              MR. KENNER:  Yes, Your Honor.

3              THE COURT:  But we're not sure exactly what order.

4              MR. KENNER:  Yes.

5              THE COURT:  Okay.  So we don't have -- so we

6    don't -- we aren't going to have problems with subpoenas,

7    et cetera.

8              MR. KENNER:  No.

9              THE COURT:  Okay.  Anything else that needs to be

10   discussed at this point?

11             Mr. Keller, anything we need to bring up?

12             MR. KELLER:  Not from the government, Your Honor.

13             THE COURT:  All right.  Mr. Kenner?

14             MR. KENNER:  Not from the defense, Your Honor.

15             THE COURT:  Okay.  Let's see if we've got the last

16   two people here.  I can't remember whether I told them to come

17   at 9:00 or 9:15.

18             THE CLERK:  At 9:00.

19             THE COURT:  Was it 9:00?

20             Witness might as well come back up.

21             All right.  We're missing two still?

22             THE CLERK:  Yes.

23             THE COURT:  Okay.  Why don't we take a break then.

24   And we're missing two jurors; they may be in line.  There's a

25   lot of people in -- so I'll wait in chambers, and let me know
```

1    when you're -- when we're ready.

2            MR. KENNER:  Thank you, Your Honor.

3            THE COURT:  Okay.  Let me do one thing.  For the

4    record, I -- (phone ringing) forgot to turn the -- I have to

5    bring it out here for that stupid security.  Sorry, the

6    validation.  It is -- it is a problem.

7            Can you put on the record, Mr. Kenner, that you're

8    definitely not calling that witness so we have something on

9    the record that says that.

10            MR. KENNER:  Yes, Your Honor.  I am definitely not

11    calling Shomik Dutta.

12            THE COURT:  Thank you.

13            All right.  I'll wait for the two jurors to make an

14    appearance.

15            (A recess was taken.)

16            THE COURT:  All right.  Come on back up.

17            Ready to go.

18            (Jury entered the courtroom.)

19            THE COURT:  Please sit down, everyone.

20            Good morning, everyone.

21            JURORS:  Good morning.

22            THE COURT:  We're ready to go.  We're in the middle

23    of the cross-examination of the special agent.

24            Mr. Kenner.

25            MR. KENNER:  Thank you, Your Honor.

|    |                                                               |
|----|---------------------------------------------------------------|
| 1  | CROSS-EXAMINATION                                              |
| 2  | BY MR. KENNER:                                                 |
| 3  | **Q.**  Good morning.  Mr. Heuchling; right?                  |
| 4  | **A.**  Yes, you got it.  Good morning, Mr. Kenner.           |
| 5  | **Q.**  I got it this morning.                                 |
| 6  | Okay.  Did you consider, in your investigation, the fact      |
| 7  | that -- well, let me withdraw that.                            |
| 8  | What percentage of the $20 million that came in for the       |
| 9  | Obama campaign went to the Obama campaign, this money from    |
| 10 | overseas that came into the United States?                    |
| 11 | **A.**  Yes, so just for reference, in 2012, just over $20 million |
| 12 | came into Mr. Michel's accounts from overseas that we         |
| 13 | attribute to Mr. Low.  And of that, under a million, I think  |
| 14 | the numbers are just over $800,000, went into the Obama       |
| 15 | Victory Fund, the campaign, and just over a million dollars   |
| 16 | went into the super PAC, so that would be about 10 percent.   |
| 17 | **Q.**  And in your investigation, did you determine that     |
| 18 | Mr. Michel kept the rest of that money?                        |
| 19 | **A.**  So in the course of the investigation, we looked at   |
| 20 | Mr. Michel's accounts, and we saw that there were transfers   |
| 21 | from Mr. Michel to some other individuals, I think most       |
| 22 | notably, Mr. Rousseau, at that time.  But the other funds     |
| 23 | moved between his accounts and then appeared to primarily be  |
| 24 | used for personal expenses, paying down debts, and other      |
| 25 | personal use.                                                 |

1    **Q.** All right. In your review of this case, did you come to

2    learn that Frank White was Mr. -- President Obama's chief

3    fundraiser in the 2012 cycle?

4    **A.** Yes, I believe we had discussed this when I testified a

5    few weeks ago, but yes, we did.

6    **Q.** Okay. And did you determine whether or not Frank White

7    met with Jho Low met in Miami?

8            MS. LOCKHART: Objection, Your Honor. Relevance.

9    Also outside the scope of his testimony in this instance.

10   Agent Heuchling was already cross-examined extensively from

11   the first time he testified on the 2012 conduct.

12           MR. KENNER: Your Honor --

13           THE COURT: Yes, I believe that's correct. Unless

14   there's something else. I mean, you did a broad amount of

15   testimony, but let me hear what you have to say.

16           MR. KENNER: Yes, I want to call his attention --

17   oh, I'm sorry.

18           (Bench conference on the record.)

19           MR. KENNER: Your Honor, I don't know yet the

20   ultimate resolution of whether or not Mr. Frank White's grand

21   jury will come in or no testimony will come in, but the point

22   here is that I'm going to focus on when Frank White flew to

23   Miami in a particular fundraising event that took place once

24   before the fundraising event in New York. And I just want to

25   make sure that this investigator considered that in his

1    evaluation.

2         THE COURT:  Did you ask about this -- I mean, I --

3    you probably remember better, Ms. Lockhart, as to whether

4    this -- we went through quite a bit with Frank White, frankly,

5    in the earlier part, and we did not stick to, you know, within

6    the direct so that you would hopefully call him once.  But at

7    any rate, did we go over this or not?

8         MS. LOCKHART:  I think -- I can't recall if this

9    specific question was asked; however, the question he's trying

10   to elicit from Agent Heuchling is based on Mr. White's grand

11   jury testimony.  So this is just a back-door way to elicit

12   hearsay through Agent Heuchling without having to introduce

13   the full grand jury transcript.

14        THE COURT:  I think the way you've ordered it,

15   that's probably correct.

16        MR. KENNER:  I'll rephrase it, but this is not

17   predicated on --

18        THE COURT:  Well, what's predicated -- what's it

19   predicated on then if it's not that?

20        MR. KENNER:  The predicate is that I believe the

21   evidence will show that Mr. White was in charge of a

22   fundraiser in Miami.  I believe that about a week and a half

23   before that event, Mr. White was short five people at $40,000

24   each.  I believe the evidence will show that the presidential

25   security detail had already been tasked, that all the

