```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,      ) CRIMINAL ACTION NO.:
                                    ) 19-00148-1
 4            Plaintiff,            )
          vs.                       )
 5                                  )
     PRAKAZREL MICHEL,              ) Washington, D.C.
 6                                  ) April 18th, 2023
              Defendant.            ) 2:08 p.m.
 7   _____) Afternoon Session

 8

 9                  TRANSCRIPT OF JURY TRIAL
           BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
10                  UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   FOR THE GOVERNMENT:       John D. Keller, Esquire
                               U.S. Department of Justice
14                             1301 New York Avenue, NW
                               Suite 1016
15                             Washington, D.C. 20530

16                             Sean F. Mulryne, Esquire
                               Nicole Rae Lockhart, Esquire
17                             U.S. Department of Justice
                               Public Integrity Section
18                             1400 New York Avenue, NW
                               Washington, D.C. 20005
19

20   For the Defendant:        David E. Kenner, Esquire
                               Alon Israely, Esquire
21                             Kenner Law Firm
                               16633 Ventura Boulevard
22                             Encino, California 91436

23

24

25
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1   APPEARANCES (CONT'D):

2

3   FOR THE DEFENDANT:           Charles R. Haskell, Esquire
                                 Law Offices of Charles R.
4                                Haskell, P.A.
                                 641 Indiana Avenue, NW
5                                Washington, D.C. 20004

6   Reported by:                 Christine T. Asif, RPR, FCRR
                                 Official Court Reporter
7                                United States District Court
                                 for the District of Columbia
8                                333 Contitution Avenue, NW
                                 Room 6507
9                                Washington, D.C., 20001
                                 (202) 354-3247

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE COURT:  Looks like I beat Dorothy in here. |
| 3 | Mr. Michel, why don't you come on back up.  As soon |
| 4 | as she makes an appearance, the jury's all lined up. |
| 5 | (Jury entered the courtroom.) |
| 6 | THE COURT:  All right.  Please sit down.  Good |
| 7 | afternoon, members of the jury. |
| 8 | PROSPECTIVE JUROR  Good afternoon. |
| 9 | THE COURT:  All right.  We're ready to proceed with |
| 10 | the direct of Mr. Kenner of Mr. Michel. |
| 11 | MR. KENNER:  Thank you, Your Honor. |
| 12 | DIRECT EXAMINATION |
| 13 | BY MR. KENNER: |
| 14 | **Q.**  Mr. Michel, I'd like to -- |
| 15 | MR. KENNER:  Mr. Campbell, please publish Exhibit |
| 16 | 728, I believe already admitted? |
| 17 | THE COURT:  Yes. |
| 18 | MR. KENNER:  Thank you, Your Honor. |
| 19 | **Q.**  (BY MR. KENNER)  Mr. Campbell, can you read this, or do |
| 20 | you need me to make it a little larger? |
| 21 | I'm sorry, Mr. Michel, do you need Mr. Campbell to make |
| 22 | this a little bigger? |
| 23 | **A.**  That's fine.  Thank you. |
| 24 | **Q.**  Can you read that, or would you like Mr. Campbell -- |
| 25 | **A.**  Yes, that's fine.  Thank you. |

4

Direct Examination - Michel

1    **Q.**  Have you read that now?

2    **A.**  Yes.

3    **Q.**  Let me go to the bottom of page 1 of Exhibit 728.  Do

4    you -- who do you see as the person who this e-mail is from?

5    **A.**  Frank White.

6    **Q.**  And what e-mail address from Frank White?

7    **A.**  Fwhite@barackobama.com.

8    **Q.**  All right.

9         MR. KENNER:  Can you scroll down some?

10   **Q.**  (BY MR. KENNER)  Mr. Michel, I'm going to read this e-mail

11   to you and then ask you some questions about it.  The e-mail

12   reads --

13        THE COURT:  Excuse me, Mr. Kenner, instead of

14   reading it to him, he's had an opportunity to review it.

15   Perhaps you could just indicate what in the e-mail you're

16   referring to?  If he doesn't -- you know, isn't sure where it

17   is, obviously you can read it to him.  But I think if he's

18   familiar with it, having looked at it, it would move things

19   along a little bit.

20        MR. KENNER:  Thank you, Your Honor.

21   **Q.**  (BY MR. KENNER)  The reference in this e-mail from

22   Mr. White starts, in capital letters, "BIG," B-I-G, in capital

23   letters, "M-A-N, tomorrow unfortunately."

24      Who do you understand BIG MAN to be based on previous

25   communications with Mr. White?

Direct Examination - Michel

1    **A.**  Barack Obama, President Barack Obama.

2    **Q.**  It goes on, after describing a shooting in Denver that

3    they're dealing with today, "Moving forward, let your guys

4    know I'll be sending a follow up e-mail on Monday, July 23rd,

5    of what we like the contribution to be at."

6        What do you understand that being in reference to?

7    **A.**  I -- to my understanding, it's referring to Jho Low taking

8    his photo or having an opportunity to take this photo at this

9    next event.

10   **Q.**  Okay.

11            THE COURT:  Can I suggest you not read it as I've

12   asked.  If you read it, it's going to take us forever to go

13   through this.  As long as he's familiar with it.  You can

14   refer to it --

15   **Q.**  (BY MR. KENNER)  In the third line from the bottom, "I

16   didn't tell" -- there's a reference to, "I didn't tell your

17   guys yet, but the BIG MAN has a special bonus for your guy."

18        Again, who did you understand the BIG MAN to be

19   referencing?

20   **A.**  President Obama.

21   **Q.**  And "a special bonus for your guy."

22        Who did you understand "your guy" to be referring to?

23   **A.**  Jho Low.

24   **Q.**  "And he appreciates his commitment to the campaign, and

25   takes care of those who take care of him."

Direct Examination - Michel

1      Who did you understand "he" to be?

2  **A.**  President Obama.

3          MR. KENNER:  Can I ask for this exhibit and the

4  previous one -- I want to show them side by side.

5  **Q.**  (BY MR. KENNER)  I'm going to show you 7 -- Government's

6  Exhibit 726, which we were talking about shortly before the

7  noon recess, on the left side of the screen, and 728, that we

8  were just talking, about on the right side of the screen.

9      Can you tell from these e-mails whether or not they were

10 both sent on the same day?

11     Do you need it larger, Mr. Michel?

12 **A.**  Yes, they were sent -- looks like they were sent on the

13 same day.

14 **Q.**  And what day was that?

15 **A.**  Friday -- the one on the left was sent on Friday, July

16 20th, at 3:41, and the one on the right was sent Friday, the

17 20th, July 2012, at 9 -- at 9:52.

18 **Q.**  Okay.  So these e-mails appear then to be both sent on the

19 same day; correct?

20 **A.**  Yes, that's correct.

21 **Q.**  Both sent from Mr. White; correct?

22 **A.**  Yes.

23 **Q.**  Both sent a matter of hours apart?

24 **A.**  That's correct.

25 **Q.**  All right.  Between these two e-mails, the one that we

1    talked about as Exhibit 726, that I believe you said you knew

2    wasn't written by Mr. Obama and you didn't feel pressured by

3    it, what happened between that time of the e-mail, 726, and

4    the e-mail on the right at 728?

5    **A.**  Well, I mean, it was just a couple hours' difference,

6    probably like six.  I still didn't believe that President

7    Obama said the things that were written on this e-mail.  But I

8    understood that Frank White wants to get this event done, and

9    he's trying to pressure me.

10   **Q.**  To do what?

11   **A.**  To fill seats.

12   **Q.**  And did you understand there would be something in

13   exchange for Mr. Jho Low?

14   **A.**  Yes, he would be provided a photo.

15   **Q.**  Was it your understanding that Mr. White was -- was it

16   your belief, after your conversations with Mr. White about the

17   September 11th fundraising party, that Mr. White was -- did

18   you understand Mr. White to be saying, this time I'll get a

19   picture of Jho Low?

20           MR. KELLER:  Objection, Your Honor.  Lack of

21   foundation.

22   **Q.**  (BY MR. KENNER)  Mr. --

23           THE COURT:  You're asking in terms of what -- having

24   him deciphering what Mr. White intended, which is -- you know,

25   there isn't some foundation here, for going beyond what's

1    already in these e-mails and what he's already testified to.

2              MR. KENNER:  Okay.

3    **Q.**  (BY MR. KENNER)  Did something happen between these two

4    e-mails with respect to Frank White?

5    **A.**  Yes.

6    **Q.**  And what had happened?

7    **A.**  Basically he was just -- I felt like he was putting

8    pressure on me so I could fill these seats, because he had

9    a -- I guess he already made a commitment to the campaign that

10   he's going to do this event at his house in September of

11   2012.

12   **Q.**  And what was your under- -- after conversations with him,

13   did you have an understanding about whether or not a photo

14   would be taken at Mr. White's house of Jho Low and the

15   President?

16             MR. KELLER:  Objection, Your Honor.  Assumes facts

17   not in evidence, and leading.

18             THE COURT:  Well, it certainly is leading.  And you

19   have leapt forward beyond what these e-mails say.  So I'll

20   sustain the objection.

21             MR. KENNER:  Okay.  Thank you.

22   **Q.**  (BY MR. KENNER)  Did you forward Exhibit 728 also to

23   Mr. Joel Rousseau?

24   **A.**  Yes.

25   **Q.**  And why did you forward that to Mr. Rousseau?

1    **A.**  Well, I forwarded it to Mr. Rousseau just because when

2    Frank White said to me don't tell anyone, usually when someone

3    said don't tell anyone, that mean tell the person.  So I

4    forwarded it to Joel Rousseau and told him not to tell

5    anyone.

6    **Q.**  Okay.  After the -- was Frank White able to fill all the

7    seats in the September event?

8    **A.**  Yes.

9    **Q.**  And how did you help him with that event?

10   **A.**  I basically invited a bunch of my Haitian friends, some

11   friends, and gave them money to donate to the campaign to come

12   and have this event with us.

13   **Q.**  And whose money did you give them?

14   **A.**  Mine.

15   **Q.**  Were you on the invitation?

16   **A.**  No, I was not.

17   **Q.**  Was it as your house?

18   **A.**  No, it wasn't.

19   **Q.**  Was it at Mr. White's house?

20   **A.**  Yes, it was his penthouse.

21   **Q.**  Did you do anything to arrange that event at Mr. White's

22   house?  And let me give you -- for example, did you do

23   anything that a host would do to plan an event like that?

24   **A.**  No.

25   **Q.**  Did you get any vendors to bring things to the event?

Direct Examination - Michel

1    **A.**  No, I didn't.

2    **Q.**  Did you arrange the seating and decide where people would

3    be seated at that table?

4    **A.**  Not at all.

5    **Q.**  Did you have anything to do with any logistics for that

6    party?

7    **A.**  No.

8    **Q.**  Did you think anything was wrong with giving your friends

9    money to come to that event?

10            MR. KELLER:  Objection, Your Honor.  Asked and

11    answered.

12            THE COURT:  I think he's already answered it earlier

13    if we're talking about the same event.

14            MR. KENNER:  We're talking about a different event,

15    Your Honor.  This is the September event.  We previously -- in

16    D.C.  We prev- -- I'm sorry.

17            MR. KELLER:  I'll withdraw it, Your Honor, if

18    it's --

19            THE COURT:  All right.  That's a different event, so

20    you can ask him.

21    **Q.**  (BY MR. KENNER)  Did you think that there was anything

22    wrong with giving your friends your money to go to the

23    event?

24            THE COURT:  We're talking about the September event?

25            MR. KENNER:  September event, yes, Your Honor.

Direct Examination - Michel

1  **Q.** (BY MR. KENNER)  The September dinner at Mr. White's

2  house.

3  **A.** No, I didn't.

4  **Q.** Why didn't you think it was wrong?

5  **A.** Because all the friends that I invited, especially two of

6  my friends who ran for elected official, they took the money.

7  Like Rudy Moises, he ran for Congress twice.  He took the

8  money and donated it to Obama.  I think that if there was

9  something wrong at that time, he could have easily said to me,

10  hey, Pras, you're not supposed to do that.

11      No one said anything to me.  And basically, to be honest

12  with you, I look at it as Apple, you know, when you go to a

13  Apple store, new iPhone comes out, each person is only allowed

14  to buy three.  It's not that they don't want to sell a million

15  phones, but they don't want to sell a million phones to one

16  person.

17      So I had all this money, and everybody was excited to

18  meet President Obama, be in a room with him.  It was a

19  intimate at Frank White's house.  Plus Jho Low couldn't come

20  again, but his father was able to come.  So I just filled the

21  seats.

22  **Q.** So Mr. Jho Low was not allowed to attend the event at

23  Frank White's house either?

24  **A.** Again, the campaign said he's just not a good look because

25  of his party ways.  He had a playboy stigma with him.

1    **Q.**   Okay.

2          MR. KENNER:  Your Honor, I'd like to --

3          Mr. Campbell, please, would you publish the

4    Government's Exhibit 105, page 3, already admitted.

5          THE COURT:  It has been admitted.

6    **Q.**   (BY MR. KENNER)  Do you recognize this picture?

7    **A.**   Yes, I do.

8    **Q.**   And who do you see to be in the picture?

9    **A.**   I see President Obama to the right, and to the left, Jho

10   Low's dad, and I'm in the back.

11   **Q.**   What are they doing?  Are they shaking hands?

12   **A.**   Yes, they're shaking hands.

13   **Q.**   Directing your -- directing your attention to page 5 of

14   Government's Exhibit 105, what is that a picture of?

15   **A.**   That is a picture of Frank White's living room.

16   **Q.**   And there are people seated around the table.  Do you see

17   yourself to be in that photo?

18   **A.**   Yes.  I'm sitting to the right of President Obama.

19   **Q.**   And next to you, to your right, who is seated there?

20   **A.**   Mohammad al-Husseiny.

21   **Q.**   And next to Mr. Obama, on his left, who is sitting

22   there?

23   **A.**   Jho Low's dad.

24   **Q.**   And next to Jho Low's dad, to his left, who is sitting

25   there?

Direct Examination - Michel

1    **A.**  Joel Rousseau.

2    **Q.**  And do you see Frank White across the table from

3    Mr. Obama, or can you not tell from this picture?

4    **A.**  I could tell from his head, but I guess --

5    **Q.**  Let me show you page 6 of that exhibit.  Do you see Frank

6    White to be present there?

7    **A.**  Yes.

8    **Q.**  And is he the gentleman with his hand up?

9    **A.**  Yes, across from President Obama.

10   **Q.**  Okay.  Do they appear to be communicating with one

11   another?

12   **A.**  Yes.

13   **Q.**  By the time you had given your money to others to attend

14   this event, how much money had you received from Jho Low?  I'm

15   sorry, not from Jho Low, from Pheng, I apologize, from

16   Mr. Pheng Laogumnerd?

17   **A.**  At this point, from what I understand, about $8 million.

18   **Q.**  Okay.  And of that $8 million, did you believe that to

19   be -- did you know that to be your money?

20   **A.**  Yes.

21   **Q.**  And how much of that $8 million was utilized to pay for

22   friends of yours with your money to attend this event?

23   **A.**  $800,000.

24   **Q.**  About 10 percent, would that be a fair statement?

25   **A.**  Yes.

Direct Examination - Michel

1    **Q.** And the rest of that money, where did it go?

2    **A.** I used it at my own discretion.

3    **Q.** Did you ever make any donation to anybody on behalf of

4    Mr. Jho Low?

5    **A.** No.

6    **Q.** Let me move along here to the subject of Las Vegas and

7    yourself and Mr. White.  Once Mr. Obama got elected -- by the

8    way, was that November 11th of 2016?

9    **A.** 2012.

10   **Q.** I'm sorry, 2012.

11   **A.** Yes, President Obama got elected in November 2012.  I'm

12   not exactly sure the date of the day, but it was November

13   2012.

14   **Q.** Was -- after Mr. -- or sorry, after President Obama was

15   re-elected, did he -- did you become aware of his still

16   wanting to donate more money -- I'm sorry, I'll withdraw that

17   question.

18       Did Jho Low still care about getting a photo with

19   President Obama after the election?

20   **A.** Yes, definitely.  He wanted the photo even more.  First

21   his friend, Mohamed, got the first photo in Miami.  Then the

22   second event, his father got a photo with President Obama and

23   his friend, Mohamed.  So now he feels like he connected them,

24   so now he really wants a photo.

25   **Q.** All right.  Did you -- without telling us what it was, did

Direct Examination - Michel

1    you have conversations with Mr. White about the subject of an

2    opportunity to get the photo after President Obama became

3    elected for the second term?

4              MR. KELLER:  Objection, Your Honor.  Relevance as to

5    what happened after the election.

6              THE COURT:  Let me see what -- if I'm correct.

7              (Bench conference on the record.)

8              THE COURT:  Is this, Mr. Kenner, still your idea of

9    his quest for the photo?

10             MR. KENNER:  Yes.  Your Honor, the government

11   admitted an exhibit of -- with financial numbers and when they

12   came.  In that exhibit, on November the 12th, the day after

13   the election, it reflects that Mr. Michel received

14   $11 million, or that Mr. White received $11 million.  And I

15   believe that the connection --

16             THE COURT:  Who got the 11?

17             MR. KENNER:  It's shown on a chart to Mr. Michel.

18             THE COURT:  I know, but if you're telling me why

19   it's relevant, then it seems to me I need to know who got the

20   11.

21             MR. KENNER:  I believe the 11 went to Mr. Michel,

22   and I think it was in -- still in connection with the desire

23   for -- by Mr. Jho Low to still get a picture with the

24   President.  I think the evidence will show that it was

25   substantially -- it's hard to understand, but it was

 1    substantially easier to accomplish that after the election

 2    than before the election.

 3             THE COURT:  Okay.  So you're trying to show that

 4    somehow the 11 million was connected to getting the photo

 5    still?

 6             MR. KENNER:  Yes.

 7             THE COURT:  Mr. Keller.

 8             MR. KELLER:  The 11 million came in on November 6th,

 9    which was election day.  I -- I guess if there's a question

10    about the 11 million being related to the photo, but not to

11    the election, I understand the relevance of that.  Beyond

12    that, I don't -- I don't think this line of questioning is

13    relevant.

14             THE COURT:  I have to say that putting it in the

15    context of the election doesn't go anywhere.  Especially if

16    the date's wrong.  It seems to me if you want to tie somehow

17    that the 11 million he got paid in order to get this photo,

18    then you need to go down that path if that's what you're

19    doing.  And we need to move this along, Mr. Kenner.

20             MR. KENNER:  Thank you.

21             THE COURT:  Okay.

22             (The following proceedings were had in open court.)

23             THE COURT:  I'll sustain it as asked.

24    Q.  (BY MR. KENNER)  Did you meet with Mr. White regarding a

25    photo with Jho Low and the newly elected President Obama after

Direct Examination - Michel

1  the election?

2  **A.** Yes.  After the election, Frank White came with an

3  opportunity for Jho Low to take a photo, this time at the

4  White House with President Obama.

5  **Q.** Okay.  And did you and Mr. White travel to Las Vegas,

6  Nevada for a birthday party?

7  **A.** Yes.  Frank White and myself traveled to this party,

8  birthday party that Jho Low did in Vegas.  He rented a plot of

9  land, about 50,000 square feet, with a tent.  It was every

10  celebrity you could think of.  I think there was a ferris

11  wheel, there was a Kentucky Fried Chicken stand, Noble,

12  Bradley Cooper, Robert Di Niro, Britney Spears coming out of a

13  birthday cake.  First time I ever seen Leonardo DiCaprio rap.

14  It was an extraordinarily lavish party in a tent in the desert

15  in Nevada.

16  **Q.** And Mr. White was there with you?  I'm sorry, that's

17  leading.

18      Was Mr. White there with you?

19  **A.** Yes, he was.

20  **Q.** Did you talk to Jho Low at this tent party?

21  **A.** I spoke to Jho Low at an after-party.

22  **Q.** And where was the after -- an after-party, meaning after

23  this tent birthday party, there was a party after that?

24  **A.** Yes, an after-party after the party.

25  **Q.** Okay.  And where did the after-party take place?

Direct Examination - Michel

1    **A.**  It took place at the hotel.  I don't remember which hotel,

2    but it took place at a hotel where he was staying at a

3    penthouse suite.

4    **Q.**  Okay.  And did Mr. White accompany you to the

5    after-party?

6    **A.**  Yes, he did.

7    **Q.**  Can you describe the after-party?

8              MR. KELLER:  Your Honor, objection at this point in

9    terms of descriptions of these parties.

10             THE COURT:  Yeah, I -- it seems to me that -- let's

11   get to the -- to the point of their meeting, as opposed to the

12   trappings of the party.

13             MR. KENNER:  Okay.

14   **Q.**  (BY MR. KENNER)  Did you see Jho Low to be present at this

15   after-party?

16   **A.**  At the after-party, Frank White and I went to pay Jho Low

17   a visit.  Frank White wanted to explain the logistics of this

18   photo taking place at the White House.  And at that same time

19   we discussed payment, which was $20 million, that Frank White

20   would receive to bring Jho Low to take a photo with President

21   Obama.

22   **Q.**  And where did that discussion take place?  Was it in the

23   middle of a crowd of people in the party?

24   **A.**  We tried to have a conversation in the living room, but

25   there was a Ferrari in there, so we went to the balcony to

Direct Examination - Michel

1    have this discussion.

2    **Q.**  All right.  And at the discussion, you were present?

3    **A.**  Yes.

4    **Q.**  Was Mr. White present?

5    **A.**  Yes.

6    **Q.**  Was Jho Low present?

7    **A.**  Yes, he was.

8    **Q.**  And did a conversation ensue about what would be involved

9    in getting that photo?

10            MR. KELLER:  Objection, Your Honor.  We've gone as

11   far as I think is relevant with this information.  Now it's

12   just back-dooring hearsay in.

13            THE COURT:  It does seem to me that they -- they

14   were -- the purpose of the meeting, et cetera, you just asked

15   did they discuss what they intended to discuss.  And move

16   along here.

17   **Q.**  (BY MR. KENNER)  Mr. Michel, let's move forward to late

18   2016.  Did you come into contact with Mr. Higginbotham

19   again?

20   **A.**  Yes.

21   **Q.**  And how did you come in contact with him again?

22   **A.**  I contacted Mr. Higginbotham because I had some financial

23   issues with my financial manager at the time named Barry

24   Bekkedam.

25   **Q.**  And did Mr. Higginbotham assist you in resolving those

Direct Examination - Michel

1    issues?

2    **A.**  Yes.  He put me in contact with a forensic accountant who

3    actually went in and looked at my finances.

4    **Q.**  Did Mr. Higginbotham draft an agreement between Pheng

5    Laogumnerd and your company?

6    **A.**  Yes.

7    **Q.**  And did you present him with what the deal points were?

8              THE COURT:  Okay.  Did present who?

9              MR. KENNER:  Mr. Higginbotham.

10             THE COURT:  Okay.

11   **A.**  Yes.  Basically -- basically, I gave Mr. Higginbotham just

12   the deal points, and he was supposed to just go in and write

13   the contract.

14   **Q.**  (BY MR. KENNER)  And by "deal points," what do you mean?

15   **A.**  Usually --

16             THE COURT:  Go ahead.

17   **Q.**  (BY MR. KENNER)  By "deal points," what do you mean?

18   **A.**  Usually when I have an attorney, I tell them what the deal

19   points are, like basically I want this percentage or this is

20   the amount I'm receiving, these are the parties that are

21   involved, just give them like bullet points, and he goes in

22   and write a contract.

23   **Q.**  All right.  Was it common practice for Mr. Higginbotham to

24   show you the completed contract to see if the deal points were

25   accurately reflected?

1    **A.**  Well, usually what he does is once the contracts are

2    written, he basically tells me they're ready to be signed.  So

3    I just rely on his legal, professional, perspective.  I mean,

4    I don't read the contract, I just -- once it's ready, I take

5    it and I sign it.

6    **Q.**  Did you pay Mr. Higginbotham for his legal advice?

7    **A.**  Yes.

8    **Q.**  About how much, if you recall?

9    **A.**  About $170,000.

10   **Q.**  Now, the government alleges that you were in a conspiracy

11   with Mr. Higginbotham to do the things that you're charged

12   with in this case.  If Mr. Higginbotham were your

13   co-conspirator, why would he only be getting $170,000 from

14   you?

15   **A.**  Because he wasn't, he was my attorney.  And there was a

16   lot of different contracts he was writing for me, from music

17   entertainment contract, publishing.  We even were working on a

18   gold mine deal in Sudan that he negotiated for me.  I was

19   supposed to be an investor in that.  I put up some money in

20   that.

21       So it ranges.  He just did -- anything that had to do

22   with legal work, Mr. Higginbotham would look at the contracts,

23   and he would negotiate or write these contracts for me.

24   **Q.**  Okay.  Let me just for a moment go back to 2012.  Was

25   there an agreement reached between Mr. White and Jho Low for

Direct Examination - Michel

1    that picture?

2    **A.**  Yes.  The agreement was $20 million for Frank White to get

