```
 1                      UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2
         * * * * * * * * * * * * * * *   )
 3       UNITED STATES OF AMERICA,       )     Criminal Action
                                         )     No. 19-00148-1
 4                      Plaintiff,       )
                                         )
 5          vs.                          )
                                         )
 6       PRAKAZREL MICHEL,               )     Washington, D.C.
                                         )     April 17, 2023
 7                      Defendant.       )     1:36 p.m.
                                         )     AFTERNOON SESSION
 8       * * * * * * * * * * * * * * *   )


 9

10                      TRANSCRIPT OF JURY TRIAL
               BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY,
11                    UNITED STATES DISTRICT JUDGE

12


13

         APPEARANCES:
14
         FOR THE GOVERNMENT:        JOHN D. KELLER, ESQ.
15                                  U.S. DEPARTMENT OF JUSTICE
                                    1301 New York Avenue, Northwest
16                                  Suite 1016
                                    Washington, D.C. 20530
17
                                    SEAN F. MULRYNE, ESQ.
18                                  NICOLE RAE LOCKHART, ESQ.
                                    U.S. DEPARTMENT OF JUSTICE
19                                  Public Integrity Section
                                    1400 New York Avenue, Northwest
20                                  Washington, D.C. 20005

21
         FOR THE DEFENDANT:         DAVID E. KENNER, ESQ.
22                                  ALON ISRAELY, ESQ.
                                    KENNER LAW FIRM
23                                  16633 Ventura Boulevard
                                    Encino, California 91436
24


25
```

```
 1      APPEARANCES, CONT'D:

 2      FOR THE DEFENDANT:        CHARLES R. HASKELL, ESQ.
                                  LAW OFFICES OF CHARLES R.
 3                                  HASKELL, P.A.
                                  641 Indiana Avenue, Northwest
 4                                Washington, D.C. 20004

 5
        REPORTED BY:             LISA EDWARDS, RDR, CRR
 6                               Official Court Reporter
                                 United States District Court for the
 7                                 District of Columbia
                                 333 Constitution Avenue, Northwest
 8                               Room 6706
                                 Washington, D.C. 20001
 9                               (202) 354-3269

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3                                    Direct      Cross        Red.

4

WITNESSES FOR THE DEFENDANT:

5

Harry Lidsky                          6          42          50

6

Frank White, Jr.                55

7    (Testimony read into the record)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. KENNER:  Your Honor, I just wanted to say,

2     Mr. Michel wants to waive his right, and has asked me to do

3     that, to be present for this hearing.

4          THE COURT:  I can repeat it in front of him.  I

5     don't have a problem.

6          So I've gone back.  I've looked at the rule.  And

7     Mr. Keller is correct that the statement-against-interest

8     exception to hearsay, which as I understand it was the

9     basis -- your legal basis for the admission of recordings of

10    interviews of Mr. Higginbotham by the OIG agent, and it only

11    applies to witnesses that are unavailable.  That's Rule

12    804(b)(3).

13         Mr. Higginbotham is available.  You cross-examined

14    him in the Government's case.  The only way he'd be

15    unavailable -- he's not dead, mentally ill, totally lacking

16    in recollection, refusing to testify or exempted from

17    testifying under some other privilege.  So he's considered

18    available.

19         So you can't get it.  You can't get those

20    recordings in.

21         You also calling Mr. Higginbotham doesn't fix the

22    issue because, again, he's available.  And therefore, under

23    the exception that you have asserted, statement against

24    interest, you can't get it admitted.

25         So given the number of hearsay objections, I want

1    to talk generally about hearsay.  It's an out-of-court

2    statement offered for the truth of the matter asserted.  And

3    "out-of-court" means any statement made by anyone, not in

4    the very proceeding in front of this Court or me.  It

5    doesn't matter if it was recorded under oath or uttered by a

6    particular witness.  If it wasn't said for the first time in

7    this courtroom, it's an out-of-court statement.

8            So you've given me the exception, which I went

9    back to look to make absolutely certain my recollection was

10   correct.  Mr. Keller was correct.  So you cannot have these

11   recordings admitted on their own separate or through

12   Mr. Higginbotham.

13           So I set it at 1:30 just to make sure there wasn't

14   some other reason you were going to come up with so we would

15   not waste time in front of the jury.  Does that end --

16           MR. KENNER:  Yes.

17           THE COURT:  -- the issue of getting them in?

18           MR. KENNER:  Yes, your Honor.

19           THE COURT:  All right.  Then we're still on our

20   lunch break.

21           MR. KENNER:  Can we -- is it possible to come back

22   at 2:15 or do you want us back at 2:00?

23           THE COURT:  I'd prefer not to if we can help it.

24   The jury has been waiting.  We've spent an extraordinary

25   time, frankly, on -- and gotten very little testimony.

```
 1                    MR. KENNER:  Can I get 2:10?  2:05?  Just a couple

 2       extra minutes?

 3                    THE COURT:  All right.  I'll tell the jury.  Ten

 4       after.

 5                    (Thereupon a recess was taken, after which the

 6       following proceedings were had:)

 7                    THE COURT:  Good afternoon.

 8                    If the witness could come forward.

 9                    (Thereupon, Mr. Lidsky entered the courtroom and

10       the following proceedings were had:)

11                    (Whereupon, the jury entered the courtroom at 2:18

12       p.m. and the following proceedings were had:)

13                    THE COURT:  Please sit down.

14                    Good afternoon, members of the jury.

15                    THE JURY:  Good afternoon.

16                    THE COURT:  We've resolved our legal issues, so

17       we're ready to proceed.

18                    Mr. Kenner.

19                    MR. KENNER:  Yes.  Thank you, your Honor.

20              (HARRY LIDSKY, DEFENSE WITNESS, PREVIOUSLY SWORN.)

21                         CONTINUED DIRECT EXAMINATION

22       BY MR. KENNER:

23       Q.  Agent Lidsky, do you remember a time when you became

24       aware that George Higginbotham and Pras Michel were on a

25       trip to Macao?
```

1    A.  I do remember the event.  I don't recall the precise

2    time I became aware of it.

3    Q.  Just with respect to establishing the date, on July

4    18th, 2017, is it your understanding that Mr. Higginbotham

5    provided some notes to you?

6    A.  I do recall some notes among the information that was

7    provided by Mr. Higginbotham in July.  Yes.

8    Q.  Thank you.

9         And on July 18th of 2017, you began your

10   investigation of Mr. Higginbotham?

11   A.  That's when I opened it, began it.  Yes.

12   Q.  Okay.  And did you have contact with Mr. Higginbotham on

13   July 20th of 2017?

14   A.  I did.  I met with him and interviewed him for --

15   Q.  I'm sorry.  I can't hear you.

16   A.  I said I did.  I met with him and interviewed him at the

17   Department of Justice for maybe two hours.

18   Q.  And on July 20th of 2017, did you again talk to

19   Mr. Higginbotham?

20   A.  I believe that's the same day that I just mentioned.

21   July 20th.

22   Q.  I'm sorry.  I apologize.

23        On July 27th of 2016 -- July 27th, 2017, you

24   start -- did you start making inquiries about somebody

25   paying Mayor Giuliani or former Mayor Giuliani about

1      $8 million?

2      A.  I think I'd like a clearer definition of "inquiries."

3      Q.  Let me first make sure.

4            You interviewed Mr. Higginbotham on July 26th,

5      2017.  Correct?

6      A.  That's correct.

7      Q.  That was another interview?

8      A.  I believe so.  Yes.

9      Q.  Okay.  And did you probe the subject of Mr. Giuliani's

10     firm having been paid $8 million by Jho Low?

11     A.  I'm not sure "probe" is a fair characterization.  At

12     this point, I was just trying to take in as much information

13     as I could get from Mr. Higginbotham at this time and from

14     what I was doing behind the scenes in terms of investigative

15     steps.

16           It was too early in the investigation to really

17     focus on any one thing.  So I was just trying to just take

18     in as much as I could to figure out what was going on.

19     Q.  Were you aware -- I'm sorry.

20           So your testimony is as of July 26, 2017, you had

21     not discussed or not -- you had not ventured a view on

22     whether or not Mr. Giuliani had been paid $8 million.  Is

23     that correct?

24     A.  Yes.  At that point, I had heard it, I believe, from

25     Mr. Higginbotham.  But aside from that, I couldn't -- I was

1    not in a position to confirm it, refute it or --

2    Q.  On July 26th, 2017, had your investigation began --

3    begun to look at Pras Michel aside from George Higginbotham?

4    A.  It's possible it had by that date.  If it hadn't, it

5    would start very soon after.

6              THE COURT:  If you could make sure you keep your

7    voice up.

8              THE WITNESS:  Yes, your Honor.

9    BY MR. KENNER:

10   Q.  On July 20th, were you also covering the subject matter

11   of Pras Michel in addition to Mr. Higginbotham?

12   A.  Did you say on July 20th?

13   Q.  July 20th.

14   A.  Again, whatever Mr. Higginbotham was providing, I was

15   taking.  So I'm not sure "covering" is a fair word.

16   Anything he said in response to, "What are we looking at

17   here, what's going on," I took it in.

18   Q.  And was one of the things you took in looking at as a

19   suspect or subject Pras Michel?

20   A.  If he mentioned Pras Michel on July 20th, then I took it

21   in.

22   Q.  And it's your testimony you do not remember whether or

23   not on July 20th, 2017, you focused in part on Mr. Michel?

24   A.  In terms of -- if Mr. Michel's name came up, I took it

25   in.  In terms of focus, maybe there's a subjective

1  definition there.  I didn't necessarily pull on one thread

2  over another.  I was just listening to everything.  If there

3  was an obvious question for me, I asked it and followed up.

4  But I didn't have a, you know, "Stop talking about that;

5  let's talk about this" approach at this stage.  I had no

6  idea what was going on.

7  Q.  Is one of the threads you pulled at a Pras Michel

8  thread?

9  A.  It may have been for context.

10  Q.  And on July 26th, six days later, did you again pull on

11  the Pras Michel thread with Mr. Higginbotham?

12  A.  Probably so.

13  Q.  And what was your takeaway from the pulling on the

14  string with Mr. Pras Michel on July 26th, 2017?

15  A.  Well, if I'm remembering correctly, Mr. Higginbotham's

16  story to me at that time was that he had gone to the embassy

17  at the request of Mr. Michel.  So I wanted to know more of,

18  Why would Mr. Michel have asked you to go to the Chinese

19  embassy?  Without looking at my notes or my report, it's

20  tough for me to say with specificity exactly what I was

21  asking.

22           MR. KENNER:  Your Honor, may I show the witness,

23  the Court and counsel Exhibit 255 to see if it refreshes his

24  recollection?

25           THE COURT:  What is it?

```
 1                    MR. KENNER:  I'm sorry.

 2                    THE COURT:  No. 2 what?

 3                    MR. KENNER:  This is not his report.  It's a

 4    report taken in the course and scope of the investigation.

 5    I just want him to look at it, read it and tell me if it

 6    refreshes his recollection.  He is present at this time.

 7                    THE COURT:  This is 255, right?

 8                    MR. KENNER:  Yes, your Honor.

 9                    THE COURT:  Okay.  When you finish reading it, if

10    you'd look up.  So read through it.

11                    THE WITNESS:  Is there a particular page?

12    BY MR. KENNER:

13    Q.  Yes.  Tell me when you're ready and I'll have

14    Mr. Campbell scroll down.

15                    Is this large enough for you to read?

16    A.  It is.  Thank you.

17    Q.  Let me know when you're ready to go to the next page.

18    A.  Okay.

19    Q.  Next page?

20    A.  On 3.  If you could hold on 3, please.

21    Q.  Okay.

22    A.  Okay.

23    Q.  Having read that document -- there's one more page.

24    Sorry.  Do you want to read that?  I apologize.  I think you

25    meant, Okay.  Go to the next page.  If not, we can move on.
```

1  A.  Yeah.  We're ready to go.  Thank you.

2  Q.  Thank you.

3       Does reading that document, Defendant's Exhibit

4  255 for identification, refresh your recollection about the

5  Pras Michel thread being pulled during the July 26th, 2017,

6  interview?

7  A.  It does.  I wasn't the one pulling on it, for lack of a

8  better term.

9  Q.  But you watched someone else pull on it?

10  A.  I was there.  Yes.

11  Q.  And did you also -- did you or someone else in your

12  presence pull the thread about whether or not former Mayor

13  Giuliani had been paid $8 million by Mr. Low?

14  A.  It was brought up in that interview.  Yes.

15  Q.  And this July 26th, 2017, interview was a followup after

16  your initial interview with Mr. Higginbotham.  Correct?

17  A.  That's correct.  Yes.

18  Q.  After these initial interviews with Mr. Higginbotham,

19  did you develop some kind of an ongoing relationship with

20  him?

21  A.  We had certainly established rapport.  And I had

22  developed a theme that I hoped would, I guess, keep the

23  prospect of future discussions at least in play.

24  Q.  Okay.  And did you do that?

25  A.  I think so.

1    Q.  You kept future discussions in play?

2    A.  I did, yes.

3    Q.  Did you talk to Mr. Higginbotham by telephone before you

4    next interviewed him after July 26th of 2017?

5    A.  I don't recall if there was another engagement with him

6    after the July 26th meeting or interview.

7    Q.  Okay.  Does that mean that you may or may not have?  You

8    just don't remember?  Or --

9    A.  I just don't remember.

10   Q.  Did there come a time in August -- on August 21st of

11   2017 that you reviewed documents obtained from Google

12   search?

13   A.  I executed a search warrant on a gmail account, at least

14   one gmail account, and it may have come in in mid- to late

15   August, at which point I would have been reviewing those

16   documents.  It would have been on a gmail account, I

17   believe, though.  I'm not sure.  I assume that's what you

18   meant by Google search.

19   Q.  And do you recall after reviewing those documents that

20   came back from that search warrant your belief that

21   Mr. Higginbotham had often represented that he was

22   Mr. Michel's lawyer?

23   A.  I'm sorry.  Could you ask me that one more time, please?

24   Q.  Yeah.  After reviewing what you got back from the search

25   warrant, you became aware that Mr. Higginbotham often or

1    frequently referenced himself as Mr. Michel's attorney.

2    Correct?

3    A.  I'm not sure I'd characterize it as "often" or

4    "frequently."  There was enough of an inference that they

5    did have a potential attorney-client relationship where I

6    took appropriate steps to ensure I stayed far clear and

7    above the attorney-client privilege that would exist.

8    Q.  So after you had read all of the Google search

9    materials, you decided that you needed to do something to

10   avoid interfering with the attorney-client relationship?

11   A.  It was prior to reading the material --

12   Q.  Okay.

13   A.  -- that we took those steps.

14   Q.  Well, what did you do?

15   A.  We established a taint team or filter team that is a

16   separate team of either attorneys or investigators or both

17   that would look through the material, determine if there was

18   any privileged material; and if there was, come up with a

19   plan to address that, which is what we did in this case.

20   Q.  Did you ever raise the subject with Mr. Higginbotham

21   about privilege?

22           MR. KELLER:  Objection, your Honor.  Relevance as

23   to this line of questioning.

24           THE COURT:  I would agree based on the status

25   of -- that there's no attorney-client privilege in

1   relationship to Mr. Higginbotham.

2                MR. KENNER:  May I go to the phone, your Honor?

3                THE COURT:  Sure.

4                (Whereupon, the following proceedings were had at

5   sidebar outside the presence of the jury:)

6                MR. KENNER:  I'm not sure what your Honor means.

7   You've made a decision there is no --

8                THE COURT:  I have issued an opinion relating

9   to -- let me get it out.

10               MR. KENNER:  The opinion was that you ruled that

11  we had not yet established --

12               THE COURT:  No.  That's special counsel.  That's a

13  different issue from whether there's an attorney-client

14  privilege.  I indicated that there wasn't any as relates to

15  Mr. Higginbotham.

16               MR. KENNER:  Okay.  I'll move on.

17               THE COURT:  I mean, which is different than what

18  you're raising.

19               MR. KENNER:  Okay.  I'll move on.  Thank you.

20               (Whereupon, the following proceedings were had in

21  open court:)

22  BY MR. KENNER:

23  Q.  Do you have any recollection of how often you would

24  communicate with Mr. Higginbotham either by text message or

25  email?

```
 1    A.  I don't recall offhand.  We did, but I don't remember

 2    how many.

 3    Q.  Would it be more than ten times?

 4    A.  I don't recall how many.

 5    Q.  Could it have been as many as 50 times?

 6    A.  I don't recall how many.  That starts to sound a little

 7    bit excessive, but I just don't recall.

 8    Q.  How about 30 times?  Does that sound excessive?

 9    A.  I just don't recall the number.

10    Q.  Does that sound like something that you would have made

11    note of in the course of your investigation so that you

12    would be able to recall it?

13    A.  It would depend.

14    Q.  On what?

15    A.  On what the nature of the communication was, if it was

16    logistics, trying to find each other in advance of a

17    meeting.  I usually don't count those as substantive.

18    Q.  How many of those communications do you recall where it

19    was about logistics?

20    A.  I don't recall.  That was just an example.

21    Q.  It was an example of something you don't recall?

22    A.  In terms of counting exchanges, I don't recall how many

23    there were.  I don't recall how many of the amount.  I don't

24    recall in terms of being logistics and nonsubstantive.

25    Q.  Agent Lidsky, directing your attention to September the
```

1    5th of 2017, do you recognize that to be a date when

2    Mr. Higginbotham and Mr. Michel took a trip to Macao?

3    A.  I do recognize that as the timeframe in which they were

4    in Macao or going to Macao or potentially on their way back

5    from Macao.

6    Q.  Okay.  And how did you -- did you acquire that

7    information before they got to Macao, before they landed in

8    Macao?

9    A.  I don't believe I did.  No.

10   Q.  Did you get that information before Mr. Higginbotham and

11   Mr. Michel left the United States?

12   A.  No.  I don't believe so.

13   Q.  Where did you get the information?

14   A.  I believe I obtained it either directly or indirectly

15   from Mr. Higginbotham upon his return.

16   Q.  So you were not aware until Mr. Higginbotham returned

17   from Macao about the trip to Macao?

18   A.  I believe that's correct.  Yes.

19   Q.  What date did he return?  And talking about

20   Mr. Higginbotham.  What date did Mr. Higginbotham -- he went

21   there on September the 3rd.  When did he return to the

22   United States?

23   A.  I don't recall if it was the 5th or 6th or 7th.  I do

24   remember it was right in the early part of September.

25   Q.  What date did Mr. Michel return?

```
1    A.  In the same timeframe, but I believe a couple days
2    before Mr. Higginbotham.
3    Q.  Mr. Michel -- do you recall that they both flew on
4    September the 5th?
5    A.  I don't recall the exact date.  But that -- if I saw my
6    report or a report documenting that, that would be in the
7    timeframe that I do recall.  So it wouldn't surprise me if
8    that was the date.
9    Q.  Did you get an email or -- or did you send an email --
10   I'm sorry.  Did you craft an email that I think you referred
11   to as the music man email?
12   A.  It's possible.
13           MR. KENNER:  Your Honor, may I -- well, let me
14   withdraw that.
15           THE COURT:  I'm sorry?
16           MR. KENNER:  Let me ask another question or two.
17   BY MR. KENNER:
18   Q.  Do you recall that email indicating when music is due to
19   fly back?
20           MR. KELLER:  Objection, your Honor.  Hearsay.
21           THE COURT:  You're starting to get into the
22   contents of documents which are clearly hearsay.  They're
23   out-of-court statements.
24           MR. KENNER:  Okay.
25           THE COURT:  If you want to do something else in
```

Lidsky - DIRECT - By Mr. Kenner

```
 1    terms of coming up with the date --
 2              MR. KENNER:  Thank you.
 3              THE COURT:  -- there's other ways of doing it.
 4              MR. KENNER:  Thank you.
 5    BY MR. KENNER:
 6    Q.  Were you following the trip to Macao through
 7    correspondence with Mr. Higginbotham or Agent Heuchling?
 8    A.  No, I was not.
 9    Q.  I'm sorry.  "Heuchling."  I apologize again.  I
10    apologize.
11              MR. KENNER:  May I ask to show Defendant's Exhibit
12    263 just to the witness and the Court and counsel to see if
13    it refreshes his recollection?
14              THE COURT:  Is this around the date?
15              MR. KENNER:  Yes.  September 5th, 2017, is the --
16              THE COURT:  So 236 is to refresh his recollection?
17              MR. KENNER:  Yes, your Honor.
18              THE WITNESS:  Okay.  Thank you.
19    BY MR. KENNER:
20    Q.  Is the document you're looking at to refresh your
21    recollection from you?
22    A.  It is.
23    Q.  And who was it to?
24    A.  Special Agent Heuchling.
25    Q.  And does looking at that document refresh your
```

1    recollection about music man?

2              THE COURT:  I thought the recollection was about

3    the date you were looking at.

4              MR. KENNER:  Or about the date.

5              THE WITNESS:  It does.  It's helpful on both.

6    BY MR. KENNER:

7    Q.  Okay.  What date did you write this email?

8    A.  On September 5th, 2017.

9    Q.  And you wrote it to Agent Heuchling.  Right?

10   A.  I did, yes.

11   Q.  And does it refresh your recollection with regard to the

12   subject matter of music man and a trip to Macao?

13   A.  It does.

14   Q.  And what is your refreshed recollection about that?

15   A.  Well, I wasn't following him with Special Agent

16   Heuchling.  I had established what is called silent hits

17   through Customs and Border Protection.  And what that does

18   is gives us a little heads-up, sometimes hours, sometimes

19   days, when anybody that we flagged for monitoring for

20   international travel is set to return; that is, has a

21   reservation or has boarded a flight.

22   Q.  Was somebody following Mr. Michel and Mr. Higginbotham

23   on that flight?

24   A.  Not to my knowledge, no.

25   Q.  Would you have told Mr. Heuchling about the date of this

```
 1    trip?  Correct?

 2    A.  I told Mr. Heuchling that because of the silent hits

 3    that I had set up through Customs, I had gotten an alert

 4    that Mr. Michel was set to fly back to the U.S.

 5    Q.  You just testified a few minutes ago that Agent

 6    Heuchling was following Mr. Michel.  Was that accurate?

 7               MR. KELLER:  Objection, your Honor.  That

 8    mischaracterizes the testimony.  There's been no testimony

 9    that anyone was following Mr. Michel.

10               THE COURT:  I don't believe there has.  And the

11    jury's recollection counts.  But I don't believe there's

12    been anything about following him.  He talked about the hits

13    that they had, which would give them information.  But I

14    didn't hear anything about following or following in the

15    sense of physically following, if that's what you're asking.

16    BY MR. KENNER:

17    Q.  Did the subject matter of that email, "We hoped you had

18    a good flight" -- I'll put it back up if you need to see it

19    again.

20    A.  I'll --

21               THE COURT:  What are you asking him to be

22    refreshed?  We need a question before he's shown the

23    document to be refreshed about recollection.

24    BY MR. KENNER:

25    Q.  What was the subject line of that email?
```

 1    A.  I believe it was --

 2              MR. KELLER:  Objection, your Honor.  Hearsay,

 3    relevance.

 4              THE COURT:  I'll sustain it on both grounds.

 5    BY MR. KENNER:

 6    Q.  In the email that you refreshed your recollection about,

 7    what was the subject matter, subject line?

 8              MR. KELLER:  Objection.  Same objection, your

 9    Honor.

10              THE COURT:  I just ruled on that.  You asked that

11    same question and I just ruled on it.  These are

12    out-of-court statements.

13    BY MR. KENNER:

14    Q.  Mr. Lidsky, as of September 5th, 2017, you were tracking

15    online purchases of plane tickets, correct, in connection

16    with Mr. Michel or Mr. Higginbotham?

17    A.  No.  I don't recall doing that at all.

18    Q.  Was -- did you recall Agent Heuchling doing that?

19    A.  If he was, I don't recall him doing it either.

20    Q.  Did you on -- do you recall that -- let me ask you this:

21    Did Mr. Michel -- I'm sorry -- Mr. Higginbotham come back

22    into the United States on September 7th, 2017?

23    A.  I believe he did.  I think the 7th is the date, but I'd

24    have to look at my notes or my report to confirm that.

25    Q.  Let me show you a defense exhibit not yet admitted,

1    Exhibit 263, to see if that refreshes your recollection.

2                THE COURT:  You're looking for the date

3    Mr. Higginbotham would have returned.

4                THE WITNESS:  Okay.

5    BY MR. KENNER:

6    Q.  Does that refresh your recollection of when

7    Mr. Higginbotham returned to the United States?

8    A.  No.

9    Q.  Did you direct Border Patrol to stop and question

10   Mr. Higginbotham when he came back from that trip?

11   A.  I believe I did, yes.

12   Q.  Why did you ask that he be stopped?

13   A.  It's another investigative tool, another investigative

14   step.  There's information to be gleaned.  First and

15   foremost, where did you go on this trip?  At this point, I

16   was aware they had gone somewhere together.  I had no idea

17   where it was.  And that very well may be how I learned that

18   it was Macao.

19   Q.  In the last email about music man, it's confirmed when

20   they went to Macao.  Correct?

21                MR. KELLER:  Objection, your Honor.

22   BY MR. KENNER:

23   Q.  When they were traveling.  I'm sorry.

24                MR. KELLER:  Assuming facts not in evidence.  The

25   email is not in evidence.

```
1              THE COURT:  The email -- it's not about the email.
2     You're asking him what he remembers.  He can testify in
3     terms of his memory, not bringing out the content of the
4     email other than to refresh his recollection.
5              MR. KENNER:  Thank you, your Honor.
6     BY MR. KENNER:
7     Q.  Did you tell border patrol to stop Mr. Higginbotham
8     because you had learned that he had a notebook in his
9     possession regarding attorney-client issues and house
10    renovations?  Is that why you had them stop him, to get that
11    notebook?
12    A.  I do recall Mr. Higginbotham having a notebook and
13    referring to it in one or both of the July interviews.  I
14    would have likely pointed that out to Customs.  I certainly
15    would not have pointed it out as it has attorney-client
16    material and I need it.  If I flagged it might contain
17    attorney-client material, it would be for them and certainly
18    me to avoid it.
19    Q.  So your testimony is that you didn't obtain a copy of
20    that notebook as a result of the border stop that you
21    arranged for Mr. Higginbotham on September 7th of 2017?
22    A.  I don't recall obtaining a copy of the notebook, no.
23    Q.  Do you recall ever having read it?
24    A.  The notebook?  Not at that time.  I do not.
25    Q.  Do you recall reading it at any time?
```

1    A.  I obtained it later in the investigation when I

2    confronted Mr. Higginbotham, executed a number of consent

3    searches.  He turned it over at that time.

4         But because of the attorney-client privilege

5    issue, it went to the filter team.  It did not come to me

6    directly.  I received pieces of it later that were deemed

7    relevant and non-privileged.

8    Q.  Is it your testimony that you have never looked at the

9    entirety of the Mr. Higginbotham notebook, that things were

10   deleted from it before you saw it, that they were deleted by

11   a filter team?  Is that your testimony?

12   A.  That's correct.  They weren't deleted, per se.  They

13   were photocopies of relevant material that was in scope, if

14   it was a warrant, or relevant to the investigation that were

15   not personal and certainly non-privileged were released to

16   the investigative team.

17   Q.  And that included the entire 59 pages of the notebook.

18   Correct?

19   A.  If there was nothing privileged in there, then it would

20   have.

21   Q.  Sir, do you recall receiving a text message from

22   Mr. Higginbotham that same day that he came out of -- came

23   back to the United States and was stopped at Customs on

24   September 7th -- do you recall receiving an email about

25   wanting to have a meeting with you?

```
 1   A.  I do --
 2   Q.  Text message.  I'm sorry.  It was not an email.  Text
 3   message.
 4   A.  I do recall receiving a message from him shortly after
 5   his return.  Yes.
 6   Q.  All right.  And what did you do as a result of
 7   Mr. Higginbotham on September 7th saying that he needed to
 8   have a meeting with you essentially ASAP?
 9   A.  We set up a meeting together that took place, I believe,
10   on September 11th of 2017.
11   Q.  Sir, directing your attention to September the 11th of
12   2017, was there another meeting between yourself and
13   Mr. Higginbotham?
14   A.  Yes.
15   Q.  And who was present other than you and Mr. Higginbotham,
16   if anyone?
17   A.  No one in person.
18   Q.  And was that meeting recorded?
19   A.  It was.
20   Q.  In that -- that was outdoors.  Am I correct?
21   A.  You are correct.
22   Q.  In fact, you met at a park at 11th Street and I Street
23   here in Washington, D.C.  Correct?
24   A.  It was an outdoor area here in Downtown D.C.  I believe
25   11th and I sounds correct.
```

1    Q.  Did you memorialize your text communication with

2    Mr. Higginbotham --

3              THE COURT:  Which --

4    BY MR. KENNER:

5    Q.  -- about the meeting, about wanting to have the meeting

6    ASAP?  It started September 7th, 2017.

7    A.  I don't recall if I memorialized it individually or as

8    part of the follow-on interview or meeting on the 11th.

9    Q.  And I hate to admit I'm not familiar with the term.

10   What is a Garrity warning, G-A-R-R-I-T-Y?

11             MR. KELLER:  Objection, your Honor.  Relevance.

12             MR. KENNER:  I'm just trying to find out what it

13   is.

14             THE COURT:  Let me talk to you for a second on the

15   phone.

16             (Whereupon, the following proceedings were had at

17   sidebar outside the presence of the jury:)

18             THE COURT:  What does Garrity mean?

19             MR. KENNER:  I'm not certain.  That's why I'm

20   asking.

21             THE COURT:  If you don't know the relevance, then

22   there is no points in asking it.

23             Mr. Keller?

24             MR. KELLER:  It's a warning that's read to

25   employees when they're being investigated by an internal

 1    agency where they inform them that if they decide not to

 2    talk to the internal investigator, that cannot result in

 3    adverse employment action.

 4              THE COURT:  Okay.  I know what that means.

 5              So what relevance is there of that?

 6              MR. KENNER:  The relevance is that after being

 7    told that his job was not in danger, Mr. Higginbotham

 8    continued to cooperate with Mr. Lidsky.

 9              And then there was another meeting where

10    Mr. Higginbotham wanted cover from the DOJ because he

11    believed he was in conflict; and they wanted something from

12    somebody official because the DOJ said, You've got to stop

13    doing this.

14              And Agent Lidsky was saying, No, no.  We need you

15    to continue doing this.

16              And Higginbotham wanted something from someone

17    official, with stars and stripes, I think the comment was,

18    to protect him going forward so that he wasn't in this

19    conflict.

20              DOJ said stop; Lidsky said go.  And Higginbotham

21    got the clarification or something official so that he

22    didn't get caught up in that trip bag.

23              THE COURT:  Mr. Keller?

24              MR. KELLER: Your Honor, these are questions for

25    Mr. Higginbotham.  But Mr. Lidsky doesn't know what

1    Mr. Higginbotham wanted or didn't want or what he knew or

2    didn't know.  We covered some of this, I think, if not all

3    of it, with Mr. Higginbotham in the extensive

4    cross-examination that was already conducted.  This is not

5    the correct witness.  I'm not even sure all the areas that

6    counsel is exploring here are even relevant.

7         THE COURT:  Mr. Kenner, it does seem to me a

8    Garrity warning is not particularly relevant.  And this is

9    not the correct witness.

10        You did talk to Mr. Higginbotham about some of

11   this, because it sounds familiar.  I don't know whether you

12   went through all of it.  But you're asking him about what

13   concerns Mr. Higginbotham had.  That doesn't work.  He isn't

14   going to talk about indicating what Mr. Higginbotham was

15   concerned about.

16        If there are emails and stuff about it, it still

17   is out-of-court statements.  So it's not appropriate through

18   this witness.

19        MR. KENNER:  Thank you.

20        (Whereupon, the following proceedings were had in

21   open court:)

22        THE COURT:  I'll sustain the objection.

23   BY MR. KENNER:

24   Q.  As of September 11th, you would admit, would you not,

25   that Mr. Higginbotham was operating as an informant at your

```
 1    direction?

