## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

PRAKAZREL MICHEL (1),
          Defendant.

Criminal No. 19-148-1 (CKK)

## MEMORANDUM OPINION
(August 30, 2024)

On April 26, 2023, a jury convicted Defendant Prakazrel Michel ("Michel") of ten (10) counts related to his conduct in three (3) schemes involving conduit contributions, witness tampering, and foreign lobbying.  *See* ECF No. 273 (verdict form).  Before the Court is Michel's [310] Motion for New Trial ("Motion" or "Mot.").  Michel moves under Federal Rule of Criminal Procedure ("Rule") 33(a) for a new trial, arguing that a myriad of errors undermine the jury's verdict.  Mot. at 10.  The Government opposes the Motion in its entirety.  *See* Gov't's Opp'n, ECF No. 321.  After holding an evidentiary hearing and upon careful consideration of the briefing, relevant legal authorities, and the record as a whole, the Court shall **DENY** Michel's [310] Motion for New Trial.[1]

---

[1] The Court's consideration has primarily focused on the following documents:
- Michel's Motion for New Trial ("Mot."), ECF No. 310;
- The Government's Opposition to Motion for New Trial ("Gov't's Opp'n"), ECF No. 321;
- Michel's Reply in Support of His Motion for New Trial ("Reply"), ECF No. 326; and
- Michel's Notice and Request to Supplement Evidentiary Hearing Record ("Notice"), ECF No. 348, and accompanying exhibits.

## I.     BACKGROUND

The Court detailed the factual allegations of this case at length in previous opinions and incorporates those discussions herein.  *See, e.g.*, *United States v. Michel*, No. 19-148-1, 2022 WL 4119774, at *1–5 (D.D.C. Sept. 9, 2022); *United States v. Michel*, No. 19-148-1, 2023 WL 2388501, at *1–2 (D.D.C. Mar. 6, 2023).  The Court refers the reader to those opinions for further background information.  The Court shall also provide a summary below.

On June 10, 2021, a superseding indictment charged Michel with ten counts related to his conduct involving three schemes between June 2012 and January 2018.  *See* Superseding Indictment, ECF No. 84.  Specifically, Michel was charged by indictment with: (1) Conspiracy to Defraud the United States and to Make Illegal Foreign and Conduit Contributions (Count 1); (2) Concealment of Material Facts (Count 2); (3) two counts of Making a False Entry in a Record (Counts 3 and 4); (4) two counts of Witness Tampering (Counts 5 and 6); (5) Conspiracy to Serve as an Unregistered Agent of a Foreign Principal and a Foreign Government and to Commit Money Laundering (Count 7); (6) acting as an Unregistered Agent of a Foreign Principal and Aiding and Abetting (Count 8); (7) acting as an Agent of a Foreign Government (Count 10); and (8) Conspiracy to Make False Statements to Banks (Count 12).  *See generally id.*

Michel's trial began with jury selection on March 27, 2023, and the jury returned guilty verdicts on all ten counts on April 26, 2023.  ECF No. 273 (verdict form).  Following the return of the guilty verdicts, the Court ordered Michel to file "his supplemental Rule 29 motion and any other post-trial motion" by June 9, 2023.  Minute Order (Apr. 26, 2023).  After a series of extensions, Michel filed the pending Motion on October 16, 2023.  *See* ECF No. 310.  The Government filed its opposition on November 6, 2023, ECF No. 321, and Michel filed his reply on November 13, 2023, ECF No. 326.  In January 2024, the Court held an evidentiary hearing on

Michel's claims of ineffective assistance of trial counsel, which began on January 10th and concluded on January 12, 2024.  *See, e.g.*, Minute Entry (Jan. 10, 2024).  The Court also obtained the official transcripts of the proceedings.  *See, e.g.*, ECF No. 318; ECF No. 325; ECF No. 347; ECF No. 349.

In addition to filing the pending Motion for New Trial, Michel simultaneously filed a Motion for Judgment of Acquittal, arguing that the evidence at trial was insufficient as a matter of law to sustain his convictions as to eight counts (Counts 1, 2, 3, 4, 7, 8, 10, and 12).  *See* ECF No. 309.  Upon consideration of the evidence at trial, this Court concluded that the evidence was sufficient to withstand a motion for judgment of acquittal under Rule 29.  *See generally United States v. Michel*, No. 19-148-1, 2024 WL 1603362 (D.D.C. Apr. 12, 2024).  The Court detailed in that opinion evidence presented at trial and incorporates those discussions herein.  *See generally id.*  As demonstrated below, the evidence at Michel's trial was voluminous.

To begin, Counts 1 through 6 pertained to an alleged conduit scheme (Counts 1, 2, 3, 4) and corresponding witness tampering (Counts 5 and 6).  For instance, Count 1 of the operative indictment charged Michel with Conspiracy to Defraud the United States and to Make Illegal Foreign and Conduit Contributions.  *See* ECF No. 84 ¶¶ 20–74.  This count alleged that Michel conspired with Low Taek Jho ("Low") to, *inter alia*, make foreign contributions.  *Id.* ¶ 21.  With respect to the 2012 conduit scheme, there was no dispute that Low wired millions of dollars to Michel or that Michel used portions of those funds to make campaign contributions to help Low and "to get [him] into the [campaign] event."  4/18/2023 PM Trial Tr. at 66:13–20; *see also id.* at 88:4–5 (Michel testifying that "[Low] sent me my money.  He sent me money for me to help him, again, get him a photo.").  There was substantial evidence that the conduit scheme arose from Low's desire to obtain a personal audience with President Barack Obama and to make

contributions to President Obama's reelection campaign—even though Low's status as a foreign national prohibited him from doing the latter. *See, e.g.*, Gov't Ex. 290 (J. Rousseau email to Low, stating, "They also guarantee you a maximum 15 minute audience with the President (one on one) that's huge brother[.]"); 4/3/2023 AM Trial Tr. at 92:22–93:11. The jury was also informed that federal law prohibits foreign nationals (like Low) from contributing to political campaigns. *See, e.g.*, 3/31/2023 PM Trial Tr. at 13:8–24 (E. Feigenbaum testimony on how "federal law prohibits foreign nationals from contributing to the campaign"); *see* 52 U.S.C. § 30121. Knowing Low could not legally contribute to the presidential campaign, Michel decided to "help [Low]" by contributing to the Obama campaign with funds that originated from Low. 4/18/2023 PM Trial Tr. at 66:13–68:11; *id.* at 88:6–8. After Michel reached his personal contribution limit, he provided tens of thousands of dollars per person (ranging from $30,000 to $40,000) to others, who in turn contributed to the Obama campaign in their names. *See, e.g.*, 3/31/2023 AM Trial Tr. at 110:5–14 (J. Toussaint testifying that he received $40,000 from Michel to contribute to the campaign and attend the fundraising event); *id.* at 128:17–21 (T. Wright testifying that Michel gave her the funds because "he had reached his contribution cap, I believe, or max contribution, the amount he could make"); 4/18/2023 PM Trial Tr. at 82:5–14 (Michel confirming that he provided money to others "to make contributions in their names").

Count 1 of the operative indictment also alleged that Michel conspired with Low to make conduit contributions (i.e., contributions made in the name of another). *See* ECF No. 84 ¶ 21. The jury heard testimony that federal law prohibits conduit contributions. *See* 3/31/2023 PM Trial Tr. at 14:7–20; *see also* 52 U.S.C. § 30122. Michel confirmed that he provided money to various people he knew so that they would make contributions to the Obama campaign in their names. 4/18/2023 PM Trial Tr. at 82:5–7. Despite receiving these funds from Low, Michel never revealed

that Low was the source of the funds and actively sought to conceal this fact.  *See, e.g.*, Gov't's Ex. 294 at 2 (email string between E. Tan and J. Rousseau with Tan stating "one of them whom you know who is a Malaysian citizen.  Pls keep name off e-mails. (to meet with the main guy + be at the event)"); 4/18/2023 PM Trial Tr. at 69:16–70:5 (Michel testifying that "[t]he money came from Jho Low"); Gov't's Ex. 245 (Michel declaration to the FEC, claiming he was the "true source" of the donations to Black Men Vote ("BMV")).  This evidence (and more) supported the charges alleged in the Superseding Indictment as it pertains to the conduit scheme (Counts 1, 2, 3, and 4).

Next, Michel was also charged for his conduct in two (2) lobbying schemes and associated money laundering and false statements to banks (Counts 7, 8, 10, and 12).  For instance, Count 10 of the Superseding Indictment charged Michel with acting as an Agent of a Foreign Government—specifically, the government of the People's Republic of China ("PRC").  *See* ECF No. 84 ¶¶ 154–55.  The evidence at trial—including Michel's own testimony—demonstrated that Michel (and others) met with the PRC Vice Minister of Public Security, Sun Lijun, on various occasions related to the PRC's desire to extradite a Chinese national, Guo Wengui, to China.  *See, e.g.*, 4/19/2023 AM Trial Tr. at 36:23–37:4 (testimony that Michel met with Vice Minister Sun in China); *id.* at 38:2–7 (testimony that Michel met with Vice Minister Sun in New York).  Michel conceded on cross-examination that Vice Minister Sun asked for his (and others') help, and that he specifically agreed to help Vice Minister Sun.  *See id.* at 37:8–11 ("Q: And Vice Minister Sun asked you and Mr. Broidy and Ms. Lum Davis to help him get meetings with U.S. Government officials. Right? A: Correct."); *id.* at 37:20–38:1 ("Q: You, Mr. Broidy, and Ms. Lum Davis agreed to help try to set up the meetings for Vice Minister Sun. Right? A: Well, my help is in connecting and relaying the information back and forth.  Yes.  Q: To help Vice Minister Sun? A: Right, because he was

supposed to meet with FBI Director Comey."). The evidence at trial showed that Michel agreed to assist the PRC government by facilitating Guo's extradition. *See id.* at 69:5–9 (Michel confirming that he sent himself an email "with the information that Low had given [him] from the Chinese government about Guo"); 4/19/2023 AM Trial Tr. at 73:21–74:7 (Michel stating Vice Minister Sun gave him a letter addressed to Attorney General Jeff Sessions from the Chinese ambassador). To do so, Michel enlisted the help of others, including his former attorney, George Higginbotham, and acted as a supervisor. *See, e.g., id.* at 44:23–45:4 (Michel confirming that he directed Higginbotham to go to the Chinese embassy in Washington, D.C. to meet with the Chinese ambassador). This evidence supported the charges in the operative indictment regarding the lobbying scheme on behalf of the PRC Government (and associated money laundering and false statements to banks).

The Superseding Indictment also charged Michel with a second lobbying scheme. Count 8 charged Michel as an Unregistered Agent of a Foreign Principal and with Aiding and Abetting. *See* ECF No. 84 ¶¶ 150–51. The jury was presented with evidence that Michel agreed to assist Low with respect to the 1MDB investigation against Low by the Department of Justice. *See, e.g.*, Gov't's Ex. 439 (contract between Pheng, an agent of Low, and Michel regarding Michel's services to achieve a favorable resolution of the 1MDB matter); 4/19/2023 AM Trial Tr. at 21:22–25 (Michel testifying, "in order for me to initiate this business transaction from Pheng, which brought to me by Jho Low, I understood I had to do something for Jho Low, which is help him with his legal affairs"). Michel actively sought and enlisted others (Higginbotham and Elliot Broidy) to assist on the 1MDB matter. *See, e.g.*, 4/6/2023 AM Trial Tr. at 7:7–10 (Higginbotham testifying that Michel "approached [him] about trying to help him identify an attorney that had the ability to resolve a civil forfeiture matter for Jho Low having to do with the 1MDB case"); 4/4/2023

AM Trial Tr. at 67:22–25 (Broidy testifying that Michel "was putting a team together . . . [Michel] was looking for people to be on the team to work on the [1MDB] matter").  Michel then served as a supervisor and intermediary between Low and the others.  *See, e.g.*, 4/19/2023 AM Trial Tr. at 78:12–14 (Michel testifying "I'm just a messenger.  I'm bringing one message to another, because part of my agreement from the investment—from Pheng is to try to help Jho Low with his legal issue.");  4/4/2023 AM Trial Tr. at 137:22–24 (Broidy testifying that when he would provide updates to Lum Davis, she would provide updates to Michel); *id.* at 112:16–18.  Critically, these lobbying schemes were done with the intent to conceal the true benefactors and leaders: Low and the PRC government.  *See, e.g.*, 4/11/2023 AM Trial Tr. at 21:19–23 (Higginbotham testifying "[t]here was definitely an attempt to anonymize what we were doing across the board, and FARA would have pretty much announced, you know, officially, that we were involved in this—in these activities"); *see also* 4/4/2023 AM Trial Tr. at 87:18–88:4.  Once again, this evidence supported the charges in the operative indictment regarding the lobbying scheme on behalf of a foreign principal, Low, and associated money laundering and false statements to banks.

As an aside, the Court notes that the counts pertaining to witness tampering (Counts 5 and 6) have not been contested in the pending Motion, or in Michel's Motion for Judgment of Acquittal. *See generally* Mot.; *see generally* ECF No. 309.

In sum, the Government provided voluminous evidence through nineteen (19) witnesses, including two (2) co-conspirators and seven (7) campaign contributors who received the funds from Michel, and extensive exhibits (hundreds of pages), supporting Michel's convictions.  Michel's own testimony largely either corroborated the Government's evidence or did not

controvert it.[2]  It is reasonable to infer that the jury did not credit Michel's testimony as it related to defenses he proffered based on their verdicts.

With this factual background information in mind and the Motion fully briefed, the Court turns to its resolution.

## II.      LEGAL STANDARD

### A.  Rule 33(a)

Under Rule 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The D.C. Circuit has held that "granting a new trial motion is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred."  *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (internal quotation marks and citation omitted).  The Court has "broad discretion" in deciding a motion for a new trial.  *Id.*  The defendant bears the burden of proving that a new trial is justified.  *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982).

### B.  Ineffective Assistance of Counsel

The Sixth Amendment of the United States Constitution guarantees criminal defendants the right to counsel.  *See* U.S. Const. amend. VI.  As the Supreme Court has recognized, this "right to counsel is the right to the effective assistance of counsel."  *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).

Claims of ineffective assistance of counsel ("IAC") are governed by the two-step standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To succeed, a defendant must show both: (1) deficient performance by his counsel; and (2) prejudice to the defense.  *Strickland*,

---

[2] In addition to Michel's testimony, Defense counsel called Special Agent Harry Lidsky and former Attorney General Jefferson Sessions, and read into the record portions of Frank White's testimony during the grand jury proceedings. *See* Section III.A.1 (discussion of Agent Lidsky's testimony).

466 U.S. at 687. Specifically, this standard requires a party claiming IAC to show that: (1) "counsel's representation fell below an objective standard of reasonableness . . . [measured] under prevailing professional norms"; and (2) the "deficiencies in counsel's performance [were] prejudicial to the defense." *Id.* at 688, 692.

To establish deficient performance, the defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690; *see also United States v. Cronic*, 466 U.S. 648, 666 (1984) (requiring defendants to "point[] to specific errors made by trial counsel"). To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The defendant bears the burden of proof as to both prongs under *Strickland* (deficient performance and prejudice), and a "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 687, 700. In deciding an IAC claim, courts need not "approach the inquiry in the same order" or "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

The Supreme Court further instructs that "[j]udicial scrutiny of counsel's performance must be highly deferential," and that courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption, that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). To "fair[ly] assess[] [an] attorney['s] performance," "every effort" must "be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

challenged conduct, and to evaluate the conduct from counsel's performance at the time." *Id.* The appropriate "benchmark" for an IAC claim is whether "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. Notably, "[u]nder established law, it is very difficult for a convicted defendant to prevail on a claim of ineffective assistance of counsel[.]" *United States v. Moore*, 703 F.3d 562, 574 (D.C. Cir. 2012).

## III.   DISCUSSION

Michel raises four (4) independent grounds—encompassing a total of fourteen (14) asserted errors—in support of his Motion for New Trial. *See generally* Mot. Broadly, Michel argues that (1) the jury was "influenc[ed]" and the verdict was "tainted" because the jury was informed that two federal judges had ruled "that Michel conspired with [others] to commit the charged crimes"; (2) FBI Special Agent Robert Heuchling provided improper overview testimony and "improperly offered lay opinion testimony that Michel was guilty of the charged schemes"; (3) Michel's trial counsel, David Kenner, was ineffective and severely prejudiced the defense; and (4) Michel's trial counsel had two conflicts of interest that affected his performance during trial. *Id.* at 14, 21, 29, 50. Lastly, Michel claims that the cumulative effect of these errors, including the errors during trial and Kenner's ineffective assistance, justifies a new trial. *Id.* at 57. The Court shall address each argument in turn.

### A.  The Rulings of Two Federal Judges

To begin, Michel argues that the Court should grant a new trial because, according to him, the jury was "aware[] that the Court, and the grand jury judge before that, had determined that Michel was guilty," which "plainly prejudiced Michel and influenced the jury's verdict." *Id.* at 18. Michel maintains that each of these purported errors are independently sufficient to warrant a

new trial, "but together they leave no doubt[.]"  *Id.*  The Court addresses each of Michel's contentions below.

    1.  <u>Grand Jury Judge's Crime-Fraud Order</u>

      Michel's first argument is that a new trial is warranted because the jury was made aware that a grand jury judge had previously found there was probable cause to believe that Michel conspired with George Higginbotham (his former attorney).  Mot. at 18.  Michel claims that it was "extremely prejudicial" for the jury to learn of this prior judicial finding.  *Id.*

      In this jurisdiction, prior judicial findings are often excluded under Federal Rule of Evidence ("FRE") 403, in part because of the potential for prejudice to the party opposing admission.  *See, e.g.*, *Moore v. Hartman*, 102 F. Supp. 3d 35, 143 (D.D.C. 2015) (BAH); *Hairston v. Wash. Metro. Area Transit Auth.*, No. 93-2127, 1997 WL 411946, at *2 (D.D.C. Apr. 10, 1997) (TFH) ("[I]t is likely that judicial findings of fact would be given undue weight by a jury which would result in a serious danger of unfair prejudice to the defendant.").  But this risk of prejudice to a defendant can be alleviated if an "appropriate limiting instruction" is given.  *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 46 (D.D.C. 2016) (RC); *cf. United States v. Sine*, 493 F.3d 1021, 1034 (9th Cir. 2007) ("Our determination that references to facts found in a judicial opinion can unfairly prejudice a party does not mean that admission of such facts will *always* fail the balancing test of Rule 403.").  Moreover, under the door-opening principle, a trial court is required to "determine whether one party's evidence and arguments, in the context of the full record, have created a 'misleading impression' that requires correction with additional material from the other side."  *Hemphill v. New York*, 595 U.S. 140, 152 (2022); *see also United States v. Brown*, 921 F.2d 1304, 1307 (D.C. Cir. 1990) ("Under the curative admissibility doctrine, the introduction of

inadmissible or irrelevant evidence by one party justifies or 'opens the door' to admission of otherwise inadmissible evidence.") (quotation cleaned up).

