**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 1:19-00148-1 (CKK) |
| | ) | |
| | ) | |
| PRAKAZREL MICHEL, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT PRAKAZREL MICHEL'S MEMORANDUM IN AID OF SENTENCING**

    Prakazrel Michel, by and through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing and requests a below guidelines sentence.

**I.    INTRODUCTION**

    Mr. Michel now comes before this Court to be sentenced for his convictions based on his involvement in two schemes. The first, which occurred in 2012, involved the use of straw donors to contribute money to the Obama re-election campaign. The true source of the money came from Jho Low, a Malaysian billionaire who resided in China. Low's motivation for giving Mr. Michel money to donate was not so that he could achieve some policy objective. Instead, Low simply wanted to obtain a photograph with himself and then-President Obama.

    The second scheme occurred in 2018, and involved Mr. Michel's failure to register under the Foreign Agent Registration Act when he enlisted others to help Low get out from under a civil forfeiture case brought by the Department of Justice, as well as attempting to persuade the U.S.

government to extradite a Chinese national wanted for prosecution in China, and who has since been charged and convicted by the U.S. Department of Justice with a $1 billion fraud.[1]

Neither of the two schemes were successful: Mr. Michel was not able to put Low and then-President Obama together in a room for a photograph, and the DOJ neither dismissed the forfeiture case against Low nor did it extradite the Chinese national wanted in China.

For his involvement in these two schemes, the Government calculates that Mr. Michel's sentencing guideline should be an eye-watering level 43, the maximum offense level provided by the Sentencing Guidelines—with a corresponding sentence of life in prison. It is a guideline range sentence typically reserved for terrorists who murder innocents and the heads of the largest Mexican drug cartels.[2] The Government's position is one that would cause Inspector Javert to recoil and, if anything, simply illustrates just how easily the Guidelines can be manipulated to produce absurd results, and how poorly equipped they are, at least on this occasion, to determine a fair and just sentence.

A more careful and considered analysis of the facts of this case, as well as sentences handed down in similar cases around the country – including Mr. Michel's co-defendants – as well as the entirety of Mr. Michel's life and all of the § 3553 factors, makes clear that the guidelines – which were improperly calculated – vastly overstate the seriousness of these offenses. Consequently, a

---

[1] *See Ho Wan Kwok, A/K/A "Miles Guo," Arrested For Orchestrating Over $1 Billion Dollar Fraud Conspiracy*, DOJ (Mar. 15, 2023), https://www.justice.gov/usao-sdny/pr/ho-wan-kwok-aka-miles-guo-arrested-orchestrating-over-1-billion-dollar-fraud-conspiracy; Statement Of U.S. Attorney Damian Williams On The Conviction Of Miles Guo, DOJ (July 16, 2024), https://www.justice.gov/usao-sdny/pr/statement-us-attorney-damian-williams-conviction-miles-guo.

[2] For example, Joaquin "El Chapo" Guzman, the convicted head of the Mexican Sinaloa cartel, whom the DOJ stated was "responsible for importing and distributing more than a million kilograms of cocaine, marijuana, methamphetamine and heroin in the United States" and reportedly was responsible for the deaths of thousands, also had an offense level of 43.

sentence far below the guidelines – as they are currently calculated – is warranted. As a result, Mr. Michel requests the Court depart downwards and sentence Mr. Michel to 36 months incarceration, with two years of supervised release. Such a sentence is at the high end of the sentences given to Mr. Michel's alleged co-conspirators for their roles: (i) Elliott Broidy was pardoned; (ii) George Higginbotham was sentenced to three months' probation, and (iii) Nickie Lum Davis was sentenced to 24 months' imprisonment.

## II.    **BACKGROUND**

### A.    **Mr. Michel's Early Life**, **Education, and Founding of The Fugees**

That Mr. Michel finds himself facing sentencing for these convictions is only slightly more improbable than Mr. Michel's life story:  a Brooklyn-born son of Haitian immigrants who attended Yale University as an undergraduate on an academic scholarship and who partnered with grade-school friends to form a band later known as The Fugees, which became the most famous hip-hop band in the world. The band won Grammys, toured internationally, and sold tens of millions of albums worldwide. It was a meteoric rise, for a very young and, to that point, sheltered young man.

Mr. Michel is 52 years-old. Mr. Michel's mother was born to Haitian parents living in Venezuela and came to the U.S. in 1970 speaking almost no English. She married Mr. Michel's father, who was from Haiti, and the young family lived in Brooklyn, where Mr. Michel's mother eventually found work as a nurse; his father worked in a factory.

The family moved to New Jersey when Mr. Michel was a young child. Mr. Michel's parents were loving, very religious, and very strict. Mr. Michel's parents were Baptists and Mr. Michel attended church at least weekly, and often multiple times per week. Alcohol, drugs and even tobacco were strictly prohibited, and Mr. Michel has never, despite all of his years in the entertainment industry, drank alcohol or tried drugs. The importance of education was stressed by

his parents, and Mr. Michel consistently got excellent grades. He eventually graduated near the very top of his high school class.

Mr. Michel was first introduced to music when he sang in the church choir. Mr. Michel had no interest in sports or other activities; it was music that became the driving force in his life. He learned piano and trumpet and, when he was 14 years-old, he met Lauryn Hill, who was three years younger than him but already extremely gifted musically. Eventually, Mr. Michel formed a band with Ms. Hill. Later, he asked Wyclef Jean, a friend of Mr. Michel's from his church choir, to join. Mr. Michel called their newly formed band "The Fugees," which was short for "refugees," which is what they considered themselves.

Pras attended Yale University after receiving an academic scholarship and other financial aid, majoring in psychology and philosophy. After completing two years at Yale, the Fugees got a record deal. Mr. Michel found that commuting from New Haven to New Jersey to practice and perform with his bandmates was too taxing, so he transferred to Rutgers, which was nearer to where the Fugees were recording music.

Mr. Michel dropped out of Rutgers before he graduated so that he could concentrate on the growing success of The Fugees. Although their first album was not commercially successful, their second album, The Score, was a huge hit, and won multiple Grammys and other awards. But, shortly after the success of that album, the bandmembers began to separate and pursue their own projects. In 1998, Mr. Michel released a solo album, Ghetto Superstar, which was a huge hit worldwide.

**B.     Mr. Michel's Post-Fugees Career and Charitable Works**

The success of the Fugees was not long-lasting. The band's heyday lasted only about five years and, although there were sporadic reunions – including, briefly, just last year – by the late

1990s, that portion of Mr. Michel's life came to a close. Mr. Michel turned to a wide-vary of other pursuits – philanthropy, documentary film-making, and various business pursuits.

Mr. Michel always felt particularly close ties to Haiti, the country where his whole family was originally from. The Fugees play a concert there in 1997, and, soon after, he began to work on charitable causes for Haiti and raised money for charities that operated there.

In 2006, Mr. Michel made a documentary, Skid Row, where he lived as a homeless person for nine days in order to give people an idea of what homelessness was like. He slept on the ground and lived without any conveniences, just as a homeless person in downtown LA would do. The documentary heightened the public's awareness for the plight of homelessness, which was not seen as a big issue at the time. Mr. Michel gave all of his royalties from the documentary to the charity Midnight Mission, which served the homeless community in downtown Los Angeles.

