## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 19-148-1 (CKK) |
| | ) | |
| PRAKAZREL MICHEL (1), | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| Defendant. | ) | |

## DEFENDANT PRAKAZREL MICHEL'S
## MOTION FOR BAIL PENDING APPEAL

On November 20, 2025, the District Court sentenced Defendant Prakazrel "Pras" Michel to concurrent sentences totaling 168 months' imprisonment. ECF No. 405 at 1, 3.[1] Michel timely filed a Notice of Appeal on December 4, 2025. ECF No. 407. Michel respectfully requests that the Cout order his continued release pending appeal, pursuant to 18 U.S.C. § 3143.

Michel satisfies the requirement of 18 U.S.C. § 1343(b). He has no prior record, he is not a flight risk, he does not pose a danger to the community, and his appeal is also not for purposes of delay. Thus, the Court must grant his motion for bail pending appeal so long as his appeal raises substantial questions that, if decided in his favor, would result in a new trial, reversal of convictions, or a reduced sentence. Michel satisfies this requirement.

Michel's appeal presents numerous substantial questions including multiple issues of first impression. These questions include, *inter alia*, whether the District Court should have granted him a new trial because the District Court: (i) admitted evidence over Michel's objection that the grand jury judge entered a crime-fraud order and found probable cause that Michel conspired and

---

[1] The District Court recommended that Michel not be required to surrender to the custody of the U.S. Bureau of Prisons before January 27, 2026. *Id.* at 3.

1

then repeated that information in a jury instruction, influencing the verdict; (ii) informed the jury of *its own* belief that Michel was guilty on at least *eight* occasions by referring to Michel and others as co-conspirators and ruling in front of the jury that the co-conspirator exception to the rule against hearsay applied, further influencing the jury; and (iii) committed what the D.C. Circuit has already held is plain error by permitting FBI Agent Robert Heuchling to provide improper overview testimony and to opine on at least *25 occasions* that Michel was guilty, often based on his own investigation and information not before the jury, in what must be the most egregious example of overview testimony in this Circuit, *further influencing* the jury's verdict.[2] Neither the D.C. Circuit nor any other Court of Appeals has ever confronted this extraordinary degree of improper jury influence, which appears to be unprecedented, and raises a substantial question.

Michel's appeal also raises multiple substantial questions regarding the sufficiency of the evidence, including issues of first impression about the scope and application of the charged statutes.[3] For just one example, no court has ever held that a false statement to an FDIC-insured bank that does *not* put bank or depositor funds at risk and is unrelated to a loan or disbursement of funds violates the bank false statements statute, 18 U.S.C. § 1014. The District Court in this case is the first to so hold. This example is illustrative of the many ways discussed below that the Government stretched the evidence in this case beyond the scope of the charged statutes.

If decided in Michel's favor, these and the other substantial questions below would result in a new trial, reversal of nearly every count, and, at a minimum, a reduced sentenced that would likely be less than the duration of Michel's appeal. Accordingly, because Michel satisfies the

---

[2] The District Court denied Michel's Motion for New Trial ("New Trial Motion"), ECF No. 310, in a Memorandum and Opinion dated August 30, 2024, ECF No. 371 ("Order Denying New Trial").

[3] The District Court denied Michel's Motion for Judgment of Acquittal ("MJOA"), ECF No. 309, in a Memorandum and Opinion dated April 12, 2024, ECF No. 355 ("Order Denying MJOA").

requirements of 18 U.S.C. 3143(b), Michel respectfully requests that he be permitted to remain on release pending his appeal.

## LEGAL STANDARD

A district court "shall order the release of" a defendant pending the appeal of his conviction if the court finds (i) "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released" and (ii) "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in . . . reversal [or] . . . an order for a new trial." 18 U.S.C. § 3143(b)(1). Where a defendant satisfies these conditions, a defendant's release pending appeal is *mandatory*. 18 U.S.C. § 3143(b); *accord United States v. Libby*, 498 F. Supp. 2d 1, 4, (D.D.C. 2007).

The last requirement of § 3143(b) involves a two-part inquiry: "(1) Does the appeal raise a substantial question? (2) If so, would the resolution of that question in the defendant's favor be likely to lead to reversal [or another outcome identified in § 3143(b)(1)(B)]?" *United States v. Perholtz*, 836 F.2d 554, 555 (D.C. Cir. 1987). A substantial question is one that is "close" or "one that very well could be decided the other way." *United States v. Bender*, No. CR 21-508, 2024 WL 960999, at *4 (D.D.C. Mar. 6, 2024) (quoting *Perholtz*, 836 F.2d at 556) (granting motion for release pending appeal). At a minimum, a "close question" is one that is "not frivolous." *United States v. Herrera*, No. CR 21-619, 2024 WL 1655204, at *5 (D.D.C. Apr. 17, 2024).

## ARGUMENT

The Court should grant bail pending appeal because Michel satisfies the conditions required for continued release pending his appeal. As demonstrated below, Michel is not a flight risk or danger to the community, and his appeal is not for purposes of delay. Michel's appeal also raises multiple substantial questions that, if decided in his favor, would result in a new trial, a

reversal of nearly all his convictions, or at a minimum a significantly reduced sentence.[4] Each requirement of § 3143(b) is addressed in turn below.

## I.     Michel is Not a Flight Risk and Does Not Pose a Danger to the Safety of Any Person or the Community.

Michel satisfies the first prong of § 3143(b)(1), just as the Probation Office concluded, because there is clear and convincing evidence that he is not a flight risk or danger to the community. ECF No. 386 at 3.

First, Michel does not pose a flight risk. He has been released on bail without incident since his arrest on May 10, 2019—more than five and one-half years ago. In the ensuing years, Michel has made all required court appearances and there have been no issues regarding his compliance with the terms and conditions of his pretrial release that preclude his continued release. *See, e.g.*, *United States v. Weyer*, No. CR 22-40 (JEB), 2024 WL 809962, at *1 (D.D.C. Feb. 27, 2024) (finding defendant not a flight risk where she complied with pretrial conditions for period of over two years, has strong community ties, and no prior adult criminal history). The Government did not seek Michel's pretrial detention, and this Court allowed Michel to remain on release following his sentencing until his surrender date, further evidencing that Michel is not a flight risk. *See, e.g.*, *United States v. Stedman*, No. CR 21-383, 2024 WL 3967389, at *5 (D.D.C. Aug. 28, 2024) (finding defendant was not a flight risk where government did not seek pretrial detention and raised no objection to defendant self-surrendering following his sentencing).

Second, Michel is not a danger to the community. He was not accused, and has not been convicted, of any violent crime, and he has no criminal history. *United States v. Edelman*, No. CR 24-239-1 (CKK), 2025 WL 1725957, at *4 (D.D.C. June 20, 2025) (finding defendant was not a

---

[4] Michel assumes the Court's familiarity with the evidence, New Trial Motion, and MJOA, and related briefing, which are hereby incorporated by reference.

danger to the community where, among other things, "[t]here has never been any suggestion that [he] . . . poses a danger to the physical safety of the community," and defendant was charged with non-violent crimes); *United States v. Foy*, No. 21-CR-00108 (TSC), 2024 WL 3471247, at *5 (D.D.C. July 19, 2024) (finding defendant was not a danger to the community where he had complied with release conditions); *Herrera*, 2024 WL 1655204, at *4 (finding defendant not a danger to the community where, even though "defendant's conduct was egregious," "defendant fully complied with the conditions of release pending trial and sentencing, and upon release, will again be placed under supervision"). Michel thus satisfies the first prong of 18 U.S.C. § 3143(b).

## II.    Michel's Appeal is Not for the Purpose of Delay.

Michel is not pursuing an appeal to delay serving his sentence. Michel has consistently and vigorously defended himself since being charged, and he has timely filed a Notice of Appeal. ECF No. 407. As demonstrated below, Michel has substantial appellate arguments. *See United States v. Alston*, No. CRIM.A. 02-0057(JDB), 2006 WL 1518952, at *2 (D.D.C. May 30, 2006) (noting appeal was not for purpose of delay where taken in good faith); *see also United States v. Hart*, 906 F. Supp. 102, 105 (N.D.N.Y. 1995) (granting bail pending appeal where appeal was not for delay, but was "rather taken in a good faith belief in . . . the merits of her arguments"). If accepted, those will likely require a new trial, reversal of convictions, a new trial, or a significantly reduced sentence. Michel thus satisfies this requirement of 18 U.S.C. § 3143(b).

## III.    Michel's Motion for New Trial Presents Substantial Questions of Law and Fact that Would Likely Lead to a New Trial on All Counts.

There is at least a substantial question whether Michel is entitled to a new trial because the jury's verdict was influenced by (i) evidence that the grand jury judge believed Michel was guilty, (ii) statements on at least eight occasions that the trial judge believed Michel was guilty, and (iii) statements on at least 25 occasions that the case agent believed Michel was guilty, along with other

improper overview testimony by the case agent. This case presents an unprecedented amount of improper jury influence with perhaps no analogue in the modern era. In addition, Michel's counsel was ineffective, unqualified, and unprepared, and he made prejudicial mistakes throughout the entire trial while failing to mount a defense. Taken together, these arguments raise at least a substantial question whether Michel is entitled to a new trial.

### A.    There is a substantial question whether the District Court was required to grant a new trial because it improperly informed the jury that the presiding judge and another judge believed Michel was guilty.

There is at least a substantial question whether the District Court should have granted Michel a new trial in the interest of justice because the jury heard evidence that at least two federal judges believed Michel was guilty and had conspired with others to commit the charged crimes. This appears to be unprecedented, and the prejudice was extraordinary.

First, during the trial, the District Court and the Government repeatedly and improperly informed the jury that another federal judge had already ruled that Michel conspired with Higginbotham—an alleged co-conspirator or principal in Counts 7, 8, 10, and 12—in a crime-fraud ruling issued before trial. As recounted in greater detail in Michel's New Trial Motion, ECF No. 310 at 5–8, the Government used leading questions to expose the jury to the fact that the grand jury judge had ruled Higginbotham's notes were admissible, stating: "the Government filter team in this case, obtained a crime fraud order from a judge ruling that because there was probable cause to believe that Mr. Michel involved Mr. Higginbotham in criminal activity, there was no valid attorney-client privilege." Tr. 4/17/2023 PM at 43–44. This inadmissible and extraordinarily prejudicial evidence, made over a defense objection, rendered the trial fundamentally unfair.