```
 1   arrangements were made, that Frank White --
 2            THE COURT:  Okay.  Hold on a second.  The question
 3   that I have is where did you get this?  Is this the grand jury
 4   testimony; you're just trying to get it in?
 5            MR. KENNER:  No.  No, Your Honor.  I mean, I can
 6   look up grand jury testimony --
 7            THE COURT:  We don't have any -- let me just say, we
 8   don't have any evidence, I believe, relating to this; am I
 9   correct, Ms. Lockhart?
10            MS. LOCKHART:  That's correct.
11            THE COURT:  So the point is, is that although I can
12   keep telling them that questions don't -- you know, the
13   information in the question is not evidence, we had a lot of
14   information that's provided in the questions.  So we don't
15   have any evidence on the record at this point that indicates
16   that that was the case.  If you want to ask it in a different
17   way --
18            MR. KENNER:  I'll try to ask it in a different
19   way.
20            THE COURT:  All right.
21            MS. LOCKHART:  But I'd also note, Your Honor, that
22   this is still outside the scope of Agent Heuchling's
23   testimony.  Here, he testified about the 2017 conduct.  The
24   only touch he had on the 2012 conduct related to the foreign
25   bank records, and the question was whether the foreign bank
```

1    records showed the transfers to Mr. Michel.  This is another

2    bite at the apple from his cross-examination, an extensive

3    cross-examination on the 2012 conduct that Agent Heuchling

4    testified to at the beginning of this case.

5            THE COURT:  So I'll allow this one question.  But

6    that's it.  Mr. Kenner, she's correct.

7            MR. KENNER:  Thank you.

8            THE COURT:  I mean, you can't keep going over the

9    same stuff just because the witness brings up -- all right.

10           MR. KENNER:  Thank you.

11           (The following proceedings were had in open court.)

12   **Q.**  (BY MR. KENNER)  In the course of your investigation, did

13   you come to be aware that Mr. Frank White flew to Miami --

14           THE COURT:  Sustained.  That -- you're asking the

15   question with information in there we don't have on the

16   record.

17           MR. KENNER:  Thank you, Your Honor.

18           THE COURT:  You can reword it --

19   **Q.**  (BY MR. KENNER)  As a -- as the lead investigator in this

20   case, did you ever determine whether or not Frank White

21   traveled to Las Vegas to attend the Jho Low birthday party?

22           MS. LOCKHART:  Objection.  Same thing, Your Honor.

23   Relevance.  Outside the scope.

24           THE COURT:  It is certainly outside the scope.  I'll

25   sustain it.

1  **Q.**  (BY MR. KENNER)  Sir, are you aware of money coming into

2  the Obama campaign, in your view from Jho Low, in the amount

3  of $11 million after the election?

4  **A.**  I am not aware of $11 million coming from Jho Low into the

5  Obama campaign after the election.

6  **Q.**  Okay.  Are you aware or you have no recollection that $11

7  million came --

8           MS. LOCKHART:  Objection.  Asked and answered.

9           THE COURT:  Well, he also didn't say he didn't have

10  any recollection.  He wasn't aware of it, which to my mind --

11      Is it that you don't remember, or you don't know it?

12           THE WITNESS:  I don't remember seeing any evidence

13  of that.  So I don't -- I don't recall.

14           MR. KENNER:  Okay.  I'll come back to that.  So --

15           THE COURT:  So does that mean it's your best memory

16  that you didn't have this information, or you don't remember

17  one way or the other?

18           THE WITNESS:  I do not recall ever seeing any

19  information that $11 million came from Jho Low to the Obama

20  campaign after the 2012 election.

21           THE COURT:  Okay.  That clarifies it.

22  **Q.**  (BY MR. KENNER)  Do you remember whether or not the

23  election was over on Tuesday, November 6th, 2012?

24  **A.**  Yes, that is accurate.

25  **Q.**  And at that point, there was no more campaigning, correct,

1    for that election?

2    **A.**  Yes, that is correct.

3    **Q.**  Did --

4             MR. KENNER:  Can I post for the witness only,

5    please, exhibit -- Defense Exhibit 265.

6    **Q.**  (BY MR. KENNER)  Sir, do you recognize Exhibit 265?

7             MS. LOCKHART:  Object --

8             THE COURT:  Is this defense or government?

9             MR. KENNER:  This is a defense exhibit.

10            THE COURT:  All right.  Well, we're not at 265,

11   but -- is this a new one that's added?  Your -- I believe your

12   exhibits go only up to -- we've added them through 223.

13            MR. KENNER:  It is marked 265 for identification,

14   Your Honor, on the document.

15            THE COURT:  Okay.  All right.  It's just not on the

16   list, and it's not one of the additions.

17            MS. LOCKHART:  Objection, Your Honor.  Relevance.

18   Outside the scope.  This also pertains to the issue that we

19   discussed via the phones.

20            MR. KENNER:  Your Honor, this is what the whole case

21   is about.

22            THE COURT:  Yes, but the point is, is that at what

23   point you get to keep asking the same thing over and over

24   again when you would have had an --

25            MR. KENNER:  I never asked it.

1        THE COURT:  -- opportunity to do so.  So let's --

2        (Bench conference on the record.)

3        THE COURT:  All right.  Ms. Lockhart, since you made

4   the objection, I'll have you go first.

5        MS. LOCKHART:  Your Honor, this still relates to the

6   2012 conduct.  Defense counsel cross-examined Agent Heuchling

7   for hours on this.

8        Second, I believe where this is heading is that

9   they're going to argue or try to put evidence into question

10  about how Mr. White is the one who got access for Mr. Low to

11  the White House Christmas party in 2012.  It's the same

12  issue.

13       THE COURT:  Okay.  So your view is it's the first

14  time around that Mr. -- in the government's case, that the

15  witness testified; is that correct?  So it's clear for the

16  record, is that what you're talking about?  This was discussed

17  when this witness was a government witness.  Is that what

18  you're saying?

19       MS. LOCKHART:  I'm saying that Agent Heuch- -- this

20  picture, I believe he is trying --

21       THE COURT:  No, I'm asking you, in terms of the --

22  the testimony that you've indicated was covered extensively,

23  if you'd be more specific as to when this was covered.

24       MS. LOCKHART:  Oh, my apologies, Your Honor.  When

25  Agent Heuchling testified at the beginning of this case

1    regarding the 2012 conduct, that's the campaign finance

2    piece.

3              THE COURT:  Okay.  As a government witness.

4              MS. LOCKHART:  Correct.

5              THE COURT:  Okay.  And as a government witness,

6    we -- you did very broad cross-examination, and we allowed it

7    in terms of expecting that he would be, you know, pretty much

8    the witness.  Instead of going back and forth, you extensively

9    cross-examined him.

10             I don't know what at this point, and certainly well

11   beyond what you have put on, what the government has put on in

12   this second, where they are not discussing the 2012, they've

13   moved on to the 2016.  So you're going back over something

14   that has not been -- this witness has not testified to.

15             MR. KENNER:  I'll recall on -- recall him as my

16   witness.

17             THE COURT:  Well, you can do whatever you wish, but

18   you're not -- at this point -- and frankly, recalling him may

19   not work if you already had an opportunity to ask all of these

20   questions the first time around when we went through the 2012.

21   And certainly, it was extensive examination relating to it.

22   Do I remember exactly everything that you asked, but you can't

23   just sort of go back each time and try and fill in blanks.

24             MR. KENNER:  I do not recall that this exhibit was

25   admitted or testified --

1          THE COURT:  The point is subject matter is the

2     issue, not so much the photo.

3          Am I correct, Ms. Lockhart?

4          MS. LOCKHART:  That's correct.  I would also note,

5     given that this seems to be a recurring theme this morning,

6     that this photo relates to Mr. White.  We have not said that

7     we would immunize him.  The path forward is to use the grand

8     jury testimony and that this photo is after the charged

9     conduct in 2012.  And it's separate conduct involving

10    Mr. White.  It has no relevance here, irrespective of the fact

11    that it's also out of scope.

12         THE COURT:  Okay.  So if this is -- so this is after

13    the charged conduct?

14         MS. LOCKHART:  It's in, I think, late November,

15    early December 2012.

16         THE COURT:  Is that correct, Mr. Kenner?  Then it

17    has even less relevance.

18         MR. KENNER:  Yes, it's after Mr. -- it's after

19    President Obama was re-elected.  This was the Christmas party

20    in December.  He was elected in November.

21         THE COURT:  What's the relevance then, if it's after

22    the charged conduct?

23         MR. KENNER:  Because it's the theory of the defense

24    that Mr. Jho Low was trying to get a photograph with Mr. Obama

25    going back to Miami, then going back to New York, going back

1    to other occasions, substitutes were allowed to come, and that

2    Mr. Jho Low still wanted that photo after the election.

3           THE COURT:  Well, the problem that you have is

4    you're trying to bring out all the testimony of Frank White.

5    They won't immunize him, and you evidently, at least so far,

6    have not indicated you want to use the grand jury.  So it's --

7    you can't keep bringing all this information out as a

8    substitute for Frank White.

9           But at this point, I think it's -- you know, I don't

10   see the photograph coming in.  You have some other evidence

11   relating to efforts that were made by Jho Low that you already

12   have on the record, frankly.  So I'm not going to allow it.

13          (The following proceedings were had in open court.)

14          MR. KENNER:  Would you take down that exhibit,

15   please.

16          May I just have a moment, Your Honor?

17          Your Honor, I would ask that we take a break to

18   consider the question of Mr. White's grand jury testimony

19   before I conclude this witness.

20          THE COURT:  All right.  Okay.  This won't be your

21   morning break, don't worry.  But it will be at ten of 10:00,

22   okay.  About 15 minutes should do it in terms of our

23   discussion about this legal issue.  It's easier than trying to

24   do it on the intercom.

25          (Jury left the courtroom.)

1           THE COURT:  Agent Heuchling, if I could ask you to

2   step outside while we talk about this.  It's going to be -- if

3   you could step outside because we'ere going to -- it will be

4   relating to your testimony.

5           THE WITNESS:  Yes, Your Honor.

6           THE COURT:  Thank you.

7           (Witness left the courtroom.)

8           MR. KENNER:  Thank you.  Your Honor, I would like to

9   ask the Court to revisit the question of what is admissible

10  from Mr. White's grand jury testimony.  There is grand jury

11  testimony-in-fact on the issue of the party.  There is grand

12  jury testimony on Mr. White -- from Mr. White saying he

13  arranged for Mr. Jho Low to be there to take the picture.

14  There's testimony from Mr. White that he skirted the security

15  measures at the White House to get Jho Low inside.  Mr. White

16  at this point is an unavailable witness --

17          THE COURT:  Well, he's not unavailable if you want.

18  He's unavailable in the sense that he will assert his

19  5th Amendment right.  The government's not going to immunize

20  him since -- for reasons that we've already indicated on the

21  record.  So I won't bring it up at this point.  But -- and you

22  have the opportunity to use the grand -- you know, have as a

23  substitute his grand jury testimony.  What you can't do is not

24  accept his grand jury testimony as his testimony, but use his

25  testimony to try and get it in without actually admitting it.

1    So it's hearsay at that point.

2           So either you decide, you know, that Mr. White's

3    grand jury testimony is coming in as testimony from Mr. White,

4    in which case obviously, you know, he's then a witness as such

5    through the grand jury.  Or, you know, I don't see how you can

6    ask questions relating to the grand jury, not admit the grand

7    jury testimony.  It's all hearsay in terms of what you're

8    trying to bring out.

9           Now, I have to say that my recollection is that with

10   some of the other witnesses, you did bring out, if the whole

11   idea is that Mr. Low wanted to have photographs with the

12   various, you know, presidents, et cetera, my recollection was

13   Obama, you asked other witnesses that, because that's familiar

14   to me.  So I think you already have that on the record.  I

15   could be wrong.  You're getting transcripts.  I'm not reading

16   them.  So presumably you're getting them and have it.

17          But I don't see how -- if you want to have the

18   testimony admitted, then, you know, ask the witness, then it's

19   a different issue.  Then he will be part of the -- you know,

20   but I think you should admit it first before you start asking

21   him questions related to it.

22          MR. KENNER:  Your Honor, I move to admit the grand

23   jury testimony of Mr. Frank White given Thursday, September

24   20th, 2018.

25          THE COURT:  Ms. Lockhart.

1          MS. LOCKHART:  I'd like to clarify, just because of

2     some statements from counsel that it's the entirety of the

3     grand jury testimony that is to be admitted and not just

4     selected excerpts from the defense.

5          THE COURT:  Mr. Kenner.

6          MR. KENNER:  Um --

7          THE COURT:  I mean, I'd have to go back and look,

8     you know, we were waiting for briefing at a later point.  But

9     my recollection is I think the rule seems to indicate that

10    it's the whole grand jury testimony.

11         MR. KENNER:  Okay.

12         THE COURT:  I can take -- I can look briefly and

13    see.  I don't think you can pick apart -- pick out what you

14    want to have it come in and not have all of it come in.  So I

15    want to make sure if -- if you're asking to have it admitted

16    as if he is -- this is his testimony, then -- and you can

17    present it in various ways in terms of to the jury.  I mean,

18    somebody can pretend to be Frank White and you can read it in

19    with questions.  I mean, there's lots of different ways of

20    doing it.  You don't want to just give them the transcript.

21    But as far as I recall, but I'll double-check if you're

22    challenging it, I think it's the whole thing.

23         MR. KENNER:  Okay.  Your Honor, I would object to it

24    being the whole thing.

25         THE COURT:  Okay.

 1              MR. KENNER:  But if Your Honor overrules that

 2    objection, then I would move to admit it --

 3              THE COURT:  Well, hopefully we would have had some

 4    briefing, but let me take a quick break and go look at the

 5    rule.

 6              MR. KENNER:  Thank you, Your Honor.

 7              THE COURT:  Okay.  I'll be back in terms of taking a

 8    look to see whether what's required is the whole thing or not.

 9    My initial recollection was that it was.

10              It would help if you all had done some research and

11    can tell me, you know, based on your reading what -- what

12    basis there is, Mr. Kenner, to do excerpts that simply are,

13    you know, favorable to you and leave the rest out.  So if

14    you've got some evidence -- you know, some interpretation of

15    rule, cases, something, that would be helpful.

16              Government, if you've got something, give it to me.

17              You know, you all have a bunch of lawyers, you

18    should be able to come up with something besides my doing your

19    research for you.

20              MS. LOCKHART:  Certainly, Your Honor.  And if this

21    had been flagged, we would have been happy to brief the

22    issue.

23              THE COURT:  All right.  Well, at this point, I guess

24    the question is can we do it quickly.  Let me look and see

25    whether this is something quick or not.  If it's something

1    quick, we -- I can come back, and if it's not quick and we

2    really actually need some -- then we may want to punt on this

3    issue, take care of whatever other questions there were and

4    then come back to it.  Okay.

5                MS. LOCKHART:  Understood.

6                (A recess was taken.)

7                THE COURT:  Okay.  So this is the way I propose to

8    proceed.  This is not a simple issue.  What I'd like to do --

9    we're still in the government's case -- is to put aside the

10   issue of the Frank White, the 2012, et cetera, what will come

11   into the grand jury.  Finish the -- whatever your cross is,

12   finish this witness, have the government, you know, finish

13   their case and ask you to brief it.

14               You need to look at *United States v. Carson*,

15   455 F.3d 336, a D.C. Circuit case in 2006, Headnote 11.  The

16   question, among others, is whether the prosecutor's motive

17   to -- and develop the testimony in the grand jury, and the

18   motive in presenting the testimony in this trial, is

19   sufficiently similar under Rule 804 in order to have it

20   admitted.  To some degree, it depends on what the

21   government's -- what the government has to say about -- if you

22   look at the case, about what their motivations are.  I didn't

23   get to the issue of whether it gets to be the whole grand jury

24   testimony or not.

25               So what I would ask is that since Mr. White's grand

1    jury testimony would be presented as part of your case,

2    Mr. Kenner, not the government's, and you are putting on a

3    case, we should -- this thing should be briefed this evening

4    so that I can take a look at it and we can make some rulings.

5         We do need some positions on the part of the

6    government in terms of the motivations for doing it.  The case

7    is a little stricter than I had realized in I terms of getting

8    its admissibility.  But at any rate, I think we should just

9    postpone it and not deal with it now.

10        MS. LOCKHART:  Understood, Your Honor.  And for the

11   record, if counsel would agree to admit to the entirety of the

12   grand jury testimony, we would waive any arguments regarding

13   similar motive or agree that the similar motives were present.

14   However, if we're in picking-and-choosing land of what

15   excerpts were to come in, then that issue I think would need

16   to be fully briefed.

17        THE COURT:  All right.  Then what I suggest is

18   you'll have time to talk about it in terms of, you know,

19   figuring out how you want to proceed.

20        But it's really a matter that you're going to bring

21   up in your own case, Mr. Kenner, so I think, you know, if you

22   need to call the agent back at some point in your case, you

23   can.  But I think it -- first we need to deal with the issue

24   of whether the grand jury material comes in or not.  And

25   rather than doing this on the fly, and when I looked at the

1    case, it's obviously not that simple.  Okay?

2              MR. KENNER:  Okay.

3              THE COURT:  So we'll get the -- the witness back.

4              Are you -- this will be the end.  He'll do -- let me

5    just indicate that, you know, any motions at the end of the

6    testimony I take under advisement.  So I'm not going to go

7    through a long to-do with you all in terms of, you know,

8    making arguments.  It will be just quick points that you want

9    to make.  I'll take it under advisement, and I'll deal with

10   it, you know, at the end of the case, dealing with it with the

11   government's case and then at the end of the whole case.

12             But just for your own information, I don't -- I'm

13   not going to make a ruling, you know, on the record today once

14   you do the motions, so that should move quickly.

15             Are you doing an opening statement or not?

16             MR. KENNER:  Yes, Your Honor.

17             THE COURT:  Okay.  Then there is one issue that I

18   did want to raise with you besides the one other one that I

19   had indicated, to make sure we don't have a problem in terms

20   of what is said as part of the opening when you may have some

21   issues developing the testimony.  But let's leave that until

22   we get to it.

23             So if we can get the agent back and let's complete

24   his testimony.

25             How much more do you have, Mr. Kenner, if we leave

Cross-examination - Heuchling

1    out the grand jury and Mr. White?

2              MR. KENNER:  I'm sorry?

3              THE COURT:  Do you have a lot more or not?

4              MR. KENNER:  No.

5              THE COURT:  Okay.

6              MR. KENNER:  Your Honor, I do have something I think

7    is important to briefly raise.  It'll just -- I can do it

8    later.

9              THE COURT:  With this witness or something else?

10             MR. KENNER:  No, I'll do it later.

11             THE COURT:  Obviously, we'll be taking a break.  Do

12   you need to talk about this before we do this witness or

13   later?

14             MR. KENNER:  No, I can do it later.

15             THE COURT:  Okay.  That's fine.

16             (Jury entered the courtroom.)

17             THE COURT:  Please sit down.

18             All right.  We're ready to proceed at this point.

19             Go ahead, Mr. Kenner.

20             MR. KENNER:  Thank you, Your Honor.

21   Q.  (BY MR. KENNER)  Agent, last time -- on last Thursday, you

22   testified that every time money was received in one of the

23   various business accounts of Mr. Michel, Mr. Michel used the

24   money to pay credit cards and a variety of personal debt.  Do

25   you recall that?

Cross-examination - Heuchling

1          MS. LOCKHART:  Objection, Your Honor.  That

2   mischaracterizes what the agent testified to.

3          THE COURT:  I think you've indicated every time.

4   I'm not sure he said every time.  He certainly indicated that

5   it was some --

6          MR. KENNER:  Okay.  I'll remove "every time" from

7   it.

8          THE COURT:  All right.

9   **A.**  Yes, Mr. Kenner, in multiple instances, when Mr. Michel's

10  accounts, specifically the Artemus account and the Urbane, LLC

11  account received funds that we traced back to Lucky Mark or

12  Mr. Low, Mr. Michel used some of those funds, I think I said

13  hundreds, and I'll say it again, hundreds of thousands of

14  dollars to pay down credit card bills.

15  **Q.**  (BY MR. KENNER)  And did you review the credit card bills

16  that he paid down?

17  **A.**  No, I did not.

18  **Q.**  Okay.  As I understood your testimony, you couldn't find

19  in the Anicorn account any expenses associated to running that

20  business; is that correct?

21  **A.**  Yes, that's correct.

22  **Q.**  And you never did determine whether or not there were

23  operating expenses that were paid through the credit card that

24  Mr. Michel was paying down, when he received money?

25  **A.**  I -- I did not -- I did not look at the credit card

1    accounts, that's correct.

2    **Q.** All right. Last week we talked a little bit about a

3    variety of charts indicating a flow of money from Pheng

4    Laogumnerd to Mr. Michel. Do you recall that?

5    **A.** I do.

6    **Q.** And you recall the total amount of money Mr. Michel

7    received from Mr. Pheng Laogumnerd?

8    **A.** Yes. I recall the funds that Mr. Michel received from

9    Lucky Mark and from Red Rock 9.

10   **Q.** Okay. And those are both signed by Pheng Laogumnerd?

11   **A.** Yes, Mr. Laogumnerd was the signatory on both those

12   accounts.

13   **Q.** Okay. And what is the total, if you recall, of the funds

14   that came from Pheng Laogumnerd to Mr. Michel?

15   **A.** It's just over a hundred million dollars.

16   **Q.** Okay. At the time you made that determination with your

17   charts, isn't it true that you analyzed this total before you

18   subpoenaed financial records until the day before Agent Van

19   Dorn filed his expert opinion on January 2nd, 2022?

20           MS. LOCKHART: Objection. Relevance.

21           THE COURT: I'm not sure what the relevance is as

22   you've worded it. Is there something you want to talk about

23   in terms of --

24           MR. KENNER: No. No, Your Honor.

25           THE COURT: It's not apparent on that -- in the

1    question.

2                MR. KENNER:  I'll move on.

3                THE COURT:  Okay.

4    **Q.**  (BY MR. KENNER)  Would it be a fair statement to say that

5    at the time of the superseding indictment, there were no

6    corresponding financial records to match its allegations; is

7    that correct?

8    **A.**  Mr. Kenner, you'd have to provide me -- provide me some

9    dates.  I don't -- I can't recall when we received which

10   records as it relates to when the superseding indictment was

11   filed.

12   **Q.**  Okay.  So you may or may not have proceeded with the

13   indictment without having access to the financial records?

14               MS. LOCKHART:  Your Honor, objection.  Relevance.

15               THE COURT:  I'm not sure the relevance, but

16   importantly --

17               MR. KENNER:  I'll move on.

18               THE COURT:  -- that's not really his answer.  He

19   just said he didn't -- he didn't -- he couldn't recall off the

20   top of his head.  But, moving on.

21   **Q.**  (BY MR. KENNER)  Did you do case updates and coordinations

22   regarding the progress into your investigation of

23   Mr. Michel?

24   **A.**  Yes.  I think yes, in the sense that I had a -- at various

25   times, I had various people I had to re- -- provide updates

1   on -- updates I had to provide related to this investigation

2   and all of my investigations.

3   **Q.**  Okay.  And during the course of your investigation, was

4   one of your interests in getting Mr. Michel to become a

5   cooperating witness in your 1MDB case?

6   **A.**  Yes.  Throughout this investigation and almost every

7   investigation I've ever run, we have tried to identify

8   subjects or witnesses who may be able to cooperate and help us

9   in our investigation.

10          MR. KENNER:  Okay.  Can you show to the witness,

11   Court, and counsel, Defense Exhibit 266, which has not been

12   admitted.

13          THE COURT:  All right.  These are additional

14   exhibits.  I mean, have you all seen them?  I don't have them

15   on my list.

16          MS. LOCKHART:  No, Your Honor.

17          THE COURT:  Okay.  The last we stopped at is 223.  I

18   just want to put on the record, the next jump is 265, did not

19   admit, and we're now at 266?  Okay.  Put it up for

20   everybody -- for us to see, not the jury.

21          You'll have to give the government an opportunity to

22   look at it.

23          MS. LOCKHART:  Your Honor, I believe this is an

24   e-mail from Agent Heuchling and is there- --

25          THE COURT:  I'm sorry, I didn't hear that.  An

1    e-mail?

2            MS. LOCKHART:  I believe this is part of an e-mail

3    from Agent Heuchling and is, therefore, inadmissible hearsay

4    unless counsel has some other purpose for this.

5            THE COURT:  Okay.  Is this part of the 302?

6            MS. LOCKHART:  No, I believe this is part of the

7    case updates that counsel was asking Agent Heuchling --

8            THE COURT:  Okay.

9            MR. KENNER:  These are -- yes, these are updates of

10   his investigation, Your Honor.

11           THE COURT:  Okay.  Let me -- let me have a

12   discussion with counsel.

13           (Bench conference on the record.)

14           THE COURT:  What's the relevance of this?  What it

15   sounds to me like is you're looking at, you know, some

16   retaliation or that he wasn't a cooperator and then you went

17   to the superseding indictment, all of which I have excluded.

18   So other than that, tell me what relevance there is to any of

19   this.

20           MR. KENNER:  The relevance is that there -- the next

21   e-mail after this is an -- is an e-mail with regard to the

22   question of pursuing FARA charges, and it reads:  Does

23   Mr. Michel know it's about to hit him, how much time he'll

24   have to work off.  And somebody was seeking permission to talk

25   to him about 1MDB, and the response was, you know, as long as

1    you don't do anything that will make him not want to

2    cooperate, because that's our goal here.

3            THE COURT:  Well, that's totally irrelevant as to

4    whether -- he is not a cooperator.  Raising the issue of

5    cooperation is still getting into, in a back door, what I have

6    excluded, which is, in terms of some sort of going at

7    misconduct or they're directing it, I don't see it.  Now,

8    Ms. --

9            MR. KENNER:  I'm not suggesting --

10           THE COURT:  That's what's suggested by the

11   questions.

12           Now, I -- you indicated irrelevance, so what's your

13   argument, Ms. Lockhart?

14           MS. LOCKHART:  Both to the vindictive prosecution,

15   but also this is the agent's prior statement.  That makes it

16   hearsay unless there's some other purpose.  Agent Heuchling

17   just testified that he was seeking or pursuing Mr. Michel as a