3    him access to a photo with President Obama.  And out of that

4    $20 million, Frank White gave me a million out of that.

5    **Q.**  Okay.  Did Mr. Jho Low ever get that photograph?

6    **A.**  Yes, he did.

7    **Q.**  How did he get that photograph?

8         MR. KELLER:  Objection, Your Honor.  Relevance at

9    this point.

10        THE COURT:  I'll sustain it.

11   **Q.**  (BY MR. KENNER)  To your knowledge, did Frank White invite

12   Jho Low to a Christmas party at the White House?

13        MR. KELLER:  Objection, Your Honor.  Leading, and

14   same relevance problems.

15        THE COURT:  I'll sustain it on both grounds.

16        MR. KENNER:  Your Honor, Mr. White testified to

17   that.

18        THE COURT:  All right.  Let me --

19        (Bench conference on the record.)

20        THE COURT:  What difference if he did or did not go

21   to the Christmas party?  Does this have to do when the photo

22   was taken?

23        MR. KENNER:  Yes.

24        THE COURT:  And I've just sustained the fact that

25   it's not relevant.  He's answered that they got the photo.  It

1  doesn't matter how they got the photo.  You've already got him

2  on the record that Frank White made the arrangement with Obama

3  and that Jho Low got the photo.  It doesn't matter whether the

4  jury knows at the Christmas party or elsewhere.  So I'm

5  sustaining both grounds and let's move it.

6            (The following proceedings were had in open court.)

7            THE COURT:  I'll sustain on both grounds.

8            MR. KENNER:  May I make another comment, Your Honor?

9            THE COURT:  You have something else?

10           MR. KENNER:  Yes.

11           (Bench conference on the record.)

12           MR. KENNER:  Your Honor, the government took almost

13  two and a half weeks to present its case.  I've been on my

14  case for less than a day --

15           THE COURT:  I'm not --

16           MR. KENNER:  And you keep telling me to move it

17  along.

18           THE COURT:  Because you're asking questions -- one,

19  you're doing things that are irrelevant.  They don't have

20  anything to do with moving it.  Two, you ask a lot of

21  questions in different ways that have the same question.

22  They're asked and answered.  And, you know, the government has

23  objected to some things, not others.  I generally don't step

24  in if they don't object.

25           But as a practical matter, some of this isn't

1    particularly relevant.  This is a good example.  You have in

2    the record that -- you know, that Jho Low wanted this

3    photograph desperately, that he got it ultimately.  Mr. White

4    was the one that arranged it.  And they got it -- it doesn't

5    make any difference to the jury whether it was at a Christmas

6    party or something else, which is the question you're asking.

7            So one of the things that when I've said to move on

8    is to point out to you that either -- you know, these are not

9    relevant questions.  And they've been asked before.  So,

10   frankly, you know, from your perspective, it seems to me that

11   some of this needs to be moved on.  This isn't a matter of

12   making comparison.  This is a matter of listening to the

13   questions that you're actually asking.

14           All right.  So if it's relevant, it's fine.  Move

15   along here.  I don't have any problem with that.

16           MR. KENNER:  Your Honor --

17           THE COURT:  There is no relevance to a Christmas

18   party.

19           MR. KENNER:  -- is there relevance to Mr. White

20   having made arrangements to get Jho Low through security check

21   points?  I believe that's relevant.

22           THE COURT:  Is that what you're -- was that the

23   point of this, to get through security points?

24           MR. KENNER:  Yes.

25           THE COURT:  And what would you argue is the

1    relevance of the security points?  Mr. White got the

2    arrangement.  What does it say that he got him through

3    security or not?  He obviously had contacts sufficient to be

4    able to get to Obama and have these people invited and have a

5    photograph ultimately done.  What difference does it make

6    whether he got him through security or not?  Okay.  Tell me

7    the relevance to the jury.

8            MR. KENNER:  The relevance is that I believe

9    Mr. White is a co-conspirator in this event, and I believe

10    that his actions are what made Mr. -- or what caused

11    Mr. Michel in this case to do the things which he did.  And I

12    think --

13            THE COURT:  I know that's your theory.  Hold on.  I

14    know that's your theory.  But I don't see getting through the

15    having this -- you've made the record on the contacts with

16    Obama.  I don't see.  And I'll let Mr. Keller tell me if

17    there's something different I'm missing here, but it seems to

18    me whether he got him through security or not doesn't make him

19    a co-conspirator.  He clearly had access to Obama, and he was

20    able to get the photograph.

21            So, Mr. Keller, is there something I'm missing here

22    about the security?

23            MR. KELLER:  No, Your Honor.  This is all after the

24    charged conduct in 2012.  This is after all of the money that

25    came in, all of the political contributions that are alleged

Direct Examination - Michel

1    as being illegal.  I don't see the relevance of this.

2              THE COURT:  Okay.  If it's after the period of the

3    charged conduct, then it's even less relevant.  So I've made

4    my ruling.

5              MR. KENNER:  Thank you, Your Honor.

6              (The following proceedings were had in open court.)

7              THE COURT:  I'll sustain it on those grounds.

8    **Q.**  (BY MR. KENNER)  Did you ever get the million dollars that

9    you were supposed to get from Mr. White for that photograph?

10             MR. KELLER:  Objection.  Relevance, Your Honor.

11             THE COURT:  I think you already indicated that -- I

12   thought you had asked him about that already.

13             MR. KENNER:  I don't believe I have, Your Honor,

14   but --

15             THE COURT:  All right.  I'll allow this question.

16   We'll see if it's the same.  The jury will remember whether it

17   was earlier done.

18             You can answer it.

19   **A.**  Yes, after --

20             THE COURT:  The question is a yes or no answer, did

21   you get it, the million dollars?

22   **A.**  Oh, yes.

23   **Q.**  (BY MR. KENNER)  Can you explain that answer, please?

24             THE COURT:  No, he got -- you asked him whether he

25   got the money, and he indicated he did.  So I'm assuming that

Direct Examination - Michel

1    there's some other questions that you're moving on to.

2    **Q.**  (BY MR. KENNER)  Separate from the money that Frank White

3    got for getting the picture, did you receive more than the

4    initial money you received to try to -- to try to arrange to

5    get a photograph with Jho Low and the President?

6             MR. KELLER:  Asked and answered, Your Honor.

7    Relevance at this point.

8             THE COURT:  I, frankly, don't understand it in terms

9    of what additional -- what money you're talking about.  Are

10   you talking about the million or some other money?  You need

11   to be more specific so I can figure out what you're asking.

12            MR. KENNER:  No, I'm -- Your Honor, I guess I'll

13   move on.  Thank you.

14            THE COURT:  Or move it -- just reword it.

15   **Q.**  (BY MR. KENNER)  Did -- how much money did you receive

16   totally from Mr. Laogumnerd, or from Jho Low?

17   **A.**  In 2012, for me to help assist Jho Low to get this photo,

18   took us about nine months.  In nine months, Jho Low paid me

19   $20 million to finally get him a photo at the White House, of

20   which I used about less than 10 percent of it to have my

21   friends come in and attend two events, of which we failed to

22   get Jho Low in these two events.

23       And finally, we got him in the White House at a Christmas

24   party in December, which he paid an additional 20 million, but

25   this time to Frank White.

Direct Examination - Michel

1    **Q.**  Sir, did the -- did there come a time when

2    Mr. Higginbotham took $41 million into his trust account after

3    a meeting in 2017 in Macau?

4    **A.**  Yes.  George had opened a client escrow account which he

5    received $41 million, and I was the client.

6    **Q.**  Was that your idea?

7    **A.**  No, it wasn't.  It was George's idea -- excuse me,

8    Mr. Higginbotham's idea.

9    **Q.**  We've heard some testimony about a person named Nickie Lum

10   Davis.  Do you recall?

11   **A.**  Yes.

12   **Q.**  And how long did you know Nickie Lum Davis before this?

13   **A.**  Before --

14   **Q.**  Before 2012.  I'm sorry, before 2017.

15   **A.**  I've known Nickie Lum Davis for couple years prior to

16   that.  I knew her from a mutual friend.  I knew her sister.

17   She was a Hawaiian businesswoman.

18   **Q.**  Was she involved in the entertainment community?

19   **A.**  Yes, she -- she dibbed and dabbled in entertainment.

20   **Q.**  Okay.  And -- did you start or launch or in the process of

21   launching, a new business venture in 2017?

22   **A.**  Yes.  That was the whole idea when I met with Pheng

23   through Jho Low, was an investment in a company called

24   Blacture.  It was a tech media company that was supposed to

25   help diversity, minorities, blacks in particular, CEOs, give

Direct Examination - Michel

1    them a place to be able to to be able to -- be able to meet each

2    other, share content, discuss business ideas, help to raise

3    funding for their start-ups.

4    **Q.**  And who was advising you legally as to how to set that

5    up?

6    **A.**  Mr. Higginbotham.

7    **Q.**  And did Mr. Higginbotham also get involved as your lawyer

8    in negotiating contracts with the variety of entities that

9    needed to be entered into to launch Blacture?

10   **A.**  Yes.  So we started to hire different vendors.  He was

11   heavier in the negotiation with Warner Brother films because

12   we were going to license some of the films to put on the

13   platform.

14       So George Higginbotham was dealing with every aspect of

15   that.  Plus he negotiated the -- we had bought a spot on NBC

16   for that following year at the Super Bowl.  He negotiated that

17   deal for me also.

18   **Q.**  And did you pay for a commercial at NBC for the Super

19   Bowl?

20   **A.**  Yes.  George negotiated a NBC deal, which was about -- I

21   think anywhere between $5 million for a 30-second ad.

22   **Q.**  And did that ad play, at the Super Bowl?

23   **A.**  Yes, it was played at the Super Bowl 2018.

24   **Q.**  Tell me about -- I'm going to withdraw that.

25       In 2017, did Mr. Higginbotham incorporate a company

Direct Examination - Michel

1    called Prosperity, LLC?

2    **A.**  Yes.

3    **Q.**  And what was Prosperity, LLC?

4    **A.**  That was another entertainment company.  It was supposed

5    to be the parent of the other companies.

6    **Q.**  And whose idea was it to make Prosperity the parent

7    company of Blacture?

8    **A.**  It was both George Higginbotham and a business manager at

9    the time named Marc Moscowitz.

10   **Q.**  And can you tell me about a company called Gorilla Music

11   Publishing?

12   **A.**  Gorilla Music Publishing was a production company that was

13   also created a couple years prior.  We were going to roll

14   everything into the parent company so the whole media company

15   could have a certain valuation at some point.

16   **Q.**  Okay.  And who gave you the legal advice as to how to do

17   that?

18   **A.**  Mr. Higginbotham.

19   **Q.**  Did you know at the time that Mr. Higginbotham was working

20   for the Department of Justice?

21   **A.**  Yes.

22   **Q.**  Were you aware of whether or not attorneys at the

23   Department of Justice were allowed to have side legal jobs?

24   **A.**  No, I didn't.  I figured if it was the case, George would

25   have known.

Direct Examination - Michel

1    **Q.**  At some point, did you become aware that that was the

2    fact?

3    **A.**  Sorry, was the --

4    **Q.**  At some point, did you become aware that there was a

5    rule -- or whether or not there was a rule about DOJ lawyers

6    having side gigs?

7    **A.**  Yes.

8    **Q.**  And how did you learn about that?

9    **A.**  From the indictment.

10   **Q.**  You heard Mr. Higginbotham testify that he spoke to you on

11   many matters daily.  I recall him saying something about seven

12   or eight times a day.  Is that your recollection?

13   **A.**  Yes, that's my recollection.

14   **Q.**  Did you speak a lot with him on a daily basis?

15   **A.**  We spoke about several times, seven to eight times, maybe

16   more or less per day.  But it was because that's the nature of

17   business when you're doing a start-up.  You've got to talk,

18   you've got to figure -- especially because he's handling all

19   the legal contracts and paperwork, so it's always did you get

20   it done, is it ready, or go back to the other side and push

21   harder or get better negotiation points.

22   **Q.**  Were any of these calls, to your knowledge, during the

23   Department of Justice business hours?

24   **A.**  Yes, it was.

25   **Q.**  And you said that -- or let me ask you, did

Direct Examination - Michel

1    Mr. Higginbotham assist you in how to go about raising money

2    from investors for the various projects that you were doing?

3    **A.**   Again, Mr. Higginbotham whole job was to -- anything that

4    had to do with legal matters, that was his job.   Paperwork,

5    contracts, whether it be leasing, whether it be gold mine.

6    Whatever it was that I needed at that time, he was my legal

7    eye.

8    **Q.**   Over the time period of October 2016 through January 2nd,

9    2018, did you rely on Mr. Higginbotham to provide whatever

10   legal advice that you needed?

11   **A.**   Yes.

12   **Q.**   Did you rely on him to identify any potential issues that

13   may arise in connection with your legal matters?

14   **A.**   Yes, I did.

15   **Q.**   From your perspective, now, did he fulfill his

16   responsibility to you as an attorney?

17   **A.**   No.   I felt he betrayed me, and I felt he didn't do the

18   job that I had hired him to do.

19   **Q.**   Okay.   Did you come to learn that Mr. Higginbotham was

20   talking with agents from the FBI during the time that he was

21   your lawyer?

22   **A.**   No, I didn't realize that.

23   **Q.**   Did you know whether or not Mr. Higginbotham was sharing

24   conversations that he had with you with the government?

25              MR. KELLER:   Objection, Your Honor.   Leading.   Lack

Direct Examination - Michel

1    of foundation; he says he didn't realize.  And relevance.

2           THE COURT:  All right.  I think certainly it's

3    leading.  There is no foundation here in terms of how he would

4    know.  He's indicated he didn't learn about it till later.  So

5    I don't understand how you would be asking him the question

6    and he would be able to answer it at this point.  So I'll

7    sustain the objections.

8    **Q.**  (BY MR. KENNER)  Did Mr. Higginbotham ever say to you, you

9    must register under FARA?

10   **A.**  No, he never did.

11   **Q.**  Did he ever say to you, you're getting close to having to

12   register for FARA?

13   **A.**  Not to my recollection.

14   **Q.**  You went -- during the course of the investigation in this

15   case, did you ever go talk to somebody from the FBI in New

16   York?

17   **A.**  Yes, I spoke to an agent.  I don't recall his name.  But

18   yes, I have.

19   **Q.**  Agent Zitman, does that refresh your recollection?

20   **A.**  I think so.

21   **Q.**  And on how many occasions did you meet with Mr. Zitman?

22   **A.**  Several times.

23   **Q.**  Can you be more specific than "several"?

24   **A.**  Anywhere between maybe two to four, two to five times.  I

25   don't really remember the exact number.

Direct Examination - Michel

1    **Q.**  Okay.  Let me direct your first -- your attention to the

2    first time you met with Agent Zitman.  Who called to arrange

3    that -- a meeting, you or Agent Zitman?

4    **A.**  I think -- from what I understand, I think I made the

5    call.

6    **Q.**  All right.  When you say from what you understand, did you

7    make the call, or do you not have a recollection of making the

8    call?

9    **A.**  I don't have a recollection.  I just remember meeting

10   Mr. -- is it Zitman or Zipperman?

11   **Q.**  Zitman.

12   **A.**  Zitman.

13   **Q.**  And where did you meet him on the first occasion that you

14   met?

15   **A.**  We met somewhere in New York City.

16   **Q.**  And was it at an office?

17   **A.**  I don't recall.

18   **Q.**  Do you recall whether or not you had lunch with him in New

19   York?

20   **A.**  Yes.

21   **Q.**  Do you recall whether that was the first time that you met

22   with him?

23   **A.**  Possibly.

24   **Q.**  And can you tell me what the conversation with Mr. Litman

25   [sic], what was the topic of that conversation with Agent

1    Zitman?

2    **A.**  From what I understand, I think the topic --

3    **Q.**  Mr. Michel, I don't want -- I didn't ask you what you

4    understand.  I asked you, do you recall the topic of your

5    conversation with Mr. Zitman?

6    **A.**  I had several conversations with Mr. Zitman, and one of

7    them involved Guo Wengui.

8    **Q.**  Okay.  And what with regard -- let me withdraw that.

9         Who brought up the subject of Guo Wengui?

10   **A.**  I did.

11   **Q.**  And was that in response to a question that he asked

12   you?

13   **A.**  No, this was because at that time I knew there was a woman

14   who was held captive in China by the name of Emily Huang, I

15   think, and I knew there was also news that elected officials

16   wanted to meet with Attorney General Jeff Session, so I was

17   just passing along information to FBI Agent Zitman.

18   **Q.**  For what purpose?

19   **A.**  Well, the purpose was to -- there was a -- that there

20   was -- Guo was a fugitive that was -- that the Chinese

21   government wanted back.  And at the same time, they had three

22   Americans that they wanted to exchange.  At that time, Sun

23   Lijun wanted to meet, was supposed to go meet with FBI

24   Director Comey, and at that time he had just gotten fired.  So

25   he was trying to figure out a way to either meet with Attorney

1    Jeff Session or someone or a new replacement.

2        And so when this American woman was supposed to be sent

3    back, I just took it upon myself to get that information,

4    because I thought it was something that the FBI should know,

5    about Guo being basically allegedly a criminal, rapist, wanted

6    by Red Notice and Interpol.  So I figure, look, they got these

7    three Americans here, they want this fugitive back, the

8    message is not getting across to you guys, I'm just trying to

9    connect.

10   **Q.**  All right.  And did you -- did you have another meeting

11   after the one you're describing with Agent Zitman, if you

12   recall?

13   **A.**  Yes.

14   **Q.**  And how long after this meeting did the next meeting take

15   place?

16   **A.**  I don't recall.

17   **Q.**  What was the subject matter of the next meeting with

18   Mr. Zitman?  Agent Zitman, I'm sorry.

19   **A.**  I think he wanted me to try to get more information about

20   this Guo matter.

21   **Q.**  And what kind of information, if you know, was he trying

22   to get about the Guo matter?

23        MR. KELLER:  Objection, Your Honor.  Calls for

24   speculation.  He's also relying on hearsay.

25        THE COURT:  I would agree the way you've worded it.

1    Sustained.

2    **Q.**  (BY MR. KENNER)  Did you become aware of a tape recording

3    in connection with -- excuse me -- with the Guo matter that

4    Agent Zitman wanted to get?

5              MR. KELLER:  Objection, Your Honor.  Leading, and

6    relevance.

7              THE COURT:  Let me just hear what the relevance

8    is.

9              (Bench conference on the record.)

10             MR. KENNER:  Your Honor, the relevance is he was

11   cooperating with the government.  The government wanted to get

12   a copy of the tape -- of two tape recordings between Jeh

13   Johnson and Guo, and Mr. Michel was asked if he could get them

14   copies.  He said yes.  He got the copies of those

15   conversations, put them on a thumb drive, and brought them

16   back to Agent Zitman.  I think that's highly relevant to

17   Mr. Michel's state of mind at the time.

18             THE COURT:  Mr. Keller.

19             MR. KELLER:  Mr. Michel is the one that raised the

20   subject of the recordings in an effort to get the FBI to

21   remove Guo as part of Mr. Michel's work for the Chinese

22   government.  The fact that then the FBI said okay, if you have

23   these recordings, can you provide them, is not cooperation.

24             It's also the details of this are not relevant.  If

25   he wants to ask Mr. Michel whether, in Mr. Michel's opinion,

1    he was cooperative with the FBI, fine.  But the details of

2    this recording and who it was between and the circumstances

3    under which it was made and how it was provided to the FBI,

4    none of that is relevant.

5              THE COURT:  All right.  I do think -- one thing,

6    Mr. Kenner, I'm sure that you know how to do nonleading

7    questions.  It would be helpful if you would do it.  We'd have

8    fewer objections.  And certainly, this is a very highly

9    intelligent witness you have.  It certainly is -- you're able

10   to form the question so he knows what you're asking without

11   making it leading.  So that's number one.

12             Number two, it does seem to me there was some

13   relevance in terms of this, but all of it -- the little

14   details about who was in the recordings, et cetera, are not

15   particularly relevant to what you wanted -- want to bring out.

16   So we don't need to get into the minutia.

17             MR. KENNER:  Thank you.

18             (The following proceedings were had in open court.)

19             THE COURT:  So reword the question.

20   **Q.**  (BY MR. KENNER)  Mr. Michel, did you provide tape

21   recordings to Mr. -- to Agent Zitman?

22   **A.**  Yes.

23   **Q.**  After meetings with Agent Zitman, did you ever meet with

24   agents in Santa Monica, California, at your studio?

25   **A.**  Yes, I did.

Direct Examination - Michel

1   **Q.**  And what agents did you meet with?

2   **A.**  I believe it was Agent -- I don't want to pronounce his

3   name wrong -- Heuchling.

4   **Q.**  I think it's Agent Heuchling?

5   **A.**  Heuchling, yeah.  I believe it was --

6           THE WITNESS:  Right?

7           (Agent raising his hand.)

8           THE WITNESS:  Okay.

9   **Q.**  (BY MR. KENNER)  Okay.  And did he come to see you in

10  Santa Monica, California?

11  **A.**  I think he came with also Agent Fern; right?  It was the

12  two of you guys that came; right?  Yes, I think so

13  **Q.**  Was it Agent Lidsky?

14  **A.**  I mean Lidsky, yes.  Yeah.

15  **Q.**  And did you have a conversation in Santa Monica with

16  Agents Heuchling, and Agent Lidsky?

17  **A.**  Yes.  It was actually on Santa Monica Boulevard.  They

18  came to my studio place, and we had conversation for a couple

19  hours.

20  **Q.**  Did the conversation touch upon the question of whether

21  you had registered under FARA?

22  **A.**  No.

23  **Q.**  What did the conversation -- what time period did the

24  conversation discuss?

25  **A.**  This was sometime in January 2018.  The conversation was

Direct Examination - Michel

1    basically about George Higginbotham, my attorney at the time.

2    They got into Pheng.  We got into conversation about Pheng.

3    We got into conversation about Anicorn, the company.  I think

4    we spoke about -- from my understanding, we spoke about Marc

5    Moscowitz.  They mentioned something about big fish, small

6    fish.  And that's kind of like the extent of the conversation.

7    They also -- sorry.  They also mentioned Jho Low.

8    **Q.**  Okay.  Did either of -- just in the interest of clarity,

9    did you ever receive any suggestion from any agents of the

10   government that you should be registering for FARA?

11   **A.**  No, absolutely not.

12   **Q.**  Did you receive any notices from any agents from the FBI

13   about registering for -- under FARA?

14   **A.**  No.

15   **Q.**  Did you receive any notices from FARA inquiring as to your

16   activity and possible registration?

17           MR. KELLER:  Objection, Your Honor.  Relevance at

18   this point.

19           MR. KENNER:  How is that not relevant?

20           THE COURT:  I'm not sure about that, lack

21   of relev- -- but tell me --

22           (Bench conference on the record.)

23           THE COURT:  Why isn't it relevant?

24           MR. KELLER:  Your Honor, there's been no foundation

25   laid that the FARA unit or the government knew about his

1    activities when they were ongoing in 2017 that would have

2    required registration.  Whether the FARA unit sent him an

3    inquiry about something that there's no foundation that the

4    FARA unit was aware of, and whether they sent him an inquiry

5    or not, I don't -- that's not relevant to whether he violated

6    the statute or not.

7              THE COURT:  Okay.  I think certainly the earlier

8    parts I think are a problem for you, if at that point they

9    weren't aware that there was an issue about it.  So I'll

10   sustain it based on those grounds.

11             MR. KENNER:  Your Honor, may I -- I tried to admit,

12   and I don't recall -- I think you didn't let me.  I tried to

13   admit a chain of e-mails between agents, including these

14   agents, about does he know what's coming next with FARA and is

15   it okay to go after FARA with him or to discuss it with him.

16   There's no question that the agents knew that there was a FARA

17   investigation going on.

18             THE COURT:  Mr. Keller.

19             MR. KELLER:  He's already asked him about whether

20   the agents talked to him about FARA, and the defendant

21   answered no, they didn't.  The question about the FARA unit

22   is --

23             THE COURT:  A different one.

24             MR. KELLER:  Yes, and it's irrelevant and

25   prejudicial.

Direct Examination - Michel