 2    A.  No.  He was not.

 3              MR. KENNER:  May I show the witness defense --

 4              THE COURT:  I can't hear you, sir.

 5              MR. KENNER:  Sorry.

 6    BY MR. KENNER:

 7    Q.  Let me go back -- hold on a moment.

 8              MR. KENNER:  Your Honor, I need to check to see

 9    whether Defense Exhibit 83 has been admitted yet.  I don't

10    know it has, your Honor.

11              THE COURTROOM DEPUTY:  I don't have it.

12              THE COURT:  No.  I don't have it.

13              MR. KENNER:  May I put it up for the -- Page 36 of

14    Exhibit 83 for the witness?

15              THE COURT:  What's the purpose?

16              MR. KENNER:   To impeach him.

17              THE COURT:  You're going to have to show it so we

18    can take a look and so that the Government can take a

19    look --

20              MR. KENNER:  Certainly.

21              THE COURT:  -- as to whether it contradicts --

22    presumably, an inconsistent statement.  Right?

23              MR. KENNER:  Yes, your Honor.

24              THE COURT:  Okay.  Let's put it up so -- not with

25    the jury, so we take a look at it.
```

 1    BY MR. KENNER:

 2    Q.  I'm directing your attention to the top few lines --

 3    actually, let me just ask you to read Page 36 of Exhibit 83.

 4              THE COURT:  To yourself.

 5    BY MR. KENNER:

 6    Q.  To yourself first.

 7              MR. KELLER: Your Honor, I'd ask that the witness

 8    also be shown Page 35.  This is out of context at the top of

 9    the page there.  It's a continuation from the previous page.

10              THE COURT:  I would --

11              MR. KENNER:  Your Honor, I have no objection to

12    showing him the entire document.

13              THE COURT:  Well, we don't need the entire

14    document.  You're showing him something in particular, I'm

15    assuming about an inconsistency you allege?

16              MR. KENNER:  Yes.

17              THE COURT:  At least let's see the beginning of

18    the page before.  There we go.

19              If you could read it to yourself.

20              MR. KENNER:  No problem.  I've gone back to

21    Page 35.

22              THE COURT:  Right.

23              Let us know when you're finished, Mr. Lidsky, and

24    we'll move to page -- the next page.

25              THE WITNESS:  Thank you.  I'm ready.

```
 1    BY MR. KENNER:

 2    Q.  Did you already read Page 36?

 3    A.  Yes.

 4    Q.  Agent Heuchling --

 5              THE COURT:  Let's not.

 6    BY MR. KENNER:

 7    Q.  I'm sorry.  Wrong agent.  I apologize.

 8              THE COURT:  Let me have a discussion with you all,

 9    please.

10              (Whereupon, the following proceedings were had at

11    sidebar outside the presence of the jury:)

12              THE COURT:  I need to see where it is that it says

13    he's an informant.

14              MR. KENNER:  Starting on the top of Page 36,

15    "Agent" --

16              THE COURT:  He talks about --

17              MR. KENNER:  There is a formal agreement.  There

18    is paperwork.

19              "As you were saying, you know to cover us to make

20    sure there's no ambiguity in what we are asking you to do

21    and to make sure that there's ambiguity [sic] in which

22    you're allowed to do, because you've become what's called a

23    government agent."

24              THE COURT:  Let me just say that we went through

25    this before.  I excluded this as not being inconsistent.
```

1    Mr. Higginbotham was asked about this, and it looks

2    familiar.  And there was some explanation about, you know,

3    what some wording in here meant.  Let me find it.

4         MR. KELLER:  It's further down on the same page.

5    He says, "We don't have any kind of formal agreement."  If

6    you look at the entire page, he's explaining to him that

7    he's not a government agent.  He's explaining what -- that

8    if he were an agent, it would require formal paperwork and a

9    formal agreement to resolve any ambiguities; and that's not

10   what they had for Mr. Higginbotham.

11        THE COURT:  Right.  So this is not inconsistent.

12   We've already dealt with it.

13        (Whereupon, the following proceedings were had in

14   open court:)

15        THE COURT:  It's not used to show an inconsistent

16   statement because there is no inconsistent statement.

17   BY MR. KENNER:

18   Q.  Sir, was Mr. Higginbotham acting as an agent for you?

19   A.  No, he was not.

20   Q.  Did you ever say to him, "You've become what's called

21   a" --

22        MR. KELLER:  Objection, your Honor.  Hearsay and

23   improper impeachment.

24        THE COURT:  Sustained.  We've gone through this

25   before.  We went through it with Mr. Higginbotham.

```
1     BY MR. KENNER:

2     Q.  Mr. Lidsky, did there ever come a time in connection

3     with your investigation that you became aware of a potential

4     conflict between the Department of Justice and you as an

5     agent in what Mr. Lidsky was being -- I'm sorry -- what

6     Mr. Higginbotham was being asked to do?

7     A.  None that I recall.

8     Q.  You have no recollection --

9               THE COURT:  Mr. Higginbotham was being asked to do

10    what?  What are you talking about?  I don't understand the

11    question.

12    BY MR. KENNER:

13    Q.  Mr. Higginbotham asking for, quote, "cover," closed

14    quote?

15              THE COURT:  And that's exactly what you're not

16    supposed to do.  That is clear hearsay, Mr. Kenner.  So what

17    I'm asking is, Mr. Higginbotham being asked to do what?

18              And it's:  Mr. Lidsky, did there come a time in

19    connection with your investigation that you became aware of

20    a potential conflict between the Department of Justice and

21    you as an agent in what Mr. Lidsky was being -- I'm sorry --

22    what Mr. Higginbotham was being asked to do?

23              What -- I don't understand the question.

24    BY MR. KENNER:

25    Q.  Do you understand it, Mr. Lidsky?
```

```
 1    A.  Not really.  But I don't remember any conflict arising
 2    in my own investigation.
 3    Q.  Did you become aware of whether or not when
 4    Mr. Higginbotham was found to be doing legal work for
 5    Mr. Michel whether or not he stopped doing it?  Do you know
 6    that, when DOJ told him to stop doing that?
 7    A.  Are you asking the date that DOJ asked him to stop doing
 8    that?
 9    Q.  No.
10    A.  Or when I became aware of that?
11    Q.  Well, yeah.  Let's start with the date they asked him to
12    stop.
13    A.  I wasn't part of that conversation.  I don't recall.  I
14    don't know when that was.
15    Q.  Can you give me a rough idea relative to the trip to
16    Macao?
17              THE COURT:  Let me just ask you.  You said:  I
18    wasn't part of that conversation.  I don't recall.
19              So do you have any knowledge about it or you just
20    can't remember?
21              THE WITNESS:  I have no knowledge about it.  I
22    could opine.
23              THE COURT:  I'd rather you didn't guess or opine
24    about something you don't know anything about.
25              Move on, Mr. Kenner.
```

1    BY MR. KENNER:

2    Q.  Are you aware of -- let me withdraw that.

3              You also had a meeting with Mr. Higginbotham on

4    September the 14th of 2017.  Correct?

5    A.  I don't remember that meeting offhand.

6              MR. KENNER:  May I show the witness defense

7    exhibit --

8    BY MR. KENNER:

9    Q.  I'll show a document just to you and counsel and the

10   Court dated September 14th, 2017.  It's marked as

11   Defendant's Exhibit 264 for identification.

12             Can you read that --

13             THE COURT:  This is to refresh his recollection?

14             MR. KENNER:   Yes, your Honor.

15   BY MR. KENNER:

16   Q.  Can you read that to tell me whether or not it refreshes

17   your recollection about whether or not you had a meeting

18   with Mr. Higginbotham on September the 14th of 2017?

19             MR. KELLER:  Just for the benefit of the witness,

20   given that this is a multipage document.

21             MR. KENNER:  Yes, please.  We can scroll through

22   it all.

23             MR. KELLER:  The bottom paragraph, maybe, is the

24   only reference I see to September 14th.  It doesn't

25   reference an interview.

1            MR. KENNER:  That's the statement I want to get to

2    once I establish they were together on September the 14th,

3    2017.

4            THE WITNESS:  We were not.

5    BY MR. KENNER:

6    Q.  Did you make some determination that on or about

7    September 14th, 2017, Mr. Higginbotham scanned from a

8    scanner in the Department of Justice a Red Rock loan

9    agreement?

10   A.  Yes.  I'm not sure of the details of the document from

11   this.  But yes.  I did become aware that he scanned a

12   document at the Department of Justice on September 14th.

13           THE COURT:  Take it down, because there's no more

14   refreshing of recollection.

15   BY MR. KENNER:

16   Q.  What you read there didn't refresh your recollection

17   with regard to whether it was -- who the party -- what the

18   agreement was that he was scanning?

19   A.  I believe there it was just referenced as "attachment

20   to."  I'd have to see that attachment to answer that fully.

21   Q.  Let me show it to you.

22           I'm putting up Page 3 of Exhibit 264 -- I'm sorry.

23   Page 2 of Exhibit 264.  I'm sorry.

24           THE COURT:  This is again to refresh his

25   recollection?

```
 1                     MR. KENNER:  Yes, your Honor.

 2                     THE COURT:  On exactly what?

 3                     MR. KENNER:  As to the date on the agreement that

 4       was scanned on the Department of Justice scanner and who it

 5       was with.  What was the agreement about?

 6                     MR. KELLER:  Your Honor --

 7                     THE COURT:  That gets into hearsay in terms of the

 8       contents of it.  Is there anything else --

 9                     MR. KENNER:  So I just want to know if he knew

10       the --

11                     THE COURT:  You can get the date, but it doesn't

12       seem to me that the content is a problem.

13                     Mr. Keller, is there anything additional?

14                     MR. KELLER:  To the extent he's trying to refresh

15       him as to which document was scanned in, I believe it's at

16       Page 20 of this exhibit and it's Exhibit 3.  It's not

17       whatever page they're displaying right now.

18                     THE COURT:  If you're trying to -- I don't know

19       the document that well.  But if you're trying to just get

20       the date and they're refreshing the recollection without

21       getting into the contents.

22       BY MR. KENNER:

23       Q.  Does that refresh your recollection as to the date?

24                     THE COURT:  Nothing's up there.

25                     MR. KENNER:  I'm sorry.
```

Lidsky - DIRECT - By Mr. Kenner

 1              Put it back up, please, Mr. Campbell.

 2      BY MR. KENNER:

 3      Q.  Let me show you the whole document and see if it

 4      refreshes your recollection of what date it was scanned at

 5      the Department of Justice.

 6              THE COURT:  Mr. Keller has indicated where it is.

 7              Can you say it again, Mr. Keller, so we can move

 8      this along?

 9              MR. KELLER:  Yes, your Honor.  I believe it's

10      Page 20 of the exhibit.

11              MR. KENNER:  Your Honor, there's an entire scan of

12      multiple, multiple pages.

13              THE COURT:  You asked to have him refresh his

14      recollection as to when it was scanned, the date.  The date.

15      And according to Mr. Keller, it's on that particular page.

16      Can we look at it and see whether it refreshes his

17      recollection?  You are not getting into the content of it.

18      You can refresh him as to the date.

19      BY MR. KENNER:

20      Q.  What is the date -- does this refresh your recollection

21      as to the date on the agreement that it was being scanned

22      in?

23      A.  It does.

24      Q.  And what was that date?

25      A.  The date of the agreement or the date of the scanning?

1    Q.  Yes.  The date of agreement.

2    A.  September 13, 2017.

3    Q.  That wasn't so hard, was it?

4         THE COURT:  Counsel, it's inappropriate to make

5    comments back.

6    BY MR. KENNER:

7    Q.  Okay.  And do you know the date that that document was

8    actually scanned?  Did that refresh your recollection about

9    that?

10   A.  September 14th, 2017.

11   Q.  Did there come a time that in or about December 27th of

12   2017 that you prepared a memo of contact with -- between

13   yourself and George Higginbotham?

14   A.  It's possible that I did.

15        MR. KENNER:  Will you show him Defense

16   Exhibit 256, please, Mr. Campbell?

17        MR. KELLER:  Your Honor, objection.  He hasn't

18   established that his memory is exhausted.  I'm not sure what

19   the relevance of the underlying memo is if he just wants to

20   know what the contact was between Mr. Lidsky and

21   Mr. Higginbotham.

22        MR. KENNER:  I want to know what date was

23   confirmed to have that meeting.  It's in a memo of contact.

24   BY MR. KENNER:

25   Q.  Would reading that memo of contact refresh your

1    recollection about when the meeting was confirmed for with

2    Mr. Higginbotham?

3            THE COURT:  Mr. Keller is objecting to the

4    relevance of it.  But at this point -- would that help you?

5            THE WITNESS:  I'm not certain which meeting.  Is

6    this the September 11th meeting?  There was no meeting on

7    the 14th.

8            THE COURT:  He's indicated there was no meeting on

9    the 14th.  So what exactly -- I think the problem is there's

10   some confusion as to what you're looking for in terms of

11   dates.

12           MR. KENNER:  Your Honor, may I just have a moment?

13           THE COURT:  Sure.

14   BY MR. KENNER:

15   Q.  Sir, do you recall on September the 7th of 2017 -- I'm

16   changing dates on you here -- September 7th of 2017, do you

17   recall setting a meeting with Mr. Higginbotham for

18   September 11th of 2017?

19   A.  Yes.

20   Q.  And do you then recall on December the 27th, which is

21   what we're asking you about right now, that you scheduled a

22   meeting for January 3rd with Mr. Higginbotham?

23   A.  Did you say December?

24   Q.  In or about December -- December 27th, 2017, did you

25   schedule a meeting with Mr. Higginbotham for January the 3rd

```
 1    of 2018?

 2    A.  Yes.  I believe I did.

 3             MR. KENNER:  I have no further questions.

 4             THE COURT:  Cross.

 5             MR. KELLER:  Thank you, your Honor.

 6                          CROSS-EXAMINATION

 7    BY MR. KELLER:

 8    Q.  Good afternoon, Mr. Lidsky, Special Agent Lidsky --

 9    Assistant Special Agent in Charge Lidsky.  Excuse me.

10    A.  Good afternoon.

11    Q.  All right.  I just -- I want to address one topic that

12    Mr. Kenner addressed with you about anyone following

13    Mr. Michel.

14             Did anyone in law enforcement over the course of

15    this investigation ever follow Mr. Michel?

16             THE COURT:  You're talking about physically?

17             MR. KELLER:  Yes, your Honor.

18             THE WITNESS:  No.

19    BY MR. KELLER:

20    Q.  In Macao?

21    A.  No.

22    Q.  In Bangkok?

23    A.  No.

24    Q.  In Shenzhen?

25    A.  No.
```

1    Q.   In Hong Kong?

2    A.   No.

3    Q.   In New York?

4    A.   Not as part of my investigation and not to my knowledge.

5    Q.   Mr. Kenner also asked you about attorney-client

6    privilege and about whether some notes of Mr. Higginbotham's

7    were privileged and what steps you took to either review or

8    not review privileged documents.

9            Do you remember those questions?

10   A.   I do.

11   Q.   The filter team, the Government filter team in this

12   case, obtained a crime fraud order from a judge ruling that

13   because there was probable cause to believe that Mr. Michel

14   involved Mr. Higginbotham in criminal activity, there was no

15   valid attorney-client privilege --

16           MR. KENNER:  Objection.

17   BY MR. KELLER:

18   Q.   -- right?

19           MR. KENNER:  Move to strike.  Inappropriate

20   question, your Honor.  Assumes facts not in evidence.

21           THE COURT:  Well --

22           MR. KELLER:  He has opened the door to this.

23           THE COURT:  Excuse me.  Let's discuss this for a

24   second.

25           (Whereupon, the following proceedings were had at

1    sidebar outside the presence of the jury:)

2              THE COURT:  Now, you opened this up.  I tried to

3    point out to you that there was no attorney-client

4    privilege.  You ignored it and then you went ahead and asked

5    a bunch of questions.

6              So there's certainly -- they did do a filter team.

7    You asked about that.  You did get into and kept talking

8    about an attorney-client privilege.  I pointed out that

9    there wasn't one.

10             So I think he can certainly point out that there

11   was a court order -- which is correct; there's nothing wrong

12   with that -- and discuss what the filter team did or didn't

13   do.  You asked about it.

14             MR. KENNER:  Thank you.

15             (Whereupon, the following proceedings were had in

16   open court:)

17             THE COURT:  Overruled.

18   BY MR. KELLER:

19   Q.  So again, Special Agent Lidsky, the filter team in this

20   case obtained a crime fraud order from a judge ruling that

21   because there was probable cause to believe that Mr. Michel

22   involved Mr. Higginbotham in criminal activity, there was no

23   valid attorney-client privilege between them.  Right?

24   A.  That is correct.

25   Q.  In other words, because Mr. Michel used an attorney to

 1    help commit his crimes, there was no valid privilege?

 2    A.  Yes.

 3              THE COURT:  Slow down, Mr. Keller.

 4              MR. KELLER:  Yes, your Honor.  I was just taking a

 5    pause.

 6    BY MR. KELLER:

 7    Q.  Special Agent Lidsky, you were asked about whether you

 8    were the lead investigator as to the 2017 piece of this

 9    investigation.

10    A.  I was.

11    Q.  And so with respect to your investigation and 2017, you

12    were asked questions about who set up a meeting between

13    George Higginbotham and the Chinese ambassador in July of

14    2017.

15              Do you recall those questions?

16    A.  I do.

17    Q.  Based on your investigation, who set up that meeting

18    between Mr. Higginbotham and the Chinese ambassador?

19    A.  Mr. Michel.

20    Q.  Mr. Michel set that meeting up through Chinese

21    government officials.  Right?

22    A.  That's correct.

23    Q.  Mr. Michel asked Mr. Higginbotham to go into the embassy

24    and meet with the Chinese ambassador.  Right?

25    A.  Yes, he did.

 1    Q.  You investigated Mr. Michel and a number of his

 2    co-conspirators with respect to the 2017 conduct?

 3    A.  I did.

 4    Q.  And Mr. Higginbotham was one of the individuals that you

 5    investigated.  Right?

 6              MR. KENNER:  Objection.  Leading, your Honor.  All

 7    these questions are leading, your Honor.

 8              MR. KELLER:  I'm on cross-examination, your Honor.

 9              THE COURT:  True.  But I think when the witness is

10    a Government witness and he's indicated that he gets to do

11    cross, you need to be more careful about your leading

12    questions.

13    BY MR. KELLER:

14    Q.  Based on your investigation, Special Agent Lidsky, who

15    financially benefited the most from this conduct out of all

16    of the co-conspirators that you investigated?

17    A.  Mr. Michel.

18    Q.  Out of the roughly $100 million that he received in 2017

19    from Jho Low, how much did Mr. Michel keep?

20    A.  There was just under 74 million --

21              MR. KENNER:  Objection.  Relevance, your Honor.

22              THE COURT:  No.  You asked some questions about

23    this.  I'll allow it.

24              THE WITNESS:  There was --

25

                     Lidsky - CROSS - By Mr. Keller

```
 1    BY MR. KELLER:

 2    Q.  Go ahead, Special Agent Lidsky.

 3    A.  There was just under 74 million of the 102 million that

 4    I had traced to Mr. Michel.

 5    Q.  How much did Mr. Higginbotham get?

 6    A.  Approximately $170,000.

 7              MR. KENNER:  Your Honor, I did not ask one

 8    question about the finances --

 9              THE COURT:  Well, you opened some of the issue in

10    terms of what he received, I believe.  And so --

11              MR. KENNER:  Received?

12              THE COURT:  -- at this point, I'll allow it.

13              MR. KENNER:  Your Honor, I didn't mention anything

14    financial or --

15              THE COURT:  Can we discuss it?

16              (Whereupon, the following proceedings were had at

17    sidebar outside the presence of the jury:)

18              THE COURT:  Mr. Keller?

19              MR. KELLER:  Your Honor, he asked a number of

20    questions about Mr. Higginbotham's financial situation to

21    imply that Mr. Higginbotham had a financial motive to direct

22    this conduct or drive this conduct.  I'm entitled to point

23    out that Mr. Higginbotham received peanuts compared to the

24    Defendant with respect to this conduct.

25              MR. KENNER:  He can point that out all he wants.
```

1    Not through this witness.

2              THE COURT:  He can point it out.  This witness is

3    certainly aware of what people received based on the

4    investigation that he did.  I don't think it has to be with

5    another witness.  We do know from Mr. Higginbotham he only

6    got 170,000.

7              In terms of the rest of it, in terms of the

8    comparison, you did get into the issue, I believe, with this

9    witness relating to -- you know, that he had difficulties,

10   et cetera, unless I'm mixing it up with the last witness.

11   But I don't think so.  So I think it's allowed.

12             But that's it, though.  I don't think you need to

13   go any further, Mr. Keller.

14             MR. KENNER:  Thank you.

15             (Whereupon, the following proceedings were had in

16   open court:)

17   BY MR. KELLER:

18   Q.  So, Special Agent Lidsky, Mr. Michel received -- kept

19   roughly $70 million?

20   A.  Just under $74 million.

21   Q.  And Mr. Higginbotham got about 170,000 of that?

22   A.  That's correct.

23   Q.  Did your investigation determine that it was Mr. Michel

24   who asked Mr. Higginbotham to find someone to help Jho Low

25   get the U.S. Government to drop the 1MDB investigation?

1    A.  Yes, it did.

2    Q.  Did your investigation reveal that Mr. Michel had a

3    prior relationship with Mr. Low?

4    A.  Yes, it did.

5    Q.  Mr. Michel had previously received $20 million from Low

6    to funnel into the 2012 presidential election.  Is that

7    right?

8    A.  That's correct.

9    Q.  Did Mr. Higginbotham have any involvement in that

10   $20 million that Mr. Michel received from Low to funnel into

11   the 2012 presidential election?

12   A.  None to my awareness.

13   Q.  Did Mr. Higginbotham have any prior relationship with

14   Jho Low?

15   A.  Not before 2017, to my knowledge.

16   Q.  As lead investigator in the 2017 piece, have you seen

17   emails, screenshots and text messages belonging to

18   Mr. Michel related to 1MDB, Guo and Jho Low?

19            MR. KENNER:  Objection.  Leading.

20            THE COURT:  No.  I'll allow that question.

21            THE WITNESS:  All of the above.

22   BY MR. KELLER:

23   Q.  Based on your investigation, did you see travel records

24   establishing that Mr. Michel traveled to Asia on multiple

25   occasions to meet with Jho Low?

1    A.  Yes, I did.

2    Q.  And to meet with a Chinese government official Vice

3    Minister Sun Lijun?

4    A.  Yes, I did.

5    Q.  Have you seen documents and communications from the

6    Chinese government in Mr. Michel's email?

7    A.  Yes.

8    Q.  Throughout this entire investigation, did you see any

9    documents or communications from the Chinese government in

10   any of Mr. Higginbotham's emails or text messages or other

11   communications?

12   A.  No, I did not, aside from things he might have scanned

13   in, separate documents.

14            MR. KELLER:  No further questions, your Honor.

15            THE COURT:  Redirect.

16            MR. KENNER:  One moment, your Honor.

17            THE COURT:  Sure.

18                    REDIRECT EXAMINATION

19   BY MR. KENNER:

20   Q.  Agent Lidsky, you had three contacts with Mr. Michel --

21   I'm sorry -- with Mr. Higginbotham in July of 2017.

22   Correct?

23   A.  I certainly remember the 20th and the 26th.

24   Q.  You don't remember the 27th -- I'm sorry -- the 19th,

25   July 19th?

1    A.  Electronic contact, yes.  But I did not meet with him on

2    the 19th.

3    Q.  All right.  And you stayed in pretty much constant

4    communication with him until he came back from his trip to

5    Macao?

6              MR. KELLER:  Objection, your Honor.  We've been

7    through this.  And it's outside the scope of the

8    cross-examination.

9              THE COURT:  I'll agree it's outside the scope.

10   And he's already answered questions relating to this.

11   BY MR. KENNER:

12   Q.  And after Mr. Higginbotham came back from Macao, you

13   continued to stay in communication with him until January of

14   2018.  Correct?

15             MR. KELLER:  Same objection, your Honor.

16             THE COURT:  Same ruling.  It's beyond the scope

17   and you've already asked these questions.

18             MR. KENNER:  Nothing further.

19             THE COURT:  You can step down, sir.

20             THE WITNESS:  Thank you.

21             THE COURT:  Let's take our afternoon break.  It's

22   25 after.  A quarter to 4:00.  I'll give you 20 minutes.  We

23   never seem to fit in the 15.

24             (Whereupon, the jury exited the courtroom at 3:26

25   p.m. and the following proceedings were had:)

Lidsky - REDIRECT - By Mr. Kenner

```
1                THE COURT:  You can step down.

2                (Witness excused.)

3                THE COURT:  I hope you have another witness.

4                MR. KENNER:  Yes.  Mr. Frank White.  We're going

5     to read --

6                THE COURT:  In terms of reading?

7                MR. KENNER:  Yes.

8                THE COURT:  Okay.  Everybody sit down.

9                How are you planning on doing it?

10               MR. KENNER:  I'm going to have somebody --

11               THE COURT:  Can you talk into the microphone?

12               MR. KENNER:   I'm sorry.  I've going to have

13    somebody take the witness stand.  I'm going to ask the

14    questions from the transcript; he'll answer them from the

15    transcript.

16               THE COURT:  Okay.  I'll explain that that's the

17    way we're doing it.  So the answers are what Mr. White would

18    have given.

19               MR. KENNER:  Yes.

20               MR. KELLER:  Just to clarify, counsel, are you

21    going to read the whole transcript in or just excerpts?

22               MR. KENNER:  No.  The whole transcript.  That's

23    what you asked for and that's what I'm going to do.