During trial, Michel's trial counsel (Kenner) questioned defense witness Special Agent Harry Lidsky during direct examination regarding Special Agent Lidsky's review of materials obtained by a search warrant from Higginbotham's email account. *See* 4/17/2023 PM Trial Tr. at 13:10–22. As reflected in the trial transcript, Kenner asked Special Agent Lidsky: "So after you had read all of the Google search materials, you decided that you needed to do something to avoid interfering with the attorney-client relationship?" *Id.* at 14:8–10. In response, Special Agent Lidsky indicated that, prior to reading the material, there was a separate "taint team or filter team" that reviewed the materials to determine "if there was any privileged material[.]" *Id.* at 14:15–19. Kenner then asked: "Did you ever raise the subject with Mr. Higginbotham about privilege?" *Id.* at 14:20–21. Government counsel objected to that question and the Court sustained the objection. *Id.* at 14:22–15:1. Shortly thereafter, Kenner asked Special Agent Lidsky: "Did you tell border patrol to stop Mr. Higginbotham because you had learned that he had a notebook in his possession regarding attorney-client issues and house renovations? Is that why you had them stop him, to get that notebook?" *Id.* at 24:7–11. Special Agent Lidsky stated that he did recall Higginbotham having a notebook, but he "certainly would not have pointed it out as it has attorney-client material and [he] need[s] it." *Id.* at 24:12–16; *see id.* at 24:16–18 ("If I flagged it might contain attorney-client material, it would be for them and certainly me to avoid it."). Special Agent Lidsky then testified that when he did eventually obtain possession of Higginbotham's notebook, he sent it to the filter team and "received pieces of it later that were deemed relevant and non-privileged." *Id.* at 25:1–7. Kenner once again questioned whether Special Agent Lidsky reviewed the "entirety of

the Mr. Higginbotham notebook," to which Special Agent Lidsky indicated that he would have only reviewed the non-privileged materials.  *Id.* at 25:8–16.

Subsequently, during cross examination, Government counsel questioned Special Agent Lidsky regarding the privileged materials contained in Higginbotham's notes.  *See id.* at 43:5–9. Government counsel began indicating that the filter team in this case "obtained a crime fraud order from a judge ruling that because there was probable cause to believe that Mr. Michel involved Mr. Higginbotham in criminal activity, there was no valid attorney-client privilege."  *Id.* at 43:11–15. Kenner objected to this line of questioning and moved to strike.  *Id.* at 43:16–44:9.  The Court overruled Kenner's objection because he "did get into and kept talking about an attorney-client privilege."[3]  *Id.*  Government counsel then repeated his question: "[T]he filter team in this case obtained a crime fraud order from a judge ruling that because there was probable cause to believe that Mr. Michel involved Mr. Higginbotham in criminal activity, there was no valid attorney-client privilege between them.  Right?"  *Id.* at 44:19–23.  After Special Agent Lidsky stated "[t]hat is correct," Government counsel clarified, "[i]n other words, because Mr. Michel used an attorney to help commit his crimes, there was no valid privilege," to which Special Agent Lidsky stated "[y]es."  *Id.* at 44:24–45:2.

The next day, the Court provided a curative instruction to the jury.  *See* 4/18/2023 AM Trial Tr. at 48:22–50:12.  The instruction is repeated below:

> Members of the jury, we are going to move in a moment to the next witness, but I wanted to give you this jury instruction.  Yesterday you heard testimony during Agent Lidsky's testimony that a different judge, not me, issued what is termed a crime-fraud order during the grand jury's investigation of this case.  So during the early stage of a criminal case, the government can apply to the court for permission to access materials that may be subject to an attorney-client privilege.  The

---

[3] As a result of this line of questioning by Government counsel, Michel's trial counsel orally moved for a mistrial on April 18, 2023.  *See* 4/18/2023 AM Trial Tr. at 8:8–11.  The Court denied trial counsel's oral motion for a mistrial, finding there was no error, "much less error mandating the severe remedy of a mistrial."  Minute Order (Apr. 18, 2023).

government can do this in order to continue on its investigation. The government may and did argue to a different judge, among other things, that the Court should find that the attorney, which would be Mr. Higginbotham, in this case assisted his client in the commission of a criminal offense. It is sometimes termed what we call the crime-fraud exception to the attorney-client privilege. So the standard for the court—for that court, to find that no attorney-client privilege existed because of the crime fraud exception to the attorney-client privilege, in other words, which allows the information to be seen and considered is much lower than the standard for you to find a defendant guilty. That Court need only find there is probable cause to believe the attorney assisted in the commission of a crime, so that would be Mr. Higginbotham. Probable cause means there are circumstances that would lead a reasonable person to believe that the attorney assisted in the commission of a crime. So here, another judge found that there was probable cause to believe that Mr. Higginbotham assisted Mr. Michel in the commission of a crime based on the information that the government provided to that particular judge. You, however, must find Mr. Michel guilty beyond a reasonable doubt, not probable cause. Anything less will not do. Proof beyond a reasonable doubt is a much higher standard and burden than probable cause. And I will be instructing you later. Proof beyond a reasonable doubt means evidence that leaves you firmly convinced of something. As a result, you may not find that Mr. Michel committed any element of any offense, simply because another judge found that probable cause existed to believe that a particular fact was true at that time based on evidence that the government had provided to that particular judge.

*Id.* at 48:22–50:12. To the Court's knowledge, and the parties do not suggest otherwise, no additional references were made to the crime-fraud order by either party for the remainder of the trial.

In his Motion, Michel argues that the "jury's awareness that the grand jury judge had already ruled that Michel conspired with Higginbotham and others plainly prejudiced Michel and tainted the jury's verdict." Mot. at 20. But it was Kenner—Michel's trial counsel, not Government counsel—who first inquired as to whether Special Agent Lidsky properly reviewed materials that originated from Higginbotham. *See generally* Section III.A.1. And Kenner continued this line of questioning even after the Court reminded him that there was not an attorney-client privilege issue as it relates to Higginbotham. *See* 4/17/2023 PM Trial Tr. at 14:24–15:15; *id.* at 24:7–25:20. As a result of this line of questioning, Kenner created the "misleading impression" that Special Agent

Lidsky infringed upon the attorney-client privilege. *Hemphill*, 595 U.S. at 152. Because Kenner "opened the door" to this issue, Government counsel sought to clarify to the jury that Special Agent Lidsky did not, in fact, infringe upon the attorney-client privilege. *See generally* Section III.A.1; *see also* 4/17/2023 PM Trial Tr. at 43:22 (Government counsel stating Kenner "opened the door to this"). Notably, Government counsel did not produce a copy of the crime-fraud order to the jury, read excerpts of the crime-fraud order to the jury, or (to the best of the Court's recollection) raise the issue again during trial. Because Kenner opened the door to this line of questioning, Government counsel was permitted to briefly address what would have otherwise been inadmissible evidence. *See Brown*, 921 F.2d at 1307.

Michel also argues that the Court's subsequent instruction to the jury "amplified the error and prejudice" because the Court "repeated multiple times that the prior judge ruled that Michel had conspired." Mot. at 20. The Court disagrees. As shown by the transcript, the Court's jury instruction focused on the different levels of proof—probable cause and beyond a reasonable doubt—and the Court's instruction reminded the jury that they may not find Michel "committed any element of any offense, simply because another judge found that probable cause existed to believe that a particular fact was true at that time based on evidence that the government had provided to that particular judge." 4/18/2023 AM Trial Tr. at 49:12–50:12. The Court's passing references to Michel served to explain the circumstances surrounding the crime-fraud order and the differences in the level of proof. *See id.* And, like Government counsel, the Court did not repeat this information to the jury for the remainder of the trial.

In all, considering Government counsel's limited questioning after Michel's trial counsel "opened the door" and the Court's own curative instruction, Michel has not carried his burden of demonstrating that a "serious miscarriage of justice" occurred. *Wheeler*, 753 F.3d at 208 (internal

quotation marks and citation omitted); *see Hassanshahi*, 195 F. Supp. 3d at 46 (concluding that admitting a prior judicial opinion would not be too prejudicial when the government proposed to "excise much, if not all, of the substantive discussion of the opinion" and "any prejudice can be lessened by an appropriate limiting instruction").  Defense counsel's line of inquiry strongly implied that Special Agent Lidsky and other investigators improperly sought evidence—the notebook—that would interfere with or breach the attorney-client privilege between Michel and Higginbotham, his attorney.  Defense counsel opened the door as to whether there was an attorney-client privilege that applied in this instance.  The crime-fraud exception, which vitiates the attorney-client privilege, did apply in this case, as held in a grand jury order by another judge.  It was proper to introduce the subject of the court order, with an appropriate explanatory jury instruction, to counter the prejudicial effect of Defense counsel's questions as to the applicability of the privilege to evidence in the case.  Accordingly, Michel's Motion for New Trial on this basis fails.

### 2.  This Court's Rulings

Michel's second contention is that this Court erred by ruling on certain evidentiary objections in the presence of the jury.  Mot. at 21.  Michel further claims that the Court provided no curative instruction following its rulings, which served to amplify the prejudice to Michel.  *Id.*

"The precepts of fair trial and judicial objectivity do not require a judge to be inert." *United States v. Liddy*, 509 F.2d 428, 438 (D.C. Cir. 1974).  But while a federal judge "has inherent authority [] to comment on the evidence adduced by counsel[;] [w]hat is required, however, are reins of restraint" such that the court does not "'tilt' or oversteer the jury or control their deliberations." *Id.* (citations omitted); *see also Quercia v. United States*, 289 U.S. 466, 470 (1933) ("This court has accordingly emphasized the duty of the trial judge to use great care that an

expression of an opinion upon the evidence should be so given as not to mislead, and especially that it should not be one-sided.") (citations and internal quotation marks omitted).

To the Court's knowledge, the D.C. Circuit has yet to address the issue raised by Michel. Some circuit courts have found that certain evidentiary rulings made by a district court in the presence of a jury can amount to error.  *See United States v. Sevilla-Acosta*, 746 F.3d 900, 905 (8th Cir. 2014) ("[T]he court's ruling [on the co-conspirator hearsay exception] in the jury's presence was error."); *United States v. Hester*, 140 F.3d 753, 758 (8th Cir. 1998) ("The district court's sua sponte ruling on the admissibility of coconspirator evidence before the jury . . . was indeed an unfortunate error."); *United States v. Lance*, 853 F.2d 1177, 1182 (5th Cir. 1988) ("We begin by acknowledging the prejudicial nature of the judge's statement."); *see also United States v. August*, 745 F.2d 400, 405 (6th Cir. 1984) ("We are mindful that 'conspiracy' is a particularly prejudicial word, and that a jury may give great weight to a judge's remarks, even if told it should disregard them.").  But even in the circuits that have recognized the potential "prejudicial nature" of such judicial rulings, the statements do not "necessarily [constitute] reversible error."  *Lance*, 853 F.2d at 1182.  Rather, they "must be reviewed under the totality of the circumstances, considering factors such as the context of the remark, the person to whom it is directed, and the presence of curative instructions."  *Id.*; *see also Sevilla-Acosta*, 746 F.3d at 905 (considering whether district court provided instructions to cure any prejudicial effect).

During trial, the Court made a myriad of evidentiary rulings.  As relevant here, the Court, at times, made its rulings in the presence of the jury,[4] including six (6) instances in which the Court stated that the co-conspirator exception to the ban on hearsay—Rule 801(d)(2)(E)—applied during

---

[4] The Court notes that the trial in this matter occurred in March and April 2023, during which time the Court continued its COVID-19 safety procedures, which involved the use of plexiglass shields between the Court, the parties, and the jury, as well as the use of intercoms for bench conferences.

the testimony of two witnesses (five instances during the testimony of Higginbotham and one instance during the testimony of Heuchling), and therefore the objected-to statements were admissible. *See* 4/6/2023 AM Trial Tr. at 76:4–11 ("Mr. Kenner: Same objection, Your Honor. He can testify to what Mr. Michel said or did. The Court: He can certainly testify as to what Mr. Michel did as a co-conspirator statement. And at this point there's sufficient evidence that the government has put on for the Court to consider them as co-conspirator statements and enough for a conspiracy in order to be able to do so.").[5] These evidentiary rulings were primarily made in response to Defense counsel's objections to certain statements addressed to or elicited from Higginbotham, a cooperating co-conspirator witness. *See id.*; *supra* n.5. Kenner's objections focused on what he perceived to be eliciting state-of-mind testimony; however, Kenner conceded on the record that testimony about what "Michel said or did" would be admissible under the co-conspirator exception to hearsay. *See id.* at 76:4–5.

On two (2) separate occasions, the Court instructed the jurors that they were the sole finders of fact in this case, and that they were to disregard any comments by the Court that may have suggested an opinion as to Michel's guilt. First, during preliminary instructions, the Court stated:

> Now, during this trial I may rule on motions and objections by the lawyers, make comments to the lawyers. I will do only clarifying questions of the witnesses and instruct you on the law. You should not take any of my statements or actions as any indication of an opinion on my part about how you should decide the facts. If you think that somehow I've expressed or even hinted at an opinion as to the facts in this case, you should disregard it. It was certainly not intentional. The verdict, in this case, is your sole and exclusive responsibility in terms of determining the facts.

3/30/2023 AM Trial Tr. at 25:13–23. Similarly, during final jury instructions, the Court stated:

> You may not take anything I may have said or done as indicating how I think you should decide the case. I try not to develop any views during the course of a trial.

---

[5] Additional instances of the disputed evidentiary rulings are cited herein. *See* 4/6/2023 AM Trial Tr. at 17:17–19; 4/11/2023 PM Trial Tr. at 53:11–15; *id.* at 57:13–21; *id.* at 72:19–73:2; 4/13/2023 PM Trial Tr. at 21:23–22:15.

But if you believe that I have expressed or indicated any such opinion, you should ignore it.  The verdict in this case is your sole and exclusive responsibility.

4/24/2023 AM Trial Tr. at 8:10–15.   The final jury instructions the jury received for their deliberations also mirrored this language.  *See* Jury Instructions, ECF No. 290, at 7 (Instruction No. 2).   Additionally, the final instructions informed the jury on how they can consider co-conspirator statements:

> In determining whether a conspiracy between two or more persons existed and whether Mr. Michel was one of its members, you may consider the acts and statements of any other member of the conspiracy as evidence against Mr. Michel whether done in or out of his presence while the conspiracy existed.  When persons enter into an agreement to commit a crime, they become agents for each other so that actions which are said or done by one of them in furtherance of that purpose are deemed to be the actions of all who have joined in that conspiracy and is evidence against all of the conspirators.  However, statements of any conspirator which are made before its existence or after its termination may be considered as evidence only against the person making such statements.

*Id.* at 38 (Instruction No. 25).

As a threshold matter, Michel's trial counsel did not object to the disputed evidentiary rulings made by the Court during trial.  As such, the Court must apply the plain error standard.  *See United States v. Brown*, 508 F.3d 1066, 1076 (D.C. Cir. 2007).  To establish "plain error," the defendant must show there was: (1) a legal error; (2) that was plain (i.e., clear or obvious); and (3) that affected defendant's substantial rights.  *United States v. Eiland*, 738 F.3d 338, 363 (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *United States v. Wilson*, 605 F.3d 985, 1022 (D.C. Cir. 2010)).  Even if plain error is shown, reversal is only warranted if: (4) "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.* (quoting *Wilson*, 605 F.3d at 1022).  The defendant bears the burden of proving each element under the plain error standard.  *Id.* (quoting *Wilson*, 605 F.3d at 1022).

Without guidance from the D.C. Circuit, the Court looks primarily to out-of-circuit case law to determine whether its evidentiary rulings made in the presence of the jury—as it relates to

the co-conspirator exception to hearsay—was error.  Notably, this case law recognizes the weight a jury may place on what they perceive to be a district court's opinion.  *See Lance*, 853 F.2d at 1182.  Out of an abundance of caution, the Court shall assume, *arguendo*, that making the disputed evidentiary rulings in the jury's presence was error.  Even under that assumption, viewing the trial as a whole and the context in which the rulings were made, any error stemming from the disputed evidentiary rulings did not affect Michel's substantial rights.  *See id.* (any comments "suggesting a judge's opinion concerning guilt" is not per se "reversible error but must be reviewed under the totality of the circumstances"); *see also Sevilla-Acosta*, 746 F.3d at 905 (curative instructions were sufficient to "purge any prejudicial effect" of the court's statements).

In this case, the Court's statements were made in the context of an evidentiary ruling on the admissibility of a statement of an alleged conspirator, while the co-conspirator was testifying about the respective roles of Michel and the co-conspirator witness.  Specifically, Michel's trial counsel would raise an objection and the Court would rule on his objection by referring to a FRE exception to hearsay (the co-conspirator exception).  *See id.*  The Court never directed its statements to members of the jury; each statement was directed to counsel.  *Id.*  Moreover, the Court repeatedly informed the jury to disregard any comments made by the Court that the jury believed indicated the Court's opinion in this case.  *See generally* Section III.A.2.  In doing so, the Court emphasized on multiple occasions that the verdict in this case was the jury's exclusive responsibility.  *Id.*  The jury is presumed to have followed the Court's instructions.  *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009).

Considering the context of the Court's evidentiary rulings, as well as the Court's instructions to the jury, Michel has not established that the decision to rule in the presence of the jury with respect to the disputed evidentiary rulings affected his substantial rights.  *See, e.g.*, *Lance*,

853 F.2d at 1182 (declining to reverse defendant's convictions for similar reasons); *Sevilla-Acosta*, 746 F.3d at 905 (declining to reverse motion for mistrial in light of trial judge's curative instructions); *Hester*, 140 F.3d at 758 (same).