In 2010, when a massive earthquake struck Haiti, he and Wyclef worked to publicize Haiti's plight to a U.S. audience, and the world, to raise awareness of the scope of the tragedy. Mr. Michel collaborated with Sean Penn's charity organization, J/P HRO, to help raise money for Haiti.

In 2010-2011, Mr. Michel helped the campaign of Michel Martelly to run for President of Haiti. The campaign was successful. Mr. Michel made a documentary about that campaign called Sweet Mickey for President, which also won awards. This was one of the first elections in Haiti that was deemed to be free and fair. Martelly's election was widely celebrated for that at the time.

In September, 2011, Mr. Michel worked with the actor Ben Stiller to organize an auction for Artists for Haiti. The auction raised $13.6 million for Haiti in just one hour. All of this money went to support humanitarian projects in Haiti.

Mr. Michel and the film director Paul Haggis created a charity called "Embrace Haiti Now" because they were concerned that not enough of the money donated to Haiti was going to those

who needed it most. The pair created the first High School in Haiti that was free for kids to attend. Prior to this, the only way a High School–age child could go to school was to pay tuition, so that disadvantaged children were not able to attend school. Embrace Haiti Now raised the money for this High School. The academy, which provided students free tuition and uniforms, meals and access to medical care, had a goal of educating 3,000 kids every year.

Mr. Michel also contributed significantly to charities. For example, in 2013, he donated $100,000 to the Kennedy Center; in 2015, he donated $100,000 to the Clara Lionel Foundation; in 2016, he donated $100,000 to Alicia Key's charity, Keep a Child Alive; in 2017, he donated $20,000 to Gabriel's Angels Foundation, which raises money for cancer research.

Mr. Michel's life began its veer off of its successful course after he met Jho Low. Low, a Malaysian-born billionaire and prolific spendthrift who sought to mix with celebrities on the East and West coasts of the United States. Low and Mr. Michel were, at first, simply casual acquaintances. But then Low sought Mr. Michel's help to get a photograph with then-President Obama. Low was willing to spend a seemingly limitless amount of money to obtain this photograph, and Mr. Michel was more than willing to accept his money. From there, Mr. Michel made the fateful decision to have his own impact on the Obama campaign by contributing to various campaign arms through the use of conduits. Neither Mr. Michel nor Low sought to change or even influence any Obama administration policies; the goal was simply to get Low his sought-after photograph with President Obama.

A few years later, the Department of Justice filed a civil forfeiture case against Low seeking money DOJ contended Low siphoned from the Malaysian government. Low began to cast about for help with this case, and offered huge sums of money to anyone who could help him get the case dismissed. Although Mr. Michel had no relevant legal or governmental experience that should

have made him a logical person for Low to turn to, Low nevertheless agreed to pay Mr. Michel lavish sums for his help. Mr. Michel, in turn, enlisted others – who became co-defendants in this case – to assist with Low's request.

## III.   <u>THE OFFENSE CONDUCT</u>

### A.    **The Campaign Finance-Related charges**

Jho Low, a Malaysian born billionaire with prodigious spending habits came into Mr. Michel's orbit in approximately 2006. Mr. Michel watched from afar as Low spent hundreds of thousands of dollars in a single evening at a night club in New York. And Mr. Michel observed as Low spent millions on a lavish birthday party for himself in the Las Vegas desert, paying Hollywood celebrities small fortunes to attend. There appeared to be no limits to Low's spending habits. So when Low offered Mr. Michel the prospect of millions of dollars if Mr. Michel could arrange for a photograph of Low and then-President Obama, Mr. Michel made the fateful decision to take advantage of a fool looking for yet more ways to part with his money.

Rather than turning Mr. Low away and ignoring his entreaties, Mr. Michel asked Low for a million dollars to "think about" how he could help. Soon Mr. Michel was speaking with people associated with the Obama re-election campaign and offering to make contributions. Because of limits on personal contributions that capped how much any one person could contribute, Mr. Michel distributed the funds he had received from Low to various friends so that they could, in turn, pay to attend two campaign events on behalf of the Obama re-election effort. These contributions were made in the names of the attendees, not in the names of Low or Mr. Michel, thus allegedly causing the Obama campaign to make false statements to the Federal Election Commission.[3]

---

[3] As noted in Mr. Michel's Motion for Judgment of Acquittal, ECF No. 309 at 10, the Government never introduced the donor cards showing any false information so it is impossible for the defense

In total, Low paid Mr. Michel approximately $12 million as part of the conduit contribution scheme. Of that $12 million, Mr. Michel used less than $2 million to make contributions, through a series of other donors, to the Obama Victory Fund and Black Men Vote, part of the Obama campaign operation. Mr. Michel kept the rest of this money for himself. As for the photograph, Mr. Michel was not able to even achieve that goal for Low. Fortunately for Mr. Low, he was ultimately invited by Frank White to attend to the 2012 Obama Christmas party at the White House where, like all attendees, he was photographed with the Obamas. The photograph Low ultimately obtained was no different than those of literally thousands of people who are invited to attend the two dozen or so White House Christmas held every season. Low, like all of the guests who attended, was finally able to get his long sought-after photograph with the President, and he got it for free.

In 2019, more than seven years after these donations had been made, the FBI began to investigate and contacted the donors for interviews. Mr. Michel heard about this investigation and, as he described it in his trial testimony, he "panicked" and went to see an attorney. This attorney then wrote to two of the straw donors, falsely stating that money Mr. Michel had given them years earlier had been a loan, and demanding repayment. Text messages to this effect were also sent.

### B.    The FARA Scheme

#### i.    The 1MDB Civil Forfeiture Case

In 2016, DOJ filed a civil forfeiture action against Low, seeking funds he allegedly stole from the Malaysian government. Low came to think – for whatever reason, and despite his lack of relevant training or experience – that Mr. Michel could somehow assist him by persuading the DOJ to dismiss the case. Mr. Michel, seeing further opportunity to separate Low from his money,

---

to know if, in fact, any information was provided to the FEC, much less whether it was, in fact, false.

did not disabuse him of the notion that he could be of assistance to him. Instead, an agreement with Low was drafted that provided that, in exchange for an $8 million retainer fee and a $50 million success fee, the defendants would work to have the case dismissed.

Mr. Michel enlisted the help of Nickie Lum Davis, an associate of his, to see if she knew anyone who could help. It was Lum Davis who enlisted Elliott Broidy, the former finance chair of the Republican National Party, to assist. Davis chose Broidy, whom Mr. Michel did not know, because of his close contacts with the Trump administration. Broidy made some rather limited efforts to assist on the matter but, as the Government has acknowledged, although Broidy sought to tout his efforts to Low, in fact he "greatly exaggerated his efforts regarding the 1MDB investigation." *United States v. Nickie Mali Lum Davis,* D. Hawaii, 1:20-cr-00068, Dkt. No. 15, at 23. Broidy unsuccessfully attempted to arrange a golf game between President Trump and the Malaysian Prime Minister, in the hopes that the 1MDB matter would be resolved on the golf course. That golf game never happened. At another point, Lum Davis sent talking points she had received from Mr. Michel to Broidy, so that Broidy could provide them to the Secretary of State, who had a meeting scheduled with the Malaysian Prime Minister. But there is no evidence that these talking points were ever ultimately shared with the Secretary of State, or even that a meeting with the Malaysian Prime Minister ever occurred – much less that the 1MDB matter was discussed. Tellingly, although Broidy reported to Low that he had raised the 1MDB matter with President Trump, this was not true. Broidy later admitted in his testimony that he lied to Low and that, in fact, he had been embarrassed to raise the issue with President Trump when he had the chance. Broidy, like Mr. Michel, was simply taking advantage of Low, taking his money, and largely going through the motions of providing the promised services.