Rather than sustain defense counsel's objection to this evidence, the District Court allowed the Government to continue, and the Government took full advantage by repeating the prejudicial information twice more:

BY MR. KELLER [prosecutor]:
Q. So again, Special Agent Lidsky, **the filter team in this case obtained a crime fraud order from a judge ruling that because there was probable cause to believe that Mr. Michel involved Mr. Higginbotham in criminal activity**, there was no valid attorney-client privilege between them. Right?
A. **That is correct**.
Q. In other words, because **Mr. Michel used an attorney to help commit his crimes, there was no valid privilege**?
A. **Yes**.

*Id.* at 44–45 (emphasis added).

The District Court exacerbated the prejudice when, the following day, it *sua sponte* provided an instruction to the jury that emphasized the crime-fraud ruling rather than simply directing the jury to completely disregard the testimony:

THE COURT: Yesterday you heard testimony during Agent Lidsky's testimony that **a different judge, not me, issued what is termed a crime-fraud order during the grand jury's investigation of this case**… The government may and did argue to a different judge, among other things, that the Court should find that the attorney, which would be Mr. Higginbotham, in this case assisted his client in the commission of a criminal offense. **It is sometimes termed what we call the crime-fraud exception to the attorney-client privilege. …That Court need only find there is probable cause to believe the attorney assisted in the commission of a crime, so that would be Mr. Higginbotham… So here, another judge found that there was probable cause to believe that Mr. Higginbotham assisted Mr. Michel in the commission of a crime based on the information that the government provided to that particular judge**…[Y]ou many not find that Mr. Michel committed any element of any offense, simply because **another judge found that probable cause existed to believe that a particular fact was true at that time based on evidence that the government had provided to that particular judge** . . . .

Tr. 4/18/2023 AM at 48–50 (emphasis added). Critically, the jury was never instructed to disregard the prior judge's factual finding of probable cause of Michel's guilt. Instead, the jury was effectively permitted to consider this evidence, provided the jury did not do so exclusively.[5]

---

[5] Nor did the District Court inform the jury that the crime-fraud ruling was made on the basis of an *ex parte* request by the Government with no input from the defense, and that none of the offenses discussed in the order were even charged in this case. Thus, the Government and the District Court gave the *false* impression that the prior ruling had found that Michel and Higginbotham conspired as alleged in the indictment.

The District Court further erred in denying Michel's New Trial Motion. The District Court sought to blame Michel's trial counsel who, although ineffective throughout trial, did in fact object to admission of the crime-fraud ruling. Specifically, the District Court reasoned that Michel's trial counsel, David Kenner, opened the door to testimony about the crime-fraud ruling. Not so. Kenner questioned Agent Lidsky regarding steps Lidsky took to ensure he did not review privileged material in Higginbotham's notebook. These questions were appropriate because they probed the contours of the investigation and materials of an alleged co-conspirator that the government obtained and reviewed. Thus, the curative-admissibility doctrine, or "door opening" doctrine relied on by the District Court, did not apply. *United States v. Brown*, 921 F.2d 1304, 1307 (D.C. Cir. 1990) (curative-admissibility doctrine applies only when "the introduction of inadmissible or irrelevant evidence" is offered). Lidsky also dispatched with any concerns that he had reviewed privileged materials, Order Denying New Trial, ECF No. 371 at 12–13, avoiding any unfair prejudice to the Government. Even if Kenner had opened the door, however, the only permissible testimony would have been testimony to reaffirm that no privilege was violated, which also could have been addressed through a jury instruction. There was no need for Agent Lidsky to inform the jury about the crime-fraud order and its meaning. *See, e.g.*, *Brown*, 921 F.2d at 1307–08 ("the range of otherwise-inadmissible evidence that may be squeezed through an 'open door' is limited" and the doctrine applies "only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence"). Thus, the District Court erred in admitting the crime-fraud order as evidence, thereby influencing the verdict.[6]

---

[6] The only case defense counsel identified involving a jury that had been informed of a crime-fraud order reversed the convictions, despite, as here, an instruction to the jury regarding the difference between probable cause and proof beyond a reasonable doubt. *See People v. Hudson*, 333 N.W.2d 12 (Mich. Ct. App. 1982). There is no reason to think the D.C. Circuit would not do the same.

Second, the District Court exacerbated the prejudice when it informed the jury of *its own conclusion* that Michel had conspired by ruling on *eight occasions* in front of the jury that certain statements were admissible because they were "co-conspirator statements" and because Michel and the other individuals were co-conspirators. *See* Tr. 4/4/2023 AM at 94–95 ("The COURT: **And they're all co-conspirators at this point**; am I correct? Mr. Mulryne: Yes, Your Honor. The Court: All right. **I'll allow it**."); Tr. 4/6/2023 AM at 17 ("Mr. Kenner: Objection; hearsay. … The Court: No, **it's a co-conspirator statement**."); Tr. 4/6/2023 AM at 75 ("The Court: … If you can do it in the context of whatever **discussions you had with Mr. Michel, which would be viewed as a co-conspirator at this point**."); Tr. 4/6/2023 AM at 76 ("The Court: **He can certainly testify as to what Mr. Michel did as a co-conspirator statement. And at this point there's sufficient evidence that the government put on for the Court to consider them as co-conspirator statements and enough for a conspiracy in order to be able to do so**."); Tr. 4/11/2023 PM at 53 ("The Court**: I think these are conversations with Mr. Michel. I think they fit in the coconspirator aspect of it**."); 4/11/2023 PM at 57 ("The Court: … **These are co-conspirators**. … so I will allow it."); 4/11/2023 PM at 72–73 ("The Court: I don't think that is – in the context of not state of mind, but based on **conversations or interactions that they would have had as co-conspirators**, I will allow it."); Tr. 4/13/2023 PM at 22 ("The Court: All right. **So there it includes Mr. Michel. So these are the co-conspirators, that includes your client**.").[7]

This was a clear error. *See, e.g.*, *United States v. Sevilla-Acosta*, 746 F.3d 900, 904–05 (8th Cir. 2014) ("District courts should rule on the admissibility of a coconspirator's statement on the record but out of the hearing of the jury. [T]he court's ruling in the jury's presence was error." (internal quotation marks and citations omitted)). The District Court erroneously reasoned that its

---

[7] Emphasis added. *See also* New Trial Motion, ECF No. 310 at 7–8.

repeated errors were harmless by relying on cases where a court inadvertently made a *single* co-conspirator exception ruling in front of the jury and provided a *curative instruction* to the jury to address the specific error made by the court. Order Denying New Trial, ECF No. 371 at 20–21 (citing *see Sevilla-Acosta*, 746 F.3d at 905;[8] *United States v. Lance*, 853 F.2d 1177, 1182 (5th Cir. 1988); *United States v. Hester*, 140 F.3d 753, 758 (8th Cir. 1998)). In contrast here, the District Court made this error *eight times across four different trial days and never gave a curative instruction* directed to the error. The District Court's reliance on *Sevilla-Acosta*, *Lance*, and *Hester* is therefore misplaced.[9] The defense is unaware of any other case involving this many such rulings in front of the jury, let alone without a curative instruction.

The unprecedented amount of judicial influence over the jury verdict in this case requires a new trial. At a minimum, it raises a substantial question.

**B.    There is a substantial question whether Michel was entitled to a new trial because the District Court committed plain error by permitting Agent Heuchling to repeatedly testify as to his opinion of Michel's guilt and provide overview testimony in contravention of D.C. Circuit precedent.**

Exacerbating the prejudice, the District Court permitted Agent Heuchling to *also opine* that Michel was guilty throughout trial—which he did on at least 25 occasions—and to serve as an

---

[8] For instance, the court in *Sevilla-Acosta* explained: "Members of the jury, let me clarify something for you. When I just admitted these two documents into evidence, I referred to something called the co-conspirator exception or co-conspirator statement exception to the hearsay rule. That's just a label that means something to me and the lawyers. It's a legal label. It is *not* a finding by me that Mr. Sevilla was in fact a conspirator of Mr. Carreon or anyone else. Whether or not Mr. Sevilla is guilty of the charge against him is entirely for you to decide; it isn't for me to decide. In no way, shape or form was I implying by referring to this label for one of the rules of evidence was I implying that I somehow have decided that Mr. Sevilla is guilty; I haven't. It's not my decision to make. In no way was I suggesting to you what your verdict should be. All right. Do you all understand that? Okay." 746 F.3d at 904.

[9] The boiler-plate admonitions given to the jury at the outset and conclusion of the trial that the District Court points to in its Order Denying New Trial (ECF No. 371 at 18–19) were also insufficient in these circumstances. It is fanciful to think the jury would consider a generalized instruction given before the trial had begun or even during the reading of the jury instructions.

improper overview witness, which the D.C. Circuit has already held is plain error because of the way it influences the jury verdict. *United States v. Miller*, 738 F.3d 361, 373 (D.C. Cir. 2013).[10]

The District Court acknowledged in its Order Denying New Trial that, "[b]ecause of the dangers associated with overview testimony, the D.C. Circuit has recognized there are 'certain circumstances' in which the prejudice resulting from overview testimony may be sufficient to warrant the reversal of a guilty verdict." ECF No. 371 at 22 (quoting *United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011)); *see also United States v. Williams*, 827 F.3d 1134, 1162 (D.C. Cir. 2016) (reversing conviction because "there was a strong 'likelihood that the jurors afforded [Agent] Bevington substantial authority because of his expertise and access to information unavailable to them,' allowing his lay opinion testimony to influence their decision"). In *Moore*, the court ruled that an agent "crossed the line" when he testified that cooperating witnesses were co-conspirators. 651 F.3d at 59. Such testimony "went far beyond 'constructing the sequences of events in the investigation … to provide background information and to explain how and why the agents even came to be involved with [a] particular defendant.'" *Id.* "Instead, these statements suggested both directly and indirectly to the jury that an experienced and highly trained FBI agent had determined that the cooperating co-conspirators who would testify at trial were to be treated as credible witnesses and that appellants were guilty of the charged crimes." *Id.*

The District Court further acknowledged that a "portion of Agent Heuchling's testimony was erroneous," including his repeated testimony that he believed Michel was guilty. Order

---

[10] The District Court also permitted others to testify about Michel's guilt. For instance, the Government asked Higginbotham as its final question of his redirect whether he was one of Michel's co-conspirators: "By Mr. Keller: Q. All of these things that you did, lying to banks, pretending to be Mr. Broidy's representative, going into the Chinese embassy and meeting with the Chinese ambassador, all of those were at whose direction? A. Mr. Michel. … Q. Your role was as a co-conspirator, wasn't it? A. Yes, sir, it was. Mr. Keller: No further questions, Your Honor." Tr. 4/11/2023 PM at 74–75. This was also improper and exceptionally prejudicial.