18   cooperator, like he would anybody else in a criminal case,

19   including in the 1MDB investigation.  So, therefore, this

20   document is inconsistent with his testimony and it's

21   inadmissible.

22           THE COURT:  Okay.  Tell me why it's admissible.  It

23   is hearsay.  It doesn't seem to be inconsistent, and I still

24   think it raises the specter of some sort of retaliation or

25   vindictive prosecution.  Tell me your other reason for it,

1    since she already indicated what -- the efforts they have

2    made.

3              MR. KENNER:  My other reason for it is simply to

4    show that the government was trying to get Mr. Michel's

5    cooperation and that they were tactically devising a plan to

6    do that.  I'm not talking about any government --

7              THE COURT:  Mr. Kenner, you know, that's --

8    that's -- you know, that is -- the implication is he didn't

9    cooperate and therefore they indicted him.  Whether you argue

10   it or not, that's the way it's left.  So I will not allow it.

11   I've done an opinion on this.  It's not relevant.  He's

12   indicated they did, you know, contact him about cooperation.

13   Beyond that is inappropriate.  It's hearsay -- it's hearsay.

14   It gets into what I've indicated is not an appropriate --

15   whether you argue it or not, that's the way it's left here.

16   Otherwise, it has absolutely no relevance.  You cannot pursue

17   this line of questioning.

18              MR. KENNER:  Thank you.

19              (The following proceedings were had in open court.)

20              THE COURT:  I'll sustain the objection for the rec-

21   -- for the jury.

22   Q.  (BY MR. KENNER)  Just a few more things, Agent.  I think

23   we've already covered this, but it's true, is it not, that

24   Pras went to an agent in New York to provide information with

25   regard to tape recordings?

1          MS. LOCKHART:  Objection.  Asked and answered.  We

2    covered this.

3          THE COURT:  Sustained.

4          MR. KENNER:  Okay.  If I can't ask these questions

5    at this point, I have no further questions.

6          THE COURT:  I've sustained objections under grounds

7    that I've said on the record --

8          MR. KENNER:  Yes.

9          THE COURT:  -- that the jury does not need to hear.

10   But if you've decided that you don't have any further

11   questions, then I'll move to redirect.

12                    REDIRECT EXAMINATION

13   BY MS. LOCKHART:

14   **Q.**  Good morning, Agent Heuchling.

15   **A.**  Good morning, Ms. Lockhart.  Sorry.

16   **Q.**  Mr. Kenner asked you about money paid to Colfax last

17   Thursday and that Colfax had received millions of dollars.  Do

18   you remember that?

19   **A.**  I do.

20   **Q.**  For the money in the millions of dollars that went into

21   Colfax Law office, did that money stay there?

22   **A.**  No.  Almost all of it was moved out of the Colfax account

23   to either Mr. Broidy, Ms. Lum Davis, and some to Mr. Broidy's

24   wife.

25   **Q.**  Mr. Kenner also just asked you about business expenses for

Redirect Examination - Heuchling

1    Anicorn and Artemus and Mr. Michel's entities.  And you

2    testified you hadn't looked at the Amex records or didn't

3    recall; is that right?

4    **A.**  Yeah, that was right, but I should point out that those

5    Amex cards and credit cards I did see on the Urbane account

6    and the Artemus account were in Mr. Michel's personal name.

7    They were not in a business -- they were not business credit

8    cards, or not in the name of a business.

9    **Q.**  With respect to some of those personal transfers, I'd like

10   to show you what's previously been admitted as Government's

11   Exhibit 17.

12           MS. LOCKHART:  And if we could go to page 4,

13   Ms. Orozco.

14           THE COURT:  I'm sorry, what was it again, what

15   number?

16           MS. LOCKHART:  Government's Exhibit 17.

17           THE COURT:  Do we have that?  I don't have it

18   admitted unless it was part of the stipulation.

19           MS. LOCKHART:  It was part of the original

20   stipulation.

21           THE COURT:  Okay.  It's part of the stipulation.

22           THE CLERK:  Yes.

23           THE COURT:  Okay.  Then it's admitted.

24           Go ahead.  The jury can see it.

25           MS. LOCKHART:  And if we could go to page 4,

1    Ms. Orozco.

2         THE COURT:  And we need to have it enlarged so we

3    can see what it is.  Okay.

4    **Q.**  (BY MS. LOCKHART)  Do you recognize this as an account

5    statement for Artemus Group?

6    **A.**  I do.

7         MS. LOCKHART:  Ms. Orozco, if we could go to a

8    transaction on May 10th, to Tiffany's.  All right.

9    **Q.**  (BY MS. LOCKHART)  Agent Heuchling, have you reviewed this

10   transaction previously?

11   **A.**  I have.

12   **Q.**  For the funds used by Mr. Michel to make this payment to

13   Tiffany's, what funds did he use?

14   **A.**  I believe this is a late May account.  So these would be

15   funds that came from his Anicorn account into the Artemus

16   account, and the funds that were received from -- into the

17   Anicorn account came from Lucky Mark.  And then there's a

18   $90,000 payment out to Tiffany's.

19         MS. LOCKHART:  Ms. Orozco, if we could look at a

20   transaction on May 11th, the next day, also to Tiffany's.

21   Thank you.

22   **Q.**  (BY MS. LOCKHART)  Do you recognize this transaction?

23   **A.**  I do.

24   **Q.**  And what is this transaction showing?

25   **A.**  This is a transaction for just under $55,000, again to

1    Tiffany's.

2    **Q.**  And again, what funds did Mr. Michel use to make these

3    purchases at Tiffany's?

4    **A.**  These are the funds that Mr. Michel received in early May

5    in his Anicorn account from Lucky Mark.  And then those funds

6    were transferred into the Artemus account and then

7    subsequently paid out here.

8            MS. LOCKHART:  Thank you, Ms. Orozco, we can take

9    this down.

10   **Q.**  (BY MS. LOCKHART)  Throughout the course of your

11   investigation, did you find any indication that Anicorn and

12   Artemus, in this time period of March to August, September,

13   October of 2017, were legitimate -- or had legitimate

14   operating expenses?

15           MR. KENNER:  Objection.  Calls for speculation and

16   conclusion --

17           THE COURT:  Well, why don't you set a legitimate

18   word --

19           MR. KENNER:  And also asked and answered.

20           THE COURT:  I don't think so.

21           Go ahead.

22   **Q.**  (BY MS. LOCKHART)  Did you find any indication during the

23   course of your investigation that Anicorn and Artemus, in this

24   time period, had operating expenses?

25   **A.**  No.

1    **Q.**  I'd like to show you what's also been marked as -- or

2    previously been admitted as Government's Exhibit 474, page 4.

3    Mr. Kenner asked you questions about this exhibit last week.

4    Do you remember that?

5    **A.**  I do.

6    **Q.**  And I believe you mentioned that you had seen this

7    document before outside of the photographs found on Ms. Lum

8    Davis's Google Drive?

9    **A.**  Yes, I did.

10          MS. LOCKHART:  I'd like to do a side-by-side,

11   Ms. Orozco, if we could show this document and Government's

12   Exhibit 395, page 1, which has also been previously admitted

13   for the record.  All right.

14   **Q.**  (BY MS. LOCKHART)  Agent Heuchling, looking at the top of

15   the right-hand exhibit, on Government's Exhibit 474, do you

16   see a partial title there at the top?

17   **A.**  I do.

18   **Q.**  In looking over in the title of the documents in 395, this

19   document that's an e-mail from Mr. Michel to himself, do those

20   titles of those documents look similar to you?

21   **A.**  Yes.  The title of the attachment on the right appears to

22   match the title of the attachment -- the first attachment to

23   the e-mail that Mr. Michel sent to himself.

24   **Q.**  I'd like to look at the actual document for Government's

25   Exhibit 395.

1    MS. LOCKHART:  Ms. Orozco, if we could go to page 2

2    of 395.  Thank you.

3    **Q.**  (BY MS. LOCKHART)  Now looking at the document itself,

4    with the photograph found in Ms. Lum Davis's Google Drive --

5    MS. LOCKHART:  And, Ms. Orozco, if you're able to

6    show us the other --

7    **Q.**  (BY MS. LOCKHART)  Do these appear to be a similar

8    document or the same document?

9    **A.**  Yes, they appear to be the same.

10   **Q.**  And generally, what kinds of information does this

11   document contain?

12   **A.**  So this document contains information related to the

13   charges and allegations against Mr. Guo as levied by the

14   Chinese and Hong Kong governments, as well as talking points

15   that appear to be -- come from the Chinese government as to

16   why Mr. Guo should be deported and when he should be deported.

17   Again, I think it highlights the July 15th date.  And then

18   this attachment also has information related to the Interpol

19   and Red Notice out against Mr. Guo.

20   MS. LOCKHART:  Ms. Orozco, if we could just go to

21   page 395, page 3, and drop Government's Exhibit 474.

22   **Q.**  (BY MS. LOCKHART)  On Thursday, Mr. Kenner asked you

23   questions about the return of a pregnant woman from China to

24   the United States named Emily Huang.  Do you remember that?

25   **A.**  I do.

1    **Q.**  And I believe your testimony was, is that you did not know

2    why she was returned; correct?

3    **A.**  That's correct.

4    **Q.**  I'm showing you Government's Exhibit 395, page 3.  If we

5    could take a look at the second check mark under bullet point

6    No. 2.

7    **A.**  Is it the one starting with Attorney Jeff Sessions?

8    **Q.**  Yep, there we go.  I was waiting.  Ms. Orozco was going to

9    zoom in to make it easier to read.

10        And Mr. Kenner also asked you about a letter from

11   Mr. Sessions; correct?

12   **A.**  That's correct.

13   **Q.**  And you have no recollection of this letter; right?

14   **A.**  I have not seen a copy of that letter, that's correct.

15   **Q.**  Agent Heuchling, if you could read the first --

16           MR. KENNER:  Excuse me, move to strike the last

17   response as nonresponsive.  The question was are you aware of

18   it, and the answer was I never read it or saw it.

19   **A.**  I --

20           THE COURT:  "I've not seen a copy of the letter,

21   that's correct."  Okay.  So he's indicated that.  She's moving

22   on to something else.

23   **Q.**  (BY MS. LOCKHART)  Agent Heuchling, if you could read

24   beginning with Attorney Jeff Sessions, please?

25   **A.**  "Attorney Jeff Sessions, in a letter, end of" -- or "end

1    May 2017, to the PRC's ambassador to USA requests for three

2    USA persons to be sent from PRC back to the USA."

3    **Q.**  If you could read the bullet point immediately underneath

4    it?

5    **A.**  "As a good-faith gesture, one USA person, female, Emily

6    Huang, USA passport No. XXXXXXXXX, has already immediately

7    been sent back to the USA upon receipt of such letter."

8    **Q.**  So based on this document, is it correct that upon the

9    receipt of the letter from the attorney general, he returned

10   the hostages?

11           According to this document, that is why she was

12   returned.

13           MS. LOCKHART:  Nothing further.

14           THE COURT:  All right.  You can step down, sir.  You

15   can step down.  Thank you.

16           THE WITNESS:  Thank you, Your Honor.

17           THE COURT:  All right.  Anything else on the

18   government, either witnesses or exhibits?

19           MS. LOCKHART:  No, Your Honor, the government

20   rests.

21           THE COURT:  All right.  Why don't we take our

22   morning break.  In terms of -- we'll do it at five to 11:00

23   and then we'll start again.  We have a legal issue to talk

24   about.

25           (Jury left the courtroom.)

1            THE COURT:  All right.  Presumably we have two

2      things.  One is, do you have a motion, Mr. Kenner?

3            MR. KENNER:  Yes, Your Honor.

4            THE COURT:  Right now?

5            MR. KENNER:  I move to dismiss --

6            THE COURT:  You need to speak into the microphone.

7            MR. KENNER:  I'm sorry.  I apologize.  I move under

8      Rule 29 to dismiss certain portions of the indictment.  I will

9      briefly read them.  At the same time, they're being

10     electronically filed.

11           THE COURT:  Okay.

12           MR. KENNER:  Would Your Honor not want me to

13     summarize them now or just --

14           THE COURT:  It's up to you how you wish to do it.

15     As I've indicated to you, I'm taking it under advisement,

16     which I can under the rules, and I'm likely to rule on it at

17     the -- after the case has been submitted to the jury and we

18     get whatever their verdict is going to be.  And then I will

19     deal with it.  And obviously I'll deal with it based on the

20     government's evidence that they have then presented, since

21     you're planning on putting on a defense.  And then at the end

22     of both the government and the defense case, And I will do

23     something in writing and with -- also with transcripts.  But

24     it's up to you how you wish to do it.  I mean, obviously

25     you're preserving your rights.

1      MR. KENNER:  Yes, Your Honor, I am.

2      And I believe by now it's been electronically filed;

3  is that correct?

4      Yes, it's -- we're --

5      THE COURT:  Okay.  I at this point -- I'm not going

6  to require you to respond at this point.  I want you, frankly,

7  focused more on the issue of the -- Mr. White's grand jury

8  testimony.  We need the -- I need you to brief that so we can

9  make some decisions in terms of Mr. Michel's case.

10      You wanted to bring something else up, sir?

11      MR. KENNER:  Oh, yes, I think -- I don't remember if

12  the Court addressed this or not, but apparently one of the

13  hearings outside the presence of the jury that we had dealing

14  with the matters, that I believe the Court sealed, I think

15  were erroneously sent to the government as a transcript.

16      Am I right about that?

17      THE COURT:  I think that's -- I think that's

18  correct.  And I put a minute -- I believe it was a minute

19  entry, am I correct, indicating that delete it and the court

20  reporter sent one without it.

21      MR. KELLER:  That's --

22      THE COURT:  It's the court reporter that sent it.

23      MR. KENNER:  Okay.

24      MR. KELLER:  That's correct, Your Honor.  None of

25  the prosecutors reviewed that transcript prior to receiving

1    the Court's notice and deleting it.  One of our paralegals may

2    have saved it on the -- on our shared drive prior to receiving

3    the Court's notice, but it has been deleted, and no one

4    reviewed any of the portions that the Court referenced.

5              THE COURT:  Okay.

6              MR. KENNER:  That's fine.  I just wanted to make

7    sure.

8              THE COURT:  No problem.

9              So when we come back, we'll do -- we need to have

10   your opening.  Keep in mind the advice of legal counsel, don't

11   include it.  I've left the record open.

12             The other thing is, I want you to look at my orders

13   relating to motive, particularly in terms of Mr. Low and the

14   2012 conduct.  This is -- you know, there may have been a

15   bunch of motives, but that doesn't really excuse the

16   violations if there's such evidence.  And they don't have a

17   specific intent element.  So I'm not going to make a full

18   ruling, but my suggestion is that you stay out of that in your

19   opening.

20             You can, you know, develop -- you can see whether

21   it's useful, frankly, to develop motives on their part, which

22   may turn out not to be as exculpatory upon careful looking.

23   But I would just simply ask that you not include it as part of

24   your opening.  If you go back and look at my orders, you'll

25   see what I have.  It relates to the 2012 conduct.

1          MS. LOCKHART:  And, Your Honor, given that the --

2     the issue of the Frank White grand jury testimony is still

3     outstanding, I assume there should not be reference to that in

4     defense counsel's opening statement either; correct?

5          THE COURT:  I'm assuming he's not going to do -- you

6     would not be doing that, at least I hope not.

7          MR. KENNER:  May I just inquire.  If I understood

8     Ms. Lockhart earlier, notwithstanding anything else you -- the

9     government would be willing to stipulate to the admissibility

10    of the Frank White transcripts as long as it's in its

11    entirety.

12         MS. LOCKHART:  That's correct.  But unless you're

13    agreeing now for us to admit that, I don't think it should be

14    brought out in your opening statement.

15         MR. KENNER:  I am --

16         THE COURT:  I think you need to discuss it -- my

17    suggestion is that you, if you want to discuss it over this,

18    should write out the stipulation, because it is a tricky issue

19    if the Court has to make a ruling on it.  It's not quite so

20    simple, I indicated.  But, I mean, if you want to agree and

21    stipulate, that's fine.  But there should be a written

22    stipulation, don't do this orally, so we don't have any issues

23    as to exactly what is the full grand jury testimony.  So

24    you're in agreement about what actually is coming in.

25         MS. LOCKHART:  Understood.

1          THE COURT:  If you agree to not have to look at the

2     issues of similar motives, et cetera, which is what I had

3     indicated to you I thought was somewhat of a tricky legal

4     issue.

5          All right.  We're on a break.

6          MR. KENNER:  Thank you.

7          (A recess was taken.)

8          THE COURT:  Anything we need to talk about, or are

9     we all set?  Can we bring the jury in?

10          MR. KENNER:  The government's preparing --

11          THE COURT:  If I could hear you --

12          MR. KENNER:  The government's preparing the

13     stipulation with regard to Frank White, which will be ready

14     momentarily, and we intend to sign it before my opening

15     argument.

16          THE COURT:  Okay.

17          MS. LOCKHART:  That's correct, Your Honor.

18          THE COURT:  All right.  Then I'll -- pretend I'm not

19     here.  It's not worth getting off the bench and getting back

20     on again.

21          MR. KENNER:  Okay.

22          THE COURT:  So let them sign it first.

23          Maybe I will get off the bench instead of peering

24     down at you.  If you want to have it printed, can we just

25     e-mail it to --

Redirect Examination - Heuchling

1          THE CLERK:  You can e-mail it to me.

2          THE COURT:  Okay.  What I suggest is that when you

3    get it ready, e-mail it to Ms. Patterson.  She can print it

4    out in the courtroom and give it to you.

5          MR. KENNER:  Perfect.

6          THE COURT:  So that way you can actually see it in a

7    paper copy.

8          MR. KENNER:  Perfect.  Thank you, Your Honor.

9          THE COURT:  Okay.  And I'll just tell -- are they

10   lined up?  Are they lined up?  Shall we tell them to --

11         THE CLERK:  Oh, yes.

12         THE COURT:  And that way you'll have a paper copy to

13   take a look at.  And then I'd ask that both sign.

14         MR. KENNER:  Thank you, Your Honor.

15         THE COURT:  Just let me know.

16         (A recess was taken.)

17         THE COURT:  Okay.  So I take it everybody's waiving

18   all of their legal arguments that they could make to its

19   admissibility.

20         Government?

21         MS. LOCKHART:  That's correct, Your Honor.

22         THE COURT:  Mr. Kenner?

23         MR. KENNER:  Yes, Your Honor.

24         THE COURT:  All right.  Let's proceed.  And we'll

25   have to figure out how you want to present it.

1              (Jury entered the courtroom.)

2         THE COURT:  All right.  Good morning again.

3         JURORS:  Good morning.

4         THE COURT:  The government has rested its case.  The

5    defendant does not have to present a case, but it's chosen to

6    do so.  And Mr. Kenner reserved his opening statement until

7    the beginning of his case.

8         So, Mr. Kenner.

9         This is his opening statement.

10        MR. KENNER:  Thank you, Your Honor.

11        Still good morning, ladies and gentlemen.

12        JURORS:  Good morning.

13        MR. KENNER:  It seems like many, many, weeks ago now

14   we all became somewhat acquainted with each other, and you

15   heard the government tell you what it expected that the

16   evidence will show.  I now have an opportunity to address you

17   with respect to what I believe the evidence will show, but I

18   want you to understand it's all of the evidence.  When I

19   address you "the evidence will show," what I mean is evidence

20   that has already been admitted in this case and evidence that

21   will be admitted in the case through the defense.

22        So what is this case really, really about?  This

23   case is about Pras Michel, a young man growing up in New

24   Jersey and being fortunate enough to found a band called the

25   Fugees with Lauryn Hill, who he met in church, and with Wyclef

1    Jean, who was also singing in the choir at church.  This is a

2    case about a young man who grew up in poverty with a strong

3    religious and educational influence from his parents in his

4    life.  It's a case about a man who, by the time he was 25

5    years old, had come to be famous and had made a lot, a lot of

6    money at 25.

7            I think that the evidence has already shown through

8    Mr. Leonardo DiCaprio, and the evidence will show that people

9    who have celebrity status, that are busy engaging in their

10   art, hire people to surround themselves to help them make good

11   decisions about what they need to do.  They hire lawyers.  The

12   evidence will show he hired a lawyer.  The evidence will show

13   that he hired an agent.  The evidence will show that he hired

14   a financial manager.  The evidence will show that he

15   surrounded himself with the people that are necessary to do

16   the part of a life of a celebrity that does not involve

17   himself in his own -- in his own celebrity.

18           I think the evidence will show that Mr. Michel met

19   Mr. Low in a chance meeting in a nightclub in 2006.  I think

20   the evidence will show that Mr. Michel was a witness to

21   incredibly large amounts of money being thrown around at this

22   club by Jho Low.  And that that was his first introduction to

23   him.  This was his first introduction to a man who, for you

24   and I might be a dollar, $100 million would be to him.  He

25   appeared and he acted as though he had unlimited amounts of

Redirect Examination - Heuchling

1    money.

2              After that encounter in this bar, Mr. Michel does

3    not come across Mr. Jho Low again until a chance meeting in

4    2008.  And in 2008, Mr. Michel was walking in Columbus Square

5    in New York, and Joe Rousseau and Joel (sic) were sitting

6    there.  Pras walked up to say hello, and there was a

7    conversation that ensued.  And in this conversation, Jho Low

8    appeared to be taking the position that the United States was

9    not ready to elect a black president yet.  And Mr. Michel

10   argued with him and tried to convince him that, in fact, it

11   was ready.

12             Mr. Michel then went on throughout subsequent years

13   without coming into contact again with Mr. Low until 2011.

14   And between those two periods of time and after that,

15   Mr. Michel saw what the evidence will show everybody saw,

16   which was Mr. Jho Low spending enormous, almost ridiculous

17   amounts of money for jewelry, for movie stars, to get Paris

18   Hilton to come with him as his date when he went to various

19   places, to financing the Wolf of Wall Street with $100

20   million, and all of the other things, the real estate that he

21   bought.  And the evidence will show that Jho Low lived in the

22   United States when he went to Wharton.  The evidence will show

23   that Mr. Michel -- I'm sorry, Mr. Jho Low had invested heavily

24   in companies, in entertainment companies, in publishing

25   companies, movies, et cetera.

1          So now we move -- I think it is easy to say at this

2     point that Mr. Michel observed Jho Low giving away literally

3     hundreds of millions of dollars to do whatever he felt he

4     wanted to do.  Now, you might sit there thinking to yourself,

5     well, Pras made money for this.  And the answer is, the

6     evidence will show, he did.  We do not deny that Pras Michel

7     made money from doing this.  I think the evidence will show

8     that making money, even if you consider it greedy, is not a

9     crime.  It's not alleged in this indictment.  There are 11

10    counts alleged in this indictment.  The evidence will show not

11    one of them charges Mr. Michel with taking advantage of the

12    situation.  Not one of them charges Mr. Michel with making

13    money.  That's all legal activity, even if you believe that

14    the evidence supports that.

15         So let me go first to the election law counts in

16    this case.  Mr. White, the evidence will show, was a chief

17    fundraiser for Mr. Obama in 2012.  The evidence will show that

18    Mr. Michel viewed Mr. White as a mentor into the political

19    game.  Now, I want to emphasize, the evidence is going to show

20    that Mr. Michel, on the back end of a very long and successful

21    recording career, all of a sudden was, as most entertainers do

22    after the peak of their popularity, transitioning into other

23    areas of his life.  And that transition for him took place

24    into a political encounter with the desire to become involved

25    in the political campaign for President Obama.

1          I think that one thing that will be clear from this

2     evidence is that Joe Rousseau was a friend of Pras's, both of

3     them coming from Haitian decent.  And I believe the evidence

4     will show the real relationship with Jho Low was not with Pras

5     Michel but with Joel Rousseau.  And I believe that the

6     evidence will show that Mr. Rousseau reached out to

7     Mr. Michel, and you'll see evidence of that, looking for --

8     acquainting Mr. Michel with this good client of his.  I

9     believe he referred to him as a whale.  Whales are people that

10    spend lots of money when they go to casinos or hotels or

11    nightclubs.  And Joel Rousseau's profession was making whales

12    happy and getting paid for it.  And that's what the

13    relationship was.

14         The evidence will show that Mr. Rousseau contacted

15    Mr. Michel and said I have a friend who wants to support

16    President Obama for -- in his presidential re-election.  And I

17    think the evidence will go on to show that what Jho Low wanted

18    as a result of this was an opportunity to get a photo with

19    Mr. Obama, for whatever his reasons.  And we know from the

20    evidence, he spends enormous amounts of money and spent an

21    enormous amount of money trying to do that.

22         And then the evidence will show that there was a

23    fundraiser in Miami back in June of 2017.  The evidence will

24    show that that fundraiser was sponsored by Mr. White and that

25    five or seven days before the event, the $40,000-a-person

1    event, Mr. White was short five people to make the quota.

2    Well, all of the advanced security for the President to be

3    there had been done.  Invitations had been sent out.  There

4    was a lot of publicity about the event.  And Mr. White reached

5    out to Mr. Michel, to whom he had been previously introduced,

6    and said, can you get five more people there?  And what ended

7    up happening is Mr. Michel spent $120,000 of his own money to

8    allow some Haitian descendants to go to that place, that

9    fundraiser.  He went himself and paid for himself.

10           And he had arranged, through Frank White, who had

11   been requested to get a photo for Jho Low at that event,

12   wanted Jho Low to attend, but that the campaign did not

13   approve Jho Low to come to the event.  And why did it not

14   approve it?  Remember, this is years before anybody heard of

15   anything about 1MDB.  The reason they didn't approve it is

16   they didn't like the profile that Jho Low was putting out in

17   the public as a crazy rich playboy, spending money left and

18   right.  They didn't like that association.  So Mr. White

19   arranged to have Jho Low's friend, Mohammed Al Husseiny, come

20   to that event and he did.  And at that event, Mohammed Al

21   Husseiny, the evidence will show, got a photograph with the

22   president.

23           Flash-forward now to September of 2017, and there is

24   now an event to be held at Frank White's home.  And Frank

25   White had believed that he could get Joel (sic) in easier

1    because it was his home.  Now, if you recall the evidence -- I

2    think you were shown a picture of it -- the invitation for

3    that event was not Mr. Michel.  You'll see it again.  But if

4    you -- I'm sorry, I'm talking about 2000 -- I'm out of

5    context.  I'm talking about 2012 right now.  I apologize.  The

6    evidence is going to show that during that time, it was

7    arranged to have Jho Low's father come to Frank White's house,

8    because Jho Low still was not okayed by the campaign staff for

9    the same reasons.  Jho Low's father, the evidence will show,