```
1              THE COURT:  Okay.  It's a different question than
2    whether the agents asked than whether the unit asked in terms
3    of the testimony that we had from Ms. Hunt.  So I would agree
4    with him that you had -- that the agents did not discuss it.
5    And if the -- from the testimony, I don't believe the agents
6    would have been the e-mails that -- I don't remember exactly
7    what happened with those.  But in terms of the unit itself,
8    which is different, and at that point the testimony, as I
9    recall it, was that they were -- didn't -- were not aware of
10   this until later.  So that's an improper question in terms of
11   at least the unit, but you do have that the agents didn't say
12   anything.
13              MR. KENNER:  Okay.  Thank you.
14              (The following proceedings were had in open court.)
15              THE COURT:  I'll sustain it as to the questions
16   about the FARA unit.  Lack of foundation.
17   Q.  (BY MR. KENNER)  Did you have additional meetings with
18   Agents Lidsky and/or Heuchling?
19   A.  I think -- sorry.  From what I recall, I had one more at
20   the end of January 2018, which I volunteer -- I volunteered to
21   go meet with, along with my counsel, to go meet with -- I
22   guess it's at the FBI headquarters or DOJ headquarters, to
23   basically explain to them what had transpired in 2017.
24   Q.  And did you go do that?
25   A.  Yes.
```

Direct Examination - Michel

1    **Q.**  And who was present at that time from the government?

2    **A.**  From my understanding --

3    **Q.**  Not your understanding, who was present?

4    **A.**  The prosecutors.

5    **Q.**  I'm sorry?

6    **A.**  The prosecutor.

7    **Q.**  Which prosecutor?

8    **A.**  I think at that time it was -- I'm sorry.  From my

9    understanding, it was someone named Jonathan Crass.  I don't

10   want to mispronounce his name.  I remember seeing the agent,

11   FBI Agent H.  I'm just going to say H for now.  I don't want

12   to screw his name up.

13   **Q.**  Heuchling?

14   **A.**  Heuchling, yeah.  And there were maybe probably -- there

15   probably was maybe like maybe seven to 10 people at this

16   meeting.

17   **Q.**  And how many of the seven or ten people were from the

18   government?

19   **A.**  Well, besides myself and my attorney, they're all from the

20   government.

21   **Q.**  All right.  And did you have any conversation at that time

22   about the events that took place in 2017?

23   **A.**  I tried to.  This meeting was supposed --

24          MR. KELLER:  Objection, Your Honor.  Relevance.  And

25   sounds like we're about to venture into hearsay.

Direct Examination - Michel

1          THE COURT:  If you're going to get into the

2     discussions from others about the meeting, it is hearsay,

3     out-of-court statements, so it's not appropriate.

4     **Q.**  (BY MR. KENNER)  Did anyone at that meeting suggest to you

5     that you should register under FARA?

6          MR. KELLER:  Objection, Your Honor.  Hearsay.

7          MR. KENNER:  Goes to the defendant's state of mind,

8     Your Honor.

9          THE COURT:  I'm not sure I see that, but let me hear

10    how you --

11          (Bench conference on the record.)

12          THE COURT:  How does this go to the state of mind in

13    terms of -- explain to me, in terms of their not having

14    brought it up.  Is that what you're saying?

15          MR. KENNER:  Your Honor, I won't offer it for the

16    truth of the matter.  I will offer it for what Mr. Michel's

17    understanding was as to whether or not, after that meeting, he

18    knew he should register for FARA.

19          MR. KELLER:  Your Honor, his understanding after

20    this meeting isn't relevant.  It's his understanding at the

21    time he was engaging in charged conduct.  That meeting

22    postdated the charged conduct, and it was about potential

23    negotiations to try and resolve this matter preindictment.

24          THE COURT:  Okay.  So if that's correct about the

25    preindictment thing, we definitely should not be getting into

Direct Examination - Michel

1    it.  And if it's not, if it's after all of this conduct that

2    would have required him to register, that doesn't -- then I

3    agree it -- it's the state of mind at the time.  State of mind

4    is an appropriate exception to hearsay, but it should be at

5    the time that you're doing it, not -- that you're engaging in

6    it, not some point, you know, basically a year after the

7    occurrences.

8            So I'll -- I will -- you know, I've allowed some

9    information on the state of mind, but that was all during the

10   period of time that he would have been required to register.

11   And the events occurred during that period of time, when he

12   was engaged in what the government has claimed are these

13   activities.  What you're bringing up is something that's

14   totally afterwards.  So at that point, that's not -- I don't

15   see how it's relevant.  So I'll allow you to go through it

16   this way.

17           (The following proceedings were had in open court.)

18   Q.  (BY MR. KENNER)  After that meeting that you've just

19   referred to, did you believe that you had to register under

20   FARA?

21           MR. KELLER:  Objection.  Relevance, Your Honor.

22           THE COURT:  I'll sustain it based on the discussion.

23   This is discussions after the fact of the activities that are

24   at issue.

25           MR. KENNER:  Your Honor, may I --

1          THE COURT:  We've discussed this same thing unless

2     you're bringing up a new argument.

3          MR. KENNER:  Yes.

4          (Bench conference on the record.)

5          THE COURT:  Okay.

6          MR. KENNER:  Yes, Your Honor, there's been evidence

7     in this case that the -- FARA allows registration even

8     subsequent to the events.  It even allows retroactive

9     registration.  It is clearly relevant whether or not it's in

10    2018 because he could have still registered and satisfied the

11    requirement under FARA, if anybody would have let him know or

12    if he had a reason to believe he should.  I cannot understand

13    how this is not relevant.  He's --

14         MR. KELLER:  He's not --

15         THE COURT:  Mr. Keller.

16         MR. KELLER:  I'm sorry, Your Honor.  He's not

17    charged with not registering retroactively in 2018.  And even

18    if he had registered retroactively, that wouldn't somehow

19    negate his criminal liability for his unregistered actions in

20    2017.  It's not relevant.  Postdates the charged conduct.

21         THE COURT:  It seems to me --

22         MR. KENNER:  -- charged conduct.

23         THE COURT:  Well, I'm -- I don't remember, frankly,

24    the discussion of doing it retroactively, where it -- to cover

25    the criminal conduct.  You may be able to do it retroactively

1    in terms of you're just engaging in the activity.  But as a

2    practical matter -- and I don't remember that specifically,

3    frankly, from Ms. Hunt.  But it does seem to me that there's

4    some problem in terms of retroactively, which would basically

5    wipe away any criminal conduct that you had engaged in.  That

6    doesn't sound right.  I mean, in terms of being able to sign

7    up at a later point.

8           Now, if as settlement -- as discussions of

9    negotiations you might have been able to do something as part

10   of that, but we're not talking about that.  I don't see how --

11   we do not have on the record clearly enough that -- that he

12   would have been able to file, retroactively in 2018, and that

13   would have wiped out his criminal conduct in terms of us not

14   having filed at the earlier point when he was committing what

15   the government considers FARA crimes.

16          So I don't -- you don't have a clear enough record,

17   frankly, as far as I can tell, in terms -- I'll take the

18   afternoon break and take a look at the testimony.  But I don't

19   believe that we have testimony that indicates that it would

20   simply wipe away his criminal conduct, which is the impression

21   that you would be leaving.  So I'll take the afternoon break

22   at this point and take a look.

23          MR. KELLER:  Thank you, Your Honor.

24          (The following proceedings were had in open court.)

25          THE COURT:  All right.  Members of the jury, I think

Direct Examination - Michel

 1    this is probably a good time to take our afternoon break.  So

 2    it's -- let me see, these clocks are all different.  It's 20

 3    after 3:00.  So if we could go till 3:35.  Okay.  So don't

 4    talk about the case.

 5                (Jury left the courtroom.)

 6          THE COURT:  All right.  Come back a few minutes

 7    early and I'll -- after I've looked at it, I'll tell you what

 8    my ruling is.

 9          MR. KENNER:  Thank you.

10          (A recess was taken.)

11          THE COURT:  All right.  It's okay.  I'm going to be

12    making a legal ruling anyway.  He can hear.  No, that's okay.

13          All right.  So I did -- as I was leaving, I asked

14    chambers to ask defense for the statutory section on which you

15    were relying for the proposition that FARA permits retroactive

16    registration.  In my review, I found no statutory regulatory

17    provision creating such a safe harbor myself.  18, U.S.C.,

18    612(a) requires a person to register within ten days of

19    becoming an agent of a foreign principal.  Section 618(a)

20    criminalizes knowingly and willfully failing to register while

21    acting as a foreign agent; in other words, a person subject to

22    the registration requirement in Section 612(a).  So

23    Mr. Michel's knowledge of the requirement to register doesn't

24    matter if it falls outside of the period of when he was

25    required to register by law.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Direct Examination - Michel

1          You did cite, just before I came out, so I did look

2    at it, defense cited 22, U.S.C., 618(e), which relates to the

3    statute of limitations of FARA in terms of when you can charge

4    him.  That's not applicable.  We're not talking about statute

5    of limitations.  We're talking about whether he can

6    retroact- -- you know, sign up after the criminal conduct and

7    have it apply retroactively so as to wipe out his criminal

8    conduct.  There is no statutory provision.  There is no

9    regulatory provision.

10          I will not say that Ms. Hunt's testimony was looked

11    at with total care, but went through enough to see that

12    there's nothing in her testimony that could be relied on to

13    suggest in any way that you can register later for conduct

14    that should have been -- when you should have registered

15    earlier and somehow have it apply retroactively.

16          So based on what I've -- what you've proposed is a

17    reason for it, I'm finding that you cannot pursue this line of

18    questioning.

19          Now we can get the jury in.

20          (Jury entered the courtroom.)

21          THE COURT:  Good afternoon.  Please, everyone, sit

22    down.

23          All right.  We're ready to proceed.  We're still in

24    the direct of Mr. Michel.

25          Mr. Kenner.

1          MR. KENNER:  Thank you.

2     **Q.**  (BY MR. KENNER)  Mr. Michel, I want to direct your

3     attention to 2017.  Did you meet with Pheng Laogumnerd?

4     **A.**  Yes.

5     **Q.**  And where did you meet with him?

6     **A.**  Bangkok.

7     **Q.**  And when did you meet with him?  Was that the trip that --

8     well, I don't want to lead you, but do you remember the date

9     that you got there?

10    **A.**  No.  I met with him somewhere in 2017, April, May-ish.

11    **Q.**  Okay.  It wasn't in September of 2017?

12    **A.**  I met him a second time -- well, I mean, I met him again

13    in September of 2017, but the very first time I met Pheng

14    Laogumnerd was early part of 2017.

15    **Q.**  All right.  And did you meet with him at that time?

16    **A.**  Yes, I met with him.

17    **Q.**  Did you have a conversation with him relative to investing

18    in your entertainment projects?

19    **A.**  Yes.

20    **Q.**  What was your understanding, after that conversation, of

21    whether or not, in 2017, Pheng Laogumnerd was or was not going

22    to pursue investing in your entertainment businesses?

23    **A.**  My understanding was Pheng was going to invest a

24    substantial amount of money into my entertainment company, and

25    we came -- walked away with an agreement.

Direct Examination - Michel

1    **Q.**  Okay.  And do you recall the terms of that agreement?

2    **A.**  Well, I don't remember the exact detail, because again,

3    George dealt with the contract, but I know it was an

4    investment in the media company that he gave me, and I was

5    going to build this media structure, entertainment, tech, to

6    do as I please.

7    **Q.**  Okay.  And this had nothing to do with monies that you

8    received in 2012; correct?

9    **A.**  Correct, 2012, again.

10   **Q.**  Okay.

11   **A.**  It was about a photo for Jho Low, which I got paid

12   $20 million.

13   **Q.**  Right.

14   **A.**  In 2017, money came from Pheng.  That's who gave me money

15   in 2017.

16   **Q.**  And did you direct how the money that you received in 2017

17   was to be used?

18   **A.**  Yes.

19   **Q.**  And what -- what was your -- what did you direct it be

20   used for?

21   **A.**  Well, obviously the majority of it -- this was a business

22   deal, so majority of it has to go into the business.  But some

23   of it, you know, I paid off some people who helped me put this

24   deal together.  And you get a small percentage that you can

25   use obviously for your own personal use.  But the majority was

1   to help build the media structure or media platform that I

2   intended to build.

3   **Q.**  We've heard testimony from Mr. Higginbotham that you

4   instructed him to put $25 million of the 41 million he

5   received in his client trust account into a CD.  Did you do

6   that?

7   **A.**  Yes.

8   **Q.**  And why did you direct him to segregate $25 million and

9   put it into a CD?

10  **A.**  Because at the time, when I was working with Nickie Lum

11  Davis, we was going to start an entertainment company, and she

12  wanted me to give her the $25 million so she can run with it.

13  In the beginning, I thought about doing that, then I kind of

14  like said I don't want to do that anymore.  So I told George

15  Higginbotham to just put the 25 million in a CD and when I'm

16  ready to deal with it, I'll deal with it accordingly.

17  **Q.**  All right.  Mr. Michel, did you register under FARA?

18  **A.**  No.

19  **Q.**  Why?

20  **A.**  No one ever told me.  Elliott Broidy never told me to

21  register.  Nickie Lum Davis never told me to register.  George

22  Higginbotham never told me to register.  No one I spoke to

23  ever mentioned FARA to me.  Not the FBI agents, no one.

24  **Q.**  Is it your testimony that -- well, let me ask you this,

25  were you aware of FARA at all in 2017?

Cross-examination - Michel

1    **A.**  No, I wasn't.

2    **Q.**  Had you known about it, what would you have done?

3    **A.**  I would have registered if I -- if I knew about FARA in

4    2017, I would have registered.

5    **Q.**  And is the reason -- or what is the reason you didn't

6    register?

7            MR. KELLER:  Objection, Your Honor.  Asked and

8    answered at this point.

9            THE COURT:  I'll sustain it.  You've asked it in

10   various ways already.

11           MR. KENNER:  I have no further questions.

12           THE COURT:  All right.  Cross.

13           MR. KELLER:  Thank you, Your Honor.

14                          CROSS-EXAMINATION

15   BY MR. KELLER:

16   **Q.**  Good afternoon, Mr. Michel.

17   **A.**  Good afternoon, Mr. Keller.

18   **Q.**  So I want to start where Mr. Kenner started back in 2012.

19   You discussed how you were introduced to Jho Low and the terms

20   of the initial $1 million that came in from Jho Low to you.

21   Do you recall that?

22   **A.**  Yes.

23   **Q.**  I believe it was your testimony that you were introduced

24   to Jho Low in -- sometime around 2006, through Joel

25   Rousseau?

Cross-examination - Michel

1   **A.**  Yes.

2   **Q.**  And then you had one conversation with him again in

3   2008?

4   **A.**  Yes.

5   **Q.**  So your testimony is that you saw him in 2006, you had a

6   brief conversation with him in 2008, and then you had another

7   conversation with him in 2012; is that right?

8   **A.**  Through Joel, yes.  Sorry, Joel Rousseau.

9   **Q.**  I believe you testified that you had no relationship with

10  Jho Low at that point; is that right?

11  **A.**  What point, 2012?

12  **Q.**  Yes.

13  **A.**  No.

14  **Q.**  No, you did not have a relationship with Jho Low at that

15  point?

16  **A.**  That is correct.

17  **Q.**  But it's your testimony that based on two or three

18  conversations and no relationship, Jho Low sent you a million

19  dollars in 2012?

20  **A.**  Yes.

21  **Q.**  And it's your testimony that he sent you that million

22  dollars to think about whether you would help him try to get a

23  photo with President Obama; right?

24  **A.**  Yes.

25  **Q.**  So it wasn't a million dollars for the photo; correct?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Cross-examination - Michel

1   **A.**  It was a million dollars -- it was a million dollars for

2   me to figure out and think about how I'm going to help him get

3   this photo.

4   **Q.**  So it was kind of a consulting fee for you to figure out

5   how to get the photo?

6   **A.**  It was a million dollars for me to think about how I'm

7   going to get this photo for Jho Low.

8   **Q.**  But it's your testimony that that was your money; right?

9   **A.**  Yes.

10  **Q.**  So it was a fee for some kind of service; right?

11  **A.**  Well, no, I just -- it was just money that was sent to me

12  to think about it.  I didn't think about whether it was a fee

13  or not.  To be quite honest with you, I never thought he was

14  going to send it.

15  **Q.**  But he did send it; right?

16  **A.**  Yes, he did.

17  **Q.**  And it was money to you, and it was for some kind of

18  brainstorming that you were going to do about how to get --

19              MR. KENNER:  Objection.  Asked and answered.

20              THE COURT:  This is cross-examination.

21              MR. KELLER:  He hasn't answered the question.

22  **Q.**  (BY MR. KELLER)  It was for -- it was a million dollars

23  for you to do some kind of brainstorming or for you to do

24  something for Jho Low; right?

25  **A.**  It was a million dollars to figure out if I can help him

Cross-examination - Michel

1    get this photo with President Obama.

2    **Q.**  But it was not for a political contribution; correct?

3    **A.**  Correct.

4          MR. KELLER:  Could we bring up Government's Exhibit

5    294, which is previously admitted, Ms. Orozco?

6          THE COURT:  It has been admitted.

7    **Q.**  (BY MR. KELLER)  Mr. Michel, do you recognize this as an

8    e-mail from Joel Rousseau to you on June 19th, 2012?

9    **A.**  Yes.

10   **Q.**  And it's a -- it's a forward of an e-mail chain;

11   correct?

12   **A.**  Yes.

13   **Q.**  There's e-mails from Eric Tan in here, e-mails from Joel

14   Rousseau; right?

15   **A.**  Yes.

16   **Q.**  All right.  So down at the bottom of what Ms. Orozco has

17   just called out there, the original message at the bottom of

18   what we can see in the call-out box, that's an e-mail from

19   Eric Tan to Joel Rousseau regarding the event in the USA;

20   right?

21   **A.**  Yes.

22   **Q.**  And it says, "1 million sent.  They should have gotten

23   it"; right?

24   **A.**  Yes.

25   **Q.**  That's the million dollars we're talking about, isn't

Cross-examination - Michel

1  it?

2  **A.**  Yes.

3  **Q.**  And that's for the event in the USA, that's for a campaign

4  event; right?

5  **A.**  No.  It's for Jho Low to take a photo with President

6  Obama.

7  **Q.**  At a campaign event; right?

8  **A.**  Yes.

9         MR. KELLER:  Ms. Orozco, if you can drop that

10  call-out box.  Could you bring 294 back up, please.  And then,

11  Ms. Orozco, if we could call out the bottom half of that

12  e-mail after the 1 million sent that we just reviewed.

13  **Q.**  (BY MR. KELLER)  So this is an e-mail from Joel Rousseau,

14  and if you look at the third paragraph there, he says -- or

15  the third -- the third line, "I was told the amount is

16  1 million to be wired to that nonprofit account set up for

17  that purpose.  And upon receipt, this amount would be

18  forwarded to another party, as you know."

19      That's the million dollars that we're talking about;

20  right?

21  **A.**  Yes.

22  **Q.**  And so it's going to a nonprofit account first; right?

23  **A.**  Mr. Keller, I don't understand what the communication that

24  Joel and Eric Tan were having this back and forth.  When I

25  spoke to Joel, when he first called me, my understanding was

Cross-examination - Michel

1    Jho Low wants a photo with President Obama, whatever that

2    means.  And I said to Joel, tell him send me a million

3    dollars, then I'll figure out if I can or cannot be able to

4    assist with him in having this photo.

5    **Q.**  Mr. Michel, you were sent this e-mail; correct?

6    **A.**  I was sent a lot of e-mails, yes.

7              MR. KENNER:  Objection.  Hearsay, Your Honor.  The

8    e-mail --

9              THE COURT:  If this had been sent -- I'm sorry.

10             MR. KELLER:  This has already --

11             THE COURT:  Go ahead.

12             MR. KELLER:  This has already been admitted, Your

13   Honor, number one.

14             MR. KENNER:  It's still hearsay.

15             THE COURT:  It's -- let's -- so we take care of this

16   at the beginning.

17             (Bench conference on the record.)

18             THE COURT:  This is something that's being sent, I

19   assume to Mr. Michel, and he's on it?

20             MR. KELLER:  Yes, Your Honor.

21             THE COURT:  Okay.  You want to respond to his

22   hearsay?

23             MR. KELLER:  It's already been admitted.  I don't --

24   it doesn't -- he can't call it hearsay now when he didn't

25   object to it earlier when it came in.  It's in evidence.  I

Cross-examination - Michel

1    can ask him about it.

2           THE COURT:  Yes, and I think he can.  So that's --

3    that's the end of it.

4           (The following proceedings were had in open court.)

5           THE COURT:  Go ahead.

6    **Q.**  (BY MR. KELLER)  All right.  Mr. Michel, I believe your

7    testimony is you were sent a lot of e-mails, including this

8    e-mail; correct?

9    **A.**  Yes.

10    **Q.**  And this e-mail says that "$1 million will be wired to a

11    nonprofit set up for that purpose and upon receipt, the amount

12    will be forwarded to another party."

13     That's what the e-mail says; right?

14    **A.**  Correct.

15    **Q.**  All right.  And then if you skip down two lines, it says,

16    "Keep in mind to make transfer at your earliest convenience as

17    it will have to be forwarded to them upon receipt.  And once

18    they got it, they will send you the confirmation with the

19    address."

20     That's what the e-mail says; right?

21    **A.**  That's what it says.

22    **Q.**  That's the million dollars to be forwarded to the Obama

23    campaign so they'll give you the address of the event;

24    right?

25    **A.**  That's what it says, but that's not what happened.

Cross-examination - Michel

1    **Q.**  All right.

2              MR. KELLER:  Could we -- Ms. Orozco, if we can drop

3    this call-out.  And if you could call out the bottom of

4    page 1, down through the end of that e-mail that runs into

5    page 2, starting with the header at the bottom of page 1.

6    Can -- yeah.  Can you scroll down in the call-out box --

7    that's perfect.  Thank you, Ms. Orozco.

8    **Q.**  (BY MR. KELLER)  Mr. Michel, so let's forget about what

9    other people said in e-mails for a moment.  This is an e-mail

10   from you, isn't it?

11   **A.**  Yes.

12   **Q.**  It's an e-mail from you to Joel Rousseau on June 14th,

13   2012; right?

14       Right, Mr. Michel?

15   **A.**  Yes.

16   **Q.**  And it's about this $1 million, isn't it?

17   **A.**  It's about Jho Low getting a photo with President Obama.

18   **Q.**  In exchange for a $1 million campaign contribution;

19   right?

20   **A.**  There was no campaign contribution.

21   **Q.**  So if we look down at No. 2, bullet No. 2 in the call-out

22   there, BRB Holdings, LLC, that's your company; right?

23   **A.**  No, sir.

24   **Q.**  BRB Holdings was not a company that you controlled?

25   **A.**  Never.

Cross-examination - Michel

1    **Q.**  That bank account, Wells Fargo, that wasn't -- that wasn't

2    an account associated with you?

3    **A.**  Absolutely not.

4              MR. KELLER:   Ms. Orozco, can we bring up -- well,

5    actually let's drop that for a minute.

6    **Q.**  (BY MR. KELLER)  Okay.  Bullet No. 3 says, "it's fine to

7    send the wire from an offshore company"; right?

8    **A.**  Yes.

9    **Q.**  Who was the BRB Holdings account associated with then, if

10   it wasn't you?

11   **A.**  It was Barry Bekkedam's, my former financial manager,

12   account.

13   **Q.**  And he set that up for you, didn't he?

14   **A.**  That was already his account.

15   **Q.**  That he used as your financial manager for your financial

16   dealings; right?

17   **A.**  I suppose.

18   **Q.**  And then No. 4 says, "The main event is on Tuesday, June

19   26, at 4:00 p.m."

20        That's a reference to the fundraising event, the campaign

21   fundraising event; right?

22   **A.**  Yes.

23   **Q.**  And you say, "Once they receive the donation, they give us

24   the address where the event is taking place."

25        That's the million dollars; right?

62

Cross-examination - Michel

1    **A.**  No, it's not.

2    **Q.**  So it's your testimony that this whole e-mail exchange is

3    not about the million dollars that Jho Low sent you to get

4    into the political event?

5    **A.**  Can I explain?

6    **Q.**  Just answer the question.

7    **A.**  Well, the question --

8            THE COURT:  Answer the question yes or no and you

9    can explain.

10   **A.**  No, I need to explain.

11   **Q.**  (BY MR. KELLER)  Is this e-mail chain about the million

12   dollars that Jho Low sent you to try to get into a political