24               MR. KELLER:  Okay.

25               THE COURT:  Then let's take our break.
```

1          (Thereupon a recess was taken, after which the

2    following proceedings were had:)

3          THE COURT:  So, Mr. Kenner, I have an instruction

4    which I'll give them.  It's sort of based on the deposition

5    testimony, one where you indicate they're treated as

6    testimony like they would as if the live witness had come

7    in, that kind of thing.

8          Who is going to be reading for Mr. White?

9          MR. KENNER:  Steve McClain, M-c-C-L-A-I-N.

10          THE COURT:  Okay.  Let me just look at this for a

11    moment.

12          I'm not going to indicate why he's unavailable.

13    I'll just say he's unavailable.

14          MR. KENNER:  I'm sorry.  I didn't hear that, your

15    Honor.

16          THE COURT:  I'm not going to say why he's

17    unavailable.  I'm just going to say he's unavailable.

18          (Whereupon, the jury entered the courtroom at 3:55

19    p.m. and the following proceedings were had:)

20          THE COURT:  Good afternoon, members of the jury.

21          THE JURY:  Good afternoon.

22          THE COURT:  I'm going to give you an instruction

23    relating to the next evidence and witness.

24          Mr. Kenner intended to call Mr. Frank White in his

25    case in chief.  But Mr. White is unavailable.  Don't

1    speculate as to why.

2         As a result, Mr. Kenner is going to present the

3    testimony of Mr. White that Mr. White gave during a grand

4    jury proceeding.  There is a transcript of the grand jury

5    proceedings, in other words, sworn recorded answers to

6    questions asked at the time in the grand jury of Mr. White

7    by Mr. Mulryne, one of the prosecutors in the case.

8         And when a witness is unavailable, such as

9    Mr. White, then a party may present in this case the

10   transcript testimony by placing someone else on the witness

11   stand to read Mr. White's answers that he gave at the grand

12   jury proceeding, and Mr. Kenner is going to read the

13   questions.

14        So we're going to have somebody up here by the

15   name of Steve McClain who will answer the questions as

16   Mr. White answered them at the grand jury proceedings.  And

17   Mr. Kenner will ask the questions that Mr. Mulryne asked at

18   the grand jury proceedings.

19        Now, the transcript of the testimony is entitled

20   to the same consideration to be judged as to credibility,

21   weight, otherwise considered by you insofar as possible in

22   the same way as if the witness had been present and had

23   testified from the witness stand.

24        So don't place any significance on the behavior or

25   tone of voice of any person reading either the questions or

1    the answers.  It's really what questions were asked and what

2    answers were given are now part of the testimony as if

3    Mr. White had come to testify.

4            So if we can have whoever it is that's going to

5    sit up here.

6            MR. KENNER:  Yes.  The defense calls Mr. Frank

7    White.

8            (Mr. McClain approaches the witness stand.)

9            THE COURT:  You can go ahead and sit down.  And if

10   you'll just make sure you speak into the microphone.  And

11   obviously, you're reading the answers exactly as they are

12   written in the transcript.

13           Thank you.

14           Mr. Kenner?

15           MR. KENNER:  Thank you, your Honor.

16   TESTIMONY OF FRANK WHITE, JR., READ INTO THE RECORD AS

17   FOLLOWS:

18                       DIRECT EXAMINATION

19   BY MR. KENNER:

20   Q.  "Good afternoon, Mr. White.

21   A.  Hi.

22   Q.  Would you mind just moving ever so slightly this way?  I

23   just want to make sure the jurors can all see you.

24   A.  Sure.

25   Q.  Mr. White, would you please state your full name for the

 1    record?

 2    A.  Frank White, Jr.

 3    Q.  Mr. White, in what city or state do you live?

 4    A.  D.C.

 5    Q.  Before we go into some of your background information,

 6    I'd like to take a moment to provide you with some

 7    information and advise you of rights that witnesses before

 8    this grand jury are entitled to.  Okay?

 9    A.  Thank you.

10    Q.  This investigation involves allegations of possible

11    violations of the campaign election, the Federal Campaign

12    Election Act and other related statutes in connection with

13    the 2012 presidential election.

14            As a witness before the jury, you are entitled to

15    be presented by -- represented" --

16            MR. KENNER:  Your Honor, it says "presented," but

17    I believe it means "represented" --

18    BY MR. KENNER:

19    Q.  "-- by counsel.  Do you currently have representation?

20    A.  I do.

21    Q.  Are your attorneys Tom Perrelli and Brandon Fox?

22    A.  They are.

23    Q.  And are they both here just down the hallway?  Is that

24    correct?

25    A.  They are.

1    Q.  If at some point you wish to consult with your

2    attorneys, you are entitled to do that.  Just ask, and I'm

3    sure the foreperson or the deputy foreperson will excuse

4    you.  Okay?

5    A.  Sure.

6    Q.  As a witness before the grand jury generally, anything

7    that you say or do here in the grand jury could be used

8    against you, whether it be by the grand jury or in another

9    legal proceeding.

10           Do you understand that?

11   A.  I do.

12   Q.  Also, generally, as a grand jury witness, anything that

13   you say, any response you have to a question where the

14   response may incriminate you of some sort of crime, you

15   would have the right not to answer that question.

16           Do you understand?

17   A.  I do.

18   Q.  Those are the rights for a witness like yourself who

19   appears before the grand jury.

20           Now, in your case, you're testifying here today

21   pursuant to a proffer agreement.  Is that correct?

22   A.  That is correct.

23   Q.  I'm going to put this here on the projector.  It's

24   labeled Grand Jury Exhibit FW-1."

25           THE COURT:  I'm assuming we're going to call it a

1    different number, but we can do that later.

2              MR. KENNER:  Yes, your Honor.  I'm just reading

3    from the transcript.

4              THE COURT:  No problem.  No problem.

5    BY MR. KENNER:

6    Q.  "Do you recognize the proffer agreement on the screen in

7    front of you?

8    A.  It looks like it, yeah."

9              MR. KENNER:  Your Honor, I can publish this to the

10   jury.  Correct?

11             THE COURT:  Yes.

12   BY MR. KENNER:

13   Q.  "So is this a copy of the proffer agreement that you

14   have with the Government?

15   A.  It looks like it, yeah.

16   Q.  I'll turn to Page 2 here.  Up here in the upper

17   right-hand corner, is that your signature?

18   A.  That is.

19   Q.  Just below, there is the signature of one of your

20   attorneys.  It appears to me -- hmm -- just below, there is

21   that -- the signature of one of your attorneys?

22   A.  It appears to be, uh-huh.

23   Q.  If we go back to Page 1 -- and we're not going to go

24   through this whole thing, but at least just a couple of

25   provisions here -- but looking at Paragraph 1, do you

1    understand that as part of this agreement you agree that all

2    statements and all testimony is going to be truthful and

3    completely honest?

4    A.  Of course.

5    Q.  Then if we drop down to Paragraph No. 3 -- just showing

6    you Paragraph 1 -- Paragraph 3 -- Paragraph No. 3, do you

7    understand that the Government -- pursuant to this

8    agreement, the Government is restricted in being able to use

9    your statements against you directly to some degree?  Do you

10   understand that?

11   A.  I do.

12   Q.  All right.  Turning back to the second page, you see

13   that this is dated July 23rd, 2018.  Right?

14   A.  Uh-huh.

15   Q.  On or about that date, did you meet with the Government

16   and agents for an interview?

17   A.  I did."

18           THE COURT:  Can you speak into the microphone?

19   Just move it down a bit.  There we go.

20           MR. McCLAIN:  "I did."

21           THE COURT:  Perfect.

22   BY MR. KENNER:

23   Q.  "This agreement, was it executed at that time?

24   A.  Yes.

25   Q.  And you understand that the conditions of this agreement

1    extend to your testimony here today.  Is that right?

2    A.  I do.

3    Q.  Mr. White, could you tell the grand jury a little bit

4    about your educational background, specifically any college

5    or higher education you may have?

6    A.  I have an MS degree in engineering.  Also, I attended

7    Tuck School of Business at Dartmouth College, where I

8    received training as an executive.

9    Q.  How is it that you are currently employed?

10   A.  I am actually retired, honestly, but I've grown so --

11   I've grown so -- three businesses in my life and I'm

12   currently raising my family.

13   Q.  These businesses that you had, did you found and serve

14   as the chief executive officer or CEO to those businesses?

15   A.  I did.

16   Q.  We're not going to get into all those details here.  But

17   could you just verify briefly -- just name those businesses

18   and give a brief summary as to what they did or do?

19   A.  Advanced Concepts was -- we did computer security for

20   NSA, CIA, FBI and Homeland Security.  I sold that company in

21   2007.  At that point, I started to raise money for Obama.

22   After he became president, I went back to business and

23   started a private equity firm; and we did basically solar

24   projects in Southeast Asia and Nigeria.  I sold that, too.

25   Q.  What was the name of that company?

Testimony of Frank White, Jr.

```
 1    A.   DuSable Capital Management.

 2    Q.   Did you say there was a third company?

 3    A.   Yeah.   In between those two, I had a third-party

 4    logistics firm that -- that we sold at a loss, quite

 5    frankly.   It didn't last long.   But basically, moved parts

 6    around for a different truck companies.

 7    Q.   And what was the name of that company?

 8    A.   I can't remember.

 9    Q.   You mentioned moments ago about working, helping out

10    with the -- with President Obama, at the time Senator

11    Obama's, 2007-2008 presidential campaign.   Is that correct?

12    A.   And 2012.

13    Q.   We're going to talk about 2012 in a moment.

14    A.   Okay.   I'm sorry.

15    Q.   Now -- that's okay.

16            Just starting with 2007-2008, you helped out on

17    that campaign.   Is that right?

18    A.   I did.

19    Q.   Now, you did not actually work for the campaign itself,

20    did you?

21    A.   No.   I was a volunteer.

22    Q.   Is the same true about your time working with the 2012

23    campaign?

24    A.   That is correct.   Right.

25    Q.   In 2007-2008, can you explain to the grand jury what
```

1    were the kinds of things that you were doing in furtherance

2    of Senator Obama's presidential company?

3    A.  I raised money for the campaign.  I was what you call a

4    bundler.  I did events with him and his wife and just raised

5    money for the campaign.

6    Q.  How would you do that?  How would you go about raising

7    money?"

8              MR. KENNER:  Can you speak up, too, Mr. McClain?

9              MR. McCLAIN:  "Well, I worked with campaigns -- I

10   worked with the campaign to find sites and dates where he

11   could come and I would call folks who I knew, get them to

12   call folks who they knew and basically write checks to

13   support the campaign."

14   BY MR. KENNER:

15   Q.  "So you would help organize events in which donors would

16   attend these events and would pay donations to the campaign

17   in order to attend those events?

18   A.  That's correct.

19   Q.  And then often would there be someone who would be

20   attending the event like a guest of sorts that would be, for

21   lack of a better term, the headliner of the event?

22   A.  I'm sorry.  Can you repeat that?

23   Q.  Sure.  And let me rephrase it.

24              Were there times where -- I think you may have

25   just said this -- were there times where Senator Obama

1    and/or his wife would attend those events?

2    A.  Yeah.  I mean, it would have -- it would have to have a

3    draw, I mean, a person they wanted to come see to be a part

4    of and get a photo with.  It was the draw.  The actual

5    candidate or -- I'm sorry.  The actual candidate or one of

6    his people, his wife or someone who he wanted to use as an

7    advisor in the administration or on the campaign.  They were

8    the draw.  So folks wrote checks to come and see them speak

9    and take photos with them or what have you.

10    Q.  In addition to hosting or helping out with these types

11    of events, did you also make calls or solicit individuals to

12    make donations to the campaign?

13    A.  Of course.  Yeah.  Yeah.

14    Q.  Also, you said moments ago that you were not officially

15    a staff member of the campaign.  Correct?

16    A.  Yes.  I was a volunteer.  I mean, I didn't hold a title.

17    I wasn't paid.  I was -- it was -- I'm not a staffer; I'm a

18    volunteer.  That's all I can say about that.

19    Q.  And as a volunteer, did you communicate with the

20    campaign?

21    A.  Of course.  I mean, they called the shots.  I would make

22    requests for dates and locations and they would say yes or

23    no.

24    Q.  We're going to talk here in a moment about your

25    experience in 2012 as well.

1          But as a fundraiser, did you understand that

2     foreign nationals could not donate or contribute to a

3     campaign?

4     A.  I understood that, uh-huh.

5     Q.  Did you understand that people who were making -- donors

6     who were making contributions or donations to a campaign had

7     to do that themselves and in their own name?

8     A.  Correct.

9     Q.  In other words, they couldn't make donations or

10    contributions on behalf of someone else or using someone

11    else's money.  Is that right?

12    A.  Yes.  That's correct.

13    Q.  Did you also understand that the names of contributors

14    and amounts that they contributed, that information had to

15    be reported to the campaign so that the campaign could then

16    in turn report that to the Federal Election Commission?

17    A.  I knew that.  It had to be reported from me to the

18    campaign.  That was part of the process.  What they did with

19    it beyond that wasn't always clear to me.  But I knew that

20    it was -- the info was made public.  Whether it was the FEC

21    or the newspaper or -- they filed reports every quarter to

22    somebody.  They didn't tell me who.  But somebody.

23    Q.  So you understand that the campaign with this

24    information would have to submit and file reports that would

25    ultimately be made public.  Is that correct?

1    A.  Exactly.  Yes.  Yes.

2    Q.  And did you know that there were limits to the amount of

3    money that can be donated --

4    A.  Yeah.

5    Q.  -- by a person to a particular candidate or to a

6    particular campaign?

7    A.  Yes.

8    Q.  And you understood again that this information was all

9    information the campaign had to keep track of and ultimately

10   report?

11   A.  Yeah.

12   Q.  Moving ahead to the 2012 reelection campaign by

13   President Obama, you said that you helped out on that as

14   well.  Is that correct?

15   A.  I did.

16   Q.  What did you at this time -- were you bestowed with an

17   official title or a role in your fundraising endeavor?

18   A.  Yeah.  I was vice chair of finance.  And it's a title;

19   but again, it wasn't paid.  I was a volunteer.  But the

20   title helped me raise more money because I had a title

21   behind my name.  So when I called somebody, I could say, I'm

22   the vice chair of finance, and they'd be more inclined to

23   listen and respond in a positive way if I have a title

24   behind my name.  So I was vice chair of finance for the

25   entire country."

1            MR. KENNER:  Sir, I lost the page number.  Can you

2       direct me to the page and line number you just read?

3            MR. McCLAIN:  It would be DOJ 033486.  And it

4       would be Line 19 where you would start.

5            MR. KENNER:  Thank you.

6       BY MR. KENNER:

7       Q.  "During that period for that campaign, the 2012

8       reelection campaign, did you do the same sorts of

9       fundraising and bundling efforts that you had done in 2007?

10      A.  Same sort.

11      Q.  You mentioned in 2000-2008 that you were helping to host

12      events and bring donors into these campaign events where the

13      president, at the time the senator, would appear.  Correct?

14      A.  Yes.  Correct.

15      Q.  Were you doing those same sorts of activities in 2012?

16      A.  I did more, actually, in 2012, than I did in 2008.

17      Q.  In 2012, were those events that you were helping to host

18      and helping to get donors for -- were those events

19      throughout the country?

20      A.  Yeah.  I did some in Florida, New York, Chicago, D.C. or

21      Virginia.

22      Q.  Were you still doing personal outreach as well through

23      phone calls or meetings to try to solicit donations?

24      A.  Absolutely.  Yeah.  I was.

25      Q.  During the 2012 period -- well, first, let me ask, the

1    title that you had mentioned -- and I know you said a moment

2    ago it was essentially just a title.

3    A.  Right.

4    Q.  But national vice chair, who is it that bestowed that

5    title upon you?  Was it the campaign that gives you that

6    title?

7    A.  Yeah.  I didn't give it to myself.  Yeah.  That would

8    have been nice.  But yeah.  The campaign gave it to me.

9    Q.  Okay.  During this period of 2012, same as back in 2008,

10   were you in communication with campaign staff members?

11   A.  I'm sorry.  Say that again.

12   Q.  In 2012, were you in contact with campaign staff members

13   for President Obama?

14   A.  Oh, yeah.  Of course.

15   Q.  You've already told us a little bit about this.  But

16   just briefly, what kinds of issues would you be in contact

17   with staffers about?

18   A.  Well, for instance, trying to find a location or a date

19   or get on the president's schedule was hard.  So again, I

20   didn't make any decisions; I just made requests.  And they

21   would come back with a yes or no based on what I wanted to

22   get done.

23   Q.  So --

24   A.  So oftentimes, I had an idea about when and where to do

25   an event and how much I could possibly raise; and I would

1    ask, Can he come to this place on this date and raise the

2    amount of money?

3              And they would say -- you know, they would try to

4    get it done.  It worked sometimes; sometimes it didn't.  But

5    that's my reason for talking back and forth with the

6    campaign.

7    Q.  In addition to that, would there be times when you would

8    have to communicate with the campaign about what's called as

9    vetting?

10   A.  Oh, of course.  Yeah.  There are lots of folks who want

11   to help, want to write checks, but they don't always vet,

12   meaning they have problems with their taxes that they

13   haven't paid, taxes, for instance, or they are not U.S.

14   citizens or they have some issues with the press have gotten

15   ahold of and the campaign didn't think it was good politics

16   to have this person tied to the president's event.  So they

17   would get vetted and cleared or not cleared to be part of

18   the process.  That's what vetting means.

19   Q.  And in order, I think -- we may see some examples of

20   this later.  But in order to vet, would those potential

21   donors have to submit some personal information to the

22   campaign?

23   A.  Yeah.  Uh-huh.

24   Q.  I'd like to now turn your attention to an individual

25   named Prakazrel Michel, or Pras Michel.

1    A.  Pras.  Yeah.  Right.

2    Q.  Can you tell the grand jury, approximately when and

3    where did you first meet Mr. Michel?

4    A.  Well, I met Pras at a convention in -- I'm not sure what

5    year.  I met him prior to Obama running for president.  I

6    met him just in passing at a convention.  I said, Hey,

7    that's Pras from -- I went over and said, Hi.  I'm Frank

8    White.  It was just a hi-and-bye kind of thing, you know.

9    Didn't talk much, but just hello.

10   Q.  When you say convention, what convention?

11   A.  The DNC.  But I'm not sure which year it was.

12   Q.  Is that the Democratic National Convention?

13   A.  Yes.  I'm sorry.  Yeah.  Democratic National Convention.

14   That's held by the -- each party holds their own convention

15   when they do their own candidate nomination for president of

16   the United States.  And the DNC had theirs in Colorado.  I'm

17   not sure where it was, frankly, but that's when I first met

18   Pras for the first time.

19   Q.  Did you meet and interact with Mr. Michel again in 2012?

20   A.  Yeah.  In 2012, we had dinner.  A friend of mine who was

21   working on the campaign knew that I was trying to find guys

22   or folks who could help me raise money, and he knew that

23   Pras wanted to get involved in the campaign.  So he got me

24   and Pras together for dinner at a restaurant in New York.

25   Q.  Who was that -- who was the individual?

1    A.  His name was -- it escapes me right now.  Jason.  Jason.

2    I can't remember.

3    Q.  Just briefly, how is it that you knew Jason?

4    A.  Jason worked in my building at the time.  Jason was, you

5    know, a good brother.  He was -- he was a guard in between

6    jobs during the Great Recession.  He couldn't find a job in

7    his own field, but when he was not -- when he was not a

8    guard, he worked with artists, entertainers and athletes.

9    And when the campaign jumped off, he went into the campaign

10   and helped the campaign get to know more athletes,

11   entertainers, you know, stars, frankly.  So folks like Pras

12   were in his orbit.  And he put me and Pras together.

13   Q.  When you and Pras then were in contact with one another,

14   did the two of you go out to dinner?

15   A.  Well, we met at a dinner with -- that Jason put

16   together.

17   Q.  Where was that?

18   A.  In Soho, in New York.

19   Q.  Could you tell the grand jury what was discussed at that

20   dinner between you and Mr. Michel specifically as it relates

21   to the 2012 elections?

22   A.  Well, again, Pras made it clear to me at that point that

23   he wanted to be involved in the campaign.  So I didn't know

24   if he was serious or not because, you know, you get a lot of

25   folks saying that they want to help, but they really can't.

1    They really don't know what's involved.  They really don't
2    know what's involved.  But they say they want to do
3    something.
4            So, you know, I didn't think I would ever hear
5    from Pras again, to be honest with you.
6            But he said he wanted to help.  And I said:  Okay.
7    Let's talk about it.
8    Q.  You understood him to mean that?  President Obama's
9    reelection campaign?
10   A.  Of course.  Yeah.  Yeah.  Yeah.  Help raise money for
11   the campaign.
12   Q.  Between the time that you met Mr. Michel in 2007 and
13   when you sat with him in 2012 for this dinner, had you had
14   any contacts with him?
15   A.  Say that again, please.
16   Q.  Between '07, when you first met Mr. Michel, and 2012,
17   this dinner, did you and Mr. Michel have any contacts?
18   A.  I didn't know him.
19   Q.  Okay.  Did there come a point after that dinner where
20   you and Mr. Michel communicated again about possibly doing
21   something for the campaign?
22   A.  Yeah.  Yeah.  We did.  He was -- he said he wanted to
23   really get involved and he wanted to do his own event at
24   some point, which is a big deal, because doing your own
25   event is hard.  I mean, it's hard to raise money for a

1    candidate so, you know -- so I told him at this time that I

2    was doing an event in Miami with Marc Anthony and Obama of

3    course at this house owned by a woman named Abigail Pollak

4    in Miami.

5          And I told him if he wanted to sort of see -- if

6    he wanted to sort of see what you can do at this event and

7    get some of your folks to come to this event, I'll see about

8    getting you your own event down the road if you can show me

9    that you can actually help me raise money.

10          And we discussed that in great detail, quite

11    frankly, but --

12    Q.  When you say 'great detail,' what kind of detail?  What

13    is it that the two of you discussed?

14    A.  Where it was going to be, what it cost to be a part of

15    this event, who is going to be there, that kind of thing.

16    Q.  Did in fact Mr. Michel assist in getting donors to pay

17    and actually attend the event?

18    A.  He did.  He did.  He got about six people to come.

19    Q.  Okay.  Prior to the event, did you meet up with

20    Mr. Michel at a hotel in Miami?

21    A.  I did.  I met up with him at the W the day before, I

22    think, the event, where I met some of his potential donors

23    and folks who he wanted to bring or wanted to come to the

24    event and hope that they would pass vetting.  Yeah.  We met

25    and discussed the possibilities of these guys coming to the

1    event with Obama.

2    Q.  Were some of these individuals present there at the

3    hotel?

4    A.  Yeah.

5    Q.  Did Mr. Michel introduce you to some of them?

6    A.  He did.

7    Q.  Could you tell the grand jury whom you remember being

8    present that Mr. Michel introduced you to at that hotel?

9    A.  Mohamad Al-Husseiny, Joel Rousseau, Jho Low.  That's all

10   I remember being that explicitly -- being there explicitly.

11   Q.  I just want to touch on each of these briefly.  So let's

12   start with -- you mentioned Mohamad Al-Husseiny.

13   A.  Right.

14   Q.  Who did you understand Mr. Husseiny to be and what did

15   you understand his relationship to be to Mr. Michel?

16   A.  A friend of Pras.  I looked him up and he was a CEO of a

17   pretty large sovereign wealth fund in Abu Dhabi, a very

18   wealthy guy who runs a very wealthy company.

19   Q.  Some questions for Mr. Rousseau.  Who did you understand

20   him to be and his relationship to Mr. Michel?

21   A.  Just a close friend of Pras.  I mean, I didn't know he

22   was -- he didn't -- he did parties.  He was a party

23   promoter.  Nice guy.  That's all I knew about him.

24   Q.  And Jho Low?  What did you know about him?

25   A.  Jho was a friend of Pras as well as Jho -- as well --

1    and Jho, from what I could see about him, was a very wealthy

2    business guy who threw big parties.  That's what I -- that's

3    what he was to me, quite frankly.

4    Q.  And you understand him to be a friend of Mr. Michel as

5    well?

6    A.  Yeah.  Yeah.  They were all friends.

7    Q.  Around this time -- this is all prior to that Miami

8    event, correct, in 2012?

9    A.  Yeah.  Uh-huh.

10   Q.  Around this time, did Mr. Michel ask you if Mr. Jho Low

11   could attend the Miami fundraising event?

12   A.  He did.  He asked.

13   Q.  What did you do in response to him asking?

14   A.  Well, Jho is a foreign national.  He couldn't write a

15   check to the campaign.

16   Q.  Why couldn't Mr. Jho Low write a check to the campaign?

17   A.  Because he is a foreign national.  I mean, we don't take

18   foreign money.

19   Q.  Did you tell Mr. Michel that?

20   A.  I did.

21   Q.  When Mr. Michel asked if Mr. Jho Low could attend to the

22   campaign, did you go to the campaign and ask whether or not

23   he might be able to attend?

24   A.  I'm trying to think.

25   Q.  Sure.

```
 1   A.  There are times when -- let me just say this -- let me

 2   just say it this way:  There are times when even when a

 3   person" --

 4              MR. KENNER:  Excuse me.  Talk into the microphone,

 5   Mr. McClain.

 6              MR. McCLAIN:  Sure.

 7              "There are times when -- let me just say it this

 8   way:  There are times when even -- there are times when even

 9   when a person we knew they didn't vet and can't write a

10   check will ask the campaign can they still come and just be

11   a part of the process and not write a check.  That happens

12   sometimes.  There is no law against that.  It's just a

13   matter of optics, you know, politics.  Do you want them

14   there or not?

15              So if I may, you know, you said earlier you know

16   that foreign nationals can't donate money, cannot write a

17   check."

18   BY MR. KENNER:

19   Q.  "But if I understand your testimony, you're saying that

20   it doesn't mean that someone can't attend an event; it just

21   means that the person who is attending the event wouldn't be

22   able to make a contribution?