* * *

In sum, the Court shall deny Michel's Motion for New Trial on this ground (judicial rulings).  Michel has not satisfied his burden in demonstrating that the references to the grand jury judge's crime-fraud order was error, nor has he demonstrated that the Court's evidentiary rulings made in the presence of the jury affected his substantial rights.

## B. Agent Robert Heuchling's Testimony

Michel's second ground for a new trial is that Government counsel improperly used Agent Heuchling as an "overview witness," in contravention of D.C. Circuit precedent.  Mot. at 21. Michel also argues that Agent Heuchling provided improper lay opinion testimony that Michel was guilty of the charged schemes, which "usurp[ed] the role of the jury and influenc[ed] the jury's verdict."  *Id.* at 21–22.

The D.C. Circuit's opinion in *United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011), provides the appropriate framework for the Court in resolving whether Agent Heuchling delivered improper overview witness and lay opinion testimony.  In *Moore*, the D.C. Circuit "condemn[ed] the practice" of overview witness testimony (meaning a witness presenting a summary of the government's case) because such testimony "runs the serious risk of permitting the government to impermissibly 'paint a picture of guilt before the evidence has been introduced' and may never be introduced."  651 F.3d 30, 60 (D.C. Cir. 2011) (quoting *United States v. Griffin*, 324 F.3d 330, 349 (5th Cir. 2003)) (citing other circuit court cases).  Prior to *Moore*, the D.C. Circuit had identified three "obvious dangers" exacerbated by the use of an overview witness (also known as a summary

witness). *Id.* at 56 (quoting *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983)).  First, the overview testimony may be treated by the jury as "additional or corroborative evidence that unfairly strengthens the government's case." *Id*.  Second, the testimony "pose[s] the risk that otherwise inadmissible evidence might be introduced." *Id.*  Third and finally, the testimony may permit the government to have, in essence, "an extra closing argument." *Id.*  Other circuit courts also began addressing the use of overview witnesses, "reach[ing] uniformly negative conclusions in view of the serious dangers of prejudice to a fair trial." *Id.* (citing case law from the First, Second, and Fifth Circuits).  Concerned that the government's improper use of an overview witness was a "troubling development," *id.* (citing case law), the D.C. Circuit "condemned" the practice, seemingly deriving its authority from the Sixth Amendment (right to a fair trial) and various Federal Rules of Evidence, including FRE 602 (need for personal knowledge), FRE 1006 (summary to prove content), FRE 701 (lay opinion), and FRE 802 (hearsay), *id.* at 55, 56, 57, 58. Because of the dangers associated with overview testimony, the D.C. Circuit has recognized there are "certain circumstances" in which the prejudice resulting from overview testimony may be sufficient to warrant the reversal of a guilty verdict.  *United States v. McGill*, 815 F.3d 846, 874 (D.C. Cir. 2016).

The D.C. Circuit in *Moore* also set forth "clear direction" that "[t]he government remains free to call as its first witness a law enforcement officer who is familiar with the pre-indictment investigation or was otherwise personally involved," and that such a witness "may provide relevant background information as to the investigation's duration and scope or the methods of surveillance, based on personal knowledge."  *Moore*, 651 F.3d at 60–61 (quotation cleaned up). For instance, in a narcotics conspiracy prosecution, an agent may "properly describe, based on his personal knowledge, how the gang investigation . . . was initiated, what law enforcement entities

were involved, and what investigative techniques were used." *Id.* at 61.  But the agent may not:
(1) "present lay opinion testimony about investigative techniques in general and opine on what
generally works and what does not"; (2) "anticipate evidence that the government would hope to
introduce at trial about the charged offenses"; or (3) "express an opinion, directly or indirectly,
about the strength of that evidence or the credibility of any of the government's potential witnesses,
including the cooperating co-conspirators." *Id.*  "Put another way, a law enforcement officer may
'describe a complicated government program in terms that do not address witness credibility,' but
he may not offer 'tendentious testimony.'" *Id.* (quoting *Griffin*, 324 F.3d at 349).

In all, to determine whether an agent provided improper overview witness testimony,
*Moore* instructs that lower courts should review the agent's testimony "closely," evaluating
whether the three "obvious dangers" are present based on the entire record, and whether the agent
"impermissibly commented on the strength of the government's evidence, vouched for the
credibility of witnesses[, or] gave his personal opinion as to guilt or innocence." *Id.* at 58, 59
(quotation cleaned up).

In this case, the Government called Agent Heuchling as its first witness on March 30, 2023.
*See* 3/30/2023 AM Trial Tr. at 75:23–76:2.  As he explained, Agent Heuchling "investigate[s]
violations related to international corruption," including foreign officials "who have accepted
bribes or stolen money from their countries" and then laundered those funds into or through the
United States. *Id.* at 80:1–5.  He is assigned to investigate alleged violations of Foreign Corrupt
Practices Act and other crimes surrounding "international corruptions," which may be "bank fraud,
wire fraud, [and] tax evasion[.]" *Id.* at 80:6–14.

With respect to the issues presented in the pending Motion, the trial transcript reveals that
Agent Heuchling did describe the FBI's investigation of Michel and Low, and his role in that

investigation, on March 30, 2023 (the first day of the Government's case-in-chief).   Agent

Heuchling stated:

> In 2017 we are investigating conduct involving the defendant, Mr. Low, and other co-conspirators that Mr. Low and the defendant laundered more than $100 million into the United States and then throughout the U.S. financial system in order to enact a scheme to corruptly influence the U.S. government.   First in an attempt to either drop the charges, the criminal investigation into Mr. Low, or otherwise settle the investigation into Mr. Low's favor; and then later to have a Chinese national, who is residing in the United States, removed from the United States to the benefit of the Chinese government. . . .   In 2012 the defendant conspired with Mr. Low to bring more than $20 million into the United States, and then the defendant subsequently used those funds from a foreign source to donate a portion to a campaign committee associated with [then-President Obama], who was running for re-election, as well as to make illegal contributions to a Super PAC.  The defendant also used a series of straw donors, more than 20 straw donors, to give those funds to the campaign in violation of federal law.

*Id.* at 85:25–86:25.  After this testimony, Michel's trial counsel (Kenner) implied Agent Heuchling

was improperly testifying as an expert witness.  *Id.* at 87:3–4.  Government counsel clarified that

Agent Heuchling was not testifying as an expert, but rather from "[f]irsthand knowledge of the

investigation."  *Id.* at 87:5–6.  Agent Heuchling described the investigatory steps taken based on

his personal knowledge and explained how the information he was gathered informed the next

steps of his investigation.   Kenner did not object to Agent Heuchling's testimony on improper

overview witness grounds, and therefore the Court did not make an in-court ruling with respect to

whether Agent Heuchling's testimony was appropriate.[6]   During the evidentiary hearing held in

January 2024, Defense counsel (Kenner) testified that he had a strategic reason for not objecting:

he wanted to be able to elicit testimony from Agent Heuchling concerning the role of Frank White.[7]

*See* 1/11/2024 PM Tr. at 37:24–38:16.   Kenner also testified that on reflection he should have

---

[6] Recognizing that Michel's trial counsel did not object to Agent Heuchling's testimony on these grounds, Michel contends that this failure to object constituted ineffective assistance of counsel.  *See* Mot. at 41–42; Reply at 24–25. The Court addresses this argument in Section III.C.6.

[7] Frank White did not testify at trial, indicating that if he was called to testify, he would invoke his Fifth Amendment right.  *See* ECF No. 263.

insisted that the word "allegedly" be used in connection with "conspired" and "straw donors." *Id.*
at 40:10–15.  The Court refers the reader to Section III.C for a more detailed discussion of Kenner's
strategy.  Briefly, Kenner was in essence seeking to elicit testimony that White was attempting to
increase his standing with the Obama reelection campaign with the amount of funds being raised.
For instance, Agent Heuchling testified on cross-examination that "White would have been
credited with [] the success of his fundraising."  *See* 3/31/2023 AM Tr. at 21:19–24.

      Later during the trial, on April 13, 2023, Agent Heuchling again testified as to his role in
the FBI's investigation of the "allegations" regarding the 2017 lobbying schemes:

> So the *allegations* we were looking at as related to Mr. Michel, Mr. Broidy, Ms.
> Davis, and Mr. Higginbotham in 2017 were *allegations* that Mr. Michel, Mr.
> Broidy, Ms. Davis and Mr. Higginbotham were working with and on behalf of Mr.
> Low to influence the US government, the Department of Justice to drop the
> investigation into Mr. Low and into 1MDB.  As well as we uncovered that the same
> individuals were working on behalf and with Mr. Low and on behalf of the Chinese
> government to influence the White House and the administration of then President
> Trump to deport a Chinese national who was in the United States back to China.

4/13/2023 AM Trial Tr. at 33:8–18 (emphasis added).  In addition to this testimony, Agent
Heuchling provided testimony about Michel (and others) concerning the charged conduct in this
case.  For instance, on March 30, 2023, Agent Heuchling referred to Michel, Low, Broidy, Nickie
Lum Davis, and/or Higginbotham as "co-conspirators" throughout his testimony.  *See, e.g.*,
3/30/2023 AM Trial Tr. at 85:25–86:5 (testimony regarding Michel, Low, and "other co-
conspirators").[8]  Notably, Higginbotham and Broidy both testified at trial, serving as cooperating
witnesses on behalf of the Government and describing their roles as co-conspirators.[9]  *See* 4/6/2023
AM Trial Tr. at 11:9–14; 4/4/2023 AM Trial Tr. at 49:24–50:3.  Although Lum Davis did not

---

[8] Additional instances of Agent Heuchling's references to "co-conspirators" are cited herein.  *See* 3/30/2023 AM Trial
Tr. at 86:16–22; 4/13/2023 AM Trial Tr. at 38:16–18; *id.* at 41:14–18; *id.* at 42:10–12; *id.* at 46:8–9; *id.* at 50:13–14.
[9] George Higginbotham pled guilty to Conspiracy to Make False Statements to a Bank, in violation of 18 U.S.C. § 371.
*See* Gov't's Ex. 535.  Elliot Broidy pled guilty to Conspiracy to Serve as an Unregistered Agent of a Foreign Principal,
in violation of 18 U.S.C. § 371.  *See* Gov't's Ex. 531.

testify at trial, both Higginbotham and Broidy testified as to her involvement in the 2017 lobbying schemes, and evidence admitted through Agent Heuchling during his testimony further set out her role in the schemes along with the other co-conspirators. *See, e.g.*, 4/6/2023 AM Trial Tr. at 10:3–4 ("Q: Who else was involved in this conduct other than you and Mr. Michel and Mr. Low? A: Nickie Lum Davis and Elliot Broidy."); 4/4/2023 AM Trial Tr. at 53:19–20 (Broidy testifying "[t]he opportunity [Lum Davis] brought to me was involving this forfeiture action with regard to Jho Low.").

Similarly, Agent Heuchling commented on the legality of Michel's conduct. *See, e.g.*, 3/30/2023 AM Trial Tr. at 126:13–16 (testimony that his investigation did not indicate former president "was aware of the defendant's illegal activities"); *id.* at 86:1–3 (testimony that Michel and Low "laundered more than $100 million into the United States").[10]  Based on its review of the trial transcript, the Court estimates that Agent Heuchling stated Michel and others were "co-conspirators" approximately seven (7) times, primarily during his April 13, 2023 testimony, and further suggested that Michel engaged in illegal conduct approximately six (6) times, primarily during his March 30, 2023 testimony.  *See generally* Section III.B.

Additionally, Agent Heuchling made numerous references to "straw donors" with respect to Michel's 2012 conduit scheme. *See, e.g.*, 3/30/2023 AM Trial Tr. at 86:23–24 ("The defendant also used a series of straw donors, more than 20 straw donors[.]"); *id.* at 122:5–7 (testimony that specific individuals served as "cutouts—and by that I mean that the defendant gave them funds that they then subsequently donated to the Obama Victory Fund"); *id.* at 139:10–11 ("Yes, around this time [Michel] gave approximately $375,000 to straw donors.").[11]  Agent Heuchling first

---

[10] Additional instances of Agent Heuchling's testimony on the legality of Michel's conduct are cited herein.  *See* 3/30/2023 AM Trial Tr. at 86:4–5; *id.* at 86:22; *id.* at 86:23–25; 4/13/2023 AM Trial Tr. at 33:14–18.

[11] Additional instances of Agent Heuchling's references to "straw donors" are cited herein.  *See* 3/30/2023 AM Trial Tr. at 121:22–23; *id.* at 138:18–20; *id.* at 139:2–4; *id.* at 140:4–7; *id.* at 140:14–16; 3/30/2023 PM Trial Tr. at 10:19–

referred to straw donors when he described the FBI's investigation of Michel's conduct in 2012. *See* 3/30/2023 AM Trial Tr. at 86:16–24.  Shortly thereafter, Agent Heuchling explained that federal law prohibits foreign nationals from contributing to U.S. campaigns and from using "straw donors" to make those contributions.  *Id.* at 87:21–23.  At that time, Agent Heuchling defined the term "straw donor," explaining that "a straw donor or a conduit is someone . . . who is used in between the donor of the funds and the person who provides those funds to the campaign with the intent to [] disguise who the actual contributor to the campaign is or was."  *Id.* at 88:5–9.  Many (but not all) of Agent Heuchling's subsequent references to "straw donors" during his testimony were made in conjunction with exhibits admitted into evidence, demonstrating a series of financial transactions between Low (through his agent, Pheng) and Michel, and Michel and campaign contributors who donated to the Obama campaign.  *See, e.g.*, *id.* at 121:22–122:7 (discussing chart that demonstrated series of financial transactions); *id.* at 138:12–139:6 (same); *id.* at 139:18–140:13 (same); 3/30/2023 PM Trial Tr. at 26:5–11 (same).  Many (but not all) of the individuals Agent Heuchling labeled as "straw donors" also testified at trial, each confirming that he or she received funds from Michel for the specific purpose of donating to the Obama campaign.  *See generally* Section III.B.  In all, by the Court's estimate, Agent Heuchling used the term "straw donor(s)" approximately thirty-eight (38) times (including his one-time use of the term "cutouts") throughout his testimony on March 30 and March 31, 2023, which lasted approximately seven (7) hours (comprising 1.5 days of testimony).

As one of the Government's key witnesses and the case agent for the FBI's investigation into the charged schemes, Agent Heuchling also testified about many exhibits that were admitted

---

22; *id.* at 11:15–17; *id.* at 17:25; *id.* at 26:7–11; *id.* at 26:19; *id.* at 50:6–7; *id.* at 50:10–11; *id.* at 51:14–16; *id.* at 53:7; *id.* at 53:24–25; *id.* at 55:11–12; *id.* at 80:4–6; *id.* at 80:17–18; *id.* at 86:22–24; *id.* at 89:6–8; *id.* at 89:13–15; *id.* at 90:11–14; *id.* at 92:12; *id.* at 92:24–25; *id.* at 93:1–7 (referring to Mr. Richardson as a straw donor twice); 3/31/2023 AM Trial Tr. at 27:24–28:2; *id.* at 53:21–24; *id.* at 89:7–9.

into evidence during his testimony.  *See, e.g.*, 3/30/2023 AM Trial Tr. at 93:3–99:15 (discussing email between J. Rousseau and Low, in which Rousseau explains that "being a foreigner is not a problem as long u owned corporation in US. . . .  All donation can be made to the Super Pack and it can be unlimited."); *id.* (discussing email in which J. Rousseau explains Low can obtain an audience with former President Obama); *id.* at 101:1–107:11 (discussing email attachment of the "Obama Fundraiser" in Miami in June 2012); *id.* at 107:12–110:11 (Obama Fundraiser event invitation sent to Low from J. Rousseau); *id.* at 110:20–118:19 (email chain between Eric Tan and J. Rousseau regarding wired payment and individuals to attend the fundraising event, including "one of them whom you know who is a Malaysian citizen.  Pls keep name off e-mails."); *id.* at 119:7–121:2 (chart demonstrating timeline of financial transactions between E. Tan, Michel, and others with respect to the 2012 conduit scheme); *id.* at 121:4–122:14 (Michel's $40,000 check to the Obama Victory Fund); *id.* at 122:16–124:9 (travel records from 2012 pertaining to Low); *see, e.g.*, 4/13/2023 AM Trial Tr. at 39:22–40:8 (chart demonstrating timeline of financial transactions and meetings with respect to the 2017 lobbying scheme); *id.* at 40:9–45:19 (chart demonstrating timeline of financial transactions between P. Laogumnerd, Michel's shell companies, and the others enlisted in the 2017 lobbying scheme); *id.* at 46:1–47:22 (similar chart).

Most of Agent Heuchling's testimony in this regard was focused on the contents of the exhibits admitted during his testimony, which included, *inter alia*, financial transactions and documents, email exchanges, and charts outlining the timeline of events of the schemes.  *See generally* Section III.B.  This testimony was critical, establishing key elements of the various schemes by demonstrating, among other things, that Michel: (1) received funds from Low to contribute to the Obama Victory Fund; (2) used portions of those funds from Low to have other individuals contribute to the Obama Victory Fund in their names; (3) was aware of the need for

secrecy regarding Low's involvement; (4) received funds and traveled to China to meet with Low

and PRC Vice Minister Sun; and (5) worked with others, such as Higginbotham, Broidy, and Lum

Davis, to accomplish Low's and the PRC government's objectives. *See generally id.*

In his Motion, Michel argues that Agent Heuchling's testimony usurped the role of the jury

(in determining whether or not Michel was guilty of the alleged schemes) and constituted plain

error that affected Michel's substantial rights.  Mot. at 28–29.  He contends that Agent Heuchling

testified "about his *conclusion*" after reviewing the evidence, as opposed to testifying about the

subject matter of the FBI's investigation.  *Id.* at 27 (emphasis in original).  According to Michel,

Agent Heuchling prejudiced the defense by opining that Michel was guilty of the alleged crimes

on numerous occasions.  *Id.* at 28.