### ii.    The Extradition of Wengui Guo

Despite the defendants' inability (or refusal to try) to achieve Low's goal of having the 1MDB forfeiture matter dismissed, Low later presented Mr. Michel and his team of misfits another goal: the extradition of Guo Wengui. Guo was a Chinese national and multi-millionaire who lived on a $35 million yacht on Long Island Sound and was sought by the PRC for his alleged criminal activities. (Guo was later be prosecuted by the Department of Justice in the United States, and he was convicted of perpetrating a $1 billion fraud.[4]) Various combinations of Mr. Michel, Broidy, Lum Davis, and Mr. Michel's attorney, George Higginbotham, traveled to China to meet with Low and a Chinese government official to discuss this goal. To effectuate his request, Low ultimately wired approximately $100 million dollars to accounts controlled by Mr. Michel and his lawyer, Higginbotham. Mr. Michel sent approximately $16.5 million of this amount to his co-defendants, Elliott Broidy and Nicky Lum Davis; the remainder of the money was kept by Mr. Michel and Higginbotham.

Broidy enlisted a friend, Steve Wynn, to lobby the administration to get Guo extradited, but there was no evidence this request was ever seriously considered by any decision makers in the administration, much less actually happened. In the end, Mr. Low's goal of having Guo extradited to China fared no better than his attempt to have his forfeiture case dismissed, or his goal of getting a personal photograph with President Obama. Instead, in exchange for his $120 million, Low got nothing except a Christmas photo with the Obamas – without Mr. Michel's help.

---

[4] *See Ho Wan Kwok, A/K/A "Miles Guo," Arrested For Orchestrating Over $1 Billion Dollar Fraud Conspiracy*, DOJ (Mar. 15, 2023), https://www.justice.gov/usao-sdny/pr/ho-wan-kwok-aka-miles-guo-arrested-orchestrating-over-1-billion-dollar-fraud-conspiracy; Statement Of U.S. Attorney Damian Williams On The Conviction Of Miles Guo, DOJ (July 16, 2024), https://www.justice.gov/usao-sdny/pr/statement-us-attorney-damian-williams-conviction-miles-guo.

The photograph that was no different than the holiday photographs that thousands of White House Christmas party attendees are given every year, for free. The matters Low truly cared about – the dismissal of the 1MDB civil forfeiture case and the extradition of Guo – either were never even raised with the administration or were never seriously considered.

## IV.    MR. MICHEL'S GUIDELINE RANGE IS 12 TO 18 MONTHS, AND THE GUIDELINES INITIALLY PROPOSED BY PROBATION IN ITS DRAFT PSR WERE INCORRECTLY CALCULATED.

A fair and correct calculation of Mr. Michel's guidelines yields a range of 12 to 18 months. As detailed in Mr. Michel's Objections to the draft Pre-Sentence Report (ECF No. 377), the pre-sentence report made numerous errors that massively, and incorrectly, increased Mr. Michel's guidelines.[5] The correct calculation, and a recap of some of the errors in the draft PSR, are set forth below.

### A.    Mr. Michel's total offense level should be 13, yielding a guideline range of 12 to 18 months.

For the Group 1 offenses, the guideline is determined by reference to Counts 3, 4, 5, and 6, which produce the highest guideline of the offenses, and yields a total of 14.[6] Each of these three counts produces the same base offense level of 14, and no enhancements or adjustments apply. To be sure, if the guideline for the Group 1 offenses were determined based on Count 1 (conspiracy), as the draft PSR assumes, the base offense level would be determined by U.S.S.G. § 2X1.1 (Attempt, Solicitation, or Conspiracy (Not Covered by a Specific Offense Guideline)), and

---

[5] Mr. Michel hereby incorporates by reference his previously filed Objections to Pre-sentence Report (ECF No. 377).

[6] Count 2 would produce the same offense level because, under U.S.S.G. § 2B1.1(a)(2), the base offense level would be a 6, and there would be no increase under § 2B1.1(b)(1) since there was no "loss" in connection with Count 2.

specifically § 2X1.1(a).[7] Section 2X1.1(a) provides: "Base Offense Level: The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." In turn, the substantive offense here would be determined by § 2C1.8, which specifies a "Base Offense Level" of 8. Moreover, no "Specific Offense Characteristics" should apply because § 2X1.1(a) refers only to the addition of "adjustments," which are unambiguously covered by Chapter 3, and which are not the same as offense conduct enhancements set forth in Chapter 2.[8] Because the guideline for Counts 3, 4, 5, and 6 are higher than for Count 1, however, the guideline for those counts determine the guideline for Group 1. *See* U.S.S.G. § 3D1.2. Indeed, the base offense level for Counts 3 through 6 is 14. *See* U.S.S.G. § 2J1.2(a). No adjustment for obstruction of justice is applicable because the counts that produce this offense level are obstruction of justice and an adjustment would be double-counting, and because Mr. Michel did not perjure himself at trial, as discussed below and in Mr. Michel's Objections to the draft PSR. *See also* U.S.S.G. § 3C1.1 Application Note 7. And as discussed below and in Mr. Michel's Objections to the draft PSR, no further enhancements or adjustments apply. Thus, the total offense level is a 14 for Group 1.

For the Group 2 offenses, the guideline is determined by reference to Count 12, which produce the highest guideline of the offenses, and yields an offense level of 6. In contrast, Counts

---

[7] The draft PSR incorrectly applied § 2X1.1(c)(1), which states: "When an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section, apply that guideline section." Application Note 1 to § 2X1.1 lists "Offense guidelines that expressly cover conspiracies," and does not include § 2C1.8, nor does § 2C1.8 include a guideline that expressly covers conspiracy to commit the offenses charged in Count 1.

[8] No consideration should be given to the application notes on this point because § 2X1.1 is not "genuinely ambiguous," in that it clearly permits addition only of adjustments, which are in Chapter 3. *Kisor v. Wilkie*, 588 U.S. 558, 574 (2019). Even if consideration were given to Application Note 2, and it were read to permit addition of specific offense characteristics, moreover, the application note should be disregarded because it is inconsistent with and a plainly erroneous reading of § 2X1.1(a). *Stinson v. United States*, 508 U.S. 36, 38 (1993).