Denying New Trial, ECF No. 371 at 30–31; *see also id*. at 38 (recognizing "that some elements of Agent Heuchling's testimony were inappropriate"). The District Court acknowledged that "Heuchling stated Michel and others were 'co-conspirators' approximately seven (7) times … and further suggested that Michel engaged in illegal conduct approximately six (6) times." ECF No. 371 at 26. In addition, the District Court agreed that Agent Heuchling made "approximately [38]" "references to 'straw donors' with respect to Michel's 2012 conduit scheme." *Id.* at 26–27. The District Court agreed that Agent Heuchling should not have been "permitted to characterize the campaign contributors as 'straw donors,' nor was he permitted to characterize Michel as a co-conspirator (or otherwise offer testimony opining that Michel engaged in illegal conduct)," *id* at 29, and also agreed that at least some of this testimony constituted error. *Id.* at 30.

A typical example of Heuchling's improper testimony was when he testified that Michel was guilty of conspiracy to use straw donors, in violation of federal law, tainting the jury on the very first day of trial:

> A. In 2012 the ***defendant conspired with Mr. Low*** to bring more than $20 million into the United States, and then the defendant subsequently used those funds from a foreign source to donate a portion to a campaign committee associated with the president -- sorry, then-President Obama, who was running for re-election, as well as to *make illegal contributions* to a Super PAC. The ***defendant also used a series of straw donors*, more than 20 straw donors*, to give those funds to the campaign in violation of federal law.*

Tr. 3/30/2023 AM at 86 (emphasis added). But whether Michel "conspired with Mr. Low," made "illegal contributions to a Super PAC," used "a series of straw donors," or "violat[ed] federal law" were all questions for the jury to decide; it was manifestly improper for Heuchling to give his conclusions on this jury question. In addition to Heuchling testifying that Michel was guilty of the alleged conduit scheme on at least 17 occasions, he also testified that Michel "conspired with Low"; made "illegal contributions to a Super PAC"; gave "funds to the campaign in violation of federal law"; engaged in "illegal activities"; and, on 14 occasions, testified that Michel received

money from Low and then transferred it to "straw donors" or "cutouts" who donated it to the Obama Victory Fund. Tr. 3/30/2023 AM at 122–23, 126, 138–40; Tr. 3/30/2023 PM at 17, 26, 51–53, 75.

Rather than testify about the *subject matter* of the FBI's investigation, Agent Heuchling testified about his *conclusions* after reviewing all of the evidence. For instance, he testified as to the alleged back-channel lobbying scheme: "[W]e uncovered that the same individuals [*Michel, Broidy, Lum Davis, and Higginbotham] were working on behalf and with Mr. Low and on behalf of the Chinese government to influence the White House and the administration of then President Trump to deport a Chinese national who was in the United States back to China.*" Tr. 4/13/2023 AM at 33 (emphasis added).

Every danger identified by *Moore* was realized. As outlined in greater detail in Michel's New Trial Motion, ECF No. 310 at 15–20, on 17 separate occasions the Government improperly elicited Heuchling's improper lay opinion that Michel was guilty of the charged conduit scheme, based almost entirely on hearsay, including based on his "investigation," including "witness interviews," and without identifying the specific evidence he relied on. *See, e.g.*, Tr. 3/30/2023 AM at 87, 91, 110; Tr. 3/30/2023 PM at 5. Agent Heuchling also expressed his opinions about the strength of the evidence, including based on hearsay, such as when he testified that he traced funds to entities associated with Michel and "others confirmed that tracing as well," which was "straightforward" and "is solid." Tr. 3/30/2023 PM at 28–29. No limiting instruction to the jury was given that it should disregard Agent Heuchling's conclusions about Michel's guilt.

The District Court's denial of a new trial was erroneous. The District Court's conclusion that this testimony "[a]t most … suggested that Michel was guilty of the charged schemes … and the jury may (or may not) have treated Agent Heuchling's commentary as 'additional or

13

corroborative evidence,'" ECF No. 371 at 31, massively understates what occurred. Agent Heuchling did not "suggest" Michel was guilty; he testified that Michel "conspired with Mr. Low" to commit the alleged offenses. That was no mere "suggestion"; it was a conclusion by an experienced FBI agent whose testimony would obviously sway the jury.[11]

The District Court's conclusion that the errors did not affect Michel's substantial rights was also erroneous. Agent Heuchling made dozens of references to Michel's guilt, testimony that was far more prejudicial than the agent's testimony that was found to have "crossed the line" in *Moore*, where the agent testified that certain *witnesses* were co-conspirators, 651 F.3d at 59, or in *Williams*, where the court reversed because the agent testified about his interpretations of wire-tap evidence, 827 F.3d at 1162. Agent Heuchling's testimony conveyed to the jury that, based on his expertise and knowledge of the case, he had already concluded that Michel was guilty, and therefore the jury should feel comfortable doing the same. The jury naturally "place[d] greater weight on evidence perceived to have the imprimatur of the government," given that Agent Heuchling was a "highly trained FBI agent." *Moore*, 651 F.3d at 57, 59.

The District Court's conclusion that evidence of Michel's guilt was substantial and neutralizes the errors also ignores the numerous close questions of law and fact presented as to each offense as detailed in Michel's MJOA (ECF No. 309). The District Court further erred in failing to consider the impact of these errors in conjunction with the District Court's erroneous

---

[11] The District Court analyzed this portion of Agent Heuchling's testimony under the plain error standard because defense counsel failed to object. Order Denying New Trial, ECF No. 371 at 30. But while the District Court found that counsel's failure to object to the testimony about the straw donors was a strategic choice, *id.* at 24–25, no such finding could conceivably be made regarding the failure to object when Agent Heuchling repeatedly told the jury that Michel conspired with his co-defendants to commit the alleged offenses and repeatedly identified Broidy, Lum Davis, and Higginbotham as Michel's "co-conspirators." This was textbook ineffective assistance of counsel.

decision to permit evidence about the crime-fraud order. Together, the magnitude of prejudice from these errors was unprecedented and denied Michel a fair trial.

C.    **There is a substantial question whether a new trial was required because Michel's defense counsel, David Kenner, was ineffective, unqualified, and unprepared, and his conduct severely prejudiced the defense.**

Michel's trial counsel, David Kenner, was ineffective and incompetent. He failed to object when the Government used Agent Heuchling as an overview witness, or to Heuchling's repeated testimony that Michel was guilty of the offenses charged, betraying a lack of familiarity with the rules of evidence. There was no strategic rationale behind failing to object when the District Court, in the jury's presence, repeatedly stated that Michel was a co-conspirator of Higginbotham's. Nor was there any strategic advantage in not objecting when Heuchling testified that Michel and his co-defendants "were working on behalf and with Mr. Low and on behalf of the Chinese government to influence the White House and the administration of President Trump to deport a Chinese national who was in the United States back to China." Tr. 4/13/2023 AM at 33. These failures, which occurred repeatedly throughout the trial, were the result of gross ineffectiveness. Kenner's performance was woefully deficient and prejudiced the defense.

At times, Kenner himself used Agent Heuchling as an overview witness who opined about Michel's guilt, such as this exchange during his cross of George Higginbotham:

Q: So you were continuing to work with him and at some point you ran into him in DC or in New York?
A. What is the timeframe, sir?
Q. The timeline, sir, is when you again started to represent Mr. Michel.
A. Yes.
Q. *During the time period of this conspiracy.* Do you have that in mind?

Tr. 4/11/2023 AM at 64–65 (emphasis added).

Some of Kenner's questions of Agent Heuchling could easily have been mistaken for those of the prosecutor:

> Q. (BY MR. KENNER) *Mr. Heuchling, when did you first determine that Mr. Michel was violating the FARA laws? What year, what month?*
> A. *I – I couldn't point to any – any specific year or month, but we got turned on to Mr. Michel's scheme as it relates to FARA in July of 2017 after Mr. Higginbotham entered the Chinese embassy.*
> Q. *So would it be a fair statement, then, as of July of 2017, Mr. Michel was in violation of FARA?*
> A. *I – I couldn't tell you exactly when – when Mr. Michel would have been in violation of FARA, so that – you asked me when I became aware of it. My understanding of the statute, though, is that it applies as soon as any individual starts acting on behalf of a foreign principal. So, therefore, I assume that he would have been in violation of the law prior to that.*

Tr. 4/13/2023 PM at 48 (emphasis added). Rather than vigorously cross-examine Agent Heuchling, Kenner encouraged his plainly erroneous opinion testimony that Michel was guilty of violating FARA. More than simply ineffective, this testimony was directly adverse to Michel.

As outlined in more detail in Michel's New Trial Motion (ECF No. 310 at 25–29), Kenner lacked the experience required for a complex white-collar case, and those he had assisting him were even less equipped for the task. The attorney who was second chair for Michel's defense team not only had never defended a case at trial before, he had never even practiced law. Zeidenberg Decl. ¶¶ 4, 8, ECF No. 310-1. Other attorneys on the team—who drafted briefs, critical cross-examinations, and other central defense materials—were out-of-state contract attorneys who had never defended a criminal case. *Id.* ¶ 15.

Kenner also did not understand the nature of the charges against Michel. For example, in his closing, he admitted that Michel had made contributions to Obama campaign so that Low could get a photograph with Obama. Tr. 4/20/2023 PM at 10. It appears that Kenner was operating under the mistaken belief that if Michel was not attempting to influence policy, there was no violation of law: "This was not about an attempt to influence the United States Government or its position on anything . . . Jho Low in 2012 wanted a photograph. That is what this entire case at that time was about." *Id.* But the motive involved was not relevant—a fact that Kenner clearly did not grasp.