10   came to that fundraising event, got his picture with President

11   Obama, which you'll see.  And that Jho Low was told, through

12   Frank White, that he will get him a picture, he just couldn't

13   do it now.

14          So we've had those pictures.  And now, in 2011, the

15   evidence will show that $11 million came into Frank White --

16   or I'm sorry, to the campaign, not to Frank White directly, to

17   the Obama campaign the day after the election.  The election

18   was on November 11th.  The $11 million came on November the

19   12th.  And I believe the evidence will show that Frank White

20   still had the belief that if he played it right with

21   Mr. Michel and Mr. Rousseau, he would be able to get a

22   photograph of the President and Jho Low easier, believe it or

23   not, after he became president than while he was running for

24   president.  And the evidence will show that it was

25   Mr. Frank --

Redirect Examination - Heuchling

1                MS. LOCKHART:  Objection, Your Honor.

2     Argumentative.  We're getting into the ground we've already

3     tread previously during the course of the government's case.

4                THE COURT:  All right.  Let's move on.  But you do

5     need to keep it --

6                MR. KENNER:  All right.

7                THE COURT:  -- regarding the facts and less

8     argument.

9                MR. KENNER:  All right.

10               The evidence will show that Frank White arranged,

11    after Mr. Obama -- President Obama became president, to escort

12    Jho Low through security --

13               MS. LOCKHART:  Same objection, Your Honor.

14               MR. KENNER:  This is what the evidence is going to

15    show.

16               THE COURT:  I'm not sure what the -- you're arguing

17    that it's --

18               MR. KENNER:  I'm not arguing.  I'm just saying

19    that's what the evidence --

20               THE COURT:  Right, and I'm not sure what your

21    objection is at this point.

22               MS. LOCKHART:  Your Honor, I believe -- I don't know

23    of any evidence that will show what he is about to say.  It's

24    what he's attempted to elicit from multiple witnesses, and the

25    evidence that will be introduced, that we have discussed over

1    the course of the break, does not say that.

2         THE COURT:  Well, do you want to reword this,

3    Mr. Kenner?

4         MR. KENNER:  You know what, I'll just move --

5         THE COURT:  I have not had the advantage of looking

6    at the materials.  I don't know whether she's correct or

7    not.

8         MR. KENNER:  I'll just move on, Your Honor.

9         So remember, the charges are three different

10   conspiracies.  The evidence will show that there was no

11   agreement to do anything lawful in an unlawful way, or to do

12   anything unlawful.  The evidence will show that at no time was

13   there an agreement between Mr. Michel and anyone else to not

14   register for FARA.  FARA is one of those unusual, if not the

15   unusual statute, which punishes an act of omission, not

16   comission, and the evidence will show that such a conspiracy

17   never, ever existed.

18        The evidence will show that the conspiracy for FARA

19   is the predicate act the government alleges took place that

20   charge -- to ask for a verdict of guilty on money laundering.

21   I think the evidence will show that without the FARA

22   violations, that they cannot be proved, and therefore they

23   cannot be the predicate act for money laundering.

24        MS. LOCKHART:  Your Honor, that mischaracterizes the

25   indictment.

1                THE COURT:  I'm sorry.

2                MS. LOCKHART:  Counsel's statements are misstating

3      the law and mischaracter- --

4                THE COURT:  Yeah, I -- you're getting into legal

5      issues and doing it in a --

6                MR. KENNER:  I'll move on.

7                THE COURT:  -- superficial way, which is not totally

8      accurate.

9                MS. LOCKHART:  And we're also dangerously close to

10     closing argument with this line of --

11               THE COURT:  I can't hear you.

12               MR. KELLER:  We're also dangerously close to a

13     closing argument-type statement with this line of argument.

14               THE COURT:  Well, let's stay -- if we can stay away

15     from what the elements of the offense are, since they're

16     fairly discrete.

17               MR. KENNER:  Certainly, Your Honor.  Certainly, Your

18     Honor.

19               The evidence will show that of the money that Pras

20     Michel received, through Jho Low or otherwise, he got gifted

21     from Jho Low to him.  And the evidence will show that it was

22     Mr. Michel's money at the point in which he paid for people of

23     Haitian decent to come to this fundraising event, that it was

24     his money, not Jho Low's money, not Lucky Mark's money, not

25     any of the other -- Blackstone's money, not Alsen Chance

Redirect Examination - Heuchling

1    money, none of the events to which it has been attributed.

2         I want to move now to the FARA counts.  With regard

3    to the FARA counts, the evidence will show that it was a law

4    that started to be enforced during the beginning of --

5         MS. LOCKHART:  Objection, Your Honor.

6         THE COURT:  I'll sustain it.  We've stayed out of

7    getting into when it started or when it didn't and when it was

8    enforced.  We didn't -- I precluded that evidence.

9         MR. KENNER:  Okay.

10        The evidence will show that this is not a James Bond

11   spying kind of statute.  This is a statute that punishes the

12   failure to register.  No cloak and dagger kind of stuff.  The

13   evidence will show that in 2016, a forfeiture complaint was

14   filed against Jho Low's assets.  The evidence will show that

15   in early 2017, Pras, who had built up relationships with

16   people all over the world, got introduced -- not got

17   introduced, turned to George Higginbotham, who had previously,

18   some 15 years before, represented him.

19        MS. LOCKHART:  Objection, Your Honor, with respect

20   to the Court's order on this issue.

21        THE COURT:  It depends.  He hasn't said anything

22   yet.  I'm assuming you know what my ruling is.

23        MR. KENNER:  Yes, I do.  Of course.

24        THE COURT:  Okay.

25        MR. KENNER:  Okay.

Redirect Examination - Heuchling

1          And I think the -- I think the evidence will also

2     show that Pras Michel had a relationship with Nickie Lum

3     Davis, and he also, through her, acquired a connection or a

4     meeting with Elliott Broidy and the Colfax Law office.  I

5     think the evidence has shown and will show that there was a

6     series of ridiculous contracts done by the Colfax Law owner,

7     Robin Rosenzweig, Elliott Broidy's wife.  I believe the

8     evidence will show that there -- I believe there is no

9     evidence to show and there will be no evidence to show that

10    Mr. Michel ever entered into an agreement to not register as a

11    foreign agent on behalf of Jho Low or the People's Republic of

12    China.

13         There were discussions, as you'll recall from the

14    testimony, Mr. Higginbotham never testified that he told Pras

15    Michel he must register under FARA.  Elliott Broidy never

16    testified that he told Mr. Michel that he had to register

17    under FARA.  Mr. Higginbotham never told Mr. Michel that he

18    must register.  The evidence will show nobody in Mr. Michel's

19    new entre into political fundraising put him in a position to

20    know that he needed to register.

21         The evidence will show, and has already shown, that

22    Pras Michel's initial involvement requested by Joel Rousseau

23    was to find a lawyer for Jho Low that was not only a big-time

24    lawyer but a well-connected big-time lawyer.  The evidence has

25    shown and will show that Jho Low had gone to retain the

1    services of Mayor Giuliani, and that he paid him something in

2    the neighborhood of $8 million with no result.  The evidence

3    will show that he retained Chris Christie and paid him a lot

4    of money.  And the evidence will show that Mr. Michel was

5    continually suggesting other names that he got primarily from

6    referrals by Mr. Higginbotham through an employment agency for

7    lawyers.

8          The evidence will show that the first time that Jho

9    Low responded affirmatively, after having been burned through

10   any of these recommendations, was the recommendation that

11   Nickie Lum Davis made to Pras to make -- to Joel Rousseau to

12   make to Jho Low which was Elliott Broidy.  And boy, did Jho

13   Low light up about Elliott Broidy.  The evidence will show

14   that Elliott Broidy -- I don't want to -- I don't want to say

15   this wrong.  Forgive me if my recollection is incorrect.  I

16   believe Mr. Broidy was introduced to you in the government's

17   opening statement as the fixer.  And I believe the government

18   probably referred to him 12, 15 or more times as the fixer.

19         And Elliott Broidy had a reputation of being able to

20   resolve matters because he had a wonderful relationship with

21   President Trump and President Trump's government.  The

22   evidence will show that he had access to President Trump.  The

23   evidence will show that that was a widely known situation.

24   And the evidence will show, yeah, Jho Low wanted to engage

25   this person, Elliott Broidy.  But Elliott's wife steps in, and

1    I think the evidence has shown, suggests, oh, no, no, you

2    can't do that, let me do a legal contract so nobody will know

3    that you and my husband are getting paid to try to influence

4    the government.  And you all remember what took place after

5    that, and the series of machinations that Elliott Broidy's

6    wife and Elliott went through.

7           It was no secret that China wanted Guo Wengui

8    returned to China.  It is no secret that the Chinese

9    government, through Minister Sun, and I believe the evidence

10   will show, through the ambassador from China to the United

11   States, that China was pushing to get Mr. Guo Wengui returned.

12   Mr. Michel was sent information, put together -- I'm not sure

13   where it originated, but it came to him from Nickie Lum

14   Davis -- about all the terrible things that Mr. Guo had

15   alleged to have happened, the rape in China, rape in New York,

16   other massive fraud crimes, a red notice.  And yet when

17   Mr. Michel went to people to try to effectuate Mr. Guo's

18   removal from the United States, what did he really do?  He

19   tried to arrange a meeting between the Chinese government and

20   Jeff Sessions, the then-attorney general.  He tried to arrange

21   a meeting between President Trump and the Chinese government.

22          The evidence will show it's kind of backwards, it's

23   supposed to be clandestine, and Mr. Michel was hiding it from

24   the world, but he was doing this with China.  Well, at the

25   same time, what he was doing was trying to go through proper

1    channels.  And you'll see those words.  He was trying to

2    arrange, through proper channels, a meeting with the attorney

3    general and the President.

4            And you will recall the testimony of Mr. Pottinger,

5    who was of the view that he had to come down to the Oval

6    Office the next day, after Mr. Wynn had met with and left a

7    stack of papers on Mr. -- President Trump's desk to give to

8    him, that Mr. Pottinger came down and said to the President,

9    this is not an Executive decision, you can't do this.  This

10   has to be done through the Department of Justice.  And that's

11   exactly what they attempted to arrange.

12           So, ladies and gentlemen, you can go through the

13   evidence on all of these counts, and I submit to you, take as

14   hard a look at it as you can because I don't think this case

15   can be proven beyond a reasonable doubt.  I thank you for your

16   attention.

17           THE COURT:  All right.  Mr. Kenner, who is your

18   first witness?

19           MR. KENNER:  Agent Lidsky, please.

20           THE COURT:  All right.  Agent Lidsky.

21           MR. KENNER:  Might I have just a moment, Your

22   Honor.

23           THE COURT:  Yes, that's fine.  And you should move

24   the -- thank you.  If you could move that other a little bit

25   so we can -- everybody can see Mr. Kenner, including the

| | |
|---|---|
| 1 | witness.  Great. |
| 2 | All right.  Agent Lidsky, we need to swear you in. |
| 3 | SPECIAL AGENT HARRY LIDSKY, |
| 4 | called as a witness, being first duly sworn, was examined and |
| 5 | testified as follows: |
| 6 | THE WITNESS:  I do. |
| 7 | THE CLERK:  Thank you, sir. |
| 8 | THE COURT:  All right.  You can go ahead and sit |
| 9 | down. |
| 10 | You've heard me before, but let me just remind |
| 11 | everybody.  Make sure you speak into the microphone.  Make |
| 12 | sure you let counsel finish their question even if you know |
| 13 | what they're asking you before you start to answer.  They |
| 14 | should do the same thing for you.  If you hear the word |
| 15 | "objection" or see somebody start to stand, if you haven't |
| 16 | started to answer, don't.  If you're in the middle of your |
| 17 | answer, please stop, let me hear the objection, and then I'll |
| 18 | tell you whether you can answer.  All right? |
| 19 | THE WITNESS:  Thank you, Your Honor. |
| 20 | THE COURT:  Okay. |
| 21 | DIRECT EXAMINATION |
| 22 | BY MR. KENNER: |
| 23 | Q.  Good morning, Agent Lidsky. |
| 24 | A.  Good morning. |
| 25 | Q.  Can you state and spell your name for the Court, please? |

 1    **A.**   Harry Lidsky, H-a-r-r-y, L-i-d-s-k-y.

 2    **Q.**   And you -- what -- where are you employed, sir?

 3    **A.**   I'm a special agent with the U.S. Department of Justice,

 4    Office of the Inspector General.

 5    **Q.**   And are you one of the lead investigators on the case now

 6    on trial here?

 7    **A.**   I initiated and led --

 8    **Q.**   I'm over here.  I'm asking --

 9            THE COURT:  He can talk to the jury if he wishes or

10    direct it however he wants to.

11            MR. KENNER:  Okay.  All right.

12    **A.**   I initiated and led the 2017 portion of this case; that

13    is, the influence campaign portion of the investigation.

14    **Q.**   (BY MR. KENNER)  Tell me a little bit what a senior

15    special agent for OIG, Department of Justice entails.

16    **A.**   At the time of the initiation of this investigation, I was

17    a senior special agent.  In that capacity, I was -- I wore

18    multiple hats.  I was with the cyber investigations office, so

19    I conducted mobile and computer forensic investigations.  I

20    was also the insider threat program manager for our agency.

21    And that addressed direct internal threats that originated

22    from within the department, so employees of the department

23    would fall under that category.

24            And generally, the Office of the Inspector General,

25    or OIG, is charged with investigating allegations of waste,

Direct Examination - Lidsky

1    fraud, abuse, or misconduct, conducted by employees of the

2    department or people conducting business with the department.

3    So matters affecting the department falls under our purview as

4    well.

5    **Q.**  Were you previously ever a DEA agent?

6    **A.**  I was.  That's the Drug Enforcement Administration.

7    **Q.**  And what time period were you working for the Drug

8    Enforcement Administration?

9    **A.**  From 1998 through 2005.

10   **Q.**  Were you ever employed by the CIA?

11   **A.**  I was.

12   **Q.**  And during what years were you employed by the CIA?

13   **A.**  I'm not at liberty to say in this forum.

14   **Q.**  Are you at liberty to say if you're still employed by the

15   CIA?

16   **A.**  I am, and I'm not.

17   **Q.**  May I ask if you were employed by the CIA at the same time

18   frame of your investigation into this case in 2017?

19   **A.**  I was not.  I was an employee of the Department of

20   Justice.

21   **Q.**  Okay.  So you -- you are essentially the lead investigator

22   in the case; correct?

23   **A.**  For the 2017 influence campaign portion of the

24   investigation, yes.

25   **Q.**  Okay.  Directing your attention, if you can recall, to

1    July 15th of 2017, on August 21st -- to August 21st, were you

2    made aware of a Chinese embassy visit that you put in your

3    search warrant application?

4    **A.**   I was aware of a visit that occurred on July 16th of 2017

5    to the Chinese embassy here in D.C. by a member, a then-member

6    of the Department of Justice.

7    **Q.**   And in the course of your investigation, did you come to

8    learn that George Higginbotham, who was at the time a DOJ

9    attorney, had set up a meeting with the Chinese ambassador,

10   that occurred on July 16th, 2017; is that correct?

11   **A.**   Not entirely.

12   **Q.**   Okay.  Tell me what part is incorrect.

13   **A.**   I'm unaware -- my understanding is that George

14   Higginbotham did not set up the meeting with the Chinese

15   ambassador, he attended the meeting only.

16   **Q.**   Okay.

17             MR. KENNER:  Mr. Campbell, will you pull up for the

18   witness, and Court, and counsel, Defendant's Exhibit 242 and

19   243.

20             THE COURT:  Do you have an extra list, because I

21   don't have a list of exhibits that go beyond 216.

22             MR. KENNER:  Yes.  Mr. Israely will --

23             THE COURT:  Okay.  It would be helpful -- does the

24   government have a copy of exhibits that go that high?

25             MR. KELLER:  No, Your Honor.

Direct Examination - Lidsky

1          THE COURT:  -- copies for the Court.  There was a

2    whole series of people that need to get it, including the

3    government.

4          MR. KENNER:  Yes.

5          THE COURT:  Have you given one to them?

6          MR. KENNER:  Do we have another one, please?  We

7    gave one to Mr. Pottinger -- I'm sorry, not Mr. Pottinger --

8          THE COURT:  I have one, but the government needs to

9    have one.  You can't have exhibits and not have them have the

10   list.

11         MR. KENNER:  I'm sorry, we gave one previously to

12   Ms. Patterson.  If we could give the one that we just

13   handed to Your Honor --

14         THE COURT:  You have one.  She needs to keep track

15   of the exhibits, so she gets to keep that.

16         MR. KENNER:  Yeah.

17         THE COURT:  So you need to give -- among the four

18   attorneys over there, and investigator, you don't have an

19   extra copy of this?

20         MR. KENNER:  Not that I can put my hands on at this

21   moment.

22         THE COURT:  Well, she needs it because she has to

23   mark it up.

24         MR. KENNER:  Okay.

25         THE COURT:  So --

Direct Examination - Lidsky

1          MR. KENNER:  So can I just show exhibit -- Defense

2     Exhibit 242 and 243?

3          MR. KELLER:  We can proceed, Your Honor, to move

4     this along.

5          THE COURT:  All right.  During the break, I expect

6     you and I've told you that you need to provide everybody, and

7     I've indicated it's people who need the exhibits, so we don't

8     have issues with the exhibits as we move through here.

9     **Q.**  (BY MR. KENNER)  Sir, do you recognize Exhibit 242 to the

10    left of your screen?

11         THE COURT:  Do you need to have it enlarged?

12         THE WITNESS:  No, I can read it.  Thank you, Your

13    Honor.

14    **A.**  I do, sir.

15    **Q.**  (BY MR. KENNER)  All right.  And does that refresh your

16    recollection about who called the Chinese embassy on Saturday,

17    the day before the meeting with the -- with Mr. --

18         MR. KELLER:  Objection, Your Honor.  He hasn't

19    established that the witness's memory is exhausted.  That's

20    not the question that he just asked.  And the documents are

21    still up in front of the witness, which is not proper

22    refreshing of recollection.

23         THE COURT:  All right.  I was going to say he didn't

24    testify that he didn't remember.  He testified to something

25    specific.  So refreshing his recollection doesn't work.  He

1    hasn't indicated he needs it refreshed.

2              MR. KENNER:  Okay.  All right.

3    **Q.**  (BY MR. KENNER)  Are you aware of any documents, that you

4    authored or are aware of, that indicated that George

5    Higginbotham called the Chinese embassy on Saturday, July

6    15th, to set up this meeting?

7    **A.**  No, I do not.  I recall Mr. Higginbotham contacted the

8    embassy in advance of a meeting that had already been set up

9    by somebody else.

10   **Q.**  Okay.  Do you -- do you remember Mr. Higginbotham

11   contacting the embassy on the Saturday before July 16th to

12   tell them he was coming?

13   **A.**  I do recall that, yes.

14   **Q.**  All right.  So just so I'm clear, you recall that George

15   Higginbotham, on Saturday, July 15th, called the Chinese

16   embassy to tell them that he was coming on Sunday, July

17   16th?

18              MR. KELLER:  Asked and answered, Your Honor.

19              THE COURT:  Sustained.

20   **Q.**  (BY MR. KENNER)  And do you recall what the source of the

21   information about George Higginbotham, calling on Saturday,

22   July 15th, where that information came from?

23   **A.**  I believe I learned from Mr. Higginbotham, in my

24   discussion that happened a few days later, that he had been

25   asked by a friend, who turned out to be Mr. Michel, to attend

1    the meeting.

2    **Q.**  Thank you, but that's not my question.

3    **A.**  I'm sorry, then can you repeat the question?

4    **Q.**  The question is --

5         THE COURT:  You asked him where that information

6    came from, and he indicated where it came from.  I'm not sure

7    why it's not responsive.

8    **Q.**  (BY MR. KENNER)  Are you -- have you read a document or

9    reviewed a document that reflects that the information about

10   the visit to the Chinese embassy on Sunday, that was called by

11   Mr. Higginbotham on Saturday, was information that you

12   received from the Chinese embassy?

13        MR. KELLER:  Objection, Your Honor.  He can't

14   back-door the contents of a document which are hearsay by

15   reading it to the witness.

16        MR. KENNER:  I'm not reading the document.

17        THE COURT:  He's answered in terms of what you asked

18   him in terms of his source.  You now seem to be talking from

19   something else that indicates something that you claim is

20   different.  I mean, you can't do it that way.  You may need to

21   ask the question a different way.

22        MR. KENNER:  Okay.

23   **Q.**  (BY MR. KENNER)  When you went for a search warrant to

24   search Mr. Higginbotham's communications devices, e-mail,

25   computers, phones, et cetera, did you put information in that

1  affidavit that you learned from the Chinese embassy?

2  **A.**  Yes.

3  **Q.**  And, in fact, that visit to the Chinese embassy is what

4  precipitated your involvement in investigating this case;

5  isn't that true?

6  **A.**  So the Department, my office, was notified from the unit

7  or the component where Mr. Higginbotham worked, that they had

8  received a call from the Chinese embassy or from staff at the

9  Chinese embassy on or about I believe July 15th, in advance of

10 Mr. Higginbotham's meeting.  And that's what -- that's what

11 precipitated the investigation, that's how I learned of it.

12      And I'm sorry if, Mr. Kenner, that's what you were going

13 at, and we just weren't talking about --

14 **Q.**  Nothing to be sorry for.

15 **A.**  -- the same --

16 **Q.**  I'm just asking questions.

17      Did -- was your initial suspicion and concern that

18 Mr. Higginbotham might be a double agent?

19          MR. KELLER:  Objection, Your Honor.  Relevance as to

20 his initial suspicion or concern.

21          THE COURT:  I sustain -- I'll sustain that.  You can

22 ask him in a different way.

23          MR. KENNER:  Okay.

24 **Q.**  (BY MR. KENNER)  Did you open an investigation regarding

25 an insider threat?

1  **A.**  I did, potential.

2  **Q.**  And was the insider that you were thinking might be

3  threatening, George Higginbotham?

4  **A.**  It was.

5  **Q.**  And after you found that out, did you gather some

6  background information about Mr. Higginbotham before you ever

7  met with him?

8  **A.**  I did some cursory research, yes.

9  **Q.**  All right.  And did that research do anything to confirm

10  or refute your theory that he might be involved in the way you

11  thought he was?

12  **A.**  No, at that stage I had very little information I was able

13  to review about Mr. Higginbotham, and it lacked the essential

14  details about the meeting, what the meeting was about, what

15  precipitated the meeting, et cetera.  So it was just a normal

16  initial investigative step.  I'd find out everything I can in

17  the minimal time that I have.

18  **Q.**  And from the information that you reviewed, and before you

19  first interviewed Mr. Higginbotham, you considered him a

20  possible insider threat; correct?  That's how you felt when he

21  came in?

22  **A.**  I consider everything.  I open the investigation as a

23  potential insider threat, without knowing whether or not he

24  was, whether or not he was something more, or whether or not

25  it was just a misunderstanding.

Direct Examination - Lidsky

1    **Q.**  Okay.  Do you recall on July 19th, before you interviewed

2    Mr. Higginbotham, writing an e-mail to Gregg Maisel, the

3    deputy Assistant U.S. Attorney, and Jonathan Kravis, an

4    attorney then with the Public Integrity unit at DOJ, reporting

5    that Mr. Higginbotham was a possible inside --

6              MR. KELLER:  Objection, Your Honor.  Hearsay.

7              THE COURT:  Sustained.

8              MR. KENNER:  Did you write the e-mail is hearsay?

9              THE COURT:  You're reading from an e-mail with the

10   content of the e-mail.  It's classic hearsay.

11             MR. KENNER:  I'm reading from my notes.  I'm not

12   from an e-mail.

13             THE COURT:  Well, the notes reflect what's in the

14   e-mail, and the way you've asked the question makes it sound

15   like you're reading from what the e-mail is.

16             MR. KENNER:  For the record, I'm not.

17             THE COURT:  Well, then reword your question.

18   **Q.**  (BY MR. KENNER)  Did you include with that e-mail a

19   memo?

20   **A.**  I probably would have, a summary of what I knew at the

21   time, yes.

22   **Q.**  Okay.  Do you recall what you included in that memo as a

23   summary of what you thought?

24   **A.**  Not with specificity, no.

25             MR. KENNER:  May I show the witness only, and the

1    Court, and counsel, a document that I asked to show

2    previously, to see whether or not it refreshes his

3    recollection.

4            MR. KELLER:  Objection as to the relevance of the

5    overall contents of this memo, Your Honor.

6            MR. KENNER:  It goes -- Your Honor --

7            THE COURT:  Let's discuss this.

8            (Bench conference on the record.)

9            THE COURT:  Okay.  So what's in this e-mail that

10   refreshes his recollection?  He doesn't sound like he's -- he

11   doesn't remember things, so I'm not sure what you're trying to

12   refresh.

13           MR. KENNER:  It's his e-mail that he wrote.  I want

14   to see if it looking at it refreshes his recollection.

15           THE COURT:  As to what?  As to what, Mr. Kenner?

16           MR. KENNER:  As to whether or not a memo was

17   attached to his e-mail to the people that he sent it to.

18           THE COURT:  He said he probably -- what did it say?

19   Okay.  "Not with specificity."  So you want to refresh him

20   whether or not he sent -- there's a memo along with it.  Let

21   us assume it refreshes, oh, yes, there's a memo there.  What's

22   the relevance of any of that?

23           MR. KENNER:  I think it goes to his belief about

24   Mr. Higginbotham before he even interviews him and --

25           THE COURT:  Okay.  Assume -- okay.  So assuming

1    there's something, the purpose of this is to get something in

2    the memo; is that correct?

3            MR. KENNER:  Yes.

4            THE COURT:  Okay.  And what is the something in the

5    memo that you're trying to do?  Is this an inconsistent

6    statement?  I don't see any refreshing recollection at this

7    point.  So it's not clear to me what in the memo you would

8    be -- how you would be using it and about what testimony.

9            MR. KENNER:  Can I just have a moment?  Let me just

10   take another look, Your Honor.

11           The attachment to the e-mail indicates that there

12   was a conversation by phone with Mr. Higginbotham and that he

13   was attempting to verify and change -- that he met with the --

14   Higginbotham did not acknowledge that he met with the

15   ambassador to OIA.  Higginbotham claimed that he did not

16   present himself to the Chinese as a DOJ employee.  And he

17   opined that they made the connection on their own through

18   their open source research.  That's what I want --

19           MR. KELLER:  Your Honor, no question related to any

20   of those topics is currently pending for this witness.

21   There's no inconsistency in the record to impeach.  There's

22   nothing to refresh, and that's all hearsay.

23           THE COURT:  Okay.  One, it is hearsay in terms of

24   what Mr. Higginbotham said.  But probably more importantly, if

25   you're trying to do an inconsistent statement, we don't have

Direct Examination - Lidsky