13   event with President Obama, yes or no?

14   **A.**  No.  The million dollars is for Jho Low to get a photo.

15       So if I can please explain.  He sent me a million

16   dollars.  Frank White, at that time, needed five heads.  Joel

17   was one of them.  This is for Joel.  Because at that point we

18   all know Jho Low cannot come to this event.  Mohamed al Basile

19   [sic] was supposed to come to the event, and three of my

20   friends that I paid for went to the event, along with myself.

21   **Q.**  You hadn't received the money at the time of this e-mail,

22   had you?

23   **A.**  Excuse me?

24   **Q.**  You had not received the $1 million at the time of this

25   e-mail.  That's what the e-mail is about, isn't it?

Cross-examination - Michel

1    **A.**  I don't -- I'm not sure.

2    **Q.**  Well, you're providing account information for the money

3    to be sent to you, aren't you?

4    **A.**  Correct.

5          MR. KENNER:  Objection.  Assumes facts not in

6    evidence.

7          THE COURT:  He's asking him whether that's correct

8    or not.  It's on -- the account is listed, so he can indicate

9    whether or not the money was sent there or not.

10   **A.**  Again, Mr. Keller, when Joel spoke to me about --

11   **Q.**  (BY MR. KELLER)  I'm sorry, Mr. Michel, I didn't ask you

12   about when Joel spoke to you.  I asked you if in this e-mail

13   you provided account information --

14         MR. KENNER:  Objection, Your Honor.  Argumentative

15   and not necessary.

16         THE COURT:  Excuse me.  Sir, he was asked a

17   question.

18         Mr. Michel, you have to answer his question.

19         And Mr. Kenner, I'm sure, can follow up.

20         If it's a yes or no answer, I'll allow you to give

21   an explanation.  He's asked a question as to whether you

22   provided --

23   **A.**  What was the question, Mr. Keller?

24         THE COURT:  Go ahead and ask again.

25   **Q.**  (BY MR. KELLER)  This is an e-mail from you, providing

1    account information for the $1 million to be wired from Jho

2    Low; right?

3    **A.**   Yes.

4    **Q.**   And in this same e-mail, you're referencing a political

5    event and a political donation; right?

6    **A.**   No.

7    **Q.**   Your e-mail doesn't say, "Once they received the donation,

8    they give us the address where the event is taking place"?

9        That's not what you wrote?

10   **A.**   That's pertaining to Joel Rousseau, who has to -- Joel

11   Rousseau and Mohammad al Basile.  That's what that e-mail is

12   pertaining to.

13   **Q.**   Oh, so once we get to No. 4, we're no longer talking about

14   money from Jho Low?

15   **A.**   No, we're not.

16           MR. KELLER:  Can we pull up Government's Exhibit

17   665, which has not yet been admitted?

18           Your Honor, I'd like to use this as a demonstrative

19   with this witness.

20           THE COURT:  Let me see what it is, and Mr. Kenner

21   needs to look at it too.

22           Okay.

23           MR. KENNER:  I have no objection.

24           THE COURT:  I'm sorry?

25           MR. KENNER:  I have no objection.

Cross-examination - Michel

1              THE COURT:  All right.  Then go ahead.

2              This is a demonstrative, so it's not going to be

3    admitted into evidence.  It's simply to show it to you for you

4    to look at the information on it.

5    **Q.**  (BY MR. KELLER)  So, Mr. Michel, you received --

6              MR. KENNER:  Your Honor, I would move to have this

7    admitted.

8              THE COURT:  Any objection, Mr. Keller?

9              MR. KELLER:  No objection.

10             THE COURT:  All right.  Then we'll admit, without

11   opposition, 665.

12             MR. KELLER:  If we could publish this,

13   Ms. Patterson.

14   **Q.**  (BY MR. KELLER)  So on June 15th, Mr. Michel, you received

15   this one million that we were talking about from Jho Low;

16   right?

17   **A.**  Based on your exhibit, yes.

18   **Q.**  Well, do you have any reason to doubt that that money came

19   in on June 15th?

20   **A.**  No.

21   **Q.**  All right.  And then within three days, you start making

22   political contributions to the Obama Victory Fund; right?

23   **A.**  I gave money to the donors to make donation to the fund,

24   yes.

25   **Q.**  Right.  Starting on June 18th; right?

1    **A.**  Okay.  Yes.

2    **Q.**  And then about a week later, there's the first fundraising

3    event that you attend, right, on June 26th?

4    **A.**  Yes.

5    **Q.**  After that first 1 million came in from Mr. Low, you asked

6    for more money, didn't you?

7    **A.**  Yes.

8    **Q.**  You said that you needed more money for more

9    contributions; correct?

10   **A.**  I don't recall.

11   **Q.**  You don't recall if you requested more money for more

12   political contributions?

13   **A.**  No, I recall asking -- June 15, I received the $1 million.

14   June 26th, put $150,000 of donation to get Jho Low into the

15   event.  Jho Low can't get into the event.  So now we got to

16   try to figure out how to get him to the next event.  Which is

17   the second event right here.  So I said to him, the million

18   dollars he gave me, I tried, it didn't work.  Now you have to

19   send me more money for me to try to figure out how to get you

20   into another event.

21   **Q.**  Even though you had only put $150,000 of that million into

22   the campaign at that point; right?

23   **A.**  Yes.

24   **Q.**  You asked for more money because you needed more money to

25   put into the campaign?

Cross-examination - Michel

1   **A.**  No, because I needed to try to get him to another event
2   that he couldn't get in the first one.  Had he got in in the
3   first one, it would have stopped right there.
4   **Q.**  So you spent all the rest of that $1 million on your own
5   personal expenses?  There was none of that money left?
6   **A.**  No, there was some of that money left.  I gave Joel
7   Rousseau $300,000, and whatever else was left from that
8   point.
9   **Q.**  So you had a half a million dollars left, but you still
10  asked Mr. Low for more money; right?
11  **A.**  Yes.
12  **Q.**  All right.  And then 600,000 comes in from Jho Low on
13  August 2nd; right?
14  **A.**  Yes.
15  **Q.**  And then another 9 million comes in on August 7th?
16  **A.**  Yes.
17  **Q.**  Within three days, you start making more contributions to
18  the Obama Victory Fund?
19  **A.**  Yes.
20  **Q.**  With Jho Low's money; right?
21  **A.**  Yes.  Well, no, no, I'm confused.  You said August 2nd,
22  $600,000 come in.  August 7th, $9 million come in.
23  August 10th, I gave $715,000 to my friends to go and donate
24  for the campaign.
25  **Q.**  But that was Low's money?

1   **A.**  That was my money.

2   **Q.**  So it's your testimony that you were earning that

3   $9 million in some capacity?

4   **A.**  It was free money.

5   **Q.**  It was free money, but for you to get a photo for Jho

6   Low?

7   **A.**  For me to help him get a photo with President Obama,

8   yes.

9   **Q.**  So based on whatever you were doing to get him the photo,

10  he was paying you this money; right?

11  **A.**  Yes.

12  **Q.**  And so when you received the money from Jho Low, you used

13  it to make political contributions; right?

14  **A.**  No.  Once he gave me the money, it was my discretion how I

15  spent the money, because it's my money.

16  **Q.**  I understand that it's your testimony that --

17  **A.**  And -- and the only reason that I gave the 715, the

18  $715,000 to the donors, is because Frank White wanted me to

19  fill his seats.  So in filling the seats, I invite my friends

20  who just wanted to be in the room with President Obama.  So it

21  was my discretion to use my money that Jho Low gave me to

22  figure out how to get him in this photo.  We didn't get him in

23  the photo for the second event.  We had to try it again.

24  **Q.**  I understand it's your testimony that once you received

25  it, this is your money.  I'm just saying that the money that

Cross-examination - Michel

1   you used, whether it's your money or whether it's still Jho

2   Low's money, let's leave that aside, the money that you used

3   to make these political contributions, it was money that had

4   been transferred in from Jho Low, whether it was your money at

5   that point or whether it was his money.

6           MR. KENNER:  Objection, Your Honor.  Irrelevance.

7           THE COURT:  Objecting to what?

8           MR. KENNER:  Objection to the distinction that he's

9   trying to draw --

10          THE COURT:  Well, he's -- no, it's an appropriate

11  question.

12          Go ahead and finish it.

13          MR. KENNER:  It's also asked and answered, Your

14  Honor.

15          THE COURT:  No, it hasn't been.

16  **Q.**  (BY MR. KELLER)  Mr. Michel, the money that you used for

17  the political contributions, it was money that you had

18  received from Jho Low; correct?

19  **A.**  No.  Once that was my money that I -- once Jho Low gave me

20  that money, it's my money.  I could have walked away.  I could

21  have done anything with the money.

22  **Q.**  Where did the money come from, Mr. Michel?

23  **A.**  Where it came from is irrelevant.

24          MR. KENNER:  Objection.  Asked and answered.

25          THE COURT:  Mr. Kenner, he's trying to get him to

Cross-examination - Michel

1    give an answer one way or the other.

2            I think you have probably gotten as far as he's

3    going to come up with an answer.

4    **Q.**  (BY MR. KELLER)  Where did the money come from?

5    **A.**  The money came from Jho Low.

6    **Q.**  Thank you.

7    **A.**  Okay.

8    **Q.**  And then about a month later, there's the second political

9    event; right?

10   **A.**  Yes.

11   **Q.**  And that's at Frank White's house?

12   **A.**  Yes.

13   **Q.**  That's where you get Jho Low's dad into the event;

14   right?

15   **A.**  Yes.

16   **Q.**  Because again, Jho Low doesn't vet; right?

17   **A.**  Yes.

18   **Q.**  And then you put a little bit over a million dollars --

19           MR. KENNER:  Excuse me.  Can we take down this

20   exhibit, or is this still being used?

21           THE COURT:  He's continuing to use it.

22           Unless you're not.  Are you using it?

23           MR. KELLER:  I am, Your Honor.  I'm moving to the

24   next bullet point.

25           MR. KENNER:  Bullet point?

Cross-examination - Michel

1          MR. KELLER:  The next bullet point on the time line,

2    Counsel.  Do you need me to explain further?

3          MR. KENNER:  Yes, please.

4          THE COURT:  Stop this.

5    Q.  (BY MR. KELLER)  So, Mr. Michel, you then put a little

6    over a million dollars reflected in the next bullet point on

7    the time line on September 7th.  You put a little over a

8    million dollars into the Black Men Vote Political Action

9    Committee; right?

10   A.  Yes.

11   Q.  And you understood that the Obama campaign was being

12   informed that you were making that contribution to the

13   political action committee; right?

14   A.  I was dealing with Frank White.  So whatever he was

15   dealing with, all he told me, donate to Black Men Vote, and I

16   did what he instructed me to do.

17   Q.  And you were making these political contributions to try

18   and raise your stature with the campaign so that you could get

19   this photo for Jho Low; right?

20   A.  Not necessarily.  Because -- because Frank White was

21   handling that.

22        My reason for trying to raise my status with the campaign

23   was simply because of previous relationship that I had with

24   President Obama.  And we wanted -- and I wanted to feel like I

25   could contribute in raising money for him by filling the seats

Cross-examination - Michel

1    and helping him get to a second term.  Now, if that raised my

2    status, fine.  If it didn't, it didn't matter to me.  The

3    point was helping President Obama get re-elected.

4    **Q.**  But you also wanted to be an ambassador to Haiti or have

5    some official role; right?

6    **A.**  No, what happened is I told Frank White it would be cool

7    to have a diplomatic plate.  And so he took that as me wanting

8    to be an ambassador.  You have to be an ambassador to have a

9    diplomatic plate.  But I really did not want to be an

10   ambassador.

11   **Q.**  Okay.  All right.  So then on November 6th, the last point

12   on the time line, you got an additional $11 million from Jho

13   Low; right?

14   **A.**  Correct.

15   **Q.**  So in total, you got a little bit over $20 million?

16   **A.**  Correct.

17   **Q.**  And this is all for you to get this photo for Jho Low;

18   right?

19   **A.**  Yes.

20   **Q.**  So you earned this money?

21   **A.**  Mr. Keller, Jho Low has been spending millions of dollars

22   prior to all of this for things that are not even that

23   important, between celebrities and whatnot.  He comes and says

24   he wants to have a photo with, arguably, the most iconic,

25   historic president in our lifetime.  So it's what the market

1    is willing to bear.  Give me this money, and I'm going to try

2    to figure it out.

3         Frank, as my mentor, is helping me figure it out.  Now,

4    since he didn't get the photo in the second event because he

5    thought he was coming, Frank White said he didn't vet, Frank

6    White suggested he send his father, his father had a great

7    time.  Obama gets re-elected.  He still now wants the photo,

8    of which Frank White now says we can get him the photo at the

9    White House.

10        So yes, that's what that $11 million for, for me to

11   continue to help him get this photo.  And once Frank White

12   confirmed the White House, he paid an additional $20 million

13   to Frank White to actually go in the White House and get the

14   photo.

15   **Q.**  Mr. Michel, my question is not about other people that

16   Mr. Low paid or other places where he threw around money.  My

17   question is about the 21 million that's reflected on

18   Government's Exhibit 665 there in front of you.  He paid you

19   this money; right?

20   **A.**  He paid me this money, yes.

21   **Q.**  Okay.  You didn't pay any taxes on that money, did you?

22   **A.**  No.

23   **Q.**  You lied and said it was a gift?

24   **A.**  I didn't lie.

25   **Q.**  Well, you lied and said it came from Eric Tan; right?

Cross-examination - Michel

1    **A.**  I didn't lie.

2    **Q.**  You said it was a gift, didn't you?

3    **A.**  My manager, financial manager at the time, again, Barry

4    Bekkedam, suggested, with Marcum, that this should be

5    considered a gift.  And he and Marcum thought that's the way

6    to go.

7        Again, these are people that I rely on their professional

8    expertise.  I would have never know how to come up with a gift

9    tax.  That was Barry Bekkedam suggesting.

10        And by the way, may I ask -- may I add, Barry Bekkedam

11    stole a good portion of that money.

12            MR. KELLER:  Your Honor, I'd move to strike as

13    nonresponsive.

14            MR. KENNER:  It is responsive.

15            THE COURT:  I'll leave it.

16            But, Mr. Michel, we don't need a whole narrative

17    about some of the rest of the things.  I would listen to the

18    question.  You can answer yes or no and explain.  But you have

19    gone well beyond what was asked.  So I would just ask that you

20    listen carefully to it and confine the answer to that.

21            But I won't strike this.

22            THE WITNESS:  Thank you, Your Honor.

23            MR. KELLER:  If we could pull up Government's

24    Exhibit 107, please.

25            THE COURT:  Sorry, what was it?

Cross-examination - Michel

1          MR. KELLER:  107, your Honor.  This has previously

2    been admitted.

3          THE COURT:  Okay.

4          MR. KELLER:  Ms. Orozco, if we could call out the --

5    if you can just call out the top three-quarters of the

6    document.

7          THE COURT:  This has been admitted.

8    **Q.**  (BY MR. KELLER)  This is a gift letter so that you

9    wouldn't have to pay taxes on this money; right, Mr. Michel?

10   **A.**  Yes.

11   **Q.**  But that money from Jho Low, you just testified it wasn't

12   a gift, it was payment to get him a photo with President

13   Obama; right?

14   **A.**  The logistics of it, how to word it, I don't know.  Barry

15   Bekkedam, again, is the one who suggested that.

16   **Q.**  The logistics you don't know, that's your testimony?

17   **A.**  What I'm saying is he's my financial manager.  So I rely

18   on what his expertise are.

19   **Q.**  Can a financial manager turn income into a gift?

20   **A.**  I don't know.

21   **Q.**  Do you know the difference between a gift and income?

22   **A.**  No.

23   **Q.**  Well, what was this, Mr. Michel, was it a gift, or was it

24   a payment to get a photo?

25   **A.**  I looked at it as free money.

Cross-examination - Michel

1   **Q.**  Right.  So was it a gift, or was it a payment to get a

2   photo?

3   **A.**  I didn't work for it.  I was having fun to try to get him

4   a photo with President Obama.

5   **Q.**  Well, you were putting hundreds of thousands of dollars

6   into campaign events; right?

7   **A.**  Yes.

8   **Q.**  And you were bringing your friends to fill seats at

9   campaign events; right?

10  **A.**  Yes.

11  **Q.**  And you were making contributions to Black Men Vote in

12  connection with Frank White; right?

13  **A.**  Yes.

14  **Q.**  And that was all as part of this effort to get a photo for

15  Jho Low; right?

16  **A.**  No.

17  **Q.**  So it's your testimony that you would have been engaging

18  in all of that activity, regardless of Jho Low?

19  **A.**  Well, I would have helped out regardless, yes, regardless

20  of Jho Low.  What I'm saying is if I wasn't told to donate to

21  Black Men Vote, for example, which I thought it was a great

22  cause, the point I'm saying is that did not mean that Jho Low

23  was going to get a photo.

24  **Q.**  Right.  It was just so that you could put Jho Low's money

25  into the campaign?

Cross-examination - Michel

1    **A.**  At that point it's not Jho Low money, it's my money.

2              MR. KELLER:  Ms. Orozco, you can drop that

3    exhibit.

4    **Q.**  (BY MR. KELLER)  So you testified that you gave money to

5    your friends so that they could make political contributions;

6    right?

7    **A.**  Correct.

8    **Q.**  Even though they couldn't afford to go themselves;

9    right?

10   **A.**  Right.

11   **Q.**  And you testified you didn't think there was anything

12   wrong with that; right?

13   **A.**  Correct.

14   **Q.**  You said no one told you that there was anything wrong

15   with that; right?

16   **A.**  Yes.

17   **Q.**  Do you remember the testimony of Jack Brewer?

18   **A.**  No.

19   **Q.**  Well, you know Jack Brewer, don't you?

20   **A.**  Yes, I do.

21   **Q.**  You gave him money to contribute to the Obama campaign,

22   didn't you?

23   **A.**  Yes.

24   **Q.**  He returned that money, didn't he?

25   **A.**  I don't recall.

Cross-examination - Michel

1    **Q.** He didn't tell you that he returned the money because he

2    talked to a lawyer and he wasn't comfortable making the

3    contribution the way you that asked him to?

4    **A.** I don't recall.

5    **Q.** Naomi Firestone, she's another person that you gave money

6    to to make contributions to the Obama campaign; right?

7    **A.** Correct.

8           MR. KENNER:  Objection, Your Honor.  There's no

9    testimony about that.  There's no foundation.  She didn't

10   testify.

11          MR. KELLER:  There are financial records showing

12   that she made a contri- -- that Mr. Michel sent her money to

13   make a contribution.

14          MR. KENNER:  Objection, Your Honor.

15          THE COURT:  If that's in -- if that's evidence,

16   let's talk about that.

17          (Bench conference on the record.)

18          MR. KELLER:  Your Honor, he's already answered the

19   question that yes, he sent her money for that purpose, and

20   there are financial records showing him sending her money.

21          THE COURT:  And I take it the financial records are

22   in evidence?

23          MR. KELLER:  Yes, Your Honor.

24          THE COURT:  Okay.  So what do you have to say,

25   Mr. Kenner, to that?  If there's records that show it, then I

Cross-examination - Michel

1    don't -- it's part of the evidence.

2            MR. KENNER:  The question is whether or not

3    Mr. Michel knew about it, not whether or not records show that

4    it happened.

5            THE COURT:  Well --

6            MR. KELLER:  The records show that he did it, so the

7    question is did you do it and he said yes.

8            THE COURT:  So the point is, is that did he give her

9    the money.  He's already answered he gave her the money, and

10    it shows in the record that he sent her the money.  The

11    financial records.  So there's something that shows there.  I

12    don't know whether it shows what we have exactly about whether

13    she didn't -- returned it.

14            Is that -- did she return it, or what are you --

15            MR. KELLER:  Yes, she returned it.

16            THE COURT:  All right.  Then he can ask the

17    question.

18            (The following proceedings were had in open court.)

19            THE COURT:  Overruled.

20    **Q.**  (BY MR. KELLER)  Mr. Michel, you also sent money to Naomi

21    Firestone to contribute to the Obama campaign; right?

22    **A.**  Correct.

23    **Q.**  And she returned the money too, didn't she?

24    **A.**  Yes.

25    **Q.**  And she told you that she also talked to a lawyer and that

Cross-examination - Michel

1    she wasn't comfortable making a contribution in her name with

2    your money; right?

3    **A.**  Not true.

4    **Q.**  She never told you that?

5    **A.**  No.

6    **Q.**  Frank White told you that Jho Low couldn't contribute,

7    didn't he?

8    **A.**  Right, because he was a foreigner.

9    **Q.**  And Frank White told you that any money that you

10   contributed had better be legitimate, better be your money;

11   right?

12   **A.**  Right.

13   **Q.**  Is a gift legitimate?

14   **A.**  Yes.

15   **Q.**  A gift for the purpose of getting a photo with President

16   Obama, that's legitimate?

17   **A.**  No, the gift is for me to help him get a photo.

18   **Q.**  By making political contributions?

19   **A.**  No.

20            MR. KENNER:  Your Honor, I'm going to object to

21   this.  There's no tax count charged in this case.

22            THE COURT:  That's not the issue.  It's -- let's

23   move on.  It's -- well, never mind.  Go ahead.

24   **Q.**  (BY MR. KELLER)  So Mr. Brewer returned the money,

25   Ms. Firestone returned the money, Frank White told you that

Cross-examination - Michel

1    any money you contributed had to be legitimately your money;

2    right?

3    **A.**  Right.

4    **Q.**  But it's still your testimony that you had no idea that

5    there's anything wrong running your money through these other

6    people?

7    **A.**  No.  I didn't think there was anything wrong with it.

8    **Q.**  You said that you had celebrity friends who had made

9    contributions to the Obama campaign; right?

10   **A.**  Correct.

11   **Q.**  But you didn't ask them to contribute because they had

12   already contributed; right?

13   **A.**  Right.

14   **Q.**  I think you said they were already maxed out?

15   **A.**  Right.

16   **Q.**  So you knew there were contribution limits; right?

17   **A.**  Yeah.  Like I said previously, I knew there were limits

18   but that's why the friends that I went and told them to come,

19   because they had not yet donated.

20   **Q.**  And you couldn't donate all the money yourself, because of

21   the limits; right?

22   **A.**  Correct.

23   **Q.**  So to get around the limits, you gave the money to your

24   friends to donate; right?

25   **A.**  Well, again, I knew my cap was already done at 40,000.  So

Cross-examination - Michel

1    I thought that I could just give my friends, like Rudy Moises,

2    like Bill Rutherford, who ran for city councilman.  As a

3    matter of fact, they took the money and they contributed to

4    the fund, to the Victory Fund.

5    **Q.**  You gave money to other people to make contributions in

6    their names; right?

7    **A.**  Yes, correct.

8    **Q.**  Because you were maxed out and you couldn't give any more

9    money; right?

10   **A.**  Right.

11   **Q.**  So in order to get around the limit, you gave your money

12   to other people to make contributions in their names?

13   **A.**  Right.  I gave my money to these people to make

14   contribution.

15   **Q.**  People who could not have afforded to make those

16   contributions without the money that you were giving them;

17   right?

18   **A.**  People who I thought --

19   **Q.**  Mr. Michel, yes or no?

20   **A.**  People, yes, who could not afford it, I gave them an

21   opportunity to come sit down with President Obama.

22   **Q.**  But it's your testimony that you thought that was

23   legitimate too?

24   **A.**  Yes.

25             MR. KELLER:  Could we bring up Government's Exhibit

1    302, Ms. Orozco?  This has previously been admitted.

2    **Q.**  (BY MR. KELLER)  Do you remember this invitation that

3    Mr. Kenner showed you on direct?

4    **A.**  Yes.

5    **Q.**  He walked through essentially every line of this,

6    including the e-mail addresses and the date and the time and

7    the location, all that?

8    **A.**  Yes.

9    **Q.**  He didn't ask you about page 2 of this exhibit, did he?

10   **A.**  No, I don't think so.

11          MR. KELLER:  Can we go to page 2, Ms. Orozco?  If

12   you could call out the middle section there.

13   **Q.**  (BY MR. KELLER)  Mr. Michel, can you read the section

14   under home phone, starting with "Federal law prohibits"?

15   **A.**  "Federal law prohibits foreign nationals, except lawfully

16   admitted permanent residents of the United States, from

17   contributing to the Obama Victory Fund 2012.  By signing

18   below, I certify that I am a U.S. citizen or lawfully admitted

19   permanent resident of the U.S.  The funds I am donating are

20   not being provided to me by another person or entity for the

21   purpose of making this contribution and that my contribution

22   shall be allocated as stated below."

23   **Q.**  Every single person that you gave money to, your friends

24   to attend these events, the funds that they were donating were

25   being provided by another person.  They were being provided by

Cross-examination - Michel