23   A.  Correct.

24   Q.  So did there come a time where you asked the campaign on

25   behalf of Mr. Michel whether or not Jho Low could attend the
```

 1    event?

 2    A.  I don't remember that event in particular, if I asked

 3    for that reason or not.  I can't remember.  I don't know for

 4    that event.  You mean the one in Miami?

 5    Q.  We're talking about the one in Miami.

 6    A.  I can't remember.  But I know he wanted to come.  And I

 7    asked, Could he come?

 8            And they said, No, because he's a foreign

 9    national.

10            Now, beyond that, I'm not sure if I pushed anymore

11    or not.  I mean, I don't know Jho.  I mean, pushed for --

12    pushed for what?  What was the point?

13    Q.  Taking the -- taking away the notion of pushing, I'm

14    simply asking, did you at least ask or consult with the

15    campaign whether or not he could attend?

16    A.  Beyond writing checks?

17    Q.  Simply attend the event.

18    A.  Oh, yeah.  Of course.  I mean --

19    Q.  Why did you ask on that?

20    A.  Wait a minute.  Let me back up.  Okay.

21    Q.  Sure.

22    A.  I don't remember, because Jho -- I know Jho was foreign,

23    so if he can't write a check I wouldn't ask him, Can you

24    write a check?  I knew he can't.  So I'm not going to ask

25    that question.

1          Now, if you're asking me, did I ask him could he

2     come notwithstanding the check, I don't recall the

3     conversation.  I probably didn't have it because I didn't

4     know Jho to ask that question.  So I don't remember.

5     Q.   Okay.  Of that group, who attended the event in Miami?

6     A.   Joel came.  Joel is a U.S. citizen.  Mohamad came

7     because he's a dual citizen of Abu Dhabi and the U.S.  He

8     has two passports.  So he can come legally.  No problem at

9     all.

10          And did Pras come?"

11          MR. KENNER:  I'm sorry.  That should be a

12     question.

13     BY MR. KENNER:

14     Q.   "And did Pras come?

15     A.   I think Pras came.  I can't remember that entire -- I

16     can't remember that either.

17     Q.   Were you in attendance of that event as well?

18     A.   Oh, yeah.  I was there.

19     Q.   So we are talking about this conversation that you had

20     at this time where you had told -- you had mentioned to

21     Mr. Michel -- asked if Jho Low and you had made clear that a

22     foreign national can't donate or contribute money.  Correct?

23     A.   Correct.

24     Q.   Did there come a later conversation sometime after this

25     event after this period in which Mr. Michel had mentioned

1    that Jho Low wanted to get involved with the campaign?

2    A.  Yeah.  That happened.  Yeah.  Definitely.

3    Q.  What did you understand Mr. Michel to mean when he said

4    that Jho Low wanted to get involved with the campaign?

5    A.  Well, I wasn't sure what he meant.  But I knew what I

6    didn't want to see happen, is I wanted to make sure that

7    Pras was not implying that Jho wanted to find a way to put

8    money into the campaign in any way, because we just can't do

9    that.  So...

10   Q.  To that effect, what did you tell Mr. Michel, then, in

11   response to that?

12   A.  I said that any monies that go from Jho to you had

13   better be legitimate.

14   Q.  What did you mean by 'legitimate'?

15   A.  Meaning there better be a reason for him to give you

16   money.  There better be a real reason for that.

17   Q.  And at this time, what, if anything, did you tell

18   Mr. Michel about any money that he himself was donating to

19   the campaign?

20   A.  At that particular time, at the same time?

21   Q.  Correct.

22   A.  That same conversation, nothing.  I mean, that I -- that

23   didn't happen in exchange for a check.  It was just a

24   conversation we had.  At this point it came up, but not in

25   the context of writing a check.

1          Now, down the road, at some point down the road, I

2    can't recall exactly when, he did make a contribution.

3          And I asked him specifically:  Is this your money?

4          His answer to me was yes.

5          I said:  Okay.  Fine.  Then I can take it.

6    Q.  Why did you ask him that?

7    A.  Because I knew he had a conversation prior where I

8    thought maybe he was thinking -- you know, maybe he was

9    thinking that Jho could get involved without writing a check

10   himself, getting money into the campaign some other way.

11         And I wanted to make sure Pras understood that he

12   can't help him do that, that we cannot.  Any money that goes

13   from Jho to Pras had better be a legitimate transfer of

14   funds.  It had better be legitimate.

15   Q.  At some point during your conversation with Mr. Michel,

16   did you express to him that any money that went from

17   Mr. Michel to the campaign had to be Mr. Michel's money?

18   A.  Say that question one more time.  I'm sorry.

19   Q.  During your communications, during your dealings with

20   Mr. Michel, did you make clear to Mr. Michel that any money

21   that went from him to the campaign had to be his own money

22   as opposed to someone else's money?

23   A.  When I asked him, Is this your money, that implies that

24   for me, is this your -- is this check yours?  That's the

25   question I asked.

Testimony of Frank White, Jr.

1           The answer was yes.

2    Q.  And you had said that Mr. Michel did make a donation.

3    Correct?

4    A.  He made -- he made at least one.  Yeah.

5    Q.  Do you remember there being any issues surrounding

6    possible tax issues involving Mr. Michel?

7    A.  Yeah.  Yeah.  There was.  You know, throughout the

8    vetting process, things pop up and the campaign calls me

9    because it's my guy who wrote the check.

10          And they -- and they'll say -- well, if there's a

11   tax issue, for instance, federal or state, I will tell the

12   person who wants to write the check what type of -- what

13   type of proof the government will -- well, the campaign

14   needs to see in order for us to accept the check from this

15   person, because the last thing you want in a campaign is to

16   have a check being written to you when the person owes money

17   to the Federal Government.  You don't ever want that.  It

18   just doesn't look good.  It's a bad look.

19          So it's not illegal; it's just not good politics.

20   So we don't take money from anybody who owes tax issues,

21   frankly, a tax lien.

22          So they asked me at this point to go -- they asked

23   me at this point to go to the donor or potential donor and

24   say:  Can you prove via documentation that this means --

25   that this may have been satisfied or it's in the process of

1    being satisfied?  And I was asked to do that, and that's

2    what I did.

3    Q.  Do you know whether or not that was ever resolved?

4    A.  I did -- I don't.  I'm sorry.  I don't.

5    Q.  We have been talking about an event in Miami as part of

6    the campaign.  Was there a later -- was there later an event

7    in September of 2012 for the campaign?

8    A.  Yeah.  There was an event at my house, actually.

9    Q.  Was that here in D.C.?

10   A.  In D.C.  Yeah.

11   Q.  At this event, did President Obama attend?

12   A.  He did.

13   Q.  I don't think I asked you.  The event in Miami, did he

14   attend that one as well?

15   A.  He did.

16   Q.  What, if any, role did Mr. Michel have in the September

17   2012 campaign at your home?

18   A.  Well, it was -- I mean, he was an anchor for the event,

19   meaning he raised almost all the money for the event.  His

20   friends, his network and -- had shown me in Miami that he

21   could raise money given, like, days to do it.

22           So in D.C., he had weeks, maybe months.  I

23   didn't -- I don't remember.  He had a lot of time to put

24   together a list of people who could possibly write these

25   checks and come.  He put together a pretty impressive list

1    of people and they showed up, had a great event, great

2    success.

3    Q.  Leading up to that event, you mentioned that Mr. Michel,

4    he served as the anchor.  That's your term?

5    A.  He was the anchor, meaning it was his event.  He

6    basically brought most of the money to the event.  His

7    people came that he knew from all over his network.

8    Q.  What conversations did you and Mr. Michel have prior to

9    that event that led to him serving as the anchor?

10    A.  What do you mean?  Sorry.

11    Q.  Can you tell the grand jury your discussions with

12    Mr. Michel leading up to that event that got him involved in

13    it?

14    A.  I'm trying to narrow it down -- I'm trying to narrow it

15    down, what you want me to answer.

16    Q.  Sure.  You hosted the event at your home.  Correct?

17    A.  Yes, I did.

18    Q.  Mr. Michel was the person who was principally primarily

19    responsible for bringing donors to the event.  Is that

20    right?

21    A.  That is correct.

22    Q.  Mr. Michel in turn is the one -- he is the one who was

23    bringing the money to the event.  The more donors, the more

24    money.  Correct?

25    A.  Uh-huh.

1    Q.  Is that a yes or a no?

2    A.  That's a yes.  Sorry.

3    Q.  Sorry.  It's just for the record.

4    A.  Sorry.

5    Q.  It's okay.

6         Did you and Mr. Michel have conversations prior to

7    the event in which you and he were talking about setting up

8    this -- about setting this up and organizing it?

9    A.  Of course.

10   Q.  Could you just tell the grand jury a little bit about

11   those conversations?

12   A.  I'm trying to answer your question, but that's a very

13   wide, general question.  I mean, we talked about a lot of

14   things.

15   Q.  Specifically related to this event.

16   A.  Okay.  About the size of it, about who could come, about

17   the location.  I mean, a lot goes into an event.  So what

18   exactly are you asking me?  I'm sorry.  I'm trying.

19   Q.  I think that answered it in part.

20        Let me also ask you this.  This is a different

21   question:  Did Mr. Michel at some point talk to you about

22   his interest as far as getting something out of the work

23   that he was doing for the campaign?

24   A.  Oh, well, yeah.  I mean, okay.  Yeah.  People do this

25   for a lot of reasons.  I raised money for Obama because I

1    just want him to win.  I was in it for that reason.  That's

2    all I wanted.  I was offered jobs.  I didn't want it.  I

3    mean, I just didn't want it.

4            Now, some people do it because of course they want

5    him to win, but they also want to be in the administration

6    at some point.  Any administration is made up of -- made up

7    from folks who work on the campaign.  So if you're on the

8    campaign, you're probably going to be at some point in the

9    administration.

10           Now, Pras, I know he wanted to be a diplomat.  He

11   wanted to be an ambassador or just a diplomat of some sort.

12   Tie it back to Haiti.  And he said -- and he asked me,

13   frankly, how could he improve his chances of being a

14   diplomat in the administration?

15           My point to him was, well, you got to raise your

16   profile.

17           And folks make this decision based on a set of

18   criteria, including:  Are you loyal?  Did you work hard?  Do

19   they like you?  Do you present well?  Do you bring value?

20           And me being in finance and fundraising, raising a

21   ton of money raises your profile.  It doesn't give you a

22   job, but it definitely puts you on the list and gives you

23   consideration.

24           There are a lot of things they put into the

25   equation to figure out if you're going to get that job or

1    not.  But raising a lot of money in finance helps with that

2    decision.  It doesn't guarantee you anything, but it does

3    put you on the map.

4            So my point to him was, you know, raise a lot of

5    money.  You'll raise your profile and you have a better shot

6    at being a diplomat because you're in finance.  You're not

7    in policy.  You're not bringing any votes.  You are a

8    finance guy.  You are bringing money to the campaign, so

9    that -- so that's how they measure your value.  And you go.

10            And that point is on the list of criteria that

11    they use to make this decision.

12    Q.  You're talking about this criteria by which they make a

13    decision as to who might get a position with the

14    administration.  Correct?

15    A.  Yeah.

16    Q.  This particular point on that list of other factors, how

17    is it that people with the campaign and ultimately the

18    administration -- how is it that they would know, for

19    example, that Mr. Michel through his work and his

20    fundraising here, he helped the campaign earn this amount of

21    money?  How is it they would come to know that type of

22    information?  I mean, every campaign" --

23            MR. KENNER:  I'm sorry.  I believe that's an

24    answer.

25            MR. McCLAIN:  "I mean, every campaign is

1  different.  But in this case, they track numbers as they --

2  as the years go on and the campaign goes on.  And those

3  numbers are associated with you, a particular fundraiser,

4  based on their event.  Money that you raise is counted

5  through means, through your event.  I can tell them when you

6  did an event.  I can tell them who your people are.  These

7  are Pras's people.  These checks go under his name."

8  BY MR. KENNER:

9  Q.  "When you say 'you,' you yourself could be the one to

10  reply to the campaign that Mr. Michel was involved in this

11  particular event and brought this number of people?

12  A.  Well, yeah.  If he did it.  I'm not going to lie about

13  it.

14  Q.  And to be clear, I don't think I asked you this earlier.

15  In 2008, how did you rank among the highest fundraisers for

16  President Obama?

17  A.  I was number three in the country in 2008."

18          MR. KENNER:  Speak into the microphone, please.

19          MR. McCLAIN:  "I was number three in the country

20  in 2008."

21  BY MR. KENNER:

22  Q.  "So that means in the country, you raised the third most

23  amount of money for that particular campaign?

24  A.  That's right.

25  Q.  And how about in 2012?

Testimony of Frank White, Jr.

1    A.   Number one.

2    Q.   So as part of what the campaign or the administration

3    may consider, would they perhaps consult with people like

4    you who are fundraisers that would know who is actually

5    helping, bringing money, and who is not so involved?

6    A.   'Consult' is probably the wrong word to use.  I mean,

7    'consult' implies opinion.  I just state the facts.  The

8    fact is, I raised this amount of money.

9    Q.   Okay.  Take 'consult' off the table.

10          Would they confer with you, ask you about who

11   helped bring in money?

12   A.   If there was a question about it.  But again, every

13   event is counted and they know the numbers.  The staffers

14   know who wrote the checks because they are all tracked.  I

15   mean, every event is tracked pretty closely.  And they know

16   at that time who wrote what checks, you know what I mean?

17   If there's a question, they'll ask me.  But -- but they

18   already know.

19   Q.   Based on that sort of tracking, that statistical or

20   numerical calculus, would they know who is the host or, to

21   use your term, the anchor for each event?

22   A.   I would tell them that.

23   Q.   You would share that with the campaign?

24   A.   Yes.

25   Q.   And in this particular event, the one we're talking

1    about at your home in September 2012, that was Pras.

2    Correct?

3    A.  Yes.

4    Q.  What was the amount of money that someone for an event

5    like this, the one at your home or the one in Miami would

6    approximately -- would be the amount of money that a donor

7    would be paying in order to attend these events?

8    A.  Oh, well, you know, approximately -- it's 40,000.  It's

9    pretty exact.  That's the number, or it was back then."

10          MR. KENNER:  Your Honor, I'm about to publish an

11   exhibit shown to this witness.  May I take a moment to be

12   sure that it's accurate before I put it up?

13          THE COURT:  Yes.  Go ahead.  No problem.  Yes.

14          MR. KENNER:  Mr. Campbell, would you publish Grand

15   Jury Exhibit FW-2.

16   BY MR. KENNER:

17   Q.  "I'm going to put this here on the projector, so bear

18   with me a second.

19          How do you recognize this, an email between --

20   from you to Mr. Michel dated September 7th?

21   A.  Okay.

22   Q.  Is that what it is?  Do you recognize it?

23   A.  Well, from -- yeah.  Uh-huh.  Right.

24   Q.  And I realize this may look a little odd.  This is

25   showing a photo of an email on a Motorola phone.  Is that

1    your phone number?

2    A.  It appears to be, yeah.

3    Q.  Were these documents photographs of messages on your

4    phone that were produced to the Government as part of this

5    investigation?

6    A.  Uh-huh.

7    Q.  So we were saying, this is an email from yourself to

8    Mr. Michel on September 7th.  And what is it that you're

9    sending to Mr. Michel?

10   A.  It looks like a copy of the invitation.  Every event has

11   an invitation with the name of the host, the location, time,

12   date.  It's an event, basically, and it's official campaign

13   information.

14   Q.  The first line here, it reads:  Send this to your folks.

15   Right?

16   A.  Right.

17   Q.  What are you saying there?

18   A.  Well, again, if he's the anchor, he's bringing the

19   people, the checks.  They're his folks; they're not mine.

20   So folks that he knew personally that he's invited to come

21   to this event.  That's -- I'm assuming that's what I sent

22   him to send to his people.

23   Q.  Okay.  Going to the second page here of FW-1, is this a

24   copy, a photo, of the invitation?

25   A.  Yeah; as it existed that day.  But those things change.

Testimony of Frank White, Jr.

1    But that's probably the latest version that day.  But that

2    was the week prior, so it could have changed a little bit

3    between then and the actual event itself.

4    Q.  Just zooming in here briefly, we see on top you're

5    listed, Frank White.  Is that because you're hosting the

6    event at your home?

7    A.  It's my house.  Yeah.

8    Q.  The name next to you is Joel Rousseau?

9    A.  Right.

10   Q.  Is that who you were referencing earlier, one of the

11   people you met at the Miami hotel?

12   A.  That is correct."

13           MR. KENNER:  May I have a moment, your Honor?

14           Thank you.

15   BY MR. KENNER:

16   Q.  "A friend of Mr. Michel?

17   A.  Yeah.

18   Q.  I think you said he was a party organizer, club

19   organizer?

20   A.  Yeah.  He's a -- yeah.  He's an event planner,

21   technically.  That's what he does for a living.  Yeah.

22   Q.  Do you know why he's listed on this invitation?

23   A.  No.  I wish I knew.  I'm not sure why he's there.

24   Q.  Did he have any involvement in organizing the event?

25   A.  He may have helped Pras.  He could have.

Testimony of Frank White, Jr.

1    Q.  Do you know whether or not he helped Pras?

2    A.  I don't know for sure.

3    Q.  Did he help you in any way?

4    A.  No.  Not really.  Not really.  No.

5    Q.  You're not aware of him bringing anybody in particular

6    to the event?

7    A.  They're all friends.  They're all in the same crew.

8    Q.  I'm asking, are you aware of him bringing anyone

9    specifically to the event?

10   A.  No.

11   Q.  Turning to the next page now, this form here -- and I

12   know it's a little tough to see --

13   A.  Yeah, it is.

14   Q.  -- it's black and white.  And it's a photograph from a

15   phone.  This form here, was that attached?  Was that part of

16   the attachment with the invitation?

17   A.  Yeah.

18   Q.  Just generally -- we're not going to go in any great

19   detail right now about this; but generally, what is this

20   for?

21   A.  Well, this -- it's a -- I mean, it's your name, address,

22   credit card information.  It tells the campaign who you are

23   and how to pay for the event.  That's what that's for.

24   Q.  I apologize.  I should have probably -- I forgot that I

25   attached these.  So these are -- this page here that I'm

1   putting up here, this is essentially a cleaner copy of what

2   we were just looking at, the -- the invitation itself.

3   Correct?

4   A.  Right.  Right.  Uh-huh.

5   Q.  Skipping ahead, is this a copy of what we had just seen

6   in the attachment of the form you were describing?

7   A.  Right.

8   Q.  That information that you were just talking about in

9   terms of name, address, mentions employer, occupation, this

10  information, this form, this ultimately goes to the

11  campaign.  Is that correct?

12  A.  Well, I don't get it.  Yeah.  But most of the -- most of

13  the guys who I dealt with would just go online and make the

14  contribution.  By then, we were trying to be paperless.  So

15  99.9 percent of the time, we would just use the link,

16  honestly.

17  Q.  And the link that you're talking about doing something

18  like this online, the link would still ask for these -- for

19  this kind of information --

20  A.  Yeah.  Of course.

21  Q.  -- as part of the donation?

22  A.  Yeah.

23  Q.  This form, then, is the intended -- is this intended for

24  someone who is paying by, say, check or credit card?

25  A.  If they want to by mail it -- or fax it in, which most

1    folks don't want to -- but their number's on a piece of

2    paper and mail it in, they would just go to the website and

3    just --

4    Q.  Input it on the website?

5    A.  Yeah.  Mr." --

6              MR. KENNER:  No, no.

7    BY MR. KENNER:

8    Q.  "I think we're unfortunately out of time at the moment.

9    So if the foreperson -- deputy foreperson -- if it's okay,

10   we would like to excuse Mr. White at this time and ask him

11   to come back here this afternoon."

12             MR. KENNER:  The juror says yes.

13             On Page 38, Line 2:

14             MR. McCLAIN:  "The witness:  What time?  Do we

15   have a time?"

16             MR. KENNER:  "I'll speak with you in a moment.

17             "Whereupon, the witness was excused at 11:48 a.m.

18             "Whereupon, the witness was re-called at 3:35

19   p.m."

20   BY MR. KENNER:

21   Q.  "Good morning, Mr. White.

22   A.  Hi."

23             MR. KENNER:  I'm sorry.  I misread it.

24   BY MR. KENNER:

25   Q.  "Good afternoon, Mr. White.

```
1    A.  Hi."

2             MR. KENNER:  Is this a good time to stop when we

3    start the new session?

4             THE COURT:  How much more do you have?  How many

5    pages is this?

6             MR. KENNER:  We're on Page 38.  We're about

7    halfway, your Honor.  It's 72 pages.

8             THE COURT:  We're not going to get through all of

9    that this evening.  All right.  I'll break at this point.

10            And I'm going to ask you if you'd be on time for

11   9:00.  We'll bring you right in at 9:00 and, you know, have

12   them present the rest of the evidence.  Okay?

13            So take care of yourselves.  Be well.  Get some

14   rest, for those of you who need it, and don't talk about the

15   case.

16            (Whereupon, the jury exited the courtroom at 4:57

17   p.m. and the following proceedings were had:)

18            THE COURT:  Sir, you can step down.  Thank you.

19            MR. McCLAIN:  Thank you.

20            THE COURT:  You can sit.  I wanted to bring up

21   just a couple of things as soon as Dorothy comes back for a

22   minute.

23            (Thereupon, the courtroom deputy entered the

24   courtroom and the following proceedings were had:)

25            THE COURT:  We had listed this grand jury
```

Testimony of Frank White, Jr.

```
 1         testimony as an exhibit.  And I believe it was --
 2                   MR. KENNER:  102, your Honor.
 3                   THE COURT:  Okay.  You have a stipulation which
 4         needs to be filed on the record.  So it should be, you know,
 5         docketed as filed.
 6                   The exhibit itself is not going to be an exhibit
 7         that's sent to the jury.  It's basically the testimony,
 8         which she has taken down as part of it.
 9                   They're going to be viewing this as testimony for
10         them.  So they're not getting grand jury testimony to look
11         at back there, unlike other witnesses.
12                   The question that I have is, the proffer agreement
13         with this has an exhibit and there's a couple other exhibits
14         that are connected to this.  Does your agreement include
15         admitting those?  In which case we need to put different
16         numbers on them.
17                   MR. KENNER:  Yes, your Honor.
18                   THE COURT:  Mr. Keller?
19                   MR. KELLER:  Well, without the context of the
20         transcript --
21                   THE COURT:  Well, they're supposed to pay
22         attention to it.  That's why I gave that instruction to
23         begin with.  Otherwise, they get a transcript of one witness
24         and not transcripts of everybody else.  That's the whole
25         point of reading -- you know, having this done as if they're
```

1    a live witness.  My instruction to them is to view this as a

2    witness actually testifying.

3            MR. KENNER:  I'm sorry, Mr. Keller.  I just have

4    one issue or question.

5            Is this transcript available for rereading like

6    any other witness if a reread was requested?

7            THE COURT:  No.  Generally speaking, in this

8    jurisdiction -- and I say to them at the beginning they

9    shouldn't count on getting transcripts.  So there are

10   occasions when one can do it around particular things.  But

11   it's tricky to give it because then they tend to focus on

12   something that they don't -- on something within the

13   transcript itself as opposed to what they would remember.

14           But they don't get transcripts generally.  We can

15   discuss it if they ask for one.  They're told at the

16   beginning they don't get transcripts.  They have to

17   remember -- it's either their memory or they take notes.

18           But I assumed that since we went to the trouble to

19   present him as a witness -- and that's why I gave the

20   instruction -- the testimony is like everybody else.

21           MR. KENNER:  I agree, your Honor.

22           THE COURT:  Mr. Keller, did you not understand

23   that?  Or is that not your agreement?

24           MR. KELLER:  I'm just concerned about the exhibits

25   not being understood in context.  But no objection to their

1    admission.

2              THE COURT:  Well, the proffer agreement, if

3    Mr. White had testified, you would have admitted that

4    anyway.  So we just need to give it a different number.  Or

5    we can leave it as a grand jury -- as an exhibit in the

6    grand jury, which would go back.  In other words, like a

7    regular witness, if we admitted an exhibit, those exhibits

8    are part of the evidence and the exhibits would go back to

9    the jury.  So these exhibits, assuming your stipulation

10   covered it, that they would be admitted.

11             The second one is basically what I think they've

12   seen before, which is that invitation we've seen a couple

13   times.

14             MR. KELLER:  Yes, your Honor.

15             THE COURT:  And the form that was attached to it

16   we've seen also a couple times.

17             So I don't see a problem, unless --

18             MR. KELLER:  No.

19             THE COURT:  -- there's something I'm missing.

20             MR. KELLER:  No, no.  I guess my concern is that

21   it's made clear to them somehow through the way they're

22   marked that they correspond to Frank White's grand jury

23   testimony and that they weren't --

24             THE COURT:  You can mark it as whatever you want.

25             MR. KENNER:  Yes.

1      THE COURT:  I don't have any problem marking it,

2  you know, as Frank White's grand jury testimony.  That's

3  fine.

4      All I'm saying is we need to have it be on the

5  list and presented to them like a regular exhibit.  The rest

6  of it is they're not -- the evidence really isn't the

7  exhibit -- the grand jury transcript itself.  We'll admit it

8  for our purposes so that we have it.  But the court reporter

9  has been taking everything down here, just like a regular

10  witness.

11      MR. KELLER:  So maybe what we can do is delete the

12  grand jury transcript from -- I submitted to the Court and

13  to counsel a revised version of Exhibit 102, which included

14  the transcript and all of the grand jury exhibits.

15  Previously, just the transcript had been marked to the

16  extent it would be necessary for impeachment or refreshing

17  recollection.

18      We could delete the transcript from Government's

19  Exhibits 102 -- Government's Exhibit 102 and just leave the

20  four grand jury exhibits as they're currently marked and

21  make that Government's Exhibit 102.

22      THE COURT:  Okay.  I don't have a problem with

23  that.

24      MR. KENNER:  I don't either.

25      THE COURT:  At some later point we need something

```
 1    to -- if there's an inconsistent statement or something.

 2    But we don't have that at the present time.  That makes

 3    sense to me.

 4              MR. KENNER:  Makes sense to me as well, your

 5    Honor.

 6              THE COURT:  Okay.  I think that's it.  Just make

 7    sure that you file the stipulation.  Just put it on the

 8    docket so we've got it.

 9              MR. KELLER:  Yes, your Honor.

10              THE COURT:  We're not reading it to them, but we

11    should have it.

12              MR. KELLER:  Yes, your Honor.

13              For planning purposes, at the point at which the

14    defense rests, is the Court inclined to move straight into

15    closing arguments?  And how much time will each side --

16              THE COURT:  My question is, once he's finished --

17    I don't know whether you're planning on doing any kind of

18    rebuttal.

19              MR. KELLER:  Not at this point, your Honor.

20              THE COURT:  Then you've got -- you should have

21    Part 2 of the instructions.  They were sent to you, I

22    believe, Friday.  We're -- in the Part 1, we're in the

23    process of -- because as things happen in court, you sort of

24    add stuff to it.  But I'll get that out maybe by Wednesday.

25    We will have gone far enough along that we'll have a
```

1    little -- all the parentheticals will have been attached, so

2    you can take a look at it.

3            We'll still go over instructions before your

4    closings to make sure we've got everything and everything's

5    the way it should be.  And if there's objections or

6    whatever, we'll hear about it.  Okay?  And then we'll do the

7    closings.

8            We do have one issue in that we have one juror --

9            THE COURTROOM DEPUTY:  Seat 10.

10           THE COURT:  The juror in Seat No. 10 had indicated

11   to us -- and I put this on the record -- she originally was

12   leaving town on the 22nd.

13           THE COURTROOM DEPUTY:  Oh, no.

14           THE COURT:  That's not the right one.  It's --

15           THE COURTROOM DEPUTY:  13.  It's 13.

16           THE COURT:  Let's double-check that.  I think it's

17   13.

18           MR. KENNER:  I believe you're right, your Honor.

19           THE COURT:  I have it written down someplace.

20           Anyway, she originally was going to be traveling

21   out of town on the 22nd to celebrate Eid, the religious --

22           MR. KENNER:  Ramadan, I think.

23           THE COURT:  No.  Ramadan is done.  This is

24   different.  And she told us she was going to be out Friday

25   because she had planned being with her family.

1          So the question is, do we take a day off?  Or do
2     we excuse her and do an alternate?  Part of it may depend on
3     where we are.  It may be that that's the day we go over jury
4     instructions or something.  I don't know.  We'll see.  I'm
5     hopeful, because you're certainly getting beyond the time
6     the jury was told they were going to be, you know, jurors.
7     And I'd like to move this along as fast as we can.
8          MR. KELLER:  Thank you, your Honor.
9          THE COURT:  Not having -- if it's going to leave
10    us with a day off when we're ready to go, I'd be inclined to
11    use an alternate.  But I'll talk to you about that.
12         MR. KELLER:  Your Honor, based on the defense
13    witness list, my best estimate would be that we're likely to
14    rest, defense is likely to rest, either at the end of the
15    day tomorrow or sometime on Wednesday.  And so the reason
16    why I'm asking for clarification is, is it the Court's
17    intent that you would then send the jurors home for the rest
18    of the day for us to discuss jury instructions?
19         THE COURT:  Well, it depends on how -- I mean,
20    I'll have to go back and look and see how far along we are.
21    We'll send you Part 3.  That's strictly the foreperson and
22    stuff.  I'll send that off to you tonight.  That's easy.
23         Maybe we can do it tomorrow.  Let me go back and
24    look at how far we've gotten with it.  Part of it is the
25    parentheticals, not to waste a lot of time, frankly, when we

```
1    have our discussions, to let me and chambers make the
2    changes.  But maybe we can get it to you tomorrow at the end
3    of the day or something.
4             It depends on whether there's a lot to talk about,
5    frankly.  I mean, Part 2, I've made my rulings.  So it'll
6    depend on how much time we actually need to discuss whether
7    there are any issues.  Part 1 should be just, you know, some
8    things needed to be taken out or added or something of that
9    nature.
10            MR. KELLER:  Your Honor, as I understood it, the
11   only outstanding issue was the proposed theory-of-
12   the-defense instruction.  And so I guess the Government
13   would just request that we proceed to closings as close in
14   time to concluding the evidence as we can without losing a
15   day on Friday and --
16            THE COURT:  If we can, I'm more than happy to.  I
17   mean, this is not helping my schedule with other matters
18   either.  But we'll take what time needs to be done.  I don't
19   know how long these witnesses that Mr. Kenner is calling are
20   actually going to take.
21            MR. HASKELL:  Your Honor, I was just going to ask
22   for chambers to resend Part 2 of the jury instructions.  We
23   didn't receive that.
24            THE COURT:  I can send it again.
25            THE LAW CLERK:  I'll check.
```

```
1          THE COURT:  Why don't you talk to my law clerk to
2    make sure everybody's getting it who needs to get it at your
3    table.
4          MR. HASKELL:  Okay.
5          THE COURT:  So Part 2 as far as I'm concerned is
6    done.  If you have a theory of the defense you're working on
7    as an instruction, it would help to float it out.  I will
8    see about the advice of counsel.  At this point, there's no
9    basis for it.  But I'll make a final decision once the
10   evidence is in.  So I don't see having to do one for that.
11         But it would be helpful to have your theory of
12   defense.  Since the Court reads it, it should not be
13   argument.  Okay?  It has to be like an instruction:  This is
14   what you're claiming, that kind of thing.
15         MR. KENNER:  Yes, your Honor.
16         MR. KELLER:  Just finally on the point of
17   scheduling, if defense counsel is in a position to state on
18   the record who they have scheduled to testify tomorrow.
19         MR. KENNER:  I've already indicated that on the
20   record, your Honor.
21         THE COURT:  No.  You said Sessions.  You didn't
22   say who else came next.  What you have is Sessions, then
23   Kelly Cook and McMaster.  Do you know the order in which
24   they're going to testify?  Or are they going to testify?
25         MR. KENNER:  I don't.  I believe they're going to
```