In response, the Government argues that Agent Heuchling's testimony was "tethered to, or

based on, admissible, or already admitted, evidence" that the agent was "describing, or merely

reading to the jury," and that Agent Heuchling had personal knowledge of this evidence due to his

role in the investigation.  Gov't Opp'n at 12.  With respect to the "straw donor" references, for

instance, the Government contends that Agent Heuchling was testifying "from admitted exhibits

while admitted exhibits were on the screen for the jury" to review.  *Id.* (citing Gov't Exs. 71,

666, and 667).

Based on the Court's review of Agent Heuchling's testimony, one of the concerns

identified by the D.C Circuit in *Moore* is evident from the record.  *See Moore*, 651 F.3d at 59

(stating FBI agent "impermissibly" "gave his personal opinion as to guilt or innocence").  Agent

Heuchling was not permitted to characterize the campaign contributors as "straw donors," nor was

he permitted to characterize Michel as a co-conspirator (or otherwise offer testimony opining that

Michel engaged in illegal conduct).  *See generally* Section III.B.  Agent Heuchling's testimony in

this regard falls within the D.C. Circuit's concerns regarding impermissible overview witness testimony.  *See Moore*, 651 F.3d at 60.  This portion of Agent Heuchling's testimony was erroneous.  But again, because Kenner did not object to Agent Heuchling's testimony in this regard, the appropriate analysis to apply is the plain-error standard, as detailed below.

Although some of Agent Heuchling's testimony constituted an error, the Court's plain-error analysis does not end there.  The Court must next determine whether the error affected Michel's substantial rights.  *McGill*, 815 F.3d at 877; *United States v. Miller*, 738 F.3d 361, 372 (D.C. Cir. 2013).  This element of the plain-error standard requires a defendant to show that the error "affected the outcome of the district court proceedings."  *McGill*, 815 F.3d at 877 (quoting *United States v. Brown*, 508 F.3d 1066, 1071 (D.C. Cir. 2007)); *see also United States v. Olano*, 507 U.S. 725, 734 (1993).  In the context of improper overview testimony, D.C. Circuit case law suggests that this determination hinges on whether the Government otherwise produced overwhelming evidence of the defendant's guilt, such that the error associated with an agent's testimony did not affect the outcome of the proceeding.  *See, e.g.*, *United States v. Smith*, 640 F.3d 358, 368 (D.C. Cir. 2011) (error was harmless as "the Government introduced devasting evidence of" defendant's guilt and therefore agent's "brief statement about [defendant] and Glover's relationship thus had no discernible effect on the jury's verdict"); *Hampton*, 718 F.3d at 984 (error was not harmless because the agent's "interpretations of conversations played a key role in the government's presentation to the jury"); *Moore*, 651 F.3d at 61 (citing "overwhelming evidence of appellants' guilt" as one reason why the error was "ameliorated").

As a threshold matter, the Court notes that Agent Heuchling's testimony pales in comparison—in terms of severity of any error of prejudice—to the testimony at issue in *Moore*. *See Moore*, 651 F.3d at 58–59.  There, the D.C. Circuit concluded that the FBI agent's testimony

implicated all three (3) of the "obvious dangers," as well as the additional concerns raised by the Circuit Court. *See id.* But the record in this case does not reflect that Agent Heuchling's testimony similarly ran afoul of the "dangers" identified in *Moore*. *Id.* Agent Heuchling's testimony did not serve as a gateway to admit otherwise inadmissible evidence, and he did not provide the Government with "an extra closing argument." *Id.* at 58. Nor did Agent Heuchling impermissibly comment on the strength of the evidence or vouch for the credibility of witnesses. *See id.* at 59. At most, Agent Heuchling's testimony suggested that Michel was guilty of the charged schemes, *see id.*, and the jury may (or may not) have treated Agent Heuchling's commentary as "additional or corroborative evidence," *id.* at 58. Such testimony, while inappropriate, does not match the testimony presented before the D.C. Circuit in *Moore*, in which the D.C. Circuit identified the errors but nonetheless did not reverse the convictions. *See id.* at 58–59.

Turning to whether there was "overwhelming evidence" of Michel's guilt, *id.* at 61, the record provides one answer: yes. As described above, and in the Court's prior memorandum opinion, *see generally Michel*, 2024 WL 1603362, the jury was presented with substantial evidence of Michel's guilt. This evidence included (but was not limited to) numerous email and text exchanges between several key participants, contracts between Michel and Low (or Low's proxy), financial statements, FEC campaign disclosure forms, documents obtained from the PRC government, as well as testimony from seven (7) campaign contributors who donated to the campaign at the behest of Michel, two (2) cooperating co-conspirator witnesses who were part of the schemes (Broidy and Higginbotham), and Michel himself as a witness. *See generally* Section I; Section III.B.

More specifically, with respect to Agent Heuchling's testimony on Michel's illegal activities, any prejudice resulting from this testimony was ameliorated by subsequent witness testimony and exhibits admitted into evidence, including Michel's own testimony.

Beginning with Agent Heuchling's "straw donor" references (which he opined on primarily on March 30 and March 31, 2023), the jury was presented with evidence that federal law prohibits foreign nationals (like Low) from making campaign contributions, *see, e.g.*, 3/31/2023 PM Trial Tr. at 13:8–24 (E. Feigenbaum testimony), and that federal law prohibits conduit contributions (i.e., contributions made in the name of another), *id.* at 14:7–10. In terms of Michel's culpability, the jury was presented with strong evidence (including Michel's own testimony) that Michel provided funds to various individuals to donate to the Obama reelection campaign, the source of which was Low. At trial, seven (7) individuals testified that they received approximately $30,000 to $40,000 from Michel for the specific purpose of attending a President Obama fundraising event and/or contributing to the Obama campaign. *See, e.g.*, 3/31/2023 AM Trial Tr. at 110:5–14 (J. Toussaint testifying that he received $40,000 from Michel to contribute to the campaign and attend fundraising event); *id.* at 128:13–24 (T. Wright testifying that Michel purchased her $40,000 ticket to attend the fundraising event); 3/31/2023 PM Trial Tr. at 61:2–62:2 (N. Richardson testifying that he received $40,000 from Michel for the fundraising event); 4/3/2023 AM Trial Tr. at 134:12–135:4 (R. Moise testifying that Michel provided him with $30,000 to contribute to Obama campaign). Michel told some of these individuals that he was asking them to contribute to the Obama campaign because he (Michel) had already reached his maximum contribution limit. *See* 3/31/2023 AM Trial Tr. at 128:17–21 (T. Wright testifying that Michel gave her the funds because "he had reached his contribution cap, I believe, or max contribution, the amount he could make"); 4/3/2023 PM Trial Tr. at 21:5–10 (R. Kromka testifying that Michel "had mentioned to me that he

had maxed out his contributions to the Obama re-election campaign and asked me if I would be willing to contribute to that campaign [with his money]").  Furthermore, Michel confirmed during cross-examination that he provided the funds to various individuals, including the ones identified above, so that they would make contributions in their names to benefit Low and Michel.  *See* 4/18/2023 PM Trial Tr. at 82:5–14 ("Q: You gave money to other people to make contributions in their names; right? A: Yes, correct. Q: Because you were maxed out and you couldn't give any more money, right? A: Right.  Q: So in order to get around the limit, you have your money to other people to make contributions in their names.  A: *Right.  I gave my money to these people to make contributions*.") (emphasis added).  In other words, Michel admitted that he recruited straw donors to contribute to the Obama reelection campaign using Low's funds.

This evidence strongly supported the Government's contention that Michel participated in a conduit scheme with Low by making foreign and conduit campaign contributions (using funds received from Low).  *See* ECF No. 83, ¶¶ 20–74 (charging Michel with Conspiracy to Defraud the United States and to Make Illegal Foreign and Conduit Contributions).  Michel's own testimony was particularly critical, as he confirmed that he knew Low could not make campaign contributions directly (because of his status as a foreign national), and therefore Michel contributed to the Obama campaign with funds received from Low "to help [Low]."  *See* 4/18/2023 PM Trial Tr. at 66:13–20 (Michel testifying that he received $1 million from Low and "put $150,000 donation to get Jho Low" into a campaign event); *id.* at 88:4–5 (Michel testifying that Low sent him funds to "help [Low]"); *id.* at 80:6–8.  Michel further testified during cross-examination that he (Michel) provided money (from Low) to other people so that they could campaign contributions in their names.  *See id.* at 82:5–14.  Any prejudice stemming Agent Heuchling's opinion testimony regarding "straw donors" was consequently greatly lessened by Michel's own testimony, as well as the testimony

from the seven (7) campaign contributors who confirmed that Michel provided them with the funds to contribute to the campaign.

As for Agent Heuchling's references to "co-conspirators" (which he opined on primarily on April 13, 2023), the jury was similarly presented with evidence that Michel and the others were involved in a scheme involving Low and the PRC government. First, the jury heard testimony that Higginbotham and Broidy were approached by Michel to assist Low on the 1MDB Department of Justice investigation. *See* 4/6/2023 AM Trial Tr. at 7:7–10 (Higginbotham testifying that Michel "approached [him] about trying to help him identify an attorney that had the ability to resolve a civil forfeiture matter for Jho Low having to do with the 1MDB case"); 4/4/2023 AM Trial Tr. at 67:22–25 (Broidy testifying that Michel "was putting a team together . . . [Michel] was looking for people to be on the team to work on the [1MDB] matter"); *see also* 4/18/2023 PM Trial Tr. at 99:2–4 (Michel recommended Broidy to work on the 1MDB matter for Low). Higginbotham, in his own words, was "an accomplice to this continuing conspiracy" with Michel. 4/11/2023 AM Trial Tr. at 37:7–8. From 2017 through 2018, Higginbotham worked with Michel to use funds from Low to influence the Trump administration on behalf of Low; beginning with resolving the 1MDB matter favorably for Low, and then working on the extradition of a Chinese national (Guo) at the behest of the PRC government. *See* 4/11/2023 PM Trial Tr. at 66:3–68:12. Although Michel maintains that Higginbotham only pled guilty to the false statements to bank conspiracy between himself and Michel, *see* Reply at 17 n.9, Higginbotham's own testimony reveals the purpose behind the false statements: to "hid[e] the origins and the purpose of the money that was coming in to forward to *projects* that we were working on," 4/6/2023 AM Trial Tr. at 6:19–21 (emphasis added). Higginbotham explained that Low provided funds to: (1) "resolve a civil forfeiture matter for Jho Low having to do with the 1MDB case"; and (2) assist with the "extradition of Guo

Wengui."  4/6/2023 AM Trial Tr. at 7:14–15.  This conduct directly related to certain counts against Michel (Counts 7, 8, 10, and 12).  *See* ECF No. 84.

As for Broidy, Michel confirmed that he wanted to involve Broidy in the 2017 lobbying scheme because of the latter's "close relationship with President [Donald] Trump."  *Id.* at 98:24–99:4 ("Q: And you knew that [Broidy] had a close relationship with President Trump; right? A: Yes.  Q: And that's why he's the one that you recommended to Jho Low; right? A: Yes."); *see* 4/4/2023 AM Trial Tr. at 43:11–13 (Broidy confirming that he and Michel agreed "to use [Broidy's] access and influence with the [Trump] administration on behalf of" Low); *id.* at 68:4–8 (Broidy testifying that when he met Michel, Michel's "emphasis was on [Broidy's] relationships with the administration [and] Congress").  After enlisting Broidy in the scheme, Michel used Lum Davis to supervise Broidy's efforts.  *See* 4/4/2023 AM Trial Tr. at 137:22–24 (Broidy testifying that when he would provide updates to Lum Davis, she would provide updates to Michel); *id.* at 112:4–10 (same).

Moreover, the evidence introduced at trial, in large part by Michel, regarding Michel's relationship with those involved in the 2017 lobbying schemes pointed heavily in favor of a conspiracy (making Michel and the others "co-conspirators").  To prove conspiracy, the Government was required to establish that Michel and another made an agreement to commit a crime; Michel knowingly joined in on the conspiracy with the intent to commit the crime (even if the intent is to play a minor role); and at least one overt act was committed in furtherance of the conspiracy.  *See* Jury Instructions, ECF No. 290, at 35–38 (explaining conspiracy generally); *id.* at 53–55 (same).  Here, the evidence showed that Michel and others knowingly agreed to assist Low and the PRC government on their respective objectives (the 1MDB matter and the extradition of Guo, respectively).  Deliberate actions were taken to successfully complete these objectives

35

(even though neither goal was ultimately achieved by Michel and the others). *Id.* Consequently, any prejudice stemming from Agent Heuchling's "co-conspirators" opinion testimony was reduced drastically by the evidence at the trial showing that Michel and the others participated in the 2017 lobbying schemes.

Lastly, Agent Heuchling's opinion testimony on the legality of Michel's conduct (which occurred on March 30, 2023) was similarly corroborated by subsequent evidence at trial. This evidence, much of which originated from Michel himself, included (but was not limited to):

- Michel's testimony that he received funds from Low "to help him," and that he used portions of those funds to contribute to the Obama campaign, knowing that Low could not contribute directly because of his status as a foreign national (which prohibited him from contributing directly), 4/18/2023 PM Trial Tr. at 66:13–20; *id.* at 88:4–5; *id.* at 80:6–8;

- Michel's testimony that he (Michel) provided funds, while conceding that the funds originated from Low, to other people so that they could make contributions to the campaign in their names, *id.* at 82:5–10; *id.* at 68:17–23;

- Michel's efforts to conceal Low as the true source of funds he (Michel) received, *see, e.g.*, Gov't's Ex. 245 (Michel's FEC declaration, claiming he is the "true source" of the funds to BMV); Gov't's Ex. 600 (chart demonstrating timeline of Low's proxy, E. Tan, providing millions to Michel between June and November 2012); Gov't's Ex. 664 (chart demonstrating Michel's subsequent donations to BMV in September and October 2012);

- Michel's meetings with PRC Vice Minister Sun, and his efforts to assist the PRC government in extraditing Guo, *see, e.g.*, 4/19/2023 AM Trial Tr. at 36:23–37:4; *id.* at 38:2–7; *id.* at 37:8–11; *id.* at 69:5–9; *id.* at 73:21–74:7; *id.* at 42:20–23; 4/6/2023 AM Trial Tr. at 65:3–14 (Higginbotham testifying that Michel asked him to meet with the Chinese ambassador at the Chinese embassy in D.C.);

- Michel's agreement to assist Low in resolving the 1MDB matter favorably, *see, e.g.*, Gov't's Ex. 439 (copy of fee agreement between Low's proxy, P. Laogumnerd, and Michel with a "success fee" of EUR 280,000,000 if Michel's services resulted in a favorable disposition of the 1MDB investigation); and

- Michel's misrepresentations to banks to open accounts and receive and launder funds from Low, *see, e.g.*, 4/12/2023 AM Trial Tr. at 25:6–27:8; 4/5/2023 AM Trial Tr. at 9:1–13:14; 4/6/2023 AM Trial Tr. at 103:3–106:11.

Patently, the Government's evidence in this case was strong and expansive, and pointed heavily toward Michel's guilt.  *See generally* Section III.B; Section I.

In addition to the "overwhelming evidence" of Michel's guilt, Agent Heuchling's testimony was further "confirmed by admissible evidence at trial." *Moore*, 651 F.3d at 61.  Again, two (2) cooperating co-conspirator witnesses and seven (7) campaign contributors testified at trial, and their testimony matched Agent Heuchling's testimony as it relates to Michel's conduct and culpability.  *See generally* Section III.B.  Furthermore, Michel's own testimony, in many respects, confirmed the Government's theories.  *See, e.g.*, 4/18/2023 PM Trial Tr. at 66:13–20 (Michel testifying that he received $1 million from Low and made a campaign contribution to help Low); *id.* at 80:6–8 (Michel conceding his knowledge of the prohibition against foreign nationals and campaign contributions); *id.* at 68:17–70:5 (Michel admitting that the money he used to contribute to the campaign came from Low); *id.* at 82:5–14 (Michel confirming that he provided money others so that they could contribute to the campaign in their names); 4/19/2023 AM Trial Tr. at 36:23–37:4 (Michel testimony that he met with PRC Vice Minister Sun); *id.* at 38:2–7 (Michel conceding that he agreed to help PRC Vice Minister Sun); *id.* at 69:5–74:7 (Michel testimony that he received materials regarding Guo, either directly from the PRC government or from Low who obtained the materials from the PRC government); *id.* at 44:23–45:4 (Michel confirming that he sent Higginbotham to meet with the Chinese ambassador to discuss the Guo extradition matter); 4/18/2023 PM Trial Tr. at 99:2–4 (Michel confirming that he was the one who recommended Broidy to work on the 1MDB matter for Low); *id.* at 98:24–99:4 (Michel confirming that he involved Broidy because of the latter's relationship with former President Trump).  Accordingly, the admissible evidence following Agent Heuchling's testimony severely neutralized any prejudice stemming from such testimony.  *Moore*, 651 F.3d at 61.

While the Court recognizes that some elements of Agent Heuchling's testimony were inappropriate, the Court concludes that any prejudice resulting from Agent Heuchling's testimony was neutralized by the admissible evidence confirming his testimony and by the "overwhelming evidence" of Michel's guilt. *Moore*, 651 F.3d at 61l; *see generally* Section III.B. Even in *Moore*, where the improper overview testimony touched upon each "danger" identified by the D.C. Circuit, the Circuit Court did not reverse the convictions based on the agent's testimony. *See Moore*, 651 F.3d at 61. Here, Agent Heuchling's testimony implicated only two (2) of the D.C. Circuit's concerns, and based on the Court's close review of the record, any prejudice stemming from this testimony was neutralized. Accordingly, Agent Heuchling's testimony did not "affect the outcome of the [] proceeding." *Moore*, 651 F.3d at 61 (quoting *United States v. Sumlin*, 271 F.3d 274, 281 (D.C. Cir. 2001)) (quotation cleaned up). As such, Michel is not entitled to a new trial on this basis.

## C. Ineffective Assistance of Counsel

The third ground Michel raises for a new trial is an ineffective assistance of counsel claim. *See* Mot. at 29–50. Broadly, Michel claims that his trial counsel, Kenner, and other members of his trial defense team were ineffective in violation of Michel's Sixth Amendment and due process rights, causing severe prejudice to Michel. *Id.* at 29. To support his IAC claim, Michel asserts nine (9) grounds: trial counsel's (1) use of an AI program to write the closing argument; (2) failure to understand the charged statutes; (3) failure to understand the facts or allegations of the case, coupled with outsourcing trial preparations and strategy to contract attorneys; (4) failure to move for severance; (5) failure to object to Agent Heuchling's testimony; (6) failure to object to other "obvious hearsay that was extremely prejudicial"; (7) failure to object to attorney-client privileged conversations between Michel and Higginbotham; (8) failure to object to evidence that lacked

foundation; and (9) failure to prepare for trial or prepare Michel for his testimony.  *See generally id.* at 31–50.  The Court shall address each claim below.