7, 8, and 10 produce the same base offense level of 4:

- Count 7 is governed by U.S.S.G. § 2X1.1(a), which imports the base offense level for the substantive offenses of FARA and § 951 violations.[9] As explained in Mr. Michel's Objections to the draft PSR, however, because FARA and § 951 do not have dedicated guidelines, U.S.S.G. § 2X5.1 ("Other Felony Offenses") provides that "the most analogous offense guideline" applies, or, "[i]f there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control, except that any guidelines and policy statements that can be applied meaningfully in the absence of a Chapter Two offense guideline shall remain applicable." U.S.S.G. § 2X5.1. Here, because non-registration with DOJ in violation of requirements is a regulatory offense, the most analogous offenses are the other "Regulatory Offenses." *See* Ch. 1 Pt. A(1), (4)(f) (policy statement discussing regulatory offenses); *see also United States v. McGoff*, 831 F.2d 1071, 1075 (D.C. Cir. 1987) ("FARA thus creates a comprehensive *regulatory scheme* for foreign agent registration. It delineates a certain class of individuals who must provide information to the Government. It details precisely the information required, as well as the timing of and form for that information. Finally, and more directly pertinent to the case at hand, the statute criminalizes the willful failure to comply with the information production requirements." (emphasis added)). Regulatory offenses generally have a base offense level of 4, *see, e.g.*, U.S.S.G. §§ 2D3.2, 2T2.2, which should apply here under § 2X5.1.

- Counts 8 and 10: The FARA and § 951 violations should also have a base offense level of 4 because, as noted above, they are regulatory offenses. *See* U.S.S.G. § 2X5.1.

In contrast, a higher offense level is produced with reference to Count 12, for conspiracy to make false statements to banks. For that count, U.S.S.G. § 2X1.1(a) would import the base offense level for the substantive offense of 18 U.S.C. § 1014, which is governed by § 2B1.1. Under that guideline, the base offense level is a 6—as this Court and the Government already determined with respect to defendant Higginbotham. *See* 1:18-cr-00343-CKK, ECF No. 72 at 2; 1:18-cr-00343-

---

[9] To the extent the substantive offenses of money laundering concealment or promotion were subject to consideration under § 2X1.1(a)—over Mr. Michel's objection set forth in his Objections to the draft PSR—the same result would attach. This is because U.S.S.G. § 2S1.1(a)(1) would import the guideline for the substantive offenses of FARA and § 951 violations. *See* U.S.S.G. § 2S1.1(a)(1) ("The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined."). As noted above, the guideline for those offenses should be a 4.

CKK, ECF No. 80 at 5. Because there was no loss or intended loss to the banks, however—indeed, the allegation was that Mr. Michel conspired to *deposit* funds at the bank while concealing the source of the funds, ECF No. 164—no increase is applicable under § 2B1.1(b)(1). As discussed below and in Mr. Michel's Objections to the draft PSR, no further enhancements or adjustments are applicable, and thus the offense level is a 6.

Because Group 1 has a 14 offense level and Group 2 has a 6 offense level, the 14 offense level for Group 1 is used, and it is increased be one offense level under U.S.S.G. § 3D1.4(b) to account for the Group 2 offenses. The adjusted offense level is therefore 15. As asserted in Mr. Michel's supplemental objection to the draft PSR, a two-level reduction is then made under U.S.S.G. § 4C1.1, because Mr. Michel is a zero-point offender. The total offense level is therefore a 13. Because Mr. Michel has a Criminal History Category of I, his guideline range is therefore 12–18 months.

B.    **The Draft PSR Incorrectly Calculated Mr. Michel's Guidelines Range.**

As explained in greater detail in Mr. Michel's Objections, the draft pre-sentence report, *inter alia*:

- Erroneously awards a two two-level obstruction enhancement, one for each grouping of offenses. This is erroneous because, as to Group 1, the two level obstruction enhancement would amount to double-counting. *See* U.S.S.G. § 3C1.1 Application Note 7 ("if the defendant is convicted of an offense covered by [ ] § 2J1.2 . . . this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (*e.g.*, if the defendant threatened a witness during the course of the prosecution for the obstruction offense")). Because there was no *additional* obstructive conduct over and above the charged conduct, applying the obstruction of justice enhancement to the offenses of making a false entry and of witness tampering (or its group of offenses), which are already covered by the obstruction of justice sentencing guideline, would amount to double-counting, as this conduct is subsumed in § 2J1.2. Nor is there any testimony identified that was false, as Mr. Michel, while insisting on his innocence, acknowledged almost all of the facts alleged by the Government that he was asked about on cross examination. Thus, no such

enhancement applies.

- Erroneously awards two 3-level enhancements for Role in the Offenses, one for each group of offenses, based on the contention that Mr. Michel was a "manager or supervisor" of five or more participants in each of the two schemes. The first scheme only had, at most, three participants (Mr. Michel, Low and Joel Rousseau), and Low was the manager/supervisor, not Mr. Michel. As for the Group 2 offenses, Mr. Michel had no managerial or supervisor role over any co-defendants. Low was the manager and, as this Court previously held, "Michel was involved in the 1MDB scheme on behalf of Low, *primarily as a messenger, facilitator, and intermediary*. *See, e.g.*, 4/19/2023 AM Trial Tr. at 78:12–14 (emphasis added). Thus, this enhancement does not apply to Group 1 and Group 2.

- Erroneously awards a two-level upward enhancement on the basis that "the offense involved an illegal transactions [sic] made by, or received from, a foreign national [pursuant to] USSG §2C1.8(b)(2)(A)." This enhancement should not apply because it was a charged element of the offense that Mr. Michel conspired to "make foreign contributions directly and indirectly … in violation of Title 52, United States Code, Sections 30121 and 30109(d)(1)(A)." Indictment ¶ 21(b). It is not possible to be convicted for this offense unless a foreign national has provided the funds. Thus, an enhancement on this basis would constitute double-counting, and the enhancement does not apply.

- Erroneously adds two "Specific Offense Characteristics" to the base offense level for the conspiracy charge in Count 1 (which the draft PSR uses to determine the Group 1 offense level), amounting to +16 and +2, each of which is inapplicable under the relevant guideline for Count 1 found in U.S.S.G. § 2X1.1. *See* ECF No. 377 at 4. Therefore, an additional 16 levels should be reduced from the Group 1 calculation made by the draft PSR.

- Erroneously awards a 6-level enhancement on the basis that the FARA scheme involved "laundered funds were the proceeds of, or were intended to promote an offense involving national security (1MDB investigation against codefendant [Low] by the Department of Justice)." As an initial matter, even if the money laundering object were at issue such that § 2S1.1 applied, that would mean that § 2S1.1(a)(1) would apply, and not § 2S1.1(a)(2), which is required to implicate the 6-level enhancement based on national security. In addition, because there has been no showing that either the civil forfeiture action against Low for the 1MDB matter or the sought-after extradition of Guo involved U.S. national security, this enhancement should not apply. Thus, an additional 6 levels should be reduced from the Group 2 offenses.