Kenner also made an egregious error by not moving to sever the campaign finance allegations, which all concerned the 2012 Obama campaign and associated witness tampering counts,[12] and the 2017 FARA and money laundering allegations,[13] which involved distinct offenses and alleged entirely different co-conspirators. As outlined in more detail in Michel's New Trial Motion (ECF No. 310 at 29–32), the alleged conduit scheme involved the Obama reelection campaign, whereas the alleged back-channel lobbying campaign involved the Trump administration. The conduit scheme had no specific policy goal in mind; there was no legislative "ask" that was being sought. The lobbying scheme allegedly had two specific aims—the cessation of the forfeiture case against Low, and the extradition of Guo to China. Different individuals were involved in the two schemes, and vastly different statutes were involved—the conduit scheme involved the violation of campaign finance laws and the lobbying scheme involved FARA and being an unregistered foreign agent. In sum, these two sets of cases should not have been indicted together and, once they were, severance would have been required under Rules 8(a) and 14 had the appropriate motion been made.

Kenner's failure to seek severance caused tremendous spill-over prejudice from the conduit scheme. Severance would have avoided having the jury that heard the unregistered lobbying case also hear about the alleged conduit scheme and witness tampering. And it would have enabled Michel to advance a defense on the lobbying counts while remaining silent on the conduit scheme. Apart from evincing prejudicial ineffective assistance of counsel, the lack of severance also constituted plain error that affected Michel's substantial rights, further warranting a new trial.

---

[12] Counts 1, 2, 3, 4, 5 and 6.
[13] Counts 7, 8, 10 and 12.

Kenner's post-hoc rationalization that he did not file a severance because he believed it unlikely to succeed was apparently based only on his understanding that such motions were rarely granted. Tr. 1/11/2024 PM at 30. But a motion's likelihood of success can only be determined after a careful analysis of the facts and circumstances of the particular case. Kenner failed to do this analysis, instead making his decision based on generalized probabilities of success.

Kenner was unqualified, unprepared, and ineffectual throughout the trial, and his myriad errors severely prejudiced the defense and undermined the reliability of the verdict, easily satisfying both prongs of the *Strickland* test. For example, Kenner's first substantive statement to the jury in his closing argument appeared to be an admission of guilt: "Ladies and gentleman, this case started back in 2012 when there was, as the government characterizes it, an effort to funnel money to President Obama's reelection campaign." Tr. 4/20/2023 PM at 10. Having admitted to the scheme, Kenner launched into his sole, frivolous defense—that Michel had made the contributions in order to help Low get a photograph with President Obama, and not because he wanted to influence policy:

> In 2012, Mr. Michel was trying to arrange to get a photograph for someone named Jho Low. *This was not about an attempt to influence the United States Government or its position on anything.* I don't really think that it mattered what happened in the election insofar as Jho Low was concerned. *Jho Low in 2012 wanted a photograph. That is what this entire case at that time was about. . . . Jho Low is willing again to spend any amount of money to get this photograph*. . . . Jho Low had whatever reasons he had for wanting that photo. You could call it a trophy photo. You could call it whatever it is you want. This is a man who had the money, the wherewithal to spend anything he wanted to do or spend – you heard about this man spending a million dollars a day to rent a yacht for 40 days to party in Europe. This $20 million to him was nothing. To Pras, $20 million transitioning into a new life and a new career was incredible for him. He wanted to make that money. He did get that money. And he did try his very, very best to get Jho Low that photo.

*Id.* at 10, 13, 15–16 (emphasis added).[14]

---

[14] Kenner also included this as the primary defense to the conduit charges in the jury instructions. Tr. 4/24/2023 AM at 106.

Of course, the reason *why* Low allegedly wanted to funnel money to the Obama re-election campaign was immaterial. But Kenner appeared to confuse the conduit scheme with the lobbying scheme, which did allege Low's policy aims.[15] Kenner conflated these schemes again when he argued: "What he did was use what he believed to be his money to further the effort to get Jho Low this $20 million photograph. The question of whether or not Mr. Michel was involved in a conspiracy, willfully and knowingly to funnel foreign money into President Obama's election campaign and another conspiracy to not register under FARA, willfully and knowingly, is simply not true... For the 2012 accounts, as I told you, this was all about a photograph." Tr. 4/20/2023 PM at 18. But the alleged FARA scheme was completely independent of the 2012 conduit scheme, as anyone who read the indictment would know. By focusing only on a meritless defense about Low's reasons for the alleged conduit scheme, Kenner failed to provide a cogent theory of defense.

Similarly, when Kenner attempted to argue why the jury should acquit on the § 951 charge and conspiracy, he failed to make the strongest and most obvious argument: that there was no evidence that Michel or anyone else acted at the "direction or control" of the Chinese government. Indeed, Kenner made no reference to the "direction or control" element central to the charge. *See* ECF No 310 at 33–34. Instead, he appeared to incorrectly believe that the success of the alleged scheme was an element of the offense, and he agreed with the Government that Steve Wynn had lobbied the Trump administration. *Id.* at 24. Kenner appeared to believe it was a defense if the alleged lobbying was unsuccessful or if Wynn had tried to influence the government to extradite Guo. Kenner appeared ignorant of the Government's contention that Broidy used Wynn for this

---

[15] An alternative explanation for this gaffe is that Kenner—or the AI program—had conflated the alleged conduit scheme with the alleged unregistered lobbying scheme, as Kenner had done in the leadup to trial. Michel Decl. ¶ 4, ECF No. 310-3.

purpose. Kenner did not understand either point and, as a result, his closing offered no coherent rationale for acquittal.

Kenner's ineffectiveness was also evident during his cross-examination of Broidy and Higginbotham. For example, at no point did Kenner cross-examine Higginbotham about the fact that Wynn agreed to lobby the Trump administration regarding Guo because Wynn wanted Low to help him secure casino permits in Macau[16]—which would have demonstrated that Wynn was lobbying to curry favor with Low for his own benefit, and not as part of the alleged conspiracy with Michel or Broidy, and not at the direction or control of the Chinese government.

Kenner also failed to elicit testimony during the cross-examination of Broidy about his Statement of Offense, in which he attested that he and his co-defendants had "agreed to lobby the Administration and the DOJ to arrange for the removal and return of [ ] PRC National [Guo] . . . *on behalf of Foreign National [Low]*." Ex. 532 at 1 (emphasis added). This admission directly contradicted the Government's claim that the efforts to extradite Guo were done at the behest of the Chinese government. Nor did Kenner think to ask Broidy if he or anyone else in the alleged conspiracy was acting at the "direction and control" of the Chinese government. The answer likely would have been no, eviscerating the substantive and conspiracy count related to § 951. Kenner also failed to cross-examine Broidy about the fact that Wynn did not ask to be paid for his role in the lobbying scheme, which buttressed the argument that Wynn had acted to curry favor with Low so that he could secure casino permits in Macau—not as part of a conspiracy with Michel or Broidy.

---

[16] Higginbotham should also have been asked about the fact that Wynn had personal reasons to curry favor with Guo and/or the PRC since 70% of Wynn's business was in China. FBI 302, DOJ # 0000105617 (Ex. B to New Trial Motion).

Kenner also failed to object to other obvious hearsay apart from the examples given above. Indeed, aware of Kenner's lack of facility with the hearsay rules, the Government took full advantage, such as when Matthew Pottinger of the National Security Council testified almost entirely to prejudicial hearsay without any objection from Kenner. As outlined in greater detail in Michel's New Trial Motion (ECF No. 310 at 33–36), Pottinger was the sole witness who provided evidence that the alleged lobbying scheme had purportedly reached inside the Trump administration, yet Pottinger had virtually no first-hand knowledge of the information about which he testified. Instead, without objection or a limiting instruction, Pottinger testified about: (i) what he had heard President Trump say that he learned from a third party—which constituted double-hearsay; (ii) what the FBI had told him they had done about Guo; (iii) what the State Department had told him they had done about Guo; (iv) how the "U.S. government" in general was responding to the extradition requests; and (v) what Steve Wynn had told him about his desire to see Guo extradited.

The Government used Pottinger to introduce hearsay and double-hearsay, without any objection from Kenner, as the following excerpts make clear:

> There were a handful of staff who were meeting with the President. *And the President mentioned during this meeting, that he had received some information about Guo Wengui at dinner the previous night. So he had some things he wanted to tell us about that.*[17] ….
> Q. In addition to the meetings that you have already testified about, did you also have a later meeting at the end of summer or fall of 2017 at the White House with Steve Wynn?
> A. I did. ….
> Q. What was the general topic of the meeting?

---

[17] Not only is this double hearsay, but the Government also moved *in limine* to preclude the defense from calling former President Trump as a witness, ECF No. 193, and the District Court granted that motion, ECF No. 207. So, after precluding testimony from the percipient witness, the Government instead introduced it as hearsay, without objection, so that there could be no cross-examination.

A. *The topic was how to extradite Guo Wengui from the United States,* **which Mr. Wynn had said the Chinese government had asked him to do**.

Tr. 4/11/2023 PM at 80–87 (emphasis added).

Kenner failed to object to this critical and severely damaging testimony, either because he did not recognize it as hearsay or because he did not understand that Wynn's conduct, as an alleged co-conspirator, could be attributed to Michel. All of this inadmissible hearsay was extraordinarily damaging, none of it was cumulative, and all would have been excluded had Kenner objected. Pottinger was the only witness who testified about what went on inside the White House, with President Trump, and with Steve Wynn, and the actions that the State Department, FBI, and the "U.S. government" took in connection with Guo.

In addition to the failures outlined above, Kenner also failed to object to attorney-client privileged communications between Michel and Higginbotham that formed the basis of the Government's argument that Michel knowingly and willfully failed to register and conspired to violate FARA. *See* ECF No. 310 at 36–37. The District Court's conclusion that this evidence was admissible to the crime-fraud exception was erroneous; Michel's dismissal of Higginbotham's concerns did not further a crime. *See United States v. White*, 887 F.2d 267, 271–72 (D.C. Cir. 1989): ("Far from showing [an attorney's] advice was intended to further a crime or fraud, the evidence suggests . . . that [the attorney's] advice was intended to *prevent* unlawful conduct. [The defendant's] failure to heed his lawyer's counsel does not alter this critical facet of the case.") (emphasis added). This conversation with Higginbotham was the sole evidence that could even arguably suggest that Michel had any knowledge of FARA. An effective defense counsel would not have failed to exclude this conversation, which did not further the offense in any fashion.