```
1    any testimony that Mr. -- that this agent has said that you

2    want to show is inconsistent.  You're trying to bring

3    something in with Mr. Higginbotham.  And, frankly, my

4    recollection is we have no testimony that indicates that

5    Mr. Higginbotham ever represented himself as a DOJ employee,

6    unless I'm mistaken.  I mean, he -- you know, I don't think --

7    anyway, let's leave that out of the picture.

8              But my problem is, what you want to show in there is

9    to bring out what Mr. Higginbotham supposedly said to this

10   agent.  That's hearsay, number one.  Number two, if you're

11   having -- there's no evidence from this witness that

12   contradicts what's in the memo that you've just highlighted,

13   that portion of it.  So there's no reason to do an

14   inconsistency.

15             And, frankly, you can refresh his recollection that

16   there was a memo, but it doesn't get to the content.  So,

17   frankly, there's no reason to look at the memo, and there is

18   no reason to look at the contents, at least based on the

19   present record, because you have no evidence that what you

20   want to bring out to impeach him that contradicts it.  And,

21   two, it's Mr. Higginbotham's statement, which is hearsay.  So

22   at this point, you can't go any further.

23             MR. KENNER:  Thank you.

24             (The following proceedings were had in open court.)

25             THE COURT:  Members of the jury, I know I've said
```

1    this before, but I'll bring it up again.  I realize that these

2    interruptions are probably annoying, and we do try and discuss

3    things out of the presence of the jury.  But I want to make

4    sure you understand, the Court is required, the judge is

5    required to make legal rulings about different issues.  So

6    that's why we're discussing it.  You don't need to know these

7    things.  You listen to what the evidence is, not what the

8    legal rulings are.  And I don't want you speculating or

9    wondering what we're talking about or what we're bringing in

10   or not bringing in.  That's not your concern.  That's my role,

11   to make the legal rulings, and for you to listen to whatever

12   evidence comes out.

13        And I also don't want you to hold it against either

14   party that we have these discussions that there is evidence

15   that one party or the other wants in and the other objects.

16   Okay.  Just to make sure you understand that.

17        All right.  Proceed, Mr. Kenner.

18        MR. KENNER:  Thank you, Your Honor.

19        THE COURT:  I'll sustain the last objection.

20   **Q.**  (BY MR. KENNER)  Did you report to others in the DOJ that

21   Mr. Higginbotham was discovered to have been doing work as an

22   attorney outside of the DOJ?

23   **A.**  I don't recall the manner in which that was reported.  I

24   did learn of that.  I likely would have included that at some

25   point in a summary of the case or in a report.

Direct Examination - Lidsky

1  **Q.**  Okay.  Do you recall including it before you ever met with

2  Mr. Higginbotham?

3  **A.**  I don't recall the timing of when that would have been.

4  I'm not sure how I would have known about it prior to meeting

5  with Mr. Higginbotham.

6              MR. KENNER:  Can I show, just to the witness, an

7  e-mail to see if refreshes his recollection?

8              THE COURT:  You need to speak into the microphone.

9  I'm sorry.

10              MR. KENNER:  I would like to put up for the witness

11  an e-mail to see if it refreshes his recollection.

12              THE COURT:  As to exactly what?

13              MR. KENNER:  As to when he reported that

14  Mr. Higginbotham was working as an attorney outside the

15  Department of Justice.

16              THE COURT:  All right.  Put the exhibit up.

17              Refresh recollection is to -- for you to read it and

18  see if it refreshes your recollection as to what Mr. Kenner

19  asked you.

20              THE WITNESS:  Thank you.

21              THE COURT:  When you're finished, indicate that and

22  we'll be taking it down.

23              And this is exhibit what, 242?

24              MR. KENNER:  Yes, Your Honor.

25              THE COURT:  Okay.

Direct Examination - Lidsky

1    **Q.**  (BY MR. KENNER)  Let me know when to move on.

2    **A.**  Can you move on to the attachment, please?

3    **Q.**  Yes.

4    **A.**  Thank you.

5        Okay.  Thank you.

6    **Q.**  And there's one more page, just short part.

7    **A.**  Okay.  Thank you.

8    **Q.**  Does reading that refresh your recollection of what you

9    were seeking before you met with Mr. Higginbotham?

10   **A.**  Yes.  This -- there was information provided to me from

11   Mr. Higginbotham's component; that is, the unit where he

12   worked.  They had received word of Mr. Higginbotham's visit to

13   the embassy before I did.  They had inquired with

14   Mr. Higginbotham about elements of that meeting, and he

15   provided them some responses.  They, in turn, provided that to

16   me, and I included it as part of what I believed at the time

17   or what I knew at the time.

18   **Q.**  Okay.  And just to confirm, that was before you first

19   interviewed Mr. Higginbotham?

20   **A.**  I believe it was.  I think it was on July 18th or 19th.  I

21   spoke with Mr. Higginbotham for the first time on the 20th.

22   **Q.**  And did you receive written reports from the people at the

23   Department of Justice?  Was that a human resources hearing

24   just to --

25                THE COURT:  Okay.  You've got two questions.

Direct Examination - Lidsky

1              MR. KENNER:  I'm sorry.

2  **Q.**  (BY MR. KENNER)  Was the meeting between Mr. Higginbotham

3  and the DOJ before you interviewed Mr. Higginbotham, was that

4  from your human resources department?

5  **A.**  I don't believe human resources were involved.  I

6  believe -- I believe that employees from the Office of

7  International Affairs spoke with him.  And then I believe one

8  or more people from his chain of command in his unit at the

9  time, which I think was Office of Legislative Affairs, also

10  spoke with him.

11  **Q.**  All right.  And you said you received a copy of that

12  information, or the report that was generated from those

13  interviews?

14  **A.**  I don't believe they generated any reports.  What I got

15  from them, I believe, was provided to me over the phone.

16  **Q.**  Okay.  And what was your understanding, after that phone

17  call, about whether or not Mr. Higginbotham had a side job

18  separate from the DOJ?

19              MR. KELLER:  Objection, Your Honor.  Relevance as to

20  what he learned from people who spoke to Mr. Higginbotham.

21  It's two levels of hearsay, Your Honor.

22              THE COURT:  I'll sustain it on those grounds.

23  **Q.**  (BY MR. KENNER)  Did you form an opinion -- after hearing

24  whatever it is you heard in a telephone report with the Office

25  of International Affairs, what was your reaction to that

1    report?  Without regard to the truth of the matter of the

2    report, I just want to know what you -- you -- how you reacted

3    to it in terms of the investigation.

4    **A.**  I wanted to know more.

5    **Q.**  Okay.  And did you -- did you report to others that

6    Higginbotham was engaged in --

7              MR. KELLER:  Objection, Your Honor.  Hearsay again,

8    same issues, reading from some report from Mr. Lidsky.

9              THE COURT:  I don't know whether he's reading or

10   not, but it does seem to me you're going down the road of

11   hearsay, at least the way you've worded it.

12             MR. KENNER:  Okay.  All right.  Thank you.  I'll

13   reword it, Your Honor.

14   **Q.**  (BY MR. KENNER)  Did you ever form an opinion, after

15   hearing whatever it is that you heard in a telephone call with

16   the Office of the International Affairs, that Mr. Higginbotham

17   was engaged in consulting work?  How did that impact you --

18   without regard to the truth of the statement, what was your

19   reaction to that information?

20             THE COURT:  You've asked a couple of questions in

21   there, among other things.

22             But what is your objection, Mr. Keller?

23             MR. KELLER:  Objection as to his opinion, Your

24   Honor.  What he did is one matter, what his opinion was is

25   another.

Direct Examination - Lidsky

1          THE COURT:  I agree.  I mean, what he did next based

2     on that information is -- you can inquire about.  But you've

3     also put a couple questions in the same --

4          MR. KENNER:  Okay.

5          THE COURT:  Same one.

6     **Q.**  (BY MR. KENNER)  When you -- when you did write a report,

7     did you refer to Higginbotham's work as a consulting work?

8          MR. KELLER:  Objection, Your Honor.  Hearsay.

9          THE COURT:  You're getting into what he did in terms

10    of his -- the way you've asked it.  Plus it's not clear what

11    report we're talking about.

12    **Q.**  (BY MR. KENNER)  Sir, did you write a report in which you

13    characterize, based on whatever you based it on, that

14    Mr. Michel was providing consulting work for Mr. Michel?

15         MR. KELLER:  Objection, Your Honor.  Hearsay.

16    (BY MR. KENNER)  I'm sorry, Mr. Higginbotham.  I apologize

17         MR. KELLER:  He can ask him what he knows now on the

18    stand.  He can't ask him what he wrote in a report years

19    ago.

20         THE COURT:  I agree.

21         MR. KENNER:  Overruled.

22         (Laughter.)

23         THE COURT:  No, it's not overruled.  I spoke first,

24    so mine carries weight.

25         MR. KENNER:  Yes, I understand.

1          THE COURT:  The way you've gone about it,

2    Mr. Kenner, isn't going to work.

3          MR. KENNER:  Okay.

4          THE COURT:  Let me just put it that way, legally.

5    Q.  (BY MR. KENNER)  After having the conversation you did

6    with the Office of International Affairs, do you recall

7    characterizing yourself, the work that Mr. Michel did as --

8    I'm sorry, Mr. Higginbotham did as consulting work?

9          MR. KELLER:  Objection.

10   Q.  (BY MR. KENNER)  Without regard to the truth of the

11   statement, just what did you -- do you recall characterizing

12   it as consulting work?

13         MR. KELLER:  Objection as to the characterization,

14   Your Honor.

15         THE COURT:  No, I -- that doesn't work either,

16   Mr. Kenner, in terms of what he characterized it.  It's also

17   based on whatever information that he -- you know, that he had

18   from other people in terms of how he would characterize it.

19   You're getting, again, what's in the report in a back-door

20   way.

21   Q.  (BY MR. KENNER)  All right.  Did you form an assessment of

22   whether or not Mr. Higginbotham had a history of credit

23   problems, bad debts, and possible foreclosure?

24   A.  I'm not sure I would characterize it as an assessment.  At

25   this time, everything I had was second hand at best,

1    uncorroborated, just data points, which certainly piqued my

2    interest.  I wanted to know more, but absent facts, I don't

3    make conclusions or formal assessments, I just write the --

4    summarize the information that I have at hand.  And I do my

5    best to characterize it with the appropriate context given its

6    source, which at this time, again, was second hand, or do

7    attributable to my own open source research, align things that

8    I could find about, at this point, Mr. Higginbotham.

9    **Q.**  Was the history of credit problems, bad debts, and

10   possible foreclosure acquired in your course of open source

11   research into Mr. Higginbotham?

12   **A.**  I do recall I had found some indications unvetted,

13   uncorroborated, but some indications of either credit problem,

14   foreclosure, or financial -- financial problems in his past,

15   yes.

16   **Q.**  Did you ever do anything to verify those things?

17   **A.**  At the time, they were relevant as -- you know, from an

18   insider threat perspective, motive is a -- is a potential

19   characteristic for insiders.  People who want to sell the

20   department information might do so for money if they have

21   financial problems.  There's been history of that over the

22   years with the U.S. Government.

23       To the extent I fleshed that out, I don't recall at this

24   time.  I merely flagged it as a data point that might or might

25   not become relevant as the investigation took shape.

1    **Q.** But you would agree that fleshing those things out would

2    be a significant thing to you as an investigator?

3           MR. KELLER:  Objection.  Leading, Your Honor.

4           MR. KENNER:  I'm cross-examination -- oh, I'm

5    sorry.

6           THE COURT:  Sustained.

7           MR. KENNER:  Your Honor, I'd like to take this

8    witness -- I believe it's 603, is it? -- as an adverse

9    witness.

10           THE COURT:  I believe that since he's a -- I'd have

11    to look at it, but I believe that he actually can do -- if --

12    can do it, not as the -- in the old hostile witness but as

13    a -- viewed as an adverse witness.

14           All right.  You can do more leading questions.

15           MR. KENNER:  Thank you.

16           THE COURT:  As long as they're appropriate.

17           MR. KENNER:  Thank you.

18    **Q.** (BY MR. KENNER)  And did you make a request, before you

19    interviewed Mr. Higginbotham, to government attorneys to

20    approve gathering Mr. Higginbotham's government e-mail and

21    imaging his work computer and government phone?  Correct?

22    **A.** So for normal investigations conducted by my office,

23    that's usually a first step, at least a discussion of that.

24    In this case, I do recall requesting Mr. Higginbotham's work

25    e-mail.  And I believe I did raise the topic, at least, of

Direct Examination - Lidsky

1   obtaining and looking into the contents of his work-issued

2   mobile device and laptop.

3   **Q.**  Did you inquire about his personal phone, getting

4   information from that?

5   **A.**  I may have opined that it was something I would like to do

6   should circumstances permit.  But government employees are not

7   obligated to provide us their personal devices.  The OIG is

8   entitled to look at work-issued devices, to include e-mail.

9   **Q.**  Okay.  Let me just segue for a second.  The first time you

10  met Mr. Higginbotham in person, you took his personal cell

11  phone; correct?

12          MR. KELLER:  Your Honor, objection as to relevance.

13  At this point, I don't know if this is an attempt to impeach

14  Mr. Higginbotham.  He's been on the stand, he was crossed for

15  seven hours, he pled guilty to a crime, he was fired from the

16  department.  I'm not sure where we're going with this.

17          MR. KENNER:  Was that closing argument or an

18  objection?

19          THE COURT:  That was an objection around several

20  things, but let's have a discussion.

21          (Bench conference on the record.)

22          THE COURT:  It's not clear to me, I mean, in terms

23  of all of the stuff -- we already have Mr. Higginbotham

24  admitting that he had financial difficulties.  We have a

25  meeting with him.  It's not clear to me about his personal

```
 1    phone, whether he gave it voluntarily or didn't give it
 2    voluntarily, what it has anything to do with it.  Okay.  So I
 3    don't see any discrepancy, frankly, with what Mr. Higginbotham
 4    has said in terms of going into some of the additional things.
 5    So tell me what the relevance is in terms of going through the
 6    minutia.
 7              MR. KENNER:  The relevance --
 8              THE COURT:  We don't have any dispute.
 9              MR. KENNER:  The relevance is that he took
10    Mr. Higginbotham's phone, and he copied the information on it
11    and had it to use thereafter, and did he tell Mr. Higginbotham
12    that he was doing that?  And I think it's an appropriate
13    question.
14              THE COURT:  No, and so he did -- he was doing
15    what -- this gets into how they've conducted and whether
16    they've conducted it appropriately from Mr. Higginbotham's
17    perspective.  It's hard to tell whether, you know, he said you
18    have to give me your personal phone, or did he ask him if he'd
19    give it and Mr. Higginbotham handed it over.  Whether or not
20    he told him he was going to do -- look at anything that was on
21    there gets into the nature of the investigation as to whether
22    somehow they did something wrong in their investigation with
23    Mr. Higginbotham, which is not relevant to Mr. Michel's case.
24    So if that's the point of it, it doesn't go anywhere.  And you
25    need to move on to something that's more relevant.
```

1          MR. KENNER:  It's also -- it's also going to go to

2    attorney-client relationship.

3          THE COURT:  In what way?

4          MR. KELLER:  This is government misconduct, Your

5    Honor.  You've excluded this motion in limine.

6          THE COURT:  Hold on.  It certainly goes to

7    government misconduct which doesn't -- what does this have to

8    do with the --

9          MR. KENNER:  It has to --

10          THE COURT:  Hold on, just a minute, let me ask the

11    question.  What does it have to do with your legal advice

12    defense, which at this point you don't have?  What does it

13    have to do with it in terms of asking about whether or not

14    they looked at the personal phone or did anything with the

15    personal phone?  What does it have to do with it?

16          MR. KENNER:  It has to do with that Mr. Lidsky would

17    have quickly observed telephone conversations and e-mails

18    between Mr. Higginbotham, as an attorney, and Mr. Michel, as a

19    client, that he didn't submit for a privilege log until way,

20    way later, that he read all of the attorney-client privilege

21    communications, and I think I'm entitled to go into that.

22          THE COURT:  No, you're not.  All you're doing is

23    getting into issues.  You're assuming that the phone calls and

24    e-mails, et cetera, had to do with, you know, a legal defense.

25    He indicated he was acting as his attorney.  The question is

1    whether it's enough in terms of the advice of counsel defense,

2    which is a different issue.

3              But more importantly, what you're clearly doing is

4    trying to point out that somehow in the investigation of

5    Mr. Higginbotham, that they did something that was

6    inappropriate in terms of how they got the information

7    relating to Mr. Michel or Mr. Higginbotham.  Now, I have

8    clearly precluded that.  You cannot go down that path.  Do you

9    understand?

10             MR. KENNER:  I totally understand as it

11   pertains to --

12             THE COURT:  And you're not going into anything with

13   the personal phone, what was on it, or communications, whether

14   he should have done a privilege log or anything else.  Do you

15   understand me?

16             MR. KENNER:  Of course I understand you.

17             THE COURT:  All right.  Then that's that.

18             (The following proceedings were had in open court.)

19             THE COURT:  I'll sustain the objection.

20   **Q.**   (BY MR. KENNER) Did you write -- did you convey to the

21   government attorneys that the only matter or possible urgency

22   at this time would be a search warrant for the subject's

23   personal phone?  Did you do that?

24             MR. KELLER:  Objection, Your Honor.  Hearsay and

25   relevance.

Direct Examination - Lidsky

1        THE COURT:  I'll sustain it based on the way you've

2   worded it.

3        MR. KENNER:  May I show the --

4        THE COURT:  Not if it's going to relate to what

5   we've talked -- what we've discussed already and the last

6   question that you asked, but you can show it to him as long as

7   we're not trying to go down that path again.

8        MR. KENNER:  I guess I'm going down that path again,

9   so I'll move on.

10  **Q.**  (BY MR. KENNER)  And do you recall when -- the date that

11  you first interviewed Mr. Higginbotham?

12  **A.**  I believe it was July 20th, 2017.

13  **Q.**  Okay.  Do you usually place people that you are

14  investigating under oath before you interview them?

15       MR. KELLER:  Objection, Your Honor.  Relevance.

16       THE COURT:  I'll allow that question.

17  **A.**  Typically, potential subjects of investigations,

18  specifically members of the Department, employees, yes.

19  **Q.**  (BY MR. KENNER)  And who swore him in?

20  **A.**  I believe I did.

21  **Q.**  And you came to recognize that during that July 20th

22  interview, Mr. Higginbotham lied to you on multiple occasions;

23  correct?

24  **A.**  I believe at the very least he omitted key details.  And

25  he wasn't fully honest with me, yes.

Direct Examination - Lidsky

1  **Q.** Did he deny working for Mr. Michel as a lawyer?

2          MR. KELLER:  Objection, Your Honor.  Hearsay.

3          THE COURT:  You're getting into the conversations

4  that they would have had relating to it, so I think the way

5  you worked it -- you've done it, it is hearsay, unless it fits

6  some other exception here.  You're basically trying to bring

7  out testimony that -- or information from the -- that he heard

8  from Mr. Higginbotham.

9  **Q.** (BY MR. KENNER)  I assume you read Mr. Higginbotham his

10 rights before you proceeded with the interview, or is that not

11 a good assumption?

12         MR. KELLER:  Objection, Your Honor.  Relevance.

13         THE COURT:  That's starting to get into, you know,

14 the issues in terms of -- legal issues that the Court would be

15 ruling on, if there was an issue about the statement that he

16 gave.  And so since we have not had that, there's no reason to

17 get into it.

18 **Q.** (BY MR. KENNER)  Did Mr. Higginbotham lie to you, saying

19 no, he knew nothing about Pras' involvement with the

20 Chinese?

21         MR. KELLER:  Objection, Your Honor.  Hearsay.

22         THE COURT:  Counsel --

23         (Bench conference on the record.)

24         THE COURT:  You asked a bunch of questions of

25 Mr. Higginbotham, and if I recall correctly, he did indicate

Direct Examination - Lidsky

1    some of this information in terms of what he provided and what

2    he didn't provide, and he indicated that he lied about a

3    number of things.  All you're trying to do is to bring out

4    something from -- in terms of Mr. -- this special agent

5    discussing what Mr. Higginbotham told him.

6         You already had Mr. Higginbotham, who you could ask

7    all of these questions to.  And if he had said something in

8    terms of a discrepancy, you might have been able to impeach

9    him.  So there's no reason to try and bring it out at this

10   point.  The special agent is repeating hearsay.  So it's not

11   appropriate.

12        MR. KENNER:  Is it Your Honor's position that a tape

13   recording of that interview is hearsay?

14        THE COURT:  We're not talking about the tape

15   recording.  If you wish to -- you had an opportunity to ask

16   questions of Mr. Higginbotham.  If Mr. Higginbotham said

17   something that was inconsistent with other statements,

18   et cetera, you had an opportunity to impeach him.

19        MR. KENNER:  And I think I did.

20        THE COURT:  Right.  So what is it -- why are you --

21   what you're trying to bring out through Mr. -- this agent is

22   hearsay about Mr. Higginbotham, when you had an opportunity to

23   ask those questions of Mr. Higginbotham directly.  So trying

24   to get him to say something that's hearsay is not appropriate,

25   especially where you already have it on the record from the

1    source, which is Mr. Higginbotham.  All right.

2              MR. KENNER:  Thank you.

3              (The following proceedings were had in open court.)

4              THE COURT:  I'll sustain the objections.

5    **Q.**  (BY MR. KENNER)  After your conversation with

6    Mr. Higginbotham, what was your position with regard to

7    whether or not Mr. Higginbotham did legal work for

8    Mr. Michel?

9    **A.**  I believe he acknowledged that he did some work on the

10   side for Mr. Michel.  I don't recall the specifics in terms of

11   whether or not it was legal or consulting or something, but I

12   do recall he acknowledged he did some work for a former -- for

13   Mr. Michel, a former -- somebody he had worked with in the

14   past.

15   **Q.**  Was Mr. Higginbotham, pursuant to the Department of

16   Justice rules, permitted to do legal work for somebody on the

17   side?

18   **A.**  I came to learn later that he was not, no.

19   **Q.**  Sir, without -- you eventually got consent from

20   Mr. Higginbotham to search his phone; correct?

21   **A.**  I did, yes.

22   **Q.**  And you -- when you listened to what was on his phone, did

23   you believe that you heard things that would be pertinent to

24   your investigation --

25             MR. KELLER:  Objection.  Assumes facts --

94

Direct Examination - Lidsky

1    **Q.**  (BY MR. KENNER)  -- without regard to the truth?

2              MR. KELLER:  Assumes facts --

3              THE COURT:  What's the point of it if -- in terms

4    of -- without regard to the facts, what's the point of in

5    terms of listening to it, it's still a problem.

6              MR. KENNER:  Okay.  Then my response would be I move

7    to admit it for the truth based upon the --

8              THE COURT:  Move what?

9              MR. KENNER:  Proof of what this --

10             THE COURT:  Okay.  What are you asking to have

11   admitted?

12             MR. KENNER:  The communications between Mr. Michel

13   and --

14             THE COURT:  Based on what?  Let's have a discussion

15   about this.

16             (Bench conference on the record.)

17             THE COURT:  You're trying to get into communications

18   in terms of it's not clear to me what precisely they're -- I'm

19   not sure under what theory you're getting -- you would get

20   these admissions.  These are admissions, or these are comments

21   that Mr. Michel, allegedly, and Mr. Higginbotham are having,

22   or Mr. Higginbotham is having with somebody else.  These -- I

23   don't understand under what theory you think you can get them

24   admitted.  These are not discussions from this witness, you

25   know, in terms of what he's saying.  These are things that are

1    on the phone between Higginbotham and somebody else.  They're

2    classic hearsay.

3            And, Mr. Keller, what else is -- you started to

4    object about something else and I cut you off, I'm sorry.

5            MR. KELLER:  I was objecting to him characterizing

6    Mr. -- or Agent Lidsky as listening to items on

7    Mr. Higginbotham's phone.  It assumes facts not in evidence.

8    I'm not -- I'm not even sure what he's talking about on the

9    phone.  I don't know what these communications are that he's

10   talking about with Mr. Michel.  But I agree that these are --

11   these are statements of Mr. Michel, I guess, or

12   Mr. Higginbotham.  Either way, they're -- they're hearsay.

13           MR. KENNER:  Your Honor --

14           THE COURT:  I don't know whether they're text

15   messages, because, you know, there's nothing else that you

16   have, unless a voice mail.  Are you talking about text

17   messages?

18           MR. KENNER:  I'm talking about text messages, I'm

19   talking about other -- by the way, I do want to admit

20   Mr. Higginbotham's statements as an exception to the hearsay

21   rule and that they were statements against penal interest.

22           THE COURT:  It's a little late to be -- in terms of

23   trying to do this.  I don't know whether you've set it out.

24   But I'd have to go back and take a look at what you're talking

25   about in terms of get -- asking to have admitted.  We don't

1    have an exhibit, we don't have something in front of us to be

2    able to decide whether these would be viewed as admissions

3    against interest.  Admissions, I don't even know what they

4    are.

5            MR. KENNER:  Can I -- can I ask to post for you and

6    counsel --

7            THE COURT:  All right.  We're going to take a break

8    for lunch.  We're going to take a break for lunch.  It's

9    obvious that this isn't going to be quick.  And you're trying

10   to get, Mr. Kenner, in things that are, frankly, not, for the

11   most part, as far as I can tell, admissible, and we're wasting

12   an extraordinary amount of time.  I'll send them off to lunch,

13   add some additional time so we can figure out what it is that

14   you're actually talking about.

15           MR. KELLER:  Mr. Higginbotham is not unavailable.

16           THE COURT:  Yes.  You want him as a witness, then

17   you can --

18           MR. KELLER:  He testified.  He's already

19   testified.

20           THE COURT:  Not only that, he testified, and he's

21   available again if you want to put him on the stand about

22   something.  But I'm not sure what you're getting at.  So let

23   me send them off to lunch instead of leaving them sitting here

24   most of the morning.

25           MR. KENNER:  Okay.

1          (The following proceedings were had in open court.)

2          THE COURT:  Ladies and gentlemen, I'm going to send

3     you home -- send you home -- I'm going to send you to lunch

4     early so we can have some discussion and you're not left

5     sitting there.  All right.  So let me -- it's 25 to 1:00.  I'm

6     going to ask you to come back at 2:00 so we actually get these

7     legal issues resolved for you so when you come back, we can

8     proceed.  Okay?  Don't speculate, don't worry about it, don't

9     talk about the case.  Have a good lunch.

10         (Jury left the courtroom.)

11         THE COURT:  Mr. Lidsky, you're in the middle of your

12    testimony, so you can't discuss it with anybody.  You can step

13    out while we go through this.

14         THE WITNESS:  Understood, Your Honor.  Thank you.

15         THE COURT:  Have you provided me, Mr. Kenner, with

16    copies of the exhibits, of these extra exhibits that were not

17    on your original list?  So do I have them in the materials

18    that I have, hard copies, or not?

19         MR. HASKELL:  Yes, Your Honor.  I sent a e-mail to

20    chambers, and we're working on that.

21         THE COURT:  Okay.  So at this point I -- in the back

22    here, in terms of paper copies, I do not have them.  Is that

23    right or not?

24         MR. HASKELL:  No, that's correct, you don't have --

25    not the new ones.  You have everything --

1          THE COURT:  Okay.  But it's the new ones that we

2     seem to be -- at least I'm assuming -- we're talking about.

3          So, Mr. Kenner, if you could set out what it is that

4     you want in so I can see what we're talking about, the

5     government can see, and then I can figure this out in terms of

6     what comes in.

7          MR. KENNER:  Yes.

8          THE COURT:  You seem to be wanting, as I understand

9     it, some text messages that were on the personal phone of

10    Mr. Higginbotham with whom?  Mr. Higginbotham and who was the

11    other person he's sending these text messages to --

12         MR. KENNER:  Mr. Michel.

13         THE COURT:  -- according to you?

14         MR. KENNER:  Mr. Michel.

15         THE COURT:  I'm sorry?

16         MR. KENNER:  Mr. Michel.

17         THE COURT:  Okay.  All right.  And do you have

18    exhibit numbers?

19         MR. KENNER:  Yeah.  This is in -- I think the best

20    exhibit for it is Defense Exhibit 260.  I don't believe --

21         THE COURT:  Okay.  Mr. Michel, usually we don't

22    excuse you if you -- unless you need to go.

23         THE DEFENDANT:  Restroom.

24         THE COURT:  Okay.  No problem.  I just -- we're

25    discussing legal issues, and just I want to make sure there's

1    not a prob- -- I can wait if you want me to.  No, I don't want

2    you to wait.  I can wait if you want me to.

3              All right.  So tell me what the -- what exhibit

4    you're talking about --

5              MR. KENNER:  It's primarily --

6              THE COURT:  -- that would supposedly --

7              MR. KENNER:  It's primarily Defense Exhibit 260, and

8    I will refer you to the pages as I go through and tell you

9    what I'm trying to admit.

10             THE COURT:  All right.  So put it up since we --

11   nobody's seen this.  Do you have -- I don't have it, the

12   government doesn't have it.

13             Mr. Kenner, this is not the way you operate.  You

14   don't bring in new exhibits and not provide it, importantly,

15   to the government so that they can look at it as well as the

16   Court.  And, frankly, certainly over the weekend, I would have

17   thought if you were adding exhibits, you would have said

18   something to us so we would have them.  We're wasting an

19   extraordinary amount of time.  So --

20             MR. KENNER:  I thought we had them, Your Honor.  I

21   apologize.

22             THE COURT:  All right.

23             MR. KENNER:  Anyway, the exhibit that's up there now

24   is marked for identification as 260.  On page 1 of Exhibit 260

25   is the reference to -- from the analysis of the cell phone.

1    He saw potential evidence of a financial conflict of interest

2    and other federal crimes.  That's at page 1, paragraph 2.

3         Moving on, on page -- I'm sorry.

4         THE COURT:  So all of this is to show that

5    Mr. Higginbotham was involved in some other crimes?  Is that

6    the point of this?

7         MR. KENNER:  The point of this is to show that,

8    yeah, that what Mr. --

9         THE COURT:  I thought this -- what does this have to

10   do with Mr. Michel?  As I understood it, and if I could have

11   this focused discussion, my understanding is that the text

12   messages you were interested and you viewed against penal

13   interest of Mr. Higginbotham, was that they were e-mails or

14   text messages between Mr. Higginbotham and Mr. Michel.  That's

15   not what I'm listening to now.  So is there something

16   different?

17        MR. KENNER:  It's the second paragraph, "Special

18   Agent Lidsky is investigating Higginbotham as a potential

19   insider threat to the DOJ, based on his meeting with Chinese

20   ambassador to the U.S."  And then --

21        THE COURT:  Okay.  All right.  Tell me what interest

22   it has in terms of, it indicates the meeting and a potential

23   financial conflict of interest and other crimes came to light,

24   and the purpose of bringing that in is what?

25        MR. KENNER:  To show that --

1              THE COURT:  What?

2              MR. KENNER:  To show that on the telephone, which

3    Mr. Lidsky, in the second part of that paragraph, says he did

4    a -- he went through a cursory analysis of his cell phone and

5    found potential evidence of a financial conflict of interest

6    and other federal crimes came to light.

7              THE COURT:  Right.  And what's the purpose?  I'm

8    asking you the purpose of that.  What are you bringing that in

9    for?

10             MR. KENNER:  The purpose of it is to inform Agent

11   Lidsky's state of mind at the time, on July 20th, that this

12   interview was taking place.

13             THE COURT:  What does his state of mind have to do

14   with anything, in terms of Mr. Lidsky's state of mind at the

15   point that he's interviewing him, or afterwards?  What

16   difference does it make, you know, what he thinks?  The

17   question is what did he do as part of the investigation.  I

18   don't see what his state of mind has to do with anything, at

19   least relating, if that's what this is.

20             MR. KENNER:  And what he did was to review the

21   telephone.

22             THE COURT:  All right.  So let's get to the review

23   of the telephone.

24             MR. KENNER:  Okay.

25             THE COURT:  I don't see anything.

1          But, Mr. Keller, what's your view in terms of this

2    business about the state of mind of Agent Lidsky in terms of

3    the potential evidence of financial conflict, et cetera?

4          MR. KELLER:  So this to me is three steps removed

5    from what we were discussing on the phone when you sent the

6    jury out.  This is not communications between

7    Mr. Higginbotham and Mr. Michel.

8          THE COURT:  No, I understand.  He's -- Mr. Kenner

9    shifts around, okay, so let's deal with everything that he

10   has.

11         MR. KELLER:  This is also --

12         THE COURT:  For this one, what's your position?

13         MR. KELLER:  I believe that if we're talking about

14   Special Agent Lidsky's state of mind when he interviewed

15   Mr. Higginbotham, this report was drafted after the interview

16   with Mr. Higginbotham, where Mr. Higginbotham provided consent

17   to download his phone.  So to the extent that any of this

18   informed Special Agent Lidsky's state of mind, it would have

19   been after the interview that Mr. Kenner is talking about.

20         THE COURT:  All right.  So tell me what -- is he

21   incorrect factually?  If not, then I don't see how this comes

22   in.  Then we'll move to the texts.

23         MR. KENNER:  I believe that he did this before the

24   interview on July 20th.  I would certainly ask that as a

25   predicate question.

1          THE COURT:  When did he get the phone?

2          MR. KENNER:  He got it from Mr. Higginbotham --

3          MR. KELLER:  During the interview --

4          THE COURT:  Excuse, not at the same time.

5          Mr. Keller.

6          MR. KELLER:  During the interview on July 20th.  The

7    introduction to the report says on July 20th, 2017.  This

8    couldn't have happened before July 20th.

9          THE COURT:  Okay.  So on July 20th, in part of the

10   interview, he gave him the phone.  The analysis would have

11   been after that.  So -- and, frankly, doesn't go to the state

12   of mind of his meeting on July 20th, because that's the time

13   he got the phone.  So then there's no relevance to this.

14         Let's move to the texts between Mr. Higginbotham and

15   Mr. Michel.  What do they say?  At least show them --

16         MR. KENNER:  I believe that -- it included -- I

17   believe, Your Honor, that it --

18         THE COURT:  You need to speak into the microphone.

19         MR. KENNER:  I'm sorry.  I believe, Your Honor, that

20   there is text messages about Mr. Michel's various matters,

21   including a document that was on the phone showing a

22   $2-million-plus deposit into the Anicorn account on May 8th.

23         THE COURT:  So tell me -- let me see these text

24   messages.  I don't have a copy, government doesn't have a

25   copy, so we can't discuss this unless you put it up so

1    everybody can see it.  Okay.  Put it up and then let's have a

2    discussion.

3              And if you can enlarge it.  If we're supposed to

4    read this, it's too -- the print is too teeny.

5              MR. KELLER:  Your Honor, this is not a state of mind

6    of Mr. Higginbotham.  It's not a statement of Mr. Michel.

7    This is a statement --

8              THE COURT:  Hold on one second.

9              What did you say?  I'm sorry, I didn't hear the --

10   Mr. Keller.

11             MR. KENNER:  Let me just take a moment to make sure

12   I --

13             THE COURT:  Is that the text message, Mr. Kenner,

14   that you're interested in having admitted?  It just went off.

15   So give me the text message so the government and I can look

16   at it to see whether it should be admitted.

17             MR. KENNER:  Okay.

18             THE COURT:  Mr. Michel, are you -- I don't want to

19   leave you sitting here if you actually need to leave and come

20   back.  We can take a moment to let you do that.  Okay.

21             What I would like to do is to just get the text

22   message and to hear what you're saying so I can make some

23   decisions about it.  I'm not going to make it immediately.  I

24   need to have it printed out, but I want to know what you're

25   talking about.

1           MR. KENNER:  Your Honor, let me first -- and then I

2   can pull up any one of them.  What I'm putting on the screen

3   right now is the text message chain between Mr. Michel and

4   Mr. Higginbotham.

5           THE COURT:  Okay.

6           MR. KENNER:  And which one of those --

7           THE COURT:  Are you asking to have this admitted, or

8   is this just simply to --

9           MR. KENNER:  Yes, I'd ask that this be admitted.

10          THE COURT:  Okay.  So under what theory?

11          MR. KENNER:  That it's a summary of text messages --

12          THE COURT:  Legally, how is it getting admitted?

13          MR. KENNER:  I'm offering it as a legal -- as a

14  summary --

15          THE COURT:  I can't hear you.

16          MR. KENNER:  I'm offering it as a summary of

17  e-mails -- of text messages, rather --

18          THE COURT:  That's the content, but I'm asking you

19  legally, why is this being admitted?

20          MR. KENNER:  To show the chain of e-mails between

21  the two of them.

22          THE COURT:  It's a summary that presumably --

23          MR. KENNER:  In chronological order.

24          THE COURT:  Excuse me.

25          It's a summary that presumably Mr. Lidsky or

1      somebody in his group made, okay.

2              MR. KENNER:  Yes.

3              THE COURT:  So let me -- in terms of presenting it,

4      I'm not clear how it's getting admitted.

5              Mr. Keller.

6              MR. KELLER:  Your Honor, if he wants to admit the

7      text messages, they're hearsay.  And these don't appear to be

8      exclusively between Mr. Michel and Mr. Higginbotham.  There's

9      messages from Marc Moscowitz on this exhibit.  It looks like

10     it's maybe all of the text messages that were pulled from

11     Mr. Higginbotham's phone.

12             THE COURT:  So you're interested in only -- so

13     certainly all of them should not be the ones that would be

14     admitted.  It would be -- plus I don't know that you need a

15     text if you're going to actually show what the -- you need the

16     summary as a practical matter, as opposed to showing me what

17     the texts are.  Because it's the text that you actually wanted

18     admitted; right?

19             MR. KENNER:  I would be happy to have this admitted,

20     Your Honor.

21             THE COURT:  That doesn't say -- have any relevance

22     then in terms of that they were messages back and forth.

23     Plus, you know, it's hearsay.  I'm still waiting to hear what

24     the exception is.  Plus it's somebody else putting together

25     the list.

1        We haven't progressed, Mr. Michel, so you haven't

2   missed anything.

3        MR. KENNER:  All right.  I'm just going to move away

4   from this subject.

5        THE COURT:  Okay.  So let me understand, because I

6   want to make sure if -- I broke early for lunch so that we

7   could have a discussion about it.  But -- so you've decided at

8   this point you're not going to ask to admit the summary or

9   texts between Mr. Higginbotham and Mr. Michel; is that

10  correct?

11       MR. KENNER:  Based on Your Honor's indicated ruling,

12  yes.

13       THE COURT:  I'm waiting to see the text, okay.

14       MR. KENNER:  Oh, okay.  No, I'm going to move away

15  from this.

16       THE COURT:  Okay.  But I want to point out, I

17  haven't made a ruling because you haven't shown what they are.

18  So I want to make it clear that I -- you're not giving up

19  because I've ruled against you.  You've decided to basically

20  move on and not proceed with it.

21       MR. KENNER:  Yes, Your Honor.

22       THE COURT:  I haven't ruled on anything.  I haven't

23  been able to figure it out.

24       MR. KENNER:  Yes.

25       THE COURT:  So is it correct you've made a decision,