```
1   you; right?

2   A.  Well, I gave them the money in the hopes that they would

3   donate.  If they didn't donate -- because I had some friends

4   who didn't donate, they kept the money.

5   Q.  So it's your testimony now that it was not that the money

6   was specifically to donate to the Obama campaign, it with was

7   a gift for them to do whatever they want --

8   A.  Yes, I wanted them to donate.

9        But by the way, I've never seen this form.

10  Q.  Just the first page?

11  A.  I didn't even pay attention to the first page.

12            MR. KELLER:  You can drop that, Ms. Orozco.

13  Q.  (BY MR. KELLER)  Mr. Michel, after the 2012 cycle, the FEC

14  sent inquiries to you about the contributions you had made to

15  Black Men Vote; right?

16  A.  Yes.

17  Q.  About the source of that money?

18  A.  Yes.

19  Q.  And you told the FEC that that money was business income

20  to your company, SPM Holdings; right?

21  A.  I don't recall.

22            MR. KELLER:  Could we pull up Government's Exhibit

23  245, Ms. Orozco?  This has previously been admitted.

24  Q.  (BY MR. KELLER)  Mr. Michel, you recognize this as your

25  declaration, the declaration of Prakazrel Michel?
```

Cross-examination - Michel

1   **A.**  Yes.

2   **Q.**  Before the Federal Election Commission?

3   **A.**  Yes.

4           MR. KELLER:  And if we could go and call out

5   paragraph 3, Ms. Orozco?

6           THE COURT:  All right.  It had been admitted.

7   **Q.**  (BY MR. KELLER)  You say that the sole consideration for

8   using SPM for the third and fourth contributions to Black Men

9   Vote was cash flow; right?  That's the first sentence?

10  **A.**  I didn't write this.

11  **Q.**  But this is your declaration; right, sir?

12  **A.**  Yes.

13  **Q.**  Are you claiming that the money you donated to Black Men

14  Vote did not come from SPM?

15  **A.**  Yeah, I think at that time it came from SPM.

16  **Q.**  And that's what the declaration says; right?

17  **A.**  Right.

18  **Q.**  The declaration doesn't say anything about Jho Low, does

19  it?

20  **A.**  No.

21          MR. KELLER:  You can drop this, Ms. Orozco.  Sorry,

22  can we bring the document back up, 245?  If we could go to the

23  second page.  If you could call out subparagraph 5.

24  **Q.**  (BY MR. KELLER)  That's your signature on the document

25  there; right, Mr. Michel?  Underneath the call-out box?

Cross-examination - Michel

1   **A.**  Yes.

2   **Q.**  And you say, in subparagraph 5, "I had no reason to hide

3   the true source of my donations to Black Men Vote, nor did I

4   wish to diminish the disclosure of source or amounts of my

5   contributions"; right?

6   **A.**  Yes.

7   **Q.**  But you did hide Jho Low as the source of those donations,

8   didn't you?

9   **A.**  It's not a donation.  At that point it's my money.

10  **Q.**  You knew, based on your conversations with Mr. White, that

11  Jho Low couldn't make any of these contributions himself;

12  right?

13  **A.**  Yes.

14  **Q.**  And you knew that you were maxed out, in terms of your

15  contributions to the Obama campaign; right?

16          MR. KENNER:  Objection.  Asked and answered.

17          THE COURT:  This is cross-examination, and

18  presumably he's moving up to something.

19  **Q.**  (BY MR. KELLER)  Right, Mr. Michel, you knew that you

20  couldn't make anymore contributions?

21  **A.**  Yes.

22  **Q.**  So Jho Low couldn't make contributions; right?

23  **A.**  Right.

24  **Q.**  You couldn't make contributions?

25  **A.**  Right.

1    **Q.** But you had to get enough money into the campaign,

2    according to you, to try to set up a photo opportunity for Jho

3    Low; right?

4    **A.** No, I didn't have to get any money to the campaign. What

5    I'm saying to you is it didn't matter. All he wanted was a

6    photo. So whatever that entail. I could either kept the

7    whole money to myself. I could have went and bought 12

8    elephants with it. It's whatever I wanted to do with that

9    money because at that point it's my money, and all it is, is

10    for me to help him get a photo.

11    **Q.** Mr. Michel, your e-mails to Joel Rousseau and Eric Tan

12    reference political donations; right?

13    **A.** Yes, because at that time Joel Rousseau and Mohamed

14    al Basile, they paid their own way to come in. So I'm saying

15    to Joel, this is what you're going to need to do. Here's what

16    you're going to have pay, whatever it is, and this is the

17    dress code and once we get the information, that's it.

18    **Q.** Joel Rousseau never transferred any money to BRB for

19    purposes of making a political contribution, did he?

20    **A.** No, because Joel Rousseau is getting line items of to-do

21    lists. When -- when he -- when I told him tell Jho Low to

22    send me the million dollars, if Jho Low never sent the money,

23    that whole e-mail would have meant nothing. That e-mail was

24    just list items.

25    **Q.** Mohamed Al-Husseiny, he never sent any money to BRB

1  Holdings, did he?

2  **A.**  No.

3  **Q.**  But Jho Low did, didn't he?

4  **A.**  Right.  He sent me my money.  He sent me money for me to

5  help him, again, get him a photo.

6  **Q.**  By making a political contribution?

7          MR. KENNER:  Your Honor --

8          Excuse me, Counsel.

9          Just so the records's clear, we've heard about an

10  al-Basire and now an Al-Husseiny.  I believe that that's the

11  same person, but could we ask that that record get clarified

12  so that we know whether or not those are two different people

13  or one person?

14          THE COURT:  All right.  Go ahead, clarify.

15  **Q.**  (BY MR. KELLER)  Mr. Michel, Mohamed al-Basire, Mohamed

16  al-Husseiny, are those the same person?

17  **A.**  Clearly I'm not good with names, pronouncing names, but

18  yes, Mohamed B., can we call him Mohamed B.?

19          THE COURT:  So they're not two different people?

20          THE WITNESS:  No, they're the same person, yes.

21  **Q.**  (BY MR. KELLER)  So he didn't send any money to BRB?

22  **A.**  No.

23  **Q.**  But you sent an e-mail to Eric Tan listing BRB as the

24  receiving account for wire transfer and referencing a

25  political donation?

Cross-examination - Michel

1    **A.**  I sent an e-mail to Joel Rousseau, and he turn around and

2    sent it to Eric.

3    **Q.**  And he sent it to Jho Low; right?

4    **A.**  I don't know.

5    **Q.**  Well, that's what we saw, isn't it?

6    **A.**  Well, I see it now, but I didn't know at the time.

7    **Q.**  He forwarded that e-mail chain to you, didn't he?

8    **A.**  I'm -- again, Mr. Keller, I'm not paying attention to

9    these things.  I told him what my conditions were, $1 million

10   for me to figure out how to get this photo.  What happened

11   from that point --

12   **Q.**  You were the one who was giving money to third parties to

13   make political contributions; right?

14   **A.**  I gave money to my friends to make donation so they can

15   attend an event with President Obama.

16   **Q.**  With Jho Low's money?

17   **A.**  With my money.

18   **Q.**  Which is also illegal?

19   **A.**  Sorry?

20   **Q.**  Which is also illegal.  Whether it's Jho Low's money or

21   your money, they can't make contributions with somebody else's

22   money; right?

23   **A.**  Right.  At that time I didn't know that.

24           MR. KELLER:  Could we pull up Government's Exhibit

25   601, Ms. Orozco?  This is previously been admitted.

Cross-examination - Michel

1    **Q.**  (BY MR. KELLER)  These are a bunch of the people that you

2    gave money to to make contributions to the Obama Victory Fund;

3    right?

4    **A.**  Correct.

5    **Q.**  In total, you gave over $800,000 to the Obama Victory Fund

6    funneled through third parties; right?

7    **A.**  I don't know which one it is because, you know, the last

8    exhibit you had at 700-something thousand dollars.  So let's

9    say between 700- and $800,000, yes.

10           MR. KELLER:  Ms. Orozco, could we pull up

11   Government's Exhibit 665 again?

12   **Q.**  (BY MR. KELLER)  So, Mr. Michel, you see the 150,000 there

13   on the left side of the diagram?

14   **A.**  Oh, sorry, I thought you were referring about the one

15   September event, but okay, yes.

16   **Q.**  So over $850,000; right?

17   **A.**  Yes, for the both campaign.

18           MR. KELLER:  Can we go back to Government's Exhibit

19   601, Ms. Orozco?

20   **Q.**  (BY MR. KELLER)  All right.  So you sent money to all

21   these people to make contributions to the Obama Victory Fund;

22   right?

23   **A.**  Correct.

24   **Q.**  No loan agreements; right?

25   **A.**  Correct.

Cross-examination - Michel

1    **Q.**  No contracts?

2    **A.**  Correct.

3    **Q.**  And then seven years later, after you knew you were under

4    investigation for making illegal conduit contributions, you

5    had letters sent to all these people claiming that the money

6    was just a loan and that they needed to repay you; right?

7    **A.**  No.

8         MR. KELLER:  Ms. Orozco, if we could bring up

9    Government's Exhibit 433-1.

10   **Q.**  (BY MR. KELLER)  Mr. Michel, you don't recognize these as

11   letters sent from your lawyers, in February and March of

12   2019 -- these are three examples to Mr. Kromka, Mr. Hippolyte,

13   and Ms. Oriole and Mr. Moises -- demanding that they repay you

14   the money they gave you them to contribute to the Obama

15   Victory Fund?

16   **A.**  Right.

17   **Q.**  That's not what these are?

18   **A.**  Right, I went to the lawyer.

19   **Q.**  Yes or no, Mr. Michel?

20   **A.**  Yes.  Yes.

21   **Q.**  These people --

22        MR. KENNER:  Can he explain his answer, Your Honor?

23        THE COURT:  He's answered yes.

24        Do you have an explanation?

25        THE WITNESS:  Yes, Your Honor.

1    THE COURT:  Go ahead.

2    **A.**  My explanation is simple.  I went in at that time -- first

3    of all, I didn't know I was being investigated.  I heard

4    through friends that they getting visits from the FBI.  So I

5    panic.  I went to a lawyer and explain them the situation and

6    asked his advice, what's the best thing to do.

7         For some of the people that I had worked with, I didn't

8    randomly just pick all the donors, it was people that I had

9    worked with, he said, well, you can convert it into a loan.

10   In retrospect, that was a dumb thing for me to do.  But at

11   that time, I went to legal counsel to advise me on what to

12   do.

13   **Q.**  (BY MR. KELLER)  Because none of this money was loans, was

14   it?

15   **A.**  No.

16   **Q.**  So that's lies, in these letters; right?

17   **A.**  It's not lie -- he advised me you can convert them into

18   loans.

19   **Q.**  Every time you lied or did something illegal, it's because

20   someone advised you.  Is that your testimony?

21   **A.**  No.  No, I told him the situation, and it was a bad idea.

22   I take onuses on that.  That was a stupid idea.  But like I

23   said to you, people and friends was telling me they're getting

24   visits.  So I was scared.  I just did something stupid.

25   **Q.**  You lied.

1             MR. KENNER:  Objection.  Asked and answered.

2             THE COURT:  Well, he hasn't answered it.

3    **Q.**  (BY MR. KELLER)  You did something stupid.  You lied.

4    **A.**  Well, I didn't lie, because the lawyer said to -- I can

5    convert it to a loan.  You can -- you can give someone a gift

6    and convert it into a loan.

7    **Q.**  Can a lawyer turn a lie into the truth?

8    **A.**  I don't know what that means, but I'm saying based on his

9    advice, he said you could turn it -- if you feel like you gave

10   them this money, you can convert it into a loan.

11   **Q.**  So you can give somebody money, not intending it to be a

12   loan and then seven years later, you can decide, hey, that was

13   a loan, you got to pay me that money back?

14   **A.**  That's what he --

15   **Q.**  That's truth?

16   **A.**  That's what he said.

17   **Q.**  And did you believe that?

18   **A.**  At the time I did.

19   **Q.**  These people were your friends; right?

20   **A.**  Yes.

21   **Q.**  And you did this because you panicked, so you threatened

22   legal action against them to try to cover your own tracks?

23   **A.**  I didn't threaten them.

24            MR. KELLER:  Ms. Orozco, if we could bring up those

25   exhibits again, please.  If you could highlight the fourth

1    paragraph there.

2    **Q.**  (BY MR. KELLER)  Mr. Michel, it says in the letter, "If

3    you fail to do so," being repay the money, "Mr. Michel will

4    file suit for breach of contract and other claims.  We will

5    seek and obtain contractual damages, attorneys' fees and

6    costs, past due interest and other related relief.  We will

7    also seek consequential damages against you."

8         You don't construe that as threatening legal action?

9    **A.**  Yeah, it was legal, but it wasn't a threat the way you say

10   it was.  It was a legal action, which I did not act upon.

11   **Q.**  I'm not asking whether you actually sued them.  I'm saying

12   that you wrote these letters to your friends, lying about the

13   terms on which you originally gave them money and threatening

14   legal action against them to cover your own tracks; right?

15   **A.**  Yes.

16            MR. KELLER:  You can take that down, Ms. Orozco.

17   **Q.**  (BY MR. KELLER)  All right.  In 2017, you got more money

18   from Jho Low; right?

19   **A.**  No.

20   **Q.**  You didn't receive $100 million from Jho Low in 2017?

21   **A.**  No.

22            MR. KELLER:  Can we pull up Government's Exhibit

23   439, Ms. Orozco?

24   **Q.**  (BY MR. KELLER)  Mr. Michel, I just want to make sure,

25   it's your testimony that the money you received in 2017 from

1    Lucky Mark Trading, that wasn't for Jho Low?

2    **A.**    That wasn't from Jho Low, no.

3    **Q.**    That wasn't for work related to Jho Low?

4    **A.**    That was not for Jho Low.

5    **Q.**    All right.  That's your company at the top of this

6    document, Anicorn, LLC; right?

7    **A.**    Correct.

8    **Q.**    And it's dated May 1st, 2017?

9    **A.**    Yes.

10          MR. KELLER:  If we could go to the second page of

11    this document, Ms. Orozco.  And if you could call out the

12    bolded section.

13    **Q.**    (By MR. KELLER)  So this is a contract for your company,

14    Anicorn, to provide services in exchange for roughly

15    $100 million.  And the services that you were supposed to

16    provide were to, you see the underlined portion there, drop

17    all civil and/or criminal cases and/or cease investigations

18    and remove Interpol Red Notice by September 31st [sic], 2017,

19    and then if you skip down two lines, against Mr. Low Taek Jho.

20          That was the contract that you entered into; right?

21    **A.**    Correct.

22    **Q.**    So you lied when you just said that the money wasn't for

23    work --

24    **A.**    No, I didn't lie.  My job was to help him find legal

25    services, that was it.  To find him an attorney to help him

1    with his civil forfeiture in 2017.

2    **Q.**  Well, this says -- and this -- which was dated back at the

3    time that you were actually engaging in this conduct, this

4    document says it was to get the U.S. and other authorities to

5    drop all civil and/or criminal cases against Jho Low.  That's

6    what it says; right?

7    **A.**  Well, an attorney would do that for him.

8    **Q.**  Yeah, but this isn't an agreement with an attorney, it's

9    an agreement with you; right?

10   **A.**  To help him find an attorney.

11   **Q.**  That's not what it says, is it?

12   **A.**  Well, that's -- I didn't write it.

13   **Q.**  You're not an attorney, are you?

14   **A.**  No.

15            MR. KELLER:  You can drop that call-out, Ms. Orozco.

16   If you could call out the fee schedule above there?

17   **Q.**  (BY MR. KELLER)  This corresponds pretty closely to

18   millions of Euros that you received starting in May 2017;

19   right?

20   **A.**  Correct.

21            MR. KENNER:  It says Euros, Your Honor.

22            THE COURT:  Oh, your screen is not showing.

23            MR. KENNER:  Oh, I'm sorry, I saw a juror raising

24   their hand.

25            THE COURT:  Excuse me.  Hold on.  You can say it in

1    a minute.

2            It's not showing up on the screen?

3            JUROR:  It's not.

4            THE COURT:  Okay.

5            Then you can say what you want; I'm sorry.

6            Is there something else?  Oh, yours aren't --

7    they're not working?

8            JUROR:  It's not on the back screen.

9            THE COURT:  Is the screen not working, or is it just

10   not up?

11           JUROR:  They're up now.

12           THE COURT:  Okay.

13           Sorry.  Thank you.  All right.  Mr. Kenner, I just

14   wanted to --

15           MR. KENNER:  That's all I wanted to call to the

16   attention of the Court that I saw a hand go up.

17           THE COURT:  Okay.  Thank you.

18           MR. KELLER:  Your Honor, if we could just clarify

19   whether it was working during the last set of questions?

20           THE COURT:  No, I don't think so.

21           MR. KELLER:  Okay.

22           Ms. Orozco, could we drop the call-out and then call

23   out the previous section again, the bolded paragraph?  If you

24   could highlight the section starting with "dropping all civil

25   and/or criminal cases."

Cross-examination - Michel

1          I won't go through the questions again, but for the

2     jurors' benefit, this is what was being referenced.

3          If we can just leave it up a moment, Ms. Orozco.

4          Okay.  You can drop that call-out.

5     **Q.**  (BY MR. KELLER)  So, Mr. Michel, you were paid for the

6     work on behalf of Jho Low; right?

7     **A.**  I was paid by an investor.  That money is money from Pheng

8     Lao- -- I don't want to mispronounce his name, but Pheng gave

9     me that money and as a business decision, I used some of that

10    money to help find legal counsel for Jho Low.

11    **Q.**  He gave you that money pursuant to this agreement to get

12    you to help get the government to drop the investigation into

13    Jho Low; right?

14    **A.**  I can't get -- I can't make the government do anything.

15    What I can do is find him legal services to help resolve his

16    civil forfeiture at the time.

17    **Q.**  You found Mr. Broidy; right?

18    **A.**  I was introduced to Mr. Broidy, yes.

19    **Q.**  He's not a lawyer, is he?

20    **A.**  Well, at the time I thought he was because he mentioned

21    Colfax Law.

22    **Q.**  But he's not a lawyer, is he?

23    **A.**  No.

24    **Q.**  And you knew that he had a close relationship with

25    President Trump; right?

Cross-examination - Michel

1    **A.**  Yes.

2    **Q.**  And that's why he's the one that you recommended to Jho

3    Low; right?

4    **A.**  Yes.

5    **Q.**  Mr. Broidy never did anything in court for Jho Low, did

6    he?

7    **A.**  No, he just had one conversation with his legal team.

8            MR. KENNER:  Your Honor, is this exhibit still

9    necessary to be up?

10           THE COURT:  I can't hear a single thing --

11           MR. KENNER:  Is this exhibit still necessary to be

12   up?

13           THE COURT:  I don't know.

14           MR. KELLER:  We're talking about the money that was

15   paid pursuant to this contract, so I think it's still

16   relevant, but we can take it down either way.

17   **Q.**  (BY MR. KELLER)  The point is, Mr. Michel, Mr. Broidy

18   didn't do any legal work for Mr. Jho Low, did he?

19   **A.**  Mr. Broidy -- no, he didn't.

20   **Q.**  Instead, he tried to use his connections to President

21   Trump and the administration to influence them to drop the

22   investigations into Low; right?

23   **A.**  No, what I know is he was looking for legal services to

24   help.

25           And by the way, he has connection.  Everybody looking for

Cross-examination - Michel

1    someone who has connection. Now, to drop it, I don't know, it

2    was more like to advise his -- he was coming on to help advise

3    his legal -- Jho Low's -- sorry -- legal team and how to deal

4    with his civil forfeiture.

5    **Q.** So it's your testimony that you didn't recommend

6    Mr. Broidy understanding that he was going to try to influence

7    Reince Priebus, President Trump, General Kelly. You're saying

8    that's not what Mr. Broidy was brought in to do?

9    **A.** No, Mr. Broidy obviously had connection, but I don't think

10   he was going to influence them. What -- I knew that he had

11   great connection, and he obviously knew great attorneys that

12   he can recommend also along with his connection.

13        That's what everybody does. Everyone who has a

14   situation, you try to get you the best attorney, who has the

15   best relationship or connection to help you out. And yes,

16   when I suggested Guiliani, for example, Chris Christie to Jho

17   Low, he didn't want them because he already got -- he already

18   paid 8 million to Giuliani. He didn't do anything for them.

19   So Giuliani also has relationship and connection, but Giuliani

20   didn't do anything for him.

21        So when Elliott came, Elliott was going to bring his

22   connection and his expertise at the same time, which included

23   legal.

24   **Q.** Well, Mr. --

25              THE COURT: Can you move the microphone back just a

Cross-examination - Michel

| | |
|---|---|
| 1 | teeny bit?  There's a little bit of a reverberation. |
| 2 | THE WITNESS:  Oh, you want -- |
| 3 | THE COURT:  Yeah, just a teeny bit. |
| 4 | THE WITNESS:  Okay. |
| 5 | THE COURT:  There you go.  Thank you. |
| 6 | **Q.**  (BY MR. KELLER)  Mr. Broidy tried to set up a golf game |
| 7 | between the Malaysian prime minister and the President; |
| 8 | right? |
| 9 | **A.**  From my understanding, yes. |
| 10 | **Q.**  That's not legal work, is it? |
| 11 | **A.**  I don't know.  That's Broidy and his own company.  I had |
| 12 | nothing to do with it. |
| 13 | **Q.**  Mr. Michel, is trying to set up a meeting between |
| 14 | President Trump and the prime minister of Malaysia legal work |
| 15 | on Jho Low's legal case? |
| 16 | **A.**  Sorry, I don't know. |
| 17 | **Q.**  Mr. Broidy also tried to set up a meeting between the |
| 18 | prime minister, an official meeting between the prime minister |
| 19 | and President Trump; right? |
| 20 | **A.**  I don't recall. |
| 21 | **Q.**  Didn't you meet with Mr. Broidy and the prime minister of |
| 22 | Malaysia the night before the prime minister went in and met |
| 23 | officially with President Trump here in D.C.? |
| 24 | **A.**  Yeah, I met with them, but I didn't -- I wasn't -- |
| 25 | **Q.**  But you don't recall? |

1  **A.**  No, I wasn't privy to the conversation.  I didn't know

2  what they were doing.

3  **Q.**  You were in the meeting, weren't you?

4  **A.**  With President Trump?

5  **Q.**  With Mr. Broidy and the prime minister to prep him for the

6  meeting the next day with President Trump.

7  **A.**  I came by to say hello to Elliott and the prime minister

8  and I left.

9  **Q.**  And you understood that the prime minister was going in to

10 meet with President Trump the next day; right?

11 **A.**  I don't recall that.

12          MR. KELLER:  If we could bring up what's been

13 previously admitted as Government's Exhibit 681, Ms. Orozco.

14          THE COURT:  The demonstrative, okay, which we

15 eventually admitted actually.

16 **Q.**  (BY MR. KELLER)  Mr. Michel, you traveled to Bangkok,

17 Thailand with Mr. Broidy and Ms. Lum Davis to meet with Jho

18 Low on May 3rd; right?

19 **A.**  Correct.

20 **Q.**  2017?

21 **A.**  Yes.

22 **Q.**  Ms. Lum Davis isn't a lawyer, is she?

23 **A.**  No.

24 **Q.**  And then shortly after that trip, 2.8 million comes in

25 from Lucky Mark; right?

Cross-examination - Michel

1    **A.** Yes.

2    **Q.** But it's your testimony that it had nothing to do with

3    work for Jho Low, that it was an investment in your

4    entertainment business?

5    **A.** Yes.

6    **Q.** It just coincidentally came in five days after you,

7    Mr. Broidy, and Ms. Lum Davis went to Bangkok, Thailand to

8    meet with Jho Low?  That's just a coincidence?

9    **A.** No, it's not.

10   **Q.** But it's not related to the subject of that meeting?

11   **A.** Well, prior to that, I met with -- again --

12   **Q.** Was it related to the subject matter of that meeting or

13   not?

14            MR. KENNER:  Objection, Your Honor.  Let him finish

15   what he was saying.

16            MR. KELLER:  He didn't answer the question, Your

17   Honor.

18            MR. KENNER:  Let him say what he's saying.

19            THE WITNESS:  Pheng sent me the money.

20            THE COURT:  Well, I'll let -- excuse me a minute.

21            THE WITNESS:  Sorry.

22            THE COURT:  I'll let you finish.

23            And then you see whether he's answering it or not

24   and then you can ask it again if he does not.

25   **A.** I was given money and from the money, investment money

Cross-examination - Michel

1    that was given to me by Pheng, I used some of that to help Jho

2    Low find counsel to help with his situation.