```
 1    testify.  I do not know the order.  They're both going to be
 2    extremely short witnesses.
 3              THE COURT:  Who's -- which --
 4              MR. KENNER:  Less than 30 minutes on direct.
 5              THE COURT:  Which is short?
 6              MR. KENNER:  Both of them, your Honor.
 7              THE COURT:  Who is both?
 8              MR. KENNER:  McMaster, General McMaster and --
 9              THE COURT:  Cook and Kelly is what you have listed
10    besides Sessions.
11              MR. KENNER:  I'm sorry.  Kelly.  Yes.
12              THE COURT:  So is Cook going to testify?
13              MR. KENNER:   Cook, no.
14              THE COURT:  So --
15              MR. KENNER:  Kirk.  That's "Kirk," not Cook.
16              THE COURT:  Okay.
17              MR. KENNER:  But I am not going to call Mr. Kirk.
18              THE COURT:  Okay.  I'm sorry.
19              MR. KENNER:  We also have -- I may seek to re-call
20    Mr. Higginbotham.
21              THE COURT:  Well, that may require some sort of a
22    discussion.  We certainly had everything from what I know
23    and what you've gone over with other witnesses.  I don't
24    know what's left.
25              MR. KELLER:  Your Honor, we went over this
```

1    extensively last week.  You asked Mr. Kenner to highlight

2    what he had left and what was not covered.  You challenged

3    him.  He said:  Challenge accepted.  And the next day he

4    withdrew acceptance of the challenge and withdrew

5    Mr. Higginbotham as a witness.

6            Are we going to go through this every day?

7            THE COURT:  I mean, are you putting it back in?

8    You can't use him for --

9            MR. KENNER:  Based on the testimony of Agent

10   Lidsky, I want to go back and look again at whether or not I

11   need -- I believe based on Lidsky's testimony I do need to

12   re-call him.  The review would be limited to things that

13   came up during Mr. Lidsky's testimony.

14           THE COURT:  I have to say to you, you've gone

15   through all of those dates, the interviews.  You can't use

16   Mr. Higginbotham to bring in those interviews.  But you're

17   going to have to tell me exactly what it is that you want to

18   use him for.  And I want something this evening so we can

19   get moving on this.  So let's see in terms of what we're

20   doing.

21           MR. KENNER:  Okay.

22           THE COURT:  We will resend Part 2.  We'll send

23   Part 3 if not today, tomorrow morning.  That one's easy.

24   It's just, you know, foreperson, blah, blah, blah.

25           I'll see where we are with Part 1.  It's put

1    together.  It's just a matter of working with the

2    parentheticals on some of this.

3              In terms of the order of the next witnesses, Kelly

4    and McMaster, it would be helpful probably to know.  But if

5    we're going to keep it to those three, then we need to know

6    that.  Tonight I need to know Higginbotham and what you're

7    planning on bringing up.  You've had his transcript for

8    quite some time.

9              MR. KENNER:  Yes.  I will do that, your Honor.

10   Thank you.

11             MR. KELLER:  It sounds like the parties should be

12   prepared to provide closing arguments on Wednesday, your

13   Honor.  It sounds like --

14             THE COURT:  That would be great.

15             MR. KELLER:  Thank you.

16             THE COURT:  I don't want to tempt the fates by

17   picking a date.

18             At this point, you're going to let me know this

19   evening in terms of Higginbotham.

20             Are there any other issues with the other proposed

21   witnesses?

22             MR. KENNER:  Your Honor, Mr. Keller may choose not

23   to answer this question, and I understand if he doesn't.

24             It would help in terms of planning to get some

25   estimate if Mr. Michel testifies of how long the cross would

1    be anticipated to be.

2              THE COURT:  In terms of Mr. Michel, I don't know

3    whether you wish me to do the inquiry.

4              MR. KENNER:  Tomorrow, your Honor.

5              THE COURT:  Tomorrow?  Okay.  Then I'll do the

6    inquiry about --

7              And again, Mr. Michel, it's just to make sure you

8    know what your rights are.  And it's your decision to make.

9    And presumably, we'd find out.

10             MR. KELLER:  I think cross would be one to two

11   hours, your Honor.

12             THE COURT:  Okay.

13             MR. KENNER:  Thank you very much, Mr. Keller.  I

14   appreciate that.

15             THE COURT:  Anything else?

16             MR. KENNER:  No, your Honor.

17             MR. KELLER:  No, your Honor.

18             THE COURT:  The parties are excused, then.

19             (Proceedings concluded.)

20

21

22

23

24

25

1                              **<u>CERTIFICATE</u>**

2

3                      I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                     Dated this 17th day of April, 2023.

11

12                _/s/ Lisa Edwards, RDR, CRR_
                  Official Court Reporter
13                United States District Court for the
                    District of Columbia
14                333 Constitution Avenue, Northwest
                  Washington, D.C. 20001
15                (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$100** [1] - 46:18
**$170,000** [1] - 47:6
**$20** [2] - 49:5, 49:10
**$70** [1] - 48:19
**$74** [1] - 48:20

## '

**'07** [1] - 71:16
**'consult'** [3] - 87:6, 87:7, 87:9
**'great** [1] - 72:12
**'legitimate'** [1] - 78:14
**'you** [1] - 86:9

## /

**/s** [1] - 108:12

## 0

**033486** [1] - 66:3

## 1

**1** [6] - 58:23, 58:25, 59:6, 99:22, 102:7, 105:25
**10** [2] - 100:9, 100:10
**1016** [1] - 1:16
**102** [6] - 47:3, 95:2, 98:13, 98:19, 98:21
**11:48** [1] - 93:17
**11th** [8] - 26:10, 26:11, 26:22, 26:25, 27:8, 29:24, 41:6, 41:18
**13** [4] - 40:2, 100:15, 100:17
**1301** [1] - 1:15
**1400** [1] - 1:19
**14th** [10] - 36:4, 36:10, 36:18, 36:24, 37:2, 37:7, 37:12, 40:10, 41:7, 41:9
**15** [1] - 51:23
**16633** [1] - 1:23
**17** [1] - 1:6
**170,000** [2] - 48:6, 48:21
**17th** [1] - 108:10
**18th** [2] - 7:4, 7:9
**19** [1] - 66:4

**19-00148-1** [1] - 1:3
**19th** [3] - 50:24, 50:25, 51:2
**1:30** [1] - 5:13
**1:36** [1] - 1:7
**1MDB** [2] - 48:25, 49:18

## 2

**2** [9] - 11:2, 37:23, 58:16, 93:13, 99:21, 102:5, 102:22, 103:5, 105:22
**20** [3] - 38:16, 39:10, 51:22
**2000-2008** [1] - 66:11
**20001** [2] - 2:8, 108:14
**20004** [1] - 2:4
**20005** [1] - 1:20
**2007** [3] - 60:21, 66:9, 71:12
**2007-2008** [3] - 61:11, 61:16, 61:25
**2008** [5] - 66:16, 67:9, 86:15, 86:17, 86:20
**2012** [25] - 49:6, 49:11, 56:13, 61:12, 61:13, 61:22, 63:25, 65:12, 66:7, 66:15, 66:16, 66:17, 66:25, 67:9, 67:12, 69:19, 69:20, 70:21, 71:13, 71:16, 74:8, 81:7, 81:17, 86:25, 88:1
**2016** [1] - 7:23
**2017** [43] - 7:4, 7:9, 7:13, 7:18, 7:23, 8:5, 8:20, 9:2, 9:23, 10:14, 12:5, 12:15, 13:4, 13:11, 17:1, 19:15, 20:8, 22:14, 22:22, 24:21, 26:10, 26:12, 27:6, 36:4, 36:10, 36:18, 37:3, 37:7, 40:2, 40:10, 40:12, 41:15, 41:16, 41:18, 41:24, 45:8, 45:11, 45:14, 46:2, 46:18, 49:15, 49:16, 50:21
**2018** [3] - 42:1, 51:14, 59:13
**202** [2] - 2:9, 108:15
**2023** [2] - 1:6, 108:10
**20530** [1] - 1:16
**20th** [9] - 7:13, 7:18, 7:21, 9:10, 9:12, 9:13,

9:20, 9:23, 50:23
**21st** [1] - 13:10
**22nd** [2] - 100:12, 100:21
**236** [1] - 19:16
**23rd** [1] - 59:13
**25** [1] - 51:22
**255** [3] - 10:23, 11:7, 12:4
**256** [1] - 40:16
**26** [1] - 8:20
**263** [2] - 19:12, 23:1
**264** [3] - 36:11, 37:22, 37:23
**26th** [9] - 8:4, 9:2, 10:10, 10:14, 12:5, 12:15, 13:4, 13:6, 50:23
**27th** [6] - 7:23, 40:11, 41:20, 41:24, 50:24
**2:00** [1] - 5:22
**2:05** [1] - 6:1
**2:10** [1] - 6:1
**2:15** [1] - 5:22
**2:18** [1] - 6:11

## 3

**3** [9] - 11:20, 37:22, 38:16, 59:5, 59:6, 101:21, 105:23
**30** [2] - 16:8, 104:4
**333** [2] - 2:7, 108:14
**35** [2] - 31:8, 31:21
**354-3269** [2] - 2:9, 108:15
**36** [4] - 30:13, 31:3, 32:2, 32:14
**38** [2] - 93:13, 94:6
**3:26** [1] - 51:24
**3:35** [1] - 93:18
**3:55** [1] - 53:18
**3rd** [3] - 17:21, 41:22, 41:25

## 4

**40,000** [1] - 88:8
**42** [1] - 3:5
**4:00** [1] - 51:22
**4:57** [1] - 94:16

## 5

**50** [2] - 3:5, 16:5
**55** [1] - 3:6
**59** [1] - 25:17

**5th** [6] - 17:1, 17:23, 18:4, 19:15, 20:8, 22:14

## 6

**6** [1] - 3:5
**641** [1] - 2:3
**6706** [1] - 2:8
**6th** [1] - 17:23

## 7

**72** [1] - 94:7
**74** [2] - 46:20, 47:3
**7th** [11] - 17:23, 22:22, 22:23, 24:21, 25:24, 26:7, 27:6, 41:15, 41:16, 88:20, 89:8

## 8

**8** [4] - 8:1, 8:10, 8:22, 12:13
**804(b)(3)** [1] - 4:12
**83** [3] - 30:9, 30:14, 31:3

## 9

**91436** [1] - 1:23
**99.9** [1] - 92:15
**9:00** [2] - 94:11

## A

**a.m** [1] - 93:17
**Abigail** [1] - 72:3
**ability** [1] - 108:7
**able** [4] - 16:12, 59:8, 74:23, 75:22
**absolutely** [2] - 5:9, 66:24
**Abu** [2] - 73:17, 77:7
**accept** [1] - 80:14
**acceptance** [1] - 105:4
**accepted** [1] - 105:3
**according** [1] - 39:15
**account** [3] - 13:13, 13:14, 13:16
**accurate** [3] - 21:6, 88:12, 108:4
**acquire** [1] - 17:6
**Act** [1] - 56:12

**acting** [1] - 33:18
**action** [1] - 28:3
**Action** [1] - 1:3
**activities** [1] - 66:15
**activity** [2] - 43:14, 44:22
**actual** [3] - 63:4, 63:5, 90:3
**add** [1] - 99:24
**added** [1] - 102:8
**addition** [3] - 9:11, 63:10, 68:7
**additional** [1] - 38:13
**address** [4] - 14:19, 42:11, 91:21, 92:9
**addressed** [1] - 42:12
**administration** [8] - 63:7, 84:5, 84:6, 84:9, 84:14, 85:14, 85:18, 87:2
**admission** [2] - 4:9, 97:1
**admit** [3] - 27:9, 29:24, 98:7
**admitted** [7] - 4:24, 5:11, 22:25, 30:9, 97:3, 97:7, 97:10
**admitting** [1] - 95:15
**advance** [1] - 16:16
**advanced** [1] - 60:19
**adverse** [1] - 28:3
**advice** [1] - 103:8
**advise** [1] - 56:7
**advisor** [1] - 63:7
**afternoon** [11] - 6:7, 6:14, 6:15, 42:8, 42:10, 51:14, 53:20, 53:21, 55:20, 93:11, 93:25
**AFTERNOON** [1] - 1:7
**agency** [1] - 28:1
**agent** [9] - 4:10, 6:23, 32:7, 32:23, 33:7, 33:8, 33:18, 34:5, 34:21
**Agent** [19] - 16:25, 19:7, 19:24, 20:9, 20:15, 21:5, 22:18, 28:14, 32:4, 32:15, 42:8, 42:9, 44:19, 45:7, 46:14, 47:2, 48:18, 50:20, 105:9
**agents** [1] - 59:16
**ago** [4] - 21:5, 61:9, 63:14, 67:2
**agree** [4] - 14:24, 51:9, 59:1, 96:21
**agreement** [21] -

32:17, 33:5, 33:9,
37:9, 37:18, 38:3,
38:5, 39:21, 39:25,
40:1, 57:21, 58:6,
58:13, 59:1, 59:8,
59:23, 59:25, 95:12,
95:14, 96:23, 97:2
**ahead** [6] - 44:4,
47:2, 55:9, 65:12,
88:13, 92:5
**ahold** [1] - 68:15
**AI** [2] - 73:9, 73:12
**Al-Husseiny** [2] -
73:9, 73:12
**alert** [1] - 21:3
**allegations** [1] -
56:10
**allege** [1] - 31:15
**allow** [3] - 46:23,
47:12, 49:20
**allowed** [2] - 32:22,
48:11
**almost** [1] - 81:19
**ALON** [1] - 1:22
**alternate** [2] - 101:2,
101:11
**ambassador** [4] -
45:13, 45:18, 45:24,
84:11
**ambiguities** [1] -
33:9
**ambiguity** [2] -
32:20, 32:21
**AMERICA** [1] - 1:3
**amount** [8] - 16:23,
65:2, 68:2, 85:20,
86:23, 87:8, 88:4,
88:6
**amounts** [1] - 64:14
**anchor** [6] - 81:18,
82:4, 82:5, 82:9,
87:21, 89:18
**answer** [10] - 37:20,
52:14, 54:15, 57:15,
79:4, 80:1, 82:15,
83:12, 85:24, 106:23
**answered** [3] -
51:10, 54:16, 83:19
**answers** [6] - 52:17,
54:5, 54:11, 55:1,
55:2, 55:11
**Anthony** [1] - 72:2
**anticipated** [1] -
107:1
**anyway** [2] - 97:4,
100:20
**apologize** [6] - 7:22,
11:24, 19:9, 19:10,
32:7, 91:24
**appear** [1] - 66:13

**APPEARANCES** [1] -
2:1
**aPPEARANCES** [1] -
1:13
**applies** [1] - 4:11
**appreciate** [1] -
107:14
**approach** [1] - 10:5
**approaches** [1] -
55:8
**appropriate** [2] -
14:6, 29:17
**April** [2] - 1:6, 108:10
**area** [1] - 26:24
**areas** [1] - 29:5
**argument** [1] -
103:13
**arguments** [2] -
99:15, 106:12
**arising** [1] - 35:1
**arranged** [1] - 24:21
**artists** [1] - 70:8
**AS** [1] - 55:16
**ASAP** [2] - 26:8, 27:6
**Asia** [2] - 49:24,
60:24
**aside** [3] - 8:25, 9:3,
50:12
**asserted** [2] - 4:23,
5:2
**assist** [1] - 72:16
**Assistant** [1] - 42:9
**associated** [1] - 86:3
**assume** [1] - 13:17
**assumed** [1] - 96:18
**assumes** [1] - 43:20
**assuming** [5] -
23:24, 31:15, 57:25,
89:21, 97:9
**athletes** [2] - 70:8,
70:10
**attached** [4] - 91:15,
91:25, 97:15, 100:1
**attachment** [4] -
37:19, 37:20, 91:16,
92:6
**attend** [14] - 62:16,
62:17, 63:1, 72:17,
74:11, 74:21, 74:23,
75:20, 75:25, 76:15,
76:17, 81:11, 81:14,
88:7
**attendance** [1] -
77:17
**attended** [2] - 60:6,
77:5
**attending** [1] - 62:20,
75:21
**attention** [5] - 16:25,
26:11, 31:2, 68:24,

95:22
**attorney** [16] - 14:1,
14:5, 14:7, 14:10,
14:25, 15:13, 24:9,
24:15, 24:17, 25:4,
43:5, 43:15, 44:3,
44:8, 44:23, 44:25
**attorney-client** [14] -
14:5, 14:7, 14:10,
14:25, 15:13, 24:9,
24:15, 24:17, 25:4,
43:5, 43:15, 44:3,
44:8, 44:23
**attorneys** [5] - 14:16,
56:21, 57:2, 58:20,
58:21
**August** [3] - 13:10,
13:15
**available** [4] - 4:13,
4:18, 4:22, 96:5
**Avenue** [5] - 1:15,
1:19, 2:3, 2:7, 108:14
**avoid** [2] - 14:10,
24:18
**aware** [15] - 6:24,
7:2, 8:19, 13:25,
17:16, 23:16, 34:3,
34:19, 35:3, 35:10,
36:2, 37:11, 48:3,
91:5, 91:8
**awareness** [1] -
49:12

# B

**background** [2] -
56:5, 60:4
**bad** [1] - 80:18
**bag** [1] - 28:22
**Bangkok** [1] - 42:22
**based** [13] - 14:24,
45:17, 46:14, 48:3,
49:23, 53:4, 67:21,
84:17, 86:4, 87:19,
101:12, 105:9, 105:11
**basis** [3] - 4:9, 103:9
**bear** [1] - 88:17
**became** [7] - 6:23,
7:2, 13:25, 34:3,
34:19, 35:10, 60:22
**become** [4] - 32:22,
33:20, 35:3, 37:11
**BEFORE** [1] - 1:10
**began** [3] - 7:9, 7:11,
9:2
**begin** [1] - 95:23
**beginning** [1] -
31:17, 96:8, 96:16
**begun** [1] - 9:3

**behalf** [2] - 64:10,
75:25
**behavior** [1] - 54:24
**behind** [3] - 8:14,
65:21, 65:24
**belief** [1] - 13:20
**belonging** [1] - 49:17
**below** [2] - 58:19,
58:20
**benefit** [1] - 36:19
**benefited** [1] - 46:15
**best** [2] - 101:13,
108:7
**bestowed** [2] -
65:16, 67:4
**better** [8] - 12:8,
62:21, 78:13, 78:15,
78:16, 79:13, 79:14,
85:5
**between** [15] - 26:12,
34:4, 34:20, 40:12,
40:20, 44:23, 45:12,
45:18, 61:3, 70:5,
70:20, 71:12, 71:16,
88:19, 90:3
**beyond** [5] - 51:16,
64:19, 76:10, 76:16,
101:5
**big** [2] - 71:24, 74:2
**bit** [6] - 16:7, 59:19,
60:3, 67:15, 83:10,
90:2
**black** [1] - 91:14
**blah** [3] - 105:24
**boarded** [1] - 20:21
**Border** [2] - 20:17,
23:9
**border** [2] - 24:7,
24:20
**bottom** [1] - 36:23
**Boulevard** [1] - 1:23
**Brandon** [1] - 56:21
**break** [4] - 5:20,
51:21, 52:25, 94:9
**brief** [1] - 60:18
**briefly** [5] - 60:17,
67:16, 70:3, 73:11,
90:4
**bring** [7] - 66:12,
72:23, 84:19, 87:11,
94:11, 94:20, 105:16
**bringing** [10] - 24:3,
82:19, 82:23, 85:7,
85:8, 87:5, 89:18,
91:5, 91:8, 106:7
**brother** [1] - 70:5
**brought** [3] - 12:14,
82:6, 86:11
**building** [1] - 70:4
**bunch** [1] - 44:5

**bundler** [1] - 62:4
**bundling** [1] - 66:9
**Business** [1] - 60:7
**business** [2] - 60:22,
74:2
**businesses** [4] -
60:11, 60:13, 60:14,
60:17
**BY** [65] - 2:5, 6:22,
9:9, 11:12, 15:22,
18:17, 19:5, 19:19,
20:6, 21:16, 21:24,
22:5, 22:13, 23:5,
23:22, 24:6, 27:4,
29:23, 30:6, 31:1,
31:5, 32:1, 32:6,
33:17, 34:1, 34:12,
34:24, 36:1, 36:8,
36:15, 37:5, 37:15,
38:22, 39:2, 39:19,
40:6, 40:24, 41:14,
42:7, 42:19, 43:17,
44:18, 45:6, 46:13,
47:1, 48:17, 49:22,
50:19, 51:11, 55:19,
56:18, 58:5, 58:12,
59:22, 62:14, 66:6,
75:18, 77:13, 86:8,
86:21, 88:16, 90:15,
93:7, 93:20, 93:24
**bye** [1] - 69:8

# C

**calculus** [1] - 87:20
**California** [1] - 1:23
**campaign** [79] -
56:11, 61:11, 61:17,
61:19, 61:23, 62:3,
62:5, 62:10, 62:13,
62:16, 63:7, 63:12,
63:15, 63:20, 64:3,
64:6, 64:15, 64:18,
64:23, 65:6, 65:9,
65:12, 66:7, 66:8,
66:12, 67:5, 67:8,
67:10, 67:12, 68:6,
68:8, 68:15, 68:22,
69:21, 69:23, 70:9,
70:10, 70:23, 71:9,
71:11, 71:21, 74:15,
74:16, 74:22, 75:10,
75:24, 76:15, 78:1,
78:4, 78:8, 78:19,
79:10, 79:17, 79:21,
80:8, 80:13, 80:15,
81:6, 81:7, 81:17,
83:23, 84:7, 84:8,
85:8, 85:17, 85:20,
85:22, 85:25, 86:2,

86:10, 86:23, 87:2, 87:23, 89:12, 91:22, 92:11
**Campaign** [1] - 56:11
**campaigns** [1] - 62:9
**Campbell** [4] - 11:14, 39:1, 40:16, 88:14
**candidate** [5] - 63:5, 65:5, 69:15, 72:1
**cannot** [4] - 5:10, 28:2, 75:16, 79:12
**Capital** [1] - 61:1
**card** [2] - 91:22, 92:24
**care** [1] - 94:13
**careful** [1] - 46:11
**case** [11] - 4:14, 14:19, 43:12, 44:20, 53:25, 54:7, 54:9, 57:20, 86:1, 94:15, 95:15
**caught** [1] - 28:22
**celebrate** [1] - 100:21
**CEO** [2] - 60:14, 73:16
**certain** [3] - 5:9, 27:19, 41:5
**certainly** [11] - 12:21, 24:14, 24:17, 25:15, 30:20, 44:6, 44:10, 48:3, 50:23, 101:5, 104:22
**CERTIFICATE** [1] - 108:1
**certify** [1] - 108:4
**cetera** [1] - 48:10
**chair** [4] - 65:18, 65:22, 65:24, 67:4
**challenge** [2] - 105:3, 105:4
**challenged** [1] - 105:2
**chambers** [2] - 102:1, 102:22
**chances** [1] - 84:13
**change** [1] - 89:25
**changed** [1] - 90:2
**changes** [1] - 102:2
**changing** [1] - 41:16
**characterization** [1] - 8:11
**characterize** [1] - 14:3
**Charge** [1] - 42:9
**CHARLES** [2] - 2:2, 2:2
**check** [20] - 30:8, 74:15, 74:16, 75:10,

75:11, 75:17, 76:23, 76:24, 77:2, 78:23, 78:25, 79:9, 79:24, 80:9, 80:12, 80:14, 80:16, 92:24, 100:16, 102:25
**checks** [9] - 62:12, 63:8, 68:11, 76:16, 81:25, 86:7, 87:14, 87:16, 89:19
**Chicago** [1] - 66:20
**chief** [2] - 53:25, 60:14
**Chinese** [8] - 10:18, 45:13, 45:18, 45:20, 45:24, 50:2, 50:6, 50:9
**choose** [1] - 106:22
**CIA** [1] - 60:20
**citizen** [2] - 77:6, 77:7
**citizens** [1] - 68:14
**city** [1] - 56:3
**claiming** [1] - 103:14
**clarification** [2] - 28:21, 101:16
**clarify** [1] - 52:20
**cleaner** [1] - 92:1
**clear** [8] - 14:6, 34:16, 64:19, 70:22, 77:21, 79:20, 86:14, 97:21
**cleared** [2] - 68:17
**clearer** [1] - 8:2
**clearly** [1] - 18:22
**CLERK** [1] - 102:25
**clerk** [1] - 103:1
**client** [14] - 14:5, 14:7, 14:10, 14:25, 15:13, 24:9, 24:15, 24:17, 25:4, 43:5, 43:15, 44:3, 44:8, 44:23
**close** [2] - 73:21, 102:13
**closed** [1] - 34:13
**closely** [1] - 87:15
**closing** [2] - 99:15, 106:12
**closings** [3] - 100:4, 100:7, 102:13
**club** [1] - 90:18
**co** [2] - 46:2, 46:16
**co-conspirators** [2] - 46:2, 46:16
**COLLEEN** [1] - 1:10
**college** [1] - 60:4
**College** [1] - 60:7
**Colorado** [1] - 69:16
**Columbia** [2] - 2:7,

108:13
**COLUMBIA** [1] - 1:1
**coming** [2] - 19:1, 72:25
**comment** [1] - 28:17
**comments** [1] - 40:5
**Commission** [1] - 64:16
**commit** [1] - 45:1
**communicate** [3] - 15:24, 63:19, 68:8
**communicated** [1] - 71:20
**communication** [5] - 16:15, 27:1, 51:4, 51:13, 67:10
**communications** [5] - 16:18, 50:5, 50:9, 50:11, 79:19
**companies** [1] - 61:6
**company** [6] - 60:20, 60:25, 61:2, 61:7, 62:2, 73:18
**compared** [1] - 47:23
**comparison** [1] - 48:8
**complete** [1] - 108:6
**completely** [1] - 59:3
**computer** [1] - 60:19
**Concepts** [1] - 60:19
**concern** [1] - 97:20
**concerned** [3] - 29:15, 96:24, 103:5
**concerns** [1] - 29:13
**concluded** [1] - 107:19
**concluding** [1] - 102:14
**conditions** [1] - 59:25
**conduct** [5] - 46:2, 46:15, 47:22, 47:24
**conducted** [1] - 29:4
**confer** [1] - 87:10
**confirm** [2] - 9:1, 22:24
**confirmed** [3] - 23:19, 40:23, 41:1
**conflict** [5] - 28:11, 28:19, 34:4, 34:20, 35:1
**confronted** [1] - 25:2
**confusion** [1] - 41:10
**connected** [1] - 95:14
**connection** [4] - 22:15, 34:2, 34:19, 56:12
**consent** [1] - 25:2
**consider** [1] - 87:3

**consideration** [2] - 54:20, 84:23
**considered** [2] - 4:17, 54:21
**conspirators** [2] - 46:2, 46:16
**constant** [1] - 51:3
**constitutes** [1] - 108:4
**Constitution** [2] - 2:7, 108:14
**consult** [3] - 57:1, 76:14, 87:3
**CONT'D** [1] - 2:1
**contact** [9] - 7:12, 40:12, 40:20, 40:23, 40:25, 51:1, 67:12, 67:16, 70:13
**contacts** [3] - 50:20, 71:14, 71:17
**contain** [1] - 24:16
**content** [3] - 24:3, 38:12, 39:17
**contents** [3] - 18:22, 38:8, 38:21
**context** [5] - 10:9, 31:8, 78:25, 95:19, 96:25
**continuation** [1] - 31:9
**continue** [1] - 28:15
**CONTINUED** [1] - 6:21
**continued** [2] - 28:8, 51:13
**contradicts** [1] - 30:21
**contribute** [2] - 64:2, 77:22
**contributed** [1] - 64:14
**contribution** [3] - 75:22, 79:2, 92:14
**contributions** [2] - 64:6, 64:10
**contributors** [1] - 64:13
**convention** [5] - 69:4, 69:6, 69:10, 69:14
**Convention** [2] - 69:12, 69:13
**conversation** [9] - 35:13, 35:18, 77:3, 77:19, 77:24, 78:22, 78:24, 79:7, 79:15
**conversations** [3] - 82:8, 83:6, 83:11
**Cook** [3] - 103:23, 104:12, 104:15

**cook** [2] - 104:9, 104:13
**cooperate** [1] - 28:8
**copy** [7] - 24:19, 24:22, 58:13, 89:10, 89:24, 92:1, 92:5
**corner** [1] - 58:17
**correct** [56] - 4:7, 5:10, 8:5, 8:6, 8:23, 12:16, 12:17, 14:2, 17:18, 21:1, 22:15, 23:20, 25:12, 25:18, 26:20, 26:21, 26:25, 29:5, 29:9, 36:4, 44:11, 44:24, 45:22, 48:22, 49:8, 50:22, 51:14, 56:24, 57:21, 57:22, 58:10, 61:11, 61:24, 62:18, 63:15, 64:8, 64:12, 64:25, 65:14, 66:13, 66:14, 74:8, 75:23, 77:22, 77:23, 78:21, 80:3, 82:16, 82:21, 82:24, 85:14, 88:2, 90:12, 92:3, 92:11
**Correct** [1] - 26:23
**correctly** [1] - 10:15
**correspond** [1] - 97:22
**correspondence** [1] - 19:7
**cost** [1] - 72:14
**counsel** [11] - 10:23, 15:12, 19:12, 29:6, 36:9, 40:4, 52:20, 56:19, 98:13, 103:8, 103:17
**count** [2] - 16:17, 96:9
**counted** [2] - 86:4, 87:13
**counting** [1] - 16:22
**country** [5] - 65:25, 66:19, 86:17, 86:19, 86:22
**counts** [1] - 21:11
**couple** [7] - 6:1, 18:1, 58:24, 94:21, 95:13, 97:12, 97:16
**course** [14] - 11:4, 16:11, 42:14, 59:4, 63:13, 63:21, 67:14, 68:10, 71:10, 72:3, 76:18, 83:9, 84:4, 92:20
**Court** [11] - 2:6, 2:6, 5:4, 10:23, 19:12, 36:10, 98:12, 99:14, 103:12, 108:12,

108:13