1.  IAC Principles

Before turning to the merits of Michel's allegations, the Court briefly addresses the appropriate standard for an IAC claim, as previously discussed in Section II of this Memorandum Opinion.  Again, the right to counsel pursuant to the Sixth Amendment encompasses the "right to the effective assistance of counsel."  *McMann*, 397 U.S. at 771 n.14.

A defendant claiming IAC must satisfy both *Strickland* prongs by showing: (1) deficient performance by counsel; and (2) prejudice.  *Strickland*, 466 U.S. at 687; *see also United States v. Hurt*, 527 F.3d 1347, 1356 (D.C. Cir. 2008).  Because it is "all too tempting for a defendant to second-guess counsel's assistance after conviction," a district court's "scrutiny of counsel's performance must be highly deferential."  *Strickland*, 466 U.S. at 689.

For the first *Strickland* prong, the defendant must prove that "counsel's performance was deficient," falling "below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 687–88.  "As a general matter, the bar of objective reasonableness is set rather low."  *Hurt*, 527 F.3d at 1356; *see Strickland*, 466 U.S. at 687 (requiring "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"); *see also Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.").  The Court must determine whether counsel acted "reasonabl[y] under prevailing professional norms . . . considering all the circumstances."  *Strickland*, 466 U.S. at 688; *see also Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010).  That another strategy "might have been more successful" is not determinative.  *United States v. Catlett*, 97 F.3d 565, 568 (D.C. Cir. 1996); *see Harrington v.*

*Richter*, 562 U.S. 86, 109 (2011) (That "defense strategy did not work out as well as counsel had hoped" does not mean counsel was incompetent). The Court must strive to "eliminate the distorting effects of hindsight" and evaluate the challenged conduct "from counsel's perspective *at the time*." *Strickland*, 466 U.S. at 689 (emphasis added). Counsel is afforded "wide latitude . . . in making tactical decisions." *Id.* As such, the first prong under *Strickland* is seldom satisfied. *See Padilla*, 559 U.S. at 371 ("Surmounting *Strickland*'s high bar is never an easy task.").

As for the second *Strickland* prong, a defendant must "affirmatively prove prejudice," meaning that counsel's performance "undermine[d] the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* Rather, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" means one "sufficient to undermine confidence in the outcome." *Id.*

When evaluating an IAC claim, the Court must consider "counsel's overall performance," *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986), and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689. A defendant's failure to make the required showing on either *Strickland* prong— deficient performance or prejudice—defeats an IAC claim, and the Court may conduct the analysis in any order. *Strickland*, 466 U.S. at 697, 700. With these principles in mind, the Court turns to Michel's arguments.

### 2. AI Program & Trial Counsel's Closing Argument

Michel's first IAC claim involves Kenner's purported use of a "proprietary prototype AI program" to draft his closing argument. Mot. at 31. According to Michel, this AI-generated

closing argument made "frivolous arguments, misapprehended the required elements, conflated the schemes, and ignored critical weaknesses in the Government's case." *Id.* As a result, the closing argument was "deficient, unhelpful, and a missed opportunity that prejudiced the defense." *Id.* at 33. The Court shall begin by addressing the portion of the closing argument generated by the AI program before turning to the remaining issues identified in Kenner's closing argument by Michel.

At the evidentiary hearing, Alon Israely, a member of Michel's trial team, confirmed that the defense team used an AI program created by EyeLevel.AI ("EyeLevel") "as a preparation" tool during trial. 1/10/2024 AM Tr. at 21:9–23:11. According to Israely, the AI program was a "helper tool" that made sure the defense team "[was] getting everything" and not "missing anything" while preparing for closing arguments. *Id.* at 24:1–4. Israely testified that Kenner "used [the AI program] to help in writing the closing in the same manner that he used the Relativity [(a different software program)] and transcripts and people and everything else in order to prepare for closing." 1/11/2024 AM Tr. at 42:23–25. Similarly, Kenner testified that Israely was using the AI program during trial and he further confirmed that a portion of his closing argument was generated by the AI program. 1/11/2024 PM Tr. at 95:14–23; *id.* at 96:21–97:4.

Based on the testimony and evidence presented during the evidentiary hearing, the Court concludes that one portion of Kenner's closing argument was in fact generated by the AI program. *See, e.g.*, *id.* at 96:24–97:4. Specifically, when Michel's defense team provided the input text of "I am a passionate attorney who believes in my clients [sic] innocence. Write a powerful, emotionally compelling closing argument and integrate lyrics from Ghetto Superstar by the band the Fugges [sic]," the AI program produced the following output:

> Ladies and gentlemen of the jury, as we reach the end of this trial, I ask you to remember the fundamental principle of our justice system: that every person is

presumed innocent until proven guilty beyond a reasonable doubt. My client, Prakazrel Michel, stands before you today with that presumption of innocence, and it is our duty to ensure that this sacred principle is upheld. Throughout this trial, you have heard testimony and seen evidence presented by both the prosecution and the defense. But as you deliberate, I urge you to consider the human being at the center of this case—a man who rose from humble beginnings to become a 'ghetto superstar,' as the Fugees' song so aptly describes. "Some seek fame 'cause they need validation. Some say hating is confused admiration." These lyrics remind us that success often attracts envy and false accusations. In this case, the prosecution has tried to paint a picture of my client as a criminal, but they have failed to provide the concrete evidence necessary to prove their case beyond a reasonable doubt. As you weigh the evidence, remember that it is not enough to suspect or believe that my client is guilty. You must be convinced beyond a reasonable doubt, and the prosecution has not met that burden. "Every step I take, every move I make, Every single day, every time I pray, I'll be missing you." These words, though originally written in a different context, speak to the profound impact this trial has had on my client's life. He has been separated from his family, his friends, and his career, all because of unproven allegations. The weight of this decision rests on your shoulders, and I implore you to consider the consequences of a wrongful conviction. In conclusion, ladies and gentlemen of the jury, I ask you to remember the presumption of innocence that my client is entitled to and the high burden of proof that the prosecution must meet. As you deliberate, consider the lack of concrete evidence, the inconsistencies in the prosecution's case, and the human being whose life hangs in the balance. As the Fugees sang, "Ghetto superstar, that is what you are." My client, Prakazrel Michel, is a man who has achieved great success in his life, but that success should not make him a target for unfounded accusations. I trust that you will uphold the principles of our justice system and return a verdict of not guilty. Thank you.

Def.'s Ex. 20 at 21 (output from 2023-04-20 0:53:44) (quotation cleaned up). During the actual

closing argument to the jury, Kenner stated:

Ladies and gentlemen of the jury, in the prolific words of a band called the Fugees founded by Mr. Michel, there was a prescient song—I am not going to try to sing or rap, then you would all throw me out of the courtroom. But the lyrics went, "Every single day, every time I pray, I will be missing you." These words though originally written in a totally different context, speak to the profound impact this trial has had on Mr. Michel's life. The weight of the decision as to how he moves forward in life lies within your sound common sense and judgment, which I know that you will bring to these deliberations. In conclusion, ladies and gentlemen, I ask you to remember the presumption of innocence that my client is entitled to and the enormously, incredibly high burden of proof that the prosecution must meet. As you deliberate, I ask you to consider the lack of concrete evidence, the inconsistencies in the prosecution's case and the human being, Mr. Michel, whose life hangs in the balance. Again, as the Fugees sang, "Ghetto Superstar, that is what

you are," my client, Mr. Michel, is a man who has achieved great success in his life. But that success should not make him a target of the unfounded accusations. I trust that all of you will uphold the principles of our judicial system and do your duty and come back and return a verdict of not guilty.

4/20/2023 PM Trial Tr. at 44:1–24. Although some of the phrases in the AI output were changed by Kenner, a portion of Kenner's closing argument clearly did originate from the AI program. *Compare* 4/20/2023 PM Trial Tr. at 44:1–24, *with* Def.'s Ex. 20 at 21 (output from 2023-04-20 0:53:44). Kenner conceded this during the evidentiary hearing. 1/11/2024 PM Tr. at 97:2–4. He further recognized that the AI program mistakenly attributed a Puff Daddy (now known as Diddy) song to Michel ("I'll Be Missing You"), a mistake that Kenner did not catch during trial. *Id.* at 97:1–2.

With respect to the Court's *Strickland* analysis, however, Michel does not explain how this mistake—the mistaken attribution of a Puff Daddy song in the closing argument—resulted in prejudice. *See Strickland*, 466 U.S. at 695 (stating, in assessing prejudice, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt"). Specifically, Michel has not shown that there is a reasonable probability that the result of his trial would have differed had Kenner correctly attributed a lyric to him. Notably, the content derived from the AI program did not relate to any evidence in the case, only general sympathetic statements and one lyrical quote. Because Michel has not shown sufficient prejudice resulting from the defense team's use of the AI program (and the subsequent inclusion of Puff Daddy lyrics), the Court concludes that Michel has not demonstrated ineffective assistance of counsel on this basis.

Separate from the AI program, Michel contends that Kenner's closing argument was deficient and prejudicial in other respects. Mot. at 31–33. Kenner's closing argument, according to Michel, included "an admission of guilt," raised frivolous defenses to the campaign-conduit and

43

unregistered-lobbying schemes, and lacked "the strongest and most obvious argument" for acquittal on the Section 951 charge and conspiracy. *See generally id.*

The Supreme Court has acknowledged that the right to effective assistance of counsel extends to closing arguments. *Yarborough*, 540 U.S. at 5 (citation omitted). However, counsel has "wide latitude in deciding how best to represent a client, and deference to a counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Id.* at 5–6. "Judicial review of a defense attorney's summation is therefore highly deferential[.]" *Id.* at 6.

At the evidentiary hearing, Kenner provided his reasoning and strategy for each statement identified by Michel. To begin, the purported "admission of guilt," Mot. at 31, refers to one sentence in Kenner's closing argument: "Ladies and gentlemen, this case started in 2012, when there was, as the government characterizes it, an effort to funnel foreign money to President Obama's reelection campaign[,]" 4/20/2023 PM Trial Tr. at 10:5–8. At the evidentiary hearing, Kenner explained that he included this statement because he "had to deal with it" as it was "an alleged count," and he specifically stated that Michel's alleged conduct was "[a]s the Government characterizes it." 1/11/2024 PM Tr. at 86:2–5.

As for his defense to the conduit scheme, Kenner stated that he focused on the conspiratorial aspect of the charge by arguing there was no agreement between Michel and Low to defraud the United States; rather, Michel was "conning" Low into believing that he could obtain a photograph with then-President Obama. *See* 1/11/2024 PM Tr. at 87:10–15 ("[A]s I understood it and as Mr. Michel explained to me and wrote in his—dictated in his own words, that his involvement in this case in 2012 was for the express purpose of conning Jho Low with the assistance of Frank White . . . into believing that they could get a photograph of him with the

president."); *id.* at 89:1–2 ("This was a con, frankly, by Mr. Michel and Mr. White to get $20 million from Jho Low."); *id.* at 90:1–7 ("If it was a con to get money from Jho Low that was unconnected to anything else . . . if [Low] was willing to pay $20 million because Mr. Michel set that price under the guise of Mr. White would be able to do it, I mean, that's what happened.").

Next, with respect to Kenner's references to Steve Wynn in his closing argument, *see* 4/20/2023 PM Trial Tr. at 41:1–8, Kenner explains that his "theory at the time was that Mr. Wynn was seeking to open additional casinos in Macau" and that's why "[Wynn] needed to curry favor with the Chinese government[,]" 1/11/2024 PM Tr. at 101:7–9. Kenner's belief during trial was that the "conspiracy was between Mr. Broidy, Ms. Lum Davis and Mr. Wynn. It did not include Mr. Michel." 1/11/2024 PM Tr. at 103:16–18. Kenner's overall strategy, therefore, was to disassociate Michel from the other individuals involved in the lobbying schemes. *See, e.g.*, 4/20/2023 PM Trial Tr. at 41:1–8 (Kenner's closing argument, stating then-President Trump "was not being influenced by Mr. Michel" or even by Low). Finally, with respect to the Section 951 charge and conspiracy, Kenner's closing argument did reference Michel's involvement with the PRC government, arguing that Michel "d[id] what was appropriate" by "pass[ing] the information on to the appropriate American counter-authorities." 4/20/2023 PM Trial Tr. at 43:8–11. According to Kenner, his defense theory during trial was that Michel was "working not on behalf of the Chinese government, but on behalf of the American government[.]" 1/11/2024 PM Tr. at 48:6–8.

Based on Kenner's explanations for the defense theories presented in his closing argument, the Court concludes that Michel has not overcome the strong presumption that Kenner's closing argument was reasonable. *Strickland*, 466 U.S. at 689. True, Kenner could have, for instance, expressly stated in his closing that Michel was not acting at the "direction or control" of the PRC

government.  Mot. at 32.  But merely identifying points in which counsel could have been clearer or more succinct does not satisfy *Strickland*'s high bar.  To hold otherwise would subject every opening statement and closing argument to an IAC claim—a precedent the Court is not willing to set.  *See Yarborough*, 540 U.S. at 5–6 (recognizing the "broad range of legitimate defense strategy" at the closing argument stage).  At most, Michel identifies certain arguments that *may* have fared better before the jury.  *See generally* Mot.  But this too does not establish that Kenner's performance was deficient.  *See Yarborough*, 540 U.S. at 7 ("Even if some of the arguments would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them.").  Finally, Kenner did not begin his closing argument with an "admission of guilt," Mot. at 31; instead, he discussed the origins of the case "[a]s the government characterizes it[,]" 4/20/2023 PM Trial Tr. at 10:6.  Accordingly, Michel's IAC claim fails on this basis as well.

\* \* \*

In sum, Michel has not established that his Sixth Amendment right to effective assistance of counsel was violated by Kenner's closing argument at trial or by Kenner's use of an AI program to draft a small portion of the closing argument that mistakenly attributes another musical artist's lyrics to Michel.  *See Yarborough*, 540 U.S. at 8 ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.").

### 3.  Lack of Familiarity with the Charged Statutes

Next, Michel claims that Kenner was unfamiliar with the charged statutes.  Mot. at 34.  To support this belief, Michel discusses two interactions that his trial team had with other attorneys.  First, Michel claims that Israely was "so alarmed by the state of Kenner's preparation and understanding of the case that he asked a law school classmate," Joel Denaro, to help with trial

preparation.  *Id.*; *see also* Zeidenberg Decl., ECF No. 310-1, ¶¶ 8–9.  According to Michel, Denaro "immediately recognized that the defense was unprepared for trial and was particularly alarmed when Kenner asked him to explain the money laundering statute to him."  Mot. at 34; *see* Zeidenberg Decl. ¶¶ 10–12.  Second, Michel contends that Kenner did not understand the lobbying statutes (FARA and Section 951) because in April 2023, while trial was ongoing, Kenner's defense team contacted an attorney with FARA experience, Jasmine Zaki, and asked if she would testify as a FARA expert.  Mot. at 34; *see also* Zaki Decl., ECF No. 310-2, ¶¶ 3, 5.  In all, Michel claims that Kenner's general unfamiliarity with the charged statutes "explain[s] why he failed to make critical arguments during his closing argument or during the examination of witnesses, further prejudicing the defense."  Mot. at 34.

At the evidentiary hearing, Israely testified regarding his outreach to Denaro.  *See* 1/10/2024 AM Tr. at 59:3–62:5.  Israely explained that he reached out to Denaro, who resides in Florida, and asked him to come to Kenner's law office in California because "Kenner needed someone to prep Mr. Michel on cross."  *Id.* at 59:18–25.  Denaro traveled to California in the weeks leading up to trial and met with Kenner, Israely, and Lois Heaney (another member of Michel's defense team).  *Id.* at 60:3–6.  During this meeting, Denaro recommended that Kenner retain an FEC expert.  *Id.* at 62:2–5.  Apart from this trial preparation meeting, the record does not reflect any additional relevant interactions between Kenner's defense team and Denaro.

As for Zaki, Kenner's defense team reached out to her in April 2023 because she had FARA experience and an acquaintance in common with Michel.  *See* 1/12/2024 PM Tr. at 45:3–9.  Zaki met with Kenner and Israely in their "war room" to discuss FARA.  *Id.* at 45:16–46:3.  According to Zaki, this meeting focused on "basic" questions about FARA and lasted less than one hour.  *Id.* at 48:5; *id.* at 49:2–6.  Also during this meeting, Kenner asked Zaki if she would be willing to

testify as an expert witness on FARA. *Id.* at 49:7–20. After the Court rejected Kenner's attempt to propose Zaki as a witness, Kenner and Israely inquired about whether Zaki would serve as a "FARA consultant." *Id.* at 50:5–11. Although Zaki did send them an engagement letter, dated April 14, 2023, *see* Def.'s Ex. 40, there were no "follow up consultations" between Zaki and Kenner's defense team, 1/12/2024 PM Tr. at 52:4–7.

With respect to Kenner's FARA experience, Israely opined that Kenner did not have much experience in that area of the law prior to Michel's trial. 1/10/2024 AM Tr. at 17:9–11 ("[Kenner] knew the law, but he didn't have a lot of—I don't think anyone had a lot of experience with it."); *id.* at 55:11–13 (Israely testifying that Kenner "didn't know the nuances" of FARA, but he "got to know it very quickly"). Kenner testified that he met with Zaki because he wanted "to get any additional knowledge that [he] might feel that [he] didn't have." 1/11/2024 PM Tr. at 25:3–5; *id.* at 25:17–19 ("And I had a very nice, polite conversation with [Zaki]; and I may have even said, We'll call you if we want you to testify."). And while Kenner did seek additional information about FARA during trial, Kenner stated that he began looking for a FARA expert before trial began, and several were recommended to him. *Id.* at 24:4–10. Despite not formally consulting with a FARA expert for this case, Kenner "believed [he] understood the FARA issues to the extent necessary to try th[e] case successfully."[12] *Id.* at 28:2–13. His overall strategy during trial was to show that Michel "did not have any knowledge or intent to violate FARA." *Id.* at 29:1–2; *id.* at 29:4–8 ("My overriding strategy was to connect Mr. Michel's naivete in the political world and try to cast him as a person who communicated to the community through his art, through his music and through his speaking on behalf of the community.").