- The draft PSR erroneously treats the guideline calculation for the Group 2 offenses as being based on U.S.S.G. § 2S1.1(a)(2) and (b). Instead, as described in more detail in Mr. Michel's Objections to the draft Pre-Sentence Report (ECF No. 377 at 5-7) the correct guideline is U.S.S.G. § 2X1.1(a), which imports the offense level for FARA and § 951 violations. Because there is no base offense level for

failing to register under FARA or § 951, U.S.S.G. § 2X5.1 ("Other Felony Offenses") provides that "the most analogous offense guideline" applies, or, "[i]f there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control, except that any guidelines and policy statements that can be applied meaningfully in the absence of a Chapter Two offense guideline shall remain applicable." U.S.S.G. § 2X5.1. Here, because non-registration with DOJ is a regulatory offense, the most analogous offenses are the other "Regulatory Offenses." *See* Ch. 1 Pt. A(1), (4)(f) (policy statement discussing regulatory offenses); *see also United States v. McGoff*, 831 F.2d 1071, 1075 (D.C. Cir. 1987) ("FARA thus creates a comprehensive *regulatory scheme* for foreign agent registration. It delineates a certain class of individuals who must provide information to the Government. It details precisely the information required, as well as the timing of and form for that information. Finally, and more directly pertinent to the case at hand, the statute criminalizes the willful failure to comply with the information production requirements." (emphasis added)). As noted above, these offenses typically have a base offense level of 4. *See, e.g.*, U.S.S.G. §§ 2D3.2, 2T2.2

- Moreover, even if U.S.S.G. § 2S1.1 were the correct guideline for Count 7 due to the money laundering object(s), as noted in the Objections to the draft PSR, the draft PSR errs by applying § 2S1.1(a)(2) rather than § 2S1.1(a)(1) (which would import the FARA and § 951 offense level of 4 noted above). It further errs by applying "Specific Offense Characteristics" in § 2S1.1(b) because § 2X1.1(a) does not reference or otherwise implicate § 2S1.1(b). Indeed, § 2X1.1(a) provides: "Base Offense Level: The base offense level from the guideline for the substantive offense, plus any *adjustments* from such guideline for any intended offense conduct that can be established with reasonable certainty." (Emphasis added.) It thus refers to the base offense level and "adjustments"—found in Chapter 3; it does *not* instruct that the "Specific Offense Characteristics" from the substantive offense guideline such as § 2S1.1(b) should apply. The draft PSR simply ignores the distinction between "adjustments" and "Offense Characteristics"; these are terms of art and are not to be used interchangeably. Thus, under no circumstance would an enhancement in § 2S1.1(b)(1) apply as an offense purportedly involving national security. For all of these reasons, the base offense level for Group 2 should be reduced 24 levels— from Level 28 to Level 4. Moreover, as note above, to the extent the Government argues that the Application Notes require a contrary result, the Court should disregard the Application Notes because they would be inconsistent with the unambiguous guideline in § 2X1.1(a), which refers only to adjustments (implicating Chapter 3 Adjustments)—not enhancements found in Chapter 2. *See* Kisor, 588 U.S. 558 at 574; *Stinson*, 508 U.S. at 38.

- The draft PSR erroneously finds that Mr. Michel is not eligible for a 2-level reduction for being a zero-point offender (U.S.S.G. § 4C1.1) because he received aggravating role adjustments. As discussed above, the aggravating role adjustments were improperly applied, and thus Mr. Michel is entitled to the 2-level reduction. *See* ECF No. 379.

16

## V.    IF THE COURT DETERMINES THE GUIDELINES ARE CORRECTLY CALCULATED, OR EVEN REMOTELY SO, A DOWNWARD DEPARTURE OR VARIANCE IS WARRANTED BECAUSE THE GUIDELINES DRASTICALLY OVERSTATE THE SERIOUSNESS OF THE OFFENSES.

### A.    The Guidelines Are Advisory, and the Sentence Should Be No Greater Than Necessary to Satisfy the Statutory Purposes of Sentencing Under § 3553(a).

Although the Guidelines were once mandatory, following *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines no longer carry the force of law, judges are no longer bound to strictly apply them, and "[a] district court may not presume that a Guidelines sentence is reasonable." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Guidelines are now purely advisory, and the Court has significant discretion to vary from the Guideline range. *See id.* at 187–88. Instead of applying the Guidelines as compulsory, the Court has discretion to impose a non-Guideline sentence as long as the sentence is reasonable and justified. *See United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc) ("*Booker*'s remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness."), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007); *see also Koon v. United States*, 518 U.S. 81, 96–97 (1996) (determining that a district court is vested with broad discretion to depart from the Guidelines); U.S.S.G § 5K2.0 (2018).

The Guidelines are now but a "starting point and initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 39 (2007). After calculating the Guidelines range, the Court must then "make an individualized assessment based on the facts presented" by the parties. *Id.* Post-*Booker* sentencing involves two steps. After the first step of calculating the Guideline range, the Court must then engage in the second step of considering the § 3553(a) factors to determine a reasonable sentence. *See United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005), *abrogated*

*on other grounds by Rita*, 551 U.S. at 338; *United States v. Hung*, 459 F.3d 1180, 1185 (11th Cir. 2006). Just as the Court has discretion to impose a non-Guidelines sentence, "the weight to be afforded any § 3553(a) factor is a matter firmly committed to the discretion of the sentencing judge." *United States v. Verkhoglyad*, 516 F.3d 122, 131 (2d Cir. 2008) (internal quotation marks omitted). Furthermore, the Court has discretion to decide whether any § 3553(a) factor justifies a downward variance. *See Gall*, 552 U.S. at 51. When imposing a sentence outside the Guidelines range, the Court applies a non-mathematical formula with individualized assessments based on facts presented by the parties. *Id.* at 47, 50.

This Court must be guided by the fact that the ultimate sentence should be "not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)(2)." *United States v. Kimbrough*, 552 U.S. 85, 111 (2007).

###### B.    Neither the Conduit Contribution Scheme Nor the FARA Scheme Warrants Statutory Maximum Sentences.

The Government's position is that the proper guidelines calculation for these offenses "should be 43 with a corresponding total punishment of life." ECF No. 376 at 3. It is unconscionable to even suggest the appropriateness of such a sentence based on the charges and evidence adduced at trial.

###### i.    The Guidelines for the conduit contribution scheme proposed by the draft PSR and the Government vastly overstate the seriousness of the offense.

The 12 year-old conduit scheme at issue here was no different than dozens of similar cases routinely prosecuted around the country, and which typically result in sentences of less than 27 months, and often receive far less than that. For example, in *United States v. Magliocchetti*, No. 1:10-CR-00286 (E.D. Va.), the defendant was convicted of conducting a "massive scheme to secretly funnel money to political campaigns – all so that he could gain wealth and prestige." *See*

https://www.justice.gov/opa/pr/lobbyist-sentenced-27-months-prison-role-illegal-campaign-contribution-scheme. According to the DOJ press release, "Magliocchetti carried out one of the largest federal campaign finance frauds in history [with the goal to] enrich himself and [his company] by increasing the firm's influence, power and prestige among the firm's current and potential clients as well as among the elected public officials to whom [the company] and its lobbyists sought access." *Id.* For this "massive" scheme to corruptly enrich himself, Magliocchetti was sentenced to 27 months—or 333 fewer months than the Government contends that the Guidelines indicate Mr. Michel should receive.