**D.    At a minimum, when viewed in the aggregate, the errors during the trial and the ineffective assistance of counsel raise a substantial question as to whether Michel had a fair trial.**

Even if individual errors viewed in isolation do not warrant a new trial, a new trial is warranted here because the errors and ineffective assistance of counsel plainly prejudiced Michel when viewed in the aggregate. As the First Circuit recently explained:

> The cumulative-error doctrine holds that errors not individually reversible can become so cumulatively. That is because "[i]ndividual errors, ***insufficient in themselves to necessitate a new trial,*** may *in the aggregate* have a more debilitating effect" and thus add up to prejudice. And we have long held that the prejudice inquiry under *Strickland* can be a cumulative one as to the effect of all of counsel's slipups that satisfy the deficient-performance prong – meaning that a defendant need show it more likely than not that the several blunders, even if not prejudicial on their own, prejudiced him when taken together. . . . So what matters is the cumulative effect of counsel's errors (even if no error in isolation suffices to establish qualifying prejudice) – *i.e.*, the focus must be on the collective impact of counsel's deficiencies. . . . [T]he "interest of justice" empowers a judge to grant a new trial based on perceived unfairness of something not amounting to reversible error.

*United States v. Baptiste*, 8 F.4th 30, 39–41 (1st Cir. 2021) (citations omitted). So too here. The myriad errors during Michel's trial cumulatively raise a substantial question as to the fairness of Michel's trial. *See id.*

**IV.    Michel's Motion for Judgment of Acquittal Presents Substantial Questions of Law and Fact that Would Likely Lead to Reversal of Nearly all Counts of Conviction.**

As demonstrated below, Michel's MJOA also raises substantial questions of law and fact that, if granted in his favor, would result in the reversal of nearly every count and, at a minimum, a reduced sentence that is less than the duration of Michel's appeal.

**A.    Count 1 raises a substantial question whether Michel can be convicted of conspiring with Low to violate campaign finance laws where Low was advised he was complying with campaign finance laws.**

Count 1 charged Michel with conspiring with Low to: (i) "defraud the United States by impairing, obstructing, and defeating" the "FEC's [Federal Election Commission's] ability to

administer federal regulations concerning source and dollar restrictions in federal elections, including the prohibitions applicable to foreign nationals and straw donors"; (ii) "knowingly and willfully make foreign contributions" of more than $25,000 in a calendar year in violation of 52 U.S.C. §§ 30121 and 30109; (iii) "knowingly and willfully make contributions to a candidate for federal office in the names of other persons." ECF No. 84 ¶ 21.

As the District Court acknowledged, because the Indictment charged Michel with conspiring with Low to commit this offense, the Government had to prove beyond a reasonable doubt that Low—not just Michel—knowingly and willfully agreed to violate campaign finance laws. ECF No. 355 at 5. But the evidence at trial established that Joel Rousseau *hid* and omitted from his email to Low the second page of the Obama fundraiser invitation, which stated that "Federal law prohibits foreign nationals . . . from contributing to the Obama Victory Fund 2012," before sending the invitation to Low. ECF No. 309 at 5–9; *compare* Exs. 301 & 302, *with* Ex. 291.[18] Rousseau also advised Low in a May 29, 2012 email that "being a foreigner is not a problem as long u owned corporation in US like George Soros etc… All donation can be made to the Super Pack [sic] and it can be unlimited." Ex. 290. Thus, Rousseau misinformed Low that his contributions to a Super PAC were "not a problem" and could be "unlimited" even though he was a foreigner if he contributed through a corporation, *id.*, despite that Agent Heuchling testified this was untrue, Tr. 3/30/2023 AM at 96–98. The lack of evidence of Low's knowledge of the wrongfulness of his conduct was fatal to this count.

The District Court sustained Michel's conviction on Count 1 despite identifying *no evidence* that Low knowingly and willfully agreed to violate campaign finance laws. Rather, the

---

[18] This is why the Government made a sleight of hand and left the jury with the false impression that Low had received the invitation discussing campaign finance law, when he did not. ECF No. 355 at 5–8. It is telling that the Government did not dispute this fact in its Opposition brief.

District Court failed to address Rousseau's concealment from Low of the prohibition on foreign contributions when Rousseau sent the fundraiser invitation to Low, and it agreed with the Government that Rousseau's advisement that foreign contributions were "not a problem" somehow meant that Low knew and agreed to violate campaign finance laws. *See* ECF No. 355 at 8. But any hypothetical jury inference that Low understood the Rousseau email to mean he was legally prohibited from contributing to Obama's campaign, despite being told the opposite, would be unreasonable. And even if the email could reasonably be interpreted in that way, there was no evidence that Low opened, reviewed, or saw the email—or even monitored the account. *See id.* at 95.[19] Without evidence of Low knowingly and willfully agreed to violate campaign finance laws, Michel could not have conspired with him to do so, raising at least a substantial question.

    **B.    Count 12 raises a substantial question whether Michel could have conspired to make false statements to FDIC-insured banks when the alleged false statements placed no bank funds or deposits at risk and were unrelated to a loan or disbursement of funds.**

Count 12 alleged that Michel conspired with George Higginbotham to make false statements to FDIC-insured banks in violation of 18 U.S.C. § 1014, in violation of the general federal conspiracy statute, 18 U.S.C. § 371. ECF No. 84. The Government alleged that Michel and Higginbotham conspired to make false statements about the origin and purpose of funds deposited with City National Bank, Morgan Stanley, and Citibank after each bank grew suspicious about

---

[19] The District Court also reasoned that efforts by Rousseau or Eric Tan purportedly to "conceal Low as the true source of the funds" somehow showed that *Low* was aware of US campaign finance laws and its prohibitions. ECF No. 355 at 9. But the supposed intent of *others* who were not charged as co-conspirators is no substitute for the required intent of the charged co-conspirator, Low. The District Court also reasoned that Michel was aware of campaign finance laws, but that is insufficient to prove Low's knowledge and willfulness necessary to prove a conspiracy. *Id.* at 8. The District Court also pointed to Low's desire to contribute to President Obama's campaign and to have a personal audience with President Obama, *id.* at 7, which are also not evidence of knowledge and willfulness to violate campaign finance laws.

large deposits. ECF No. 84 ¶¶ 158–81. Count 12 raises at least two substantial questions, each of which should result in an acquittal on appeal but at a minimum raises a substantial question.

First, no court has ever held that 18 U.S.C. § 1014 applies to false statements made to FDIC-insured banks that, as here, do not place bank or depositor funds at risk.[20] The District Court identified a circuit split between courts that "limit[] Section 1014 liability to lending-related statements" and those that extend the statute "beyond [the] strict lending context." ECF No. 355 at 49. Although the District Court's recognition of a circuit split that the D.C. Circuit could resolve in Michel's favor itself evinces a substantial question, the fact that *no court on either side of the circuit split has ever* extended § 1014 to false statements that do not subject an FDIC-insured bank to a risk of loss of bank or depositor funds establishes a strong likelihood of reversal on appeal.[21]

_____

[20] Section 1014, entitled "Loan and credit applications generally; renewals and discounts; crop insurance," applies to certain false statements made to FDIC-insured banks in "any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee, or any change or extension of any of the same." 18 U.S.C. § 1014.

[21] **Cases Limiting § 1014 to False Statements in the Lending Context:** *United States v. Devoll*, 39 F.3d 575, 579 (5th Cir. 1994) ("We hold today that section 1014 relates only to lending activities by financial institutions."); *United States v. Krown*, 675 F.2d 46, 51 (2d Cir. 1982) (reversing § 1014 convictions because "there was no 'application' or 'commitment,'" and "[t]hese broad terms must be interpreted with reference to the statute as a whole, and can only refer to an application or commitment involving an advance or loan or other credit transaction listed in the statute").

**Cases Extending § 1014 to False Statements to Fraudulently Induce Banks to Disburse Funds:** *United States v. Agne*, 214 F.3d 47, 57 (1st Cir. 2000) (§ 1014 applies where defendant sought "to fraudulently induce the bank to issue the monies authorized by the letter of credit"); *United States v. Pinto*, 646 F.2d 833, 838 (3d Cir. 1981) (§ 1014 applies to false statement to bank about entitlement to funds the bank mistakenly deposited into defendant's business account, which he drew down); *United States v. Yoo*, 833 F.2d 488, 490 (3d Cir. 1987) (§ 1014 applies to false statement made "to influence a bank to disburse its insured deposits" against a letter of credit); *United States v. Bonnette*, 781 F.2d 357, 365 (4th Cir. 1986) (§ 1014 applied to false and fraudulent sight drafts submitted to banks for credit leading to hundreds of thousands of dollars in losses); *United States v. Tucker*, 773 F.2d 136, 139 (7th Cir. 1985) (§ 1014 applies to false statements "to induce the [bank] to deposit $5 million in the defendants' account" against a letter of credit); *United States v. Krilich*, 159 F.3d 1020, 1028 (7th Cir. 1998) (§ 1014 applies to bogus invoices submitted to bank to obtain disbursement of funds from trusts because they were "designed to

Even the circuits cited by the District Court that apply the broadest interpretation of § 1014 have recognized that Congress enacted § 1014 "to cover all undertakings *which might subject the FDIC insured bank to risk of loss*," *Pinto*, 646 F.2d at 838; *accord Stoddart*, 574 F.2d at 1053 (emphasis added), and none of the cases cited by the District Court have extended § 1014 outside of contexts in which a defendant makes a false statement to induce a loan or disbursement of funds. There can be no dispute that Michel and Higginbotham's alleged attempt to convince FDIC-insured banks to *keep their deposits* did not place bank or depositor funds at risk, and there is no allegation or evidence Michel or Higginbotham sought to fraudulently induce the disbursement of bank funds.[22] No court has applied § 1014 in these circumstances.