```
 1    tactically, that you are not going to be asking to have these
 2    text messages admitted; is that correct?
 3              MR. KENNER:  Yes.
 4              THE COURT:  All right.  Then do we have anything
 5    else we need to talk about before we take our lunch break?
 6              MR. KENNER:  No, Your Honor.
 7              THE COURT:  Mr. Keller.
 8              MR. KELLER:  Your Honor, when we were on the phones,
 9    it was my understanding that what Mr. Kenner was talking about
10    was an audio recording of an interview between
11    Mr. Higginbotham and Special Agent Lidsky.  I don't know if
12    he's still intending to try to admit that.  I thought that's
13    what he was saying was a hearsay exception for statements
14    against penal interest.  The government would object --
15              THE COURT:  That's a different issue, but let's --
16    hang on.  Okay.  So we've -- we're leaving the text messages
17    from the phone aside.  We now have the -- I believe, if I'm
18    not mistaken, there was a recorded interview.  Is that what
19    we're discussing?
20              MR. KENNER:  Yes, Your Honor.
21              THE COURT:  Okay.  The recorded interview that
22    Special Agent Lidsky took of the -- his first meeting with
23    Mr. Higginbotham.  Is that what we're talking about?
24              MR. KENNER:  Yes, Your Honor.
25              THE COURT:  Okay.  And are you asking to have that
```

1  admitted?

2          MR. KENNER:  Yes, Your Honor.

3          THE COURT:  Okay.  And under what theory is that

4  being admitted?

5          MR. KENNER:  Statements against penal interest.

6          THE COURT:  Okay.

7          Mr. Keller.

8          MR. KELLER:  Your Honor, the exception -- the

9  hearsay exception for statements against penal interest only

10  applies to witnesses who are unavailable.  Mr. Higginbotham is

11  not unavailable.  He was here, he testified.  He could have

12  been confronted with any prior inconsistent statements from

13  that interview.  It cannot come in through some other witness

14  when the witness that it pertains to is available.

15          And I don't -- I mean, the whole interview certainly

16  doesn't come in as a statement against penal interest, if

17  there's some particular statement that he would seek -- it's

18  not even worth going down that road.  He's not unavailable, so

19  the exception doesn't apply.

20          THE COURT:  Okay.  Do you want to respond to that,

21  Mr. Kenner?

22          MR. KENNER:  Your Honor, I'll seek to recall him,

23  and I will not go down that path now.

24          THE COURT:  I'm sorry, you will seek to --

25          MR. KENNER:  I will seek to recall Mr. Higginbotham.

1    I will not go down this path with this witness then.

2              MR. KELLER:  Your Honor, that doesn't make the audio

3    admissible.

4              THE COURT:  I think you need, Mr. Kenner -- and

5    we'll take a break to take a look at it from a legal

6    perspective, and I'll come back and -- or you can let me know

7    that you've decided whether or not you're going to use it.

8    And let me go back and make sure before I make a ruling on

9    this, that -- what my grounds are.  Okay?

10             MR. KENNER:  Thank you, Your Honor.

11             THE COURT:  Okay.  So whether it's -- whether it's

12   without Mr. Higginbotham getting back on the stand or with him

13   getting back on the stand.

14             I think that's it in terms of our discussions off --

15   on the record but on the intercom.

16             Mr. Keller, is that correct?

17             MR. KELLER:  I believe so, Your Honor.

18             MR. KENNER:  Yes, Your Honor.

19             THE COURT:  Anything else, Mr. Kenner?  Okay.

20             All right.  So let's take a break here.

21             What exhibit number is this, the testimony?

22             MR. KENNER:  260.

23             THE COURT:  260.  Okay.  We don't have it.

24             MR. KENNER:  Are you talking about the audio tape?

25             THE COURT:  I'm talking about the audio tape that

1    you are asking to have admitted.

2              MR. KENNER:  Yes.  What exhibit -- just a moment,

3    Your Honor.

4              THE COURT:  Okay.  I think we have the audio tape --

5              MR. KENNER:  I think this defendant -- it's two

6    segments.  There are two separate recordings, one after the

7    other.  They are defendant's proposed Exhibit 6 and

8    defendant's proposed Exhibit 7.

9              THE COURT:  Okay.  So they're --

10             MR. KENNER:  Which we received from the

11   government.

12             THE COURT:  Right.  But are these the actual -- is

13   there a transcript associated with this or only the

14   recordings?

15             MR. KELLER:  Yes.

16             MR. KENNER:  These are the actual recordings.  I

17   believe there's a transcript associated with one of these two

18   interviews, but I have not seen one with regard to the other.

19   If there is one, I'd love to see it.

20             THE COURT:  Is there -- are there transcripts?

21   We've -- we got the recordings but not the transcripts.

22             MR. KELLER:  I believe there's a transcript for one

23   interview and that, I believe, has already been marked as

24   Defense Exhibit 1.  And we've talked about that when

25   Mr. Higginbotham was on the stand.

1          THE COURT:  Okay.

2          MR. KELLER:  I don't believe there's a transcript

3     for the second audio recording.

4          THE COURT:  Okay.  So we have the two things, and

5     legally, you're proceeding on a statement against penal

6     interest; is that correct?  That's the rubric you're putting

7     this under.

8          MR. KENNER:  Let me reverse.  I think --

9          THE COURT:  You need to speak into --

10         MR. KENNER:  I believe there is a recording -- a

11    transcript, rather, of the first portion of the -- I'm sorry,

12    the second portion of the interview, but not a transcript for

13    the first portion of the interview.  That's my recollection.

14         THE COURT:  I don't know.  The government, I assume

15    that you would know one way or the other.  It would be helpful

16    if somebody would give us the transcript, and I'll make a copy

17    of it so we can look at it.

18         But let me take a look at the legal -- I just want

19    to make sure, when I'm doing my research, I have the right

20    rubric, Mr. Kenner, that you're asking to have this admitted

21    under.

22         MR. KENNER:  Yes.

23         MR. KELLER:  It's still not clear to me what exact

24    transcript he's talking about.  If defense counsel wants to

25    identify specific transcripts with Bates stamps, then maybe we

1    can go and try to find them for the convenience of the Court,

2    although I would submit that it's defense counsel's obligation

3    to do that.  But I'm not even sure what he's talking about.

4              THE COURT:  He's talking, as I understand it, about

5    the two recordings, one of which --

6              MR. KENNER:  From July 20th.

7              THE COURT:  -- I'm not sure which one, has a

8    transcript.

9              MR. KELLER:  There is a transcript which is Defense

10   Exhibit 1, which is a transcript of a September 11th, 2017

11   interview.  Beyond that, I'm not sure what transcript he's

12   referencing.

13             THE COURT:  Okay.  And so there's recordings that

14   seem to be a different date, which is --

15             MR. KENNER:  July 20th.

16             THE COURT:  Okay.  So you're -- can we make sure

17   we're talking about which recordings you want to have

18   admitted.

19             MR. KENNER:  Yes, Your Honor.

20             THE COURT:  And the date of the recording.

21             MR. KENNER:  Your Honor, the date of the recording

22   is July 20th, and I do have a transcript.  It was marked

23   Defendant's Exhibit 254 of -- of the second half of that

24   interview.

25             THE COURT:  Okay.  Which of course none of us

1   have.

2            MR. KELLER:  No.  We don't have it.

3            MR. KENNER:  It's going to be okay --

4            THE COURT:  So -- I mean, it's hard to make a ruling

5   if you can't look at what it is.

6            MR. KELLER:  May I give you the DOJ number for it,

7   if that would help?  The DOJ number is 0000106895.  I've just

8   handed a copy to Mr. Keller.

9            THE COURT:  Okay.  So what is it -- which one do you

10  want admitted?  What's the date on it, admitted?

11           MR. KENNER:  The only transcript I have is this one.

12  I wanted --

13           THE COURT:  That's not my question.  Listen to my

14  question, Mr. Kenner.  I'm asking you -- forget transcripts or

15  recordings -- as to what the form is, which interview do you

16  wish by date?

17           MR. KENNER:  July 20th of 2017.

18           THE COURT:  And that's the only one you want?

19           MR. KENNER:  No.

20           THE COURT:  Then what other ones do you want?

21           MR. KENNER:  And the 9/11 of '17 interview.  That

22  was recorded.

23           THE COURT:  Okay.  Now, both are recordings.  One is

24  the 5 and the other 6.  And it looks like the transcript in

25  one is not for the correct -- well, maybe it is.  Maybe it is

1   for No. 6, the September 11th.

2          What did they give you, Mr. Keller?  Is that for

3   what -- which one is that?

4          MR. KELLER:  This -- Your Honor, they've just handed

5   me Defense Exhibit 254, which looks like the transcript for

6   the July 20th interview, but I believe this is -- there's only

7   a transcript for the second half of that interview.

8          MR. KENNER:  That's correct.  That's all we have.

9          MR. KELLER:  That's all we have as well.

10         THE COURT:  Okay.  So how are you planning on

11   presenting it to the jury, Mr. Kenner, assuming that the Court

12   would allow it?

13         MR. KENNER:  I was intending to play it, but if it

14   doesn't -- go over it if it --

15         THE COURT:  It's rather difficult without people

16   being -- having an opportunity to hear it so that I can have

17   an intelligent discussion.

18         And, Mr. Keller, have you listened to it?  Are you

19   in a position to discuss it, or is it the legal issue take

20   care of it to begin with?

21         MR. KELLER:  I have not heard how it's not hearsay,

22   Your Honor, and so I'm not sure that --

23         THE COURT:  Okay.  It's his statement against penal

24   interest, is what he's discussing.  I'm not -- I need to go

25   back and make a full ruling on this.  But that's as I

 1    understand it.

 2              MR. KELLER:  That only applies to witnesses who are

 3    unavailable under Rule 804, Your Honor.

 4              THE COURT:  Okay.  So -- and your response to that,

 5    Mr. Kenner, just so I know what the -- when I'm looking at

 6    this, what the responses are.

 7              MR. KENNER:  My response to that is that they are

 8    statements against penal interest.  The witness has

 9    testified -- if the government would prefer, I won't pursue it

10    now.  I'll attempt to recall Mr. Higginbotham.

11              MR. KELLER:  Unavailability doesn't depend on

12    whether or not the witness is the declarant of the statement.

13    Unavailability is a -- is an initial matter that the defense

14    must show that the witness is unavailable in order for the

15    exception to apply.  It doesn't matter if the witness is on

16    the stand or not.  He's not unavailable.  He's already

17    testified in this case.

18              THE COURT:  Okay.  Anything else you want to raise?

19    I'll go back and do the research.

20              MR. KENNER:  No, Your Honor.

21              THE COURT:  All right.

22              MR. KENNER:  No.

23              THE COURT:  I think we've gone as far -- so let me

24    look at the legal stuff and then I'll -- in the meantime,

25    you'll need to figure out what -- what we're talking about in

1      terms of which exhibits.

2              MR. KENNER:  Yes, we will immediately, Your Honor.

3              THE COURT:  All right.  So I'm going to be looking

4      at whether he testifies or doesn't testify about the

5      recordings.  And you want to have them admitted; is that

6      correct?

7              MR. KENNER:  Yes.

8              THE COURT:  All right.  Then I will see you back --

9      it is now five after -- well, it's -- excuse me, it's a few

10     minutes after 1:00.  Why don't you come back at 1:30 and I'll

11     tell you my legal ruling, and then we see whether we need to

12     fiddle around with the exact exhibits.  Okay?  People are

13     going to have to eat a quick lunch.  Do the full thing till

14     2:00, but I want to figure out the whole thing first.

15             MR. KENNER:  I'm sorry, Your Honor, do we have 30

16     minutes for lunch?

17             THE COURT:  I'm sorry?

18             MR. KENNER:  Did you say we have 30 minutes for

19     lunch?

20             THE COURT:  You're excused between now and 1:30.

21     Then come back at 1:30 and I'll tell you whether I think

22     there's a legal issue and whether you get to admit it or not.

23     If you get to admit it, then we'll discuss -- how we're going

24     to do that.  If not, then that's the end of it, and you've

25     been -- well, we'll definitely break in terms of the jury

1    until 2:00, which is what I told them.

2              (The proceedings were concluded at 1:03 p.m.)

3

4              I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
     record of proceedings in the above-entitled matter.

5
                    _____/s/_____
6                        Christine T. Asif
                      Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

< Dates >.
April 17th,
  2023 1:11.
August 21st
  66:1.
August,
  September
  37:12.
December 2012
  17:15.
January 2nd,
  2022 28:19.
July 15th
  39:17, 66:1,
  69:5, 69:15,
  69:22,
  71:9.
July 16th 66:4,
  69:11,
  69:16.
July 16th, 2017
  66:10.
July 18th
  79:20.
July 19th
  73:1.
May 2017
  41:1.
May 8th
  103:22.
November 6th,
  2012 13:23.
$100 49:24,
  50:19.
$11 13:3, 13:4,
  13:6, 13:19,
  54:15,
  54:18.
$120,000
  53:7.
$2-million-plus
  103:22.
$20 8:8,
  8:11.
$40 52:25.
$40,000
  10:23.
$55,000
  36:25.
$8 60:2.

$800,000
  8:14.
$90,000
  36:18.
'17 114:21.
.
.
< 0 >.
000-a-person
  52:25.
0000106895
  114:7.
.
.
< 1 >.
1 38:12, 99:24,
  100:2,
  111:24,
  113:10.
10 8:16.
1016 1:28.
10:00 18:21.
10th 36:8.
11 23:15,
  51:9.
11:00 41:22.
11th 36:20,
  54:18,
  113:10,
  115:1.
12 60:18.
12th 54:19.
1301 1:27.
1400 1:35.
15 18:22,
  58:18,
  60:18.
16633 1:42.
17 35:11,
  35:16.
19-00148-1
  1:6.
1998 65:9.
19th 79:20.
1:00 97:5,
  117:10.
1:03 118:2.
1:30 117:10,
  117:20,
  117:21.

1MDB 30:5,
  31:25, 32:19,
  53:15.
.
.
< 2 >.
2 39:1, 40:6,
  100:2.
2000 54:4.
20001 2:17.
20004 2:9.
20005 1:36.
2005 65:9.
2006 23:15,
  49:19.
2008 50:4.
2011 50:13,
  54:14.
2012 8:11, 9:3,
  9:11, 11:24,
  12:3, 13:20,
  15:6, 15:11,
  16:1, 16:12,
  16:20, 17:9,
  23:10, 44:14,
  44:25, 51:17,
  54:5.
2016 16:13,
  58:13.
2017 11:23,
  37:13, 52:23,
  53:23, 58:15,
  64:12, 65:18,
  65:23, 66:1,
  66:4, 90:12,
  103:7,
  113:10,
  114:17.
2018 20:24.
202 2:18.
20530 1:29.
20th 20:24,
  79:21, 90:12,
  90:21,
  101:11,
  102:24,
  103:6, 103:7,
  103:8, 103:9,
  103:12,
  113:6,

  113:15,
  113:22,
  114:17,
  115:6.
216 66:21.
223 14:12,
  30:17.
242 66:18,
  68:2, 68:9,
  78:23.
243 66:19,
  68:2.
25 49:4, 49:6,
  97:5.
254 113:23,
  115:5.
260 98:20,
  99:7, 99:24,
  110:22,
  110:23.
265 14:5, 14:6,
  14:10, 14:13,
  30:18.
266 30:11,
  30:19.
29 42:8.
2:00 97:6,
  117:14,
  118:1.
.
.
< 3 >.
3 39:21,
  40:4.
30 117:15,
  117:18.
302 31:5.
333 2:15.
336 23:15.
354-3247
  2:18.
395 38:12,
  38:18, 38:25,
  39:2, 39:21,
  40:4.
.
.
< 4 >.
4 35:12, 35:25,
  38:2.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

455 23:15.
474 38:2,
   38:15,
   39:21.
.
< 5 >.
5 114:24.
5th 4:21, 4:24,
   5:9, 19:19.
.
.
< 6 >.
6 111:7,
   114:24,
   115:1.
603 85:8.
641 2:8.
6507 2:16.
.
.
< 7 >.
7 111:8.
.
.
< 8 >.
804 23:19,
   116:3.
.
.
< 9 >.
9 1:12, 28:9.
9/11 114:21.
91436 1:43.
9:00 6:17,
   6:18, 6:19.
9:02 1:12.
9:15 6:17.
9th 4:22.
_____/s/___
_____
   118:8.
.
.
< A >.
able 5:1,
   22:18, 30:8,
   39:5, 54:21,
   60:19, 72:12,
   92:8, 96:2,

107:23.
above-entitled
   118:6.
absent 84:2.
absolutely
   33:16.
abuse 65:1.
accept 19:24.
access 15:10,
   29:13,
   60:22.
According
   41:11,
   98:13.
account 27:10,
   27:11, 27:19,
   34:22, 35:5,
   35:6, 36:4,
   36:14, 36:15,
   36:16, 36:17,
   37:5, 37:6,
   103:22.
accounts 8:12,
   8:20, 8:23,
   26:23, 27:10,
   28:1,
   28:12.
accurate 13:24,
   57:8.
acknowledge
   75:14.
acknowledged
   93:9,
   93:12.
acquainted
   48:14.
acquainting
   52:8.
acquired 59:3,
   84:10.
across 50:3.
act 56:15,
   56:19,
   56:23.
acted 49:25.
acting 88:25.
ACTION 1:5.
activity
   51:13.
actual 38:24,

111:12,
   111:16.
Actually 5:20,
   19:25, 23:2,
   45:24, 47:6,
   85:11, 96:14,
   97:6, 104:19,
   106:15,
   106:17.
add 96:13.
added 14:11,
   14:12.
adding 99:17.
additional
   30:13, 87:4,
   96:13.
additions
   14:16.
address 48:16,
   48:19.
addressed
   43:12,
   64:21.
Administration
   65:6, 65:8.
admissibility
   24:8, 45:9,
   47:19.
admissible
   19:9, 32:22,
   96:11,
   110:3.
Admissions
   94:20, 96:2,
   96:3.
admit 20:6,
   20:20, 20:22,
   22:2, 24:11,
   30:19, 45:13,
   94:7, 95:19,
   99:9, 106:6,
   107:8,
   108:12,
   117:22,
   117:23.
admitting
   19:25,
   86:24.
advance 69:8,
   71:9.

advanced
   53:2.
advantage
   51:11,
   56:5.
adverse 85:8,
   85:13.
advice 44:10,
   88:11,
   89:1.
advisement
   25:6, 25:9,
   42:15.
Affairs 80:7,
   80:9, 80:25,
   81:16,
   83:6.
affecting
   65:3.
affidavit
   71:1.
affirmatively
   60:9.
afterwards
   101:15.
agency 60:6,
   64:20.
ago 9:5, 48:13,
   82:19.
agree 24:11,
   24:13, 45:20,
   46:1, 82:1,
   82:20, 85:1,
   95:10.
agreeing
   45:13.
agreement
   45:24, 56:11,
   56:13,
   59:10.
ahead 26:19,
   35:24, 37:21,
   63:8.
Al 53:19,
   53:20.
align 84:7.
allegations
   29:6, 39:13,
   64:25.
alleged 51:9,

51:10,
61:15.
allegedly
94:21.
alleges
56:19.
allow 12:5,
18:12, 33:10,
53:8, 90:16,
115:12.
allowed 16:6,
18:1.
Almost 30:6,
34:22,
50:16.
Alon 1:40.
already 9:10,
10:25, 16:19,
18:11, 19:20,
20:14, 33:1,
33:23, 41:6,
48:20, 49:7,
55:2, 59:21,
69:8, 86:23,
90:5, 92:6,
92:25, 96:18,
111:23,
116:16.
Alsen 57:25.
although 11:11,
113:2.
ambassador
41:1, 61:10,
66:9, 66:15,
75:15,
100:20.
Amendment 4:24,
19:19.
AMERICA 1:5.
Amex 35:2,
35:5.
among 23:16,
67:17,
81:21.
amount 9:14,
13:2, 28:6,
52:21, 96:12,
99:19.
amounts 49:21,
49:25, 50:17,

52:20.
analysis 99:25,
101:4,
103:10.
analyzed
28:17.
Anicorn 27:19,
35:1, 36:15,
36:17, 37:5,
37:11, 37:23,
103:22.
annoying
77:2.
answer 29:18,
40:18, 51:5,
63:13, 63:16,
63:17,
63:18.
answered 13:8,
34:1, 37:19,
69:18,
70:17.
anybody 32:18,
53:14,
97:12.
Anyway 76:7,
99:23.
apart 21:13.
apologies
15:24.
apologize 5:21,
42:7, 54:5,
82:16,
99:21.
apparent
28:25.
apparently
43:12.
appear 39:7,
39:9, 39:15,
106:7.
appearance
7:14.
APPEARANCES
1:23, 2:1.
appeared 8:23,
49:25,
50:8.
appears
38:21.

apple 12:2.
application
66:3.
applies 109:10,
116:2.
apply 109:19,
116:15.
appropriate
33:14, 84:5,
85:16, 87:12,
92:11,
92:24.
appropriately
87:16.
approve 53:13,
53:14, 53:15,
85:20.
areas 51:23.
argue 15:9,
33:9,
33:15.
argued 50:10.
arguing 55:16,
55:18.
argument 32:13,
46:15, 55:8,
57:10, 57:13,
86:17.
argument-type
57:13.
Argumentative
55:2.
arguments
24:12, 25:8,
47:18.
around 15:14,
16:20, 49:21,
86:19, 102:9,
117:12.
arrange 61:19,
61:20, 62:2,
62:11.
arranged 19:13,
53:10, 53:19,
54:7,
55:10.
arrangements
11:1.
art 49:10.
Artemus 27:10,

35:1, 35:6,
36:5, 36:15,
37:6, 37:12,
37:23.
aside 23:9,
108:17.
Asif 2:11,
118:4,
118:9.
assert 19:18.
asserting
4:25.
assessment
83:21,
83:24.
assessments
84:3.
assets 58:14.
Assistant
73:3.
associated
27:19,
111:13,
111:17.
association
53:18.
Assume 45:3,
74:21, 74:25,
91:9,
112:14.
Assumes 93:25,
94:2, 95:7.
assuming 45:5,
58:22, 74:25,
88:23, 98:2,
115:11.
assumption
91:11.
attached
74:17.
attachment
38:21, 38:22,
39:18, 75:11,
79:2.
attempt 86:13,
116:10.
attempted
55:24,
62:11.
attempting

75:13.
attend 12:21,
  53:12,
  69:25.
attended
  66:15.
attention 9:16,
  62:16,
  65:25.
Attorney 40:7,
  40:24, 40:25,
  41:9, 62:2,
  66:9, 73:3,
  73:4, 77:22,
  78:14, 88:18,
  88:25.
attorney-client
  88:2,
  88:20.
attorneys
  67:18, 85:19,
  89:21.
attributable
  84:7.
attribute
  8:13.
attributed
  58:1.
audio 108:10,
  110:2,
  110:24,
  110:25,
  111:4,
  112:3.
authored
  69:4.
available
  96:21,
  109:14.
Avenue 1:27,
  1:35, 2:8,
  2:15.
aware 12:13,
  13:1, 13:4,
  13:6, 13:10,
  40:17, 66:2,
  66:4, 69:3,
  69:4.
away 51:2,
  57:14, 107:3,

107:14.
.
.
< B >.
back-door
  10:11, 70:14,
  83:19.
background
  72:6.
backwards
  61:22.
bad 83:23,
  84:9.
band 48:24.
bank 11:25.
bar 50:2.
Based 10:10,
  22:11, 41:8,
  42:19, 76:18,
  82:1, 82:13,
  83:17, 90:1,
  94:7, 94:14,
  100:19,
  107:11.
basically 91:6,
  107:19.
basis 22:12.
Bates 112:25.
became 48:14,
  54:23,
  55:11.
become 30:4,
  51:24,
  84:25.
begin 115:20.
beginning 12:4,
  15:25, 40:24,
  48:7, 58:4.
behalf 59:11.
belief 54:20,
  74:23.
believed 53:25,
  79:16.
Bench 9:18,
  15:2, 31:13,
  46:19, 46:23,
  74:8, 86:21,
  91:23,
  94:16.
besides 22:18,

25:18.
best 13:15,
  83:25, 84:5,
  98:19.
better 4:5,
  10:3.
Beyond 16:11,
  33:13, 62:15,
  66:21,
  113:11.
big-time 59:23,
  59:24.
bills 27:14,
  27:15.
birthday
  12:21.
bit 10:4, 28:2,
  62:24,
  64:14.
bite 12:2.
black 50:9.
Blackstone
  57:25.
blanks 16:23.
Bond 58:10.
bought 50:21.
Boulevard
  1:42.
boy 60:12.
break 6:23,
  18:17, 18:21,
  22:4, 26:11,
  41:22, 46:5,
  56:1, 68:5,
  96:7, 96:8,
  108:5, 110:5,
  110:20,
  117:25.
brief 22:21,
  23:13,
  43:8.
briefed 24:3,
  24:16.
briefing 21:8,
  22:4.
briefly 21:12,
  26:7, 42:9.
bring 6:11,
  7:5, 18:4,
  19:21, 20:8,

20:10, 24:20,
  43:10, 46:9,
  76:2, 76:9,
  76:20, 77:1,
  91:6, 92:3,
  92:9, 92:21,
  99:14.
bringing 18:7,
  77:9, 77:10,
  100:24,
  101:8.
brings 12:9.
broad 9:14,
  16:6.
Broidy 34:23,
  59:4, 59:7,
  59:15, 60:12,
  60:13, 60:14,
  60:16, 60:19,
  60:25,
  61:5.
broke 107:6.
brought
  45:14.
built 58:15.
bullet 40:5,
  41:3.
bunch 22:17,
  44:15,
  91:24.
burned 60:9.
business 26:23,
  27:20, 34:25,
  35:7, 35:8,
  65:2,
  102:2.
busy 49:9.
.
.
< C >.
California
  1:43.
call 9:16,
  10:6, 24:22,
  71:8, 80:17,
  81:15.
called 48:24,
  63:4, 68:16,
  69:5, 69:15,
  70:10.

calling 5:23,
7:8, 7:11,
69:21.
Calls 37:15,
88:23.
campaign 8:9,
8:15, 13:2,
13:5, 13:20,
16:1, 51:25,
53:12, 54:8,
54:16, 54:17,
64:13,
65:23.
campaigning
13:25.
Campbell
66:17.
capacity
64:17.
card 27:14,
27:15, 27:23,
27:25.
cards 26:24,
35:5, 35:8.
care 23:3,
115:20.
career 51:21.
careful
44:22.
carries
82:24.
Carson 23:14.
cases 22:15.
casinos
52:10.
category
64:23.
celebrity 49:9,
49:16,
49:17.
cell 86:10,
99:25,
101:4.
certain 42:8.
Certainly
12:24, 16:10,
16:21, 22:20,
27:4, 57:17,
84:1, 88:6,
99:16,

102:24,
106:13,
109:15.
certify
118:4.
cetera 6:7,
20:12, 23:10,
46:2, 50:25,
70:25, 72:15,
88:24, 92:18,
102:3.
chain 80:8,
105:3,
105:20.
challenging
21:22.
chambers 6:25,
97:20.
Chance 49:19,
50:3,
57:25.
change 75:13.
channels 62:1,
62:2.
characteristic
84:19.
characterizatio
n 83:13.
characterize
82:13, 83:18,
83:24,
84:5.
characterized
83:16.
characterizing
83:7, 83:11,
95:5.
charge 10:21,
56:20.
charged 17:8,
17:13, 17:22,
64:25.
charges 31:22,
39:13, 51:11,
51:12,
56:9.
Charles 2:5,
2:6.
charts 28:3,
28:17.

check 40:5.
chief 9:2,
51:16.
China 39:23,
59:12, 61:7,
61:8, 61:10,
61:11, 61:15,
61:24.
Chinese 39:14,
39:15, 61:8,
61:19, 61:21,
66:2, 66:5,
66:9, 66:14,
68:16, 69:5,
69:15, 70:10,
70:12, 71:1,
71:3, 71:8,
71:9, 75:16,
91:20,
100:19.
choir 49:1.
chosen 48:5.
Chris 60:3.
Christie
60:3.
Christine 2:11,
118:4,
118:9.
Christmas
15:11,
17:19.
chronological
105:23.
church 48:25,
49:1.
CIA 65:10,
65:12, 65:15,
65:17.
Circuit
23:15.
circumstances
86:6.
claim 70:19.
claimed
75:15.
clandestine
61:23.
clarifies
13:21.
clarify 21:1.