3    **Q.**  (BY MR. KELLER)  That wasn't my question, sir.  My

4    question was whether that $2.8 million was related to the

5    meeting on or about May 3rd with you, Mr. Broidy, Ms. Lum

6    Davis, and Jho Low in Bangkok, Thailand?  Was that money

7    related to that meeting or not?

8    **A.**  No.

9    **Q.**  So it was just a coincidence?

10   **A.**  Well, I wouldn't say it was a coincidence, but I'm saying

11   it had nothing to do with Jho Low.

12   **Q.**  Even though the contract said that the money was being

13   paid to get the government to drop the investigations into Jho

14   Low, it had nothing to do with Jho Low?

15   **A.**  The money was for to find him to resolve his civil

16   forfeiture.

17   **Q.**  Let's assume that's true for a minute.  That still relates

18   to Jho Low; right?

19   **A.**  Well, it -- but you got to put it in context.

20   **Q.**  Well, the context is it relates to Jho Low; right?  You

21   just said it had nothing to do with Jho Low.

22   **A.**  No, what I -- what I'm saying in context, you have to put

23   it in context, because you didn't mention about the trip I had

24   in Bangkok before this trip.

25   **Q.**  You returned to Asia with Mr. Broidy and Ms. Lum Davis on

Cross-examination - Michel

1    May 19th, and this time you met with Jho Low and you also met

2    with a Chinese official, Vice Minister of Public Securities,

3    Sun Lijun; right?

4    **A.**  Correct.

5    **Q.**  And then roughly six days later, another 2.7 million came

6    in from Lucky Mark; right?

7    **A.**  Right.

8    **Q.**  Your testimony is that 2.7 million had nothing to do with

9    that trip on May 19th?

10    **A.**  Correct.

11    **Q.**  It wasn't related to Jho Low?

12    **A.**  Mr. Keller, I'm providing a service.  When Pheng -- it's

13    understood that Elliott, myself, and Nickie were trying to

14    help Jho Low find representation.  There's nothing illegal

15    about that.

16        Now, when Jho Low introduced me to Pheng, Pheng is doing

17    investment.  I understand that Elliott wants to get paid to

18    help Jho Low's situation.  So I'm using a portion from this

19    investment to paid Elliott.  That's the context.

20        So when you look at Bangkok and May 3rd, I actually went

21    to Bangkok before that to first meet with Jho Low and meet

22    with Pheng and discuss entertainment.  And I understood,

23    because Elliott testified that he wanted to make sure that

24    money did not come from Jho Low.  And it didn't come from Jho

25    Low, it came from Pheng.

Cross-examination - Michel

1    **Q.**  So you met with Pheng and you met with Jho Low before any

2    of the dates we see on this chart; right?  That's what you

3    just testified to?

4    **A.**  Yeah, so May 3rd is --

5    **Q.**  Mr. Michel, if you could please just answer my question.

6    You just testified that you met with Pheng Laogumnerd and Jho

7    Low before May 3rd, before the date that we see on this chart;

8    right?

9    **A.**  Sorry, I don't remember the dates.  I know before I went

10   to Bangkok with Nickie and Elliott, I met with Pheng and Jho

11   Low before that first trip.

12   **Q.**  Without Nickie and Elliott; right?

13   **A.**  Yes.

14   **Q.**  And that's where you entered into this investment

15   agreement; right?

16   **A.**  Yes.

17   **Q.**  The money didn't flow until Mr. Broidy met with Jho Low;

18   right?

19   **A.**  Correct.

20           THE COURT:  Mr. Keller, you need to slow down.

21           MR. KENNER:  And I'd ask that he lower his voice as

22   well.

23           THE COURT:  I'm sorry?

24           MR. KENNER:  I said I would ask that he lower his

25   voice.  He's appearing to be very argumentative.

Cross-examination - Michel

1              THE COURT:  Mr. Kenner, let's have a discussion.

2              (Bench conference on the record.)

3              THE COURT:  Mr. Kenner, that's totally inappropriate

4     to say that.  Some things could have been said about your

5     tone, the way you've acted as well.  None of it has been said

6     in front of the jury.  It's inappropriate for you to say that.

7     If I thought that there was an issue in terms of his yelling

8     at him or something, that would be one thing.  He's pushing,

9     obviously, in terms of doing it.  But this is

10    cross-examination, and it seems to me your client is quite

11    intelligent, doing a nice job of dodging around.  So if he's

12    pushing, he's doing it, but he is not acting inappropriately.

13    And it is not appropriate for you to say something in front of

14    the jury.  I don't expect that.  I don't want you to -- nor do

15    I want you having little tits with each other, as you did

16    earlier, about having the exhibit up or not.

17             (The following proceedings were had in open court.)

18             THE COURT:  I don't know how much more you have.  We

19    are at the 5:00 o'clock point.

20             MR. KELLER:  Your Honor, I have a considerable

21    amount more.

22             THE COURT:  Okay.  Then I -- we will adjourn for

23    today.  And we'll be back tomorrow.  Let me just talk to

24    people about something I -- scheduling sort of things.

25             (Bench conference on the record.)

1        THE COURT:  Okay.  So I'm going to go through this
2   evening and try and get more of the -- some of the jury
3   instructions done so that you get another version of these.
4   I'm not discussing it tomorrow morning.
5        Do you -- are there issues that are coming up that
6   we need to know that are going to come up this evening, or is
7   it -- can I focus on the jury instructions?
8        MR. KENNER:  I don't have any other issues, Your
9   Honor.
10        MR. KELLER:  Nothing from the government, Your
11   Honor.  And I would anticipate that my cross of the defendant
12   would probably be done by 11:00 a.m. tomorrow.
13        THE COURT:  Okay.  I'll see about in terms of
14   getting some of the additional information.
15        One thing I wanted to point out, that I decided not
16   to do this in front of the jury, presumably this is about the
17   gift.  Nobody's suggesting he has a tax issue.  But the
18   question is what's the source of -- what's the purpose of the
19   money.  Was it compensation for work, or was it a gift.  And
20   that was the only reason for getting into it.  So I decided
21   trying to say something to the jury would probably complicate
22   matters.  But I can certainly indicate that there isn't
23   anything.  And we can do it in jury instructions, that there's
24   nothing related to taxes that he's been charged with in this
25   case.

Cross-examination - Michel

1      MR. KENNER:  Thank you.

2           (The following proceedings were had in open court.)

3      THE COURT:  All right.  Members of the jury, so I'll

4  ask you to come back tomorrow at 9:00.  We'll continue with

5  the -- with the cross-examination, finish with Mr. Michel.

6  Okay.  So have a good evening, take care of yourselves.  Be

7  well.  Don't talk about the case.  We'll see you tomorrow.

8           (Jury left the courtroom.)

9      THE COURT:  All right.  Mr. Michel, you can step

10 down.

11     I wanted for you to wait a few minutes.  I want to

12 check on something and then I'll be back out.  Okay?

13     MR. KENNER:  Thank you.

14     THE COURT:  Let me just check legally on whether I

15 can give an instruction.  So ten minutes should do it.  If I

16 can't find it by then, I'll be back out.

17          (A recess was taken.)

18     THE COURT:  Let me just say there's nothing else.  I

19 was looking for something but decided it was -- I'm not going

20 to say anything more, so I'll leave it at that.  So we'll see

21 you tomorrow then.  Everybody's excused.

22     Mr. Keller.

23     MR. KELLER:  Your Honor, can I just ask logistically

24 in terms of timing, I know we've got, I think based on the

25 Court's -- or do you want me to wait until Mr. Kenner is back?

Cross-examination - Michel

 1              THE COURT:  I'm sorry?

 2              MR. KELLER:  I just -- I just wanted to ask --

 3              THE COURT:  Excuse me.  Everybody calm down, okay.

 4              Mr. Kenner, I'll wait till he comes back for a

 5       second.

 6              Do we have Mr. Michel?  I guess he left too.  Did he

 7       just step out as well, or is he gone?

 8              MR. ISRAELY:  He left.  He has a special diet.

 9              THE COURT:  That's fine.  Not a problem.  It's

10       strictly logistics, so.

11              MR. ISRAELY:  I found him in the hall, Your Honor.

12              THE COURT:  Oh, okay.  No, if he needs to go for

13       his, you know, medical reasons or diet or something, that's

14       not a problem.

15              THE DEFENDANT:  I can wait, Your Honor.

16              THE COURT:  Okay.  There was more -- we just wanted

17       to discuss the logistics.  The issue I looked at, I'm not

18       going to say anything about.  So logistically, let me just

19       mention, you have part two.  I'm sending you the aiding and

20       abetting instruction so you'll be -- this evening.  And

21       shortly after I get off, I need to do one last read.  I'm

22       putting on or about, which is the typical thing.  So then part

23       2 will be ready, other than theory of the defense, which I

24       will look at.

25              It's -- it needs to be redone, Mr. Kenner.  I'm

Cross-examination - Michel

1    going to make a stab at it and send it back to you and see

2    what I think it's got -- it's got, I think, too much factual

3    information, and it doesn't read the way an instruction, which

4    is what -- I mean, it's the theory of the defense, but it

5    still has to be in the language of an instruction.  So let me

6    make a stab at it and I'll try and send something.

7              Part one, I'm just adding stuff to it.  So I --

8    if -- I'll see where we are with it.  I mean, it's the

9    standard stuff and you already got it.  It's just that I'm

10   fixing inconsistent statements or whatever else that comes

11   up.

12             MR. KELLER:  Your Honor, I was just going to ask,

13   since I -- I think the last set we looked at, there's over a

14   hundred pages of jury instructions.

15             THE COURT:  Right.

16             MR. KELLER:  I don't know if the Court plans to

17   instruct before arguments or after arguments or argue --

18             THE COURT:  Before.

19             MR. KELLER:  -- part one.

20             THE COURT:  No, I -- no, I'm sorry, we go over them,

21   and I give instructions afterwards.  You make your closing

22   arguments and I instruct.  I do it that way so if there are

23   issues that need to be fixed, there's a way of doing it.  We

24   will go over them, though.  So before you do closings, you'll

25   know exactly what's in the instructions.

Cross-examination - Michel

1          And I would ask that you be careful, if you're going

2     to use anything from the instructions, that people not pick

3     apart stuff.  So we need to talk about it.  You do closings.

4     And then we'll do -- you know, I'll do the instructions.

5          MR. KELLER:  And how much time for each side for

6     closings?

7          THE COURT:  I was going to ask you all what,

8     generally, you were thinking of.  I mean, with the opening, it

9     was easy to figure out.  Closing, I'm -- you know, it's been a

10    fairly long case, and you've got three -- well, you've got

11    quite a number of charges, although still around three

12    conspiracies.  So what are you asking for?

13         MR. KELLER:  I think total for the Government for

14    initial closing and rebuttal --

15         THE COURT:  Generally what I do is initial closing

16    and then the rebuttal is about a third of that time, you know,

17    in terms of -- I give you whatever the time should be.

18    Hopefully you'll stick to it.  He gets whatever time he's

19    going to get and then the rebuttal is usually about a third to

20    a quarter -- you know, a third of what the time you would have

21    had to respond.

22         MR. KELLER:  Then I would -- I would say at least

23    the government would request 90 minutes for the initial

24    close.

25         THE COURT:  Okay.  Mr. Kenner, what are you thinking

Cross-examination - Michel

1    of?

2              MR. KENNER:  Two hours, Your Honor.

3              THE COURT:  Really?  I mean, don't you think 90

4    minutes should work?

5              MR. KENNER:  I can tell you I'll do my best.  As you

6    said, it's a lot of charges, a lot of counts, and a very long

7    trial.

8              THE COURT:  All right.  Two hours.  Then we'll do 90

9    minutes and then you get the extra period of time for your

10   rebuttal.

11             MR. KELLER:  Okay.  Thank you, Your Honor.

12             THE COURT:  Okay.

13             MR. KELLER:  And so if we finish --

14             THE COURT:  It depends on timing tomorrow and,

15   frankly, how much time -- we do need to carve out some time to

16   go over the instructions before you do closings, so it depends

17   on where we end tomorrow.

18             I would ask whatever I send you this evening to

19   please look at it.  So, you know, part two is done.  Part

20   three is easy because it's just, you know, foreperson and

21   stuff like that, that they get the notes and whatever.  And so

22   it's really part one that I just need to bring up.

23             Is there -- from your -- from both of your

24   perspectives, do you see any reason for an instruction in

25   terms of impeachment on inconsistent statements?

Cross-examination - Michel

 1          MR. KELLER:  I don't believe there were

 2    any perfected impeachments.

 3          THE COURT:  Okay.  I didn't either, but I just

 4    wanted to make sure.  I mean, in terms of actually completing

 5    an impeachment.  People have said different things.  And

 6    they're inconsistent but not in the formal way that you would

 7    do an instruction.  I didn't see any, but I wanted to make

 8    sure that somebody didn't think so.

 9          MR. KENNER:  This is something we disagreed about

10    through the entire trial.  I do believe there are.  I know you

11    don't believe there are.

12          THE COURT:  Well, I don't think you completed the

13    impeachment, because I didn't believe that what you had showed

14    an inconsistent statement.  That's on the record.  What I'm

15    asking is whether there's been a completed impeachment which

16    you would give the instruction.  The instruction goes to

17    somebody who's been impeached, whether you view it for

18    impeachment on credibility or if it's under oath, et cetera.

19    You obviously viewed it as actual evidence.  I don't think

20    there was any by either side at this point, has successfully

21    done that.  There may be inconsistent statements, but that's

22    not the same thing.

23          MR. KENNER:  I would submit that with

24    Mr. Higginbotham, that instruction should be given, but --

25              THE COURT:  For what?  Tell me if -- tell in this --

Cross-examination - Michel

1   I'll tell you what, this evening you send me, by 7:00, where

2   in the -- where in the transcript it shows that he was

3   actually impeached.  You made efforts, and I told you that

4   some of the things that I looked at did not impeach because it

5   wasn't contrary to what the person said.  By 7:00 o'clock

6   tonight, send me a piece of the transcript that shows that

7   there was actually an impeachment, a completed one.  Okay.

8           MR. KENNER:  Thank you, Your Honor.

9           THE COURT:  And I'll consider it.

10          MR. KELLER:  And would it be -- last question, Your

11  Honor -- the Court's preference that we conclude all the

12  closing arguments in the same day without taking a break

13  overnight, in which case I think, based on what we're

14  discussing --

15          THE COURT:  You know, it would be better to do that,

16  but, you know, it also may be a problem of, you know, not

17  leaving -- you know, the jury has been here for quite some

18  time.  You do still have the issue of the one juror who needs

19  to be off on Friday, or not, you know, I mean, in terms of

20  just simply substituting a -- you know, one of the -- we have

21  three alternates.

22          MR. KELLER:  That would be the government's

23  request.

24          THE COURT:  And I will also get back to you about

25  the one alternate that the government has asked to be excused

1    on sleeping.  I am keeping track of it, and I'll tell you how

2    long she has been sleeping in the case.

3         MR. KELLER:  Thank you, Your Honor.

4         MR. KENNER:  All right.  Your Honor, I also would

5    agree with the request that we have all the arguments in the

6    same day.

7         THE COURT:  If we can do that, I will.  I just don't

8    want to leave -- have everything done and have them go off for

9    half the day when we've got -- we may have some issues about

10   what to do with the other witness.  It's an open issue, I'll

11   just say.  I prefer, and I know everybody prefers, to have it

12   all together.  And if we can orchestrate that, I certainly

13   will do it.

14        MR. KELLER:  Thank you, Your Honor.

15        THE COURT:  I mean, if it's late enough in the day,

16   it doesn't make any sense to start it.  And the instructions

17   can be done -- you know, it's really getting -- the

18   instructions don't have to be immediately after the -- you

19   know, we can take a break and do something later, because

20   they'll -- after listening to over four hours, giving them

21   instructions is -- they're not going to absorb a lot.

22   Although we give them copies of the instructions.

23        Okay.  Everybody's excused.  Take care.  Be well,

24   everybody, tonight.

25             (The proceedings were concluded 5:20 p.m.)

117

Cross-examination - Michel

1          I, Christine Asif, RPR, FCRR, do hereby certify that
the foregoing is a correct transcript from the stenographic
2    record of proceedings in the above-entitled matter.

3                    _____/s/_____
                         Christine T. Asif
4                     Official Court Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cross-examination - Michel

< Dates >.
$1 million
  June 26th
  66:14.
April 18th,
  2023 1:11.
August 2nd
  67:13.
August 2nd,
  $600 67:21.
August 7th
  67:15.
August 7th, $9
  million
  67:22.
January 2018
  39:25,
  42:20.
January 2nd
  32:8.
July 2012
  6:17.
July 23rd
  5:4.
June 14th, 2012
  60:12.
June 15
  66:13.
June 15th
  65:14,
  65:19.
June 18th
  65:25.
June 19th, 2012
  56:8.
June 26
  61:18.
June 26th
  66:3.
May 19th 105:1,
  105:9.
May 1st, 2017
  95:8.
May 2017
  96:18.
May 3rd 102:18,
  104:5,
  105:20,
  106:4,
  106:7.

November 2012
  14:11,
  14:12.
November 6th
  16:8,
  72:11.
October 2016
  32:8.
one September
  90:14.
September 31st
  95:18.
September 7th
  71:7.
$1 53:20,
  59:10, 60:16,
  60:18, 62:24,
  64:1, 66:13,
  67:4, 89:9.
$100 94:20,
  95:15.
$11 15:14,
  72:12,
  73:10.
$150,000 66:14,
  66:21.
$170,000 21:9,
  21:13.
$2.8 104:4.
$20 18:19,
  22:2, 22:4,
  27:19, 51:12,
  72:15,
  73:12.
$25 52:4, 52:8,
  52:12.
$300,000
  67:7.
$41 28:2,
  28:5.
$5 29:21.
$600,000
  67:22.
$715,000 67:23,
  68:18.
$8 13:17,
  13:18,
  13:21.
$800,000 13:23,
  90:5, 90:9.

$850,000
  90:16.
$9 68:3.
.
.
< 1 >.
1 4:3, 56:22,
  57:12, 57:16,
  60:4, 60:5,
  66:5.
10 13:24,
  27:20,
  43:15.
1016 1:28.
105 12:4,
  12:14.
107 74:24,
  75:1.
10th 67:23.
11 15:16,
  15:20, 15:21,
  16:4, 16:8,
  16:10,
  16:17.
11:00 108:12.
11th 7:17,
  14:8.
12 87:7.
12th 15:12.
1301 1:27.
1400 1:35.
150,000
  90:12.
16633 1:42.
18 48:17.
19-00148-1
  1:6.
.
.
< 2 >.
2 1:12, 60:5,
  60:21, 83:9,
  83:11,
  110:23.
2.7 105:5,
  105:8.
2.8 102:24.
20 27:24,
  48:2.
20001 2:17.

20004 2:9.
20005 1:36.
2006 53:24,
  54:5.
2008 54:3,
  54:6.
2012 8:11,
  14:9, 14:10,
  21:24, 25:24,
  27:17, 28:14,
  51:8, 51:9,
  53:18, 54:7,
  54:11, 54:19,
  83:17,
  84:13.
2016 14:8,
  19:18.
2017 28:3,
  28:14, 28:21,
  29:25, 41:1,
  42:23, 43:22,
  46:20, 50:3,
  50:10, 50:11,
  50:13, 50:14,
  50:21, 51:14,
  51:15, 51:16,
  52:25, 53:4,
  94:17, 94:20,
  94:25, 95:18,
  96:1,
  102:20.
2018 29:23,
  32:9, 46:10,
  46:17,
  47:12.
2019 91:12.
202 2:18.
20530 1:29.
20th 6:16,
  6:17.
21 73:17.
22 49:2.
245 84:23,
  85:22.
25 52:15.
294 56:5,
  57:10.
2:08 1:12.
.
.

Cross-examination - Michel

< 3 >.
3 12:4, 61:6,
    85:5.
30-second
    29:21.
302 83:1.
333 2:15.
354-3247
    2:18.
3:00 48:3.
3:35 48:3.
3:41 6:16.
.
.
< 4 >.
4 61:18,
    64:13.
40,000 81:25.
41 52:4.
433-1 91:9.
439 94:23.
4:00 61:19.
.
.
< 5 >.
5 12:13, 85:23,
    86:2.
50,000 17:9.
5:00 107:19.
5:20 116:25.
.
.
< 6 >.
6 13:5.
600,000
    67:12.
601 89:25,
    90:19.
612(a 48:18,
    48:22.
618(a 48:19.
618(e 49:2.
641 2:8.
6507 2:16.
665 64:17,
    65:11, 73:18,
    90:11.
681 102:13.
.
.

< 7 >.
7 6:5.
700- 90:9.
700-something
    90:8.
715 68:17.
726 6:6, 7:1,
    7:3.
728 3:16, 4:3,
    6:7, 7:4,
    8:22.
7:00 115:1,
    115:5.
.
.
.
< 8 >.
8 100:18.
.
.
< 9 >.
9 6:17,
    67:15.
90 112:23,
    113:3,
    113:8.
91436 1:43.
9:00 109:4.
9:52 6:17.
[sic] 34:25,
    62:19,
    95:18.
_____/s/___
    ‾‾‾‾‾‾‾‾‾‾‾‾‾
    117:5.
.
.
< A >.
a.m. 108:12.
abetting
    110:20.
able 9:6,
    11:20, 25:4,
    25:20, 29:1,
    33:6, 38:9,
    46:25, 47:6,
    47:9, 47:12,
    58:3.
above 96:16.
above-entitled
    117:3.

Absolutely
    40:11,
    61:3.
absorb
    116:21.
access 22:3,
    25:19.
accompany
    18:4.
accomplish
    16:1.
according
    87:2.
accordingly
    52:16.
account 28:2,
    28:4, 52:5,
    57:16, 57:22,
    61:1, 61:2,
    61:9, 61:12,
    61:14, 63:2,
    63:8, 63:13,
    64:1,
    88:24.
accountant
    20:2.
accurately
    20:25.
across 13:2,
    13:9, 36:8.
act 94:10.
acted 107:5.
acting 48:21,
    107:12.
Action 1:5,
    71:8, 71:13,
    93:22, 94:8,
    94:10,
    94:14.
actions 25:10,
    46:19.
activities
    41:1, 45:13,
    45:23.
activity 40:16,
    47:1,
    76:18.
actual
    114:19.
actually 20:3,

24:13, 39:17,
    61:5, 73:13,
    94:11, 96:3,
    102:15,
    105:20,
    114:4, 115:3,
    115:7.
ad 29:21,
    29:22.
add 74:10.
adding 111:7.
additional
    27:9, 27:24,
    42:17, 72:12,
    73:12,
    108:14.
address 4:6,
    59:23, 61:24,
    64:8.
address.
    59:19.
addresses
    83:6.
adjourn
    107:22.
administration
    99:21.
admit 41:11,
    41:13,
    65:10.
admitted 3:16,
    12:4, 12:5,
    15:11, 56:5,
    56:6, 58:12,
    58:23, 64:17,
    65:3, 65:7,
    75:2, 75:7,
    83:1, 83:16,
    83:18, 84:23,
    85:6, 89:25,
    102:13,
    102:15.
advice 21:6,
    30:16, 32:10,
    92:6, 93:9.
advise 92:11,
    100:2.
advised 92:17,
    92:20.
advising

Cross-examination - Michel

29:4.
afford 77:8,
  82:20.
afforded
  82:15.
after-party
  17:21, 17:22,
  17:24, 17:25,
  18:5, 18:7,
  18:15,
  18:16.
Afternoon 1:13,
  3:7, 3:8,
  47:18, 47:21,
  48:1, 49:21,
  53:16,
  53:17.
afterwards
  45:14,
  111:21.
Agent 33:17,
  33:19, 34:2,
  34:3, 34:25,
  35:17, 36:11,
  36:18, 37:4,
  37:16, 38:21,
  38:23, 39:2,
  39:4, 39:7,
  39:11, 39:13,
  39:16, 43:10,
  43:11, 48:19,
  48:21.
Agents 32:20,
  38:24, 39:1,
  39:16, 40:9,
  40:12, 41:13,
  41:14, 41:16,
  41:20, 42:2,
  42:4, 42:5,
  42:11, 42:18,
  52:23.
agree 36:25,
  42:3, 45:3,
  116:5.
agreement 20:4,
  21:25, 22:2,
  50:25, 51:1,
  96:8, 96:9,
  98:11,
  106:15.

agreements
  90:24.
ahead 20:16,
  58:11, 59:5,
  63:24, 65:1,
  69:12, 80:23,
  88:14,
  92:1.
aiding
  110:19.
al 62:18,
  64:11,
  87:14.
al-basire
  88:10,
  88:15.
Al-husseiny
  12:20, 87:25,
  88:10,
  88:16.
alleged
  25:25.
allegedly
  36:5.
alleges
  21:10.
allocated
  83:22.
allow 26:15,
  45:15,
  63:20.
allowed 11:13,
  11:22, 30:23,
  45:8.
allows 46:7,
  46:8.
almost 23:12.
Alon 1:40.
already 3:16,
  8:1, 8:9,
  10:12, 12:4,
  23:1, 26:11,
  26:12, 41:19,
  53:10, 58:10,
  58:12, 58:23,
  61:14, 78:18,
  79:9, 81:12,
  81:14, 81:25,
  100:17,
  111:9.

alternate
  115:25.
alternates
  115:21.
Although
  112:11,
  116:22.
ambassador
  72:4, 72:8,
  72:10.
AMERICA 1:5.
American
  36:2.
Americans
  35:22,
  36:7.
amount 20:20,
  50:24, 57:15,
  57:17, 59:11,
  107:21.
amounts 86:4.
and/or 42:18,
  95:17, 96:5,
  97:25.
Anicorn 40:3,
  95:6,
  95:14.
Answer 26:18,
  26:20, 26:23,
  33:6, 62:6,
  62:8, 63:18,
  63:20, 70:1,
  70:3, 74:18,
  74:20, 91:22,
  103:16,
  106:5.
answered 10:11,
  10:12, 22:25,
  23:22, 27:6,
  41:21, 53:8,
  55:19, 55:21,
  69:13, 69:24,
  78:18, 79:9,
  86:16, 91:23,
  93:1, 93:2.
answering
  103:23.
anticipate
  108:11.
anybody 14:3,

46:11.
anyway 48:12.
apart 6:23,
  112:3.
apologize
  13:15.
appear 6:18,
  13:10.
appearance
  3:4.
APPEARANCES
  1:23, 2:1.
appearing
  106:25.
Apple 11:12,
  11:13.
applicable
  49:4.
apply 49:7,
  49:15.
appreciates
  5:24.
appropriate
  44:3, 45:4,
  69:10,
  107:13.
April 50:10.
arguably
  72:24.
argue 24:25,
  111:17.
argument
  46:2.
Argumentative
  63:14,
  106:25.
arguments
  111:17,
  111:22,
  115:12,
  116:5.
arise 32:13.
around 12:16,
  53:24, 73:16,
  81:23, 82:11,
  89:1, 107:11,
  112:11.
arrange 9:21,
  10:2, 27:4,
  34:2.

Cross-examination - Michel

arranged
   24:4.
arrangement
   23:2, 25:2.
arrangements
   24:20.
Asia 104:25.
aside 69:2.
Asif 2:11,
   117:1,
   117:6.
aspect 29:14.
assist 19:25,
   27:17, 32:1,
   58:4.
associated