**COURT** [169] - 1:1, 4:4, 5:17, 5:19, 5:23, 6:3, 6:7, 6:13, 6:16, 9:6, 10:25, 11:2, 11:7, 11:9, 14:24, 15:3, 15:8, 15:12, 15:17, 18:15, 18:21, 18:25, 19:3, 19:14, 19:16, 20:2, 21:10, 21:21, 22:4, 22:10, 23:2, 24:1, 27:3, 27:14, 27:18, 27:21, 28:4, 28:23, 29:7, 29:22, 30:4, 30:12, 30:15, 30:17, 30:21, 30:24, 31:4, 31:10, 31:13, 31:17, 31:22, 32:5, 32:8, 32:12, 32:16, 32:24, 33:11, 33:15, 33:24, 34:9, 34:15, 35:17, 35:23, 36:13, 37:13, 37:24, 38:2, 38:7, 38:11, 38:18, 38:24, 39:6, 39:13, 40:4, 41:3, 41:8, 41:13, 42:4, 42:16, 43:21, 43:23, 44:2, 44:17, 45:3, 46:9, 46:22, 47:9, 47:12, 47:15, 47:18, 48:2, 49:20, 50:15, 50:17, 51:9, 51:16, 51:19, 51:21, 52:1, 52:3, 52:6, 52:8, 52:11, 52:16, 52:25, 53:3, 53:10, 53:16, 53:20, 53:22, 55:9, 57:25, 58:4, 58:11, 59:18, 59:21, 88:13, 94:4, 94:8, 94:18, 94:20, 94:25, 95:3, 95:18, 95:21, 96:7, 96:22, 97:2, 97:15, 97:19, 97:24, 98:1, 98:22, 98:25, 99:6, 99:10, 99:16, 99:20, 100:10, 100:14, 100:16, 100:19, 100:23, 101:9, 101:19, 102:16, 102:24, 103:1, 103:5, 103:21, 104:3, 104:5, 104:7, 104:9, 104:12, 104:14, 104:16, 104:18, 104:21, 105:7, 105:14, 105:22, 106:14, 106:16, 107:2, 107:5, 107:12, 107:15, 107:18

**court** [14] - 5:1, 5:3, 5:7, 15:21, 18:23, 22:12, 29:17, 29:21, 33:14, 44:11, 44:16, 48:16, 98:8, 99:23
**Court's** [1] - 101:16
**COURTROOM** [4] - 30:11, 100:9, 100:13, 100:15
**courtroom** [8] - 5:7, 6:9, 6:11, 51:24, 53:18, 94:16, 94:23, 94:24
**cover** [3] - 28:10, 32:19, 34:13
**covered** [3] - 29:2, 97:10, 105:2
**covering** [2] - 9:10, 9:15
**craft** [1] - 18:10
**credibility** [1] - 54:20
**credit** [2] - 91:22, 92:24
**crew** [1] - 91:7
**crime** [3] - 43:12, 44:20, 57:14
**crimes** [1] - 45:1
**Criminal** [1] - 1:3
**criminal** [2] - 43:14, 44:22
**criteria** [3] - 84:18, 85:10, 85:12
**Cross** [1] - 3:3
**cross** [8] - 4:13, 29:4, 42:4, 46:8, 46:11, 51:8, 106:25, 107:10
**CROSS** [1] - 42:6
**cross-examination** [3] - 29:4, 46:8, 51:8
**CROSS-EXAMINATION** [1] - 42:6
**cross-examined** [1] - 4:13
**CRR** [3] - 2:5, 108:3, 108:12
**Customs** [4] - 20:17, 21:3, 24:14, 25:23

# D

**D.C** [13] - 1:6, 1:16, 1:20, 2:4, 2:8, 26:23, 26:24, 56:4, 66:20, 81:9, 81:10, 81:22, 108:14
**danger** [1] - 28:7
**Dartmouth** [1] - 60:7

**date** [39] - 7:3, 9:4, 17:1, 17:19, 17:20, 17:25, 18:5, 18:8, 19:1, 19:14, 20:3, 20:4, 20:7, 20:25, 22:23, 23:2, 35:7, 35:11, 38:3, 38:11, 38:20, 38:23, 39:4, 39:14, 39:18, 39:20, 39:21, 39:24, 39:25, 40:1, 40:7, 40:22, 59:15, 67:18, 68:1, 89:12, 106:17
**dated** [3] - 36:10, 59:13, 88:20
**Dated** [1] - 108:10
**dates** [5] - 41:11, 41:16, 62:10, 63:22, 105:15
**DAVID** [1] - 1:21
**days** [4] - 4:10, 18:1, 20:19, 81:21
**dead** [1] - 4:15
**deal** [1] - 71:24
**dealings** [1] - 79:19
**dealt** [2] - 33:12, 92:13
**December** [5] - 40:11, 41:20, 41:23, 41:24
**decide** [1] - 28:1
**decided** [1] - 14:9
**decision** [7] - 15:7, 84:17, 85:2, 85:11, 85:13, 103:9, 107:8
**decisions** [1] - 67:20
**deemed** [1] - 25:6
**Defendant** [2] - 1:7, 47:24
**DEFENDANT** [3] - 1:21, 2:2, 3:4
**Defendant's** [3] - 12:3, 19:11, 36:11
**Defense** [2] - 30:9, 40:15
**defense** [11] - 22:25, 30:3, 36:6, 55:6, 99:14, 101:12, 101:14, 102:12, 103:6, 103:12, 103:17
**DEFENSE** [1] - 6:20
**definitely** [2] - 78:2, 84:22
**definition** [2] - 8:2, 10:1
**degree** [1] - 59:9, 60:6
**delete** [2] - 98:11, 98:18
**deleted** [3] - 25:10,

25:12
**Democratic** [2] - 69:12, 69:13
**DEPARTMENT** [2] - 1:15, 1:18
**Department** [7] - 7:17, 34:4, 34:20, 37:8, 37:12, 38:4, 39:5
**deposition** [1] - 53:4
**deputy** [3] - 57:3, 93:9, 94:23
**DEPUTY** [4] - 30:11, 100:9, 100:13, 100:15
**describing** [1] - 92:6
**detail** [4] - 72:10, 72:12, 91:19
**details** [2] - 37:10, 60:16
**determination** [1] - 37:6
**determine** [2] - 14:17, 48:23
**develop** [1] - 12:19
**developed** [1] - 12:22
**Dhabi** [2] - 73:17, 77:7
**different** [9] - 15:13, 15:17, 58:1, 61:6, 83:20, 86:1, 95:15, 97:4, 100:24
**difficulties** [1] - 48:9
**dinner** [8] - 69:20, 69:24, 70:14, 70:15, 70:20, 71:13, 71:17, 71:19
**diplomat** [4] - 84:10, 84:11, 84:14, 85:6
**DIRECT** [2] - 6:21, 55:18
**Direct** [1] - 3:3
**direct** [4] - 23:9, 47:21, 66:2, 104:4
**directing** [3] - 16:25, 26:11, 31:2
**direction** [1] - 30:1
**directly** [3] - 17:14, 25:6, 59:9
**discuss** [6] - 43:23, 44:12, 47:15, 96:15, 101:18, 102:6
**discussed** [5] - 8:21, 70:19, 72:10, 72:13, 72:25
**discussion** [2] - 32:8, 104:22
**discussions** [4] - 12:23, 13:1, 82:11, 102:1

**displaying** [1] - 38:17
**DISTRICT** [3] - 1:1, 1:1, 1:11
**district** [1] - 108:13
**District** [3] - 2:6, 2:7, 108:13
**DNC** [2] - 69:11, 69:16
**docket** [1] - 99:8
**docketed** [1] - 95:5
**document** [15] - 11:23, 12:3, 19:20, 19:25, 21:23, 31:12, 31:14, 36:9, 36:20, 37:10, 37:12, 38:15, 38:19, 39:3, 40:7
**documentation** [1] - 80:24
**documenting** [1] - 18:6
**documents** [9] - 13:11, 13:16, 13:19, 18:22, 43:8, 50:5, 50:9, 50:13, 89:3
**DOJ** [6] - 28:10, 28:12, 28:20, 35:6, 35:7, 66:3
**donate** [3] - 64:2, 75:16, 77:22
**donated** [1] - 65:3
**donating** [1] - 78:18
**donation** [2] - 80:2, 92:21
**donations** [5] - 62:16, 63:12, 64:6, 64:9, 66:23
**done** [7] - 66:9, 67:22, 68:4, 95:25, 100:23, 102:18, 103:6
**donor** [2] - 80:23, 88:6
**donors** [9] - 62:15, 64:5, 66:12, 66:18, 68:21, 72:16, 72:22, 82:19, 82:23
**door** [1] - 43:22
**Dorothy** [1] - 94:21
**double** [1] - 100:16
**double-check** [1] - 100:16
**down** [21] - 6:13, 11:14, 33:4, 37:13, 45:3, 51:19, 52:1, 52:8, 55:9, 56:23, 59:5, 59:19, 72:8, 79:1, 82:14, 82:15, 94:18, 95:8, 98:9, 100:19
**Downtown** [1] -

26:24
draw [3] - 63:3, 63:4, 63:8
drive [1] - 47:22
drop [2] - 48:25, 59:5
dual [1] - 77:7
due [1] - 18:18
during [10] - 12:5, 54:3, 66:7, 66:25, 67:9, 70:6, 79:15, 79:19, 105:13
DuSable [1] - 61:1

# E

early [2] - 8:16, 17:24
earn [1] - 85:20
easy [2] - 101:22, 105:23
education [1] - 60:5
educational [1] - 60:4
EDWARDS [2] - 2:5, 108:3
Edwards [1] - 108:12
effect [1] - 78:10
efforts [1] - 66:9
Eid [1] - 100:21
either [11] - 14:16, 15:24, 17:14, 22:19, 43:7, 54:25, 77:16, 96:17, 98:24, 101:14, 102:18
election [4] - 49:6, 49:11, 56:11, 56:13
Election [2] - 56:12, 64:16
elections [1] - 70:21
electronic [1] - 51:1
email [21] - 15:25, 18:9, 18:10, 18:11, 18:18, 20:7, 21:17, 21:25, 22:6, 23:19, 23:25, 24:1, 24:4, 25:24, 26:2, 50:6, 88:19, 88:25, 89:7
emails [3] - 29:16, 49:17, 50:10
embassy [3] - 10:16, 10:19, 45:23
employed [1] - 60:9
employees [1] - 27:25
employer [1] - 92:9
employment [1] - 28:3
Encino [1] - 1:23
end [3] - 5:15, 101:14, 102:2

endeavor [1] - 65:17
enforcement [1] - 42:14
engagement [1] - 13:5
engineering [1] - 60:6
ensure [1] - 14:6
entered [4] - 6:9, 6:11, 53:18, 94:23
entertainers [2] - 70:8, 70:11
entire [8] - 25:17, 31:12, 31:13, 33:6, 39:11, 50:8, 65:25, 77:15
entirety [1] - 25:9
entitled [5] - 47:22, 54:19, 56:8, 56:14, 57:2
equation [1] - 84:25
equity [1] - 60:23
escapes [1] - 70:1
ESQ [6] - 1:14, 1:17, 1:18, 1:21, 1:22, 2:2
essentially [3] - 26:8, 67:2, 92:1
establish [1] - 37:2
established [5] - 12:21, 14:15, 15:11, 20:16, 40:18
establishing [2] - 7:3, 49:24
estimate [2] - 101:13, 106:25
et [1] - 48:10
evening [3] - 94:9, 105:18, 106:19
event [66] - 7:1, 62:20, 62:21, 67:25, 68:16, 71:23, 71:25, 72:2, 72:6, 72:7, 72:8, 72:15, 72:17, 72:19, 72:22, 72:24, 73:1, 74:8, 74:11, 75:20, 75:21, 76:1, 76:2, 76:4, 76:17, 77:5, 77:17, 77:25, 81:5, 81:6, 81:8, 81:11, 81:13, 81:18, 81:19, 82:1, 82:3, 82:5, 82:6, 82:9, 82:12, 82:16, 82:19, 82:23, 83:7, 83:15, 83:17, 86:4, 86:5, 86:6, 86:11, 87:13, 87:15, 87:21, 87:25, 88:4, 89:10, 89:12, 89:21, 90:3, 90:6, 90:20, 90:24, 91:6, 91:9, 91:23

events [11] - 62:4, 62:15, 62:16, 62:17, 63:1, 63:11, 66:12, 66:17, 66:18, 88:7
evidence [9] - 23:24, 23:25, 43:20, 53:23, 94:12, 97:8, 98:6, 102:14, 103:10
exact [2] - 18:5, 88:9
exactly [9] - 10:20, 34:15, 38:2, 41:9, 55:11, 65:1, 79:2, 83:18, 105:17
EXAMINATION [4] - 6:21, 42:6, 50:18, 55:18
examination [3] - 29:4, 46:8, 51:8
examined [1] - 4:13
example [3] - 16:20, 16:21, 85:19
examples [1] - 68:19
exception [4] - 4:8, 4:23, 5:8
excerpts [1] - 52:21
excessive [2] - 16:7, 16:8
exchange [1] - 78:23
exchanges [1] - 16:22
excluded [1] - 32:25
excuse [6] - 42:9, 43:23, 57:3, 75:4, 93:10, 101:2
excused [3] - 52:2, 93:17, 107:18
executed [3] - 13:13, 25:2, 59:23
executive [2] - 60:8, 60:14
exempted [1] - 4:16
exhausted [1] - 40:18
exhibit [13] - 22:25, 36:7, 38:16, 39:10, 88:11, 95:1, 95:6, 95:13, 97:5, 97:7, 98:5, 98:7
Exhibit [10] - 10:23, 12:3, 19:11, 23:1, 30:9, 30:14, 31:3, 36:11, 37:22, 37:23, 38:16, 40:16, 57:24, 88:15, 98:13, 98:19, 98:21
Exhibits [1] - 98:19
exhibits [7] - 95:13, 96:24, 97:7, 97:8, 97:9, 98:14, 98:20
exist [1] - 14:7

existed [1] - 89:25
exited [2] - 51:24, 94:16
experience [1] - 63:25
explain [2] - 52:16, 61:25
explaining [2] - 33:6, 33:7
explanation [1] - 33:2
explicitly [2] - 73:10
exploring [1] - 29:6
express [1] - 79:16
extend [1] - 60:1
extensive [1] - 29:3
extensively [1] - 105:1
extent [2] - 38:14, 98:16
extra [1] - 6:2
extraordinary [1] - 5:24
extremely [1] - 104:2

# F

fact [3] - 26:22, 72:16, 87:8
factors [1] - 85:16
facts [3] - 23:24, 43:20, 87:7
fair [2] - 8:11, 9:15
familiar [3] - 27:9, 29:11, 33:2
family [2] - 60:12, 100:25
far [6] - 14:6, 83:22, 99:25, 101:20, 101:24, 103:5
fast [1] - 101:7
fates [1] - 106:16
fax [1] - 92:25
FBI [1] - 60:20
FEC [1] - 64:20
federal [1] - 80:11
Federal [3] - 56:11, 64:16, 80:17
few [2] - 21:5, 31:2
field [1] - 70:7
figure [2] - 8:18, 84:25
file [2] - 64:24, 99:7
filed [1] - 64:21, 95:4, 95:5
filter [8] - 14:15, 25:5, 25:11, 43:11, 44:6, 44:12, 44:19
final [1] - 103:9

finally [1] - 103:16
finance [7] - 65:18, 65:22, 65:24, 84:20, 85:1, 85:6, 85:8
finances [1] - 47:8
financial [2] - 47:14, 47:20, 47:21
financially [1] - 46:15
fine [2] - 79:5, 98:3
finish [1] - 11:9
finished [2] - 31:23, 99:16
FIRM [1] - 1:22
firm [3] - 8:10, 60:23, 61:4
first [10] - 5:6, 8:3, 23:14, 31:6, 66:25, 69:3, 69:17, 69:18, 71:16, 89:14
fit [1] - 51:23
fix [1] - 4:21
flagged [2] - 20:19, 24:16
flew [1] - 18:3
flight [3] - 20:21, 20:23, 21:18
float [1] - 103:7
Florida [1] - 66:20
fly [2] - 18:19, 21:4
focus [3] - 8:17, 9:25, 96:11
focused [1] - 9:23
folks [15] - 62:11, 62:12, 63:8, 68:10, 69:22, 70:11, 70:25, 72:7, 72:23, 84:7, 84:17, 89:14, 89:19, 89:20, 93:1
follow [2] - 27:8, 42:15
follow-on [1] - 27:8
followed [1] - 10:3
following [28] - 6:6, 6:10, 6:12, 15:4, 15:20, 19:6, 20:15, 20:22, 21:6, 21:9, 21:12, 21:14, 21:15, 27:16, 29:20, 32:10, 33:13, 42:12, 43:25, 44:15, 47:16, 48:15, 51:25, 53:2, 53:19, 94:17, 94:24
FOLLOWS [1] - 55:17
followup [1] - 12:15
FOR [5] - 1:1, 1:14, 1:21, 2:2, 3:4
foregoing [1] - 108:4
foreign [8] - 64:2,

74:14, 74:17, 74:18,
75:16, 76:8, 76:22,
77:22
  **foremost** [1] - 23:15
  **foreperson** [6] -
57:3, 93:9, 101:21,
105:24
  **forgot** [1] - 91:24
  **form** [6] - 91:11,
91:15, 92:6, 92:10,
92:23, 97:15
  **formal** [4] - 32:17,
33:5, 33:8, 33:9
  **former** [2] - 7:25,
12:12
  **forth** [1] - 68:5
  **forward** [2] - 6:8,
28:18
  **four** [1] - 98:20
  **Fox** [1] - 56:21
  **Frank** [9] - 3:6, 52:4,
53:24, 55:6, 56:2,
69:7, 90:5, 97:22,
98:2
  **FRANK** [1] - 55:16
  **frankly** [10] - 5:25,
61:5, 69:17, 70:11,
72:11, 74:3, 80:21,
84:13, 101:25, 102:5
  **fraud** [2] - 43:12,
44:20
  **frequently** [2] - 14:1,
14:4
  **Friday** [3] - 99:22,
100:24, 102:15
  **friend** [6] - 69:20,
73:16, 73:21, 73:25,
74:4, 90:16
  **friends** [3] - 74:6,
81:20, 91:7
  **front** [4] - 4:4, 5:4,
5:15, 58:7
  **full** [2] - 55:25, 108:5
  **fully** [1] - 37:20
  **fund** [1] - 73:17
  **fundraiser** [2] - 64:1,
86:3
  **fundraisers** [2] -
86:15, 87:4
  **fundraising** [5] -
65:17, 66:9, 74:11,
84:20, 85:20
  **funds** [1] - 79:14
  **funnel** [2] - 49:6,
49:10
  **furtherance** [1] -
62:1
  **future** [2] - 12:23,
13:1
  **FW-1** [2] - 57:24,

89:23
  **FW-2** [1] - 88:15

## G

  **Garrity** [3] - 27:10,
27:18, 29:8
  **GARRITY** [1] - 27:10
  **general** [1] - 83:13
  **General** [1] - 104:8
  **generally** [7] - 5:1,
57:6, 57:12, 91:18,
91:19, 96:7, 96:14
  **George** [4] - 6:24,
9:3, 40:13, 45:13
  **Giuliani** [4] - 7:25,
8:22, 12:13
  **Giuliani's** [1] - 8:9
  **given** [6] - 4:25, 5:8,
36:20, 52:18, 55:2,
81:21
  **gleaned** [1] - 23:14
  **gmail** [3] - 13:13,
13:14, 13:16
  **Google** [3] - 13:11,
13:18, 14:8
  **Government** [11] -
30:18, 43:11, 46:10,
48:25, 58:14, 59:7,
59:8, 59:15, 80:17,
89:4, 102:12
  **government** [7] -
32:23, 33:7, 45:21,
50:2, 50:6, 50:9,
80:13
  **GOVERNMENT** [1] -
1:14
  **Government's** [4] -
4:14, 98:18, 98:19,
98:21
  **Grand** [2] - 57:24,
88:14
  **grand** [29] - 54:3,
54:4, 54:6, 54:11,
54:16, 54:18, 56:8,
57:6, 57:7, 57:8,
57:12, 57:19, 60:3,
61:25, 69:2, 70:19,
73:7, 82:11, 83:10,
94:25, 95:10, 97:5,
97:6, 97:22, 98:2,
98:7, 98:12, 98:14,
98:20
  **great** [5] - 72:10,
82:1, 91:18, 106:14
  **Great** [1] - 70:6
  **grounds** [1] - 22:4
  **group** [1] - 77:5
  **grown** [1] - 60:10,

60:11
  **guarantee** [1] - 85:2
  **guard** [2] - 70:5, 70:8
  **guess** [4] - 12:22,
35:23, 97:20, 102:12
  **guest** [1] - 62:20
  **Guo** [1] - 49:18
  **guy** [5] - 73:18,
73:23, 74:2, 80:9,
85:8
  **guys** [3] - 69:21,
72:25, 92:13

## H

  **Haiti** [1] - 84:12
  **halfway** [1] - 94:7
  **hallway** [1] - 56:23
  **hand** [1] - 58:17
  **happy** [1] - 102:16
  **hard** [5] - 40:3,
67:19, 71:25, 84:18
  **HARRY** [1] - 6:20
  **Harry** [1] - 3:5
  **HASKELL** [4] - 2:2,
2:3, 102:21, 103:4
  **hate** [1] - 27:9
  **headliner** [1] - 62:21
  **heads** [1] - 20:18
  **heads-up** [1] - 20:18
  **hear** [6] - 7:15,
21:14, 30:4, 53:14,
71:4, 100:6
  **heard** [1] - 8:24
  **hearing** [1] - 4:3
  **hearsay** [9] - 4:8,
4:25, 5:1, 18:20,
18:22, 22:2, 33:22,
34:16, 38:7
  **held** [1] - 69:14
  **hello** [1] - 69:9
  **help** [15] - 5:23, 41:4,
45:1, 48:24, 62:15,
68:11, 69:22, 70:25,
71:6, 71:10, 72:9,
79:12, 91:3, 103:7,
106:24
  **helped** [8] - 61:16,
65:13, 65:20, 70:10,
85:20, 87:11, 90:25,
91:1
  **helpful** [3] - 20:5,
103:11, 106:4
  **helping** [7] - 61:9,
63:10, 66:11, 66:17,
66:18, 87:5, 102:17
  **helps** [1] - 85:1
  **hereby** [1] - 108:3
  **Heuchling** [10] -

19:7, 19:9, 19:24,
20:9, 20:16, 20:25,
21:2, 21:6, 22:18,
32:4
  **hi** [4] - 55:21, 69:8,
93:22, 94:1
  **Hi** [1] - 69:7
  **hi-and-bye** [1] - 69:8
  **Higginbotham** [101] -
4:10, 4:13, 4:21, 5:12,
6:24, 7:4, 7:7, 7:10,
7:12, 7:19, 8:4, 8:13,
8:25, 9:3, 9:11, 9:14,
10:11, 12:16, 12:18,
13:3, 13:21, 13:25,
14:20, 15:1, 15:15,
15:24, 17:2, 17:10,
17:15, 17:16, 17:20,
18:2, 19:7, 20:22,
22:16, 22:21, 23:3,
23:7, 23:10, 24:7,
24:12, 24:21, 25:2,
25:9, 25:22, 26:7,
26:13, 26:15, 27:2,
28:7, 28:10, 28:16,
28:20, 28:25, 29:1,
29:3, 29:10, 29:13,
29:14, 29:25, 33:1,
33:10, 33:18, 33:25,
34:6, 34:9, 34:13,
34:17, 34:22, 35:4,
36:3, 36:18, 37:7,
40:13, 40:21, 41:2,
41:17, 41:22, 41:25,
43:14, 44:22, 45:13,
45:18, 45:23, 46:4,
47:5, 47:21, 47:23,
48:5, 48:21, 48:24,
49:9, 49:13, 50:21,
51:12, 104:20, 105:5,
105:16, 106:6, 106:19
  **Higginbotham's** [4] -
10:15, 43:6, 47:20,
50:10
  **higher** [1] - 60:5
  **highest** [1] - 86:15
  **highlight** [1] - 105:1
  **himself** [3] - 14:1,
78:18, 79:10
  **hits** [3] - 20:16, 21:2,
21:12
  **hmm** [1] - 58:20
  **hold** [3] - 11:20,
30:7, 63:16
  **holds** [1] - 69:14
  **home** [6] - 81:17,
82:16, 88:1, 88:5,
90:6, 101:17
  **Homeland** [1] -
60:20

  **honest** [2] - 59:3,
71:5
  **honestly** [2] - 60:10,
92:16
  **Hong** [1] - 43:1
  **Honor** [79] - 4:1,
5:18, 6:19, 9:8, 10:22,
11:8, 14:22, 15:2,
15:6, 18:13, 18:20,
19:17, 21:7, 22:2,
22:9, 23:21, 24:5,
27:11, 28:24, 30:8,
30:10, 30:23, 31:7,
31:11, 33:22, 36:14,
38:1, 38:6, 39:9,
39:11, 40:17, 41:12,
42:5, 42:17, 43:20,
45:4, 46:6, 46:7, 46:8,
46:21, 47:7, 47:13,
47:19, 50:14, 50:16,
51:6, 51:15, 53:15,
55:15, 56:16, 58:2,
58:9, 88:10, 90:13,
94:7, 95:2, 95:17,
96:21, 97:14, 99:5,
99:9, 99:12, 99:19,
100:18, 101:8,
101:12, 102:10,
102:21, 103:15,
103:20, 104:6,
104:25, 106:9,
106:13, 106:22,
107:4, 107:11,
107:16, 107:17
  **HONORABLE** [1] -
1:10
  **hope** [2] - 52:3,
72:24
  **hoped** [2] - 12:22,
21:17
  **hopeful** [1] - 101:5
  **host** [4] - 66:11,
66:17, 87:20, 89:11
  **hosted** [1] - 82:16
  **hosting** [2] - 63:10,
90:5
  **hotel** [4] - 72:20,
73:3, 73:8, 90:11
  **hours** [3] - 7:17,
20:18, 107:11
  **house** [4] - 24:9,
72:3, 81:8, 90:7
  **Husseiny** [3] - 73:9,
73:12, 73:14

## I

  **idea** [4] - 10:6, 23:16,
35:15, 67:24

115

**identification** [2] - 12:4, 36:11
**ignored** [1] - 44:4
**ill** [1] - 4:15
**illegal** [1] - 80:19
**impeach** [1] - 30:16
**impeachment** [2] - 33:23, 98:16
**implies** [2] - 79:23, 87:7
**imply** [1] - 47:21
**implying** [1] - 78:7
**impressive** [1] - 81:25
**improper** [1] - 33:23
**improve** [1] - 84:13
**inappropriate** [2] - 40:4, 43:19
**inclined** [3] - 65:22, 99:14, 101:10
**include** [1] - 95:14
**included** [2] - 25:17, 98:13
**including** [1] - 84:18
**inconsistency** [1] - 31:15
**inconsistent** [6] - 30:22, 32:25, 33:11, 33:15, 33:16, 99:1
**incriminate** [1] - 57:14
**Indiana** [1] - 2:3
**indicate** [2] - 53:5, 53:12
**indicated** [6] - 15:14, 39:6, 41:8, 46:10, 100:10, 103:19
**indicating** [2] - 18:18, 29:14
**indirectly** [1] - 17:14
**individual** [2] - 68:24, 69:25
**individually** [1] - 27:7
**individuals** [3] - 46:4, 63:11, 73:2
**inference** [1] - 14:4
**info** [1] - 64:20
**inform** [1] - 28:1
**informant** [2] - 29:25, 32:13
**information** [20] - 7:6, 8:12, 17:7, 17:10, 17:13, 21:13, 23:14, 56:5, 56:7, 64:14, 64:24, 65:8, 65:9, 68:21, 85:22, 89:13, 91:22, 92:8, 92:10, 92:19
**initial** [2] - 12:16,

12:18
**input** [1] - 93:4
**inquiries** [2] - 7:24, 8:2
**inquiry** [2] - 107:3, 107:6
**insofar** [1] - 54:21
**instance** [3] - 67:18, 68:13, 80:11
**instruction** [8] - 53:3, 53:22, 95:22, 96:1, 96:20, 102:12, 103:7, 103:13
**instructions** [5] - 99:21, 100:3, 101:4, 101:18, 102:22
**Integrity** [1] - 1:19
**intended** [3] - 53:24, 92:23
**intent** [1] - 101:17
**interact** [1] - 69:19
**interest** [3] - 4:7, 4:24, 83:22
**interfering** [1] - 14:10
**internal** [2] - 27:25, 28:2
**international** [1] - 20:20
**interview** [9] - 8:7, 12:6, 12:14, 12:15, 12:16, 13:6, 27:8, 36:25, 59:16
**interviewed** [4] - 7:14, 7:16, 8:4, 13:4
**interviews** [5] - 4:10, 12:18, 24:13, 105:15, 105:16
**INTO** [1] - 55:16
**introduce** [1] - 73:5
**introduced** [1] - 73:8
**investigated** [4] - 27:25, 46:1, 46:5, 46:16
**investigation** [24] - 7:10, 8:16, 9:2, 11:4, 16:11, 25:1, 25:14, 34:3, 34:19, 35:2, 42:15, 43:4, 45:9, 45:11, 45:17, 46:14, 48:4, 48:23, 48:25, 49:2, 49:23, 50:8, 56:10, 89:5
**investigative** [4] - 8:14, 23:13, 25:16
**investigator** [3] - 28:2, 45:8, 49:16
**investigators** [1] - 14:16
**invitation** [7] - 89:10,

89:11, 89:24, 90:22, 91:16, 92:2, 97:12
**invited** [1] - 89:20
**involved** [13] - 43:14, 44:22, 69:23, 70:23, 71:1, 71:2, 71:23, 78:1, 78:4, 79:9, 82:12, 86:10, 87:5
**involvement** [2] - 49:9, 90:24
**involves** [1] - 56:10
**involving** [1] - 80:6
**ISRAELY** [1] - 1:22
**issue** [10] - 4:22, 5:17, 15:13, 25:5, 47:9, 48:8, 80:11, 96:4, 100:8, 102:11
**issued** [1] - 15:8
**issues** [9] - 6:16, 24:9, 67:16, 68:14, 80:5, 80:6, 80:20, 102:7, 106:20
**it'll** [1] - 102:5
**itself** [6] - 61:19, 90:3, 92:2, 95:6, 96:13, 98:7

## J

**January** [3] - 41:22, 41:25, 51:13
**Jason** [6] - 70:1, 70:3, 70:4, 70:15
**Jho** [27] - 8:10, 46:19, 48:24, 49:14, 49:18, 49:25, 73:9, 73:24, 73:25, 74:1, 74:10, 74:14, 74:16, 74:21, 75:25, 76:11, 76:22, 77:4, 77:21, 78:1, 78:4, 78:7, 78:12, 79:9, 79:13
**job** [4] - 28:7, 70:6, 84:22, 84:25
**jobs** [2] - 70:6, 84:2
**Joel** [4] - 73:9, 77:6, 90:8
**JOHN** [1] - 1:14
**Jr** [2] - 3:6, 56:2
**JR** [1] - 55:16
**JUDGE** [1] - 1:11
**judge** [2] - 43:12, 44:20
**judged** [1] - 54:20
**July** [27] - 7:3, 7:7, 7:9, 7:13, 7:18, 7:21, 7:23, 8:4, 8:20, 9:2, 9:10, 9:12, 9:13, 9:20, 9:23, 10:10, 10:14,

12:5, 12:15, 13:4, 13:6, 24:13, 45:13, 50:21, 50:25, 59:13