---

[12] Defendant in fact filed a motion to dismiss the FARA counts in the Superseding Indictment, arguing, *inter alia*, Michel lacked an agency relationship with Low and did not engage in registrable conduct as defined by the statute. *See generally* Mot. to Dismiss, ECF No. 130.

In all, the record establishes that Kenner sought to discuss various issues regarding the charged statutes with two individuals leading up to and even during trial. *See* Section III.C.3. But Michel has not shown how these interactions satisfy either *Strickland* prong—neither objectively deficient performance nor prejudice. That Kenner was edifying his understanding of, or defenses to, the charged statutes does not necessarily mean that Kenner was ineffective. Even a counsel's own belief that he is ill-prepared for trial does not, without more, satisfy *Strickland*. *See United States v. Gray-Burriss*, 251 F. Supp. 3d 13, 25 (D.D.C. 2017) (CRC) ("A lawyer can perform proficiently despite qualms about her method of preparation, even if her peers would have pursued a different course."). Michel's assertions that Kenner was unfamiliar with the charged statutes are conclusory, based on two limited interactions with other attorneys, and insufficient to satisfy his high burden under *Strickland*. *See, e.g.*, *Simms v. United States*, 730 F. Supp. 2d 58, 61 (D.D.C. 2010) (RJL) (holding that "vague and conclusory" allegations that counsel's representation was ineffective do not overcome presumption of effective representation). As a result, Michel's IAC claim fails on this basis as well.

### 4. Assistance of Contract Attorneys

Michel's next IAC claim is that Kenner was ineffective by "outsourc[ing] trial preparations to inexperienced contract attorneys who worked for an e-discovery vendor, Business Intelligence Associates, Inc. (BIA)[.]" Mot. at 35. Michel also takes issue with Israely's service as second chair during trial, even though he lacked white collar or litigation experience. *Id.*

During trial, Kenner's defense team consisted of the following individuals: Israely, an attorney and self-proclaimed "discovery expert," 1/10/2024 AM Tr. at 5:24–25, Kriss Anne Carlstrom, a "Relativity expert" and attorney who was initially hired as a contract attorney before being hired by Kenner's law firm, *id.* at 7:5–8, investigator Katherine Lestelle, *id.* at 7:14–20, Lois

Heaney,[13] a jury consultant who drove the mock trial, *id.* at 7:22–25, Bill Maddix, a contract attorney, *id.* at 9:13, and Charles Haskell, who served as local counsel, *id.* at 6:21.

Although they were initially hired to assist with discovery, Carlstrom and Maddix "proved [themselves]" and were entrusted by Kenner to do a large portion of the trial preparation and motions in the case. *See, e.g.*, 1/11/2024 AM Tr. at 113:16–24 (Kenner testifying that Maddix "proved himself to be adequate and appropriate [and] a wonderful writer"). According to Kenner, "[e]verybody in the war room [during trial] was tasked with giving an outline to me of what they thought they got out of the testimony and what areas they thought that I should go into," which Kenner would then "consider[] all of those and then ma[ke] the best decision [he] could in order to effectuate the strategy that [he] was using at trial." *Id.* at 132:23–133:4. In essence, Kenner enlisted everybody's assistance (in varying degrees) during trial.

Although Michel may disagree with Kenner's use of contract attorneys for his case, Michel's conclusory assertion that his defense team was ineffective because of their lack of white-collar litigation experience is unavailing. *See* Mot. at 35 (referring to the contract attorneys as "inexperienced" and noting they "lacked white collar and litigation experience"). As an initial matter, the "Sixth Amendment does not guarantee representation by a single counsel[.]" *United States v. Bell*, 795 F.3d 88, 94 (D.C. Cir. 2015) (citing *Morris v. Slappy*, 461 U.S. 1, 19–20 (1983)). And it is a defense team's entire performance that is assessed to determine whether a defendant's

---

[13] During the evidentiary hearing, current counsel for Michel suggested that Heaney was not qualified to assist Kenner in certain trial matters; for instance, "merg[ing] and help[ing] put together a direct examination outline in a federal criminal case involving the FEC campaign finance counts." 1/11/2024 AM Tr. at 148:7–10; *id.* at 148:12–13 (current defense counsel asking, "Do you have any reason to think that she was knowledgeable about the FEC regulations"); *see also* Def.'s Ex. 32 (email from Heaney to defense team regarding "Pras FEC direct"). Kenner explained that Heaney is an "expert in crafting and dealing with preparing a witness to testify," and that she assisted in preparing Michel to testify in this case. 1/11/2024 AM Tr. at 151:7–9. Michel's own exhibits establish that Heaney was supervised, as she sent her outlines to the attorneys on the defense team. *See* Def.'s Ex. 32 (email from Heaney to Kenner, Israely, Carlstrom, Lestelle, and Maddix); Def.'s Ex. 33 (email from Heaney to Maddix, Kenner, and Carlstrom).

right to effective assistance of counsel was violated.  *See Stitt v. United States*, 369 F. Supp. 2d 679, 689 (E.D. Va. 2005) ("To assess [IAC], courts do not isolate the behavior of one member of a defendant's team, but rather take the performance of all the counsel together."); *see Soering v. Deeds*, 217 F.3d 840, at *5 (4th Cir. 2000) (unpublished disposition) (considering whether another defense team member was representing defendant competently).  While Carlstrom and Maddix may have been contract attorneys without litigation experience, they were still supervised by Kenner, an attorney with trial experience.  *See, e.g.*, Def.'s Ex. 36 (Maddix sharing Lidsky cross-examination outline to defense team, including Kenner); Def.'s Ex. 35 (Maddix sharing Higginbotham cross-examination outline to defense team, including Kenner).  Moreover, the lack of white-collar litigation experience does not presumptively mean any member of the defense team was ineffective.  *See Cronic*, 466 U.S. at 665 ("Every experienced criminal defense attorney once tried his first criminal case.").  Simply claiming that Kenner's use of contract attorneys resulted in ineffective assistance of counsel is not sufficient to succeed on an IAC claim.  *See United States v. Tucker*, 12 F.4th 804, 818 (D.C. Cir. 2021) ("But we reject conclusory claims that leave out specific reasons for counsel's deficient performance and prejudice under *Strickland*."); *id.* ("It is not enough for Fields to simply state his dissatisfaction and then conclude that his dissatisfaction satisfied *Strickland*.").

In an attempt to satisfy *Strickland*, Michel argues that the use of the contract attorneys (Maddix and Carlstrom) resulted in "obvious" prejudice because Kenner failed to effectively cross-examine two critical witnesses: Higginbotham and Broidy.  Mot. at 35–36.  Michel highlights three lines of questioning that Kenner should have elicited from Higginbotham, involving Higginbotham's meeting in the Chinese embassy, Steven Wynn, and the lack of "direction or control" from the PRC government.  *Id.*

51

But two of these matters were brought out during trial.  Higginbotham did testify that the purpose of his meeting at the Chinese embassy was "to make the Chinese ambassador feel more comfortable that work was actually taking place and progress was taking place with the extradition of Guo Wengui."  4/6/2023 AM Trial Tr. at 67:11–14.  At no point did Higginbotham suggest that he received instructions from the Chinese ambassador during this interaction.  *See id.* at 69:20–22 ("The Chinese ambassador wanted more information than what I provided.  It seemed incomplete.  But he was satisfied with what I had said to him.").  Second, with respect to Wynn, Kenner explained that his theory was that Wynn "was seeking to open additional casinos in Macau" and that's why "[h]e needed to curry favor with the Chinese government."  1/11/2024 PM Tr. at 101:7–10.  At trial, Kenner elicited the following testimony from Matthew Pottinger:

> Q.  Okay.  Were you ever able to determine what Mr. Wynn's interest in trying to get Mr. Guo—or the President to extradite Mr. Guo back to China was?
> A.  Well, Mr. Wynn said he was under pressure from the Chinese government to get Guo back to China.
> Q.  Did you have any understanding with regard to what it was that the Chinese government could do to apply pressure to Mr. Wynn?
> A.  I could only speculate on that side.
> Q.  Mr. Wynn at the time was operating casinos in Macau; correct?
> A.  That's correct.
> Q.  Multiple casinos in Macau?
> A.  Yes.

4/11/2023 PM Trial Tr. at 97:24–98:14 (quotation cleaned up).  And then, during his closing argument, Kenner emphasized that then-President Trump was "being influenced by Mr. Steve Wynn, the casino magnate, as you heard."  4/20/2023 PM Trial Tr. at 41:7–8.  Accordingly, focusing on eliciting testimony from Higginbotham that Wynn was working "to curry favor with Low," as opposed to the PRC government, would not necessarily have been consistent with Kenner's strategy at the trial.  Mot. at 36.

As for Broidy, Michel identifies certain questions that Kenner could have raised during cross-examination. These questions involve whether Michel and the others were working on behalf of Low, as opposed to the PRC government, and whether Wynn was paid for his purported efforts in the lobbying scheme. Mot. at 35–36. But Kenner did question Broidy on whether he was told to register (or not register) under FARA, *see* 4/4/2023 PM Trial Tr. at 55:3–10, and whether Broidy told Michel to register (or not register) under FARA, *id.* at 55:14–16. Broidy further testified that Michel was not copied on email, *id.* at 57:12–14, nor was Michel "a major part" of various conversations held throughout the lobbying scheme, *see, e.g.*, *id.* at 58:24–59:1; *id.* at 60:7–9.

In all, Michel identifies a few questions that he contends Kenner should have asked during the cross-examination of Higginbotham and Broidy, which *may* or *may not* have elicited certain testimony that Michel claims would have been favorable. Mot. at 35–36. But Michel fails to recognize how some of this testimony was elicited during trial, or how some of his questions may have conflicted with Kenner's defense strategy at the trial. And, while Kenner's cross-examinations could have in theory been more effective had he asked one or two additional questions, the standard for effective assistance of counsel is not perfection. *See Yarborough*, 540 U.S. at 8 ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."). Such a standard would be impossible to satisfy, and would only serve to subject every litigation attorney to an IAC claim. *See Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997) ("[T]here are few, if any, cross-examinations that could not be improved upon. If that were the standard of constitutional effectiveness, few would be the counsel whose performance would past muster."). Moreover, it is only Michel's speculation that the answers to his suggested questions would have been helpful for his defense.

Overall, Michel offers conclusory allegations that the use of contract attorneys is presumptively ineffective assistance of counsel, and he identifies a handful of questions that Kenner could have asked during the cross-examinations of Higginbotham and Broidy that may or may not have elicited favorable testimony. *See* Mot. at 35–36. For the aforementioned reasons, the Court concludes that Michel has not established deficient performance with respect to Kenner's use of contract attorneys or failure deliver a perfect cross-examination.[14]

5. Motion to Sever[15]

Next, Michel claims that he was severely prejudiced by Kenner's failure to move to sever the 2012 conduit scheme from the 2017 unregistered lobbying schemes. Mot. at 38. According to Michel, the jury "needlessly heard highly prejudicial evidence that Michel sought to corruptly tamper with alleged straw donors to dissuade them from testifying against him." *Id.*

Under Rule 8(a), joinder of offenses is permitted if the "offenses charged [] are of the same or similar character, or are based on the same action or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). "Rule 8 has generally been construed liberally in favor of joinder." *United States v. Gooch*, 665 F.3d 1318, 1326 (D.C. Cir.

---

[14] Michel also suggests that Kenner's health issues may have "affect[ed] his concentration during trial" and may have been "[o]ne reason why" Kenner outsourced trial preparation and strategy. Mot. at 37–38. For context, in October 2022, Kenner "had an accident wherein he fell and was admitted to the hospital emergency room." ECF No. 176. As a result of his injuries from the accident, Kenner moved to continue the initial trial date in this matter, which was in November 2022. *Id.* ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Trial was eventually set to begin on March 27, 2023. *See* Minute Order (Oct. 11, 2022). During trial, Kenner did continue to experience discomfort, presumably stemming from his injuries. *See* 4/3/2023 PM Trial Tr. at 93:8–23 (Kenner requesting to adjourn early "because [his] knee is hurting very badly and so is [his] lower back. It's difficult for me to concentrate[.]"). But Michel's speculation that Kenner's injuries caused him to become ineffective are just that: speculation. Without more, the Court will not grant Michel's Motion for New Trial on this basis. *See United States v. Tucker*, 12 F.4th 804, 818 (D.C. Cir. 2021) ("But we reject conclusory claims that leave out specific reasons for counsel's deficient performance and prejudice under *Strickland*.").

[15] Michel suggests that Kenner may have been motivated to avoid severance because Michel paid him a flat fee for the representation. Mot. at 41 n.22 (citing Michel Decl., ECF No. 310-3, ¶ 2; *see also* Def.'s Ex. 45 (copy of flat fee agreement between Michel and Kenner). However, Kenner testified that he spent approximately $1,400,000 of his own funds to prepare for trial because he was not receiving additional payments from Michel and because he did not want to "compromise" the trial. 1/11/2024 AM Tr. at 128:25–129:2; *id.* at 129:4–7. Accordingly, the Court finds Michel's allegations concerning Kenner's desire to cut costs unpersuasive.

2012) (quoting *United States v. Richardson*, 161 F.3d 728, 733 (D.C. Cir. 1998)).  The joinder analysis "does *not* take into account the evidence presented at trial"; rather, the "court applying Rule 8 focuses solely on the indictment and pre-trial submissions." *Id.* at 1334.

Under Rule 14, however, "[i]f the joinder of offenses . . . appears to prejudice a defendant . . . the court may order separate trials of counts [] or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  Although the defendant carries the burden of demonstrating prejudice resulting from a failure to sever, a showing of prejudice does not result in the automatic grant of the motion.  *Gooch*, 665 F.3d at 1326 (citation omitted).  "A showing that the defendant 'may have a better chance of acquittal in separate trials' is [an] insufficient" basis for a severance. *United States v. Carson*, 455 F.3d 336, 374 (D.C. Cir. 2016) (quoting *Zafiro v. United States*, 506 U.S. 534, 540 (1993)).  Severance is proper "only if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Id.* (quoting *Zafiro*, 506 U.S. at 539).  When, as here, there is only one defendant, "Rule 8(a) permits joinder of [] offenses [of the same or similar character], even if they are entirely unrelated to each other." *United States v. Jackson*, 562 F.2d 789, 796 (D.C. Cir. 1977); *id.* ("When similar but unrelated offenses are jointly charged to a single defendant, some prejudice almost necessarily results. . . . Rule 8(a) permits [this] sort of prejudice.") (citation omitted).

Here, Michel argues that Kenner was ineffective by failing to move to sever the lobbying schemes and associated money laundering and false statements counts (Counts 7, 8, 10, and 12) from the conduit scheme and witness tampering counts (Counts 1, 2, 3, 4, 5, and 6).  Mot. at 40. However, an attorney's failure to file "a non-meritorious motion renders [their] performance efficient, not deficient."  *United States v. Carr*, 373 F.3d 1350, 1354 (D.C. Cir. 2004). Additionally, the "crux of an ineffective assistance claim is not simply whether trial counsel

neglected to press a viable legal argument, but whether counsel's failure to do so was objectively unreasonable under the circumstances." *United States v. Doost*, 3 F.4th 432, 442 (D.C. Cir. 2021) (citation omitted).

At the evidentiary hearing, Kenner explained that he believed challenging the joinder of the offenses would be futile in this case. Specifically, Kenner testified that he "went in and looked at the D.C. Circuit rulings on that—severance motions. There were a scant number that were granted." 1/11/2024 PM Tr. at 30:21–23. Moreover, because Kenner was "new to this district, new to her Honor," he "didn't want to file a motion that [he] knew statistically had virtually no chance of being granted and might put [him] in disrepute with the Court in front of whom [he] was going to be trying this case." *Id.* at 30:24–31:3.

Considering Kenner's reasoning for not filing a motion to sever the counts, the Court cannot conclude that Michel's arguments override the "strong presumption" that Kenner's "conduct [fell] within the wide range of reasonable professional assistance." *Doost*, 3 F.4th at 437 (quoting *Strickland*, 466 U.S. at 689). Even if, *arguendo*, a motion to sever the counts would have been granted by the Court—an opinion the Court does not reach—Kenner's decision to not file a motion that he perceived to be futile is not objectively unreasonable under the circumstances. There were numerous commonalities between the schemes, which suggests that the motion may have been futile. Both schemes involved millions of dollars from the same foreign benefactor (Low), and these funds were funneled through different entities to conceal Low as the source. Both schemes involved accessing U.S. Presidents (Obama and Trump) to accomplish what Michel wanted on behalf of and at the direction of Low (or, in some instances, the PRC government). And in both schemes, Michel lied to (or otherwise omitted information from) the FEC and to various banks to achieve his goals.

Under these circumstances, it was not objectively unreasonable for Kenner to believe a motion to sever would have been denied.  And, to the extent the joinder of the conduit scheme with the unregistered lobbying schemes may have resulted in some "spill-over prejudice," Mot. at 40, the Federal Rules of Criminal Procedure contemplate and permit such prejudice, *see Jackson*, 562 F.2d at 796 ("When similar but unrelated offenses are jointly charged to a single defendant, some prejudice almost necessarily results. . . .   Rule 8(a) permits the first sort of prejudice.") (citation omitted).  Accordingly, the Court shall not grant Michel's Motion for New Trial on this ground.

6.  <u>Failure to Object to Agent Heuchling's Overview and Opinion Testimony</u>

In addition to arguing that Government counsel improperly used Agent Heuchling as an overview witness, *see* Section III.B., Michel maintains that Kenner was ineffective by "fail[ing] to object to obviously inadmissible evidence," including when Agent Heuchling "repeatedly testified as to his opinion that Michel was guilty of the various schemes," Mot. at 41.  This failure to object, Michel claims, "usurp[ed] the role of the jury and caus[ed] severe prejudice to Michel." *Id.*

According to Kenner, this failure to object was intentional.  Kenner explained that his "strategy became that [Agent Heuchling] was the closest person [he] could get to what happened with Mr. Frank White and how [White] was the culprit because [Kenner] couldn't call Frank White.  All [Kenner] had was [White's] testimony from the grand jury, and [Kenner] wanted to use him in the same way to try to reach issues that were otherwise unreachable to [Kenner] because the ability to get to them in different ways was denied to [him]."  1/11/2024 PM Tr. 37:25–38:6. Because Frank White was unavailable to Kenner during trial,[16] Kenner sought to use Agent

---

[16] White indicated that if he was called to testify, he would invoke his Fifth Amendment right.  *See* ECF No. 263.