*Magliocchetti* is no outlier. *See, e.g.*, *United States v. Benton, et al.*, No. 1:21-cr-00569 (D.D.C.) (defendant sentenced to 18 months for causing a Russian national, who hoped to meet a 2016 presidential candidate, to wire $100,000 to defendant's political consulting firm, which in turn made an illegal foreign contribution to the presidential campaign and disguised such payment from the Russian national as one for fraudulent consulting services). Indeed, defendants convicted of making conduit contributions typically receive sentences of about two years or less. *See* Ex. A, (compilation of conduit contribution cases).

Indeed, what stands out most about in this case, and which distinguishes it from virtually all of the other conduit contribution cases, is that the motive here was *not* self-enrichment (like *Magliocchetti*) or self-aggrandizement, or the modification of a particular policy. Instead, it was all done to help facilitate Low obtaining a photograph with himself and then-President Obama. While the motive for committing an offense is not an element of proof, it is highly relevant when considering punishment. Here, the motive driving the offense was – at least compared to the typical conduit contribution case – relatively benign.

A review of the nearly two dozen conduit contribution cases collected at Ex. A makes clear not one of them received a sentence even a tiny fraction as long as the Guideline sentence calculated in the draft PSR. And every conduit contribution scheme case involves, almost by definition, counts concerning false statements to the Federal Election Commission. Many, too, also include obstructive conduct, sometimes including witness tampering.

In light of the draft PSR and the Government's sentencing recommendation, it apparently needs repeating that the statute prohibiting conduit contributions carries a *five-year maximum sentence.* According to the draft PSR and the Government, not only is this statutory maximum sentence inadequate punishment in these circumstances, only a multiple of that maximum sentence would do justice here.

Witness tampering can, of course, potentially cover a wide range of possible conduct. At one end of the spectrum is actual violence, where a witness is physically assaulted. Next comes threats of physical violence to a witness or a witness's loved ones. Next, perhaps, are threats of property damage. All the way at the other end of the spectrum is what occurred here: letters from an attorney, on behalf of Mr. Michel, *threatening a possible lawsuit* if the money previously given to the witnesses by Mr. Michel was not repaid, based on the claim that they were loans – which they were not. None of the witnesses who were "victimized" testified that they were fearful or intimidated by the correspondence. Neither suggested that the letter made them reluctant to testify or cooperate with the Government's investigation.

This is not an attempt to justify Mr. Michel's conduct. It is, however, critically important to consider Mr. Michel's conduct within the broad context of the type of potential illegal conduct that could constitute witness tampering, particularly considering the draconian amount of prison the Government is now seeking for Mr. Michel.

### ii.     The Guidelines for the FARA scheme vastly overstate the seriousness of the offense.

The draft PSR calculates the offense level for the group of offenses comprising the FARA scheme alone at level 39, or 262–327 months—or approximately 25 years in prison. But taking a step back, and looking at this scheme in its totality, reveals that the conduct here warrants a sentence a fraction of that length.

At the outset, it bears noting that lobbying one's representatives is not only legal, it is a right enshrined in the Constitution. It was not inherently illegal, or wrongful, for Broidy to seek on Low's behalf to persuade the Trump administration to dismiss the 1MDB civil forfeiture action, or in trying to persuade it to extradite Guo. What made this scheme illegal, according to the Government, is the failure to register with the Attorney General. Had the defendants registered, they could have lawfully done everything they did, including receive $100 million from Low for their efforts. Nor did Mr. Michel or his co-defendants attempt to use corrupt means to persuade anyone in the administration to change their positions. Despite having tens of millions of dollars at hand, there was never a discussion among any of the defendants about paying a bribe or gratuity.[10]

In addition, the scheme was entirely unsuccessful. The 1MDB case was not dismissed, and no effort was ever made to extradite Guo.[11] While the lack of success of the scheme is irrelevant when considering guilt, it is highly relevant when considering the harm caused by the conduct, and the degree to which the conduct deserves punishment. Assigning the maximum possible sentence

---

[10] Of course, had Mr. Michel bribed administration officials to achieve these goals his sentencing guidelines would not be any higher than what they are now – Level 43 is the top of the scale. It doesn't go any higher than that. This reinforces the absurd results of the draft PSR's calculation.

[11] Indeed, Guo has since been tried and convicted in the Southern District of New York on fraud charges.   *See*   https://www.nytimes.com/2024/07/16/nyregion/guo-wengui-fraud-trial-verdict-china.html.

for Mr. Michel's conduct here, where the scheme was entirely unsuccessful, begs the question of what would have been the appropriate sentence if the 1MDB case had been dismissed? Or if Guo had been extradited so that he could not have faced justice here? Surely both circumstances are not deserving of the same punishment.

Further evidence of how the Guidelines here have been willfully distorted to unfairly punish Mr. Michel is lying in plain sight when one reviews how his co-defendants – convicted or implicated in the same FARA scheme as the one alleged here, have been treated by the Courts.

George Higginbotham was a DOJ lawyer who was intimately involved with all aspects of the FARA scheme, including by traveling to China and visiting a Chinese government official at the Chinese Embassy in Washington, D.C. Low wired $40 million to Higginbotham's escrow account in furtherance of the scheme. But rather than apply that $40 million to the § 2B1.1 fraud-loss table, which would have added 24 levels to a base offense of 6, the Government only calculated the $70,000 that Higginbotham personally earned during the course of the scheme.[12] So, although he committed the same overt acts as Mr. Michel, and facilitated the offense in every way he could, and even though he was a DOJ lawyer who was informed of the FARA requirements, instead of facing a guidelines range of 97-121 months, his adjusted guideline range was only 10, and he ultimately received a sentence of three months' probation.

Or consider Elliott Broidy. Broidy was enlisted by Lum Davis to actually do the lobbying work. Broidy was a sophisticated Washington player, and fully understood the FARA requirements. It was he who insisted the payments not go to him directly but, instead, to his wife's law firm. Despite being paid millions of dollars and being a full participant in the alleged money

---

[12] Mr. Higginbotham pled guilty to conspiring to make false statements to banks, but it is undisputed that he was involved in the same conduct alleged against Mr. Michel with respect to the FARA scheme.

laundering, the Government took the position that U.S.S.G. § 5X1.1 applied to a FARA violation, and that § 3553 factors, not the guidelines, would determine his sentence. Mr. Broidy was also pardoned for his role.

Finally, consider Nickie Lum Davis. Lum Davis was a full participant in the FARA scheme. It was Lum Davis that involved Broidy; it was Davis who acted as a go-between Mr. Michel and Broidy and Low. Lum Davis traveled to China with the co-defendants to meet with Low. According to the sentencing memorandum filed by the same prosecutors in this case, Lum Davis "and her co-conspirators were paid approximately $100 million by Low and his proxies for this influence," and she received $7.5 million in her own bank account. *United States v. Nickie Mali Lum Davis*, 1:20-cr-00068 (LEK) (D. Hawaii), ECF No. 115. Yet the same prosecutors who here report that the appropriate guideline sentence for Mr. Michel is a life sentence, in Lum Davis's case recommended 30 months. *Id.* at 22. Perhaps even more remarkable, the probation department in Lum Davis' case recommended that she receive a sentence of 3 months, noting that probation is frequently the sentence provided in FARA cases. *Id.* at 17. Lum Davis  ultimately received a sentence of two years or 28 years less than what the government contends Mr. Michel's guidelines should be.