Second, there was no evidence that Michel conspired to make a false statement "upon any application, advance, . . . commitment, loan" or other medium referenced in § 1014. To the contrary, Higginbotham and Michel allegedly made false statements about the source and purpose of the funds only in response to inquiries from the banks made *after* they had already opened accounts and made large deposits. *See* Tr. 4/11/2023 AM at 45–49 (testimony of City National Bank employee Santos); Tr. 4/5/2023 at 9–11, 15–17 (testimony of Morgan Stanley employee Vinder); Tr. 4/6/2023 AM at 125–27 (testimony of Higginbotham regarding movement of funds

---

induce a financial institution to disburse money"); *United States v. Boren*, 278 F.3d 911, 916 (9th Cir. 2002) (§ 1014 charge on motion to dismiss sustained where defendant lied to the bank to get a stop-payment on a cashier's check drawn on bank's own funds that he had already presented to casino leading to gambling losses); *United States v. Stoddart*, 574 F.2d 1050, 1053 (10th Cir. 1978) (§ 1014 conviction where the defendant lied to bank to convince it to honor a check despite insufficient funds); *United States v. Wade*, 266 F.3d 574, 580 (6th Cir. 2001) (§ 1014 applied on plain error review to false statement "to open checking accounts to further a check kiting scheme").
[22] The District Court highlighted the Sixth Circuit's opinion in *Wade*, which is the only circuit court to have held—on plain error review—that § 1014 can apply to a false statement made in an application to open a bank account. ECF No. 355 at 51. But the defendant in *Wade* falsified his applications to open checking accounts as part of a scheme to defraud the bank as part of his check-kiting scheme, plainly placing bank funds at risk. 266 F.3d at 579–81.

to his Citibank escrow account, resulting in a call with a Citibank employee); *accord* Tr. 4/20/2023 AM at 65–66 (Government closing argument). The alleged false statements were *not* made in an application or by other means encompassed by § 1014, and false responses to bank inquiries about specific deposits are not within the ambit of § 1014. Each defect provides a clear basis for reversal but at a minimum raises a substantial question.

### C.    Counts 2 and 3 raise a substantial question whether evidence that Michel provided funds for others to donate to political committees *alone* is sufficient to convict him of knowingly and willfully causing the committees to file false reports with the FEC.

Counts 2 and 3 alleged that Michel caused political committees to falsely report contribution information to the FEC, in violation of 18 U.S.C. §§ 1001(a)(1) and 2, and §§ 1519 and 2, respectively. Michel allegedly did this by giving money he received from Low to straw donors who, in turn, donated the money to the Obama Victory Fund. The evidence was insufficient as a matter of law in at least three critical ways.

First, the Government failed to prove causation. There was no evidence that Michel caused the Obama Victory Fund to make a false statement to the FEC. At trial, the Government sought to prove that Michel caused the Obama Victory Fund to make false statements to the FEC *solely* because he provided funds to the alleged straw donors for contributions to the Obama Victory Fund. The Government later argued that this evidence alone was sufficient to prove that Michel caused a false statement to the FEC, ECF No. 320 at 7, and the District Court agreed, ECF No. 355 at 10–14.[23] But the District Court erred because there was no evidence Michel instructed the

---

[23] The District Court relied upon *United States v. Hsia*, 176 F.3d 517, 523 (D.C. Cir. 1999) (*Hsia I*), in stating that "the simple interposition of conduits to sign the checks is certainly enough to cause' a committee to make false statements in its report [to the FEC]." ECF No. 355 at 11 (quoting *Hsia*, 176 F.3d at 523). This reliance on *Hsia* is misplaced. In *Hsia*, the D.C. Circuit held that the district court erred in dismissing the indictment for failure to state an offense where Hsia, unlike Michel, personally contributed to various campaign committees as if she were the true source

straw donors to report themselves as the true donors and to conceal that the funds were provided to them by Michel. In fact, there was not even evidence that Michel was aware how the alleged strong donors reported the funds to the Obama Victory Fund or how, in turn, the Obama Victory Fund reported the contributions to the FEC. Eric Feigenbaum from the Obama campaign testified that the Obama Victory Fund primarily used donor cards to collect this information, Tr. 3/31/2023 PM at 10, 12, as the donor cards required the donors to list their information and certify that the funds "are not being provided to me by another person," Ex. 509. But the Government did not introduce the donor cards, evidence of how the donors completed the cards, or any other evidence of whether or how the donors reported their contributions to the Obama Victory Funds. Despite the alleged straw donors being called as witnesses, they were never asked how they filled out their donor cards, and they never testified that they reported any false information because of anything Michel said or did. Providing funds for another to contribute, without more, could violate campaign finance laws, but it does not constitute a *per se* violation of §§ 1001 and 1519. To hold otherwise would make every conduit contribution into a false statement offense, swallowing the separate conduit contribution offense statutes (52 U.S.C. §§ 30122, 30109(d)). Michel cannot have caused a false statement of which he had no awareness and with which he had no involvement.

Second, the Government failed to prove the falsity of the FEC Form 3X Schedule A submissions charged in Counts 2 and 3. For instance, Count 3 alleged that the Schedule A submitted by the Obama Victory Fund on June 3, 2013 "falsely listed the names of straw donors as the true sources of the contributions." ECF No. 84 ¶ 78. The Government introduced the Schedule A for Count 3, entitled "Itemized Receipts," which listed the names, addresses, "Date of

---

despite receiving funds from foreign donors. Hsia was thus personally involved with the reporting to the campaign, which in turn reported the information to the FEC. *Hsia* illustrates the type of causal evidence that is missing here.

Receipt," and "Amount of Each Receipt this Period" for each name. Ex. 518. But the Schedule A included no instructions requiring that the "true sources" of donations be listed, and it instead referred only to names associated with "[r]eceipts." *Id.* There was no dispute that the names listed are individuals from whom funds were received, rendering the statements literally true. The Government provided no evidence that the FEC required that the "true source" of a donation be listed in the Schedule A, rather than the individual from whom the funds were received. Thus, the Government failed to prove the names in the Schedule A were false (or even misleading).[24]

Third, the evidence was insufficient to prove that Michel's mens rea of knowledge and willfulness. As the D.C. Circuit explained in *Hsia I*, the government must prove as to mens rea "(1) that the defendant knew that the statements to be made were false . . . and (2) that the defendant intentionally caused such statements to be made by another." 176 F.3d at 522. The Government proved neither. There was no evidence that Michel was aware of the Form 3X and Schedule A submission the Obama Victory Fund was required to provide to the FEC. Even if he had been aware of the Schedule A, there was no evidence that Michel was aware of a legal requirement— which also was not presented to the jury—that the Schedule A list only the true donor and not the individual who provided the funds to the Obama Victory Fund. And there was no evidence that Michel intended for the Obama Victory Fund to make these allegedly false statements to the FEC—related to submissions of which he had no awareness. The District Court's reliance on Michel's alleged awareness of his own contribution limits was insufficient to prove he had the requisite mens rea beyond a reasonable doubt.

---

[24] Notably, in *United States v. Hsia*, 30 F. App'x 1 (D.C. Cir. 2001) (unpublished) (*Hsia II*), unlike here, the jury was instructed that the FECA requires political action committees to "report the true source of the contributions," thus giving the jury the ability to conclude that reporting names in the FEC submission was false. No evidence or instruction was given here, and thus the jury had no basis to conclude that the Schedule A forms were false.

**D.    Count 4 raises a substantial question because, in context, Michel's statement in his declaration to the FEC was neither false nor intended to obstruct the FEC's narrow investigation into unrelated matters.**

Count 4 charged Michel with making a false declaration to the FEC in order to obstruct its investigation into a private complaint alleging that Michel used his company (SPM Holdings LLC) to make a contribution to a super PAC (Black Men Vote), when he should have used his own name, in violation of 18 U.S.C. § 1519. ECF No. 84 ¶¶ 74, 79–80.[25]

First, Michel's conviction on Count 4 raises a substantial question because the charged statement in his declaration to the FEC was not false. The FEC had sent him a copy of the private complaint and asked him to respond. Ex. 584. Michel's attorneys responded by submitting a declaration from Michel that stated, in relevant part:

> I had no reason to hide the true source of my donations to Black Men Vote nor did I wish to diminish the disclosure of source or amounts of my contributions to Black Men Vote as being attributable to myself. To the contrary, I had every reason and desire to take full credit for the full amount of the contributions that I made to Black Men Vote.

Ex. 245 ¶ 5. This was literally true. In context of the private complaint to which he was responding, Michel was merely stating that he had no reason to use SPM Holdings LLC instead of his own name to make the donation, and he had in fact used his own name to contribute to Black Men Vote in the past. *See Thompson v. United States*, 604 U.S. 408, 418 (2025) ("Context obviously matters in determining whether a statement is false." (brackets omitted)). Even if Low had provided funds later used to make these contributions, this did not provide a reason for Michel to use SPM Holdings LLC and hide himself as a source of the contributions. In these circumstances, no reasonable juror could have found beyond a reasonable doubt that Michel had a reason to hide

---

[25] Count 2 also alleges in part that the FEC declaration was a false statement. Thus, the arguments on Count 4 apply equally to that portion of Count 2.

himself as the source of the SPM Holdings LLC contribution. Ex. 245 ¶ 1. Nor was there evidence

that the FEC even interpreted Michel's statement as a denial that he had received foreign funds.

Second, the evidence was insufficient to prove that Michel had made this statement with

intent to obstruct the FEC's investigation, which was unrelated to Low or the source of Michel's

funds. Agent Heuchling acknowledged that the FEC was investigating "allegations that were

different and distinct from those in [Count 2]." Tr. 3/30/2023 PM at 62. Michel had no reason to

admit, deny, or otherwise discuss the original source of the funds he donated, because that was not

a subject of the inquiry. Thus, no reasonable juror could have found beyond a reasonable doubt

that his declaration was meant to obstruct the FEC's investigation, *which had nothing to do with

whether Michel received foreign funds to make contributions.* The District Court reasoned that this

was not a basis to acquit Michel because § 1519 applies to falsifications with intent to obstruct an

agency matter or the "contemplation of any such matter." 18 U.S.C. § 1519; *see* ECF No. 355 at

16. But there was no evidence that Michel had contemplated there would be an investigation into

Low at that time, particularly given that the private complaint had nothing to do with Low or the

Obama fundraiser three years earlier. Thus, the "contemplation" language in § 1519 cannot save

the conviction on Count 4.