classic 73:10,
95:2.
clear 15:15,
52:1, 69:14,
75:7, 82:10,
86:22, 86:25,
94:18, 106:4,
107:18,
112:23.
clearly 89:3,
89:8.
CLERK 6:22.
client 52:8,
88:19.
cloak 58:12.
close 57:9,
57:12.
closing 57:10,
57:13,
86:17.
club 49:22.
Colfax 34:16,
34:17, 34:21,
34:22, 59:4,
59:6.
COLLEEN
KOLLAR-KOTELL
Y 1:18.
Columbia
2:14.
COLUMBIA 1:2.
Columbus
50:4.
comes 24:24,
77:12, 98:6,
102:21.
coming 4:10,
13:1, 13:4,
18:10, 20:3,
45:24, 50:13,
52:3, 69:12,
69:16.
comission
56:16.
command 80:8.
comments
94:20.
communications
70:24, 88:21,
89:13, 94:12,

94:17, 95:9,
102:6.
companies
50:24,
50:25.
complaint
58:13.
complete
25:23.
component 71:7,
79:11.
computer 64:19,
85:21.
computers
70:25.
concern 71:17,
71:20,
77:10.
conclude
18:19.
concluded
118:2.
conclusion
37:16.
conclusions
84:3.
conduct 9:11,
11:23, 11:24,
12:3, 15:6,
16:1, 17:9,
17:13, 17:22,
44:14,
44:25.
conducted
64:19, 65:1,
85:22, 87:15,
87:16.
conducting
65:2.
conference
9:18, 15:2,
31:13, 74:8,
86:21, 91:23,
94:16.
confirm 72:9,
79:18.
conflict 100:1,
100:23,
101:5,
102:3.

conflicts
5:14.
confronted
109:12.
connection
59:3,
75:17.
consent 93:19,
102:16.
consider 8:6,
18:18, 51:8,
72:22.
considered
9:25,
72:19.
conspiracies
56:10.
conspiracy
56:16,
56:18.
consulting
81:17, 82:7,
82:14, 83:8,
83:12,
93:11.
CONT'D 2:1.
contact 33:12,
50:13.
contacted
52:14,
69:7.
contacting
69:11.
contain
39:11.
contains
39:12.
content 73:10,
76:16,
105:18.
contents 70:14,
74:5, 76:18,
86:1.
context 54:5,
84:5.
continually
60:5.
Contitution
2:15.
contract

61:2.
contracts
59:6.
contradicts
76:12,
76:20.
convenience
113:1.
conversation
50:7, 75:12,
83:5, 93:5.
conversations
88:17,
91:3.
convey 89:20.
convince
50:10.
Cook 5:25.
cooperate 30:8,
32:2, 33:9.
cooperating
30:5.
cooperation
32:5, 33:5,
33:12.
cooperator
31:16, 32:4,
32:18.
coordinations
29:21.
copied 87:10.
copies 67:1,
97:16, 97:18,
97:22.
copy 40:14,
40:20, 47:7,
47:12, 66:24,
67:19, 80:11,
103:24,
103:25,
112:16,
114:8.
correct.
40:21.
correctly
91:25.
corresponding
29:6.
Counsel 5:4,
5:6, 5:22,

15:6, 21:2,
24:11, 30:11,
31:4, 31:7,
31:12, 44:10,
45:4, 57:2,
63:12, 66:18,
74:1, 89:1,
91:22, 96:6,
112:24,
113:2.
counts 51:10,
51:15, 58:2,
58:3,
62:13.
couple 81:20,
82:3.
course 8:19,
12:12, 30:3,
37:10, 37:23,
55:3, 56:1,
58:23, 66:7,
84:10, 89:16,
113:25.
court. 12:11,
18:13, 33:19,
76:24, 89:18,
93:3, 97:1.
courtroom
47:4.
courtroom.
7:18, 18:25,
19:7, 26:16,
41:25, 48:1,
97:10.
covered 15:22,
15:23, 33:23,
34:2.
crazy 53:17.
credit 26:24,
27:14, 27:15,
27:23, 27:25,
35:5, 35:7,
83:22, 84:9,
84:13.
crime 51:9,
86:15.
crimes 61:16,
100:2, 100:5,
100:23,
101:6.

CRIMINAL 1:5,
  32:18.
cross 23:11.
CROSS-EXAMINATI
  ON 7:23, 8:1,
  12:2, 12:3,
  16:6, 85:4.
cross-examined
  9:10, 15:6,
  16:9.
crossed
  86:14.
currently
  75:20.
cursory 72:8,
  101:4.
cut 95:4.
cyber 64:18.
cycle 9:3.
.
.
< D >.
dagger 58:12.
dangerously
  57:9,
  57:12.
data 84:1,
  84:24.
date 39:17,
  50:18, 90:10,
  113:14,
  113:20,
  113:21,
  114:10,
  114:16.
dates 29:9.
David E. Kenner
  1:39.
Davis 34:23,
  38:8, 39:4,
  59:3, 60:11,
  61:14.
day 4:18,
  28:18, 36:20,
  54:17, 62:6,
  68:17.
days 52:25,
  69:24.
DEA 65:5.
deal 24:9,

24:23, 25:9,
  42:19,
  102:9.
dealing 25:10,
  43:13.
debt 26:24.
debts 8:24,
  83:23,
  84:9.
December
  17:20.
decent 52:3,
  57:23.
decide 20:2,
  96:2.
decided 34:10,
  107:7,
  107:19,
  110:7.
decision 62:9,
  107:25.
decisions 43:9,
  49:11,
  104:23.
declarant
  116:12.
Defendant 1:12,
  1:39, 2:5,
  48:5, 66:18,
  111:5, 111:7,
  111:8,
  113:23.
Defense 6:14,
  14:5, 14:8,
  14:9, 15:6,
  17:23, 21:4,
  30:11, 42:21,
  42:22, 45:4,
  48:21, 68:1,
  88:12, 88:24,
  89:1, 98:20,
  99:7, 111:24,
  112:24,
  113:2, 113:9,
  115:5,
  116:13.
definitely 7:8,
  7:10,
  117:25.
degree 23:20.

delete 43:19.
deleted 44:3.
deleting
  44:1.
deny 51:6,
  91:1.
Department
  1:26, 1:33,
  62:10, 64:3,
  64:15, 64:22,
  65:2, 65:3,
  65:19, 66:6,
  71:6, 78:15,
  79:23, 80:4,
  84:20, 86:16,
  90:18,
  93:15.
depend
  116:11.
depends 23:20,
  58:21.
deported
  39:16.
deposit
  103:22.
deputy 73:3.
descendants
  53:8.
desire 51:24.
desk 62:7.
detail 10:25.
details 72:14,
  90:24.
determination
  28:16.
determine 8:17,
  9:6, 12:20,
  27:22.
develop 23:17,
  44:20,
  44:21.
developing
  25:21.
device 86:2.
devices 70:24,
  86:7, 86:8.
devising
  33:5.
Dicaprio
  49:8.

difference
  101:16.
different
  11:16, 11:18,
  20:19, 21:19,
  56:9, 70:20,
  70:21, 71:22,
  77:5, 89:2,
  100:16,
  108:15,
  113:14.
difficult
  115:15.
difficulties
  86:24.
DIRECT 10:6,
  63:21, 64:10,
  64:21.
Directing 32:7,
  65:25.
directly 54:16,
  92:23.
discovered
  77:21.
discrepancy
  87:3, 92:8.
discrete
  57:16.
discuss 45:16,
  45:17, 74:7,
  77:2, 97:12,
  103:25,
  115:19,
  117:23.
discussed 6:10,
  9:4, 14:19,
  15:16, 55:25,
  90:5.
discussing
  16:12, 77:6,
  92:5, 98:25,
  102:5,
  108:19,
  115:24.
discussion
  18:23, 31:12,
  69:24, 85:23,
  86:20, 94:14,
  97:4, 100:11,
  104:2, 107:7,

115:17.
discussions
  59:13, 77:14,
  94:24,
  110:14.
dismiss 42:5,
  42:8.
dispute 87:8.
District 1:1,
  1:2, 1:19,
  2:13, 2:14.
document 14:14,
  32:20, 38:7,
  38:11, 38:19,
  38:24, 39:3,
  39:8, 39:11,
  39:12, 41:8,
  41:11, 70:8,
  70:9, 70:14,
  70:16, 74:1,
  103:21.
documents
  38:18, 38:20,
  68:20,
  69:3.
doing 21:20,
  22:18, 24:6,
  24:25, 25:15,
  45:6, 51:7,
  57:5, 61:24,
  61:25, 77:21,
  87:12, 87:14,
  88:22, 89:3,
  112:19.
DOJ 66:8, 73:4,
  75:16, 76:5,
  77:20, 77:22,
  80:3, 80:18,
  100:19,
  114:6,
  114:7.
dollar 49:24.
dollars 8:15,
  27:14, 28:15,
  34:17, 34:20,
  51:3.
done 22:10,
  33:11, 53:3,
  59:6, 62:10,
  89:14,

91:5.
door 32:5.
Dorn 28:19.
double 71:18.
double-check
  21:21.
doubt 62:15.
down 7:19,
  8:24, 18:14,
  26:17, 27:14,
  27:16, 27:24,
  37:9, 41:14,
  41:15, 46:24,
  62:5, 62:8,
  63:9, 78:22,
  81:10, 89:8,
  90:7, 90:8,
  109:18,
  109:23,
  110:1.
download
  102:17.
drafted
  102:15.
Drive 38:8,
  39:4, 44:2.
drop 39:21.
dropped 5:19.
Drug 65:6,
  65:7.
duly 63:4.
During 30:3,
  37:22, 54:6,
  55:3, 58:4,
  65:12, 68:5,
  90:21, 103:3,
  103:6.
Dutta 5:2, 5:3,
  5:19, 5:21,
  7:11.
  .
  .
< E >.
e-mail 5:7,
  30:24, 31:1,
  31:2, 31:21,
  38:19, 38:23,
  46:25, 47:1,
  47:3, 70:24,
  73:2, 73:8,

73:9, 73:10,
  73:12, 73:14,
  73:15, 73:18,
  74:9, 74:13,
  74:17, 75:11,
  78:7, 78:11,
  85:20, 85:25,
  86:8,
  97:19.
e-mails 88:17,
  88:24,
  100:13,
  105:17,
  105:20.
earlier 10:5,
  45:8.
early 17:15,
  37:4, 58:15,
  97:4,
  107:6.
easier 18:23,
  40:9, 53:25,
  54:22.
easy 51:1.
eat 117:13.
educational
  49:3.
effectuate
  61:17.
efforts 18:11,
  33:1.
Either 20:2,
  34:23, 41:18,
  45:4, 77:13,
  83:15, 84:13,
  95:12.
elect 50:9.
elected
  17:20.
election 13:3,
  13:5, 13:20,
  13:23, 14:1,
  18:2, 51:15,
  54:17.
electronically
  42:10,
  43:2.
element
  44:17.
elements 57:15,

79:14.
elicit 10:10,
  10:11,
  55:24.
Elliott 59:4,
  59:7, 59:15,
  60:12, 60:13,
  60:14, 60:19,
  60:25, 61:5,
  61:6.
embassy 66:2,
  66:5, 68:16,
  69:5, 69:8,
  69:11, 69:16,
  70:10, 70:12,
  71:1, 71:3,
  71:8, 71:9,
  79:13.
Emily 39:24,
  41:5.
emphasize
  51:19.
employed 64:2,
  65:10, 65:12,
  65:14,
  65:17.
employee 65:19,
  75:16,
  76:5.
employees
  64:22, 65:1,
  80:6, 86:6,
  90:18.
employment
  60:6.
Encino 1:43.
encounter 50:2,
  51:24.
end 25:4, 25:5,
  25:10, 25:11,
  40:25, 42:21,
  51:20,
  117:24.
ended 53:6.
enforced 58:4,
  58:8.
Enforcement
  65:6, 65:8.
engage 60:24.
engaged 81:6,

81:17.
engaging
   49:9.
enlarge
   104:3.
enlarged 36:2,
   68:11.
enormous 50:16,
   52:20,
   52:21.
enough 48:24,
   89:1.
ensued 50:7.
entails
   64:15.
entered 7:18,
   26:16, 48:1,
   59:10.
entertainers
   51:21.
entertainment
   50:24.
entirely
   66:11.
entirety 21:2,
   24:11,
   45:11.
entities
   35:1.
entitled 86:8,
   88:21.
entre 59:19.
entry 43:19.
erroneously
   43:15.
escort 55:11.
especially
   92:25.
Esquire 1:25,
   1:31, 1:32,
   1:39, 1:40,
   2:5.
essential
   72:13.
essentially
   65:21.
established
   68:19.
estate 50:20.
et 6:7, 20:12,

23:10, 46:2,
   50:25, 70:25,
   72:15, 88:24,
   92:18,
   102:3.
evaluation
   10:1.
evening 24:3.
event 9:23,
   9:24, 10:23,
   52:25, 53:1,
   53:4, 53:11,
   53:13, 53:20,
   53:24, 54:3,
   54:10,
   57:23.
events 58:1.
eventually
   93:19.
everybody
   30:20, 47:17,
   50:15, 62:25,
   63:11, 68:6,
   104:1.
everyone 4:2,
   7:19, 7:20.
everything
   16:22, 72:16,
   72:22, 83:25,
   97:25,
   102:9.
evidently
   18:5.
exact 112:23,
   117:12.
exactly 6:3,
   16:22, 45:23,
   62:11,
   78:12.
EXAMINATION
   16:21, 34:12,
   63:21.
examined
   63:4.
exception 91:6,
   95:20,
   106:24,
   108:13,
   109:8, 109:9,
   109:19,

116:15.
excerpts 21:4,
   22:12,
   24:15.
excluded 31:17,
   32:6, 88:5.
exclusively
   106:8.
exculpatory
   44:22.
Excuse 40:16,
   44:15, 98:22,
   103:4,
   105:24,
   117:9.
excused
   117:20.
Executive
   62:9.
exhausted
   68:19.
exhibits 14:12,
   30:14, 41:18,
   66:21, 66:24,
   67:9, 67:15,
   68:7, 68:8,
   97:16, 99:14,
   99:17, 117:1,
   117:12.
existed
   56:17.
expect 68:5.
expected
   48:15.
expecting
   16:7.
expenses 8:24,
   27:19, 27:23,
   34:25, 37:14,
   37:24.
expert 28:19.
extensive 12:2,
   16:21.
extensively
   9:10, 15:22,
   16:8.
extent 84:23,
   102:17.
extra 66:20,
   67:19,

97:16.
extraordinary
   96:12,
   99:19.
.
.
< F >.
F. 1:31.
F.3d 23:15.
fact 8:6,
   17:10, 50:10,
   71:3.
facts 55:7,
   84:2, 93:25,
   94:2, 94:4,
   95:7.
factually
   102:21.
failure
   58:12.
fair 29:4.
fairly 57:16.
fall 64:23.
falls 65:3.
familiar
   20:13.
famous 49:5.
far 18:5,
   21:21, 96:11,
   116:23.
FARA 31:22,
   56:14, 56:18,
   56:21, 58:2,
   58:3, 59:15,
   59:17.
father 54:7,
   54:9.
favorable
   22:13.
FCRR 2:11,
   118:4.
federal 100:2,
   101:6.
feeling 4:4.
felt 51:3,
   72:20.
female 41:5.
few 9:5, 33:22,
   69:24,
   117:9.

fiddle 117:12.
figure 47:25, 96:13, 98:5, 107:23, 116:25, 117:14.
figuring 24:19.
filed 28:19, 29:11, 42:10, 43:2, 58:14.
fill 16:23.
finance 16:1.
financial 28:18, 29:6, 29:13, 49:14, 84:14, 84:21, 86:24, 100:1, 100:23, 101:5, 102:3.
financing 50:19.
find 27:18, 37:11, 37:22, 59:23, 72:16, 84:8, 113:1.
fine 26:15, 44:6, 45:21, 62:23.
Finish 23:11, 23:12, 63:12.
finished 78:21.
fired 86:15.
Firm 1:41.
first 9:11, 15:4, 15:13, 16:20, 20:20, 24:23, 38:22, 40:15, 46:22, 49:22, 49:23, 51:15, 60:8, 62:18, 63:4, 72:19, 79:18, 79:21, 82:23,

85:23, 86:9, 90:11, 105:1, 108:22, 112:11, 112:13, 117:14.
fits 91:5.
five 4:13, 10:23, 41:22, 52:25, 53:1, 53:6, 117:9.
fixer 60:17, 60:18.
flagged 22:21, 84:24.
Flash-forward 53:23.
fleshed 84:23.
fleshing 85:1.
flew 9:22, 12:13.
flow 28:3.
fly 24:25.
focus 9:22.
focused 43:7, 100:11.
following 12:11, 18:13, 33:19, 76:24, 89:18, 93:3, 97:1.
follows 63:5.
foreclosure 83:23, 84:10, 84:14.
foregoing 118:5.
foreign 11:24, 11:25, 59:11.
forensic 64:19.
forfeiture 58:13.
forget 114:14.
Forgive

60:15.
forgot 7:4.
form 80:23, 81:14, 83:21, 114:15.
formal 84:3.
former 93:12, 93:13.
forth 16:8, 106:22.
fortunate 48:24.
forum 65:13.
forward 17:7.
found 38:7, 39:4, 48:24, 72:5, 84:12, 101:5.
four 67:17.
frame 65:18.
Frank 9:2, 9:6, 9:20, 9:22, 10:4, 11:1, 12:13, 12:20, 18:4, 18:8, 20:23, 21:18, 23:10, 45:2, 45:10, 46:13, 53:10, 53:24, 54:7, 54:12, 54:15, 54:16, 54:19, 54:25, 55:10.
frankly 10:4, 16:18, 18:12, 43:6, 44:21, 76:3, 76:15, 76:17, 87:3, 96:10, 99:16, 103:11.
fraud 61:16, 65:1.
friend 52:2, 52:15, 53:19, 69:25.
front 68:21, 96:1.
Fugees 48:25.
full 10:13, 44:17, 45:23,

115:25, 117:13.
fully 24:16, 90:25.
Fund 8:15.
fundraiser 9:3, 10:22, 51:17, 52:23, 52:24, 53:9.
fundraising 9:23, 9:24, 54:10, 57:23, 59:19.
funds 8:22, 27:11, 27:12, 28:8, 28:13, 36:12, 36:13, 36:15, 36:16, 37:2, 37:4, 37:5.
.
.
< G >.
game 51:19.
gather 72:5.
gathering 85:20.
gave 67:7, 67:11, 87:1, 91:16, 103:10.
General 41:9, 61:20, 62:3, 64:4, 64:24.
generally 39:10, 64:24.
generated 80:12, 80:14.
gentlemen 48:11, 62:12, 97:2.
George 58:17, 66:8, 66:13, 69:4, 69:14, 69:21, 72:3.
gesture 41:5.

gets 23:23,
   33:14, 67:15,
   87:15,
   87:21.
getting 5:13,
   20:15, 20:16,
   24:7, 30:4,
   32:5, 46:19,
   52:12, 55:2,
   57:4, 58:7,
   61:3, 82:9,
   83:19, 86:3,
   88:23, 91:3,
   94:19, 96:22,
   105:12,
   106:4,
   110:12,
   110:13.
gifted 57:20.
Giuliani
   60:1.
give 21:20,
   22:16, 30:21,
   47:4, 62:7,
   67:12, 67:17,
   87:1, 87:18,
   87:19,
   104:15,
   112:16,
   114:6,
   115:2.
given 17:5,
   20:23, 45:1,
   67:5, 84:5.
giving 51:2,
   107:18.
goal 32:2.
good-faith
   41:5.
Google 38:8,
   39:4.
governments
   39:14.
grand 9:20,
   10:10, 10:13,
   11:3, 11:6,
   17:7, 18:6,
   18:18, 19:10,
   19:11, 19:22,
   19:23, 19:24,

20:3, 20:5,
   20:6, 20:22,
   21:3, 21:10,
   23:11, 23:17,
   23:23, 23:25,
   24:12, 24:24,
   26:1, 43:7,
   45:2,
   45:23.
Great 63:1.
greedy 51:8.
Gregg 73:2.
grew 49:2.
ground 55:2.
grounds 34:6,
   80:22,
   110:9.
Group 36:5,
   106:1.
growing
   48:23.
guess 22:23,
   90:8,
   95:11.
guilty 56:20,
   86:15.
Guo 39:13,
   39:16, 39:19,
   61:7, 61:11,
   61:14,
   61:17.
.
.
< H >.
H-a-r-r-y
   64:1.
Haitian 52:3,
   53:8,
   57:23.
half 10:22,
   113:23,
   115:7.
hand 83:25,
   84:4, 84:6.
handed 67:13,
   87:19, 114:8,
   115:4.
hands 67:20.
hang 108:16.
happened 61:15,

69:24,
   103:8.
happening
   53:7.
happy 22:21,
   52:12,
   106:19.
hard 62:14,
   87:17, 97:18,
   114:4.
Harry 63:3,
   64:1.
HASKELL 2:5,
   2:7, 97:19.
hats 64:18.
He'll 4:14,
   25:4,
   31:23.
head 29:20.
heading 15:8.
Headnote
   23:15.
hear 9:15,
   30:25, 34:9,
   46:11, 57:11,
   63:14, 63:17,
   104:9,
   104:22,
   105:15,
   106:23,
   115:16.
heard 48:15,
   53:14, 63:10,
   80:24, 81:15,
   91:7, 93:23,
   115:21.
hearing 79:23,
   80:23,
   81:15.
hearings
   43:13.
heavily
   50:23.
held 53:24.
hello 50:6.
help 22:10,
   30:8, 49:10,
   114:7.
helpful 22:15,
   66:23,

112:15.
hereby 118:4.
Heuch- 15:19.
Heuchling 8:3,
   9:10, 10:10,
   10:12, 11:22,
   12:3, 15:6,
   15:25, 19:1,
   30:24, 31:3,
   31:7, 32:16,
   34:14, 36:9,
   38:14, 40:15,
   40:23.
hiding 61:23.
high 66:24.
highlighted
   76:12.
highlights
   39:17.
Hill 48:25.
Hilton 50:18.
hire 49:10,
   49:11.
hired 49:12,
   49:13.
history 83:22,
   84:9,
   84:21.
hit 31:23.
Hold 11:2,
   77:13, 88:6,
   88:10,
   104:8.
home 53:24,
   54:1, 97:3.
honest 90:25.
Hong 39:14.
HONORABLE
   1:18.
hope 4:7,
   45:6.
hopefully 10:6,
   22:3.
hostages
   41:10.
hostile
   85:12.
hotels 52:10.
hours 15:7,
   86:15.

House 15:11,
  19:15,
  54:7.
Huang 39:24,
  41:6.
human 79:23,
  80:4, 80:5.
hundred
  28:15.
hundreds 27:13,
  51:3.
husband 61:3.
Husseiny 53:19,
  53:21.
.
.
< I >.
idea 20:11.
identification
  14:13,
  99:24.
identify 30:7,
  112:25.
imaging
  85:21.
immediately
  41:3, 41:6,
  104:23,
  117:2.
immunize 17:7,
  18:5,
  19:19.
impact 81:17.
impeach 75:21,
  76:20, 86:13,
  92:8,
  92:18.
implication
  33:8.
important
  26:7.
importantly
  29:16, 75:24,
  89:3,
  99:14.
in. 18:10,
  21:14, 45:24,
  77:10, 98:6,
  102:22.
inadmissible

31:3,
  32:21.
inappropriate
  33:13,
  89:6.
include 44:11,
  44:23, 73:18,
  86:8.
included 73:22,
  77:24, 79:16,
  103:16.
including
  32:19, 62:25,
  67:2, 78:1,
  103:21.
inconsistency
  75:21,
  76:14.
inconsistent
  32:20, 32:23,
  75:5, 75:25,
  76:2, 92:17,
  109:12.
incorrect
  60:15, 66:12,
  102:21.
incredibly
  49:21.
Indiana 2:8.
indicate 4:19,
  21:9, 25:5,
  78:21,
  91:25.
indicated 5:22,
  15:22, 18:6,
  19:20, 25:19,
  27:3, 27:4,
  32:12, 33:1,
  33:12, 33:14,
  40:21, 42:15,
  45:20, 46:3,
  68:7, 69:1,
  69:4, 70:6,
  88:25, 92:2,
  107:11.
indicates
  11:15, 70:19,
  75:11, 76:4,
  100:22.
indicating

28:3,
  43:19.
indication
  37:11,
  37:22.
indications
  84:12,
  84:13.
indicted
  33:9.
indictment
  29:5, 29:10,
  29:13, 31:17,
  42:8, 51:9,
  51:10,
  56:25.
individuals
  8:21.
influence 49:3,
  61:3, 64:13,
  65:23.
inform
  101:10.
informed
  102:18.
initial 22:9,
  59:22, 71:17,
  71:20, 72:16,
  116:13.
initiated 64:7,
  64:12.
initiation
  64:16.
inquire 45:7,
  82:2, 86:3.
inquired
  79:13.
inside 19:15,
  73:5.
insider 64:20,
  71:25, 72:2,
  72:20, 72:23,
  84:18,
  100:19.
insiders
  84:19.
Inspector 64:4,
  64:24.
instance 9:9.
instances

27:9.
Instead 16:8,
  46:23,
  96:23.
Integrity 1:34,
  73:4.
intelligent
  115:17.
intend 46:14.
intending
  108:12,
  115:13.
intent 44:17.
intercom 18:24,
  110:15.
interest 84:2,
  95:21, 96:3,
  100:1,
  100:13,
  100:21,
  100:23,
  101:5,
  108:14,
  109:5, 109:9,
  109:16,
  112:6,
  115:24,
  116:8.
interested
  100:12,
  104:14,
  106:12.
interests
  30:4.
internal
  64:21.
International
  80:7, 80:25,
  81:16,
  83:6.
Interpol
  39:18.
interpretation
  22:14.
interruptions
  77:2.
interview
  90:14, 90:22,
  91:10, 92:13,
  101:12,

102:15,
102:19,
102:24,
103:3, 103:6,
103:10,
108:10,
108:18,
108:21,
109:13,
109:15,
111:23,
112:12,
112:13,
113:11,
113:24,
114:15,
114:21,
115:6,
115:7.
interviewed
72:19, 73:1,
79:19, 80:3,
85:19, 90:11,
102:14.
interviewing
101:15.
interviews
74:24, 80:13,
111:18.
introduce
10:12.
introduced
53:5, 55:25,
58:16, 58:17,
60:16.
introduction
49:22, 49:23,
103:7.
invested
50:23.
investigating
64:25, 71:4,
90:14,
100:18.
investigation
8:6, 8:17,
8:19, 12:12,
29:22, 30:1,
30:3, 30:6,
30:7, 30:9,

31:10, 32:19,
37:11, 37:23,
64:13, 64:16,
65:18, 65:24,
66:7, 71:11,
71:24, 72:22,
81:3, 84:25,
87:21, 87:22,
89:4, 93:24,
101:17.
investigations
30:2, 64:18,
64:19, 85:22,
90:17.
investigative
72:16.
investigator
9:25, 12:19,
65:21, 67:18,
85:2.
investigators
64:5.
invitation
54:2.
Invitations
53:3.
involve
49:16.
involved 51:24,
72:10, 80:5,
100:5.
involvement
59:22, 71:4,
91:19.
involving
17:9.
irrelevance
32:12.
irrelevant
32:3.
irrespective
17:10.
Israely 1:40,
66:22.
issue 14:18,
15:12, 17:2,
18:23, 19:11,
20:19, 22:22,
23:3, 23:8,
23:10, 23:23,

24:15, 24:23,
25:17, 32:4,
41:23, 43:7,
45:2, 45:18,
46:4, 58:20,
89:2, 91:15,
108:15,
115:19,
117:22.
issues 4:11,
25:21, 45:22,
46:2, 57:5,
68:8, 77:5,
81:8, 88:23,
91:14, 97:7,
98:25.
It'll 26:7.
items 95:6.
itself 39:3.
.
.
< J >.
James 58:10.
Jean 49:1.
Jeff 40:7,
40:24, 40:25,
61:20.
Jersey 48:24.
jewelry
50:17.
job 80:17.
Joe 50:5,
52:2.
Joel 50:5,
52:5, 52:11,
53:25, 59:22,
60:11.
John D. Keller
1:25.
Jonathan
73:3.
JUDGE 1:19,
77:4.
July 90:12,
90:21,
101:11,
102:24,
103:6, 103:7,
103:8, 103:9,
103:12,

113:6,
113:15,
113:22,
114:17,
115:6.
jump 30:18.
June 52:23.
JURORS 4:8,
6:24, 7:13,
7:21, 48:3,
48:12.
Justice 1:26,
1:33, 62:10,
64:3, 64:15,
65:20, 66:6,
78:15, 79:23,
93:16.
.
.
< K >.
Keep 11:12,
12:8, 14:23,
18:7, 44:10,
55:5, 67:14,
67:15.
Keller 5:17,
5:22, 6:11,
81:22, 95:3,
102:1, 103:5,
104:5,
104:10,
106:5, 108:7,
109:7,
110:16,
112:2, 114:8,
115:2,
115:18.
Kelly 5:25.
kept 8:18.
key 90:24.
kind 58:11,
58:12,
61:22.
kinds 39:10.
knowing
72:23.
known 60:23,
78:4.
knows 82:17.
Kong 39:14.

Kravis 73:3.
.
< L >.
L-i-d-s-k-y
  64:1.
lacked 72:13.
Ladies 48:11,
  62:12,
  97:2.
land 24:14.
Laogumnerd
  28:4, 28:7,
  28:10, 28:11,
  28:14.
laptop 86:2.
large 49:21.
Las 12:21.
Last 5:19,
  6:15, 26:21,
  28:2, 30:17,
  34:16, 38:3,
  40:16, 77:19,
  90:5.
late 17:14,
  36:14,
  95:22.
later 4:19,
  21:8, 26:8,
  26:10, 26:13,
  26:14, 69:24,
  88:20,
  93:18.
Laughter.
  82:22.
laundering
  56:20,
  56:23.
Lauryn 48:25.
Law 1:41, 2:6,
  34:21, 51:15,
  57:3, 58:3,
  59:4, 59:6.
lawful 56:11.
lawyer 49:12,
  59:23, 59:24,
  91:1.
lawyers 22:17,
  49:11,
  60:7.

lead 12:19,
  64:5,
  65:21.
Leading 85:3,
  85:14.
learn 9:2,
  66:8, 77:24,
  93:18.
learned 69:23,
  71:1, 71:11,
  80:20.
least 18:5,
  45:6, 76:18,
  81:11, 85:23,
  85:25, 90:24,
  98:2, 101:19,
  103:15.
leave 22:13,
  25:21, 25:25,
  76:7,
  104:19.
leaving 96:23,
  108:16.
led 64:7,
  64:12.
left 18:25,
  19:7, 33:10,
  33:15, 41:25,
  44:11, 53:17,
  62:6, 68:10,
  97:4,
  97:10.
legal 18:23,
  41:23, 44:10,
  46:3, 47:18,
  51:13, 57:4,
  61:2, 77:5,
  77:8, 77:11,
  88:11, 88:24,
  91:14, 93:7,
  93:11, 93:16,
  97:7, 98:25,
  105:13,
  110:5,
  112:18,
  115:19,
  116:24,
  117:11,
  117:22.
Legally 83:4,

105:12,
  105:19,
  112:5.
Legislative
  80:9.
legitimate
  37:13,
  37:17.
length 5:15.
Leonardo
  49:8.
less 17:17,
  55:7.
letter 40:10,
  40:13, 40:14,
  40:20, 40:25,
  41:9.
letter. 41:7.
levels 80:21.
levied 39:13.
liberty 65:13,
  65:14.
Lidsky 4:17,
  5:24, 62:19,
  62:20, 63:2,
  63:3, 63:23,
  64:1, 81:8,
  88:16, 95:6,
  97:11,
  100:18,
  101:3,
  101:11,
  101:14,
  102:2,
  102:14,
  102:18,
  105:25,
  108:11,
  108:22.
lie 91:18.
lied 90:22,
  92:2.
life 49:4,
  49:16,
  51:23.
light 60:13,
  100:23,
  101:6.
likely 42:16,
  77:24.

limine 88:5.
line 6:24,
  33:17, 57:10,
  57:13.
lined 47:10.
list 4:9, 6:1,
  14:16, 30:15,
  66:20, 66:21,
  67:10, 97:17,
  106:25.
listed 6:1.
Listen 77:7,
  77:11,
  114:13.
listened 93:22,
  115:18.
listening 94:5,
  95:6,
  100:15.
literally
  51:2.
little 24:7,
  28:2, 62:24,
  64:14, 72:12,
  95:22.
lived 50:21.
LLC 27:10.
LOCKHART 1:32,
  10:3, 11:9,
  15:3, 17:3,
  20:25, 32:13,
  34:15, 35:12,
  36:7, 36:9,
  36:19, 36:22,
  37:8, 37:10,
  38:10, 38:14,
  39:1, 39:3,
  39:5, 39:7,
  39:20, 39:22,
  45:8,
  45:25.
log 88:19,
  89:14.
long 25:7,
  31:25, 45:10,
  51:20, 85:16,
  90:6.
looked 8:19,
  24:25, 35:2,
  88:14.

looking 31:15,
38:14, 38:18,
39:3, 44:22,
52:7, 56:5,
74:14, 86:1,
116:5,
117:3.
looks 106:9,
114:24,
115:5.
lot 6:25,
11:13, 26:3,
49:5, 53:4,
60:3.
lots 21:19,
52:10.
love 111:19.
Lucky 27:11,
28:9, 36:17,
37:5,
57:24.
Lum 34:23,
38:7, 39:4,
59:2, 60:11,
61:13.
lunch 96:8,
96:12, 96:23,
97:3, 97:9,
107:6, 108:5,
117:13,
117:16,
117:19.
.
.
< M >.
machinations
61:5.
mail 95:16.
Maisel 73:2.
man 48:23,
49:2, 49:4,
49:23.
manager 49:14,
64:20.
manner 77:23.
Marc 106:9.
March 37:12.
Mark 27:11,
28:9, 36:17,
37:5, 40:5,

57:24,
67:23.
marked 14:13,
38:1, 99:24,
111:23,
113:22.
massive
61:16.
match 29:6,
38:22.
material
24:24.
materials 56:6,
97:17.
matter 17:1,
24:20, 81:1,
81:24, 89:21,
106:16,
116:13,
116:15,
118:6.
matters 43:14,
60:20, 65:3,
103:20.
Mayor 60:1.
Mcmaster
5:25.
mean 9:14,
10:2, 11:5,
12:8, 13:15,
21:7, 21:17,
21:19, 30:14,
42:24, 45:20,
48:19, 70:20,
76:6, 82:1,
86:22,
109:15,
114:4.
meantime
116:24.
measures
19:15.
meeting 49:19,
50:3, 59:4,
61:19, 61:21,
62:2, 66:9,
66:14, 66:15,
68:17, 69:6,
69:8, 70:1,
71:10, 72:14,

72:15, 78:4,
79:14, 80:2,
86:25,
100:19,
100:22,
103:12,
108:22.
member 66:5.
Members 76:25,
90:18.
memo 73:19,
73:22, 74:5,
74:16, 74:20,
74:21, 75:2,
75:5, 75:7,
76:12, 76:16,
76:17.
memory 13:15,
68:19.
mentioned
38:6.
mentor 51:18.
merely 84:24.
message 104:13,
104:15,
104:22,
105:3.
messages 95:15,
95:17, 95:18,
98:9, 98:11,
100:12,
100:14,
103:20,
103:24,
105:11,
105:17,
106:7, 106:9,
106:10,
106:22,
108:2,
108:16.
met 9:7, 48:25,
49:18, 62:6,
72:7, 75:13,
75:14, 78:1,
79:9,
86:10.
Miami 9:7,
9:23, 10:22,
12:13, 17:25,

52:23.
microphone
42:6, 63:11,
78:8,
103:18.
middle 7:22,
63:16,
97:11.
million 8:8,
8:11, 8:13,
8:15, 13:3,
13:4, 13:7,
13:19, 28:15,
49:24, 50:20,
54:15, 54:18,
60:2.
millions 34:17,
34:20,
51:3.
mind 13:10,
44:10,
101:11,
101:13,
101:14,
101:18,
102:2,
102:14,
102:18,
103:12,
104:5.
mine 82:24.
minimal
72:17.
Minister
61:9.
minute 43:18,
88:10.
minutes 18:22,
117:10,
117:16,
117:18.
minutia 87:6.
mischaracter-
57:3.
mischaracterize
s 27:2,
56:24.
misconduct
32:7, 65:1,
88:4, 88:7.

missed 107:2.
missing 4:8,
   6:21, 6:24.
misstating
   57:2.
mistaken 76:6,
   108:18.
misunderstandin
   g 72:25.
mobile 64:19,
   86:2.
Mohammed 53:19,
   53:20.
moment 18:16,
   62:21, 67:21,
   75:9, 104:11,
   104:20,
   111:2.
momentarily
   46:14.
Morning 1:13,
   4:2, 4:3,
   4:14, 7:20,
   7:21, 8:3,
   8:4, 8:5,
   17:5, 18:21,
   34:14, 34:15,
   41:22, 48:2,
   48:3, 48:11,
   48:12, 63:23,
   63:24,
   96:24.
Moscowitz
   106:9.
motion 5:8,
   42:2, 88:5.
motions 25:5,
   25:14.
motivations
   23:22,
   24:6.
motive 23:16,
   23:18, 24:13,
   44:13,
   84:18.
motives 24:13,
   44:15, 44:21,
   46:2.
Move 20:22,
   22:2, 25:14,

29:2, 29:17,
   34:11, 40:16,
   42:5, 42:7,
   51:1, 55:4,
   56:4, 56:8,
   57:6, 58:2,
   62:23, 62:24,
   68:3, 68:8,
   79:1, 79:2,
   87:25, 90:9,
   94:6, 94:8,
   102:22,
   103:14,
   107:3,
   107:14,
   107:20.
moved 8:23,
   16:13,
   34:22.
movie 50:17.
movies 50:25.
Moving 29:20,
   40:21,
   100:3.
MR. HASKELL
   97:24.
Mulryne 1:31.
multiple 27:9,
   55:24, 64:18,
   90:22.
.
.
< N >.
name 35:6,
   35:8,
   63:25.
named 39:24.
names 60:5.
nature 87:21.
necessary
   49:15.
needed 59:20.
needs 6:9,
   67:8, 67:14,
   67:22,
   69:1.