   61:2, 61:9.
assume 58:19,
   104:17.
Assumes 8:16,
   63:5.
assuming
   26:25.
at. 5:5.
attend 11:22,
   13:13, 13:22,
   27:21, 66:3,
   83:24,
   89:15.
attention
   12:13, 34:1,
   50:3, 84:11,
   89:8,
   97:16.
Attorney 20:18,
   21:15, 32:16,
   35:16, 35:25,
   40:1, 43:19,
   95:25, 96:7,
   96:8, 96:10,
   96:13,
   100:14.
attorneys
   30:22, 94:5,
   100:11.
August 67:23.
authorities
   96:4.
Avenue 1:27,
   1:35, 2:8,

2:15.
aware 14:15,
   30:22, 31:1,
   31:4, 37:2,
   41:4, 41:9,
   42:9,
   52:25.
away 47:5,
   47:20, 50:25,
   69:20.
.
.
< B >.
B-I-G 4:22.
B. 88:18.
back 3:3,
   12:10, 21:24,
   31:20, 35:21,
   36:3, 36:7,
   37:16, 48:6,
   53:18, 57:10,
   57:24, 85:22,
   90:18, 93:13,
   96:2, 97:8,
   100:25,
   107:23,
   109:4,
   109:12,
   109:16,
   109:25,
   110:4, 111:1,
   115:24.
back-dooring
   19:12.
bad 92:21.
balcony
   18:25.
Bangkok 50:6,
   102:16,
   103:7, 104:6,
   104:24,
   105:20,
   105:21,
   106:10.
bank 61:1.
Barack 5:1.
Barry 19:23,
   61:11, 74:3,
   74:9, 74:10,
   75:14.

Based 4:24,
   41:10, 45:22,
   49:16, 54:17,
   65:17, 68:9,
   86:10, 93:8,
   109:24,
   115:13.
Basically 8:7,
   9:10, 11:11,
   20:11, 20:19,
   21:2, 36:5,
   40:1, 42:23,
   45:6, 47:4.
Basile 62:18,
   64:11,
   87:14.
basis 31:14.
bear 73:1.
beat 3:2.
became 15:2.
become 14:15,
   31:1, 31:4,
   37:2.
becoming
   48:19.
beginning
   52:13,
   58:16.
behalf 14:3,
   98:6.
Bekkedam 19:24,
   61:11, 74:4,
   74:9, 74:10,
   75:15.
belief 7:16.
believe 3:16,
   7:1, 7:6,
   13:18, 15:15,
   15:21, 24:21,
   25:8, 25:9,
   26:13, 39:2,
   39:5, 42:5,
   45:19, 46:12,
   47:19, 53:23,
   54:9, 59:6,
   88:10, 93:17,
   114:1,
   114:10,
   114:11,
   114:13.

below 83:18.
below. 83:22.
Bench 15:7,
   22:19, 23:11,
   37:9, 40:22,
   44:11, 46:4,
   58:17, 78:17,
   107:2,
   107:25.
benefit 98:2.
besides
   43:19.
best 92:6,
   100:14,
   100:15,
   113:5.
betrayed
   32:17.
better 31:21,
   80:10,
   115:15.
Beyond 7:25,
   8:19, 16:11,
   74:19.
BIG 4:22, 4:24,
   5:17, 5:18,
   40:5.
bigger 3:22.
Bill 82:2.
birthday 17:6,
   17:8, 17:13,
   17:23.
bit 4:19,
   70:18, 72:15,
   101:1,
   101:3.
Black 71:8,
   71:15, 76:11,
   76:21, 84:15,
   85:8, 85:13,
   86:3.
blacks 28:25.
Blacture 28:24,
   29:9, 30:7.
bolded 95:12,
   97:23.
bonus 5:17,
   5:21.
bottom 4:3,
   5:15, 56:16,

56:17, 57:11,
60:3, 60:5.
bought 29:15,
87:7.
Boulevard 1:42,
39:17.
Bowl 29:16,
29:19, 29:22,
29:23.
box 56:18,
57:10, 60:6,
85:25.
Bradley
17:12.
brainstorming
55:18,
55:23.
BRB 60:22,
60:24, 61:9,
87:18, 87:25,
88:21,
88:23.
breach 94:4.
break 47:18,
47:21, 48:1,
115:12,
116:19.
Brewer 77:17,
77:19,
80:24.
brief 54:6.
bring 9:25,
18:20, 38:15,
56:4, 57:10,
61:4, 82:25,
85:22, 91:8,
93:24,
100:21,
102:12,
113:22.
bringing 45:13,
46:2, 76:8.
Britney
17:12.
Broidy 52:20,
98:17, 98:18,
99:5, 99:17,
99:19, 100:6,
100:8, 100:9,
101:6,

101:11,
101:17,
101:21,
102:5,
102:17,
103:7, 104:5,
104:25,
106:17.
Brother
29:11.
brought 35:9,
37:15, 44:14,
100:8.
build 51:5,
52:1, 52:2.
Bullet 20:21,
60:21, 61:6,
70:24, 70:25,
71:1, 71:6.
bunch 9:10,
90:1.
business 28:21,
29:2, 30:8,
31:17, 31:23,
51:21, 51:22,
84:19, 98:9,
103:4.
businesses
50:22.
businesswoman
28:17.
buy 11:14.
.
.
< C >.
cake 17:13.
California
1:43, 38:24,
39:10.
call 34:5,
34:7, 34:8,
57:11, 58:24,
60:3, 75:4,
75:5, 83:12,
85:4, 85:23,
88:18, 95:11,
96:16, 97:15,
97:22.
call-out 56:18,
57:10, 60:3,

60:6, 60:21,
85:25, 96:15,
97:22,
98:4.
called 28:23,
30:1, 30:10,
34:2, 56:17,
57:25.
Calls 31:22,
36:23.
calm 110:3.
campaign 5:24,
8:9, 9:11,
11:24, 57:3,
57:7, 59:23,
60:18, 60:20,
61:20, 66:22,
66:25, 67:24,
71:11, 71:18,
71:22, 76:6,
76:9, 76:25,
77:21, 78:6,
79:21, 81:9,
84:6, 86:15,
87:1, 87:4,
90:17.
Campbell 3:15,
3:19, 3:21,
3:24, 12:3.
cap 81:25.
capacity
68:3.
capital 4:22.
captive
35:14.
care 5:25,
14:18, 49:11,
58:15, 109:6,
116:23.
careful
112:1.
carefully
74:20.
carve 113:15.
case 21:12,
23:13, 23:14,
25:11, 30:24,
33:15, 46:7,
48:4, 80:21,
101:15,

108:25,
109:7,
112:10,
115:13,
116:2.
cases 95:17,
96:5.
cases. 97:25.
cash 85:9.
cause 76:22.
caused 25:10.
CD 52:5, 52:9,
52:15.
cease 95:17.
celebrities
72:23.
celebrity
17:10,
81:8.
Ceos 28:25.
certain
30:15.
certainly 8:18,
33:2, 38:8,
38:9, 41:7,
108:22,
116:12.
certify 83:18,
117:1.
cetera 19:14,
38:14,
114:18.
chain 41:13,
56:10, 62:11,
89:7.
chambers
48:14.
charge 49:3.
charged 21:11,
25:24, 26:3,
44:21, 44:22,
46:17, 46:20,
46:22, 80:21,
108:24.
charges 112:11,
113:6.
Charles 2:5,
2:6.
chart 15:17,
106:2,

123

Cross-examination - Michel

106:7.
check 24:20,
  109:12,
  109:14.
Chicken
  17:11.
China 35:14.
Chinese 35:20,
  37:21,
  105:2.
Chris 100:16.
Christie
  100:16.
Christine 2:11,
  117:1,
  117:6.
Christmas
  22:12, 22:21,
  23:4, 24:5,
  24:17,
  27:23.
circumstances
  38:2.
cite 49:1.
cited 49:2.
citizen
  83:18.
City 34:15,
  82:2.
civil 95:17,
  96:1, 96:5,
  97:24, 98:16,
  100:4,
  104:15.
claimed
  45:12.
claiming 85:13,
  91:5.
claims 94:4.
clarified
  88:11.
clarify 88:14,
  97:18.
clarity 40:8.
clear 47:16,
  88:9.
Clearly 25:19,
  46:9, 47:11,
  88:17.
client 28:4,

28:5, 52:5,
  107:10.
clocks 48:2.
close 33:11,
  98:24,
  112:24.
closely
  96:17.
Closing 111:21,
  112:9,
  112:14,
  112:15,
  115:12.
closings
  111:24,
  112:3, 112:6,
  113:16.
co-conspirator
  21:13, 25:9,
  25:19.
code 87:17.
coincidence
  103:8, 104:9,
  104:10.
coincidentally
  103:6.
Colfax 98:21.
COLLEEN
  KOLLAR-KOTELL
  Y 1:18.
Columbia
  2:14.
COLUMBIA 1:2.
comes 11:13,
  67:12, 67:15,
  72:23,
  102:24,
  110:4,
  111:10.
Comey 35:24.
comfortable
  78:2, 80:1.
coming 17:12,
  41:14, 73:5,
  100:2,
  108:5.
comment 23:8.
commercial
  29:18.
Commission

85:2.
commitment
  5:24, 8:9.
Committee 71:9,
  71:13.
committing
  47:14.
common 20:23.
communicating
  13:10.
communication
  57:23.
communications
  4:25.
community
  28:18.
companies
  30:5.
company 20:5,
  28:23, 28:24,
  29:25, 30:4,
  30:7, 30:10,
  30:12, 30:14,
  40:3, 50:24,
  51:4, 52:11,
  60:22, 60:24,
  61:7, 84:20,
  95:5, 95:13,
  101:11.
comparison
  24:12.
compensation
  108:19.
completed
  20:24,
  114:12,
  114:15,
  115:7.
completing
  114:4.
complicate
  108:21.
conclude
  115:11.
concluded
  116:25.
conditions
  89:9.
conduct 25:24,
  26:3, 44:21,

44:22, 45:1,
  46:20, 46:22,
  46:25, 47:5,
  47:13, 47:20,
  49:6, 49:8,
  49:13,
  96:3.
conduit 91:4.
conference
  15:7, 22:19,
  23:11, 37:9,
  40:22, 44:11,
  46:4, 58:17,
  78:17, 107:2,
  107:25.
confine
  74:20.
confirmation
  59:18.
confirmed
  73:12.
confused
  67:21.
Congress
  11:7.
connect 36:9.
connected
  14:23,
  16:4.
connection
  15:15, 15:22,
  32:13, 37:3,
  76:12, 99:25,
  100:1, 100:9,
  100:11,
  100:12,
  100:15,
  100:19,
  100:22.
connections
  99:20.
consequential
  94:7.
consider
  115:9.
considerable
  107:20.
consideration
  85:7.
considered

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Cross-examination - Michel

74:5.
considers
  47:15.
conspiracies
  112:12.
conspiracy
  21:10.
construe
  94:8.
consulting
  55:4.
CONT'D 2:1.
contact 19:18,
  19:21,
  20:2.
contacted
  19:22.
contacts 25:3,
  25:15.
content 29:2.
context 16:15,
  104:19,
  104:20,
  104:22,
  104:23,
  105:19.
continue 73:11,
  109:4.
continuing
  70:21.
Contitution
  2:15.
contract 20:13,
  20:22, 20:24,
  21:4, 21:17,
  51:3, 94:4,
  95:13, 95:20,
  99:15,
  104:12.
contracts 21:1,
  21:16, 21:22,
  21:23, 29:8,
  31:19, 32:5,
  91:1.
contractual
  94:5.
contrary
  115:5.
contri-
  78:12.

contribute
  71:25, 77:21,
  79:21, 80:6,
  81:11,
  91:14.
contributed
  80:10, 81:1,
  81:12,
  82:3.
contributing
  83:17.
contribution
  5:5, 56:2,
  60:18, 60:20,
  71:12, 78:3,
  78:13, 80:1,
  81:16, 82:14,
  83:21, 87:19,
  88:6.
contributions
  25:25, 65:22,
  66:9, 66:12,
  67:17, 68:13,
  69:3, 69:17,
  71:17, 76:11,
  77:5, 78:6,
  80:18, 81:9,
  82:5, 82:12,
  82:16, 84:14,
  85:8, 86:5,
  86:11, 86:15,
  86:20, 86:22,
  86:24, 89:13,
  89:21, 90:2,
  90:21,
  91:4.
controlled
  60:24.
convenience
  59:16.
conversation
  18:24, 19:8,
  34:24, 34:25,
  35:5, 39:15,
  39:18, 39:20,
  39:23, 39:24,
  39:25, 40:2,
  40:3, 40:6,
  43:21, 50:17,
  50:20, 54:2,

54:6, 54:7,
  99:7,
  102:1.
conversations
  7:16, 8:12,
  15:1, 32:24,
  35:6, 37:15,
  54:18,
  86:10.
convert 92:9,
  92:17, 93:5,
  93:6,
  93:10.
cool 72:6.
Cooper 17:12.
cooperating
  37:11.
cooperation
  37:23.
cooperative
  38:1.
copies 37:14,
  116:22.
copy 37:12.
corresponds
  96:17.
costs 94:6.
councilman
  82:2.
Counsel 42:21,
  71:2, 88:8,
  92:11, 98:10,
  104:2.
count 80:21.
counts 113:6.
couple 7:5,
  28:15, 30:13,
  39:18.
course 33:14.
court. 16:22,
  23:6, 26:6,
  38:18, 42:14,
  45:17, 47:24,
  59:4, 79:18,
  107:17,
  109:2.
courtroom. 3:5,
  48:5, 49:20,
  109:8.
cover 46:24,

93:22,
  94:14.
Crass 43:9.
created
  30:13.
creating
  48:17.
credibility
  114:18.
crimes 47:15.
CRIMINAL 1:5,
  36:5, 46:19,
  46:25, 47:5,
  47:13, 47:20,
  49:6, 49:7,
  95:17, 96:5,
  97:25.
criminalizes
  48:20.
Cross 53:12,
  108:11.
CROSS-EXAMINATI
  ON 53:14,
  55:20, 86:17,
  107:10,
  109:5.
crowd 18:23.
cycle 84:13.
.
.
< D >.
dabbled
  28:19.
dad 12:10,
  12:23, 12:24,
  70:13.
daily 31:11,
  31:14.
damages 94:5,
  94:7.
date 14:12,
  16:16, 50:8,
  83:6,
  106:7.
dated 95:8,
  96:2.
dates 106:2,
  106:9.
David E. Kenner
  1:39.

Davis 28:10,
 28:12, 28:15,
 52:11, 52:21,
 102:17,
 102:22,
 103:7, 104:6,
 104:25.
day 6:10, 6:13,
 6:14, 6:19,
 14:12, 15:12,
 16:9, 23:14,
 31:12, 31:16,
 102:6,
 102:10,
 115:12,
 116:6, 116:9,
 116:15.
days 48:18,
 65:21, 67:17,
 103:6,
 105:5.
deal 20:7,
 20:12, 20:14,
 20:17, 20:18,
 20:24, 21:18,
 29:17, 29:20,
 51:22, 51:24,
 52:16,
 100:3.
dealing 5:3,
 29:14, 71:14,
 71:15.
dealings
 61:16.
dealt 51:3.
December
 27:24.
decide 10:2,
 93:12.
decided 108:15,
 108:20,
 109:19.
deciphering
 7:24.
decision
 98:9.
declaration
 84:25, 85:11,
 85:16,
 85:18.

DEFENDANT 1:12,
 1:39, 2:5,
 41:20, 44:7,
 108:11.
defense 48:14,
 49:2, 110:23,
 111:4.
definitely
 14:20,
 44:25.
demanding
 91:13.
demonstrative
 64:18, 65:2,
 102:14.
Denver 5:2.
Department
 1:26, 1:33,
 30:20, 30:23,
 31:23.
depends 113:14,
 113:16.
describe
 18:7.
describing 5:2,
 36:11.
descriptions
 18:9.
desert 17:14.
desire 15:22.
desperately
 24:3.
detail 51:2.
details 37:24,
 38:1,
 38:14.
Di 17:12.
diagram
 90:13.
dibbed 28:19.
Dicaprio
 17:13.
diet 110:8,
 110:13.
difference 7:5,
 22:20, 24:5,
 25:5,
 75:21.
different
 10:14, 10:19,

21:16, 23:21,
 25:17, 29:10,
 41:23, 42:1,
 42:8, 48:2,
 88:12, 88:19,
 114:5.
diminish
 86:4.
dinner 11:1.
diplomatic
 72:7, 72:9.
DIRECT 3:10,
 3:12, 34:1,
 49:24, 50:2,
 51:16, 51:19,
 52:8, 83:3.
Directing
 12:13.
Director
 35:24.
disagreed
 114:9.
disclosure
 86:4.
discretion
 14:2, 68:14,
 68:21.
discuss 19:15,
 29:2, 39:24,
 41:15, 42:4,
 105:22,
 110:17.
discussed
 18:19, 46:1,
 53:19.
discussing
 108:4,
 115:14.
discussion
 18:22, 19:1,
 19:2, 45:22,
 46:24,
 107:1.
discussions
 44:2, 45:23,
 47:8.
distinction
 69:8.
District 1:1,
 1:2, 1:19,

2:13, 2:14.
diversity
 28:25.
document 75:6,
 85:22, 85:24,
 95:6, 95:11,
 96:4.
dodging
 107:11.
doing 12:11,
 16:19, 23:19,
 31:17, 32:2,
 45:5, 46:24,
 52:13, 68:9,
 102:2,
 105:16,
 107:9,
 107:11,
 107:12,
 111:23.
DOJ 31:5,
 42:22.
dollars 26:8,
 26:21, 54:19,
 54:22, 54:25,
 55:1, 55:6,
 55:22, 55:25,
 56:25, 57:19,
 58:3, 59:22,
 61:25, 62:3,
 62:12, 62:14,
 62:16, 66:18,
 67:9, 70:18,
 71:6, 71:8,
 72:21, 76:5,
 87:22,
 90:8.
donate 9:11,
 14:16, 67:23,
 71:15, 76:20,
 81:20, 81:24,
 84:3, 84:4,
 84:6, 84:8.
donated 11:8,
 81:19,
 85:13.
donating 83:19,
 83:24.
donation 14:3,
 61:23, 64:5,

Cross-examination - Michel

64:7, 65:23,
66:14, 86:9,
88:25,
89:14.
donations 86:3,
86:7,
87:12.
done 7:8, 25:5,
26:17, 31:20,
53:2, 69:21,
81:25, 108:3,
108:12,
113:19,
114:21,
116:8,
116:17.
donors 65:23,
68:18,
92:8.
Dorothy 3:2.
doubt 65:18.
down 3:6, 4:9,
16:18, 49:22,
56:16, 59:15,
60:4, 60:6,
60:21, 70:19,
82:21, 94:16,
95:19, 99:16,
106:20,
109:10,
110:3.
draft 20:4.
draw 69:9.
dress 87:17.
drive 37:15.
drop 57:9,
60:2, 61:5,
77:2, 84:12,
85:21, 95:16,
96:5, 96:15,
97:22, 98:4,
98:12, 99:21,
100:1,
104:13.
dropping
97:24.
due 94:6.
dumb 92:10.
during 31:22,
32:20, 33:14,

45:9, 45:11,
97:19.
.
.
< E >.
e-mails 6:9,
6:18, 6:25,
8:1, 8:4,
8:19, 41:13,
42:6, 56:13,
58:6, 59:7,
60:9,
87:11.
earlier 10:12,
26:17, 41:7,
47:14, 49:15,
58:25,
107:16.
earliest
59:16.
early 48:7,
50:14.
earned 72:20.
earning 68:2.
easier 16:1.
easily 11:9.
easy 112:9,
113:20.
effort 37:20,
76:14.
efforts
115:3.
eight 31:12,
31:15.
either 11:23,
24:8, 35:25,
40:8, 87:6,
99:16, 114:3,
114:20.
elected 11:6,
14:7, 14:11,
15:3, 16:25,
35:15.
Election 14:19,
15:5, 15:13,
16:1, 16:2,
16:9, 16:11,
16:15, 17:1,
17:2, 85:2.
elephants

87:8.
Elliott 52:20,
100:21,
102:7,
105:13,
105:17,
105:19,
105:23,
106:10,
106:12.
elsewhere
23:4.
Emily 35:14.
Encino 1:43.
end 42:20,
59:3, 60:4,
113:17.
engaged 45:12,
47:5.
engaging 44:21,
45:5, 47:1,
76:17,
96:3.
enough 47:11,
47:16, 49:11,
87:1,
116:15.
ensue 19:8.
entail 87:6.
entered 3:5,
29:9, 49:20,
95:20,
106:14.
entertainment
21:17, 28:18,
28:19, 30:4,
50:18, 50:22,
50:24, 51:5,
52:11, 103:4,
105:22.
entire
114:10.
entities
29:8.
entity 83:20.
Eric 56:13,
56:19, 57:24,
73:25, 87:11,
88:23,
89:2.

escrow 28:4.
Especially
11:5, 16:15,
31:18.
Esquire 1:25,
1:31, 1:32,
1:39, 1:40,
2:5.
essentially
83:5.
et 19:14,
38:14,
114:18.
Euros 96:18,
96:21.
evening 108:2,
108:6, 109:6,
110:20,
113:18,
115:1.
events 27:21,
27:22, 43:22,
45:11, 46:8,
76:6, 76:9,
83:24.
eventually
102:15.
Everybody
11:17, 99:25,
100:13,
109:21,
110:3,
116:11,
116:23,
116:24.
Everyone 49:21,
100:13.
everything
30:14,
116:8.
evidence 8:17,
15:24, 46:6,
58:25, 63:6,
65:3, 78:15,
78:22, 79:1,
114:19.
exact 33:25,
51:2.
exactly 14:12,
42:6, 79:12,

Cross-examination - Michel

111:25.
EXAMINATION
3:12.
example 9:22,
24:1, 76:21,
100:16.
examples
91:12.
except 83:15.
exception
45:4.
exchange 7:13,
35:22, 60:18,
62:2,
95:14.
excited
11:17.
Excuse 4:13,
28:7, 37:3,
62:23, 63:16,
70:19, 88:8,
96:25,
103:20,
110:3.
excused 109:21,
115:25,
116:23.
exhibits
93:25.
expect
107:14.
expenses
67:5.
expertise 74:8,
75:18,
100:22.
explain 18:17,
26:23, 42:23,
44:13, 62:5,
62:9, 62:10,
62:15, 71:2,
74:18, 91:22,
92:5.
explanation
63:21, 91:24,
92:2.
extent 40:6.
extra 113:9.
extraordinarily
17:14.

eye 32:7.
.
.
< F >.
F. 1:31.
fact 22:24,
31:2, 37:22,
45:23,
82:3.
facts 8:16,
63:5.
factual
111:2.
fail 94:3.
failed 27:21.
failing
48:20.
fair 13:24.
fairly
112:10.
falls 48:24.
familiar 4:18,
5:13.
far 19:11,
47:17,
70:2.
FARA 33:9,
33:12, 39:21,
40:10, 40:13,
40:15, 40:25,
41:2, 41:4,
41:14, 41:15,
41:16, 41:20,
41:21, 42:16,
44:5, 44:18,
45:20, 46:7,
46:11, 47:15,
48:15, 49:3,
52:17, 52:23,
52:25,
53:3.
Fargo 61:1.
father 11:20,
14:22,
73:6.
FBI 32:20,
33:15, 35:17,
35:23, 36:4,
37:20, 37:22,
38:1, 38:3,

40:12, 42:22,
43:11, 52:23,
92:4.
FCRR 2:11,
117:1.
February
91:11.
FEC 84:13,
84:19.
Federal 83:14,
83:15,
85:2.
fee 55:4,
55:10, 55:12,
96:16.
feel 7:2,
71:24,
93:9.
feels 14:23.
fees 94:5.
feet 17:9.
felt 8:7,
32:17.
Fern 39:11.
Ferrari
18:25.
ferris 17:10.
few 48:6,
109:11.
fewer 38:8.
figure 27:11,
31:18, 35:25,
36:6, 55:2,
55:4, 55:25,
58:3, 66:16,
66:19, 68:22,
73:2, 73:3,
89:10,
112:9.
figured
30:24.
file 47:12,
94:4.
filed 47:14.
fill 7:11, 8:8,
9:6, 68:19,
76:8.
filled 11:20.
filling 68:19,
71:25.

films 29:11,
29:12.
finally 27:19,
27:23.
finances
20:3.
financial
15:11, 19:22,
19:23, 61:11,
61:15, 74:3,
75:17, 75:19,
78:11, 78:20,
78:21,
79:11.
find 95:24,
95:25, 96:10,
98:10, 98:15,
104:2,
104:15,
105:14,
109:16.
finding
49:17.
fine 3:23,
3:25, 24:14,
38:1, 61:6,
72:2,
110:9.
finish 69:12,
103:14,
103:22,
109:5,
113:13.
fired 35:24.
Firestone 78:5,
79:21,
80:25.
Firm 1:41.
First 14:20,
14:21, 17:13,
34:1, 34:2,
34:13, 34:21,
50:13, 57:22,
57:25, 66:2,
66:5, 67:2,
67:3, 84:10,
84:11, 85:9,
92:2, 105:21,
106:11.
fish 40:5,

40:6.
five 33:24,
   62:16,
   103:6.
fixed 111:23.
fixing
   111:10.
flow 85:9,
   106:17.
focus 108:7.
follow 5:4,
   63:19.
following
   16:22, 23:6,
   26:6, 29:16,
   38:18, 42:14,
   45:17, 47:24,
   59:4, 79:18,
   107:17,
   109:2.
foregoing
   117:2.
foreign 48:19,
   48:21,
   83:15.
foreigner
   80:8.
forensic
   20:2.
foreperson
   113:20.
forever 5:12.
forfeiture
   96:1, 98:16,
   100:4,
   104:16.
forget 60:8.
form 38:10,
   84:9.
formal 114:6.
former 61:11.
forth 57:24.
forward 5:3,
   8:19, 8:22,
   8:25, 19:17,
   56:10.
forwarded 9:1,
   9:4, 57:18,
   59:12, 59:17,
   59:22,

89:7.
found 48:16,
   98:17,
   110:11.
foundation
   7:21, 7:25,
   33:1, 33:3,
   40:24, 41:3,
   42:16,
   78:9.
four 33:24,
   116:20.
fourth 85:8,
   93:25.
frankly 24:10,
   27:8, 46:23,
   47:3, 47:17,
   113:15.
free 68:4,
   68:5,
   75:25.
Friday 6:15,
   6:16,
   115:19.
Fried 17:11.
friend 14:21,
   14:23,
   28:16.
friends 9:10,
   9:11, 10:8,
   10:22, 11:5,
   11:6, 13:22,
   27:21, 62:20,
   67:23, 68:19,
   76:8, 77:5,
   81:8, 81:18,
   81:24, 82:1,
   83:23, 84:3,
   89:14, 92:4,
   92:23, 93:19,
   94:12.
front 73:18,
   107:6,
   107:13,
   108:16.
fugitive 35:20,
   36:7.
fulfill
   32:15.
fun 76:3.

Fund 65:22,
   65:23, 67:18,
   82:4, 83:17,
   90:2, 90:5,
   90:21,
   91:15.
funding 29:3.
fundraising
   7:17, 61:20,
   61:21,
   66:2.
funds 83:19,
   83:24.
funneled
   90:6.
Fwhite@barackob
   ama.com
   4:7.
.
.
< G >.
game 101:6.
General 35:16,
   100:7.
Generally
   23:23, 112:8,
   112:15.
gentleman
   13:8.
George 28:4,
   28:7, 29:14,
   29:20, 30:8,
   30:24, 40:1,
   51:3, 52:14,
   52:21.
gets 73:7,
   112:18.
getting 14:18,
   16:4, 19:9,
   21:13, 25:14,
   27:3, 33:11,
   36:8, 44:25,
   60:17, 80:15,
   87:20, 92:4,
   92:23,
   108:14,
   108:20,
   116:17.
gift 73:23,
   74:2, 74:5,

74:8, 75:8,
   75:12, 75:19,
   75:21, 75:23,
   76:1, 80:13,
   80:15, 80:17,
   84:7, 93:5,
   108:17,
   108:19.
gigs 31:6.
Giuliani
   100:18,
   100:19.
Give 9:13,
   9:22, 20:21,
   28:25, 52:12,
   59:23, 61:23,
   63:20, 64:8,
   70:1, 73:1,
   79:8, 82:1,
   82:8, 93:5,
   93:11,
   109:15,
   111:21,
   112:17,
   114:16,
   116:22.
given 13:13,
   103:25,
   104:1,
   114:24.
giving 10:8,
   10:22, 82:16,
   89:12,
   116:20.
gold 21:18,
   32:5.
golf 101:6.
Gorilla 30:10,
   30:12.
gotten 35:24,
   56:22,
   70:2.
great 73:6,
   76:21,
   100:11.
grounds 22:15,
   23:5, 23:7,
   26:7,
   41:10.
guess 8:9,

Cross-examination - Michel

13:4, 16:9,
27:12, 42:22,
110:6.
Guiliani
100:16.
Guo 35:7, 35:9,
35:20, 36:5,
36:20, 36:22,
37:3, 37:13,
37:21.
guy 5:22.
guy. 5:17,
5:21.
guys 5:3, 5:17,
36:8,
39:12.
.
.
< H >.
H. 43:11.
Haiti 72:4.
Haitian 9:10.
half 23:13,
57:11, 67:9,
116:9.
hall 110:11.
hand 13:8,
96:24,
97:16.
hand. 39:7.
handling 31:18,
71:21.
hands 12:11,
12:12.
happen 8:3.
happened 7:3,
8:6, 15:5,
42:7, 59:25,
72:6, 79:4,
89:10.
harbor 48:17.
hard 15:25.
harder 31:21.
Haskell 2:5,
2:7.
Hawaiian
28:17.
head 13:4.
header 60:5.
headquarters

42:22.
heads 62:16.
hear 37:7,
44:9, 48:12,
99:10.
heard 28:9,
31:10, 52:3,
88:9, 92:3.
Hearsay 19:12,
36:24, 43:25,
44:2, 44:6,
45:4, 58:7,
58:14, 58:22,
58:24.
heavier
29:11.
held 35:14.
hello 102:7.
help 9:9,
27:17, 28:25,
29:2, 52:1,
54:22, 55:2,
55:25, 68:7,
73:11, 80:17,
87:10, 88:5,
95:24, 95:25,
96:10, 98:10,
98:12, 98:15,
99:24, 100:2,
100:15,
104:1, 104:2,
105:14,
105:18.
helped 51:23,
76:19.
helpful 38:7.
helping 72:1,
72:3, 73:3.
hereby 117:1.
Heuchling 39:3,
39:4, 39:5,
39:16, 42:18,
43:13,
43:14.
hide 86:2,
86:7.
highlight
93:25,
97:24.
highly 37:16,

38:8.
him. 5:25.
Hippolyte
91:12.
hire 29:10.
hired 32:18.
historic
72:25.
Hold 25:13,
96:25.
Holdings 60:22,
60:24, 61:9,
84:20,
88:1.
home 83:14.
honest 11:11,
55:13.
HONORABLE
1:18.
Hopefully
112:18.
hopes 84:2.
host 9:23.
hotel 18:1,
18:2.
hours 6:23,
7:5, 31:23,
39:19, 113:2,
113:8,
116:20.
House 8:10,
8:14, 9:17,
9:19, 9:22,
11:2, 11:19,
11:23, 17:4,
18:18, 22:12,
27:19, 27:23,
70:11, 73:9,
73:12,
73:13.
Huang 35:14.
hundred
111:14.
hundreds
76:5.
Hunt 42:3,
47:3,
49:10.
.
.

< I >.
iconic 72:24.
idea 15:8,
28:6, 28:7,
28:8, 28:22,
30:6, 81:4,
92:21,
92:22.
ideas 29:2.
identify
32:12.
illegal 26:1,
89:18, 89:20,
91:4, 92:19,
105:14.
immediately
116:18.
impeach
115:4.
impeached
114:17,
115:3.
impeachment
113:25,
114:5,
114:13,
114:15,
114:18,
115:7.
impeachments
114:2.
important
72:23.
impression
47:20.
improper
42:10.
in. 47:5,
49:19, 58:25,
67:22,
87:14.
inappropriate
107:3,
107:6.
inappropriately
107:12.
included
100:22.
including
41:13, 59:7,

Cross-examination - Michel

83:6.
income 75:19,
  75:21,
  84:19.
inconsistent
  111:10,
  113:25,
  114:6,
  114:14,
  114:21.
incorporate
  29:25.
Indiana 2:8.
indicate 4:15,
  63:8,
  108:22.
indicated
  26:11, 26:25,
  33:4.
indicates
  47:19.
indictment
  31:9.
influence
  99:21, 100:6,
  100:10.
information
  19:11, 35:17,
  36:3, 36:19,
  36:21, 45:9,
  63:2, 63:13,
  64:1, 65:4,
  87:17,
  108:14,
  111:3.
informed
  71:12.
initial 27:4,
  53:20,
  112:14,
  112:15,
  112:23.
inquiries
  84:14.
inquiring
  40:15.
inquiry 41:3,
  41:4.
Instead 4:13,
  99:20.

instruct
  111:17,
  111:22.
instructed
  52:4,
  71:16.
instruction
  109:15,
  110:20,
  111:3, 111:5,
  113:24,
  114:7,
  114:16,
  114:24.
instructions
  108:3, 108:7,
  108:23,
  111:14,
  111:21,
  111:25,
  112:2, 112:4,
  113:16,
  116:16,
  116:18,
  116:21,
  116:22.
Integrity
  1:34.
intelligent
  38:9,
  107:11.
intended 7:24,
  19:15,
  52:2.
intending
  93:11.
interest 40:8,
  94:6.
Interpol 36:6,
  95:18.
intimate
  11:19.
introduced
  53:19, 53:23,
  98:18,
  105:16.
invest 50:23.
investigated
  92:3.
investigation

33:14, 41:17,
  91:4,
  98:12.
investigations
  95:17, 99:22,
  104:13.
investing
  50:17,
  50:22.
investment
  28:23, 51:4,
  103:3,
  103:25,
  105:17,
  105:19,
  106:14.
investor 21:19,
  98:7.
investors
  32:2.
invitation
  9:15, 83:2.
invite 22:11,
  68:19.
invited 9:10,
  11:5, 25:4.
involved 19:8,
  20:21, 28:18,
  29:7, 35:7.
iphone 11:13.
Irrelevance
  69:6.
irrelevant
  23:19, 41:24,
  69:23.
Israely 1:40.
issue 41:9,
  45:24, 80:22,
  107:7,
  108:17,
  110:17,
  115:18,
  116:10.
issues 19:23,
  20:1, 32:12,
  108:5, 108:8,
  111:23,
  116:9.
items 87:20,
  87:24.

itself 42:7.
.
.
< J >.
Jack 77:17,
  77:19.
Jeff 35:16,
  36:1.
Jeh 37:12.
job 32:3, 32:4,
  32:18, 95:24,
  107:11.
jobs 30:23.
Joel 8:23, 9:4,
  13:1, 53:24,
  54:8, 56:8,
  56:13, 56:19,
  57:13, 57:24,
  57:25, 58:2,
  60:12, 62:16,
  62:17, 63:10,
  63:12, 64:10,
  67:6, 87:11,
  87:13, 87:15,
  87:18, 87:20,
  89:1.
John D. Keller
  1:25.
Johnson
  37:13.
Jonathan
  43:9.
JUDGE 1:19.
July 6:15.
JUROR 96:23,
  97:3, 97:8,
  97:11,
  115:18.
jurors 98:2.
Jury 1:17, 3:4,
  3:5, 3:7,
  23:4, 24:5,
  25:7, 26:16,
  47:25, 48:5,
  49:19, 49:20,
  107:6,
  107:14,
  108:2, 108:7,
  108:16,
  108:21,

Cross-examination - Michel

108:23,
109:3, 109:8,
111:14,
115:17.
Justice 1:26,
1:33, 30:20,
30:23,
31:23.
.
.
< K >.
Keep 23:16,
59:16.
keeping
116:1.
Kelly 100:7.
Kenner 1:41,
3:10, 3:15,
4:9, 4:10,
4:13, 6:3,
6:5, 15:8,
16:19, 20:17,
24:16, 38:6,
49:25, 53:18,
63:19, 64:20,
69:25, 70:25,
78:25, 83:3,
93:1, 97:13,
107:1, 107:3,
109:13,
109:25,
110:4,
110:25,
112:25.
Kentucky
17:11.
kept 84:4,
87:6.
kind 36:21,
40:6, 52:13,
55:4, 55:10,
55:17,
55:23.
know. 57:18.
knowingly
48:20.
knowledge
22:11, 31:22,
48:23.
known 28:15,

30:25,
53:2.
knows 23:4,
38:10.
Kromka 91:12.
.
.
< L >.
Lack 7:20,
32:25, 40:20,
42:16.
laid 40:25.
land 17:9.
language
111:5.
Lao- 98:8.
Laogumnerd
13:16, 20:5,
27:16, 50:3,
50:14, 50:21,
106:6.
larger 3:20,
6:11.
Las 14:6,
17:5.
last 72:11,
90:7, 97:19,
110:21,
111:13,
115:10.
late 19:17,
116:15.
later 33:4,
42:10, 47:7,
49:13, 66:2,
70:8, 91:3,
93:12, 105:5,
116:19.
launch 28:20,
29:9.
launching
28:21.
lavish 17:14.
Law 1:41, 2:6,
48:25, 83:14,
83:15,
98:21.
lawfully 83:15,
83:18.
lawyer 29:7,

32:21, 78:2,
79:25, 91:18,
92:5, 93:4,
93:7, 98:19,
98:22,
102:22.
lawyers 31:5,
91:11.
lead 50:8.
Leading 8:17,
8:18, 17:17,
22:13, 32:25,
33:3, 37:5,
38:11.
leapt 8:19.
learn 31:8,
32:19,
33:4.
leasing 32:5.
least 42:11,
112:22.
leave 69:2,
74:15, 98:3,
109:20,
116:8.
leaving 47:21,
48:13,
115:17.
left 6:7, 6:15,
12:9, 12:21,
12:24, 48:5,
67:5, 67:6,
67:7, 67:9,
90:13, 102:8,
109:8, 110:6,
110:8.
legal 21:3,
21:6, 21:22,
30:16, 30:23,
31:19, 32:4,
32:6, 32:10,
32:13, 48:12,
92:11, 93:22,
94:8, 94:9,
94:10, 94:14,
95:24, 98:10,
98:15, 99:7,
99:18, 99:23,
100:3,
100:23,

101:10,
101:14,
101:15.
legally 29:4,
109:14.
legitimate
80:10, 80:13,
80:16,
82:23.
legitimately
81:1.
Leonardo
17:13.
less 23:14,
26:3, 27:20,
31:16.
letter 75:8,
94:2.
letters 4:22,
4:23, 91:5,
91:11, 92:16,
94:12.
liability
46:19.
license
29:12.
Lidsky 39:13,
39:14, 39:16,
42:18.
lie 73:24,
74:1, 92:17,
93:4, 93:7,
95:24.
lied 73:23,
73:25, 92:19,
92:25, 93:3,
95:22.
lies 92:16.
lifetime
72:25.
Lijun 35:23,
105:3.
limit 82:11.
limitations
49:3, 49:5.
limits 81:16,
81:17, 81:21,
81:23.
line 5:15,
16:12, 49:17,

Cross-examination - Michel

57:15, 71:1,
71:7, 72:12,
83:5,
87:20.
lined 3:4.
lines 59:15,
95:19.
list 87:24.
listed 63:8.
listen 74:17,
74:20.
listening
24:12,
116:20.
listing
88:23.
lists 87:21.
Litman 34:24.
little 3:20,
3:22, 4:19,
38:13, 70:18,
71:5, 71:7,
72:15, 101:1,
107:15.
living 12:15,
18:24.
LLC 30:1, 30:3,
60:22,
95:6.
loan 90:24,
91:6, 92:9,
93:5, 93:6,
93:10, 93:12,
93:13.
loans 92:13,
92:18.
location
83:7.
Lockhart
1:32.
logistically
109:23,
110:18.
logistics 10:5,
18:17, 75:14,
75:16,
110:10,
110:17.
long 5:13,
28:12, 36:14,

112:10,
113:6,
116:2.
longer 64:13.
look 11:12,
11:24, 21:22,
36:6, 47:18,
47:22, 49:1,
57:14, 60:21,
64:21, 65:4,
105:20,
110:24,
113:19.
looked 4:18,
20:3, 48:7,
49:10, 75:25,
110:17,
111:13,
115:4.
looking 99:23,
99:25,
109:19.
Looks 3:2,
6:12.
lot 21:16,
23:20, 31:14,
58:6, 59:7,
113:6,
116:21.
lower 106:21,
106:24.
Lucky 95:1,
102:25,
105:6.
Lum 28:9,
28:12, 28:15,
52:10, 52:21,
102:17,
102:22,
103:7, 104:5,
104:25.
lunch 34:18.
lying 94:12.
.