**jumped** [1] - 70:9
**jurisdiction** [1] - 96:8
**juror** [3] - 93:12, 100:8, 100:10
**jurors** [2] - 55:23, 101:6, 101:17
**jury** [52] - 5:15, 5:24, 6:3, 6:11, 6:14, 15:5, 27:17, 30:25, 32:11, 44:1, 47:17, 51:24, 53:18, 53:20, 54:4, 54:6, 54:12, 54:16, 54:18, 56:8, 56:14, 57:6, 57:7, 57:8, 57:12, 57:19, 58:10, 60:3, 61:25, 69:2, 70:19, 73:7, 82:11, 83:10, 94:16, 94:25, 95:7, 95:10, 97:5, 97:6, 97:9, 97:22, 98:2, 98:7, 98:12, 98:14, 98:20, 101:3, 101:6, 101:18, 102:22
**Jury** [2] - 57:24, 88:15
**JURY** [3] - 1:10, 6:15, 53:21
**jury's** [1] - 21:11
**Justice** [7] - 7:17, 34:4, 34:20, 37:8, 37:12, 38:4, 39:5
**JUSTICE** [2] - 1:15, 1:18

## K

**keep** [5] - 9:6, 12:22, 46:19, 65:9, 106:5
**Keller** [17] - 4:7, 5:10, 27:23, 28:23, 38:13, 39:6, 39:7, 39:15, 41:3, 45:3, 47:18, 48:13, 95:18, 96:3, 96:22, 106:22, 107:13
**KELLER** [58] - 1:14, 14:22, 18:20, 21:7, 22:2, 22:8, 23:21, 23:24, 27:11, 27:24, 28:24, 31:7, 33:4, 33:22, 36:19, 36:23, 38:6, 38:14, 39:9, 40:17, 42:5, 42:7, 42:17, 42:19, 43:17, 43:22, 44:18, 45:4, 45:6, 46:8, 46:13,

47:1, 47:19, 48:17, 49:22, 50:14, 51:6, 51:15, 52:20, 52:24, 95:19, 96:24, 97:14, 97:18, 97:20, 98:11, 99:9, 99:12, 99:19, 101:8, 101:12, 102:10, 103:16, 104:25, 106:11, 106:15, 107:10, 107:17
**Kelly** [4] - 103:23, 104:9, 104:11, 106:3
**Kenner** [14] - 6:18, 29:7, 34:16, 35:25, 42:12, 43:5, 53:3, 53:24, 54:2, 54:12, 54:17, 55:14, 102:19, 105:1
**KENNER** [180] - 1:21, 1:22, 4:1, 5:16, 5:18, 5:21, 6:1, 6:19, 6:22, 9:9, 10:22, 11:1, 11:3, 11:8, 11:12, 15:2, 15:6, 15:10, 15:16, 15:19, 15:22, 18:13, 18:16, 18:17, 18:24, 19:2, 19:4, 19:5, 19:11, 19:15, 19:17, 19:19, 20:4, 20:6, 21:16, 21:24, 22:5, 22:13, 23:5, 23:22, 24:5, 24:6, 27:4, 27:12, 27:19, 28:6, 29:19, 29:23, 30:3, 30:5, 30:6, 30:8, 30:13, 30:16, 30:20, 30:23, 31:1, 31:5, 31:11, 31:16, 31:20, 32:1, 32:6, 32:14, 32:17, 33:17, 34:1, 34:12, 34:24, 36:1, 36:6, 36:8, 36:14, 36:15, 36:21, 37:1, 37:5, 37:15, 38:1, 38:3, 38:9, 38:22, 38:25, 39:2, 39:11, 39:19, 40:6, 40:15, 40:22, 40:24, 41:12, 41:14, 42:3, 43:16, 43:19, 44:14, 46:6, 46:21, 47:7, 47:11, 47:13, 47:25, 48:14, 49:19, 50:16, 50:19, 51:11, 51:18, 52:4, 52:7, 52:10, 52:12, 52:19, 52:22, 53:9, 53:14, 55:6, 55:15, 55:19, 56:16, 56:18, 58:2, 58:5, 58:9, 58:12, 59:22, 62:8,

116

62:14, 66:1, 66:5, 66:6, 75:4, 75:18, 77:11, 77:13, 85:23, 86:8, 86:18, 86:21, 88:10, 88:14, 88:16, 90:13, 90:15, 93:6, 93:7, 93:12, 93:16, 93:20, 93:23, 93:24, 94:2, 94:6, 95:2, 95:17, 96:3, 96:21, 97:25, 98:24, 99:4, 100:18, 100:22, 103:15, 103:19, 103:25, 104:4, 104:6, 104:8, 104:11, 104:13, 104:15, 104:17, 104:19, 105:9, 105:21, 106:9, 106:22, 107:4, 107:13, 107:16
**kept** [3] - 13:1, 44:7, 48:18
**kind** [6] - 12:19, 33:5, 53:7, 69:8, 72:12, 72:15, 92:19, 99:17, 103:14
**kinds** [2] - 62:1, 67:16
**Kirk** [3] - 104:15, 104:17
**knowledge** [5] - 20:24, 35:19, 35:21, 43:4, 49:15
**KOLLAR** [1] - 1:10
**KOLLAR-KOTELLY** [1] - 1:10
**Kong** [1] - 43:1
**KOTELLY** [1] - 1:10

## L

**labeled** [1] - 57:24
**lack** [2] - 12:7, 62:21
**lacking** [1] - 4:15
**landed** [1] - 17:7
**large** [2] - 11:15, 73:17
**last** [5] - 23:19, 48:10, 61:5, 80:15, 105:1
**late** [1] - 13:14
**latest** [1] - 90:1
**LAW** [3] - 1:22, 2:2, 102:25
**law** [3] - 42:14, 75:12, 103:1
**lawyer** [1] - 13:22
**lead** [2] - 45:8, 49:16
**leading** [6] - 46:6,

46:7, 46:11, 49:19, 82:3, 82:12
**learned** [2] - 23:17, 24:8
**least** [6] - 12:23, 13:13, 31:17, 58:24, 76:14, 80:4
**leave** [3] - 97:5, 98:19, 101:9
**leaving** [1] - 100:12
**led** [1] - 82:9
**left** [3] - 17:11, 104:24, 105:2
**legal** [4] - 4:9, 6:16, 35:4, 57:9
**legally** [1] - 77:8
**legitimate** [3] - 78:13, 79:13, 79:14
**less** [1] - 104:4
**Lidsky** [26] - 3:5, 6:9, 6:23, 16:25, 22:14, 28:8, 28:14, 28:20, 28:25, 31:23, 34:2, 34:5, 34:18, 34:21, 34:25, 40:20, 42:8, 42:9, 44:19, 45:7, 46:14, 47:2, 48:18, 50:20, 105:10
**LIDSKY** [1] - 6:20
**Lidsky's** [2] - 105:11, 105:13
**lie** [1] - 86:12
**lien** [1] - 80:21
**life** [1] - 60:11
**Lijun** [1] - 50:3
**likely** [3] - 24:14, 101:13, 101:14
**limited** [1] - 105:12
**limits** [1] - 65:2
**line** [5] - 14:23, 21:25, 22:7, 66:2, 89:14
**Line** [2] - 66:4, 93:13
**lines** [1] - 31:2
**link** [3] - 92:15, 92:17, 92:18
**LISA** [2] - 2:5, 108:3
**Lisa** [1] - 108:12
**list** [7] - 81:24, 81:25, 84:22, 85:10, 85:16, 98:5, 101:13
**listed** [4] - 90:5, 90:22, 94:25, 104:9
**listen** [1] - 65:23
**listening** [1] - 10:2
**live** [3] - 53:6, 56:3, 96:1
**living** [1] - 90:21
**loan** [1] - 37:8
**location** [3] - 67:18,

83:17, 89:11
**locations** [1] - 63:22
**LOCKHART** [1] - 1:18
**logistics** [4] - 16:16, 16:19, 16:24, 61:4
**look** [20] - 5:9, 9:3, 11:5, 11:10, 14:17, 22:24, 30:18, 30:19, 30:25, 33:6, 39:16, 53:10, 80:18, 88:24, 95:10, 100:2, 101:20, 101:24, 105:10
**looked** [3] - 4:6, 25:8, 73:16
**looking** [10] - 9:16, 9:18, 10:19, 19:20, 19:25, 20:3, 23:2, 41:10, 58:25, 92:2
**looks** [4] - 33:1, 58:8, 58:15, 89:10
**losing** [1] - 102:14
**loss** [1] - 61:4
**lost** [1] - 66:1
**Low** [19] - 8:10, 12:13, 46:19, 48:24, 49:3, 49:5, 49:10, 49:14, 49:18, 49:25, 73:9, 73:24, 74:10, 74:16, 74:21, 75:25, 77:21, 78:1, 78:4
**loyal** [1] - 84:18
**lunch** [1] - 5:20

## M

**M-c-C-L-A-I-N** [1] - 53:9
**Macao** [17] - 6:25, 17:2, 17:4, 17:5, 17:7, 17:8, 17:17, 19:6, 20:12, 23:18, 23:20, 35:16, 42:20, 51:5, 51:12
**mail** [2] - 92:25, 93:2
**man** [4] - 18:11, 20:1, 20:12, 23:19
**Management** [1] - 61:1
**map** [1] - 85:3
**Marc** [1] - 72:2
**mark** [1] - 97:24
**marked** [4] - 36:10, 97:22, 98:15, 98:20
**marking** [1] - 98:1
**material** [5] - 14:11, 14:17, 14:18, 24:16, 24:17, 25:13
**materials** [1] - 14:9

**matter** [8] - 5:2, 5:5, 9:10, 20:12, 21:17, 22:7, 75:13, 106:1
**matters** [1] - 102:17
**Mayor** [3] - 7:25, 12:12
**McClain** [12] - 53:9, 54:15, 55:8, 59:20, 62:8, 62:9, 66:3, 75:6, 85:25, 86:19, 93:14, 94:19
**mcClain** [1] - 75:5
**McMaster** [4] - 103:23, 104:8, 106:4
**mean** [35] - 13:7, 15:17, 27:18, 63:2, 63:3, 63:16, 63:21, 71:8, 71:25, 73:21, 74:17, 75:20, 76:4, 76:11, 76:18, 78:3, 78:14, 78:22, 81:18, 82:10, 83:13, 83:17, 83:24, 84:3, 85:22, 85:25, 87:6, 87:15, 87:16, 91:21, 101:19, 102:5, 102:17, 105:7
**meaning** [4] - 68:12, 78:15, 81:19, 82:5
**means** [9] - 5:3, 15:6, 28:4, 56:17, 68:18, 75:21, 80:24, 86:5, 86:22
**meant** [4] - 11:25, 13:18, 33:3, 78:5
**measure** [1] - 85:9
**meet** [8] - 45:24, 49:25, 50:2, 51:1, 59:15, 69:3, 69:19, 72:19
**meeting** [26] - 13:6, 16:17, 25:25, 26:8, 26:9, 26:12, 26:18, 27:5, 27:8, 28:9, 36:3, 36:5, 36:17, 40:23, 41:1, 41:5, 41:6, 41:8, 41:17, 41:22, 41:25, 45:12, 45:17, 45:20
**meetings** [1] - 66:23
**member** [1] - 63:15
**members** [6] - 6:14, 53:20, 67:10, 67:12
**memo** [4] - 40:12, 40:19, 40:23, 40:25
**memorialize** [1] - 27:1
**memorialized** [1] - 27:7
**memory** [3] - 24:3, 40:18, 96:17
**mentally** [1] - 4:15

**mention** [1] - 47:13
**mentioned** [9] - 7:20, 9:20, 61:9, 66:11, 67:1, 73:12, 77:20, 77:25, 82:3
**mentions** [1] - 92:9
**message** [5] - 15:24, 25:21, 26:2, 26:3, 26:4
**messages** [3] - 49:17, 50:10, 89:3
**met** [14] - 7:14, 7:16, 26:22, 69:4, 69:5, 69:6, 69:17, 70:15, 71:12, 71:16, 72:21, 72:22, 72:24, 90:11
**Miami** [13] - 72:2, 72:4, 72:20, 74:7, 74:11, 76:4, 76:5, 77:5, 81:5, 81:13, 81:20, 88:5, 90:11
**MICHEL** [1] - 1:6
**Michel** [92] - 4:2, 6:24, 9:3, 9:11, 9:19, 9:20, 9:23, 10:7, 10:11, 10:14, 10:17, 10:18, 12:5, 17:2, 17:11, 17:25, 18:3, 20:22, 21:4, 21:6, 21:9, 22:16, 22:21, 35:5, 42:13, 42:15, 43:13, 44:21, 44:25, 45:19, 45:20, 45:23, 46:1, 46:17, 46:19, 47:4, 48:18, 48:23, 49:2, 49:5, 49:10, 49:18, 49:24, 50:20, 68:25, 69:3, 69:19, 70:20, 71:12, 71:16, 71:17, 71:20, 72:16, 72:20, 73:5, 73:8, 73:15, 73:20, 74:4, 74:10, 74:19, 74:21, 75:25, 77:21, 77:25, 78:3, 78:10, 78:18, 79:15, 79:17, 79:20, 80:2, 80:6, 81:16, 82:3, 82:8, 82:12, 82:18, 82:22, 83:6, 83:21, 85:19, 86:10, 88:20, 89:8, 89:9, 90:16, 106:25, 107:2, 107:7
**Michel's** [5] - 9:24, 13:22, 14:1, 50:6, 79:17
**microphone** [5] - 52:11, 55:10, 59:18, 75:4, 86:18
**mid** [1] - 13:14

**might** [4] - 24:16, 50:12, 74:23, 85:13
**million** [12] - 8:1, 8:10, 8:22, 12:13, 46:18, 46:20, 47:3, 48:19, 48:20, 49:5, 49:10
**mind** [1] - 55:22
**mine** - 69:20, 89:19
**Minister** [1] - 50:3
**minute** [2] - 76:20, 94:22
**minutes** [4] - 6:2, 21:5, 51:22, 104:4
**mischaracterizes** [1] - 21:8
**misread** [1] - 93:23
**missing** [1] - 97:19
**mixing** [1] - 48:10
**Mohamad** [2] - 73:9, 73:12, 77:6
**moment** [12] - 30:7, 41:12, 50:16, 53:11, 56:6, 61:13, 63:24, 67:1, 88:11, 90:13, 93:8, 93:16
**moments** [2] - 61:9, 63:14
**money** [47] - 60:21, 62:3, 62:5, 62:7, 64:11, 65:3, 65:20, 68:2, 69:22, 71:10, 71:25, 72:9, 74:18, 75:16, 77:22, 78:8, 78:16, 78:18, 79:3, 79:10, 79:12, 79:16, 79:17, 79:20, 79:21, 79:22, 79:23, 80:16, 80:20, 81:19, 81:21, 82:6, 82:23, 82:24, 83:25, 84:21, 85:1, 85:5, 85:8, 85:21, 86:4, 86:23, 87:5, 87:8, 87:11, 88:4, 88:6
**monies** [1] - 78:12
**monitoring** [1] - 20:19
**months** [1] - 81:22
**morning** [2] - 93:21, 105:23
**most** [6] - 46:15, 82:6, 86:22, 92:12, 92:25
**motive** [1] - 47:21
**Motorola** [1] - 88:25
**move** [10] - 11:25, 15:16, 15:19, 31:24, 35:25, 39:7, 43:19,

59:19, 99:14, 101:7
**moved** [1] - 61:5
**moving** [3] - 55:22, 65:12, 105:19
**MR** [245] - 4:1, 5:16, 5:18, 5:21, 6:1, 6:19, 6:22, 9:9, 10:22, 11:1, 11:3, 11:8, 11:12, 14:22, 15:2, 15:6, 15:10, 15:16, 15:19, 15:22, 18:13, 18:16, 18:17, 18:20, 18:24, 19:2, 19:4, 19:5, 19:11, 19:15, 19:17, 19:19, 20:4, 20:6, 21:7, 21:16, 21:24, 22:2, 22:5, 22:8, 22:13, 23:5, 23:21, 23:22, 23:24, 24:5, 24:6, 27:4, 27:11, 27:12, 27:19, 27:24, 28:6, 28:24, 29:19, 29:23, 30:3, 30:5, 30:6, 30:8, 30:13, 30:16, 30:20, 30:23, 31:1, 31:5, 31:7, 31:11, 31:16, 31:20, 32:1, 32:6, 32:14, 32:17, 33:4, 33:17, 33:22, 34:1, 34:12, 34:24, 36:1, 36:6, 36:8, 36:14, 36:15, 36:19, 36:21, 36:23, 37:1, 37:5, 37:15, 38:1, 38:3, 38:6, 38:9, 38:14, 38:22, 38:25, 39:2, 39:9, 39:11, 39:19, 40:6, 40:15, 40:17, 40:22, 40:24, 41:12, 41:14, 42:3, 42:5, 42:7, 42:17, 42:19, 43:16, 43:17, 43:19, 43:22, 44:14, 44:18, 45:4, 45:6, 46:6, 46:8, 46:13, 46:21, 47:1, 47:7, 47:11, 47:13, 47:19, 47:25, 48:14, 48:17, 49:19, 49:22, 50:14, 50:16, 50:19, 51:6, 51:11, 51:15, 51:18, 52:4, 52:7, 52:10, 52:12, 52:19, 52:20, 52:22, 52:24, 53:9, 53:14, 55:6, 55:15, 55:19, 56:16, 56:18, 58:2, 58:5, 58:9, 58:12, 59:20, 59:22, 62:8, 62:9, 62:14, 66:1, 66:3, 66:5, 66:6, 75:4, 75:6, 75:18,

77:11, 77:13, 85:23, 85:25, 86:8, 86:18, 86:19, 86:21, 88:10, 88:14, 88:16, 90:13, 90:15, 93:6, 93:7, 93:12, 93:14, 93:16, 93:20, 93:23, 93:24, 94:2, 94:6, 94:19, 95:2, 95:17, 95:19, 96:3, 96:21, 96:24, 97:14, 97:18, 97:20, 97:25, 98:11, 98:24, 99:4, 99:9, 99:12, 99:19, 100:18, 100:22, 101:8, 101:12, 102:10, 102:21, 103:4, 103:15, 103:16, 103:19, 103:25, 104:4, 104:6, 104:8, 104:11, 104:13, 104:15, 104:17, 104:19, 104:25, 105:9, 105:21, 106:9, 106:11, 106:15, 106:22, 107:4, 107:10, 107:13, 107:16, 107:17
**MS** [1] - 60:6
**Mulryne** [2] - 54:7, 54:17
**MULRYNE** [1] - 1:17
**multipage** [1] - 36:20
**multiple** [3] - 39:12, 49:24
**music** [5] - 18:11, 18:18, 20:1, 20:12, 23:19

**N**

**name** [15] - 9:24, 54:15, 55:25, 60:17, 60:25, 61:7, 64:7, 65:21, 65:24, 70:1, 86:7, 89:11, 90:8, 91:21, 92:9
**named** [2] - 68:25, 72:3
**names** [1] - 64:13
**narrow** [2] - 82:14
**National** [2] - 69:12, 69:13
**national** [5] - 67:4, 74:14, 74:17, 76:9, 77:22
**nationals** [2] - 64:2, 75:16
**nature** [2] - 16:15, 102:9

**necessarily** [1] - 10:1
**necessary** [1] - 98:16
**need** [19] - 21:18, 21:22, 24:16, 28:14, 30:8, 31:13, 32:12, 46:11, 48:12, 94:14, 95:15, 97:4, 98:4, 98:25, 102:6, 105:11, 106:5, 106:6
**needed** [3] - 14:9, 26:7, 102:8
**needs** [4] - 80:14, 95:4, 102:18, 103:2
**network** [2] - 81:20, 82:7
**never** [2] - 25:8, 51:23
**New** [6] - 1:15, 1:19, 43:3, 66:20, 69:24, 70:18
**new** [1] - 94:3
**newspaper** [1] - 64:21
**next** [11] - 11:17, 11:19, 11:25, 13:4, 31:24, 53:23, 90:8, 91:11, 103:22, 105:3, 106:3
**nice** [2] - 67:8, 73:23
**NICOLE** [1] - 1:18
**Nigeria** [1] - 60:24
**nomination** [1] - 69:15
**non** [2] - 25:7, 25:15
**non-privileged** [2] - 25:7, 25:15
**none** [2] - 34:7, 49:12
**nonsubstantive** [1] - 16:24
**Northwest** [5] - 1:15, 1:19, 2:3, 2:7, 108:14
**note** [1] - 16:11
**notebook** [8] - 24:8, 24:11, 24:12, 24:20, 24:22, 24:24, 25:9, 25:17
**notes** [7] - 7:5, 7:6, 10:19, 22:24, 43:6, 96:17, 108:5
**nothing** [4] - 25:19, 44:11, 51:18, 78:22
**nothing's** [1] - 38:24
**notion** [1] - 76:13
**notwithstanding** [1] - 77:2
**NSA** [1] - 60:20
**number** [15] - 4:25,

16:9, 25:2, 46:1, 47:19, 58:1, 66:1, 66:2, 86:11, 86:17, 86:19, 87:1, 88:9, 89:1, 97:4
**number's** [1] - 93:1
**numbers** [4] - 86:1, 86:3, 87:13, 95:16
**numerical** [1] - 87:20

**O**

**oath** [1] - 5:5
**Obama** [11] - 60:21, 61:10, 62:25, 65:13, 67:13, 69:5, 72:2, 73:1, 81:11, 83:25, 86:16
**Obama's** [3] - 61:11, 62:2, 71:8
**objecting** [1] - 41:3
**objection** [19] - 14:22, 18:20, 21:7, 22:2, 22:8, 23:21, 27:11, 29:22, 31:11, 33:22, 40:17, 43:16, 46:6, 46:21, 49:19, 51:6, 51:15, 96:25
**objections** [2] - 4:25, 100:5
**obtain** [1] - 24:19
**obtained** [5] - 13:11, 17:14, 25:1, 43:12, 44:20
**obtaining** [1] - 24:22
**obvious** [1] - 10:3
**obviously** [1] - 55:11
**occasions** [2] - 49:25, 96:10
**occupation** [1] - 92:9
**odd** [1] - 88:24
**OF** [7] - 1:1, 1:3, 1:10, 1:15, 1:18, 2:2, 55:16
**offered** [2] - 5:2, 84:2
**offhand** [2] - 16:1, 36:5
**officer** [1] - 60:14
**OFFICES** [1] - 2:2
**official** [7] - 28:12, 28:17, 28:21, 50:2, 65:17, 89:12, 108:12
**Official** [1] - 2:6
**officially** [1] - 63:14
**officials** [1] - 45:21
**often** [5] - 13:21, 13:25, 14:3, 15:23, 62:19
**oftentimes** [1] -

67:24
  **OIG** [1] - 4:10
  **once** [3] - 37:2, 99:16, 103:9
  **one** [44] - 8:17, 9:18, 10:1, 10:7, 11:23, 12:7, 13:14, 13:23, 24:13, 26:17, 42:11, 44:9, 46:4, 47:7, 50:16, 53:5, 54:7, 58:19, 58:21, 63:5, 70:13, 76:4, 76:5, 79:18, 80:4, 81:14, 82:22, 86:9, 87:1, 87:25, 88:5, 90:10, 95:23, 96:4, 96:10, 96:15, 97:11, 100:8, 100:14, 103:10, 107:10
  **one's** [1] - 105:23
  **ongoing** [1] - 12:19
  **online** [3] - 22:15, 92:13, 92:18
  **open** [5] - 15:21, 29:21, 33:14, 44:16, 48:16
  **opened** [4] - 7:11, 43:22, 44:2, 47:9
  **operating** [1] - 29:25
  **opine** [2] - 35:22, 35:23
  **opinion** [3] - 15:8, 15:10, 87:7
  **opposed** [2] - 79:22, 96:13
  **optics** [1] - 75:13
  **orbit** [1] - 70:12
  **order** [11] - 43:12, 44:11, 44:20, 62:17, 68:19, 68:20, 80:14, 88:7, 103:23, 104:1, 106:3
  **organize** [1] - 62:15
  **organizer** [2] - 90:18, 90:19
  **organizing** [2] - 83:8, 90:24
  **originally** [2] - 100:11, 100:20
  **otherwise** [2] - 54:21, 95:23
  **out-of-court** [6] - 5:1, 5:3, 5:7, 18:23, 22:12, 29:17
  **outdoor** [1] - 26:24
  **outdoors** [1] - 26:20
  **outreach** [1] - 66:22
  **outside** [7] - 15:5, 27:17, 32:11, 44:1, 47:17, 51:7, 51:9

  **outstanding** [1] - 102:11
  **overruled** [1] - 44:17
  **owes** [2] - 80:16, 80:20
  **own** [10] - 5:11, 35:2, 64:7, 69:14, 69:15, 70:7, 71:23, 71:24, 72:8, 79:21
  **owned** [1] - 72:3

# P

  **P.A** [1] - 2:3
  **p.m** [6] - 1:7, 6:12, 51:25, 53:19, 93:19, 94:17
  **Page** [14] - 30:13, 31:3, 31:8, 31:21, 32:2, 32:14, 37:22, 37:23, 38:16, 39:10, 58:16, 58:23, 93:13, 94:6
  **page** [20] - 11:11, 11:17, 11:19, 11:23, 11:25, 31:9, 31:18, 31:24, 33:4, 33:6, 38:17, 39:15, 59:12, 66:1, 66:2, 89:23, 91:11, 91:25
  **pages** [4] - 25:17, 39:12, 94:5, 94:7
  **paid** [6] - 8:10, 8:22, 12:13, 63:17, 65:19, 68:13
  **paper** [1] - 93:2
  **paperless** [1] - 92:14
  **paperwork** [2] - 32:18, 33:8
  **Paragraph** [5] - 58:25, 59:5, 59:6
  **paragraph** [1] - 36:23
  **parentheticals** [3] - 100:1, 101:25, 106:2
  **park** [1] - 26:22
  **part** [23] - 9:23, 17:24, 27:8, 35:13, 35:18, 43:4, 55:2, 59:1, 63:3, 64:18, 68:17, 72:14, 75:11, 81:5, 83:19, 87:2, 89:4, 91:15, 92:21, 95:8, 97:8, 101:2, 101:24
  **Part** [10] - 99:21, 99:22, 101:21, 102:5, 102:7, 102:22, 103:5, 105:22, 105:23,

105:25
  **particular** [15] - 5:6, 11:11, 31:14, 39:15, 65:5, 65:6, 76:2, 78:20, 85:16, 86:3, 86:11, 86:23, 87:25, 91:5, 96:10
  **particularly** [1] - 29:8
  **parties** [4] - 73:22, 74:2, 106:11, 107:18
  **parts** [1] - 61:5
  **party** [6] - 37:17, 54:9, 61:3, 69:14, 73:22, 90:18
  **pass** [1] - 72:24
  **passing** [1] - 69:6
  **passports** [1] - 77:8
  **Patrol** [1] - 23:9
  **patrol** [1] - 24:7
  **pause** [1] - 45:5
  **pay** [4] - 62:16, 72:16, 91:23, 95:21
  **paying** [3] - 7:25, 88:7, 92:24
  **peanuts** [1] - 47:23
  **people** [17] - 48:3, 63:6, 64:5, 72:18, 81:24, 82:1, 82:7, 83:24, 84:4, 85:17, 86:6, 86:7, 86:11, 87:3, 89:19, 89:22, 90:11
  **per** [1] - 25:12
  **percent** [1] - 92:15
  **perfect** [1] - 59:21
  **perhaps** [1] - 87:3
  **period** [4] - 66:7, 66:25, 67:9, 77:25
  **Perrelli** [1] - 56:21
  **person** [12] - 26:17, 54:25, 63:3, 65:5, 68:16, 75:3, 75:9, 75:21, 80:12, 80:15, 80:16, 82:18
  **personal** [2] - 25:15, 66:22, 68:21
  **personally** [1] - 89:20
  **phone** [7] - 15:2, 27:15, 66:23, 88:25, 89:1, 89:4, 91:15
  **photo** [3] - 63:4, 88:25, 89:24
  **photocopies** [1] - 25:13
  **photograph** [1] - 91:14
  **photographs** [1] - 89:3

  **photos** [1] - 63:9
  **physically** [2] - 21:15, 42:16
  **picking** [1] - 106:17
  **piece** [3] - 45:8, 49:16, 93:1
  **pieces** [1] - 25:6
  **place** [3] - 26:9, 54:24, 68:1
  **placing** [1] - 54:10
  **Plaintiff** [1] - 1:4
  **plan** [1] - 14:19
  **plane** [1] - 22:15
  **planned** [1] - 100:25
  **planner** [1] - 90:20
  **planning** [5] - 52:9, 99:13, 99:17, 106:7, 106:24
  **play** [2] - 12:23, 13:1
  **point** [37] - 8:12, 8:24, 13:15, 23:15, 41:4, 44:3, 44:10, 47:12, 47:22, 47:25, 48:2, 57:1, 60:21, 70:22, 71:19, 71:24, 76:12, 78:24, 79:1, 79:15, 80:22, 80:23, 83:21, 84:6, 84:8, 84:15, 85:4, 85:10, 85:16, 94:9, 95:25, 98:25, 99:13, 99:19, 103:8, 103:16, 106:18
  **pointed** [3] - 24:14, 24:15, 44:8
  **points** [1] - 27:22
  **policy** [1] - 85:7
  **politics** [3] - 68:15, 75:13, 80:19
  **Pollak** [1] - 72:3
  **pop** [1] - 80:8
  **position** [3] - 9:1, 85:13, 103:17
  **positive** [1] - 65:23
  **possession** [1] - 24:9
  **possibilities** [1] - 72:25
  **possible** [7] - 5:21, 9:4, 18:12, 40:14, 54:21, 56:10, 80:6
  **possibly** [3] - 67:25, 71:20, 81:24
  **potential** [6] - 14:5, 34:3, 34:20, 68:20, 72:22, 80:23
  **potentially** [1] - 17:4
  **Prakazrel** [1] - 68:25
  **PRAKAZREL** [1] - 1:6
  **Pras** [34] - 6:24, 9:3,

9:11, 9:19, 9:20, 10:7, 10:11, 10:14, 12:5, 68:25, 69:1, 69:4, 69:7, 69:18, 69:23, 69:24, 70:11, 70:12, 70:13, 70:22, 71:5, 73:16, 73:21, 73:25, 77:10, 77:14, 77:15, 78:7, 79:11, 79:13, 84:10, 88:1, 90:25, 91:1
  **Pras's** [1] - 86:7
  **precise** [1] - 7:1
  **prefer** [1] - 5:23
  **prepared** [2] - 40:12, 106:12
  **presence** [6] - 12:12, 15:5, 27:17, 32:11, 44:1, 47:17
  **present** [12] - 4:3, 11:6, 26:15, 54:2, 54:9, 54:22, 73:2, 73:8, 84:19, 94:12, 96:19, 99:2
  **presented** [3] - 56:15, 56:16, 98:5
  **President** [6] - 61:10, 65:13, 67:13, 71:8, 81:11, 86:16
  **president** [4] - 60:22, 66:13, 69:5, 69:15
  **president's** [2] - 67:19, 68:16
  **presidential** [5] - 49:6, 49:11, 56:13, 61:11, 62:2
  **press** [1] - 68:14
  **presumably** [2] - 30:22, 107:9
  **pretty** [5] - 51:3, 73:17, 81:25, 87:15, 88:9
  **previous** [1] - 31:9
  **PREVIOUSLY** [1] - 6:20
  **previously** [2] - 49:5, 98:15
  **primarily** [1] - 82:18
  **principally** [1] - 82:18
  **private** [1] - 60:23
  **privilege** [12] - 4:17, 14:7, 14:21, 14:25, 15:14, 25:4, 43:6, 43:15, 44:4, 44:8, 44:23, 45:1
  **privileged** [6] - 14:18, 25:7, 25:15, 25:19, 43:7, 43:8
  **probable** [2] - 43:13,

44:21
  **probe** [2] - 8:9, 8:11
  **problem** [11] - 4:5,
31:20, 38:12, 41:9,
58:4, 77:8, 88:13,
97:17, 98:1, 98:22
  **problems** [1] - 68:12
  **proceed** [2] - 6:17,
102:13
  **proceeding** [4] - 5:4,
54:4, 54:12, 57:9
  **Proceedings** [1] -
107:19
  **proceedings** [22] -
6:6, 6:10, 6:12, 15:4,
15:20, 27:16, 29:20,
32:10, 33:13, 43:25,
44:15, 47:16, 48:15,
51:25, 53:2, 53:19,
54:5, 54:16, 54:18,
94:17, 94:24, 108:6