Heuchling as a path to shift the focus surrounding the 2012 conduit scheme on to White.  *Id.*  As

for the 2017 lobbying schemes, Kenner explained:

> I was trying to get to strategically the separation of Nickie Lum Davis and Mr.
> Broidy from Mr. Michel.  The evidence in the case . . . but it was Nickie Lum Davis
> and Mr. Broidy who were influencing the president.  Mr. Michel was not—never
> met with the president and wouldn't know who Mr. Michel was.  He never went to
> the Executive Branch of the government. . . .  My second observation is that I
> wanted to argue, and therefore I didn't object—and a big part of my strategy was
> to argue that Mr. Michel was working not on behalf of the Chinese government,
> but on behalf of the American government[.]

*Id.* at 47:16–48:8; *id.* at 48:23–49:2 ("It opened the door to my arguing that Mr. Michel was

working on behalf of the United States, not on behalf of China, and it was my intention ultimately

and my strategy to separate Ms. Nickie Lum Davis and Mr. Broidy from Mr. Michel.").  In essence,

Kenner wanted to use Agent Heuchling "for the same purpose" as Government counsel, "to get to

the defense side of what he knew and the defense theory that [Kenner] chose to use."  *Id.* at 38:12–

15; *see id.* at 45:14–17 (Kenner testifying that he "wanted to be able to ask the same kind of

questions of Agent Heuchling with regard to [Kenner's] side of the case and what [he] could bring

out since [he] couldn't get Frank White; [he] couldn't get President Trump").  Because Kenner

wanted to use Agent Heuchling in a similar manner, he believed he "couldn't object to what [he]

was going to strategically do [himself]."  *Id.* at 45:20–21.  As previously discussed, Kenner was

seeking to assign culpability to White by attempting to show that White was gathering the relevant

contributions to increase his own standing.  *See* 3/31/2023 AM Tr. at 21:19–24.

     With respect to specific terms used by Agent Heuchling, such as "straw donor," Kenner

explained that "[his] lack of objection was to effectuate [his] strategy of doing the same kinds of

questions.  [He] couldn't very well object when the Government did it and then do the same thing

[himself]."  *Id.* at 46:1–4.  Upon reflection during the evidentiary hearing in January 2024, Kenner

did concede that he "should have made the objection that it should have had the word 'allegedly' before the crime." *Id.* at 41:13–14.

The Court notes that Kenner's strategic decisions during trial are entitled to a "'strong presumption' of reasonableness." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (quoting *Harrington*, 562 U.S. at 104). Generally, defense counsel have "limited time and resources, and so must choose from among 'countless' strategic options." *Id.* (quoting *Harrington*, 562 U.S. at 106–07). "[E]ven if there is reason to think that counsel's conduct 'was far from exemplary,' a court still may not grant relief if '[t]he record does not reveal' that counsel took an approach that no competent lawyer would have chosen." *Id.* (quoting *Burt v. Titlow*, 571 U.S. 12, 23–24 (2013)). Furthermore, in evaluating a defendant's IAC claim, the Court must resist the temptation to judge counsel's conduct harshly in hindsight. *Strickland*, 466 U.S. at 689.

Overall, the record reflects that Kenner's strategy at trial was to use Agent Heuchling to his advantage by separating Michel from the alleged schemes—the 2012 conduit scheme and the 2017 lobbying schemes—and focusing on the actions of other individuals (White, Lum Davis, and Broidy). *See, e.g.*, 3/31/2023 AM Trial Tr. at 21:1–22:8; *id.* at 55:24–60:12; *see* 4/20/2023 PM Trial Tr. at 42:12–14 ("[T]he evidence shows that Nickie Lum-Davis had direct communication with Jho Low."). Ultimately, this strategy was unsuccessful, for Michel was convicted on all counts by the jury. But a strategy's ultimate failure does not mean an attorney is incompetent for pursuing it. *See Harrington*, 562 U.S. at 109 (That "defense strategy did not work out as well as counsel had hoped" does not mean counsel was incompetent). While Kenner's performance with respect to Agent Heuchling's testimony "was far from exemplary," the Court cannot conclude that his strategy to use Agent Heuchling was one that "no competent lawyer would have chosen." *Dunn*, 594 U.S. at 739 (citation omitted).

However, the Court does agree that it was erroneous for Kenner to not object to Agent Heuchling's conclusions regarding Michel's role in the schemes. That portion of his testimony was erroneous, and objections should have been raised by Kenner during trial. *See Moore*, 651 F.3d at 60. But based on the subsequent admissible evidence confirming Agent Heuchling's conclusions, as well as the overwhelming evidence of Michel's guilt—particularly the significant evidence (encompassing his own testimony) that Michel used straw donors to contribute to the Obama campaign—the Court cannot conclude that Kenner's error resulted in prejudice. Michel's own testimony demonstrated that he asked various individuals to contribute to the Obama campaign with funds provided by him because he reached his maximum contribution limit. *See* 4/18/2023 PM Trial Tr. at 82:5–14. Without demonstrating sufficient prejudice, the Court cannot grant Michel a new trial on this ground.

7. <u>Failure to Object to Other Hearsay</u>

Similarly, Michel argues that Kenner was ineffective by failing to object to inadmissible hearsay in the testimony of Pottinger (a former National Security Council staff member in the White House), taking issue with specific portions. Mot. at 43–45; *see* 4/11/2023 PM Trial Tr. at 80:19–88:5. According to Michel, Pottinger had "virtually no first-hand knowledge of the information about which he testified," which included what others had said and done with respect to the Guo lobbying scheme. Mot. at 42.

At the evidentiary hearing, Kenner explained that he did not object to the various portions of Pottinger's testimony because Kenner believed it was "helpful testimony." 1/11/2024 PM Tr. at 63:1. Specifically, there were messages "between Nickie Lum Davis and Broidy and others," but "[n]ever with Mr. Michel were those messages discussed, their scheme to get this matter to the attention of the president." *Id.* at 63:9–14. According to Kenner, Pottinger's testimony

"strategically helped separate Mr. Michel from the scheme[.]" *Id.* at 63:18–19.  With respect to the Wynn statements, Kenner testified that he "thought it was helpful to draw the distinction of—[] that Mr. Wynn, Mr. Broidy, and Nickie Lum Davis and Mr. Higginbotham were involved in an attempt to influence the Executive Branch of the government," but Michel never was. *Id.* at 66:10–14.  Kenner's strategy was, once again, to "separate [Michel] from the people that were going to the White House, which [Michel] wasn't." *Id.* at 66:15–17; *see also id.* at 69:2–3 (Kenner testifying that he knew it was hearsay "[b]ut [he] felt that it was beneficial for Mr. Michel"); *id.* at 103:16–18 ("[I]t is certainly consistent with my belief that the conspiracy was between Mr. Broidy, Ms. Lum Davis and Mr. Wynn.  It did not include Mr. Michel.").

In general, "a tactical decision to hold an objection at trial is not deficient." *United States v. Browne*, 619 F. Supp. 3d 100, 112–13 (D.D.C. 2022) (TNM).  And the Supreme Court recognizes the "wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 689.  Here, Kenner's decision not to object to Pottinger's testimony does not constitute deficient performance because it was consistent with the reasonable trial strategy of separating Michel from the other members of the conspiracy (Broidy, Wynn, and Lum Davis).  The Court will not second-guess Kenner's strategy simply because it failed.  *See, e.g.*, *Strickland*, 466 U.S. at 689 ("[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."); *id.* (courts must make "every effort [] to eliminate the distorting effects of hindsight").

In sum, Michel has not "overcome the presumption that, under the circumstances," Kenner's conduct "might be considered sound trial strategy." *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  Accordingly, Michel's IAC claim fails on this basis as well.

8.  Failure to Object to Introduction of Attorney-Client Privilege Conversations Between
    Michel and Higginbotham

Next, Michel argues that Kenner was deficient for failing to object to privileged

communications between Michel and Higginbotham, which ultimately "formed the basis of the

Government's argument that Michel knowingly and willfully failed to register and conspired in

violation of FARA." Mot. at 45.  Michel discusses the following testimony during Higginbotham's

direction examination:

> Q.  Based on the work for Low, the 1MDB work and the work on trying to get the
> Chinese national extradited, did you have concerns about FARA?
> A.  I did have concerns about FARA, yes.
> Q.  Did you share those concerns with the defendant?
> A.  I did, on more than one occasion.
> Q.  And what was Mr. Michel's response when you raised FARA?
> A.  Also very dismissive.  You know, I remember one time he said something to
> the effect of "I don't want to register for FARA because, you know, I travel a lot,
> and I get stopped coming in and out of airports, and it just all seemed like a very
> much inconvenience."
> Q.  Did Mr. Michel ever ask you, when you raised it, "What is FARA? I don't know
> what FARA is"?
> A.  Oh, no, no.  There was—he was aware of what FARA was.  And I think that—
> A.  Yes.  It was something that he was aware of[.]"

4/6/2023 AM Trial Tr. at 20:16–21:18 (quotation cleaned up).  According to Michel, this testimony

was extremely prejudicial because, without it, "there is no evidence that Michel was familiar with

FARA or any other registration requirement or had reason to believe it applied to him or to

Broidy."  Mot. at 46.  To emphasize the alleged prejudicial effect, Michel highlights that the

Government used this evidence to prove its FARA allegations during closing arguments.  *Id.*

(quoting 4/20/2023 AM Trial Tr. at 60).

A counsel's "failure to raise a meritless objection" is not sufficient to satisfy deficient

performance under *Strickland*.  *United States v. Islam*, 932 F.3d 957, 964 (D.C. Cir. 2019).  And,

as pertinent to this IAC claim, the attorney-client privilege does not apply to communications

"made in furtherance of a crime, fraud, or other misconduct." *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007) (citation and internal quotation marks omitted).

According to Kenner, he did not object based on attorney-client privilege because the Court had already ruled that Higginbotham was a co-conspirator to the schemes. 1/11/2024 PM Tr. at 76:8–12. During Higginbotham's testimony, the Court overruled Kenner's hearsay objections based on the co-conspirator exception. *See, e.g.*, 4/6/2023 AM Trial Tr. at 17:17–19; *see id.* at 35:1–2 (the Court stating during a bench conference that "[Higginbotham is] part of it so presumably, as a co-conspirator, he would know it."). Moreover, as discussed in Section III.A.1, the Government in this case sought and obtained a crime-fraud order governing communications between Higginbotham and Michel, which, as stated by the Government, "vitiated any privilege 'pertaining to the alleged schemes and crimes described in the government's motion.'" Gov't's Opp'n at 29 (quoting DOJ-0002453394-95). Lastly, the Court notes that the attorney-client privilege does not apply to communications made in furtherance of a crime (also known as the crime-fraud exception to privilege). *See In re Grand Jury*, 475 F.3d at 1305. Higginbotham testified that "[t]here was definitely an attempt to anonymize what we were doing across the board, and FARA would have pretty much announced, you know, officially that we were involved in [] these activities." 4/6/2023 AM Trial Tr. at 21:19–23. Accordingly, communications between Michel and Higginbotham regarding how registering for FARA would inhibit their ability to succeed would not have been privileged.

For these reasons, Michel has not demonstrated deficient performance by Kenner for failing to raise a "meritless objection." *Islam*, 932 F.3d at 964. Michel's IAC claim on this ground therefore fails.

9.  <u>Failure to Object to Evidence Lacking Foundation</u>

Michel's next ground for his IAC claim is Kenner's alleged deficient performance by failing to object to Government Exhibit 474.  Mot. at 47.  This exhibit contained photographs extracted from Lum Davis's Google Drive, which contained various photographs and screenshots of communications and documents.  *See generally* Gov't's Ex. 474; 4/13/2023 AM Trial Tr. at 92:21.  At trial, Agent Heuchling was asked by Government Counsel to review the various pages in Government Exhibit 474.  *See, e.g.*, 4/13/2023 AM Trial Tr. at 93:1–12; *id.* at 95:22–98:6. Michel contends that Kenner's failure to object on foundation or FRE 403 grounds was deficient, and resulted in severe prejudice because Agent Heuchling was permitted to speculate who or what he believed was being referenced in the photographs.  Mot. at 48; *see, e.g.*, 4/13/2023 PM Trial Tr. at 9:24 (Agent Heuchling stating he "can't say with certainty who [T1 Freedom] is").

According to Kenner, he did not object to Government Exhibit 474 because he "believed th[e] document was very beneficial to [his] theory of the defense for Mr. Michel" as it demonstrated "communications between Nickie Lum Davis, Mr. Broidy and others" but "no reference in this exhibit [] about Mr. Michel."  1/11/2024 PM Tr. at 79:18–23.  As with the other aspects of this trial, Kenner's strategy was "to cut the conspiracy at Broidy, Nickie Lum Davis, and that Mr. Michel was trying to get a $20 million fee for a photo op with the president."  *Id.* at 79:24–80:2; *see id.* at 83:1–3 ("[T]his evidenced the fact that the pressure that was being put on was to Nickie Lum Davis and Elliot Broidy, not from Mr. Michel.").

The Court reiterates that, in general, a "tactical decision" to abstain from objecting at trial does not constitute deficient performance.  *Browne*, 619 F. Supp. 3d at 112–13; *see also Strickland*, 466 U.S. at 689 (recognizing the "wide latitude counsel must have in making tactical decisions").  Kenner's decision not to object to the admission of Government Exhibit 474 does not constitute

deficient performance because he tried to use that exhibit to his advantage by separating Michel from his co-conspirators (Lum Davis and Broidy). Again, the Court will not question Kenner's strategy simply because it failed. *See, e.g.*, *Strickland*, 466 U.S. at 689 ("[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable.").

Overall, Michel has not "overcome the presumption that, under the circumstances," Kenner's conduct "might be considered sound trial strategy." *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Accordingly, Michel's IAC claim fails on this basis as well.

10. Failure to Prepare Michel for his Testimony & Cross-Examination

The final ground Michel raises for his IAC claim is Kenner's purported failure to prepare Michel for his direct examination and explain to him the risks of testifying. Mot. at 50.

As an initial matter, Michel's own declaration states that he "spent a great deal of time discussing the facts of my case with Mr. Kenner." Michel Decl., ECF No. 310-3, ¶ 4. And although Michel claims that Kenner "rarely took notes," *id.*, Michel's current counsel indicated that he has reviewed the transcripts Kenner made reflecting Michel's dictation of events, *see* 1/11/2024 AM Tr. at 125:15 ("And I've seen those transcripts[.]"); *see id.* at 125:10–14 (Kenner testifying that Michel "dictated for me the events as he perceived them from the beginning of the case till the end of the case. I took that dictation, I had it reduced to transcripts, and I went over each of those transcripts and I talked to Mr. Michel about the contents of them.").

Michel also claims that he was informed that he would testify "[s]hortly before the Government rested its case," Michel Decl. ¶ 11, yet he was aware that Heaney, Kenner's jury consultant, was helping "draft [his] direct examination," *id.* ¶ 12. Government counsel rested their case on April 17, 2023. *See* 4/17/2023 AM Trial Tr. at 41:19–20. Michel's own exhibits from the

evidentiary hearing reveal that Heaney was working on Michel's testimony in the weeks leading up to April 17, 2023.  *See* Def.'s Ex. 32 (email from Heaney to defense team on March 26, 2023, titled "Pras FEC direct"); Def.'s Ex. 33 (email from Heaney to defense team on April 7, 2023, titled "Pras testimony").  Kenner testified that Heaney was "an expert on preparing a witness to testify," 1/11/2024 AM Tr. at 150:20; and Heaney would "go with Mr. Michel to work on his testimony" in a breakout room, *id.* at 149:25–150:2.

While the final decision for Michel to testify may have occurred on April 17, 2023, *see* 4/18/2023 AM Trial Tr. at 61:12–13 (Michel: "Well, yesterday was actually the first time that I heard that I was going to testify."), Michel, after taking a break from court proceedings to consult with his attorneys and consider his options, ultimately decided to testify, *id.* at 63:22–23 ("[A]fter consulting with my attorneys and the universe, I decided I will testify.").  And the record reflects that Kenner's defense team was preparing for Michel's testimony, and preparing Michel as well, in the weeks leading up to his testimony.  *See, e.g.*, Def.'s Ex. 32; Def.'s Ex. 33.

For the aforementioned reasons, the Court finds that Michel's arguments that Kenner failed to prepare him for his testimony are "vague and conclusory," and do not adequately establish either *Strickland* prong.  *Simms*, 730 F. Supp. 2d at 61 (D.D.C. 2010) (holding that "vague and conclusory" allegations that counsel's representation was ineffective do not overcome presumption of effective representation).  Moreover, the Court inquired into whether Michel had sufficient time to consult with his attorneys on the decision to testify and if he was comfortable with that decision.  4/18/2023 AM Trial Tr. at 61:9–62:16.  After taking a recess, Michel conclusively stated that he had decided to testify.  *Id.* at 63:16–23.  Accordingly, Michel's final IAC claim fails.

* * *

The Sixth Amendment does not guarantee defendants perfection or success. Even if Michel received neither perfection nor success, Michel has not demonstrated that his counsel was ineffective under the standard set forth in *Strickland*. Accordingly, the Court declines to grant Michel a new trial on account of Kenner's allegedly ineffective assistance.

### D. Kenner's Conflicts of Interest

Ordinarily, courts apply the *Strickland* framework when evaluating a defendant's IAC claim. However, where, as here, a movant alleges that counsel's deficient performance was a result of a conflict of interest, the movant may avoid the burden of demonstrating prejudice under *Strickland*. *See United States v. Gantt*, 140 F.3d 249, 254 (D.C. Cir. 1998). The Supreme Court has held that a criminal defendant makes a showing sufficient to support a finding of constitutionally deficient performance where he demonstrates that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). "By making the required showing under *Cuyler*, a defendant avoids the more stringent two-part test for ineffective assistance set forth in *Strickland*," as satisfaction of the *Cuyler* standard gives rise to a presumption of prejudice to the defendant's interests." *Gantt*, 140 F.3d at 254.