The sentencing guidelines were instituted to try ensure uniformity in sentencing, such that similarly situated defendants are treated similarly. Here the process is being manipulated such that Lum Davis, who was engaged in the same conspiracy as Mr. Michel, received a sentence of 24 months, and a guideline sentence of 30 months as proposed by the same prosecutors here, whereas Mr. Michel is to get life, according to the draft PSR and Government.

Similarly, Mr. Michel was convicted of false statements to a financial institution. The overwhelming majority of cases where this offense is charged involve individuals who lie about

their credit worthiness in order to obtain a loan. In other words, the false statement is made to extract money *from* a bank. Here, the false statements were made so that Mr. Michel could make deposits *into* the banks. The banks' funds were never at risk. It would be deeply unjust to punish Mr. Michel's conduct for this offense, where no bank was harmed – and indeed, could not have been harmed – no differently than if he were a fraudster who lied to obtain a loan he was unable to pay back. But that is exactly what is happening here, where Mr. Michel is facing a guideline life sentence. Yet he would be in no more jeopardy had his lies led to the bank being defrauded, and Mr. Michel enriched, of $100 million.

## VI.    THE GUIDELINES PROPOSED BY THE GOVERNMENT AND IN THE DRAFT PSR, AS APPLIED HERE, VASTLY DISTORT THE SERIOUSNESS OF THE CONDUCT.

The absurdly high offense level proposed by the Government and the draft PSR in this case is a prime example of how the Sentencing Guidelines can, in certain cases, be stretched and manipulated beyond all recognition. Although the Court agreed with the Government's position that Mr. Michel's trial should not have been severed and both schemes tried separately (ECF No. 372 at 54–57), the PSR apparently disagrees. Instead, the draft PSR finds that these were two distinct schemes and, therefore, the upward enhancements or adjustments can be applied to each group of offenses, instead of just one. So Mr. Michel received obstruction of justice and role in offense enhancements not once, but twice.

But the Guidelines also distort the seriousness of the offense here in a more fundamental fashion. There were two distinct schemes here. The first scheme involved a series of conduit contributions. *The maximum sentence for this offense is five years.* Yet the guidelines level for this set of offenses is *108-135 months.* How does the draft PSR accomplish this feat? By yoking the scheme to the § 2B1.1 loss tables – even where there was no actual financial loss suffered by anyone.

The second set of offenses concerned the FARA scheme. Once again, the *maximum sentence for this offense is five years.* Yet, according to the Government, the offense level should be 43, and the sentence is life imprisonment. How does the draft PSR do this? Again, by tying the offense conduct to § 2B1.1 financial loss tables – despite, once again, there being no victim who suffered any financial loss.

Here, as is far too often is the case, the Guidelines loss enhancement provisions proposed by the draft PSR and the Government result in an excessive sentence that overstates the seriousness of the offenses, resulting in a grave injustice. Therefore, if the Court were to accept a guideline range even remotely nearing that of the draft PSR or the Government's proposal, a downward departure under the Guidelines is warranted. *See* U.S.S.G. § 2B1.1, cmt. 21(C) ("There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted.").

As part of a district court's "obligation to consider whether a sentence other than a Guidelines sentence would be sufficient, but not greater than necessary, to serve the purposes of sentencing," district courts "have an obligation to consider whether to depart from the Guidelines sentencing range or to impose a non-Guidelines sentence in every case." *United States v. Corsey*, 723 F.3d 366, 382 (2d Cir. 2013) (Underhill, J., concurring). This duty "will frequently require judges applying the loss guideline to evaluate whether the calculated Guidelines range substantially overstates the seriousness of a crime." *Id.*

Courts have increasingly recognized that, "unless applied with great care," the fraud loss guidelines "can lead to unreasonable sentences that are inconsistent with what § 3553 requires," and thus may require a significant downward variance. *Id.* at 379. As Judge Rakoff has explained, strict adherence to the fraud loss guidelines can result in an "utter travesty of justice . . . from the

guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, 441 F. Supp. 2d. 506, 512 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). That principle applies with particular force in this case, particularly where there was no actual fraud loss, and given the facts presented here.

Indeed, the courts are to consider a downward variance in cases where, as here, the loss enhancement dwarfs the base offense level, distorting the resulting Guidelines range and overwhelming the § 3553 factors. In *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016), the Second Circuit questioned the wisdom of the fraud loss guidelines for this very reason. Judge Newman acknowledged that the district court's loss-related "increases complied with the Guidelines Manual," and that "the Commission had the authority to construct a set of guidelines that used loss amount as the predominant determination of the adjusted offense level for monetary offenses." *Id.* But Judge Newman cautioned that, while "[t]his approach, unknown to other sentencing systems, was one the Commission was entitled to take, . . . its unusualness is a circumstance that a sentencing court is entitled to consider." *Id.* The district court in *Algahaim* had increased one defendant's adjusted offense level from a base of 6 to 18, based on the loss amount, which the court observed was a "three-fold increase," and had increased the second defendant's adjusted offense level from a base of 6 to 16, based on the loss amount. *Id.* Noting the sharp increase due to the fraud loss guidelines, the Second Circuit remanded for resentencing, concluding that "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id.*

Here, of course, the problem is even more severe. Although the Guidelines for campaign finance violations is level 8, the fraud loss enhancement adds 20 levels, if it were applied (which Mr. Michel contends is improper). And for the FARA scheme, there is no specific guideline for a FARA violation. Yet the draft PSR applies the fraud-loss guidelines and, voila, Mr. Michel is a level 39 (again, if the fraud-loss guideline applied, which Mr. Michel contends it does not).

Part of the problem with the fraud-loss guidelines is that the way in which they were developed renders them "fundamentally flawed, especially as loss amounts climb." *Corsey*, 723 F.3d at 380 (Underhill, J., concurring); *United States v. Johnson*, 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018). Specifically, the fraud-loss table, unlike certain other sections of the Guidelines, "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *Corsey*, 723 F.3d at 379; *accord Johnson*, 2018 WL 1997975, at *3. As Judge Underhill explained:

> The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges. As a well-known sentencing commentator has put it, "For the small class of defendants … convicted for fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges."

*Corsey*, 723 F.3d at 380 (quoting Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent'g. Rep. 167, 168 (2008)).

This is why courts have increasingly found that the fraud loss guidelines result in unreasonable sentencing ranges in cases where, like here, the Court has found a substantial loss amount. *See, e.g.*, *id.* ("Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just and reasonable. But where, as here, the calculations under the guidelines have so run amok that they are patently absurd on

their face, a Court is forced to place greater reliance on the more general considerations set forth

in section 3553(a), as carefully applied to the particular circumstances of the case and of the human

being who will bear the consequences."); *Johnson*, 2018 WL 1997975, at *3 (departing downward

in a financial fraud case from 87–108 months to a non-guidelines sentence of 24 months and

observing that, "because the loss Guideline was not developed by the Sentencing Commission

using an empirical approach based on data about past sentencing practices …, district judges can

and should exercise their discretion when deciding whether or not to follow the sentencing advice

that guideline provides" (internal quotation marks omitted)); *United States v. Gupta*, 904 F. Supp.