### E.    Count 10 raises a substantial question whether Michel can be convicted of being an agent of the Chinese government because there was no evidence he or anyone else had agreed to act at the Chinese government's "direction or control."

The Government alleged in Count 10 that Michel violated 18 U.S.C. § 951 by agreeing to

operate as an agent of China and at the "direction or control" of the Chinese government to

convince Trump administration to extradite Guo to China. The Government failed to prove Count

10 because the evidence at trial showed that Michel and the alleged co-conspirators were all

working at the direction and control of Low, who paid them for their work, not the Chinese government, which paid them nothing and had no authority over them.

Section 951 defines "agent of a foreign government" to mean "an individual who *agrees* to operate within the United States subject to the *direction or control* of a foreign government or official." *Id.* § 951(d) (emphasis added). As the Fourth Circuit observed, "One thing is clear right off the bat: To fall within § 951's ambit, a person must do more than act in parallel with a foreign government's interest or pursue a mutual goal. An 'agent' further 'agrees to operate … subject to the *direction or* control of that government." *United States v. Rafiekian*, 991 F.3d 529, 538 (4th Cir. 2021) ("*Rafiekian I*"). A defendant does not operate subject to the "direction or control" of a foreign government merely because he "is willing to do something the foreign principal requests." *Id.* at 539–40. The person must also "agree[]" to act at the direction or control of the foreign government, such that the person "does not become an 'agent' for purposes of § 951 simply by acting in accordance with foreign interests." *Id.* at 540–41; *accord United States v. Rafiekian*, 68 F.4th 177, 184 (4th Cir. 2023) ("*Rafiekian II*").

In denying Michel's motion for judgment of acquittal on Count 10, the District Court asserted that there was a "reasonable inference that Low was acting as an intermediary between the PRC government and Michel and the others." ECF No. 355 at 27. Even if that were a reasonable inference—and not speculation—Low's motivation for hiring Broidy, Michel, and Lum Davis is legally insufficient because it does not transform Michel and the others into agents of the Chinese government under § 951. The evidence is undisputed that the alleged co-conspirators were hired by Low and paid by him, and it was Low that gave them direction. At times, Low directed them to meet with Chinese officials to brief them of the status of their efforts, and Michel and his co-

defendants complied with Low's directions because Low was paying them. At all times, however, Michel and the others worked as agents of Low, not the Chinese government.[26]

The evidence at trial established that Low sought the extradition of Guo to China and financed this effort, giving directions as to how it should be carried out. Low directed Michel and the alleged co-conspirators to occasionally report on their progress to Chinese officials, but no Chinese officials had authority over Michel to direct or control him or the other alleged co-conspirators to do anything.

To the contrary, Broidy testified that at his meeting in Shenzhen, China, in May 2017, he did not have an agreement to act at the direction or control of the Chinese government, but instead was part of the engagement with Low. Broidy testified that he met with Sun and agreed to help him because he "**felt that it was part of my engagement with Jho Low**; that I was there, and I thought I would try to help him assist with getting the meetings." Tr. 4/4/2023 AM at 91–92.

> Q. So you said that you felt this was sort of also related to your arrangement with Mr. Low. How did you understand Mr. Low to be connected at all to this request?
> A. Well, he told us to come there. It was his meeting. He set up the meeting, and he was present. Although he didn't say much, he was present during the meeting.

*Id.* at 92. Any doubt as to who was in charge of this effort to return Guo to China is erased by Broidy's Statement of Offense, introduced into evidence by the Government, which made clear that the effort to return Guo to China was at the behest and direction of Low, not the Chinese government: "BROIDY, Davis, and [Michel] also agreed to lobby the Administration and the DOJ to arrange for the removal and return of [ ] PRC National [GUO] . . . ***on behalf of Foreign National [Low]***." Ex. 532 at 1 (emphasis added). The District Court ignored all this evidence.

---

[26] Similarly, when a U.S. Government official is directed by his or her superiors to meet with a foreign government counterpart in the U.S. to debrief them or even assist with matters, the official need not register as an agent of the foreign government, because they remain under the direction and control of the U.S. Government, not the foreign government.

Broidy assisted in securing the meetings because of his engagement with Low—who was Malaysian and not part of the Chinese government. That the Chinese government was interested in securing Guo's extradition is insufficient as a matter of law to transform Michel, Broidy, Higginbotham, or Lum Davis into foreign agents of China acting at the direction or control of the Chinese government. A person "does not become an 'agent' for purposes of § 951 simply by acting in accordance with foreign interests." *Rafiekian I*, 991 F.3d at 540–41; *accord Rafiekian II*, 68 F.4th at 184. At a minimum, these issues raise a substantial question regarding Count 10.

**F.    Count 8 raises a substantial question whether Michel could have aided and abetted Broidy's alleged failure to register under FARA despite the absence of evidence that Michel intended or assisted with Broidy's nonregistration.**

The Government charged Michel with being an unregistered agent of a foreign principal by "executing an unregistered, back-channel lobbying campaign to resolve the 1MDB investigation favorably for Low," in violation of FARA (22 U.S.C. §§ 612, 618). ECF No. 84 ¶ 151. The Government further alleged that Michel aided and abetted Broidy's, Higginbotham's, and Lum Davis's FARA violations in violation of 18 U.S.C. § 2. *Id.* The evidence was insufficient as to both theories.

First, there was no evidence that Michel personally had a duty to register under FARA because he did not personally lobby the U.S. Government, and the District Court did not conclude otherwise. *See* ECF No. 355 at 32–33 (declining to "make that determination"). In fact, the District Court found only that the evidence at trial showed Michel was "primarily . . . a messenger, facilitator, and intermediary," *id.* at 32, and not that he acted as a lobbyist. Michel thus had no duty to register, let alone based on his own personal lobbying, which did not occur. *See* 22 U.S.C. § 611(c)(1).

Second, the evidence was insufficient to prove that Michel aided and abetted unregistered lobbying by Broidy. As a threshold matter, the Government failed to prove that Broidy himself

lobbied the U.S. Government merely because (i) Broidy attempted to set up a golf game between the Malaysian Prime Minister President Trump, which is not political activity or lobbying, or (ii) Broidy shared talking points with Richard Gates and asked that he share them with Secretary of State Tillerson, despite that there was no evidence Gates was in the government at the time and there was no evidence Tillerson saw the talking points. ECF No. 352 at 8–9.[27] In any event, there was no evidence that Michel aided and abetted Broidy's alleged failure to register, and it is undisputed that Michel had never discussed with Broidy or anyone else whether Broidy should register. Tr. 4/4/2023 PM at 54–56. Mere awareness of Broidy's plan to lobby—without knowledge and intent that Broidy not register while being required to do so—is insufficient as a matter of law to prove aiding and abetting. *Rosemond v. United States*, 572 U.S. 65, 76–77 (2014) (aiding and abetting intent must go "to the specific and entire crime charged").[28]

Nor could Michel have aided and abetted Broidy's nondisclosure, as there was no evidence he assisted Broidy in his failure to register in any way, and Michel himself had no independent duty to disclose Broidy as an alleged foreign agent. *See, e.g.*, *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 292 (2025) ("aiding and abetting usually requires misfeasance rather than nonfeasance. Absent an independent duty to act, a person's 'failure[s],' 'omissions,' or 'inactions'—even if in some sense blameworthy—will rarely support aiding-and-abetting liability"); *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 488-89 (2023) ("our legal system generally does not impose liability for mere omissions, inactions, or nonfeasance"); *Monsen v.*

---

[27] Despite that Michel raised this defect in a brief invited by the District Court, the District Court declined to consider it. *See* ECF No. 355 at 33 & n.3.

[28] Thus, where the defendant was charged with aiding and abetting a principal's use of a firearm in relation to a drug trafficking crime under 18 U.S.C. § 924(c), the Court held that the Government had to prove that the defendant must intend for both elements to occur—that the principal commit a drug trafficking crime *and* that the principal use a firearm. *See Rosemond*, 572 U.S. at 77.

*Consolidated Dressed Beef Co.*, 579 F.2d 793, 800 (3d Cir. 1978) ("The securities laws comprehend that mere knowledge of a violation alone, without assistance or a duty to disclose the violation, is not an actionable wrong"); *Delany v. Blunt, Ellis & Loewi*, 631 F. Supp. 175, 179 (N.D. Ill. 1986) ("nondisclosure does not provide the 'substantial assistance' requisite to Rule 10b–5 aiding and abetting liability without some special duty").

These arguments at a minimum raise substantial questions as to Count 8.

### G.    Count 7 raises substantial questions as to each charged object of the alleged conspiracy.

Count 7 alleges a conspiracy under the general federal conspiracy statute, 18 U.S.C. § 371, with four alleged objects: (1) to lobby the U.S. Government to end an investigation into Low's embezzlement of assets from 1MDB, a Malaysian sovereign wealth fund, in violation of FARA (22 U.S.C. §§ 612 and 618); (2) to lobby the U.S. Government to extradite Chinese national Guo Wengui, while acting as agents of China and without registering, in violation of 18 U.S.C. § 951; (3) to engage in financial transactions to conceal the proceeds of the FARA violation, in violation of 18 U.S.C. § 1956(a)(1)(B); and (4) to transfer funds into the United States to promote the FARA violation in violation of 18 U.S.C. § 1956(a)(2)(A). ECF No. 84 ¶¶ 105–49. Count 7 raises a substantial question as to the legal and factual sufficiency of proof as to each of these objects.

### 1.    There was no evidence of an agreement between Michel and an alleged co-conspirator for anyone to violate FARA.

The evidence was insufficient to prove that Michel and another alleged coconspirator *agreed* to violate FARA, in violation of 22 U.S.C. §§ 612 and 618. *See* ECF No. 84 ¶ 105(a). There was no evidence that Michel had ever considered or discussed whether Broidy should register. Although Broidy and Higginbotham both testified as cooperating witnesses, neither testified that there was an agreement, explicit or tacit, for Broidy not to register under FARA. *See supra* § IV.F.