neighborhood
   60:2.
nervous 5:15.
New 1:27, 1:35,

9:24, 14:11,
   17:25, 33:24,
   48:23, 50:5,
   59:19, 61:15,
   97:25, 98:1,
   99:14.
next 30:18,
   31:20, 36:20,
   62:6, 82:1.
Nickie 59:2,
   60:11,
   61:13.
Nicole 1:32.
nightclub
   49:19.
nightclubs
   52:11.
No. 1:5, 11:5,
   28:24, 34:22,
   40:6, 41:6,
   114:2,
   115:1.
nobody 59:18,
   61:2,
   99:11.
None 43:24,
   58:1,
   113:25.
nonresponsive
   40:17.
normal 72:15,
   85:22.
notably 8:22.
note 11:21,
   17:4.
notes 73:11,
   73:13.
Nothing 41:13,
   71:14, 75:22,
   91:19,
   95:15.
Notice 39:19,
   44:1, 44:3,
   61:16.
notified
   71:6.
notwithstanding
   45:8.
November 17:14,
   17:20,

54:18.
Number 35:15,
   76:10, 92:3,
   110:21,
   114:6,
   114:7.
numbers 8:14,
   98:18.
NW 1:27, 1:35,
   2:8, 2:15.
.
.
< O >.
oath 90:14.
Obama 8:9,
   8:14, 9:2,
   13:2, 13:5,
   13:19, 17:19,
   17:24, 20:13,
   51:17, 51:25,
   52:16, 52:19,
   54:11, 54:17,
   55:11.
Object 14:7,
   21:23, 95:4,
   108:14.
objecting
   95:5.
objections
   34:6, 93:4.
objects
   77:15.
obligated
   86:7.
obligation
   113:2.
observed 51:2,
   88:17.
obtaining
   86:1.
obvious 96:9.
Obviously 5:15,
   20:4, 25:1,
   26:11, 42:19,
   42:24.
occasions 18:1,
   90:22.
occurred 66:4,
   66:10.
October

37:13.
offense
  57:15.
offering
  105:13,
  105:16.
Office 34:21,
  59:4, 62:6,
  64:4, 64:18,
  64:24, 71:6,
  80:6, 80:9,
  80:24, 81:16,
  83:6,
  85:22.
Offices 2:6.
Official 2:12,
  118:10.
OIA 75:15.
OIG 64:15,
  64:25,
  86:7.
okayed 54:8.
old 49:5,
  85:12.
omission
  56:15.
omitted
  90:24.
once 9:23,
  10:6,
  25:13.
ones 5:25,
  97:25, 98:1,
  106:13,
  114:20.
open 12:11,
  18:13, 33:19,
  44:11, 71:24,
  72:22, 75:18,
  76:24, 84:7,
  84:10, 89:18,
  93:3, 97:1.
opening 25:15,
  25:20, 44:10,
  44:19, 44:24,
  45:4, 45:14,
  46:14, 48:6,
  48:9,
  60:17.
operate

99:13.
operating
  27:23, 37:14,
  37:24.
opined 75:17,
  86:5.
opinion 28:19,
  33:11, 80:23,
  81:14, 81:23,
  81:24.
opportunity
  15:1, 16:19,
  19:22, 30:21,
  48:16, 52:18,
  92:15, 92:18,
  92:22,
  115:16.
opposed
  106:16.
orally 45:22.
order 4:10,
  6:3, 23:19,
  58:20,
  105:23,
  116:14.
ordered
  10:14.
orders 44:12,
  44:24.
original 35:19,
  97:17.
originated
  61:13,
  64:21.
Orozco 35:13,
  36:1, 36:7,
  36:19, 37:8,
  38:11, 39:1,
  39:5, 39:20,
  40:8.
others 23:16,
  77:20,
  81:5.
Otherwise 4:11,
  33:16,
  57:20.
Outside 9:9,
  11:22, 12:23,
  12:24, 14:18,
  19:2, 19:3,

38:7, 43:13,
  77:22,
  78:14.
outstanding
  45:3.
Oval 62:5.
overall 74:5.
Overruled
  82:21,
  82:23.
overrules
  22:1.
overseas 8:10,
  8:12.
own 24:21,
  25:12, 49:17,
  53:7, 75:17,
  84:7.
owner 59:6.
.
.
< P >.
p.m. 1:12,
  118:2.
PAC 8:16.
page 35:12,
  35:25, 38:2,
  38:12, 39:1,
  39:21, 40:4,
  79:6, 99:24,
  100:2,
  100:3.
pages 99:8.
paid 27:16,
  27:23, 34:16,
  37:7, 52:12,
  53:9, 57:22,
  60:1, 60:3,
  61:3.
paper 47:7,
  47:12,
  97:22.
papers 62:7.
paragraph
  100:2,
  100:17,
  101:3.
paralegals
  44:1.
parents 49:3.

Paris 50:17.
part 10:5,
  20:19, 24:1,
  24:5, 25:20,
  31:2, 31:5,
  31:6, 35:18,
  35:19, 35:21,
  44:21, 44:23,
  49:16, 66:12,
  79:6, 79:16,
  96:11, 101:3,
  101:17,
  103:9.
partial
  38:16.
particular
  9:23,
  109:17.
particularly
  44:13.
party 12:21,
  15:11, 17:19,
  19:11, 77:14,
  77:15.
passport
  41:6.
past 84:14,
  93:14.
path 17:7,
  89:8, 90:7,
  90:8, 109:23,
  110:1.
Patterson 47:3,
  67:12.
pay 26:24,
  27:14.
paying 8:24,
  27:24.
payment 36:12,
  36:18.
peak 51:22.
peering
  46:23.
penal 95:21,
  100:12,
  108:14,
  109:5, 109:9,
  109:16,
  112:5,
  115:23,

116:8.
pending
75:20.
People 6:16,
6:25, 10:23,
29:25, 49:8,
49:10, 49:15,
52:9, 53:1,
53:6, 57:22,
58:16, 59:11,
61:17, 65:2,
67:2, 68:7,
74:17, 79:22,
80:8, 80:20,
83:18, 84:19,
90:13,
115:15,
117:12.
percent 8:16.
percentage
8:8.
Perfect 47:5,
47:8.
period 37:12,
37:24,
65:7.
periods
50:14.
permission
31:24.
permit 86:6.
permitted
93:16.
person 41:5,
60:25, 86:10,
98:11.
personal 8:24,
8:25, 26:24,
35:6, 35:9,
86:3, 86:7,
86:10, 86:25,
87:18, 88:14,
88:15, 89:13,
89:23,
98:9.
persons 41:2.
perspective
84:18, 87:17,
110:6.
pertains 14:18,

89:11,
109:14.
pertinent
93:23.
Pheng 28:3,
28:7, 28:10,
28:14.
phones 14:19,
70:25,
108:8.
photo 17:2,
17:6, 17:8,
18:2, 52:18,
53:11.
photograph
17:24, 18:10,
39:4, 53:21,
54:22.
photographs
20:11,
38:7.
pick 21:13.
picking-and-cho
osing
24:14.
picture 15:20,
19:13, 54:2,
54:10, 54:12,
76:7.
pictures
54:14.
piece 16:2.
piqued 84:1.
place 9:23,
51:23, 53:8,
56:19, 61:4,
90:13,
101:12.
places 50:19.
Plaintiff
1:7.
plan 33:5.
planning 42:21,
115:10.
play 115:13.
playboy
53:17.
played 54:20.
Please 7:19,
14:5, 18:15,

26:17, 40:24,
62:19, 63:17,
63:25, 67:6,
79:2.
pled 86:15.
Plus 82:10,
106:14,
106:23,
106:24.
points 25:8,
39:14,
84:1.
political
51:18, 51:24,
51:25,
59:19.
popularity
51:22.
portion 64:12,
64:13, 65:23,
76:13,
112:11,
112:12,
112:13.
portions 42:8,
44:4.
position 50:8,
59:19, 92:12,
93:6, 102:12,
115:19.
positions
24:5.
possible 72:20,
73:5, 83:23,
84:10,
89:21.
post 14:4,
96:5.
postpone
24:9.
potential 72:1,
72:23, 84:18,
90:17, 100:1,
100:18,
100:22,
101:5,
102:3.
Pottinger 62:4,
62:8, 67:7.
poverty 49:2.

practical
106:16.
PRAKAZREL
MICHEL
1:10.
Pras 33:24,
48:23, 50:6,
51:5, 51:6,
52:2, 52:4,
57:19, 58:15,
59:2, 59:14,
59:22, 60:11,
91:19.
PRC 41:1,
41:2.
precipitated
71:4, 71:11,
72:15.
precisely
94:18.
precluded 58:8,
89:8.
predicate
10:20, 56:19,
56:23,
102:25.
predicated
10:17, 10:18,
10:19.
prefer 116:9.
pregnant
39:23.
preparing
46:10,
46:12.
preponderance
4:18.
presence 43:13,
77:3.
present 21:17,
24:13, 47:25,
48:5, 75:16,
76:19.
presented 24:1,
42:20.
presenting
23:18, 106:3,
115:11.
preserving
42:25.

President 9:2,
    17:19, 50:9,
    51:25, 52:16,
    53:2, 53:22,
    54:10, 54:22,
    54:23, 54:24,
    55:11, 60:21,
    60:22, 61:21,
    62:3, 62:7,
    62:8.
presidential
    10:24,
    52:16.
presidents
    20:12.
Presumably
    20:16, 42:1,
    105:22,
    105:25.
pretend 21:18,
    46:18.
pretty 16:7.
previously
    35:10, 36:10,
    38:2, 38:12,
    53:5, 55:3,
    58:17, 65:5,
    67:11,
    74:2.
primarily 8:23,
    60:5, 99:5,
    99:7.
print 47:3,
    104:4.
printed 46:24,
    104:24.
prior 32:15,
    43:25, 44:2,
    78:4,
    109:12.
privilege
    88:19, 88:20,
    89:14.
prob- 99:1.
probably 5:9,
    10:3, 10:15,
    60:18, 73:20,
    74:18, 75:24,
    77:2.
problem 4:22,

7:6, 18:3,
    25:19, 44:8,
    76:8, 84:13,
    94:5,
    98:24.
problems 6:6,
    83:23, 84:9,
    84:14,
    84:21.
Proceed 23:8,
    24:19, 26:18,
    47:24, 68:3,
    77:17, 97:8,
    107:20.
proceeded
    29:12,
    91:10.
proceeding
    112:5.
proceedings
    12:11, 18:13,
    33:19, 76:24,
    89:18, 93:3,
    97:1, 118:2,
    118:6.
profession
    52:11.
profile
    53:16.
program
    64:20.
progress
    29:22.
progressed
    107:1.
Proof 94:9.
proper 61:25,
    62:2,
    68:21.
propose 23:7.
proposed 111:7,
    111:8.
prosecution
    32:14,
    32:25.
prosecutor
    23:16.
prosecutors
    43:25.
proved 56:22.

proven 62:15.
provide 29:8,
    29:25, 30:1,
    33:24, 68:6,
    86:7, 92:2,
    99:14.
provided 11:14,
    79:10, 79:15,
    80:15, 92:1,
    97:15,
    102:16.
providing
    82:14.
Public 1:34,
    53:17,
    73:4.
publicity
    53:4.
publishing
    50:24.
pull 66:17,
    105:2.
pulled
    106:10.
punishes 56:15,
    58:11.
punt 23:2.
purchases
    37:3.
purpose 31:4,
    32:16, 75:1,
    100:24,
    101:7, 101:8,
    101:10.
pursuant
    93:15.
pursue 33:16,
    116:9.
pursuing 31:22,
    32:17.
purview 65:3.
pushing
    61:11.
Put 7:7, 15:9,
    16:11, 23:9,
    30:18, 30:19,
    43:18, 59:19,
    61:12, 66:2,
    67:20, 70:25,
    78:10, 78:16,

82:3, 83:4,
    96:21, 99:10,
    103:25,
    104:1.
putting 24:2,
    42:21, 53:16,
    105:2,
    106:24,
    112:6.
.
.
< Q >.
quash 5:8.
questioning
    33:17.
questions
    11:12, 11:14,
    16:20, 20:6,
    20:21, 21:19,
    23:3, 32:11,
    34:4, 34:5,
    34:11, 38:3,
    39:23, 71:16,
    79:25, 81:20,
    82:3, 85:14,
    91:24, 92:7,
    92:16,
    92:23.
quick 22:4,
    22:25, 23:1,
    25:8, 96:9,
    117:13.
quickly 5:10,
    22:24, 25:14,
    88:17.
quite 10:4,
    45:19.
quota 53:1.
.
.
< R >.
R. 2:5, 2:6.
Rae 1:32.
raise 25:18,
    26:7, 85:25,
    116:18.
raises 32:24.
Raising 32:4.
rape 61:15.
rate 10:7,

24:8.
rather 24:25,
  105:17,
  112:11,
  115:15.
re- 29:25.
re-elected
  17:19.
re-election
  52:16.
reached 52:6,
  53:4.
reacted 81:2.
reaction 80:25,
  81:19.
read 21:18,
  40:9, 40:15,
  40:18, 40:23,
  41:3, 42:9,
  68:12, 70:8,
  78:17, 88:20,
  91:9,
  104:4.
reading 20:15,
  22:11, 70:15,
  70:16, 73:9,
  73:11, 73:15,
  79:8, 81:8,
  81:9.
reads 31:22.
Ready 7:1,
  7:17, 7:22,
  26:18, 46:13,
  47:3, 50:9,
  50:11.
real 50:20,
  52:4.
realize 77:1.
realized
  24:7.
really 23:2,
  24:20, 29:18,
  44:15, 48:22,
  61:18.
reason 32:25,
  33:3, 53:15,
  76:13, 76:17,
  76:18, 91:16,
  92:9.
reasonable

62:15.
reasons 19:20,
  52:19,
  54:9.
rec- 33:20.
recalling
  16:18.
receipt 41:7,
  41:9.
receive
  79:22.
received 26:22,
  27:11, 27:24,
  28:7, 28:8,
  29:9, 34:17,
  36:16, 37:4,
  57:20, 70:12,
  71:8, 79:12,
  80:11,
  111:10.
receiving
  43:25,
  44:2.
recess 7:15,
  23:6, 46:7,
  47:16.
recognize 14:6,
  36:4, 36:22,
  68:9,
  90:21.
recollection
  13:6, 13:10,
  20:9, 20:12,
  21:9, 22:9,
  40:13, 60:15,
  68:16, 68:22,
  68:25, 74:3,
  74:10, 74:14,
  75:6, 76:4,
  76:15, 78:7,
  78:11, 78:17,
  78:18, 79:8,
  112:13.
recommendation
  60:10.
recommendations
  60:10.
record 7:4,
  7:7, 7:9,
  11:15, 12:16,

15:16, 18:12,
  19:21, 20:14,
  24:11, 25:13,
  30:18, 34:7,
  38:13, 44:11,
  73:16, 75:21,
  76:19, 92:25,
  110:15,
  118:6.
record. 9:18,
  15:2, 31:13,
  74:8, 86:21,
  91:23,
  94:16.
recorded
  108:18,
  108:21,
  114:22.
recording
  51:21, 92:13,
  92:15,
  108:10,
  112:3,
  112:10,
  113:20,
  113:21.
recordings
  33:25, 111:6,
  111:14,
  111:16,
  111:21,
  113:5,
  113:13,
  113:17,
  114:15,
  114:23,
  117:5.
records 11:25,
  12:1, 28:18,
  29:6, 29:10,
  29:13,
  35:2.
recurring
  17:5.
Red 28:9,
  39:19,
  61:16.
REDIRECT 34:11,
  34:12.
refer 82:7,

99:8.
reference 8:11,
  45:3,
  99:25.
referenced
  44:4.
referencing
  113:12.
referrals
  60:6.
referred 52:9,
  60:18.
reflect
  73:13.
reflects
  70:9.
Refresh 68:15,
  74:12, 74:19,
  75:22, 76:15,
  78:17,
  79:8.
refreshed
  69:1.
refreshes 74:2,
  74:10, 74:14,
  74:21, 78:7,
  78:11,
  78:18.
refreshing
  68:22, 68:25,
  75:6.
refute 72:10.
regard 31:21,
  33:25, 46:13,
  58:2, 81:1,
  81:18, 83:10,
  93:6, 94:1,
  94:4,
  111:18.
regarding 16:1,
  24:12, 29:22,
  55:7,
  71:24.
register 56:14,
  58:12, 59:10,
  59:15, 59:16,
  59:18,
  59:20.
relate 90:4.
related 11:24,

20:21, 30:1,
  39:12, 39:18,
  75:19.
relates 15:5,
  17:6, 29:10,
  44:25.
relating 11:8,
  16:21, 18:11,
  19:4, 20:6,
  44:13, 89:7,
  91:4,
  101:19.
relationship
  52:4, 52:13,
  59:2, 60:20,
  88:2.
relationships
  58:15.
Relevance 9:8,
  12:23, 14:17,
  17:10, 17:17,
  17:21, 28:20,
  28:21, 29:14,
  29:15, 31:14,
  31:18, 31:20,
  33:16, 71:19,
  74:4, 74:22,
  80:19, 86:12,
  87:5, 87:7,
  87:9, 89:25,
  90:15, 91:12,
  103:13,
  106:21.
relevant 33:11,
  84:17, 84:25,
  87:23,
  87:25.
religious
  49:3.
Remember 6:16,
  10:3, 13:11,
  13:12, 13:16,
  13:22, 16:22,
  34:18, 38:4,
  39:24, 43:11,
  53:14, 56:9,
  61:4, 68:24,
  69:10,
  74:11.
remind 63:10.

removal
  61:18.
remove 27:6.
removed
  102:4.
repeat 70:3.
repeating
  92:10.
rephrase
  10:16.
report 77:20,
  77:25, 80:12,
  80:24, 81:1,
  81:2, 81:5,
  81:8, 82:6,
  82:11, 82:12,
  82:18, 83:19,
  102:15,
  103:7.
Reported 2:11,
  77:23,
  78:13.
Reporter 2:12,
  43:20, 43:22,
  118:10.
reporting
  73:4.
reports 79:22,
  80:14.
represented
  58:18,
  76:5.
Republic
  59:11.
reputation
  60:19.
request
  85:18.
requested
  53:11,
  59:22.
requesting
  85:24.
requests
  41:1.
require 43:6.
required 22:8,
  77:4, 77:5.
research 22:10,
  22:19, 72:8,

72:9, 75:18,
  84:7, 84:11,
  112:19,
  116:19.
reserved
  48:6.
resolution
  9:20.
resolve
  60:20.
resolved
  97:7.
resources
  79:23, 80:4,
  80:5.
respect 35:9,
  48:17,
  58:19.
respond 43:6,
  109:20.
responded
  60:9.
response 31:25,
  40:17, 94:6,
  116:4,
  116:7.
responses
  79:15,
  116:6.
responsive
  70:7.
rest 4:16,
  8:18,
  22:13.
rested 48:4.
Restroom
  98:23.
rests 4:17,
  41:20.
result 52:18,
  60:2.
retain 59:25.
retained
  60:3.
retaliation
  31:16,
  32:24.
return 39:23.
returned 40:2,
  41:9, 41:12,

61:8,
  61:11.
reverse
  112:8.
review 9:1,
  27:15, 72:13,
  101:20,
  101:22.
reviewed 36:9,
  43:25, 44:4,
  70:9,
  72:18.
revisit 19:9.
reword 12:18,
  56:2, 73:17,
  81:13.
rich 53:17.
ridiculous
  50:16,
  59:6.
right-hand
  38:15.
rights 42:25,
  91:10.
ringing 7:4.
road 81:10,
  109:18.
Robin 59:7.
Rock 28:9.
role 77:10.
Room 2:16.
Rosenzweig
  59:7.
Rousseau 8:22,
  50:5, 52:2,
  52:5, 52:6,
  52:11, 52:14,
  54:21, 59:22,
  60:11.
RPR 2:11,
  118:4.
rubric 112:6,
  112:20.
Rule 21:9,
  22:5, 22:15,
  23:19, 42:8,
  42:16, 95:21,
  116:3.
ruled 107:19,
  107:22.

rules 42:16,
93:16.
ruling 25:13,
44:18, 45:19,
58:22, 91:15,
107:11,
107:17,
110:8, 114:4,
115:25,
117:11.
rulings 24:4,
77:5, 77:8,
77:11.
run 30:7.
running 27:19,
54:23.
.
.
< S >.
S-h-o-m-i-k
5:5.
Saturday 68:16,
69:5, 69:11,
69:15, 69:21,
70:11.
saved 44:2.
saw 8:20,
40:18, 50:15,
100:1.
saying 5:7,
5:8, 15:18,
15:19, 19:12,
55:18, 91:18,
94:25,
104:22,
108:13.
says 7:9,
101:3,
103:7.
scheduling
4:11.
scope 9:9,
11:22, 12:23,
12:24, 14:18,
17:11.
screen 68:10,
105:2.
sealed 43:14.
Sean 1:31.
search 66:3,

70:23, 70:24,
89:22,
93:20.
Second 11:2,
15:8, 16:12,
40:5, 83:25,
84:6, 86:9,
100:17,
101:3, 104:8,
112:3,
112:12,
113:23,
115:7.
secret 61:7,
61:8.
Section 1:34.
security 7:5,
10:25, 19:14,
53:2,
55:12.
seeing 13:12,
13:18.
seek 109:17,
109:22,
109:24,
109:25.
seeking 31:24,
32:17,
79:9.
seem 32:23,
70:18, 81:10,
98:2, 98:8,
113:14.
seems 17:5,
21:9,
48:13.
seen 30:14,
38:6, 40:14,
40:20, 99:11,
111:18.
segments
111:6.
segue 86:9.
selected
21:4.
sell 84:19.
send 96:12,
96:23, 97:2,
97:3.
sending

98:11.
senior 64:14,
64:17.
sense 19:18,
29:24.
sent 5:7,
38:23, 41:2,
41:7, 43:15,
43:20, 43:22,
53:3, 61:12,
74:17, 74:20,
97:19,
102:5.
separate 17:9,
80:18,
111:6.
September
20:23, 53:23,
113:10,
115:1.
series 59:6,
61:5, 67:2.
service 5:9.
services
60:1.
Session 1:13.
Sessions 4:13,
4:19, 5:25,
40:7, 40:11,
40:24, 40:25,
61:20.
set 37:17,
46:9, 66:9,
66:14, 69:6,
69:8, 95:23,
98:3.
seven 52:25,
86:15.
several
86:19.
Shall 47:10.
shape 84:25.
shared 44:2.
shifts 102:9.
Shomik 5:3,
7:11.
short 10:23,
53:1, 79:6.
showed 12:1.
showing 36:24,

40:4, 103:21,
106:16.
shown 49:7,
54:2, 59:5,
59:21, 59:25,
61:1,
107:17.
sic 50:5,
53:25.
side 80:17,
93:10,
93:17.
side-by-side
38:10.
sign 46:14,
46:22,
47:13.
signatory
28:11.
signed 28:10.
significant
85:2.
similar 23:19,
24:13, 38:20,
39:7, 46:2.
simple 23:8,
25:1,
45:20.
simply 22:12,
33:3, 44:23,
105:8.
singing 49:1.
Sir 13:1, 14:6,
41:14, 43:10,
63:7, 64:2,
68:9, 68:14,
82:12,
93:19.
sit 7:19,
26:17, 51:4,
63:8.
sitting 50:5,
96:23, 97:5,
104:19.
situation
51:12,
60:23.
six 4:13.
skirted
19:14.

somebody 4:21, 4:25, 21:18, 31:24, 63:15, 69:9, 93:13, 93:16, 94:22, 95:1, 106:1, 106:24, 112:16.
somehow 87:22, 89:4.
somewhat 5:15, 46:3, 48:14.
sort 16:23, 32:6, 32:24.
sound 73:14, 74:10.
sounds 31:15.
source 69:20, 70:18, 75:18, 84:6, 84:7, 84:10, 93:1.
Special 7:23, 63:3, 64:3, 64:15, 64:17, 92:4, 92:10, 100:17, 102:14, 102:18, 108:11, 108:22.
specific 10:9, 15:23, 44:17, 68:25, 112:25.
specifically 27:10, 90:18.
specificity 73:24.
specificity. 74:19.
specifics 93:10.
specter 32:24.
speculate 97:8.

speculating 77:8.
speculation 37:15.
spell 63:25.
spend 52:10.
spending 50:16, 53:17.
spends 52:20.
spent 52:20, 53:7.
spoke 79:21, 80:7, 80:10, 80:20, 82:23.
spoken 5:4, 5:6.
sponsored 52:24.
spying 58:11.
Square 50:4.
stack 62:7.
staff 54:8, 71:8.
stage 72:12.
stamps 112:25.
stand 63:15, 82:18, 86:14, 96:21, 110:12, 110:13, 111:25, 116:16.
stars 50:17.
start 20:20, 41:23, 63:13, 63:15.
started 58:4, 58:7, 63:16, 95:3.
starting 40:7, 91:13.
state 63:25, 101:11, 101:13, 101:14, 101:18, 102:2, 102:14,

102:18, 103:11, 104:5.
statement 25:15, 29:4, 32:15, 36:5, 45:4, 45:14, 48:6, 48:9, 57:13, 60:17, 75:6, 75:25, 76:21, 81:18, 83:11, 91:15, 104:6, 104:7, 109:16, 109:17, 112:5, 115:23, 116:12.
Statements 21:2, 57:2, 92:17, 95:11, 95:20, 95:21, 108:13, 109:5, 109:9, 109:12, 116:8.
States 1:1, 1:5, 1:19, 2:13, 8:10, 23:14, 39:24, 50:8, 50:22, 61:11, 61:18.
status 49:9.
statute 56:15, 58:11.
stay 34:21, 44:18, 57:14.
stayed 58:6.
stenographic 118:5.
step 19:2, 19:3, 41:14, 41:15, 72:16, 85:23, 97:12.
steps 60:25, 102:4.
stick 10:5.

stipulate 45:9, 45:21.
stipulation 35:18, 35:20, 35:21, 45:18, 45:22, 46:13.
stop 63:17.
stopped 30:17.
Street 50:19.
stricter 24:7.
strike 40:16.
strong 49:2.
stuff 12:9, 58:12, 86:23, 116:24.
stupid 7:5.
subject 17:1, 89:22, 107:4.
subjects 30:8, 90:17.
submit 62:13, 88:19, 113:2.
submitted 42:17.
subpoenaed 28:18.
subpoenas 6:6.
subsequent 50:12.
subsequently 37:7.
substitute 18:8, 19:23.
substitutes 18:1.
successful 51:20.
sudden 51:21.
sufficiently 23:19.
suggest 24:17, 47:2.
suggested

32:10.
suggesting
  32:9, 60:5.
suggestion
  44:18,
  45:17.
suggests
  61:1.
Suite 1:28.
summarize
  42:13,
  84:4.
summary 73:20,
  73:23, 77:25,
  105:11,
  105:14,
  105:16,
  105:22,
  105:25,
  106:16,
  107:8.
Sun 61:9.
Sunday 69:16,
  70:10.
super 8:16.
superficial
  57:7.
superseding
  29:5, 29:10,
  31:17.
support
  52:15.
supports
  51:14.
supposed 61:23,
  104:3.
supposedly
  76:9, 99:6.
surround
  49:10.
surrounded
  49:15.
suspect 4:17.
suspicion
  71:17,
  71:20.
sustain 12:25,
  33:20, 58:6,
  71:21, 77:19,
  80:22, 89:19,

90:1, 93:4.
Sustained
  12:14, 34:3,
  34:6, 69:19,
  73:7, 85:6.
swear 63:2.
swore 90:19.
sworn 63:4.
.
.
< T >.
T. 2:11,
  118:9.
tactically
  33:5,
  108:1.
taken. 7:15,
  23:6, 46:7,
  47:16.
talked 4:12,
  5:21, 28:2,
  90:5,
  111:24.
tape 33:25,
  92:12, 92:14,
  110:24,
  110:25,
  111:4.
tasked 10:25.
teeny 104:4.
telephone
  80:24, 81:15,
  88:17, 101:2,
  101:21,
  101:23.
ten 18:21.
terrible
  61:14.
testified 9:4,
  9:11, 11:23,
  12:4, 15:15,
  15:25, 16:14,
  16:25, 26:22,
  27:2, 32:17,
  35:2, 59:14,
  59:16, 63:5,
  68:24, 96:18,
  96:19, 96:20,
  109:11,
  116:9,

116:17.
testifies
  117:4.
testify 5:1,
  68:24,
  117:4.
testifying
  4:22.
testimony-in-fa
  ct 19:11.
text 95:14,
  95:16, 95:18,
  98:9, 98:11,
  100:11,
  100:14,
  103:20,
  103:23,
  104:13,
  104:15,
  104:21,
  105:3,
  105:11,
  105:17,
  106:7,
  106:10,
  106:15,
  106:17,
  107:13,
  108:2,
  108:16.
texts 102:22,
  103:14,
  106:17,
  107:9.
THE CLERK 6:18,
  35:22, 47:1,
  47:11,
  63:7.
THE DEFENDANT
  4:6, 98:23.
THE WITNESS
  19:5, 41:16,
  63:19,
  78:20.
theme 17:5.
themselves
  49:10.
then-attorney
  61:20.
then-member

66:5.
theory 17:23,
  72:10, 94:19,
  94:23,
  105:10,
  109:3.
there- 30:24.
thereafter
  87:11.
they've 16:12,
  87:15, 87:16,
  115:4.
thinking 51:4,
  72:2.
thinks
  101:16.
though 49:25.
thousands
  27:13.
threat 64:20,
  71:25, 72:20,
  72:23, 84:18,
  100:19.
threatening
  72:3.
threats
  64:21.
three 41:1,
  56:9,
  102:4.
Throughout
  30:6, 37:10,
  50:12.
thrown 49:21.
Thursday 20:23,
  26:21, 34:17,
  39:22.
Tiffany 36:8,
  36:13, 36:18,
  36:20, 37:1,
  37:3.
till 117:13.
timing 78:3.
title 38:16,
  38:18, 38:21,
  38:22.
titles 38:20.
to-do 25:7.
today 4:14,
  4:19,

25:13.
together 61:12,
  106:24.
tomorrow
  4:14.
took 9:23,
  51:23, 56:19,
  61:4, 84:25,
  86:10, 87:9,
  108:22.
top 29:20,
  38:14,
  38:16.
topic 85:25.
topics 75:20.
total 28:6,
  28:13,
  28:17.
totally 32:3,
  57:7,
  89:10.
touch 11:24.
traced 27:11.
track 67:14.
transaction
  36:8, 36:10,
  36:20, 36:22,
  36:24,
  36:25.
TRANSCRIPT
  1:17, 10:13,
  21:20, 43:15,
  43:25,
  111:13,
  111:17,
  111:22,
  112:2,
  112:11,
  112:12,
  112:16,
  112:24,
  113:8, 113:9,
  113:10,
  113:11,
  113:22,
  114:11,
  114:24,
  115:5, 115:7,
  118:5.
transcripts

20:15, 42:23,
  45:10,
  111:20,
  111:21,
  112:25,
  114:14.
transferred
  37:6.
transfers 8:20,
  12:1, 35:9.
transition
  51:23.
transitioning
  51:22.
traveled
  12:21.
tread 55:3.
TRIAL 1:17,
  5:15, 23:18,
  64:6.
tricky 45:18,
  46:3.
tried 30:7,
  50:10, 61:19,
  61:20.
true 28:17,
  33:23,
  71:5.
Trump 60:21,
  60:22, 61:21,
  62:7.
truth 81:1,
  81:18, 83:10,
  94:1, 94:7.
try 11:18,
  15:9, 16:23,
  19:25, 61:3,
  61:17, 77:2,
  92:9, 108:12,
  113:1.
trying 4:13,
  10:9, 11:4,
  15:20, 17:24,
  18:4, 18:23,
  20:8, 33:4,
  52:21, 61:25,
  62:1, 74:11,
  75:5, 75:25,
  76:2, 89:4,
  90:7, 91:6,

92:3, 92:21,
  92:23, 94:17,
  95:23, 96:9,
  99:9.
Tuesday
  13:23.
turn 7:4,
  44:22,
  79:15.
turned 58:17,
  69:25.
two 4:8, 5:16,
  6:16, 6:21,
  6:24, 7:13,
  42:1, 50:14,
  76:10, 76:21,
  79:25, 80:21,
  105:21,
  111:5, 111:6,
  111:17,
  112:4,
  113:5.
Typically
  90:17.
.
.
.
< U >.
U.S. 100:20.
ultimate
  9:20.
Unavailability
  116:11,
  116:13.
unavailable
  19:16, 19:17,
  19:18, 96:15,
  109:10,
  109:11,
  109:18,
  116:3,
  116:14,
  116:16.
unaware
  66:13.
uncorroborated
  84:1,
  84:13.
underneath
  41:3.
understand

48:18, 77:4,
  77:16, 82:25,
  89:9, 89:10,
  89:15, 89:16,
  94:23, 98:8,
  102:8, 107:5,
  113:4,
  116:1.
understanding
  66:13, 80:16,
  100:11,
  108:9.
Understood
  23:5, 24:10,
  27:18, 45:7,
  45:25, 97:14,
  100:10.
unit 71:6,
  73:4, 79:11,
  80:8.
United 1:1,
  1:5, 1:19,
  2:13, 8:10,
  23:14, 39:24,
  50:8, 50:22,
  61:10,
  61:18.
unlawful 56:11,
  56:12.
Unless 9:13,
  31:4, 32:16,
  35:18, 45:12,
  76:6, 91:5,
  95:16, 98:22,
  103:25.
unlimited
  49:25.
until 25:21,
  28:18, 48:6,
  50:3, 50:13,
  88:19,
  118:1.
unusual 56:14,
  56:15.
unvetted
  84:12.
updates 29:21,
  29:25, 30:1,
  31:7, 31:9.
Urbane 27:10,

35:5.
urgency
  89:21.
USA 41:1, 41:2,
  41:5, 41:6,
  41:7.
USA. 41:2.
useful 44:21.
using 75:8.
.
.
< V >.
v. 23:14.
validation
  7:6.
Van 28:18.
variety 26:24,
  28:3.
various 20:12,
  21:17, 26:23,
  29:24, 29:25,
  50:18,
  103:20.
Vegas 12:21.
Ventura 1:42.
verdict 42:18,
  56:20.
verify 75:13,
  84:16.
via 14:19.
Victory 8:15.
view 13:2,
  15:13, 62:5,
  102:1.
viewed 51:18,
  85:13, 96:2,
  100:12.
vindictive
  32:14,
  32:25.
violations
  44:16,
  56:22.
visit 66:2,
  66:4, 70:10,
  71:3,
  79:12.
voice 95:16.
voluntarily
  87:1, 87:2.

vs 1:8.
.
.
< W >.
wait 6:25,
  7:13, 99:1,
  99:2.
waiting 21:8,
  40:8, 106:23,
  107:13.
waive 24:12.
waiving
  47:17.
walked 50:6.
walking 50:4.
Wall 50:19.
wanted 18:2,
  20:11, 43:10,
  44:6, 51:4,
  52:17, 53:12,
  60:24, 61:7,
  81:4, 84:2,
  106:17,
  114:12.
wanting 98:8.
wants 52:15,
  64:10, 77:15,
  106:6,
  112:24.
warrant 66:3,
  70:23,
  89:22.
Washington
  1:10, 1:29,
  1:36, 2:9,
  2:17.
waste 64:25.
wasting 96:11,
  99:18.
ways 21:17,
  21:19.
we'ere 19:3.
week 10:22,
  28:2, 38:3.
weekend
  99:16.
weeks 5:16,
  9:5, 48:13.
weight 82:24.
well-connected

59:24.
Wengui 61:7,
  61:11.
whale 52:9.
Whales 52:9,
  52:11.
Wharton
  50:22.
whatever 16:17,
  23:3, 23:11,
  42:18, 51:3,
  52:19, 77:11,
  80:24, 81:15,
  82:13,
  83:17.
whole 14:20,
  20:10, 21:10,
  21:22, 21:24,
  22:8, 23:23,
  25:11, 67:2,
  109:15,
  117:14.
whom 53:5,
  98:10.
widely 60:23.
wife 34:24,
  59:7, 60:25,
  61:6.
willing 45:9.
wish 16:17,
  42:14, 42:24,
  92:15,
  114:16.
wishes 64:9.
withdraw 8:7.
within 10:5,
  64:22.
Without 10:12,
  19:25, 29:13,
  43:20, 50:13,
  56:21, 72:23,
  81:1, 81:18,
  83:10, 93:19,
  94:1, 94:4,
  110:12,
  115:15.
witnesses 4:10,
  20:10, 20:13,
  30:8, 41:18,
  55:24,

109:10,
  116:2.
Wolf 50:19.
woman 39:23.
wonderful
  60:20.
wondering
  77:9.
word 37:18,
  63:14,
  79:12.
worded 28:22,
  81:11,
  90:2.
words 62:1.
wore 64:17.
work 16:19,
  31:24, 68:25,
  77:21, 81:17,
  82:7, 82:14,
  83:2, 83:7,
  83:8, 83:12,
  83:15, 85:21,
  85:24, 93:7,
  93:9, 93:12,
  93:16.
work-issued
  86:1, 86:8.
worked 71:7,
  79:12, 91:5,
  93:13.
working 65:7,
  78:14, 91:1,
  97:20.
world 58:16,
  61:24.
worried 5:13.
worry 18:21,
  97:8.
worth 46:19,
  109:18.
write 45:18,
  73:8, 82:6,
  82:12, 84:3,
  89:20.
writing 42:23,
  73:2.
written 45:21,
  79:22.
wrote 74:13,

82:18.
Wyclef 48:25.
Wynn 62:6.
.
.
< X >.
XXXXXXXXX
    41:6.
.
.
< Y >.
years 49:5,
    50:12, 53:14,
    58:18, 65:12,
    82:18,
    84:22.
Yep 40:8.
yesterday
    5:7.
York 1:27,
    1:35, 9:24,
    17:25, 33:24,
    50:5,
    61:15.
young 48:23,
    49:2.
yourself 51:4,
    83:7.
.
.
< Z >.
zoom 40:9.