.
< M >.
M-A-N 4:23.
Macau 28:3.
main 61:18.
majority 51:21,

51:22,
51:25.
Malaysia
101:14,
101:22.
Malaysian
101:7.
MAN 4:24, 5:17,
5:18.
manager 19:23,
30:8, 61:11,
61:15, 74:3,
75:17,
75:19.
Marc 30:9,
40:4.
March 91:11.
Marcum 74:4,
74:5.
Mark 95:1,
102:25,
105:6.
market 72:25.
matter 6:23,
23:1, 23:3,
23:25, 24:11,
24:12, 36:17,
36:20, 36:22,
37:3, 44:16,
44:23, 47:2,
48:24, 72:2,
82:3, 87:5,
103:12,
117:3.
matters 31:11,
32:4, 32:13,
108:22.
maxed 81:14,
82:8,
86:14.
May-ish
50:10.
mean 7:5, 9:3,
20:14, 20:17,
21:3, 39:14,
47:6, 50:12,
76:22, 111:4,
111:8, 112:8,
113:3, 114:4,
115:19,

116:15.
meaning
17:22.
means 58:2,
93:8.
meant 87:23.
media 28:24,
30:14, 51:4,
51:5, 52:1.
medical
110:13.
meet 11:18,
16:24, 29:1,
33:21, 34:13,
35:16, 35:23,
35:25, 38:23,
39:1, 42:21,
50:3, 50:5,
50:7, 50:15,
101:21,
102:10,
102:17,
103:8,
105:21.
meeting 18:11,
19:14, 28:3,
34:3, 34:9,
36:10, 36:14,
36:17, 43:16,
43:23, 44:2,
44:4, 44:17,
44:20, 44:21,
45:18,
101:13,
101:17,
101:18,
102:3, 102:6,
103:10,
103:12,
104:5,
104:7.
meetings 38:23,
42:17.
Members 3:7,
47:25,
109:3.
Men 71:8,
71:15, 76:11,
76:21, 84:15,
85:8, 85:13,

Cross-examination - Michel

86:3.
mention 104:23,
   110:19.
mentioned 40:5,
   40:7, 52:23,
   98:20.
mentor 73:3.
message 36:8,
   56:17.
met 28:22,
   34:2, 34:14,
   34:15, 34:21,
   50:10, 50:12,
   50:13, 50:16,
   101:22,
   101:24,
   103:11,
   105:1, 106:1,
   106:6,
   106:10,
   106:17.
Miami 14:21.
microphone
   100:25.
middle 18:23,
   83:12.
millions 72:21,
   96:18.
mind 37:17,
   44:7, 44:12,
   45:3, 45:9,
   59:16,
   80:23.
Mine 9:14,
   21:18,
   32:5.
Minister 101:7,
   101:14,
   101:18,
   101:21,
   101:22,
   102:5, 102:7,
   102:9,
   105:2.
minorities
   28:25.
minute 61:5,
   97:1, 103:20,
   104:17.
minutes 48:6,

109:11,
109:15,
112:23,
113:4,
113:9.
minutia
   38:16.
mispronounce
   43:10,
   98:8.
missing 25:17,
   25:21.
Mohamed 14:21,
   14:23, 62:18,
   87:13, 87:25,
   88:15,
   88:18.
Mohammad 12:20,
   64:11.
Moises 11:7,
   82:1,
   91:13.
moment 21:24,
   60:9, 98:3.
Monday 5:4.
Monica 38:24,
   39:10, 39:15,
   39:17.
monies 51:7.
month 70:8.
months 27:18.
morning
   108:4.
Moscowitz 30:9,
   40:5.
Move 4:18,
   14:6, 16:19,
   19:15, 19:17,
   23:5, 23:16,
   24:7, 24:14,
   27:13, 27:14,
   65:6, 74:12,
   80:23,
   100:25.
moved 24:11.
Moving 5:3,
   23:20, 27:1,
   70:23,
   86:18.
MR. ISRAELY

110:8.
110:11.
Mulryne 1:31.
Music 21:16,
   30:10,
   30:12.
mutual 28:16.
myself 17:7,
   36:3, 43:19,
   48:17, 62:20,
   87:7,
   105:13.
.
.
< N >.
name 33:17,
   35:14, 39:3,
   43:10, 43:12,
   80:1, 98:8.
named 19:23,
   28:9, 30:9,
   43:9.
names 82:6,
   82:12,
   88:17.
Naomi 78:5,
   79:20.
narrative
   74:16.
nationals
   83:15.
nature 31:16.
NBC 29:15,
   29:18,
   29:20.
necessarily
   71:20.
necessary
   63:15, 99:9,
   99:11.
need 3:20,
   3:21, 6:11,
   15:19, 16:18,
   16:19, 27:10,
   38:16, 62:10,
   71:2, 74:16,
   87:15,
   106:20,
   108:6,
   110:21,

111:23,
112:3,
113:15,
113:22.
needed 29:9,
   32:6, 32:10,
   62:16, 66:8,
   66:24, 67:1,
   91:6.
needs 24:11,
   64:21,
   110:12,
   110:25,
   115:18.
negate 46:19.
negotiate
   21:23.
negotiated
   21:18, 29:15,
   29:16,
   29:20.
negotiating
   29:8.
negotiation
   29:11,
   31:21.
negotiations
   44:23,
   47:9.
Nevada 17:6,
   17:15.
New 1:27, 1:35,
   11:13, 28:21,
   33:15, 34:15,
   34:18, 36:1,
   46:2.
newly 16:25.
news 35:15.
next 5:9,
   12:19, 12:21,
   12:24, 36:14,
   36:17, 41:14,
   66:16, 70:24,
   71:1, 71:6,
   102:6,
   102:10.
nice 107:11.
Nickie 28:9,
   28:12, 28:15,
   52:10, 52:21,

105:13,
106:10,
106:12.
Nicole 1:32.
night 101:22.
nine 27:18.
Niro 17:12.
No. 1:5, 32:17,
50:10, 57:5,
60:21, 61:6,
61:18, 62:14,
64:13, 68:14,
69:19, 81:7,
88:22,
92:21.
Noble 17:11.
Nobody
108:17.
None 38:4,
67:5, 92:13,
107:5.
nonleading
38:6.
nonprofit
57:16, 57:22,
59:11.
nonresponsive
74:13.
noon 6:7.
nor 86:3,
107:14.
notes 113:21.
Nothing 49:12,
51:7, 87:23,
101:12,
103:2,
104:11,
104:14,
104:21,
105:8,
105:14,
108:10,
108:24,
109:18.
Notice 36:6,
95:18.
notices 40:12,
40:15.
November 14:8,
15:12.

Number 33:25,
38:11, 38:12,
58:13,
112:11.
numbers
15:11.
NW 1:27, 1:35,
2:8, 2:15.
.
.
< O >.
o'clock 107:19,
115:5.
oath 114:18.
object 23:24,
58:25,
80:20.
objected
23:23.
Objecting
69:7.
objections
33:7, 38:8.
obtain 94:5.
obviously 4:17,
25:3, 51:21,
51:25, 100:9,
100:11,
107:9,
114:19.
occasion
34:13.
occasions
33:21.
occurred
45:11.
occurrences
45:7.
offer 44:15,
44:16.
office 34:16.
Offices 2:6.
Official 2:12,
11:6, 72:5,
101:18,
105:2,
117:7.
officially
101:23.
officials

35:15.
offshore
61:7.
Once 14:7,
21:1, 21:4,
59:17, 61:23,
64:7, 64:13,
68:14, 68:24,
69:19, 73:11,
87:17.
ongoing 41:1.
onuses 92:22.
open 16:22,
23:6, 26:6,
38:18, 42:14,
45:17, 47:24,
59:4, 79:18,
107:17,
109:2,
116:10.
opened 28:4.
opening
112:8.
opinion
37:25.
opportunity
4:14, 5:8,
15:2, 17:3,
82:21,
87:2.
opposed
18:11.
opposition
65:11.
orchestrate
116:12.
order 16:17,
82:11.
original
56:17.
originally
94:13.
Oriole 91:13.
Orozco 56:5,
56:16, 57:9,
57:11, 60:2,
60:7, 61:4,
75:4, 77:2,
83:1, 83:11,
84:12, 84:23,

85:5, 85:21,
89:25, 90:10,
90:19, 91:8,
93:24, 94:16,
94:23, 95:11,
96:15, 97:22,
98:3,
102:13.
others 13:13,
23:23,
44:2.
out-of-court
44:3.
outside
48:24.
overnight
115:13.
Overruled
79:19.
own 14:2,
51:25, 67:4,
87:14, 93:22,
94:14,
101:11.
.
.
< P >.
p.m. 1:12,
61:19,
116:25.
page 4:3, 12:4,
12:13, 13:5,
60:4, 60:5,
83:9, 83:11,
84:10, 84:11,
85:23,
95:10.
pages 111:14.
paid 16:17,
27:18, 27:24,
51:11, 51:23,
62:20, 73:12,
73:16, 73:18,
73:20, 87:14,
98:5, 98:7,
99:15,
100:18,
104:13,
105:17,
105:19.

Cross-examination - Michel

panic 92:5.
panicked
    93:21.
Paperwork
    31:19,
    32:4.
paragraph
    57:14, 85:5,
    94:1,
    97:23.
parent 30:5,
    30:6,
    30:14.
Part 37:21,
    47:9, 50:14,
    76:14, 79:1,
    110:19,
    110:22,
    111:7,
    111:19,
    113:19,
    113:22.
particular
    28:25.
particularly
    24:1,
    38:15.
parties 18:9,
    20:20, 89:12,
    90:6.
parts 41:8.
party 7:17,
    10:6, 11:25,
    17:6, 17:7,
    17:8, 17:14,
    17:20, 17:23,
    17:24, 18:12,
    18:23, 22:12,
    22:21, 23:4,
    24:6, 24:18,
    27:24,
    57:18.
party. 59:12.
passing
    35:17.
past 94:6.
path 16:18.
Patterson
    65:13.
pay 13:21,

18:16, 21:6,
    29:18, 73:21,
    75:9, 84:11,
    87:16,
    93:13.
paying 68:10,
    89:8.
payment 18:19,
    75:12, 75:24,
    76:1.
penthouse 9:20,
    18:3.
People 10:2,
    12:16, 18:23,
    25:4, 43:15,
    43:17, 51:23,
    60:9, 73:15,
    74:7, 81:6,
    82:5, 82:12,
    82:13, 82:15,
    82:18, 82:20,
    88:12, 88:19,
    90:1, 90:21,
    91:5, 91:21,
    92:7, 92:8,
    92:23, 93:19,
    107:24,
    112:2,
    114:5.
per 31:16.
percent 13:24,
    27:20.
percentage
    20:19,
    51:24.
perfect 60:7.
perfected
    114:2.
Perhaps 4:15.
period 26:2,
    32:8, 39:23,
    45:10, 45:11,
    48:24,
    113:9.
permanent
    83:16,
    83:19.
permits
    48:15.
person 4:4,

9:3, 11:13,
    11:16, 28:9,
    48:18, 48:21,
    78:5, 83:20,
    83:23, 83:25,
    88:11, 88:13,
    88:16, 88:20,
    115:5.
personal 51:25,
    67:5.
perspective
    21:3, 24:10,
    32:15.
perspectives
    113:24.
pertaining
    64:10,
    64:12.
Pheng 13:15,
    13:16, 20:4,
    28:22, 40:2,
    50:3, 50:13,
    50:21, 50:23,
    51:14, 98:7,
    98:8, 103:19,
    104:1,
    105:12,
    105:16,
    105:22,
    105:25,
    106:1, 106:6,
    106:10.
phone 83:14.
phones 11:15.
photograph
    22:5, 22:7,
    24:3, 25:5,
    25:20, 26:9,
    27:5.
pick 92:8,
    112:2.
picture 7:19,
    12:6, 12:8,
    12:14, 12:15,
    13:3, 15:23,
    22:1, 27:3.
piece 115:6.
place 17:25,
    18:1, 18:2,
    18:18, 18:22,

29:1, 36:15,
    39:18, 43:22,
    64:8.
place. 61:24.
places 73:16.
Plaintiff
    1:7.
plan 9:23.
plans 111:16.
plate 72:7,
    72:9.
platform 29:13,
    52:1.
play 29:22.
playboy
    11:25.
played 29:23.
Please 3:6,
    3:15, 12:3,
    26:23, 49:21,
    51:6, 57:10,
    62:15, 71:3,
    74:24, 93:25,
    106:5,
    113:19.
plot 17:8.
Plus 11:19,
    29:15.
points 20:7,
    20:12, 20:14,
    20:17, 20:19,
    20:21, 20:24,
    24:21, 24:23,
    25:1,
    31:21.
Political
    25:25, 56:2,
    62:4, 62:12,
    64:4, 64:5,
    65:22, 66:12,
    68:13, 69:3,
    69:17, 70:8,
    71:8, 71:13,
    71:17, 77:5,
    80:18, 87:12,
    87:19, 88:6,
    88:25,
    89:13.
portion 74:11,
    95:16,

Cross-examination - Michel

105:18.
possible
  40:16.
Possibly
  34:23.
postdated
  44:22.
Postdates
  46:20.
potential
  32:12,
  44:22.
practical
  23:25,
  47:2.
practice
  20:23.
Prakazrel
  84:25.
PRAKAZREL
  MICHEL
  1:10.
Pras 11:10.
prefer
  116:11.
preference
  115:11.
prefers
  116:11.
preindictment
  44:23,
  44:25.
prejudicial
  41:25.
prep 102:5.
present 13:6,
  18:14, 19:2,
  19:4, 19:6,
  20:7, 20:8,
  23:13, 43:1,
  43:3.
pressure 7:9,
  8:8.
pressured
  7:2.
presumably
  86:18,
  108:16.
pretty 96:17.
prev- 10:16.

previous 4:24,
  6:4, 71:23,
  97:23.
previously
  10:15, 56:5,
  75:1, 81:17,
  83:1, 84:23,
  89:25,
  102:13.
Priebus
  100:7.
prime 101:7,
  101:14,
  101:18,
  101:21,
  101:22,
  102:5, 102:7,
  102:9.
principal
  48:19.
prior 28:15,
  30:13, 72:22,
  103:11.
privy 102:1.
probably 7:6,
  43:14, 43:15,
  48:1, 70:2,
  108:12,
  108:21.
problem 24:15,
  41:8, 47:4,
  110:9,
  110:14,
  115:16.
problems
  22:14.
proceed 3:9,
  49:23.
proceedings
  16:22, 23:6,
  26:6, 38:18,
  42:14, 45:17,
  47:24, 59:4,
  79:18,
  107:17,
  109:2,
  116:25,
  117:3.
process
  28:20.

production
  30:12.
professional
  21:3, 74:7.
prohibits
  83:14,
  83:15.
projects 32:2,
  50:18.
pronounce
  39:2.
pronouncing
  88:17.
proposed
  49:16.
proposition
  48:15.
prosecutor
  43:6, 43:7.
prosecutors
  43:4.
PROSPECTIVE
  JUROR 3:8.
Prosperity
  30:1, 30:3,
  30:6.
provide 32:9,
  37:23, 38:20,
  95:14,
  95:16.
provided 7:14,
  38:3, 63:13,
  63:22, 83:20,
  83:25.
providing 63:2,
  63:25,
  105:12.
provision
  48:17, 49:8,
  49:9.
Public 1:34,
  105:2.
publish 3:15,
  12:3,
  65:12.
Publishing
  21:17, 30:11,
  30:12.
pull 64:16,
  74:23, 84:22,

89:24, 90:10,
  94:22.
purpose 19:14,
  35:18, 35:19,
  57:17, 59:11,
  78:19, 80:15,
  83:21,
  108:18.
purposes
  87:19.
pursuant 98:11,
  99:15.
pursue 49:17,
  50:22.
push 31:20.
pushing 107:8,
  107:12.
put 20:2,
  21:19, 29:12,
  37:15, 51:23,
  52:4, 52:9,
  52:15, 66:14,
  66:21, 66:25,
  70:18, 71:5,
  71:7, 76:24,
  104:19,
  104:22.
putting 8:7,
  16:14, 76:5,
  110:22.
.
.
.
< Q >.
quarter
  112:20.
quest 15:9.
questioning
  16:12,
  49:18.
questions 4:11,
  23:18, 23:21,
  24:9, 24:13,
  27:1, 38:7,
  42:15, 53:11,
  97:19,
  98:1.
quite 55:13,
  107:10,
  112:11,
  115:17.

Cross-examination - Michel

.

.

< R >.

R. 2:5, 2:6.

Rae 1:32.

raise 29:2,
   71:18,
   71:22.

raised 37:19,
   72:1.

raising 32:1,
   39:7, 71:25,
   96:23.

ran 11:6, 11:7,
   82:2.

randomly
   92:8.

ranges 21:21.

rap 17:13.

rapist 36:5.

re-elected
   14:15, 72:3,
   73:7.

reached
   21:25.

read 3:19,
   3:24, 4:1,
   4:10, 4:17,
   5:11, 5:12,
   21:4, 83:13,
   110:21,
   111:3.

reading 4:14.

reads 4:12.

ready 3:9,
   21:2, 21:4,
   31:20, 49:23,
   52:16,
   110:23.

realize 32:22,
   33:1.

Really 14:24,
   33:25, 72:9,
   113:3,
   113:22,
   116:17.

reason 46:12,
   49:17, 53:5,
   65:18, 68:17,
   71:22, 86:2,

108:20,
   113:24.

reasons
   110:13.

rebuttal
   112:14,
   112:16,
   112:19,
   113:10.

recall 21:8,
   28:10, 31:11,
   33:17, 34:17,
   34:18, 34:21,
   35:4, 36:12,
   36:16, 41:12,
   42:9, 42:19,
   51:1, 53:21,
   66:10, 66:11,
   66:13, 77:25,
   78:4, 84:21,
   101:20,
   101:25,
   102:11.

receipt 57:17,
   59:11,
   59:17.

receive 18:20,
   27:3, 27:15,
   40:9, 40:12,
   40:15, 61:23,
   94:20.

received 13:14,
   15:13, 15:14,
   27:4, 28:5,
   51:8, 51:16,
   52:5, 62:21,
   62:24, 64:7,
   65:5, 65:14,
   66:13, 68:12,
   68:24, 69:18,
   94:25,
   96:18.

receiving
   20:20,
   88:24.

recess 6:7,
   48:10,
   109:17.

recognize 12:6,
   56:7, 84:24,

91:10.

recollection
   31:12, 31:13,
   33:13, 33:19,
   34:7, 34:9.

recommend
   100:5,
   100:12.

recommended
   99:2.

record 23:2,
   24:2, 25:15,
   47:11, 47:16,
   79:10, 88:11,
   114:14,
   117:3.

record. 15:7,
   22:19, 23:11,
   37:9, 40:22,
   44:11, 46:4,
   58:17, 78:17,
   107:2,
   107:25.

recording 37:2,
   38:2.

recordings
   37:12, 37:20,
   37:23, 38:14,
   38:21.

records 78:11,
   78:20, 78:21,
   78:25, 79:3,
   79:6, 79:11,
   88:9.

Red 36:6,
   95:18.

redone
   110:25.

refer 5:14.

reference 4:21,
   5:6, 5:16,
   61:20,
   87:12.

referenced
   98:2.

referencing
   5:19, 64:4,
   88:24.

referred
   45:19.

referring 4:16,
   5:7, 5:22,
   90:14.

reflected
   20:25, 71:6,
   73:17.

reflects
   15:13.

refresh
   33:19.

regard 35:8.

regarding
   16:24,
   56:19.

regardless
   76:18,
   76:19.

register 33:9,
   33:12, 44:5,
   44:18, 45:2,
   45:10, 45:19,
   48:18, 48:20,
   48:23, 48:25,
   49:13, 52:17,
   52:21, 52:22,
   53:6.

registered
   39:21, 46:10,
   46:18, 49:14,
   53:3, 53:4.

registering
   40:10, 40:13,
   46:17.

registration
   40:16, 41:2,
   46:7, 46:9,
   48:16,
   48:22.

regulatory
   48:16,
   49:9.

Reince 100:7.

related 16:10,
   94:6, 95:3,
   103:10,
   103:12,
   104:4, 104:7,
   105:11,
   108:24.

relates 49:2,

104:17,
104:20.
relationship
54:9, 54:14,
54:18, 71:23,
98:24,
100:15,
100:19.
relative
50:17.
relev- 40:21.
Relevance 15:4,
16:11, 22:8,
22:14, 24:17,
24:19, 25:1,
25:7, 25:8,
26:1, 26:10,
27:7, 33:1,
37:6, 37:7,
37:10, 38:13,
40:17, 43:24,
45:21.
relevant 15:19,
16:13, 19:11,
22:25, 24:1,
24:9, 24:14,
24:21, 26:3,
37:16, 37:24,
38:4, 38:15,
40:19, 40:23,
41:5, 44:20,
45:15, 46:9,
46:13, 46:20,
99:16.
relied 49:12.
relief 94:6.
rely 21:3,
32:9, 32:12,
74:7,
75:17.
relying 36:24,
48:15.
remember 18:1,
26:16, 33:25,
34:9, 42:6,
43:10, 46:23,
47:2, 50:8,
51:2, 77:17,
83:2,
106:9.

remove 37:21,
95:18.
rented 17:8.
repay 91:6,
91:13,
94:3.
replacement
36:1.
Reported
2:11.
Reporter 2:12,
117:7.
representation
105:14.
request 112:23,
115:23,
116:5.
requested
66:11.
required 41:2,
45:2, 45:10,
48:25.
requirement
46:11, 48:22,
48:23.
requires
48:18.
resident
83:19.
residents
83:16.
resolve 44:23,
98:15,
104:15.
resolving
19:25.
respect 8:4.
respond 58:21,
112:21.
response
35:11.
responsibility
32:16.
responsive
74:14.
rest 14:1,
67:4,
74:17.
retroact-
49:6.

retroactive
46:8,
48:15.
retroactively
46:17, 46:18,
46:24, 46:25,
47:4, 47:12,
49:7,
49:15.
retrospect
92:10.
return 79:14.
returned 77:24,
78:1, 79:13,
79:15, 79:23,
80:24, 80:25,
104:25.
reverberation
101:1.
review 4:14,
48:16.
reviewed
57:12.
reword 27:14,
38:19.
Robert 17:12.
role 72:5.
roll 30:13.
Room 2:16,
11:18, 12:15,
18:24,
68:20.
roughly 95:14,
105:5.
Rousseau 8:23,
8:25, 9:1,
9:4, 13:1,
53:25, 54:8,
56:8, 56:14,
56:19, 57:13,
60:12, 64:10,
64:11, 67:7,
87:11, 87:13,
87:18, 87:20,
89:1.
RPR 2:11,
117:1.
Rudy 11:7,
82:1.
rule 31:5.

ruling 26:4,
48:8,
48:12.
run 52:12.
running 81:5.
runs 60:4.
Rutherford
82:2.
.
.
< S >.
safe 48:17.
Santa 38:24,
39:10, 39:15,
39:17.
satisfied
46:10.
saw 54:5, 89:5,
96:23,
97:16.
saying 7:18,
31:11, 44:14,
68:25, 75:17,
76:20, 76:22,
87:5, 87:14,
93:8, 94:11,
100:7,
103:15,
103:18,
104:10,
104:22.
says 33:1,
56:22, 57:14,
59:10, 59:13,
59:15, 59:20,
59:21, 59:25,
61:6, 61:18,
72:23, 73:8,
85:16, 94:2,
96:2, 96:4,
96:6, 96:11,
96:21.
scared 92:24.
schedule
96:16.
scheduling
107:24.
screen 6:7,
6:8, 96:22,
97:2, 97:8,

97:9.
screw 43:12.
scroll 4:9,
   60:6.
Sean 1:31.
seated 10:3,
   12:16,
   12:19.
seating 10:2.
seats 7:11,
   8:8, 9:7,
   11:21, 68:19,
   71:25,
   76:8.
second 14:22,
   15:3, 50:12,
   66:17, 68:23,
   70:8, 72:1,
   73:4, 85:23,
   95:10,
   110:5.
Section 1:34,
   48:14, 48:19,
   48:22, 83:12,
   83:13, 95:12,
   97:23,
   97:24.
Securities
   105:2.
security 24:20,
   24:23, 25:1,
   25:3, 25:6,
   25:18,
   25:22.
seeing 43:10.
seek 94:5,
   94:7.
seem 19:13,
   38:12,
   47:3.
seems 15:19,
   16:16, 18:10,
   24:10, 25:17,
   46:21,
   107:10.
seen 17:13,
   84:9.
segregate
   52:8.
sell 11:14,

11:15.
send 55:14,
   55:15, 58:2,
   59:18, 61:7,
   66:19, 73:6,
   87:22, 88:21,
   111:1, 111:6,
   113:18,
   115:1,
   115:6.
sending 5:4,
   78:20,
   110:19.
sense 116:16.
sentence
   85:9.
Separate
   27:2.
September 7:17,
   8:10, 9:7,
   10:15, 10:24,
   10:25, 11:1,
   50:11,
   50:13.
service 55:10,
   105:12.
services 95:14,
   95:15, 95:25,
   98:15,
   99:23.
Session 1:13,
   35:16,
   36:1.
set 29:4,
   57:16, 59:11,
   61:13, 87:2,
   97:19, 101:6,
   101:13,
   101:17,
   111:13.
settlement
   47:8.
seven 31:11,
   31:15, 43:15,
   43:17, 91:3,
   93:12.
Several 31:15,
   33:22, 33:23,
   35:6.
shaking 12:11,

12:12.
shall 83:22.
share 29:2.
sharing
   32:23.
shooting 5:2.
shortly 6:6,
   102:24,
   110:21.
show 6:4, 6:5,
   13:5, 15:24,
   16:3, 20:24,
   65:3, 78:25,
   79:3, 79:6.
showed 83:3,
   114:13.
showing 78:11,
   78:20, 96:22,
   97:2.
shown 15:17.
shows 79:10,
   79:11, 79:12,
   115:2,
   115:6.
side 6:4, 6:7,
   6:8, 30:23,
   31:6, 31:20,
   90:13, 112:5,
   114:20.
sign 21:5,
   47:6, 49:6.
signature
   85:24.
signed 21:2.
signing
   83:17.
simple 92:2.
simply 47:20,
   65:3, 71:23,
   115:20.
single 83:23,
   99:10.
Sir 28:1,
   60:23, 63:16,
   85:11,
   104:3.
sister 28:16.
sit 3:6, 49:21,
   82:21.
sitting 12:18,

12:21,
   12:24.
situation 92:5,
   92:21,
   100:14,
   104:2,
   105:18.
six 7:6,
   105:5.
skip 59:15,
   95:19.
sleeping 116:1,
   116:2.
slow 106:20.
small 40:5,
   51:24.
sole 85:7.
somebody 33:15,
   89:21, 93:11,
   114:8,
   114:17.
somehow 16:4,
   16:16, 46:18,
   49:15.
someone 9:2,
   36:1, 43:9,
   92:20, 93:5,
   100:1.
sometime 39:25,
   53:24.
somewhere
   34:15,
   50:10.
soon 3:3.
sort 107:24.
sound 47:6.
sounds 43:25.
source 84:17,
   86:3, 86:4,
   86:7,
   108:18.
Spears 17:12.
special 5:17,
   5:21,
   110:8.
specific 27:11,
   33:23.
specifically
   47:2, 84:6.
speculation

Cross-examination - Michel

36:24.
spending
  72:21.
spent 67:4,
  68:15.
SPM 84:20,
  85:8, 85:14,
  85:15.
spoke 17:21,
  31:10, 31:15,
  33:17, 40:4,
  52:22, 57:25,
  63:10,
  63:12.
spot 29:15.
square 17:9.
stab 111:1,
  111:6.
stand 17:11.
standard
  111:9.
start 28:20,
  52:11, 53:18,
  65:21, 67:17,
  116:16.
start-up
  31:17.
start-ups
  29:3.
started 29:10,
  53:18.
Starting 60:5,
  65:25, 83:14,
  96:18,
  97:24.
starts 4:22.
State 37:17,
  44:7, 44:12,
  45:3, 45:9.
stated 83:22.
statement
  13:24,
  114:14.
statements
  44:3, 111:10,
  113:25,
  114:21.
States 1:1,
  1:5, 1:19,
  2:13,

83:16.
stature
  71:18.
status 71:22,
  72:2.
statute 41:6,
  49:3, 49:4.
statutory
  48:14, 48:16,
  49:8.
staying 18:2.
stenographic
  117:2.
step 23:23,
  109:9,
  110:7.
stick 112:18.
stigma 11:25.
stole 74:11.
Stop 71:4.
stopped 67:3.
store 11:13.
strictly
  110:10.
strike 74:12,
  74:21.
structure 51:5,
  52:1.
studio 38:24,
  39:18.
stuff 111:7,
  111:9, 112:3,
  113:21.
stupid 92:22,
  92:24,
  93:3.
subject 14:6,
  15:1, 35:9,
  36:17, 37:20,
  48:21,
  103:10,
  103:12.
submit
  114:23.
subparagraph
  85:23,
  86:2.
subsequent
  46:8.
substantial

50:24.
substantially
  15:25,
  16:1.
substituting
  115:20.
successfully
  114:20.
Sudan 21:18.
sued 94:11.
sufficient
  25:3.
suggest 5:11,
  44:4,
  49:13.
suggested 73:6,
  74:4, 75:15,
  100:16.
suggesting
  74:9,
  108:17.
suggestion
  40:9.
suit 94:4.
Suite 1:28,
  18:3.
Sun 35:22,
  105:3.
Super 29:16,
  29:18, 29:22,
  29:23.
suppose
  61:17.
supposed 11:10,
  20:12, 21:19,
  26:9, 28:24,
  30:4, 35:23,
  36:2, 43:23,
  62:19,
  95:15.
sustain 8:20,
  16:23, 22:10,
  22:15, 23:7,
  26:7, 33:7,
  41:10, 42:15,
  45:22,
  53:9.
Sustained
  22:24,
  37:1.

sustaining
  23:5.
.
.
< T >.
T. 2:11,
  117:6.
table 10:3,
  12:16,
  13:2.
Taek 95:19.
taken. 48:10,
  109:17.
talked 7:1,
  41:20, 78:2,
  79:25.
Tan 56:13,
  56:19, 57:24,
  73:25, 87:11,
  88:23.
tape 37:2,
  37:12,
  38:20.
tax 74:9,
  80:21,
  108:17.
taxes 73:21,
  75:9,
  108:24.
team 99:7,
  100:3.
tech 28:24,
  51:5.
teeny 101:1,
  101:3.
tells 21:2.
ten 43:17,
  48:18,
  109:15.
tent 17:9,
  17:14, 17:20,
  17:23.
term 15:3,
  72:1.
terms 7:23,
  18:9, 27:8,
  33:3, 38:13,
  42:2, 42:7,
  42:10, 44:13,
  47:1, 47:4,

Cross-examination - Michel

47:6, 47:13,
47:17, 49:3,
51:1, 53:19,
86:14, 94:13,
107:7, 107:9,
108:13,
109:24,
112:17,
113:25,
114:4,
115:19.
testified 8:1,
22:16, 54:9,
75:11, 77:4,
77:11,
105:23,
106:3,
106:6.
testify 31:10,
78:10.
Thailand
102:17,
103:7,
104:6.
THE DEFENDANT
110:15.
themselves
77:8.
theory 25:13,
25:14,
110:23,
111:4.
they'll 59:23,
116:20.
they've 24:9.
thinking 112:8,
112:25.
third 5:15,
57:14, 57:15,
85:8, 89:12,
90:6, 112:16,
112:19,
112:20.
though 66:21,
77:8, 104:12,
111:24.
thousand
90:8.
thousands
76:5.

threat 94:9.
threaten
93:23.
threatened
93:21.
threatening
94:8,
94:13.
three 11:14,
35:21, 36:7,
54:17, 62:19,
65:21, 67:17,
91:12,
112:10,
112:11,
113:20,
115:21.
three-quarters
75:5.
threw 73:16.
thumb 37:15.
tie 16:16.
till 33:4,
48:3,
110:4.
timing 109:24,
113:14.
tits 107:15.
to-do 87:20.
today 5:3,
107:23.
together 51:24,
116:12.
tomorrow 4:23,
107:23,
108:4,
108:12,
109:4, 109:7,
109:21,
113:14,
113:17.
tone 107:5.
tonight 115:6,
116:24.
took 11:6,
11:7, 18:1,
18:2, 23:12,
27:18, 28:2,
36:3, 43:22,
72:7, 82:3.

top 75:5,
95:5.
topic 34:25,
35:2, 35:4.
total 49:11,
72:15, 90:5,
112:13.
totally 27:16,
45:14,
107:3.
touch 39:20.
track 116:1.
tracks 93:22,
94:14.
Trading 95:1.
TRANSCRIPT
1:17, 115:2,
115:6,
117:2.
transfer 59:16,
88:24.
transferred
69:4,
87:18.
transpired
42:23.
trappings
18:12.
travel 17:5.
traveled 17:7,
102:16.
TRIAL 1:17,
113:7,
114:10.
tried 18:24,
41:11, 41:12,
43:23, 66:18,
99:20, 101:6,
101:17.
trip 50:7,
102:24,
104:23,
104:24,
105:9,
106:11.
true 80:3,
86:3,
104:17.
Trump 98:25,
99:21, 100:7,

101:14,
101:19,
101:23,
102:4, 102:6,
102:10.
trust 28:2,
52:5.
truth 44:16,
93:7,
93:15.
try 27:4,
36:19, 44:23,
54:22, 62:12,
66:16, 66:19,
67:1, 68:23,
71:17, 73:1,
76:3, 87:2,
93:22, 100:6,
100:14,
108:2,
111:6.
trying 7:9,
16:3, 35:25,
36:8, 36:21,
69:9, 69:25,
71:22,
101:13,
105:13,
108:21.
Tuesday
61:18.
turn 75:19,
89:1, 93:7,
93:9.
twice 11:7.
Two 6:25, 8:3,
11:5, 23:13,
23:20, 27:21,
27:22, 33:24,
37:12, 38:12,
39:12, 54:17,
59:15, 88:12,
88:19, 95:19,
110:19,
113:2, 113:8,
113:19.
typical
110:22.
.
.

Cross-examination - Michel

< U >.
ultimately
    24:3, 25:5.
under- 8:12.
underlined
    95:16.
Underneath
    85:25.
understand
    4:24, 5:6,
    5:18, 5:22,
    6:1, 7:12,
    7:18, 13:17,
    15:25, 16:11,
    27:8, 33:5,
    34:4, 34:6,
    35:2, 35:4,
    46:12, 57:23,
    68:16, 68:24,
    105:17.
understanding
    5:7, 7:15,
    8:13, 40:4,
    43:2, 43:3,
    43:9, 44:17,
    44:19, 44:20,
    50:20, 50:23,
    57:25, 100:6,
    101:9.
understood 7:8,
    71:11, 102:9,
    105:13,
    105:22.
unfortunately.
    4:23.
unit 40:25,
    41:2, 41:4,
    41:21, 42:2,
    42:7, 42:11,
    42:16.
United 1:1,
    1:5, 1:19,
    2:13,
    83:16.
Unless 46:1,
    70:22.
unregistered
    46:19.
until 42:10,
    106:17,

109:25.
USA 56:19,
    57:3.
using 70:22,
    85:8,
    105:18.
utilized
    13:21.
.
.
< V >.
valuation
    30:15.
variety 29:8.
various 32:2,
    53:10.
Vegas 14:6,
    17:5, 17:8.
vendors 9:25,
    29:10.
Ventura 1:42.
venture 28:21,
    43:25.
version
    108:3.
vet 70:16,
    73:5.
Vice 105:2.
Victory 65:22,
    67:18, 82:4,
    83:17, 90:2,
    90:5, 90:21,
    91:15.
view 114:17.
viewed
    114:19.
violated
    41:5.
visit 18:17.
visits 92:4,
    92:24.
voice 106:21,
    106:25.
volunteer
    42:20.
volunteered
    42:20.
Vote 71:8,
    71:15, 76:11,
    76:21, 84:15,

85:9, 85:14,
    86:3.
vs 1:8.
.
.
< W >.
wait 109:11,
    109:25,
    110:4,
    110:15.
walked 50:25,
    69:20,
    83:5.
wanted 14:20,
    18:17, 24:2,
    35:16, 35:21,
    35:22, 35:23,
    36:5, 36:19,
    37:4, 37:11,
    38:15, 52:12,
    68:18, 68:20,
    71:24, 72:4,
    84:8, 87:5,
    87:8, 97:14,
    97:15,
    105:23,
    108:15,
    109:11,
    110:2,
    110:16,
    114:4,
    114:7.
wanting 14:16,
    72:7.
wants 7:8,
    14:24, 37:25,
    58:1, 72:24,
    73:7,
    105:17.
Warner 29:11.
Washington
    1:10, 1:29,
    1:36, 2:9,
    2:17.
ways 11:25,
    23:21,
    53:10.
week 66:2.
weeks 23:13.
Wells 61:1.

Wengui 35:7,
    35:9.
Whatever 32:6,
    32:9, 58:1,
    67:7, 68:9,
    71:14, 84:7,
    87:6, 87:8,
    87:16,
    111:10,
    112:17,
    112:18,
    113:18,
    113:21.
whatnot
    72:23.
wheel 17:11.
whole 28:22,
    30:14, 32:3,
    62:2, 74:16,
    87:7,
    87:23.
will 15:24,
    26:16, 44:16,
    45:8, 49:10,
    59:10, 59:12,
    59:17, 59:18,
    94:3, 94:4,
    94:6, 107:22,
    110:23,
    110:24,
    111:24,
    115:24,
    116:7,
    116:13.
willfully
    48:20.
willing 73:1.
wipe 47:5,
    47:20,
    49:7.
wiped 47:13.
wire 61:7,
    88:24.
wired 57:16,
    59:10,
    64:1.
wish 86:4.
withdraw 10:17,
    14:16, 29:24,
    35:8.

Cross-examination - Michel

Within 48:18,
  65:21,
  67:17.
Without 14:25,
  38:10, 65:10,
  82:16,
  106:12,
  115:12.
WITNESS 38:9,
  39:6, 39:8,
  64:19, 74:22,
  88:20, 91:25,
  101:2, 101:4,
  103:19,
  103:21,
  116:10.
woman 35:13,
  36:2.
word 75:14.
worded 36:25.
words 48:21.
work 21:22,
  37:21, 66:18,
  76:3, 95:3,
  95:23, 98:6,
  99:18,
  101:10,
  101:14,
  103:3,
  108:19,
  113:4.
worked 92:7,
  92:9.
working 21:17,
  30:19, 52:10,
  97:7, 97:9,
  97:19.
write 20:12,
  20:22, 21:23,
  85:10,
  96:12.
writing
  21:16.
written 7:2,
  7:7, 21:2.
wrote 64:9,
  94:12.
.
.
< Y >.

year 29:16,
  45:6.
years 28:15,
  30:13, 91:3,
  93:12.
yelling
  107:7.
York 1:27,
  1:35, 33:16,
  34:15,
  34:19.
you. 94:7.
yourself 12:17,
  14:7,
  81:20.
yourselves
  109:6.
.
.
< Z >.
Zipperman
  34:10.
Zitman 33:19,
  33:21, 34:2,
  34:3, 34:10,
  34:11, 34:12,
  35:1, 35:5,
  35:6, 35:17,
  36:11, 36:18,
  37:4, 37:16,
  38:21,
  38:23.