  **process** [6] - 64:18,
68:18, 75:11, 80:8,
80:25, 99:23
  **produced** [2] - 89:4,
108:6
  **proffer** [5] - 57:21,
58:6, 58:13, 95:12,
97:2
  **profile** [3] - 84:16,
84:21, 85:5
  **projector** [2] - 57:23,
88:17
  **projects** [1] - 60:24
  **promoter** [1] - 73:23
  **proof** [1] - 80:13
  **proposed** [2] -
102:11, 106:20
  **prosecutors** [1] -
54:7
  **prospect** [1] - 12:23
  **protect** [1] - 28:18
  **Protection** [1] -
20:17
  **prove** [1] - 80:24
  **provide** [2] - 56:6,
106:12
  **provided** [2] - 7:5,
7:7
  **providing** [1] - 9:14
  **provisions** [1] -
58:25
  **Public** [1] - 1:19
  **public** [2] - 64:20,
64:25
  **publish** [3] - 58:9,
88:10, 88:14
  **pull** [4] - 10:1, 10:10,
12:9, 12:12
  **pulled** [2] - 10:7,

12:5
  **pulling** [2] - 10:13,
12:7
  **purchases** [1] -
22:15
  **purpose** [1] - 30:15
  **purposes** [2] - 98:8,
99:13
  **pursuant** [2] - 57:21,
59:7
  **pushed** [3] - 76:10,
76:11, 76:12
  **pushing** [1] - 76:13
  **put** [18] - 21:18,
30:13, 30:24, 39:1,
57:23, 70:12, 70:15,
78:7, 81:23, 81:25,
84:24, 85:3, 88:12,
88:17, 95:15, 99:7,
100:11, 105:25
  **puts** [12] - 84:22
  **putting** [3] - 37:22,
92:1, 105:7

## Q

  **quarter** [2] - 51:22,
64:21
  **questioning** [1] -
14:23
  **questions** [21] -
28:24, 42:3, 43:9,
44:5, 45:12, 45:15,
46:7, 46:12, 46:22,
47:20, 50:14, 51:10,
51:17, 52:14, 54:6,
54:13, 54:15, 54:17,
54:25, 55:1, 73:19
  **quite** [4] - 61:4,
72:10, 74:3, 106:8
  **quote** [2] - 34:13,
34:14

## R

  **RAE** [1] - 1:18
  **raise** [14] - 14:20,
60:21, 65:20, 67:25,
68:1, 69:22, 71:10,
71:25, 72:9, 81:21,
84:15, 85:4, 85:5,
86:4
  **raised** [6] - 62:3,
62:4, 81:19, 83:25,
86:22, 87:8
  **raises** [1] - 84:21
  **raising** [5] - 15:18,
60:12, 62:6, 84:20,
85:1

  **Ramadan** [2] -
100:22, 100:23
  **rank** [1] - 86:15
  **rapport** [1] - 12:21
  **rather** [1] - 35:23
  **RDR** [2] - 2:5, 108:3,
108:12
  **re** [3] - 93:18,
104:19, 105:12
  **re-call** [2] - 104:19,
105:12
  **re-called** [1] - 93:18
  **READ** [1] - 55:16
  **read** [20] - 3:7, 11:5,
11:10, 11:15, 11:23,
11:24, 14:8, 24:23,
27:24, 31:3, 31:19,
32:2, 36:12, 36:16,
37:16, 52:5, 52:21,
54:11, 54:12, 66:2
  **reading** [12] - 11:9,
12:3, 14:11, 24:25,
40:25, 52:6, 53:8,
54:25, 55:11, 58:2,
95:25, 99:10
  **reads** [2] - 89:14,
103:12
  **ready** [6] - 6:17,
11:13, 11:17, 12:1,
31:25, 101:10
  **real** [1] - 78:16
  **realize** [1] - 88:24
  **really** [10] - 8:16,
35:1, 55:1, 70:25,
71:1, 71:23, 91:4,
98:6
  **reason** [7] - 5:14,
68:5, 76:3, 78:15,
78:16, 84:1, 101:15
  **reasons** [1] - 83:25
  **rebuttal** [1] - 99:18
  **receive** [1] - 102:23
  **received** [10] - 25:6,
46:18, 47:10, 47:11,
47:23, 48:3, 48:18,
49:5, 49:10, 60:8
  **receiving** [3] - 25:21,
25:24, 26:4
  **recess** [2] - 6:5, 53:1
  **Recession** [1] - 70:6
  **recognize** [5] - 17:1,
17:3, 58:6, 88:19,
88:22
  **recollection** [34] -
4:16, 5:9, 10:24, 11:6,
12:4, 15:23, 19:13,
19:16, 19:21, 20:1,
20:2, 20:11, 20:14,
21:11, 21:23, 22:6,
23:1, 23:6, 24:4, 34:8,

36:13, 36:17, 37:14,
37:16, 37:25, 38:20,
38:23, 39:4, 39:14,
39:17, 39:20, 40:8,
41:1, 98:17
  **record** [7] - 3:7, 56:1,
83:3, 95:4, 100:11,
103:18, 103:20
  **RECORD** [1] - 55:16
  **recorded** [3] - 5:5,
26:18, 54:5
  **recordings** [3] - 4:9,
4:20, 5:11
  **records** [1] - 49:23
  **Red** [2] - 3:3, 37:8
  **redirect** [1] - 50:15
  **REDIRECT** [1] -
50:18
  **reelection** [3] -
65:12, 66:8, 71:9
  **reference** [2] - 36:24,
36:25
  **referenced** [2] -
14:1, 37:19
  **referencing** [1] -
90:10
  **referred** [1] - 18:10
  **referring** [1] - 24:13
  **refresh** [17] - 12:4,
19:16, 19:20, 19:25,
20:11, 23:6, 24:4,
36:13, 37:16, 37:24,
38:14, 38:23, 39:13,
39:18, 39:20, 40:8,
40:25
  **refreshed** [4] -
20:14, 21:22, 21:23,
22:6
  **refreshes** [7] - 10:23,
11:6, 19:13, 23:1,
36:16, 39:4, 39:16
  **refreshing** [3] -
37:14, 38:20, 98:16
  **refusing** [1] - 4:16
  **refute** [1] - 9:1
  **regard** [2] - 20:11,
37:17
  **regarding** [1] - 24:9
  **regular** [3] - 97:7,
98:5, 98:9
  **related** [3] - 49:18,
56:12, 83:15
  **relates** [2] - 15:14,
70:20
  **relating** [4] - 15:8,
48:9, 51:10, 53:23
  **relationship** [8] -
12:19, 14:5, 14:10,
15:1, 49:3, 49:13,
73:15, 73:20

  **relative** [1] - 35:15
  **released** [1] - 25:15
  **relevance** [9] -
14:22, 22:3, 27:11,
27:21, 28:5, 28:6,
40:19, 41:4, 46:21
  **relevant** [5] - 25:7,
25:13, 25:14, 29:6,
29:8
  **religious** [1] - 100:21
  **remember** [28] -
6:23, 7:1, 9:22, 13:8,
13:9, 16:1, 17:24,
35:1, 35:20, 36:5,
43:9, 50:23, 50:24,
61:8, 70:2, 73:7,
73:10, 76:2, 76:3,
76:6, 76:22, 77:4,
77:15, 77:16, 80:5,
81:23, 96:13, 96:17
  **remembering** [1] -
10:15
  **remembers** [1] - 24:2
  **renovations** [1] -
24:10
  **repeat** [2] - 4:4,
62:22
  **rephrase** [1] - 62:23
  **reply** [1] - 86:10
  **report** [8] - 10:19,
11:3, 11:4, 18:6,
22:24, 64:16, 65:10
  **reported** [2] - 64:15,
64:17
  **REPORTED** [1] - 2:5
  **reporter** [1] - 98:8
  **Reporter** [2] - 2:6,
108:12
  **reports** [2] - 64:21,
64:24
  **representation** [1] -
56:19
  **represented** [3] -
13:21, 56:15, 56:17
  **request** [2] - 10:17,
102:13
  **requested** [1] - 96:6
  **requests** [2] - 63:22,
67:20
  **require** [2] - 33:8,
104:21
  **reread** [1] - 96:6
  **rereading** [1] - 96:5
  **resend** [2] - 102:22,
105:22
  **reservation** [1] -
20:21
  **resolve** [1] - 33:9
  **resolved** [2] - 6:16,
81:3

**respect** [4] - 7:3, 45:11, 46:2, 47:24
**respond** [1] - 65:23
**response** [5] - 9:16, 57:13, 57:14, 74:13, 78:11
**responsible** [1] - 82:19
**rest** [7] - 48:7, 94:12, 94:14, 98:5, 101:14, 101:17
**restaurant** [1] - 69:24
**restricted** [1] - 59:8
**rests** [1] - 99:14
**result** [4] - 24:20, 26:6, 28:2, 54:2
**retired** [1] - 60:10
**return** [6] - 17:15, 17:19, 17:21, 17:25, 20:20, 26:5
**returned** [3] - 17:16, 23:3, 23:7
**reveal** [1] - 49:2
**review** [3] - 43:7, 43:8, 105:12
**reviewed** [1] - 13:11
**reviewing** [3] - 13:15, 13:19, 13:24
**revised** [1] - 98:13
**right-hand** [1] - 58:17
**rights** [3] - 56:7, 57:18, 107:8
**road** [3] - 72:8, 79:1
**Rock** [1] - 37:8
**role** [2] - 65:17, 81:16
**Room** [1] - 2:8
**rough** [1] - 35:15
**roughly** [2] - 46:18, 48:19
**Rousseau** [3] - 73:9, 73:19, 90:8
**rule** [1] - 4:6
**Rule** [1] - 4:11
**ruled** [3] - 15:10, 22:10, 22:11
**ruling** [3] - 43:12, 44:20, 51:16
**rulings** [1] - 102:5
**running** [1] - 69:5
**runs** [1] - 73:18

## S

**sat** [1] - 71:13
**satisfied** [2] - 80:25, 81:1

**saw** [2] - 18:5, 25:10
**scan** [1] - 39:11
**scanned** [9] - 37:7, 37:11, 38:4, 38:15, 39:4, 39:14, 39:21, 40:8, 50:12
**scanner** [2] - 37:8, 38:4
**scanning** [2] - 37:18, 39:25
**scenes** [1] - 8:14
**schedule** [3] - 41:25, 67:19, 102:17
**scheduled** [2] - 41:21, 103:18
**scheduling** [1] - 103:17
**School** [1] - 60:7
**scope** [5] - 11:4, 25:13, 51:7, 51:9, 51:16
**screen** [1] - 58:6
**screenshots** [1] - 49:17
**scroll** [2] - 11:14, 36:21
**se** [1] - 25:12
**SEAN** [1] - 1:17
**search** [6] - 13:12, 13:13, 13:18, 13:20, 13:24, 14:8
**searches** [1] - 25:3
**Seat** [2] - 100:9, 100:10
**second** [6] - 27:14, 43:24, 59:12, 88:18, 89:23, 97:11
**Section** [1] - 1:19
**security** [1] - 60:19
**Security** [1] - 60:20
**see** [33] - 10:23, 19:12, 21:18, 23:1, 30:8, 31:17, 32:12, 36:24, 37:20, 39:3, 39:16, 49:23, 50:8, 55:23, 59:12, 63:3, 63:8, 68:19, 72:5, 72:6, 72:7, 74:1, 78:6, 80:14, 90:4, 91:12, 97:17, 101:4, 101:20, 103:8, 103:10, 105:19, 105:25
**seek** [1] - 104:19
**seem** [3] - 29:7, 38:12, 51:23
**Senator** [3] - 61:10, 62:2, 62:25
**senator** [1] - 66:13
**send** [8] - 18:9, 89:14, 89:22, 101:17,

101:21, 101:22, 102:24, 105:22
**sending** [1] - 89:9
**sense** [3] - 21:15, 99:3, 99:4
**sent** [3] - 89:21, 95:7, 99:21
**separate** [3] - 5:11, 14:16, 50:13
**September** [33] - 16:25, 17:21, 17:24, 18:4, 19:15, 20:8, 22:14, 22:22, 24:21, 25:24, 26:7, 26:10, 26:11, 27:6, 29:24, 36:4, 36:10, 36:18, 36:24, 37:2, 37:7, 37:12, 40:2, 40:10, 41:6, 41:15, 41:16, 41:18, 81:7, 81:16, 88:1, 88:20, 89:8
**serious** [1] - 70:24
**serve** [1] - 60:13
**served** [1] - 82:4
**serving** [1] - 82:9
**SESSION** [1] - 1:7
**session** [1] - 94:3
**Sessions** [3] - 103:21, 103:22, 104:10
**set** [9] - 5:13, 20:20, 21:3, 21:4, 26:9, 45:12, 45:17, 45:20, 84:17
**setting** [3] - 41:17, 83:7, 83:8
**share** [1] - 87:23
**Shenzhen** [1] - 42:24
**short** [2] - 104:2, 104:5
**shortly** [1] - 26:4
**shot** [1] - 85:5
**shots** [1] - 63:21
**show** [12] - 10:22, 19:11, 22:25, 30:3, 30:17, 33:15, 36:6, 36:9, 37:21, 39:3, 40:15, 72:8
**showed** [1] - 82:1
**showing** [4] - 31:12, 31:14, 59:5, 88:25
**shown** [4] - 21:22, 31:8, 81:20, 88:11
**sic** [1] - 32:21
**side** [1] - 99:15
**sidebar** [1] - 15:5, 27:17, 32:11, 44:1, 47:17
**signature** [3] - 58:17, 58:19, 58:21

**significance** [1] - 54:24
**silent** [2] - 20:16, 21:2
**simply** [2] - 76:14, 76:17
**sit** [5] - 6:13, 52:8, 55:5, 55:9, 94:20
**sites** [1] - 62:10
**situation** [1] - 47:20
**six** [2] - 10:10, 72:18
**size** [1] - 83:16
**skipping** [1] - 92:5
**slightly** [1] - 55:22
**slow** [1] - 45:3
**so..** [1] - 78:9
**Soho** [1] - 70:18
**solar** [1] - 60:23
**sold** [3] - 60:20, 60:24, 61:4
**solicit** [2] - 63:11, 66:23
**someone** [13] - 12:9, 12:11, 28:16, 48:24, 54:10, 62:19, 63:6, 64:10, 75:20, 79:22, 88:4, 92:24
**someplace** [1] - 100:19
**sometime** [2] - 77:24, 101:15
**sometimes** [5] - 20:18, 68:4, 75:12
**somewhere** [1] - 23:16
**soon** [2] - 9:5, 94:21
**sorry** [41] - 7:15, 7:22, 8:19, 11:1, 11:24, 13:23, 18:10, 18:15, 19:9, 22:21, 23:23, 26:2, 30:5, 32:7, 34:5, 34:21, 37:22, 37:23, 38:25, 50:21, 50:24, 52:12, 53:14, 61:14, 62:22, 63:5, 67:11, 69:13, 77:11, 79:18, 81:4, 82:10, 83:2, 83:3, 83:4, 83:18, 85:23, 93:23, 96:3, 104:11, 104:18
**sort** [9] - 53:4, 57:14, 66:10, 72:5, 72:6, 84:11, 87:19, 99:23, 104:21
**sorts** [3] - 62:20, 66:8, 66:15
**sound** [3] - 16:6, 16:8, 16:10
**sounds** [4] - 26:25,

29:11, 106:11, 106:13
**Southeast** [1] - 60:24
**sovereign** [1] - 73:17
**speaking** [1] - 96:7
**Special** [8] - 20:15, 42:8, 42:9, 44:19, 45:7, 46:14, 47:2, 48:18
**special** [2] - 15:12, 19:24
**specifically** [5] - 60:4, 70:20, 79:3, 83:15, 91:9
**specificity** [1] - 10:20
**speculate** [1] - 54:1
**spent** [1] - 5:24
**staff** [3] - 63:15, 67:10, 67:12
**staffer** [1] - 63:17
**staffers** [2] - 67:17, 87:13
**stage** [1] - 10:5
**stand** [4] - 52:13, 54:11, 54:23, 55:8
**stars** [2] - 28:17, 70:11
**start** [7] - 7:24, 9:5, 35:11, 66:4, 73:12, 94:3
**started** [3] - 27:6, 60:21, 60:23
**starting** [3] - 18:21, 32:14, 61:16
**starts** [1] - 16:6
**state** [5] - 55:25, 56:3, 80:11, 87:7, 103:17
**statement** [10] - 4:7, 4:23, 5:2, 5:3, 5:7, 30:22, 33:16, 37:1, 99:1
**statement-against-interest** [1] - 4:7
**statements** [5] - 18:23, 22:12, 29:17, 59:2, 59:9
**States** [8] - 2:6, 17:11, 17:22, 22:22, 23:7, 25:23, 69:16, 108:13
**STATES** [3] - 1:1, 1:3, 1:11
**statistical** [1] - 87:19
**status** [1] - 14:24
**statutes** [1] - 56:12
**stay** [1] - 51:13
**stayed** [2] - 14:6, 51:3

**stenographic** [1] - 108:5

**step** [4] - 23:14, 51:19, 52:1, 94:18

**steps** [4] - 8:15, 14:6, 14:13, 43:7

**Steve** [2] - 53:9, 54:15

**still** [6] - 5:19, 29:16, 66:22, 75:10, 92:18, 100:3

**stipulation** [3] - 95:3, 97:9, 99:7

**stop** [10] - 23:9, 24:7, 24:10, 24:20, 28:12, 28:20, 35:6, 35:7, 35:12, 94:2

**Stop** [1] - 10:4

**stopped** [3] - 23:12, 25:23, 35:5

**story** [1] - 10:16

**straight** [1] - 99:14

**Street** [2] - 26:22

**strictly** [1] - 101:21

**strike** [1] - 43:19

**string** [1] - 10:14

**stripes** [1] - 28:17

**stuff** [3] - 16:14, 99:24, 101:22

**subject** [9] - 8:9, 9:10, 9:19, 14:20, 20:12, 21:17, 21:25, 22:7

**subjective** [1] - 9:25

**submit** [2] - 64:24, 68:21

**submitted** [1] - 98:12

**substantive** [1] - 16:17

**success** [1] - 82:2

**Suite** [1] - 1:16

**summary** [1] - 60:18

**Sun** [1] - 50:3

**support** [1] - 62:13

**supposed** [2] - 34:16, 95:21

**surprise** [1] - 18:7

**surrounding** [1] - 80:5

**suspect** [1] - 9:19

**sustain** [2] - 22:4, 29:22

**sustained** [1] - 33:24

**SWORN** [1] - 6:20

**sworn** [1] - 54:5

---

**T**

---

**table** [2] - 87:9,

103:3

**taint** [1] - 14:15

**takeaway** [1] - 10:13

**talks** [1] - 32:16

**tax** [4] - 80:6, 80:11, 80:20, 80:21

**taxes** [2] - 68:12, 68:13

**team** [11] - 14:15, 14:16, 25:5, 25:11, 25:16, 43:11, 44:6, 44:12, 44:19

**technically** [1] - 90:21

**telephone** [1] - 13:3

**tempt** [1] - 106:16

**ten** [2] - 6:3, 16:3

**tend** [1] - 96:11

**term** [5] - 12:8, 27:9, 62:21, 82:4, 87:21

**terms** [8] - 8:14, 9:24, 9:25, 16:22, 16:24, 19:1, 24:3, 38:7, 41:10, 47:10, 48:7, 52:6, 92:9, 105:19, 106:3, 106:19, 106:24, 107:2

**testified** [3] - 21:5, 54:23, 97:3

**testifies** [1] - 106:25

**testify** [8] - 4:16, 24:2, 55:3, 103:18, 103:24, 104:1, 104:12

**testifying** [3] - 4:17, 57:20, 96:2

**testimony** [27] - 5:25, 8:20, 9:22, 21:8, 24:19, 25:8, 25:11, 53:5, 53:6, 54:3, 54:10, 54:19, 55:2, 59:2, 60:1, 75:19, 95:1, 95:7, 95:9, 95:10, 96:20, 97:23, 98:2, 105:9, 105:11, 105:13

**Testimony** [1] - 3:7

**TESTIMONY** [1] - 55:16

**text** [7] - 15:24, 25:21, 26:2, 27:1, 49:17, 50:10

**THE** [195] - 1:1, 1:10, 1:14, 1:21, 2:2, 3:4, 4:4, 5:17, 5:19, 5:23, 6:3, 6:7, 6:13, 6:15, 6:16, 9:6, 9:8, 10:25, 11:2, 11:7, 11:9, 11:11, 14:24, 15:3, 15:8, 15:12, 15:17, 18:15, 18:21, 18:25,

19:3, 19:14, 19:16, 19:18, 20:2, 20:5, 21:10, 21:21, 22:4, 22:10, 23:2, 23:4, 24:1, 27:3, 27:14, 27:18, 27:21, 28:4, 28:23, 29:7, 29:22, 30:4, 30:11, 30:12, 30:15, 30:17, 30:21, 30:24, 31:4, 31:10, 31:13, 31:17, 31:22, 31:25, 32:5, 32:8, 32:12, 32:16, 32:24, 33:11, 33:15, 33:24, 34:9, 34:15, 35:17, 35:21, 35:23, 36:13, 37:4, 37:13, 37:24, 38:2, 38:7, 38:11, 38:18, 38:24, 39:6, 39:13, 40:4, 41:3, 41:5, 41:8, 41:13, 42:4, 42:16, 42:18, 43:21, 43:23, 44:2, 44:17, 45:3, 46:9, 46:22, 46:24, 47:9, 47:12, 47:15, 47:18, 48:2, 49:20, 49:21, 50:15, 50:17, 51:9, 51:16, 51:19, 51:20, 51:21, 52:1, 52:3, 52:6, 52:8, 52:11, 52:16, 52:25, 53:3, 53:10, 53:16, 53:20, 53:21, 53:22, 55:9, 55:16, 57:25, 58:4, 58:11, 59:18, 59:21, 88:13, 94:4, 94:8, 94:18, 94:20, 94:25, 95:3, 95:18, 95:21, 96:7, 96:22, 97:2, 97:15, 97:19, 97:24, 98:1, 98:22, 98:25, 99:6, 99:10, 99:16, 99:20, 100:9, 100:10, 100:13, 100:14, 100:15, 100:16, 100:19, 100:23, 101:9, 101:19, 102:16, 102:24, 102:25, 103:1, 103:5, 103:21, 104:3, 104:5, 104:7, 104:9, 104:12, 104:14, 104:16, 104:18, 104:21, 105:7, 105:14, 105:22, 106:14, 106:16, 107:2, 107:5, 107:12, 107:15, 107:18

**the-defense** [1] - 102:12

**theirs** [1] - 69:16

**theme** [1] - 12:22

**themselves** [1] - 64:7

**theory** [3] - 102:11, 103:6, 103:11

**theory-of** [1] - 102:11

**therefore** [1] - 4:22

**Thereupon** [4] - 6:5, 6:9, 53:1, 94:23

**they've** [1] - 97:11

**thinking** [2] - 79:8, 79:9

**third** [3] - 61:2, 61:3, 86:22

**third-party** [1] - 61:3

**thread** [5] - 10:1, 10:8, 10:11, 12:5, 12:12

**threads** [1] - 10:7

**three** [5] - 50:20, 60:11, 86:17, 86:19, 106:5

**threw** [1] - 74:2

**throughout** [3] - 50:8, 66:19, 80:7

**tickets** [1] - 22:15

**tie** [1] - 84:12

**tied** [1] - 68:16

**timeframe** [3] - 17:3, 18:1, 18:7

**title** [10] - 63:16, 65:17, 65:18, 65:20, 65:23, 67:1, 67:2, 67:5, 67:6

**today** [3] - 57:20, 60:1, 105:23

**together** [9] - 23:16, 26:9, 37:2, 69:24, 70:12, 70:16, 81:24, 81:25, 106:1

**Tom** [1] - 56:21

**tomorrow** [7] - 101:15, 101:23, 102:2, 103:18, 105:23, 107:4, 107:5

**ton** [1] - 84:21

**tone** [1] - 54:25

**tonight** [2] - 101:22, 106:6

**took** [9] - 9:17, 9:18, 9:20, 9:24, 14:6, 14:13, 17:2, 26:9, 43:7

**tool** [1] - 23:13

**top** [4] - 31:2, 31:8, 32:14, 90:4

**topic** [1] - 42:11

**totally** [1] - 4:15

**touch** [1] - 73:11

**tough** [2] - 10:20, 91:12

**town** [2] - 100:12, 100:21

**traced** [1] - 47:4

**track** [2] - 65:9, 86:1

**tracked** [2] - 87:14, 87:15

**tracking** [2] - 22:14, 87:19

**training** [1] - 60:8

**transcript** [21] - 52:14, 52:15, 52:21, 52:22, 54:4, 54:10, 54:19, 55:12, 58:3, 95:20, 95:23, 96:5, 96:13, 98:7, 98:12, 98:14, 98:15, 98:18, 106:7, 108:5, 108:6

**TRANSCRIPT** [1] - 1:10

**transcripts** [4] - 95:24, 96:9, 96:14, 96:16

**transfer** [1] - 79:13

**travel** [2] - 20:20, 49:23

**traveled** [1] - 49:24

**traveling** [2] - 23:23, 100:20

**treated** [1] - 53:5

**TRIAL** [1] - 1:10

**tricky** [1] - 96:11

**tried** [1] - 44:2

**trip** [11] - 6:25, 17:2, 17:17, 19:6, 20:12, 21:1, 23:10, 23:15, 28:22, 35:15, 51:4

**trouble** [1] - 96:18

**truck** [1] - 61:6

**true** [4] - 46:9, 61:22, 108:4, 108:5

**truth** [1] - 5:2

**truthful** [1] - 59:2

**try** [2] - 66:23, 68:3

**trying** [15] - 8:12, 8:17, 16:16, 27:12, 38:14, 38:18, 38:19, 67:18, 69:21, 74:24, 82:14, 83:12, 83:18, 92:14

**Tuck** [1] - 60:7

**turn** [4] - 58:16, 64:16, 68:24, 82:22

**turned** [1] - 25:3

**turning** [2] - 59:12, 91:11

**two** [7] - 7:17, 18:16, 61:3, 70:14, 72:13,

77:8, 107:10
**type** [3] - 80:12, 80:13, 85:21
**types** [1] - 63:10

## U

**U.S** [7] - 1:15, 1:18, 21:4, 48:25, 68:13, 77:6, 77:7
**ultimately** [4] - 64:25, 65:9, 85:17, 92:10
**unavailable** [8] - 4:11, 4:15, 53:12, 53:13, 53:17, 53:25, 54:8
**under** [7] - 4:17, 4:22, 5:5, 46:20, 47:3, 48:20, 86:7
**underlying** [1] - 40:19
**understood** [6] - 64:4, 65:8, 71:8, 79:11, 96:25, 102:10
**unfortunately** [1] - 93:8
**United** [7] - 17:11, 17:22, 22:22, 23:7, 25:23, 69:16, 108:13
**UNITED** [3] - 1:1, 1:3, 1:11
**united** [1] - 2:6
**unless** [2] - 48:10, 97:17
**unlike** [1] - 95:11
**up** [45] - 5:14, 9:7, 9:24, 10:3, 11:10, 12:14, 14:18, 19:1, 20:18, 21:3, 21:18, 26:9, 28:22, 30:13, 30:24, 37:22, 38:24, 39:1, 44:2, 45:12, 45:17, 45:20, 48:10, 54:14, 55:5, 58:16, 62:8, 72:19, 72:21, 73:16, 76:20, 78:24, 80:8, 82:1, 82:3, 82:12, 83:7, 83:8, 84:6, 88:12, 92:1, 94:20, 105:13, 106:7
**upper** [1] - 58:16
**uttered** [1] - 5:5

## V

**valid** [3] - 43:15, 44:23, 45:1
**value** [2] - 84:19,

85:9
**Ventura** [1] - 1:23
**ventured** [1] - 8:21
**verify** [1] - 60:17
**version** [2] - 90:1, 98:13
**vet** [3] - 68:11, 68:20, 75:9
**vetted** [1] - 68:17
**vetting** [4] - 68:9, 68:18, 72:24, 80:8
**via** [1] - 80:24
**Vice** [1] - 50:2
**vice** [4] - 65:18, 65:22, 65:24, 67:4
**view** [2] - 8:21, 96:1
**viewing** [1] - 95:9
**violations** [1] - 56:11
**Virginia** [1] - 66:21
**voice** [2] - 9:7, 54:25
**volunteer** [5] - 61:21, 63:16, 63:18, 63:19, 65:19
**votes** [1] - 85:7
**vs** [1] - 1:5

## W

**wait** [1] - 76:20
**waiting** [1] - 5:24
**waive** [1] - 4:2
**wants** [4] - 4:2, 40:19, 47:25, 80:12
**warning** [3] - 27:10, 27:24, 29:8
**warrant** [4] - 13:13, 13:20, 13:25, 25:14
**Washington** [7] - 1:6, 1:16, 1:20, 2:4, 2:8, 26:23, 108:14
**waste** [2] - 5:15, 101:25
**watched** [1] - 12:9
**ways** [1] - 19:3
**wealth** [1] - 73:17
**wealthy** [3] - 73:18, 74:1
**website** [2] - 93:2, 93:4
**Wednesday** [3] - 99:24, 101:15, 106:12
**week** [2] - 90:2, 105:1
**weeks** [1] - 81:22
**weight** [1] - 54:21
**White** [8] - 3:6, 52:4, 53:24, 55:7, 56:2, 60:3, 69:8, 90:5
**WHITE** [1] - 55:16

**white** [17] - 52:17, 53:8, 53:25, 54:3, 54:6, 54:9, 54:16, 55:3, 55:20, 55:25, 56:3, 91:14, 93:10, 93:21, 93:25, 97:3
**White's** [2] - 97:22, 98:2
**white's** [1] - 54:11
**whole** [5] - 39:3, 52:21, 52:22, 58:24, 95:24
**wide** [1] - 83:13
**wife** [3] - 62:4, 63:1, 63:6
**win** [2] - 84:1, 84:5
**wish** [3] - 57:1, 90:23, 107:3
**withdraw** [2] - 18:14, 36:2
**withdrew** [2] - 105:4
**Witness** [1] - 52:2
**witness** [45] - 5:6, 6:8, 10:22, 19:12, 29:5, 29:9, 29:18, 30:3, 30:14, 31:7, 36:6, 36:19, 46:9, 46:10, 48:1, 48:2, 48:5, 48:9, 48:10, 52:3, 52:13, 53:6, 53:23, 54:8, 54:10, 54:22, 54:23, 55:8, 56:14, 57:6, 57:12, 57:18, 88:11, 93:14, 93:17, 93:18, 95:23, 96:1, 96:2, 96:6, 96:19, 97:7, 98:10, 101:13, 105:5
**WITNESS** [14] - 6:20, 9:8, 11:11, 19:18, 20:5, 23:4, 31:25, 35:21, 37:4, 41:5, 42:18, 46:24, 49:21, 51:20
**WITNESSES** [1] - 3:4
**witnesses** [8] - 4:11, 56:7, 95:11, 102:19, 104:2, 104:23, 106:3, 106:21
**woman** [1] - 72:3
**word** [2] - 9:15, 87:6
**wording** [1] - 33:3
**words** [4] - 44:25, 54:5, 64:9, 97:6
**write** [12] - 20:7, 62:12, 68:11, 74:14, 74:16, 75:9, 75:11, 75:16, 76:23, 76:24, 80:12, 81:24
**writing** [3] - 76:16,

78:25, 79:9
**written** [3] - 55:12, 80:16, 100:19
**wrote** [5] - 20:9, 63:8, 80:9, 87:14, 87:16

## Y

**year** [2] - 69:5, 69:11
**years** [1] - 86:2
**York** [6] - 1:15, 1:19, 43:3, 66:20, 69:24, 70:18
**yourself** [8] - 26:12, 31:4, 31:6, 31:19, 40:13, 57:18, 86:9, 89:7
**yourselves** [1] - 94:13

## Z

**zooming** [1] - 90:4