In this jurisdiction, courts are hesitant when a defendant attempts to "force [his] ineffective assistance [of] counsel claims into the 'actual conflict of interest' framework . . . and thereby supplant the strict *Strickland* standard with the far more lenient *Cuyler* test." *United States v. Bruce*, 89 F.3d 886, 893 (D.C. Cir. 1996) (citation omitted). As such, "the [mere] possibility of conflict is insufficient to impugn a criminal [judgment]," *Cuyler*, 446 U.S. at 350; and an actual conflict of interest does not arise from every ethical lapse, *Bruce*, 89 F.3d at 893–94, from "a misunderstanding between a defendant and trial counsel on trial tactics," *Taylor*, 139 F.3d at 931,

or from a "hypothetical conflict having no effect on trial counsel's representation," *id.* (citing *Cuyler*, 446 U.S. at 350).

To satisfy *Cuyler*, a defendant must show (1) trial counsel "actively represented conflicting interests," and (2) that the "conflict 'adversely affected his lawyer's performance.'" *Taylor*, 139 F.3d at 930 (quoting *Strickland*, 466 U.S. at 692).  In other words, the defendant must show "that his counsel advanced his own [] interest to the detriment of the defendant." *Id.* at 930.  "If an attorney fails to make a legitimate argument *because* of the attorney's conflicting interest . . . then the *Cuyler* standard has been met." *Id.* (citation omitted).  Often, a *Cuyler* claim is raised where defense counsel jointly represented two or more defendants.  But, where joint representation is not the source of the alleged conflict, "the defendant's burden is to show that counsel *actually acted* in a manner that adversely affected his representation by doing something, or refraining from doing something, *that a non-conflicted attorney would not have done*." *Id.* (emphasis added).  Courts must "closely scrutinize claims under *Cuyler*." *Tucker*, 12 F.4th at 818.

Here, Michel claims that Kenner labored under two conflicts of interest during his representation of Michel: (1) a pecuniary interest in the AI company used during trial; and (2) the contempt charges brought against him, which appeared the month before trial.  Mot. at 51–52.  The Court addresses each purported conflict below.

1.  Financial Stake in AI Company

Michel first argues that Kenner and Israely had an "undisclosed financial interest in the [AI] program" used by Israely during trial.  Mot. at 51.  Michel claims that Kenner and Israely wanted to use his trial "as a test case to promote the program and their financial interests." *Id.*

Shortly after the trial concluded in this case, EyeLevel (the company that created the AI program) released a press release titled: *First Use of AI in Federal Trial: EyeLevel's Litigation*

*Assist Aids Defense in Pras Michel Fraud Case*.  *See generally* Def.'s Ex. 17.  This press release discussed the use of the AI program during Michel's trial, and included the following quote from Kenner: "This is an absolute game changer for complex litigation.  The system turned hours or days of legal work into seconds.  This is a look into the future of how cases will be conducted." *Id.* at 2.  Additionally, the press release stated that EyeLevel launched the AI program "with technology partner CaseFile Connect."  *Id.* at 1.

At the evidentiary hearing, it was confirmed that CaseFile Connect ("Case File") is owned by Israely and Kenner (and a third individual).  1/10/2024 AM Tr. at 20:12–16; *id.* at 34:25–35:1.  However, neither Kenner nor Israely have (or had) a financial interest in EyeLevel.  *See id.* at 25:13–14 (Israely testifying that CaseFile does not have a business relationship with EyeLevel); *id.* at 35:5–6; *id.* at 21:12–13; 1/11/2024 AM Tr. at 63:24–64:2.  Rather, both Kenner and Israely are "good friend[s]" with one of EyeLevel's founders, Neil Katz.  1/10/2024 AM Tr. at 21:7; 1/11/2024 PM Tr. at 96:2–5.  With respect to the alleged partnership between CaseFile and EyeLevel, Israely explained that he asked for that language to be included in EyeLevel's press release "because [he] wanted to get some free press for [his] company."  1/10/2024 AM Tr. at 25:18–25.

Based on the evidence and testimony produced at the evidentiary hearing, the Court concludes that Michel has not established there was an actual conflict of interest that affected Kenner's representation of him.  *Taylor*, 139 F.3d at 931 (stating there must be an "actual conflict," not a "hypothetical conflict having no effect on trial counsel's representation").  The record reveals that Kenner and Israely did not have a financial interest in EyeLevel; therefore, there is no evidence suggesting they "deci[ded] to elevate their financial interest in the AI program over Michel's

interest in a competent and vigorous defense." Mot. at 52. Michel's *Cuyler* claim on this basis therefore fails.

    2.  <u>Contempt Proceedings</u>

        Michel's second *Cuyler* claim involves the contempt charges Government counsel filed against Kenner the month leading up to the trial. Mot. at 52. Michel claims these contempt charges created "significant stress and distraction" for Kenner and gave him an "incentive to curry favor with the prosecution and pursue an unaggressive defense." *Id.* at 56.

        On March 2, 2023, two stories were published by Bloomberg about Michel's case. *See* J. Leopold et al., *The Fugee, the Fugitive, and the FBI: How rapper Pras Michel got entangled in one of the century's great financial scandals, mediated a high-stakes negotiation between global superpowers, and was accused of major crimes*, Bloomberg Businessweek (Mar. 2, 2023), https://www.bloomberg.com/features/2023-us-china-tensions-scandal-fugees-1mdb/#:~:text=The%20Fugee%2C%20the%20Fugitive%20and,was%20accused%20of%20major%20crimes; J. Leopold et al., *FBI Documents Show Leonardo DiCaprio, Kim Kardashian Grilled for 1MDB Secrets*, Bloomberg Businessweek (Mar. 2, 2023), https://www.bloomberg.com/news/features/2023-03-02/leonardo-dicaprio-kim-kardashian-grilled-for-1mdb-secrets-fbi-documents-show. Based on the information cited to and quoted from in the articles, the Government filed a Motion for Order to Show Cause on March 3, 2023, alleging that Kenner violated the Court's Protective Order by "willful[ly]" providing discovery materials to the media. *See generally* Mot., ECF No. 204. That same day, Kenner provided a response to the Government's motion, claiming that the defense team "shared some limited information only after the Protective Order was signed or acknowledged" in "furtherance of the Defense investigation into the facts of the case." Resp., ECF No. 205, at 1. At that time, Kenner claimed

that the authors of the articles were "acting as agents" of the defense team.  *Id.* at 2.  On March 7,

2023, the Court held the motion in abeyance, pending trial.  Order, ECF No. 211.

On March 31, 2023, Government counsel raised, during trial, the issue of the contempt

charges.  Specifically, Government counsel requested that the Court engage in a "brief colloquy

with the defendant about waiving any potential conflict of interests that could be imputed to his

counsel, given the contempt motion filed by the government and any issue that could raise in terms

of his counsel wanting to appease the government to try and avoid negative consequences

associated with that motion."  3/31/2023 AM Trial Tr. at 6:7–13 (quotation cleaned up).  At that

time, Kenner stated: "I very much appreciate Mr. Keller raising that.  It is very uncomfortable for

me to vigorously defend my client in front of a judge who may rule on whether or not my conduct

has been contemptuous."  *Id.* at 6:17–20.  Kenner and Government counsel subsequently indicated

that they would discuss the contempt issue prior to raising it to the Court again.  *Id.* at 8:22–24.

Later that day, the Court suggested severing the motion and having it randomly assigned to a

separate judge to deal with after the trial concluded.  3/31/2023 PM Trial Tr. at 4:4–10.  In

response, Kenner requested additional time to discuss the matter with Government counsel, which

the Court permitted.  *Id.* at 4:11–13.

On April 3, 2023, the Court raised the contempt motion with the parties again.  At that

time, Kenner stated "there is no conflict" because "there has been no ruling by this Court on the

substance of that motion."  4/3/2023 AM Trial Tr. at 5:18–20.  Nonetheless, the Court decided to

perform a colloquy with Michel "to make sure he understands and that he's comfortable" with the

contempt issue.  *Id.* at 5:5–7; *id.* at 8:1–8.  Kenner then informed the Court that he "had [a] brief

conversation with [Michel] about" this topic, but that he believed Michel "may be entitled to totally

independent counsel to advise him."  *Id.* at 8:13–17.  Additionally, Government counsel confirmed

that a separate office would handle further proceedings related to the contempt charges against Kenner. *Id.* at 10:12–18.

In its colloquy with Michel, the Court explained that Government counsel had filed a motion for order to show cause, directed at Kenner, asking Kenner to explain why he should not be held in contempt for allegedly sharing certain discovery materials with the public. *Id.* at 12:22–13:7. The Court informed Michel that another judge, not this Court, "would be making a decision as to whether or not they agree with the government." *Id.* at 13:16–19. The Court also explained the potential penalties Kenner could face if the allegations were true. *Id.* at 13:20–22. The Court then told Michel there was a potential "conflict with your counsel having this motion pending out there in terms of his advocacy for you." *Id.* at 13:24–14:1. And while Kenner "has assured [the Court] that he will continue to advocate effectively on [Michel's] behalf," the Court wanted "to make sure that [Michel] want[ed] to continue to be represented by [Kenner] notwithstanding that this motion is out there which could present a conflict." *Id.* at 14:2–12.

Initially, Michel stated that he did not "really understand" and that he was "totally pleased with [his] attorney." *Id.* at 14:15–17. Michel told the Court that he did not know what the conflict was. *Id.* at 14:19–20. Consequently, the Court again explained the potential conflict of interest to Michel, stating there was a motion pending that may affect Kenner's representation of him. *Id.* at 14:24–15:13. The Court further offered to appoint independent counsel for Michel, if he would like to discuss the matter with another attorney. *Id.* at 15:14–16. In response, Michel stated he was "very satisfied with [his] attorney." *Id.* at 15:17–18.

Notwithstanding Michel's satisfaction, the Court severed the contempt charges for assignment to a random judge in this jurisdiction. *See* Minute Order (Apr. 3, 2023). Those charges were ultimately resolved in January 2024, when Kenner entered into a plea agreement with the

Government, pleading guilty to the information that charged him with misdemeanor criminal contempt. ECF No. 348-1. Specifically, Kenner was charged, by information, with "willfully, and intentionally, and recklessly violated and caused a violation of" the Court's Protective Order in this case by "shar[ing] and caus[ing] to be shared covered discovery material with persons to whom he was not permitted to provide the material under the terms" of the Protective Order. ECF No. 348-2. Kenner conceded to these allegations. ECF No. 348-3.

Beginning with Kenner's contempt proceedings before Judge Amit Mehta, *see* Notice ECF No. 348, the Court notes that none of the supplemental materials provided by Michel demonstrate that Kenner's performance during Michel's trial was adversely affected by the contempt charges. *See Cuyler*, 446 U.S. at 348. Without demonstrating how Kenner's performance was adversely affected by the conflict, Michel's *Cuyler* claim cannot succeed.

Next, with respect to Michel's waiver, Michel claims that Kenner "coached" him to respond to the Court's colloquy by saying that he "loved his attorney." Mot. at 55; *see* Michel Decl. ¶ 8. He further maintains that he had "no understanding of the conflict issue," and therefore could not have knowingly and intelligently waived the conflict. *Id.* But, as evinced above, the Court's colloquy with Michel involved two separate explanations of Kenner's potential conflict of interest, *id.* The Court also offered to appoint independent counsel for Michel if he wished to obtain advice from an attorney other than his defense team. 4/3/2023 AM Trial Tr. at 15:14–16. Michel rejected this offer, stating he was "very satisfied" with Kenner. *Id.* at 15:17–18.

The D.C. Circuit has recognized that a defendant's "expressions of satisfaction with his trial counsel's performance" can "bar any claims arising from prior acts or omissions of counsel of which" the defendant "reasonably could or should have known." *Taylor*, 139 F.3d at 931; *id.* ("[T]he court may assume that [defendant] also knowingly and voluntarily waived any future

claims of ineffective assistance based upon trial counsel's drug abuse, at least to the extent it was known and understood by [defendant]."). While Michel did indicate that he did not know what the conflict was, 4/3/2023 AM Trial Tr. at 14:15–17, the Court explained this conflict to Michel twice, *id.* at 12:22–15:16. Both times Michel indicated he was content with Kenner's representation. *Id.* at 14:15–17; *id.* at 15:17–18. Accordingly, the Court can presume, considering Michel's "expressions of satisfaction," that Michel waived "any claims arising from prior acts or omissions of counsel of which [Michel] reasonably could or should have known." *Taylor*, 139 F.3d at 931.

In any event, assuming, *arguendo*, Michel did not knowingly and intelligently waive this conflict, Michel does not explain how the conflict actually resulted in a lapse of representation by Kenner. Nor is the alleged lapse supported by the record. During the evidentiary hearing, Israely indicated that, after the contempt motion was filed by Government counsel, Kenner became "if anything, [] more aggressive." 1/10/2024 AM Tr. at 27:9; *id.* at 27:10 ("I don't think he was bothered by it."). Kenner similarly stated that he was not impacted by the contempt charges against him during this case. *See* 1/11/2024 PM Tr. at 94:16–19 ("And I do not believe in any way, shape or form that the filing of that request for a contempt charge had any impact on the aggressiveness with which I believe I tried this case.").

To satisfy *Cuyler*'s second prong, Michel is required to "articulate a strategy that a reasonable, nonconflicted defense counsel would have pursued." *Tucker*, 12 F.4th at 819. Michel fails to do so, offering only conclusory allegations that Kenner's performance must have been adversely affected by this conflict. *See* Mot. at 57 ("Kenner likely concluded that a guilty verdict for Michel would reduce the Government's appetite to prosecute him for contempt."). The Court declines to grant Michel a new motion based on such allegations.

* * *

In sum, the Court concludes that Michel has not satisfied his burden under *Cuyler*. The record reflects that Kenner was not laboring under a financial conflict of interest with respect to his use of the AI program during trial. And the record does not indicate that Kenner's performance was adversely affected by the contempt charges pending against him. Accordingly, the Court shall deny Michel's Motion for New Trial on this ground.

### E.  Effect of Cumulative Errors

Michel's final argument in his Motion is that the cumulative effect of the errors, when viewed in the aggregate, "plainly prejudiced" Michel and warrants a new trial in the "interest of justice." Mot. at 57, 58. Michel urges the Court to consider the cumulative effect of each identified error—the two (2) federal judges' rulings, Agent Heuchling's testimony, and Kenner's purported ineffective assistance of counsel under *Strickland* and *Cuyler*. *Id.* at 57.

"[A]lthough certain errors standing alone might be insufficient to overturn a verdict, these errors may exert a cumulative effect such as to warrant reversal." *United States v. Brown*, 508 F.3d 1066, 1076 (D.C. Cir. 2007) (citation omitted). The "critical inquiry is an analysis of the probable impact, appraised realistically, of the particular [errors] upon the jury's factfinding function." *Id.* (alterations in original) (quoting *United States v. Jones*, 482 F.2d 747, 749 n.2 (D.C. Cir. 1973)). In other words, the Court must determine whether, "[v]iewed cumulatively, the errors do [or do not] demonstrate that [Michel] [was] so prejudiced as to deny [him] a fair trial." *Miller*, 738 F.3d at 387 (quoting *Egan v. United States*, 287 F. 958, 971 (D.C. Cir. 1923)).

However, the cumulative error doctrine only applies to conduct found to be an error. *See, e.g.*, *United States v. Simmons*, 431 F. Supp. 2d 38, 73 (D.D.C. 2006) (RCL) ("[T]he cumulative error analysis does not apply where the Court finds no error."); *United States v. Bailey*, 209 F.

Supp. 3d 55, 66 (D.D.C. 2016) (RBW) (concluding there is "nothing to consider in the aggregate" when none of the defendant's claims "constitute error"); *United States v. Pole*, No. 09-354, 2024 WL 756781, at *28 (D.D.C. Feb. 23, 2024) (EGS) (rejecting defendant's cumulative error argument when none of the alleged actions "constitute deficient errors").

The Court has determined that two (2) errors occurred during Michel's trial: (1) portions of Agent Heuchling's testimony, Section III.B., and (2) Kenner's failure to object to these portions of Agent Heuchling's testimony, Section III.C.6.  Additionally, out of an abundance of caution, the Court has assumed (without deciding) that its evidentiary rulings on the co-conspirator exception to the ban of hearsay made in the presence of the jury were error.  *See* Section III.A.2. Accordingly, it is these three (3) errors that the Court may consider in determining whether, in the aggregate, Michel was "so prejudiced" such that he was denied a fair trial.  *Miller*, 738 F.3d at 387 (citation omitted) (evaluating actual errors to determine cumulative effect).

The Court concludes that out of the fourteen (14) asserted errors Michel raises in his Motion, the three (3) claims that can be evaluated as errors under the cumulative error doctrine did not "exert a cumulative effect such as to warrant reversal" of Michel's conviction.  *Brown*, 508 F.3d at 1076 (citation omitted).  The Government's evidence in this case was strong and voluminous.  Its case-in-chief ran for approximately three (3) weeks, beginning on March 30, 2023 and concluding on April 17, 2023.  The Government's evidence consisted of, *inter alia*, incriminating documents, financial transactions, email and text communications, as well as testimony from several witnesses—including two (2) key co-conspirators (Higginbotham and Broidy)—and Michel himself; all of which corroborated the Government's charges.  In all, the evidence neutralized any prejudicial effect on the verdict in this case.  Accordingly, viewed cumulatively, Michel has not shown that a "serious miscarriage of justice" has occurred or that he

was denied a fair trial.  In sum, any purported errors that occurred during his trial do not warrant the reversal of Michel's conviction and a new trial.  *See Miller*, 738 F.3d at 397–98 (considering the cumulative effect of the errors and the strength of the evidence presented at trial).

## IV.   CONCLUSION

For the foregoing reasons, the Court shall **DENY** Michel's [310] Motion for New Trial. An appropriate Order accompanies this Memorandum Opinion.

Dated:  August 30, 2024

                          /s/
                          COLLEEN KOLLAR-KOTELLY
                          United States District Judge