2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes,

on [loss enhancement], the Sentencing Commission . . . effectively guaranteed that many such

sentences would be irrational on their face."), *aff'd*, 747 F.3d 111 (2d Cir. 2014); *United States v.*

*Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2014) (noting that the Guidelines place "undue"

and "excessive weight" on the loss amount) (Lynch, J.); *United States v. Ranum*, 353 F. Supp. 2d

984, 990 (E.D. Wis. 2005) ("One of the primary limitations of the guidelines, particularly in white-

collar cases, is their mechanical correlation between loss and offense level.").[13]

---

[13] This is why courts routinely impose below-Guidelines sentences in fraud cases. *See, e.g.*, *United States v. Collins*, No. 07-cr-1170, ECF No. 244 (S.D.N.Y. Oct. 17, 2013) (Preska, J.) (Sentencing Tr. at 36) (imposing sentencing of one year and one day despite Guidelines sentence of life imprisonment); *United States v. Treacy*, No. 08-CR-366, ECF No. 130 (S.D.N.Y. Sept. 2, 2009) (imposing 24-month sentence despite range of 121 to 151 months); *United States v. Graham*, No. 06-cr-137, ECF No. 1266 (D. Conn. Apr. 30, 2009) (Droney, J.) (imposing sentence of one year and one day despite Guidelines sentence of life imprisonment); *United States v. Milton*, No. 3:06-CR-137, ECF No. 1216 (D. Conn. Jan. 30, 2009) (imposing 48-month sentence despite Guidelines recommendation of life imprisonment); *United States v. Turkcan*, No. 08-CR-428, ECF No. 52 (E.D. Mo. June 11, 2009) (imposing sentence of one year and one day despite Guidelines range of 63 to 78 months' imprisonment); *United States v. Parris*, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008) (imposing 60-month sentence despite Guidelines range of 360 months to life imprisonment); *United States v. Ferguson*, No. 3:06-cr-137, ECF No. 1199 (D. Conn. Dec. 31, 2008) (imposing sentences ranging from one year and one day to four years on five defendants despite Guidelines

In addition, the fraud-loss guidelines are ill-equipped to take into account the nature and seriousness of a particular offense, especially the offense at issue in this case. As Judge Garaufis explained, the fraud loss guidelines are flawed in part because of "the weakness of the correlation between loss and moral seriousness; the rigidity of the loss amount overriding the diverse reality of complex financial crimes; the lack of any consideration of danger to society; and so on." *Johnson*, 2018 WL 1997975, at *4. The court added:

> As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime. . . . Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less *solely* responsible for a white-collar offender's Guideline sentence. . . . I agree with Judge Underhill, and refuse to mechanistically impose such an illogical sentence. That this situation continues unabated is a great shame for many offenders sentenced under this Guideline who do not receive a sentence that makes any sense for the actual crime of conviction.

*Id.* at *3. For example, contrary to the Guidelines approach, not all loss amounts should be treated the same in terms of culpability because "not all actual loss is equally serious." *Corsey*, 723 F.3d at 381 (Underhill, J., concurring). Indeed, "[a] fraud that results in the loss of even a few thousand dollars by an elderly or sick person who, as a result of the loss, becomes unable to afford the necessities of life or medical care is much more serious than a fraud that results in ten or a hundred times that loss by a large corporation able to absorb the financial consequences without a need to close plants, fire employees or even declare the loss as material in public financial reports. Simply put, contrary to the assumption underlying the loss guideline, not all dollars of loss are fungible." *Id.*

---

ranges that included possibility of life imprisonment); *Adelson*, 441 F. Supp. 2d at 514 (imposing 42-month sentence despite Guidelines range that included life imprisonment).

This absurdity of relying on the fraud-loss guidelines here is even more apparent *when there was no fraud committed and no loss suffered.* There was no victim here. No one was deprived of any money or property. The banks did not lose money. The U.S. Government did not lose money. *No one was actually harmed.* Yet the life sentence proposed by the Government under the Guidelines (which is incorrect), is no different than if there were victims here who were defrauded of over $100 million.

It would be truly unjust, and an absurd result, if the Court were to sentence Mr. Michel no differently than if he had deprived a victim, or victims, of $120 million. Clearly, Mr. Michel should not be treated as if he is were in the category of defendants who, like a Bernie Madoff, caused catastrophic harm to a multitude of blameless victims. Thankfully, none of that happened here.

In sum, Mr. Michel is significantly less culpable than defendants who have committed numerous frauds contemplated by the fraud loss guidelines, and a Guidelines sentence would vastly overstate the seriousness of the offense and result in an injustice. In contrast, a sentence of 36 months would adequately reflect the seriousness of the offense, promote respect for law, and provide just punishment.

## VII.    <u>CONCLUSION</u>

It a maxim of American jurisprudence that the punishment should fit the crime. Here, the fitting punishment should not be determined simply by the amount of money Low was willing to pay to accomplish his goals. After all, if Mr. Michel was willing to undertake the exact same efforts, and perform the same acts, for $100,000 instead of $100,000,000, any harm caused would be identical. Moral culpability would also be identical. But in the first instance, Mr. Michel would likely be looking at a guidelines sentence of 1-2 years, instead of life. There is simply no penological reason why the amount of money Low was willing to pay should play the determinative and overriding factor in Mr. Michel's punishment.

Instead, the Court should strongly consider the amount of harm this scheme actually caused. And, thankfully, the actual harm caused was minimal. No actions were taken by the government as a result of entreaties made by Broidy on Mr. Michel's behalf. Not only was Guo not extradited to China, he was convicted of fraud charges in federal court in New York. And not only was the 1MDB case not dismissed, in 2019 – shortly after the events here –the DOJ announced a settlement with Low that permitted the recovery of $700 million in assets. *See* *https://www.justice.gov/usao-cdca/pr/us-reaches-settlement-recover-more-700-million-assets-allegedly-traceable-corruption*. A just sentence in this case, one not skewed by ill-applied fraud-loss guidelines, would be 36 months. That would achieve the aim of § 3553 of deterrence and promote respect for the law. That respect would be undermined, not promoted, by a sentence even approaching the draft PSR guidelines. A three-year sentence is entirely just and appropriate where, as was the case here, no one suffered any pecuniary harm and there was no intention to cause such harm.

Dated:  December 20, 2024                       Respectfully submitted,

                                                 */s/ Peter Zeidenberg*
                                                Peter Zeidenberg (Bar No. 440803)
                                                Michael F. Dearington (Bar No. 5223987)
                                                David M. Tafuri (*pro hac vice*)
                                                ARENTFOX SCHIFF LLP
                                                1717 K Street, NW
                                                Washington, DC 20006-5344
                                                Telephone: (202) 857-6000
                                                Facsimile:  (202) 857-6395
                                                peter.zeidenberg@afslaw.com
                                                michael.dearington@afslaw.com
                                                david.tafuri@afslaw.com

                                                *Counsel for Defendant Prakazrel Michel*