Nor did Michel agree that any other alleged co-conspirator should avoid registering while believing such person was legally required to do so. Higginbotham testified that while he did not believe he personally needed to register, he suggested to Michel that he *might* need to register. Specifically, Higginbotham testified that he "ha[d] concerns about FARA" and indicated to Michel that registration *might* be necessary, but Michel did not share those concerns—which demonstrates an *absence* of an agreement. Tr. 4/6/2023 AM at 20–21. Higginbotham further testified: "I didn't say, You must register. I suggested to him that it looked like FARA becomes very, very important as we were doing activities with regards to 1MDB and Guo Wengui." Tr. 4/11/2023 AM at 22. Higginbotham further testified that he did not believe that he (Higginbotham) was required to register under FARA because he "was not the one that was actually performing the services that would fall under – that would fall under FARA." *Id.* Critically, despite being a cooperating government witness, Higginbotham never testified that there was any agreement—express or tacit—between himself, Michel, or any of the other alleged coconspirators that Broidy or anyone else should not register under FARA.[29]

Courts have reversed conspiracy convictions where, as here, none of the Government's cooperating coconspirator witnesses testify that the defendant joined in an agreement to commit a crime. *See, e.g.*, *United States v. Gaskins*, 690 F.3d 569, 572 (D.C. Cir. 2012) (reversing because "[n]one of the cooperating witnesses, many of whom pled guilty to participating in the conspiracy, described [the defendant] as having any knowledge of the conspirators' drug trafficking activities"); *United States v. Wilson*, 160 F.3d 732, 737–38, 750 (D.C. Cir. 1998) (reversing

---

[29] The District Court's conclusion that there was a "tacit or mutual understanding" between Michel and Higginbotham not to register, ECF No. 355 at 37, cannot be squared with this evidence, particularly given the complete absence of evidence that they believed registration was legally required.

because none of "several witnesses" who would have had knowledge of the defendant's involvement testified that he was part of the murder plot).[30] Reversal is warranted in these cases because, "when witnesses with inside knowledge of a conspiracy 'are in a position to offer testimony about the nature of a defendant's involvement, the absence of such evidence is telling.'" *Gaskins*, 690 F.3d at 577 (quoting *Wilson*, 160 F.3d at 737) (brackets and ellipsis omitted). There is "reason to doubt [a defendant's] involvement in the charged conspiracy" if cooperating witnesses who were "motivated to provide the government with whatever evidence [they] had on" the defendant were "unable to point to" conclusive evidence of the defendant's guilt. *Id.* at 578.

This principle applies *a fortiori* where, as here, the Government had the cooperation of three of the alleged cooperators, two of whom testified at trial, and none indicated that there was an agreement not to register for FARA. "[A]ny reasonable jury should have wondered why the government could not find such evidence," in these circumstances, "given the scope of the government's investigation and the role its witnesses played in the conspiracy." *Id.* at 577. Thus, the evidence was insufficient to prove that Michel conspired to violate FARA.

> **2.    There was no evidence of an agreement between Michel and an alleged co-conspirator for anyone to lobby the Trump administration under the "direction or control" of the Chinese government.**

For the same reasons explained above in § IV.E, the evidence was also insufficient to prove that Michel and another alleged co-conspirator agreed that Broidy (or anyone else) should lobby the U.S. Government at the "direction or control" of the Chinese government, in violation of 18 U.S.C. § 951; *see* ECF No. 84 ¶ 105(b). Thus, this alleged object of the conspiracy also fails.

---

[30] *See also United States v. Viola*, 35 F.3d 37, 44 (2d Cir. 1994) (reversing RICO conspiracy conviction where "testimony from participants in the conspiracy" did not implicate the defendant in the charged enterprise), *abrogated on other grounds as recognized in United States v. Boyland*, 862 F.3d 279, 289 (2d Cir. 2017); *United States v. Klein*, 515 F.2d 751, 757 (3d Cir. 1975) (reversing conviction for conspiracy to commit mail fraud where the "chief government witness," an unindicted coconspirator, provided "no testimony implicating" the defendant).

**3.    The evidence was insufficient to prove a conspiracy to conceal the proceeds of a FARA violation, or to transfer funds into the United States to promote a FARA violation, in contravention of the money laundering statute.**

The Government further alleged in Count 7 that Michel conspired to violate the money laundering statute in two ways: (1) by conspiring to conduct a financial transaction that involved "the proceeds" of a FARA violation and that was designed to "conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of" the alleged FARA violation, in violation of 18 U.S.C. § 1956(a)(1)(B) (*i.e.*, concealment money laundering); and (2) by conspiring to transfer funds into the United States "with the intent to promote the carrying on of" a FARA violation, in violation of 18 U.S.C. § 1956(a)(2)(A) (*i.e.*, promotional money laundering). *See* ECF No. 84 ¶ 105(c), (d).

The Government failed to prove that Michel conspired to commit promotional money laundering by allegedly accepting funds from Low to pay for the lobbying campaign. There was no evidence that Michel intended to distribute Low's funds to pay for *unregistered* lobbying, the specified unlawful activity, rather than lobbying generally. Indeed, there was no evidence that Michel was even aware of Broidy's alleged failure to register, let alone that he would only distribute funds received from Low if the lobbying were unregistered. *See supra* § IV.F. The only evidence of Michel's intent the District Court pointed to was evidence that: (i) Michel was concerned that if he personally registered he may be stopped at airports, but Michel was not required to register and there was no evidence he believed he was required to register; and (ii) Michel did not inform Agent Zitman about his work with Low or Broidy, but that is not evidence that Michel was aware and intended for Broidy to be paid to not register. ECF No. 355 at 42.[31]

---

[31] The efforts to "anonymize" Low, recounted at length by the District Court, did not include evidence Michel agreed with anyone that Broidy should not register under FARA. To the contrary,

The Government also failed to prove that Michel conspired to commit concealment money laundering. Each of the charged transfers involved funds that were meant to pay for the alleged lobbying, and none involved "proceeds" from the alleged scheme itself. *See* 18 U.S.C. § 1956(c)(9). "The offense of money laundering must be separate and distinct from the underlying offense that generated the money to be laundered." *United States v. Hall*, 613 F.3d 249, 254 (D.C. Cir. 2010), *amended*, No. 07-3036, 2019 WL 6794225 (D.C. Cir. Dec. 12, 2019). Thus, "[t]here must be evidence of activity that is separate from the underlying predicate offense that generates the proceeds to be laundered, in order to successfully to charge a defendant with involvement in a conspiracy to commit money laundering." *United States v. Castro-Aguirre*, 983 F.3d 927, 941 (7th Cir. 2020). "The evidence against a defendant will not support a conviction for conspiracy to commit money laundering when it demonstrates involvement only in a conspiracy that generated proceeds but does not demonstrate involvement in any subsequent conspiracy to launder those proceeds." *Id.* Under these principles, transfers of funds used to pay the alleged co-conspirators for their roles in the lobbying scheme are not "proceeds" of a FARA violation. Thus, the alleged concealment object fails.

### 4. Count 7 also raises a substantial question because one of the objects was legally invalid, and the Court misapplied the harmless error rule in declining to reverse.

In Count 7, the Government made the unprecedented and aggressive decision to charge Michel with conspiring *with* a foreign principal (Low) to violate FARA. *See* ECF No. 84 ¶ 105(a) (alleging that Michel and Low "conspired with one another" to "willfully act as agents of a foreign principal, specifically, Low, without registering"). This theory is legally invalid under the principle in *Gebardi v. United States*, 287 U.S. 112 (1932), however, because FARA reflects an

---

Broidy testified that he wanted to ensure any funds he received "would be untainted" by not being traceable to Low, who had been accused of embezzlement. Tr. 4/4/2023 AM at 80.

affirmatively legislative policy to leave the foreign principal unpunished. The Government therefore cannot charge a conspiracy between Michel and Low to violate FARA, and the Court can have no confidence that the jury rested its verdict on a legally valid theory of guilt rather than this invalid theory. *See* ECF No. 309 at 32–36.

The District Court declined to decide whether "foreign principals cannot be prosecuted for conspiring to violate FARA," because it instead concluded that "Count 7 would stand nonetheless under the harmless-error principle." ECF No. 355 at 47. The District Court reasoned that the analysis requires it "to determine whether 'beyond a reasonable doubt … the jury verdict would have been the same absent the error.'" *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 19 (1999)).

The District Court then misapplied this standard in concluding that "there was ample evidence for the jury to conclude beyond a reasonable doubt that Michel conspired with others (not Low) to violate FARA," and there was also "ample evidence for the jury to conclude beyond a reasonable doubt that Michel conspired with others to violate Section 951 and the money laundering provisions." *Id.* at 47–48. Rather than find *harmless error beyond a reasonable doubt*, the District Court purportedly found harmless error merely because the jury *could have* found guilt based on an alternative object of the charged conspiracy, without concluding that "beyond a reasonable doubt that … the jury verdict would have been the same absent the error." *Neder*, 527 U.S. at 17. This raises yet another substantial question regarding Count 7.

**V.    If the Court denies Michel's request for bail pending appeal, the Court should at least permit Michel to remain on bail pending appeal until the D.C. Circuit decides whether bail pending appeal is appropriate.**

If the Court denies Michel's request for bail pending appeal, or is unable to decide it before Michel's surrender date, Michel respectfully requests that the Court postpone his surrender date until after it and/or the D.C. Circuit decides his request for bail pending appeal. That would avoid rushing this Court in its review of this Motion and avoid rushing the D.C. Circuit in its review of

this Court's decision on the Motion, as Michel will not need to surrender until the D.C. Circuit rules on the request.

## CONCLUSION

For the reasons stated above, Michel respectfully requests that the Court grant the instant motion for bail pending appeal.

Dated:  December 19, 2025

Respectfully submitted,

 */s/ Peter Zeidenberg*
Peter Zeidenberg (Bar No. 440803)
Michael F. Dearington (Bar No. 5223987)
David M. Tafuri (*pro hac vice*)
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20006-5344
Telephone: (202) 857-6000
Facsimile:  (202) 857-6395
peter.zeidenberg@afslaw.com
michael.dearington@afslaw.com
david.tafuri@afslaw.com

*Counsel for Defendant Prakazrel Michel*